**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| PATRICK J. BRANDNER, M.D., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | )  Case No. 10-cv-8161 |
| | ) |
| AMERICAN ACADEMY OF | )  Hon. Dist. J. Ronald A. Guzman |
| ORTHOPAEDIC SURGEONS and | ) |
| AMERICAN ASSOCIATION OF | ) |
| ORTHOPAEDIC SURGEONS, | ) |
| | ) |
| Defendants, | ) |

## PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
## RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Ryan F. Stephan, Esq.
STEPHAN ZOURAS, LLP
205 n. Michigan Avenue, Suite 2560
Chicago, Illinois 60601
312-233-1550
www.stephanzouras.com

Aaron R. Maurice, Esq.
WOODS ERICKSON WHITAKER
& MARUICE LLP
1349 West Galleria Drive Suite 200
Henderson, Nevada 89014
www.woodserickson.com

# TABLE OF CONTENTS

I.     INTRODUCTION..................................................................................................1

II.    FACTUAL BACKGROUND...............................................................................3

III.   LEGAL STANDARD .........................................................................................5

     A.      Summary Judgment. . ..........................................................................5

     B.      Judicial Review of Processional Associations............................................6

IV.   ARGUMENT........................................................................................................7

     A.      The AAOS' blatant disregard for its own internal bylaws deprived Dr. Brandner of due process...................................................................7

           1.      The AAOS improperly shifted the burden of proof and production to Dr. Brandner and ruled without a complete evidentiary record. ...................................................................8

           2.      The AAOS continually recast the Grivance leaving Dr. Brandner helpless to defend himself against ever-changing allegations. . ......................................................................12

           3.      The AAOS attempt to cure its acknowledged procedural defect by conducting a second hearing before the Board of Directors could not undo the previous violation. ...................17

     B.      The AAOS was influenced by bias, prejudice and lacked good faith in its handling of Grivance 2008-23 which deprived Dr. Brandner of due process..................................................................18

           1.      The AAOS failed to disclose that a member of the Judiciary Committee (and likely others who sat in judgment of Dr. Brandner) served on the board of directors for a physican's mutual insurance company whose primary business was insuring physicians against malpractice claims. ...................19

           2.      The AAOS allowed a member of the Committee on Professionalism to "poison the well" by vouching for the integrity of the physician who testified opposite Dr. Brandner in the underlying action in a group-wide email to the members of the Committee on Professionalism. . ...................21

           3.      A review of the Grivance Program hearing results reveals that the AAOS has used its Professional Compliance Program as a tool to further its tort reform agenda by punishing those doctors who dare testify against members fo the AAOS in medical malpractice actions................................23

     C.      Dr. Brandner's suspension from the AAOS would interfere with an important economic interest...............................................................24

V.    CONCLUSION .................................................................................................26

**Cases**

American Service Insurance Company v. Olszewski, 324 Ill.App.3d 743, 756 N.E.2d 250

(Ill. App. Ct. 2001)...................................................................................................11-12

Austin v. American Association of Neurological Surgeons, 253 F.3d 967 (7th Cir. 2001) 24, 25, 26

Boland v. Kawasaki Motors Manufacturing Corp, USA, 309 Ill.App.3d 645, 651, 722

N.E.2d 1234 (Ill. App. Ct. 2000) ...................................................................................... 11

Buehler v. Whalen, 70 Ill.2d 51, 67, 374 N.E. 2d. 460, 467 (Ill. 1977) ..................................... 11

Burger v. Lutheran General Hospital, 198 Ill.2d 21, 44-45, 759 N.E.2d 533 (Ill. 2001) ............ 11

Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S. Ct. 2548, 2555 (1986) ................................. 5

Treister v. American Academy of Orthopeadic Surgeons, 78 Ill.App.3d 746, 396 N.E.2d

1225 (1st Dist. 1979) .................................................................................................. 6, 25

Virgin v. American College of Surgeons, 42 Ill.App.2d 352, 368, 192 N.E.2d 414, 422

(1st Dist. 1963) ..................................................................................................... 6, 15, 25

**Rules of Civil Procedure**

Fed. R. Civ. P 56.1........................................................................................................................ 1

Fed. R. Civ. P. 56(c) ...................................................................................................................... 5

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| PATRICK J. BRANDNER, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Case No. 10-cv-8161 |
| | ) | |
| AMERICAN ACADEMY OF | ) | Hon. Dist. J. Ronald A. Guzman |
| ORTHOPAEDIC SURGEONS and | ) | |
| AMERICAN ASSOCIATION OF | ) | |
| ORTHOPAEDIC SURGEONS, | ) | |
| | ) | |
| Defendants, | ) | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, PATRICK J. BRANDNER, M.D., by and through his attorneys of record, the law firms of STEPHAN ZOURAS, LLP and WOODS ERICKSON WHITAKER & MAURICE LLP, pursuant to Rule 56 of the Federal Rules of Civil Procedure, Local Rule 56.1 and the Honorable Ronald A. Guzman's Case Management Procedure for Cross Motions for Summary Judgment, submits the following Memorandum in Support of Plaintiff's Cross-Motion for Summary Judgment and Response to Defendant's Motion for Summary Judgment.

### POINTS & AUTHORITIES

### I. INTRODUCTION

On December 23, 2010, Patrick J. Brandner, M.D. ("Dr. Brandner") filed a Complaint alleging that the American Academy of Orthopaedic Surgeons and the American Association of Orthopaedic Surgeons (collectively "AAOS") should be enjoined from taking any action against him in connection with a grievance filed by Kipling Sharpe, M.D. ("Dr. Sharpe") because the AAOS knowingly violated its Grievance Procedures in the handling of the grievance. The Complaint alleged that the

AAOS was influenced by bias and prejudice and that its handling of the grievance violated the most basic principles of due process.[1]

Following this Court's entry of a Preliminary Injunction enjoining the AAOS from taking any action against Dr. Brandner during the pendency of the case, the parties engaged in extensive discovery. That discovery revealed that the allegations in Plaintiff's Complaint (and Plaintiff's Amended Complaint) were true – the "hearings" conducted in connection with the Sharpe/Brandner grievance were a farce. The AAOS repeatedly ignored its own internal bylaws; continually recast the grievance (leaving Dr. Brandner helpless to defend himself against ever-changing allegations); failed to disclose that a member of the Judiciary Committee (and likely others who sat in judgment of Dr. Brandner) served on the board of directors for a physician's mutual insurance company whose primary business was insuring physicians against malpractice claims; and allowed a member of the Committee on Professionalism to vouch for the integrity of the physician who testified opposite Dr. Brandner to all of the members of the Committee on Professionalism.

As will be demonstrated in detail below, there is no dispute of material fact. The AAOS knowingly violated its Grievance Procedures in the handling of the Sharpe/Brandner grievance. The AAOS did so to advance its own interests in favor of tort reform.[2] As will be demonstrated below, once Dr. Brandner was identified in the

_____

[1] The American Academy of Orthopaedic Surgeons ("Academy") and the American Association of Orthopaedic Surgeons ("Association") are, by design, indistinguishable. (SOF ¶ 7.) In this regard, a member of Academy is considered a member of the Association and a member of the Association is considered a member of the Academy. Id. Similarly, suspension from the Academy results in suspension from the Association (and vice versa). Id. The Academy and the Association even share a Board of Directors. Id. For the purposes of this action, the Academy and the Association are referred to as the "AAOS".

[2] It is no mistake that the Professional Compliance Program is established in Article VIII of the Bylaws for the Association (as opposed to the Academy). (SOF ¶ 10.) The Association was established specifically to engage in advocacy activities (i.e., lobbying). Id. One of the Association's primary areas of focus is tort reform (i.e., efforts to shield its members from liability to their patients for malpractice). Id. Statistics establish that the Program has been used to further that cause (punishing those who testify against members of the AAOS in medical malpractice actions and seeking to dissuade others from doing so). See statistical discussion infra Section IV(B) (showing that on seventeen occasions the AAOS has ordered the suspension of a

grievance as an AAOS member who was willing to offer expert testimony on behalf of a patient suing a fellow AAOS member for medical malpractice, the AAOS was going to do everything in its power to put an end Dr. Brandner's ability to provide expert testimony (no matter how many of its Grievance Procedures the AAOS had to ignore and no matter many how many times it had to recast the allegations in the grievance to do so). As will be demonstrated below, there can be no reasonable dispute that the AAOS's handling of the Sharpe/Brandner grievance violated the most basic principles of due process. Summary judgment should be granted in favor of Dr. Brandner and against the AAOS in this action.

## II. FACTUAL BACKGROUND[3]

In October of 2004, Dr. Brandner was retained to provide expert testimony in a medical malpractice lawsuit in Arizona.[4] (SOF ¶¶ 12, 16, 17.) The lawsuit had been filed on behalf of a minor who had suffered a peroneal nerve palsy as the result of a proximal tibial osteotomy.[5] (SOF ¶ 13) As plaintiff's expert, Dr. Brandner testified (at deposition and at trial) that: (1) The standard of care for informed consent in the context of a proximal tibial osteotomy required a discussion of the risk to the peroneal nerve and the potential of a foot drop; and (2) that there was nothing in the plaintiff's medical records that documented that such a discussion had occurred (only that there had been a

---

member who testified on behalf of the plaintiff in a medical malpractice case while not once having ordered the suspension of a member who testified on behalf of the defense).

[3] A detailed factual statement is provided in the Amended Compliant on file herein [Doc. 6] (verified by Dr. Brandner in connection with his Affidavit in Support of Plaintiff's Memorandum in Support of Plaintiff's Emergency Motion for Temporary Restraining Order & Injunctive Relief [Doc. 12, Exhibit 1]) as well as in Plaintiff's Rule 56.1 Statement of Undisputed Facts filed concurrently herewith. Both are incorporated herein. Accordingly, the lengthy history of this case will not be repeated in full herein.

[4] Dr. Brandner is licensed to practice in Arizona, California, Louisiana and Nevada. (SOF ¶ 1.)

[5] A proximal tibial osteotomy is a surgical procedure designed to realign a deformity of the lower leg. It is performed by cutting the tibia and correcting the angle of the deformity of the bone. After the bone has been realigned, metal plates, a rod or other alignment devices are used to hold the corrected tibial position. A peroneal nerve palsy (commonly known as a "foot drop") results from an injury to the nerve and is characterized by the loss of control to either or both the side-to-side or up-and-down movements of the foot. In most instances, the loss of control is permanent. (SOF ¶ 14.)

discussion of "nerve injury" in general). (SOF ¶¶ 22, 23.) As to whether such a discussion had in fact occurred, Dr. Brandner refused to opine – noting that it was a "he said/she said" situation (with Dr. Sharpe claiming that he had advised the plaintiff and his parents about the risk to the peroneal nerve and the plaintiff and his parents claiming that Dr. Sharpe had failed to do so). (SOF ¶¶ 22, 23.) The testimony provided by Dr. Brandner was truthful, scientifically correct and in accordance with the merits of the case. (SOF ¶¶ 8, 36.)

The jury found in favor of Dr. Sharpe in the malpractice action. (SOF ¶ 24.) Unsatisfied with the vindication provided by the jury, Dr. Sharpe lashed out at those affiliated with the plaintiff. (SOF ¶ 24.) He filed a bar complaint against the attorney who had represented the plaintiff and a grievance against Dr. Brandner with the American Academy of Orthopaedic Surgeons. (SOF ¶ 24.) While the attorney – who had access to all of the deposition transcripts – had no difficulty getting the bar complaint dismissed, Dr. Brandner – who was unable to obtain copies of the transcripts prior to the evidentiary hearing conducted by the AAOS – was not as fortunate. (SOF ¶ 25.) The AAOS, in its zeal to punish those of its members who dare to offer expert testimony (no matter how innocuous) in malpractice actions brought against fellow AAOS members and to dissuade others from offering similar testimony in the future, ignored its own Grievance Procedures and Dr. Sharpe's selective document production and misrepresentations and found that Dr. Brandner had violated two AAOS Standards of Professionalism for Orthopaedic Expert Testimony when he agreed to offer expert testimony on behalf of the plaintiff. (SOF ¶¶ 27-73.) As punishment, the Board of Directors ordered Dr. Brandner suspended from the AAOS for one year. (SOF ¶ 67.) In accordance with its Bylaws, the Board also ordered public disclosure of the suspension (including to the national practitioner's disciplinary data bank). (SOF ¶¶ 69 – 70.)

The AAOS considered its finding "final" and rejected Dr. Brandner's request to refrain from publicly disclosing the Board's finding until this Court had an opportunity to rule on the merits of the case. (SOF ¶¶ 67, 69, 70.) Because in excess of 70% of Dr. Brandner's income is derived from medical-legal support and his ability to provide that

support is dependent upon his professional reputation (which is impeccable), public disclosure by the AAOS would have caused Dr. Brandner irreparable harm. (SOF ¶¶ 9, 11.) As a result, on December 23, 2010, Dr. Brandner filed a Complaint [Doc. 1] with this Court seeking to enjoin the AAOS from taking any action against him in connection with the Grievance filed by Dr. Sharpe. In addition, because the AAOS refused to voluntarily delay public disclosure during the course of the litigation, on January 17, 2011, Dr. Brandner filed a Motion for Temporary Restraining Order and Preliminary Injunction [Doc. 12]. On February 25, 2011, this Court granted Dr. Brandner's Motion for Preliminary Injunction [Doc. 28]. Therein this Court found that Dr. Brandner had made a sufficient showing to demonstrate that the threatened disclosure by the AAOS posed a significant harm to an important economic interest and that Dr. Brandner had a greater than negligible chance of proving that the AAOS had failed to act in accord with its own constitution and bylaws, was influenced by bias, prejudice or lacked good faith or violated due process in its handling of the Grievance.

As will be demonstrated below, the AAOS' blatant disregard for its own internal bylaws coupled with its bias and prejudice (which permeated its handling of the Grievance) deprived Dr. Brandner of a meaningful opportunity to defend himself against the allegations leveled by Dr. Sharpe and repeatedly recast by the AAOS. Summary judgment is appropriate in favor of Dr. Brandner and against the AAOS as to each of the claims asserted in this case.

### III. LEGAL STANDARD

#### A.     Summary Judgment.

Summary judgment is appropriate when, after a review of the record viewed in the light most favorable to the non-moving party, there are no remaining genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Summary judgment is generally supported or opposed by the pleadings, depositions, answers to interrogatories, admissions and affidavits on file. If no genuine issue of material fact exists, or is shown to exist, it is the duty of the court to grant summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S. Ct. 2548, 2555

(1986). Regarding the intent and purpose of the Rule, the United State Supreme Court has stated:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed, "to secure the just, speedy and inexpensive determination of every action."

Id. (quoting FRCP 1).

**B.      Judicial Review of Professional Associations.**

"Membership in a voluntary association is an interest of substance within the scope of judicial control." Virgin v. American College of Surgeons, 42 Ill.App.2d 352, 368, 192 N.E.2d 414, 422 (1st Dist. 1963).   Because wrongful expulsion from a professional association has a serious effect on the ability of a professional to pursue his livelihood, Illinois courts have long followed the rule that a member of a professional association who is wrongfully expelled has an "interest of substance" which the judiciary will protect. Id. at 368-69.  In this regard, Courts will annul expulsions from voluntary associations if: (1) the association failed to conduct its proceedings in accordance with the constitution and bylaws of the association; or (2) the proceedings were influenced by bias, prejudice or lacked good faith; or (3) the proceedings were contrary to rudimentary principles of due process or natural justice. Id. at 369.

Due process requires, at a minimum, for a party to be afforded those rudimentary rights which will give him an opportunity to defend against any charges made, including notice of the charges made against him, an opportunity to be present at a hearing before a fair and impartial tribunal, to confront and cross examine his accusers, to make a defense, and to endeavor to refute any evidence adduced in support of the charges.  Virgin v. American College of Surgeons, 42 Ill.App.2d 352, 192 N.E.2d 414, 422 (1st Dist. 1963); Treister v. American Academy of Orthopaedic Surgeons, 78 Ill.App.3d 746, 396 N.E.2d 1225 (1st Dist. 1979).

The undisputed facts in this case establish that the AAOS's blatant disregard for its own internal bylaws deprived Dr. Brandner of due process.  In addition, the AAOS was influenced by bias, prejudice and lacked good faith in its handling of the Grievance.

Under such circumstances, and as will be demonstrated below, Plaintiff's Motion for Summary Judgment should be granted.

## IV. ARGUMENT

**A.      The AAOS' blatant disregard for its own internal bylaws deprived Dr. Brandner of due process.**

Dr. Brandner's Amended Complaint details numerous violations of the AAOS Grievance Procedures and, concomitantly, Dr. Brandner's due process rights. Article II of the Professional Compliance Grievance Procedures provides: "These Professional Compliance Grievance Procedures are designed to supplement Article VIII of the Association Bylaws and to create a process that is transparent, expeditious, and equitable." (SOF ¶ 27.) Accordingly, a violation of the Professional Compliance Grievance Procedures is a violation of the AAOS' bylaws. Id.

As set forth in the Findings of Fact, the AAOS failed to act in accordance with its Professional Compliance Grievance Procedures on no fewer than thirty-six occasions in its handling of the Grievance. (SOF ¶¶ 27-29, 32-33, 37-44, 47, 50-48, 63, 65, 67, 72-73.) In deposition, members of the various committees, panels and boards that comprise the professional compliance program and staff from the AAOS Office of General Counsel (which oversees the Professional Compliance Program) confirmed that the very people charged with following and enforcing the AAOS internal bylaws are unfamiliar with them and, at their convenience, consciously choose to ignore them. (SOF ¶ 75.)(discussing how the AAOS Grievance Procedures are, "as a matter of practice," applied). While the repeated disregard of the AAOS Grievance Procedures demonstrates that the Grievance process was fraught with due process violations, two notable departures from the bylaws – standing on their own – demonstrate that Dr. Brandner was deprived of a reasonable opportunity to defend himself against the charges leveled by Dr. Sharpe, thereby depriving Dr. Brandner of his due process rights. Specifically, by improperly shifting the burden of proof and the burden of production (from Dr. Sharpe as Grievant to Dr. Brandner as Respondent) and repeatedly recasting the Grievance (such that Dr. Brandner was forced to defend against ever-changing allegations), the AAOS

deprived Dr. Brandner of a reasonable opportunity to defend himself against the charges leveled by Dr. Sharpe.

1. **The AAOS improperly shifted the burden of proof and production to Dr. Brandner and ruled without a complete evidentiary record.**

Section VII(A)(5) of the Grievance Procedures provides: "The Grievant bears the burden of proof and must submit written material as part of the grievance process." (SOF ¶ 40).

Section VI(C) of the Grievance Procedures provides:

> Each party to a grievance is responsible for obtaining and providing **ALL** written material, such as transcripts and medical records, for consideration by AAOS.

(SOF ¶ 40.) (Emphasis added).

Section VII(D)(9) provides:

> After the grievance hearing and prior to issuing its recommendations, the Grievance Hearing Panel may request additional information from the Grievant, Respondent, or any third party. Any additional information will be made available to each party.

(SOF ¶ 40).

In Dr. Brander's initial response to the Grievance, he stated: "I am presently at somewhat of a disadvantage due to the absence of the actual records and literature reviewed for the case. All documents were returned to Plaintiff's attorney, who states the information is irretrievable." (SOF ¶ 31.) Later, in his witness and exhibit list submitted in preparation for the hearing before the COP Hearing Panel, Dr. Brandner advised the AAOS that he had attempted to obtain copies of records from the plaintiff's attorney but that his requests had been rejected. (SOF ¶ 36.) Finally, at the hearing before the COP Hearing Panel, Dr. Brandner repeatedly pointed out that Dr. Sharpe had not produced all of the deposition transcripts and that, without reviewing the same, the COP Hearing Panel had only half the evidentiary picture. (SOF ¶ 38.) Despite having repeatedly advised the AAOS that, as a non-party to the underlying litigation, he was not in

possession of the documents necessary to his defense, the COP Hearing Panel, rather than demanding that Dr. Sharpe comply with Section VI(C) of the Grievance Procedures and produce "all written material such as transcripts and medical records" in his possession, extensively questioned Dr. Brandner as to why he had failed to produce the documents. (SOF ¶ 41.) When Dr. Brandner again advised the COP Hearing Panel that he had been unable to obtain the documents, Dr. Sharpe interjected (i.e., no question had been posed), stating: "I believe I provided all the depositions to this Committee." (SOF ¶ 41.) Dr. Sharpe's statement could not have been further from the truth. In reality, Dr. Sharpe had withheld four transcripts – two deposition transcripts and two trial transcripts – each of which documented testimony that was damning of Dr. Sharpe and established unequivocally that Dr. Sharpe's characterization of the testimony was untrue. (SOF ¶ 48.)

The COP Hearing panel ignored Dr. Brandner's pleas, accepted Dr. Sharpe's misrepresentation that he "provided all the depositions to this Committee" and issued its Report and Recommendation without reviewing the transcripts from the depositions taken of the Plaintiff and his mother in June of 2005 (two months before Dr. Brandner testified at deposition in the case) or from their trial testimony. (SOF ¶ 44.) In its Report and Recommendation, the COP Hearing Panel found that "the record show[ed] that informed consent was given" because "the deposition transcripts reflected that both the plaintiff and his mother had an understanding about the specific possibility and causation of foot drop." (SOF ¶ 44.) In reality, the COP Hearing Panel had no idea what "the record show[ed]." Dr. Sharpe had intentionally withheld two-thirds of the sworn statements provided by the plaintiff and his mother and misrepresented information to the COP Hearing Panel to conceal his selective document production.[6] (SOF ¶ 41.) The COP Hearing Panel's refusal to follow its own Grievance Procedures and its

---

[6] In this Court's order granting Plaintiff's Motion for Preliminary Injunction, the Court noted that the record was unclear as to whether Dr. Sharpe had provided the June 2005 deposition transcripts of the plaintiff and the plaintiff's mother to the AAOS or Dr. Brandner. For clarification, Dr. Sharpe **never** provided the transcripts – to the AAOS or Dr. Brandner. Following the COP Hearing, Dr. Brandner's counsel, through threat of litigation, obtained the transcripts and provided the same to the AAOS. To provide this Court with a complete evidentiary record, all transcripts have been included with Plaintiff's Rule 56.1(a)(3) Statement of Undisputed Facts. See SOF ¶48, Exhibits 26, 27, 28 and 29.

unwillingness to avail itself of Section VII(D)(9) of its Grievance Procedures to ensure a complete evidentiary record shows the extraordinary lengths to which the AAOS was willing to go to punish Dr. Brandner.

Following the COP Hearing Panel, by threat of litigation, Dr. Brandner's counsel was able to obtain copies of the missing transcripts. (SOF ¶ 48.) The transcripts were provided to the AAOS by Dr. Brandner's counsel prior to the hearing before the Judiciary Committee. (SOF ¶ 48.) Unfortunately, the structure of the AAOS's Grievance process severely impairs a party's ability to address new evidence or arguments on appeal. (SOF ¶ 50.) Specifically, strict time limits (ten minutes per presentation) make it impossible for a party to engage in any type of meaningful discussion of the evidence at either the Judiciary Committee or Board of Directors levels. (SOF ¶ 50.) In this regard, the COP Hearing Panel's refusal to follow the Grievance Procedures to ensure a complete evidentiary record prevented Dr. Brandner from having any meaningful opportunity to defend against Dr. Sharpe's baseless allegations.[7] In this regard, the AAOS' assertion that its initial violation of its internal bylaws (i.e., by failing to require Dr. Sharpe to produce those transcripts which were exculpatory to Dr. Brandner) was somehow cured by the fact that the Judiciary considered the transcripts during the appeal is misplaced. The structure of the appeal and the standard of review applied on appeal (which does not permit a de novo review but, rather, reviews the administrative record for due process violations and queries only whether the finding is contrary to the clear weight of the evidence) render the Judiciary Committee ill-equipped to consider new evidence. (SOF ¶ 54.) In fact, Section VII(E)(9) of the Grievance Procedures specifically states that no new evidence may be presented to the Judiciary Committee.

---

[7] The attempt by the AAOS to paint Dr. Brandner's production of the transcripts as somehow untimely only illustrates the bias and prejudice that plagued the grievance process. Dr. Brandner's counsel never should have been forced to undertake efforts to obtain copies of the relevant transcripts. Dr. Sharpe, as a party to the underlying litigation, was in possession of the transcripts and was obligated under Grievance Procedure VI(C) and VII(A)(5) to provide the same in connection with his Grievance. At a bare minimum, the COP Hearing Panel should have delayed issuing its Report & Recommendation and directed Dr. Sharpe to produce the transcripts in accordance with Grievance Procedure VII(D)(9).

In Defendant's Motion for Summary Judgment, the AAOS conveniently ignores the declaration in Section VII(A)(5) that the grievant bears the burden of proof and the explicit use of the word "**all**" In Section VI(C). The AAOS does so to allow it to argue that "[p]ursuant to the plain language of [Section VI(C)], it is the responsibility of <u>each party</u>, rather than that of the AAOS, to provide written material for the COP Hearing Panel's review." <u>See</u> Defendant's Memorandum in Support of Motion for Summary Judgment [Doc. 71], p. 10, ll. 16-18. Relying on this false logic, the AAOS went on to assert: "It was therefore Dr. Brandner's responsibility, not that of the AAOS, or even Dr. Sharpe, to provide the COP hearing Panel with the transcripts he believed were pertinent to his defense." <u>Id.</u> at p. 10-11.

The problem with the AAOS' argument is that it is belied by the plain language of the Grievance Procedures themselves. Section VI(C) of the AAOS Professional Compliance Program Grievance Procedures explicitly uses the word "**ALL**" when discussing what written material must be produced by the grievant. (SOF ¶ 40.) Thus, to suggest that a grievant has satisfied his or her burden of proof and production (imposed by Section VII(A)(5)) by submitting only that written material that the grievant believes supports the grievant's case (while allowing the grievant to withhold written material which may detract from the grievant's case) smacks of injustice and runs contrary to the most basic principles of due process.

In considering the AAOS's argument, it is helpful to consider how courts construe the rules of discovery and document production in the context of litigation. Illinois courts have long found that the goal of discovery is to encourage and promote full disclosure. <u>See</u> <u>Buehler v. Whalen</u>, 70 Ill.2d 51, 67, 374 N.E. 2d. 460, 467 (Ill. 1977). It allows a party to obtain information and documents maintained in the possession of others necessary to promote or defend against a claim. <u>See</u> <u>Burger v. Lutheran General Hospital</u>, 198 Ill.2d 21, 44-45, 759 N.E.2d 533 (Ill. 2001). Discovery is not a tactical game; rather, it is intended to be a mechanism to ascertain the truth and promote fairness. <u>See</u> <u>Boland v. Kawasaki Motors Manufacturing Corp, USA</u>, 309 Ill.App.3d 645, 651, 722 N.E.2d 1234 (Ill. App. Ct. 2000); <u>see</u> <u>also</u> <u>American Service Insurance Company v.</u>

Olszewski, 324 Ill.App.3d 743, 756 N.E.2d 250 (Ill. App. Ct. 2001). In this regard, the AAOS's interpretation of Section VII(A)(5) – an interpretation which wholly ignores the explicit use of the word "all" in Section VI(c) – is, per se, unreasonable. No reasonable person could, reading the same language, conclude – as the AAOS has asked this Court to hold as a matter of law – that a grievant has satisfied his or her burden of proof and production by producing only those materials that support the allegations in the grievance while withholding those materials that refute the very same allegations.

Finally, in the context of the grievance against Dr. Brandner, where the grievant, Dr. Sharpe, was a party to the underlying litigation and, therefore, had access to all of the documents in connection with the action and the respondent, Dr. Brandner, was not a party to the action and, as such, had no access to said documentation (reporting as such to the AAOS on no fewer than three occasions), penalizing Dr. Brandner for being unable to produce the documents necessary to defend himself rather than forcing Dr. Sharpe to comply with his obligation to produce "**ALL** written material such as transcripts and medical records" was a fundamental due process violation.

### 2. The AAOS continually recast the Grievance leaving Dr. Brandner helpless to defend himself against ever-changing allegations.

The Grievance filed by Dr. Sharpe identified five alleged violations of the Mandatory Standards and the factual basis underlying each alleged violation. (SOF ¶26.) On October 2, 2009, Dr. Brandner appeared before the COP Hearing Panel and addressed each of the allegations leveled by Dr. Sharpe one by one. (SOF ¶38.) For those allegations that were factually inaccurate (which was most of them), Dr. Brandner pointed to the facts belying Dr. Sharpe's claims. (SOF ¶38.) For those allegations that were legally deficient (i.e., unsupported by the Mandatory Standards adopted by the AAOS), Dr. Brandner pointed out the defects and demanded that the AAOS summarily reject Dr. Sharpe's allegations with respect to the same. (SOF ¶38.)

On December 14, 2009, the COP Hearing Panel issued its Report and Recommendation. (SOF ¶¶ 42-43.) It was a remarkable document. While the COP

Hearing Panel rejected each of the allegations made by Dr. Sharpe (finding that Dr. Brandner violated none of the Mandatory Standards identified by Dr. Sharpe for the reasons cited by Dr. Sharpe), the COP chose to recast the Grievance and found that Dr. Brandner violated AAOS Mandatory Standards Nos. 3, 4 and 7 (but not for the reasons cited by Dr. Sharpe). (SOF ¶ 43.) In this regard, the COP Hearing Panel did not find that Dr. Brandner violated Mandatory Standards Nos. 3 and 4 when, as Dr. Sharpe alleged, he: (1) testified at deposition and at trial that the standard of care for informed consent in the context of a proximal tibial osteotomy required a discussion of the peroneal nerve; and (2) testified at deposition that the plaintiff was not given a non-operative option and that the fracture had remodeling potential. Id. Similarly, the COP Hearing Panel did not find any evidence that Dr. Brandner violated Mandatory Standard No. 7 when he, as Dr. Sharpe alleged: (1) testified that there was a 3-13% incidence rate of peroneal nerve palsy in a proximal tibial osteotomy; and (2) testified in a case in which he had no "current relevant experience with [the] procedure." Id.

Instead, the COP Hearing Panel ignored the allegations leveled by Dr. Sharpe and – in direct violation of Dr. Brandner's due process rights – recast the Grievance. (SOF ¶ 43.) The COP Hearing Panel found that Dr. Brandner had violated Mandatory Standards Nos. 3 and 4 by "condemn[ing] performance that [fell] within generally accepted practice standards" because "[t]he record show[ed] that informed consent was given." (SOF ¶44.) Also ignoring the allegations in Dr. Sharpe's Grievance, the COP Hearing Panel found that Dr. Brandner had violated Mandatory Standard No. 7 by testifying that the patient's fracture could remodel.[8] (SOF ¶ 44.) The recasting of the Grievance by the COP Hearing Panel violated AAOS Professional Compliance Grievance Procedure VI(B)(3) which provides that the parties to a professional compliance matter have the "[r]ight to know the specific allegations made in the Grievance." (Id.) Dr. Brandner had a right to

---

[8] The COP Hearing Panel's finding with respect to Mandatory Standard No. 7 was begrudgingly rejected by the Judiciary Committee after it was shown that the X-rays that Dr. Sharpe provided to the AAOS were not the same ones upon which Dr. Brandner had based his opinion (the X-rays that Dr. Sharpe provided to the AAOS had been taken months later (after the patient's growth plates had completely closed)). (SOF ¶ 38.)

know not only the allegations made against him by Dr. Sharpe but also that if he proved that those allegations had no merit, that the Grievance would be rejected (not simply re-written by the COP Hearing Panel).

Dr. Brandner filed a timely appeal of the COP Hearing Committee's Report and Recommendation. (SOF ¶ 45.) Pursuant to AAOS Professional Compliance Grievance Procedure VII(E)(15), the Judiciary Committee is obligated to reject the Report and Recommendation of the COP Hearing Panel if it finds that there has been a lack of due process in the grievance proceedings or that it is contrary to the clear weight of the evidence. (SOF ¶ 46.)

On March 12, 2010, Dr. Brandner (accompanied by legal counsel this time) appeared before the Judiciary Committee (in New Orleans) and addressed each of the findings by the COP Hearing Panel. (SOF ¶ 50.) For those findings that were factually inaccurate (which, again, was many of them), Dr. Brandner's counsel pointed to the facts belying the same. (SOF ¶ 50.) For those findings that were legally deficient, Dr. Brandner's counsel pointed out the defects and requested that the Judiciary Committee reject the Report and Recommendation by the COP Hearing Panel. Id.

Amazingly, the Judiciary Committee – like the COP Hearing Panel before it – elected not to rule on the merits of the matter as presented to it. (SOF ¶ 53.) Rather than review the Report and Recommendation issued by the COP Hearing Panel to determine if the parties had been afforded due process and if the Report and Recommendation was supported by fact, the Judiciary Committee chose to once again recast the Grievance. Id. In this regard, the Judiciary Committee ignored Dr. Sharpe's selective document production and his misrepresentation to the COP Hearing Panel (wherein he represented that he had produced "all of the depositions to the committee"). Id. In affirming the COP Hearing Panel's finding, the Judiciary Committee rejected the proposition (advanced by the COP Hearing Panel) that Dr. Brandner had violated Mandatory Standards Nos. 3 and 4 by "condemn[ing] performance that [fell] within generally accepted practice standards" because "[t]he record show[ed] that informed consent was given." Id. Instead, the Judiciary Committee found that Dr. Brandner violated

Mandatory Standards Nos. 3 and 4 when he agreed to offer expert testimony on behalf of the plaintiff in the face of conflicting deposition testimony. Id. As stated by the Judiciary Committee:

> [T]he question of whether a violation of the Standards of Professionalism exists is not that he chose to base his opinion on contradictory evidence from patient and treating physician, but the fact that he chose one version of the plaintiffs' depositions over another. This choice took Dr. Brandner out of the realm of objectively "counseling" on standards of care and made him condemning of the care provided by Dr. Sharpe.

Id.

What made the Judiciary Committee's Report and Recommendation notable was the fact that the Mandatory Standards that Dr. Brandner was alleged to have violated were not even adopted until some six months after Dr. Brandner agreed to act as an expert in the case. (SOF ¶¶ 18, 57, 66.) Moreover, as originally adopted (in April of 2005),[9] the Mandatory Standards did not require a member testifying as an expert to review deposition transcripts from the case (only the "pertinent medical records"). (SOF ¶ 21.)[10]

Due process requires at a minimum that a party be afforded those rudimentary rights which will give him an opportunity to defend against any charges made, **including reasonable notice thereof**, an opportunity to be present at a hearing, to confront and cross examine his or its accusers, to make a defense, and to endeavor to refute any evidence adduced in support of the charges. Virgin v. American College of Surgeons, 42 Ill.App.2d 352 (1st Dist. 1963). Section VI(B)(3) of the Grievance Procedures acknowledges that in order for a person to have an opportunity to defend himself, he must

---

[9] The Mandatory Standards have since been amended (in May of 2010) to require a review of certain legal documents (including deposition transcripts). (SOF ¶ 21.)

[10] In this Court's order granting Plaintiff's Motion for Preliminary Injunction, the Court noted that the record did not include transcripts of the hearings before the various AAOS panels, committees and boards, making it impossible for the Court to determine whether Dr. Brandner's claim with regard to the repeated recasting of the grievance was well-founded. To provide this Court with a complete evidentiary record, transcripts from each of the hearings have been included with Plaintiff's Rule 56.1(a)(3) Statement of Undisputed Facts. See Exhibits 25, 35, 37, 45 to SOF.

be aware of the specific allegations made against him. It is for that reason that Section VI(B)(3) of the Grievance Procedures provides that the parties to a grievance have a right to "know the **specific allegations** made in the Grievance." (SOF ¶ 53.)

As discussed above, by the time Dr. Brandner appeared before the Board, allegations regarding his alleged violation of Mandatory Standards Nos. 3 and 4 had changed not once but twice and bore no resemblance to those contained in the original Grievance submitted by Dr. Sharpe. (SOF ¶¶ 53, 54.) The repeated recasting of the Grievance – after the evidentiary hearing conducted by the COP Hearing Panel no less – not only violated the Professional Compliance Grievance Procedures adopted by the AAOS, but also deprived Dr. Brandner of reasonable notice of the charges against him and of his opportunity to defend against said charges. (SOF ¶¶ 53, 54.) In this regard, the recasting of the grievance violated fundamental principles of due process (it is indeed difficult to confront and cross-examine one's accusers or to endeavor to refute evidence adduced in support of the charges when the "charges" are constantly being rewritten after every hearing by the very body that is ostensibly acting as the impartial finder of fact). (SOF ¶¶ 53, 54.) More concerning, however, is the fact that the AAOS ordered Dr. Brandner suspended from its ranks for agreeing to act as an expert in the case in October of 2004, despite the fact that the Mandatory Standards that he is alleged to have violated by agreeing to do so *were not even adopted by the AAOS until some six months later* (in April of 2005). (SOF ¶¶ 18, 57, 66.) In this regard, the AAOS' final finding (which bears no resemblance to Sharpe's original grievance) convicted Dr. Brandner for violating a rule *ex post facto*.

While punishing Dr. Brandner for allegedly violating a Standard of Professionalism *ex post facto* clearly constitutes a due process violation, the finding also conflicts with the express terms of the AAOS bylaws. Grievance Procedure IV(A) (entitled "Applicability of Professional Compliance Procedures") provides that the Grievance Procedures "shall apply to grievances filed against an AAOS Fellow or Member that allege a violation of the AAOS Standards of Professionalism arising from activities **that occurred on or after April 18, 2005**, and to alleged violations of any

additional SOPs occurring after their adoption by the AAOS as provided for in the Bylaws." (SOF ¶ 18.) Here, it is undisputed that Dr. Brandner agreed to act as an expert in October of 2004 – some six months before the original standards apply. (SOF ¶¶ 12, 18, 57, 66.) Because the very rules under which the AAOS claims the authority to suspend Dr. Brandner clearly provide that they only apply to "violations of the AAOS Standards of Professionalism arising from activities that occurred on or after April 18, 2005," the fact that the Judiciary's Finding condemned Dr. Brandner for agreeing to provide expert testimony six months earlier demonstrates that the AAOS consciously chose to ignore its own internal bylaws. (SOF ¶¶ 12, 18, 57, 66.) The AAOS' repeated recasting of the Grievance and its imposition of sanctions *ex post facto* violated the express terms of the AAOS bylaws and denied Dr. Brandner his fundamental right to a fair and impartial hearing. Accordingly, this Court should permanently enjoin the AAOS from taking any action against him in connection with the Grievance.

3. **The AAOS' attempt to cure its acknowledged procedural defect by conducting a second hearing before the Board of Directors could not undo the previous violation.**

In tacit acknowledgment of the procedural irregularities that tainted the initial COP Hearing Panel, the appeal to the Judiciary Committee, and the initial hearing before the Board of Directors, the AAOS elected to rehear the Sharpe/Brandner grievance during its December 4, 2010 Board of Directors meeting. (SOF ¶ 63.) For the first time, in its Motion for Summary Judgment, the AAOS has argued that the decision to rehear the Sharpe/Brandner grievance was due to the fact that, in violation of its Grievance Procedures, the Board allowed a member of the COP Hearing Panel to make a presentation as part of the hearing during the first Board meeting. In addition, the AAOS has attempted to explain-away the procedural irregularities that infected the grievance process and rendered it little more than a dog and pony show. In its self-serving affidavit, the AAOS makes no effort to explain how a second hearing before the very members who previously heard the improper presentation by the COP Hearing Panel member somehow cured the procedural defect – i.e., they do not explain how the bell was un-

rung. Instead, the AAOS simply asserts that because it "substantially" (and selectively) complied with some of its Grievance Procedures, the Court should overlook the thirty-five other occasions in which it violated its Grievance Procedures in the handling of the Sharpe/Brandner grievance (describing the conceded multiple infractions as "trivial").

Although the Board's prior decision was to be considered "null and void" and the AAOS considers the findings of the COP Hearing Panel and the Judiciary Committee to be essentially irrelevant once the Board has ruled, the fact of the matter is that the procedural irregularities which plagued the process at the COP Hearing Panel level deprived Dr. Brandner of his one "bite at the evidentiary apple." Such is the case as the time limits imposed on presentations before the Judiciary Committee and the Board of Directors render the presentations unsuitable to address new evidence or new allegations. Moreover, the idea that a second hearing before the same members of the Board would somehow cure the fact that the Board had previously heard and considered the improper arguments of the COP Hearing Panel member defies logic. The only manner in which the multiple procedural defects could have been addressed, from the outset, was to grant Dr. Brandner a new evidentiary hearing at the COP level. That the AAOS elected not to do so demonstrates that the AAOS willfully and knowingly conducted its hearings in complete disregard to its own internal policies. It is appropriate for this Court to intervene and summarily enjoin the AAOS from taking any further disciplinary against Dr. Brandner in connection with the Grievance.

**B.** **The AAOS was influenced by bias, prejudice and lacked good faith in its handling of Grievance 2008-23 which deprived Dr. Brandner of due process.**

Taking a novel view on conflicts of interest, the AAOS allowed a member of the Judiciary Committee who served in a paid position on the board of directors for a physician's mutual insurance company whose primary business was insuring physicians against malpractice to sit in judgment of Dr. Brandner without disclosing the conflict. The AAOS also allowed a member of the COP Hearing panel to vouch for the integrity of Dr. Sharpe's expert (who testified opposite Dr. Brandner) to the members of the

Committee on Professionalism before recusing himself and then failed to notify Dr. Brandner of the conflict (in direct contrast to their own determination as to how the conflict should be addressed). Finally, the statistical analysis of the grievances considered by the AAOS from the inception of its so-called "Professional Compliance Program" demonstrates that the AAOS is using its professional compliance program to further its tort reform goals by punishing those members who dare to testify against members of the AAOS in medical malpractice actions. As will be demonstrated below, there can be no reasonable dispute that the AAOS's handling of the Sharpe/Brandner grievance violated the most basic principles of due process. Summary judgment should be granted in favor of Dr. Brandner and against the AAOS in this action.

1. **The AAOS failed to disclose that a member of the Judiciary Committee (and likely others who sat in judgment of Dr. Brandner) served on the board of directors for a physician's mutual insurance company whose primary business was insuring physicians against malpractice claims.**

Section VII(E)(2) of the Grievance Procedures provides:

> For each appeal received by AAOS, the Office of General Counsel will canvass the members of the Judiciary Committee to determine whether there exists any real or perceived conflict of interest between a Judiciary Committee member and the Grievant and/or Respondent. No Judiciary Committee member may participate in a case with whom that individual has a personal relationship or is in partnership or in direct economic competition.

(SOF ¶ 72.)

Through discovery, it was revealed that Dr. Richard Geline – who served on the Judiciary Committee – is a member of the board of directors for ISMIE Mutual Insurance Company; a physician-owned insurance company whose primary business is insuring doctors against medical malpractice claims. (SOF ¶ 72.) Dr. Geline acknowledged that his position on the board would prohibit him from testifying for a plaintiff in a medical malpractice action. Id. He further testified that he and other members of ISMIE receive a return in the form of a reduction in premiums for any premiums collected which exceed

the amount paid out on claims. Id. Dr. Geline further testified that he is compensated for serving as a member of the board of directors for ISMIE (he received $24,000 in 2009). Id. Dr. Geline also acknowledged that the single greatest risk to the financial stability of ISMIE (and, concomitantly, the annual stipend he receives for sitting on the ISMIE board) is medical malpractice claims made by patients. Id. Geline further recognized that he has a fiduciary duty as a member of the ISMIE board to "guard the welfare of the company." Id. Finally, Geline testified that he had disclosed the fact that he was a member of ISMIE to the AAOS. Id. While Dr. Geline was not aware of any other Judiciary Committee member who also served on the board of directors of ISMIE, he did acknowledge that at least one member of the COP Hearing Panel was a member of ISMIE, that a second member of the Judiciary Committee was, to his knowledge, a board member of a similar Minnesota-based insurance company and that he believed that one other member of the Judiciary Committee was insured by a physician's mutual insurance company. Id.

It is undisputed that the AAOS did not disclose to Dr. Brandner the fact that those proposed to sit in judgment of him had a financial interest in minimizing the size and number of medical malpractice claims or that a number of them owed fiduciary duties to companies that obligated them to do so. In failing to disclose this conflict, the AAOS failed to follow its own procedures for dealing with real and perceived conflicts. Specifically, as members of the boards and/or insureds of these mutual insurance companies, the AAOS panel members have a direct financial incentive to reduce the number and size of medical malpractice claims. Because the Sharpe/Brandner grievance was directly related to Dr. Brandner's testimony as an expert witness for a plaintiff in a medical malpractice case, any proposed panel member's position as a board member (paid or otherwise) or an insured of a physician's mutual insurance company should have been disclosed. The Grievance Procedures specifically state that the Office of General Counsel will look for a "real or perceived conflict of interest" and further provides that any Committee member found to have a financial conflict may not participate in the case. Dr. Geline testified that he had disclosed his position as a board member of ISMIE to the

AAOS. Despite Dr. Geline's disclosure of his position to the AAOS – a position which Dr. Geline acknowledged imposed fiduciary duties upon him to guard the welfare of the company (the welfare of which he acknowledged faced the single greatest threat from medical malpractice claims) – the AAOS failed to disclose this real or perceived conflict of interest to Dr. Brandner. Understanding that this conflict prohibits Dr. Geline from testifying on behalf of a plaintiff in a medical malpractice claim made against a doctor, it is apparent that Dr. Geline cannot objectively consider the merits of a grievance asserted against a doctor who testifies in support of a malpractice claim against a doctor.[11] The failure to notify Dr. Brandner of this potential conflict deprived Dr. Brandner of a meaningful opportunity to defend against the charges leveled by Dr. Sharpe, thereby depriving Dr. Brandner of his right to due process. Under such circumstances, this Court should intervene and summarily enjoin the AAOS from taking any disciplinary against Dr. Brandner as a result of the Grievance.

**2. The AAOS allowed a member of the Committee on Professionalism to "poison the well" by vouching for the integrity of the physician who testified opposite Dr. Brandner in the underlying action in a group-wide email to the members of the Committee on Professionalism.**

In response to a conflicts inquiry addressed to each of the members of the COP Hearing Panel, Dr. Peter Mandell responded to all members of the hearing panel advising that: "I believe I was on the Board of Councilors with Vince Russo [Dr. Sharpe's expert] a few years back. But I only know him causally [sic.] and haven't seen him in years. I don't think that constitutes a conflict but would welcome other opinions." (SOF ¶ 73.)

Recognizing the need to disclose the potential conflict, members who received the e-mail responded as follows: "They have the option to object if they believe there is a conflict, correct?" (SOF ¶ 73.) In response, another member of the Committee on Professionalism responded: "Yes, and so far any such objection has be [sic.] honored by the recusal of the objectionable party. The problem is that while one party may be

---

[11] It is absurd for the AAOS to argue otherwise.

acquainted with a COPper, [sic.] the other party may not know of that relationship." (SOF ¶ 73.)

Dr. Dale Butler, acknowledging his own personal conflict, then responded to all members of the COP Hearing Panel as follows:

> I also knew Vince Russo on the BOC for several years, and I also have not seen him for many years. I am more comfortable recusing myself. I agree that parties have the right to object, but the other side would not know the extent of the relationship or the "COPper's" (is that a new word?) personal feelings about the individual. **I new [sic.] Vince well enough and have good memories of him as a person and doctor. I might be biased for him, so I would prefer not to have any appearance of favoritism.** As for Peter, maybe both parties could be informed about the relationship and let them object if they choose. My general feeling is that we should bend WAY over to avoid any appearance of a conflict, and we have enough COP members to still have a hearing panel even if three members were recused.

(SOF ¶ 73.) While Dr. Butler's decision to recuse himself was appropriate, the manner by which he effectuated his recusal was not (giving Dr. Sharpe's expert a glowing recommendation to all of the other members of the Committee on Professionalism).

Dr. Mandell then responded as follows:

> My relationship with Vince was not as close (or perhaps as long) as Dale's. I'm confident that I would be fair and impartial in assessing his involvement in this case. Obviously, if he were the grievant or respondent, I would recuse myself. **I agree that Rosalind should inform both parties that I had a past casual acquaintance with Dr. Russo but have had no contact with him for years. The parties should be allowed to object to me.**

(SOF ¶ 73.)

Other members agreed that the suggested manner in which to handle the conflict was through disclosure. (SOF ¶ 73)(agreeing "both parties will be sent the names of the members on the Hearing Panel if the COP determines that a *prima facie* violation has been established. At that time, the background information re: Dr. Mandell will be shared with both parties to allow for transparency in the opportunity to challenge for cause."). Despite the members' determination as to how to handle the conflict – through

transparent disclosure – the AAOS never informed Dr. Brandner of the conflict (or Dr. Russo's involvement on the AAOS Board of Councilors). Moreover, at no point was Dr. Brandner informed of the relationships that Dr. Russo had developed with various members of the Committee on Professionalism or the fact that Dr. Butler, when announcing his decision to recuse himself, had vouched for the skill and integrity of the very person who had testified opposite Dr. Brandner in a group-wide e-mail to the Committee on Professionalism. The failure to disclose this potential conflict, deprived Dr. Brandner of a meaningful opportunity to defend against the charges leveled by Dr. Sharpe and deprived Dr. Brandner of his right to due process. Moreover, even after having recused himself, Dr. Butler continued to receive correspondence related to the Sharpe/Brandner Grievance – up to and after the hearing was held. (SOF ¶ 73.) Thus, despite the fact that Dr. Butler's conflict prevented him from sitting in judgment of Dr. Brandner, he was allowed to continue monitoring the progress of the Grievance.[12]

3. **A review of the Grievance Program hearing results reveals that the AAOS has used its Professional Compliance Program as a tool to further its tort reform agenda by punishing those doctors who dare testify against members of the AAOS in medical malpractice actions.**

Of the fifty-seven grievances considered by the AAOS since the inception of the program, forty-four have involved complaints against doctors who provided expert testimony in connection with medical malpractice cases. (SOF ¶ 74.) A review of those forty-four grievances reveals that not once has the AAOS suspended a member who offered expert medical testimony on behalf of the defense. Id. In marked contrast, on seventeen occasions the AAOS has suspended the member who offered testimony given

---

[12] Despite the fact that the documents disclosing the conflict of interest were requested by Dr. Brandner in his initial request for production of documents served on Defendants on April 8, 2011, the documents disclosing the conflict were not produced by the AAOS until September 19, 2011 – near the discovery cut-off. In addition, the AAOS failed to produce any electronic mail related to the conflicts check performed at the Board of Directors level; however, due to the fact that Dr. Redfern recused himself from participating in the hearing it is believed that such documents exist and have been intentionally withheld by Defendants despite the fact that the documents would be responsive to Plaintiff's April 8, 2011 request for production of documents. The AAOS' refusal to produce such documents begs the question of whether similar conflicts were revealed during the Board's screening process.

by a physician in support of the plaintiff (i.e., expert testimony asserting that a fellow or member of the AAOS fell below the standard of care). Id.

The 17-0 score sends a clear message – a member of the AAOS who dares to testify against another member of the AAOS in a medical malpractice case is risking his or her livelihood. If the physician against whom the medical malpractice action has been filed submits a grievances against the member serving as the plaintiff's expert, there is a strong likelihood that the member will be suspended from the AAOS (and will have to deal with the consequences that flow from public disclosure of the suspension). A member testifying on behalf of the defense in the same action bears no such risk. This was the purpose of the Professional Compliance Program from its inception. To argue otherwise in the face of the statistical data (17-0) is disingenuous.

**C.     Dr. Brandner's suspension from the AAOS would interfere with an important economic interest.**

The AAOS acknowledges that discovery in this case confirmed that from 2008 through 2010, seventy-three percent of Dr. Brandner's income was generated from medical legal support. Dr. Brandner testified unequivocally at deposition that it is his belief that suspension from the AAOS would end his medical career. (SOF ¶ 11.) Dr. Brandner explained that the loss of income that would result from being suspended from the AAOS would render him unable to meet the overhead obligations required to maintain his outpatient practice. (SOF ¶ 11.) The AAOS has no evidence to refute Dr. Brandner's opinion that his suspension from the AAOS would irreparably damage his reputation and destroy his means of earning over 70% of his income – ultimately ending his medical career. Indeed, in the order granting Plaintiff's Motion for Preliminary Injunction this Court recognized that it is not unreasonable for "clients to expect an expert to have an impeccable reputation, which includes being a member in good stating with the voluntary organization that governs the expert's behavior." [Doc. 28]

Nevertheless, relying on Austin v. American Association of Neurological Surgeons, 253 F.3d 967 (7th Cir. 2001) – the same case the AAOS relied upon when

making the same argument in opposition to Plaintiff's Motion for Preliminary Injunction – the AAOS argues that Dr. Brandner should be denied the protection of a permanent injunction because he has failed to establish an "important economic interest" in his continued membership in the AAOS. In doing so, the AAOS grossly oversimplifies the decision in Austin to assert that the "analysis in Austin is on all fours with this case." In advancing the argument, the AAOS ignores the fact that the plaintiff in Austin was neither seeking an injunction nor seeking readmission into the association. The plaintiff brought suit to recover money damages for a 35% decline in his "moonlighting" expert witness income; income which the court held was not an "important economic interest" to Dr. Austin. Id. It should be noted that the 35% reduction in income was not a reduction in total income, but rather, was a reduction in what the court termed to be Dr. Austin's "moonlighting" income (which presumably was far less than 35% of the doctor's total gross income).

Thus, even if this Court were to somehow conclude that, under Austin, Illinois courts no longer recognize that membership in a voluntary association has such a serious effect on the ability of a professional to pursue his livelihood that wrongfully expelling a member is an "interest of substance" that the judiciary will protect,[13] the reality of the situation is that Dr. Brander's continued membership in the AAOS nevertheless rises to the heightened standard pronounced in Austin. Such is the case because of Dr. Brandner's unique physical condition and the role that medical-legal support plays in allowing Dr. Brandner to generate sufficient income to satisfy his overhead requirements so as to support his outpatient practice.

---

[13] Compare, Virgin v. American College of Surgeons, 42 Ill.App.2d 352 (1st Dist. 1963) (noting that wrongful expulsion from a professional association has such serious effect on the ability of a professional to successfully pursue his livelihood that Illinois courts have long followed the rule that a member of a professional association who is wrongfully expelled has an "interest of substance" which the judiciary will protect), with Treister v. American Academy of Orthopaedic Surgeons, 78 Ill.App.3d 746 (1st Dist. 1979)(distinguishing non-admittance into a voluntary professional association with the expulsion from a voluntary professional association and finding that the expulsion from a voluntary association should be afforded a hearing before a fair and impartial tribunal whereas, in cases of non-admittance, courts will review application procedures only when membership in the organization is an economic necessity).

Dr. Brandner is physically unable to perform surgery. (SOF ¶ 11.) After declaring surgical disability in 1995, Dr. Brandner began providing medical-legal support to make up for the revenue lost as the result of his disability. Id. Currently, more than seventy percent of Dr. Brandner's income is derived from medical-legal support. Id. Unlike the plaintiff in Austin, the income Dr. Brandner generates from medical-legal support is not mere "moonlighting" income – it is the principal source of his and his family's livelihood. Austin recognized that "the association's action must jeopardize the principal source of the professional's livelihood and not a mere sideline." Id. at 972. Here, Dr. Brandner's medical-legal support income is not "a mere sideline" – it accounts for over seventy percent of his total income and provides the basis by which Dr. Brandner is able to meet his overhead requirements so that he may continue his outpatient practice. (SOF ¶ 11.) Because the AAOS has failed to provide any evidence to refute Dr. Brandner's testimony that suspension from the AAOS would end his medical career, it is apparent that Dr. Brandner has satisfied his burden to demonstrate that his continued membership in the AAOS constitutes an important economic interest.

## V. CONCLUSION

As demonstrated above, Plaintiff's Cross Motion for Summary Judgment should be granted. Such is the case as Dr. Brandner has shown that the allegations in Plaintiff's Amended Complaint were true – the "hearings" conducted in connection with the Sharpe/Brandner grievance were a sham. The AAOS repeatedly ignored its own internal bylaws; improperly shifted the burden of proof and the burden of production; continually recast the Grievance (leaving Dr. Brandner helpless to defend himself against ever-changing allegations); and failed to disclose multiple known conflicts. Under such circumstances, summary judgment should be entered in favor of Dr. Brandner and against the AAOS. This Court should issue an order permanently enjoining the AAOS from taking any action against Dr. Brandner in connection with the Sharpe/Brandner Grievance. To do otherwise would encourage the AAOS to continue improperly using its Professional Compliance Program to punish those of its members who dare to testify

against other AAOS members in malpractice actions and to dissuade others from doing so.

Dated: December 13, 2011

Respectfully Submitted,

_Hun R. Maurici_

Ryan F. Stephan, Esq.
STEPHAN ZOURAS, LLP
205 n. Michigan Avenue, Suite 2560
Chicago, Illinois 60601
312-233-1550
www.stephanzouras.com

Aaron R. Maurice, Esq.
WOODS ERICKSON WHITAKER
& MARUICE LLP
1349 West Galleria Drive Suite 200
Henderson, Nevada 89014
www.woodserickson.com