# EXHIBIT "4"

IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


PATRICK J. BRANDNER, M.D.,      )
                                )
              Plaintiff,         )
                                )
       -vs-                      )Case No. 10-cv-8161
                                )
AMERICAN ACADEMY OF              )
ORTHOPAEDIC SURGEONS and         )
AMERICAN ASSOCIATION OF          )
ORTHOPAEDIC SURGEONS,            )
                                )
              Defendants.        )


The videotaped deposition of MELISSA A. YOUNG, called for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of videotaped depositions, before ANDREW ROBERT PITTS, C.S.R. No. 84-4575, a Certified Shorthand Reporter within and for the County of Cook, State of Illinois, at 205 North Michigan Avenue, Suite 2560, Chicago, Illinois, on the 21st day of September, A.D. 2011, at 10:16 a.m.

PRESENT:

WOODS ERICKSON WHITAKER & MAURICE LLP,

1349 West Galleria Drive, Suite 200,

Henderson, Nevada 89014-6653,

702-433-9696, by:

MR. AARON R. MAURICE,

appeared on behalf of the Plaintiff;

VEDDER PRICE,

222 North LaSalle Street, Suite 2600,

Chicago, Illinois 60601,

312-609-7790, by:

MR. MICHAEL A. CHABRAJA,

appeared on behalf of the Defendants.

ALSO PRESENT:

MR. MARC BUHMANN,

Legal Videographer.

REPORTED BY:    ANDREW R. PITTS,

C.S.R. No. 84-4575.

3

I N D E X

MELISSA YOUNG                                    EXAMINATION

        BY MR. MAURICE                              7


                    E X H I B I T S

BINDER                                              PAGE

Tab 1             AAOS bylaws 3/12/10               31
                  Brandner 00004-00030

Tab 2             AAOS bylaws incorporated          32
                  2/13/98, Brandner 00702-00745

Tab 3             AAOS Professional Compliance      33
                  Program Grievance Procedures
                  Brandner 00746-00763

Tab 4             AAOS Standards of                 57
                  Professionalism
                  Brandner 00001-00003

Tab 5             AAOS Standards                    58
                  amended 4/18/05, Brandner 00003
                  00764 and 00766

Tab 51            Report of BOC/BOS, 10/18/09       61
                  AAOS_B0039300-B0039306

Tab 52            Proposed Revisions                64
                  AAOS_B0029294-B0029299,
                  AAOS_B0005877, AAOS_B0027837,
                  AAOS_B0027970

Tab 8             AAOS Professional Compliance      77
                  Program Grievance Report
                  Brandner 00114-00118

Tab 11            Letter from Dr. Sharpe            120

4

EXHIBITS  CONTINUED

BINDER                                              PAGE

Tab 15          AAOS Grievance Hearing Report    134
                Brandner 00767-00776

Tab 16          Letter from Woods Erickson        135
                12/29/09, Brandner 00233-00242

Tab 17          Letter from Ms. Giulietti         145
                2/1/10, Brandner 00245-00246

Tab 18          Letter from Crawford & Kline      146
                to Mr. Peterson, 2/19/10
                Brandner 00572-00577

Tab 19          AAOS Judiciary Committee          153
                Hearing transcript 3/12/10
                Brandner 00578-00596

Tab 20          AAOS Judiciary Committee          170
                report and recommendation
                Brandner 00606-00614

Tab 23          Letter from Dr. Callaghan         197
                6/28/10, Brandner 00633

Tab 24          Letter to Mr. Aaron from          200
                Mr. Peterson 7/8/10
                Brandner 00638-00640

Tab 25          Letter to Mr. Maurice from        201
                Ms. Hackett, 7/30/10
                Brandner 00641

Tab 29          Letter from Dr. Callaghan
                12/9/10, Brandner 00694

Tab 30          Letter from Woods Erickson        212
                12/15/10, Brandner 00695-00700

5

EXHIBITS CONTINUED

| BINDER | | PAGE |
|---|---|---|
| Tab 31 | Letter from Mr. Peterson 12/17/10, Brandner 00701 | 213 |
| Tab 32 | Article AAOS Now 2/09 issue | 222 |
| Tab 33 | Article AAOS Now 5/09 issue | 223 |
| Tab 35 | Affidavit of Ms. Young | 230 |
| Tab 12 | AAOS letter 5/26/09 Brandner 00127-00128 | 244 |
| Tab 37 | E-mail from Dr. Mandell 1/2/09, AAOS_B0038818-B0038819 | 261 |
| Tab 38 | E-mail from Dr. Strain 1/2/09, AAOS_B0038825-B0038826 | 262 |
| Tab 39 | E-mail from Dr. Martin 1/2/09, AAOS_B0038827-B0038828 | |
| Tab 41 | E-mail from Dr. Butler 1/2/09, AAOS_B0038834-B0038834 | 264 |
| Tab 42 | E-mail from Dr. Mandell 2/4/09, AAOS_B0038837-B38839 | 268 |
| Tab 45 | E-mail from Ms. Giulietti 1/5/09, AAOS_B0038858-B0038860 | 270 |
| Tab 36 | E-mails AAOS_B0038906-B0038924 | 271 |
| Tab 49 | E-mail from Dr. Schmidt 4/19/10, AAOS_B0039117 | 273 |

6

THE VIDEOGRAPHER: Good morning. I am Mark Buhmann, your videographer, and I represent Atkinson-Baker, Incorporated of Glendale, California. I'm not financially interested in this action, nor am I a relative or employee of any attorney of any of the parties. The date today is September 21st, 2011 and the time is 10:16 a.m.

10:16:45

This deposition is taking place at 205 North Michigan Avenue, Suite 2560 in Chicago, Illinois. This is Case No. 10-CV-8161 entitled Patrick J. Brandner, M.D. versus American Academy of Orthopaedic Surgeons, et al. The Deponent is Melissa Young, and this deposition is being taken on behalf of the Plaintiff. The court reporter is Andrew Pitts with Reporters Direct.

10:16:58

10:17:19

And will counsel please introduce themselves for the record.

MR. MAURICE: Aaron Maurice, on behalf of the Plaintiff.

10:17:30

MR. CHABRAJA: Mike Chabraja, on behalf of the Defendants.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

7

(WHEREUPON, the witness was duly sworn.)

MELISSA A. YOUNG,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. MAURICE:

Q. Would you please state and spell your name for the record, please.

A. Melissa Young; M-E-L-I-S-S-A,     10:17:52 Y-O-U-N-G.

Q. Ms. Young, have you ever had your deposition taken before?

A. No.

Q. Okay. Let me go over some of     10:18:01 the -- some of the ground rules then to make sure we're all on the same page. The oath which you just took, the same oath as you take in a court of law, carries with it the same obligation to tell the truth, the same penalty for violating that     10:18:12 oath.

Do you understand that?

A. Yes.

Q. The court reporter to my left, to your

right, is going take down everything that's said in this room and ultimately prepare a transcript of these proceedings. Accordingly, to maintain a -- to make sure we have a clear record, it's important we follow some special rules.

The first rule is all responses must be audible. Nods of the head, shrugs of the shoulders, things which out in the hallway I would take as a response to my question do not appear on the record. So if I -- if I see you use one of these non-audible responses, I will say is that a "yes," is that a "no." I'm not trying to be rude; I'm just trying to clarify it for the record.

Do you understand that?

A. I do.

Q. Okay. With that said, certain audible responses nonetheless do not appear well on the record. "Uh-huh" and "huh-uh" do not appear well on the record. Mr. Chabraja and I will find ourselves on the eve of trial calling each other up late at night trying to figure out was Melissa saying "yes," was she saying "no," and that's not what Mr. Chabraja and I want to be doing on the eve of trial.

So if I hear you use one of these generic responses, I will say is that a "yes," is that a "no." Again, not trying to be rude, just trying to clarify it for the record.

Do you understand that?                    10:19:27

A.     I do.

Q.     In everyday conversation, it's very -- it's customary for the person who is responding to a question to volunteer the answer when the person asking the question's about three fourths of the    10:19:32 way done with the question.  It allows our society to move along a little faster.  You don't need to wait to hear the end of the question before you volunteer the answer.

That's great if you're on the street    10:19:43 and somebody's asking you for directions to Wrigley Field; that is not good in a deposition, because you get a choppy transcript where you actually see the answer in the middle of the question, and that's not good for anybody.    10:19:53

I'm going to do everything in my power today to wait until you are done answering my question questions before I ask you another question.  I just ask that you do everything in

your power today to wait until I am done asking my questions before you volunteer an answer.  Fair enough?

A.    Very fair.

Q.    Okay.  I am not here to trick you                    10:20:09 today.  This is not like if you're watching Perry Mason on television.  There's not going to be dramatic music at any moment when I ask you a question and force you to answer the question that I'm posing.                                                          10:20:19

We're here on a fact-finding mission. If I ask you a question that you don't understand, I don't want you to answer it.  I want you to say, "Aaron, I do not understand that question, please explain," and I will do everything in my power to       10:20:31 provide you with the information necessary so that you can -- you can respond to my questions.  If you respond to one of my questions, I'm going presume that you understood it.  Fair enough?

A.    Very fair.                                            10:20:44

Q.    Okay.  At the end of this process, you're going to have had an opportunity to review your deposition transcript.  I'm sure you've seen them before.  They read much like a play with me

asking, hopefully, very artful questions and you, hopefully, giving very good answers, and you're going to have an opportunity to make any changes that you feel are necessary to that transcript to ensure that it accurately reflects your testimony. 10:21:03

While I encourage you to make any changes that you feel are necessary to your transcript, I do want to caution you that substantive changes to your testimony, changes that materially alter the nature of your testimony 10:21:15 can be commented upon by any of the attorneys in the case in at the time of trial, and those comments may tend to reflect on your credibility.

Do you understand that?

A. Perfectly. 10:21:27

Q. Okay. With all of that said, is there any reason you can't go forward and give your best deposition testimony today?

A. No.

Q. Okay. Not under the effects of any 10:21:35 medication that would make it impossible for you to understand my questions and respond truthfully?

A. No.

Q. Okay. Not under the effects of any

medication that make it so you can't recall events?

A. No.

Q. Okay. And you're not dealing with any kind of personal crisis so that you're here in body but your mind is somewhere else, you know, your dog ran away this morning, and even though you're sitting in the chair, all you're thinking about is Fluffy running around on the mean streets of Chicago?

A. No.

Q. Nothing like that? Okay.

What did you do to prepare for your deposition today?

A. I reviewed the professional compliance program grievance procedures. I took a look at the bylaws for the academy and for the association. I'm trying to remember what else I took a look at. I did review my affidavit, reviewed some of our responsive pleadings, and I conferred with our counsel.

Q. Mr. Chabraja?

A. Yes.

Q. Anything else?

13

A. No.

Q. When you say you reviewed your affidavit, did you just review the actual text of the affidavit or all of the exhibits attached to the affidavit?                                    10:23:05

A. The affidavit.

Q. I was going to say if you reviewed all the exhibits attached to the affidavit, your review session would have taken hours, because I reviewed it last night.                    10:23:16

With regard to your conversations with Mr. Chabraja, did they occur in person or over the phone?

A. In person.

Q. And when did that occur?                    10:23:23

A. I met with Mike on Monday.

Q. And where did you meet with him?

A. In my office in Rosemont.

Q. Anybody else present for that meeting?

A. Our professional compliance program                    10:23:41
coordinator.

Q. Ms. Giulietti?

A. "Giulietti," yes.

MR. MAURICE: "Giulietti." Mike, you could

have corrected me on that three depositions ago so I wouldn't have been mispronouncing her name the whole time.

BY MR. MAURICE:

Q.    How long did that meeting last?    10:23:59

A.    Probably three hours.

Q.    And at that time, did you review any documents in the case?

A.    No.

Q.    And then did you have any other    10:24:07
meetings with Mr. Chabraja in preparation for today's deposition?

A.    I met with him prior to coming here today.

Q.    And was that at his office?    10:24:20

A.    Yes.

Q.    And how long did you meet him?

A.    Maybe an hour.

Q.    And did you review any documents during that meeting?    10:24:30

A.    No.

Q.    Okay.  Have you read Dr. Goodman's deposition?

A.    No.

Q.    What about Dr. Sharpe's deposition?

A.    No.

Q.    What about Dr. Craig's deposition?

A.    No.

Q.    Have you seen a summary of    10:24:47
Dr. Goodman's deposition?

A.    No.

Q.    How about a summary of Dr. Sharpe's
deposition?

A.    No.    10:24:54

Q.    How about a summary of Dr. Craig's
deposition?

A.    No.

Q.    How about Dr. Geline's deposition, a
summary?    10:25:03

A.    No.

Q.    Other than your meetings with
Mr. Chabraja, have you discussed the fact that
you're being deposed today with anybody else?

A.    My supervisor, Rick Peterson, is aware    10:25:16
that I'm being deposed today.

Q.    But in terms of discussing the fact
that you were coming here to be deposed, did you
discuss it with anybody else?

A.   Well, my husband is aware, but --

Q.   Did you discuss the subject matter of the deposition with your husband our just the fact that you were being deposed?

A.   Just the fact that I'm coming.   10:25:46

Q.   Yeah.  Yeah, my wife knows I'm taking a deposition today, but she doesn't know what the substance is either.

In terms of your background, where did you grow up?   10:26:00

A.   Southwest Virginia.

Q.   And in terms of education, where did you go to undergrad?

A.   James Madison University.

Q.   What degree did you obtain?   10:26:11

A.   I have a Bachelor's of Art in Communications and Political Science.

Q.   And what year did you obtain that degree, that degree or those degrees?

A.   1988.   10:26:24

Q.   And then law school, where did you go to law school?

A.   Washington Lee University.

Q.   And what year did you graduate from

Washington Lee?

A.    1992.

Q.    And tell me about your -- well, I guess I should ask this.

What states are you licensed to practice law in?        10:26:48

A.    Virginia and Illinois.

Q.    Give me starting in 1992 and then coming to the present just a general breakdown of your employment history.        10:27:05

A.    Okay.  I practiced law with a law firm Gentry Locke Rakes and Moore from 1992 until 2005. I moved to Chicago area in January 2005.  I did some volunteer work for the legal aid services for a while, I'm guessing maybe six months or so.  I        10:27:33 practiced in-house with Johnson Publishing for about eight months, then I started with the AAOS in September of 2008, and that's where I've been since.

Q.    When you were practicing at Gentry        10:27:54 Locke's from 1998 to 2005, give me a general description of the area or areas in which you were practicing.

A.    Insurance defense work.

18

Q.    Any specific type?  Are we talking personal injury?  Are we talking professional negligence?

A.    A little bit of everything.  Did some property damage, did some car crash type of stuff.  10:28:30 We did workers' comp, Black Lung, you know, run-of-the-mill stuff.

Q.    In your, looks like, 13 years with Gentry Locke, did you conduct any trials?

A.    I have had trial work, yes.    10:28:59

Q.    Approximately how many?

A.    Probably maybe ten, 12.

Q.    Did you first chair any of those trials?

A.    Yes.    10:29:13

Q.    Of those ten to 12 or so trials, how many of those were jury trials?

A.    Three.

Q.    And were those three trials -- well, I should ask it this way.    10:29:33

Of those three trials, how many of those did you sit first chair?

A.    I didn't sit first chair on any of those.

Q.    So you joined the AAOS in September of 2008.  Tell me how that happens.  How is that it you end up going to work at the AAOS?

A.    The AAOS had an opening, and I applied for it.                                              10:30:03

Q.    And so if you joined in September of 2008, I take it that means that the professional compliance program was already in place and operating when you joined the AAOS?

A.    That's correct.                              10:30:22

Q.    Okay.  And give me an idea.  Who do you answer to at the AAOS?

A.    The general counsel.

Q.    And who is that?

A.    Richard Peterson.                            10:30:33

Q.    And are there any attorneys that answer to you?

A.    No.

Q.    Is the general counsel's office comprised solely of you and Mr. Peterson?        10:30:51

A.    No.  The professional compliance coordinator also is in our office, and we have two assistants.

Q.    But in terms of attorneys, it's just

20

you and Mr. Peterson?

A.    That's correct.

Q.    What is Mr. Pelton's role with the AAOS?

A.    Mr. Pelton does not work for the academy.

Q.    He is outside counsel?

A.    That's correct.

Q.    Give me a general explanation of your job responsibilities at the AAOS.

A.    I am responsible for oversight of the professional compliance program.  I -- that's probably, I don't know, maybe 50 to 60 percent of what I do.

The remaining responsibilities vary a lot, but primarily, it's the contract administration for the academy, and that's every department in the academy I have to handle the contract work for the various departments.  I do a lot of review for the various publications in terms of articles that go through the publications.

Trademark and other intellectual property work, I work with our outside counsel and

the various departments. Let me think. Some human resources work. I staff a number of committees. I guess that would come under a general administration type thing.

Q. Any -- anything else you can think of? 10:33:13

A. Amicus briefs.

Q. Can you think of anything else? Do you think that -- I mean, I understand there might be some miscellaneous stuff you're not listing.

A. There could be a few others, but that's 10:33:38 the big part, the big picture there.

Q. Fair enough. When you said contract work for various departments, what does that mean?

A. Anytime we contract with a vendor, we have a contract with them, and I have to do review 10:33:51 and do routing through the various departments. Department heads have to sign off and our CFO and our CEO has to sign, actually sign the contract.

Q. And when you said you staff a number of committees, what did that -- what does that mean? 10:34:08

A. Each of the committees that are under the academy or the association has to have a staff liaison, and there are quite a few, so every -- every committee has either one or two

22

staff liaisons. I have, I think, four.

Q. And what are those committees, those four?

A. The committee on professionalism, the judiciary committee -- actually five: The bylaws review committee, which is a board committee, the board of counselors, and the board of specialty societies, professionalism committee, the board of counselors and the board of specialty societies, bylaws -- bylaws committee, and then they also have a -- oh, goodness. There's a third committee I'm not coming up with. Professionalism, bylaws, and -- oh, I'm drawing a blank.

Q. So far -- let me see if I can help you out.

So far I have specialization, professionalism, judiciary, bylaws review, board of counselors. Were those right or --

A. Well, I should give them to you in groups. How about that? The board of counselors has -- how can I describe this to you? Underneath the board of directors, there are two groups, the board of counselors is one, and that's representatives from every state, and there's also

10:34:39

10:35:01

10:35:23

10:35:38

a board of specialty societies, and that would be spine surgeons or whatever. They each have representatives that come to the academy as well.

So those two groups have joint committees. Okay. So the BO -- we'll call that the BOC/BOS. They have a bylaws committee, a professionalism committee, and there's one other one that I staff, and I cannot come up with that one at the moment. 10:36:20

So there's three for them that I staff; the board has a bylaws review committee that I staff, that's four; and then the COP and the judiciary. So that's six. Sorry. 10:36:31

Q. And are there other committees in the AAOS that are staffed by other attorneys at the AAOS? 10:36:51

A. Oh, yes.

Q. And I take it that would be Mr. Peterson?

A. Yes. 10:37:02

Q. And then you mentioned amicus briefs.

A. Uh-huh. Yes.

Q. What does that mean?

A. The academy will file amicus briefs in

24

support of various parties in appeals in various states or in federal courts, depending on whatever -- what the issue is, if it's an issue that the AAOS has an interest in.

Q. And what kind of issues does the AAOS have an interest in?                    10:37:34

A. Physician-owned physical therapy, physician-owned imaging equipment, that type of thing.

Q. What about tort reform?                    10:37:53

A. That is a piece of the academy's advocacy agenda, but I'm trying to think. Actually, there was an amicus brief that was filed, but I didn't -- I didn't write it.

Q. Is that in Arizona?                    10:38:17

A. Actually, I think that's in Florida maybe.

Q. When you said that tort reform is part of the AAOS's advocacy agenda, what else is on the AAOS's advocacy agenda?                    10:38:32

A. You know, that's not the committee that I staff, so I don't have that memorized. I can't recite it to you, and it's a pretty lengthy -- it has tiers.

Q.    Well, then let's just focus on the tort reform.

You're familiar with the tort reform component of the AAOS's advocacy agenda, correct?

A.    I have some familiarity with it, yes.    10:38:59

Q.    Is it tort reform in general, or is it specifically tort reform as it relates to physicians being sued for medical malpractice?

A.    I think it's tort reform in -- in general.    10:39:19

Q.    So the AAOS is just as concerned about putting liability caps on personal injury accidents related to automobiles as it is to personal injury claims against surgeons for malpractice?    10:39:33

A.    I think that they are concerned with tort reform as it relates to medical malpractice, yes.

Q.    And is the AAOS for or against tort reform as it relates to medical malpractice?    10:39:54

A.    I think that would depend on the state and the -- how the -- shapes up in the state.    I mean, I don't know that I can answer that in general.

Q. Well, the big issue in tort reform, at least in medical malpractice liability, are the efforts by certain states to impose caps on malpractice awards. Do you understand that?

A. Absolutely. 10:40:27

Q. Okay. Is the AAOS for or against caps on medical malpractice awards?

A. I don't know that I can -- I feel qualified to say that. I mean, I -- I guess you could -- well, I don't feel qualified to say that. 10:40:44

Q. Well, I mean, it seems kind of a common sense situation.

Does the AAOS want limits imposed upon plaintiffs suing physicians for malpractice, or do they want to remove limits that have been imposed 10:40:59 upon plaintiffs suing physicians for malpractice?

A. Well, let me respond to that this way. I have no involvement with the advocacy efforts of the academy or the association, so I don't -- I don't feel qualified to address that. 10:41:17

Q. Have you ever written an amicus brief for the academy advocating a position that would strike down a cap imposed by a state legislature on a medical malpractice award?

A. No.

Q. Have you ever written an amicus brief on behalf of the academy in favor of upholding a cap imposed upon medical malpractice awards?

A. No.                                                    10:41:43

Q. Okay. What about -- well, tell me about the amicus briefs that you have written, just the topics.

A. Physical therapy, physician-owned physical therapy, dietary. Those are the only two   10:42:01 since I've been there.

Q. And I take it there may be other people at the AAOS preparing amicus briefs with respect to other issues; you're just not familiar with them?                                                      10:42:23

A. No.

Q. Right? Meaning "no," if they're -- if the AAOS was preparing an amicus brief, you would be familiar with the topic?

A. Yes.                                                  10:42:31

Q. When you talked about an advocacy agenda, to me that sounds like lobbying.

Does the AAOS engage in lobbying?

A. It does.

28

Q.   Okay.   And does it retain outside lobbyists to represent the interests of the AAOS members, or does it handle it in-house?

A.   It has an general government relations office.                                                      10:42:55

Q.   So that's in-house at the AAOS?

A.   It is.

Q.   And are you aware of the various issues that the AAOS is lobbying either in favor or against at this time?                                          10:43:22

A.   Not with any degree of confidence, no. It's not -- it is not under the purview of the general counsel's office.

Q.   Okay.   How about just general understanding or your general thoughts?   I don't   10:43:33 need specifics.

MR. CHABRAJA:   General thoughts about what?

BY MR. MAURICE:

Q.   About the issue of what the AAOS is currently lobbying either for or against?          10:43:44

A.   I really can't say that I do, no.   I don't have any specific knowledge or even a -- it's -- it's a completely different office.

Q.   Does that office report to the board of

29

directors?

A.    They do.

Q.    Do they report at the meetings that are held throughout the year by the board of directors?                                                    10:44:14

A.    They do.

Q.    Okay.  Do you attend those meetings?

A.    No.

Q.    Okay.  You do not attend the board of directors meetings?                                          10:44:19

A.    I do not attend all of the board of directors meetings.  I attend the meetings that deal with issues directly related to the office of general counsel.

Q.    And just so I understand then, it's my    10:44:31 understanding that the board of directors meetings may take place over one or two days; is that correct?

A.    It takes place over three days generally.                                                        10:44:49

Q.    Okay.  Does that mean your answer that you only attend meetings that relate to business of the office of general counsel, does that mean that there are certain three-day meetings that you

30

don't attend in their entirety, or does that mean that you may attend certain portions over a three-day period and those portions would only deal with the business of the office of general counsel? 10:45:14

A. I will attend portions of a meeting over the course of three days, an hour here, an hour there, and then generally on Saturday is when we hold professional compliance program issues.

Q. Do you have any children? 10:45:29

A. I do.

Q. How many?

A. Two.

Q. All right. Boy, boy? Girl, girl?

A. Two boys. 10:45:41

Q. How old?

A. Fourteen and 11.

Q. What brought you to Chicago?

A. My husband was transferred.

Q. What does he do? 10:45:54

A. He works for AllState Insurance.

Q. And what does he do for AllState Insurance?

A. He works in the policy processing

31

department.

Q. Does he focus on any specific types of policies or just policies in general?

A. You know, that is such a big company. How do I explain what he does? It's more of the homeowner's policy. 10:46:26

Q. What is your work e-mail address?

A. Young@aaos.org.

Q. And do you have a personal e-mail address? 10:46:49

A. I do.

Q. Do you ever use your personal e-mail address for AAOS business?

A. No.

Q. Okay. I'm going hand you a -- well, I'm going hand it to Mike, and then he will hand it to you so I don't knock over your water. Let me have you open up to the document marked for identification as Exhibit 1. 10:46:55

A. Okay. 10:47:25

Q. Do you recognize this document?

A. I do.

Q. And what is it?

A. It's the bylaws of the academy.

Q. And I take it as an attorney who works in-house for the academy you are intimately familiar with the bylaws for the academy?

A. I am.

Q. Okay. If you could turn to Exhibit 2.  10:47:47

A. Okay.

Q. Do you recognize the document marked for identification as Exhibit 2?

A. I do.

Q. And what is -- what is that document?  10:47:56

A. It's the bylaws for the association.

Q. And similarly with Exhibit 1, I take it as an attorney for the AAOS you are intimately familiar with the bylaws for the association; is that correct?  10:48:10

A. Yes, I am.

Q. What is the difference between association and the academy?

A. The academy was the first organization that was organized, and it deals primarily with  10:48:21 the education of orthopaedic surgeons in musculoskeletal medicine, and it provides public advocacy, public -- well, let me see, public awareness type issues on musculoskeletal health.

33

And the association did not come into existence until 1997 for the sole purpose of musculoskeletal advocacy issues. It's a 501(C)(6) where the academy is a 501(c)(3).

Q. And pursuant to the bylaws of each, if you're a member of one you're a member of the other, correct?

A. That's correct.

Q. Okay. And is it okay today if I don't distinguish between members and fellows and just refer to everybody as members?

A. That's fine.

Q. Okay. In terms of the bylaws for the association and the bylaws for the academy, which set of bylaws creates this professional compliance program?

A. The association.

Q. Okay. And which article in the association?

A. VIII.

Q. If you could turn to the document marked for identification as Exhibit 3, do you recognize this document?

A. I do.

34

Q. And what is it?

A. Professional Compliance Program Grievance Procedures.

Q. And explain to me the purpose of the Professional Compliance Program Grievance Procedures.

A. The grievance procedures supplement the bylaws that address the establishment of the professional compliance program and they set forth the framework for the compliance program and how it's going to run from day to day.

Q. Fair for me to characterize them as the rules for the grievance process?

A. Yes.

Q. And would you agree that the AAOS is obligated to follow the Professional Compliance Program Grievance Procedures?

A. Yes.

Q. I mean, it is a supplement to the -- to the bylaws. So, I mean, it carries -- the Professional Compliance Program Grievance Procedures carry with them the same authority that would exist under the bylaws, correct?

A. Yes.

35

Q.   What do you know about why the professional compliance program was adopted by the AAOS?

A.   I was not there when it was developed, so I can't tell you with -- with -- you know, what happened, but my understanding was that the fellowship wanted this program in place so that one fellow could bring a grievance against another for what they considered to be unsupported expert witness testimony.

And the board decided to put together a project team to look at this issue, and the project team decided that there were other ethical issues that needed to be addressed as well, and initially there were three standards of professionalism that were adopted.

Q.   But it's your understanding that the initial moving force behind the creation of the professional compliance program was the concern over expert witness testimony?

A.   Unsupported expert witness testimony.

Q.   Okay.  So it's -- the answer to my question is correct?

A.   That's correct, yes.

Q. And then I understand, based on the testimony that I have heard from the witnesses over the last month or so, that there are other mandatory standards related to areas other than expert witness testimony. 10:52:24

But would you agree that by far the area that receives the most grievances is the area of expert witness testimony?

A. That's correct.

Q. Would you agree that the area that 10:52:35 receives the most grievances, to even get more specific, is allegations against physicians who have testified as expert witnesses on behalf of plaintiffs in medical malpractice cases?

A. In -- yes, that would be true. 10:52:53

Q. What is your understanding of how the program is supposed to work? Give me the big picture starting from an angry member submitting a grievance report and walk me through to the end.

A. Okay. We're dealing with which 10:53:31 standard of professionalism?

Q. Which --

A. Or with any standard of professionalism?

Q. We could use any -- I mean, the reality is no matter whether the grievance report alleges a violation of the mandatory standards for expert witness or for relationships in the industry, it's supposed to be handled the same through the grievance process, correct?     10:53:57

A. There may be slight variations depending on the topic, but --

Q. Well, let's go with witness testimony then.     10:54:07

A. Okay.

Q. Since that's what we're here to talk about.

A. Okay. That's fine. Okay. We at the AAOS will receive a grievance submitted by a     10:54:14 member. It is -- once it is received by our staff, it's reviewed to determine whether or not the materials are complete.

Q. Who performs that review?

A. Rosaliand Giulietti.     10:54:37

Q. In the office of general counsel?

A. In the office of general counsel, that's correct. The review is essentially looking at the allegations that are raised, determining

38

the references that are made in the allegations to determine whether or not they're -- all of the supporting materials are there.

If there are things like images that are submitted, whether or not they're in a format 10:55:06 that can be distributed; if they're not, then that has to be taken care of. If they are compliant with the requirements, with HIPAA compliance, that type of thing. All of that has to be taken care of before they are considered -- the grievance is 10:55:28 considered filed.

Once all of that is taken care of and it's in the right format, the respondent is notified of the grievance, he's given an opportunity to respond, submit any materials that 10:55:40 he or she would like to submit in response.

Once that material is received, it is then provided to the committee on professionalism for a prima facie determination.

If the committee on professionalism 10:56:03 does not believe that there is sufficient material or sufficient evidence for a prima facie determination, the parties are advised that that's the case.

39

The grievant, if he doesn't like that finding, he then has the option of making a -- demanding a hearing, and he would have costs associated with that.

If the committee on professionalism does have a -- does make a prima facie finding, then the parties are notified of that, and a hearing is set. They are allowed to submit additional material if they would like to in support of their positions.

Let's see. The -- there's a notification of the members of the hearing panel so that the -- the parties will have a chance to challenge any of the members that are going to be sitting on the panel.

I'm trying to remember. Even before all of that happens, I think the -- the -- excuse me, the members on the committee on professionalism are given the notice of the parties, and we try to do a pretty extensive list of -- of the parties and where they went to school and --

Q.  Why is that important? I've seen the -- I know the breakdown you're talking about,

and it does, it's more than just saying Dr. Sharpe, Dr. Brandner. I mean, it breaks down --

A.     Yeah.

Q.     -- where their education was, who their experts were, who the attorneys are.

Why does the AAOS do that when canvassing the COP members to inquire if they believe there's a conflict?

A.     Well, sometimes the committee on -- well, yeah, I think they do it at the judiciary and the board level also, but we'd like to give them a chance to say, well, I was at the school at the same time as this person, or I taught this person; I don't remember them, but I taught this person at such and such a place, or we went -- it's just a chance for them to say, to raise the issue that, you know, is this considered -- would this be considered a conflict of interest.

Q.     And why does the AAOS want to raise that issue?

A.     Why do they want to raise the issue? It's just an attempt at transparency.

41

Q. Right. They want to avoid conflicts of interest, correct?

A. Yes.

Q. Okay. They want to -- they want to create the appearance of a fair process, correct? 10:59:06

A. Right.

Q. Okay. Sorry to interrupt you. Back to where you were.

A. Excuse me. I was -- I forgot where I was. Oh, the hearing, COP hearing. Parties are 10:59:19 notified of the members of the committee, the hearing panel, and parties are allowed to challenge the members of the hearing panel if they'd like to.

At the hearing, each party is permitted 10:59:40 to make presentations, 30 minutes each. The hearing panel is -- has an opportunity to ask questions of the parties.

Q. And that's during the 30-minute presentation that -- that each has, correct? 10:59:58

A. You know, that's really not all that strictly enforced. I mean, if it runs over, the chairs that discretion if he wants to. I mean, it depends on kind of how the hearing is going. If

42

you use your 30 minutes, the chair kind of uses his discretion. That's kind of how it has -- has happened in the past, and it depends on, I guess, the complexity of the case.

Q.    Okay.                                                    11:00:24

A.    He uses his discretion to do that if it runs over.

Q.    Sorry to interrupt you. Okay.

So they have the hearing, each side is making their presentation. What then?            11:00:33

A.    At the conclusion of the hearing, the parties are excused, it goes to into closed executive session, the committee members will deliberate and reach a decision.

There is 60 days after the hearing for    11:00:47 the committee members to write their report, and it's -- copies are provided to the parties.

Q.    Generally speaking, who actually prepares the report? Is that one of the physicians on the COP hearing panel, or is it      11:01:03 staff for the AAOS?

A.    There's one member of the hearing panel is designated as the chair, and he drafts it.

Q.    Okay.

43

A.    And it's reviewed by all the members of the hearing panel, and they each have input on all the -- the various components if there's something they want changed or something they want added then.                                                              11:01:26

Q.    And my understanding from the testimony in this case is that most of the communications that occur between the members on these -- on the COP hearing panel, on the judiciary committee occur by e-mail, they just copy everybody on          11:01:42 e-mails.  Is that your experience?

A.    That's correct.

Q.    Okay.  Sorry to interrupt.  Back to you.

A.    At that point, parties are notified.          11:01:50 If the COP has found violations, then the grievant has the opportunity to note an appeal to the judiciary committee.  If there are no violations, the grievant has the opportunity to note a -- force an appeal, and of course there are          11:02:10 costs associated with that.

If there is no appeal, then it goes directly to the board of directors.  Nobody gets to appear if there is no appeal before the

44

judiciary committee, but assuming there is an

appeal before the board -- I'm sorry, before the

judiciary committee, each party is given an

opportunity to submit written statements, but

there's no new material that's allowed before the    11:02:35

judiciary committee.

          You get an opportunity to make -- give

written comments to the judiciary committee.  You

can question the other side, I think.  I'm trying

to remember.  There are so many different sets of    11:02:51

grievance procedures at this point.  I think I've

got four sets in my, so I apologize.  I'd have to

go back every time and look.

          I believe in this set, it does not

expressly say that the judiciary committee gets to    11:03:06

ask questions, but as a matter of practice, they

have.  Sometimes they will have questions that are

unresolved from reading the materials, and they'll

ask.

          At the conclusion of the hearing, they    11:03:25

will go into closed executive session, they'll

deliberate, reach a conclusion, a report is

prepared and issued to the parties.

     Q.    Same question about who prepares the

45

report at the judiciary committee level. Is it the same thing, the chairman generally takes the lead on that?

A. The chairman is always the same. It's going to be Dick Schmidt. And so the staff, general counsel, Rosaliand Giulietti, and I will take down their vote and their -- their thought processes, and they'll tell us in the deliberations this is why, this is why, this is why. And so we literally just put their comments on paper.

Q. Okay. So the judiciary committee, unlike at the COP hearing panel level, the report and recommendation, at least the initial draft, is prepared by the office of general counsel?

A. Correct.

Q. Okay. And when you talk about taking notes during this process, is that done -- well, the deliberations are not transcribed by a court reporter, correct?

A. No.

Q. Okay. Who is taking the notes of what the judiciary committee members are saying during their deliberations?

A. Oh. The staff present.

Q. Okay. So is it -- but it's not like you have -- do you have one person who is a shorthand person who can take it all down?

A. No.    11:05:05

Q. Okay. So it's just more like general notes you would take if you were in class?

A. Correct.

Q. But if I understand what you're saying, after staff prepares an initial draft of the    11:05:13 judiciary committee's report and recommendation, it's then circulated by e-mail to all the judiciary committee members, and they're free to make any changes that they believe are necessary to ensure that it accurately reflects the basis    11:05:27 for their opinion?

A. Correct.

Q. Okay. Sorry. Back to you.

A. The report and recommendation is then submitted or distributed to the parties. The    11:05:40 report will then go to the -- the board of directors who, of course, has the final decision in all professional compliance matters. The -- it'll go before the board usually at the

47

next board meeting.

The parties will have an opportunity to appear before the board and they're allowed to make comments. There's a representative from the committee on professionalism and the judiciary committee. As a matter of practice, both committees were allowed to make or make short comments.

A change between one set of procedures to the next required the judiciary committee to make the presentation, then the committee on professionalism to submit written statements, and the board will have an opportunity to ask questions if they'd like.

Q. It's your testimony that the board of directors is free to ask questions of the grievant and the respondent at the actual board of directors meeting?

A. If they'd like to.

Q. Okay. Do you believe that that's supported by the Professional Compliance Program Grievance Procedures, or is that similar to the judiciary committee, just how it's been done?

A. That's how it's been done.

48

Q. Okay. Okay.

A. The board will go into closed executive session and deliberate and reach a conclusion, and then, by practice, they usually will get a decision out to the -- the parties within a week, 11:07:52 two weeks.

Q. The member of the judiciary committee and the member of the COP hearing panel that are in attendance during the presentations by the grievant and the respondent at the board of 11:08:08 directors level, are they permitted to stay in the room during deliberations process?

A. Yes.

Q. Are they permitted to participate in the discussions at that time? 11:08:20

A. No, only if they are asked questions.

Q. But are there occasions where they are asked questions?

A. Yes.

Q. Do you know if in the Brandner Sharpe 11:08:28 grievance they were asked questions?

A. Oh, no, I don't.

Q. Would your notes, would staff's notes from those deliberations reflect whether the

49

representative of the judiciary committee or the representative of the COP hearing panel were asked questions during those deliberations?

A. I don't think I took any notes. I know I didn't take any notes. I don't know if anybody 11:08:54 else took notes, but I don't -- I don't know.

Q. In the -- thinking of this from the big picture, you mentioned that each party gets 30 minutes at the COP hearing panel level to make their presentations, correct? 11:09:17

A. Yes.

Q. Okay. And at that time, they're encouraged to use those 30 minutes to present any evidence they have that they believe supports their position, correct? 11:09:28

A. Yes.

Q. And I know at least Dr. Brandner even brought another member of the AAOS with him to testify on his behalf. Is that common? Do you see -- 11:09:40

A. Yes.

Q. -- members bring other witnesses?

A. Yes.

Q. Okay. You didn't mention the time

50

periods permitted for presentations at the

judiciary committee level. It's ten minutes,

correct?

    A.    Yes.

    Q.    Okay. And it's my understanding    11:09:52

pursuant to the rules no new evidence is to be

introduced at the judiciary committee level,

correct?

    A.    Correct.

    Q.    Okay. And then at the board of    11:10:02

directors' hearing level, again it's only a

ten-minute presentation, correct?

    A.    That's correct.

    Q.    And again, pursuant to the Professional

Compliance Program Grievance Procedures, no new    11:10:13

evidence is supposed to be introduced at the board

of directors level, correct?

    A.    That's correct.

    Q.    Okay. So thinking of this, kind of

taking a step back and looking at this whole    11:10:22

process, really the parties' bite at the

evidentiary apple, so to speak, occurs at the COP

hearing panel level, correct?

    A.    That's correct.

Q. I mean, that's just the way the -- the process is designed, correct?

A. That's correct.

Q. I mean, it's similar to a court of law. I mean, if you try to introduce new evidence in front of an Appellate Court, you might have a hard time doing so unless you could show that that evidence was concealed by the opposing party or there was some kind of bad faith on the other side, correct?

A. That's correct.

Q. Have you ever looked at a statistical analysis of the professional compliance actions taken specifically in the area of expert witness testimony with respect to how those actions are divided amongst witnesses testifying on behalf of plaintiffs in medical malpractice cases as opposed to witnesses testifying on behalf of defendants in medical malpractice cases?

A. I have not looked at a -- at an analysis. If you're asking me how many cases have -- we've had involving defense witnesses, I can tell you that we've had some.

Q. Right. But none of them, at least in

52

the context of medical malpractice cases, have ever resulted in a professional compliance action against the expert for the defense, correct?

A.    Wrong.

Q.    Wrong?                                      11:12:10

A.    Wrong.

Q.    Tell me which one.

A.    I'm sorry.  I don't have a number for you, but I can tell you that it did involve a censure.                                         11:12:21

Q.    So it's your testimony that an expert witness who testified on behalf of the defense in a medical malpractice case received a censure as a result of a grievance submitted to the AAOS against him in connection with that testimony?    11:13:19

A.    Yes.

Q.    Do you know approximately what year that occurred?

A.    I'm sorry.  I don't.  It has been since I arrived at the academy, however.            11:13:31

Q.    So that would be sometime after '08?

A.    Correct.

Q.    And you don't know the number off the top of your head?

53

A. I'm sorry. I don't.

Q. If I gave you the number, would it refresh your recollection, or is it one of those things where it would just sound like a number?

A. It really would sound like a number. 11:14:38 At this point, there is 141 of them, you know.

Q. Okay. Other than the one censure, can you think of any other professional compliance action taken against a witness who testified on behalf of the defense in a medical malpractice 11:14:51 case?

A. You know, there are -- that is the only one that comes to mind. No, that's -- that's the only one.

Q. Do you know, as you sit here today, the 11:15:24 number of professional compliance actions taken against witnesses who testified on behalf of the plaintiffs in medical malpractice cases?

A. I'm sorry. Ask me that again.

Q. Do you know, as you sit here today, the 11:15:38 number of instances where professional compliance actions have been taken against experts who testified on behalf of the plaintiffs in medical malpractice cases?

54

A.  I do not know the numbers, no.

Q.  Okay.  Does the number 22 sound about right?

A.  That could very well be the case.

Q.  Have you ever sat in a meeting with the board of directors where anybody voiced any concern that, based on the statistical breakdown of the professional compliance actions that have been taken by the board, that it could be argued that the board is actually using the grievance process to try to punish those members of the AAOS who testify in medical malpractice cases against other members of the AAOS?

A.  No.

Q.  Okay.  So nobody's ever said, you know, based on the numbers we're seeing come out of this program, we're concerned that it looks like we're trying to punish some of our members for trying to testify against other members?

A.  No.

Q.  Have you ever had thoughts along that line?

A.  No.

Q.  And is that because you just don't

think about it or because you think about it, but it just doesn't concern you?

A. That's because I see how many grievances we get in and never make it past prima facie, and I don't think you're taking those into account when you're looking at your 22. A number of those cases are completely dropped, so not every grievance that walks through the door makes it to the board of directors and they automatically find against a plaintiff's doctor.

Q. Right. I know I took Dr. Geline's testimony yesterday, and he said he's been on the judiciary committee since its inception, and he has never seen a single grievance before his committee that was against an expert who testified on behalf of the defense, meaning that they've all been resolved either at the administrative at the preliminary evaluation performed by the office of general counsel, at the prima facie level by the committee on professionalism, or at the COP hearing panel level.

So I understand what you're saying, that many of the grievances don't make it to the COP hearing panel level, but the reality is none

56

have ever made it to the judiciary committee level.

A. So where is your question?

Q. Well, but even despite that fact, your position is that a 22 to, it sounds like, 11:18:44 one score in terms of professional compliance actions doesn't cause you any concern?

A. I'm not concerned.

Q. Okay. And is that because that's what the process was put in place to do? 11:19:03

A. What is what the process was put in place to do?

Q. I'll rephrase.

Is the reason that you're not concerned about this 22 to one ratio because you understand 11:19:19 that the professional compliance program was established to dissuade those AAOS members who had testified against other AAOS members in medical malpractice cases from doing so?

A. That's not my understanding at all. 11:19:43

Q. And do you deny that that's the way it's being used?

A. I deny that that's the way it's being used.

Q.    If you could turn to the document marked for identification as Exhibit 4, do you recognize this document?

A.    I do.

Q.    And what is it?    11:20:13

A.    The standard of professionalism on expert witness testimony.

Q.    And this is the version of the standards that was adopted in April of 2005, correct?    11:20:26

A.    That's correct.

Q.    Okay.  So this is long before you even join today AAOS, correct?

A.    Correct.

Q.    So it's not going to do my a whole lot    11:20:31 of good to ask you questions about how this came into existence because you weren't there.  Fair enough?

A.    That's right.

Q.    Okay.  The standards for orthopaedic    11:20:43 witness testimony have been amended subsequent to April 18 of 2005, correct?

A.    That's right.

Q.    And if you could turn to the document

58

marked for identification as Exhibit 5, do you recognize that document?

A.    I do.

Q.    And what is it?

A.    It is the orthopaedic expert -- expert    11:21:04 opinion and testimony standard of professionalism that was amended in May 12th of 2010.

Q.    Okay.  Now, you were with the AAOS in May of 2010, correct?

A.    That's correct.    11:21:18

Q.    Okay.  Can you tell me how it is that the standards of professionalism for orthopedic expert witness testimony were amended, came to be amended in May of 2010.

A.    Standards of professionalism get    11:21:35 reviewed periodically.  This would not be the only one that has been.  It's a -- as I recall in the spring of 2009, it may have been -- Dr. Goodman and Rosaliand and I met to discuss the standard of professionalism.    11:22:14

Over the course of, I don't know, probably since we came, Rosaliand and I have been -- had kept a kind of a rolling list of issues that had come up while we were

59

administering grievances that needed to be addressed, and Dr. Goodman kind of went over them with us, and we discussed how we could best maybe address those through an amendment to this SOP.

And so together, the three of us worked 11:22:48 on language for the standard of professionalism. We added language where necessary. We -- we, you know, took out some language where it was dated.

We provided our amended language to Rick Peterson, the general counsel. There's a 11:23:14 process that takes kind of a year-long route after that. The other members of the committee on professionalism had the opportunity to review and comment and make suggestions, as did the judiciary committee, and they may have made comments on it. 11:23:36 I don't remember.

The -- the next committee, the next big meeting coming up might have been the NOLC, National Orthopaedic Leadership -- National Orthopaedic Leadership Counsel, or something like 11:23:54 that.

Anyway, it's in the spring of every year. It's in Washington, D.C. The board of counselors and the board of specialty societies,

60

all of their various meetings will be held then, and the professionalism committee would have met and reviewed this as well. Probably over the summer, the ethics committee would have met and reviewed it.                                          11:24:23

I'm trying to think who else. The bylaw -- the board bylaw review committee has oversight of the professional compliance program. They probably would have had an opportunity to review this, and that might have occurred at the     11:24:39 fall meeting. I have no idea where that was, but -- that year, but they would have had an opportunity.

At the summer or fall COP or judiciary committee meetings, they would have had an     11:24:58 opportunity to comment on the revisions that happened at that point and make any other comments or suggestions they wanted to make, and it's a -- it's a pretty long route. I mean, tons of committees would have had an opportunity to input.  11:25:11

It would have ended up with the board of directors in December. They would have an opportunity to have their input if they wanted to make suggestions, revisions, comments. They could

adopt what had been done -- well, I can't say "adopt." They would make a recommendation to accept these amendments.

And then ultimately it would go on the ballot for the whole fellowship to vote on after the annual meeting in the spring of 2010.

Q. And does it pass by a simple majority? Is that all that's required?

A. Yes.

Q. To what extent did the Brandner-Sharpe grievance play a role in the amendment of the orthopaedic -- well, the standards of professionalism for orthopaedic expert witness testimony in May of 2010?

A. It had absolutely nothing to do with it.

Q. Okay. So the fact that -- I guess that would be mandatory standard number 6 was revised to include an applicable legal documents including relevant deposition transcripts had nothing to do with the COP hearing panel's consideration of Dr. Sharpe's grievance against Dr. Brandner wherein he alleged that Dr. Brandner had violated mandatory standard number 6 by failing to review

62

the transcripts of the plaintiff and the

plaintiff's mother's depositions?

A.    No, that, believe it or not, was not

original.  That would have been kind of a common

interpretation of prior, the previous standard of    11:27:05

professionalism, and so the committee felt that it

would -- it required clarification.

Q.    So this was an issue that was coming up

in more grievances than just Sharpe-Brandner?

A.    The -- as I've said, the committee felt  11:27:22

that there -- it required clarification.

Q.    You said this whole process started in

the spring of 2009?

A.    Yes.

Q.    Would you turn to the very back of your  11:27:36

binder.  I think it's last two exhibits.  Yeah,

let's try Exhibit 51.

      Do you recognize the document marked

for identification as Exhibit 51?

A.    I'm sorry.  Give me just a minute,        11:28:04

please.

Q.    Sure.

MR. CHABRAJA:  Are you on the first page?

THE WITNESS:  Oh I'm sorry.  Yeah, that's

what I was trying to figure out, what this was.

Okay.

BY THE WITNESS:

A.    Oh, okay.    This is the fall meeting,

2009.    Okay.                                                    11:28:37

BY MR. MAURICE:

Q.    Do you see the date at the top,

October 18th, 2009?

A.    Uh-huh.    Yes.

Q.    And you see below it, below the date,    11:28:43

you see, "Proposed revised standards of

professionalism on orthopaedic expert opinion

testimony."

Do you see that?

A.    Uh-huh.                                                    11:28:53

Q.    Is that a "yes"?

A.    Yes, I do.

Q.    Okay.    If you turn back to the page

with Bates number AAOS B0039304, I think you would

see some --                                                      11:29:05

A.    004.

Q.    -- red-lined versions of the proposed

revised standards of professionalism on

orthopaedic testimony.    Do you see that?

64

A. Yes.

Q. Okay. In the proposed mandatory standard number 6, as of October 18, 2009, has the language been added to include relevant deposition transcripts and legal documents?

A. No, it is not in this version of it.

Q. Okay. Now let's go to Exhibit 52.

Do you recognize Exhibit 52?

A. Yes, I do.

Q. Okay. What is Exhibit 52?

A. I'm trying to think what this is. This would have been comments that came from all of the various committees.

Q. Regarding the proposed revisions to the standards of professionalism for orthopaedic expert witness testimony?

A. Correct.

Q. Okay. And you see the date up at the top is October -- pardon me.

A. November.

Q. Is November 20, 2009?

A. Correct.

Q. So that's about a month after the document that we looked at in Exhibit 51, correct?

65

A.     Correct.

Q.     Okay.  Now if we go back to the page with the Bates number AAOS B0039296, do you see the comments that are provided by the ethics committee, the judiciary committee, and the committee on professionalism?

11:31:42

A.     I do.

Q.     Okay.  And do you see that the committee -- the comments of the ethics committee have requested that the language and applicable legal documents related to the case be add, correct?

11:31:55

A.     Correct.

Q.     And if you go down to the comments of the judiciary committee, the judiciary committee has -- has asked that the language "and related legal documents to include at a minimum all medical reports and prior depositions" be included.

11:32:06

A.     Okay.

11:32:16

Q.     Correct?

A.     Correct.

Q.     And then if you look at the comments on the committee of professionalism, that committee

has requested that the language be added "and applicable legal documents, including relevant prior depositions," and then it says, well, "before -- that's the last portion of it.

Do you see that that language has been requested?    11:32:36

A.    Yes.

Q.    Okay.  So the language that ultimately finds its way into the amendment in May of 2010 was not present in the October 18, 2009 report of the BOC/BOS professionalism committee, but it does show up in the notes a month later on November 20, 2009, correct?    11:32:49

A.    Yes.  Now, is your assumption that the -- all of these committees met somewhere between October and November?    11:33:11

Q.    No, I don't care about that.

Do you know date on which the COP hearing panel considered the Brandner-Sharpe grievance?    11:33:24

A.    I don't have those dates in my head, no.

Q.    October 2, 2009.

Is it still your testimony that the

Brandner-Sharpe grievance had nothing to do with the revisions to mandatory standard number 6 in May of 2010?

A. Yes. Yes.

MR. MAURICE: Let's take a break. We've got 11:33:46 to change the tape.

THE VIDEOGRAPHER: We are going off the record at the end of Tape 1 at 11:33 a.m.

(WHEREUPON, a recess was had.)

THE VIDEOGRAPHER: We are going back on the 11:41:19 video record at the start of Tape 2 at 11:41 a.m.

BY MR. MAURICE:

Q. Ms. Young, I think you mentioned earlier that you may serve in some capacity in connection with the board of counselors. Am I 11:41:34 right about that?

A. Yes.

Q. All right. What is that role at the board of counselors?

A. Well, I staff some of the board of 11:41:42 counselors' committees.

Q. What is the board of counselors?

A. The board of counselors, essentially there are -- think of it as sort of the -- the

68

Senate or the -- yeah, they have representatives from each state that --

Q. Okay. How -- how many representatives do they have from each state?

A. There's a formula. 11:42:09

Q. Okay.

A. For -- based on the number of orthopaedic surgeons in each state.

Q. So more akin to the House of Representatives? 11:42:19

A. Well, yeah, more akin to the House, yeah.

Q. And what do they do? I mean, it sounds like they counsel somebody. Who do they counsel? 11:42:26

A. No.

Q. What do they do?

A. Well, they -- they -- well, that's a good question. They -- they form the policy for -- for the academy. For the most part, they are half of the leadership of -- of the academy. 11:42:50 The other half would be the board of specialty societies.

Q. Do you know how many members there are on the board of counselors?

69

A.    Oh, goodness.  I don't know offhand.

Q.    Does it number in the hundreds?

A.    Yes.

Q.    When I say "hundreds," I mean, we're talking more than 200?                                    11:43:20

A.    Yes.

Q.    Okay.  Do they actually conduct meetings, or do they just communicate by e-mails?

A.    There are meetings, yes.

Q.    Meetings where all of them or as many    11:43:34 of them as can attend actually show up and make it?

A.    Not just board of counselors, board of counselors and board of specialty societies and the board of directors.                                    11:43:48

Q.    How many times a year does the board of counselors meet?

A.    The academy leadership meets at the NOLC in the spring and at the fall meeting.

Q.    And is the fall meeting here in              11:44:05 Chicago?

A.    No, it's at a different location every year.

Q.    Is it the NOLC that meets here in

70

Chicago, or Rosemont?

A.    No, the NOLC is always in Washington, D.C.

Q.    Okay.  And those are the two times in which per year the board of counselors meets, along with, it sounds like, a whole bunch of other groups?

A.    Correct.

Q.    And you attend those meetings as, well, representative of the office of general counsel?

A.    Correct.

Q.    In your work with the -- what is it called -- board of counselors, did you ever come in contact with Vincent Russo?

A.    No.

Q.    You don't know Vincent Russo?

A.    I do not.

Q.    The AAOS acknowledges that it has a public purpose, correct?

A.    Yes.

Q.    And I was basing that on the statements I see throughout the standards of professionalism that provided as a public interest for orthopaedic

testimony to be "readily available, knowledgeable, and objective. As a member of this profession, an orthopaedic surgeon must recognize the responsibility to provide testimony that is truthful, scientific -- scientifically correct, and in accordance with the merits of the case."

That's kind of the Cliff Notes version of the public purpose that the AAOS espouses, at least with respect to expert witness testimony, correct?

A.    That's correct.

Q.    Talk a little bit about due process.

What does due process mean to you?

A.    It means affording -- affording the parties an opportunity to be heard.

Q.    Do you believe due process is satisfied if both parties are afforded an opportunity to be heard but, throughout the process, the grievance procedures that have been established in connection with the professional compliance program have been ignored or violated?

A.    I don't know that I can answer that.

Q.    All right. I'm not talking specifically with respect to our grievance,

72

despite the fact that my hypothetical may sound a lot like our complaint.

I am -- the idea that -- that you've just espoused that affording the parties an opportunity to be heard means due process, to me, sounds a little light.  To me, there needs to be a little more to satisfy due process.  So that's what I was trying to get -- to get at.

Do you think that the AAOS could ignore its professional compliance grievance procedures and, in some cases, violate the terms of its professional compliance grievance procedures, but as long as the grievant and the respondent had an opportunity to state their case to the COP hearing panel the judiciary committee and the board of directors, that due process would be satisfied?

A.    I don't know that I'm the best person to answer that.

Q.    Who do you think would be the best person to answer that?

A.    Well, I think since we're in the midst of litigation, probably a judge.

Q.    Well, I think the judge -- there's no question the judge is going to ultimately rule on

73

this, but I want to know, as a representative of the office of general counsel who's charged with oversight of the professional compliance program, I want to know how seriously your office and the AAOS take the idea of due process?          11:48:51

A.     Is that the question?  Okay.  The office of the general counsel, as well as the committees involved in this program, made every effort to be fair and equal to both parties in this process.          11:49:04

Q.     And you base that on what?

A.     I base that on the fact that both parties were given the opportunity to present materials.  I base that on the fact that both parties were given the opportunity to present          11:49:31 before the committee on professionalism.  They were given the opportunity to appear before the judiciary committee.  They were given the opportunity to present before the board twice.

Q.     And the fact that two deposition          11:49:49 transcripts and two transcripts from the trial testimony of the patient and the patient's mother were not provided by Dr. Sharpe to the COP hearing panel and the COP hearing panel didn't ask

74

Dr. Sharpe a single question about whether he had those documents in his file, whether his attorney had access to those documents, whether he could produce those to the COP hearing panel so that the COP hearing panel could review them prior to issuing its report and recommendation, that doesn't cause you any concern?

A.    No.

Q.    Okay.  Despite the fact that your one bite at the evidentiary apple is in front of the COP hearing panel?

A.    Dr. Sharpe's burden was to make his case, and I think he did that.

Q.    What about his burden of production? You're talking about burden of proof.  What about his obligation of production?

A.    I'm talking about him producing what he needed to produce to prove his case, and he did that.

Q.    Right.  And it's your position that the professional compliance grievance procedures provide that Dr. Sharpe's burden of production was only to provide those documents necessary to support his grievance report?

75

A.    Yes.

Q.    Okay.

A.    It is not his burden to prove the respondent's case.

Q.    I'm not -- again, we're talking about two different things.  You're talking about burden of proof.  I'm talking about burden of production.                                    11:51:14

A.    That's -- that's what I'm -- that's what I'm saying, yes.

Q.    Let's make sure we're very clear on this.                                    11:51:23

      The AAOS's position is that the burden of production is a one-way street, a party is only obligated to produce those materials necessary to support their allegations?                                    11:51:40

A.    Exactly.

Q.    Let's go back to Exhibit 3.  Let's go to Exhibit 3, and let's turn specifically to the page Bates -- well, the Bates number are a little off.                                    11:52:01

      MR. CHABRAJA:  Hold on one second.

      THE WITNESS:  Hold on, please.  Okay.

BY MR. MAURICE:

Q.    Looks likes Brandner 00751, which is

76

actually Page 6 of the grievance procedures.

A.      Okay.   Hold on.   Okay.

Q.      Okay.   Section 6C of the grievance procedures.

And you agree that the grievance procedures are put in place to ensure that the parties are afforded due process, correct?

A.      That's correct.

Q.      Okay.   So it's not like you can say we're going to follow Section 3B, but we're not going to follow Section 7F, correct?

A.      That's correct.

Q.      Okay.   You can't pick and choose among -- amongst the sections and choose to enforce one section over another section, correct?

A.      No, that would be correct.

Q.      Okay.   So back to Section 6C, it says, "Each party to a grievance is responsible for obtaining and providing all written material, such as transcripts and medical records, for consideration by AAOS.   All correspondence or materials must be sent to the office of general counsel."

Do you see where I read that?

A.     Yes, I do.

Q.     Okay.  Is there anything in there that provides that a party is only responsible for producing those materials that support their position?                                                    11:53:31

A.     No.

Q.     Okay.  Now, I do know that there's a conflict between Section 6C and the actual grievance report.  I think if we go to --

A.     You noticed that?                                              11:53:44

Q.     I did notice that.

A.     Wow.

Q.     I also noticed the typographical errors in the grievance procedures as well.  So it doesn't surprise me that there are conflicts.       11:53:53

Let's go to Exhibit 8.

       Do you recognize the document marked for identification as Exhibit 8?

A.     I do.

Q.     Okay.  What is it?                                            11:54:03

A.     This would be the professional compliance program grievance report.

Q.     Okay.  This is a document that I believe you can download from the AAOS' website

78

and then fill in the information and submit it to the AAOS, correct?

A. Correct.

Q. This is tantamount to -- to a complaint in a civil action. It kicks off the proceedings, correct?

A. Yes.

Q. Okay. And if we go to Section 6, the language which is printed on the AAOS form grievance report provides, "Attach complete copies of any documents that you rely on as evidence, providing specific page references to the portions that support your allegations."

Do you see where I read that?

A. Yes.

Q. Okay. So that's different from what's provided in Rule 6C of the Professional Compliance Grievance Procedures, correct?

A. Correct.

Q. Okay. And the way -- I mean, my understanding of the way this works conceptually is after a party submits a grievance report, after that, upon receipt of that, the AAOS then sends them the professional compliance grievance

procedures, correct?

A. That's correct.

Q. Okay. When --

A. Well, I'm sorry. Let me -- let me stop you for a second.          11:55:25

Q. Okay.

A. Frequently, we will get inquiries, and we will send the grievance report to them with -- together with the procedures -- or, I'm sorry, with the procedures or the bylaws,          11:55:39 depending on --

Q. I know when I deposed Dr. Sharpe, Dr. Sharpe testified that he downloaded the compliance program grievance report off the website, filled it out, and submitted it, and he          11:55:51 testified that he did not download the grievance procedures at the same time?

A. Right.

Q. So I'm presuming he received them at some point in time after that.          11:56:03

A. Okay.

Q. When the AAOS sends out the professional compliance grievance procedures to a party who has submitted a grievance, does the AAOS

80

advise them, hey, you've provided the documents in support of your grievance report, but you need to know that Rule 6C of the professional compliance grievance procedures actually requires that you submit all materials related to this matter?          11:56:28

In other words, do they advise the parties submitting the grievance that there is going to be a greater burden of production down the road if their grievance report makes it past the preliminary evaluation?          11:56:44

A.     Okay.   The academy looks for materials that are referenced in their grievance we look for if it's referenced, for instance, images, we will ask them to provide images and in a format that can be distributed to the parties and to the          11:57:10 committee on professionalism.   If that's not there, we require that.

If there are medical records that are referenced and they're not there, we ask them to provide them.   If there is a deposition that's          11:57:19 referenced and it's not there, we'll ask for it. But beyond that, how in the world would we even know that it existed?

Q.     So I think, if I understand your

81

testimony correctly, at no point does the AAOS advise a party submitting a grievance report that the burden of production described in Paragraph 6 of the grievance report is nowhere near as broad as the obligation of production described in Section 6C of the grievance procedures?

A.     We do not consider that the burden of production is any broader than what you see in number 6, and that is this is your allegation, make it, and support it.

Q.     Okay.  So what you're telling me is that the burden of production is not what is shown in Rule 6C of the grievance procedures, which actually supplement Article 8 of the association's bylaws, but instead what is identified here in italics under Section 6 of the grievance report?

A.     I think you have to read them together.

Q.     Well, I can't read them together because they conflict.  One says produce all material.  The other one says produce -- attach copies of any documents that you rely on as evidence, providing specific page references to the portions that support your allegations.  They are two different things.

82

A.    Well, I don't recall reading in the bylaws or in the grievance procedures where it says produce at a later time all.  I didn't see that either.  So --

Q.    I'm not going to dispute with you that    11:58:52 your grievance report conform -- conflicts with Rule 6C of your grievance procedures.  I agree with you that that's the case.

What I want to confirm is that it's the AAOS's position that it is not Rule 6C of the    11:59:06 professional compliance grievance procedures that actually govern the obligation of production but instead the italics that's provided under Paragraph 6 of the grievance report.

A.    I think that it is -- that it is both.    11:59:22 You have to read them together.

Q.    Can you -- reading Section 6 C of the grievance procedures --

A.    Section 6C and Paragraph 6 together.

Q.    Paragraph 6C of the grievance    11:59:39 procedures says, "Each party to a grievance is responsible for obtaining and providing all written material, such as transcripts and medical records, for consideration by AAOS."  Doesn't say

83

"that supports your allegations," such as what we see in Paragraph 6 of the grievance report, correct?

A. All material that's to be reviewed by the committee on professionalism should be provided by the parties, yes.

Q. Okay. Well, that doesn't -- that's what it says in Rule C6. 6C doesn't say all the materials that are to be reviewed by the committee on professionalism, correct?

A. That's how we interpret it.

Q. You interpret Rule 6C as really what we see in Paragraph 6 of the grievance report?

A. I think you're leaving out the other half of the whole grievance, which is the respondent's burden. That's the other part you're leaving out.

Q. No, I'm not leaving that out.

I'm not disputing that each party to a grievance is responsible for obtaining and providing all written material, such as transcripts and medical records, for consideration by AAOS. I understand that's a mutual obligation bestowed on both parties.

84

A.    Okay.   Good.

Q.    Okay?   That is not true of Section 6 of the grievance report, correct?

A.    In Section 6, we're merely talking about the grievant's obligations.                    12:00:59

Q.    Correct.   Correct.   The grievant can satisfy his obligation as set forth in Section 6 of the grievant's report by only attaching copies of any documents that he relies on, he or she relies upon, as evidence providing specific page    12:01:16 references to portions that support the allegations, correct?

A.    Correct.

Q.    That doesn't mean that the grievant can satisfy the production obligation of Section 6C of    12:01:26 the grievance procedures by providing such documents, correct?

A.    I think you have to read the two together.

Q.    Okay.   Section 6C of the grievance    12:01:36 procedures, would you agree, provides for a much broader obligation of production?

A.    I think that if the grievance procedures can supplement the bylaws, the report

85

can supplement the grievance procedures.

Q.   Okay.  So it's your position that the form that is on the AAOS website of the grievance report supplements the grievance procedures, which supplements the bylaws?  That's your position?    12:02:08

A.   That's how it's been used, yes.

Q.   Okay.  That's the way the AAOS has applied it?

A.   Correct.

Q.   Okay.  I'm going to ask you to step out   12:02:18 of your AAOS shoes and think back to your civil litigation experience.  Let's just use FRCP 26 as an example.

You're familiar with FRCP 26, correct?

A.   Refresh my memory so we're both on the   12:02:37 same page.

Q.   It's -- it's simply the provision in the Federal Rules of Civil Procedure that governs the production documents from the outset of the litigation.  Do you recall that?    12:02:51

A.   Yes.

Q.   Okay.  Now, do you recall that under FRCP 56, a party has an obligation to produce all documents relevant to a cause -- to a case

86

regardless of whether they support their allegations, refute their allegations, help them, or hurt them. Do you remember that?

A. Yes.

Q. Okay. You can't hide the ball. Do you 12:03:11 remember that?

A. Yes.

Q. Okay. You're under an obligation to produce those documents that support your allegations and those documents that might refute 12:03:22 your allegations, correct?

A. Correct.

Q. And, again, I am talking about FRCP 56. I'm not talking about your grievance procedures.

A. Well, then we agree, yes. 12:03:34

Q. Do you recall the rationale behind that rule?

A. For federal purposes, federal court purposes yes.

Q. Okay. I mean, I take it when you 12:03:47 practiced at the state level, most states have a very similar provision in their states rules of civil procedure, correct?

A. Yes.

Q.    Okay.  But do you recall the rationale behind that rule?

A.    Yes.  Essentially, you're doing away with the old ambush rule.

Q.    You got it.  The whole idea is that idea that one litigator could sucker-punch another litigator or another party by hiding the documents that undermine his legal position, you know, essentially speaking out of both sides of his mouth and presenting only one side of the story.

That was done away with by the -- in the Federal Rules of Civil Procedure and said no, no more of that.  It may be an adversarial procedure, but you guys have to at least put all of the documents before the other party so that they have in access to rely upon those that help them and address those that hurt them, correct?

A.    That is under the Federal Rules of Civil Procedure, yes.

Q.    Now, back to the AAOS, Rule 6C of the Professional Compliance Grievance Procedures follows that same logic where it says, "Each party to a grievance is responsible for obtaining and providing all written material, such as

88

transcripts and medical records, for consideration by the AAOS," correct?

A.   No.   Are you telling me that that is what the intended purpose was?   Is that what you're asking me?

Q.   I think anybody who reads that is going to include that that was the intended purpose.

A.   I don't know that that's the case at all.

Q.   Okay.   You do not believe that a sentence that says, "Each party to a grievance is responsible for obtaining and providing all written material, such as transcripts and medical records, for consideration by the AAOS" --

A.   Conceivably, that could include every single transcript in a malpractice case.   My office is not that big.

Q.   Okay.   There's nothing in Rule 6C that says the party is only to produce those documents that support their case, correct?

A.   There is nothing in there that says that.

Q.   Okay.   In fact, it says the complete opposite, saying that all written materials, such

89

as transcripts and medical records, are to be produced for consideration by the AAOS, correct?

A.   That's what it says.

Q.   Okay.  Now, as an attorney, you don't look at that and say, "I understand the purpose behind this rule, similar to the way the Federal Rules of Civil Procedure are drafted, similar to the way almost every state's local rules of civil procedure are drafted, that this is designed to do away with the hide the ball, the ambush"?          12:06:16

A.   This is not a federal court.  It's not intended to be a federal court procedure.

Q.   Due process isn't a concern?

A.   I didn't say that.

Q.   All right.          12:06:26

A.   I said this is not a federal court procedure.

Q.   Okay.  So despite the fact that the idea of requiring parties to produce all materials they have related to a matter, despite the fact          12:06:38 that that is a rule grounded in due process, the AAOS takes the position that in reading Rule 6C that, in fact, it's not -- a party's not obligated to provide all written material, such as

transcripts and medical records, for consideration by the AAOS, it's really a far lesser burden which is just what's set forth in Section 6 of the grievance report?

A.   What I can tell you is that there is 12:07:08 500 years of federal court history and there is five years of history for this program.  So there's no way this program can be as complex as I'm sure you would like for it to be, and I can tell you that is -- I can't tell you that that was 12:07:17 the thought process that went into the word "all."

Q.   Let's talk about that.  The grievance -- that's a good point.

The professional compliance grievance program is in its infancy, correct? 12:07:29

A.   It's five, six years old.

Q.   Right.  I mean, it's a work in progress.  Would you agree with that?

A.   There have been revisions to the standards of professionalism. 12:07:39

Q.   Right.  I mean, an initial draft was put in place of this thing and enacted in 2005 and then, I think as you indicated, the office of general counsel has been taking notes ever since

then to try to figure out ways to improve the system, correct?

A.    Correct.

Q.    Okay.  And so amendments have been made to the mandatory standards, correct?    12:07:58

A.    That's true.

Q.    And amendments have been made to the grievance procedures as well, correct?

A.    That's true.

Q.    Okay.  So does it surprise you that    12:08:06 issues like this, interpretations of the rules differing amongst attorneys, does it surprise you that those are popping up, you know, on a regular basis?

A.    Not at all.    12:08:22

Q.    Okay.  It's to be expected with a program this young, correct?

A.    Yes.

Q.    Maybe 200 years from now, the program will evolve to the -- to the point where all of    12:08:31 these little issues will be taken care of, correct?  Is that at least the hope?

A.    I don't plan to live that long.

Q.    Okay.  But I'm saying the idea is that

92

the program is a work in progress, it is hoping -- hoping it's getting better with every amendment, correct?

A.    That is, yes, the -- the hope, yes.

Q.    All right.  Does it bother you as an    12:08:56 attorney that the rules set forth in Section 6C of the grievance procedures differs from the language provided in the actual grievance report?

A.    All right.  I got -- I'm sorry, I got get back to 6C, because we're -- we're going    12:09:12 around.  Which tab are we?

Q.    We're -- 6C, and the grievance procedures is in Exhibit 3?

A.    Okay.  Thank you.

MR. CHABRAJA:  Page 6.    12:09:26

THE WITNESS:  Okay.  Thank you.  All right.

BY MR. MAURICE:

Q.    I'm just asking you conceptually, as an attorney, does it bother you that the language of the rule in Section 6C of the grievance procedures    12:09:35 differs from what is provided in the grievance report?

A.    I would perhaps have written it differently.

93

Q. Might this be something that -- in the future, either the grievance report or the professional compliance grievance procedures, might Rule 6C be something that makes it onto your notes to be something addressed by the AAOS in the future? 12:10:07

A. I'm sure that all of the various parts of the procedures and the report will be reviewed or -- at least once a year.

Q. What about the language of the grievance report? Is that something else that gets reviewed once a year? 12:10:20

A. Yes.

Q. And the AAOS does recognize that a person who is the subject of a grievance, in other words the respondent, has a right to due process, correct? 12:10:34

A. Absolutely.

Q. Back when you were practicing as a civil litigator, did you ever have a situation where you hired expert witnesses? 12:10:54

A. Yes.

Q. Okay. Would you agree that an expert witness' value is dependent upon their

94

professional reputation?

A.    Yes.

Q.    So you don't dispute that Dr. Brandner's value as an expert witness is dependent upon his disciplinary databank record being clean; do you?    12:11:16

A.    Not exclusively, no.

Q.    What do you mean not exclusively?

A.    I think there are a number of factors that weigh in on an expert witness' reputation.    12:11:31

Q.    But as a civil litigator, if you had a choice of hiring two experts and one had just been suspended from the preeminent professional organization which governs his practice and the other one was still a member in good standing, which one would you go with?    12:11:49

A.    Depends on the case.

Q.    You're telling me there's a circumstance under which you would take the expert who has been suspended over the expert that has not?    12:12:01

A.    There, as I said, are a number of factors.

Q.    Come on.

95

A.    Which --

Q.    Imagine that deposition.  Imagine that expert deposition when the plaintiff's attorney starts digging into the fact that, hey, you have been suspended by the American Association of    12:12:20 Orthopaedic Surgeons and the American Academy of Orthopaedic Surgeons.

You don't think that would be a problem for you as a civil litigator?

A.    You know what?  As I think has -- I    12:12:29 can't say this with all certainty, but it's not admissible everywhere.

Q.    What is not admissible everywhere?

A.    The fact that a surgeon has been -- had some type of disciplinary action by a voluntary    12:12:48 association.  It's not admissible everywhere.

Q.    Dr. Brandner practices in Nevada, California, Arizona, and Louisiana.

Is it your position that suspension from the AAOS would not be admissible in those    12:13:04 states?

A.    I don't -- as I said, I don't know, but I'm simply suggesting that it is not admissible everywhere.

Q.    Okay.    Well, let's operate under the presumption that it is admissible in Dr. Brandner's states of practice, and I'm going to give you one more chance on this one.

Is it your testimony that you as a    12:13:27 civil litigator in a state where that information would be admissible would still consider hiring as an expert witness a physician who was suspended from the preeminent professional organization that governs that area of practice?    12:13:43

MR. CHABRAJA:    Just object.    It's been asked and answered already.

You can answer it again.

MR. MAURICE:    I'm giving you one more chance.

BY THE WITNESS:    12:13:52

A.    It would depend on what the issue was.

BY MR. MAURICE:

Q.    So you might?

A.    It would depend on the type of case.

Q.    So I'm taking that to mean that there's    12:13:58 a possibility that you would?

A.    There's -- there's a chance.

Q.    You've read the judge's order granting the preliminary injunction in this case, correct?

97

A.    Yes.

Q.    Okay.  You understand the judge took a far different position on that point?

A.    It's been a while since I read it, but yes.                                                    12:14:23

Q.    I mean, you recall the judge saying there's -- you know, it makes perfect sense that a person who is an expert witness cannot be suspended from the professional organization that governs his conduct, correct?                               12:14:32

A.    I read it, yes.

Q.    So you disagree with the judge on that point?

A.    He may have to do a different type of work, but yeah, he could -- you know, it could happen.                                                                  12:14:44

Q.    When you say he may have to do a different type of work, what are you -- what are you talking about?

A.    Well, he can do other things.                        12:14:50

Q.    Like what, gardening?  What do you mean?

A.    He could do other kinds of work.

Q.    Well, what other kind of work?

98

A.   There are -- there are other types.

Q.   Well, what?

A.   Well, other kinds.

Q.   But give me some ideas of what kind of work he could do.                                    12:15:12

A.   Well, I'm not here to help your client, so --

Q.   Oh, that's very clear.

A.   I mean help him, you know, select his other suggestions or job types or anything.   I      12:15:23 mean, if he needs that type of assistance, there are programs for that at the academy.   It's not my -- it's not in my department.

Q.   He's a board certified orthopaedic surgeon who is surgically disabled.  He physically   12:15:36 cannot perform surgery.   You understand that, correct?

A.   I do.

Q.   Okay.

A.   And there are options.                                    12:15:42

Q.   And you understand that his income, his ability to participate in the medical practice that he's been at for, I think, coming up on 30 years is deponent upon his ability to generate

99

revenue for his services. You understand that;
don't you?

    A.    Yes.

    Q.    Okay. And you understand that
72 percent of Dr. Brandner's revenue on an annual   12:16:01
basis is derived from providing what he describes
as medical legal support, expert medical services,
correct?

    A.    That's what we've been told, yes.

    Q.    Right. And, I mean, have you seen   12:16:13
anything that causes you to doubt those numbers?

    A.    I haven't seen anything.

    Q.    Okay. Well, you might ask Mr. Chabraja
to perform -- to provide you with the financial
information, because it documents that, that   12:16:24
percentage.

        Can you think of anything else
Dr. Brandner could do to replace the income that
he would lose if the AAOS were able to do what
it's attempting to do?   12:16:39

    A.    I guess I'm going to have to take
exception to the assumption that this is some kind
of a death knell, that it -- I don't -- I can't
conclude that it is. I'm going to have to take

100

exception to that.

Q.   Okay.  Well, let's accept the judge's view that it is, and say you've said he can do other things.

Give me two examples of other things he could do.                                          12:17:09

A.   As I said, it's not my area, but there -- there are other programs that help with that.

Q.   What kind of programs?                                12:17:22

A.   Our practice management program.

Q.   What kind of things does your practice management program do?

A.   They assist orthopaedic surgeons with these types of issues.                                      12:17:35

Q.   When you say these types of issues, do you mean a physical disability or suspension from the AAOS?

A.   Career transition type issues, I guess is the best way to describe it.                              12:17:49

Q.   And do you have to be a member of the AAOS to avail yourself of the services available at the practice management program?

A.   Yes, and Dr. Brandner is still a member

of the academy.

Q.   Yeah, but I mean, he's suspended if the AAOS got its way?

A.   Well, this would be a good time to take advantage of it.

Q.   So during that year that he's suspended, he would have no ability to avail himself of the practice management program, correct?

A.   That's correct.

Q.   Okay.   But after that year, he can go right on in there, assuming he applies for reinstatement and pays his dues, and then at that point they would help him try to figure out what he is going to do now that he -- presumably, his ability to testify as an expert has been weakened or damaged?

A.   Correct.

Q.   You don't dispute that the amended standards of professionalism have no application to the Brandner-Sharpe grievance, correct?

A.   The amended standards of professionalism, no.

Q.   Right.   You agree with my statement

that they have no application?

A.    The 2010?

Q.    Correct.

A.    No.

Q.    Right.  Well, I mean, that's going to    12:19:23
look horrible on a transcript.

Do you agree with my statement that the amended standards of professionalism are irrelevant for the purposes of the Brandner-Sharpe grievance?    12:19:36

A.    That's correct.

Q.    Okay.  Section 4J of the Professional Compliance Grievance Procedures, which is Exhibit 3, provides that, "The AAOS professional compliance program is an ethics compliance program    12:20:06 that was not designed and is not intended to be a peer-review program.  Thus it does not fall under the protections of the Federal Health Care Quality Improvement Act."

Do you see where I read that?    12:20:23

A.    Yes.

Q.    Give me an explanation for why it's important that the professional compliance program be viewed as an ethics compliance program and not

103

a peer-review program, or at least your understanding.

A. There are specific federal statutes that apply to peer-reviewed programs, such as the programs that are found within hospitals. This program would not qualify. We wouldn't meet the federal statutory requirements.

Q. Have you ever -- well, let me ask it this way.

Do you have an understanding of the personal liability of a person who participates in an ethics compliance program versus a peer-reviewed program? Have you ever looked at that?

A. No.

Q. Turning back to Exhibit 5K, which are the orthopaedic expert and opinion -- pardon me.

Turning back to Exhibit 5, which are the standards of professionalism for orthopaedic expert opinion testimony adopted April 18, 2005, is there any mandatory standard that requires a member who is testifying as an expert to review legal documents or depositions before rendering an opinion?

104

A.    I'm sorry.  We're looking at the 2005 version?

Q.    Correct.  The version that arguably would govern the Brandner-Sharpe grievance.

A.    Okay.  No.  Under the specific reading 12:22:27 of the -- the standard of professionalism, it does not say legal documents.  I can tell you that from having worked with the committee on professionalism that they would look at each case individually and they would consider the issues 12:22:50 involved in the case to determine what type of materials an expert witness would have to review in order to arrive at a well-supported opinion.

I can't tell you or -- I can't speak for the committee or the doctors, but I can tell 12:23:10 you in my opinion in an informed consent type of case, testimony of the patient or in the -- in the situation of a minor parent's and the treating physician probably should be reviewed.

Q.    I guess I should ask it in a more 12:23:35 roundabout way.

Clearly, there's no specific language in the mandatory standards for orthopaedic expert opinion testimony that were adopted in April of

105

2005 that require the review of legal documents or prior depositions, correct? We agree on that point?

A. Correct.

Q. Okay. But if I understand your testimony correctly, what you're saying is that doesn't mean that there haven't been situations where the COP hearing panel has not considered that issue in connection with the grievance?

A. It's a case-by-case situation.

Q. Okay. In the Brandner case, do you know how that was handled?

A. I don't remember the deliberations specifically, no.

Q. As an attorney for the AAOS, does it trouble you that, despite the fact that the standards of professionalism for orthopaedic expert witness testimony that were in effect at the time of -- well, I guess from April 18th, 2005 through May 12, 2010, despite the fact that those do not require specifically a review of legal documents and deposition testimony, that the board may nonetheless be factoring that in to their determination on a grievance?

106

A. Does that bother me that they may be factoring in to their determination on the Brandner -- in this particular situation?

Q. In any situation?

A. In this particular situation, Dr. Brandner did review the transcripts.

Q. That's right. I'm not disputing that. I'm saying does it bother you that you have a COP hearing panel that is treating --

specifically, it's mandatory standard number 6.

You have a COP hearing panel that is treating mandatory standard number 6 as including legal documents and deposition transcripts despite the fact that mandatory standard number 6 doesn't say legal documents or deposition transcripts?

A. Well, I think that they are requiring and the standard requires a doctor to reach a fully supported opinion. That's what an expert witness is supposed to do.

So, I mean, however you arrive at that is -- well, I guess, you're a professional, you're supposed to know. I mean, there are lots of things that are probably not included on this. For instance, it might be relevant to review a

police report. I mean, I'm not a doctor, so I'm assuming they would know what would be relevant.

Q. But, I mean, Rule 6 doesn't require -- let's use the police report as an example.

If a physician submitted a grievance against another physician saying this physician violated mandatory standard number 6 because that physician testified in the case without reviewing this police report.

And, of course, what's the response of the physician going to be? "Mandatory standard number 6 doesn't require that I review a police report. It requires that I review all pertinent medical records."

Would it bother you if the COP hearing panel took a position similar to what you just said, which is, well, as a professional you're supposed to review everything, so we are going to find that this physician violated mandatory standard number 6 for not reviewing that police report?

A. I think it's going to depend on the case. If it's something that is so obvious that it should have been reviewed, that it is kind of

108

glaring and it's staring at you in the face, I don't know what to say. I mean, that's --

Q. Do you agree that due process requires first that a party know the rules which governs his or her conduct?

A. Yes.

Q. Okay. Or at least have an ability to know? In other words, the party needs to have at least been able to go to a document to determine what rules would govern their conduct or do govern their conduct. Fair enough?

A. Yes.

Q. Okay. And would you agree that once an alleged violation has occurred, that party has a right to know not only which of the rules they are alleged to have violated but also the factual basis for the alleged violation?

A. Yes.

Q. And don't you agree that that's because the only way for the person to be able to defend themselves against the allegation is to be able to understand specifically which rules they allege to have violated and the factual basis for the alleged violation?

109

A.    Yes.    Having said that, I think the materials which notify the parties that all of our grievance -- grievances do also notify them that the committee on professionalism considers or will consider all of the material before it in making its determination.    12:29:39

Q.    Right.    But you're not taking the position that that means that the AAOS can, after reviewing the information, essentially rewrite the grievance and find the respondent to have violated a mandatory standard that either wasn't identified by the grievant at the beginning or for a reason not asserted by the grievant?    12:29:55

A.    I'm not suggesting that, no.    What I am saying is that all of the material that the committee reviews -- reviews can be seen or used for support for the allegations raised by the grievant.    12:30:14

Q.    Now, you remember back when you were practicing as a litigator, you know, you kick off a lawsuit by filing a complaint, correct?    12:30:27

A.    That's right.

Q.    Okay.    And a complaint, it's a short, plain statement by rule, but it needs to set forth

110

factual allegations which, if proven true, would support the legal claims asserted in the complaint, correct?

A.    Correct.

Q.    Okay.  Because that's what puts the     12:30:53
other side on notice of the allegations of wrongdoing that have been made against them, correct?

A.    Correct.

Q.    Okay.  And then if evidence is     12:31:00
uncovered during the course of discovery that causes the plaintiff in the civil litigation to believe that the evidence supports different -- a different set of allegations, the litigant is retired to go to court to actually amend their     12:31:22
complaint to assert the new causes of action based on the new evidence, correct?

A.    That's how it works in civil discovery, yes.

Q.    Right.  And the idea again, though, is     12:31:33
that by the time you show up to trial, the defendant in the case is supposed to know the evidence that is going to be introduced against him in terms of the actual allegations and the

legal claims that are been being asserted against him, correct?

A.     That's how it works in a civil process, yes.

Q.     Okay.  Is it your position that the          12:31:58
AAOS, the professional compliance program, is somehow different in terms of the respondent's right to know the allegations being made against him in terms of the specific mandatory standards alleged to have been violated and the factual       12:32:14
basis for the same?

A.     No.

Q.     Okay.  If you could turn to Exhibit 8, please.  I think you've already looked at it before.  And this is the professional compliance    12:33:01
program grievance report submitted by Dr. Sharpe, correct?

A.     Yes.

Q.     Okay.  And you see Dr. Sharpe attaches to the end of the grievance report a two-page      12:33:17
letter to essentially provide the detail in supports of the grievance report.  Do you see that?

A.     Yes.

112

Q. Okay. Is that common? Is that normally the way it's done?

A. Yes.

Q. Because I don't see any big, gaping spaces in the actual grievance report form where they're supposed to fill this out. So I was presuming this is the normal way it's done?

A. That's correct.

Q. Okay. In this opening paragraph, it ends with a personal attack on Dr. Brandner. It says, "I was able to find Dr. Brandner listed online as a witness for hire, and according to this website he has been deposed or testified 50 times in the past four years. This, in my opinion, is exactly the type of character that deserves scrutiny by our academy."

Do you see that?

A. Yes.

Q. I take it you have read a lot of grievance reports in your day?

A. I have.

Q. Is it common to see these kind of personal attacks?

A. It is not common.

Q. Do you agree that back in October of 2008 when Dr. Sharpe submitted his grievance report, that he was obligated to follow HIPAA guidelines for de-identifying patient information?

A. At that time, it probably was not the academy's requirement that matters that have been involved in liability lawsuits be de-identified.

Q. Let's go back to Exhibit 3, specifically Section VII A1 provides, "All grievances must be in the format required by the AAOS, contain specific allegations against a fellow or member, and follow HIPAA guidelines for de-identifying patient information unless otherwise exempted."

Is it -- is it your understanding that the materials that related to a lawsuit were exempted from HIPAA guidelines?

A. That's right.

Q. Okay. So that's where that understanding comes from?

A. Yes.

Q. Okay. You do acknowledge that the initial -- well, that the grievance report submitted by Dr. Sharpe in this case did not

114

de-identify patient identifying information, correct?

A.    That is correct, yes.

Q.    If you could turn to the next page of Exhibit 4, Section VII B2 provides, "Within 60 days of receipt of the grievance, the office of general counsel will conduct a preliminary administrative evaluation of the grievance.  Any grievance that does not conform to the required format will be returned to the grievant."

Do you see that?

A.    Yes.

Q.    Give me an idea of what's involved in this preliminary administrative evaluation.

A.    It -- many times, we'll get a grievance that is submitted in a pdf format and we have to have an original that's signed.  Sometimes we'll get a faxed copy, and, again, we have to have the original.

Sometimes we will get -- as I told you before, we'll get materials that are referenced, but we don't get the actual either image or we don't get the medical record or we don't get the deposition transcript, and we'll have to have all

115

those materials in.

We'll get -- we'll have to get the images, x-rays, or CT scans, or whatever, and they will have to be in a format that can be shared with the other party and with the doctors, and frequently that takes some time.          12:38:23

Q.    What is it that constitutes an end of the preliminary administrative evaluation?

A.    Once we have all of those materials back from -- from the grievant.          12:38:42

Q.    Now, is that supposed to occur pursuant to Rule VII B2, all within 60 days?

A.    No.  The time period more or less gets told while we're waiting for the grievant to comply with our request to submit materials.  The 60 days more or less gives us the time to get copying done for submission to the committee on professionalism and that kind of thing.          12:39:06

Q.    So is the office of general counsel supposed to basically within 60 days of receipt of the grievance have reviewed it to determine if additional information is required and request that from the grievant?          12:39:24

A.    Yes.

Q.    Okay.  Now, in this case, Exhibit 8 shows that the grievance was received on October 21, 2008.  If you look at Exhibit 9, we see a letter from Ms. Giulietti to Dr. Sharpe requesting additional materials.  Do you see that?    12:40:23

A.    Correct.

Q.    Okay.  Is there a reason why this letter, which is dated December 30, 2008, falls outside that 60-day timeframe?

A.    I don't know.    12:40:37

Q.    Do you know when it was that the office of general counsel actually determined that Dr. Sharpe's grievance materials had passed the preliminary evaluation?

A.    No, off the top of my head, I do not.    12:41:04

Q.    With regard to Exhibit 9, one of the questions I had asked Dr. Sharpe was -- well, I guess I should phrase it this way.

Nothing in Exhibit 9 advises Dr. Sharpe as the grievant that he has an obligation to    12:41:41 produce all materials related to the matter in accordance with Section 6C of the grievance procedures, correct?

A.    That's not in this letter, no.

Q. Right. I mean, this letter says we're in the middle of this administrative review, there's a few things we're missing. Please send us these three types of documents, correct?

A. That's what it says, yes.      12:42:12

Q. And you can't think of any other letter that was ever sent to Dr. Sharpe advising him that he had satisfied his production obligation as identified in Paragraph 6 of the grievance report, but now that his grievance has been accepted, that    12:42:32 he had a greater obligation such as that identified in Section 6C of the grievance procedures?

MR. CHABRAJA: Just a question. Is there a writing to that effect?      12:42:45

MR. MAURICE: Correct.

BY MR. MAURICE:

Q. Is there any kind of letter that is sent advising Dr. Sharpe that although he has satisfied his obligation as identified under    12:42:54 Paragraph 6 of the grievance report, that now that his grievance has been accepted, he has a greater burden of production, that identified in Section 6C of the grievance procedures?

118

A.     The academy would never tell a grievant when he has satisfied his burden of producing something.  They are -- it's up to them to decide what they want to produce to meet whatever their obligation is or to prove their allegations.          12:43:28

I mean, if there's something obviously missing, you know, you've referenced this, but you didn't provide it, get this in, otherwise your grievance isn't going anywhere, we'll tell them that.  But other that than that, if there is          12:43:43 something that they want the academy to see, it's up to them to produce -- to produce it.

Q.     Okay.  Fair enough.  Then let me phrase it another way.

At any point, does the AAOS send          12:43:54 Dr. Sharpe a letter saying pursuant to Section 6C of our grievance procedures, you have an obligation to produce all materials related to the underlying allegation?

A.     No.          12:44:17

Q.     Now, you agree that nothing in the professional compliance grievance procedures, specifically Section VII B, provides that the grievant is permitted to submit a response to the

response provided by the respondent?

A.    Try that one again, please.

Q.    All right.  No problem.  I'm work it out.

A.    I'm sorry.                                    12:44:42

Q.    Okay.  According to the grievance procedures, the way this process works is after the office of general counsel has determined that the grievance report has passed preliminary administrative evaluation, then it is forwarded on   12:44:55 to the respondent, and the Respondent is given a time period to submitted a written response, correct?

A.    Correct.

Q.    Okay.  And this whole process is         12:45:06 governed by Section VII B of the grievance procedures?

A.    Right.

Q.    Okay.  What I want to make sure is you agree with me that nothing in Section VII B   12:45:18 provides that the grievant, after receiving a copy of the respondent's response, has the ability to submit further documentation, essentially a reply?

A.    That's correct.

120

Q.    And you acknowledge that Dr. Sharpe did so in this instance, correct?

A.    He did.

Q.    Have you ever read that response?  It's Exhibit 11 in your binder.                           12:45:53

A.    I read it at some point.  I haven't read it recently.

Q.    Okay.  Do you recognize the document marked for identification as Exhibit 11 as Dr. Sharpe's response?                           12:46:04

A.    I do.

Q.    Is there a reason why Dr. Sharpe's response to Dr. Brandner's response was not returned to Dr. Sharpe?

A.    That's not typically the procedure.       12:47:10 Assuming -- how can I rephrase that?  If -- if the committee on professional -- professionalism finds prima facie the parties are allowed to submit additional materials, if that had been the case, as it was the case, those additional materials are  12:47:34 compiled and provided to the parties prior to the -- the hearing, and that's what was done.

Q.    But in this case, Dr. Sharpe submitted his response before there had been a prima facie

determination, correct?

A. And it was not provided to the committee on professionalism.

Q. Right. But I need you to answer my question first.

12:47:59

Dr. Sharpe submitted his response before the COP had ruled on the or voted on the prima facie determination, correct?

A. He did.

Q. Okay.

12:48:14

A. It had no weight in their determination, however.

Q. Again, not what I'm going for.

The question is -- I understand what you're saying, that parties submit materials in connection with grievances throughout the process, correct, once there's been a prima facie determination?

12:48:21

A. Correct.

Q. Okay. In this instance, Dr. Sharpe submits a response to Dr. Brandner's response before there's even been a prima facie determination, correct?

12:48:30

A. He did, yes.

122

Q.    Okay.  And I understand.  It was not forwarded by the office of general counsel to the committee on professionalism for consideration in the prima facie determination, correct?

A.    Correct.                                    12:48:54

Q.    Okay.  But the question I have is why, upon receipt of this non-conforming document, didn't the office of general counsel send it back to Dr. Sharpe and say, "You have no right to submit this at this time," you know, "so we're    12:49:09 sending it back to you"?

MR. CHABRAJA:   Let me just object to the characterization of the document.

You can go ahead and answer though.

BY THE WITNESS:                                  12:49:20

A.    Parties submit materials all the time that -- that are held and simply distributed to the other party.  The academy, in an attempt to be transparent and equal, will simply distribute it to the other party.  You can respond to it or    12:49:41 choose not to respond to it.

BY MR. MAURICE:

Q.    So why -- and I understand that answer.

Why does the office of general counsel

123

hold Dr. Sharpe's response for five months before submitting it to Dr. Brandner?

A.    It went out with the very next distribution of materials.

Q.    Yeah, but it went out after Dr. Brandner's -- it went out after the deadline to provide materials in preparation for the COP hearing panel.

A.    Dr. Brandner did have an opportunity to make a presentation before the committee, and he also had an opportunity to submit something at the committee on professionalism.

Q.    Right.  But I'm talking about in writing.

After the deadline to submit materials in writing in preparation for the COP hearing panel, that's when the office of general counsel mails out Dr. Sharpe's response to Dr. Brandner's response.

So Dr. Brandner did not have an opportunity to address Dr. Sharpe's comments in his response in preparation for the COP hearing panel.  The question is why?

A.    I don't know why.

Q. Is it normal for the office of general counsel to hold a submission from one party to a grievance for a number of months before sending it to the other party?

A. I don't know how to answer that. I mean, yes, we hold submissions until the next time we do distribution of materials. That's procedure.

Q. What are the -- when do you -- you refer to these distribution of materials. When does that occur?

A. It occurs prior to the -- the hearing.

Q. But after the deadline for the parties to submit materials?

A. You know, I'm not sure.

Q. Okay. Have you ever dealt with the American Arbitration Association?

A. I have not had that pleasure.

Q. Oh, every time you send them a letter, they immediately photocopy it and send it to every party -- every other party in the case and charge you for the privilege of doing so, but it makes it so you have a lot of correspondence going back and forth throughout the process, all going through

125

the triple A.

That's one way to handle documents that are being received, to immediately photocopy them and send them to all the parties.

If I understand your testimony, that is not the way the AAOS handles materials received from the parties; rather, the AAOS collects those materials until the next, I guess, event at which there is going to be a hearing and then distributes them kind of in one fell swoop to all the parties. Am I correct about that?

A.    That would be correct.

Q.    Okay. And so that's why even though Dr. Sharpe submits a response to Dr. Brandner's grievance, even before there's been a prima facie determination, the AAOS just holds that document until the next time when they're going to be distributing materials to the other side -- to both parties?

A.    Correct.

Q.    Okay. Do you agree that the grievant has the burden of proof under the grievance procedures?

A.    Yes.

Q.   Okay.   You're aware that Section VII D9 of the grievance procedures provides that after the grievance hearing and prior to issuing its recommendations, the grievance hearing panel may request additional information from the grievant,     12:54:54 respondent, or any third party in any --

A.   Okay.   Hold on a second.   VII D9.   I'm sorry.

Q.   VII D9.   No problem.

A.   Okay.                                               12:55:07

Q.   And this is VII -- VII D is referral to grievance hearing panel, correct?

A.   Right.

Q.   Okay.   VII D9 says after the grievance hearing panel -- pardon me.   "After the grievance     12:55:20 hearing" --

A.   Right.

Q.   -- "and prior to issuing its recommendations, the grievance hearing panel may request additional information from the grievant,     12:55:27 respondent, or any third party.   Any additional information will be made available to each party."

Do you see that?

A.   Yes.

Q.    Okay.   And you are aware that the COP hearing panel on the Sharpe-Brandner grievance did not make such a request, correct?

A.    No, they did not, not that -- no, they did not.                                                    12:55:51

Q.    When it talks about making a request of any third party, in your experience, has the COP hearing panel ever requested documents from a third party?

A.    Not that I'm aware of, no.                   12:56:07

Q.    I mean, the COP hearing -- the AAOS doesn't have the ability to subpoena documents, correct?

A.    No, they do not.

Q.    So any request would just be a --          12:56:25 essentially a -- you know, a request for courtesy from whoever would be producing the documents, correct?

A.    Yes.

Q.    Okay.   But, to your knowledge, you       12:56:34 can't think of any occasion where the COP hearing panel has requested documents from a third party?

A.    That's correct.

Q.    Now, if you look at Exhibit 14, you

128

don't have to spend a lot of time on it. I'm just going show you the front page.

A. Okay.

Q. You will see that the COP hearing was conducted on October 2nd, 2009. Do you see that? 12:56:58

A. Yes.

Q. Okay. Now, pursuant to VII D14, back to where we were, the COP hearing panel was required to issue its report and recommendation within 60 days from the conclusion of the COP 12:57:18 hearing, correct?

A. That's right.

Q. Now, that didn't happen, correct?

A. I believe they were a little bit late.

Q. Okay. Now, my office alleged that was 12:57:33 a violation of due process at the judiciary committee, and that was quickly rejected.

If you can give me your explanation for why the untimely issuance of the COP hearing panel's report and recommendation did not violate 12:57:55 the professional compliance grievance procedures.

A. I believe the judiciary committee found that the grievance procedures allow the academy to extend all deadlines.

129

MR. MAURICE: Will you read that back to me.

(WHEREUPON, the record was read

by the reporter as requested.)

BY MR. MAURICE:

Q. When you say allows the "academy to 12:58:27
extend all deadlines," who is it on behalf of the
academy that is authorized to extend those
deadlines?

A. I don't know that there is a person
designated in the grievance reports. I would 12:58:45
suppose that the committee chair could do that.

Q. The committee chair of which committee?

A. Of the committee issuing the report, if
necessary.

Q. Have you ever looked at Rule VII D14? 12:59:07

A. Yes, I have.

Q. Okay. And you note in there that it
references AAOS when it talks about having sole
discretion to extend the date of the grievance
hearing panel's report and recommendation, 12:59:28

correct?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes.

Q. Okay. And you understand that way back at the beginning of this document in Section II -- pardon me, Section III, there are definitions provided for general counsel, committee on professionalism, grievance hearing panel, and judiciary committee. Do you see that?

12:59:51

A. Uh-huh. Uh-huh.

Q. Is that a "yes"?

A. Yes.

Q. Okay. So Section VII D14 does not provide that the COP hearing panel has the sole discretion to extend the date of the grievance hearing panel's report and recommendation, correct?

12:59:57

A. No.

13:00:19

Q. It doesn't say that the office of general counsel has that discretion, correct?

A. No.

Q. It doesn't say that the judiciary committee has that discretion, correct?

13:00:26

A. No.

Q. But it's your view that the use of AAOS is kind of all-encompassing, meaning that the chair of the committee, in this case, has that

131

sole discretion to extend it. That's your position?

A. The committees are committees of the AAOS.

Q. Right. But, I mean, committee, if you 13:00:47 go back to Section III, the committee that we're dealing with here is specifically defined in Section III H as committee on professionalism, which can be referred to as COP?

A. Uh-huh. 13:01:05

Q. Is that a "yes"?

A. The committee on professionalism is the AAOS body responsible for reviewing, considering grievances.

Q. And it -- 13:01:11

A. AAOS body.

Q. Right. And it's going to be --

A. AAOS.

Q. And it's going to be designated as COP in this document, correct? 13:01:16

A. Yes. What I don't see defined is AAOS.

Q. Yeah. Check the very opening paragraph, Section I.

A. That's not a definition. So I thought,

132

I mean, my understanding is the committee is AAOS. They're bodies of the academy.

Q. Okay. You don't read Section I where it has a parenthetical with open quotes "AAOS" to mean that any references in this document to AAOS 13:01:41 shall mean American Academy of Orthopaedic Surgeons and the American Association of Orthopaedic Surgeons?

A. Yes.

Q. That's the way you read that? 13:01:49

A. That's the AAOS.

Q. Right.

A. Who is the AAOS? They're committees of the AAOS.

Q. How would I refer to the board of 13:01:59 directors of the AAOS?

A. I don't know. Are they defined? I don't see those defined. In any event, I don't know that you would -- that I would recommend taking a grievance to the board before it's been 13:02:19 decided by the COP or the judiciary. That probably would be a conflict.

MR. MAURICE: We're running out of tape, so we're going to take a break.

THE VIDEOGRAPHER: We are going off the video record at the end of Tape No. 2 at 1:02 p.m.

(WHEREUPON, a recess was had.)

THE VIDEOGRAPHER: We are going back on the video record at the start of Tape 3 at 1:42 p.m. 13:42:49

BY MR. MAURICE:

Q. Ms. Young, before we took a break for lunch, we were discussing the fact that the COP hearing panel's report and recommendation was issued beyond the 60-day timeframe identified in 13:43:02 Rule VII D14 and the extension of that time period.

Question for you: Was any notice provided to any of the parties, either the grievant or the respondent, advising them that the 13:43:24 AAOS had made the decision to extend the deadline for the issuance of the report and recommendation?

A. No.

Q. And you do acknowledge that, pursuant to Section VI B1 of the professional compliance 13:43:44 grievance procedures, that the parties have the right, have a right to timely communication from the AAOS, correct?

A. Yes.

134

Q.    Now, if you could turn to Exhibit 15, this is the actual report and recommendation issued by the COP hearing panel, if I'm correct. Am I correct in that?

A.    Yes.                                          13:44:17

Q.    Okay.   It looks at the back like it was issued on December 10th of 2009.   Is that what you get?

A.    Yes.

Q.    Okay.  Did you play any role in the          13:44:27 preparation of this report and recommendation?

A.    I did not prepare the report.  I may have reviewed it.  I may have made some minor revisions to it, but the substance of the report was prepared by the committee.                     13:44:56

Q.    And when you say "by the committee," any one person on the committee specifically that you know of?

A.    It is drafted by the chair, whoever chaired the -- the hearing panel.                     13:45:07

Q.    So in this instance, that would be Dr. Strain?

A.    Yes.

Q.    And do you have a specific recollection

of making revisions or giving comments with respect to the Sharpe-Brandner report and recommendation?

A.    I don't.

Q.    Will you turn to the document marked for identification as Exhibit 16.  Do you recognize this document?

A.    I do.

Q.    And what is it?

A.    This is the letter from your office which noted the appeal by Dr. Brandner.

Q.    How much time does a grievant or a respondent have to notify the AAOS that they are appealing the report and recommendation issued by the COP hearing panel?

A.    Fifteen days.

Q.    Have there been instances in your experience where a grievant or a respondent attempted to appeal a COP hearing panel's report and recommendation but failed to submit it within the 15-day time period?

A.    Not that I'm aware of, no.

Q.    If a grievant or respondent were to submit an appeal of a COP hearing panel's report

136

and recommendation outside the 15 days, would the AAOS nonetheless accept it?

A.    I don't -- I don't know.

Q.    Okay.  Just something you haven't dealt with yet?

A.    Correct.

Q.    Okay.  I guess what I was looking for was to see if the AAOS had decided that -- whether it was going to, I guess the word "lenient," be lenient with respect to its own adherence to the procedural deadlines if that leniency would also extend to the grievant and the respondent.

Has the AAOS ever looked at that, considered that?

A.    Ask me that again.  I'm sorry.

Q.    No.  That may have been an inartful question.  Let me give it to you this way.

My impression from your testimony with respect to the untimeliness of the COP hearing panel's report and recommendation is that it wasn't that big a deal because the AAOS, basically anybody in the AAOS had the ability to extend the deadline for the issuance of that appeal.  Am I correct in that?

A.   I wouldn't say anybody, no.  Not any employee could say -- the secretary can't say we're extending the deadline.

Q.   Okay.  How about any of the COP hearing panel members?

A.   The chair.

Q.   Okay.

A.   Whoever is chairing the hearing panel might have the ability to say this report isn't ready, we're going to extend the deadline.

Q.   Okay.  And there's no obligation to send out notice to any of the parties that deadline has been extended, correct?

A.   A notice was not sent out in this instance, that's correct.

Q.   Right.  But do you believe there was an obligation on the part of the AAOS to notify the grievant and the respondent that the deadline for the issuance of the COP hearing panel's report and recommendation had been extended?

A.   I don't think the grievance procedures require it, no.

Q.   Okay.  So -- and let me ask it this way.

138

Do you see anything in the grievance procedures that provides that the chair of the COP hearing panel has to get approval from anybody else before extending the deadline?

A.    No.                                        13:49:31

Q.    Okay.  So it's basically, according to your reading, at the sole discretion of the chair of the COP hearing panel, correct?

A.    Correct.

Q.    So the question I have is has the     13:49:42 office of general counsel ever looked at the deadlines imposed upon the grievant and the respondent under the grievance procedures with a similar view towards adherence to the deadlines imposed by those procedures?                13:50:13

A.    Yes, they have.  Extensions are permitted.  There are exceptions in the -- within the grievance procedures where extensions were granted.

Q.    And if the grievant or respondent     13:50:24 requests the extension, who is it at the AAOS that rules on the extension?

A.    Generally, it's the office of general counsel.

139

Q.   And does the office of general counsel need to get approval from the chair of the COP hearing panel?

A.   No.

Q.   Does the office of general counsel,   13:50:43 upon granting such an extension, provide notice to the other party to the grievance?

A.   Yes.  Let me rephrase that.  I think it would depend on the circumstances of what the extension is for.  I mean, are we talking about a   13:51:05 specific thing here or just in general?

Q.   Well, let's use the appeal for example.

If a grievant requested an extension of the 15-day deadline to submit an appeal or a respondent requested an extension of the 15-day   13:51:25 period to submit an appeal, would that be the kind of request that would be fielded by the office of general counsel?

A.   Yes.

Q.   Okay.  And if the office of general   13:51:35 counsel elected to extend that deadline for the grievant, would the office of general counsel then advise the respondent?

A.   Yes.

Q.    And would the office of general counsel extend the deadline for both parties?

A.    Yes.

Q.    If you could turn back to Exhibit 3, please.  Could I have you look at Section VII A -- sorry, VII E15.

A.    VII E15?  Is that what we said -- what you said?  15.  Okay.

Q.    Yes.

A.    Okay.

Q.    And this Section VII E governs the conduct of the judiciary committee, correct?

A.    That's right.

Q.    Okay.  VII E15 provides, "The judiciary committee shall uphold the recommendation of the grievance hearing panel unless it finds that there has been a lack of due process in the AAOS grievance proceedings or it is contrary to the clear weight of evidence."

      Do you see that?

A.    Yes.

Q.    Okay.  Do you believe that the judiciary committee is obligated to reject the recommendation of the grievance hearing panel if

it finds that there has been a lack of due process in the AAOS grievance proceedings?

A. That there has been a lack of due process in the grievance proceedings? Okay. Ask me that one more time. I'm sorry. 13:53:44

Q. No problem.

Do you believe that Section VII E15 requires that the judiciary committee reject the recommendation of the grievance hearing panel if it finds that there has been a lack of due process 13:54:06 in the AAOS grievance proceedings?

A. I never looked at it that way before. To be honest, that's not the -- that's not the format that the question is -- it could be viewed that way. 13:54:52

Q. I mean, because VII E15 is telling the judiciary committee you're obligated to uphold the recommendation of the COP hearing panel unless you find one of two things, correct?

A. That -- that is correct. 13:55:07

Q. Right. And one of those things is that there has been a lack of due process in the grievance proceedings, and the second is or it is contrary to the clear weight of evidence, correct?

142

A.    That's correct.

Q.    So it seems logical that the converse would be true, which is that the judiciary committee is obligated to reject the report and recommendation of the grievance hearing panel if    13:55:31 it finds either that there has been a lack of due process in the AAOS grievance proceedings or that the report and recommendation is contrary to the clear weight of the evidence.  Makes sense?

A.    Correct.                                      13:55:49

Q.    What training do the judiciary committee members go through to understand what their obligations are in connection with their role on the judiciary committee?

A.    We have not had any new members of the    13:56:05 judiciary committee since I've been there.

Q.    So basically the judiciary committee members that were there when you started with the AAOS in 2008 are the same ones who are there today?                                          13:56:23

A.    Correct.

Q.    So any training that they received occurred prior to your arrival at the AAOS?

A.    Correct.

143

Q.    Since 2008, are you aware of any seminars or training materials that have been provided to members of the judiciary committee to kind of update them with respect to their obligations in connection with their role in the judiciary committee?

A.    I am not aware of any, no.

Q.    Now, I know when I deposed Dr. Craig in New York, he indicated that he had been invited to attend a seminar when he first joined the committee, which would educate him in the process, but that he was busy and declined to attend.

Are you aware of how many of the judiciary committee members actually have gone through the training provided by the AAOS to be judiciary committee members?

A.    I am not.

Q.    You would agree that if one of the functions of the judiciary committee is to determine if there has been a lack of due process in the AAOS grievance proceedings, that those judiciary committee members need to at least have an understanding of what is required to satisfy due process; safe to say?

144

A.    That's a safe assumption, yes.

Q.    If you could turn forward a few pages to Section VII F8 of the grievance procedures, do you see the second paragraph in Section VII F8 has language similar to the language we just looked at in Section VII E15?    13:58:30

A.    Yes.

Q.    I'm not going to bother going through all the same questions with you, but just kind of from a -- from a big picture standpoint, would you agree that the board of directors is obligated under the rules to reject a report and recommendation issued by either the COP hearing panel or the judiciary committee if it finds that there has been a lack of due process in the AAOS proceedings?    13:58:42    13:59:01

A.    Yes.

Q.    Similarly, the board of directors is obligated to reject the report and recommendation of the COP hearing panel or the judiciary committee if it finds that it's not supported by the clear weight of evidence, correct?    13:59:11

A.    Correct.

Q.    If you could turn forward to

145

Exhibit 17, do you recognize the document marked

for identification as Exhibit 17?

A.    Yes.

Q.    What is Exhibit -- the document that

that's been marked for identification as          14:00:00

Exhibit 17?

A.    This is a letter to the parties from

Rosaliand Giulietti February 1st, 2010 advising

that our policy changed with regard to HIPAA and

redaction of patient identifiable information.     14:00:16

Q.    And enclosed with this letter was a big

stack of documentation, basically all of the

material that had already been produced in

the -- with respect to the grievance, but now it

had redactions, correct?                          14:00:30

A.    Yes.

Q.    Okay.  Was the change in the AAOS'

policy with respect to the removal of

patient-identifying information in any way related

to the Brandner-Sharpe grievance?                 14:00:54

A.    No.

Q.    Isn't it true that at some point a

letter was forwarded to the AAOS by, I'm going to

say, an attorney in Arizona who was involved in

146

the underlying litigation objecting to the use of that information in this grievance?

A.    Yes.

Q.    But that letter didn't have anything to do with the change to the grievance procedures?        14:01:22

A.    No.

Q.    If you would turn to the document marked for identification as Exhibit 18.  Do you recognize this document?

A.    Yes.        14:01:54

Q.    And what is it?

A.    This is appeal material submitted on behalf of Dr. Sharpe.

Q.    If you could turn to the second page of that exhibit, it has the Bates number Brandner 00573.        14:02:14

A.    Okay.

Q.    In the second to last paragraph, the first two sentences provide, "Dr. Sharpe provided AAOS with all of the medical records,        14:02:25 deposition/trial transcript, x-rays, et cetera, which he believed were relevant to his grievance. It was not Dr. Sharpe's responsibility to decide what Dr. Brandner thought relevant to

provide" -- pardon me, "relevant or provide documents for Dr. Brandner."

Do you see where I read that?

A. Yes, I do.

Q. Bruce Crawford is advocating a subjective relevant standard for document production. In other words, he's not saying that a party to a grievance is responsible for producing only that documentation that is relevant to the grievance; he's saying that Dr. Sharpe, or a party to a grievance, is only responsible for producing that documentation which that party believes is relevant to the grievance.

Do you understand that?

A. I understand that's what you understand.

Q. Well, I -- well, how would you come to any other conclusion based on what was just written that there?

A. I read what he said there, and I'm not placing any interpretation on it at all. I just -- I read the words. But what's your question?

Q. Well, I mean, you understand the

148

difference between a subjective and objective standard in terms of relevance, correct?

A.    Yes.

Q.    Okay.  And what he's saying here, by including the language "he believed," meaning Dr. Sharpe, what Dr. Sharpe believed, he's advocating for subjective relevance, correct?

A.    He's advocating for his client.  So, I mean, I'm not sure what your point is here.

Q.    Well, I'm going to get to another point, but I want to make sure we're on the same page.

Bruce Crawford is advocating that the grievance procedures allow for a subjective relevance standard when it comes to document production, correct?

A.    Okay.

Q.    Okay.  Do you believe that the grievance procedures provide for a subjective relevant standard when it comes to document production?

A.    I don't agree that it -- I'm going to call it a subjective standard, but I thought we'd gone over that.

149

Q.   Right.

A.   But if you -- if you'd like to do it again, we can.

Q.   Well, I mean, Rule VI C doesn't say anything that says --                           14:04:52

A.   I don't remember "subjective" in there.

Q.   Right.

A.   Would you like to go over it again?

Q.   Sure.

A.   Okay.  Great.  Let's do that.        14:05:00

Q.   Exhibit 3.

A.   I'm going to go back to the report, which is under Tab 8, number 6, which says, "Describe in detail how the action or statement allegedly violated the minimum standard listed     14:05:15 above and identify any evidence that supports your allegation.  Attach complete," underlined, "complete copies of any documents that you rely on as evidence providing specific page references to the portions that support your allegations."       14:05:30

Q.   Okay.  Now, I'm looking at Exhibit 3, which are the compliance grievance procedures, Section VI C, which provides, "Each party to a grievance is responsible for obtaining and

150

providing all written material, such as transcripts and medical records, for consideration by AAOS."

A. I'm sorry. Tell me which page you're on again. 14:05:59

Q. It's Section VI C --

A. VI C. Okay.

Q. -- which is Page 6 of the actual procedures. I mean, there's nothing in Section VI C that provides for relevance. 14:06:10

I mean, you don't see anything in there that says that the party was responsible for producing documents that are relevant to the grievance, correct?

A. No. I see in the grievance report, 14:06:23 which the AAOS reads together, which we think one supports the other, and it says evidence that supports your allegation.

Q. I'm going ask you questions about Rule VI C in the grievance procedures. 14:06:39

There's nothing in Rule VI C of the grievance procedures that identifies that a party is only responsible for producing documents that are relevant, objectively or subjectively,

151

correct?

A.    No.

Q.    Okay.  And there's certainly nothing in Rule VI C of the grievance procedures that provides for a subjective relevance standard by stating that relevancy is to be determined by the producing party, correct?

14:07:03

A.    No, I don't see relevant, subjective, objective, any of that in there, no.

Q.    It just says "all materials, such as transcripts and medical records," correct?

14:07:19

A.    Yes.

Q.    Do you remember Bruce Crawford making that argument at the judiciary committee hearing in Louisiana?

14:07:39

A.    You know, I go to so many hearings. I -- I'm sorry.  My memory of any one specific hearing is not -- I don't remember specifics.  I'm sorry.

Q.    Okay.  Do you have any recollection specifically during the deliberations of any of the members of the judiciary committee saying, you know, this is a real issue, this guy is claiming that he only had to produce those documents that

14:07:54

152

he believed were relevant?

A.    No, I don't remember.

Q.    Okay.  With respect to the judiciary committee hearing specifically, Rule VII E11 is the rule that provides that the parties are to be given ten minutes to make their presentations, and that applies to both the grievant and the respondent, correct?

A.    Yes.

Q.    Okay.  In light of the fact that the patient's deposition transcript from '05 had not been produced to the COP hearing panel, the patient's mother's deposition transcript from June of '05 had not been produced to the COP hearing panel, the transcript from the patient's trial testimony had not been produced to the COP hearing panel, and the transcript from the patient's mother's trial testimony had not been produced to the COP hearing panel, do you believe that ten minutes was sufficient for the judiciary committee -- well, strike that.

Do you believe that ten minutes was sufficient for Dr. Brandner as the respondent to address all of the issues and new evidence that

153

was before the judiciary committee?

A. In conjunction with his written statement and the committee's review of all of those transcripts, which they did accept, even though it's not prohibited -- it's not allowed in the rules, yes, I do. I do think that was sufficient.

Q. Do you remember Bruce Crawford making an argument in front of the judiciary committee that the -- the '05 transcripts and the '08 trial testimony were irrelevant for the purposes of the grievance because the point of Dr. Sharpe's grievance from the very beginning was that Dr. Brandner never should have agreed to act as an expert in October of '04, and at that time he only had the January of '04 deposition transcripts to review? Do you recall that?

A. I don't remember specifics, arguments from the hearing. I --

Q. If you turn to Exhibit 19.

A. Give me just a second. Okay.

Q. If you go to the page with the Bates number Brandner 00583.

A. 83. Okay.

154

Q.    There's four pages of deposition testimony, and I'm going to start reading on Page 22, Line 10.

A.    Okay.

Q.    This is Bruce Crawford speaking. He says, "Dr. Brandner agrees to be an expert witness in this case sometime in October of 2004, and what he has available to him are the medical records, the x-rays, the depositions of Dr. Sharpe, the patient and mother before Dr. Sharpe was ever sued. And Dr. Sharpe, in fact, specifically says that the risk of perineal nerve injury was discussed.

"That is what he had before he agreed to be an expert witness in this case, and that is the points of Dr. Sharpe's grievance in this case?

"The point of the grievance from day one by Dr. Sharpe has been, based on the information available, Dr. Brandner should not have agreed to give expert testimony opinions critical of Dr. Sharpe in any way, shape, or form. That was the point."

Do you see where I read that?

A.    Yes, I do.

Q.     When I go through the report and recommendation issued by the judiciary committee, there are no fewer than six discussions of when Dr. Brandner was retained and the fact that the time he agreed to act as an expert witness these subsequent transcripts, the transcripts from June of '05, were not in existence, and so they were irrelevant.

The question I have for you is you recognize that Dr. Brandner cannot be held to have violated any of the mandatory standards for anything he did in 2004, correct?

A.     Yes.

Q.     Okay.  So the whole point of Dr. Sharpe's grievance was -- which was apparently that Dr. Brandner never should have agreed to be an expert witness in the first place in this case, cannot be a finding of violation with respect to Dr. Brandner, correct?  Do you want me to restate that?  I stuttered in the middle of it.  Let me give it to you this way.

You understand that the point of Dr. Sharpe's grievance, this idea that Dr. Brandner never should have agreed to be an

156

expert in the first place, cannot form the basis for a finding that Dr. Brandner violated any of the mandatory standards?

A.    Correct.

Q.    Does it trouble you that we are here, what, three years later and Dr. Brandner is being subjected to professional compliance action based on a grievance where the entire point of the grievance from one was essentially an allegation upon which no finding of violation could occur?

MR. CHABRAJA:  Can you --

BY THE WITNESS:

A.    I don't -- I'm sorry.

MR. CHABRAJA:  Can you re-read that.

(WHEREUPON, the record was read by the reporter as requested.)

BY THE WITNESS:

A.    I don't believe that was the basis of the findings.

BY MR. MAURICE:

Q.    No.  No.  No.  I'm not saying it was the basis of the findings.

I'm saying Bruce Crawford is saying that the whole point of Dr. Sharpe's grievance

from day one was that Dr. Brandner never should have agreed to act as an expert in 2004. I mean, that's what I just read you, correct?

A. That's what you just read, yes.

Q. Okay. But it's undisputed that there was no professional compliance program in October of 2004, correct?

A. That's correct.

Q. It wasn't adopted until April 18th of 2005, correct?

A. That's correct.

Q. And it's very clear in the terms of the professional compliance grievance program that it is to apply for violations occurring from that date forward, correct?

A. That's correct.

Q. Okay. That's why you're confident in your ability to say that, no, Dr. Brandner cannot be found to have violated any of the mandatory standards for agreeing to act as an expert in October of 2004, correct?

A. That's correct.

Q. Okay. So now I'm asking you to say does it -- well, I'm asking you to think about

158

does it bother you that we're three years down the line, Dr. Brandner is the subject of a finding in favor of a professional compliance action based on a grievance where the whole point of that grievance from day one was an allegation that legally could not have merit?

A.    No.

Q.    Okay.

A.    Professional compliance program does not have any standards of professionalism that address serving as an expert witness.  It does have agreeing to serve as an expert witness.  It does have standards of professionalism that address the substance of your expert witness testimony, and that was the basis of the grievance.

Q.    So -- that was basis of the grievance?

A.    That's my -- I mean, Dr. -- Dr. Sharpe listed his grievances, stated the expert -- standards of professionalism specific numbers, he provided the underlying material that supported his allegations, and that was the basis of the committee of professionalism's findings as well as the judiciary committee's findings and ultimately

the board the director's findings.

Q. Now, you do know that this is -- the portion of this transcript that I've read to you, this isn't the only place where this is point is made by Bruce Crawford. Bruce Crawford in his written appeal statement makes the same point. Bruce Crawford in the written submission submitted to the board of directors not once, but twice, makes the same statement.

I mean, Bruce Crawford keeps coming back to the point that the point of the grievance from day one was that Brandner never should have agreed to be an expert witness.

But, again, that doesn't bother you, the fact that even though that legally had no merit because the program wasn't even in existence at the time, the fact that Brandner is still being subjected to a finding of a professional compliance action?

A. No.

Q. All right. If you can turn back to the page with the Bates number Brandner 00585, I'm going to ask you to read from Line 9 on Page 30.

A. Okay. Line 9.

160

Q. Through the ruling on the objection on Page 4. And you can just read silently and just look up when you're done.

A. Okay.

Q. Okay. You see this is where I am            14:20:51
questioning Dr. Sharpe during the five minutes allotted to each side to ask questions of the other party at the judiciary committee level.

I'm questioning him on his failure to produce certain documents and the representation            14:21:07
he made to the COP hearing panel with respect to his belief that he had produced all the deposition transcripts, correct?

A. Yes.

Q. Okay. And you see on Page 34 starting            14:21:16
at Line 2, there is an objection by Mr. Crawford, who is Dr. Sharpe's counsel, correct?

A. Yes.

Q. Okay. And what is his objection?

A. This argument, and it is extensive            14:21:30
cross-examination.

Q. Okay. And who is it who addresses the objection on behalf of the AAOS?

A. Mr. Chabraja.

161

Q.   Okay.  And does he agree with Mr. Crawford or does he disagree with Mr. Crawford?

A.   He says, "Mr. Maurice, you are on extensive cross-examination."

14:21:50

Q.   Okay.  So does he agree with Mr. Crawford or does he disagree with Mr. Crawford?

A.   That would be agreement.

Q.   Pardon?

14:22:00

A.   That would be agreement.

Q.   Okay.  And then he even ends with saying, "I think we understand the point," correct?

A.   Yes.

14:22:06

Q.   Okay.  First question is you're in the room at this point as well, correct?

A.   Yes, I am.

Q.   Who else from the office of general counsel was in the room at this point?

14:22:13

A.   Rosaliand Giulietti and Rick Peterson.

Q.   Earlier, I had made an objection and the objection was ruled upon by the chairman of the committee, Dr. Schmidt.  Are you familiar with

that?

A.    I don't remember the objection, no.

Q.    What are -- when it comes to the judiciary committee, when objections are lodged, who is it who generally rules on the objection?    14:22:39

A.    Ultimately, it can be up to the chairman to decide that.

Q.    Any understanding of why in this instance it was the AAOS' outside counsel who was ruling on the objection?    14:23:00

A.    There will be questions of a legal nature that the chairman will look to the outside counsel for assistance.

Q.    Do you see anything in here indicating that Dr. Schmidt as the chairman of the judiciary    14:23:17 committee requested that Mr. Chabraja respond to the objection?

A.    No.

Q.    By the time we all showed up in New Orleans for the judiciary committee hearing, you    14:23:32 already understood that this grievance was likely to result in litigation, correct?

A.    I -- you know, I don't remember.  I'm sorry.  I --

163

Q.    Well, is it common for the -- strike that.

In your experience in the general counsel's office at the AAOS when dealing with the grievance as they proceed through the process, is it common to have an understanding of which grievances are going to be more hotly contested than others?

14:24:03

A.    They are all becoming more hotly contested than others.

14:24:20

Q.    Okay.  But are there some that, based on the comments of counsel, the involvement of counsel, that kind of thing, that it becomes apparent early on in the process this, this grievance is, you know, a hot one, this one's likely to result in litigation?

14:24:35

A.    I wish I could tell you that, but, to be honest, Counsel, it is the norm these days.

Q.    Well, by the time -- I'm trying to think which exhibit it is.

14:24:49

By the time I send in the appeal statement that is Exhibit -- or the appeal that is Exhibit 16, that letter is already making it clear that there's going to be litigation if this

164

proceeds, correct?

A.   I'm sorry.  I don't remember this one specifically.  I'm -- I -- I would be happy to read it for you, if you'd like, but I don't know that that, you know, is what you're looking for right now.

Q.   Well, let me ask you it this way.

Was the handling of the objection by Mr. Chabraja in -- at the judiciary committee level the result of the AAOS realizing that this was a grievance that was likely to result in litigation?

A.   No.

Q.   Okay.  So there was no special handling of any kind with respect to the judiciary committee hearing based on the fact that litigation was likely with respect to this grievance?

A.   No.

Q.   Okay.  Are there instances at the judiciary committee level where either you or Mr. Peterson will rule on objections?

A.   Only in the absence of outside counsel.

Q.   So normally, outside counsel would

165

address it first?

A.    Yes.

Q.    Is it normal to have outside counsel present at the judiciary committee?

A.    Yes.                                                    14:26:17

Q.    Okay.

A.    Outside counsel is present at every hearing.

Q.    Okay.  Well, then, why would the answer to my question of have either you or Mr. Peterson    14:26:25 rule on objections, why would the answer be only in the absence of outside counsel?

A.    There are instances where they aren't available, I mean, for instance if they have other places they need to be.  It is -- it is    14:26:42 exceedingly rare.

Q.    But so more often than not, it is outside counsel that would respond to an objection if not -- if it was not going to be the committee chair?                                                    14:26:55

A.    Correct.

Q.    What is extensive cross-examination?

A.    It is examination that is -- this is -- well, in my experience, it's been overly

166

aggressive or hostile or repetitive or kind of

cumulative asking the same thing over and over

again.

Q.     And why is it that the AAOS prohibits

that?                                                      14:27:29

A.     It's not necessarily a productive use

of time.  We like to keep the hearings

professional.  We don't necessarily want to have

to use armed guards at these hearings, although

you have to, you have to.  It is an attempt to      14:27:47

keep the hearings moving.

The -- the -- especially at places like

annual meetings, the purpose of the meeting is

educational, so we do like to keep the meetings

moving.                                             14:28:06

Q.     But if you have one party to a

grievance that has lied at the COP hearing panel

level and yet the finding of the COP hearing panel

level was favorable to him, doesn't the opposing

party have a right to highlight to the judiciary    14:28:24

committee the fact that the finding of the COP

hearing panel was based on certain

misrepresentations by the opposing party?

A.     I would assume that five or six times

asking the questions, same questions, would probably make that point.

Q. So I guess, if I understand correctly, cross-examination is allowed?

A. Correct. 14:28:58

Q. It's the extensive cross-examination that's a problem?

A. That's what the rule indicates is that cross-examination is permitted, extensive --

Q. And your -- if I understand your 14:29:13 testimony correctly, the difference between cross-examination and extensive cross-examination, at least one of the things that would denote extensive cross-examination would be repetition in the -- the questioning? 14:29:33

A. Yeah -- yes.

Q. Can you think of other things beyond just repetition that would take cross-examination which is permissible under the rules and make it extensive cross-examination? 14:29:45

A. In my experience with the academy, those are the examples that I gave you, you know, being --

Q. Overly hostile?

168

A.    Yes, or, you know -- well, those are the main examples.  Those are what I've seen.

Q.    So either repetition or overly hostile?

A.    Yes, although I guess that's leaving room for something else that I haven't seen.    14:30:18

Q.    Now, you were present at the judiciary committee, correct?

A.    Yes.

Q.    Do you recall my questioning of Dr. Sharpe?    14:30:25

A.    Not specifically, no.

Q.    Okay.  So prior to reading this, it's not like if I had asked you to give me a -- you know, to -- to recount the cross-examination.  You couldn't have done so?    14:30:34

A.    No.

Q.    Okay.  So my questioning of him was not so repetitious that it seared it into your memory, you know, years down the line?

A.    I don't recall it, no.    14:30:47

Q.    Okay.  And my questioning of Dr. Sharpe was not so hostile that years later you still shudder to think about it, correct?

A.    I don't remember it, no.

Q. Okay. And, obviously, I mean, you're not Mr. Chabraja, so you don't know what was in Mr. Chabraja's head when he sustained that objection, correct?

A. I am not Mr. Chabraja, no. 14:31:15

Q. Okay. Only Mr. Chabraja knows what he was thinking when he addressed that objection, correct?

A. Mr. Chabraja knows what Mr. Chabraja was thinking. 14:31:24

Q. Okay. We talked a little bit earlier about this idea of the judiciary committee asking questions of the parties before it, even if the rules don't necessarily provide that they're entitled to do so. Do you recall that? 14:31:54

A. Yes.

Q. And my understanding from your testimony is whether the rules say it's permitted or not, that is the practice of the judiciary committee? 14:32:05

A. That's correct.

Q. Okay. Is there anything that you can think of that is sent in writing to the grievant and the respondent advising them that, hey, the

170

rules may not say this -- that there is going to be questioning from the judiciary committee, but you need to know that that may happen?

A.   No.

Q.   Could I ask you to turn to Exhibit 20.   14:32:47
Do you recognize this document?

A.   I do.

Q.   And what is it?

A.   It's the judiciary committee recommendation and report.   14:33:06

Q.   Okay.  And if I understand your testimony from earlier today, the initial draft of the judiciary committee's report and recommendation is prepared by staff based on notes that are taken by the general counsel's office,   14:33:21 and then it is forwarded to the members of the judiciary committee for comment and revision, correct?

A.   That's correct.

Q.   Okay.  If you could turn back to Page   14:33:31 Brandner 00612 under the heading Discussion and Summary.

A.   Okay.

Q.   Point number 1 is the point that

addresses the due process arguments advanced by Dr. Brandner, correct?

A.    Yes.

Q.    I want to start the fourth line down. There is a sentence that starts with the word "Furthermore."

It provides, "Furthermore, the judiciary committee acknowledged that there were materials, specifically a second set of depositions of the plaintiff and his mother, that were not submitted by the grievant.  These documents have been reviewed by the judiciary committee and found to be irrelevant as they do not remove the basis for the findings by the committee on professionalism."

Do you see where I read that?

A.    Yes.

Q.    Okay.  Now, was that language that was in the initial draft prepared by the office of general counsel?

A.    I don't remember.

Q.    Do you recall there being discussions during the deliberations regarding the fact that those subsequent transcripts were, in their view,

172

irrelevant?

A.    I -- I really don't remember.

Q.    Well, would it have ended up in the report if the judiciary committee and their deliberations had not mentioned the fact that they viewed those second set of transcript as irrelevant?

A.    They would have discussed it. Whether -- how they phrased it in their deliberations, I don't remember, but at some point, they would have reached the conclusion that this -- you know, that was their conclusion, that the -- the documents did not remove the basis for the committee's findings.

Q.    Right.  And as a result, they were irrelevant.  That's the word that's in the Discussion and Summary, correct?

A.    That's the word that's in the report, yes.

Q.    And, I mean -- and we know that this report, if you go to the back page, it is signed by all five members of the judiciary committee, correct?

A.    That's correct.

173

Q.   Okay.  Now, if we drop down to point number 2 here, this is where the judiciary committee provides their discussion and summary with respect to their findings related to mandatory standards 3 and 4, correct?          14:36:10

A.   Yes.

Q.   Okay.  And if you go down about the fifth line down, there's a sentence that starts, "Moreover."

And it says, "Moreover, the question of          14:36:21 whether a violation of the standards of professionalism exists is not that he chose to base his opinion on contradictory evidence from the patient and treating physician, but the fact that he chose one version of the plaintiffs'          14:36:35 depositions over another.  This choice took Dr. Brandner out of the realm of objectively counseling on standard of care and made him condemning of the care provided by Dr. Sharpe."

Do you see where I read that?          14:36:50

A.   I do.

Q.   Is that language that was provided by the office of general counsel?

A.   I don't recall where it came from.

174

Q. Do you recall there being discussions during the deliberations where the judiciary committee members said Dr. Brandner's decision to essentially accept the plaintiff's second depositions and ignore their first depositions made him condemning or Dr. Sharpe?

A. That was basis of their findings, yes.

Q. Do you agree with me that the statement that we just looked at in -- under point number 2 is completely incongruent with the statement that we looked at in finding number 1 related to the relevance of those second deposition transcripts?

A. No.

Q. Okay. Obviously, if the basis for the finding with respect to mandatory standards 3 and 4 was that Dr. Brandner's decision to base his opinion on contradictory evidence choosing one version of the plaintiffs' depositions over another, if that was the basis for that finding, obviously, that second set of deposition transcripts was relevant, correct?

A. Sorry. I'm trying to -- I'm really trying my best here to remember the facts of this case. And, as I said, the doctors are the ones

who decide these cases. They're the ones who get into all the facts of these cases, and it's -- that's not my job.

Q. Okay. And as you sit here today, what you know based on this is the doctor sitting in the judiciary committee viewed the fact that Dr. Brandner chose one version of the plaintiffs' depositions over another as taking him out of the realm of objectively counseling on standard of care and made him condemning of the care provided by Dr. Sharpe? That's -- that's what's in the reports, and that's all you know?

A. That's correct.

Q. Okay. So if I have questions about how they arrived at that, the best people to ask are the actual doctors themselves. Fair enough?

A. I think what -- I don't speak for them because I'm not the committee, okay, I think what I can suggest to you is that if Dr. -- Dr. Brandner were -- it wasn't so much that if he were looking at all of these depositions, and I -- as I recall, he did review or he said that he reviewed all of the depositions, the fact that -- that the earlier depositions, the

judiciary committee looked at those depositions as being more persuasive because they were closer in time to the accident and the -- the later depositions were not, in their view. That's, as I recall, some part of how they viewed this situation.

Q. And so their problem was by -- how do they describe it? By choosing the second version of the plaintiff's deposition testimonies over the first version of their testimony, that's where he went outside of the realm of objectively counseling on standard of care and made him condemning of the care provided by Sharpe. Is that your understanding?

A. Well, at some point, as I recall, there was -- there was -- I think, Dr. Brandner told the judiciary committee that he wasn't deciding who was right and who -- who was wrong, he was simply -- it was a he said/she said or something, and so if that were the truth, then he didn't need to pick a side, but then they -- the judiciary committee, I guess, or possibly felt that what he chose when he chose one version of the depositions over another, he did become an advocate.

177

Q.    Even -- even if all he did was show up at trial and educate the jury as to the standard of care for informed consent in a --

A.    Well, that's not --

Q.    -- proximal tibial osteotomy?    14:41:27

A.    That's -- that's not what they were looking at.  They were looking at his testimony, and they had all of his testimony to look at, so trial was only one component of it.  They looked at all of his testimony.    14:41:40

Q.    And the basis for this finding is, in his testimony, the basis for this finding is the fact that he chose one version of the plaintiff's depositions over another.  And that's what they're -- they're saying?    14:41:48

A.    And they should -- and he should have looked at all of it was their point before he arrived at his opinion.  If he was going to look at it, look at all of the testimony of all of the parties before arriving at your conclusion.    14:41:58

Q.    But, I mean, it's not disputed on the in the record that he read both sets of transcripts, correct?

A.    No, I think he told them that.

178

Q.   Right.

A.   But at some point he also said this is he said/she said, I didn't get into whether he did or whether he didn't, but then he also, in looking at the reports or his -- his opinions at some          14:42:19 point, he did enter the fray.  It wasn't just he said/she said; he offered an opinion, and the opinion was he didn't provide informed consent.

Q.   That's your understanding?

A.   I don't know.  I'm just giving you what 14:42:36 I think.

Q.   You're giving me -- are you giving me your recollection or your -- your -- what you think?

A.   As -- as I best recall, and, again, I   14:42:43 haven't looked at all of this in depth, this is just from memory.

Q.   When you say he entered the fray --

A.   That's my term.  Please do not -- do not attribute that to anybody else.          14:42:58

Q.   No.  No.  No.  Understood.

A.   As I said, I don't speak for the docs.

Q.   You know, this goes back to Dr. Sharpe's grievance and that Dr. Sharpe's --

179

the whole point of Dr. Sharpe's grievance from day one was that Brandner never should have entered the fray, I'll use the phrase.

A.    Oh that's -- that's not --

Q.    That was -- that was his point.    14:43:16

A.    That's not me speaking for Dr. Sharpe either.  That's just I'm -- I'm using the -- as I recall, and I remember this phrase only because I -- it -- you know, I've seen it in quotes a couple of times was he said/she said, and I -- as    14:43:29 I recall, that was kind of their -- their thought process was if you're going to -- you know, if you're going to be that objective and just say -- if you're -- if you're objective, then be objective, but if you're -- if you're not going to    14:43:50 be objective, then look at all of this, you look at all of it and then, you know, say whatever. But he wasn't objective.  He said he was, but he wasn't.

Q.    It was interesting.  Yesterday,    14:44:02 Dr. Geline took an interesting slant on this, because I brought that issue up to him.

Dr. Brandner repeatedly testifies when asked at deposition and at trial if he can

180

opine --

A.    I'm -- I'm sorry.  Are we talking about Dr. Geline or Dr. Brandner?

Q.    Well, I'll --

A.    Okay.                                          14:44:21

Q.    I'll come back to Dr. Geline.

A.    Okay.

Q.    So Dr. Brandner repeatedly testifies, deposition, trial when he's asked, "Can you opine whether this discussion, in fact, occurred between    14:44:28 Dr. Sharpe and the patient," because Dr. Sharpe said it did; the patient and the patient's mother said it didn't.

Dr. Brandner says, "I cannot opine. That's a factual determination the jury needs to    14:44:40 make."

Dr. Geline yesterday said that he believed that that testimony by Dr. Brandner, that he could not opine, was somehow condemning of Dr. Sharpe.  He described it as a back-handed way    14:44:55 to -- to condemn Dr. Sharpe.  I didn't fully understand it.

Did you hear anything along those lines in the deliberations?

A.    No, I don't remember anything like that.

Q.    Okay.

A.    I definitely don't remember anything like that in the report.

Q.    No, it wasn't in the report.  I was -- and this whole line of testimony came up when I was trying to have Dr. Geline explain why this was in the report and Dr. Geline kept saying it's not in the report, it's not in the report.  So I didn't fully understand.

A.    Oh, okay.

Q.    Let me ask you this.  That's interesting.  Dr. Geline brought something up yesterday.

I presented to him the idea that the allegations of wrongdoing are controlled by the grievance report, that the COP hearing panel considers the allegations of wrongdoing as asserted in the grievance report and then issues its report and recommendation, and then the judiciary committee considers the grievance hearing panel, the committee on professionalism's report and recommendation to determine if it is

supported by the clear weight of evidence or if there were any due process violations, and then basically at the top level the board of directors is -- performs the same analysis as the judiciary committee. Dr. Geline disagreed with me.                14:46:30

Dr. Geline took the position that the grievance report is just a commencement of the proceedings, that the allegations set forth in there are not binding or controlling really in any way, they can change depending on the evidence,       14:46:48 that the COP hearing panel had freedom to deviate from the grievance report, and, what I thought was most interesting, that the judiciary committee isn't really look at the COP hearing panel's recommendation but has the ability to basically      14:47:09 perform a de novo review of all the evidence and come up with their own conclusions based on the evidence.

Accepting my representation as true, which you don't -- you don't have to ultimately,       14:47:25 but which of those two kind of versions of the way the system is supposed to work is in line with your understanding? And if it's a hybrid, feel free to give me the hybrid. I don't mind being

told I'm wrong.

A. Wow. Okay. Well, I don't want to speak for Dr. Geline, because I don't speak for Dr. Geline. I don't speak for any of the doctors.

I think when the program first started, 14:48:16 the judiciary committee did do a de novo review. The program changed, and I really don't know when the change happened. So I can't give you a timeframe.

But at some point, it did change so 14:48:34 that the judiciary committee just did a review of due process and the weight of the evidence of the commission -- committee on professionalism's report, and then they did a review of the various findings of violations and that kind of thing, and 14:48:51 that was carried up to the board of directors. But I don't -- it's been that way since as long as I've been there.

Q. And I was going to say I hate to make you go back to Exhibit 3, but I think Exhibit 3 14:49:02 tells us on the very first page that these Professional Compliance Program Grievance Procedures apply to grievances filed after September 13 of 2008.

184

Is it possible that maybe that de novo review was what was in existence prior to September 13 of 2008?

A.    It's possible.

Q.    But, I mean, this is around the same time same time that you joined the AAOS too, correct?

A.    Yeah.

Q.    Okay.  Will you at least agree with me to the extent that what the judiciary committee is supposed to be reviewing is the COP hearing panel's report and recommendation to look at the due process issues and whether it's supported by clear weight of evidence, correct?

A.    Under the 2008 procedures, that is correct.

Q.    Correct.  And you agree that the Brandner-Sharpe grievance is governed by the 2008 grievance procedures?

A.    That's correct.

Q.    Okay.

MR. CHABRAJA:  Hey, let's take a quick break, a real quick break?

MR. MAURICE:  Sure.  Sure.

185

MR. CHABRAJA: Yeah. Great. Thanks.

THE VIDEOGRAPHER: We are going off the video record at the end of Tape 3 at 2:50 p.m.

(WHEREUPON, a recess was had.)

THE VIDEOGRAPHER: We are going back on the video record at the start of Tape 4 at 2:55 p.m.

BY MR. MAURICE:

Q. You don't have to turn to it just yet, because I don't want to make you go all the way back, but if you want to, that's fine.

A. Okay.

Q. Rule VI B3 of the grievance procedures provides that the parties involved in a professional compliance matter have the right to know the specific allegations made in the grievance, correct?

A. Correct.

Q. Okay. Do you agree that that means that the allegations cannot morph and change throughout the grievance process?

A. The allegations do not morph and change throughout the grievance process, that's correct.

Q. Right. They're not supposed to, correct?

186

A.     That's correct.

Q.     Okay.  When you're standing in front of the board of directors in all of its glory at the very end of the process, you're supposed to be arguing about the same allegations that were made     14:57:10 at the beginning of the process, which were the grievance report, correct?

A.     Correct.

Q.     Okay.  And that's done to ensure fairness.  I mean, it's so you -- so the -- the     14:57:23 respondent knows what's asserted against them, correct?

A.     Correct.

Q.     Okay.  Have you ever had a piqata for one of your kids' birthdays?     14:57:35

A.     A time or two.

Q.     Okay.  Now, are you the kind of person that just ties the piqata to the tree and lets the kids go to town with a blindfold on, or are you the kind of person that actually has somebody     14:57:45 holding the piqata and so the kid's not only blindfolded, but the person holding the piqata can maneuver it so that they can -- they swing and miss.  Which -- which category do you fall into?

A.    No, don't have anybody holding it.

Q.    Okay.  I mean, you agree there is something unfair about the idea that you not only blind the kid and you spin him around so he's dizzy but then also have an adult actually controlling the piqata so that when they swing, they miss.  Doesn't seem quite fair?

A.    Well, I kind of miss the whole piqata thing on being fun anyway, but --

Q.    But there's -- there's something unfair about the idea that you can't see the target you're trying to hit, correct?

A.    Correct.

Q.    Okay.  And there is something even more unfair if, not only can't you see it, but the target's moving throughout the process?

A.    Right.

Q.    And the party -- it's even more unfair if the party that's moving the target isn't wearing a blindfold so they can see everything you're doing?

A.    Right.

Q.    I guess I am going to ask you to turn back to those grievance procedures and

188

specifically to Section VII F5.  Sorry about that.

A.    That's all right.  I can't remember which tab they are.

MR. CHABRAJA:  3.

THE WITNESS:  Procedure VII F5.  Okay.          15:00:01

BY MR. MAURICE:

Q.    And VII F governs the board of directors, correct?

A.    Correct.

Q.    And VII F5, if you look about four          15:00:23 lines down, there's a sentence that starts "If appearing."

It says, "If appearing in person or by representative, the grievant or respondent will be given a maximum of ten minutes for his or her          15:00:39 presentation.  If a grievant or respondent has pursued an appeal to the judiciary committee, he or she may submit a written statement of no more than two pages to the board in lieu of personal appearances.  Such written statement must be          15:00:54 received by AAOS within 15 days of the meeting of the board."

Do you see where I read that?

A.    Uh-huh.  Yes, I do.

189

Q. Now, in this instance, Dr. Brandner and I actually appeared before the board -- well, I guess there were two board meetings. Let's -- the first board meeting.

A. Okay.                                                    15:01:20

Q. The initial board meeting, Dr. Brandner and I appeared at the board meeting, correct?

A. Yes.

Q. And you were present for that, correct?

A. Yes.                                                     15:01:27

Q. Okay. Dr. Sharpe and his counsel elected not to appear, correct?

A. That's correct.

Q. Okay. Did you know immediately after that first board meeting that Dr. Sharpe and his     15:01:37 counsel were not going to appear at that board meeting?

A. I don't remember.

Q. Do you recall that Dr. Sharpe did submit a written statement to be read into the           15:01:56 record for that board meeting?

A. Yes.

Q. Okay. And do you also recall that he sent an e-mail explaining why he was not going to

190

be in attendance?

A.    I know that he sent an e-mail attachment, but I don't remember the reason of the e-mail.

Q.    Do you know if the written statement    15:02:20
that Dr. Sharpe sent to the board, I guess it goes to the general counsel office, was received within 15 days of the meeting?

A.    You know, I don't remember that.  I don't remember the exact dates, timeline, that    15:02:36
kind of thing.

Q.    Now, this is interesting.  I just want to make sure that I'm not wrong in this.

What this requires is actually that the written statement be submitted no further out than    15:02:46
15 days, correct?

A.    That's correct.

Q.    Okay.  So he could submit a written statement just the day before, and it would still be accepted and read into the record, correct?    15:02:56

A.    That's what the -- that's what the procedures say.

Q.    Okay.  Well, we've been reading a lot of procedures and finding out that that may be

what it says, but that's not really the way it happens.

Is this one of these things that that's what it says, but that's not really the way it happens?                    15:03:18

MR. CHABRAJA:  Let me just object.  I think that mischaracterizes this witness' testimony today.

But you can answer.

BY THE WITNESS:                    15:03:31

A.    You know, I can't honestly say that I have monitored all of the dates that these board statements are received.  So I don't know that I could answer that.

BY MR. MAURICE:                    15:04:00

Q.    With regard to the first board of directors meeting, you don't dispute that both Dr. Sharpe's e-mail and his written statement were read into the record, correct?

A.    That's correct.                    15:04:11

Q.    Do you dispute that the combined length of those two statements exceeded two pages?

A.    You know, I don't remember how long the two pages were --

Q. Okay.

A. -- of the written statement. So --

Q. Do you recall Dr. Sharpe sending in his written statement and having the office of general counsel actually advise him that his statement was too long? 15:04:38

A. I don't remember having that discussion with him, no.

Q. Could have happened, but you don't know? 15:04:48

A. That's correct.

Q. And I think you touched on this a little bit earlier.

Section VII F6, this provision provides, "At its option, the grievance hearing panel of the committee on professionalism that considered the case may prepare written comments for the AAOS board of directors regarding the report and recommendations of the judiciary committee. These comments must be received by AAOS within 15 days of the meeting of the board. 15:05:15

15:05:30

"These comments will be provided to the board of directors, the grievant, respondent, counsel of the grievant and respondent, if any,

193

and to the representative of the judiciary committee who shall be presenting the matter to the board of directors."

Do you see where I read that?

A.    Yes.                                                    15:05:55

Q.    Okay.  Now, the first board of directors meeting, the COP hearing panel did not submit a -- did not prepare written comments to the board of directors, correct?

A.    Correct.                                                15:06:09

Q.    Okay.  Instead, the COP hearing panel actually made a presentation to the board of directors, correct?

A.    Yes.

Q.    Okay.  And you would agree with me that    15:06:17 there is nothing in Section VII F that authorizes the COP hearing panel to make a presentation to the board of directors when the grievance was appealed to the judiciary committee, correct?

A.    That's correct.                                        15:06:33

Q.    But, as you've testified, this wasn't something unusual in the Brandner case; that's just the way the board of directors has handled it in a number of grievances, correct?

A.    That's the -- that -- it has -- let me rephrase that.  Under a prior set of bylaws, it was handled that way.  With the revisions for this particular set of procedures -- I'm sorry.  Under a prior set of procedures, that's way it was handled.  With the change for the 2008 procedures, it was -- this arrangement was put into place.

The -- I suppose we could say but as a matter of practice, yes, it was -- it was handled this way still.

Q.    And that's not -- it's not specific to the Brandner-Sharpe grievance?  That's with respect to all of the grievances, correct?

A.    Well, I don't know that I can make that statement with certainty, but yes, I don't -- I can't -- well, I can't say -- I can't pick one that was different.  Let's put it that way.

Q.    Okay.  I'm just asking was Brandner-Sharpe treated differently during the first board of directors hearing than other grievances that had made that it far?

A.    No.

Q.    Okay.  And so this is one of these examples of the rules as amended in 2008 may not

15:07:15

15:07:49

15:08:02

15:08:19

195

provide for this, and it may not put parties on

notice that this is going to happen, but in

practice, that's the way the board has been

handling it?

A.    That's true, yes.                           15:08:43

Q.    All right.  Now, if the COP hearing panel does prepare written comments to the board of directors, those are then distributed to all of the parties with who will be presenting at the board of directors hearing, correct?          15:09:35

A.    Presenting -- they are distributed to all of the parties.  So even if one of the parties, the grievant or the respondent, aren't coming, they will still receive a copy.

Q.    Okay.  So they receive those actually    15:09:50 before they show up to attend the hearing, correct?

A.    Yes.

Q.    Okay.  So they at least know what position the COP hearing panel is advocating, and    15:09:58 they can plan accordingly, correct?

A.    Correct.

Q.    Okay.  Now, that's not the way it happens if the COP hearing package just sends a

representative to make a presentation, correct?

A.    That's correct.

Q.    Right.    There's no -- it's not like the representative of the COP hearing package types out, you know, the written comments he's going to make and distributes them prior to the hearing, correct?

A.    That's correct.

Q.    Okay.    Now, it's different for representatives of the judiciary committee if the grievance has been appealed to the judiciary committee.    The representative of the judiciary committee actually does make a presentation before the board of directors, correct?

A.    Yes.

Q.    And no synopsis of the presentation that he's going to make is provided to the parties before the hearing, correct?

A.    No.

Q.    And that's going to appear poorly on the record.    Is that correct?

A.    Yes.

Q.    If you turn to Exhibit 23, please.    Do you recognize this document?

A.     Yes.    This is the notification letter after the first board hearing.

Q.     And this is the letter that notifies Dr. Brandner that he is being suspended for one year from the AAOS for violating mandatory standards 3 and 4, correct?

A.     Yes.

Q.     Now, at the COP hearing panel level, they produce a report and recommendation, correct?

A.     Yes.

Q.     At the judiciary committee level, they prepare a report and recommendation, correct?

A.     Yes.

Q.     Okay.    This is just a letter from the board saying -- basically advising what they had chosen to do based on those reports and recommendations.

Is this the normal way the AAOS board of directors advises a respondent and a grievant as to the results of the board of directors hearing?

A.     Yes.

Q.     Okay.    And then there is absolutely no analysis provided in here whatsoever as to the

board of directors' thought process other than to say that they have voted to suspend him. Is that normal?

A. This is what happens every time.

Q. This is the standard way it's done?   15:13:28

A. Yes.

Q. Okay. Is this letter prepared by office of the general counsel?

A. It is drafted by the office of general counsel and reviewed by the president, and he   15:13:39 proves -- he signs off on it.

Q. And then generally it's short and sweet just like this one?

A. That's correct.

Q. Or in my client's view short and sour,   15:13:50 the way he looked at it.

Now, this said that the -- it says that more than two-thirds of the voting members present concurred. Do you see that?

A. Yes.   15:14:18

Q. Do you know what the actual vote count was?

A. I do not know.

Q. It's normal just to use that language

199

in these letters?

A.    Yes.

Q.    Do you remember what happened after the June 28th, 2010 letter advising Dr. Brandner that he was going to be suspended from the AAOS that essentially stopped that from happening, at least in the short term?

A.    If I remember correctly, we may have received a draft injunction or something like that. You know, it -- there's been a lot -- or maybe it was a letter. I'm sorry. It's just --

Q.    No problem. So the answer is no, you don't have a specific recollection?

A.    I really don't.

Q.    Okay. Fair enough. Let's have you turn to the document marked for identification as Exhibit 24.

A.    Okay.

Q.    This isn't going to fill in all the blanks, but it may give you enough to refresh your recollection.

Do you recognize the document marked for identification as Exhibit 24?

A.    Better not say yes until I read it.

200

Okay. Let's see.

Q. Why don't you go ahead and read it since I'm going see if it refreshes your recollection. Just go ahead and read it silently, and look up when you're done. 15:16:13

A. Oh, okay. Well, let me see. Okay. Yes.

Q. Okay. Does this refresh your recollection as to what happened shortly after the board of direct- -- board of directors issued its 15:16:50 initial finding that Dr. Brandner should be suspended?

A. Yes.

Q. Okay. What was that?

A. We received communication from your 15:17:01 office, and we agreed to refrain from publication.

Q. Okay. Until the board of directors could convene and consider extending the period until the court has decided the case on the merits. Do you see that? 15:17:21

A. Yes.

Q. Okay. And then do you recall that shortly thereafter I forwarded a draft copy of the complaint that was going to be filed?

A.    Yes.

Q.    Okay.  If you can turn to Exhibit 25, do you see the next correspondence that follows receipt of that.  Do you recognize this document?

A.    I do.                                    15:17:48

Q.    Who is Karen Hackett?

A.    Karen is our chief executive officer.

Q.    And so is she actually on the board of directors, or is this a completely different position?                                    15:18:01

A.    She is an ex officio member of the board of directors.  She is -- she does not vote.

Q.    The second paragraph here in this letter which we're looking at, Exhibit 25, says, "On July 22nd, 2010, the AAOS board of directors    15:18:22 met by conference call and voted unanimously to follow the AAOS bylaws regarding the public communication of its decision in AAOS grievance No. 2008-23."

      Do you see that?                         15:18:39

A.    Uh-huh.

Q.    Is that a "yes"?

A.    Yes, I do.

Q.    And that's the Brandner grievance,

202

correct?

A. It is.

Q. Okay. But then the next -- next sentence says, "We do not, however, anticipate publication of the board's decision in this matter, nor any of the board's other June 2010 professional compliance decisions involving violations of the AAOS standards of professionalism while the board considers Dr. Brandner's draft pleading and any additional new information submitted by September 1, 2010."

Do you see where I read that?

A. Yes.

Q. Okay. So the second paragraph of the letter basically says the AAOS board has voted to follow its bylaws regarding public communications, and then the second paragraph says but hold on, we're going to give your draft pleading some consideration. Fair characterization?

A. Yes.

Q. Okay. Tell me what was going on at the AAOS during this timeframe while they are considering the draft pleading.

A. What was going on was the board of

203

directors voted to follow the bylaws, which require publication once a year. As a matter of practice, it takes several months for us to get professional compliance actions published just because of drafting and getting the wording approved by the various committees and the general counsel's office and -- and because of the publication schedule. So at a minimum, it's 90 days anyway.

15:19:59

Q.     And so basically the second paragraph is saying during this period, we're going to give your draft pleading some consideration?

15:20:16

A.     Correct.

Q.     Okay. Did you play any role in the consideration of the draft pleading? Let me strike that. That's a horrible question.

15:20:27

When you -- I take it you read the draft pleading when it was initially submitted?

A.     I did.

Q.     Okay. What was your response in terms of your thought process upon reviewing the draft pleading?

15:20:40

A.     That was over a year ago. I don't remember what my initial thought process was.

204

Q.    Any chance it was, "Oh, I can't believe we botched this so horribly"?

A.    I don't remember that.

Q.    Okay.  I was hoping you'd say yes, just so you know.                                        15:21:19

At some point, the board decides they're going to re-hear the matter.  Do you recall that?

A.    I do.

Q.    Okay.  From 2008 to September 29th of        15:21:31 2010, that would roughly be the time between which you started working at the AAOS and the date on which they advised the parties that they were going to rehear the matter, had any other grievances been re-heard by the board of               15:21:51 directors?

A.    Well, Dr. Brandner was the first.

Q.    What is your understanding as to why the board of directors close to re-hear the matter of Sharpe v Brandner?                                    15:22:04

A.    The board of directors -- again, I don't speak for the board, but as my recollection of events was that, having reviewed your materials, they -- they wanted you to have an

opportunity to present Dr. Brandner's materials to the board a second time. It's a brand new hearing. And that's what was done.

Q. But you do recognize that the draft pleading didn't just identify procedural infirmities at the board of directors level; they permeated the process. They went all the way back to the preliminary administrative review through the COP hearing panel, through the judiciary committee, correct? 15:22:56 15:23:14

A. Yes.

Q. Okay. In your mind, would the re-hearing of the Brandner-Sharpe grievance at the board of directors level remedy the issues raised at each of those prior levels? 15:23:36

A. Are you asking me for a legal conclusion?

Q. Just your mind. If you want to give me your legal conclusion, give me your legal conclusion. 15:23:51

A. I don't know.

Q. Now, at the second board of directors meeting, you were present for that as well, correct?

206

A.    I was.

Q.    Okay.  At that -- well, in preparation for that hearing, the COP hearing panel issued written comments to the board of directors, correct?                                                    15:24:25

A.    The committee on professionalism --

Q.    Yes.

A.    -- representative?  Yes.

Q.    Yeah.  And I think if you look at Exhibit 27, I think that's the -- is that the                    15:24:33 cover letter sending out the written comments to the AAOS board of directors?

A.    Yes, it is.

Q.    Okay.  And at the second board of directors meeting, the chairman of the COP hearing              15:24:48 panel was not permitted to make a presentation, correct?

A.    That's correct.

Q.    Okay.  I guess I just have to ask it this way.                                                        15:25:16

Ultimately, the second board of directors meeting resulted in the exact same result as the first, correct?

A.    Yes.

207

Q.    I mean, if I remember correctly, I think the letter advising Dr. Brandner that he was being suspended from the AAOS may have gotten -- may have been drafted and sent before Dr. Brandner and I were even outside of Chicago.    15:25:41 It happened pretty quick.

Do you recall that?

A.    I don't recall that.

Q.    Okay.  Well, if you go back to Exhibit 29, I believe this is the letter advising    15:25:52 Dr. Brandner that once again the board of directors voted to suspend him, correct?

A.    Yes.

Q.    You see they met on the -- December 4th and by the 9th, the letter had already been sent    15:26:05 out, correct?

A.    Correct.

Q.    The impression I had -- and I'm going to let you correct me if I'm wrong -- was that the second board of directors meeting was an absolute    15:26:18 farce.

Basically, we were invited back to Chicago so that the board of directors could cure the procedural infirmities that had occurred at

their level and then basically rubber stamped the same finding that they previously had. That was my impression.

Did you have a different impression?

A. No, it was -- it was a de novo hearing. That's what it was designated as a de novo hearing, completely new set of materials were prepared by the general counsel's office. The board of directors were all given new hearing materials. They all took it very seriously. They all reviewed them at the advance of the hearing. The judiciary committee prepared their statement. The committee on professionalism did their statement. It was considered a new hearing.

Q. Why is it important that it was a de novo hearing?

A. Why is it important that it was a de novo hearing.

Q. Yeah. You pointed that out twice in your answer. I'm curious why you view that as important.

A. Well, it's important because it's never happened before, at least from my perspective. It's certainly not provided for in the procedures,

and I think that it's important because, at least from the board's perspective, they were -- it was novel from their perspective as well, and they were giving Dr. Brandner a chance to present before the board again.                                          15:27:54

Q.    But he was still getting only ten minutes, correct?

A.    That's what's permitted under the procedures.

Q.    Right.  But, I mean, he was never going 15:28:01 to get his 30 minutes back at the COP hearing panel level to make an evidentiary presentation using those additional transcripts, correct?

A.    That's not permitted under the procedures either.                                          15:28:16

Q.    Right.  I agree with that.

But what I'm saying is the ten minutes he got in front of the board, it's not like in ten minutes he was going to be able to get up there and present the evidence that the COP hearing    15:28:28 panel didn't hear, correct?

A.    Well, I can assure you that the board of directors all took their responsibility seriously.  They reviewed all of the -- all the

210

materials, and they came to their own conclusions.

I certainly don't want to speak for them, but --

Q.    Does the board of directors ask questions of the grievant and the respondent during the board of directors hearing?    15:29:03

A.    They do sometimes.

Q.    I mean, this is very similar to the judiciary committee.

There's nothing in the rules that indicate that the board of directors is permitted    15:29:12 to ask questions of the grievant or respondent, correct?

A.    It does not expressly say that they can or that they can't.

Q.    Right.  And there's no letters that are    15:29:23 sent out to the parties who -- advising them that, even though the rules don't provide for this, we're just letting you know the board may ask you questions during this process, during your presentations.    15:29:35

There's nothing like that, correct?

A.    No.

Q.    Okay.  But if I understand your testimony correctly, that doesn't mean that it

doesn't happen?

A.    Right.

Q.    Okay.  Now, do you know how many questions were asked of the board of directors of Dr. Brandner or myself during the initial board of directors hearing?

A.    I'm sorry.  I --

Q.    You don't?

A.    I'm drawing a blank.  I really don't remember.

Q.    Do you know how many questions were asked of Dr. Brandner and myself in the second board of directors hearing?

A.    No, I don't.

Q.    Would it surprise you if I told you I could add them both together and it would still equal zero?

A.    No, that wouldn't surprise me.

Q.    Okay.  But it's your testimony that you have a different opinion of the second board of directors meeting than I do, mine being that it was a farce, we were just going back there to -- to fix these procedural infirmities and rubber stamp the same result as the first.

You disagree with that?

A. I do.

Q. Okay. The second board of directors meeting, the letter that actually goes out, Exhibit 29, has that same language, "The vote was by secret ballot with more than two thirds of the voting members present concurring."

Do you recall the specific vote count?

A. I don't.

Q. If you could turn to the document marked for identification as Exhibit 30, do you recognize this document?

A. Yes.

Q. And what is it?

A. This is correspondence from your office December 15th, 2010 notifying the AAOS of your intent to file a complaint.

Q. And you see in the middle of the second paragraph there, I write, "By this letter, I am requesting that the AAOS refrain from publicly disclosing the board's decision until the court has ruled on a motion for temporary restraining order and preliminary injunction that my office will be filing in this matter."

213

Do you see that?

A.    I do.

Q.    Do you recall how the AAOS responded to that request?

A.    I don't specifically recall how we responded, although I can say that we have not published, if that helps.

Q.    No, and I understand.  I understand that.  If you go to the next exhibit, Exhibit 31, it's a letter dated December 17, 2010 from Richard Peterson to me.

It says, "I am in receipt of your December 15, 2010 correspondence.  The American Association of Orthopaedic Surgeons will not agree to withhold publication of the board in the directors' decision in the above-mentioned professional compliance program grievance."

Do you see that?

A.    Yes.

Q.    Okay.  Did you play any role in the decision to reject the request made by my office to refrain from publishing the results until the court had ruled on the merits of the case?

A.    No, that would be a board of directors

214

decision.

Q. Do you think the board convened between December 15th when I sent the letter and December 17th when Mr. Peterson sent me a letter telling me no? 15:33:50

A. That would -- that could happen.

Q. That could happen?

A. With a conference call or a presidential line conference call, yes, it could happen. 15:33:59

Q. Do you know if it happened in this instance?

A. I do not know, no.

Q. Do you disagree that the AAOS wants to dissuade its members from testifying in medical 15:34:25 malpractice lawsuits filed against other AAOS members, no matter how innocuous the testimony would be?

A. Do I disagree with that?

Q. Yeah. 15:34:39

A. I disagree with that, yes.

Q. Okay. It's your -- does the AAOS -- well, I should phrase it this way.

Does the AAOS take a position with

respect to one member of the AAOS testifying as an expert witness in a medical malpractice case against another AAOS member?

A.   Do we take a position?

Q.   Right.  Whether it's good or bad?     15:35:01

A.   We --

Q.   Do you encourage it?  Do you discourage it?

A.   We do encourage our members, our fellows to serve as expert witnesses, yes, in a -- 15:35:12 in a variety of ways.

Q.   What about in cases against other AAOS members?

A.   We do not take a position on that one way or the other.     15:35:23

Q.   Okay.  Because, I mean, the reality of the grievance program is that the only party who can submit a grievance against an AAOS is another AAOS member, correct?

A.   That is true.     15:35:30

Q.   Okay.  So if Dr. Brandner goes out and gives the most hair-brained testimony the world has ever seen in a medical malpractice case against a physician who is not a member of the

AAOS, that physician is not in a position to submit a grievance to the AAOS, correct?

A. Not for lack of requests, however.

Q. I'm sure.

A. And not for lack of requests from patients either.     15:35:53

Q. But if the patient or if, in this case, the physician who Dr. Brandner testifies against submits the grievance, the AAOS would reject the grievance because the grievant in that case would not have standing to assert such a grievance, correct?     15:36:06

A. That's correct.

Q. Okay. So the only party who can submit the grievance in the medical malpractice context would be if the other physician was a member of the AAOS?     15:36:15

A. This is not limited to medical malpractice. It is -- it is expert witness testimony in any context.     15:36:29

Q. Right. But I'm talking about medical malpractice.

A. Well, that's fine, but I thought I'd clarified for you.

217

Q.    Okay.   Well, I'm talking about medical malpractice.

A.    Okay.

Q.    So you agree that only if the physician being sued for medical malpractice is a member of    15:36:43 the AAOS could that physician submit a complaint or a grievance against the expert testifying on behalf of the plaintiff?

A.    He doesn't necessarily have to be the physician that is sued.   He could simply be    15:37:02 another fellow who was aware of that testimony.

Q.    Okay.   So the aggrieved party in that instance has to be able to find some AAOS member willing to submit the grievance on their behalf?

A.    Correct.    15:37:16

Q.    Okay.   And does that happen as well? Do you find people --

A.    It has happened.

Q.    People being, you know, lobbied or contacted by other parties asking that they submit    15:37:25 grievances with respect to matters that they were not involved in?

A.    It has happened.

Q.    And that's not a problem, because as

218

long as the grievance is submitted by a member of the AAOS against a member of the AAOS, there is standing and jurisdiction, correct?

A.    As long as they have supporting documentation.  That's not always the case, however.  If they can't support the grievance, they can't go forward.

Q.    What do you say to those who believe that the AAOS is using their grievance program to narrow the pool of physicians available to testify as experts against its members in medical malpractice cases?

A.    I have not been asked that question.

Q.    Right.  But I'm asking you.

I'm saying what would you say to a person who believes that that's the case?

A.    I would say that this is a legitimate program that addresses experts who testify with un- -- who provide unsupported expert witness testimony, and that was the intent of the program when they developed the standard of professional -- standard of professionalism on expert witness testimony.

When -- when it was developed, that

was -- that was the range of standards that they developed was to ensure that academy members who testified would meet the standard so that they provided testimony that was scientifically sound and supported.

That's not to say we don't want you to testify, but if your going to do it and you're going to wear the academy badge, you should do it to a high ethical standard.

Q. Dr. Brandner testified in the underlying case that the standard of care for informed consent in a proximal tibial osteotomy retires a discussion of the perineal nerve and the risk of a drop foot. I have been unable to find any physician who has been deposed in this case who disagrees with that testimony.

Do you have an opinion?

A. I'm not a physician.

Q. Stepping back from the grievance program itself, talking big picture at the AAOS, do you agree that one of the goals of the AAOS is to help its members avoid liability to patients for medical malpractice?

A. Avoid liability to -- I think that the

academy has a number of offerings, benefits for its members. There is a, as I think I mentioned to you, practice management program and part of what they do is offer things that will help you sort of train your staff in ways to reduce your risks when it comes to dealing with patients or with electronic medical records or, I mean, there are a number of offerings that the academy has.

Q.      Educational opportunities that if the members avail themselves of, they may be able to reduce their risk?

A.      Yes.

Q.      Okay.  And it's my understanding from Mr. -- pardon me, Dr. Geline's testimony yesterday the AAOS either had or has a liability committee?

A.      We have a --

Q.      Is that correct?

A.      -- professional liability committee.

Q.      And I believe he indicated that the purpose of that committee is to analyze statistical data provided by medical malpractice insurance companies to try and educate their members as to ways in which they can reduce their exposure to liability for medical malpractice.

Would you agree with that?

A. Well, that's a very small portion of what the committee does. It's a fairly large committee, actually. They do education on a number of topics, including what I just talked to you about, risk management with your office staff. A lot of it has to do with they write -- a portion of the committee is assigned to our publications department, so they write articles. Some of them do courses at the annual meeting.

Q. When you talk about courses and articles, are those courses and articles explaining ways that the AAOS members can reduce their exposure to liability for medical malpractice?

A. You know what? Actually, some of them were written by -- some of them were written by attorneys, plaintiffs' attorney. Some of them are written by defense attorneys. Some of them are written by Ph.D.'s on various, you know, issues like infection in the hospital or, I mean, those kind of things, you know, in -- on the hospital -- what do they call them -- doctors' jackets or those kinds of things. I mean, there are all

kinds of issues that they write about.

Q. But the idea is by putting that information out there to the AAOS members, the members may be able to reduce the risk of incurring liability in connection with medical malpractice, whether it be because there's a -- you know, an infection, you know, there's a bacteria on their -- on their jacket or, you know, whether they're making a mistake in the operating room, correct?

A. They might even save a life, yeah.

Q. Right. If you could turn to the document marked for identification as Exhibit 32. Do you recognize this document?

A. I do.

Q. Okay. What is it?

A. This was an article that I wrote a long time ago, feels like a long time ago.

Q. What is the title of the document?

A. Ad damnum, which was written by the professional liability -- or for the professional liability committee, actually.

Q. Okay. What's the rest of the title of the document?

223

A.    "The plaintiff's hope."

Q.    Okay.  What did you mean by "The plaintiff's hope"?

A.    I don't know.  I didn't write the title.                                                    15:44:25

Q.    Okay.  Who wrote the title?

A.    The editors for the magazine.

Q.    Got you.  If you go to the second page of the article, it says, "With a new administration and a markedly different Congress    15:44:39 taking office this month, the future and shape of tort reform is unclear.  In the interim, however, big jury awards such as the following are likely to continue," and then it's got them listed out.

Do you see that?                                                    15:44:55

A.    Uh-huh.

Q.    What is the purpose of -- of that section in this article?

A.    Just to highlight some large cases that have jury awards that had happened.                   15:45:05

Q.    And I think we've already discussed this, but let's just make it clear.

In terms of tort reform, the AAOS as a lobbying body advocates for tort reform to the

extent that it protects the physicians, correct?

A.    Yes.

Q.    I'm sure if I was taking a deposition of a bunch of plaintiff's attorneys, they would be lobbying for tort reform in a much different way.    15:45:32
Would you agree?

A.    I'd say that's a safe assumption.

Q.    Okay.  If you would turn to the next document marked for identification as Exhibit 3, do you recognize this document?    15:45:45

A.    I do.

Q.    And what is it?

A.    Another article that I wrote a long time ago.

Q.    And what's the title of this document?    15:45:53

A.    "Court Upholds Expert Witness Qualifications."

Q.    And this specifically is talking about or at least it focuses on a case in Arizona,    15:46:04
correct?

A.    Yes.

Q.    Okay.  And you know that the Sharpe underlying litigation occurred in Arizona, correct?

225

A.    I don't remember that, but okay.

Q.    Okay.  Do you know how it was that the AAOS ended up submitting an amicus brief in the case before the Arizona Supreme Court?

A.    I do not.                                                    15:46:26

Q.    All right.  Is this something that -- well, I guess I should ask this.

Do you play a role in determining which cases the AAOS should get involved as a friend of the court, or are you further down the line,                         15:46:39 basically once that why decision's been made, you go ahead and prepare the brief?

A.    I take that back.  Ask me your question again.

Q.    The initial one --                                          15:46:49

A.    The prior question.

Q.    Okay.

A.    Yeah.  Yes.

Q.    How is it that the AAOS ended up submitting an amicus brief in this Arizona Supreme   15:46:55 Court case?

A.    Okay.  This is a brief that had already been submitted before I came.  I can tell you the process, however, if that would help you.

Q.    Sure.

A.    Okay.  The process is we will get a request from, well, a variety of sources.  It could come from another society, sometimes the AMA, sometimes the state orthopaedic society, sometimes a specialty society, sometimes from a surgeon who is a party to the litigation, for the academy to participate.  They will provide us with the information.

15:47:29

The office of general counsel will review the information, prepare a recommendation or report and recommendation to the board of directors, and the board of directors makes a decision one way or the other whether to participate or not to participate.

15:47:43

15:48:01

Q.    Here under the heading Upholding Tort Reform, it says, "The Supreme Court noted that in enacting the statute, the Arizona legislature was addressing," quote, "what it believes to be a serious substantive problem," the effects on health -- pardon me, "the effects on public health, of increased medical malpractice insurance indicate rates and the reluctance of qualified physicians to practice here by effectively

15:48:14

227

increasing the plaintiff's burden of production in

medical malpractice actions," period, closed

quote.

Do you see where I read that?

A.    I do.                                        15:48:34

Q.    That is -- the fact that this decision was viewed as a blow to the plaintiff's bar in medical malpractice case -- cases, that is in line with the AAOS's advocacy efforts in the area of tort reform, correct?                              15:48:53

A.    I don't think I said that, but that -- it could be seen that way, yes.

Q.    Yeah, I mean, I'm -- I'm not saying that that sentence said that.

I'm saying that this sentence has told    15:49:03 us what the Supreme Court -- how the Supreme Court views the upholding the legislature's intent with that legislation, and I just wanted to make sure that you and I are on the same page, that by increasing the plaintiff's burden of production in  15:49:18 medical malpractice actions, the Arizona Supreme Court, by affirming the legislature's amendment of the statute, that is in line with the advocacy efforts of the AAOS?

228

A.     I think I told you I don't do the advocacy piece, but I think it would be safe to say that the academy is a -- is -- is -- would prefer tort reform in favor of physicians.

Q.     Right.  I mean, let's put this in     15:49:55
simple -- we go downstairs, Michigan Avenue.  If there's a rally going on and on the left side of the street there are a bunch of doctors and insurance companies advocating for tort reform and on the right side of the street there are a bunch     15:50:09
of attorneys advocating against tort reform, if the AAOS is going to be supplying posters for one side of the street, it's going to be the left side of the street, correct?

A.     Correct.     15:50:26

Q.     Okay.

A.     Which brings up an interesting question.  Which side of the street will Dr. Brandner be on?

Q.     You know, he testifies in --     15:50:32

A.     You don't have answer that.

Q.     No, I can, because he testifies 95 percent of the time for the plaintiff -- pardon me, for the defense, which I think is the thing

that is most upsetting to him about this is that he is viewed as a defense W-H-O-R-E in Nevada, and he finds himself --

A.    Did you say that?

Q.    That's what it's -- that's the way he's viewed in Nevada as a defense guy, and he finds himself dealing with this here in Chicago where he's being, in his view, attacked for, like, the one time where he ever testified on behalf of the plaintiff.

So that is a -- an upsetting thing for him, especially when he's getting contacted by the -- what is it, the American Trial Lawyers Association asking him if -- you know, if they can take up his -- you know, take up his fight and help him in his case against the AAOS, the very people that he testifies to.

Brandner is famous in Nevada for dealing with an attorney named Bob Vannah, who is a plaintiff's attorney, and at one time they got into a heated exchange, and Brandner looks at him and says, "If I took the change out of my pocket and threw it into the corner, you would dive for it."

230

So this is out of -- being on the plaintiff's side is out of context for him. Okay. Back to the questioning. We've talked to death about Exhibit 34, so we don't need that.

Okay. Let's go to Exhibit 35. Do you recognize this document?          15:52:05

A.     I do.

Q.     Okay. And what is it?

A.     That would be my affidavit.

Q.     Okay. And this is the affidavit that          15:52:23 was submitted in support of what?

A.     That would be the affidavit submitted in support of this lawsuit.

Q.     Okay. This was actually, I believe, submitted --          15:52:34

A.     Well, in support of our -- our pleadings, our --

Q.     I believe it was submitted in opposition to the motion for temporary restraining order and preliminary injunction filed by my          15:52:45 office?

A.     I --

Q.     Does that sound right?

MR. CHABRAJA:  That's --

231

BY THE WITNESS:

A.     That sounds about right, yes.

MR. CHABRAJA:  That is correct.

BY MR. MAURICE:

Q.     Okay.  Now, I see your signature.  If     15:52:54
you go back to Page 37, I believe that's your
signature, correct?

A.     Yes.

Q.     Did you write the affidavit?

A.     I reviewed it and made corrections.     15:53:03

Q.     Okay.  So you were not the original
drafter of the affidavit?

A.     No.

Q.     Do you know who the original drafter of
the affidavit was?                             15:53:17

A.     My counsel.

Q.     Okay.  When you say your counsel, that
was back when you were represented by the firm of
McGuire Woods, correct?

A.     Yes.                                     15:53:30

Q.     Okay.  If you could, turn back to
Page 4, Paragraph 14, and it's actually the last
sentence of Paragraph 14, says, "The orthopaedic
expert witness SOPs reflect the AAOS's position

232

that any expert medical testimony given by its members must be truly expert, impartial, and available to all litigants."

Q.    Do you see that?

A.    I do.                                                    15:54:11

Q.    Okay.  What did you mean when you had -- when you signed an affidavit that said "truly" expert?

A.    That means that they -- they -- an AAOS member providing the expert witness testimony has    15:54:25 to be knowledgeable, has to essentially know what he's testifying about.  He has to be -- have relevant experience in whatever the testimony is, educational requirements, that kind of thing.

Q.    Does that mean the AAOS takes the    15:54:46 position that it could find a respondent, who may have been qualified as an expert in the underlying litigation, to not have been qualified based on the standards propounded by the AAOS?

A.    That was qualified -- I'm sorry.  Ask    15:55:10 me that again.

Q.    Well, I'm thinking in the Brandner -- in the Brandner context.  Nobody ever challenged Dr. Brandner at the trial court level his

233

expertise. Nobody -- they didn't voir dire him, they didn't question his ability to offer that testimony. Nobody objected to his being introduced in front of the jury as an expert witness.

15:55:34

But then Dr. Sharpe came to Chicago and submits a grievance that says Dr. Brandner was not qualified to act as an expert in the case. And so I'm wondering if your use of the word "truly" expert here means that the AAOS takes the position 15:55:49 that it doesn't matter if the court admits you as a witness, as an expert witness or not, the AAOS has the right to look at your qualifications and determine if you were truly expert?

A.     I think that the AAOS standards are         15:56:05 considered to be wholly separate from what a state would require, because we have to keep in mind there are 50 states.

Q.     Okay.  So the AAOS would view their mandatory standards -- well, strike that.         15:56:27

So the AAOS's view would be that a -- even if a physician was admitted as an expert in his home state to testify as an expert, by offering that testimony, that expert, that witness

234

may nonetheless have violated the mandatory standards set down by the AAOS, the higher standard, so to speak?

A. A different standard.

Q. Okay. When it says "and available to all litigants," what does that mean?

A. Available to all litigants. It doesn't matter who the litigant is. I mean, if they need an expert, they should be available.

Q. Let's go down to Paragraph 16, second sentence. It says, "The general procedural mechanisms provided by the AAOS" -- pardon me, "provided in the AAOS bylaws are amplified in the AAOS's Professional Compliance Program Grievance Procedures."

You see where I wrote that -- you see where I read that?

A. I do.

Q. Paragraph 16?

A. Yes.

Q. What did you mean when you used the word "amplified"?

A. Well, I think I meant the same thing as supplemented.

235

Q.    If you could turn back to Paragraph 20 in the affidavit, it says, "Within 90 days of receipt of the grievance, the AAOS office of general counsel conducts a preliminary administrative evaluation of the grievance."

Do you see where I read that?

A.    Yes.

Q.    It's not really 90 days pursuant to the grievance procedures, correct?  It's a 60-day period, and then there's a 30-day notice period to the respondent, correct?

A.    Correct.

Q.    I mean, arguably, the preliminary administrative evaluation is supposed to occur in that --

A.    Sixty.

Q.    -- 60-day period, and then once that has been completed, then the office of general counsel has 30 days from that point to advise the respondent that a grievance has been submitted against them, correct?

A.    That's correct.

Q.    Paragraph 21 provides, "Before the COP receives materials regarding a grievance, the AAOS

15:58:15

15:58:26

15:58:37

15:58:47

office of general counsel conducts an inquiry to ensure that there are no conflicts of interest between a committee member and a grievant and/or a respondent. The identity of the COP members is provided to the parties, and they have the right 15:59:28 to challenge their involvement for cause."

Do you see where I read that?

A. I do.

Q. Okay. Now, this period in which the grievant and respondent have a right to challenge 15:59:42 the involvement of a COP member for cause occurs after the prima facie determination, correct?

A. You know what? I'm going -- I'm going to have to look. I'm trying -- I think that it is actually before the prima facie review. 16:00:06

Q. That's your understanding?

A. Different sets.

Q. I think we're going to look -- I think we're going to look at some e-mails a little later, and what it's going to show is initially 16:00:20 before any materials are sent out the office of general counsel canvasses the members of the COP --

A. Oh, I'm sorry. You're exactly right.

Q.    Yeah.

A.    We do.

Q.    To find out if they want to say, "I need recuse myself"?

A.    That's exactly right.  I apologize.    16:00:36 That is -- that is what happens.

Q.    Okay.  And then the materials are sent to them, they vote on the prima facie determination, and then when it is set for a hearing, that's when the grievant and respondent    16:00:48 are given an opportunity to -- to challenge for cause.

Does that sound right?

A.    Yes.  The grievant and the respondent are given an opportunity to challenge for cause    16:01:00 prior to the hearing.

Q.    Okay.  What disclosure obligations do the members of the COP have in terms of ensuring that the grievant and the respondent have all the necessary information to determine if they are    16:01:19 going to challenge one of them for cause?

A.    We provide the parties with the names of the members of the committee on professionalism and, to my knowledge, that is probably all that's

included on the -- on the notice in terms of information.

Is that what you're asking about, the information on the various members?

Q.    Yeah.  And I guess I should break it up this way.  Well, let's go back a little bit.

The office of general counsel, when it's canvassing the members of the committee on professionalism to determine if they want to recuse themself provides -- it's kind of like a page-and-a-half snapshot of these are the parties, this is where they went to school, this is where they did their residencies, it provides some general information to the COP members so that they can make their determination as to whether they want to recuse themself, correct?

A.    That is correct.

Q.    They gave the COP members enough information so that they can, looking at it, make their determination, correct?

A.    Correct.

Q.    Okay.  This -- the office of general counsel does not provide that matrix to the grievant and the respondent when asking them if

they want to challenge for cause, correct?

A.    No, we do not.

Q.    Okay.  That's correct?

A.    That is correct.

Q.    Okay.  All the office of general counsel provides to the grievant and respondent are the names of the members of the committee on professionalism, correct?

A.    That is correct.

Q.    It's then up to the members on the committees of professionalism to determine whether they want to challenge for cause, correct?

A.    Yes.

Q.    Okay.  And is that -- and I know we're talking about the COP hearing panel level, but is that process, the canvassing of the members, the submission of the names to the grievant and the respondent, is that the same process that occurs at the COP hearing panel level, the judiciary hearing panel level, and the board of directors hearing panel level?

A.    It is.

Q.    Okay.  If you could turn to Paragraph 55 in Exhibit 35, actually, I guess

Paragraph 53.

A.    Okay.

Q.    We've discussed this a little bit previously, but I just want to make sure we're clear.                                                    16:05:32

Paragraph 53 says, "on September 15, 2009, Dr. Brandner submitted his witness list and additional grievance material to the association."

Do you see that?

A.    I do.                                          16:05:42

Q.    And this is in preparation for the COP hearing panel, just to make sure we're on the same page.

If you drop down to Paragraph 55, it says, "On September 18, 2009," so that's three          16:05:52 days later, "the association forwarded Dr. Sharpe's April 23, 2009 letter to Dr. Brandner."

Do you see where I wrote that?

A.    Yes.                                           16:06:04

Q.    Okay.  And it's my understanding from your testimony that the office of general counsel did not make some calculated decision to wait until after Dr. Brandner had submitted his witness

list and additional grievance material before forwarding that letter received by -- from Dr. Sharpe back in April of '09, that's just the standard way the office of general counsel handles the collection of correspondence from the parties and the transmission of that to the parties?

A. That's right.

Q. If you will go to Paragraph 77, please. Paragraph 77 is a long one, so I'm not going to go through it all, but it says, "Dr. Brandner, however, agreed to testify against Dr. Sharpe in October 2004. At that time, the patient and his mother had each been deposed only once in the lawsuit against Dr. Matthews, the physician who had treated the patient prior to Dr. Sharpe."

And then it goes to say, "As of October 2004, there were only three sources of evidence available to Dr. Brandner on the issue of informed consent," and I'm going to stop right there.

This again is going back to this idea that Dr. Brandner, in agreeing to act as an expert in October of 2004, did something wrong.

Why is it that October 2004 is underlined in Paragraph 77?

242

A.   I don't know.

Q.   It wasn't a -- that wasn't a requested revision that you asked for?

A.   No.

Q.   When you reviewed this prior to signing 16:08:01 it, that wasn't something that you noticed and thought, "Hey, that doesn't make any sense because there were no professional compliance grievance procedures prior to April of 2005, so why are we emphasizing October 2004?" 16:08:16

A.   I don't think that was the point of why it was underlined.  I'm sure that at some point -- and I'd have to go back and read this again and all the way through or back through here.  I think possibly maybe the point was that 16:08:43 while there wasn't a program at that point, he still had signed off on the affirmation statement prior to that, and it has the same type of requirements.

Q.   We're going to talk about that 16:09:05 affirmation statement a little later.  Let's make sure we look at Paragraph 77 where it talks about this, "Dr. Brandner, however, agreed to testify against Dr. Sharpe in October 2004."

243

Now let's go to Paragraph 78. It says, "When Dr. Brandner decided to act as an expert witness against Dr. Sharpe in October 2004, there was no factual dispute over Dr. Sharpe's discussion of the risk of perineal nerve injury with the patient and his mother."

Again, is it your testimony that this issue of when Dr. Brandner agreed to act as an expert witness on behalf of the plaintiff in this case that that was not the basis for the finding by -- at every single level, the COP hearing panel level, the judiciary committee level, the board of directors level against Dr. Brandner?

A.    Yes.

Q.    And you'll find it strange that it not only comes up six times in the judiciary report, but it also comes up in your affidavit?

A.    No.

Q.    I'm going to ask you to turn back all the way to Exhibit 3, specifically Section VII C11.

A.    Okay.

Q.    It provides, "The office of general counsel will notify the grievant and respondent if

the grievance has been accepted for review.  In addition, the office of general counsel will advise the grievant and the respondent of the specific mandatory standards of the AAOS" -- pardon me, "of the AAOS standards of professionalism that is alleged to have been violated and that will be considered at the grievance hearing."

    A.    Okay.

    Q.    Do you see that?

    A.    Yes, I do.

    Q.    Okay.  Now I would ask you to turn to Exhibit 12.

    Do you recognize this as the letter by which the AAOS advised Dr. Brandner and Dr. Sharpe that the committee on professionalism had concluded that a prima facie case of unprofessional conduct had been established and that a hearing was warranted?

    A.    Yes.

    Q.    Okay.  Do you see anything in the letter in Exhibit 12 that advises the grievant and the respondent of the specific mandatory standards of the AAOS that are alleged to have been violated

245

and that will be considered at the grievance hearing?

A.    No.

MR. MAURICE:  Let's take a break.  We're running out of tape.                                    16:13:39

THE VIDEOGRAPHER:  We're going off the video record at the end of Tape 4 at 4:13 p.m.

(WHEREUPON, a recess was had.)

THE VIDEOGRAPHER:  We are going back on the video record at the start of Tape 5 at 4:19 p.m.    16:19:16

BY MR. MAURICE:

Q.    Okay.  If you could turn to -- we're still on Exhibit 35, so if you could go back to Exhibit 35 and if you could turn back to Paragraph 123.                                    16:21:05

A.    Okay.

Q.    And, actually, if you go to the portion of Page 123 that is Page 7, it says, "Moreover, Dr. Brandner signed an AAOS expert witness affirmation statement on August 18, 2004 in which    16:21:30 he agreed to abide by substantially the same guidelines as those latter" -- or "later," pardon me, "included in the AAOS's standards of professionalism for orthopaedic expert witness

testimony."

Do you see where I read that?

A.    Yes.

Q.    Okay.  Now, that affirmation statement was not submitted to the committee on professionalism as part of its determination, prima facie determination, correct?

A.    No.

Q.    Okay.  Well, again, it's the way I asked the question.

It is a correct statement that the affirmation statement was not provided to the committee on professionalism when it was making its prima facie determination, correct?

A.    Okay.  The grievant did not submit the affirmation statement, and the academy would not do it for him.

Q.    Right.  So -- and I'm just going to be going through the different levels here.

Is it a correct statement that when the committee on professionalism was making its prima facie determination, it did not have in front of it the AAOS expert witness affirmation statement that Dr. Brandner apparently executed in August

of 2004?

A.    That is correct.

Q.    Okay.  Is it also a correct statement that the COP hearing panel did not have before it the AAOS expert witness affirmation statement that Dr. Brandner executed in August of 2004 when it was conducting the actual hearing?    16:23:11

A.    That is correct.

Q.    Okay.  Is it also correct that the judiciary committee did not have the AAOS expert witness affirmation statement that Dr. Brandner executed in August of 2004 when it conducted the judiciary hearing?    16:23:25

A.    That is correct.

Q.    Okay.  Is it also correct that the board of directors that presided over the first board of directors hearing did not have before it the AAOS expert witness affirmation statement that Dr. Brandner executed in or around August 18 of 2004?    16:23:37    16:23:53

A.    That is correct.

Q.    Is it also true that the board of directors that presided over the second board of directors hearing did not have the AAOS expert

248

witness affirmation statement that Dr. Brandner executed on or around August 18, 2004?

A.    That is correct.

Q.    Okay.  So what makes or what made you think when executing an affidavit on January 28, 2011 that you could introduce the AAOS expert witness affirmation statement to the court?

MR. CHABRAJA:  Wait.  Repeat that, please.

(WHEREUPON, the record was read by the reporter as requested.)

MR. CHABRAJA:  I'm going to object.  You're asking for her mental impressions.

BY MR. MAURICE:

Q.    You're an attorney licensed to practice in the State of Illinois, correct?

A.    I am.

Q.    You've practiced in the federal courts, not only in Illinois but in other states, correct?

A.    That's true.

Q.    Okay.  You act as counsel to a number of committees of the AAOS, correct?

A.    I act as -- that is true.

Q.    Okay.  You understand the concept of an administrative record, correct?

249

A.    That is true, yes.

Q.    And you understand that after the administrative process is over, the administrative record is what it is, correct?

A.    Yes.                                              16:25:46

Q.    Okay.  And you recognize, as we've just gone through each level of this administrative process, that this AAOS expert witness affirmation statement that Dr. Brandner executed on or about August 18, 2004 is not part of the administrative    16:25:59 records of these proceedings, correct?

A.    To my knowledge, it is not.

Q.    Right.  It was not introduced, considered, or discussed at any level of these proceedings, correct?                                    16:26:15

A.    That is true.

Q.    Okay.  So we're here arguing over a motion for preliminary injunction, and in Paragraph 123 of your 37-page affidavit, you introduce a document that is -- and attach it as    16:26:29 Exhibit FF that was not part of the administrative record.

And so I'm saying why would you do that?

MR. CHABRAJA: Same objection. Calling for the mental impressions of the legal counsel of the association. Wallace matters in litigation.

MR. MAURICE: So you're objecting on the grounds that it's subject to privilege.

16:26:53

MR. CHABRAJA: I am -- yes, I am.

And to the extent you can answer this question without divulging privileges communications, you can do so. I would caution you, however --

16:27:08

MR. MAURICE: You know what, I'm going withdraw the question because I don't know how you could answer that question without divulging -- divulging attorney-client -- either attorney-client protected information or attorney work product. I will withdraw that question.

16:27:18

BY MR. MAURICE:

Q. Let me ask you to -- let me at least ask you this.

When you talk about the revisions you made to the affidavit, was one of the revisions you made to add reference to the AAOS expert witness affirmation statement?

16:27:24

A. I really don't remember.

Q.    In terms of the obligation of the members of the committee on professionalism to avoid conflicts of interest -- well, I guess I should ask do you agree that members of the committee of professionalism have an obligation to try to avoid conflicts?    16:28:26

A.    Try to avoid conflicts with the parties?

Q.    Right.  Conflicts of interest?

A.    Yes.    16:28:40

Q.    Right.  Whether they're real or perceived, it's better to -- to try to avoid the appearance of impropriety, correct?

A.    Yes.

Q.    Okay.  What are the standards by which    16:28:51 the AAOS requests that its committee members evaluate potential conflicts?

A.    There are -- well, there are a couple of ways.  We -- for each grievance, we will provide the members of the various levels with    16:29:18 lists of the parties and affiliated programs or parties, whether it's people who have testified in the underlying matter, experts, fairly lengthy list of involved persons or entities, and ask them

252

if they know these people or -- or are otherwise involved with the entities and, if so, whether or not they feel that it's a conflict that they are unable to separate themselves from while they're considering the grievance and, if so, they'll let us know.

And if it's something that they feel or they're unsure about, they'll ask, and we'll consider it with legal counsel, outside counsel, and, if necessary, a final decision might be made, have to be made by a panel that's identified in the grievance procedures.

Q. Would the AAOS consider it a conflict if a member of the committee of professionalism -- is it committee "of" professionalism or "on" professionalism?

A. "On."

Q. Okay. Committee on professionalism was an acquaintance of a grievant or a respondent?

A. It was -- it would be something that needed to be disclosed, and that person would have to decide how close that acquaintance is, but most of the time, they're pretty open about it and decided that it's not a grievance that they

can -- they can hear.

Q.    Generally speaking, they err on the side of caution?

A.    Yes.

Q.    And just recuse themself?    16:31:26

A.    Yes.

Q.    What about if the acquaintance of the COP member is not the grievant or the respondent but is the expert witness for the grievant or the respondent in the underlying case?    16:31:41

A.    If they know the expert witness?

Q.    Uh-huh.

A.    Well, that -- I'm sure that that has happened at some point.  They would have to make a decision on that and, if necessary, we would seek    16:31:57 advice from outside counsel on how to handle that.

Q.    I mean, it's basically the same analysis as before:  To avoid the appearance of impropriety, safer to recuse, correct?

A.    Case by case, but yes, I'm -- most --    16:32:13 I'm sure in most circumstances, they would do that, yes.

Q.    I mean, the simple fact is you don't want at the beginning of a hearing, you know, one

254

party walking in, the respondent walking in and saying, "Hey, Fred," to a guy who's sitting on the panel because that's going to make the other side uncomfortable, correct?

A.    Correct.                                                    16:32:36

Q.    Better to have a group of strangers getting together for this event?

A.    That's correct.

Q.    Okay.

A.    Well, oh, I'm sorry.  I did say there          16:32:53
were two ways.  The other way is we have a disclosure database that we require volunteers to disclose in, but that's the kind -- the industry issue for -- for if you have participation in device manufacturer or pharmaceutical manufacturer   16:33:14
type.

Q.    What about insurance companies?

A.    What about insurance companies?

Q.    Do you know how many of your COP members are insured under mutual insurance            16:33:36
companies?

A.    Are insured under mutual insurance companies?

Q.    Yeah, have malpractice insurance

through mutual insurance companies?

A. You know, there are -- lots of our members are insured under mutual insurance companies, so no, I don't have that information.

Q. But, I mean, you do recognize that if a mutual insurance company has a particularly good year where there are very few claims, the benefit that's derived by the insureds of that company is that they pay less premiums the next year, they receive a credit in relation to the money paid the year before, correct?

A. That's how they work, yes.

Q. Okay. So those insured physicians have a financial incentive in there being less claims as opposed to more claims, correct?

A. You could see it that way.

Q. Okay. I mean, do you see anything in that characterization that you disagree with?

A. I think that any physician practicing physician, has an incentive in paying less premiums. So they all have an incentive to have less claims.

Q. Right. But it's a little --

A. The better their experience rating, the

256

lower their claims.

Q.   Right.  But it's a little different in a mutual insurance company where you actually receive a -- essentially a rebate which is a credit towards your next year's premium if the company in which you -- through which you obtain your insurance doesn't have a lot of claims in the prior year.  It's a little different, correct?

A.   I have no personal experience with this.

Q.   Are you telling me that the AAOS does not monitor the number of committee on professionalism members who obtain their malpractice insurance through a mutual insurance company?

A.   I can tell you that I don't monitor it.

Q.   Do you feel that there is an obligation on the part of a COP member to disclose to the grievant and respondent in a grievance the fact that they obtain their insurance through a mutual insurance company?

A.   The bulk of -- well, every practicing physician, I'm sure, has requirements, whether it's state required or hospital required, to have

malpractice insurance. How they choose to acquire that is purely personal.

Now, some of them are required to, in some instances, self-fund. You know, I mean, I don't know that the academy has an obligation to delve into how they choose to do that.

Q. Right. But it's a little different if you're part of a mutual insurance company because, come January, if there haven't been a lot of claims, you're going to get a larger credit toward next year's premium, correct?

A. That's -- as you say, I have no experience with that.

Q. I mean, under those circumstances, the physician actually has a financial incentive if there are less claims as opposed to more claims. Do you disagree with that?

A. Every doctor has an incentive to have less claims, every doctor.

Q. Well, I'm not talking about in this instance against claims against that physician; I'm talking about claims against other physicians.

A. Every doctor feels that way.

Q. Well, let's go one step beyond that.

To what extent does the AAOS believe that its COP members have an obligation to disclose to the grievant and the respondent the fact that they serve in a -- on a board position of a mutual insurance company and are paid to do so?

A.    Well, I can't speak for the academy. What I can say is that our members are required to complete disclosures twice a year in our disclosure database.  There would be, I want to say, a category, probably one of the last ones, that would -- it's sort of a catch-all, that does -- it's not on point for this, but it's a catch-all category where they could disclose that.

Q.    And why is it that the AAOS requires its members to fill out one of these disclosure statements twice a year?

A.    Transparency.

Q.    That's important to the AAOS?

A.    It is.

Q.    So if you've got two doctors on your judiciary committee, Dr. Schmidt, chairman, Dr. Geline, who served on the board of directors for mutual insurance companies and have disclosed

259

that twice a year every year to the AAOS, what obligation does the AAOS then have to disclose that to the grievant and respondent who appear before the judiciary committee?

A.    The academy does not disclose this information through the professional compliance program.    The disclosure database is open to the public.    It's on our website.

Q.    You do understand that the director of a company owes a fiduciary duty to the company and to the company's investors, correct?

A.    Yes.

Q.    Okay.    So if you've got Dr. Schmidt and you've got Dr. Geline sitting on the judiciary committee owing fiduciary duties to the -- their respective mutual insurance companies while they're sitting up there, you don't believe that's a conflict of interest with respect to the grievant and the respondent if they're there in connection with a medical malpractice case?

A.    I believe that it is a potential conflict of interest.

Q.    Does that sound like something that should be disclosed, to you?    And that's going to

16:39:00

16:39:50

16:40:03

16:40:16

260

appear horrible in the transcript.

Is that something that, in your mind, should be disclosed to the parties to the grievance?

MR. CHABRAJA: Let me be clear. Is that -- that's a hypothetical?

16:40:45

MR. MAURICE: I don't think it is, based on Dr. Geline's testimony yesterday.

MR. CHABRAJA: No. Are you asking her as a general statement if that's -- should that -- assume --

16:40:54

MR. MAURICE: Yeah, should that be disclosed. Yeah.

BY MR. MAURICE:

Q. Assuming that you've got two of your five members on the judiciary committee are actually paid to act as directors of these mutual insurance companies, and they owe -- as a result, they owe fiduciary duties those companies, is that something that you believe should be disclosed to the grievant and respondent?

16:40:59

16:41:18

A. You know, I've never had to face that situation, so I don't know.

Q. You would agree, though, that the

AAOS's policy with respect to conflicts aimed at transparency is when in doubt, disclose?

A.    Yes.

Q.    Okay.  I'll ask you to turn back to the document I have marked as Exhibit 37.  And I take it the -- this is an e-mail chain, and I take it the language that we see below, "Dear members on the committee on professionalism," and then it proceeds, I take it that is generally the type of e-mail that is sent to canvas the committee on professionalism to determine if there is any conflicts.

Would you agree with that?

A.    I see I'm not a party on this e-mail, but yes, this is typically the kind of e-mail that is sent.

Q.    And you see the response from Dr. Mandell is, "I believe I was on the board of counselors with Vince Russo a few years back, but I only knew him casually and I haven't seen him in years.  I don't think that would constitute a conflict but would welcome other opinions."

Do you sympathy?

A.    I do see that.

262

Q. Okay. So this is Dr. Mandell responding to the e-mail that canvasses the board saying I know the expert for Dr. Sharpe, but it was only casual and I haven't seen him in years, correct?                                                      16:43:36

A. That's what he says, yes.

Q. And I guess I should ask you this.

He says, "I don't know that constitutes a conflict, but I would welcome other opinions."

What are your thoughts? Would that be    16:43:51 a conflict?

A. To be honest, I don't remember who Dr. Russo is. I think that, as a result of Dr. Mandell going on the counsel on advocacy, his question became moot.                                                16:44:05

Q. All right. Yeah. Dr. Mandell ultimately is not on the COP hearing panel, correct?

A. That's correct.

Q. Okay. If you go to Exhibit 38, this is 16:44:16 another e-mail you're not copied on. You see that Dr. Strain responds that he thinks Dr. Mandell is right.

Do you see that?

A.   Yes, I do.

Q.   Would you go to the -- to Exhibit 39, and you've got Dr. Martin saying they have the option to object if they believe there is a conflict, correct?  Do you see that?  16:44:56

A.   Yes.

Q.   And if you go to Exhibit 40, we see Dr. Mandell's response, which is, "Yes, as far as any such objection has been honored by the recusal of the objectionable party, the problem is that  16:45:22 while one party may be acquainted with the COPper's, the other party may not know of that relationship."

Do you see that?

A.   Yes.  16:45:34

Q.   Is that -- it's my understanding from your testimony that the AAOS does not make disclosures with respect to the members of the -- the COP hearing package.  It's up to -- or the perspective members.  It's up to the grievant  16:45:52 and the respondent to go out and do their own research, correct?

A.   We identify the members of the panel, yes.

Q. But if you had a situation where one member knows an expert who was in the underlying litigation, that's not something that the AAOS is going to disclose to the grievant and the respondent; it's up to them to figure it out for themselves?

A. That is how the procedures have worked out, yes.

Q. And in this case, it didn't matter, because Dr. Mandell left the committee anyway, correct?

A. That's correct, yes.

Q. Okay. Now, if we go to Exhibit 41, you see this is an e-mail from Dale Butler?

A. Yes.

Q. Do you see that up at the top of the page?

A. I do.

Q. And you see who it's written to? It's written to every single member of the committee on professionalism. Do you see that?

A. Yes.

Q. This e-mail says, "I also knew Vince Russo on the BOC for several years, and I also

have not seen him for many years. I am more comfortable with recusing myself. I agree the parties have the right to object, but the other side would not know the extent of the relationship of the COPper's -- is that a new word? -- personal feelings about the individual.

"I knew Vince well enough and have good memories of him as a -- as person and doctor. I might be biased for him, so I would prefer not to have any appearance of favoritism. As for Peter, maybe both parties could be informed about the relationship and let them object if they choose.

"My general feeling is that we should bend way over to avoid any appearance of conflict and we have enough COP members to still have the hearing panel, even if three members were recused. Dale."

Do you see where I read that?

A.    Yes, I do.

Q.    Okay. I know you haven't first-chaired a jury trial, but you've participated in three in some other capacity.

Have you ever had a situation where a juror during voir dire has indicated that they

know one of the attorneys or one of the parties involved in the lawsuit?

A. That did come up once or twice.

Q. Yeah, because normally when you do -- at the very beginning, you stand up in front of the jury and you got to read off a list of every person who, basically, works at your firm, everyone witness who could possibly testify. There's always somebody in the jury pool who says, "Hey, I know so-and-so," correct?

A. Right.

Q. Okay. When somebody puts their hand up and says, "I know so-and-so," does the judge then ask in front of the rest of the jury pool, "Hey, let me know your thoughts about that person," or that witness or that attorney?

A. No.

Q. Okay. Why doesn't the judge do that?

A. They're generally excused.

Q. Well, right. And you don't want that witness -- you don't want that perspective juror to say, "I know that attorney, and he is a complete crook," or, "I know that witness, she's pure as the driven snow, she would never lie."

267

You don't want the one person in your pool who knows the other person that's involved in the case to poison the well for the rest of everybody else, correct?

A.    That's correct.                                    16:49:32

Q.    Okay.  So here we've got Dr. Butler saying, "I'm going to recuse myself because I have personal feelings about the individual.  I knew Vince well enough and have good memories of him as person and doctor.  I might be biased for him."     16:49:49

Do you see anything wrong with these individuals who ultimately sat in judgment of my client having been told that the plaintiff's expert, the person who my client essentially disagreed with in this case, receiving a ringing     16:50:03 endorsement from Dr. Butler?  Is that troubling to you?

A.    As I said, I'm not a party to this, so I -- this is not something that I am --

Q.    Do you at least see how that would make  16:50:33 my client's skin crawl?

A.    I don't know what to tell you about that.  I'm just, you know -- they're --

Q.    Dr. Butler ultimately recused himself

268

in this matter, correct?

A.    Yes.

Q.    And Dr. Mandell moved on to a different committee, so they didn't participate in the -- in the process, correct?                              16:51:12

A.    Yes.

Q.    Okay.  If we go on to the next e-mail, it's Exhibit 41, this is from Dr. Mandell again sent to all members of this committee.

A.    41 or 440 --                                        16:51:30

Q.    Pardon me, 42.  Sorry about that.

From Dr. Mandell to everybody on the COP, it says, "My relationship with Vince was not as close or perhaps as long as Dale.  I'm confident that I would be fair and impartial in      16:51:46 assessing his involvement in this case. Obviously, if he were the grievant or respondent, I would recuse myself" -- or, "I would rescue myself."  I feel a feeling he meant recuse.

"I agree with Rosaliand" -- pardon me.    16:52:02 "I agree that Rosaliand should inform both parties that I had a past casual acquaintance with Dr. Russo but have no contact with him for years. The parties should be allowed to object to me."

269

Do you see that?

A. I do.

Q. Okay. Dr. Mandell seems to draw a distinction and a conflict based on Dr. Russo's involvement in the matter, stating that if Dr. Russo was the grievant or respondent, he would recuse himself, but if he's just the expert for the plaintiff -- or the defendant in this case, he doesn't believe that it -- that it creates a conflict.

What are your thoughts on that? Are there degrees of conflict?

MR. CHABRAJA: Well, wait. What are her thoughts on -- on Dr. Mandell's understanding?

MR. MAURICE: Well, Dr. Mandell is saying that there are degrees of conflict, that if Dr. Russo was the grievant or respondent, he would recuse himself based on his relationship with him, but if he was just the expert for the defense in the case, he doesn't believe he has an obligation to recuse himself.

There's somehow a lesser conflict, and I want to know if Ms. Young agrees that there are degrees of conflict.

270

BY THE WITNESS:

A. To my knowledge, there is no set protocol on this for the committee on professionalism or the professional compliance program. Each situation is looked at on a case-by-case basis.                    16:53:33

BY MR. MAURICE:

Q. That's the way it's been handled since you've been there in 2008?

A. That's correct.                    16:53:42

Q. And, again, this -- I think we -- it goes back to our discussion earlier.

This program's in its relative infancy, correct? It's about five years old?

A. That's right.                    16:53:52

Q. Okay. So maybe somewhere down the line, there will be more specific protocols related to how to handle this. Fair to say?

A. They may be developed at some point, that's -- that's right.                    16:54:04

Q. If you could turn back to Exhibit 45. From Ms. Giulietti to Dr. Butler, it says, "Dr. Butler, I've made a note that you have recused yourself in the matter of Sharpe v

271

Brandner, Grievance 2008-23. Thank you,

Rosaliand."

Do you see that?

A.     I do.

Q.     Okay.  So at that point, Dr. Butler     16:54:42

is -- is out.  He's been recused, correct?

A.     That's correct.

Q.     If you could turn back to the document

marked for identification as Exhibit 36 and then

specifically within 36 the page that has the Bates  16:55:04

number AAOS B0038909.  Are you on that page?

A.     I am.

Q.     You see that the e-mail that we're

looking at here dated May 19, 2009, which is

months after Dr. Butler has recused himself, he's  16:55:28

still on the mailing list.

Do you see that?

A.     Yes.

Q.     And if you go back to the last page in

Exhibit 36, you'll see a -- but this one is AAOS   16:55:45

B0038924, you see there's another e-mail that is

copied to Dr. Butler.

Do you see that?

A.     I do.

272

Q.    Okay.  Once a member of the COP has recused himself, are they supposed to be receiving e-mails in connection with the grievance?

A.    I suspect what happened is there's a group e-mail for the committee on professionalism, 16:56:37 and that may have been used to send out information on a bunch of grievances at the same time.

Q.    Okay.

A.    As was the case here on 2008-117 -- I'm 16:56:49 sorry, 2008-17 as well as the additional four cases that were being sent to them for review.  She would know that Dr. Butler had been recused from 2008-23, and he obviously would know. So any materials would not go out to him in the 16:57:18 way of hard copy or forwarding of materials.  That wouldn't happen.

Q.    Now, that explanation makes perfect sense with the e-mail you're looking at, but if you look back at the first e-mail we -- I directed 16:57:32 you to, AAOS B0038909, that's related to only the Brandner-Sharpe prima facie determination, correct?

A.    That's correct.

Q.    Okay.  That's not supposed to happen,

273

correct? I mean, once you recuse yourself, that's supposed to be the end of your involvement with the matter, correct?

A. That's correct.

Q. If you could turn back to the document marked for identification as Exhibit 49, and it's an e-mail chain. If you start at the bottom, it's an e-mail from Rosaliand Giulietti to the members of the judiciary committee.

Do you see that?

A. I do.

Q. And it's enclosing a draft of the report in connection with the Brandner-Sharpe grievance, correct?

A. Yes.

Q. Now, up in the top, there's a response from Dr. Schmidt, who is the chairman of the judiciary committee, correct?

A. Yes.

Q. And it's sent to Ms. Giulietti and, it looks like, the remainder of the judiciary committee.

It says, "Rosaliand, the judiciary committee appeal report 2008-23 was excellent. It captured all of the points we made and did so very

274

concisely and in a very judicial way. I don't think the members could have done this in such a concise fashion.

"I did find one problem in the recommendations. I believe that we found that he did not violate number 6, 7, and 8. The report, as written, indicates number 1, 6, and 8. Number 1 was not alleged. Thank you for your efforts. This was a difficult -- this one was difficult."

Do you see where I read that?

A.   Yes.

Q.   His assessment that this one was difficult," would you agree with that?

A.   With -- well, yes, there -- they're all difficult, to be honest.

Q.   Well, was the Brandner-Sharpe grievance more difficult than others?

A.   Yes.

Q.   And why so?

A.   There was a difference in the finding between the judiciary committee and the committee on professionalism, and that's difficult.

Q.   And when you say "a difference," are you talking about the fact that the judiciary

committee rejected the finding with respect to mandatory standard number 7 or that the judiciary committee found Dr. Brandner to be in violation of the mandatory standards 3 and 4 but for different reasons than the -- than the COP hearing panel?          17:00:57

A.     Because they found -- they did not find number 7.

Q.     Okay.  So it was the -- the fact that the judiciary committee rejected the report and recommendation of the COP hearing panel with          17:01:10 respect to mandatory standard number 7 --

A.     Correct.

Q.     -- that made it difficult?

A.     Correct.

Q.     Any other reasons?          17:01:17

A.     Not that I recall, no.

MR. MAURICE:  With that, I have no further questions.

MR. CHABRAJA:  We'll reserve.

THE VIDEOGRAPHER:  We are going off the video 17:01:43 record at the end of Tape 5 at 5:01 p.m.  This concludes the videotaped deposition of Melissa Young.

FURTHER DEPONENT SAITH NOT

276

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PATRICK J. BRANDNER, M.D.,       )
                                 )
            Plaintiff,           )
                                 )
    -vs-                         )Case No. 10-cv-8161
                                 )
AMERICAN ACADEMY OF              )
ORTHOPAEDIC SURGEONS et al.,     )
                                 )
            Defendants.          )

        I hereby certify that I have read the

foregoing transcript of my deposition given at the

time and place aforesaid, consisting of Pages 1 to

276, inclusive, and I do again subscribe and make         .

oath that the same is a true, correct and complete

transcript of my deposition so given as aforesaid,

and includes changes, if any, so made by me.

                                MELISSA A. YOUNG

SUBSCRIBED AND SWORN TO

before me this         day

of                , A.D. 2011.

        Notary Public

277

STATE OF ILLINOIS    )

                     )  SS:

COUNTY OF C O O K    )

I, ANDREW ROBERT PITTS, C.S.R. No. 84-4575, a Certified Shorthand Reporter within and for the County of Cook, State of Illinois, do hereby certify:

That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein;

That the foregoing videotaped deposition transcript was reported stenographically by me, was thereafter reduced to typewriting under my personal direction and constitutes a true record of the testimony given and the proceedings had;

That the said videotaped deposition was taken before me at the time and place specified;

That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

278

IN WITNESS WHEREOF, I do hereunto set my hand and affix my seal of office at Chicago, Illinois, this 6th day of October, 2011.


                    Certified Shorthand Reporter,

                    Cook County, Illinois.

                    My commission expires May 31, 2013.


C.S.R. Certificate No. 84-4575.