# EXHIBIT "6"

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PATRICK J. BRANDNER, M.D.,     )
    )
          Plaintiff,     )
    )
    )       **Case No. 10-cv-8161**
    )
AMERICAN ACADEMY OF     )       **Hon. Dist. J. Ronald A. Guzman**
ORTHOPAEDIC SURGEONS and     )
AMERICAN ASSOCIATION OF     )
ORTHOPAEDIC SURGEONS,     )
    )
          Defendants,     )

## AFFIDAVIT OF PATRICK J. BRANDNER, M.D. IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

STATE OF NEVADA     )
                    ) ss
COUNTY OF CLARK     )

I, Patrick J. Brandner, M.D., being first duly sworn on oath, according to law, hereby state as follows:

1.      I am the Plaintiff in the above-captioned litigation. I am over 18 years of age, I am competent to testify to the matters set forth herein, and I make this Affidavit based upon my own personal knowledge and in support of Plaintiff's Cross Motion for Summary Judgment and Response to Defendant's Motion for Summary Judgment.

2.      I have been licensed as a doctor since 1973. I am currently licensed to practice in Arizona, California, Louisiana and Nevada. However, I am no longer physically able to perform surgery. I declared surgical disability in 1995 as the result of a degenerative spinal condition.

3.      In October of 2004, I was contacted by an attorney in Arizona who was representing a minor and his parents in a medical malpractice case against a physician in

Arizona. The attorney described the facts of the case and indicated that he wanted to retain me to perform a records review in connection with the case and, possibly, to provide expert testimony on behalf of the plaintiff. I agreed to perform the records review but indicated that I could not agree to provide expert testimony until after I had reviewed all of the pertinent medical records.

4. The attorney forwarded the plaintiff's medical records to me and I reviewed the same. The records revealed:

a. That the plaintiff had suffered a fractured tibia while playing in a high school football game in September of 2001. The physician who was the subject of the malpractice claim had treated the fracture with a long leg cast for approximately eight weeks. Within four months of the removal of the cast, there was an obvious deformity in the proximal leg (i.e., the bones at the fracture site were drifting). The plaintiff was complaining that the leg had not returned to full function and that he suffered pain during strenuous activity. The plaintiff and his parents had questioned the physician with regard to the options available to correct the deformity and restore full function to the leg. The physician advised that there were multiple surgical options but recommended against them at that time (counseling a "wait and see" approach).

b. In March of 2002 (approximately six months after the injury), the plaintiff and his parents sought a second opinion. The physician with whom they met examined the plaintiff and his medical records; noted the obvious deformity in the proximal leg; and concluded that there was a malunion of the proximal tibial fracture. The physician noted that he believed that the malunion should probably be corrected but indicated that he wanted to discuss the matter with a conference of orthopaedic surgeons because surgical correction in cases such as the plaintiff's – especially where the patient was having minimal pain on flat walking – was a controversial issue. Ultimately, the physician referred the

plaintiff to another physician in his practice group – Kipling G. Sharpe, MD ("Dr. Sharpe").

c. In April of 2002, the plaintiff and his parents met with Dr. Sharpe. Dr. Sharpe reviewed the plaintiff's medical records; performed a physical examination of the plaintiff; made a recommendation for a surgical correction of the deformity; discussed the risks involved in surgery; and, upon obtaining consent for the procedure, ordered a series of studies related to the deformity and scheduled the plaintiff for surgery.

d. In early June of 2002, the plaintiff and his mother attended a pre-operative evaluation. During that evaluation Dr. Sharpe performed a physical examination of the plaintiff and discussed the surgical procedure and options in detail with the plaintiff and his parents. Dr. Sharpe's assistant then identified the risks inherent in surgery and indicated that the plaintiff and his mother understood the risks and were ready to proceed with the surgery.

e. On June 26, 2002, Dr. Sharpe performed the surgical procedure (a proximal tibial osteotomy) on the plaintiff. Unfortunately, as a result of the surgery the plaintiff suffered peroneal nerve palsy (i.e., a "foot drop"). The plaintiff's ability to control the upward and downward movement of his foot was lost.

5. Upon completing my review of the plaintiff's medical records, I concluded that there was doubtful evidence of malpractice by any physician involved in the treatment of the plaintiff. I reported to the attorney that the course of treatment employed by the original treating physician was appropriate; that the drifting of the bones at the fracture site was not the result of anything the treating physician (who had been sued for malpractice) did or did not do; that a proximal tibial osteotomy was an appropriate surgical procedure to correct the deformity; and that the fact that the plaintiff suffered a foot drop did not mean that Dr. Sharpe had improperly performed the proximal tibial osteotomy (peroneal nerve palsy is a significant complication in such a surgical

procedure). The only thing that I indicated was unusual about the medical records was the absence of a notation documenting a discussion between Dr. Sharpe and the plaintiff and his parents about the risk to the peroneal nerve and the potential of a foot drop when obtaining their consent to perform the surgical procedure. I indicated that such a discussion was required to satisfy the standard of care for informed consent in the context of a proximal tibial osteotomy because of the increased likelihood of the complication (i.e., a general discussion regarding the potential of "nerve injury" was not sufficient).

6. The attorney indicated that it was his understanding that the plaintiff and his parents had been unaware of the risk to the peroneal nerve or the potential of a foot drop when consenting to the surgery. It was only after the surgery, when they learned of the complication, that Dr. Sharpe advised them of the risk to the peroneal nerve in a proximal tibial osteotomy. The attorney indicated that based on my review of the medical records, it was his intention to amend the complaint to assert a claim against Dr. Sharpe for failure to obtain informed consent for the surgical procedure.

7. The attorney inquired as to whether I would be willing to provide expert testimony on behalf of the plaintiff in relation to such a claim. I indicated that I would only be willing to testify: (1) That the standard of care for informed consent in the context of a proximal tibial osteotomy required a discussion of the risk to the peroneal nerve and the potential of a foot drop; and (2) That there was nothing in plaintiff's medical records that documented that such a discussion had occurred (only that there had been a discussion of "nerve injury" in general). The question of whether such a discussion in fact occurred would be a question for the jury.

8. The attorney agreed with the limitations I imposed. An amended complaint was filed naming Dr. Sharpe as a defendant.

9. On June 9, 2009, I sent a letter to the AAOS advising that while I looked forward to attending the COP Hearing to defend myself against the baseless allegations leveled by Dr. Sharpe, I was scheduled to be out of the country from September 29th through October 11th. Accordingly, as permitted by AAOS Professional Compliance

Grievance Procedure VII(D)(3), I requested that the COP Hearing be postponed to the next COP meeting. On June 10, 2009, the AAOS sent a letter to Dr. Sharpe advising him of my scheduling conflict and my request to postpone the COP Hearing to the next COP meeting. On June 23, 2009, I received a letter from the AAOS advising that Dr. Sharpe had declined to postpone the hearing. Accordingly, I rearranged my travel plans (at significant cost) to allow me to attend the COP Hearing.

10. Pursuant to AAOS Professional Compliance Grievance Procedure VII(D)(14), the COP Hearing Panel was required to issue its Report and Recommendation within sixty days from the conclusion of the COP Hearing. Accordingly, I expected to receive the COP Hearing Panel's Report and Recommendations on or before December 1, 2009. Knowing that I would have only fifteen days to appeal any adverse ruling, I retained counsel and arranged my holiday travel plans to ensure that I would be available to assist in the preparation of an appeal (if necessary).

11. I directed my counsel to appeal the COP Hearing Panel's Report and Recommendations to the AAOS Judiciary Committee. Unfortunately, the untimely issuance of the Report and Recommendation deprived me of a meaningful opportunity to assist in the preparation of my appeal (I was traveling over the Christmas holiday).

12. Leading up to the Judiciary appeal hearing, my counsel was able to obtain copies of the transcripts that Dr. Sharpe had intentionally withheld from the COP Hearing Panel.

13. I reviewed the factual allegations contained in the Amended Complaint on file in this case and believe them to be true.

Further your Affiant sayeth naught.

DATED this ___ day of December, 2011.

PATRICK J. BRANDER, M.D.

SUBSCRIBED AND SWORN to before me this ___ day of December, 2011.

NOTARY PUBLIC in and for said County and State

BRITTANY WOOD
Notary Public-State of Nevada
APPT. NO. 10-1357-1
My App. Expires January 14, 2014

Page 5 of 5