# EXHIBIT "10"

9F03779

DR. PATRICK BRANDNER    AUGUST 5, 2005

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

- - -

████████████████████████ individually )
and as parents and guardians, and )
████████████ a minor, )
)
Plaintiffs, )
)
vs. ) No. CV2003-
) 017451
ANDRE MATTHEWS, M.D., and JANE DOE )
MATTHEWS, husband and wife; KIPLING P. )
SHARPE, M.D., and JANE DOE SHARPE, )
husband and wife; BAYWOOD ORTHOPEDIC )
CLINIC, an Arizona Corporation; )
MEZONA ORTHOPAEDIC, an Arizona )
Corporation; VALLEY LUTHERAN HOSPITAL, )
an Arizona Non-Profit Organization; )
et al., )
)
Defendants. )
)

DEPOSITION OF

DR. PATRICK BRANDNER

LAS VEGAS, NEVADA

AUGUST 5, 2005

At 1:59 p.m.

ATKINSON-BAKER, INC.
COURT REPORTERS
500 North Brand Boulevard, Third Floor
Glendale, California 91203-4725
(818) 551-7300

REPORTED BY:  MARGIE L. CARLSON, C.C.R. No. 287

FILE NO.: 9F03779

Page 1

BRANDNER 00031

9F03779
DR. PATRICK BRANDNER     AUGUST 5, 2005

APPEARANCES

FOR THE PLAINTIFFS:

LAW OFFICES OF KOELLER, NEBEKER, CARLSON & HALUCK, LLP
BY: CHRISTOPHER GRAHAM, ESQUIRE
3200 North Central Avenue
Suite 2300
Phoenix, Arizona 85012

FOR THE DEFENDANTS SHARPE AND MEZONA ORTHOPAEDIC:
LAW OFFICES OF CRAWFORD & KLINE, P.L.C.
BY: BRUCE D. CRAWFORD, ESQUIRE
1920 East Southern Avenue
Suite 101
Tempe, Arizona 85282

Page 2

INDEX
WITNESS:  DR. PATRICK BRANDNER

EXAMINATION                      PAGE

    BY MR. CRAWFORD               4

EXHIBITS     PLAINTIFFS'
NUMBER       DESCRIPTION        PAGE

             (NONE)

             DEFENDANTS'
LETTER       DESCRIPTION        PAGE

             (NONE)

QUESTIONS WITNESS WAS INSTRUCTED NOT TO ANSWER:
             (NONE)

INFORMATION TO BE SUPPLIED:
             (NONE)

Page 3

PATRICK BRANDNER, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. CRAWFORD:

Q. Could you please tell me your full name for the record, sir?

A. Patrick Brandner, B-r-a-n-d-n-e-r.

Q. And could you give me your professional address, please?

A. 2800 East Desert Inn Road, No. 100, Las Vegas 89121.

Q. You have been retained as an expert witness by the plaintiffs in this case; is that correct?

A. Yes.

Q. I assume you have had your deposition taken many times?

A. Yes.

Q. Do you feel comfortable that you understand the basic guidelines of a deposition?

A. I do.

Q. Let me just remind you of one, and that's this, if you do not understand one of my questions tell me, don't answer it, just let me know you have a

Page 4

problem with it so that I can rephrase it, okay?

A. Yes.

Q. If you go ahead and answer a question without indicating you have a problem, I'm going to assume that you understood it, fair enough?

A. Fair.

Q. Doctor, we asked you to bring your complete file related to this case with you today. You have brought some things, but I understand in some off-the-record discussions you have not brought everything; is that correct?

A. I brought everything that I had available. I'm not sure where the other file is, whether we sent it back earlier than when we received the request or the subpoena.

Q. Subpoena by who; do you know?

A. Well, I'm saying it's a subpoena I assume that, the notice of the deposition.

Q. Okay. Okay. So you believe there are some additional medical records you have reviewed which you do not have here today?

A. Correct.

Q. Can you tell me what the health-care provider was?

A. Well, I recall the hospitalization under

Page 5

2 (Pages 2 to 5)

9F03779
## DR. PATRICK BRANDNER     AUGUST 5, 2005

Dr. Sharpe and the records from the hospital, progress notes. I believe that's all.

Q. So you are talking about the hospital chart for the surgery that Dr. Sharpe performed?

A. Correct.

Q. And did it appear to you based on your knowledge of what's typically in a hospital chart that you were provided with a complete copy?

A. It appeared so.

Q. There were nurses' notes, doctors' notes, orders, things like that?

A. Correct.

Q. And that's the part of what you have been sent that you do not have and you are not sure exactly where it is today, fair?

A. Correct.

Q. I noticed while reviewing your file that you had some records from Dr. Sharpe's office, correct?

A. Correct.

Q. As far as you understand were you provided with a complete copy of Dr. Sharpe's office records?

A. As far as my understanding, yes.

Q. What other health-care providers' records have you reviewed?

Page 6

A. I reviewed some records from Dr. Peter Mitchell.

Q. Okay, I saw those in there too, in fairness to you.

A. And the original orthopedic surgeon, and I'm blocking his name right now.

Q. Dr. Matthews?

A. Matthews. Of course the hospital records contained other consultants that came in on the case while the plaintiff was hospitalized.

Q. From?

A. Infectious disease.

Q. You mean subsequent to Dr. Sharpe's surgery?

A. Correct.

Q. Yeah, those were contained within the hospital chart.

A. Correct.

Q. Let me show you a document I received from plaintiffs' counsel. It's the plaintiffs' first supplemental disclosure statement. They have listed some records. You have identified some of those. It sounds to me like you have reviewed some additional records that you have told me about on the record today; is that correct?

Page 7

A. Repeat the question.

Q. Look at that disclosure statement. It lists some medical records you have been sent. Do you see that?

A. Correct.

Q. You have reviewed some records in addition to what's listed there, and you have told me about that on the record.

A. Correct.

Q. Are there any records from any other health-care providers that you have reviewed in this case?

A. No.

Q. So what you have told me on the record and then what's listed in that first supplemental disclosure statement would be exhaustive of the medical records that you have seen?

A. To the best of my knowledge, yes.

Q. Now, it also indicates that you reviewed some radiological studies.

A. Yes, there was also the CT scan and plain X-rays. I don't remember the radiologists, but there were some studies.

Q. Okay, you were actually brought the films at some point or sent the films at some point?

Page 8

A. Yes.

Q. Do you still have those or did you send those back?

A. The films I had were the plain films, preop and postop, of ▮▮▮▮▮▮'s tibia and fibula fracture. Those are in my vehicle, and my wife took my vehicle this morning because of a sticker getting into a controlled area for a home development and I didn't know that, so I do have the X-rays, and they are traveling somewhere around the city right now.

Q. Okay, traveling somewhere around Las Vegas.

Do you recall having made any markings on those X-rays to demonstrate anything?

A. Absolutely not, no, I did not.

Q. Would any of the records that you have here today tell us the dates of those X-rays and CT scans that you have seen?

A. Yes, the CT scan report is in these records, and I can't remember the date.

Q. Okay, so there was a preop CT scan for planning purposes or are you talking about a postop CT scan?

A. I think it was a preop CT scan for planning purposes.

Page 9

3 (Pages 6 to 9)

BRANDNER 00033

9F03779
DR. PATRICK BRANDNER      AUGUST 5, 2005

Q. Did you see the spiral images as well?

A. I have the report of the spiral images. To the best of my recollection those were included in the hard films that I reviewed.

Q. I'll let you and the attorney figure it out. I would like to know the dates of the X-rays that you have seen and what views you have seen.

A. Okay.

Q. And I don't know if it's easiest for you to just send them back to plaintiffs' counsel and he can let me look at those or you can simply provide a list. I don't know what's the easiest.

A. It would be easiest for the plaintiffs' counsel to -- I think you have a record of what was sent. I know the films I can give you today on the tibia, pre- and postop. I don't remember the exact date on the reconstruction CT X-rays, and I believe there was such a voluminous amount of records that some of them may have been sent back because we can't store them, and I certainly don't want to take the chance of losing them.

Q. Do you have a recollection of seeing the plain X-ray views that were taken at Mezona Orthopaedic the first time ▮▮▮▮▮▮ was there when he saw Dr. Dinowitz on I think it was March 22, 2002?

Page 10

A. To the best of my recollection those are the X-rays that I have, and I looked at those as late as last night in preparation.

Q. And those I presume are things that you were sent originally when you first reviewed this case, both the records and the X-rays?

A. Yes.

Q. Have you reviewed anything in terms of specific medical literature that you think is relevant to this case or your opinions?

A. I did review the basic literature on the peroneal nerve, the complexity of the structure and the anatomy and the actual microscopic anatomy, histology.

Q. Did you go to a textbook?

A. Yes, I did.

Q. What textbook?

A. It was the -- the authors. I believe it's both Roger Mann's textbook on the foot and ankle and lower leg, and it was the foot and ankle, three volume text. I can give you the cover page and copy it. I don't remember the authors. It's well-known foot and ankle experts known nationally. I have it. I own it. It's probably more volumes now because mine's probably ten years old, but I can easily copy the

Page 11

cover page and provide that for you.

Q. That could be great if you could just copy the cover page of both texts and send them to counsel, that will be helpful, and although it's ten years old, the structure of the peroneal nerve hasn't changed.

A. Correct.

Q. And you specifically referenced the pages that deal with the anatomy of the peroneal nerve?

A. Yes, I did.

Q. Anything else?

A. Any other literature?

Q. Or anything within those texts that you specifically looked at. I don't know, for example, is there something in there about surgical technique or something like that?

A. There was some discussion about reconstruction for tendon transfer that I looked at, but I didn't go in depth on that.

Q. So primarily what you were looking at is simply refresh yourself again the distribution of the peroneal nerve?

A. Not only distribution, but the histology, why the peroneal nerve is susceptible to injury, at least in the best understanding of anatomists and basic science.

Page 12

Q. Fair enough. Any other literature you have reviewed?

A. No.

Q. In terms of depositions, it appeared to me that you had reviewed Dr. Sharpe's deposition before he was actually a defendant in this case when Dr. Matthews was the defendant?

A. Yes.

Q. And then you reviewed the depositions of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?

A. Yes.

Q. Is there any other deposition testimony you have seen or reviewed?

A. To the best of my recollection there is not.

Q. And then there appear to be some miscellaneous legal documents in there, including the summary of other experts' opinions including the defense expert, correct?

A. Correct, and I want to clarify. I'm not sure if the deposition of Dr. Sharpe's was before he was a defendant. I think it was after he was a defendant.

Q. It has to have been before because he hasn't had his deposition since he has been sued.

Page 13

4 (Pages 10 to 13)

**Atkinson-Baker, Inc., Court Reporters**                                    **1-800-288-3376**

BRANDNER 00034

A. Well, it's a deposition of Dr. Sharpe. I know that.

Q. And then you have seen the summary of the defense expert's opinions?

A. Yes, I have.

Q. Is there anything else that you have been sent to review or that you have relied upon for purposes of any opinions that you have in this case?

A. No.

Q. And then I put separately, there is a manila folder here with some correspondence in it, and then we took some of the cover letters and included those, and I'm going to, hopefully we can get those copied before you leave today.

Are there other cover letters that you have been sent that may be with other records or with these X-rays?

A. There may be, but it would be again identifying any records that I was being sent for review, and there was no other -- it was after I accepted the case as an expert witness, and it didn't give any other information in the letter to the best of my recollection.

Q. Fair enough. If when you go looking for those X-rays or those records you find any additional

Page 14

cover letters, would you make a copy and send those on to plaintiffs' counsel as well?

A. Yes, I will.

THE WITNESS: There will be a list of things out of this deposition that you will send me?

MR. GRAHAM: Sure.

MR. CRAWFORD: Right now it's the X-rays.

THE WITNESS: The cover letters.

MR. CRAWFORD: And then those two textbooks, just the cover pages.

Q. It appears to me that you were first retained in October, 2004, and just going by the first cover letter to you; is that correct?

A. I don't know what that cover letter says, but if the initial discussion was that I would look at the case, I didn't accept it until I looked at the case and defined what the exact problems would be, so if that's the initial letter, I didn't agree to be a plaintiff's expert until I reviewed it, and I believe I may have reviewed it and then said, "Okay, I will take it," but I defined what I was going to look at and testify to.

Q. Okay. I appreciate your answer. I know you are trying to be helpful. What I was really trying to find out is the first time you were

Page 15

contacted about looking at this case and giving an opinion appears to have been October, 2004; is that fair?

A. Let me see that letter.

Q. Sure.

A. Well, I don't know the legal aspects of what it means to be retained. I believe this letter introduced the case to me. My instructions were that I would look at this case, determine on where I felt problems were and if I was needed as an expert I was going to discuss it further because the initial presentation of the case to me was, didn't seem to be out of bounds by either orthopedist, the initial presentation on discussion, so I wanted to get into this case further. It's a fine line case.

Q. I think I understand.

A. This letter introduced, I believe this letter introduced the case to me. I don't think I accepted the jersey and the number.

Q. I think you are thinking I'm being sneakier than I really am.

A. No; no; no; no, I know the first letter was written to me, and I can't remember the date, but I basically reviewed a lot of records before I came on to this as an expert.

Page 16

Q. Okay, I understand. Your first contact with the case was October, 2004.

A. I don't know. The letter obviously speaks for itself. I cannot recall dates with this case. There were a lot of letters and there was a lot of discussion.

Q. At some point you were sent some initial records to review?

A. That is correct.

Q. And you are telling me that you did not agree to be an expert witness in the case until, quote, more information was provided?

A. Until more -- well, until I defined the case further, but, and again I'm not, I don't know the legal aspects of when you are accepted as an expert or when you are not accepted as an expert, and I can't remember the exact dates. I do know in my mind before I told Mr. Causey, "Okay, I will testify and be an expert," there was discussion about whether I would take the case or not based on the information I received and looked at.

Q. Let me see if I understand it correctly. You are sent some records. You look at those records, and they included the records of Dr. Matthews, Dr. Sharpe, and the operations that they were both

Page 17

5 (Pages 14 to 17)

BRANDNER 00035

9F03779
DR. PATRICK BRANDNER    AUGUST 5, 2005

involved with, correct?
A. Correct.
Q. And based on that review it didn't appear to you that either Dr. Matthews or Dr. Sharpe had done anything wrong, fair?
A. I didn't see where there was gross malpractice at that point by any physician.
Q. What do you mean by gross malpractice?
A. Gross malpractice is a term that is always used when you are defending some case in my experience against an accusation of malpractice.
Q. People use different terms based on the cities they are in, and it can mean something different. You are just talking about you didn't see that somebody fell below the standard of care?
A. Correct.
Q. And then you basically said, "I don't see based on what I've read here malpractice," and you said, "Before I get involved as an expert I need some more information"?
A. That is correct; that would be an accurate depiction.
Q. And the more information you got was what? Was it discussions with Mr. Causey basically?
A. It was depositions. It was, it was further

Page 18

records regarding informed consent on Dr. Sharpe's, in Dr. Sharpe's records. And I don't know if it was postop hospital records or not. I can't recall, but there were further records to define informed consent.
Q. The only deposition you could have been provided would have been Dr. Sharpe's because that was the only one that had been taken at that point, so I assume you asked for Dr. Sharpe's deposition?
A. Oh, absolutely. I wanted to see Dr. Sharpe's deposition, and I wanted to see records regarding informed consent.
Q. So the records regarding informed consent would be what's in Dr. Sharpe's office records before surgery and then is there an informed consent form or something like that perhaps in the hospital chart?
A. That's correct.
Q. But you had the preoperative office records from Dr. Sharpe, and you knew what they said on informed consent?
A. I had some, but in my mind to the best of my recollection in the chronology of the case I required more records before making a decision to be an expert in the case.
Q. And did you need to get, beyond these records you were provided or Dr. Sharpe's deposition

Page 19

did you still need some information from Mr. Causey that was not contained within these records before you were willing to act as an expert?
A. To the best of my recollection I wanted to see mainly the depositions, particularly the plaintiff's deposition and the parents' deposition to try and define what their understanding of nerve injury was.
Q. But you were disclosed as an expert in this case before their depositions were taken; are you aware of that?
A. No, I wasn't aware of that, and basically in my mind it was sort of an ongoing running decision I was going to make if I was going to be an expert or not.
Q. You have now reviewed the depositions of the ███████ family.
A. I have.
Q. You have seen what they have to say about issues that would fall within the rubric of informed consent?
A. Yes.
Q. Do you still believe Dr. Sharpe fell below the standard of care?
A. Yes.

Page 20

Q. And is it because they dispute what's been disclosed on behalf of Dr. Sharpe in terms of whether they were told about a risk to the peroneal nerve?
A. Specifically my problem is that peroneal nerve is not stated specifically to the plaintiff or their understanding was they state that they never heard the word peroneal nerve or drop foot, and basically the bottom line is that that is the nerve you are worried about and that is the nerve that will be injured if you state nerve injury in informed consent. That's the only real nerve that you are worried about. It's not going to be the tibial nerve. It's going to be the peroneal nerve, and although surgery may be a choice in the treatment of this type of case, peroneal injury needs to be emphatically discussed and so everyone understands what peroneal nerve injury means.
Q. Okay. I appreciate your answer, but what it comes down to in terms of whether you believe Dr. Sharpe fell below the standard of care or not in this case is whether basically the jury believes what the ███████ have to say or the jury believes what Dr. Sharpe has to say.
MR. GRAHAM: Form.
A. By golly, that is exactly what I said to

Page 21

6 (Pages 18 to 21)

Atkinson-Baker, Inc., Court Reporters

1-800-288-3376

136

BRANDNER 00036

9F03719

## DR. PATRICK BRANDNER    AUGUST 5, 2005

Wade Causey.

MR. CRAWFORD:

Q. Because you have seen the disclosure of Dr. Sharpe's anticipated testimony specific to that point?

A. Correct.

Q. So in your mind this whole case rises and falls on whether the ███ are accurate or not on the peroneal nerve issue?

A. Well, the whole case rises and falls on what the jury believes whether peroneal nerve was stated or not.

Q. Okay, but you can't make that decision as an expert in terms of your opinion that Dr. Sharpe fell below the standard of care; it's dependent on whether the ███ testimony is accurate or not, fair?

MR. GRAHAM: Object to the form.

A. I don't think that's ever going to be able to be decided. Dr. Sharpe says, he stated, "I discussed the peroneal nerve injury." According to my understanding of looking at the ███ ███ deposition as well as his parents, they have no knowledge of peroneal nerve nor drop foot. Is it a he said she said case? I would state in a nonexpert,

Page 22

nonlawyer stance that, yes, it looks like that. I don't dispute that Dr. ███ claims he says peroneal nerve.

MR. CRAWFORD:

Q. Dr. Sharpe. You said ███

A. Dr. Sharpe.

Q. And I'm not asking you to be the decider here about who is telling the truth, okay. You are right, a jury is going to decide that issue. My point is if the ███ are wrong, if their memory is incorrect, they were told about potential injury to the peroneal nerve and the possibility of drop foot, then you have no criticisms of Dr. Sharpe, fair?

A. Fair.

Q. Have you ever expressed an opinion that Dr. Matthews did anything wrong?

A. No.

Q. Did you see when you were first sent materials in October, 2004, Dr. Matthews had already been sued and they were basically asking you to comment on his care?

A. Yes, I understood that, and that's why I didn't accept the case.

Q. Let me do some more housekeeping. What will your charges be to come to Phoenix, Arizona, and

Page 23

Q. testify at trial?

A. Cost of hotel, cost of flight, a full day is $8,000 to testify.

Q. Is there any charge for travel time on top of that or is that the charge?

A. Well, yeah, I'll charge what the lawyers charge, from the time I leave my front door to go to the airport and the time I get back to my front door. I don't know.

Q. I'll trade you.

A. I'll find out what the standard is. I've never traveled to give testimony.

Q. We are just kidding here. Your charge for coming to Arizona to testify would be $8,000 because you are going to miss a whole day of work?

A. Correct.

Q. On top of that there will be some hourly charge for travel time?

A. Correct.

Q. And then costs on top of that?

A. Correct.

Q. I have been provided by plaintiffs' counsel, Dr. Brandner, a listing of some cases that you have been involved with in the past.

Page 24

A. Oh, good, I don't have that.

Q. Let me just show it to you. I think you sent it to them, and they sent it in March of 2005?

A. Yes.

Q. What I'd like to know, have you ever testified in a medical malpractice case before on the issue of informed consent?

A. Yes.

Q. Do you know which cases out of those?

A. Yes, there is two. Well, from the best of my recollection there is only two medical malpractice cases I've been an expert in and two — let me put it this way, there are two that I remember being expert witness in that involved malpractice against or I was the plaintiff's expert, and that was a case against Andrew Welch and a case against Hisham Hito, H-i-t-o.

Q. Are those M.D.s to your knowledge?

A. They are both orthopedic surgeons here in Las Vegas. I'm sorry, there is one more, and this involves the case you have here, Brenda Page, and that was against Dr. Egtagar, E-g-t-a-g-a-r, I think.

Q. M.D. again?

A. Yes, an orthopedic surgeon. Those are the three that stand out that I was expert in. As far as those three, as far as informed consent, you know,

Page 25

7 (Pages 22 to 25)

BRANDNER 00037

9F03779
## DR. PATRICK BRANDNER     AUGUST 5, 2005

that's a fine line question because two of them involved whether the patient knew that they might have a complication. There were complications in both cases, so none of the cases were exactly like this where you go in and look in the records and see that there is a claim of informed consent on one side and an absence of knowledge of informed consent on the other, none of them are that discrete, but there were complications in both cases and both of them involved whether the individual knew that there would be problems if they had surgery.

Q. All right, so to that extent they involved informed consent?

A. Yes.

Q. Now, do you remember the defense attorneys that took your depositions in those cases?

A. One, that one attorney for -- no, I don't remember the defense attorney. I can give you the plaintiff's attorney.

Q. Okay, who is the plaintiff's attorney?

A. The plaintiff's attorney for Hito was Bob Vannah.

Q. B-a-n-a?

A. V, as in victory, V-a-n-n-a-h.

Q. Is he from here?

Page 26

A. Yeah, and I don't remember the other, and I think that was Vannah was for Dr. Hito, was against Dr. Hito.

Q. How about Welch?

A. I don't remember who that was. That was over ten years ago.

Q. How about the last one?

A. No, I don't remember.

Q. Were all of these cases up here in Las Vegas, the normal court system?

A. Correct.

Q. I've also been provided with a copy of your curriculum vitae. Let me show you. What I would like to know is whether it is current. There is one attached, Doctor, to the plaintiff's first supplemental disclosure statement and if you could just take a look at it and let me know whether it appears to be current.

A. The staff privileges have changed since you have gotten this. Actually the staff privileges have become a little bit in flux because of the malpractice situation here in town and the fact that the group doesn't take emergency call any longer, so I am not on staff at Sunrise Hospital. I am not on staff at Sunrise MountainView Hospital. I am not on staff at

Page 27

Valley Hospital, and I am regaining staff privileges as we speak at Desert Springs Hospital. Formerly they didn't have any orthopedic surgery for their emergency room, and now they are opening up for orthopedics again so they are asking for staff privileges. I am on staff at Southern Hills Hospital, which is a new hospital here in town.

Q. Do you have an updated curriculum vitae?

A. Dee Kleindorfer, my medical-legal secretary, should have provided. This may have been sent out before we just changed it, but the hospital staff privileges have changed quickly in this town.

MR. CRAWFORD: Counsel, can you give me a copy of the current CV?

MR. GRAHAM: All right.

MR. CRAWFORD:

Q. You say the hospital staff privileges situation has changed because of the malpractice situation you have up here and because you guys don't take trauma call?

A. We don't take trauma call any longer, and a lot of surgery by my group has been switched to outpatient surgery, so we have our own surgery center or we have a surgery center as part of our building and our practice.

Page 28

Q. First off why is the group not taking trauma call anymore? Just give me the short summary.

A. They don't want to take trauma. Trauma is, this is becoming a major situation in town that it's not, it's not necessarily covered. I'm sure it's the same situation in Phoenix or any major city. It will eat up a significant amount of your professional time, and it will cut into your practice, and your private practice can literally be turned upside-down.

Q. What do you mean it's not covered?

A. A lot of it is not insured, and we don't have any way to --

Q. Get reimbursed?

A. Well, reimbursement is one thing, but there are also some socioeconomic problems involved. For instance, cut flexor tendons, and if you are on call for a, for instance, cut flexor tendon in the hand which is treated by the emergency room, a bandage is slapped on it, but they have to go back and get it fixed, and they are uninsured, you are responsible for that individual, and the hospital does not have to take them back, so that is a socioeconomic problem that's been dumped on physicians to figure out a way to treat these people.

Q. And then the other issue you said is the

Page 29

8 (Pages 26 to 29)

malpractice situation. How does that have anything to do with the staff privileges?

A. There is a tremendous amount of malpractice involved or a tremendous amount of malpractice allegations involved with severe trauma. In other words, significant polytrauma, infection, gunshot wounds, a lot of times these are uninsured individuals, and there can be a lot of complications involved that you are liable for.

Q. So you are just saying it's not worth it?

A. I'm saying that your malpractice can go up significantly, and it's unaffordable.

Q. Your malpractice premiums can go up significantly if you take trauma call?

A. Correct.

Q. And these hospitals basically say "If you don't take trauma call here you are not going to be on staff"?

A. It used to be like that. They are starting to change that now.

MR. CRAWFORD: Off the record.

(Discussion off the record.)

MR. CRAWFORD: Back on the record.

Q. What specific information did you need and finally get from some source before you agreed to be

Page 30

an expert and give the opinion that Dr. Sharpe fell below the standard of care?

A. Well, let me put a caveat on that, and I'll answer your question. If Dr. Sharpe did not discuss specifically peroneal nerve injury and drop foot, if, then it's below standard of care, in my opinion. Now, what I needed to see was mainly the depositions of all of the involved individuals in the case, Dr. Sharpe, ███████████████████, to try and figure out if there was informed consent. The supposed position of the tibia when I looked at it was not so bad in my mind and my experience that it could not have gone on to heal and not been a problem. I also needed to look at the discussion surrounding the family as to why they felt they needed to have this fixed. I wanted to see what activities were involved in causing pain, what level of activity ███ was involved in, what his plans were for the future, if he was a potential college scholarship, those kind of things, because all of that in my mind had a lot to do with whether that treatment, surgical treatment, was chosen.

Q. Okay. You signed an affidavit in this case indicating that you thought Dr. Sharpe fell below the standard of care because there was not a specific

Page 31

discussion of potential injury to the peroneal nerve and its consequences and that was before the ███████ depositions occurred, so were you told something by plaintiffs' counsel to fill in the gap in terms of what these people were or were not going to say once they were deposed?

A. No, I was told that peroneal nerve -- well, what I was told was the peroneal nerve specifically was not discussed and drop foot was not discussed.

Q. So you asked Mr. Causey flat out, "I need to know what their position is in terms of whether this was discussed or not before I would be willing to be an expert"?

A. Not only that, I wanted to go back in the records after I read those depositions and look to see if the records reflected specifically a statement of peroneal nerve and drop foot.

Q. Okay. But again, and I'm not accusing you of anything so don't take this question this way, but you said in an affidavit that it was your opinion that Dr. Sharpe fell below the standard of care because he did not discuss the risk of injury to the peroneal nerve and the consequences with the family and that was before these people were deposed in this case so you couldn't have been given their depositions at that

Page 32

point. Did you have a specific discussion with Mr. Causey about what they were going to be saying in their deposition on that issue?

A. I asked Mr. Causey if they understood specifically that nerve injury meant peroneal nerve and drop foot.

Q. Okay, and he got back to you and said no?

A. He said that they did not. My first discussion with Mr. Causey was that, No. 1, I signed the affidavit based on some review of the records. When he was going after the first physician I looked at the records, and I called him, and I said, "No, there is no malpractice on this gentleman's part." Subsequently I guess the sites changed and from the best of my recollection there was a hard look at the records on Dr. Sharpe's side to see if peroneal nerve and drop foot was in the records despite what the deposition says, is it in the records that that was discussed? All I could find was two entries that said that gave the standard menu of things that are stated to patients before they have surgery, despite the fact that there are statements that there was in-depth discussion about this. There was nothing documented in the records as to peroneal nerve or drop foot.

Q. I'll grant you those words were not written

Page 33

9 (Pages 30 to 33)

9F03779
DR. PATRICK BRANDNER      AUGUST 5, 2005

in the records, but you clearly did see documentation by Dr. Sharpe before he was ever sued in this case that he had an extensive discussion with these people before surgery about potential risks and complications; he does say that?

A. He says it, yes.

Q. And he lists a number of risks and complications that he says that he told them about.

A. There is a menu of complications that are in the record, yes.

Q. Well, and you have read their depositions, the family's depositions?

A. Yes, I have.

Q. They clearly were told about those risks and complications; weren't they?

A. They were told about nerve injuries in general.

Q. Well, they were told about you could die from the surgery?

A. Yes, the menu they were told about, correct, and they admit that in the depositions. What they say they didn't understand was what nerve injuries meant. Now, that's believable. It depends on and in my practice you have to – let's take another separate injury. Let's take an example of

Page 34

A. And again I agree with you, if Dr. Sharpe said it to them then I feel badly about being an expert, but I didn't see it specifically elucidated in the hospital records.

Q. Okay, you keep referring to the lists of complications and risks that he puts in his records as a menu.

A. Okay, look on April, I remember the dates, it's April, 2002, and June, 2002.

Q. I know the dates too, but my specific, why do you keep calling it a menu?

A. Because you see it over and over in standard informed consents for the patient, death, anesthesia complications, pneumonia. You know, it's the same bundle of complications, and obviously you can't go and talk about each thing. It would take you three days. I use the analogy of you listen to these potential complications but put it in context, you also have potential problems if you cross the street with the light, you could get hit by a car, but they understand death. They may understand pneumonia or lung problems. I'm not sure they understand nerve injury, and if you have an incidence that is fairly significant with a procedure you are doing, and it's a possibility, you can't just state nerve injury in

Page 36

rupture of the tendon of the biceps at the elbow. Well, you can tell someone I have got to fix this, but there is a potential for nerve injury. That individual, that layperson is not going to understand what that means, nerve injury. If you tell them that the nerve in the forearm will result in weakness in extending your fingers and your thumb, and it's a known complication, and sometimes you can't avoid it because the nerve is right behind where you have to reattach the tendon, you give them an idea of what their choice is. Do they accept the weakness in their arm that's still functional or do they want to take the chance on getting it repaired. Peroneal nerve injury is a well-known injury with this kind of correction in surgery, but if you just say nerve injury to a layperson, that doesn't really register. Nerve injury is, well, I might not be able to feel something. You have got to go into depth and tell them what nerve you are worried about, what nerves in the literature is the known complication, and do you understand that there may be a problem. Then you are giving them an informed consent and choice.

Q. I understand that's your opinion.

A. That's my opinion, yes.

Q. I understand.

Page 35

general. My feeling is you go into it with them.

Q. Is there any other nerve in your opinion he was required to discuss?

A. In the leg associated with this?

Q. Yeah.

A. I've never seen it. I've never read or seen an incidence of other nerve injuries associated with this surgery.

Q. My question was was he required to discuss any other nerves?

A. I think that's going to depend upon your community standards as far as what your jury thinks. I don't think you can discuss every possible scenario. You discuss the obvious ones, and if the discussion of the obvious one is general you go into specifics.

Q. I understand. I'm just trying to find out in your opinion for this surgery, you have told me that you think he was required to discuss specifically injury to the peroneal nerve and its consequences. I understand that. I'm trying to find out if there are any other specific nerves that you believe he was required to discuss with him before surgery to comply with the standard of care.

A. No.

Page 37

10 (Pages 34 to 37)

DR. PATRICK BRANDNER    AUGUST 5, 2005

**Page 38**

Q. Have you reviewed the orthopedic literature specific on informed consent and how people forget over time what they were told before surgery?

MR. GRAHAM: Object to the form.

A. I don't know of any literature that defines the exact memory of the general population.

MR. CRAWFORD:

Q. Do you agree that ▮▮▮ had significant problems before he ever went to Mezona and saw Dr. Dinowitz or Dr. Sharpe?

MR. GRAHAM: Object to the form.

THE WITNESS: You would have to define significant.

MR. CRAWFORD: Significant to him and his parents.

A. It was significant to him in the activities that he was doing, and apparently it was significant to his mother and father. Pain is significant to people. I think you have got to put pain in a context and define and help people understand what that pain means, and if you have an understanding of it and you decrease the anxiety level, then the pain, the physical pain will decrease or you put limitations on an individual, and you again give them informed consent about what you expect this fracture to do.

**Page 39**

MR. CRAWFORD:

Q. This was a situation where Dr. Matthews' attempt to repair the fracture had not resulted in complete healing, fair?

A. Fair.

Q. What was the specific initial fracture that he had?

A. ▮▮▮ had a tibia and fibula fracture in the proximal third.

Q. And that was managed in what way by Dr. Matthews?

A. Closed reduction and casting.

Q. And at the time that the family started seeking other opinions, meaning someone other than Dr. Matthews, was there a malunion?

A. I would call it a delayed union. At that point in time it was mal -- it wasn't united yet, but it was a malpositioned fracture.

Q. Was it a malunion?

A. It wasn't united. It was partially united so it had the potential to heal further, and it had the potential to remottle some.

Q. How many times have you treated that type of a patient?

A. I've thought back on the number of tibial

**Page 40**

fractures I've done with osteotomies, and to the best of my recollection I've done five tibial osteotomies.

Q. So where you had to go in and essentially try to fix a fracture that had not appropriately healed?

A. To straighten the bone because it was in a position that was causing problems.

Q. Because a fracture had not healed correctly?

A. Correct.

Q. So about five times over how many years?

A. Twenty-five.

Q. And it's not common for any orthopedic surgeon to deal with that a lot, fair?

A. Correct.

Q. Were any of those in your training?

A. There were probably one or two in my training, but the most of them, I don't recall any of them being in private practice. I was in the army for eight years, and the remainder that weren't in my training were at the basic training facility, Fort Jackson, South Carolina.

Q. How long ago was that?

A. 1979, 1980.

Q. So it's been about 25 years since you have

**Page 41**

dealt with one of these?

A. Yes, since I did surgery on one.

Q. Okay, well, have you had, how many times have you had a situation like that that was presented to Dr. Sharpe before he performed surgery?

A. You mean that particular position of a fracture?

Q. Yeah. In that age person.

A. I don't think I've had any in that position in my practice.

Q. In private practice?

A. In private practice -- well, at any time. I had malunions, but they weren't at that level of the tibia, and they weren't in that age group.

Q. Was there an angular deformity to tibia before Dr. Sharpe performed surgery?

A. There was 17 degrees of angulation in the plane from the frontal plane, and there was what was reported as 30 degrees of angulation in the plane from front to back.

Q. And what are you relying on, the CT scan?

A. The report of the CT scan, and the CT scan is misstated too. They call it a varus angulation. It was a valgus angulation.

Q. And that's not normal; those angulations

11 (Pages 38 to 41)

9F03779
## DR. PATRICK BRANDNER    AUGUST 5, 2005

are not normal?

A. No, it's not normal.

Q. And do you believe that had this been allowed to go on for a number of additional months that those angulation deformities would have corrected?

A. I don't believe they would have corrected fully. I believe they would have corrected some. Let me put it this way, It's not basically what I believe would be the outcome. It's what I think the potential was. This individual had potential to change that fracture some.

Q. Okay, by the time Dr. Sharpe performed surgery it was about nine months down the road from the original fracture?

A. Correct.

Q. At that point the term nonunion applies, correct?

A. Yes, according to the literature nonunion is defined beyond, or a nonunion would be defined beyond six months of the injury.

Q. How much longer do you think you personally would have allowed this to go on without surgery? In other words, without going to the family and say, "Hey, we have waited long enough. This isn't going

Page 42

to heal. This needs to be surgically fixed"?

A. With certain caveats, and I'll go over the caveats with you if you would like, but to answer your question specifically, with certain caveats and establishing a rapport with the family I would have watched this for another eight months to one year.

Q. What are the caveats?

A. Okay, I was hoping you would ask. The caveats would have been first and foremost explaining to the family what you think this fracture could do, i.e., go on and heal.

Secondly to explain that the activities that ____ was involved in was probably causing increased symptoms, and if he would back off and put this into a scenario of use of the leg without the high-end activity that he was trying to do, we could go on and see if this would heal.

Thirdly if I had that rapport with the family and told them that they should trust the opinions I would encourage them to get other opinions, and if they had rapport with me to come back, and we could go over those opinions, surgery being one opinion, if they went out and some doctor said, "I need to fix this."

I think the explanation would have been

Page 43

there is still potential for healing. There is still potential for remottling. Surgery is an option, can be done now or it can be done in a short period of time if this goes on to show it's going to be a bad actor, this fracture is going to go on and continue to cause you problems. I would have backed him off of his high-end activity.

Q. Meaning his dancing?

A. Well, his dancing, his impact. I think he was having, from what I could understand he was having problems with impacting this fracture, whether it be dancing or gymnastic moves or whatever, even running, but the individual, the patient has to understand that the fracture was healing. There was potential for complete healing, albeit it was nine months down the road, and there were, there would be considerations for other treatment if they found that if this thing was what we call a bad actor, was not going to heal, and it was going to be in a bad position so he continued to have pain in whatever life he chose, then you could go over the surgical option with him. Surgery was an option. It's just that you have got to understand what you're facing with that option.

Q. What if ____ and his family said, "Dance is too important to me. I can't give up the impact

Page 44

dynamic of dancing and do what I potentially want to do in the future"? Now, if he says that does that put surgery higher up in terms of whether you're going to recommend it?

MR. GRAHAM: Object to the form.

A. If the individual wants to go for the quicker fix because of whatever demands he is putting on his leg, then surgery is an option with the understanding that there can be complications from the surgery.

MR. CRAWFORD: Understood.

Q. Did you see the January 2002 plain X-ray that Dr. Matthews took and compare it with the first X-ray that was taken at Mezona?

A. I did not do that so I can't say that I saw those X-rays and specifically compared them.

Q. So you don't know whether there had been a significant change between those two X-rays and how this fracture appeared or the angulation?

A. My recollection was that I looked at the X-rays that were used by the radiologist who did the CT scan to formulate his report. That's basically what I recall. I didn't look at the sequential X-rays to see what the fracture was doing over a period of time.

Page 45

12 (Pages 42 to 45)

BRANDNER 00042

DR. PATRICK BRANDNER     AUGUST 5, 2005

Q. What impact would it have if in a two to two-and-a-half-month period of time, January, 2002, versus middle of March, 2002, there was a significant change for the worse in terms of how this fracture appeared?

A. Well, define for me the change that you understand and define for the worse.

Q. How about that the X-rays showed that he had gone into further drift?

A. I don't know what that means.

Q. Dr. Sharpe put that in his records, and in fairness you are not sure exactly what he means by that?

A. No, I don't know what that means, drift. I didn't see it drifting.

Q. Well, but did you look at the X-rays that Dr. Matthews took in January of 2002 and compare them with the plain films that were taken at Mezona when he first showed there in March of 2002? Did you do that comparison?

A. No, I told you I didn't do a comparison. All I did was look at all X-rays provided. I can't recall the dates right now, but I looked at the X-rays that were provided. I looked at the CT scan, and my feeling was that this fracture had the potential to

Page 46

heal and remottle further. That's all I can tell you.

Q. But you understand I need to perhaps get more specific than that.

A. Well, I can't give it to you. I can tell you that I did see where Dr. Sharpe felt it was drifting. It didn't strike me because I would have remembered that if I saw it worsening significantly.

Q. I'm just trying to find out if in fact you even looked at those X-rays.

A. Oh, I can tell you I did.

Q. So you looked at Dr. Matthews' X-rays from January of 2002, and you also looked at the ones from March of 2002 that were done at Mezona?

A. I can't give you the dates, but I looked at all the X-rays that were sent to me.

Q. But you just don't know if you got, for example, Dr. Matthews' preoperative X-rays?

A. I don't know.

Q. Fair enough. Did you glean from the depositions of the ▇▇▇▇ that they were very unhappy with the situation and not satisfied with what they were hearing from Dr. Matthews?

A. Overall my impression looking at the cold hard deposition was that they were somewhat confused. I didn't pick up any significant animosity toward

Page 47

Dr. Matthews. I just thought that they were confused because they weren't getting the answers that they were looking for.

MR. CRAWFORD: Off the record.

(Discussion off the record.)

MR. CRAWFORD: Back on.

Q. So you did not get the impression that the family was unhappy with Dr. Matthews' care or his recommendations at least from reading the depositions?

A. Well, unhappy, I mean you are using terms that, you are asking me for subjective statements based on my experience. Unhappy means, yes, unhappy can mean confused. I don't know if they were angry at Dr. Matthews or not. I didn't get the impression they were angry. I got the impression that they were looking for answers, and they really didn't understand what the expectation was from this type of fracture, and I understand that they looked at it and saw some deformity and were concerned about the lump in the front, and my impression was that Dr. Matthews didn't establish a relationship that they would trust him saying, "Calm down, wait, this is what the situation is." I don't think Dr. Matthews ever sat down and gave them an in-depth explanation. I'm not faulting Dr. Matthews. That might be his personality.

Page 48

Q. Have you seen the records of Dr. Wall, the other orthopedic surgeon that they got another opinion by?

A. Yes, I did.

Q. We didn't talk about that earlier, but you didn't say you did, but you remember that?

A. Right, there were two second opinions that the ▇▇▇ got.

Q. So --

A. A second opinion and third opinion, that sounds really stupid.

Q. Well, Wall gave another opinion after Sharpe and he basically agreed surgery was the way to go. Do you understand that factually?

A. Well, there was no statement that surgery is the way to go. That's not my recollection. My recollection was that, yes, surgery could be done, and, yes, it would be done with pins or a fixator, but I didn't get the feeling from his note that he was saying, "Look, this needs to be operated on immediately."

Q. Well, I think the only thing he said differently was that he might use a rod for fixation as opposed to pins and screws and plates.

A. Well, he said that he would use a rod, yes,

Page 49

13 (Pages 46 to 49)

BRANDNER 00043

9F03779

DR. PATRICK BRANDNER      AUGUST 5, 2005

an iron rod.

Q. So you didn't get from Dr. Wall's note that he was in agreement surgery was the way to go; you didn't get that?

A. I got from his note that he discussed surgery with them, and I don't know if surgery was what they came to discuss or not. There wasn't in anything -- well, there wasn't anything in the record that he gave a list of opinions. There was just discussion of surgery. Now, whether a note out of, in the vacuum means that that's all he talked about and that was his recommendation, it didn't come across as that was the only recommendation that he was giving. It came across as that was what they wanted to discuss, what surgery would be done.

Q. Didn't the ▮▮▮▮ say that in fact Dr. Wall was in agreement that surgery was the way to go?

A. Yes, it was their understanding that Wall would have operated.

Q. And you are just saying that Wall's note is not clear enough to you to get that?

A. Well, no, Dr. Wall's note is clear. You are asking -- I'm basing my reactions on these records from my own experience, and I'm not so sure that the patient wasn't coming in to discuss the type of

Page 50

surgery versus what other things could be done. It was a search for a second opinion about how the fracture could be aligned. That was my impression.

Q. You agree surgery like that performed by Dr. Sharpe was an appropriate option to offer these people?

A. Yes, it is an option, and the way he did it was appropriate.

Q. So his surgical technique was appropriate?

A. It looked excellent to me.

Q. And the fact that a complication occurs doesn't mean that Dr. Sharpe did anything wrong from a technical standpoint.

A. No.

Q. They knew that doing nothing and waiting was an option, correct?

MR. GRAHAM: Object to form.

THE WITNESS: You are asking me what they understood.

MR. CRAWFORD: Factually.

THE WITNESS: Pardon?

MR. CRAWFORD: Factually.

A. Factually Dr. Matthews had given them that choice, wait and do nothing. I mean that was what they didn't like I think.

Page 51

Q. Do you believe they understood that an option was wait and do nothing at this point?

MR. GRAHAM: Object to the form.

A. I don't know.

MR. CRAWFORD:

Q. Was there any other option or is it really just those two?

A. There really is no other option. Either you wait and try and get that to heal or you straighten it out or you straighten it out later. Well, there is three options -- I mean there is two options, wait and do nothing and let this heal, let it remottle.

Q. Ever, don't ever do surgery?

A. Well, later on down the line, it's, yeah, wait and do nothing completely. Let's just put it this way, there are two options. You could let this heal, wait and let it heal, or you can correct it with surgery. You can correct it with surgery at that time when they were searching for it or you could wait and do surgery later. In the interim that bone had the potential to improve and the function had the potential to improve. That's my opinion, but as far as they're concerned they needed to either wait and let it see if it would heal and see if it would change

Page 52

its position, or surgery. That's what they understood.

Q. Are you going to give an opinion that it is likely that this would have gone on to complete healing, good remottling, and acceptable result without surgery?

A. I don't know. I can't say it would be likely. I can't say it would be probable. What I'm saying is that this poor kid was in the never never land of between having a child's skeleton and an adult skeleton, and there is an unpredictable amount of remottling that can occur, and obviously you want to watch this fracture. You want to let them know what you are doing, and let them know that maybe further down the line you would need surgery if this thing, No. 1, didn't heal or, No. 2, healed in a position that interfered with your normal function.

Q. Given everything you know about this case and knowing what this young man wanted to do long term, do you think it's probable he is going to end up with this type of surgery?

A. Again you can't, I can't state that to a reasonable degree of medical probability. It comes out in his deposition that what he wanted to do is be an eye surgeon, and I don't know how this leg would

Page 53

14 (Pages 50 to 53)

**Atkinson-Baker, Inc., Court Reporters**                    1-800-288-3376

144

BRANDNER 00044

9F03779
DR. PATRICK BRANDNER    AUGUST 5, 2005

have functioned if you are fairly sedentary on it. I don't know if the thing would have straightened more and he could have been a high-end individual where, you know, you go out and you do a lot of activity. You can't say, I cannot say how this leg would have turned out unless there is more time down the road where his growth plates completely close in all of the bones and he is truly an adult skeleton.

Q. If given where he was at, his age, he wanted to pursue dancing, and he wanted the best chance to pursue dancing immediately and not have to give up the impact of dancing, was the best option then at that point surgery?

A. Yes.

Q. And then it would go back to your proviso that there was a discussion about potential injury to the peroneal nerve, as long as he knew that?

A. Yeah, and what I'm saying, let me be clear about this. Surgery is an option at the time Dr. Sharpe did it. It's just getting a feel for, it's the fine line of getting an idea of what your patient is involved in, how smart they are, what their understanding is of what potential problems they can have and explaining in depth what the main problem would be with operating on this fracture. It's not an

Page 54

innocuous procedure, unfortunately.

Q. You did see they agreed that he spent a fair amount of time discussing with them by showing them X-rays and drawing diagrams how this surgery would be performed?

A. I saw that in his notes and deposition, yes.

Q. Well, you saw that in their depositions as well, didn't you?

A. Yes.

Q. And he also specifically discussed that there are different opinions in terms of fixation?

A. Yes, I think I recall that.

Q. And he specifically discussed what an osteotomy is and what that means?

A. Yes.

Q. Let me just see if we can get rid of some issues in this case. You believe surgery was an appropriate option; you have told me that, correct?

A. Correct, it's a choice of treatment in this case.

Q. You believe that in this particular case the surgery that Dr. Sharpe actually performed from a technical standpoint was done correctly?

A. Yes.

Page 55

Q. And you would agree and tell a jury that the fact that this complication occurred does not mean that Dr. Sharpe did anything wrong during surgery?

A. Correct.

Q. His postoperative care was appropriate?

A. Excellent.

Q. If given what you see in these records by Dr. Sharpe, given that and then you throw into it that he will testify that he did in fact discuss injury to the peroneal nerve and the potential of foot drop, would you agree that his preoperative discussions with these people would fall within the category of excellent as well?

MR. GRAHAM: Object to the form.

A. Yes.

MR. CRAWFORD: Why don't we take a five-minute break, Doctor. I am just going to check off things that we have already covered.

(Whereupon, a recess was taken from 3:10 p.m. to 3:14 p.m.)

MR. CRAWFORD:

Q. Doctor, Dr. Sharpe had a couple of CT scans done preoperatively for planning purposes. I assume you believe that was a good thing to do.

A. Oh, yes.

Page 56

Q. In the information I've gotten before today about your opinions you described this as an aggressive surgery. What do you mean by an aggressive surgery?

A. Out of the two choices of just leave it alone and wait or operate at that point, that's the most aggressive.

Q. All right. But surgery is generally speaking always more aggressive than not doing surgery?

A. Correct, yeah, but I mean if you've got a choice between opening the skin or not opening the skin and seeing what happens understanding that surgery might be necessary in the future, well, let's put may or may not. If it's a may or may not situation in the future, it's an aggressive approach at that time.

Q. Do you agree there was the potential with this fracture that had not completely healed in the tibia that it could get significantly worse over time?

A. No, I don't think it would have gotten significantly worse than it was.

Q. So it was about as bad as you think it was going to get?

A. I think it was as bad as it was going to

Page 57

15 (Pages 54 to 57)

BRANDNER 00045

9F03779

DR. PATRICK BRANDNER        AUGUST 5, 2005

get. It was partially united.

Q. Would you agree if you waited another eight months down the road, and he was still at the same spot in terms of not a complete union and the same angulation that that is not an acceptable result and that surgery would be the best choice at that point?

A. No, it would depend on, really a malunion depends on not necessarily what you see on X-ray if it was at the same spot on plain films and looking at it physically. It would really depend on how he functioned. If his function was interfered with with that malunion then it would be considered something you would have to fix.

Q. Let's assume that you wait the eight months. He doesn't get any better. He is at the same spot in terms of an incomplete healing. He has the same limitations on him being able to do dance and the activities he wants to do, then you would agree at that point surgery is the best option for him?

A. Yes.

Q. This fracture, if it didn't heal any more than it was healed at the time Dr. Sharpe performed surgery, in other words, if you allowed that to go on

Page 58

over time, that would be a very unstable tibia, wouldn't it?

A. Unstable mechanically?

Q. Yeah, for example, it would be at very high risk in a kid for refracturing.

A. Well, it wouldn't be a kid. At some point his growth plates closed. You look at the skeleton. So he is on his way to becoming an adult. Obviously you wouldn't just wait eight months and say come back in eight months and then you figure on surgery. You accept him as a patient. You follow him. So you are going to know if he is drifting any further. I'm saying he won't drift any further, but that's my opinion based on my clinical experience. It's possible that he could drift further because anything is possible, so you are watching him as a doctor. You are also establishing your relationship. Your relationship needs to be established with this family, so you can't just take this out of a vacuum. You establish a relationship with them. You give them an option, do nothing, and let's give this some time because there is a potential for remottling, but you have to back off your activity which is causing it to hurt. You have to understand that. Now, what you are saying is if this kid doesn't want to back off, if he

Page 59

doesn't like the looks of it, and it is unacceptable to him to wait, surgery is the only option then.

Q. Okay, fair. What I was getting at is, and let me try and go at it a different way, how long would you have to wait seeing no improvement in the situation before you would say, okay, surgery is the best way to go?

A. Six to eight months in my estimation. There is no one time you can state, but I'm looking at the X-rays of this child, this kid, and he has still got some growth in the distal femur. His tibial growth plates have closed, but he is going to grow a little bit more. The bone will remottle a little bit more. He is not truly an adult yet in the skeleton, so I don't know what would be totally acceptable. You are watching this thing. It's partially united. Obviously the two criteria you have is this thing has got to heal or, yes, it is prone to further injury potentially, and your activity level has to be defined. What are your wishes in life, what do you want to do. You have to know all these things and make sure that the family is satisfied with it, and if they have the education you teach them about the bone, and I think Dr. Sharpe tried to. The only problem I have is that the word peroneal and the two words drop

Page 60

foot are not in the actual records so if they are pushing and saying, Look, we don't want this right now. We don't like it, and we want to take the chance, although we don't know what the percentages are, and I'm going to protect that nerve, but you want to take the chance and we can fix it, and the peroneal nerve may or may not be stretched, we do it now, but six to eight months is what I think in my experience in treating these both open and closed that I would have given this fracture to go on and get better.

Q. When you say that there was a significant risk of peroneal nerve damage as a result of this surgery, how much of a risk are you talking about?

A. We don't know because we don't know, we don't even know why the peroneal nerve was injured. It wasn't obviously cut. It was more likely a combination of stretch and ischemia, and that's why I went and looked back at the physiology of the peroneal nerve to look back and make sure that the people who do the basic science on this nerve don't have some understanding that I didn't have, but it's a horrible problem. It can occur with any operation along the tibia but most of the time closer to the knee, and there was an attempted surgery, and there was probably a successful attempt to isolate the area where that

Page 61

16 (Pages 58 to 61)

**Atkinson-Baker, Inc., Court Reporters**                    **1-800-288-3376**

146

BRANDNER 00046

YF03119

**DR. PATRICK BRANDNER      AUGUST 5, 2005**

nerve was and to keep it out of the surgical site. I don't think anything was done to it instrumentwise. I think the injury to the nerve occurred when that leg got straightened out, and it was going to happen whether you used a rod, whether you used an external fixator, or if you put a plate on it like Dr. Sharpe did, and we cannot predict ahead of time whether it's going to happen or not. I think the incidence is definitely less than 50 percent, probably less than 20 percent or it would not be in our surgical armamentarium.

Q. You believe in retrospect the nerve was probably going to suffer this kind of an injury whether surgery was performed in June of 2002 or eight months later down the road, fair?

A. Fair. I think if this nerve was already shortened and tethered with the healing process at that point, any time beyond that point was going to damage that nerve. The problem is you can't pick out these individuals beforehand.

MR. CRAWFORD: I understand. I'm just reading this description of some of your opinions and see if we have covered everything.

Q. Even if Dr. Sharpe wrote in his records

Page 62

A. That's fair, and to put it in laymen's terms, if I sat down with ███████ and said, "Okay, I will operate on your fracture and straighten that bone out, you have to understand there is a chance, it may be smaller than 20 percent, it may be smaller than 10 percent, I can't tell you, but there is a chance you will have permanent damage because we stretched that nerve. I'm going to protect it and I'm not going to cut it as best as I can, but you have to understand that it can be stretched, and you may have a foot that's weak, and you may not be able to do all the things you are doing now. If you understand that, we can straighten that bone out."

MR. CRAWFORD:

Q. Okay, let me role play here. I'm ██████ ████, and I say back to you, "Okay, if we wait and see, does that mean that I can't do my dancing where I am doing all of these different moves, putting impact on the bone on my leg that I want to?"

MR. GRAHAM: Object to the form.

A. And I would say that everything you are doing as far as jumping and hitting that leg that is causing you pain you have to back off from. You can walk. You can do things as long as you can tolerate the pain, but I don't want you running. I don't want

Page 64

that he discussed injury to the peroneal nerve and the potential of foot drop, if the family says he didn't, then you would be at the same spot?

MR. GRAHAM: Object to the form.

A. No, I would not. I would not be sitting here. If I saw peroneal nerve and drop foot in the formal medical records, I don't think there would be a case.

MR. CRAWFORD:

Q. Well, but if they say he didn't discuss that.

A. I wouldn't be an expert here.

Q. So you would believe the doctor under that circumstance?

A. My whole reason for being here is that I cannot see peroneal or drop foot in the official medical records.

Q. I just want to make sure that I'm clear on one point, you do agree that the family knew that doing nothing and waiting was an option, you are just saying that with respect to this discussion about doing surgery this additional information needed to be discussed about injury to this specific nerve and the potential consequence; is that fair?

MR. GRAHAM: Object to the form.

Page 63

you to in contact sports, and I don't want you doing flips or dancing heavily if it's causing you pain.

MR. CRAWFORD:

Q. "Okay, the problem is, Dr. Brandner, that means I don't have any chance of going on to be a more accomplished dancer or to get a scholarship, et cetera, and I don't want that, so what do you have to offer me?"

A. "What we have to offer is surgery and straightening that bone, but if the nerve is stretched, and we can't predict it, and we can't avoid it when we straighten that bone out, and it's going to move, if it moves and it gets stretched, you will not be a dancer. You will have a drop foot to some extent, and you will not be able to run as much as you did before or dance at a high level. You have to understand that if you want me to operate on it."

Q. So if I wait this eight months I cannot do the dance at the high level, right?

A. Correct.

Q. And then if I wait the eight months and I haven't gotten any better, and we do surgery, I've got the same risk that you are telling me about now?

A. That's correct, but within that discussion is a discussion that this could get straighter, and it

Page 65

17 (Pages 62 to 65)

BRANDNER 00047

9F03779

**DR. PATRICK BRANDNER      AUGUST 5, 2005**

may heal.

Q. Understood.

Dr. Sharpe's deposition that you reviewed, there were a few highlights in there. Is there anything that you recall from this deposition of Dr. Sharpe that's specific on the opinions you have or criticisms you have of him?

A. No.

Q. And what I'm getting at is a defense attorney's fear is at trial you will point to a specific testimony in the doctor's deposition and say, "Aha, here it is. See, I told you." There is nothing like that in there, is there?

A. No, there are no surprises that I'm going to give you at trial regarding this deposition. I don't see anything that I would criticize in Dr. Sharpe's deposition.

Q. Okay, thank you.

You have never examined        have you?

A. No.

Q. And you haven't been asked to do that?

A. No, I have not.

Q. So in terms of his current functional status, what he is going to be able to do in the future, do you have an understanding or given any

Page 66

Q. Significantly abnormal?

A. Well, you've got to always compare one side to the other, and I don't know what the other normal position of the tibia was, but obviously it's not 17 degrees, so it's significant enough that you have a physical bump and that you would get some mechanical pain in the knee and possibly the ankle with activity.

Q. What long-term problems could that have caused Scott if it was allowed to go on without improvement and without surgery?

A. Okay, this is a hypothetical, but if a patient heals in that position and doesn't remottle any further, then with activity they will not have parallel joints. The knee joint and the ankle joint won't be parallel when they stand, which is going to cause increased wear and tear more likely than not on the ankle and the lower leg, and it could lead to traumatic arthritis.

Q. In which joints?

A. In the ankle, possibly in the knee but in the ankle mainly with increased activity. Obviously if you are totally sedentary you are going to get a lot more longevity out of your leg.

Q. And that's not likely given this --

A. Unlikely, but I'm just trying to give you

Page 68

opinions on that? They haven't been disclosed, but I just need to check.

A. Not unless I'm asked. I mean I can give an opinion based on the latest records and where        is at a certain time. If I see, I don't think I'm going to get any further records, I don't know if discovery is still open, I doubt it. But it appears to me that he has improved to a certain extent, but, no, I mean if asked I can give my opinion on his activity level based on what I know, but I don't think I've been asked.

Q. And in fairness it would be better to actually examine him.

A. Oh, absolutely. It's always better as a witness to have eyeballed the individual, talked to them, and examined them.

Q. In terms of the degree of angular deformity in the two planes that are in the records various people say different degrees of deformity. Did you see that?

A. No, all I saw was, what stuck in my mind, and I think it's correct, 17 degrees of angulation in one plane and 30 degrees in another plane.

Q. Is that significant?

A. Yes, it's significant.

Page 67

the scenario.

Q. I'm just saying given his age it's unlikely he is going to lead a totally sedentary life.

A. Correct.

Q. Are there any other opinions that you understand you are going to be offering in this case that we have not gone over today?

A. No, and there is only two opinions I have, and it's no surprise to you, and I'll restate them at the end of this if you would like.

Q. I know what your two core criticisms are. Surgery was an option but so was waiting and seeing if this got better on its own.

A. Okay.

Q. And that needed to be discussed, and if surgery is going to be undertaken then you also need to explain to the patient that because of this type of surgery there is an increased risk of injury to the specific nerve called the peroneal nerve, and if it gets injured here is the consequence, i.e., drop foot?

A. Perfect, that's it.

MR. CRAWFORD: Okay, then it was a pleasure meeting you, and I think I am done.

Do you want him to read and sign or do you want to waive?

Page 69

18 (Pages 66 to 69)

BRANDNER 00048

DR. PATRICK BRANDNER          AUGUST 5, 2005

MR. GRAHAM: It's up to you.

THE WITNESS: I've got my position stated extremely clearly. I've got a lot of wordiness in there, but that's it. That's the essence of why I'm here.

MR. CRAWFORD: He is going to waive.

(Whereupon, the deposition was concluded at 3:36 p.m.)

Page 70

REPORTER'S CERTIFICATE

STATE OF NEVADA )
                 ) ss
COUNTY OF CLARK )

I, Margie L. Carlson, CCR No. 287, do hereby certify:

That I reported the taking of the deposition of the witness, DR. PATRICK BRANDNER, commencing on Friday, August 5, 2005, at the hour of 1:54 p.m.

That prior to being examined, the witness was duly sworn to testify to the truth, the whole truth, and nothing but the truth and that I thereafter transcribed said shorthand notes into typewriting and the typewritten transcript of said deposition is a complete, true and accurate transcription of said shorthand notes taken down at said time.

I further certify that I am not a relative or employee of any party involved in said action, nor a person financially interested in the action.

Dated at Las Vegas, Nevada, this 15th day of August, 2005.

Margie L. Carlson
CCR No. 287

Page 71

19 (Pages 70 to 71)

9F03779
DR. PATRICK BRANDNER          AUGUST 5, 2005

## A

able 22:19 35:17 58:18 64:11 65:15 66:24
abnormal 68:1
about 6:3 7:24 8:7 9:22 12:14,16 16:1 17:19 18:14 20:19 21:3,9 21:12 23:8,11 27:4,7 33:2,23 34:4,8,14,16 34:18,20 35:19 36:2 36:16 38:25 40:11 40:25 42:14 46:8 48:19 49:5 50:11 51:2 53:18 54:16,19 57:2,23 60:23 61:13 63:21,23 65:23
absence 26:7
absolutely 9:15 19:9 67:14
accept 15:16 23:23 35:11 59:11
acceptable 53:5 58:5 60:15
accepted 14:21 16:19 17:15,16
accomplished 65:6
according 22:21 42:19
accurate 18:21 22:8,16 71:16
accusation 18:11
accusing 32:18
across 50:12,14
act 20:3
action 71:19,20
activities 31:16 38:16 43:12 58:19
activity 31:17 43:16 44:7 54:4 59:23 60:19 67:9 68:7,13 68:21
actor 44:5,18
actual 11:13 61:1
actually 8:24 13:6 27:20 55:23 67:13
addition 8:6
additional 5:20 7:23 14:25 42:4 63:22
address 4:11
admit 34:21
adult 53:10 54:8 59:8 60:14
affidavit 31:23 32:20 33:10
after 13:22 14:20 32:15 33:11 49:12
again 12:20 14:18 17:14 25:22 28:5 32:18 36:1 38:24 53:22
against 18:11 25:14,15 25:16,21 27:2
age 41:8,14 54:9 69:2
aggressive 57:3,3,7,9 57:16
ago 27:6 40:23
agree 15:18 17:11 36:1 38:8 51:4 56:1,11 57:18 58:2,20 63:19
agreed 30:25 49:13 55:2
agreement 50:3,17
Aha 66:12
ahead 5:3 62:7
airport 24:8
al 1:13
albeit 44:15
aligned 51:3
allegations 30:5
allowed 42:4,23 58:25 68:9
alone 57:6
along 61:22
already 23:19 56:18 62:16
although 12:4 21:14 61:4
always 18:9 57:9 67:14 68:2
amount 10:18 29:7 30:3,4 53:11 55:3
analogy 36:17
anatomists 12:24
anatomy 11:13,13 12:8
ANDRE 1:9
Andrew 25:16
anesthesia 36:14
angry 48:13,15
angular 41:15 67:17
angulation 41:17,19 41:23,24 42:5 45:19 58:5 67:22
angulations 41:25
animosity 47:25
ankle 11:19,20,23 68:7 68:14,17,20,21
another 34:25 43:6 49:2,12 58:2 67:23
answer 3:12 4:25 5:3 15:23 21:18 31:4 43:3
answers 48:2,16
anticipated 22:4
anxiety 38:22
anymore 29:2
anything 9:14 11:8 12:10,12 14:6 18:5 23:16 30:1 32:19 50:8,8 51:12 56:3 59:15 62:2 66:5,16
apparently 38:17
appear 6:6 13:16 18:3
appeared 6:9 13:4 45:19 46:5
appears 15:11 16:2 27:18 67:7
applies 42:17
appreciate 15:23 21:18
approach 57:16
appropriate 51:5,8,9 55:19 56:5
appropriately 40:4
April 36:8,9
area 9:8 61:25
arizona 1:1,11,11,12 2:5,10 23:25 24:14
arm 35:12
armamentarium 62:11
army 40:19
around 9:10,11
arthritis 68:18
asked 5:7 19:8 32:10 33:4 66:21 67:3,9,11
asking 23:7,20 28:5 48:11 50:23 51:18
aspects 16:6 17:15
associated 37:4,7
assume 4:17 5:5,17 19:8 56:23 58:15
ATKINSON-BAKER 1:20
attached 27:15
attempt 39:3 61:25
attempted 61:24
attorney 10:5 26:17,18 26:19,20,21
attorneys 26:15
attorney's 66:10
august 1:18 71:10,22
authors 11:18,22
available 5:12
Avenue 2:4,9
avoid 35:8 65:11
aware 20:11,12

## B

back 5:14 9:3 10:10,19 24:8 29:19,22 30:23 32:14 33:7 39:25 41:20 43:14,21 48:6 54:15 59:9,23,25 61:18,19 64:16,23
backed 44:6
bad 31:12 44:4,18,19 57:23,25
badly 36:2
bandage 29:18
based 6:6 17:20 18:3 18:12,18 33:10 48:12 59:14 67:4,10
basic 4:21 11:11 12:25 40:21 61:20
basically 16:24 18:17 18:24 20:12 21:8,21 23:20 30:16 42:9 45:22 49:13
basing 50:23
BAYWOOD 1:10
become 27:21
becoming 29:4 59:8
before 13:5,21,24 14:14 16:24 17:17 18:19 19:13,22 20:2 20:10 25:6 28:11 30:25 32:2,12,24 33:21 34:2,4 37:23 38:3,9 41:5,16 57:1 60:6 65:16
beforehand 62:20
behalf 21:2
behind 35:9
being 14:19 16:20 25:13 36:2 40:19 43:22 58:18 63:15 71:11
believable 34:23
believe 5:19 6:2 10:17 11:18 15:19 16:7,17 20:23 21:19 37:22 42:3,7,8,9 52:1 55:18,22 56:24
62:12 63:13
believes 21:21,22 22:11
below 18:15 20:23 21:20 22:15 31:2,6 31:24 32:21
best 8:18 10:3 11:1 12:24 13:14 14:22 19:20 20:4 25:10 33:15 40:1 54:10,12 58:6,20 60:7 64:9
better 58:16 61:10 65:22 67:12,14 69:13
between 45:18 53:10 57:12
beyond 19:24 42:20,21 62:18
biceps 35:1
bit 27:21 60:13,13
blocking 7:6
Bob 26:21
bone 40:6 52:21 60:13 60:23 64:4,13,19 65:10,12
bones 54:8
both 11:6,19 12:3 17:25 22:22 25:18 26:3,9,9 61:9
bottom 21:8
Boulevard 1:21
bounds 16:13
Brand 1:21
brandner 1:16 3:2 4:1 4:9 24:24 65:4 71:9
break 56:17
Brenda 25:20
bring 5:7
brought 5:9,10,12 8:24
BRUCE 2:8
building 28:24
bump 68:6
bundle 36:15
B-a-n-a 26:23
B-r-a-n-d-n-e-r 4:9

## C

C 2:1
California 1:22
call 27:23 28:20,21 29:2,16 30:14,17 39:16 41:23 44:18
called 33:12 69:19
calling 36:11
Calm 48:22
came 7:9 16:24 50:7 50:14
car 36:20
care 18:15 20:24 21:20 22:15 23:21 31:2,6 31:25 32:21 37:24 48:8 56:5
carlson 1:24 2:3 71:6 71:25
Carolina 40:22
case 4:15 5:8 7:9 8:12 11:6,10 13:6 14:8,21 15:16,17 16:1,8,9,12 16:15,15,18 17:2,4 17:11,14,20 18:10

19:21,23 20:10 21:15,21 22:7,10,25 23:23 25:6,15,16,20 31:8,23 32:24 34:2 53:18 55:18,21,22 63:8 69:6
cases 24:24 25:9,12 26:4,9,16 27:9
casting 39:12
category 56:12
cause 44:6 68:16
caused 68:9
Causey 17:18 18:24 20:1 22:1 32:10 33:2 33:4,9
causing 31:17 40:7 43:13 59:23 64:23 65:2
caveat 31:3
caveats 43:2,3,4,7,9
CCR 71:6,25
center 28:23,24
Central 2:4
certain 43:2,4 67:5,8
certainly 10:20
CERTIFICATE 71:1
certify 71:7,18
cetera 65:7
chance 10:21 35:13 54:11 61:4,6 64:4,6 65:5
change 30:20 42:11 45:18 46:4,6 52:25
changed 12:5 27:19 28:11,12,18 33:14
charge 24:4,5,6,7,14 24:19
charges 23:25
chart 6:3,7 7:17 19:15
check 56:17 67:2
child 60:10
child's 53:10
choice 21:14 35:11,22 51:24 55:20 57:12 58:6
choices 57:5
chose 44:20
chosen 31:22
CHRISTOPHER 2:4
chronology 19:21
circumstance 63:14
cities 18:13
city 9:10 29:6
claim 26:6
claims 23:2
clarify 13:20
14:5,5,6 10:24 13:10,10,10 20:17 23:2,5 31:9,9,9 64:2 64:16 71:4
█████ 21:22 22:8,16 22:22 23:10 32:2 47:20 50:16
█████ 9:5 22:23
clear 50:21,22 54:18 63:18
clearly 34:1,14 70:3
CLINIC 1:11
clinical 59:14
close 54:7

Atkinson-Baker, Inc., Court Reporters          1-800-288-3376

BRANDNER 00050

9F03779
### DR. PATRICK BRANDNER     AUGUST 5, 2005

closed 39:12 59:7 60:12 61:9
closer 61:23
cold 47:23
college 31:19
combination 61:17
come 23:25 43:21 50:12 59:9
comes 21:19 53:23
comfortable 4:20
coming 24:14 50:25
commencing 71:9
comment 23:21
common 40:13
community 37:12
compare 45:13 46:17 68:2
comparison 46:20,21
complete 5:7 6:8,22 39:4 44:15 53:4 58:4 71:16
completely 52:16 54:7 57:19
complexity 11:12
complication 26:3 35:8,20 51:11 56:2
complications 26:3,9 30:8 34:5,8,9,15 36:6,14,15,18 45:9
comply 37:23
concerned 48:19 52:24
concluded 70:8
confused 47:24 48:1 48:13
consent 19:1,4,11,12 19:14,19 20:21 21:11 25:7,25 26:6,7 26:13 31:10 35:22 38:2,25
consents 36:13
consequence 63:24 69:20
consequences 32:2,23 37:20
considerations 44:16
considered 58:13
consultants 7:9
contact 17:1 65:1
contacted 16:1
contained 7:9,16 20:2
context 36:18 38:19
continue 44:5
continued 44:20
controlled 9:8
copied 14:14
copy 6:8,22 11:21,25 12:2 15:1 27:12 28:14
core 69:11
Corporation 1:11,12
correct 4:15 5:11,22 6:5,12,16,19,20 7:15 7:18,25 8:5,9 12:6 13:19,20 15:13 17:9 18:1,2,16,21 19:16 22:6 24:17,20,22 27:11 30:15 34:21 40:10,15 42:16,18

51:16 52:18,19 55:19,20 56:4 57:11 65:20,24 67:22 69:4
corrected 42:6,7,8
correction 35:15
correctly 17:22 40:9 55:24
correspondence 14:11
cost 24:2,2
costs 24:21
counsel 7:20 10:10,14 12:3 15:2 24:24 28:13 32:4
COUNTY 1:2 71:4
couple 56:22
course 7:8
court 1:1,21 27:10
cover 11:21 12:1,3 14:12,15 15:1,8,10 15:13,14
covered 29:5,10 56:18 62:23
CRAWFORD 2:8,8 3:4 4:6 15:7,9 22:2 23:4 28:13,16 30:21,23 38:7,14 39:1 45:11 48:4,6 51:20,22 52:5 56:16,21 62:21 63:9 64:14 65:3 69:22 70:6
criteria 60:17
criticisms 23:13 66:7 69:11
criticize 66:16
cross 36:19
CT 8:21 9:17,19,21,22 9:24 10:17 41:21,22 41:22 45:22 46:24 56:22
current 27:14,18 28:14 66:23
curriculum 27:13 28:8
cut 29:8,16,17 61:16 64:9
CV 28:14
CV2003 1:8
C.C.R 1:24

**D**

D 2:8 3:1
Dad 31:9
damage 61:12 62:19 64:7
dance 44:24 58:18 65:16,19
dancer 65:6,14
dancing 44:8,9,12 45:1 54:10,11,12 64:17 65:2
date 9:20 10:17 16:23
Dated 71:21
dates 9:17 10:6 17:4 17:17 36:8,10 46:23 47:14
day 24:2,16 71:21
days 36:17
deal 12:8 40:14
dealt 41:1
death 36:13,21
decide 23:9

decided 22:20
decider 23:7
decision 19:22 20:13 22:13
decrease 38:22,23
Dee 28:9
defendant 13:6,7,22 13:23
defendants 1:14 2:7 3:9
defending 18:10
defense 13:19 14:4 26:15,18 66:9
define 19:4 20:7 38:12 38:20 46:6,7
defined 15:17,21 17:13 42:20,20 60:20
defines 38:5
definitely 62:9
deformities 42:5
deformity 41:15 48:19 67:17,19
degree 53:23 67:17
degrees 41:17,19 67:19,22,23 68:5
delayed 39:16
demands 45:7
demonstrate 9:14
depend 37:11 58:8,11
dependent 22:15
depends 34:23 58:9
depiction 18:22
deposed 32:6,24
deposition 1:15 4:17 4:21 5:18 13:5,12,21 13:25 14:1 15:5 19:5 19:8,10,25 20:6,6 22:23 33:3,18 47:24 53:24 55:6 66:3,5,11 66:15,17 70:7 71:8 71:15
depositions 13:4,9 18:25 20:5,10,16 26:16 31:7 32:3,15 32:25 34:11,12,21 47:20 48:9 55:8
depth 12:18 35:18 54:24
described 57:2
description 3:6,9 62:22
Desert 4:12 28:2
despite 33:17,21
determine 16:9
development 9:8
diagrams 55:4
die 34:18
different 18:12,14 55:12 60:4 64:18 67:19
differently 49:23
Dinowitz 10:25 38:10
disclosed 20:9 21:2 67:1
disclosure 7:21 8:2,16 22:3 27:16
discovery 67:6
discrete 26:8
discuss 16:11 31:4 32:22 37:3,9,13,14

37:19,23 50:7,15,25 56:9 63:10
discussed 21:16 22:21 32:9,9,12 33:19 50:5 55:11,14 63:1,23 69:15
discussing 55:3
discussion 12:16 15:15 16:14 17:6,19 30:22 31:14 32:1 33:1,9,23 34:3 37:15 48:5 50:10 54:16 63:21 65:24,25
discussions 5:10 18:24 56:11
disease 7:12
dispute 21:1 23:2
distal 60:11
distribution 12:20,22
doctor 5:7 27:15 43:23 56:17,22 59:16 63:13
doctors 6:10
doctor's 66:11
document 7:19
documentation 34:1
documented 33:23
documents 13:17
DOE 1:9,10
doing 36:24 38:17 45:24 51:15 53:14 57:9 63:20,22 64:12 64:18,22 65:1
done 18:4 40:1,2 44:3 44:3 47:13 49:17,18 50:15 51:1 55:24 56:23 62:2 69:23
door 24:7,8
doubt 67:7
down 21:19 42:14 44:15 48:22,23 52:15 53:15 54:6 58:3 62:15 64:2 71:17
dr 1:16 3:2 6:1,4,18,22 7:1,7,13 10:25 13:5 13:7,21 14:1 17:24 17:25 18:4,4 19:1,2 19:6,8,10,13,18,25 20:23 21:2,20,23 22:4,14,20 23:2,5,5 23:6,13,16,19 24:24 25:21 27:2,3 31:1,4 31:8,24 32:21 33:16 34:2 36:1 38:10,10 39:2,11,15 41:5,16 42:13 45:13 46:11 46:17 47:5,11,17,22 48:1,8,14,20,23,25 49:1 50:2,16,22 51:5 51:12,23 54:20 55:23 56:3,8,22 58:24 60:24 62:6,25 65:4 66:3,6,17 71:9

33:24 56:10 60:25 63:2,6,16 65:14 69:20
duly 4:2 71:12
dumped 29:23
during 56:3
dynamic 45:1

**E**

E 2:1,1 3:1
each 36:16
earlier 5:14 49:5
easiest 10:9,12,13
easily 11:25
East 2:9 4:12
eat 29:7
education 60:23
Egtagar 25:21
eight 40:20 43:6 58:3 58:16 59:9,10 60:8 61:8 62:14 65:18,21
either 16:13 18:4 52:8 52:24
elbow 35:1
elucidated 36:3
emergency 27:23 28:3 29:18
emphatically 21:16
employee 71:19
encourage 43:20
end 53:20 69:10
enough 5:5 13:1 14:24 42:25 47:19 50:21 68:5
entries 33:19
ESQUIRE 2:4,8
essence 70:4
essentially 40:3
establish 48:21 59:20
established 59:18
establishing 43:5 59:17
estimation 60:8
et 1:13 65:6
even 44:12 47:9 61:15 62:25
ever 22:19 23:15 25:5 34:2 38:9 48:23 52:14,14
every 37:13
everyone 21:16
everything 5:10,12 53:18 62:24 64:21
exact 10:16 15:17 17:17 38:6
exactly 6:14 21:25 26:4 46:12
EXAMINATION 3:3 4:5
examine 67:13
examined 4:3 66:19 67:16 71:11
example 12:13 34:25 47:17 59:4
excellent 51:10 56:6 56:13
exhaustive 8:16
EXHIBITS 3:6
expect 38:25
expectation 48:17
experience 18:10

**Atkinson-Baker, Inc., Court Reporters**     1-800-288-3376

BRANDNER 00051

9F03779
## DR. PATRICK BRANDNER    AUGUST 5, 2005

31:12 48:12 50:24
59:14 61:8
expert 4:14 13:19
14:21 15:19 16:10
16:25 17:11,15,16
17:19 18:19 19:23
20:3,9,14 22:14
25:12,13,15,24 31:1
32:13 36:3 63:12
experts 11:23 13:18
expert's 14:4
explain 43:12 69:17
explaining 43:9 54:24
explanation 43:25
48:24
expressed 23:15
extending 35:7
extensive 34:3
extent 26:12 65:15
67:8
external 62:5
extremely 70:3
eye 53:25
eyeballed 67:15
E-g-t-a-g-a-r 25:21

**F**

facility 40:21
facing 44:23
fact 27:22 33:21 47:8
50:16 51:11 56:2,9
factually 49:14 51:20
51:22,23
fair 5:5,6 6:15 13:1
14:24 16:3 18:5
22:17 23:13,14 39:4
39:5 40:14 47:19
55:3 60:3 62:15,16
63:24 64:1
fairly 36:23 54:1
fairness 7:3 46:12
67:12
fall 20:20 56:12
falls 22:8,10
family 20:17 31:15
32:23 39:13 42:24
43:5,10,19 44:24
48:8 59:18 60:22
63:2,19
family's 34:12
far 6:21,23 25:24,25
37:12 52:23 64:22
father 38:18
faulting 48:24
fear 66:10
feel 4:20 35:17 36:2
54:20
feeling 37:1 46:25
49:19
fell 18:15 20:23 21:20
22:15 31:1,24 32:21
felt 16:9 31:15 47:5
femur 60:11
few 66:4
fibula 9:5 39:8
figure 10:5 29:23 31:9
59:10
file 1:25 5:8,13 6:17
fill 32:4
films 8:24,25 9:4,4

10:4,15 46:18 58:10
finally 30:25
financially 71:20
find 14:25 15:25 24:11
33:19 37:17,21 47:8
fine 16:15 26:1 54:21
fingers 35:7
first 4:2 7:20 8:15
10:24 11:5 15:11,12
15:25 16:22 17:1
23:18 27:15 29:1
33:8,11 43:9 45:13
46:19
five 40:2,11
five-minute 56:17
fix 35:2 40:4 43:24
45:7 58:14 61:6
fixation 49:23 55:12
fixator 49:18 62:6
fixed 29:20 31:16 43:1
flat 32:10
flexor 29:16,17
flight 24:2
fiips 65:2
Floor 1:21
flux 27:21
folder 14:11
follow 59:11
follows 4:3
foot 11:19,20,22 21:7
22:24 23:12 31:5
32:9,17 33:6,17,24
56:10 61:1 63:2,6,16
64:10 65:14 69:20
forearm 35:6
foremost 43:9
forget 38:2
form 19:14 21:24 22:18
38:4,11 45:5 51:17
52:3 56:14 63:4,25
64:20
formal 63:7
Formerly 28:2
formulate 45:22
Fort 40:22
found 44:17
fracture 9:6 38:25 39:3
39:6,8,18 40:4,8
41:7 42:12,15 43:10
44:5,11,14 45:19,24
46:4,25 48:17 51:3
53:13 54:25 57:19
58:23 61:10 64:3
fractures 40:1
Friday 71:10
from 6:1,18 7:1,11,19
8:10 19:18 20:1 24:7
25:10 26:25 30:25
33:14 34:19 41:18
41:19 42:14 44:10
45:9 47:11,12,19,22
48:9,17 49:19 50:2,5
50:24 51:12 55:23
56:19 64:23 66:5
front 24:7,8 41:20
48:20
frontal 41:18
full 4:7 24:2
fully 42:8
function 52:22 53:17

58:12
functional 35:12 66:23
functioned 54:1 58:12
further 16:11,15 17:14
18:25 19:4 39:21
46:9 47:1 53:14
59:12,13,15 60:18
67:6 68:13 71:18
future 31:18 45:2
57:14,16 66:25

**G**

gap 32:4
gave 33:20 48:24
49:12 50:9
general 34:17 37:1,15
38:6
generally 57:8
gentleman's 33:13
gets 65:13 69:20
getting 9:7 35:13 48:2
54:20,21 60:3 66:9
give 4:10 10:15 11:21
14:22 24:12 26:18
28:13 29:2 31:1
35:10 38:24 44:25
47:4,14 53:3 54:12
59:20,21 66:15 67:3
67:9 68:25
given 32:25 51:23
53:18 54:9 56:7,8
61:10 66:25 68:24
69:2
giving 16:1 35:22
50:13
glean 47:19
Glendale 1:22
go 5:3 11:15 12:18
14:24 24:7 26:5
29:19 30:11,13
32:14 35:18 36:16
37:1,15 40:3 42:4,23
43:2,11,17,22 44:5
44:21 45:6 49:14,16
50:3,17 54:4,15
58:25 60:4,7 61:10
68:9
goes 44:4
going 5:4 14:13 15:12
15:21 16:11 20:14
20:14 21:12,13
22:19 23:9 24:15
30:17 32:5 33:2,11
35:4 37:11 42:24,25
44:4,5,18,19 45:3
53:3,20 56:17 57:24
57:25 59:12 60:12
61:5 62:4,8,13,18
64:8,8 65:5,12 66:14
66:24 67:5 68:15,22
69:3,6,16 70:6
golly 21:25
gone 31:13 46:9 53:4
69:7
good 25:1 53:5 56:24
gotten 27:20 57:1,21
65:22
GRAHAM 2:4 15:6
21:24 22:18 28:15
38:4,11 45:5 51:17

52:3 56:14 63:4,25
64:20 70:1
grant 33:25
great 12:2
gross 18:6,8,9
group 27:22 28:22
29:1 41:14
grow 60:12
growth 54:7 59:7 60:11
60:12
guardians 1:5
guess 33:14
guidelines 4:21
gunshot 30:6
guys 28:19
gymnastic 44:12

**H**

HALUCK 2:3
hand 29:17
happen 62:4,8
happens 57:13
hard 10:4 33:15 47:24
having 4:2 9:13 44:10
44:10 53:10
heal 31:13 39:21 43:1
43:11,17 44:18 47:1
52:9,12,18,18,25
53:16 58:23 60:18
66:1
healed 40:5,8 53:16
57:19 58:24
healing 39:4 44:1,14
44:15 53:5 58:17
62:17
heals 68:12
health-care 5:23 6:24
8:11
heard 21:7
hearing 47:22
heavily 65:2
help 38:20
helpful 12:4 15:24
Hey 42:25
high 59:4 65:16,19
higher 45:3
highlights 66:4
high-end 43:16 44:7
54:3
Hills 28:6
him 33:12 37:23 38:14
38:16 44:6,21 48:21
58:18,21 59:11,11
59:16 60:2 66:7
67:13 69:24
Hisham 25:16
histology 11:14 12:22
hit 36:20
Hito 25:16 26:21 27:2,3
hitting 64:22
home 9:8
hopefully 14:13
hoping 43:8
horrible 61:21
hospital 1:12 6:1,3,7
7:8,17 19:3,15 27:24
27:25 28:1,2,6,7,11
28:17 29:21 36:4
hospitalization 5:25
hospitalized 7:10

52:3 56:14 63:4,25
64:20 70:1
hospitals 30:16
hotel 24:2
hour 71:10
hourly 24:18
housekeeping 23:24
hurt 59:24
husband 1:9,10
hypothetical 68:11
H-i-t-o 25:16

**I**

idea 35:10 54:21
identified 7:22
identifying 14:19
images 10:1,2
immediately 49:21
54:11
impact 44:9,25 46:1
54:12 64:18
impacting 44:11
important 44:25
impression 47:23 48:7
48:14,15,20 51:3
improve 52:22,23
improved 67:8
improvement 60:5
68:10
INC 1:20
incidence 36:23 37:7
62:8
included 10:3 14:12
17:24
including 13:17,18
incomplete 58:17
incorrect 23:11
increased 43:14 68:16
68:21 69:18
indicates 8:19
indicating 5:4 31:24
individual 26:10 29:21
35:4 38:24 42:11
44:13 45:6 54:3
67:15
individually 1:5
individuals 30:8 31:8
62:20
infection 30:6
infectious 7:12
information 3:15 14:22
17:12,20 18:20,23
20:1 30:24 57:1
63:22
informed 19:1,4,11,12
19:14,19 20:20
21:10 25:7,25 26:6,7
26:13 31:10 35:22
36:13 38:2,24
initial 15:15,18 16:11
16:13 17:7 39:6
injured 21:10 61:15
69:20
injuries 34:16,23 37:7
injury 12:23 20:8 21:10
21:15,17 22:21
23:11 31:5 32:1,22
33:5 34:25 35:3,5,14
35:14,16,17 36:23
36:25 37:20 42:21
54:16 56:9 60:18
62:3,13 63:1,23

**Atkinson-Baker, Inc., Court Reporters**          1-800-288-3376

BRANDNER 00052

9F03779
## DR. PATRICK BRANDNER     AUGUST 5, 2005

| | | | | |
|---|---|---|---|---|
| 69:18 | 27:14,17 32:11 | literally 29:9 | 47:17,22 48:1,8,14 | nationally 11:23 |
| **Inn** 4:12 | 36:10,14 38:5 45:17 | literature 11:9,11 | 48:20,23,25 51:23 | **NEBEKER** 2:3 |
| **Innocuous** 55:1 | 46:10,14 47:16,18 | 12:11 13:1 35:20 | may 10:19 14:16,18 | necessarily 29:5 58:9 |
| **Instance** 29:16,17 | 48:13 50:6 52:4 53:7 | 38:1,5 42:19 | 15:20 21:14 28:10 | necessary 57:14 |
| **INSTRUCTED** 3:12 | 53:13,14,18,25 54:2 | little 27:21 60:13,13 | 35:21 36:21 57:15 | need 18:19 19:24 20:1 |
| instructions 16:8 | 54:4 59:12 60:15,21 | LLP 2:3 | 57:15,15,15 61:7,7 | 30:24 32:10 43:24 |
| instrumentwise 62:2 | 61:4,14,14,15 67:6 | long 40:23 42:25 53:19 | 64:5,5,10,11 66:1 | 47:2 53:15 67:2 |
| insured 29:11 | 67:10 68:3 69:11 | 54:17 60:4 64:24 | maybe 53:14 | 69:16 |
| interested 71:20 | knowing 53:19 | longer 27:23 28:21 | mean 7:13 18:8,13 | needed 16:10 31:7,14 |
| interfered 53:17 58:12 | knowledge 6:7 8:18 | 42:22 | 29:10 41:6 48:10,13 | 31:15 52:24 63:22 |
| interim 52:21 | 22:24 25:17 26:7 | longevity 68:23 | 51:12,24 52:11 56:2 | 69:15 |
| introduced 16:8,17,18 | known 11:23 35:8,20 | long-term 68:8 | 57:3,11 64:17 67:3,8 | needs 21:15 43:1 |
| involved 18:1,19 24:25 | **KOELLER** 2:3 | look 8:2 10:11 15:15 | meaning 39:14 44:8 | 49:20 59:18 |
| 25:14 26:2,9,12 | | 15:21 16:9 17:23 | means 16:7 21:17 35:5 | nerve 11:12 12:5,8,21 |
| 29:15 30:4,5,9 31:8 | | 26:5 27:17 31:14 | 38:21 46:10,12,14 | 12:23 20:7 21:3,5,7 |
| 31:16,18 43:13 | **L** | 32:15 33:15 36:8 | 48:12 50:11 55:15 | 21:8,9,10,11,13,13 |
| 54:22 71:19 | L 1:24 71:6,25 | 45:23 46:16,22 | 65:5 | 21:17 22:9,11,21,24 |
| involves 25:20 | land 53:10 | 49:20 59:7 61:2,19 | meant 33:5 34:23 | 23:3,12 31:5 32:1,7 |
| in-depth 33:22 48:24 | las 1:17 4:13 9:12 | looked 11:2 12:13,17 | mechanical 68:6 | 32:8,17,23 33:5,5,16 |
| iron 50:1 | 25:19 27:10 71:21 | 15:16 17:21 31:11 | mechanically 59:3 | 33:24 34:16,22 35:3 |
| ischemia 61:17 | last 11:3 27:7 | 33:11 45:20 46:23 | medical 5:20 8:3,17 | 35:5,6,9,13,15,17,19 |
| isolate 61:25 | late 11:2 | 46:24 47:9,11,12,14 | 11:9 25:6,11 53:23 | 36:22,25 37:2,7,20 |
| issue 22:9 23:9 25:7 | later 52:10,15,21 62:15 | 48:18 51:10 61:18 | 63:7,17 | 54:17 56:10 61:5,7 |
| 29:25 33:3 | latest 67:4 | looking 12:19 14:24 | medical-legal 28:9 | 61:12,15,19,20 62:1 |
| issues 20:20 55:18 | LAW 2:3,8 | 16:1 22:22 47:23 | meeting 69:23 | 62:3,12,16,19 63:1,6 |
| i.e 43:11 69:20 | lawyers 24:6 | 48:3,16 58:10 60:9 | memory 23:10 38:6 | 63:23 64:8 65:10 |
| | laymen's 64:1 | looks 23:1 60:1 | menu 33:20 34:9,20 | 69:19,19 |
| | layperson 35:4,16 | losing 10:21 | 36:7,11 | nerves 35:19 37:10,22 |
| **J** | lead 68:17 69:3 | lot 16:24 17:5,5 28:22 | mezona 1:11 2:7 10:23 | nevada 1:17 71:3,21 |
| **Jackson** 40:22 | least 12:24 48:9 | 29:11 30:7,8 31:20 | 38:9 45:14 46:18 | never 21:6 24:12 37:6 |
| **JANE** 1:9,10 | leave 14:14 24:7 57:5 | 40:14 54:4 68:23 | 47:13 | 37:6 53:9,9 66:19 |
| **January** 45:12 46:2,17 | leg 11:20 37:4 43:15 | 70:3 | microscopic 11:13 | new 28:6 |
| 47:12 | 45:8 53:25 54:5 62:3 | lower 11:20 68:17 | middle 46:3 | night 11:3 |
| **jersey** 16:19 | 64:19,22 68:17,23 | lump 48:19 | might 26:2 35:17 48:25 | nine 42:14 44:15 |
| joint 68:14,14 | legal 13:17 16:6 17:15 | lung 36:22 | 49:23 57:14 | none 3:7,10,12,16 26:4 |
| joints 68:14,19 | less 62:9,9 | **LUTHERAN** 1:12 | mind 17:17 19:20 | 26:8 |
| jumping 64:22 | let 4:23,25 7:19 10:5 | | 20:13 22:7 31:12,20 | nonexpert 22:25 |
| **June** 36:9 62:14 | 10:11 16:4 17:22 | | 67:21 | nonlawyer 23:1 |
| jury 21:21,22 22:11 | 23:24 25:2,12 27:13 | **M** | mine's 11:24 | nonunion 42:17,19,20 |
| 23:9 37:12 56:1 | 27:17 31:3 42:8 | made 9:13 | minor 1:6 | **Non-Profit** 1:12 |
| just 4:23,25 10:10 12:2 | 52:12,13,17,18,25 | main 54:24 | miscellaneous 13:17 | normal 27:10 41:25 |
| 15:10,12 18:14 | 53:13,14 54:18 | mainly 20:5 31:7 68:21 | miss 24:15 | 42:1,2 53:17 68:3 |
| 24:13 25:2 27:17 | 55:17 60:4 64:15 | major 29:4,6 | misstated 41:23 | **North** 1:21 2:4 |
| 28:11 29:2 30:10 | letter 3:9 14:22 15:13 | make 15:1 20:14 22:13 | **Mitchell** 7:2 | note 49:19 50:2,5,10 |
| 35:15 36:25 37:17 | 15:14,18 16:4,7,17 | 60:22 61:19 63:18 | **Mom** 31:9 | 50:20,22 |
| 44:22 47:8,16 48:1 | 16:18,22 17:3 | making 19:22 | months 42:4,14,21 | notes 6:2,10,10 55:6 |
| 50:9,20 52:7,16 | letters 14:12,15 15:1,8 | mal 39:17 | 43:6 44:15 58:3,16 | 71:14,17 |
| 54:20 55:17 56:17 | 17:5 | malpositioned 39:18 | 59:9,10 60:8 61:8 | nothing 33:23 51:15 |
| 57:5 59:9,19 62:22 | let's 34:24,25 52:16 | malpractice 18:7,8,9 | 62:15 65:18,21 | 51:24 52:2,12,16 |
| 63:18,20 67:2 68:25 | 57:14 58:15 59:21 | 18:11,18 25:6,11,14 | more 11:24 17:12,13 | 59:21 63:20 66:13 |
| 69:2 | level 31:17 38:22 41:13 | 27:21 28:18 30:1,3,4 | 18:20,23 19:22 | 71:13 |
| | 60:19 65:16,19 67:9 | 30:11,13 33:13 | 23:24 25:19 47:3 | notice 5:18 |
| | liable 30:9 | malunion 39:15,19 | 54:2,6 57:9 58:23 | noticed 6:17 |
| **K** | life 44:20 60:20 69:3 | 58:8,13 | 60:13,14 61:16 65:5 | number 3:6 16:19 34:7 |
| keep 36:5,11 62:1 | light 36:20 | malunions 41:13 | 68:16,23 | 39:25 42:4 |
| kid 53:9 59:5,6,25 | like 6:11 7:23 10:6 | man 53:19 | morning 9:7 | nurses 6:10 |
| 60:10 | 12:15 19:15 23:1 | managed 39:10 | most 40:18 57:7 61:23 | |
| kidding 24:13 | 25:5 26:4 27:13 | manila 14:11 | mother 38:18 | **O** |
| **KIM** 1:5 | 30:19 41:4 43:3 51:4 | **Mann's** 11:19 | **MountainView** 27:25 | Object 22:18 38:4,11 |
| kind 31:19 35:14 62:13 | 51:25 60:1 61:3 62:6 | many 4:18 39:23 40:11 | move 65:13 | 45:5 51:17 52:3 |
| **KIPLING** 1:9 | 66:13 69:10 | 41:3 | moves 44:12 64:18 | 56:14 63:4,25 64:20 |
| **Kleindorfer** 28:9 | likely 53:4,8 61:16 | **March** 10:25 25:3 46:3 | 65:13 | obvious 37:14,15 |
| **KLINE** 2:8 | 68:16,24 | 46:19 47:13 | much 42:22 61:13 | obviously 17:3 36:15 |
| knee 61:23 68:7,14,20 | limitations 38:23 58:18 | margie 1:24 71:6,25 | 65:15 | 53:12 59:8 60:17 |
| knew 19:18 26:2,10 | line 16:15 21:8 26:1 | **MARICOPA** 1:2 | **M.D** 1:9,10 25:22 | 61:16 68:4,21 |
| 51:15 54:17 63:19 | 52:15 53:15 54:21 | markings 9:13 | **M.D.s** 25:17 | occur 53:12 61:22 |
| know 4:25 5:16 9:9 | list 10:12 15:4 50:9 | materials 23:19 | | occurred 32:3 56:2 |
| 10:6,9,12,15 12:13 | listed 7:21 8:7,15 | matthews 1:9,9 7:7,8 | **N** | 62:3 |
| 14:2 15:14,23 16:6 | listen 36:17 | 13:7 17:24 18:4 | N 2:1 3:1 | occurs 51:11 |
| 16:22 17:3,14,17 | listing 24:24 | 23:16,19 39:2,11,15 | name 4:7 7:6 | October 15:12 16:2 |
| 19:2 24:9 25:5,9,25 | lists 8:3 34:7 36:5 | 45:13 46:17 47:11 | | |

Page 4

**Atkinson-Baker, Inc., Court Reporters**        1-800-288-3376

BRANDNER 00053

9F03779
**DR. PATRICK BRANDNER     AUGUST 5, 2005**

17:2 23:19
off 29:1 30:21,22 43:14 44:6 48:4,5 56:18 59:23,25 64:23
offer 51:5 65:8,9
offering 69:6
office 61:8,22 19:13,17
OFFICES 2:3,8
official 63:16
off-the 5:9
Oh 19:9 25:1 47:10 56:25 67:14
okay 5:1,19,19 7:3 8:24 9:11,21 10:8 15:20 15:23 17:1,18 21:18 22:13 23:8 26:20 31:23 32:18 33:7 36:5,8 41:3 42:13 43:8 60:3,6 64:2,15 64:16 65:4 66:18 68:11 69:14,22
old 11:25 12:4
once 32:5
one 4:23,24 19:7 25:19 26:6,17,17 27:7,14 29:14 37:15 40:17 41:1,2 43:6,22 60:9 63:19 67:23 68:2
ones 37:14 47:12
ongoing 20:13
only 12:22 19:5,7 21:11 25:11 32:14 49:22 50:13 60:2,24 69:8
open 61:9 67:7
opening 28:4 57:12,12
operate 57:6 64:3 65:17
operated 49:20 50:19
operating 54:25
operation 61:22
operations 17:25
opinion 16:2 22:14 23:15 31:1,6 32:20 35:23,24 37:2,18 43:23 49:2,10,10,12 51:2 52:23 53:3 59:14 67:4,9
opinions 11:10 13:18 14:4,8 39:14 43:20 43:20,22 49:7 50:9 55:12 57:2 62:23 66:6 67:1 69:5,8
opposed 49:24
option 44:2,21,22,23 45:8 51:5,7,16 52:2 52:6,8 54:12,19 55:19 58:20 59:21 60:2 63:20 69:12
options 52:11,12,17
orders 6:11
Organization 1:12
original 7:5 42:15
originally 11:5
orthopaedic 1:11 2:7 10:24
orthopedic 1:10 7:5 25:18,23 28:3 38:1 40:13 49:2
orthopedics 28:4

orthopedist 16:13
osteotomies 40:1,2
osteotomy 55:15
other 5:13 6:24 7:9 8:10 12:11 13:1,12 13:18 14:15,16,20 14:22 26:8 27:1 29:25 30:5 37:2,7,10 37:22 39:14,14 42:24 43:20 44:17 49:2 51:1 52:6,8 58:25 68:3,3 69:5
out 10:6 15:5,25 16:13 24:11 25:9,24 28:11 29:23 31:10 32:10 37:17,21 43:23 47:8 50:10 52:10,10 53:24 54:4,6 57:5 59:19 62:1,4,19 64:4 64:13 65:12 68:23
outcome 42:10
outpatient 28:23
over 27:6 36:12,12 38:3 40:11 43:2,22 44:21 45:24 57:20 59:1 69:7
Overall 47:23
own 11:23 28:23 50:24 69:13

**P**

P 1:9 2:1,1
page 3:3,6,9 11:21 12:1,3 25:20
pages 12:7 15:10
pain 31:17 38:18,19,20 38:22,23 44:20 64:23,25 65:2 68:7
parallel 68:14,15
Pardon 51:21
parents 1:5 20:6 22:23 38:15
part 6:13 28:24 33:13
partially 39:20 58:1 60:16
particular 41:6 55:22
particularly 20:5
party 71:19
past 24:25
patient 26:2 36:13 39:24 44:13 50:25 54:21 59:11 68:12 69:17
patients 33:21
patrick 1:16 3:2 4:1,9 71:9
people 18:12 29:24 32:5,24 34:3 38:2,19 38:20 51:6 56:12 61:19 67:19
percent 62:9,10 64:5,6
percentages 61:4
Perfect 69:21
performed 6:4 41:5,16 42:13 51:4 55:5,23 58:24 62:14
perhaps 19:15 47:2
period 44:3 45:24 46:2
permanent 64:7
peroneal 11:12 12:5,8

12:21,23 21:3,4,7,13 21:15,17 22:9,11,21 22:24 23:2,12 31:5 32:1,7,8,17,22 33:5 33:16,24 35:13 37:20 54:17 56:10 60:25 61:6,12,15,18 63:1,6,16 69:19
person 41:8 71:20
personality 48:25
personally 42:22
Peter 7:1
Phoenix 2:5 23:25 29:6
physical 38:23 68:6
physically 58:11
physician 18:7 33:11
physicians 29:23
physiology 61:18
pick 47:25 62:19
pins 49:18,24
plain 8:21 9:4 10:23 45:12 46:18 58:10
plaintiff 7:10 21:5
plaintiffs 1:7 2:2 3:6 4:15 7:20,20 10:10 10:13 15:2 24:23 32:4
plaintiff's 15:19 20:6 25:15 26:19,20,21 27:15
plane 41:18,18,19 67:23,23
planes 67:18
planning 9:22,24 56:23
plans 31:18
plate 62:6
plates 49:24 54:7 59:7 60:12
play 64:15
please 4:7,11
pleasure 69:22
pneumonia 36:14,21
point 8:25,25 17:7 18:7 19:7 22:5 23:9 33:1 39:17 42:17 52:2 54:13 57:6 58:7,20 59:6 62:18,18 63:19 66:10
polytrauma 30:6
poor 53:9
population 38:6
position 31:11 32:11 40:7 41:6,9 44:19 53:1,16 68:4,12 70:2
possibility 23:12 36:25
possible 37:13 59:15 59:16
possibly 68:7,20
postop 9:5,22 10:16 19:3
postoperative 56:5
potential 23:11 31:19 32:1 34:4 35:3 36:18 36:19 39:21,22 42:10,11 44:1,2,14 46:25 52:22,23 54:16,23 56:10 57:18 59:22 63:2,24
potentially 45:1 60:19
practice 28:25 29:8,9

34:24 40:19 41:10 41:11,12
pre 10:16
predict 62:7 65:11
premiums 30:13
preop 9:4,21,24
preoperative 19:17 47:17 56:11
preoperatively 56:23
preparation 11:3
presentation 16:12,14
presented 41:4
presume 11:4
primarily 12:19
prior 71:11
private 29:8 40:19 41:11,12
privileges 27:19,20 28:1,5,12,17 30:2
probability 53:23
probable 53:8,20
probably 11:24,25 40:17 43:13 61:24 62:9,13
problem 5:1,4 21:4 29:22 31:13 35:21 54:24 60:24 61:22 62:19 65:4
problems 15:17 16:10 26:11 29:15 36:19 36:22 38:9 40:7 44:6 44:11 54:23 68:8
procedure 36:24 55:1
process 62:17
professional 4:10 29:7
progress 6:1
prone 60:18
protect 61:5 64:8
provide 10:11 12:1
provided 6:8,21 17:12 19:6,25 24:23 27:12 28:10 46:22,24
provider 5:24
providers 6:24 8:11
proviso 54:15
proximal 39:9
purposes 9:22,25 14:8 56:23
pursue 54:10,11
pushing 61:2
put 14:10 25:12 31:3 36:18 38:19,23 42:9 43:14 45:2 46:11 52:16 57:15 62:6 64:1
puts 36:6
putting 45:7 64:18
P.L.C 2:8
p.m 1:19 56:20,20 70:8 71:10

**Q**

question 5:3 8:1 26:1 31:4 32:19 37:9 43:4
questions 3:12 4:24
quicker 45:7
quickly 28:12
quote 17:12

**R**

R 2:1
radiological 8:20
radiologist 45:21
radiologists 8:22
rapport 43:5,18,21
reactions 50:23
read 18:18 32:15 34:11 37:6 69:24
reading 48:9 62:22
real 21:11
really 15:24 16:21 35:16 48:16 49:11 52:6,8 58:8,11
reason 63:15
reasonable 53:23
reattach 35:10
recall 5:25 9:13 17:4 19:3 40:18 45:23 46:23 55:13 66:5
received 5:14 7:19 17:21
recess 56:19
recollection 10:3,22 11:1 13:14 14:23 19:21 20:4 25:11 33:15 40:2 45:20 49:16,17
recommend 45:4
recommendation 50:12,13
recommendations 48:9
reconstruction 10:17 12:17
record 4:8 5:10 7:24 8:8,14 10:14 30:21 30:22,23 34:10 48:4 48:5 50:8
records 5:20 6:1,18,22 6:24 7:1,8,22,24 8:3 8:6,10,17 9:16,20 10:18 11:6 14:16,19 14:25 16:24 17:8,23 17:23,24 19:1,2,3,4 19:10,12,13,17,22 19:25 20:2 26:5 32:15,16 33:10,12 33:16,17,18,24 34:1 36:4,6 46:11 49:1 50:23 56:7 61:1 62:25 63:7,17 67:4,6 67:18
reduction 39:12
referenced 12:7
referring 36:5
reflected 32:16
refracturing 59:5
refresh 12:20
regaining 28:1
regarding 19:1,11,12 66:15
register 35:16
reimbursed 29:13
reimbursement 29:14
related 5:8
relationship 48:21 59:17,18,20
relative 71:18

Page 5

**Atkinson-Baker, Inc., Court Reporters**          **1-800-288-3376**

154

BRANDNER 00054

9F03779
DR. PATRICK BRANDNER      AUGUST 5, 2005

relevant 11:9
relied 14:7
relying 41:21
remainder 40:20
remember 8:22 9:20
  10:16 11:22 16:23
  17:17 25:13 26:15
  26:18 27:1,5,8 36:8
  49:6
remembered 47:7
remind 4:23
remottle 39:22 47:1
  52:13 60:13 68:12
remottling 44:2 53:5
  53:12 59:22
repair 39:3
repaired 35:13
Repeat 8:1
rephrase 5:1
report 9:19 10:2 41:22
  45:22
reported 1:24 41:19
  71:8
REPORTERS 1:21
REPORTER'S 71:1
request 5:14
required 19:22 37:3,9
  37:19,23
respect 63:21
responsible 29:20
restate 69:9
result 35:6 53:5 58:5
  61:12
resulted 39:3
retained 4:14 15:12
  16:7
retrospect 62:12
review 11:11 14:7,20
  17:8 18:3 33:10
reviewed 5:20 6:25 7:1
  7:23 8:6,11,19 10:4
  11:5,8 13:2,5,9,13
  15:19,20 16:24
  20:16 38:1 66:3
reviewing 6:17
rid 55:17
right 7:6 9:10 15:7 23:9
  26:12 28:15 35:9
  46:23 49:7 57:8 61:2
  65:19
rises 22:7,10
risk 21:3 32:22 59:5
  61:12,13 65:23
  69:18
risks 34:4,7,14 36:6
road 4:12 42:14 44:16
  54:6 58:3 62:15
rod 49:23,25 50:1 62:5
Roger 11:19
role 64:15
room 28:4 29:18
rubric 20:20
run 65:15
running 20:13 44:12
  64:25
rupture 35:1

**S**

S 2:1
same 29:6 36:15 58:4

58:5,10,17,18 63:3
  65:23
sat 48:23 64:2
satisfied 47:21 60:22
saw 7:3 10:25 38:9
  45:15 47:7 48:18
  55:6,8 63:6 67:21
saying 5:17 30:10,11
  33:2 48:22 49:20
  50:20 53:9 54:18
  59:13,25 61:2 63:21
  69:2
says 15:14 22:20 23:2
  33:18 34:6,8 45:2
  63:2
scan 8:21 9:19,21,23
  9:24 41:21,22,22
  45:22 46:24
scans 9:17 56:22
scenario 37:14 43:15
  69:1
scholarship 31:19
  65:6
science 12:25 61:20
  ▮▮▮:6 9:5 10:24
  13:10 22:22 31:9,17
  38:8 39:8 43:13
  44:24 64:2,15 66:19
  67:4 68:9
  ▮▮49:8
  ▮▮41:15
screws 49:24
search 51:2
searching 52:20
second 49:7,10 51:2
Secondly 43:12
secretary 28:10
sedentary 54:1 68:22
  69:3
see 8:4 10:1 16:4 17:22
  18:6,14,17 19:9,10
  20:5 23:18 26:5 31:7
  31:16 32:15 33:16
  34:1 36:3,12 43:17
  45:12,24 46:15 47:5
  52:25,25 55:2,17
  56:7 58:9 62:23
  63:16 64:17 66:12
  66:16 67:5,20
seeing 10:22 57:13
  60:5 69:12
seeking 39:14
seem 16:12
seen 8:17 9:18 10:7,7
  13:13 14:3 20:19
  22:3 37:6,7 49:1
send 9:2 10:10 12:3
  15:1,5
sent 5:13 6:14 8:3,25
  10:15,19 11:5 14:7
  14:16,19 17:7,23
  23:18 25:3,3 28:11
  47:15
separate 34:25
separately 14:10
sequential 45:23
severe 30:5
sharpe 1:10,10 2:7 6:1
  6:4 14:1 17:25 18:4
  19:18 20:23 21:2,20

21:23 22:14,20 23:5
  23:6,13 31:1,4,8,24
  32:21 34:2 36:1
  38:10 41:5,16 42:13
  46:11 47:5 49:13
  51:5,12 54:20 55:23
  56:3,8,22 58:24
  60:24 62:6,25 66:6
Sharpe's 6:18,22 7:13
  13:5,21 19:1,2,6,8
  19:10,13,25 22:4
  33:16 66:3,17
short 29:2 44:3
shortened 62:17
shorthand 71:14,17
show 7:19 25:2 27:13
  44:4
showed 46:8,19
showing 55:3
side 26:6 33:16 68:2
sign 69:24
signed 31:23 33:9
significant 29:7 30:6
  36:24 38:8,13,14,16
  38:17,18 45:18 46:3
  47:25 61:11 67:24
  67:25 68:5
significantly 30:12,14
  47:7 57:20,22 68:1
simply 10:11 12:20
since 13:25 27:19
  40:25 41:2
sir 4:8
site 62:1
sites 33:14
sitting 63:5
situation 27:22 28:18
  28:19 29:4,6 30:1
  39:2 41:4 47:21
  48:22 57:16 60:6
six 42:21 60:8 61:8
skeleton 53:10,11 54:8
  59:7 60:14
skin 57:12,13
slapped 29:19
smaller 64:5,5
smart 54:22
sneakier 16:20
socioeconomic 29:15
  29:22
some 5:9,9,19 6:18 7:1
  7:22,22,23 8:3,6,20
  8:23,25,25 10:19
  12:16 13:16 14:11
  14:12 17:7,7,23
  18:10,19 19:20 20:1
  23:24 24:18,24
  29:15 30:25 33:10
  39:22 42:8,12 43:23
  48:18 55:17 59:6,21
  60:11 61:20 62:22
  65:14 68:6
somebody 18:15
someone 35:2 39:14
something 12:14,15
  18:13 19:15 32:3
  35:18 58:13
sometimes 35:8
somewhat 47:24
somewhere 9:10,11

son 13:10
sorry 25:19
sort 20:13
sounds 7:23 49:11
source 30:25
South 40:22
Southern 2:9 28:6
speak 28:2
speaking 57:9
speaks 17:3
specific 11:9 22:4
  30:24 31:25 33:1
  36:10 37:22 38:2
  39:6 47:3 63:23 66:6
  66:11 69:19
specifically 12:7,13
  21:4,5 31:5,32:8,16
  33:5 36:3 37:19 43:4
  45:16 55:11,14
specifics 37:16
spent 55:2
spiral 10:1,2
sports 65:1
spot 58:4,10,17 63:3
Springs 28:2
ss 71:3
staff 27:19,20,24,24,25
  28:1,5,6,12,17 30:2
  30:18
stance 23:1
stand 25:24 68:15
standard 18:15 20:24
  21:20 22:15 24:11
  31:2,6,25 32:21
  33:20 36:13 37:24
standards 37:12
standpoint 51:13
  55:24
started 39:13
starting 30:19
state 1:1 21:6,10 22:25
  36:25 53:22 60:9
  71:3
stated 21:5 22:12,20
  33:20 70:2
statement 7:21 8:2,16
  27:16 32:16 49:15
statements 33:22
  48:11
status 66:24
STEVE 1:5
sticker 9:7
still 9:2 20:1,23 35:12
  44:1,1 58:3 60:10
  67:7
store 10:20
straighten 40:6 52:10
  52:10 64:3,13 65:12
straightened 54:2 62:4
straightening 65:10
straighter 65:25
street 36:19
stretch 61:17
stretched 61:7 64:7,10
  65:11,13
strike 47:6
structure 11:12 12:5
stuck 67:21
studies 8:20,23
stupid 49:11

subjective 48:11
subpoena 5:15,16,17
subsequent 7:13
Subsequently 33:14
successful 61:25
sued 13:25 23:20 34:2
suffer 62:13
Suite 2:5,9
summary 13:18 14:3
  29:2
Sunrise 27:24,25
SUPERIOR 1:1
supplemental 7:21
  8:15 27:16
SUPPLIED 3:15
supposed 31:10
sure 5:13 6:14 13:21
  15:6 16:5 29:5 36:22
  46:12 50:24 60:22
  61:19 63:18
surgeon 7:5 25:23
  40:14 49:2 53:25
surgeons 25:18
surgery 6:4 7:14 19:14
  21:14 26:11 28:3,22
  28:23,23,24 33:21
  34:4,19 35:15 37:8
  37:18,23 38:3 41:2,5
  41:16 42:14,23
  43:22 44:2,22 45:3,8
  45:10 49:13,15,17
  50:3,6,6,10,15,17
  51:1,4 52:14,19,19
  52:21 53:1,6,15,21
  54:13,19 55:4,18,23
  56:3 57:3,4,8,10,14
  58:6,20,25 59:10
  60:2,6 61:13,24
  62:14 63:22 65:9,22
  68:10 69:12,16,18
surgical 12:14 31:21
  44:21 51:9 62:1,10
surgically 43:1
surprise 69:9
surprises 66:14
surrounding 31:14
susceptible 12:23
switched 28:22
sworn 4:2 71:12
symptoms 43:14
system 27:10

**T**

take 10:20 15:21 17:20
  27:17,23 28:20,21
  29:3,22 30:14,17
  32:19 34:24,25
  35:12 36:16 56:16
  59:19 61:3,6
taken 4:17 10:23 19:7
  20:10 45:14 46:18
  56:19 71:17
taking 29:1 71:8
talk 36:16 49:5
talked 50:11 67:15
talking 6:3 9:22 18:14
  61:13
teach 60:23
tear 68:16
technical 51:13 55:24

Page 6

**Atkinson-Baker, Inc., Court Reporters**                    **1-800-288-3376**

155

BRANDNER 00055

9F03779
## DR. PATRICK BRANDNER  AUGUST 5, 2005

technique 12:14 51:9
tell 4:7,25 5:23 9:17
35:2,5,18 47:1,4,10
56:1 64:6
telling 17:10 23:8
65:23
Tempe 2:10
ten 11:25 12:4 27:6
tendon 12:17 29:17
35:1,10
tendons 29:16
term 18:9 42:17 53:20
terms 11:8 13:4 18:12
21:2,19 22:14 32:4
32:11 45:3 46:4
48:10 55:12 58:4,17
64:2 66:23 67:17
testified 4:3 25:6
testify 15:22 17:18
24:1,3,15 56:9 71:12
testimony 13:12 22:4
22:16 24:12 66:11
tethered 62:17
text 11:21
textbook 11:15,17,19
textbooks 15:10
texts 12:3,12
thank 66:18
their 13:10 20:7,10
21:6 23:10 28:3
32:11,25 33:3 34:11
35:11,11 50:18
54:22 55:8
thing 29:14 36:16
44:17 49:22 53:15
54:2 56:24 60:16,17
things 5:9 6:11 11:4
15:5 31:20 33:20
51:1 56:18 60:21
64:12,24
think 9:24 10:14,25
11:9 13:22 16:16,18
16:20 22:19 25:2,21
27:2 37:11,13,19
38:19 41:9 42:10,22
43:10,25 44:9 48:23
49:22 51:25 53:20
55:13 57:21,23,25
60:24 61:8 62:2,3,8
62:16 63:7 67:5,10
67:22 69:23
thinking 16:20
thinks 37:12
third 1:21 39:9 49:10
Thirdly 43:18
thought 31:24 39:25
48:1
three 11:20 25:24,25
36:17 52:11
throw 56:8
thumb 35:7
tibia 9:5 10:16 31:11
39:8 41:14,16 57:20
59:1 61:23 68:4
tibial 21:12 39:25 40:2
60:11
time 10:24 15:25 24:4
24:7,8,19 29:7 38:3
39:13,17 41:12
42:13 44:4 45:25

46:2 52:19 54:6,19
55:3 57:17,20 58:24
59:1,21 60:9 61:23
62:7,18 67:5 71:17
times 4:18 30:7 39:23
40:11 41:3
today 5:8,21 6:15 7:25
9:17 10:15 14:14
57:1 69:7
told 7:24 8:7,14 17:18
21:3 23:11 32:3,7,8
34:8,14,16,18,20
37:18 38:3 43:19
46:21 55:19 66:12
tolerate 64:24
top 24:4,18,21
totally 60:15 68:22
69:3
toward 47:25
town 27:22 28:7,12
29:4
trade 24:10
training 40:16,18,21
40:21
transcribed 71:14
transcript 71:15
transcription 71:16
transfer 12:17
trauma 28:20,21 29:2,3
29:3 30:5,14,17
traumatic 68:18
travel 24:4,19
traveled 24:12
traveling 9:10,11
treat 29:24
treated 29:18 39:23
treating 61:9
treatment 21:14 31:21
31:21 44:17 55:20
tremendous 30:3,4
trial 24:1 66:10,15
tried 60:24
true 71:16
truly 54:8 60:14
trust 43:19 48:21
truth 23:8 71:12,12,13
try 20:7 31:9 40:4 52:9
60:4
trying 15:24,25 37:17
37:21 43:16 47:8
68:25
turned 29:9 54:6
Twenty-five 40:12
two 15:9 25:10,11,12
25:13 26:1 33:19
40:17 45:18 46:1
49:7 52:7,12,17 57:5
60:17,25 67:18 69:8
69:11
two-and-a-half-month
46:2
type 21:15 39:23 48:17
50:25 53:21 69:17
typewriting 71:14
typewritten 71:15
typically 6:7

**U**

unacceptable 60:1
unaffordable 30:12

under 5:25 63:13
understand 4:20,24
5:9 6:21 16:16 17:1
17:22 34:22 35:4,21
35:23,25 36:21,21
36:22 37:17,21
38:20 44:10,13,23
46:7 47:2 48:16,18
49:14 59:24 62:21
64:4,9,12 65:17 69:6
understanding 6:23
12:24 20:7 21:6
22:22 38:21 45:9
50:18 54:23 57:13
61:21 66:25
understands 21:16
understood 5:5 23:22
33:4 45:11 51:19
52:1 53:2 66:2
undertaken 69:16
unfortunately 55:1
unhappy 47:20 48:8,10
48:12,12
uninsured 29:20 30:7
union 39:16 58:4
united 39:17,20,20
58:1 60:16
unless 54:6 67:3
unlikely 68:25 69:2
unpredictable 53:11
unstable 59:1,3
until 15:16,19 17:11,13
17:13
updated 28:8
upside-down 29:9
use 18:12 36:17 43:15
49:23,25
used 18:10 30:19
45:21 62:5,5
using 48:10

**V**

V 26:24
vacuum 50:11 59:19
valgus 41:24
valley 1:12 28:1
Vannah 26:22 27:2
various 67:18
varus 41:23
vegas 1:17 4:13 9:12
25:19 27:10 71:21
vehicle 9:6,7
versus 46:3 51:1
very 47:20 59:1,4
victory 26:24
views 10:7,23
vitae 27:13 28:8
volume 11:20
volumes 11:24
voluminous 10:18
vs 1:8
V-a-n-n-a-h 26:24

**W**

Wade 22:1
wait 48:22 51:24 52:2
52:9,12,16,18,20,24
57:6 58:15 59:9 60:2
60:5 64:16 65:18,21

waited 42:25 58:2
waiting 51:15 63:20
69:12
waive 69:25 70:6
walk 64:24
Wall 49:1,12 50:16,18
Wall's 50:2,20,22
want 10:20 13:20 29:3
35:12 45:1 53:12,13
59:25 60:21 61:2,3,5
63:18 64:19,25,25
65:1,7,17 69:24,25
wanted 16:14 19:9,10
20:4 31:16 32:14
50:14 53:19,24
54:10,10
wants 45:6 58:19
wasn't 20:12 39:17,20
50:7,8,25 61:16
watch 53:13
watched 43:6
watching 59:16 60:16
way 25:13 29:12,23
32:19 39:10 42:9
49:13,16 50:3,17
51:7 52:17 59:8 60:4
60:7
weak 64:11
weakness 35:6,11
wear 68:16
Welch 25:16 27:4
well 5:17,25 10:1 14:1
15:2 16:6 17:13
22:10,23 24:6 25:10
29:14 31:3 32:7
34:11,18 35:2,17
41:3,12 44:9 46:6,16
47:4 48:10 49:12,15
49:22,25 50:8,22
52:11,15 55:8,9
56:13 57:14 59:6
63:10 68:2
well-known 11:22
35:14
went 38:9 43:23 61:18
were 6:8,10,21 7:16
8:23,24 9:4 10:3,23
11:5 12:19 15:11,25
16:8,10 17:5,7,25
19:4,25 20:3,9,10
21:3 23:11,18,20
26:3,4,8 27:9 31:16
31:18 32:3,5,5,6,24
33:2,25 34:14,16,18
34:20 38:3 40:16,17
40:21 44:16 45:21
46:18,24 47:13,15
47:20,22,24 48:1,3
48:13,15,15,19 49:7
52:20 66:4
weren't 34:15 40:20
41:13,14 48:2
while 6:17 7:10
whole 22:7,10 24:16
63:15 71:12
wife 1:9,10 9:6
willing 20:3 32:12
wishes 60:20
witness 3:2,12 4:14
14:21 15:4,8 17:11

25:14 38:12 51:18
51:21 67:15 70:2
71:9,11
word 21:7 60:25
wordiness 70:3
words 30:6 33:25
42:24 58:25 60:25
work 24:16
worried 21:9,12 35:19
worse 46:4,7 57:20,22
worsening 47:7
worth 30:10
wouldn't 59:2,6,9
63:12
wounds 30:7
written 16:23 33:25
wrong 18:5 23:10,16
51:12 56:3
wrote 62:25

**X**

X 3:1
X-ray 10:23 45:12,14
58:9
X-rays 8:22 9:9,14,17
10:6,17 11:2,6 14:17
14:25 15:7 45:16,18
45:21,23 46:8,16,22
46:23 47:9,11,15,17
55:4 60:10

**Y**

yeah 7:16 24:6 27:1
37:5 41:8 52:15
54:18 57:11 59:4
year 43:6
years 11:25 12:4 27:6
40:11,20,25
young 53:19

**$**

$8,000 24:3,15

**0**

017451 1:8

**1**

1 33:9 53:16
1:54 71:10
1:59 1:19
10 64:6
100 4:12
101 2:9
15th 71:21
17 41:17 67:22 68:5
1920 2:9
1979 40:24
1980 40:24

**2**

2 53:16
20 62:10 64:5
2002 10:25 36:9,9
45:12 46:2,3,17,19
47:12,13 62:14
2004 15:12 16:2 17:2
23:19
2005 1:18 25:3 71:10

Atkinson-Baker, Inc., Court Reporters  1-800-288-3376

BRANDNER 00056

**9F03779**
**DR. PATRICK BRANDNER      AUGUST 5, 2005**

| | | | | |
|---|---|---|---|---|
| 71:22 | | | | |
| 22 10:25 | | | | |
| 2300 2:5 | | | | |
| 25 40:25 | | | | |
| 2800 4:12 | | | | |
| 287 1:24 71:6,25 | | | | |
| **3** | | | | |
| 3:10 56:20 | | | | |
| 3:14 56:20 | | | | |
| 3:36 70:8 | | | | |
| 30 41:19 67:23 | | | | |
| 3200 2:4 | | | | |
| **4** | | | | |
| 4 3:4 | | | | |
| **5** | | | | |
| 5 1:18 71:10 | | | | |
| 50 62:9 | | | | |
| 500 1:21 | | | | |
| 551-7300 1:22 | | | | |
| **8** | | | | |
| 818 1:22 | | | | |
| 85012 2:5 | | | | |
| 85282 2:10 | | | | |
| 89121 4:13 | | | | |
| **9** | | | | |
| 9F03779 1:25 | | | | |
| 91203-4725 1:22 | | | | |

Page 8

Atkinson-Baker, Inc., Court Reporters                    1-800-288-3376

BRANDNER 00057