# EXHIBIT "11"

1

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

██████████████████████ )
husband and wife, and████ )
████, a minor, )
         Plaintiffs, )
                      )   CV No.  2003-017451
                      )
        vs. )
                      )
KIPLING P. SHARPE, M.D., and )
JANE DOE SHARPE, husband and )
wife, et al., )
         Defendants. )
_____)

April 29, 2008
Phoenix, Arizona

BEFORE THE HONORABLE:  MICHAEL JONES, Judge

REPORTER'S TRANSCRIPT OF PROCEEDINGS

*Testimony of Patrick Brandner, M.D.*

Lisa H. Vitoff
Certified Court Reporter
CCR #50251

TESTIMONY OF DR. BRANDNER

BRANDNER 00058

2

APPEARANCES

FOR THE PLAINTIFFS:
        KOELLER, NEBEKER, CARLSON & HALUCK, LLP
        by Mr. Wade R. Causey

FOR THE DEFENDANTS
        CRAWFORD & KLINE, PLC
        by Mr. Bruce D. Crawford

PROCEEDINGS

PATRICK BRANDNER, M.D.,

having been duly sworn herein, took the stand and testified as follows:

THE COURT: Doctor, thank you. If you will go ahead, have a seat on our witness stand, please.

Now we're on the record. The record will show the presence of all the members of our jury, counsel, the parties as well, and we have Dr. Brandner called out of order by the plaintiff, Mr. Causey.

Go right away.

MR. CAUSEY: Thank you for that.

TESTIMONY OF DR. BRANDNER

222

BRANDNER 00059

3

DIRECT EXAMINATION

BY MR. CAUSEY:

Q      Dr. Brandner has come in from out of town and we had scheduled a specific time.

Would you state your full name, please.

A      Patrick Brandner.

Q      And what is your profession?

A      I'm an orthopedic surgeon.

Q      Doctor, are you licensed to practice medicine then?

A      I'm licensed in the State of Nevada, Arizona, California, and Louisiana.

Q      Where do you principally office?

A      My office is in Las Vegas, Nevada, and Henderson, Nevada.

Q      Doctor, do you hold any certifications within your profession?

A      I'm board certified by the American Board of Orthopedic Surgery.

Q      Doctor, at some point in time you were contacted by my office to review a case to render your thoughts and opinions on that; is that correct?

A      That is correct.

Q      And the materials that you reviewed, those were provided by my office; correct?

TESTIMONY OF DR. BRANDNER

223

BRANDNER 00060

4

A   Correct.

Q   Describe, if you will -- it's not a test, if you miss a document or two -- as best you recall, describe the documents or information you were provided when you were initially retained in the matter?

A   To the best of my recollection, I was provided medical records of ███████ by two separate physicians. I was provided hospital records. I was provided post-operative care. I was provided x-rays, which were the pre-operative x-rays. And I believe I was provided a deposition by Dr. Sharpe.

Q   Doctor, as part of your initial work on this matter, do you review all of these materials?

A   Yes, I did.

Q   I just want to clarify at the beginning, your function in being here today is to render expert opinions within your field; is that correct?

A   Correct.

Q   In reviewing the materials and performing the initial work, if you will, on this case, am I correct that you ultimately had no complaints -- for lack of a better term -- regarding the care and treatment that Dr. Matthews had provided?

A   That is correct.

Q   And I want to talk about Dr. Sharpe. Am I also

TESTIMONY OF DR. BRANDNER

224

BRANDNER 00061

correct, with respect to the actual surgical procedure on June 26, 2002, the actual physical procedure and how it was performed itself, you also have no adverse opinions about it; is that correct?

A    Correct.  I thought it was excellent.

Q    If I understand correctly then, your opinions in this case are limited to the exchange of information that needed to take place prior to Dr. Sharpe's surgery; is that correct?

A    Correct.

Q    Sometimes we use the term "informed consent," is that what you refer to it as?

A    Yes, sir.

Q    Tell me what your understanding was about the procedure that Dr. Sharpe was going to perform?

A    The procedure was to correct a angular deformity of a fracture in the lower leg bone in an individual who was just reaching adulthood or an adult skeleton, that was partial healing, which had further healing to take place, but the healing was fairly progressed along, it was fairly going toward maturity.

Q    Does the term malunion have any specific meaning?

A    The term malunion is a term that describes a fracture that is healed in a unacceptable position.  This

TESTIMONY OF DR. BRANDNER

225

BRANDNER 00062

6

was not a malunion, in my estimation. It was still a mal-positioned fracture.

Although it met the strict criteria for a malunion, meaning it was over the period of time that science tells us that the bone is healed, there was still healing potential apparent in the physiology that appeared on x-ray.

So it was mal-positioned at that time.

Q   Doctor, you mentioned that you had reviewed some medical records in order to familiarize yourself with what had taken place historically in the treatment of Scott Clark.

I want to show you some documents that we've already looked at here today and yesterday, actually. This is what's been marked as Plaintiff's Exhibit 10, Doctor.

It should show up on the screen there in front of you. As you can see, it's the April 11, 2002, office note of Dr. Sharpe.

Do you recall reviewing this document as part of your review of this case?

A   To the best of my recollection, I did review this.

Q   Okay. Let me see if I can show you -- this is, as you can see, refers to the x-rays talking about the degrees of the deformities; do you see that?

TESTIMONY OF DR. BRANDNER

226

BRANDNER 00063

7

A    Yes.

Q    Do you have a recollection of reviewing that?

A    Yes.

Q    Then on the second page of that same day, it carries over to the next page. You can see there's a list of things.

Says: Fibular osteotomy will also be necessary. And we did have an extensive discussion about risks, including anesthetic risk, death, infection, nonunion, or delayed union, nerve injury, vessel injury.

Do you see what I'm referring to?

A    Yes, I do.

Q    Doctor, did you review these specific entries as part of your review?

A    Yes, I did.

Q    Doctor, in front of you there is a stack of documents, I believe it's marked as defendant's Exhibit 22. There's a yellow -- may I approach, your Honor?

THE COURT:  Yes, of course.

BY MR. CAUSEY:

Q    I'm going to misspeak, there should be a yellow tab at the bottom, not the bright yellow one, looks like this Post-it, is the word I'm trying to think of, right down at the bottom?

A    Pale yellow Post-it?

TESTIMONY OF DR. BRANDNER

227

BRANDNER 00064

8

Q    Exactly.  Thank you, Doctor.

And Doctor, that is Exhibit 22, defendant's Exhibit 22.

I want to show you -- I'm putting it up here on the screen as well, then I'm going to have to zoom back down, hang on just a second.

Actually, we'll just start at the top and work back, that way the words are kind of small.

Doctor, this is a document that says consent for surgical or invasive procedure.  I believe this is the hospital's document where the procedure took place.

Did you also review these materials as part of your initial work in this case?

A    Yes, I did.

Q    You can see down at the bottom there it says physician attestation; do you see that?

A    Yes.

Q    Is it your reading of these documents -- this document, excuse me, that that's the portion where the doctor is supposed to sign that?

A    Yes.

Q    One more document I want to show you.  It's not in those materials, so you can set that aside.  I have an overhead here of it.

Exhibit 11, that's been entered into evidence,

TESTIMONY OF DR. BRANDNER

228

BRANDNER 00065

9

it's a June 6, 2002, entry. You can see there it says Dr. Sharpe again.

This is what's been referred to as the pre-op evaluation, and you can see that in the very first entry: Scott is here for pre-op evaluation.

Do you see that?

A   Yes, I do.

Q   Again, is this a document you would have reviewed as part of your work in this case?

A   Yes.

Q   I apologize for moving it while you're looking at it there.

Then down at the bottom again there is language regarding there's a list again of potential risks.

You got to read the sentence in front of it to put it in context. I've given them a prescription for post-op pain medication and reviewed the risks of surgery.

Do you see what I'm referring to?

A   Yes, I do.

Q   Says these include, but are not limited to, death, other anesthetic complications, blood vessel injury, nerve injury, fracture, chronic stiffness, chronic pain, malunion, nonunion, refracture, mechanical failure of the components -- I believe that's blood loss, it looks like there might be a three-hole punch -- blood clots and

TESTIMONY OF DR. BRANDNER

229

BRANDNER 00066

10

infection.

Do you see that?

A    Yes, I do.

Q    And is this something you reviewed as part of your work in this case?

A    Yes, I did.

Q    Doctor, I asked you a moment ago about the knowledge of the procedure that Dr. Sharpe was performing.

Can you describe tibial osteotomy, this procedure that took place?

A    Yes.  The osteotomy itself is a cut at the -- what's call the apex of the deformity.  Because it's a complex deformity, it both was angled in this plane and in the front and back plane.

So, you can do this by a one-cut procedure, which has a mathematical model to it, and correct the deformity.  And you also have to cut the other bone, the fibula, in order to get this to straighten up.

So it's a, it's a fairly elegant procedure to correct a complex malposition or malunion to bring the bone back into alignment and then internally fix the bone in the position of correction with rigid fixation devices so that the fracture can heal, or the doctor-created fracture can heal.

Q    Is one of these fixation devices, would that be

TESTIMONY OF DR. BRANDNER

230

BRANDNER 00067

11

a plate and screws?

A    It's a plate and screws, yes.

Q    Doctor, as part of your review of this case, you indicated that you had also looked at some pre-operative x-rays?

A    Yes, I did.

Q    What was your purpose of looking at those?

A    The purpose of looking at the x-rays was to No. 1, define the problem; No. 2, to look at the degree of the problem, the complexity of the problem, and to determine the state of healing and the overall condition of the joint above and joint below.

Q    What did you -- actually, your Honor, 37, I believe is agreed to?

THE COURT:  You're offering 37?

MR. CAUSEY:  Yes, defendant's Exhibit 37.

THE COURT:  There is no objection?

MR. CRAWFORD:  No, your Honor.

THE COURT:  37 is admitted.  Thank you.  Go ahead.

BY MR. CAUSEY:

Q    Doctor I want to hand you what has been marked as Exhibit 37, which I believe there are actually two sheets inside, we don't have a hold-up board, but I think you might be able to utilize the light behind there.

We tried it on this projection screen, it

TESTIMONY OF DR. BRANDNER

231

BRANDNER 00068

12

didn't show up very, good so... Can everyone see okay?

A    Okay.

Q    All right, Doctor --

A    This --

Q    What if anything was significant about the x-rays?  First of all, is this an x-ray that you reviewed, the Mezona March 22, 2002?

A    I can't recall exactly.  I think I did.  There was a series of x-rays I reviewed with what appeared to be much more callus.  With callus meaning this type of bone.  And the x-rays that I saw were -- had less maturity, I believe.

But in any event, what we are looking at is an anterior-posterior or front to back view of a tibia and fibula, which includes the knee joint.

And what we're seeing is mature callus through the fibula fracture, meaning that the bone has bridged the fracture and it's beginning to look like the mature bone above and below where the shaft is.

We're also seeing a fracture, which is poorly defined in the -- what's called the proximal one-third of the tibia or the -- we call the metaphyseal, which is this part of the bone, and the diaphyseal, the tubular part of the bone, junction.  So that's how we describe it to each other.

TESTIMONY OF DR. BRANDNER

232

BRANDNER 00069

13

And this appears to be a non displaced fracture with an angulation, which is what we call valgus, which is the distal fragment away from the midline.

The second x-ray is from the side. It shows, again, the tibia and fibula. And it's, I think, it's apparent the amount of angulation or bowing that is present in the fracture.

Again, this does show more of the callus. It appears that the fibula callus is more mature. There is some cloudy or puffy-looking bone which is called primary callus or initial callus, then you get some mature bone above it.

So basically what this shows is an angulation both in the front-to-back plane and the side-to-side plane and a fractured tibia mainly.

Q Thank you, Doctor.

What was the significance, as far as the opinions that you were going to render in this case, of the information you gathered from the x-rays?

A The x-rays that I had seen, and I can't recall if they were these, but I saw x-rays that were presented to me that were representing a pre-operative x-ray, meaning that those were the x-rays that surgery was going to be planned on.

And I felt that, that the individual was

TESTIMONY OF DR. BRANDNER

233

BRANDNER 00070

14

between an adolescent and an adult; in other words, his growth plates were in the process of closing.

I had had experience where I had treated or been involved in cases where these fractures, in that age group, were watched and left alone and there was a certain amount of remodeling. Remodel, meaning the bone moves when it's stimulated by the body. It gradually can straighten some, we don't know how much.

The younger you are, the more growth you have, the better the chance you can straighten the bone on your own.

The closer the fracture is to the joint, the better the chance you can straighten the bone on your own, if you have open growth plates.

This gentleman had partially closed growth plates or closing growth plates. I felt that it could be watched a bit longer to -- one opinion I had was it could be watched a bit longer to see how much remodeling could take place. And if that amount of remodeling did not improve it significantly, then the surgical option or leave it alone were the choices.

Q    When you said or leave it alone, then whatever it healed to, the degrees of angulation, make a decision at that time with respect to proceeding to the risk of surgery or live with limitations --

TESTIMONY OF DR. BRANDNER

234

BRANDNER 00071

15

A   Correct.

Q   -- you have at the time?

A   Accept, accept what you've got and live with it.  If it's unacceptable or you're developing pain in your joints or you don't like it or you can't live with it, then surgery would be an option.

Q   As part of the pre-surgical discussions between patient and doctor, with respect to          case specifically, and this type of procedure, tibial osteotomy, did you, as a result of your review of this case, develop any opinions along those lines?

A   I felt that, No. 1, if          and his parents wanted the surgery, it was appropriate to do it.

But my only problem was I couldn't find specific discussion of the most -- the greatest potential for injury complication when you do this.  I didn't see that specifically discussed in nerve injury.

And since most of the surgeries that we do in the United States, there's a .5 percent or less of complication, meaning death, or whether the procedure works.

And not to get off the track, but an example of that was what we call the bariatric surgery, where they used to start stapling stomachs.

There was a very high mortality morbidity rate with that, so it never was mainstream.

TESTIMONY OF DR. BRANDNER

235

BRANDNER 00072

16

It's suddenly now reached the point where it's approaching every other procedure that we do that's predictable, and it's being more and more accepted.

When you have a surgery around an area that has a greater risk of injury over the vascular injury or other things that we mentioned, I felt that it had to be talked about because there's a greater chance that that is the thing that's going to happen.

And the peroneal nerve, in this type of osteotomy, has a three to 13 percent incidents of damage, not because of the surgeon, but because of the way God made the peroneal nerve.

So it's got a three to 13 percent incidents of damage, and I felt like that should have been discussed specifically, because many people get so much information from a sophisticated -- the subject, that they can't really remember everything. So it's important that they remember the thing that could -- has the greatest chance of happening.

So I felt like that needed to be discussed and I didn't see that in the medical records themselves.

Q   Doctor, are you here to render any opinions as to whether or not these conversations or communications in fact took place?

A   No.   I just didn't see it stated in the medical

TESTIMONY OF DR. BRANDNER

**236**

BRANDNER 00073

17

records I reviewed.

Q    Your opinion, with respect to the discussions that are needed regarding the risk of damage to the specific nerve in this case, how would that be described?  What are we talking about?

A    Well, you're talking about a nerve that supplies the muscles to the front of your leg and controls the top of your foot and the top of your toes.  It also controls the sensation to your foot.

So what you want to tell an individual is that that nerve can be injured and it's unavoidable.  Sometimes we don't know why it gets injured, but there is a three to 13 or 15 percent chance that this thing can be injured.

So, we want you to understand that, if you're going to decide to have this straightened out -- and I think you write down the name of the nerve, which won't mean much, but they can understand paralysis of your foot, where you can't bring the foot up and they can understand loss of sensation to the top of the foot and they can understand you might need to wear a brace for the rest of your life which can fit in your shoe and you walk with it, but -- and you wear a brace if that happens.

Now, that's a lot of information.  And there has been some criticism of physicians that say, well, you should have mentioned this.  And the answer is, well, it

TESTIMONY OF DR. BRANDNER

237

BRANDNER 00074

18

would take three days to go over everything that could happen in an operating room, and we understand that.

But when you get down to something that is beyond the norm that can happen, I think it's imperative that you talk about it and you identify it and you make your patient understand it.

Q    And Doctor, the things that we just discussed, if the physician who is performing that surgery fails to discuss those issues with his patient during the process, pre-surgery process, where the decision to go forward with the surgery is being made, would that conduct fall below the standard of care?

A    Yes, it's my feeling it would.

Q    Doctor, a moment ago you were talking about -- I just wanted to clarify something -- you were talking about the growth plates and partially closed and the straightening of the bone on its own.

Are you suggesting that the bone will straighten all the way back on its own or some --

A    No.  In fact, I think it would straighten some, but I don't think I could predict that it would straighten anywhere near normal.  And that's a total hypothetical.  I just felt that there was potential there, and that would have been discussed.

Q    Doctor, have you performed any tibial

TESTIMONY OF DR. BRANDNER

238

BRANDNER 00075

19

osteotomies in your practice over the years?

A   Yes, I have.

Q   Do you recall approximately how many?

A   Well, the traumatic -- the ones that were -- had poor -- bad angulation from trauma were five, but I also did reconstructive osteotomies in people with arthritis. And I would say that I've done over 50 of those.

Q   Doctor, along with the discussion regarding the risks of the surgery, you've mentioned earlier there was a wait and see option as well, see how it does.

Did you develop any opinions as to the content of what should be discussed with respect to that other option?

A   Well, the other option, I think, would be, in this particular case, the problem was that the individual was trying to do athletics, and it hurt.  He had a bump on the front, and it was mainly he couldn't do -- participate in what he enjoyed.

I don't think they had a good rapport with the first surgeon that was treating it closed.  I don't think he had answers to the problem.  So, he sought other doctors to get opinions and the opinions were we can surgically fix it.

I think that in the discussion with the family, they needed to understand that this could potentially straighten a bit more, if you slow down, back off, stop

TESTIMONY OF DR. BRANDNER

239

BRANDNER 00076

making it hurt, and let's give it a little bit of time.

We're not talking about a year, we're talking somewhere between six and eight months. If it doesn't, we will straighten it.

It doesn't mean that that was a better choice than operating on it at the time because, basically, everything I'm saying is a total hypothetical.

It could have been eight months from now and you looked at this fracture and it was just as bad or maybe worse and the same problem would happen. You would go in, operate on it, and I think that the peroneal nerve would be stretched.

I think this was a fait accompli. I think that peroneal nerve was going to be stretched with anybody who straightened this tibia out.

Q    Doctor, the discussion that you just described regarding the wait and see option, if the surgeon, prior to this type of surgery, failed to discuss those issues as well as part of the risk discussion and the decision to make -- excuse me the decision to go forward with this type of surgery, would that fall below the standard of care as well?

A    No, I don't think so. This is something based on the experience of two physicians in my group who have seen this.

But this fracture, I think, is showing

TESTIMONY OF DR. BRANDNER

BRANDNER 00077

progressive healing and it's showing significant angulation. So, I wouldn't agree that the choice to do surgery, at the time it was done, fell below standard of care and it's the discussion of wait and see was not done, fell below standard of care.

Q    And Doctor, I may have -- I appreciate your answer, but I think -- I'm not sure we're on the same page.

My question was more with respect to what was discussed, as opposed to the decision.

A    Correct.

Q    I just want to clarify on this before we move on.

You've testified that the risks that you described -- I don't want you to -- we won't repeat those, they've already heard that -- but the risks that you described, with respect to the peroneal nerve and the potential results from that, if the doctor had failed to discuss those as part of the pre-surgery process the surgeon had, that that fell below the standard of care.

My question now is in conjunction with that, during this same time frame, pre-surgery, if the doctor, the surgeon, also doesn't discuss, as you just described, the reduce activity, reduce pain, the wait and see option, as you described it, would that fall below the standard of care?

TESTIMONY OF DR. BRANDNER

241

BRANDNER 00078

22

A    I don't think so.

Q    Okay.  So your focus, primarily, is on a proper discussion of the risks and this peroneal nerve because of what you've already stated?

A    The discussion of foot drop.

Q    Doctor, did you have an opinion as to whether this fracture, if you did this, I think you said six to eight months wait, something along those lines, would it have become significantly worse?

A    Well, again, it's a hypothetical.  It wouldn't become necessarily significantly worse.  The possibility is it could worsen.  The possibility was that it could improve.  I don't know.

But there was -- I would, I would assume, based on the historical knowledge of fractures, that if you stimulate your leg appropriately with walking on it and using it, your body's message to the bone is to straighten it out.

You're using it, you're stimulating it, so any remodeling that would occur, I would think, probably would improve alignment.

Q    Doctor, I want to understand what you mean by activity.  You mentioned walking on it.  And then earlier you mentioned that reduce activity, reduce the pain.  I'm assuming there is line there somewhere.

TESTIMONY OF DR. BRANDNER

242

BRANDNER 00079

23

A   Well, specifically in this case, what your client was doing, I think he was doing significant dance steps and attempting to do heavy cyclic loading on the leg and he was getting pain from that.

I think activities of daily living, such as walking, swinging your leg, using it for normal activity, would still stimulate the leg, and the stimulation would lend more towards straightening than it would progressing -- getting -- making the fracture progress in a worse position.

Q   If I understand you correctly, you're saying reduce the activity, but not eliminate it entirely. Reduce it to a gentler state?

A   Correct.

Q   Doctor, with the foot drop and the brace that is now in, would there be any future problems may have with respect to the other joints in that lower extremity?

MR. CRAWFORD: Lacks foundation.

THE COURT: Counsel, in what way? What foundation is lacking at this point?

MR. CRAWFORD: I don't believe the doctor's ever evaluated the patient, certainly not recently.

MR. CAUSEY: I can rephrase, your Honor.

THE COURT: Please.

TESTIMONY OF DR. BRANDNER

243

BRANDNER 00080

23

A     Well, specifically in this case, what your client was doing, I think he was doing significant dance steps and attempting to do heavy cyclic loading on the leg and he was getting pain from that.

I think activities of daily living, such as walking, swinging your leg, using it for normal activity, would still stimulate the leg, and the stimulation would lend more towards straightening than it would progressing -- getting -- making the fracture progress in a worse position.

Q     If I understand you correctly, you're saying reduce the activity, but not eliminate it entirely. Reduce it to a gentler state?

A     Correct.

Q     Doctor, with the foot drop and the brace that Scott is now in, would there be any future problems Scott may have with respect to the other joints in that lower extremity?

MR. CRAWFORD:  Lacks foundation.

THE COURT:  Counsel, in what way?  What foundation is lacking at this point?

MR. CRAWFORD:  I don't believe the doctor's ever evaluated the patient, certainly not recently.

MR. CAUSEY:  I can rephrase, your Honor.

THE COURT:  Please.

TESTIMONY OF DR. BRANDNER

244

BRANDNER 00081

24

BY MR. CAUSEY:

Q   Doctor, in a typical patient that would have the foot drop and wear this type of brace that ████s wearing, the fiber glass brace that he wears to keep his foot up, what would you expect, down the road, future, any problems with the ankle, knee, or hip joints in that extremity?

A   The problems that I've seen with chronic use of the ankle, foot arthrosis or wear problems, where you have to change it, it will break down.

Obviously, there will be atrophy in the leg where the muscles aren't functioning, so they lose their mass and tone.

There's a possibility of a knee problem in the future because of the changed mechanisms across the knee, so that you would potentially get a wear and tear force across the knee that wouldn't have been there otherwise and might lead to arthritis.  There's a possibility, but smaller, in the hip I think.

And I'm not sure whether the ankle would suffer any problems.  The ankle may get stiffer and lose its motion ability, and so would the, potentially, the joints below the ankle.

Q   The stiffer ankle, is that a result of the foot drop condition?

TESTIMONY OF DR. BRANDNER

245

BRANDNER 00082

25

A    I think the stiffer ankle is due to the tissues that go -- glide across the front of the ankle, and the fact that they're not being stimulated by the nerve any longer and so they change from muscle to more of a fibrotic or scar tissue.

Q    Now, Doctor, if the choice had been made not to have surgery, the wait and see option, and as you've said, you had no expectation that it would heal itself back to pre-injury status, but if it didn't heal sufficiently enough that the patient decided not to have surgery and we were in the wait and see -- or are we at that point where a live-with-it-status, I guess is the phrase that was used, would there have been still some joint future problems down the road?

A    Yes.  There's a greater potential that the knee would get forces that would create sheer forces and create traumatic arthritis or arthritis in the knee.

There also may be ankle pain due to the mechanical access changing, where the ankle is not exactly parallel to the ground any longer compared to the hip.

Q    You didn't mention hip in that list, would the hip be involved there?

A    The hip to a lesser extent, but I think the main concerns would be the knee and the ankle.

Q    Is there any way of predicting how many years

TESTIMONY OF DR. BRANDNER

246

BRANDNER 00083

26

down the road these problems would arise?

A     No.

MR. CAUSEY:   That's all I have at this time, your Honor.

THE COURT:   Cross examination.

CROSS-EXAMINATION

BY MR. CRAWFORD:

Q     Doctor, what do you charge to come down to Arizona to testify?

A     $8,000.

Q     Plus expenses?

A     Plus my plane fare, and that's it.

Q     And we've heard you have an Arizona license. How long has it been since you've -- since you practiced in Arizona?

A     I practiced in a clinic in Bullhead City, 1990.

Q     18 years ago?

A     Correct.

Q     So you don't actively practice in Arizona. You don't have an office here?

A     I don't actively practice in California, Arizona, or Louisiana.

Q     I don't care about California, Louisiana. Arizona, you don't actively practice here?

TESTIMONY OF DR. BRANDNER

247

BRANDNER 00084

27

A    No, sir.

Q    You keep renewing your license you had a long time ago?

A    Yes, sir.  Yeah, based on the renewal requirements.

Q    We're talking about a fracture of the tibia and the fibula in what's called the proximal one-third area; is that right?

A    Correct.

Q    In a young man who is basically 15 years old?

A    Correct.

Q    You ever treated a patient like that?

A    Not at that age, no.

Q    In fact, you haven't treated this kind of a problem in over 25 years, that we're talking about in this case?

A    No, I've treated that kind of a problem.  25 years?

Q    Do you remember telling me, when I took your deposition, you hadn't treated one of these fractures since you've been in private practice?

A    I don't recall that.  I know I treated them in the military, but I think I did have a patient in private practice.  I can't remember how far back it was.

Q    Okay.  August 5, 2005, I came up to Las Vegas

TESTIMONY OF DR. BRANDNER

BRANDNER 00085

28

to take your deposition and find out what your opinions were going to be when this case went to trial.

Do you remember that, sir?

A    I remember that, yes.

Q    And you've had your deposition taken lots of times; right?

A    Correct.

Q    Okay. Let me show you -- counsel, Page 40, and 41 -- and I'm asking you about your experience.

Does this help refresh your recollection?

A    Let me see how you phrased it though because I think what I was referring to was the shaft near that area.

But I can tell you that I treated an individual with a malunion in the distal third, and he's a still my patient --

Q    Talking about the proximal one-third.

A    Correct, okay. Well, that would be correct, yes.

Q    So, what we're talking about in this case was a fracture of the tibia and the fibula in the proximal one-third. You haven't seen a patient or done surgery on a patient like that in over 25 years?

A    Only the patients that -- when I was in the deposition, I was thinking of the traumatic fractures. I have treated multiple patients, through my career, for

TESTIMONY OF DR. BRANDNER

249

BRANDNER 00086

29

arthritis, with tibial osteotomies, but I don't think you were alluding to that, so...

Q   This isn't an arthritis patient, is it?

A   No, but the position of the tibia is off, so I did treat that. But no, I did not treat a fracture like this for 25 years.

Q   And you've never treated a fracture like this in a man, young man who's 15 years old?

A   Correct, not exactly this age and this position.

Q   I notice that you brought a carrying case with you. By any chance did you bring the materials that you had been sent to review in this case with you?

A   Some of them.

Q   Did you bring the depositions that you had been sent?

A   Only my deposition.

Q   Okay. Experts rely on attorneys providing them materials to come to opinions; is that a fair statement?

A   Yes, sir.

Q   And is it a fair statement that expert opinions, in some cases, can only be as good as the amount of information they've been provided?

A   I would agree with that.

Q   Were you provided with ████████ s deposition

TESTIMONY OF DR. BRANDNER

250

BRANDNER 00087

30

and his mom's depositions that were taken in this case before Dr. Sharpe was sued?

A    I don't know if it was before -- well, I was -- I don't know.  I was given their depositions, I don't know the time frame there.

Q    How many ████████ depositions were you given?

A    One that I know of.

Q    How many Mrs. ████ depositions were you given?

A    One.

Q    Do you have any memory, sir, of having been given the depositions of ████████ and his mother that were taken in this case before Dr. Sharpe was brought into the case and sued?

A    I don't know.

Q    Well, if there is two volumes of their depositions, your memory is you've only been given one of each?

A    May have been that I got the whole thing in a volume and I looked at it and I didn't pay attention to the times that they were given.  But I don't recall exactly what dates they were given.

Q    And you don't recall any testimony where ████ ████ was asked:  Did Dr. Sharpe tell you about foot drop before the surgery?  And his answer being yes?

TESTIMONY OF DR. BRANDNER

251

BRANDNER 00088

31

A    I don't remember that, no.

Q    Do you remember testimony from mother's deposition, where she, hypothetically -- I'll give this to you as a hypothetical -- says that Dr. Sharpe warned her before surgery that there were nerves in the legs and when he corrected the deformity those nerves could be stretched?

MR. CAUSEY:  Your Honor, objection; evidence not in the record, and foundation.

THE COURT:  Overruled.  I'll allow it.

THE WITNESS:  I have snippets that were sent, if you allow me to look at it, I think --

BY MR. CRAWFORD:

Q    Sure, let's see what you got.

A    I think that's what is in here.  I have what was sent a, recently, deposition of ███████ performed January 29th, 2004.

Q    Can I see that, please?

A    Yeah.

Q    Today is April 29, 2008; right?

A    Correct.

Q    You were faxed something four days ago, that's what you were pulling out?

A    Correct.

Q    So the first time you saw testimony that you are talking about was four days ago?

TESTIMONY OF DR. BRANDNER

252

BRANDNER 00089

32

A     No.  I think I had seen this before, but this was basically information to center me around the trial.

Q     You just brought the snippets with you today?

A     Correct.  I think I sent back everything, that's why.  The volumes were too great, I did not have the storage room.

Q     Let's talk about this fax that you got four days ago.  It, in fact, was a portion of the deposition of ███████ that was taken on January 29, 2004?

A     Correct.

Q     And you were sent Page 51?

A     That's what I have here.

Q     Okay.  Take a look at it.

MR. CAUSEY:  Your Honor, may we approach?

THE COURT:  Of course.

(An off-the-record discussion was held out of the hearing of the jury.)

THE COURT:  For the record, the objection is overruled.

BY MR. CRAWFORD:

Q     Okay.  You were sent four days ago Page 51 of Mrs. ████'s deposition; is that correct?

A     Correct.

Q     And did you have any discussions as to why it was four days ago that this one page happened to be faxed up

TESTIMONY OF DR. BRANDNER

253

BRANDNER 00090

33

to you?

A    No.  I did not talk to Mr. Causey.  I just took it, looked at it, and I was reviewing a lot of things.

Q    Just out of the blue, four days ago you get faxed Page 51 of Mrs. ███'s deposition, right, and you have no idea why it's coming?

A    I know why it's coming, but I have no idea how it pertains to what my testimony is until I look at it.

Q    Okay.  Let's read it.

She's asked the following question:

Question:  Did ███ have that foot drop, as far as you could tell, before the surgery performed by Dr. Sharpe?

Answer:  No.

Question:  What do you mean by foot drop?

Answer:  There are, there are nerves that control the flex in a foot.  And because the bone had been twisted and there was a callus on it, it had put pressure on those nerves.

And Dr. Sharpe had said that when he moves it back into alignment and corrects all that, that those particular nerves might be very stretched and might be damaged because of that.  And that's what happened.

You don't remember ever seeing that testimony before four days ago, do you, Doctor?

TESTIMONY OF DR. BRANDNER

254

BRANDNER 00091

34

A    No.

Q    Were you, by any chance, sent Pages 99 and 100 from Mrs. ████'s deposition, the one back from January 2004?

A    99 and -- Page 99 and 100?

Q    Yes, sir.

A    I don't know.

Q    Well, you got the fax right there.  Do you see 99 and 100 in there?

A    Oh, no, not in this fax.

Q    By the way, before I get to that, you also were sent one page out of ████████'s deposition from January 2004; is that right?

A    I was sent two.

Q    Two pages?

A    28 and 29.

Q    Was that the page from his deposition back then where he was asked did Dr. Sharpe tell you about foot drop before the surgery, and he said, "Yes, he told me about all sorts of things?"

A    No -- let's see, yes.  Line 17, Page 28.

Before you had the surgery, did Dr. Sharpe ever discuss with you or did anyone discuss with you, you might end up with a drop foot?

Answer:  Yes.  He told me all the things that

TESTIMONY OF DR. BRANDNER

255

BRANDNER 00092

35

could happen. It could have nerve damage. And he said all the things. He even mentioned death. The dash dash dash we had an anesthesiologist and there could be accidents and stuff. There were a lot of things.

Q    Let me show you Page 99 and 100 of Mrs. ████s prior deposition.

Question: One thing I forgot -- I swear to you it was here and I forgot to ask -- is there any doubt in your mind that the nerve injury occurred during Dr. Sharpe's surgery?

There's an objection.

The witness: I think it happened because the leg had to be re-broken, and I think that it happened because it -- everything had to be moved around.

Question: Did you talk to Dr. Sharpe about that?

Answer: He had warned us prior to that, you know, movement of that bone, when he had to put it back in place could cause various things. And he went through a list of many things.

Have you ever been aware of that testimony?

A    I believe so. I can't recall exactly, but again, it's -- the reason I'm saying I can't recall is because it strikes me, as this lady, knowing a list or a laundry list of things, and not specifically addressing --

TESTIMONY OF DR. BRANDNER

256

BRANDNER 00093

36

it looks like she's talking about things that happened after the surgery and she understands it and she mentions it. But she doesn't specifically define that she knew the nerve could be stretched, before.

Q   I see. By any chance, have you discussed that testimony with Mr. Causey recently?

A   No.

Q   How about the stuff that got faxed up to you out of the blue four days a ago?

A   No, I did not.

Q   Do you agree with me, sir, that a doctor, when he sees a patient, he goes through lots of things, there is lots of things discussed.

Then when that visit is over, he prepares a note which, generally speaking, is a summary of the meeting?

A   Yes.

Q   And you do not expect a doctor to do a verbatim transcript of every single thing that is said during that meeting with a patient, do you, sir?

A   No.

Q   It's -- a note is supposed to be a summary?

A   Correct, a salient summary.

Q   In fact, if you, as doctors, tried to dictate a verbatim transcript of everything that was discussed with the patient during a visit, you wouldn't see very many

TESTIMONY OF DR. BRANDNER

257

BRANDNER 00094

37

patients a day, would you?

A    Either that or I'd be paying for a court reporter to follow you for every patient.

Q    Okay.  You don't have that kind of expectation, Dr. Sharpe, do you, sir?

A    No.

Q    So, what you want to know, as an expert, is was this general concept of there are nerves in the lower leg and when I correct this thing they could get stretched, and if they get stretched, you could lose some function in the leg.

That's the gist of what you're looking for in this case?

A    Correct.

Q    And it doesn't have to be the magic words "foot drop" or "peroneal nerve," does it?

A    No.

Q    So if -- regardless of whether those specific words appear in Dr. Sharpe's medical record, if you concluded, hypothetically, that there was this lay-person discussion about the concept of this nerve being injured potentially during surgery, you wouldn't have any criticisms of Dr. Sharpe at all, would you?

A    No.  And let me put this into the terms that I -- is acceptable, if you don't mind.

TESTIMONY OF DR. BRANDNER

258

BRANDNER 00095

38

If there was a discussion saying there is a nerve in the area of this operation that can be stretched and is susceptible to stretching and we just don't know, it's not injured, I won't cut it, it's going to be protected, but sometimes it doesn't work after the surgery and we don't know why and it doesn't come back in most cases.

Something like that, I think, sticks with a person and it gets it, it gets it burned in their cerebrum and so they remember, okay, I've got a potential for a nerve that won't function, make my foot function, but other than that, I think I want this operation and I'll take the chance.

That's pretty much what I think I'm driving at, just make sure that your patient remembers that kind of thing.

Q    Doctor, you can't control somebody's memory six years later?

A    No, you can't.

Q    All right.

My question was this:  If there was the gist of the discussion, was in lay terms -- not trying to throw technical medical terms at them, but just try to say, hey, I'm going to be straightening out this deformity of your leg.  And when I do that, you need to understand there are

TESTIMONY OF DR. BRANDNER

259

BRANDNER 00096

39

nerves or a nerve in your leg and it could get stretched.

And if that happens, the nerve could get knocked out, could not -- could lose its function and because of that you could have some loss of function of your foot, that -- if that general discussion took place, you wouldn't be here criticizing Dr. Sharpe, would you?

A    Correct.

Q    The consent form is a standard type consent form that's used at hospitals, isn't it?

A    It appears to be, yes.

Q    Okay.  And it's, it's done just before the surgery, where there is just one last time to say, okay, you agree, you have been told about potential risks, complications, things like that?

A    It can function like that, yes.

Q    Did you review Dr. Russo's deposition by any chance?

A    I did.

Q    During his deposition, you saw there was discussion about a graft that he prepared.  Do you remember that?

A    Yes.

Q    What he did is he took the two deformities that were in two different planes and he calculated what, in his mind, is the real degree of deformity?

TESTIMONY OF DR. BRANDNER

**260**

BRANDNER 00097

40

A    Correct.

Q    And he came up with I think 38 --

A    38 degrees.

Q    And do you agree with what he did there?

A    Oh, it's elegant, yes.

Q    So, the true deformity, when you do those kind of calculations like Dr. Russo did, is a 38 degree deformity of this leg?

A    Correct.

Q    That's not normal?

A    It's very abnormal.

Q    And it's a significant problem?

A    Yes, it can be.

Q    In fact, you know that ██████ had developed ankle pain, knee pain, and hip pain before the surgery even took place?

A    Yes.

Q    Those are the kind of things that you can see happen with a lower leg that is this mal-position?

A    Yes.

Q    Now, you don't think, technically, the term malunion applies?

A    Well, I didn't operate on this, so I don't know what the callus looked like.

On x-ray, it doesn't look like all the callus

TESTIMONY OF DR. BRANDNER

261

BRANDNER 00098

41

is secondary callus. It's matured. It looks like there is some primary callus and, therefore, technically, if you go by the book, it's a malunion.

I thought that if there's potential to remodel, and in my experience there was some, then it was a mal-positioned fracture that could change, potentially, in a short future time.

Q So, technically, if we go by the medical books, this is, in fact, a malunion?

A Yes. If you presented this case, it should be discussed as a malunion.

Q In fact, that's what Dr. Dinowitz said in his records?

A I agree.

Q That's what Dr. Sharpe said in his records?

A I agree.

Q And that's what Dr. Walls said in his records?

A I agree. And I agree that surgery is a very good choice.

Q You were shown the March 22, 2002, x-rays, do you remember that, just a few minutes ago?

A Yes.

Q You told us you're not sure those are the x-rays that you reviewed?

A I just recalled seeing more callus on the

TESTIMONY OF DR. BRANDNER

262

BRANDNER 00099

42

anterior posterior. I just -- I mean, this was four years ago. So, I just got a recollection that I'm looking at it and I'm just seeing more callus, in my memory.

Q    What was four years ago?

A    When I saw the x-rays, three to four years ago.

Q    Those are pretty important x-rays. Those are the first set of x-rays that are taken at the Mezona Orthopedics, Dr. Sharp's office; right?

A    Correct.

Q    You can't tell us, in fact, that you ever saw them before today?

A    No, no, no. I'm just saying, in my memory, they appear to be different to me. And it's been a four year span. I looked at the x-rays. I presented the x-rays. I went to my group and talked about this. The same thing Dr. Sharpe did.

So, I had x-rays. I don't remember exact the date, but I know they were pre-op x-rays.

Q    And your testimony is that the growth plates are not closed?

A    The growth plates, we felt that the growth plates had some potential. So, there is two of us in our group --

Q    I don't want to know about everybody in your group. I care about your opinion.

TESTIMONY OF DR. BRANDNER

263

BRANDNER 00100

43

A    Okay, yes.  I felt the growth plates had some potential to continue to grow.

Q    My question is this:  Are you testifying, under oath, today, looking at those x-rays before surgery, March 22, 2002, that the growth plates were not closed?

A    Let me have the x-rays again.

MR. CAUSEY:  I think they're right there next to you.

THE WITNESS:  I don't see open growth plates on these.  They appear to be closed.

BY MR. CRAWFORD:

Q    So, the March 22, 2002, x-rays that you've now -- you've seen today, you agree that growth plates in this young man were closed?

A    They appear to be.

Q    If this degree of deformity in ████████'s lower leg does not correct, surgery is not performed, and it's not -- it doesn't correct itself, okay, to any degree, he is set up for problems in his knee and his ankle; agree?

A    And potentially his hip.  Agree.

Q    So yes.  And he's set up for developing arthritis as he gets older?

A    I agree.

Q    And that is something that you, as a surgeon, as a doctor, need to tell people when you're having these

TESTIMONY OF DR. BRANDNER

264

BRANDNER 00101

44

discussions, that if this doesn't correct itself and you don't have surgery, one thing you can be looking at is problems in the other joints of your leg?

A    Correct.

Q    You're not telling us today that, in fact, had this gone on eight months without surgery that there would have, in fact, been any correction of that deformity?

A    Absolutely not.

Q    Putting aside this issue of whether this lay-person type discussion about the nerves and the function of the foot occurred, put that aside; okay?  You would describe Dr. Sharp's pre-operative work up of this young man as excellent?

A    Yes.

Q    And all of the appropriate studies were done in terms of planning this surgery?

A    Yes.

Q    And, in fact, the surgery, from a technical standpoint, was performed correctly?

A    Yes.

Q    And you would describe it as excellent?

A    Yes.

Q    A fairly elegant procedure, is that what you told us earlier?

A    An elegant presentation of the definition of

TESTIMONY OF DR. BRANDNER

265

BRANDNER 00102

45

the deformity.  A hard case and an excellent application of correction and internal fixation.

Q    Okay.  You're not suggesting to the jury, in any way, shape, or form, that Dr. Sharpe did something technically wrong during that surgery to cause this problem with this nerve?

A    Absolutely not.

Q    Okay.  It's not something you can predict in an individual patient ahead of time?

A    Correct.

Q    In other words, you can't say:  It's going to happen to ██████ as opposed to Jane Doe or whoever; right?  You just can't do that.

A    It's going to happen between 86 -- it's going to happen to 13 -- or three people -- between three and 13 people out of 100.

Q    Doctor, you can't predict --

A    So it's unpredictable, yes.

Q    You cannot predict with an individual patient whether it's going to happen to them or not, ahead of time?

A    I answered yes.

Q    And the fact that ████ had a complication from surgery does not mean that Dr. Sharpe did anything wrong during the surgery?

A    No, he didn't.

TESTIMONY OF DR. BRANDNER

266

BRANDNER 00103

46

Q    And you looked at the post-operative care and you thought that was excellent as well?

A    The post-op what?

Q    Post-operative care.

A    Correct.

Q    Were you aware of Dr. Sharpe's personal practice of at the end of a meeting with a patient and his mom, that after he'd gone over everything, he would then dictate right in front of them?

A    No, I wasn't aware of that.

Q    I'll tell you that he does that.

A    Okay.

Q    Certainly nothing wrong with doing that, is there.

A    No, it's fine.

Q    You have -- you don't recall Dr. Sharpe's testimony about why he does that?

A    No, I don't.

Q    In terms of if ▮▮▮▮ wanted the best chance to get back to dancing at a high level, as soon as possible, surgery was the best option for him?

A    Yes.

Q    The activity level of the patient and their desires is certainly relevant to you, as the surgeon, in terms of is surgery a higher, a better option for this

TESTIMONY OF DR. BRANDNER

267

BRANDNER 00104

47

person than something else?

A    The indication for surgery increases with the demands and wishes of the patient and the family and what they want to achieve from an activity level.

Q    In terms of how this nerve likely got affected by the surgery, do you agree that it doesn't appear to be a case where it was inadvertently cut or it was, it was -- got caught up in an instrument or something like that, that's not likely what happened?

A    Not likely, because, mainly, because surgeons who do this understand the anatomy and they take care to retract tissues in a way that does not put tension in that area.

Q    In addition, we know that part of the function of the nerve returned?

A    Correct.

Q    So what likely happened is when the leg was being -- the deformity was being corrected during surgery and the bones were being rotated, that that nerve probably, in retrospect, had gotten scarred down somehow, and when that correction occurred the nerve got stretched.

Do you think that's the most likely?

A    I think that can be the only conclusion you can come to, that the nerve was tethered due to the healing process and it had to be moved, whether it's half a

TESTIMONY OF DR. BRANDNER

**268**

BRANDNER 00105

48

centimeter or two centimeters, and when it does, that nerve is very sensitive to stretch and it stretches.

Q  So if this surgery had been performed two months later, six months later, you believe the same outcome would have occurred. He would have had the same complication?

A  Yes. I testified that I think it's a fait accompli. This nerve was going to get damaged at surgery no matter when it was done.

Q  And no matter who did it. In other words, no matter who the surgeon was, in retrospect it was going to happen?

A  If you operated at the deformity, like you're supposed to, it was going to happen.

MR. CRAWFORD: That's all I have.

Thank you, your Honor.

THE COURT: Folks, I think before we do the redirect, we need to take our afternoon break.

Let's take about 10 minutes, please.

MR. CAUSEY: Your Honor, I will be extremely brief, and the doctor has a plane to catch, and I can do this real brief, I promise.

THE COURT: Okay, all right.

MR. CAUSEY: If I may.

THE COURT: Sure.

TESTIMONY OF DR. BRANDNER

269

BRANDNER 00106

49

REDIRECT EXAMINATION

BY MR. CAUSEY:

Q    Doctor, first of all, you were asked about your practice in Nevada versus Arizona and California and Louisiana came up.

Are you aware of any standard in the United States, in your orthopedic field, where anyone in Arizona is entitled to less or more information than a patient in Nevada, when it comes to a surgical procedure?

A    No.  We have a national standard of care.

Q    And Doctor, even though you believe that the surgery would have been a good choice, a viable choice, as we discussed earlier, along with also the option of wait and see, whose choice is that ultimately?

A    The choice is the patient's.

Q    And Doctor, you were asked a question about whether or not you could testify that there would have, in fact, been any correction in the deformity under the wait and see option.  Do you recall that?

A    Correct.

Q    And Doctor, isn't it safe to say that the reason we don't know that is because the surgical option was the option that was engaged in at the time?

A    Correct.

TESTIMONY OF DR. BRANDNER

270

BRANDNER 00107

50

Q    That really eliminated the ability to determine what correction, if any, could have occurred over the next six to eight months; is that correct?

A    Correct.

MR. CAUSEY:  I'm done, your Honor, thank you.

THE COURT:  Marcina, please come into the courtroom. Hopefully, she's listening, folks, you have quite a few questions there.

Thank you, Marcina.  Questions, please.

(An off-the-record discussion was held out of the hearing of the jury.)

THE COURT:  Doctor, if you could tell us, please, what is the percentage of drop foot after this type of surgery?  The juror notes three to 13 people out of 100; is that correct?  Is that what you've stated?

THE WITNESS:  That's what's referred to in the literature.  There's an incident of three to 13 percent peroneal nerve palsy or peroneal nerve injury.

THE COURT:  That's not the same as drop foot, is it?

THE WITNESS:  Well, the peroneal nerve can be injured in various ways.  It can either get the sensory part, where you get numbness, or you can get numbness and a little weakness or you can get the whole thing, numbness and severe weakness, where the nerve doesn't function and your foot drops.

TESTIMONY OF DR. BRANDNER

271

BRANDNER 00108

51

You can get a weak foot that you can lift a little, but a true drop foot is where the foot can't be raised, nor the toes, and you have to support it with an ankle foot orthosis because you can't clear the ground when you walk.

THE COURT: Do you know the percentage of individuals who have the drop foot, as opposed to the other complications you've talked that?

THE WITNESS: They didn't break down the percentages in drop foot versus -- they didn't qualify the peroneal nerve injury.

THE COURT: What are the percentages of surgical risk of all of the other risks that you've explained?

THE WITNESS: The percentage, well, the percentage, generally, in these, in all procedures, should be less than .5 to one percent.

Now, in a healthy young individual, I think I would use that number because people who -- the older you get and other diseases that you get may affect your immunity, you could be more prone to infection.

If you have co-morbidities that affect your immune system, you can get infection. If you are older and have vein problems, you can get deep vein thrombosis and a pulmonary embolism.

So, generally, when we do a surgery and we

TESTIMONY OF DR. BRANDNER

272

BRANDNER 00109

52

identify through the medical history the co-morbidities, the co-morbidities are then sent to the appropriate physician for clearance and definition to try and define risk. And that's the main thing you want to try and identify.

Sometimes you can't define risk in a numerical way. You can either say it's optimum or it's too risky, but, in general, the question being, all other complications in ▮▮▮▮▮▮, in a healthy young man, would probably be less than .5 percent.

THE COURT: You stated then and explained then that three to 13 percent have nerve damage. And the question is, is that the percentage that pertains to any type of nerve or is it just the peroneal nerve?

THE WITNESS: It's the peroneal nerve in the procedure called tibial osteotomy.

THE COURT: Ladies and gentlemen, any other questions? No?

Counsel, any follow up?

MR. CAUSEY: No, your Honor.

MR. CRAWFORD: No questions.

THE COURT: Very good. Any objection if we excuse Dr. Brandner? No?

MR. CRAWFORD: No.

THE COURT: Very good. Doctor, thank you. You can step down. You can also be excused. And folks, now we'll

TESTIMONY OF DR. BRANDNER

273

BRANDNER 00110

53

take our 10 minute break, please.

TESTIMONY OF DR. BRANDNER

BRANDNER 00111