# EXHIBIT "13"

**A504586**
**KIPLING PITAMAKAN SHARPE, M.D.**          **AUGUST 24, 2011**

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PATRICK J. BRANDNER, M.D.,          )
                                    )
                    Plaintiff,      )
     vs.                            )     Case No. 10-cv-8161
                                    )
                                    )
AMERICAN ACADEMY OF                 )
ORTHOPAEDIC SURGEONS and            )
AMERICAN ASSOCIATION OF             )
ORTHOPAEDIC SURGEONS,               )
                                    )
                    Defendants.     )
_____)


          DEPOSITION OF KIPLING PITAMAKAN SHARPE, M.D.

                    Phoenix, Arizona
                    August 24, 2011
                       11:00 a.m.


ATKINSON-BAKER, INC.
COURT REPORTERS
500 North Brand Boulevard
Third Floor
Glendale, California   91203
1.800.288.3376
www.depo.com


REPORTED BY:

LISA A. NANCE, RPR, CR (AZ)
Registered Professional Reporter
Certified Reporter
Certificate No. 50349

Job No. A504586

A504586
**KIPLING PITAMAKAN SHARPE, M.D.**          **AUGUST 24, 2011**

APPEARANCES:

FOR PLAINTIFF:
WOODS ERICKSON WHITAKER & MAURICE, LLP
BY: AARON R. MAURICE, ESQ.
1349 West Galleria Drive
Suite 200
Henderson, Nevada 89014
amaurice@woodserickson.com

FOR DEFENDANTS:
VEDDER PRICE, PC
BY: MICHAEL A. CHABRAJA, ESQ.
222 North LaSalle Street
Chicago, Illinois 60601
mchabraja@vedderprice.com

FOR DEPONENT:
CRAWFORD & KLINE, PLC
BY: BRUCE D. CRAWFORD, ESQ.
1920 East Southern Avenue
Suite 101
Tempe, Arizona 85282
bcrawford@crawford-kline.com

Page 2

INDEX

WITNESS: KIPLING PITAMAKAN SHARPE, M.D.

| EXAMINATION | PAGE |
| --- | --- |
| BY MR. MAURICE | 7 |
| BY MR. CHABRAJA | -- |
| BY MR. CRAWFORD | -- |

EXHIBITS

| NO. | DESCRIPTION | MARKED |
| --- | --- | --- |
| Exhibit 1 | AAOS Professional Compliance Program Grievance Report. | 7 |
| Exhibit 2 | 11-14-08 Letter from AAOS to Dr. Sharpe. (Marked confidential; bound separately.) | 7 |
| Exhibit 3 | AAOS Professional Compliance Program Grievance Procedures. | 7 |
| Exhibit 4 | 12-30-08 Letter from AAOS to Dr. Sharpe. (Marked confidential; bound separately.) | 7 |
| Exhibit 5 | 4-21-09 Letter from AAOS to Dr. Sharpe. (Marked confidential; bound separately.) | 7 |
| Exhibit 6 | 4-23-09 Letter from Dr. Sharpe to Grievance Committee, AAOS. (Marked confidential; bound separately.) | 7 |
| Exhibit 7 | 6-10-09 Letter from AAOS to Dr. Sharpe. | 7 |
| Exhibit 8 | 6-15-09 Email from Sharpe to Giulietti. (Marked confidential; bound separately.) | 7 |
| Exhibit 9 | Transcript re 10-2-09 Hearing. | 7 |

Page 3

INDEX (CONTINUED)
EXHIBITS (CONTINUED)

| NO. | DESCRIPTION | MARKED |
| --- | --- | --- |
| Exhibit 10 | 12-14-09 Letter from Peterson, AAOS, to Drs. Sharpe and Brandner. | 7 |
| Exhibit 11 | 10-10-09 AAOS Committee on Professionalism Grievance Hearing Report. | 7 |
| Exhibit 12 | 1-4-10 Letter from Peterson to Sharpe. (Marked confidential; bound separately.) | 7 |
| Exhibit 13 | 1-14-10 Letter from Crawford to Peterson. (Marked confidential; bound separately.) | 7 |
| Exhibit 14 | 2-19-10 Letter from Crawford to Peterson. | 7 |
| Exhibit 15 | Transcript re 3-12-10 Hearing. | 7 |
| Exhibit 16 | 4-21-10 Letter from Peterson to Drs. Sharpe and Brandner. | 7 |
| Exhibit 17 | AAOS Judiciary Committee Appeal Hearing Report, Grievance 2008-23, 4-21-10. | 7 |
| Exhibit 18 | Transcript re 6-19-10 Hearing. | 7 |
| Exhibit 19 | 6-28-10 Letter from AAOS, John J. Callaghan, MD, to Drs. Sharpe and Brandner. | 7 |
| Exhibit 20 | 9-29-10 Letter from AAOS, Peterson to Drs. Sharpe and Brandner. | 7 |
| Exhibit 21 | Transcript re 12-4-10 Hearing. | 7 |
| Exhibit 22 | 12-9-10 Letter from AAOS, Callaghan, to Drs. Sharpe and Brandner. | 7 |

Page 4

INDEX (CONTINUED)
EXHIBITS (CONTINUED)

| NO. | DESCRIPTION | MARKED |
| --- | --- | --- |
| Exhibit 23 | 4-5-11 Letter from AAOS, Peterson, to Dr. Sharpe. (Marked confidential; bound separately.) | 7 |
| Exhibit 24 | 2-24-09 Letter from State Bar of Arizona, Matthew E. McGregor, to Mr. Causey. | 7 |
| Exhibit 25 | 6-8-05 Deposition of Scott Vernon Clark. | 7 |
| Exhibit 26 | 6-8-05 Deposition of Kim Clark. | 7 |
| Exhibit 27 | 4-28-08 Transcript Excerpts. | 7 |
| Exhibit 28 | 4-29-08 Transcript Excerpts. | 7 |
| Exhibit 29 | Defendants Sharpe and Mezona Orthopaedic's First Supplemental Disclosure Statement. (Marked confidential; bound separately.) | 7 |
| Exhibit 30 | 7-11-05 Letter from Crawford to Vincent J. Russo, MD. (Marked confidential; bound separately.) | 7 |
| Exhibit 31 | CD of Documents Produced by Dr. Sharpe. (Original to be copied and returned to Dr. Sharpe c/o Mr. Crawford.) | 89 |
| Exhibit 32 | 4-inch Stack of Paperwork Produced by Dr. Sharpe. (Originals to be copied and returned to Dr. Sharpe c/o Mr. Crawford.) | 89 |

INFORMATION TO BE SUPPLIED:
None.
QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
None.

Page 5

2 (Pages 2 to 5)

DEPOSITION OF KIPLING PITAMAKAN SHARPE, M.D., began at 11:00 a.m. on August 24, 2011, at Abacus Executive Suites, 3030 North Third Street, Suite 200, Phoenix, Arizona, before Lisa A. Nance, RPR, CR, Certified Reporter, Certificate Number 50349, in and for the State of Arizona, pursuant to the Rules of Civil Procedure.

The plaintiff was represented by his attorneys, Woods Erickson Whitaker & Maurice, LLP, by Mr. Aaron R. Maurice, 1349 West Galleria Drive, Suite 200, Henderson, Nevada, 89014.

The defendants were represented by their attorneys, Vedder Price, by Mr. Michael A. Chabraja, 222 North LaSalle Street, Chicago, Illinois, 60601.

The deponent was represented by his attorneys, Crawford & Kline, PLC, by Mr. Bruce D. Crawford, 1920 East Southern Avenue, Suite 101, Tempe, Arizona, 85282.

The following proceedings were had:

*Page 6*

Phoenix, Arizona
August 24, 2011
11:00 a.m.

(Deposition Exhibits Nos. 1 through 30 were marked for identification.)

KIPLING PITAMAKAN SHARPE, M.D., called as a witness herein, having been first duly sworn by the certified court reporter, was examined and testified as follows:

EXAMINATION

BY MR. MAURICE:

Q. Would you please state and spell your name for the record.

A. K I P L I N G, P I T A M A K A N, S H A R P E.

Q. Dr. Sharpe, as a housekeeping matter, before I get into the actual meat of the deposition, you were served with a subpoena duces tecum to produce certain documents today?

A. Yes.

Q. Before the deposition started, your counsel provided to me, looks like a CD of documents, and, what do you think, about a four-inch stack of paperwork. We've

*Page 7*

agreed we're going to provide those to the court reporter. We'll make the CD Exhibit 31 to the deposition. We'll make the stack of documents Exhibit 32 to the deposition. It's my understanding after the documents have been copied, they're going to be returned to Mr. Crawford.

MR. CHABRAJA: That works.

MR. CRAWFORD: That works.

THE WITNESS: That works.

MR. MAURICE: With that said, I'll put them next to the court reporter so we don't fumble over them for the next hour or so.

THE WITNESS: Yes.

Q. BY MR. MAURICE: Dr. Sharpe, you've been deposed before, correct?

A. Yes.

Q. The oath you took is the same oath you would take if you were in a court of law and carries the same penalty for violating that oath. Understand that?

A. I do.

Q. The court reporter to my left is taking down everything I say in the room, if I say it, you say it, Mr. Crawford says it. Accordingly, we need to follow special rules.

All responses must be audible. Nods of the head, shrugs of the shoulder, things which outside the

*Page 8*

context of the deposition I'd take as a response to my questions, do not appear on the record. You may hear me from time to time say "Is that a yes? Is that a no?" I'm not trying to be rude. I'm trying to clarify for the record.

A. Okay.

Q. With that said, certain responses, although audible, do not appear well on record: Uh-huh and huh-uh. If I hear you use one of those generic responses to my questions, again, I'll say, "Is that yes or no?" I'm not trying to be rude, just trying to clarify for the record. Do you understand that?

A. I understand.

Q. Outside the context of a deposition, it's very common for a person responding to a question to volunteer the answer when the person asking the question -- when the person is about three-fourths of the way done with the question. It makes life more livable, allows our society to move along a little quicker because of that. That's great out in the hallway. The problem is in a deposition it creates a very sloppy record.

I'll do everything in my power today to wait until you are done answering one of my questions before I ask another. I ask you do everything in your power to wait until I finish my question before you start an

*Page 9*

3 (Pages 6 to 9)

A504586
**KIPLING PITAMAKAN SHARPE, M.D.**          AUGUST 24, 2011

answer. Understand that?

A. Understood.

Q. I'm not here to trick you today. If I ask you a question you do not understand, I want you to say, "Aaron, I don't understand that question," and I will do whatever I can to supply you with the information necessary so that you understand that question and you can give me an answer.

If you answer a question, I'm going to presume that you understood my question.

Do you understand that?

A. Understood.

Q. At the end of this process, you are going to have an opportunity to review your deposition transcript. It reads like a play. You've probably seen them before. It will show me asking questions and you giving answers. And you will have an opportunity to make any changes you feel are necessary to your testimony.

While I encourage you to make whatever changes are necessary so that your transcript accurately reflects your testimony, I do want to caution you that substantive changes to your testimony, to that transcript, changes that materially alter the nature of your testimony, can be commented upon by any of the attorneys in the case at the time of trial, and those comments may tend to reflect on your credibility.

Page 10

Understand that?

A. Understood.

Q. With all that said, is there any reason you can't go forward and give your deposition today, anything like, you know, are you under the effects of medication that makes it impossible for you to either understand my questions, or formulate a response, or tell the truth, anything like that?

A. There is no reason.

Q. Okay. You are not dealing with any kind of personal crisis that makes it so you are here in body but your mind is elsewhere, you know, your dog has run away and you just can't concentrate on my questions, anything like that?

A. No, sir.

Q. Okay.

In terms of your background, we had a brief, little discussion before we even started. It is my understanding that you grew up in Santa Barbara?

A. In Lompoc, which is in Santa Barbara County.

Q. Okay. Undergraduate, where did you go for undergrad?

A. I spent two-and-a-half years at UC Irvine. I graduated from Westmont College in Santa Barbara.

Q. And what was your undergraduate degree in?

A. Economics and business.

Page 11

Q. How does a person with an undergraduate degree in economics and business end up going to medical school?

A. It was always my intention to go to medical school. I just wanted a different degree.

Q. Normally when I ask that question of a doctor, I get biology, chemistry.

Okay. And in terms of medical school, where did you go to medical school?

A. University of Southern California Tech School of Medicine.

Q. Mind if I call it USC?

A. That's fine.

Q. Okay. When did you graduate from USC?

A. 1989.

Q. When you graduated in 1989 -- I guess I should ask it this way: What postgraduate training did you undergo after 1989?

A. I did a five-year combined internship residency at the University of Southern California, LA County USC Medical Center, in orthopedic surgery. The year after that I did a fellowship in joint replacement in Phoenix at the Institute for Bone and Joint Disorders.

Q. Is that how you ended up practicing, actually, in Arizona was following your fellowship training?

A. That's correct.

Page 12

Q. In terms of your --

Where are you currently practicing?

A. I'm practicing in Mesa, Arizona.

Q. Is there a name of your practice group?

A. Active Orthopaedic, a Division of OSNA, O S N A, PLLC.

Q. How long have you been with Active Orthopaedic?

A. Since the first of the year.

Q. Prior to that, where were you?

A. I was with Mezona Orthopaedic, a Division of OSNA, PPLC.

Q. And then prior to Mezona, were you with any other practice group?

A. I was with Mezona Orthopaedic Professional Association which in May of last year became a Division of OSNA, PLLC.

Q. In terms of your preparation for today's deposition, what did you do?

A. I collected the requested records and skimmed a few of them.

Q. Do you recall which records you reviewed?

A. I read my original complaint.

Q. You say your "complaint." You mean the grievance report?

A. The grievance complaint, yes.

Page 13

4 (Pages 10 to 13)

A504586
KIPLING PITAMAKAN SHARPE, M.D.       AUGUST 24, 2011

I looked at a few others, and I don't remember specifically which ones. It was just skimming them as I collected them.

Q. Did you review the transcript from the COP Hearing Panel?

A. I did not.

Q. Did you review the transcript from the Judiciary Committee Hearing?

A. I did not.

Q. Other than Mr. Crawford, did you meet with anybody to prepare for your deposition today?

A. No, sir.

Q. Did you discuss the fact you were being deposed with anybody today?

A. Yes. My office staff is aware I'm being deposed, my wife.

Q. When did you join the --

I should ask it this way. Are you a member of the American Academy of Orthopaedic Surgeons or the American Association of Orthopaedic Surgeons?

A. I believe I'm a member of both. I believe those are co-organizations. Originally, when I joined, it was the American Academy of Orthopaedic Surgeons, and then they formed a pact, if I recall correctly, with the other name. It's a little confusing to me.

Page 14

Q. That's a good clarification. That's true. According to the by-laws of both, the Academy and the Association, a member of one is also a member of the other. So that is a good clarification.

But you originally joined the Academy?

A. Yes.

Q. Do you recall approximately when that was?

A. Within a year or two of 1998. I don't remember exactly.

Q. And why was it that you chose to join the Academy?

A. Seemed like the thing to do. It's the organization of orthopedic surgeons. I'm an orthopedic surgeon. I was qualified to join, so I joined.

Q. Now, are there other organizations comprised of orthopedic surgeons?

A. There are. I don't know that there is a universal group like the AAOS. There are suborganizations for foot surgeons, hand surgeons, joint surgeons.

I also belong to the American Association of Hip and Knee Surgeons, which is orthopedic surgeons.

Q. Now, when I asked that question of Dr. Murry Goodman last week, he was a member of the COP Hearing Panel, why he had joined the Academy, he said, "It was and is the preeminent professional organization for orthopedic surgeons." Do you agree with that statement?

Page 15

A. I agree with that statement.

Q. What benefits do you, as an orthopedic surgeon practicing in Arizona, derive from your membership with the AAOS?

A. They send out regular bulletins, updates on what is happening in orthopedic surgery. They produce educational materials, the Orthopaedic Knowledge Update comes out every couple years and it is kind of a current what is the state of the specialty as far as how do you treat various orthopedic problems, a lot of other educational materials, courses. That would be the main benefit, I guess. One other. They host an annual meeting that I've occasionally attended.

Q. So it sounds like one of the main reasons why you are a member of the AAOS is the access to, it sounds like, the most up-to-date educational materials in the field?

A. Yes.

Q. Do you know what it costs you on an annual basis to be a member of the AAOS?

A. I don't.

Q. Based on the benefits that you receive, is there any question in your mind that you receive a good value for your money, whatever that amount may be?

A. Yes.

Q. Taking you back, I think it would have to be to

Page 16

2005 when -- I'm just going to refer to the patient as "mother" so we can avoid their identifying information. When they amended their complaint to assert a malpractice claim against you, how was it you learned of the fact that they had amended their complaint?

A. I received a --

Is subpoena the right word?

Q. Maybe summons and complaint?

A. Yeah. Some sort of legal document was served by a process server.

Q. So nobody called you ahead of time to say this was happening. You just got served out of the blue?

A. Yes.

Q. And where were you when you were served with that? Do you recall?

A. I believe I was in my office. I'm not certain.

Q. And when you were served with it, did you have an opportunity to read through it?

A. I believe so. That was a long time ago.

Q. Do you recall how, when you read what was in the complaint --

I take it at some point you read what was in the complaint?

A. Yes.

Q. I also know, based on everything that has happened

Page 17

5 (Pages 14 to 17)

ATKINSON-BAKER, INC.                                        1-800-288-3376

A504586
KIPLING PITAMAKAN SHARPE, M.D.          AUGUST 24, 2011

here, you vehemently disagreed with almost everything that was in that complaint?

A. Yes.

Q. Would it be safe to state that upon reviewing that amended complaint which made those allegations against you, that you were angry or at least not happy with that situation?

A. Not happy would be appropriate. Angry would not be appropriate. Shocked, stunned, those would be appropriate terms, flabbergasted.

Q. Shocked, stunned, flabbergasted, certainly not happy; fair enough?

A. Fair enough.

Q. Okay.

Had you, prior to that point, ever been sued for malpractice?

A. Yes.

Q. Okay. And I said the same thing to Dr. Goodman in Chicago, you know, the old joke amongst attorneys and lawyers is, there are only two types, those that have been sued for malpractice and those that will be sued for malpractice. So don't take that as a statement about the way you perform your practice.

Your prior experience with malpractice, did it -- did the litigation go forward or was it resolved

Page 18

early on?

A. This was the first case that went to trial.

Q. Okay. So the prior action may have had some proceeding, some discovery, that kind of thing, but it got resolved one way or another?

A. Correct.

Q. On the prior occasion -- was there only one prior occasion?

A. No. There were several.

Q. On those prior occasions, did you play an active role in the defense of the case? In other words, did you have communications with the attorney that was representing you to remain appraised of the progress that he or she was making in the defense of your case?

A. Yes.

MR. CRAWFORD: Those type of questions, just answer yes or no.

MR. MAURICE: Absolutely. I'm not going to go into a whole lot of detail about those other things. They really don't matter.

Q. BY MR. MAURICE: In regard to this case, the patient and patient's mother that kind of forms the basis of this action, did you similarly monitor your attorney's defense of the case?

THE WITNESS: Yes.

Page 19

Q. BY MR. MAURICE: I mean you took it seriously, correct?

A. Yes.

Q. You were bothered by the fact that you had been brought into the action for what you viewed as were specious claims. And so you wanted to know what your attorney was doing to defend you in the case. Fair enough?

A. Fair enough.

Q. Okay.

Now, after you were vindicated by the jury in June of 2008, it's my understanding that you filed a State Bar complaint against Wade Causey?

A. Yes.

Q. And a grievance report with the grievance report against Dr. Brandner with the American Academy of Orthopaedic Surgeons, correct?

A. That is correct.

Q. You still have the binder in front of you, I hope?

A. I do.

Q. Exhibit 1, if you can turn to that document, do you recognize the document that has been marked for identification as Exhibit 1?

A. Yes.

Q. What is that?

A. Professional compliance program grievance report

Page 20

of the American Academy of Orthopaedic Surgeons.

Q. Is that your signature on the third page of the Exhibit, the one with Bates number Brandner 00116?

A. That is.

Q. And then if we go to the back, there is a letter attached.

Is the signature on the page Bates number Brandner 00118, is that also your signature?

A. It is.

Q. Okay. This is your grievance report, correct?

A. Correct.

Q. This is what was submitted to the AAOS by you asserting a grievance against Dr. Brandner, correct?

A. Correct.

Q. Now, it's my understanding that in the Bar complaint against Mr. Causey, that essentially the same position was taken by you, that was: Based on the deposition testimony provided by the patient and the patient's mother in January of 2004, Wade Causey never should have acted as counsel for the plaintiffs and amended the complaint to bring you into the case, and Dr. Brandner never should have agreed to be their expert. Is that roughly correct?

MR. CRAWFORD: Object to the form of the question.

Go ahead.

Page 21

6 (Pages 18 to 21)

A504586
KIPLING PITAMAKAN SHARPE, M.D.                AUGUST 24, 2011

THE WITNESS: It's only in part correct.

Q. BY MR. MAURICE: Okay. How am I wrong?

A. I had other assertions against Mr. Causey.

Q. Okay. Maybe it's just because I'm kind of tunnel vision when it comes to this matter. Let's just at least make clear that one of the allegations made against Mr. Causey was based on those January 2004 depositions that the patient and patient's mother gave, he never should have amended the complaint to assert causes of action against you, especially with regard to informed consent, correct?

MR. CRAWFORD: Object to form of the question.

Go ahead.

THE WITNESS: Correct.

Q. BY MR. MAURICE: Okay. Very similar, the allegation with regard to Dr. Brandner, and I believe it was Mr. Crawford that summed it up at the Judiciary Committee Hearing. Now, the point of the grievance from day one was when Dr. Brandner agreed to be an expert in that case, the deposition testimony that existed at that time was the deposition testimony from January 2004, and based on that testimony, he never should have agreed to testify as an expert witness on their behalf, fair enough?

MR. CRAWFORD: Object to form of the question.

THE WITNESS: In part.

Q. BY MR. MAURICE: In part?

Page 22

A. There were other issues as well.

Q. Well, Mr. Crawford described that as the point of your grievance from the beginning. That is what it was described to the Judiciary Committee. Do you disagree with that?

A. I do not disagree with that.

Q. I mean, as you sit here today, you still believe Dr. Brandner, based on that deposition testimony from January of '04, never should have agreed to be an expert witness against you?

A. That was only one of the items he had available to him that I would make that statement about.

Q. Okay.

A. That's not the only issue.

Q. Just tell me what were the -- other than the January 2004 deposition testimony, what other items do you believe made it so that in October 2004, when Dr. Brandner was contacted by Mr. Causey, that you believe he should have refused to become involved on behalf of the plaintiffs?

A. There were two issues that Dr. Brandner brought up as being below the standard of care: One was the informed consent issue; and the other was the rush to surgery in a fracture that potential to remodel. And I'm paraphrasing that.

Q. I was going to say, I dealt with a lot of

Page 23

paraphrasing of that in Boston a week ago.

A. Okay.

Q. I don't want to go into the --

I don't want to go into the real nitty-gritty of the underlying litigation. I think you were vindicated by a jury, and I think everybody in the room, at least on my side of the table, in terms of my clients, agree that was appropriate.

So if I understand you correctly, based on the deposition testimony and based on the medical record and the x-rays, it was your belief that Dr. Brandner in October of 2004, when he was provided with these materials by Wade Causey, should never have agreed to act as an expert for the plaintiffs?

A. Agreed.

Q. Okay. Now, what was the result of the Bar complaint against Mr. Causey?

A. They investigated it per a letter they sent me and dismissed it.

Q. Now, I'll ask you to turn to Exhibit 24. I think I have a copy of the letter that was sent to Mr. Causey regarding the dismissal of the complaint. And I have a feeling it looks similar to the letter you received.

Does this letter look familiar to you?

A. It does.

Page 24

Q. Did you receive a letter similar to this in or around late February of 2009 making the same statement that the complaint had been investigated and reviewed by Bar counsel and had been dismissed?

A. Yes.

Q. The next sentence says, "Pursuant to Rule 52(b)(2), Arizona Rules, Supreme Court, the complainant may appeal the decision within 10 days of receipt of the dismissal letter." Do you see that?

A. Yes.

Q. And you were the complainant in this instance, correct?

A. Yes.

Q. Did you appeal it?

A. I did not.

Q. Were you ever provided with the materials that Mr. Causey provided to the State Bar in defense of the complaint that you had filed against him?

A. I believe I was.

Q. And do you recall that those materials included the subsequent deposition transcripts of the patient and the patient's mother?

A. I don't recall.

Q. Okay. So it may have been in there, but you just don't know?

Page 25

7 (Pages 22 to 25)

A504586
**KIPLING PITAMAKAN SHARPE, M.D.**      AUGUST 24, 2011

A. I don't recall.

Q. But do you recall that --

And did you see the written submission that Mr. Causey provided to the State Bar as well?

A. I believe I did.

Q. Do you recall that one of his main arguments was you can't -- to the State Bar was -- that the State Bar couldn't just base its opinions or conclusions on the first set of the patient and patient's mother's depositions, that it needed to look at the whole picture which included that second set of transcripts? Do you recall that argument?

MR. CRAWFORD: Let me object to form of the question, and it lacks foundation.

Go ahead.

THE WITNESS: I have a very vague recollection of his response.

Q. BY MR. MAURICE: Do you remember that argument, him making the argument that "You don't have the whole picture here, there is another half, and here are these transcripts"?

MR. CRAWFORD: Same objections.

THE WITNESS: He may well have. I don't specifically recall his argument.

Q. BY MR. MAURICE: In any event, would you agree that by February of '04 you were aware that the State Bar

Page 26

had dismissed that complaint?

A. I believe you mean February of '09.

Q. Pardon me, February of '09 the State Bar dismissed it?

A. Approximately. I don't know if February or March, somewhere.

Q. Sometime by the Spring of '09 you know that the complaint against Causey has been dismissed?

A. Fair.

Q. Okay.

Now, on Exhibit 1, if you can turn back to Exhibit 1. If you could turn to the second page of Exhibit 1 which is Brandner 00115?

A. Yes.

Q. I guess before I ask you that question I should lay some foundation.

How was it you came up with the idea of submitting a grievance report with respect to Dr. Brandner's testimony?

MR. CRAWFORD: Okay. You need to exclude any conversation with counsel in answering that question, okay?

THE WITNESS: Yes.

MR. CRAWFORD: Go ahead.

THE WITNESS: The expert witness on my side of the case in question, original case in question, is very active

Page 27

in the American Academy of Orthopaedic Surgeons. He was familiar with this process. He felt strongly that Dr. Brandner had violated the standards of professionalism and that a complaint was warranted. He encouraged me to proceed with that.

Q. BY MR. MAURICE: And that was Dr. Russo?

A. That is correct.

Q. And how was it that you obtained this professional compliance program grievance report form?

A. I downloaded it online, I believe.

Q. Do you recall downloading any other documents at that same time related to this grievance process?

A. I don't recall.

Q. Okay. If you could turn back to that second page, you may still be on it, Bates number Brandner 00115?

A. Yes.

Q. Section six, under heading six, which is in bold, the italics provided there says, "Attach complete copies of any documents that you rely on as evidence, providing specific page references to the portions that support your allegations." Do you see that?

A. Yes.

Q. Now, I understand that --

Well, let me go back.

You have heard me say to you at the Judiciary

Page 28

Committee Hearing, the Judiciary Panel, that your submission of only one set of the deposition transcripts had violated a rule, which I believe you'll find back on Exhibit 3.

If you go back to Exhibit 3, do you see the Professional Compliance Program grievance procedures?

A. Yes.

Q. You recall that discussion, the exchange we had in front of the Judiciary Committee where I was questioning you with regard to whether you had complied with these rules in your submission of the grievance report?

A. I recall the general discussion, not the specifics.

Q. No problem.

When I was asking you those questions, I was under the mistaken belief that you had these professional compliance program grievance procedures prior to your submission of the grievance report.

If you look at Exhibit 2 in front of you, you are going to see a letter dated November 14th to you from the AAOS. Do you see that?

A. Yes.

MR. CRAWFORD: What is the question? You keep jumping around here. So what is your specific question of him?

Page 29

8 (Pages 26 to 29)

A504586
**KIPLING PITAMAKAN SHARPE, M.D.**        AUGUST 24, 2011

MR. MAURICE: The last question, she can read it back to you, which was: Do you see the Exhibit in front of you as Exhibit 2?

MR. CRAWFORD: Okay.

You need to listen to his specific question and just answer his specific question, because he's jumping around a little bit.

MR. MAURICE: There's no jumping.

Q. BY MR. MAURICE: You see the date on your grievance report? It looks like it was received by the AAOS on October 21st, 2008.

A. Yes.

Q. Okay. And then approximately, it looks like, about two weeks later, this letter goes out from the AAOS to you that is Exhibit two. Do you see that?

A. Yes.

Q. Do you recall receiving this letter?

A. Not specifically, but I probably did receive it.

Q. I was going to say: Do you dispute receiving this letter?

A. No.

Q. Okay.

The opening paragraph says, "On October 21, 2008, I received your signed and dated grievance report alleging violation of the standards of professionalism,

Page 30

SOPs, on orthopedic expert witness testimony by Patrick G. Brandner, M.D. This is under administrative review. Additional information about this grievance will be forthcoming."

New paragraph. "Enclosed is copy of Professional Compliance Program Grievance Procedures that details the process for all grievances filed after September 13, 2008. Please keep these for your reference and records."

Do you see that?

A. Yes.

Q. Then attached as Exhibit 3 are those Professional Compliance Program Grievance Procedures?

A. Yes.

Q. If you turn to Exhibit 3, the page with the Bates number Brandner 00751, you will see section six C, which is the section that we spent some time discussing in New Orleans, which provides "each party to a grievance is responsible for obtaining and providing all written material, such as transcripts and medical records, for consideration by AAOS. All correspondence or materials must be sent to the Office of General Counsel."

Do you see that?

A. Yes.

Q. Okay. So what I'm getting at is when you

Page 31

submitted your grievance report, you didn't have the Professional Compliance Program Grievance Procedures, correct? They don't come for another two weeks? That you relied --

A. I don't recall, but that makes sense from the dates shown.

Q. And so -- and the grievance report doesn't tell you to produce all written material, such as transcripts and medical records for consideration by the AAOS. It tells you to produce "complete copies of any documents that you rely on as evidence, providing specific page references and portions that support your allegations," correct?

MR. CRAWFORD: Only to form.

THE WITNESS: I'll go back and read it before I agree to it. You are reading --

Q. BY MR. MAURICE: Exhibit 1 on page Brandner 00115.

A. And I'm sorry --

Q. Section six in the italics?

A. It says, "Complete copies of any documents that you rely on as evidence, providing specific page reference and portions," yes.

Q. You believed when you submitted your grievance report that you had complied with what is provided in italics in section six of the grievance report, correct?

A. Correct.

Page 32

Q. You didn't have the Professional Compliance Program Grievance Procedures that are Exhibit 3, correct?

A. I believe so.

Q. Okay.

Well, then I apologize for at the Judiciary Committee Hearing essentially calling you a liar, because this -- based on the documents that the AAOS has now produced, it is apparent that you didn't have the very rules that we were alleging you were violating in Exhibit 1. So at least that's on the record.

MR. CRAWFORD: That's not a question, so you don't need to respond to it.

Q. BY MR. MAURICE: Now, if you could turn to Exhibit 4, please.

Do you recognize the document that has been marked for identification as Exhibit 4?

A. Yes.

Q. This was a letter provided to you by the AAOS requesting that you provide some supplemental materials, correct?

A. Yes.

Q. It identifies three different groups of documentation that the AAOS would like to see. The first one is digital format of the x-ray submissions for -- dated March 22, 2002, open parentheses, number two, and July 25,

Page 33

A504586
KIPLING PITAMAKAN SHARPE, M.D.          AUGUST 24, 2011

2002, also shows number two.

Do you recall providing those to the AAOS?

A. I don't recall what dates are on the films I provided, but I provided the films subsequent to this letter.

Q. So in response to this letter, you provided the x-rays that you had?

A. Yes.

Q. The second one provides, second point provides, "Depositions of the patient and/or mother documenting, as stated in your letter and referenced in Dr. Brandner's court testimony, the discussion of risk of peroneal nerve damage."

Do you see that?

A. Yes.

Q. And did you provide those depositions?

A. Yes.

Q. And that is the January 2004 depositions upon which your grievance was really based, correct?

A. Correct.

Q. The AAOS didn't ask you to send all deposition transcripts of the patient and patient's mother, correct?

A. Correct.

Q. And then the third bullet point is "pages six and seven of the supplemental disclosure statement, open parentheses, missing from materials submitted, close

Page 34

parentheses, dated July 1st, 2005"? Do you see that?

A. I don't recall what that was. I assume if we went forward, I must have provided it. I don't recall what that is.

Q. Do you recall ever receiving a letter from the AAOS at any point after December 30, 2008, requesting that you provide any other materials related to your grievance other than these three points provided here in Exhibit 4?

A. I don't recall.

Q. If you could turn to Exhibit 5, please.

Do you recognize the document that has been marked for identification as Exhibit 5?

A. Yes.

Q. And what is that?

A. It's the letter from the AAOS telling me they are sending the material that Dr. Brandner has submitted in response to the complaint.

Q. And upon receipt of that response from Dr. Brandner you reviewed it, correct?

A. I believe I did.

Q. I'm presuming you did, because if we get to the next Exhibit, Exhibit 6 is the response that you provided --

A. Oh.

Q. -- two days later.

A. Then I most certainly did.

Page 35

Q. Before submitting the response that is Exhibit 6, did you go through the grievance procedures that are Exhibit 3 to determine if you had the right, under the Professional Compliance Program Grievance Procedures, to submit a response to Dr. Brandner's response?

A. I don't recall whether I did or not.

Q. Did you speak to anybody at the AAOS regarding whether or not you could submit a written response to Dr. Brandner's response?

A. I don't recall speaking to anybody about it.

Q. I guess I should go back a little bit.

When you originally prepared your grievance report, did anybody assist you in the preparation of that grievance report?

MR. CRAWFORD: You need to exclude, obviously, any communications you've had with counsel, okay?

Q. BY MR. MAURICE: I'm not asking what communications you had with counsel. But if your counsel assisted in the preparation of that, I want to know. I'm not asking what your attorney told you or communication. If your attorney played a role in drafting of the grievance, I have a right to know.

MR. CRAWFORD: You are talking about the original grievance?

MR. MAURICE: The grievance report, yes.

Page 36

MR. CRAWFORD: Answer yes or no or I don't recall.

THE WITNESS: Yes.

Q. BY MR. MAURICE: Who assisted you in the drafting of the original grievance report?

A. My attorney reviewed it.

Q. And that's Mr. Crawford?

A. Correct.

Q. Anybody else?

A. No.

Q. What about Mr. Russo?

A. No.

Q. Or Dr. Russo, pardon me.

A. No.

Q. So nobody other than Mr. Crawford looked at it before it was submitted?

A. Not that I recall.

Q. Okay. What about in responding to the request for documentation which is Exhibit 4, did you have those materials available to you so that you could forward those to the AAOS or did you need to obtain them from some other source?

A. The x-rays I had, depositions I don't recall if I had those or had to obtain them. There were some materials that, during the process, had to be obtained through my attorney. I don't recall if those were them or not.

Page 37

10 (Pages 34 to 37)

A504586
KIPLING PITAMAKAN SHARPE, M.D.          AUGUST 24, 2011

Q. Do you know if you had to get documentation from any source other than your attorney or your own private files to provide this supplemental information?

A. My attorney had to get some information from the court.

MR. CRAWFORD: Do you want me to help you with that one?

MR. MAURICE: Go ahead.

MR. CRAWFORD: He didn't know how to order the trial transcript, so I had to find out who the court reporter was so he could supply Dr. Brandner's trial testimony.

MR. MAURICE: Okay.

Q. BY MR. MAURICE: Back to Exhibit 5. If I understand you correctly, before preparing the written response, which is Exhibit 6, I guess in the two days which occurred between the mailing of Exhibit 5 and your drafting of Exhibit 6, you did not contact the AAOS to determine if you had a right to submit a written response to Dr. Brandner's response?

MR. CRAWFORD: Lacks foundation.

THE WITNESS: I don't recall whether I did or not. I don't recall any contact with them in that regard.

Q. BY MR. MAURICE: During this time period, were you having any other contact with the AAOS, other than the

Page 38

letters that we are discussing here?

A. During the course of the proceedings I had occasional emails with Mrs. Giulietti, if I'm pronouncing that right.

Q. Is that going all the way back to the point where you have submitted the grievance report or is that further along in the process after a prima facie determination has already been made by the COP?

A. I don't think I had any contact with her prior to that prima facie letter.

MR. CRAWFORD: Do you want something to drink?

THE WITNESS: I'm good.

MR. CRAWFORD: If you want some water or something, just speak up.

Q. BY MR. MAURICE: If I understand you correctly, prior to the drafting of the document that is marked for identification as Exhibit 6, you did not review the Professional Compliance Program Grievance Procedures to determine if you had a right to submit a written response to Dr. Brandner's response?

A. I didn't say that. I said I don't recall whether I reviewed it or not.

Q. So as you sit here today, you don't know if you reviewed it?

A. Correct.

Page 39

Q. Let me ask you this, then: Exhibit 6, what led you to believe that you had a right, in this process, to submit a written response to Dr. Brandner's response to your grievance report?

MR. CRAWFORD: You -- obviously, if there were any discussions with counsel, you have to exclude that.

So other than that, go ahead.

THE WITNESS: I don't recall knowing whether I had a right to submit or not. I just felt the need to submit it.

Q. BY MR. MAURICE: Perfect. That's what I was getting at.

You read Dr. Brandner's response. You didn't agree with it. You wanted to send in something in writing saying why you didn't agree with that. Fair assessment?

A. That is fair.

Q. Just to make sure we're clear, Exhibit 6 is that response, correct?

A. I believe so, yes.

Q. Now, it's not signed, but do you have any reason to believe you didn't draft this?

A. No, I don't.

Q. And on page -- on the second page of Exhibit 6, it has Bates number AAOSB0000994, do you see where there is

Page 40

quotation provided to the depositions given by the patient and the patient's mother in January of '04?

A. Yes.

Q. Now, at this point, you've already provided those deposition transcripts to the AAOS, correct?

A. I don't recall the timing, but probably.

Q. Did you ever contact anybody at the AAOS to ask whether you had an obligation to provide the second set of transcripts for the patient and the patient's mother?

A. No.

Q. If you turn to Exhibit 7, please.

Do you recognize the document marked for identification as Exhibit 7?

A. Yes.

Q. And what is that?

A. It's a letter from the AAOS to me informing me of the Professional Compliance Committee Meeting, and I'm required to attend, and scheduling of October 2nd and 3rd.

Q. If you read down a little further, you'll see that this is actually the letter whereby the AAOS advises you that Dr. Brandner has requested that the hearing be postponed until the next meeting because he has overseas travel plans. Do you see that?

A. Yes.

Q. Do you recall receiving this letter --

Page 41

11 (Pages 38 to 41)

A504586
KIPLING PITAMAKAN SHARPE, M.D.          AUGUST 24, 2011

A. Yes.

Q. -- and Dr. Brandner's request to move the hearing?

A. Yes.

Q. Okay. You see in the -- after the block quote it says, "If you have no objections to Dr. Brandner's request, the hearing will be rescheduled from the following meeting" -- pardon me, "for the following meeting of the Committee on Professionalism will take place at the 2010 AAOS Annual Meeting in New Orleans." You the did you see that?

A. Yes.

Q. This letter made it clear that the only way this hearing was going to be postponed was with your consent, correct?

A. Correct.

Q. If we turn to Exhibit 8, I believe we have your response to that letter.

Do you recognize Exhibit 8?

A. Yes.

Q. What is that?

A. It's an email I sent to Ms. Giulietti indicating that I had a conflict on my schedule and I wouldn't be able to attend.

Q. What was the conflict?

A. I don't recall specifically what it was. But on

Page 42

my calendar, at the time, there was a conflict.

Q. So for that reason you refused to oblige Dr. Brandner's request that the hearing be moved?

A. Yes.

Q. As you sit here today, you don't know what that conflict was?

A. I don't. I don't.

There are many things on my calendar that come and go. I don't recall what the conflict was.

Q. And do you recall if this was one of those things that came and went?

A. I know I was able to get there for the hearing we subsequently had during that time, but I know I had to work it around my schedule and fly in and fly out on the same day.

Q. I mean, that was the point I was getting at. The date at which they are talking about moving the COP hearing to is the meeting in New Orleans which ultimately you do attend, at least it sounds like one day, for the Judiciary Committee Hearing, correct?

A. Yeah. I didn't spend the night. And I recall there were a lot -- it was a lot of schedule working to be able to attend that. And at the time they sent this, they weren't giving an exact date. And there were some things in that week of the Academy that would have been very difficult

Page 43

for me to move.

Q. More difficult than international travel plans?

A. Well, I don't know what his difficulty moving his travel plans were, but I take care of professional baseball teams spring training, and it's pretty hard to move spring training for a major baseball team.

Q. You think spring training might have been an issue here?

A. That could have been one of the conflicts, because I do physicals for a professional baseball team at that time of year.

Q. Which team was that?

A. Chicago Cubs.

Q. I will not blame you for their performance this season.

A. Thank you.

MR. CRAWFORD: At least they have a team.

THE WITNESS: Or for the last 100 years.

Q. BY MR. MAURICE: If you turn to Exhibit 9, please.

This is a transcript from the COP hearing panel that you attended along with Dr. Brandner in Rosemont, Illinois. Do you recall that?

A. Yes.

Q. I want to be sure we're clear. By this point, October 2009, when you show up at this hearing, you already

Page 44

know that Wade Causey's Bar complaint was dismissed by the State Bar, correct?

A. Yes.

Q. Do you recall the questioning that occurred after both sides had made their 30-minute presentations, or presentations with a 30-minute limit, regarding the availability of certain deposition transcripts and Dr. Brandner's claim that those transcripts had not been made available to the panel?

A. I recall there was a discussion.

Q. Okay. If you could turn to the page with the Bates number Brandner 00175 in Exhibit 9.

And I'm just going to ask you to read silently to yourself from line three on that page to line nine on the following page and just look up when you are done.

MR. CRAWFORD: Line nine on 435?

MR. MAURICE: Correct.

MR. CRAWFORD: Okay. Thank you.

THE WITNESS: Yes.

Q. BY MR. MAURICE: You only have one sentence in all of that exchange, and that's on the page with Brandner 00176, lines three to four. That's where you say, "I believe I provided all the depositions to this committee."

Do you see this?

A. Yes.

Page 45

12 (Pages 42 to 45)

A504586
KIPLING PITAMAKAN SHARPE, M.D.          AUGUST 24, 2011

Q. I know we've discussed this on previous occasions but you knew when you made that statement that it wasn't quite correct?

A. I disagree.

Q. Okay. You were -- you did not --
Well, what did you mean when you said "I believe I provided all the depositions to the Committee"?

A. My understanding was that I had provided all of the relevant to depositions to the complaint I had filed as per the instructions in the complaint.

Q. And --

A. And every additional piece of information that had been requested of me.

Q. So when you had --
When you made that statement to the Committee, it was with your understanding of what was requested in section six of the grievance report and what was provided in response to the letter dated December 30th, 2008, which is Exhibit 4, where they requested those three additional categories of documents?

A. That is correct.

Q. All right.
But you knew when you made the statement that there were other depositions that had not been produced?

Page 46

A. There were many other depositions, from my PA, from Dr. Dinowitz. There were a lot of depositions that weren't, in my opinion, relevant.

Q. Well, in the next sentence when Dr. Goodman says, "Can you tell us which deposition records are missing?" and Dr. Brandner responds, "No, I could not. I sent everything to the attorney, and I could not get anything." Why didn't you interject at that point and say "I know what depositions exist, and I can provide them. What specifically do you want?"
Why didn't you interject at that point and offer to provide them?

MR. CRAWFORD: Object to form.

THE WITNESS: I don't know why I didn't do that. It would have been good for me to do it, but I didn't.

Q. BY MR. MAURICE: I understand. But I have a feeling from what I observed at subsequent events, probably a whole bunch of people across from you. Looks like a Congressional hearing, so to speak. You are at your little table. Dr. Brandner is at his little table? Not a situation you are accustomed to being in?

A. Correct.

Q. If you could turn to the document marked for identification as Exhibit 10.
Do you recognize this letter?

Page 47

A. Yes.

Q. This is a letter dated December 14th of 2009 that shows it being sent to you and to Dr. Brandner enclosing a copy of the COP Hearing Panel's report and recommendations.
Do you recall receiving this sometime in December of '09?

A. Yes.

Q. I have attached the report and recommendation of the COP Hearing Panel as Exhibit 11, so you can see where that is.

A. Yes.

Q. Was this letter the means by which you learned of the COP Hearing Panel's decision?

A. To the best of my recollection.

Q. You didn't -- prior to December 14th, 2009, nobody from the AAOS had contacted you and advised you as to the result of the hearing?

A. No.
It is possible that not having heard I sent an email to Mrs. Giulietti and asked is there a report. But to my recollection, this is the first I knew of the report.

Q. You do remember that this report was late. It was supposed to come out within 30 days of the hearing. I know my office was looking for it in early December.

A. Yeah, I --

Page 48

Q. Do you recall it coming out late?

MR. CRAWFORD: Object to form and foundation.
Go ahead.

THE WITNESS: I recall it being later than I expected, yes.

Q. BY MR. MAURICE: You don't recall receiving a response from Ms. Giulietti indicating what the decision of the COP Hearing Panel was?

A. I don't.

Q. If you could turn to Exhibit 11.
Do you recognize this as the report from the COP Hearing Panel?

A. Yes.

Q. When you received it in December of '09, did you read through it?

A. I believe I did.

Q. If you look through it, you'll see that there are significant portions of the patient and the patient mother's deposition testimony. I think the patient's testimony is on Brandner 00769 and 771.
I think we're missing -- at least my binder is missing a page.
Do you guys have a page that is Brandner 770?

A. No.

Q. I don't either.

Page 49

13 (Pages 46 to 49)

A504586
**KIPLING PITAMAKAN SHARPE, M.D.**          **AUGUST 24, 2011**

MR. CRAWFORD: I have. It's out of order.

THE WITNESS: Oh, yes. It's the next page. I do have it.

MR. CRAWFORD: Okay. So what is the pending question? Which letter or page are you looking at?

Q. BY MR. MAURICE: Well, you read it when you received it, correct?

A. I believe so.

Q. And you can see from looking at it that the patient's deposition is quoted for about half a page from page Brandner 00769 to Brandner 00770. Do you see that?

A. Yes.

Q. Then you see the patient's mother's deposition testimony is referenced and quoted, in some instances, from Brandner 00770 to Brandner 00771. Do you see that?

A. Yes.

Q. You also see, if you turn back to Brandner 00773, that your representation to the committee that you were of the belief that you had provided all the depositions to the committee, that made it into the report as well. Do you see that?

A. I don't see that.

Q. It's 00773, second bullet point down.

A. Yes.

Q. Okay.

Page 50

When you go back to the conclusions here after discussion and summary, Brandner 00775, under finding number one, it says, "Unanimously found Dr. Brandner in violations of standards number three and four. The record shows that informed consent was given. The COP found that the deposition transcripts reflected that both the plaintiff and his mother had an understanding about the specific possibility and causation of foot drop. The COP believed that, in this regard, Dr. Brandner condemned performance that falls within generally accepted practice standards in obtaining informed consent. Do you see that?

A. Yes.

Q. So the deposition testimony that was supplied by you, the deposition testimony from January of '04, played a key role in the finding with respect to standards number three and four, correct?

MR. CRAWFORD: Lacks foundation.

THE WITNESS: From what that says, yes.

Q. BY MR. MAURICE: Yeah. I mean, it just says it exactly as you had always argued, the deposition testimony from January 2004 clearly and unequivocally established that the patient and patient's mother had an understanding to the risk to the peroneal nerve, or the risk of nerve injury, and the potential of a dropped foot when they consented to that

Page 51

procedure, correct?

A. Yes.

Q. Okay. Now, when you read this, did anything in the back of your mind tell you "Maybe I should have produced those other transcripts"?

A. No.

Q. Still didn't believe they were relevant?

A. No.

Q. Is that correct?

A. That is correct, I did not feel they were relevant.

Q. The fact the COP Hearing Panel even included your statement that you believed you had provided all the deposition transcripts, that didn't bother you at all?

A. No, sir.

Q. Did you --

Let me ask it this way: When you received this report sometime in December of '09, did you understand -- have an understanding of Dr. Brandner's physical condition and his surgical disability?

MR. CRAWFORD: Object to form and foundation.

THE WITNESS: I don't know that I still have a great understanding of his, only what he has testified to. And I don't remember which hearing he testified to his disability at. That's the only information I have on his

Page 52

physical condition.

Q. BY MR. MAURICE: Was that -- do you know if that was at the COP Hearing Panel or was that at the Judiciary Committee Hearing?

A. I don't recall.

Q. As you sit here today, do you have an understanding as to whether Dr. Brandner can or cannot perform surgery?

A. It's my understanding is he hasn't operated since '95. I believe they referred to it at some point.

Q. And do you know why that is?

A. I believe it is back problem.

Q. Do you have an understanding of what percentage of Dr. Brandner's income is derived from providing medical-legal testimony?

A. I believe at some point, somewhere along the line, there was communication that it was a significant part, but I don't recall the percentage.

Q. Did it bother you at all, when you received this report and recommendation, that Dr. Brandner was going to be suspended from the AAOS because the COP Hearing Panel found that those deposition transcripts reflected that the plaintiff and the mother had an understanding about the specific possibility and causation of foot drop, but they had never seen their second deposition transcripts?

Page 53

14 (Pages 50 to 53)

A504586
KIPLING PITAMAKAN SHARPE, M.D.          AUGUST 24, 2011

**Page 54**

A. No.

Q. What about the fact they had never seen the trial testimony?

A. I don't recall whether they received the trial testimony at that point. I thought they did.

Q. At the COP Hearing Panel, the only trial testimony was Dr. Brandner's.

A. Only the patient's trial testimony.

MR. CRAWFORD: He misunderstood.

Q. BY MR. MAURICE: Correct. At this point, the COP hearing level, the only thing the COP panel had were the January 2004 transcripts of the patient and the patient's mother and Dr. Brandner's testimony at deposition and at trial.

A. Correct.

Q. But it didn't bother you, when you saw this, that the COP Hearing Panel had grabbed onto that deposition testimony from '04 and used it as the basis for its finding without any consideration of their subsequent testimony, either at deposition or trial?

MR. CRAWFORD: Object to form.

THE WITNESS: It did not bother me, because my complaint was based upon Dr. Brandner agreeing to be a witness when he had the original depositions. Per his testimony, he had those depositions; and that was the basis.

**Page 55**

To me that was not appropriate. And that --

And the trial could never have moved forward without him agreeing to be a witness. The trial never should have moved forward, in my opinion, because it was based on claims that were from his expert opinion that I had not provided the consent when information available to him at the time he opined that, not subsequently, at the time he opined that, was that I had not provided that consent. And it was those original depositions that he admitted in his original deposition he had reviewed.

Q. BY MR. MAURICE: I think I understand what you are saying, but just so we're on the same page, if you can turn back to Exhibit 25.

And just so the record is clear, Exhibits 25, 26, 27, and 28 are provided -- they are only excerpts from the depositions. I did not lug the actual transcripts, which are significantly thicker here. So I want to make sure -- I had my assistant note on the front page they were only excerpts.

MR. CRAWFORD: They didn't provide all materials?

Q. BY MR. MAURICE: So we're clear, Exhibit 25 is the patient's second deposition. And I can tell you that because the AAOS did a horrible job of redacting. And if you turn to the third page of the Exhibit, you see his name at the top of the page.

**Page 56**

Exhibit 26 is the patient's mother's second deposition.

Do you see that? They were both deposed on the same day.

A. Yes.

Q. I want to make sure we are 100 percent clear. Your view is that the patient's second deposition, and the patient's mother's second deposition, which occurred on June 8 of 2005, were completely irrelevant because the point of your grievance was that Dr. Brandner never should have agreed to be an expert in the first place; and he had made that decision back in October of '04, well prior to these second depositions?

A. Agreed.

Q. Okay.

So really, if I understand what you are saying, when I show up at the Judiciary Committee and start talking about these second deposition transcripts and this trial testimony, your thought process is that is completely irrelevant because when Dr. Brandner made that decision in October of '04 to testify, that's when he fell below the AAOS mandatory standards for professionalism and expert testimony?

MR. CRAWFORD: Object to form.

THE WITNESS: Yes. It was no surprise to me that

**Page 57**

after Dr. Brandner agreed to testify that the patients changed their opinion.

Q. BY MR. MAURICE: If you could turn to Exhibit 12, please.

Do you recognize this document?

A. Yes.

Q. And what is it?

A. It's a notification that Dr. Brandner has exercised his right to an appeal in front of the Judiciary Committee.

Q. The date of the letter is January 4th, 2010?

A. Yes.

Q. Was this the letter, the means by which you learned Dr. Brandner had appealed the COP report and investigation?

A. I believe so.

Q. If you turn back to Exhibit 13, it's a letter dated 10 days later than Exhibit 12.

Do you recognize this document?

A. Yes. This is from my lawyer to the Academy indicating he will be representing me.

Q. Okay. And that's what I want to get to.

Prior to this, all the correspondence I see is directly between you and the Academy.

A. Correct.

15 (Pages 54 to 57)

A504586
KIPLING PITAMAKAN SHARPE, M.D.            AUGUST 24, 2011

Q. I don't see Dr. Crawford's involvement until this letter on January 14, 2010, at least in his interaction with the actual AAOS.

Was Doctor -- pardon me.

Was Mr. Crawford retained following --

Strike that.

Was Mr. Crawford retained to represent you with respect to this matter following your review of Dr. Brandner's appeal statement?

MR. CRAWFORD: Object to form and foundation.

THE WITNESS: I'm not certain I understand the definition of what "retained" means. The letter speaks to the fact that Mr. Crawford would be very directly involved representing me, speaking for me, at that point forward.

Q. BY MR. MAURICE: And I guess I should clarify: I understand that it sounds like Mr. Crawford has been your attorney for quite some time. And it sounds like he was providing certain services as an attorney, maybe reviewing and commenting upon documents, prior to this January 14th, 2010, letter. I understand that.

What I'm saying is following receipt of Dr. Brandner's notice of appeal, which you --

A. Yes.

Q. -- received somewhere around January 4, 2010, at that point you decide that Mr. Crawford is going to take a

Page 58

more public role in this thing and actually represent you in front of the Judiciary Committee, safe to state?

A. Yes.

Q. Now, at this point -- you read Dr. Brandner's notice of appeal, correct?

A. Yes.

Q. It was pretty detailed, made all sorts of grievances, gripes, and complaints. It complained about all sorts of things. Do you recall that?

A. Yes.

Q. Okay. At that point, when you review that, does it cross your mind that maybe I ought to produce this second set of deposition transcripts?

A. Somewhere in that time frame, yes. And we allowed -- I don't recall if we provided them or allowed them to be provided, but we, at the Judiciary Committee, said we don't object whatsoever because we don't find them relevant.

Q. You didn't actually produce them to the AAOS. My office had to go about getting those. But you didn't object to the Judiciary Committee's consideration of them?

A. Not whatsoever.

Q. Again, the reason you didn't object to the consideration of them was because you believed that June of '05 transcripts were completely irrelevant. The harm had

Page 59

been done back in October of '04, well prior to those depos that were being taken when Dr. Brandner agreed to testify as an expert on behalf of the plaintiffs?

MR. CRAWFORD: Object to form.

THE WITNESS: Yes.

Q. BY MR. MAURICE: If you could turn to Exhibit 14, please.

Do you recognize the document that has been marked for identification as Exhibit 14?

A. Yes.

Q. What is this?

A. It's a letter Mr. Crawford sent to the American Academy.

Q. And this is in preparation for the appeal hearing in New Orleans, correct?

A. I believe so.

Q. If you go to the last page, I see it's signed by Mr. Crawford, and I see it's cc'd to you. Do you see that?

A. Yes.

Q. Did you review this document before it was finalized?

MR. CRAWFORD: Just answer yes or no, if you recall.

THE WITNESS: I certainly reviewed it eventually. I don't know if I reviewed it before it was sent. I

Page 60

discussed it in detail with him. But I don't know that I saw the actual hard copy.

Q. BY MR. MAURICE: Well, when you looked at it afterwards, did you see anything in there that you disagreed with?

A. Not that I recall.

Q. If you would turn to the document marked for identification Exhibit 15. This is a transcript of the proceedings in New Orleans. This is in front of the Judiciary Committee.

Do you recall attending that hearing?

A. Yes, I do.

Q. And Mr. Crawford was present with you?

A. Yes, he was.

Q. On page 22 leading over into 23, it provides: "Dr. Brandner agrees to" -- this is Mr. Crawford speaking?

MR. CRAWFORD: Line 10.

MR. MAURICE: Correct.

Q. BY MR. MAURICE: Page -- this is on the page with Bates number Brandner 00583. It says, "Dr. Brandner agrees to be an expert witness in this case sometime in October of 2004. And what he has available to him are the medical records, the x-rays, the depositions of Dr. Sharpe, the patient and mother, before Dr. Sharpe was ever sued."

Now, that's the January of '04 depositions,

Page 61

16 (Pages 58 to 61)

ATKINSON-BAKER, INC.                        1-800-288-3376

**A504586**
**KIPLING PITAMAKAN SHARPE, M.D.**          **AUGUST 24, 2011**

correct?

A. I believe so.

Q. Okay.

"And Dr. Sharpe in fact specifically says that the risk of peroneal nerve injury was discussed."

New paragraph. "That is what he had before he agreed to be an expert witness in this case and that is the point of Dr. Sharpe's grievance in the case. The point of the grievance from day one, by Dr. Sharpe, has been: Based on the information available, Dr. Brandner should not have agreed to give expert testimony opinions critical of Dr. Sharpe in any way, shape or form. That was the point."

See that?

A. Yes.

Q. These were the statements of Mr. Crawford at the Judiciary Committee.

Do you agree with Mr. Crawford's characterization of the point of your grievance?

A. Yes. The main point, yes.

Q. Right. I mean it's exactly in line with what we have already discussed.

A. Yes.

Q. The point was: October of '04 Dr. Brandner never should have agreed to act as an expert witness on behalf of

*Page 62*

the plaintiff" -- pardon me, "the patient and the patient's mother," correct?

A. Correct.

Since you are reading, can I take a potty break?

Q. Can I ask --

A. Okay.

Q. I'm almost done with this transcript. I get to skip four pages of this testimony, because I have already apologized for accusing you of intentionally violating that Rule 6 C.

There is one I want to talk about before we take a break, Brandner 005863, pages 33 and 34 of the actual transcript, starting with, at line 20 of page 33. And it's my question. I say, "So Dr. Brandner is sitting there pleading with the committee telling them that there are these additional depositions. You haven't seen them. He's only shown you half the story. And you interject, 'I believe I have provided all the depositions to the Committee,' close quote. Is that correct?"

At that point Mr. Crawford objects, says it is argumentative and extensive cross-examination. And Mr. Chabraja sustains the objection noting I'm on extensive cross-examination.

Is it safe to state you would have

*Page 63*

acknowledged the accuracy of my characterization in that question had Mr. Chabraja not sustained that objection?

A. I'm confused.

Q. I was trying to bring out the fact at the COP Panel Hearing Dr. Brandner was standing up saying "You don't have the whole story. There are transcripts that you are missing." And he's pleading with them telling them that. And at that point you interjected that you believed you had produced all of the depositions to the committee. That was the point at which you made that point. All I wanted was you to acknowledge that that was, in fact, the way that that occurred.

MR. CRAWFORD: Object to form and foundation.

THE WITNESS: What occurred is in the transcription.

I'm not sure what you are trying --

I acknowledge that the transcription is correct.

MR. CRAWFORD: If you don't understand the question, you tell him, not guess about what he's asking.

THE WITNESS: I still don't understand the question.

Q. BY MR. MAURICE: You recall that there was no question posed to you at the COP Hearing Panel when you said "I believe I've produced all the deposition transcripts to this hearing committee"?

*Page 64*

A. Correct.

Q. And you acknowledge that what led up to that, what preceded your statement to the COP Hearing Panel, was Dr. Brandner trying to tell them, "You don't have the whole picture. You are missing transcripts." He couldn't tell them which transcripts, but he was trying to tell them you are missing transcripts. Do you recall that?

MR. CRAWFORD: Lacks foundation.

THE WITNESS: He says, as is recorded in the transcript, what he said was that there are other transcripts that he wanted.

Q. BY MR. MAURICE: And that's when you interjected and said, "I believe I've produced all of the transcripts to this committee."

A. Yes.

MR. MAURICE: Let's take a break.

THE WITNESS: Thank you.

(Recess taken.)

Q. BY MR. MAURICE: Dr. Sharpe, could you turn to Exhibit 16, please.

Do you recognize the document that has been marked for identification as Exhibit 16?

A. Yes.

Q. And what is this?

A. This is a report from the Academy that they have

*Page 65*

17 (Pages 62 to 65)

A504586
**KIPLING PITAMAKAN SHARPE, M.D.          AUGUST 24, 2011**

conducted the Judiciary Committee meeting and that they are -- that the decision was attached.

Q. And now for some reason when the AAOS has been producing the documents to us, they don't include the attachments. I have to kind of put them there together.

If you look at Exhibit 17, you will see the report and recommendation of the Judiciary Committee. Do you see that?

A. Yes.

Q. Okay.

Do you recall receiving a report and recommendation of the Judicially Committee sometime in late April of 2010?

A. Yes.

Q. Was the letter marked Exhibit 16 the means by which you learned of the decision of the Judiciary Committee?

A. I believe so.

Q. Okay. So it's not like you were getting a phone call from somebody at the AAOS saying, "This is how we're going to rule. You'll get the decision in a few weeks" --

A. No.

Q. -- nothing like that?

A. No.

Q. If you could return to the report and

Page 66

recommendation in Exhibit 17.

A. Yes.

You mean tab 17?

Q. Tab -- Exhibit 17, page Brandner 00608, the second-to-last bullet point has a summary of the statement from your written response. And the last sentence provides: "The point is Dr. Brandner never should have agreed to be an expert or offer the opinions he did." Do you see that?

A. Yes.

Q. Again, that's coming back to this theme that the June '05 depos are irrelevant; Dr. Brandner agreed to be an expert in October of '04; he didn't have that subsequent testimony; the only thing he could have looked at are the medical record and their transcripts from January of '04, correct?

A. Correct.

Q. In you can turn back to within Exhibit 17, page Brandner 00612, under the heading "summary of responses by both parties to questions posed by Judiciary Committee," it says, "In clarification of the records available to and reviewed by Dr. Brandner prior to his agreement to be an expert witness, Mr. Crawford stated, "Dr. Brandner agreed to be an expert witness involving Dr. Sharpe in approximately October 2004, and that is why Dr. Sharpe was brought into the case as a defendant several months later before the

Page 67

second depositions where they changed their testimony."

Do you see that?

A. Yes.

Q. This October of 2004 time frame --

A. Yes.

Q. -- I'm not saying it is in dispute, but do you know where it was that your counsel came up with the understanding that Dr. Brandner was retained in October of '04?

A. I don't recall.

MR. CRAWFORD: I can tell you, if you know.

MR. MAURICE: Go ahead. We don't dispute it, but I have just always been curious.

MR. CRAWFORD: I believe it was in Dr. Bradner's deposition. Exhibits to the deposition show when he met with Causey or agreed to be an expert.

MR. MAURICE: Based on the records that had been forwarded to him and then his evaluation of those?

MR. CRAWFORD: No. I'm just saying it was something that -- during his deposition he said it or in the Exhibits to his deposition, where that was the time frame he agreed to be an expert.

Q. BY MR. MAURICE: And then it was shortly thereafter that the complaint got amended, correct?

A. I believe so.

Page 68

Q. And, again, that was the issue. October of '04, the plaintiff and -- the patient and patient's mother had only been deposed one time, correct?

A. At that point in time, correct.

Q. And that was the testimony that you supplied to the COP Hearing Panel, correct?

A. Yes.

Q. And that was the testimony that, it was your position, unequivocally established that you had discussed the risk to the peroneal nerve and the potential of a dropped foot with the patient and the patient's mother prior to obtaining their consent for the procedure?"

A. Yes.

Q. If you can turn to the document marked for identification as Exhibit 18. This is a transcript from the first board of directors' meeting that occurred in Rosemont, Illinois.

You didn't attend this meeting, correct?

A. Correct.

Q. Why not?

A. I had a scheduled conflict. I don't remember what the conflict was. One of these meetings occurred when my wife just had surgery, I don't know if the first or second.

Q. I think this one, if we turn back to page Brandner 00622, on page 18 there, I think Ms. Young reads into the

Page 69

18 (Pages 66 to 69)

A504586
KIPLING PITAMAKAN SHARPE, M.D.          AUGUST 24, 2011

record some statements provided by you.

Do you see on line four on page 18?

A. Yes.

Q. Okay. And that's where she --

A. Yes.

Q. -- reads in a statement.

Go ahead and read through just down to line 16 and look up and I'll ask you a --

MR. CRAWFORD: Want him read it to himself.

MR. MAURICE: Correct.

Q. BY MR. MAURICE: Silently read from line four to 16.

A. Yes.

Q. Does that refresh your recollection as to why you were not in attendance?

A. My wife had surgery.

Q. Now, the statement you sent to her, did you send that in a letter or email? Do you recall which one it was?

A. Probably an email, but I don't recall.

Q. So it could have been a letter, but more likely an email?

A. Probably.

Q. Was it your intention to attend the board meeting but for your wife's surgery?

A. Yes. I struggled with the decision as to which to

Page 70

do, and my wife won.

Q. I'm sure all of us agree you made the right decision.

Starting on line 17, proceeding all the way to page 24, your written statement is read into the record. Do you see that?

A. I'm sorry, page 24?

Q. Start on page 18, line 17, where it says, "This will constitute Dr. Kipling Sharpe's written statement in anticipation of the Board's consideration of this grievance"?

A. I'm lost where you are.

Q. First go to Brandner 00622.

A. Yes.

Q. Then find page 18 on that --

A. Yes.

Q. And then look at line 17.

A. Line 17, yes.

Q. Where it says "This will constitute Dr. Kipling Sharpe's written response in anticipation of the Board of Directors' consideration of this grievance," see that?

A. Yes.

Q. That's where your written statement is read into the record, and it takes all the way to the very beginning of page 24 of the transcript for that statement to conclude.

Page 71

Do you see that?

A. Okay.

Q. Was that written statement provided in a letter or in an email?

A. I don't recall.

MR. CRAWFORD: I can help you, if you want an answer.

MR. MAURICE: Sure, sure.

MR. CRAWFORD: I believe it was in a letter.

Q. BY MR. MAURICE: Then the question was going to be: Was the letter that provided you a written statement different than the email or letter that advised the board that because of your wife's surgery that you were unable to attend?

A. I believe those were sent separately. I believe when we sent the letter, I was struggling. I knew my wife's surgery was coming up, and I hadn't made the decision, but we wanted to be represented at the Committee, if I decided not to go. And I think the email was sent more last minute when I just decided I couldn't.

Q. And, now, I have never seen an actual copy of this written statement, but I presume it was on Mr. Crawford's letterhead unless you were writing about yourself in the third person. Is that a safe presumption?

A. Yes.

Page 72

MR. CRAWFORD: Do you want something?

MR. MAURICE: If you have a date on the letter, that's the only follow-up.

MR. CRAWFORD: What is the date of the hearing, the board of directors' hearing that we're talking about?

MR. MAURICE: June 19, 2010.

MR. CRAWFORD: Okay.

THE WITNESS: June 7, 2010, it was sent by me to Richard Peterson, general counsel. And then the subsequent board, when they reconvened this thing again, was November 17, 2010. Again, to Richard Peterson, the written statement was provided.

MR. MAURICE: And the June 7, 2010, written statement does not contain this opening paragraph where Dr. Sharpe is explaining to the board about the circumstances which prevent him from being in attendance, correct?

A. Correct.

Q. Yeah. It was always our impression that there had probably been a written statement submitted in preparation for the hearing and then an email or something to that effect had come in to explain why you weren't going to be there.

A. Yeah.

Q. That just clarifies that.

Page 73

19 (Pages 70 to 73)

A504586
**KIPLING PITAMAKAN SHARPE, M.D.**          **AUGUST 24, 2011**

If you can turn to the document marked for identification as Exhibit 19.

Do you recognize this document?

A. Yes.

Q. And what is this?

A. This is the letter advising me of the board's decision following that aforementioned board of directors' meeting.

Q. So this is after the first board of directors' meeting?

A. Yes.

Q. And was this letter the means by which you learned that Dr. Brandner had been or was to be suspended from the AAOS?

A. Yes.

Q. What did you do when you received this letter?

A. I think I called or sent Mr. Crawford a note asking if he received the same.

Q. Did you speak to anybody else about it?

A. I think my wife.

Q. What about Dr. Russo?

A. I don't recall speaking to Dr. Russo about it.

Q. What about any of the physicians you practice with? This is kind of a long, grueling process.

A. I could have mentioned it to my partner, one of my

Page 74

partners who was working next to me.

Q. And who was that?

MR. CRAWFORD: Lacks foundation.

THE WITNESS: Dr. Wilson was, I believe, the one, Ralph V. Wilson.

Q. BY MR. MAURICE: Do you recall what his response was?

A. No.

Q. Can you think of anybody else that you discussed the results of the first board hearing with?

MR. CRAWFORD: Lacks foundation.

THE WITNESS: Don't recall.

Q. BY MR. MAURICE: So it's possible you may have discussed it with some other folks. You just don't, as you sit here today, recall?

A. That's correct.

Q. Okay. If you could turn to Exhibit 20, it's a letter about two months later.

Do you recall receiving this letter?

A. Yes.

Q. I guess I should ask: Do you recognize this document?

A. Yes.

Q. Okay. The opening paragraph says, "This letter is to advise you that the Board of Directors of the American

Page 75

Association of Orthopaedic Surgeons, parenthesis, AAOS, close parenthesis, meeting in Rosemont, Illinois, on September 25, 2010, voted to rehear the matter of Sharpe v Brandner at its meeting on Saturday, December 4, 2010, in Chicago, Illinois."

See where I read that?

A. Yes.

Q. Was this the first time you had heard from the AAOS that the AAOS was not proceeding in accordance with its prior letter of June 28, 2010?

A. No. Or -- yes, it was.

I'm sorry, this was, yes.

Q. Had you had any communication with the AAOS between June 28, 2010, where they advised you that the first board of directors' meeting had decided to suspend Dr. Brandner and the September 29th, 2010, letter where they say "We're going to rehear it"?

A. I don't think so.

Q. How was this letter received by you? In other words, how did you feel when you received this?

A. Feelings. Sort of set back, I guess.

I felt like there was finally closure, because the board of directors was supposed to be the final stop in the process. And I thought there was finally closure. And it was reopened.

Page 76

Q. Did you speak with anybody after you learned that the matter was going to be reheard?

A. Mr. Crawford.

Q. What about Dr. Wilson?

A. No. I don't think that I did. I might have. I don't recall if I did.

MR. CRAWFORD: Don't guess. If you recall you did, say.

THE WITNESS: I don't recall.

MR. CRAWFORD: Okay.

Q. BY MR. MAURICE: Do you have any idea why the board chose to rehear the matter?

A. I do now but I didn't at the time.

Q. What is your understanding as you sit here today?

A. My understanding was that you, on Dr. Brandner's behalf, had complained or -- about some irregularities; but I was never given any details on that.

Q. How did you find that out? How did you glean that information?

A. I think I surmised that. I don't know that I ever received direct information on that.

Q. So it was a presumption?

A. Yes.

Q. If you could turn to the document marked for identification as Exhibit 21. This is a transcript from the

Page 77

20 (Pages 74 to 77)

A504586

KIPLING PITAMAKAN SHARPE, M.D.          AUGUST 24, 2011

second board of directors' meeting.

Now, you did not attend the second board of directors' meeting, correct?

A. I did not.

Q. Why was that?

A. I recall another family conflict. I don't remember what it was, if there was --

That date was one I could not get away.

Q. Well, you missed a lovely snowstorm in Chicago that morning, let me tell you.

If you turn to the page with the Bates number Brandner 00672, which is actually page 26 of the deposition, it's where Ms. Giulietti, on line 14, begins reading your written statement. And it goes all the way to page 31, which is Brandner 00677.

Do you see that?

A. I'm sorry, goes to page what?

Q. Page 31 of the transcript.

A. Yes, okay.

Q. Now, I've compared this written statement with the previous written statement. And other than the date which appears on line 17 and 18, it looks pretty much identical to me.

Do you recall submitting a subsequent written statement for the second board of directors' meeting?

Page 78

A. We resent, essentially, the same letter.

Q. Gotcha.

MR. CRAWFORD: I gave you the second date previously. Do you need it again?

MR. MAURICE: No, no. Not a problem.

Q. BY MR. MAURICE: If you turn to Exhibit 22, please.

Do you recognize the document that has been marked for identification as Exhibit 22?

A. Yes.

Q. And what is it?

A. It is the report of a second board meeting.

Q. Okay. It says basically the same thing as the letter we looked at as letter 19, in other words, it's the same conclusion; but now this is based on the second board meeting, correct?

A. Yes.

Q. Okay. When you received this, back to those emotions, how did you feel?

A. Relieved it was over.

Q. Why were you relieved it was over?

A. It's been a long process.

Q. When you say "a long process," when you think of it in your mind, it goes all the way back to service of that complaint and summons back in late '04 or early '05,

Page 79

correct?

A. Goes back to my first meeting with Mr. Causey even before that.

Q. Okay. When you say it went back to your first meeting with Mr. Causey, what do you mean?

A. That was when involvement of lawyers first started.

Q. And was that when Mr. Causey was looking at the case with respect to Dr. Mathews?

A. Yes.

Q. So you weren't a party to the case at that point?

A. No.

Q. When you received this letter, did you speak with anybody?

A. I do not specifically recall.

Q. What about Dr. Wilson, did you go --

A. It's possible.

MR. CRAWFORD: Doctor, anything is possible in life. If you remember it, tell him. If you don't remember, tell him.

THE WITNESS: I don't remember.

I did speak with Mr. Crawford.

Q. BY MR. MAURICE: Right.

If you turn to the document marked for identification as Exhibit 23, do you recognize this

Page 80

document?

A. Yes.

Q. And what is it?

A. It's notification that Dr. Brandner had filed a lawsuit against the Academy contesting their decision.

Q. And it also advise that a preliminary injunction was issued by the court?

A. Yes.

Q. That prohibited AAOS from publishing the results of the grievance until the lawsuit was decided, correct?

A. Yes.

Q. Now, this letter is about four months after the letter we just saw as Exhibit 22, right?

A. Yes.

Q. Prior to receipt of this letter on April 5th, 2011, were you aware of the fact litigation had been filed in connection with the matter?

A. No. I did between that time contact Mrs. Giulietti inquiring as to the status, because I had not seen it published.

Q. When you say you hadn't seen it published, where is it that the AAOS publishes these things?

A. In their bulletin, I think.

Q. How often do you receive those bulletins?

A. I don't recall.

Page 81

21 (Pages 78 to 81)

A504586
KIPLING PITAMAKAN SHARPE, M.D.          AUGUST 24, 2011

Q. But often enough that by April 5th, 2011, knowing that the decision had been made in December of 2010, you had obviously received a bulletin and not seen it published, correct?

A. Correct.

Q. When you said you contacted Ms. Giulietti, by email or phone?

A. I don't recall.

Q. Do you recall what Ms. Giulietti's response was?

A. This letter.

Q. Gotcha. Okay.

So this letter was written in response to your inquiry?

A. It had that appearance.

Q. Do you recall having any telephonic communications with Ms. Giulietti prior to receiving this letter?

A. I believe it was an email, but I don't recall specifically.

Q. Okay. When you received this letter, what emotions did you go through?

A. It's not over.

Q. Have you had any communications with the AAOS following receipt of this letter regarding the grievance 2008-23?

A. No, I have not.

Page 82

Q. Have you ever reviewed a copy of the complaint that was filed in the action in Chicago?

A. If that's what was sent to me by way of service or in preparation for this. There was something that was sent to me.

MR. CRAWFORD: That was a subpoena for documents. He's talking about their lawsuit.

THE WITNESS: What was that 20-page thing we -- with all the allegations?

MR. CRAWFORD: That's a complaint.

THE WITNESS: I think I've seen that, then.

MR. CRAWFORD: It was more than 20 pages, I think.

THE WITNESS: Okay.

Q. BY MR. MAURICE: And when you saw that, do you know who provided that to you?

A. I think Mr. Crawford.

Q. Have you seen the motion for temporary restraining order and preliminary injunction that was filed in that action?

A. I don't believe I have.

Q. Have you seen the order granting that preliminary injunction?

A. I don't believe I have.

Q. Have you ever had any communications with any legal counsel for the AAOS regarding grievance 2008-23?

Page 83

A. I'm sorry, what is grievance 2008-23?

Q. That's what we know as Sharpe vs. Brandner.

A. Only the correspondence we have here from Mr. Peterson and Ms. Giulietti.

Q. Okay. So you haven't had conversations with anybody at Vedder Price or McGuireWoods regarding this matter?

A. No, sir.

Q. I'm going to ask if you agree with my view of something.

When I've looked at the records, specifically the depositions and the trial testimony from the underlying case, it appears to me that the patient and the patient's mother give those original depositions in January of 2004 taking one position, then they are deposed in June of '05 taking a different position, and then when they testify ultimately at trial in '08, they testify in line with their second set of depositions. Would you agree with that characterization?

MR. CRAWFORD: Object to form, foundation.

THE WITNESS: Yes.

Q. BY MR. MAURICE: Mr. Crawford does an excellent job of beating them up in cross-examination over the fact that the testimony they offered in response to Mr. Causey's questioning was different than the way they had responded

Page 84

back in January of '04. Do you recall that?

A. I don't like the term "beating up."

Q. Would you -- how about he effectively cross-examined them over the discrepancies in their trial testimony and their testimony during the January '04 depositions?

A. Yes.

Q. Okay. What is your -- I guess I should phrase it this way: Between 2008 and May of 2011, what was your work telephone number?

A. It changed.

Q. Did it change?

A. Yes. I changed practices on January 1st, 2011.

Q. Okay. Then let's first do this up to January of 2011. What was your work phone number up until January --

A. 480 964-2908.

Q. Any chance that you happen to know what your long distance carrier was for your work practice?

A. Not a chance.

Q. That's common, a common response, I guess.

Your work number after January of 2011?

A. 480 889-3988.

Q. And I take it you do not know your long distance carrier for your new practice as well?

A. That is correct.

Page 85

22 (Pages 82 to 85)

A504586
KIPLING PITAMAKAN SHARPE, M.D.          AUGUST 24, 2011

Q. Has your home telephone number changed between 2008 and May of 2011?

A. No.

Q. What is that?

A. 480 654-9138.

Q. Do you know your long distance carrier?

A. No.

MR. CRAWFORD: Are you going to keep his home phone number confidential?

MR. MAURICE: I don't plan on calling him, and I don't plan on handing it out to third parties.

Q. BY MR. MAURICE: Cell phone number, has your cell phone number changed between May 2008 and May of 2011?

A. No.

Q. What is your cell number?

A. 480 518-1168.

Q. Now, I'm presuming you do know who provides your cell phone service?

A. It's Verizon.

Q. Has it always been Verizon during this time period?

A. What was the beginning time frame?

Q. 2008.

A. Yes.

Q. Do you have a dedicated phone number for your car?

Page 86

A. No.

Q. Seeing less and less people answer yes to that question.

Fax number for your work prior to January of 2011?

A. I don't recall.

Q. Fax number for your work from January 2011 to May 2011?

A. 480 889-398 -- I'm not sure of the last digit. I think it's a seven.

Q. 398 possibly seven?

A. 889-398, and I believe it's a seven. It's one number different from the phone number.

Q. So if the work number is 3988, either 3987 or 3989?

A. Correct.

Q. Do you have a fax number at your house?

A. Yes.

Q. Has that changed between 2008 and May of 2011?

A. No.

Q. And what is the fax number, please?

A. 480 985-1377.

Q. Can you think of any other facsimile numbers that you might have used on a regular basis between 2008 and May of 2011?

Page 87

A. At Mezona there were a couple of fax lines, and I don't remember those fax numbers.

Q. Email addresses, up until January of 2011 --

Well, let me ask you this: Did your email address change when your employment changed?

A. My primary email address did not.

Q. What is your primary email address?

A. Sharpemd@aol.com.

Q. Is there a secondary email address you have used during this time period?

A. Not for anything related to this.

Q. Do you know a gentleman by the name of -- he's a physician, Dr. Dale Butler?

A. I don't recall a Dale Butler.

Q. That name does not sound familiar to you?

A. It does not.

MR. MAURICE: I have no further questions for you at this time.

MR. CHABRAJA: I don't have anything for you.

MR. CRAWFORD: We're done.

THE REPORTER: What would you like for your transcript order?

MR. MAURICE: That's a good question. I certainly want a mini, and I would like an E-Tran.

THE REPORTER: And you want the Exhibits?

Page 88

MR. MAURICE: Yeah.

MR. CHABRAJA: I'll take the same.

MR. CRAWFORD: He'll waive.

THE REPORTER: Do you want a copy of the transcript?

MR. CRAWFORD: I don't need a copy of the transcript.

(Deposition Exhibits Nos. 31 and 32 were marked for identification.)

(Whereupon, the deposition concluded at approximately 12:52 p.m.)

(Signature waived.)

_____
KIPLING PITAMAKAN SHARPE, M.D.

* * * *

Page 89

23 (Pages 86 to 89)

A504586
**KIPLING PITAMAKAN SHARPE, M.D.**          AUGUST 24, 2011

STATE OF ARIZONA    )
                    ) SS.
COUNTY OF MARICOPA  )

BE IT KNOWN that the foregoing deposition of KIPLING PITAMAKAN SHARPE, M.D. was taken before me, LISA A. NANCE, RPR, CR, a Certified Reporter in and for the State of Arizona, on August 24, 2011; that the witness before testifying was duly sworn by me to testify to the whole truth; that the questions propounded to the witness and the answers of the witness thereto were taken down by me in shorthand and thereafter reduced to typewriting under my direction; that the reading and signing of the deposition was waived; that the foregoing 89 pages constitute a true and accurate transcript of all proceedings had upon the taking of said deposition, all done to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to any of the parties hereto, nor am I in any way interested in the outcome hereof.

DATED at Phoenix, Arizona, this 12th of September, 2011.

_____

LISA A. NANCE, RPR, CR (AZ)
Registered Professional Reporter
Certified Reporter
Certificate No. 50349

Page 90

24 (Page 90)

A504586
KIPLING PITAMAKAN SHARPE, M.D.          AUGUST 24, 2011

1

## A

**AAOS** 3:8,10,12,13,15,18 3:19 4:4,5,15,18,20,22 5:3 15:17 16:4,15,19 21:12 29:21 30:10,14 31:21 32:9 33:7,18,23 34:2,20 35:6,15 36:7 37:20 38:18,25 41:5,7 41:16,20 42:9 48:16 53:21 55:23 56:22 58:3 59:19 66:3,20 74:14 76:1,9,9,13 81:9,22 82:22 83:25
**AAOSB0000994** 40:25
**Aaron** 2:4 6:8 10:4
**Abacus** 6:2
**ability** 90:15
**able** 42:22 43:12,23
**about** 7:25 9:17 18:22 19:19 23:12 30:14 31:3 36:10,23 37:10,17 43:17 50:10 51:8 53:23 54:2 56:18 59:8,20 63:11 64:19 72:23 73:5 73:15 74:19,21,22,23 75:18 77:4,16 80:16 81:12 83:7 85:3
**Absolutely** 19:18
**Academy** 1:7 14:19,23 15:2,5,10,23 20:15 21:1 28:1 43:25 57:20 57:24 60:13 65:25 81:5
**accepted** 51:11
**access** 16:15
**accordance** 76:9
**According** 15:2
**Accordingly** 8:22
**accuracy** 64:1
**accurate** 90:13
**accurately** 10:19
**accusing** 63:9
**accustomed** 47:21
**acknowledge** 64:11,17 65:2
**acknowledged** 64:1
**across** 47:18
**act** 24:14 62:25
**acted** 21:20
**action** 19:3,23 20:5 22:9 83:2,19
**active** 13:5,7 19:10 27:25
**actual** 7:20 55:16 58:3 61:2 63:13 72:21
**actually** 12:23 41:20 59:1 59:19 78:12
**additional** 31:3 46:13,21 63:16
**address** 88:5,6,7,9
**addresses** 88:3
**administrative** 31:2
**admitted** 55:9
**advise** 75:25 81:6
**advised** 48:16 72:12 76:14
**advises** 41:20
**advising** 74:6
**aforementioned** 74:7
**after** 8:4 12:17,20 20:10 31:7 35:6 39:7 42:4

45:4 51:1 57:1 74:9 77:1 81:12 85:21
**afterwards** 61:4
**again** 9:10 59:23 67:10 69:1 73:10,11 79:4
**against** 17:4 18:5 20:12 20:15 21:13,16 22:3,6 22:9 23:10 24:17 25:18 27:8 81:5
**ago** 17:19 24:1
**agree** 15:25 16:1 24:8 26:24 32:15 40:14,15 62:18 71:2 84:9,19
**agreed** 8:1 21:22 22:18 22:21 23:9 24:13,15 56:11,14 57:1 60:2 62:7,11,25 67:7,11,22 68:16,22
**agreeing** 54:23 55:3
**agreement** 67:21
**agrees** 61:16,20
**ahead** 17:11 21:25 22:12 26:14 27:23 38:8 40:7 49:3 68:12 70:7
**allegation** 22:15
**allegations** 18:5 22:6 28:21 32:12 83:9
**alleging** 30:25 33:9
**allowed** 59:15,15
**allows** 9:18
**almost** 18:1 63:7
**along** 9:19 39:7 44:21 53:16
**already** 39:8 41:4 44:25 62:22 63:8
**alter** 10:22
**although** 9:7
**always** 12:3 51:21 68:13 73:19 86:20
**amaurice@woodseric...** 2:6
**amended** 17:3,5 18:5 21:20 22:9 68:24
**American** 1:7,8 14:19,20 14:23 15:19 20:15 21:1 28:1 60:12 75:25
**amongst** 18:19
**amount** 16:23
**and/or** 34:10
**angry** 18:6,8
**annual** 16:12,18 42:9
**another** 9:24 19:5 26:19 32:3 78:6
**answer** 5:24 9:16 10:1,7 10:8 19:17 30:6 37:1 60:22 72:7 87:2
**answering** 9:23 27:21
**answers** 10:15 90:9
**anticipation** 71:10,20
**anybody** 14:10,14 36:7 36:10,13 37:8 41:7 74:19 75:9 77:1 80:14 84:6
**anything** 11:4,7,12 47:7 52:3 61:4 80:18 88:11 88:19
**apologize** 33:5
**apologized** 63:9
**apparent** 33:8

**appeal** 4:15 25:8,14 57:9 58:9,22 59:5 60:14
**appealed** 57:14
**appear** 9:2,8
**appearance** 82:14
**APPEARANCES** 2:1
**appears** 78:22 84:13
**appraised** 19:13
**appropriate** 18:8,9,10 24:8 55:1
**approximately** 15:7 27:5 30:13 67:23 89:11
**April** 66:13 81:15 82:1
**argued** 51:21
**argument** 26:11,17,18,23
**argumentative** 63:22
**arguments** 26:6
**Arizona** 1:13 2:20 5:5 6:4 6:5,16 7:1 12:24 13:3 16:3 25:7 90:1,6,19
**around** 25:2 29:24 30:7 43:14 58:24
**asked** 15:21 48:20
**asking** 9:16 10:15 29:15 36:17,20 64:19 74:18
**assert** 17:3 22:9
**asserting** 21:13
**assertions** 22:3
**assessment** 40:16
**assist** 36:13
**assistant** 55:18
**assisted** 36:19 37:3
**Association** 1:8 13:15 14:20 15:3,19 76:1
**assume** 35:2
**ATKINSON-BAKER** 1:15
**Attach** 28:18
**attached** 21:6 31:12 48:8 66:2
**attachments** 66:5
**attend** 41:18 42:23 43:19 43:23 69:18 70:23 72:14 78:2
**attendance** 70:15 73:16
**attended** 16:13 44:21
**attending** 61:11
**attorney** 19:12 20:6 36:20,21 37:5,25 38:2 38:4 47:7 58:17,18 10:24 18:19
**attorney's** 19:23
**audible** 8:24 9:8
**August** 1:13 6:2 7:1 90:6
**availability** 45:7
**available** 23:11 37:19 45:9 55:6 61:22 62:10 67:20
**Avenue** 2:19 6:16
**avoid** 17:2
**aware** 14:15 26:25 81:16
**away** 11:11 78:8
**AZ** 1:22 90:23
**a.m** 1:14 6:2 7:2
**A504586** 1:24

## B

**back** 16:25 21:5 27:11 28:14,24 29:3,5 30:2

32:14 36:11 38:14 39:5 50:17 51:1 52:4 53:12 55:13 56:12 57:17 60:1 67:10,17 69:24 76:21 79:18,24,25 80:2,4 85:1
**background** 11:16
**Bar** 5:5 20:12 21:15 24:16 25:3,17 26:4,7,7 26:25 27:3 45:1,2
**Barbara** 11:18,19,23
**base** 26:8
**baseball** 44:4,6,10
**based** 16:21 17:25 21:17 22:7,20 23:8 24:9,10 33:7 34:18 54:23 55:5 62:10 68:17 79:15
**basically** 79:13
**basis** 16:18 19:22 54:18 54:25 87:24
**Bates** 21:3,7 28:15 31:15 40:25 45:12 61:20 78:11
**bcrawford@crawford-...** 2:20
**beating** 84:23 85:2
**became** 13:15
**become** 23:19
**before** 6:4 7:19,23 8:14 9:23,25 10:14 11:17 27:15 32:14 36:1 37:15 38:15 60:20,25 61:24 62:6 63:11 67:25 80:3 90:4,6
**began** 6:2
**beginning** 23:3 71:24 86:22
**begins** 78:13
**behalf** 22:22 23:19 60:3 62:25 77:16
**being** 14:13,15 23:21 47:21 48:3 49:4 60:2 73:16
**belief** 24:11 29:16 50:19
**believe** 14:21,21 17:16 17:19 22:15 23:7,17,18 25:19 26:5 27:2 28:10 29:3 33:3 35:20 40:2 40:20,22 42:16 45:23 46:7 49:16 50:8 52:7 53:10,12,16 57:16 60:16 62:2 63:18 64:24 65:13 66:18 68:14,25 72:9,15,15 75:4 82:17 83:20,23 87:12
**believed** 32:22 51:9 52:13 59:24 64:8
**belong** 15:19
**below** 23:21 56:22
**benefit** 16:12
**benefits** 16:2,21
**best** 48:14 90:14
**between** 38:17 57:24 76:14 81:18 85:9 86:1 86:13 87:19,24
**binder** 20:18 49:21
**biology** 12:6
**bit** 30:7 36:11
**blame** 44:14

**block** 42:4
**blue** 17:12
**board** 69:16 70:23 71:20 72:12 73:5,10,15 74:7 74:9 75:10,25 76:15,23 77:12 78:1,2,25 79:12 79:15
**board's** 71:10 74:6
**body** 11:10
**bold** 28:17
**Bone** 12:22
**Boston** 24:1
**both** 14:21 15:2 45:5 51:7 56:3 67:19
**bother** 52:14 53:19 54:16 54:22
**bothered** 20:4
**Boulevard** 1:16
**bound** 3:11,14,16,18,22 4:8,10 5:4,13,15
**Bradner's** 68:14
**Brand** 1:16
**Brandner** 1:4 4:4,14,19 4:21,23 20:15 21:3,8 21:13,21 22:15,18 23:8 23:17,20 24:11 27:13 28:3,15 31:2,16 32:16 35:16,19 41:21 44:21 45:12,21 47:6,20 48:3 49:20,23 50:11,11,15 50:15,17 51:2,3,10 53:7,20 54:23 56:10,20 57:1,8,14 60:2 61:16 61:20,20 62:10,24 63:12,14 64:5 65:4 67:4,7,11,18,21,22 68:8 69:24 71:13 74:13 76:4,16 78:12,15 81:4 84:2
**Brandner's** 27:19 34:11 36:5,9 38:11,20 39:20 40:3,13 42:2,5 43:3 45:8 52:19 53:14 54:7 54:13 58:9,22 59:4 77:15
**break** 63:4,12 65:16
**brief** 11:16
**bring** 21:21 64:4
**brought** 20:5 23:20 67:24
**Bruce** 2:18 6:15
**bullet** 34:23 50:23 67:5
**bulletin** 81:23 82:3
**bulletins** 16:5 81:24
**bunch** 47:18
**business** 11:25 12:2
**Butler** 88:13,14
**by-laws** 15:2

## C

**C** 31:16 63:10
**calendar** 43:1,8
**California** 1:17 12:9,19
**call** 12:11 66:20
**Callaghan** 4:18,23
**called** 7:8 17:11 74:17
**calling** 33:6 86:10
**came** 27:17 43:11 68:7
**car** 86:25

A504586
KIPLING PITAMAKAN SHARPE, M.D.          AUGUST 24, 2011

2

care 23:21 44:4
carrier 85:18,24 86:6
carries 8:17
case 1:5 10:24 19:2,11
  19:14,21,24 20:7 21:21
  22:18 27:25,25 61:21
  62:7,8 67:25 80:9,11
  84:13
categories 46:21
causation 51:8 53:24
causes 22:9
Causey 5:6 20:12 21:16
  21:19 22:3,7 23:18
  24:13,17,21 25:17 26:4
  27:8 68:16 80:2,5,8
Causey's 45:1 84:24
caution 10:20
cc'd 60:18
CD 5:16 7:24 8:2
cell 86:12,12,15,18
Center 12:20
certain 7:21 9:7 17:16
  45:7 58:11,18
certainly 18:11 35:25
  60:24 88:23
Certificate 1:23 6:5
  90:24
certified 1:23 6:4 7:9
  90:5,24
CERTIFY 90:16
Chabraja 2:11 3:4 6:12
  8:6 63:23 64:2 88:19
  89:2
chance 85:17,19
change 85:12 88:5
changed 57:2 68:1 85:11
  85:13 86:1,13 87:19
  88:5
changes 10:16,18,21,22
characterization 62:19
  64:1 84:19
chemistry 12:6
Chicago 2:12 6:13 18:19
  44:13 76:5 78:9 83:2
chose 15:10 77:12
circumstances 73:16
Civil 6:6
claim 17:4 45:8
claims 20:6 55:5
clarification 15:1,4 67:20
clarifies 73:25
clarify 9:4,11 58:15
Clark 5:7,8
clear 22:6 40:18 42:12
  44:24 55:14,21 56:6
clearly 51:22
clients 24:8
close 34:25 63:19 76:2
closure 76:22,24
collected 13:19 14:3
College 11:23
combined 12:18
come 32:3 43:8 48:23
  73:22
comes 16:8 22:5
coming 49:1 67:10 72:17
commented 10:23
commenting 58:19
comments 10:25

committee 3:18 4:5,15
  14:8 22:16 23:4 29:1,9
  33:6 41:17 42:8 43:20
  45:23 46:8,16 50:18,20
  53:4 56:17 57:10 59:2
  59:16 61:10 62:17
  63:15,19 64:9,25 65:14
  66:1,7,12,17 67:19
  72:18
Committee's 59:21
common 9:15 85:20,20
communication 36:20
  53:17 76:13
communications 19:12
  36:16,18 82:15,22
  83:24
compared 78:20
complainant 25:7,11
complained 59:8 77:16
complaint 13:22,23,25
  17:3,5,8,21,23 18:2,5
  20:12 21:16,21 22:9
  24:17,22 25:3,18 27:1
  27:8 28:4 35:17 45:1
  46:10,11 54:23 68:24
  79:25 83:1,10
complaints 59:8
complete 28:18 32:10,19
completely 56:9,20
  59:25
compliance 3:8,12 20:25
  28:9 29:6,17 31:6,13
  32:2 33:1 36:4 39:18
  41:17
complied 29:10 32:23
comprised 15:14
concentrate 11:12
conclude 71:25
concluded 89:10
conclusion 79:15
conclusions 26:8 51:1
condemned 51:10
condition 52:20 53:1
conducted 66:1
confidential 3:10,14,16
  3:18,21 4:7,9 5:4,13,15
  86:9
conflict 42:22,24 43:1,6
  43:9 69:21,22 78:6
conflicts 44:9
confused 64:3
confusing 14:25
Congressional 47:19
connection 81:17
consent 22:10 23:22
  42:13 51:5,12 55:6,8
  69:12
consented 51:25
consideration 31:21
  32:9 54:19 59:21,24
  71:10,21
constitute 71:9,19 90:12
contact 38:18,23,25 39:9
  41:7 81:18
contacted 23:18 48:16
  82:6
contain 73:14
contesting 81:5
context 9:1,14

CONTINUED 4:1,2 5:1,1
conversation 27:21
conversations 84:5
COP 14:4 15:22 39:8
  43:17 44:20 48:4,9,13
  49:8,12 51:5,9 52:12
  53:3,21 54:6,10,11,17
  57:14 64:4,23 65:3
  69:6
copied 5:17,19 8:4
copies 28:18 32:10,19
copy 24:21 31:5 48:4
  61:2 72:21 83:1 89:4,6
correct 8:14 12:25 19:6
  20:2,16,17 21:10,11,13
  21:14,23 22:1,10,13
  25:12 28:7 32:3,12,24
  32:25 33:2,20 34:18,19
  34:21,22 35:19 37:7
  39:25 40:19 41:5 42:14
  42:15 43:20 45:2,17
  46:3,22 47:22 50:7
  51:17 52:1,9,10 54:10
  54:15 57:25 59:5 60:15
  61:18 62:1 63:2,3,20
  64:17 65:1 67:15,16
  68:24 69:3,4,6,18,19
  70:10 73:17,18 75:16
  78:3 79:16 80:1 81:10
  82:4,5 85:25 87:16
correctly 14:24 24:9
  38:15 39:15
correspondence 31:21
  57:23 84:3
costs 16:18
counsel 7:23 21:20 25:4
  27:21 31:22 36:16,18
  36:18 40:6 68:7 73:9
  83:25
County 11:19 12:19 90:2
couple 16:8 88:1
course 39:2
courses 16:11
court 1:1,16 7:9 8:1,10
  8:17,20 25:7 34:11
  38:5,10 81:7
co-organizations 14:22
CR 1:22 6:4 90:5,23
Crawford 2:18,18 3:5 4:9
  4:11 5:14,17,20 6:15
  6:15 8:5,7,22 14:10
  19:16 21:24 22:11,16
  22:23 23:2 26:12,21
  27:20,23 29:23 30:4
  32:13 33:11 36:15,23
  37:1,6,14 38:6,9,21
  39:11,13 40:5 44:17
  45:16,18 47:13 49:2
  50:1,4 51:18 52:21
  54:9,21 55:20 56:24
  58:5,7,10,13,16,25
  60:4,12,18,22 61:13,16
  61:17 62:16 63:21
  64:13,18 65:8 67:22
  68:11,14,19 70:9 72:6
  72:9 73:1,4,7 74:17
  75:3,11 77:3,7,10 79:3
  80:18,22 83:6,10,12,16
  84:20,22 86:8 88:20

  89:3,6
Crawford's 58:1 62:18
  72:22
creates 9:21
credibility 10:25
crisis 11:10
critical 62:12
cross 59:12
cross-examination
  63:22,24 84:23
cross-examined 85:4
Cubs 44:13
curious 68:13
current 16:8
currently 13:2
c/o 5:17,20

_____ D _____

D 2:18 6:15
Dale 88:13,14
damage 34:12
date 30:9 43:17,24 57:11
  73:2,4 78:8,21 79:3
dated 29:20 30:24 33:24
  35:1 46:19 48:2 57:18
  90:19
dates 32:6 34:3
day 22:17 43:15,19 56:4
  62:9
days 25:8 35:24 38:16
  48:23 57:18
dealing 11:9
dealt 23:25
December 35:6 46:19
  48:2,6,15,24 49:14
  52:18 76:4 82:2
decide 58:25
decided 72:18,20 76:15
  81:10
decision 25:8 48:13 49:7
  56:12,21 66:2,16,21
  70:25 71:3 72:17 74:7
  81:5 82:2
dedicated 86:25
defend 20:7
defendant 67:25
defendants 1:9 2:10 5:11
  6:11
defense 19:11,14,24
  25:17
definition 58:12
degree 11:24 12:1,4
deponent 2:17 6:14
depos 60:1 67:11
deposed 8:13 14:13,15
  56:3 69:3 84:16
deposition 1:12 5:7,8 6:1
  7:4,20,23 8:2,3 9:1,14
  9:20 10:13 11:4 13:18
  14:11 21:18 22:19,20
  23:8,16 24:10 25:21
  29:2 34:20 41:5 45:7
  47:5 49:19 50:10,13
  51:6,14,15,21 52:14
  53:22,25 54:13,17,20
  55:10,22 56:2,7,8,18
  59:13 64:24 68:15,15
  68:20,21 78:13 89:8,10
  90:3,11,14

depositions 22:7 26:9
  34:10,15,17 37:22 41:1
  45:23 46:7,10,25 47:1
  47:2,8 50:19 54:24,25
  55:9,16 56:13 61:23,25
  63:16,19 64:9 68:1
  84:12,14,18 85:6
derive 16:3
derived 53:14
described 23:2,4
DESCRIPTION 3:6 4:2
  5:2
detail 19:19 61:1
detailed 59:7
details 31:7 77:17
determination 39:7
determine 36:3 38:18
  39:19
different 12:4 33:22
  72:12 84:16,25 87:13
difficult 43:25 44:2
difficulty 44:3
digit 87:9
digital 33:24
Dinowitz 47:2
direct 77:21
direction 90:11
directly 57:24 58:13
directors 69:16 71:21
  73:5 74:7,9 75:25
  76:15,23 78:1,3,25
disability 52:20,25
disagree 23:4,6 46:4
disagreed 18:1 61:4
disclosure 5:12 34:24
discovery 19:4
discrepancies 85:4
discuss 14:13
discussed 46:1 61:1
  62:5,22 69:9 75:9,14
discussing 31:17 39:1
discussion 11:17 29:8
  29:12 34:12 45:10 51:2
discussions 40:6
dismissal 24:22 25:9
dismissed 24:19 25:4
  27:1,3,8 45:1
Disorders 12:22
dispute 30:19 68:6,12
distance 85:18,23 86:6
DISTRICT 1:1,1
Division 1:2 13:5,10,15
doctor 12:5 58:4 80:18
document 17:9 20:20,21
  33:15 35:11 39:16
  41:12 47:23 57:5,19
  60:8,20 61:7 65:21
  69:14 74:1,3 75:22
  77:24 79:8 80:24 81:1
documentation 33:23
  37:18 38:1
documenting 34:10
documents 5:16 7:21,24
  8:3,4 28:11,19 32:10
  32:19 33:7 46:21 58:19
  66:4 83:6
dog 11:11
doing 20:7
done 9:17,23 45:15 60:1

A504586
KIPLING PITAMAKAN SHARPE, M.D.          AUGUST 24, 2011

3

63:7 88:20 90:14
**down** 8:20 41:19 50:23
   70:7 90:9
**downloaded** 28:10
**downloading** 28:11
**Dr** 3:10,14,16,17,20 5:3
   5:16,17,19,19 7:19
   8:13 15:21 18:18 20:15
   21:13,21 22:15,18 23:8
   23:17,20 24:11 27:19
   28:3,6 34:11 35:16,19
   36:5,9 37:12 38:11,20
   39:20 40:3,13 41:21
   42:2,5 43:3 44:21 45:8
   47:2,4,6,20 48:3 51:3
   51:10 52:19 53:7,14,20
   54:7,13,23 56:10,20
   57:1,8,14 58:1,9,22
   59:4 60:2 61:16,20,23
   61:24 62:4,8,9,10,12
   62:24 63:14 64:5 65:4
   65:19 67:7,11,21,22,23
   67:24 68:8,14 71:9,19
   73:15 74:13,21,22 75:4
   76:16 77:4,15 80:9,16
   81:4 88:13
**draft** 40:22
**drafting** 36:21 37:3 38:17
   39:16
**drink** 39:11
**Drive** 2:5 6:9
**drop** 51:9 53:24
**dropped** 51:25 69:11
**Drs** 4:4,14,18,20,23
**duces** 7:21
**duly** 7:8 90:7
**during** 37:24 38:24 39:2
   43:13 68:20 85:5 86:20
   88:10

─────── **E** ───────

**E** 5:5 7:18
**each** 31:18
**early** 19:1 48:24 79:25
**East** 2:19 6:15
**EASTERN** 1:2
**economics** 11:25 12:2
**educational** 16:7,11,16
**effect** 73:22
**effectively** 85:3
**effects** 11:5
**either** 11:6 49:25 54:20
   87:14
**elsewhere** 11:11
**email** 3:21 42:21 48:20
   70:18,19,21 72:4,12,19
   73:21 82:7,17 88:3,4,6
   88:7,9
**emails** 39:3
**emotions** 79:19 82:20
**employment** 88:5
**Enclosed** 31:5
**enclosing** 48:3
**encourage** 10:18
**encouraged** 28:4
**end** 10:12 12:2
**ended** 12:23
**enough** 18:12,13 20:7,8
   22:22 82:1

**Erickson** 2:4 6:8
**especially** 22:10
**ESQ** 2:4,11,18
**essentially** 21:16 33:6
   79:1
**established** 51:22 69:9
**evaluation** 68:18
**even** 11:17 52:12 80:2
**event** 26:24
**events** 47:17
**eventually** 60:24
**ever** 18:15 25:16 35:5
   41:7 61:24 77:20 83:1
   83:24
**every** 16:8 46:13
**everybody** 24:6
**everything** 8:21 9:22,24
   17:25 18:1 47:6
**evidence** 28:19 32:11,20
**exact** 43:24
**exactly** 15:9 51:21 62:21
**EXAMINATION** 3:3 7:12
**examined** 7:9
**excellent** 84:22
**excerpts** 5:9,10 55:15,19
**exchange** 29:8 45:21
**exclude** 27:20 36:15 40:6
**Executive** 6:2
**exercised** 57:9
**Exhibit** 3:8,10,12,13,15
   3:17,19,21,23 4:3,5,7,9
   4:11,12,13,15,17,18,20
   4:21,22 5:3,5,7,8,9,10
   5:11,14,16,18 8:2,3
   20:20,22 21:3 24:20
   27:11,12,13 29:4,5,19
   30:2,3,15 31:12,15
   32:16 33:2,10,14,16
   35:8,10,12,22,22 36:1
   36:3 37:18 38:14,16,17
   38:18 39:17 40:1,18,24
   41:11,13 42:16,18
   44:19 45:12 46:20
   47:24 48:9 49:10 55:13
   55:21,24 56:1 57:3,17
   57:18 60:6,9 61:8
   65:20,22 66:6,15 67:1
   67:4,17 69:15 74:2
   75:17 77:25 79:6,9
   80:25 81:13
**Exhibits** 3:6 4:2 5:1 7:4
   55:14 68:15,21 88:25
   89:8
**exist** 47:9
**existed** 22:19
**expected** 49:5
**experience** 18:24
**expert** 21:22 22:18,22
   23:9 24:14 27:24 31:1
   55:5 56:11,23 60:3
   61:21 62:7,11,25 67:8
   67:12,22,23 68:16,22
**explain** 73:22
**explaining** 73:15
**extensive** 63:22,24
**E-Tran** 88:24

─────── **F** ───────

**facie** 39:7,10

**facsimile** 87:23
**fact** 14:13 17:4 20:4
   52:12 54:2 58:13 62:4
   64:4,11 81:16 84:23
**fair** 18:12,13 20:7,8
   22:22 27:9 40:15,17
**falls** 51:10
**familiar** 24:24 28:2 88:15
**family** 78:6
**far** 16:9
**fax** 87:4,7,17,21 88:1,2
**February** 25:2 26:25 27:2
   27:3,5
**feel** 10:16 52:10 76:20
   79:19
**feeling** 24:23 47:17
**Feelings** 76:21
**fell** 56:22
**fellowship** 12:21,24
**felt** 28:2 40:9 76:22
**few** 13:20 14:1 66:21
**field** 16:16
**filed** 20:11 25:18 31:7
   46:10 81:4,16 83:2,18
**files** 38:3
**films** 34:3,4
**final** 76:23
**finalized** 60:21
**finally** 76:22,24
**find** 29:3 38:10 59:17
   71:15 77:18
**finding** 51:2,16 54:18
**fine** 12:12
**finish** 9:25
**first** 5:12 7:8 13:8 19:2
   26:8 33:23 48:21 56:11
   69:16,23 71:13 74:9
   75:10 76:8,14 80:2,4,6
   85:14
**five-year** 12:18
**flabbergasted** 18:10,11
**Floor** 1:17
**fly** 43:14,14
**folks** 75:14
**follow** 8:22
**following** 6:18 12:24
   42:6,7 45:15 58:5,8,21
   74:7 82:23
**follows** 7:10
**follow-up** 73:3
**foot** 15:17 51:8,25 53:24
   69:11
**foregoing** 90:3,12
**form** 21:24 22:11,23
   26:12 28:9 32:13 47:13
   49:2 52:21 54:21 56:24
   58:10 60:4 62:12 64:13
   84:20
**format** 33:24
**formed** 14:24
**forms** 19:22
**formulate** 11:7
**forthcoming** 31:4
**forward** 11:4 18:25 35:3
   37:19 55:2,4 58:14
**forwarded** 68:18
**found** 51:3,6 53:21
**foundation** 26:13 27:16
   38:21 49:2 51:18 52:21

58:10 64:13 65:8 75:3
   75:11 84:20
**four** 45:22 51:4,17 63:8
   70:2,11 81:12
**four-inch** 7:25
**fracture** 23:23
**frame** 59:14 68:4,21
   86:22
**from** 3:10,13,15,17,19,21
   4:3,7,9,11,13,18,20,22
   5:3,5,14 9:3 11:23
   12:13 14:4,7 16:3
   22:17,20 23:3,8 29:21
   30:14 32:5 34:25 35:5
   35:15,18 37:20 38:1,4
   41:16 42:6 44:20 45:14
   47:1,2,17,18 48:16
   49:7,11 50:9,10,14
   51:15,19,22 53:14,21
   54:18 55:5,16 57:20
   62:9 65:25 66:20 67:6
   67:14 69:15 70:11
   73:16 74:13 76:8 77:25
   81:9 84:3,12 87:7,13
**front** 20:18 29:9,19 30:2
   55:19 57:9 59:2 61:9
**fumble** 8:10
**further** 39:6 41:19 88:17
   90:16

─────── **G** ───────

**G** 7:18 31:2
**Galleria** 2:5 6:9
**gave** 22:8 79:3
**general** 29:12 31:22 73:9
**generally** 51:11
**generic** 9:9
**gentleman** 88:12
**getting** 31:25 40:12
   43:16 59:20 66:19
**Giulietti** 3:21 39:3 42:21
   48:20 49:7 78:13 81:19
   82:6,16 84:4
**Giulietti's** 82:9
**give** 10:7 11:4 62:11
   84:14
**given** 41:1 51:5 77:17
**giving** 10:15 43:24
**glean** 77:18
**Glendale** 1:17
**go** 11:4,20 12:3,8 18:25
   19:18 21:5,25 22:12
   24:3,4 26:14 27:23
   28:24 29:5 32:14 36:2
   36:11 38:8 40:7 43:9
   49:3 51:1 59:20 60:17
   68:12 70:7 71:13 72:19
   80:16 82:20
**goes** 30:14 78:14,17
   79:24 80:2
**going** 8:1,5 10:8,12 12:2
   17:1 19:18 23:25 29:20
   30:19 39:5 42:13 45:13
   53:20 58:25 66:21
   72:10 73:22 76:17 77:2
   84:9 86:8
**good** 15:1,4 16:22 39:12
   47:15 88:23
**Goodman** 15:22 18:18

47:4
**Gotcha** 79:2 82:11
**grabbed** 54:17
**graduate** 12:13
**graduated** 11:23 12:15
**granting** 83:21
**great** 9:19 52:23
**grew** 11:18
**grievance** 3:9,12,18 4:5
   4:15 13:23,25 20:14,14
   20:25 21:10,13 22:17
   23:3 27:18 28:9,12
   29:6,11,17,18 30:10,24
   31:3,6,13,18 32:1,2,7
   32:22,24 33:2 34:18
   35:7 36:2,4,12,14,21
   36:24,25 37:4 39:6,18
   40:4 46:18 56:10 62:8
   62:9,19 71:11,21 81:10
   82:23 83:25 84:1
**grievances** 31:7 59:8
**gripes** 59:8
**group** 13:4,13 15:17
**groups** 33:22
**grueling** 74:24
**guess** 12:15 16:12 27:15
   36:11 38:16 58:15
   64:19 75:21 76:21 77:7
   85:8,20
**guys** 49:23

─────── **H** ───────

**H** 7:18
**half** 26:19 50:10 63:17
**hallway** 9:20
**hand** 15:18
**handing** 86:11
**happen** 85:17
**happened** 17:25
**happening** 16:6 17:12
**happy** 18:6,8,12
**hard** 44:5 61:2
**harm** 59:25
**having** 7:8 38:25 48:19
   82:15
**head** 8:25
**heading** 28:17 67:18
**hear** 9:2,9
**heard** 28:25 48:19 76:8
**hearing** 3:23 4:6,12,15
   4:17,21 14:4,8 15:22
   22:17 29:1 33:6 41:21
   42:2,6,13 43:3,12,17
   43:20 44:20,25 47:19
   48:4,9,13,17,23 49:8
   49:12 52:12,24 53:3,4
   53:21 54:6,11,17 60:14
   61:11 64:5,23,25 65:3
   69:6 73:4,5,21 75:10
**help** 38:6 72:6
**Henderson** 2:6 6:9
**her** 39:9 70:17
**hereof** 90:18
**hereto** 90:17
**He'll** 89:3
**him** 23:12 25:18 26:18
   29:25 55:3,6 61:1,22
   64:19 68:18 70:9 73:16
   80:19,20 86:10

A504586
KIPLING PITAMAKAN SHARPE, M.D.          AUGUST 24, 2011

4

himself 70:9
Hip 15:19
home 86:1,8
hope 20:18
horrible 55:23
host 16:12
hour 8:11
house 87:17
housekeeping 7:19
huh-uh 9:8

**I**
idea 27:17 77:11
identical 78:22
identification 7:5 20:22
33:16 35:12 39:17
41:13 47:24 60:9 61:8
65:22 69:15 74:2 77:25
79:9 80:25 89:9
identifies 33:22
identifying 17:2
Illinois 1:1 2:12 6:13
44:22 69:17 76:2,5
impossible 11:6
impression 73:19
INC 1:15
include 66:4
included 25:20 26:10
52:12
income 53:14
INDEX 3:1 4:1 5:1
indicating 42:21 49:7
57:21
information 5:22 10:6
17:2 31:3 38:3,4 46:13
52:25 55:6 62:10 77:19
77:21
informed 22:10 23:21
51:5,12
informing 41:16
injunction 81:6 83:18,22
injury 51:24 62:5
inquiring 81:19
inquiry 82:13
instance 25:11
instances 50:14
Institute 12:21
INSTRUCTED 5:24
instructions 46:11
intention 12:3 70:23
intentionally 63:9
interaction 58:2
interested 90:17
interject 47:8,11 63:18
interjected 64:8 65:12
international 44:2
internship 12:18
investigated 24:18 25:3
investigation 57:15
involved 23:19 58:13
involvement 58:1 80:6
involving 67:23
irregularities 77:16
irrelevant 56:9,20 59:25
67:11
Irvine 11:22
issue 23:14,22 44:7 69:1
issued 81:7
issues 23:1,20

italics 28:18 32:18,24
items 23:11,16

**J**
J 1:4 4:18 5:14
January 21:19 22:7,20
23:9,16 34:17 41:2
51:15,22 54:12 57:11
58:2,19,24 61:25 67:14
84:15 85:1,5,13,14,15
85:21 87:4,7 88:3
job 1:24 55:23 84:23
John 4:18
join 14:17 15:10,13
joined 14:22 15:5,13,23
joint 12:21,22 15:18
joke 18:19
Judicially 66:12
Judiciary 4:15 14:7
22:16 23:4 28:25 29:1
29:9 33:5 43:19 53:3
56:17 57:9 59:2,16,21
61:10 62:17 66:1,7,16
67:19
July 33:25 35:1
jumping 29:24 30:6,8
June 20:11 56:9 59:24
67:11 73:6,8,13 76:10
76:14 84:16
jury 20:10 24:6
just 9:11 11:12 12:4 14:2
17:1,12 19:16 22:4,5
23:15 25:24 26:8 30:6
39:14 40:9,18 45:13,15
51:20 55:12,14 60:22
68:13,19 69:23 70:7
72:20 73:25 75:14
81:13

**K**
K 7:18,18
keep 29:23 31:8 86:8
key 51:16
Kim 5:8
kind 11:9 16:8 19:4,22
22:4 66:5 74:24
Kipling 1:12 3:2 6:1 7:7
71:9,19 89:15 90:4
Kline 2:18 6:15
Knee 15:20
knew 46:2,24 48:21
72:16
know 11:5,11 15:16
16:18 17:25 18:19 20:6
25:25 27:5,7 36:19,22
38:1,9 39:23 43:5,12
43:13 44:3 45:1 46:1
47:8,14 48:23 52:22
53:2,11 60:25 61:1
68:7,11 69:23 77:20
83:15 84:2 85:17,23
86:6,17 88:12
knowing 40:8 82:1
Knowledge 16:7
KNOWN 90:3

**L**
L 7:18

LA 12:19
lacks 26:13 38:21 51:18
65:8 75:3,11
LaSalle 2:12 6:13
last 13:15 15:22 30:1
44:18 60:17 67:6 72:19
87:9
late 25:2 48:22 49:1
66:13 79:25
later 30:14 35:24 49:4
57:18 67:25 75:18
law 8:17
lawsuit 81:5,10 83:7
lawyer 57:20
lawyers 18:20 80:6
lay 27:16
leading 61:15
learned 17:4 48:12 57:14
66:16 74:12 77:1
least 18:6 22:5 24:7
33:10 43:19 44:17
49:21 58:2
led 40:1 65:2
left 8:20
legal 17:9 83:25
less 87:2,2
let 26:12 28:24 40:1
52:17 78:10 88:4
letter 3:10,13,15,17,19
4:3,7,9,11,13,18,20,22
5:3,5,14 21:5 24:18,21
24:23,24 25:1,9 29:20
30:14,17,20 33:18 34:5
34:6,11 35:5,15 39:10
41:16,20,25 42:12,17
46:19 47:25 48:2,12
50:5 57:11,13,17 58:2
58:12,20 60:12 66:15
70:18,20 72:3,9,11,12
72:16 73:2 74:6,12,16
75:18,19,24 76:10,16
76:19 79:1,14,14 80:13
81:12,13,15 82:10,12
82:16,19,23
letterhead 72:23
letters 39:1
let's 22:5 65:16 85:14
level 54:11
liar 33:6
life 9:18 80:19
like 7:24 10:14 11:4,7,12
15:11,17 16:14,15
30:10,13 33:23 43:19
47:18 58:16,17 66:19
66:23 76:22 85:2 88:21
88:24
likely 70:20
limit 45:6
line 45:14,14,16 53:16
61:17 62:21 63:13 70:2
70:7,11 71:4,8,17,18
78:13,22 84:18
lines 45:22 88:1
Lisa 1:22 6:4 90:4,23
listen 30:5
litigation 18:25 24:5
81:16
little 9:19 11:17 14:25
30:7 36:11 41:19 47:19

47:20
livable 9:18
LLP 2:4 6:8
Lompoc 11:19
long 13:7 17:19 74:24
79:22,23 85:17,23 86:6
look 24:24 26:10 29:19
45:15 49:17 66:6 70:8
71:17
looked 14:1 37:14 61:3
67:13 79:14 84:11
looking 48:24 50:5,9
80:8
looks 7:24 24:23 30:10
30:13 47:18 78:22
lost 71:12
lot 16:10 19:19 23:25
43:22,22 47:2
lovely 78:9
lug 55:16

**M**
M 7:18
made 18:5 22:6 23:17
39:8 42:12 45:5,9 46:2
46:16,24 50:20 56:11
56:20 59:7 64:10 71:2
72:17 82:2
mailing 38:17
main 16:11,14 26:6 62:20
major 44:6
make 8:2,2 10:16,18 22:6
23:12 40:18 55:18 56:6
makes 9:18 11:5,10 32:5
making 19:14 25:2 26:18
malpractice 17:3 18:16
18:21,22,24
mandatory 56:22
many 43:8 47:1
March 27:5 33:25
MARICOPA 90:2
marked 3:6,10,14,16,18
3:21 4:2,7,9 5:2,3,12
5:14 7:4 20:21 33:16
35:12 39:16 41:12
47:23 60:9 61:7 65:22
66:15 69:14 74:1 77:24
79:9 80:24 89:8
material 31:20 32:8
35:16
materially 10:22
materials 16:7,11,16
24:13 25:16,20 31:21
33:19 34:25 35:7 37:19
37:23 55:20
Mathews 80:9
matter 7:19 19:20 22:5
58:8 76:3 77:2,12
81:17 84:7
Matthew 5:5
Maurice 2:4,4 3:4 6:8,9
7:14 8:9,13 19:18,21
20:1 22:2,14,25 26:17
26:24 28:6 30:1,8,9
32:16 33:13 36:17,25
37:3 38:8,13,14,24
39:15 40:11 44:19
45:17,20 47:16 49:6
50:6 51:20 53:2 54:10

55:11,21 57:3 58:15
60:6 61:3,18,19 64:22
65:12,16,19 68:12,17
68:23 70:10,11 72:8,10
73:2,6,13 75:6,13
77:11 79:5,6 80:23
83:14 84:22 86:10,12
88:17,23 89:1
may 9:2 10:25 13:15
16:23 19:3 25:7,24
26:22 28:15 75:13 85:9
86:2,13,13 87:7,19,24
maybe 17:8 22:4 52:4
58:18 59:12
McGregor 5:5
McGuireWoods 84:6
mchabraja@vedderpri...
2:13
MD 4:18 5:14
mean 13:23 20:1 23:7
27:2 43:16 46:6 51:20
62:21 67:3 80:5
means 48:12 57:13
58:12 66:15 74:12
meat 7:20
medical 12:2,3,7,8,19
24:10 31:20 32:9 61:22
67:14
medical-legal 53:15
medication 11:5
Medicine 12:10
meet 14:10
meeting 16:12 41:17,22
42:7,7,9 43:18 66:1
69:16,18 70:23 74:8,10
76:2,4,15 78:1,3,25
79:12,16 80:2,5
meetings 69:22
member 14:18,21 15:3,3
15:22 16:15,19
membership 16:3
mentioned 74:25
Mesa 13:3
met 68:15
Mezona 5:11 13:10,12,14
88:1
Michael 2:11 6:12
might 44:7 77:5 87:24
mind 11:11 12:11 16:22
52:4 59:12 79:24
mini 88:24
minute 72:19
missed 78:9
missing 34:25 47:5
49:21,22 64:7 65:5,7
mistaken 29:16
misunderstood 54:9
money 16:23
monitor 19:23
months 67:25 75:18
81:12
more 9:18 44:2 59:1
70:20 72:19 83:12
morning 78:10
most 16:16 35:25
mother 17:2 19:22 21:19
22:8 25:22 34:10,21
41:2,9 51:7,23 53:23
54:13 61:24 63:2 69:2

ATKINSON-BAKER, INC.                    1-800-288-3376

A504586
KIPLING PITAMAKAN SHARPE, M.D.          AUGUST 24, 2011

69:11 84:14
mother's 26:9 49:18
  50:13 56:1,8
motion 83:17
move 9:19 42:2 44:1,5
moved 43:3 55:2,4
moving 43:17 44:3
much 78:22
Murry 15:21
must 8:24 31:21 35:3
M.D 1:4,12 3:2 6:1 7:7
  31:2 89:15 90:4

**N**

N 7:18,18 13:5
name 7:16 13:4 14:24
  55:24 88:12,15
Nance 1:22 6:4 90:5,23
nature 10:22
necessary 10:6,17,19
need 8:22 27:20 30:5
  33:12 36:15 37:20 40:9
  79:4 89:6
needed 26:10
nerve 34:12 51:24,24
  62:5 69:10
Nevada 2:6 6:10
never 21:19,22 22:8,21
  23:9 24:13 53:25 54:2
  55:2,3 56:10 62:24
  67:7 72:21 77:17
new 31:5,17 42:9 43:18
  60:15 61:9 62:6 85:24
next 8:9,11 25:6 35:22
  41:22 47:4 50:2 75:1
night 43:21
nine 45:14,16
nitty-gritty 24:4
nobody 17:11 37:14
  48:15
Nods 8:24
None 5:23,25
Normally 12:5
North 1:16 2:12 6:3,13
NORTHERN 1:1
Nos 7:4 89:8
note 55:18 74:17
nothing 66:23
notice 58:22 59:5
notification 57:8 81:4
noting 63:23
November 29:20 73:11
number 6:5 21:3,7 28:15
  31:16 33:25 34:1 40:25
  45:12 51:3,4,16 61:20
  78:11 85:10,15,21 86:1
  86:9,12,13,15,25 87:4
  87:7,13,13,14,17,21
numbers 87:23 88:2

**O**

O 13:5
oath 8:16,16,18
object 21:24 22:11,23
  26:12 47:13 49:2 52:21
  54:21 56:24 58:10
  59:17,20,23 60:4 64:13
  84:20

objection 63:23 64:2
objections 26:21 42:5
objects 63:21
obligation 41:8
oblige 43:2
observed 47:17
obtain 37:20,23
obtained 28:8 37:24
obtaining 31:19 51:11
  69:12
obviously 36:15 40:5
  82:3
occasion 19:7,8
occasional 39:3
occasionally 16:13
occasions 19:10 46:1
occurred 38:17 45:4 56:8
  64:12,14 69:16,22
October 23:17 24:12
  30:11,23 41:18 44:25
  56:12,21 60:1 61:21
  62:24 67:12,24 68:4,8
  69:1
offer 47:12 67:8
offered 84:24
office 14:15 17:16 31:22
  48:24 59:20
often 81:24 82:1
Oh 35:23 50:2
okay 9:6 11:9,15,20 12:7
  12:13 18:14,18 19:3
  20:9 21:10 22:2,4,14
  23:13 24:2,16 25:24
  27:10,20,21 28:14 30:4
  30:13,22 31:25 33:4
  36:16 37:17 38:13 42:4
  45:11,18 46:5 50:4,25
  52:3 56:15 57:22 59:11
  62:3 63:6 66:10,19
  70:4 72:2 73:7 75:17
  75:24 77:10 78:19
  79:13,18 80:4 82:11,19
  83:13 84:5 85:8,14
old 18:19
one 9:9,23 15:3 16:12,14
  19:5,7 21:3 22:6,17
  23:11,21 26:6 29:2
  33:24 34:9 38:7 43:10
  43:19 44:9 45:20 51:3
  62:9 63:11 69:3,22,24
  70:18 74:25 75:4 78:8
  84:15 87:12
ones 14:2
online 28:10
only 18:20 19:7 22:1
  23:11,14 29:2 32:13
  42:12 45:20 52:23,25
  54:6,8,11 55:15,19
  63:17 67:13 69:3 73:3
  84:3
onto 54:17
open 33:25 34:24
opening 30:23 73:14
  75:24
operated 53:9
opined 55:7,8
opinion 47:3 55:4,5 57:2
opinions 26:8 62:11 67:8
opportunity 10:13,16

17:18
order 38:9 50:1 83:18,21
  88:22
organization 15:12,24
organizations 15:14
original 5:16 13:22 27:25
  36:23 37:4 54:24 55:9
  55:10 84:14
originally 14:22 15:5
  36:12
Originals 5:19
Orleans 31:18 42:9 43:18
  60:15 61:9
Orthopaedic 1:7,8 13:5,7
  13:10,14 14:19,20,23
  16:7 20:16 21:1 28:1
  76:1
Orthopaedic's 5:12
orthopedic 12:20 15:12
  15:12,15,20,24 16:2,6
  16:10 31:1
OSNA 13:5,10,16
other 13:12 14:10,24
  15:3,14 16:10,12 19:11
  19:19 22:3 23:1,15,16
  23:22 28:11 35:7,8
  37:14,20 38:2,25,25
  40:7 46:25 47:1 52:5
  65:10 75:14 76:19
  78:21 79:14 87:23
others 14:1
ought 59:12
out 9:20 16:5,8 17:12
  30:14 38:10 43:14
  48:23 49:1 50:1 64:4
  77:18 86:11
outcome 90:18
outside 8:25 9:14
over 8:10 61:15 79:20,21
  82:21 84:23 85:4
overseas 41:22
own 38:2

**P**

P 7:18,18,18
PA 47:1
pact 14:24
page 3:3 21:2,7 27:12
  28:14,20 31:15 32:11
  32:16,20 40:24,24
  45:11,14,15,21 49:22
  49:23 50:2,5,10,11
  55:12,19,24,25 60:17
  61:15,19,19 63:13 67:4
  67:17 69:24,25 70:2
  71:5,7,8,15,25 78:11
  78:12,15,17,18
pages 34:23 63:8,12
  83:12 90:12
panel 14:5 15:22 29:1
  44:21 45:9 48:9 49:8
  49:12 52:12 53:3,21
  54:6,11,17 64:5,23
  65:3 69:6
Panel's 48:4,13
paperwork 5:18 7:25
paragraph 30:23 31:5
  62:6 73:14 75:24
paraphrasing 23:23 24:1

pardon 27:3 37:12 42:7
  58:4 63:1
parentheses 33:25 34:25
  35:1
parenthesis 76:1,2
part 22:1,24,25 53:17
parties 67:19 86:11
  90:17
partner 74:25
partners 75:1
party 31:18 80:11
patient 17:1 19:22 21:18
  22:8 25:21 26:9 34:10
  34:21 41:1,9 49:18,18
  51:23 54:12 61:24 63:1
  69:2,11 84:13
patients 57:1
patient's 19:22 21:19
  22:8 25:22 26:9 34:21
  41:2,9 49:19 50:10,13
  51:23 54:8,12 55:22
  56:1,7,8 63:1 69:2,11
  84:14
Patrick 1:4 31:1
PC 2:11
penalty 8:17
pending 50:4
people 47:18 87:2
per 24:18 46:11 54:24
percent 56:6
percentage 53:13,18
Perfect 40:11
perform 18:23 53:8
performance 44:14
  51:10
period 38:24 86:21 88:10
peroneal 34:12 51:24
  62:5 69:10
person 9:15,16,17 12:1
  72:24
personal 11:10
Peterson 4:3,7,9,11,13
  4:20 5:3 73:9,11 84:4
Phoenix 1:13 6:3 7:1
  12:21 90:19
phone 66:19 82:7 85:15
  86:9,12,13,18,25 87:13
phrase 85:8
physical 52:20 53:1
physicals 44:10
physician 88:13
physicians 74:23
picture 26:10,19 65:5
piece 46:13
PITAMAKAN 1:12 3:2 6:1
  7:7 89:15 90:4
place 42:8 56:11
plaintiff 1:5 2:3 6:7 51:7
  53:23 63:1 69:2
plaintiffs 21:20 23:19
  24:14 60:3
plan 86:10,11
plans 41:23 44:2,4
play 10:14 19:10
played 36:21 51:15
PLC 2:18 6:15
pleading 63:15 64:7
please 7:16 31:8 33:14
  35:10 41:11 44:19 57:4

60:7 65:20 79:7 87:21
PLLC 13:6,16
point 17:22 18:15 22:17
  23:2 34:9,23 35:6 39:5
  41:4 43:16 44:24 47:8
  47:11 50:23 53:10,16
  54:5,10 56:9 58:14,25
  59:4,11 62:8,9,13,19
  62:20,24 63:21 64:8,10
  64:10 67:5,7 69:4
  80:11
points 35:8
portions 28:20 32:12,21
  49:18
posed 64:23 67:19
position 21:17 69:9
  84:15,16
possibility 51:8 53:24
possible 48:19 75:13
  80:17,18
possibly 87:11
postgraduate 12:16
postponed 41:22 42:13
potential 23:23 51:25
  69:10
potty 63:4
power 9:22,24
PPLC 13:11
practice 13:4,13 18:23
  51:11 74:23 85:18,24
practices 85:13
practicing 12:23 13:2,3
  16:3
preceded 65:3
preeminent 15:24
preliminary 81:6 83:18
  83:21
preparation 13:17 36:13
  36:19 60:14 73:20 83:4
prepare 14:11
prepared 36:12
preparing 38:15
present 61:13
presentations 45:5,6
presume 10:8 72:22
presuming 35:21 86:17
presumption 72:24
  77:22
pretty 44:5 59:7 78:22
prevent 73:16
previous 46:1 78:21
previously 79:4
Price 2:11 6:12 84:6
prima 39:7,10
primary 88:6,7
prior 13:9,12 18:15,24
  19:3,7,7,10 29:18 39:9
  39:16 48:15 56:12
  57:23 58:19 60:1 67:21
  69:11 76:10 81:15
  82:16 87:4
private 38:2
probably 10:14 30:18
  41:6 47:17 70:19,22
  73:20
problem 9:20 29:14
  53:12 79:5
problems 16:10
procedure 6:6 52:1

A504586
KIPLING PITAMAKAN SHARPE, M.D.      AUGUST 24, 2011

6

69:12
**procedures** 3:12 29:6,17 31:6,13 32:2 33:2 36:2 36:4 39:18
**proceed** 28:5
**proceeding** 19:4 71:4 76:9
**proceedings** 6:18 39:2 61:9 90:13
**process** 10:12 17:10 28:2,12 31:7 37:24 39:7 40:2 56:19 74:24 76:24 79:22,23
**produce** 7:21 16:6 32:8 32:10 59:12,19
**produced** 5:16,18 33:8 46:25 52:4 64:9,24 65:13
**producing** 66:4
**professional** 1:22 3:8,12 13:14 15:24 20:25 28:8 29:6,17 31:6,12 32:2 33:1 36:4 39:18 41:17 44:4,10 90:23
**professionalism** 4:5 28:3 30:25 42:8 56:23
**program** 3:9,12 20:25 28:9 29:6,17 31:6,13 32:2 33:2 36:4 39:18
**progress** 19:13
**prohibited** 81:9
**pronouncing** 39:3
**propounded** 90:8
**provide** 8:1 33:19 34:15 35:7 38:3 41:8 47:9,12 55:20
**provided** 7:24 21:18 24:12 25:16,17 26:4 28:18 32:23 33:18 34:4 34:4,6 35:3,8,22 41:1,4 45:23 46:7,9,19 50:19 52:13 55:6,8,15 59:15 59:16 63:18 70:1 72:3 72:11 73:12 83:15
**provides** 31:18 34:9,9 61:15 67:6 86:17
**providing** 28:19 31:19 32:11,20 34:2 53:14 58:18
**public** 59:1
**published** 81:20,21 82:3
**publishes** 81:22
**publishing** 81:9
**pursuant** 6:6 25:6
**put** 8:9 66:5
**p.m** 89:11

**Q**
**qualified** 15:13
**question** 9:15,16,18,25 10:4,5,7,8,9 12:5 15:21 16:22 21:24 22:11,23 26:13 27:15,21,25,25 29:23,24 30:1,5,6 33:11 50:5 63:14 64:2 64:19,21,23 72:10 87:3 88:23
**questioning** 29:9 45:4 84:25

**questions** 5:24 9:2,10,23 10:15 11:6,12 19:16 29:15 67:19 88:17 90:8
**quicker** 9:19
**quite** 46:3 58:17
**quotation** 41:1
**quote** 42:4 63:19
**quoted** 50:10,14

**R**
**R** 2:4 6:8 7:18
**Ralph** 75:5
**re** 3:23 4:12,17,21
**read** 13:22 17:18,20,22 30:1 32:14 40:13 41:19 45:13 49:15 50:6 52:3 59:4 70:7,9,11 71:5,23 76:6
**reading** 32:15 63:4 78:14 90:11
**reads** 10:14 69:25 70:6
**real** 24:4
**really** 19:20 34:18 56:16
**reason** 11:3,8 40:21 43:2 59:23 66:3
**reasons** 16:14
**recall** 13:21 14:24 15:7 17:15,20 25:20,23 26:1 26:2,6,11,23 28:11,13 29:8,12 30:17 32:5 34:2,3 35:2,3,5,9 36:6 36:10 37:1,16,22,25 38:22,23 39:21 40:8 41:6,25 42:25 43:9,10 43:21 44:22 45:4,10 48:5 49:1,4,6 53:5,18 54:4 59:9,15 60:23 61:6,11 64:22 65:7 66:11 68:10 70:18,19 72:5 74:22 75:6,12,15 75:19 77:6,7,9 78:6,24 80:15 81:25 82:8,9,15 82:17 85:1 87:6 88:14
**receipt** 25:8 35:18 58:21 81:15 82:23
**receive** 16:21,22 25:1 30:18 81:24
**received** 17:6 24:23 30:10,24 49:14 50:7 52:17 53:19 54:4 58:24 74:16,18 76:19,20 77:21 79:18 80:13 82:3 82:19
**receiving** 30:17,19 35:5 41:25 48:5 49:6 66:11 75:19 82:16
**Recess** 65:18
**recognize** 20:21 33:15 35:11 41:12 42:18 47:25 49:11 57:5,19 60:8 65:21 74:3 75:21 79:8 80:25
**recollection** 26:15 48:14 48:21 70:14
**recommendation** 48:8 53:20 66:7,12 67:1
**recommendations** 48:4
**reconvened** 73:10
**record** 7:17 9:2,5,8,11,21

24:10 33:10 51:5 55:14 67:14 70:1 71:5,24
**recorded** 65:9
**records** 13:19,21 31:9,20 32:9 47:5 61:23 67:20 68:17 84:11
**redacting** 55:23
**reduced** 90:10
**refer** 17:1
**reference** 31:9 32:20
**referenced** 34:11 50:14
**references** 28:20 32:11
**referred** 53:10
**reflect** 10:25
**reflected** 51:6 53:22
**reflects** 10:20
**refresh** 70:14
**refused** 23:19 43:2
**regard** 19:21 22:10,15 29:10 38:23 51:9
**regarding** 24:22 36:7 45:6 82:23 83:25 84:6
**Registered** 1:22 90:23
**regular** 16:5 87:24
**rehear** 76:3,17 77:12
**reheard** 77:2
**related** 28:12 35:7 88:11 90:16
**relevant** 46:10 47:3 52:7 52:11 59:18
**relied** 32:4
**relieved** 79:20,21
**rely** 28:19 32:10,20
**remain** 19:13
**remember** 14:1 15:8 26:17 48:22 52:24 69:21 78:7 80:19,19,21 88:2
**remodel** 23:23
**reopened** 76:25
**replacement** 12:21
**report** 3:9 4:6,15 13:24 20:14,14,25 21:10 27:18 28:9 29:11,18 30:10,24 32:1,7,23,24 36:13,14,25 37:4 39:6 40:4 46:18 48:4,8,20 48:21,22 49:11 50:20 52:18 53:20 57:14 65:25 66:7,11,25 79:12
**REPORTED** 1:21
**reporter** 1:22,23 6:4 7:9 8:1,10,20 38:11 88:21 88:25 89:4 90:5,23,24
**REPORTERS** 1:16
**represent** 58:7 59:1
**representation** 50:18
**represented** 6:7,11,14 72:18
**representing** 19:12 57:21 58:14
**request** 37:17 42:2,5 43:3
**requested** 13:19 41:21 46:14,17,20
**requesting** 33:19 35:6
**required** 41:18
**rescheduled** 42:6
**resent** 79:1

**residency** 12:18
**resolved** 18:25 19:5
**respect** 27:18 51:16 58:8 80:9
**respond** 33:12
**responded** 84:25
**responding** 9:15 37:17
**responds** 47:6
**response** 9:1 11:7 26:16 34:6 35:17,18,22 36:1 36:5,5,8,9 38:16,19,20 39:19,20 40:3,3,13,19 42:17 46:19 49:7 67:6 71:20 75:6 82:9,12 84:24 85:20
**responses** 8:24 9:7,9 67:18
**responsible** 31:19
**restraining** 83:17
**result** 24:16 48:17
**results** 75:10 81:9
**retained** 58:5,7,12 68:8
**return** 66:25
**returned** 5:17,19 8:5
**review** 10:13 14:4,7 31:2 39:17 58:8 59:11 60:20
**reviewed** 13:21 25:3 35:19 37:5 39:22,24 55:10 60:24,25 67:21 83:1
**reviewing** 18:4 58:18
**Richard** 73:9,11
**right** 17:7 36:3,22 38:19 39:4,19 40:2,9 46:23 57:9 62:21 71:2 80:23 81:13
**risk** 34:12 51:24,24 62:5 69:10
**role** 19:11 36:21 51:16 59:1
**room** 8:21 24:6
**Rosemont** 44:22 69:16 76:2
**roughly** 21:23
**RPR** 1:22 6:4 90:5,23
**rude** 9:4,11
**rule** 25:6 29:3 63:10 66:21
**rules** 6:6 8:23 25:7 29:10 33:9
**run** 11:11
**rush** 23:22
**Russo** 5:14 28:6 37:10 37:12 74:21,22

**S**
**S** 7:18 13:5
**safe** 18:4 59:2 63:25 72:24
**same** 8:16,17 18:18 21:16 25:2 26:21 28:12 43:14 55:12 56:4 74:18 79:1,13,15 89:2
**Santa** 11:18,19,23
**Saturday** 76:4
**saw** 54:16 61:2 81:13 83:14
**saying** 40:15 55:12 56:17 58:21 64:5 66:20 68:6

68:19
**says** 8:22 25:6 28:18 30:23 32:19 42:5 47:4 51:3,19,20 61:20 62:4 63:21 65:9 67:20 71:8 71:19 75:24 79:13
**schedule** 42:22 43:14,22
**scheduled** 69:21
**scheduling** 41:18
**school** 12:2,4,7,8,9
**Scott** 5:7
**season** 44:15
**second** 26:11 27:12 28:14 34:9,9 40:24 41:8 50:23 53:25 55:22 56:1,7,8,13,18 59:12 68:1 69:23 78:1,2,25 79:3,12,15 84:18
**secondary** 88:9
**second-to-last** 67:5
**section** 28:17 31:16,17 32:18,24 46:18
**see** 25:9 26:3 28:21 29:5 29:20,21 30:2,9,15 31:10,16,23 33:23 34:13 35:1 40:25 41:19 41:23 42:4,9 45:24 48:9 49:17 50:9,11,13 50:15,17,20,22 51:12 55:24 56:3 57:23 58:1 60:17,18,18 61:4 62:14 66:6,8 67:8 68:2 70:2 71:6,21 72:1 76:6 78:16
**Seeing** 87:2
**Seemed** 15:11
**seen** 10:14 53:25 54:2 63:17 72:21 81:20,21 82:3 83:11,17,21
**send** 16:5 34:20 40:14 70:17
**sending** 35:16
**sense** 32:5
**sent** 24:18,21 31:22 42:21 43:23 47:6 48:3 48:19 60:12,25 70:17 72:15,16,19 73:8 74:17 83:3,4
**sentence** 25:6 45:20 47:4 67:6
**separately** 3:11,14,16,19 3:22 4:8,10 5:4,13,15 72:15
**September** 31:8 76:3,16 90:20
**seriously** 20:1
**served** 7:20 17:9,12,14 17:17
**server** 17:10
**service** 79:24 83:3 86:18
**services** 58:18
**set** 26:9,11 29:2 41:8 59:13 76:21 84:18
**seven** 34:24 87:10,11,12
**several** 19:9 67:25
**shape** 62:12
**Sharpe** 1:12 3:2,10,14,16 3:17,20,21 4:4,7,14,18 4:20,23 5:3,11,16,17

A504586
**KIPLING PITAMAKAN SHARPE, M.D.**          **AUGUST 24, 2011**

7

5:19,19 6:1 7:7,19 8:13 61:23,24 62:4,9,12 65:19 67:23,24 73:15 76:3 84:2 89:15 90:4
Sharpemd@aol.com 88:8
Sharpe's 62:8 71:9,20
Shocked 18:9,11
shorthand 90:10
shortly 68:23
shoulder 8:25
show 10:15 44:25 56:17 68:15
shown 32:6 63:17
shows 34:1 48:3 51:5
shrugs 8:25
side 24:7 27:24
sides 45:5
signature 21:2,7,8 89:14
signed 30:24 40:21 60:17
significant 49:18 53:17
significantly 55:17
signing 90:11
silently 45:13 70:11
similar 22:14 24:23 25:1
similarly 19:23
since 13:8 53:9 63:4
sir 11:14 14:12 52:15 84:8
sit 23:7 39:23 43:5 53:6 75:15 77:14
sitting 63:15
situation 18:7 47:21
six 28:17,17 31:16 32:18 32:24 34:23 46:18
skill 90:14
skimmed 13:19
skimming 14:2
skip 63:8
sloppy 9:21
snowstorm 78:9
society 9:18
some 17:9,22 19:3,4 27:16 31:17 33:19 37:20,23 38:4 39:13 43:24 50:14 53:10,16 58:17 66:3 70:1 75:14 77:16
somebody 66:20
something 39:11,14 40:14 68:20 73:1,21 83:4 84:10
sometime 27:7 48:5 52:18 61:21 66:12
somewhere 27:6 53:16 58:24 59:14
SOPs 31:1
sorry 32:17 71:7 76:12 78:17 84:1
sort 17:9 76:21
sorts 59:7,9
sound 88:15
sounds 16:14,15 43:19 58:16,17
source 37:21 38:2
Southern 2:19 6:16 12:9 12:19
speak 36:7 39:14 47:19

74:19 77:1 80:13,22
speaking 36:10 58:14 61:16 74:22
speaks 58:12
special 8:23
specialty 16:9
specific 28:20 29:24 30:5 30:6 32:11,20 51:8 53:24
specifically 14:2 26:23 30:18 42:25 47:9 62:4 80:15 82:18 84:11
specifics 29:13
specious 20:5
spell 7:16
spend 43:21
spent 11:22 31:17
spring 27:7 44:5,5,7
SS 90:1
stack 5:18 7:25 8:3
staff 14:15
standard 23:21
standards 28:3 30:25 51:4,11,16 56:22
standing 64:5
start 9:25 56:18 71:8
started 7:23 11:17 80:7
starting 63:13 71:4
state 5:5 6:5 7:16 16:9 18:4 20:12 25:17 26:4 26:7,7,25 27:3 45:2 59:2 63:25 90:1,5
stated 34:11 67:22
statement 5:12 15:25 16:1 18:22 23:12 25:2 34:24 46:2,16,24 52:13 58:9 65:3 67:5 70:6,17 71:5,9,23,25 72:3,11 72:22 73:12,14,20 78:14,20,21,25
statements 62:16 70:1
STATES 1:1
status 81:19
still 20:18 23:7 28:15 52:7,22 64:20
stop 76:23
story 63:17 64:6
Street 2:12 6:3,13
Strike 58:6
strongly 28:2
struggled 70:25
struggling 72:16
stunned 18:9,11
submission 26:3 29:2,11 29:18
submissions 33:24
submit 36:5,8 38:19 39:19 40:3,9,9
submitted 21:12 32:1,22 34:25 35:16 37:15 39:6 73:20
submitting 27:18 36:1 78:24
suborganizations 15:17
subpoena 7:21 17:7 83:6
subsequent 25:21 34:4 47:17 54:19 67:12 73:9 78:24
subsequently 43:13 55:7

substantive 10:21
sued 18:15,21,21 61:24
Suite 2:5,19 6:3,9,16
Suites 6:3
summary 51:2 67:5,18
summed 22:16
summons 17:8 79:25
supplemental 5:12 33:19 34:24 38:3
supplied 5:22 51:14 69:5
supply 10:6 38:11
support 28:20 32:12
supposed 48:23 76:23
Supreme 25:7
sure 40:18 44:24 55:18 56:6 64:16 71:2 72:8,8 87:9
surgeon 15:13 16:2
surgeons 1:7,8 14:19,20 14:23 15:12,15,18,18 15:18,20,20,25 20:16 21:1 28:1 76:1
surgery 12:20 16:6 23:22 53:8 69:23 70:16,24 72:13,17
surgical 52:20
surmised 77:20
surprise 56:25
suspend 76:15
suspended 53:21 74:13
sustained 64:2
sustains 63:23
sworn 7:8 90:7

_____

**T**

T 7:18
tab 67:3,4
table 24:7 47:20,20
take 8:16 9:1 17:22 18:22 42:8 44:4 58:25 63:4 63:12 65:16 85:23 89:2
taken 21:17 60:2 65:18 90:4,9
takes 71:24
taking 8:20 16:25 84:15 84:16 90:14
talk 63:11
talking 36:23 43:17 56:18 73:5 83:7
team 44:6,10,12,17
teams 44:5
Tech 12:9
tecum 7:21
telephone 85:10 86:1
telephonic 82:15
tell 11:7 23:15 32:7 47:5 52:4 55:22 64:19 65:4 65:5,6 68:11 78:10 80:19,20
telling 35:15 63:15 64:7
tells 32:9
Tempe 2:20 6:16
temporary 83:17
tend 10:25
term 85:2
terms 11:16 12:7 13:1,17 18:10 24:7
testified 7:9 52:23,24
testify 22:21 56:21 57:1

60:2 84:17,18 90:7
testifying 90:7
testimony 10:17,20,21 10:23 21:18 22:19,20 22:21 23:8,16 24:10 27:19 31:1 34:12 38:12 49:19,19 50:14 51:14 51:15,21 53:15 54:3,5 54:6,8,13,18,19,25 56:19,23 62:11 63:8 67:13 68:1 69:5,8 84:12,24 85:5,5
Thank 44:16 45:18 65:17
their 6:11 17:2,3,5 21:22 22:22 44:14 45:5 53:25 54:19 57:2 67:14 68:1 69:12 81:5,23 83:7 84:18 85:4,5
theme 67:10
thereto 90:9
thicker 55:17
thing 15:11 18:18 19:4 54:11 59:1 67:13 73:10 79:13 83:8
things 8:25 19:19 43:8 43:10,24 59:9 81:22
think 7:25 16:25 24:5,6 24:20 39:9 44:7 49:19 49:21 55:11 69:24,25 72:19 74:17,20 75:9 76:18 77:5,20 79:23 81:23 83:11,12,16 87:10,23
third 1:17 6:3 21:2 34:23 55:24 72:24 86:11
thought 54:5 56:19 76:24
three 33:22 35:8 45:14 45:22 46:21 51:4,17
three-fourths 9:17
through 7:4 17:18 36:2 37:24 49:15,17 70:7 82:20
time 9:3,3 10:24 17:11,19 22:19 28:12 31:17 38:24 43:1,13,23 44:10 55:7,7 58:17 59:14 68:4,21 69:3,4 76:8 77:13 81:18 86:20,22 88:10,18
timing 41:6
today 7:21 9:22 10:3 11:4 14:11,14 23:7 39:23 43:5 53:6 75:15 77:14
today's 13:17
together 66:5
told 36:20
top 55:25
training 12:16,24 44:5,6 44:7
transcript 3:23 4:12,17 4:21 5:9,10 10:13,19 10:22 14:4,7 38:10 44:20 61:8 63:7,13 65:10 69:15 71:25 77:25 78:18 88:22 89:5 89:7 90:13
transcription 64:15,17
transcripts 25:21 26:11 26:20 29:2 31:20 32:8

34:21 41:5,9 45:7,8 51:6 52:5,14 53:22,25 54:12 55:17 56:18 59:13,25 64:6,24 65:5 65:6,7,11,13 67:14
travel 41:23 44:2,4
treat 16:10
trial 10:24 19:2 38:10,11 54:2,4,6,8,14,20 55:2,3 56:19 84:12,17 85:4
trick 10:3
true 15:1 90:12
truth 11:7 90:8
trying 9:4,4,11,11 64:4 64:16 65:4,6
tunnel 22:4
turn 20:20 24:20 27:11 27:12 28:14 31:15 33:13 35:10 41:11 42:16 44:19 45:11 47:23 49:10 50:17 55:12,24 57:3,17 60:6 61:7 65:19 67:17 69:14 69:24 74:1 75:17 77:24 78:11 79:6 80:24
two 15:8 18:20 23:20 30:14,15 32:3 33:25 34:1 35:24 38:16 75:18
two-and-a-half 11:22
type 19:16
types 18:20
typewriting 90:10

_____

**U**

UC 11:22
Uh-huh 9:8
ultimately 43:18 84:17
unable 72:13
Unanimously 51:3
under 11:5 28:17 29:16 31:2 36:3 51:2 67:18 90:10
undergo 12:16
undergrad 11:21
undergraduate 11:20,24 12:1
underlying 24:5 84:13
understand 8:18 9:12,13 10:1,4,5,7,10 11:1,6 24:9 28:23 38:15 39:15 47:16 52:19 55:11 56:16 58:11,16,20 64:18,20
understanding 8:4 11:18 20:11 21:15 46:9,17 51:7,23 52:19,23 53:7 53:9,13,23 68:8 77:14 77:15
understood 10:2,9,11 11:2
unequivocally 51:22 69:9
UNITED 1:1
universal 15:16
University 12:9,19
unless 72:23
until 9:23,25 41:22 58:1 81:10 85:15 88:3
Update 16:7

A504586
**KIPLING PITAMAKAN SHARPE, M.D.**          **AUGUST 24, 2011**

8

updates 16:5
up-to-date 16:16
USC 12:11,13,19
use 9:9
used 54:18 87:24 88:9

**V**

v 75:5 76:3
vague 26:15
value 16:22
various 16:10
Vedder 2:11 6:12 84:6
vehemently 18:1
Verizon 86:19,20
Vernon 5:7
very 9:14,21 22:14 26:15
  27:25 33:9 43:25 58:13
  71:24
view 56:7 84:9
viewed 20:5
Vincent 5:14
vindicated 20:10 24:6
violated 28:3 29:3
violating 8:18 33:9 63:9
violation 30:25
violations 51:4
vision 22:5
volunteer 9:15
voted 76:3
vs 1:5 84:2

**W**

Wade 20:12 21:19 24:13
  45:1
wait 9:22,25
waive 89:3
waived 89:14 90:12
want 10:4,20 24:3,4
  36:19 38:6 39:11,13
  44:24 47:10 55:18 56:6
  57:22 63:11 70:9 72:6
  73:1 88:24,25 89:4
wanted 12:4 20:6 40:14
  64:10 65:11 72:18
warranted 28:4
wasn't 46:2
water 39:13
way 9:17 12:16 14:18
  18:23 19:5 39:5 42:12
  52:17 62:12 64:11 71:4
  71:24 78:14 79:24 83:3
  84:25 85:9 90:16,17
week 15:22 24:1 43:25
weeks 30:14 32:3 66:21
well 9:8 23:1,2 26:4,22
  28:24 33:5 44:3 46:6
  47:4 50:6,20 56:12
  60:1 61:3 78:9 85:24
  88:4
went 19:2 35:2 43:11
  80:4
were 6:11,18 7:4,20 8:17
  13:9,12 14:13 17:14,14
  17:17 18:6 19:9 20:4,5
  20:10 23:1,15,20 24:5
  25:11,16 26:25 33:9,9
  37:23,25 38:24 40:5
  43:22,24 44:4 46:5,25

47:1,2 50:18 52:7,10
  54:11 55:5,19 56:3,9
  59:25 60:2 62:16 66:19
  70:15 72:13,15,23
  79:21 81:16 88:1 89:8
  90:9
weren't 43:24 47:3 73:22
  80:11
West 2:5 6:9
Westmont 11:23
We'll 8:2,2
we're 8:1 40:18 44:24
  49:21 55:12,21 66:20
  73:5 76:17 88:20
we've 7:25 46:1
whatsoever 59:17,22
While 10:18
Whitaker 2:4 6:8
whole 19:19 26:10,18
  47:18 64:6 65:4 90:7
wife 14:16 69:23 70:16
  71:1 74:20
wife's 70:24 72:13,16
Wilson 75:4,5 77:4 80:16
witness 3:2 5:24 7:8 8:8
  8:12 19:25 22:1,13,22
  22:24 23:10 26:15,22
  27:22,24,24 31:1 32:14
  37:2 38:22 39:12 40:8
  44:18 45:19 47:14 49:4
  50:2 51:19 52:22 54:22
  54:24 55:3 56:25 58:11
  60:5,24 61:21 62:7,25
  64:14,20 65:9,17 67:22
  67:23 73:8 75:4,12
  77:9 80:21 83:8,11,13
  84:21 90:6,8,9
won 71:1
Woods 2:4 6:8
word 17:7
words 19:11 76:20 79:14
work 43:13 85:9,15,18
  85:21 87:4,7,14
working 43:22 75:1
works 8:6,7,8
wouldn't 42:22
writing 40:15 72:23
written 26:3 31:19 32:8
  36:8 38:15,19 39:19
  40:3 67:6 71:5,9,20,23
  72:3,11,22 73:11,13,20
  78:14,20,21,24 82:12
wrong 22:2
www.depo.com 1:18

**X**

x-ray 33:24
x-rays 24:11 34:7 37:22
  61:23

**Y**

Yeah 17:9 43:21 48:25
  51:20 73:19,24 89:1
year 12:20 13:8,15 15:8
  44:11
years 11:22 16:8 44:18
Young 69:25

**0**

00115 27:13 28:15 32:16
00116 21:3
00118 21:8
00175 45:12
00176 45:22
00583 61:20
005863 63:12
00608 67:4
00612 67:18
00622 69:25 71:13
00672 78:12
00677 78:15
00751 31:16
00769 49:20 50:11
00770 50:11,15
00771 50:15
00773 50:17,23
00775 51:2
04 23:9 26:25 41:2 51:15
  54:18 56:12,21 60:1
  61:25 62:24 67:12,14
  68:9 69:1 79:25 85:1,5
05 59:25 67:11 79:25
  84:16
08 84:17
09 27:2,3,7 48:6 49:14
  52:18

**1**

1 3:8 7:4 20:20,22 27:11
  27:12,13 32:16 33:10
1st 35:1 85:13
1-14-10 4:9
1-4-10 4:7
1.800.288.3376 1:18
10 4:3 25:8 47:24 57:18
  61:17
10-cv-8161 1:5
10-10-09 4:5
10-2-09 3:23
100 44:18 56:6
101 2:19 6:16
11 4:5 48:9 49:10
11-14-08 3:10
11:00 1:14 6:2 7:2
12 4:7 57:3,18
12th 90:19
12-14-09 4:3
12-30-08 3:13
12-4-10 4:21
12-9-10 4:22
12:52 89:11
13 4:9 31:8 57:17
1349 2:5 6:9
14 4:11 58:2 60:6,9 78:13
14th 29:20 48:2,15 58:19
15 4:12 61:8
16 4:13 65:20,22 66:15
  70:7,12
17 4:15 66:6 67:1,3,4,17
  71:4,8,17,18 73:11
  78:22
18 4:17 69:15,25 70:2
  71:8,15 78:22
19 4:18 73:6 74:2 79:14
1920 2:19 6:15
1989 12:14,15,17

1998 15:8

**2**

2 3:10 29:19 30:3
2nd 41:18
2-19-10 4:11
2-24-09 5:5
20 4:20 63:13 75:17
  83:12
20-page 83:8
200 2:5 6:3,9
2002 33:25 34:1
2004 21:19 22:7,20 23:16
  23:17 24:12 34:17
  51:22 54:12 61:22
  67:24 68:4 84:15
2005 17:1 35:1 56:9
2008 20:11 30:11,24 31:8
  35:6 46:20 85:9 86:2
  86:13,23 87:19,24
2008-23 4:15 82:24 83:25
  84:1
2009 25:2 44:25 48:2,15
2010 42:8 57:11 58:2,20
  58:24 66:13 73:6,8,11
  73:13 76:3,4,10,14,16
  82:2
2011 1:13 6:2 7:1 81:16
  82:1 85:9,13,15,21
  86:2,13 87:5,7,8,19,25
  88:3 90:6,20
21 4:21 30:23 77:25
21st 30:11
22 4:22 33:25 61:15 79:6
  79:9 81:13
222 2:12 6:12
23 5:3 61:15 80:25
24 1:13 5:5 6:2 7:1 24:20
  71:5,7,25 90:6
25 5:7 33:25 55:13,14,21
  76:3
26 5:8 55:15 56:1 78:12
27 5:9 55:15
28 5:10 55:15 76:10,14
29 5:11
29th 76:16

**3**

3 3:12 29:4,5 31:12,15
  33:2 36:3
3rd 41:18
3-12-10 4:12
30 5:14 7:4 35:6 48:23
30th 46:19
30-minute 45:5,6
3030 6:3
31 5:16 8:2 78:15,18 89:8
32 5:18 8:3 89:8
33 63:12,13
34 63:12
398 87:11
3987 87:14
3988 87:14
3989 87:15

**4**

4 3:13 33:14,16 35:8
  37:18 46:20 58:24 76:4

4th 57:11
4-inch 5:18
4-21-09 3:15
4-21-10 4:13,16
4-23-09 3:17
4-28-08 5:9
4-29-08 5:10
4-5-11 5:3
435 45:16
480 85:16,22 86:5,16
  87:9,22

**5**

5 3:15 35:10,12 38:14,17
5th 81:15 82:1
500 1:16
50349 1:23 6:5 90:24
518-1168 86:16
52(b)(2) 25:7

**6**

6 3:17 35:22 36:1 38:16
  38:18 39:17 40:1,18,24
  63:10
6-10-09 3:19
6-15-09 3:21
6-19-10 4:17
6-28-10 4:18
6-8-05 5:7,8
60601 2:12 6:13
654-9138 86:5

**7**

7 3:4,8,10,12,13,15,17,19
  3:19,21,23 4:3,5,7,9,11
  4:12,13,15,17,18,20,21
  4:22 5:3,5,7,8,9,10,11
  5:14 41:11,13 73:8,13
7-11-05 5:14
770 49:23
771 49:20

**8**

8 3:21 42:16,18 56:9
85282 2:20 6:16
889-398 87:9,12
889-3988 85:22
89 5:16,18 90:12
89014 2:6 6:10

**9**

9 3:23 44:19 45:12
9-29-10 4:20
91203 1:17
95 53:10
964-2908 85:16
985-1377 87:22