# EXHIBIT "25"

AAOS PROFESSIONAL COMPLIANCE PROGRAM
GRIEVANCE HEARING

IN RE THE MATTER OF:          )
                             )
KIPLING P. SHARPE, M.D.,      )                    **ORIGINAL**
                             )
                Grievant,    )
                             )
        and                  )        2008-23
                             )
PATRICK J. BRANDNER, M.D.,    )
                             )
            Respondent.      )


Report of Proceedings taken before

Patricia S. Mann, CSR, RPR, License No. 084-001853,

a notary public in and for the County of Cook and

State of Illinois, at Rosemont Hyatt Hotel, 6350

North River Road, Suite Lindburgh B, Rosemont,

Illinois, on Friday, October 2, 2009, at the hour

of 11:07 o'clock a.m.


Reported for
LAKE SHORE REPORTING SERVICE, by:
Patricia S. Mann, CSR, RPR.
License No. 084-001853

Page 1

BRANDNER 00140

HEARING PANEL:

> Richard E. Strain, Jr., M.D., Hearing
>   Panel Chair
> Richard A. Brown, M.D.
> Murray J. Goodman, M.D.
> William J. Hopkinson, M.D.
> Tamara L. Martin, M.D.
> Vincent J. Silvaggio, M.D.

AAOS STAFF:

> Karen L. Hackett, FACHE, CAE, CEO
> Richard N. Peterson, JD, General
>   Counsel
> Melissa Young, Assistant General
>   Counsel
> Rosalind Giulietti, Professional
>   Compliance Program Administrator
>   (OGC)

GRIEVANT:

> Kipling P. Sharpe, M.D.

RESPONDENT:

> Patrick J. Brandner, M.D.

WITNESS:

> James Greenwald, M.D.

RECUSED:

> Dale R. Butler, M.D.

AAOS OUTSIDE COUNSEL:

> Russell M. Pelton, J.D.

VIDEOGRAPHER:

> Donald Peterson

> * * * * *

Page 2

BRANDNER 00141

MR. PELTON: Let the record reflect that this is the hearing of the Committee on Professionalism of the American Academy of Orthopaedic Surgeons. The Committee is meeting here in Rosemont, Illinois, to hear charges of unprofessional conduct brought by Dr. Kipling Sharpe against Dr. Patrick Brandner. Drs. Sharpe and Brandner are here today, also present is Dr. James Greenwald, a witness for Dr. Brandner.

The members of the AAOS' Committee on Professionalism who are present today are Dr. Richard Strain, Chair of this hearing; and Drs. William Hopkinson, Richard Brown, Murray Goodman, Vincent Silvaggio, Tamara Martin. Dr. Dale Butler has recused himself from this matter.

Also present are Karen Hackett, CEO of the Academy; Richard Peterson, General Counsel of the AAOS; Melissa Young, Assistant General Counsel; and Rosalind Giulietti, Professional Compliance Program Coordinator of the AAOS. I'm Russell Pelton, Counsel for the Committee. Our Court Reporter is Patricia Mann of Lake Shore Reporting, a copy of the transcript of this proceeding will be attached to the Committee's

Page 3

BRANDNER 00142

report. Will the witnesses raise their hands to be sworn?

(The witnesses were duly sworn.)

MR. PELTON: All right. Dr. Strain.

DR. STRAIN: Welcome. The rules of the presentations are as follows: Each side will have thirty minutes to present, there is a timer over to your right in front of Ms. Giulietti, if you see it turn yellow, that's going to be time to finish up. At the end, there may be time for Committee members to question you and possibly for one side to question the other. We'll begin with Dr. Sharpe.

DR. SHARPE: Thank you. I do not take my presence here lightly, I think it is a serious matter. I am not here to retry versus Sharpe, I'm not here on a sense of vengeance or hubris, I'm here because Dr. Brandner agreed to be an expert in a case in which he is not qualified by the standards of our Academy, I am here because he failed in his obligation to fairly review the facts before agreeing to testify.

I am proud to belong to an organization that has establish standards of professionalism as we do. I'm grateful to each of

Page 4

you Committee members for taking time out of your busy practices and lives to be here.

We are here today to determine whether Dr. Brandner has met the Standards of Professionalism which I believe he has not. I believe that the Standards of Professionalism that he failed to meet were Number 8, that he was not properly qualified as an expert in this case. The testimony which he gave was contrary to established orthopaedic knowledge, the testimony that he gave was not based on fair and impartial review of all available information he had and the testimony tried to establish a higher -- a standard of care higher than that of the community standard.

A brief time line, I first met the patient in April of 2002, I was the third orthopaedic surgeon to see him for this problem. Subsequent to seeing me, they sought two more orthopaedists. In June of 2002, I performed a corrective tibial osteotomy which was complicated by a peroneal nerve palsy. In June -- or in 2003, the patient filed a lawsuit against the original treating orthopaedic surgeon. The plaintiffs were deposed in January of 2004, I was deposed in May of

Page 5

BRANDNER 00144

2004 prior to being a named defendant. In approximately November of 2004, Dr. Brandner agreed to be an expert witness; in February of 2005, I was served as a defendant; in August of 2005, Dr. Brandner was deposed by my attorney.

I believe Dr. Brandner inadequately reviewed the material that he had at the time that he had agreed to be a witness; he was provided with my office notes, he was provided with plaintiff's depositions,       , the patient, and      , his mother; he was provided with my deposition which was taken before I was a defendant; and he was provided with X-rays. In my office note, I clearly documented that the risk of -- the risk associated with surgery as a summary of my visit with the patient dictated in front of the patient, these notes were on April 11th and June 6th of 2002, both of these notes mention, along with other risks, nerve injury, but not the word " peroneal" nor is the word drop foot used.

These notes like most surgeons are a summary, not a verbatim transcription of everything that transpired in the visit. I don't think this projects well, but this is a copy of my

Page 6

BRANDNER 00145

office notes which I believe the Committee has been provided which show the portion where the risks was discussed and again on 2002. These are the X-rays, these were the ones that were taken before the surgery and it shows closed physes and a significant deformity that is a complex deformity of approximately 35 degrees.

My deposition, the attorney asked did you discuss peroneal nerve specifically with him, my answer, yes.                , the patient's mother, did Dr. Sharpe talk with you about that, he warned us prior to that, you know, movement of the bone, when he put it back in place could cause various things, he went through a list of many things.                , the patient, before you had surgery, did Dr. Sharpe ever discuss with you or did anyone discuss with you you might end up with a drop foot. Yes, he told all the things that could happen, I would -- it could have been -- it could have nerve damage and he said all these things, he even mentioned death.

Dr. Brandner concluded that the patient was not properly given the option of nonoperative care, that the bone had a chance to

Page 7

BRANDNER 00146

remodel its deformity and that I was required by the standard of care to list peroneal nerve injury in my pre-op notes. Is that a fair and impartial review of the facts I have just presented?

Asked of his qualifications, by his own admission, sworn testimony, he has minimal experience with this particular type of problem, only having performed five osteotomies, the last of which was 25 years prior to his deposition. From the letter he sent to this Committee, I understand he hasn't actually operated since 1995. He is clearly not an expert on the standard of care in tibial osteotomies when he's only done five 25 years prior. I think any of us who did five procedures 25 years ago would not consider ourself an expert in a court of law on that procedure.

In his deposition, he testified that there was a possibility that this young man with these closed physes could remodel this remarkable deformity, he testified that the growth plates were open. This was one of the two accusations made by the plaintiff, the other being a lack of informed consent.

As to the standard of care, I think

Page 8

there is a difference between exceeding the standard of care and meeting the standard of care. I agree that it is appropriate to discuss peroneal nerve injuries just as I did. My witness at trial, Dr. Russo, testified that there is also risk to the posterior tibial nerve. Listing a specific nerve injury is not the standard of care, both Dr. Russo and I feel that the discussion of nerve injury meets the standard of care. If we followed Dr. Brandner's logic, we would have to list radial, ulnar and median nerves in our notes with every form -- elbow surgery, axillary nerve along with the other nerves of every shoulder surgery, not that it would be wrong to do this, but I don't think that that is the community standard. These wouldn't just require that we have the discussion, but that each nerve be listed in our notes, that's the standard he wanted to hold me to. I've had the opportunity, as many of you have, to read many surgeon's notes and few would meet that standard of care.

To review, I think there are three main points: One, Dr. Brandner was not qualified per our Academy standards to testify in this case;

Page 9

he gave testimony that was specifically medically incorrect; and he either performed an incomplete review of the material given to him or gave an unfair and not impartial review of that material. Thank you for your time.

DR. STRAIN: Questions. Do any of the Panel members have any questions? No? Okay. Dr. Brandner?

DR. BRANDNER: Thank you, gentlemen. Good morning, ladies and gentlemen. I've been a member of the American Academy of Orthopaedic Surgeons for 24 years and I'm here to defend my reputation against baseless allegations that have been made by Dr. Sharpe. Present with me today to assist me in this matter is Dr. James Greenwald, he is a member -- he is the medical director for the State of Nevada and has been a member of the American Academy of Orthopaedic Surgeons for 33 years.

As you know, this matter stems from a civil action styled        et al versus Matthews et al which resulted in a jury verdict in favor of Dr. Sharpe in late April 2008. In that case, I offered certain testimony regarding the standard of care as it relates to informed consent in a

Page 10

BRANDNER 00149

proximal tibial osteotomy. Specifically, I opined that a general discussion of nerve damage such as that called for on a standard surgical consent form was insufficient in the context of a proximal tibial osteotomy because of the significantly increased likelihood of peroneal nerve palsy as a result of such a procedure, a 3 to 13 percent incident rate.

I testified that informed consent required a discussion of the risks to the peroneal nerve and the possibility of a drop foot. I made it clear to the jury through my testimony that I was not there to testify as a fact witness, that is, I could not testify as to whether Dr. Sharpe had, in fact, discussed the risk to the peroneal nerve with and his parents prior to obtaining their consent to perform the procedure as Dr. Sharpe claimed. Or if Dr. Sharpe had failed to do so as to 's claim, I could only testify regarding the fact that nothing in the pre-operative medical records documented a discussion regarding the peroneal nerve.

As set forth in the letter I sent to the Academy in response to Dr. Sharpe's grievance

Page 11

BRANDNER 00150

report, the          case against Dr. Sharpe was a he-said-she-said situation. The jury believed Dr. Sharpe, so he won, I've got no problem with that. With that said, I stand behind the testimony I offered in the case, with a 3 to 13 percent incident rate, the standard of care as it relates to informed consent requires a pre-operative discussion of the peroneal nerve. With that said, I'll address each of the allegations that Dr. Sharpe has made against me. For simplicity, I'll address them in the order Dr. Sharpe elected to raise them in his grievance report.

The allegations: Mandatory Standard Number 2, Dr. Sharpe alleges I violated Mandatory Standard Number 2. That provides "An orthopaedic expert witness shall provide opinions and/or factual testimony in a fair and impartial manner." Dr. Sharpe alleges I violated this standard by testifying that, quote, "This malunion in a skeletally mature person could substantially remodel" and -- and testifying that a 39-degree deformity was acceptable.

The allegation is on its face absurd. Such is the case for two reasons: First, I never

Page 12

BRANDNER 00151

offered such testimony. I testified that based on the X-rays that were provided to me by attorney which Dr. Sharpe elected not to supply to the Academy, was not completely skeletally mature. The growth plates at the distal femur were partially open, but were closed in the proximal tibia. I presented these unmarked X-rays to Dr. John Payne, a highly respected orthopaedic surgeon and Academy member for more than 35 years, I also presented the case with a description of the X-rays defining a closing femoral growth plate and mature and immature callus and a 38-degree deformity in valgus to Dr. Greenwald in Reno. I stated that this individual was very near to an adult skeleton. Dr. Greenwald is here to support these facts. Dr. Payne tragically died in 2007 unexpectedly.

Second, a review of my testimony in this case reveals that there was nothing unfair or partial about it. I was very complimentary of Sharpe, see my trial transcript pages 44 and 45. I simply testified that the standard of care required discussion of the peroneal nerve, that is, the potential of a drop foot, not just nerve damage in general, and the records do not -- did not

Page 13

BRANDNER 00152

document that such a discussion had occurred prior to the operation. The patient and his family said it hadn't. Sharpe said it had. It was for the jury to decide who to believe and you can go to trial transcript page 16, 17 for that.

I described Dr. Sharpe's pre-operative workup of this patient as excellent, I testified that all the appropriate studies were done in terms of planning the surgery, I testified that the surgery was performed correctly, I testified it was an elegant presentation of the definition of a deformity, a hard case and an excellent application of the correction and internal fixation, trial transcript pages 44 and 45.

If you doubt what I'm saying, read the transcript of my trial testimony, it's 53 pages and they're double spaced. There's no way you can read that testimony and conclude that my testimony was somehow unfair or partial to the plaintiffs in this case.

Mandatory Standards 3 on 4. Sharpe alleges I violated Mandatory Standards 3 and 4. Number 3, "An orthopaedic expert witness shall evaluate the medical condition and care provided in

Page 14

BRANDNER 00153

light of generally accepted standards at the time, place and in the context of care delivered." Four, "An expert -- orthopaedic expert witness shall neither condemn performance that falls within the generally accepted practice standards nor endorse or condone performance that falls outside these standards.

Sharpe alleges I violated these Mandatory Standards by stating that the standard of care required a discussion of a specific nerve, testifying at deposition that the patient was not given the nonoperative option and testifying at deposition that the fracture had a remodeling potential. Again, Dr. Sharpe's allegations are flawed.

With regard to my testimony concerning the standard of care as I set forth previously, I stand behind the same. I continue to believe as do many other orthopaedic surgeons with whom I have spoken that a general discussion of nerve damage such as that called for in a standard surgical consent form does not satisfy the standard of care as it relates to informed consent in a proximal tibial osteotomy. Such is the case as

Page 15

BRANDNER 00154

there is a significantly increased likelihood of peroneal nerve palsy as a result of such a procedure 3 to 13 percent.

Dr. James Greenwald is here today to specifically address this issue and I'll -- hopefully, he'll have the time to do that. Dr. Jeffrey Mass has included his affidavit and is supporting this information, and Dr. Althausen has also given me an affidavit.

With regard to Dr. Sharpe's allegations regarding my deposition testimony, two points must be made: First, I never testified the patient was not given the nonoperative option, I simply testified that the standard of care required such a discussion. Whether that discussion occurred was a question of fact for the jury, that's in deposition transcript page 69.

Second, while I did testify that based on the X-rays I had reviewed, the fracture had remodeling potential, deposition transcript page 39, I was careful to point out that the fracture would likely not completely remodel, transcript -- deposition transcript page 39, pages 52 to 53.

Mandatory Standard 6, Dr. Sharpe

Page 16

alleges I violated this -- and this says "An orthopaedic expert witness shall seek and review all pertinent medical records related to a particular patient prior to rendering an opinion on the medical or surgical management of the patient." Dr. Sharpe alleges I violated this by failing to adequately review transcripts from the first depositions taken of          and          . Dr. Sharpe focuses on those two deposition transcripts because of what he views as certain admissions made by the plaintiffs and -- the plaintiff and his mother with respect to their understanding of the risk of the peritoneal nerve.

Three points are made in response. First, I did review the transcript and the first deposition of          and          I testified as such in my deposition transcript page twelve, nine through eleven. They are nowhere near as damaging to the plaintiff's case as Dr. Sharpe would have this Panel believe.

Second, this Panel needs to understand this is the third time that Dr. Sharpe has tried to convince someone that the testimony given by          and          during their first

Page 17

BRANDNER 00156

depositions proves that he discussed the risk of the peroneal nerve with the          prior to performing the proximal tibial osteotomy. This is the exact same argument he advanced when trying to have the plaintiff's case summarily decided by the court and it's the exact same argument he advanced when trying to have                    attorney sanctioned by the Arizona State Bar.

Dr. Sharpe's argument was rejected on both occasions, the court and the state bar recognized that Sharpe's characterization of the deposition testimony was inaccurate. Viewed in its entirety, which includes the          subsequent depositions, there was ample evidence to support the plaintiff's claim that Dr. Sharpe failed to discuss the risk to the peroneal nerve in a proximal tibial osteotomy when he obtained the consent to perform the surgery.

That Sharpe prevailed at trial is irrelevant. This Panel should likewise reject Dr. Sharpe's self-serving characterization of the evidence in the case especially where he has failed to provide the Panel with all of the evidence.

Finally, even if this Panel elected

Page 18

BRANDNER 00157

to ignore my deposition testimony where I testified to my review of the transcripts from the plaintiff's first depositions and my testimony here today also attesting to the fact that I reviewed the transcripts, the fact is Dr. Sharpe has not properly alleged a violation of Mandatory Standard Number 6. Such is the case as Mandatory Number 6 is very clear in its scope, it encompasses pertinent medical records.

Let me read Mandatory Standard Number 6 to you again, "An orthopaedic expert witness shall seek and review all pertinent medical records related to a particular patient prior to rendering an opinion on the medical or surgical management of the patient." A deposition transcript is not a medical record, it is a litigation document. That Dr. Sharpe would ask the Academy to take disciplinary action against me under Mandatory Standard Number 6 for allegedly failing to review a deposition transcript as opposed to a medical record says volumes about his motive and how far he's willing to go to try to support his baseless allegations.

Mandatory Standard Number 7, Dr.

Page 19

BRANDNER 00158

Sharpe alleged that I violated this, and this provides "An orthopaedic expert witness shall have knowledge and experience about the standard of care and the available scientific evidence for the condition in question during the relevant time, place and in the context of medical care provided and shall respond accurately to questions about standard of care and available scientific evidence."

Dr. Sharpe alleges I violated this standard by testifying I had no current relevant experience with the procedure. This claim is nonsense. Dr. Sharpe would have this Panel believe that in order to offer expert testimony as to the standard of care for informed consent, a physician must have recently performed a significant number of the type of operations involved in the case on patients of the exact same age as the plaintiff. That is ridiculous.

Arizona law is clear on when expert testimony is permitted and what qualifies a person as an expert. With regard to when expert testimony is permitted, Rule 702 of Arizona rules of evidence provides "If scientific, technical or other

Page 20

BRANDNER 00159

specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact -- a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

The Arizona Supreme Court has noted "The primary concern in the admission of expert testimony is whether the subject of inquiry is one of such common knowledge that people of ordinary education could reach a conclusion as intelligently as the expert witness or whether, on the other hand, the matter is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact," State versus Stickney, 608 P period 2(d) 302-308, Arizona 1980.

With regard to what qualifies a person as an expert, the Arizona Supreme Court has noted "The test of whether a person is an expert is whether a jury can receive help on a particular subject from the witness," Liss versus Tries, 658, P period 2(d), 169, 172-73, 1983.

In this case, Sharpe's attorney did not object to my being called as an expert witness

Page 21

BRANDNER 00160

and did nothing to try and prevent me from taking the stand, note that he did not request an opportunity to voir dire me as was his right. The pre-operative standard of care for an orthopaedic surgeon is not within the common knowledge of people of ordinary education, accordingly, I was properly admitted as an expert witness and offered testimony within my area of expertise. Any claim by Sharpe to the contrary is ridiculous.

Mandatory Standard 8, I violated this according to Dr. Sharpe, and this provides that "An orthopaedic expert witness shall provide evidence or testify only in matters in which he or she has relevant clinical experience and knowledge in the areas of medicine that are the subject of the procedure." Dr. Sharpe alleges I violated this standard by testifying that the patient should have been offered nonoperative management, the patient had a good chance of remodeling, that he fell below standard of care by failing to discuss the risk of the peroneal nerve injury and testifying that there's a 3 to 13 percent risk of injury occurring in this type of surgery.

Again, his allegations are baseless.

Page 22

BRANDNER 00161

When it comes to Standard 8, the issue is not whether you have X number of operations over Y number of years on fifteen-year-old patients with fractures of the tibia and fibula and the proximal one-third as Dr. Sharpe would have this Panel believe. The issue is whether you have a basis from which to testify to the areas of medicine that were the subject of the proceeding -- i.e., the standard of care as it relates to informed consent in the context of proximal tibial osteotomies.

The answer in this case is yes, I've been practicing orthopaedic surgery for thirty years, I've treated this injury in the Army, I've seen this injury in private practice, I've read the recent literature regarding the danger to the peroneal nerve in this type of injury and procedure, I consulted with well-qualified, experienced and well-recognized orthopaedic surgeons before opining in this case. This surely gives me the basis from which to testify to the areas of medicine that were the subject of the proceeding, to argue otherwise is absurd.

With regard to the allegations specifically, I did testify that the patient could

Page 23

421

BRANDNER 00162

and should have been offered nonoperative management with informed consent. I did testify that if Dr. Sharpe failed to discuss the risk to the peroneal nerve injury, that he fell below standard of care and I would do it again.

With regard to my testimony at trial that there was a 3 to 13 percent risk of this injury occurring with this type of surgery, Dr. Sharpe's grievance regarding the same is by far the greatest evidence of his abuse of this Academy's grievance process. His grievance report states "he" -- meaning me "-- authoritatively stated that there was a 3 to 13 percent risk to this injury occurring. Neither my expert or I could find these numbers elsewhere." You know the reason they couldn't find the numbers elsewhere? Because they didn't look for them. Rather than do a basic internet research regarding the issue which would have clearly uncovered the investigation that was performed at the Department of Orthopaedic Surgery at Johns Hopkins University and the other multiple sources which I provided the Panel which cite the same in support of 3 to 13 percent incident rate of peroneal nerve palsy in proximal tibial osteotomies, Dr.

Page 24

BRANDNER 00163

Sharpe elected to file a grievance, calling me a character and claiming that neither he nor his expert could find any support for the statistics that I had testified to in trial.

I resent that I've had to travel to Chicago to defend myself against these baseless allegations and I resent that I had to reschedule a family reunion because Dr. Sharpe is unwilling to agree to my request to move the hearing of this matter to accommodate travel plans. I further resent the fact that I have to impose on Dr. Greenwald, Dr. Jeffrey Mass and Dr. Althausen to take time out of their busy schedules to help me against Dr. Sharpe's baseless allegations.

With that said, I ask the Panel to recommend to the Academy's Board of Directors that Dr. Sharpe's grievance not be sustained. I'd like to turn this over now to Dr. Greenwald.

DR. GREENWALD: Good morning. Jeff Mass was the third American to be asked to join the Swiss AO group, many of you here may know him. Perhaps even a bigger honor is that he was the first American to be asked to sit on the AO technical committee. Jeff and I trained together at Los Angeles County USC

Page 25

BRANDNER 00164

Medical Center, I believe you trained there. We were in the same class together and we were partners together for many years in Reno. Jeff has been a distinguished professor, as you know, coming back to USC.

Mainly because of this association with Jeff, I was aware of the AO's view of this specific fracture. I've prepared copies for you of the pertinent chapter from Professor Vaper's book discussing this specific fracture. If the guys in Arizona would have had this chapter early on in the care of this case, I think it could have made a huge difference and maybe none of us would be here today.

I was uniquely prepared to discuss this specific case with Dr. Brandner when he called me in the early two thousands. I understood this injury, I understood the risks to the peroneal nerve in this osteotomy. We see dropped foot peroneal nerve injury as, quote, a predictable complication of this specific osteotomy over and above the 3 to 13 percent baseline risk that the literature puts forth.

In the letter I wrote to you, I

Page 26

BRANDNER 00165

talked about using your imagination to appreciate the increased tension laterally when you correct a 39-degree deformity, I thought Dr. Russo's work was very interesting. But instead of doing it that way, I thought why not try it with a model. Here's the tibia -- I went through a lot of lumber to do this -- this is a tibia that's straight, the red part here represents the pes anserine tendon coming down to the fracture site as Dr. Vaper points out, pes anserine tendon in this growing child has an invaginated fracture site and that's what leads to this incredibly malignant pattern of valgus, and in a case of continued growth of the child, repeated osteotomies being necessary.

Okay, straight. Now, here we are, this is the front, here we are just before the osteotomy is being done. What I hope you can appreciate is the valgus deformity and the flexion deformity -- is everybody okay with that? The common peroneal nerves, the peroneal nerve, the deep peroneal nerve. Now, let's do this this way, let's put the proximal portion straight up and down and correct the distal portion. Anybody want to take a guess how far the angle is going to move?

Page 27

BRANDNER 00166

Eight and a half centimeters, look what happened to the peroneal nerve. Every element of the correction in this specific deformity puts increased tension on the peroneal nerve, every single element of the correction.

There are three things that I think we can point out from the X-rays that we had to work with -- pass those to you and you can pass those around. These are the same X-rays that Dr. Sharpe showed in his presentation. On the AP X-ray of 3-22-02, the circle on the medial tibial metaphysis labeled A we believe represents the invaginated pes anserine tendon. On the post-operative X-rays, on the AP X-ray labeled B, the size of the fibular gap is significant, Dr. Sharpe said that he did a one-and-a-half centimeter osteotomy of the fibula, by the time he was done, it was a three-centimeter gap, the tension of the lateral side of this leg was tremendous.

This is Dr. Mass' point, number two, on the lateral post-operative X-rays, the gap between the fibula you see, what I want you to appreciate is the anterior displacement of the fibula compared to -- of the fibula distally, we

Page 28

see that as being extremely important because the peroneal nerve is tethered proximally. Dr. Mass, as many of you know, has led the Academy on pre-operative planning, pre-operative planning would have let you anticipate this problem.

The trauma doctors who we had review this case have a very high suspicion of anterior compartment syndrome happening post-operatively. I would point out Dr. Althausen's letter, Dr. Mass' letter, my letter.

Closing comments, in his letter, Dr. Sharpe talks about Dr. Brandner being the kind of character this Panel should be looking at. Dr. Sharpe doesn't know a thing about Dr. Brandner. I'll also leave for you a copy from CNN -- a CNN report of August 19th of this year discussing the Las Vegas Medical Mafia. Many of you may have seen this, it describes a group of musculoskeletal physicians in Las Vegas doing unnecessary spine surgery simply for huge amounts of money. Dr. Fred Redfern, the president of the Nevada Orthopaedic Society and Pat and I and others have asked the AAOS for help with this situation. Unfortunately, we were turned down. Nobody in our State has done

Page 29

more to shut down the Medical Mafia than Dr. Patrick Brandner and he continues in this difficult and stressful task. I'm extremely proud to call him a friend and a colleague, he's a credit to the AAOS.

DR. STRAIN: Is that the end of the presentation?

DR. GREENWALD: That's it.

DR. STRAIN: So we have time for questions. Dr. Brown?

DR. BROWN: I have several questions. Dr. Brandner, how do you reconcile the statements regarding foot drop made by the          in deposition?

DR. BRANDNER:          and          when you look at all the depositions and the trial transcripts, they were discussing what they knew after the surgery. They were confused, they were discussing the fact that they understood the foot drop and they didn't understand that there was no pre-operative discussion, they then -- they understood in the context of what happened to them and they were answering the questions. These were not sophisticated medical people.

Page 30

BRANDNER 00169

DR. BROWN: So we -- when he says before you had the surgery, did Dr. Sharpe ever discuss with you or anyone discuss you might end with a foot drop, and he says, yes, we should just disbelieve that?

DR. BRANDNER: You need to look at all the transcript, you were given partial selected information. If you look at the cross examination, if you look at the trial transcripts, you would see that they were confused and they had no informed consent.

DR. BROWN: Okay. The second question is if the posterior tibial nerve had been injured or the sural nerve had been injured or the saphenous nerve had been injured and there was a neuroma developed or some dysfunction, would that also have been a compromise of the standard of care?

DR. BRANDNER: No, no. This -- what I'm testifying to is that 3 to 13 percent far exceeds the background complications we see in general -- in general operative procedures. You don't have a 3 to 13 percent incidence of those conditions in the surgery, that just happens.

DR. BROWN: So if we're fixing a radius --

Page 31

BRANDNER 00170

distal radius fracture and it's an ulnar-sided distal radius fracture and the median nerve is protected and it's stated in the surgical consent that the median nerve may be at risk, but it's not stated that the ulnar nerve is at risk and the ulnar nerve ultimate gets injured, so then you would say if you were in court, well, Dr. Brown, said that nerve injuries may be an issue, and he said the median nerve might be an issue, but they didn't mention the ulnar nerve, but it's still okay, because the ulnar nerve is less likely to be injured, is that okay?

DR. BRANDNER: Dr. Brown, I'm not picking out -- I'm not stating that you have to go over every nerve, what I'm stating is in this particular surgery, the peroneal nerve is at risk and this is what I felt needed to be stated. I strictly state -- focus in my testimony based on this and I felt like this nerve needed to be discussed and I've given you affidavits by qualified people who agree with me and the literature shows a 3 to 13 percent incidence, I think that's significant.

DR. BROWN: Okay.

DR. STRAIN: Other Panel members, questions?

Page 32

Yes, Dr. Hopkinson?

DR. HOPKINSON: So if, in fact, as the depositions of the injured client and his mother say, it was discussed, then you have no problems with this?

DR. BRANDNER: All I said was I didn't see it in the medical records. My -- my mandate are the medical records, that's what the court describes. I saw those transcripts, but I saw all the transcripts, I just didn't see the transcripts Dr. Sharpe sent you, I saw transcripts of depositions where they were asked specifically were you told about this before the surgery and they said no, there was confusion on their part, and this was clarified in the court and in other depositions. They're discussing their knowledge after the condition happened and they were confused about it.

DR. STRAIN: Other questions? I have a question. When the mother stated in her deposition of January 29th of 2004, page 51, line ten, "And Dr. Sharpe said that when he moves it back into alignment and corrects all that, that those particular nerves might be stretched and might be

Page 33

damaged because of that and that's what happened." You're saying that she was confused? Because I think it's pretty clear from the English that that's something that when he was going to move it, so --

DR. BRANDNER: Dr. Strain, if you take it out of context and you don't look at all of the evidence in the trial and you just read those depositions, yes. He's done this -- if that had been the case, the court would have not -- would have -- and his accusation against the plaintiff's attorney would have stood, the court looked at all of the depositions and transcripts and they found that he -- that was baseless, that these people did not understand it and that was my point in my presentation. You don't have all of the evidence, you have selected evidence.

DR. BROWN: Can I follow-up? You stated clearly that Dr. Sharpe had performed an elegant surgery, that it was well carefully planned out and you stated that these people are easily confused and there's some evidence at least to suggest that they were pretty plain questions presented to them and then they responded.

Page 34

Do you not think it's possible that perhaps they were not confused in the office and that despite a very clear presentation of what the risks were, that they didn't understand, but that -- the information was presented to them.

DR. BRANDNER: Dr. Brown, anything is possible, of course I would think that's possible. But the problem is that this is a he-said-she-said issue and that's all I testified to. They said that they didn't understand it nor did the medical records that I am mandated to look at state anything about peroneal nerve or drop foot. All I stated to the jury and the court was I didn't see it in the medical records, it was up to the jury to decide if Dr. Sharpe's testimony was accurate or if their testimony was accurate.

I thought that there was no malpractice as far as the application of the surgery, the operative procedure, and I thought that this kid would have ended up with peroneal nerve palsy no matter how you fixed this. All I stated was that the literature states that this needs -- they need to know going in that this is a great risk and it's going to probably happen with

Page 35

BRANDNER 00174

this amount of deformity.

DR. STRAIN: Dr. Goodman.

DR. GOODMAN: Dr. Brandner, we have a lot of testimony in front of us and perhaps you could point out to us where the testimony indicates that the mother and the patient were confused and testimony that supports that allegation or that statement.

DR. BRANDNER: Dr. Goodman, I was shut down on this, I got blindsided by this. Years after I did it, I went after the records to get them all, and the plaintiff's attorney -- I don't know what you've been shown, but I sent all this --

DR. GOODMAN: Well, you do know what we've been shown because you've gotten a copy of it, is that correct?

DR. BRANDNER: Right. And I asked for all of the records and I was told that HIPAA -- they sent a letter to Dr. Sharpe to cease and desist and the attorney would not release the records based on his concern about HIPAA.

DR. GOODMAN: Are you talking about medical records or depositions?

DR. BRANDNER: I'm talking about depositions

Page 36

BRANDNER 00175

because that's what's needed to be cleared up here.

DR. GOODMAN: Okay.

DR. SHARPE: I believe I provided all the depositions to this Committee.

DR. GOODMAN: Can you tell us which deposition records are missing?

DR. BRANDNER: No, I could not. I sent back everything to the attorney and I could not get anything.

DR. GOODMAN: Do you have a list of the records that you reviewed in preparation for this case for your testimony?

DR. BRANDNER: I don't have a specific list. I've got -- I think that the records that were provided, I don't have the hospital records --

DR. GOODMAN: We're talking about depositions. You are telling us, I believe, if I'm correct, that there are depositions that are missing from our packet.

DR. BRANDNER: I believe there are, I believe they --

DR. GOODMAN: Can you tell us which depositions are missing?

DR. BRANDNER: Not specifically. I think that

Page 37

BRANDNER 00176

it's in trial testimony, I think this was cleared up in trial testimony when they were examined and the attorney brought up the fact that they did not hear about the peroneal nerve.

DR. STRAIN: I just want to clarify one thing just so I'm sure I have it right. You tried to get the records from the plaintiff's attorney, is that correct?

DR. BRANDNER: Correct.

DR. STRAIN: And the plaintiff's attorney told you, as you said, you were blindsided, he shut you down, he told you that HIPAA would not allow him to send you the depositions, is that your testimony here?

DR. BRANDNER: Correct. I asked him for the entire packet that I reviewed and he said he had HIPAA concerns.

DR. STRAIN: Do you have a copy of that letter that if we asked for it, you could supply us?

DR. BRANDNER: I could look, I can look, I can -- in fact, Mr. Wade Causey may have the letter and I can ask him to send it.

DR. GOODMAN: Is trial testimony protected by HIPAA or is that a public record?

Page 38

BRANDNER 00177

DR. SHARPE: It's a public record.

DR. GOODMAN: And I believe you told me that this information came out in the trial testimony?

DR. BRANDNER: I believe that's correct.

DR. GOODMAN: Do you have a copy of the trial testimony to support your claims?

DR. BRANDNER: No, I don't.

DR. GOODMAN: Did you try to get a copy for this hearing?

DR. BRANDNER: I asked -- well, I asked the attorney to give me everything, all testimony, and he said he wouldn't.

DR. GOODMAN: Okay. Thank you.

DR. STRAIN: But you didn't ask the court, correct?

DR. BRANDNER: No, I didn't ask the court.

DR. STRAIN: Okay. Yes, Dr. Brown?

DR. BROWN: Dr. Brandner, what do you think the likelihood is that this young man would have remodeled his tibia to a point where it would have been acceptable clinically had he not undergone any type of operative management?

DR. BRANDNER: It's hard to say, there was -- I stated it was only possible that he would remodel,

Page 39

BRANDNER 00178

but I didn't think the remodeling would be significant to the court. I said that his main complaint was that he was having pain with dancing and repetitive heavy activity, otherwise, he seemed to not have too much of a problem. So my testimony was if we can wait and see what happens and you can alter your activity, you may find it -- that it's acceptable. However, it was -- it appeared to be a significant deformity and if it didn't remodel substantially, which I didn't think it would, you would probably have problems, that was my feeling.

DR. BROWN: Thank you.

DR. STRAIN: Any other questions? There being none, I would like to thank you both -- all three of you for your presentations and the -- yes, Russ?

MR. PELTON: Dr. Greenwald, if I might ask you, you say you brought your documents you intend to leave with the Committee?

DR. GREENWALD: I did, sir.

MR. PELTON: Okay. were those distributed to the Committee and the Office of General Counsel in advance of this hearing? Had they been distributed prior to today?

DR. STRAIN: Were they submitted to you?

Page 40

BRANDNER 00179

DR. GREENWALD:  No.

MR. PELTON:  They were not.  Then under our rules, the Committee cannot receive them today, they have to be exchanged in advance of the hearing.

DR. BRANDNER:  I was trying to make it easy for you to get this Swiss book.

MR. PELTON:  We appreciate that, but our rules are very clear documents have to be exchanged prior to the hearing so both sides of the Committee can review them prior to the hearing.

DR. STRAIN:  Right, okay.  Thank you.

*  *  *  *  *

Page 41

BRANDNER 00180

STATE OF ILLINOIS    )
                     )  SS.
COUNTY OF COOK       )

I, PATRICIA S. MANN, CSR, RPR, a certified shorthand reporter in the State of Illinois, do hereby certify that the above matter was recorded stenographically by me and reduced to writing by me.

I FURTHER CERTIFY that the foregoing transcript of the said matter is a true, correct and complete transcript of the proceedings at the time and place specified hereinbefore.

I FURTHER CERTIFY that I am not a relative or employee of any of the parties, nor a relative or employee of the attorneys of record or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Chicago, Illinois, this 9th day of October, 2009.

Patricia S. Mann, CSR, RPR
License No. 084-001853

Page 42

BRANDNER 00181