# EXHIBIT "26"

THE SUPERIOR COURT OF ARIZONA

MARICOPA COUNTY

███████ and ███████, individually )
and as parents and guardians, and )
███████, a minor, )
)
      Plaintiffs, )
)
 vs. ) No. CV2003-017451
)
ANDRE MATTHEWS, M.D., and JANE DOE )
MATTHEWS, husband and wife; KIPLING P. )
SHARPE, M.D., and JANE DOE SHARPE, )
husband and wife; BAYWOOD ORTHOPEDIC )
CLINIC, an Arizona Corporation; MEZONA )
ORTHOPAEDIC, an Arizona Corporation; )
VALLEY LUTHERAN HOSPITAL, an Arizona )
Non-Profit Organization; et al., )
)
      Defendants. )
)

Tempe, Arizona
June 8, 2005
11:50 a.m.

DEPOSITION OF ███████████

COPY

LEA, SHERMAN & HABESKI
Registered Professional Reporters
834 North First Avenue, Phoenix, Arizona 85003
(602) 257-8514  Fax: (602) 257-8582
Reported by: Jean L. Lea, RMR, CRR
Certified Court Reporter
Certificate No. 50004

BRANDNER 00247

Page 2

EXAMINATION INDEX

PAGE

By
    Mr. Crawford................................... 4

Page 3
DEPOSITION OF SCOTT VERNON CLARK,

taken at 11:50 a.m. on June 8, 2005, at the law offices of

Crawford & Kline, Suite 101, 1920 East Southern Avenue

Tempe, Arizona, before JEAN L. LEA, RMR, CRR, a

Certified Court Reporter in the State of Arizona.

APPEARANCES:

For the Plaintiffs:
    Koeller, Nebeker, Carlson & Haluck, LLP
    by WADE R. CAUSEY, ESQ.
    3200 North Central Avenue, Suite 2300
    Phoenix, Arizona   85012

For Defendants Sharpe and Mezona:
    Crawford & Kline
    by BRUCE D. CRAWFORD, ESQ
    Suite 101, 1920 East Southern Avenue
    Tempe, Arizona   85282

Also present:

Multi-Page™

Page 4

SCOTT VERNON CLARK,

called as a witness herein, having been first duly sworn,

was examined and testified as follows:


EXAMINATION

BY MR. CRAWFORD:

Q. Can you tell us your name, please.

A. ███████████.

Q. How old are you, ██████?

A. 18.

Q. Your deposition was previously taken in this case back when Dr. Matthews was being sued?

A. Yes.

Q. You haven't had any other depositions --

A. No.

Q. -- have you?

A. No.

Q. Let me just remind you of one thing that was probably discussed with you during your first deposition, and that's this: If you do not understand a question, don't answer it.

A. M'hum.

Q. Tell me you don't understand the question, okay?

A. M'hum.

Q. And give me a chance to rephrase it.

BRANDNER 00250

Page 5

A. Okay.

Q. Okay? In normal conversation we say "m'hum" and "uh-uh" a lot --

A. Okay, yes, no. Sorry.

Q. If you do that, and we all do it, I'm going to ask you if you meant "yes" or "no."

A. Okay.

Q. I'm not trying to give you a hard time; I'm trying to make sure the record is accurate.

A. M'hum, yes.

Q. And try to make sure I've finished my question before you start your answer so we're not talking over each other, okay?

A. Okay.

Q. Because it make it very difficult for the court reporter.

Have you reviewed anything, Scott, to help get yourself ready for today's deposition?

A. Wade showed me some piece of paper that said some -- that Dr. Sharpe had wroten down or something, and then I just quickly read it.

Q. Okay. I think wade told me before we started this deposition that he may have shown you guys Dr. Sharpe's disclosure statement. Is that what you're talking about?

Page 6

A.   Yes, I think --

Q.   Okay.

A.   -- that's it.

Q.   And it has a summary of some of the things Dr. Sharpe is going to say in the case?

A.   Yes.

Q.   Okay.  Do you remember disagreeing with something specifically that was in that document?

A.   Yes.

Q.   What is it that you recall disagreeing with?

A.   It said that he had discussed extensively the exact term "foot drop" and "perennial nerve" and that that was a risk before going into surgery.

Q.   And you don't remember that?

A.   Not at all, no.

Q.   Are you saying that did not happen, or are you saying you don't remember it?

A.   I'm saying it didn't happen.

Q.   Okay.  Anything else?

A.   No, that's it.

Q.   Do you remember Dr. Sharpe discussing the risk of nerve injury with you?

A.   Yes, he did say nerve injury, that there could be nerve damage, but nothing further was said about that, to my knowledge.

BRANDNER 00252

Page 7

Q. Okay. And when he made the comment that there was the risk of nerve injury, do you remember that at least on one occasion you, your mom, and your dad were all present?

A. I'm not sure. I don't remember.

Q. Do you remember at least one of your parents was present?

A. Yes, of course.

Q. Okay. Since we're dealing with that topic, let me just ask you this: Do you remember him telling you before surgery, during an office visit, that one of the risks of surgery was death?

A. Yes, I do.

Q. Do you remember him telling you that one of the risks was infection?

A. Yes, I do.

Q. Do you remember him telling you that one of the risks was bleeding?

A. Yes, I do.

Q. Do you remember him telling you that one of the risks was the surgery may not work?

A. Yes, I do.

Q. Do you remember him telling you that bad things could happen from receiving an anesthetic?

A. What's an anesthetic?

Page 8

Q.    That's what puts you to sleep.

A.    Oh, yes, I do remember that.

Q.    Okay.  Do you remember him discussing these various risks with you on more than one occasion before surgery?

MR. CAUSEY:  Form.

A.    All I remember is once hearing that I could die from the anesthetic.

Q.    BY MR. CRAWFORD:  Okay.  So that specific risk, you only remember it once?

A.    No.  I remember that from the anesthesia and that when he was discussing the actual surgery.

Q.    Dr. Sharpe?

A.    Yes.

Q.    Okay.

A.    Now, I think it was -- I remember the anesthesiologist discussing the risk of the anesthetic.  I don't remember Dr. Sharpe talking to me about the anesthetic.

Q.    Okay.  So when you --

A.    Exactly.

Q.    When you were at the surgery, the doctor who was going to give you the anesthetic told you that one of the risks was death?

A.    Yes, as far as I remember.

Page 9

Q. Okay. Now, are you saying Dr. Sharpe did not discuss the risk of anesthesia --

A. I don't --

Q. -- i.e., death, with you?

A. Not that I remember.

MR. CAUSEY: Let him finish.

Q. BY MR. CRAWFORD: Okay. Well, there's a difference between "I don't remember" and "It didn't happen." You told me that the discussion about peroneal nerve injury and foot drop didn't happen, right?

A. Yes.

Q. Now, with respect to Dr. Sharpe discussing with you the risk of death from anesthesia, are you saying he didn't say that or you may not remember it?

A. Okay. As far as I remember, I thought that when Dr. Sharpe was talking to me about death, that that had to do with the actual surgery, but I also remember hearing it from the anesthesiologist having to do with anesthesia.

Q. Okay. So --

A. The anesthetic.

Q. Fair.

A. Okay.

Q. You remember Sharpe telling you that one of the risks of surgery is you could die?

A. Exactly.

BRANDNER 00255

Page 10

Q. But you don't remember him specifically tying it to anesthesia?

A. Yes.

Q. All right, fair. Now, do you remember that there were two meetings with Dr. Sharpe at his office before the surgery?

A. No, I don't remember two meetings.

Q. So you only remember one meeting?

A. Yes.

Q. His records say there were two meetings. Is that something you may not remember?

A. Yes, that's something I may not remember.

Q. Okay. His records say that he discussed the risks and complications with you and at least one of your parents on two different occasions before surgery. Are you saying that may have happened on two different occasions and you just don't remember it?

A. Yes.

Q. Do you remember prior to surgery Dr. Sharpe telling you that one of the risks was that you could end up with a chronically stiff leg?

A. No, I don't remember that.

Q. Is that something you just may not remember?

A. Yes.

Q. As opposed to saying he didn't say it?

Page 11

A. Yes.

Q. Do you remember him telling you that you could end up with chronic pain in the leg?

A. Yes, I do remember that.

Q. I appreciate the fact you were only 15 years old at the time?

A. Yes.

Q. All right. You were not happy with where things were at in terms of your recovery from the original fracture and the care that you received from Dr. Matthews?

A. No.

Q. Is that correct?

A. Yes.

Q. Okay. Why were you not happy with where things were at?

A. Because, for one, of course, the pain. Also, the way it looked and, you know, people would comment on it, like, "Oh, man, what's wrong with your leg" and stuff like that. And I couldn't do a lot of activities that I could do prior to the break.

Q. Such as?

A. Like I used to -- before this ever happened, I was a very active dancer. I did all sorts of dance. I did skateboarding and I went skiing and wakeboarding, and I worked a lot with my dad. And I liked to play

BRANDNER 00257

Page 12

basketball, and I loved football, until the break happened.

Q. Anything else in terms of activities that you weren't able to do at that point prior to Dr. Sharpe's surgery?

A. Well, there was one thing I could do after -- I mean, it still hurt to do, but I did throw discus in track, and that's something I was pretty good at, even with the leg being crooked and hurting, I was still pretty good. So I did that.

Q. But did you feel like you were going to be as good as you could be, given the problems you were having?

A. No, I didn't. I knew I could be better if I was a hundred percent.

Q. Okay. Any other specific activities that you weren't able to do at that point? And we're talking about prior to Dr. Sharpe's surgery.

A. Not that I remember.

Q. Okay. So after discussions with Dr. Sharpe and maybe other doctors, you in conjunction with your parents decided that you wanted to go forward with the surgery that Dr. Sharpe was discussing?

A. Yes.

Q. All right. Tell me what kind of pain you were in prior to deciding you wanted to go forward with the

BRANDNER 00258

Page 13

surgery that Dr. Sharpe was suggesting.

A.    This is before Sharpe, after Matthews?

Q.    Sure.

A.    Okay.  My -- it hurt right where I had broken it, and my ankle hurt sometimes when I did clogging and tap dancing, and that's pretty much it.  Just mostly it was right on the break where it hurt the most.

Q.    Your dad told me earlier that the pain seemed to be getting worse over those maybe four or five months between the last visit with Matthews and talking with Sharpe about surgery.  Does that sound right to you?

A.    Yes, it does.

Q.    So it was becoming more and more of a problem?

A.    M'hum, yes.

Q.    Now, you said you didn't like -- strike that.

That pain was interfering with stuff like doing track, discus, dancing, and stuff like that?

A.    Yes.

Q.    And those were all things you wanted to get back to being able to do?

A.    Yes.

Q.    All right.  You said you didn't like the way it looked.  How did it look at that point?

A.    There was a huge knot under my knee.  It kind of looked like I had a second kneecap, to me.  And it was

BRANDNER 00259

Page 14

curved. Like if my leg was straight, it looked like it bowed out, away from my left leg.

Q. Okay. So the lower leg, if we go below the knee down to the foot, those bones, you're saying, had the appearance that the leg was bowing out to the outside, in other words, away from the right side of your body?

A. Yeah. Not the actual foot but the leg part.

Q. Okay. I mean, and this was pretty obvious to you?

A. Yes.

Q. What else about the way it looked was bothering you?

A. That's it. Those two things.

Q. Your dad told me that your foot looked like it was pointing in towards the left foot. Do you remember that?

A. That could be part of the bowing. I mean, the two things I mostly remember are the way my leg looked like when it bowed out and the actual big lump.

Q. Okay. And it was noticeable enough to other people that they were commenting about it?

A. Yes.

Q. Give me just an example.

A. They -- I'd often hear that it did look like a second kneecap, the bump did. And that --

BRANDNER 00260

Page 15

Q. Were people teasing you about it?

A. Yes. Well, I guess you -- you would call it teasing, but they were actually my friends, just like, "Oh, my goodness, look at his leg" and "You need to get that fixed" and stuff like that.

Q. Okay. Tell me how it was interfering at that point with your ability to do dance. Just so we're clear, I'm trying to find out how it was before surgery by Sharpe and then this last -- well, the visit with Matthews, which was at the end of January of 2002. Do you understand the time frame I'm talking about?

A. Okay.

Q. Yeah.

A. Like the four months or --

Q. Yeah.

A. -- five months right there?

Q. Yeah.

A. Okay. I had still done clogging, but it had hurt a lot more to do it and -- as time went on, after I had visited with Matthews, and so I was doing less of that, less tap dancing, less, you know, running on my leg.

The more I put weight on it or jumped on it, the more it would hurt, so I had to do less of that kind of stuff. Just anything that would put extra weight

Page 16

or effort on the leg I had to do less of.

Q. Okay. You've used a term that I'm not familiar with. What do you mean by "clogging"?

A. That's -- it's -- do you know what tap dancing is?

Q. M'hum.

A. It's like a tap dance except it's more jumpy and the taps are loose on the bottom of the shoe.

Q. Okay. What types of dance were you involved with? Obviously tap was one. What other types?

A. When? Before -- or in that time frame we're still talking about?

Q. Yeah, yeah.

A. Okay. I did do tap and clogging and jazz, modern, and ballet at that time, and hip-hop as well. And some acrobatics, too.

Q. Okay. Was it affecting all of those different types of dance?

A. Yes, it -- the pain was, yeah.

Q. Okay. For example, with ballet, could you go on point with that leg?

A. I -- I never had done point ever.

Q. Pardon me?

A. I never did point.

Q. Okay. Did you have to hold other dancers?

Page 17

A.   Yes, I did.

Q.   Okay.  Would it interfere with your ability to do that?

A.   Somewhat, yes, putting more weight on the leg.

Q.   And I mean, could it have been a safety issue for whoever you were holding if you started having pain?

A.   Yes, it could.  I think I remember at one time setting a girl down before I was supposed to because of the pain hurt, because it hurt.  And this was on stage, too.

Q.   So you may have dropped her?

A.   No, I didn't drop her.  I set her down before I would drop her.

Q.   I said you may have if you hadn't done that.

A.   Oh, exactly, yes.

Q.   Okay.  No, I appreciate that.  Being the father of three little girls, I'm very happy to hear that you let her down before you dropped her.

Okay.  So in terms of tap, clogging, jazz, ballet, hip-hop, the pain that you were in was interfering with your ability to do all of those the way you wanted to?

A.   Yes, very much so.

Q.   And was it pretty clear to you that you could not continue to go on like this and be able to do these

Page 18

activities the way you wanted to?

A. Yes.

Q. Now, during that period of time were you doing any skateboarding?

A. No. I had quit after the first break.

Q. All right. It's something you hopefully could get back to?

A. Yes.

Q. And now is the same about skiing and wakeboarding?

A. Yes.

Q. You hadn't done it, but it was something you hoped to get back to?

A. Yes.

Q. So at that point you were not able to get back to working construction as much with your dad as you had been before the break?

A. Yes, that's true.

Q. Had you tried basketball?

A. I -- I shot around frequently, but I never was able to run back and forth and play full court like I used to do.

Q. Would that have been very painful?

A. Yes, running would.

Q. So was running particularly painful?

LEA, SHERMAN & HABESKI      PHOENIX, ARIZONA (602)257-8514

BRANDNER 00264

Page 19

A.   Yes.

Q.   Please feel free to have some pretzels while we talk.

MR. CRAWFORD:  I presume you guys just want to go through lunch and get this done.

MR. CAUSEY:  I would prefer that.

Are you guys good with that?

(Discussion off the record.)

Q.   BY MR. CRAWFORD:  Would you agree that the condition of your leg as of, let's say, early June of 2002, which was several weeks before the surgery, was unacceptable to you?

A.   Yes.

Q.   And the restrictions it was placing on your ability to do activities was unacceptable?

A.   Yes.

Q.   I don't mean this facetiously, but when Dr. Sharpe and this anesthesiologist told you that one of the risks was death, did you take that seriously?

A.   Yes, I very much did.  All the risks I thought about before going into surgery, but because of the things I couldn't do, I -- I was willing -- you know, the good outweighed the bad to me.

Q.   Including the risk of really bad things like death?

BRANDNER 00265

Page 20

A. Yes.

Q. Had you been able to do any hunting during, let's say, the four or five months before this surgery by Dr. Sharpe?

A. I'm not sure I did do any hunting. I might -- when I fell, I'm not sure of the exact date, but I know that was either during Dr. Matthews' care or right after. I know I did go, and then I had fallen and hurt my leg at that point.

Q. This is the right leg?

A. Yes, sir.

Q. How did you fall?

A. We were climbing up a -- or I think we were climbing down a hill, and there was some rocks, and I had slipped on a rock and fell on the leg.

Q. And what, did you notice a fair amount of pain?

A. Yeah, it hurt a lot. There was, I mean, nothing visually, but it hurt a lot.

Q. Did that incident, at least from your perspective, have anything to do with how this leg was bowing out, for example? I mean, did it seem to happen after that or --

A. No.

Q. -- was it something that was already going on?

A. It was already going on.

Page 21

Q. Did it seem to, on a longer-term basis, increase the pain, or was it more of an isolated event?

A. It was an isolated event.

Q. Have you not gone hunting with your dad since the surgery with Dr. Sharpe because of the problems you're having with your leg?

A. No, I have -- well, I don't know. Wait, could you restate the question, please.

Q. Sure. Have you not gone hunting with your dad since the surgery by Dr. Sharpe because of the problems with your leg?

A. Yes, because I knew that I wouldn't be able to walk long distances, and that's very much involved in hunting. You have to be able to, you know, actually hunt. Just sitting there, your chances aren't very good of finding something, so I was kind of discouraged in the fact that I wouldn't be able to actually hunt.

Q. Okay. Is that why you turned your dad down when he asked you to go?

A. That's one of the reasons, yes.

Q. Is there any other reason?

A. Yeah. I -- I mean, I don't know exactly, but I know that I was busy. I had, you know, schooling; and a lot of times he would ask me to go hunting was during school. And I also teach classes, so it would interfere

Page 22

with that as well.

Q. When you say "teach classes," are you talking about dance?

A. Yes.

Q. When did you get back to being able to teach dance following the surgery with Dr. Sharpe?

A. I'm not sure exactly the time.

Q. Okay. The surgery by Sharpe occurs the end of June 2002. Can you give me any estimate when after that you were able to start teaching dance again?

A. Maybe -- maybe a year and a half later. Maybe a year later.

Q. Okay. Well --

A. Sometime in there. I know it was -- what?

Q. That's okay, go ahead.

A. I know it was before last summer, so -- and maybe even six months before that, so . . .

Q. Okay. Have you been back to teaching dance for at least a year?

A. Yes.

Q. What types of dance have you been back to teaching for at least a year?

A. I teach tumbling. I'm a spotter. And I do teach some tumbling classes. I help my brother in teaching hip-hop. And that's it. Those are the two.

BRANDNER 00268

Page 23

Q. Okay. Do you actually do tumbling?

A. No. I can demonstrate some things, but there are a lot of things that I can't do. I usually just spot the kids in doing what they do.

Q. Okay. And then what was the other one you said?

A. Hip-hop.

Q. Can you actually do hip-hop?

A. Yes, I can do some things. I usually choreograph, help my brother choreograph his class, the dances.

Q. But do you also show the students how to do certain moves?

A. Yes, some moves I do.

Q. And are you able to do some of the moves at least?

A. Yes.

Q. Are you able to do most of the moves?

A. Yeah, you could say most of the moves.

Q. What do the --

A. A lot of times when we make up dances, we won't make up on-the-floor things because I can't usually do things on the floor because I can't hop up in time, you know.

Q. Tell me some of the things you can't do now in terms of dance, so I can get a better handle on how this

BRANDNER 00269

Page 24

is affecting you.

A. I can't do clogging or tap because I can't, you know, make the actual sounds because I can't pick up my foot. I can't really do ballet anymore because, you know, you have to be able to point and do those sort of things, and I can't really point.

A lot of times in acro, like say I was to do a round-off back handspring, because of the way I would land on my feet, because I couldn't flex my foot to come down, my toes would jam into the floor. I can't do that sort of thing.

Q. Let me stop you. Were you able to do that between the point in time that you stopped seeing Matthews and Dr. Sharpe's surgery?

A. Was I able to do a back -- round-off back handspring?

Q. Yeah.

A. No, I could not do a round-off back handspring. I could do a simple round-off, but not a back handspring at that time. My leg wasn't strong enough.

Q. And it would hurt when you did it?

A. Yeah.

Q. Okay. Keep going. Tell me some --

A. We're still talking about dance?

Q. Yeah, examples of how it's limiting your ability

Page 25

to do dance now.

A.    I can't -- like I said, I can't do a lot of things on the floor because of it, because like in a -- in dance we do a thing called a toe rise, and I can't do that because I can't flex my foot or put weight on the point of my foot.

Q.    Let me just stop you real quick.  Most of the things you just told me, were you able to do that before Dr. Sharpe's surgery?

A.    Yeah, I did do tap and I did do clogging and I did do -- I could go down on the ground in hip-hop, and I did do some ballet.  Even though they hurt, I was still -- I could still, you know, participate in them.

Q.    You just couldn't do them like you wanted?

A.    Exactly.

Q.    Okay.  And then you had the pain when you would do some of these maneuvers?

A.    Yes.

Q.    All right.  Well, have you given me what you can think off the top of your head --

A.    Yes.

Q.    -- are examples of what you can't do?

A.    Yes.

Q.    Since the surgery with Dr. Sharpe, have you gotten back into discus at all?

Page 26

A.    I did try at Red Mountain my senior year -- that was this year -- to get back in.  I had gone to the head coaches and discussed them -- to them my -- how I couldn't flex my foot and everything, and I asked if that would affect my discus throwing.

And they said, "Well, yeah, it would affect it, but I'm sure you could still try."  So I did try. And because I can't flex my foot, I wouldn't run the track with them.  They'd do two laps in the beginning, and I wouldn't run with them.  And then there would be certain exercises to warm up for track like box jumps and jump-roping, things I couldn't do.

And then in throwing the discus, there's a move, you can either throw it called post where you just throw it standing, or you can do a spin and throw it, which gives you more leverage and the disk goes further. I couldn't do that because I can't flex my foot.

And after a while I was falling behind because I couldn't do a lot of these things, so I just quit.

Q.    Who is your coach?

A.    Coach Marquis was our throwing coach.

Q.    Coach what?

A.    Coach Marquis, Mr. Marquis.

Q.    Who is the head coach?

BRANDNER 00272

Page 27

A. The head coach of track was Mr. Jones.

Q. Okay. So you tried to do it, but you couldn't keep up with the training and couldn't make some of the moves that you needed, so you just gave up on it?

A. Yes.

Q. Had you been back to throwing discus -- well, strike that.

Had you been throwing a discus in the months leading up to Dr. Sharpe's surgery?

A. Yes, I did. I threw almost all the way -- I threw up to probably May 10th because that's when -- around when State was, and I threw through State.

Q. And that was still affecting how well you were able to do it?

A. Yeah, the pain was definitely.

Q. Okay. You did compete at State?

A. Yes.

Q. And how did you throw?

A. I was -- there's three different brackets. I was placed in the top bracket with the top throwers, but at State -- at State I threw particularly pretty poorly. It wasn't a good day for me. I did finish last in my bracket.

Q. How many kids were in that bracket?

A. I don't know exactly. I'd say probably five or

Page 28

six.

Q. Now, do you think the fact that you threw poorly that day had something to do with how you were feeling with your leg?

A. Not particularly. I mean, it hurt like it had before, but I just wasn't on that day.

Q. And Red Mountain's 5A, isn't it?

A. Yes.

Q. How did you do at the regional meet?

A. Oh, I'm not sure. I don't really remember. I'd say, because I don't remember, probably average.

Q. Okay. Your dad said you were a pretty good student. Is that right?

A. Yes.

Q. What was your GPA, do you remember?

A. Finishing when I graduated?

Q. Yeah.

A. I think it was a 3.9.

Q. And did you get any scholarship offers as a result?

A. We thought that we would from U of A, but we didn't. That's why I didn't end up going there, because I needed some scholarship money 'cause I was going to live on campus and have to pay for tuition and books and all that other stuff, so a representative from ASU had called

Multi-Page™

Page 29

and left a message on our phone saying he was surprised that I didn't apply there because of -- my academics and my SAT scores were pretty good, so he asked me to come to a meeting with him at Red Mountain.

So I did, and he told me to apply because they had some leftover scholarship money, and so I just applied, and my application is being --

Q. Reviewed?

A. -- reviewed, and I might get scholarship money, I'm not sure.

Q. Did he say how much you might get if you're approved?

A. He said I could get anywhere from, you know -- well, he said I could get a full ride, I might. But I might not, so I mean, it depends on how it goes.

So right now I don't have any scholarship money, but there is a possibility.

Q. Okay. And if you get that, you're going to go to ASU East?

A. Yes.

Q. And your idea is to study what?

A. I want to do premed. That's what I -- that's what I'm focusing on right now, to be an ophthalmologist.

Q. Why do you want to be an ophthalmologist?

A. I just felt -- feel kind of led by the Lord, I

**LEA, SHERMAN & HABESKI        PHOENIX, ARIZONA (602)257-8514**
BRANDNER 00275

Page 30

guess you could say. I was pointing towards that.

There's no particular reason. I mean, I've always wanted

to, you know, do something to help people, but -- or, you

know, like be a lawyer or doctor or something, you know,

that would challenge me.

Q. My brother's an ophthalmologist. Go the

ophthalmologist route.

MR. CAUSEY: Ophthalmologist.

A. Just something, you know, above average, not

like -- I had worked many years with my dad, and I didn't

want to do something that was, you know, that much labor,

outside, working with your hands. I'd rather do

something -- 'cause I've succeeded in academics --

something that would challenge my brain more than my

hands, I guess you could say.

Q. BY MR. CRAWFORD: Okay. So regardless of this

injury to your leg that occurred playing football and the

problems you've had since, you've had experience working

in the construction industry?

A. Yes.

Q. And nothing wrong with working in the

construction industry, but that's not where ████████

wanted to end up, fair?

A. Yes.

Q. You're more interested in advancing your

BRANDNER 00276

Page 31

education and doing some kind of white-collar job or something like that?

A.    Yes.

Q.    Okay.

MR. CAUSEY:  You know, Ira Fulton's done pretty good, though.

THE WITNESS:  Who?

MR. CAUSEY:  Ira Fulton.

THE WITNESS:  Who's that?

MR. CAUSEY:  Of Fulton Homes.  I'll tell you later.

MR. CRAWFORD:  Off the record.

(Discussion off the record.)

Q.    Do you have any plans to work this summer?

A.    I was just discussing with my mom that I want to get an application to Sports Authority, and if I get hired, work there, and if I don't, my dad said I could work with him this summer.  So either way, I'll either work there or with my dad.

Q.    How many classes a week do you help teach?

A.    Oh, I have three acro -- or three tumbling classes, one tumbling private, and I help my brother -- or one hip-hop class, and then I help my brother in his hip-hop class, so I have --

Q.    Six or seven?

BRANDNER 00277

Page 32

A.    -- five.

Q.    Five, okay.

A.    Five, six.  Yes, six.

Q.    One of them's private --

A.    Yes.

Q.    -- now?

A.    That's just one on one, me and one student.

Q.    Teaching them what?

A.    Tumbling.

Q.    What aspects of tumbling?  Everything?

A.    Mostly the basics.  What I do with her is I critique what she does, and I spot her a lot.

Q.    Okay.

A.    That's what I do in there is spot mostly.

Q.    How many hours a week are you involved with teaching dance?

A.    Probably four to five hours a week.

Q.    Does your mom have a dance studio?

A.    Yes.

Q.    Where is it located?

A.    On Higley and Southern.

Q.    And do you get paid for that?

A.    Yes.

Q.    What do you get paid?

A.    I get paid per class, which is 45 minutes, so I

BRANDNER 00278

Multi-Page™

Page 33

don't know exactly what it is per hour, but I get $6 a class and then $15 every half hour for my private.

Q. So what do you earn a week?

A. Probably like $25. 20, $25 a week.

Q. Is there opportunity to do more of that or not?

A. Yes, there is actually. I'm taking on a couple -- one more hip-hop class during the summer and I think another private after the concert, which is June 18th.

Q. You say "concert." Is that the same as recital?

A. Yes, that's what --

Q. And where is it going to be at?

A. Apache Junction High.

Q. Are those typically videotaped?

A. Yes.

Q. Have you been in any recitals since the surgery by Dr. Sharpe?

A. Yes.

Q. And how many?

A. I think I've been in two recitals, and we've competed probably two or three times.

Q. What do you mean? Are those different?

A. Yes. A competition is where a bunch of people go and compete and win awards.

Q. Are those videotaped, too?

**LEA, SHERMAN & HABESKI     PHOENIX, ARIZONA (602)257-8514**

BRANDNER 00279

Page 34

A. Yes, they are videotaped, but you have to buy the videotapes.

Q. Okay. Have you boughten any of the videotapes?

A. I think we've bought one or two, but I don't know exactly how many.

Q. Well, your mom runs the show; she probably gets a videotape for free, at least with the recitals, right?

A. With the recitals, yes, we have videos.

Q. Okay, you have those. Do those show you dancing at all?

A. Yes, they do.

MR. CRAWFORD: I asked for those.

MR. CAUSEY: I thought I had given you all the ones where you could actually see him in, but I'll give you all of them and you can decide.

MR. CRAWFORD: I don't think you've given me anything at this point.

MR. CAUSEY: Oh. Well, then maybe we gave them to prior counsel first, but I have them in a file and you can have copies of all of them.

MR. CRAWFORD: Yeah, I'd like all of the videotapes.

MR. CAUSEY: Just off the record here a minute.

(Discussion off the record.)

BRANDNER 00280

Page 35

Q.    BY MR. CRAWFORD:  Okay.  You've done two recitals and three competitions?

A.    As far as I know, yes.

Q.    In the recitals, what type of dance did you do?

A.    Now, ever since the surgery with Dr. Sharpe, all I do is modern, hip-hop, and I'm not sure if I've done any tumbling.  But I know that those are the two dances that -- the two types of dances that I do, are modern and hip-hop.

Q.    And how about the competition?  Same thing?

A.    Same thing.

Q.    And how did you guys do in any of the competitions?

A.    We do pretty good.  Mostly firsts and seconds. Me and my brother do pretty well when -- we do a duet in every concert, and usually at the competitions we usually do pretty well.

Q.    Okay.  There's something in your answers to interrogatories that said that you've lost out on the opportunity for a dance scholarship.

A.    Yeah.  We did this thing in -- at U of A called "Jazz in AZ."  It was a dance convention.

MR. CAUSEY:  Say that again for the court reporter.

A.    "Jazz in AZ."  And it's a dance convention,

Page 36

which is you go and take classes from a professional dancer, and they tell you -- they teach dances and you learn, you know, special types of dances and how it is in the professional world.

So there they did have auditions for scholarships money, scholarship moneys from the dance department, and I did an audition, and, you know, I thought that if I could go back and audition, that maybe I could get some scholarship money, you know, to U of A.

Q.   BY MR. CRAWFORD:  Okay.  Was this before or after the surgery by Sharpe?

A.   Jazz in AZ was before, and then I wanted to go back but I never did go back.

Q.   Okay.  The purpose of going to that was to see about getting scholarship money --

A.   Yeah, it was to audition, yes.

Q.   -- to U of A?

MR. CAUSEY:  Let him finish, let him finish.

THE WITNESS:  Oh, I'm sorry.

Q.   BY MR. CRAWFORD:  Did anybody approach you about offering you scholarship money?

A.   As far as I remember, I remember one of the teachers -- I think I remember one of the teachers talking to my instructor, telling her that she would like to see

Page 37

me come audition 'cause there's a good chance that I could get some scholarship moneys, especially because I was a guy, and there weren't many guy dancers that could perform like I could.

Q. When was that Jazz in AZ down at U of A?

A. I'm not quite sure exactly when.

Q. Well, was it before you broke your leg during football?

A. I don't remember.

Q. Do you remember it being after you broke your leg in football?

A. I don't remember exactly when, no.

Q. Okay. No formal offer was ever made of any type of scholarship money, fair?

A. Not that I know.

Q. Okay. Is there some way you can figure out when that Jazz in AZ was?

A. Yes, there is a way.

Q. How?

A. I could talk to my mom or --

Q. Okay.

A. -- Stephanie.

Q. All right. Have you looked into whether there's -- strike that.

Does ASU have dance as part of its

Page 38

curriculum?

A. Yes.

Q. Have you looked into whether there may be any scholarship money for you there?

A. I know they do offer scholarships, yes.

Q. Have you looked into whether they might be willing to offer any for you?

A. No. Well, no, I have not.

Q. Why not?

A. Because I don't feel that I'm good enough to even try out, I guess.

Q. So you've made that decision based on where you feel you're at in terms of your abilities?

A. Yes.

Q. As of the end of January 2002, had you become pretty frustrated with what Dr. Matthews was telling you about the condition of your leg?

A. Yes.

Q. And there was something in one of your legal documents that you felt like he was blowing off the problems you were telling him you were having?

A. Yes.

Q. Meaning he didn't appear to be really taking them seriously?

A. Yes.

Page 39

Q.    And at that point you were having a fair amount of pain?

A.    Yes.

Q.    And there was this obvious deformity of your leg?

A.    Yes.

Q.    And it was interfering with your activities?

A.    Yes.

Q.    And you were telling him all of that, and it didn't seem to be registering with him?

A.    No.    I remember specifically, when I used to tell him about the lump on my leg, he used to show me this bone callus he has on his finger from some accident where he broke his finger; and he kept comparing it, and I used to say to that, "Well, this is really big and it hurts," and he kind of just, you know, blew it off.  That's what I remember specifically.

Q.    Okay.  So is it fair to say that you, your mom, and your dad decided that you needed to seek an opinion elsewhere?

A.    Yes.

Q.    The first person that you went to see at Mezona Orthopedics was Dr. Marc Dinowitz.  Do you remember that?

A.    Yes.

Q.    Do you remember that visit with him on March 22,

Page 40

2002?

A. I don't remember that, if that was the exact visit, but I do remember a visit with him where he got a protractor or something to measure the angles of my leg from an x-ray and that they were some amount of degrees off.

Q. Okay. My understanding is you only had one office visit with Dr. Dinowitz. Is that your memory?

A. I don't know if it was more than one, but I know -- I do remember only one, so --

Q. Okay. The records suggest there was only one.

A. Okay.

Q. Let's assume there was one. You remember during that visit that he got a protractor out, held it up to the x-ray, and did some kind of measurement?

A. M'hum, yes.

Q. What else do you remember about that meeting with Dr. Dinowitz?

A. That he was going to take that and show it to somebody and see what they had to say.

Q. Did he say why he was going to take it to someone and show it to them and see what they had to say?

A. Because that there was enough -- a big enough angle, it was off enough to actually do something about it because it was not right, I guess.

Page 41

Q. Did he ask you at the beginning of the visit how this was affecting you and what kind of problems you were having with it?

A. Not that I remember.

Q. You don't remember that?

A. I don't remember if he did ask me.

Q. Is it something you may not remember at this point?

A. Yes.

Q. Okay. So do you remember him saying that he was going to conference your case with some other doctors?

A. I don't know if it was him that said it, but I do remember that being said, yes.

Q. Okay. So you remember the x-rays and the use of the protractor. Is there anything else you remember of that visit with Dr. Dinowitz?

A. No. Not right now.

Q. Do you remember him saying whether he thought surgery would be needed?

A. I don't remember him discussing surgery, but I do remember him saying that it was definitely a problem.

Q. So it was definitely a problem, and something needed to be done?

A. Yes.

Q. But you don't remember the specific word

Page 42

"surgery"?

    A.   No.

    Q.   He may have and you just don't remember it?

    A.   Yes.

    Q.   Do you remember Dr. Dinowitz calling your home and discussing the results of this conference?

    A.   No, I don't remember that.

    Q.   Is the next thing you remember after meeting with Dr. Dinowitz that an appointment was scheduled for you to see Dr. Sharpe?

    A.   I don't remember that exactly, but I do remember seeing Dr. Sharpe after seeing Dr. Dinowitz.

    Q.   Do you remember seeing anybody else in between Dr. Dinowitz and Dr. Sharpe?

    A.   No, I don't remember.

    Q.   All right. The first visit, according to the records, with Dr. Sharpe was April 11, 2002; does that sound consistent with your memory?

    A.   Yes.

    Q.   Tell me what you recall of that meeting with Dr. Sharpe.

    A.   I don't really recall much. I couldn't say anything, you know, exact or I don't really remember anything at all, unless you could bring it up to me and tell me and then I could --

BRANDNER 00288

Page 43

Q.   Well, do you remember him asking you what kind of problems you were having with the leg?

A.   No, I don't.  I don't remember anything.

Q.   You're not denying that he asked you that?

A.   No.

Q.   And do you remember him asking you what types of things you wanted to do long-term?

A.   No, I don't remember.

Q.   You're not denying that he asked you that?

A.   No.

Q.   Do you remember him doing a physical examination of your leg?

A.   What does "physical examination" mean?

Q.   Touches your leg, moves the leg, sees what the leg can and cannot do.

A.   Yeah.  I don't know exactly when he did that, but I do remember him, you know, bend- -- or torquing it, asking if it hurt, and I told him that it did hurt and where it hurt.

Q.   Okay.  So basically he held your calf with one hand and he held your foot with the other hand and he moved it around?

A.   Yes.

Q.   Did you call it torquing it?

A.   Yes.

BRANDNER 00289

Multi-Page™

Page 44

Q.   Okay.  And he asked you what caused the pain, things like that?

A.   Yes.

Q.   Do you remember him getting x-rays done that day or going over them with you?

A.   No, I don't remember.

Q.   Do you remember him discussing x-rays with you?

A.   No, I don't remember.

Q.   Okay.  Do you deny that he did that?

A.   No.

Q.   Do you remember him discussing the fact that he'd like a CT scan or CAT scan done of the leg?

A.   Yes, I do remember that.

Q.   Do you remember him telling you why?

A.   To see if it was healing or not, because that could be a source for pain, was that it wasn't healed.

Q.   Do you remember him telling you that that would help in terms of planning a surgery?

A.   Yes.

Q.   Is this the time when you saw Dr. Sharpe that you remember him going over the risks that we talked about earlier?

A.   I don't know.  I'm not sure if that's when it happened.

Q.   His records and his testimony in this case will

Page 45

be that he discussed potential risks and complications with you and one or both parents on two occasions before surgery. Would it be your testimony in this case that he didn't do it on two occasions or you just don't remember?

A.    I just don't remember.

Q.    So it may have happened, but you don't remember it?

A.    Yes.

Q.    Do you remember him discussing what the various options were?

A.    Options being types of surgery?

Q.    Types of surgery, not doing surgery.

A.    I remember two, because the one we did and another one, which him and one doctor both discussed. The one that he did where he'd rebreak it and attach a plate to keep it there. And then another where they'd insert some sort of rod into it, into my leg. I don't know the details of that one.

Q.    Okay. Do you remember understanding that you didn't have to have surgery?

A.    I knew I could -- there was the option of not having surgery at all and just staying how I was.

Q.    Yeah, living with it?

A.    Yes.

Q.    But you didn't want that one?

Multi-Page™

Page 46

A. Yes.

Q. Do you remember having ankle pain?

A. When?

Q. The first time you saw Dr. Sharpe.

A. After Matthews, the first time I saw him?

Q. Yeah, the very first visit you had with Dr. Sharpe, whichever day that was, do you remember complaining of ankle pain?

A. No, not -- not exactly.

Q. Were you having pain with your ankle?

A. I could have. I -- I don't really remember it precisely right now. I mean, my leg hurt all the time, so I know that there was one focus pain where the break was, but it could have hurt in other places and I just don't remember.

Q. So the pain had gotten to the point where it was hurting all the time?

A. Yes.

Q. And then certain activities made the pain worse?

A. Yes. I mean, I guess you could say it was uncomfortable when I would just sit there, but when I'd actually do activity on it, it would hurt.

Q. What kind of pain? Was it a sharp pain?

A. Yes.

Q. Was it like a throbbing pain?

Page 47

A. It came to that every once in a while, but like as soon as it happened, like say I were to jump on my leg, it would be a sharp pain, yes. And then after that it would throb.

Q. How long would that usually last?

A. I don't remember.

Q. Is it something that could go on for a number of hours?

A. I -- I don't remember exactly. I know it lasted a while, but I couldn't tell you any sort of amount.

Q. Do you remember, after this last visit with Dr. Matthews in January 2002, developing any pain in your ankle at any point?

A. Not exactly, no, I don't remember.

Q. Do you remember that one of the things Dr. Sharpe discussed was something called an osteotomy where he would cut the bone?

A. I don't remember that. I do remember him discussing that that would happen in one of the surgeries, that he would have to cut the bone to rebreak it, and I don't remember the word oste- --

Q. Osteotomy?

A. Yes.

Q. Okay. Do you remember Dr. Sharpe saying that it was unlikely your leg would get better on its own?

Page 48

A. With no surgery at all?

Q. Yeah.

A. I don't remember, no.

Q. Okay.

A. I kind of figured that it wouldn't just heal itself because it hadn't but --

Q. Appreciate that, but you don't remember him saying that?

A. No.

Q. Is it fair to say, ████, that you remember one visit with Dr. Sharpe; if there were two, they're probably just kind of jumbled together in your memory?

A. Discussing the --

Q. Yeah.

A. -- risks?

Q. Yeah, everything.

A. Wait, what's the question?

Q. Let me rephrase the question. The records indicate you had two office visits with Dr. Sharpe before the surgery.

A. Okay.

Q. You've told me you remember at least one.

A. Yes. They probably did just join together.

Q. And you may have had a second visit; you don't remember?

BRANDNER 00294

Page 49

A.   Yeah.

Q.   What I'm trying to get at, and let's assume there were two visits, are you telling me you can't differentiate between two visits, that whatever was discussed is just kind of meshed together in your brain?

A.   Yeah, that I just remember certain things from both visits that kind of join together.

Q.   Do you remember who was present in terms of your mom or dad during the visit with Dr. Sharpe that you do remember?

A.   I remember my mom was there for almost every one, but I don't remember if my dad was there or not.

Q.   All right.  Do you remember a visit with a physician's assistant by the name of Brian Sharp before surgery?

A.   I know who he is, but I don't remember an exact visit.

Q.   Okay.  Do you remember, between you, your mom, and/or your dad, telling Dr. Sharpe that between the choices of doing nothing and living with this and surgery, you'd rather do surgery?

A.   Do I remember discussing that with them?

Q.   Yes.

A.   I don't remember exactly, but I know that I did, just because I would have discussed with them.

BRANDNER 00295

Case: 1:10-cv-08161 Document #: 81-26 Filed: 12/13/11 Page 51 of 65 PageID #:2803

Page 50

Q. Okay. But do you remember communicating to Dr. Sharpe that between the choice of not doing surgery and surgery, you'd rather do the surgery and see if things could get better?

A. Yes. It was apparent that the good outweighed the bad to me. And when he discussed the risks, I remember him telling me that there was a small percentage that these things would happen and that kind of stuff.

Q. Okay. And what did he say the potential benefit of the surgery would be?

A. He said that it could come out a hundred percent, as far as I remember, that, you know, it would be straight and that I would be able to get back to my activities almost as normal.

Q. Okay. Put aside, you know, the drop foot, which I understand is a problem for you; I'm not belittling that, okay?

A. Yes.

Q. But did the surgery correct the alignment and the deformity of the leg?

A. Yes, it's straight now. I mean, there is still -- there's not the lump, but there is scars that are a deformity.

Q. They're not what?

A. They are a deformity, the scars that are left

BRANDNER 00296

Page 51

there.

Q.   I didn't understand what you said.  They are --

A.   A deformity, the scars.

Q.   Oh, okay.

A.   The actual lump isn't there.

Q.   The scars are a deformity to you?

A.   Yes.

Q.   All right.  Putting aside the scarring, I'm talking about the shape of the leg and the alignment of it, does it look good to you?

A.   Yes.

Q.   Do you remember why you were taken to see Dr. Thomas Walls in Scottsdale in the middle of April 2002?

A.   Because we wanted another opinion.

Q.   About what?

A.   To see if surgery was the right path and to see what surgeries he would offer, if any different ones.

Q.   And do you remember who went with you on that visit?

A.   Yes.  My mom.

Q.   And do you remember what Dr. Walls said?

A.   I remember him saying that -- discussing a surgery, that he would insert a rod into the bone.  That's all I remember.

Page 52

Q. Okay. Did he say that he agreed that surgery was necessary?

A. I don't know if he said that. I just remember him discussing that one surgery with us. I don't know if he said that would be the way to go. He was just giving us options, I think.

Q. Okay. Well, what other options did he give you?

A. That's all that I remember.

Q. So the only option he gave you was surgery?

A. As far as I remember, yes.

Q. Or doing nothing?

A. Yes.

Q. Okay. What I'm trying to find out is you're going now to see Dr. Walls for yet another opinion, and is the essence of what he told you that he thought it needed to be corrected by some type of surgery?

A. Yes. It did need to be corrected, yes.

Q. And then after Dr. Walls, you went back to see Dr. Matthews?

A. Yes.

Q. Why did you go back to Dr. Matthews?

A. I don't remember. I do remember when we were there that he said that he had heard through the physicians' grapevine that we were getting second opinions. That's what I remember from that visit.

Page 53

Q. Well, do you have any recollection -- this is a guy that you had been unhappy with, right?

A. Yes.

Q. And now you're going back to see him again?

A. Yes.

Q. Do you have any understanding why?

A. I think we were giving him one last chance maybe to see if he would discuss that he was wrong and some sort of way we could fix it.

Q. Okay. Did you get the sense during that visit that he blew you off again?

A. I got the sense during that visit that he was more upset that we were getting second opinions than even focusing on my leg.

Q. Okay. Were you satisfied with that visit with Dr. Matthews?

A. Not at all, no.

Q. Okay. Did he seem to again belittle the problems you were having?

A. Yes.

Q. Was there any discussion with him about surgery versus not having surgery?

A. No.

Q. Okay. I'll tell you that you had a couple of CT scans on your leg. Do you remember that?

Page 54

A.   Yes.

Q.   And I'll tell you that after those CT scans on the leg, there was another visit at Mezona, and Brian Sharp, physician's assistant, and Dr. Sharpe were involved.

Having tried to orient you about -- in a chronology when it all happened, do you remember now this visit with Dr. Sharpe after the CT scan had been done?

A.   I think I do, because I remember him discussing the CT scan and that did it show that it wasn't healing, that there wasn't a -- or there was mal-something or other, or there wasn't mal-something.

Q.   Malunion?

A.   Yeah.  Yes, that's the word.  I just remember him saying that it wasn't healing exactly like it should have been.

Q.   Okay.  So is there anything else about that specific visit with Dr. Sharpe that you remember, other than the discussion about the CT scan results and what it meant?

A.   No.

Q.   The surgery takes place at Mesa Lutheran Hospital on June 26, 2002.  Do you remember any discussions with Dr. Sharpe or with Brian, his physician's assistant, before the surgery?

Multi-Page™

Page 55

A. Not exactly, no. I can't really differentiate between meetings at his office or meetings at the hospital before that.

Q. When do you first remember speaking with Dr. Sharpe about the problem not being able to move your foot?

A. I remember him discussing it with me before I ever said anything to him. I was in the hospital bed and he said something. He asked me if I could move my foot or flex it, I wasn't sure -- I'm not sure which one, and I wasn't able to at that time.

And he said, as far as I remember, that "There might be some nerve problem, but we'll have to wait to see."

Q. Do you remember how many days after surgery it was that he discussed that with you?

A. No. I know that it was recently -- or pretty close. I'm not sure how many days. But I remember that I was still -- my leg was still pretty swollen at that time of the surgery.

Q. Did you ever get the sense that Dr. Sharpe was trying to be evasive about that problem or not explain what happened?

A. No.

Q. So he was pretty up-front about it?

BRANDNER 00301

Page 56

A. Yes.

Q. And do you remember him saying basically "This is a problem," that it could be temporary; it might get better, or it might not?

A. I don't really remember that at that time.

Q. Do you remember him telling you why it happened?

A. No.

Q. You had a number of other medical complications during that hospitalization?

A. Yes.

Q. Do you remember being told why they probably happened?

A. Some sort of hepatitis, a liver infection.

Q. Okay. You had another surgical procedure by Dr. Sharpe where there was like a blood clot that had built up in the leg?

A. Yes. A Melatoma.

Q. Hematoma?

A. Hematoma.

Q. Pretty good.

MR. CAUSEY: You're close. One letter off.

MR. CRAWFORD: Not bad.

Q. BY MR. CRAWFORD: And do you remember him telling you why he thought that he needed to go in and

Page 57

drain that out of there?

A.   Yea, because it could have caused infection, so he wanted to clean it out so it wouldn't infect my leg.

Q.   Was that just an in-and-out, outpatient procedure?

A.   I don't know what that means.

Q.   Where you go in, have surgery that day, it's done, and then you're discharged that same day?

A.   No.  I was there for a couple days, I think.

Q.   Couple days?  At some point do you remember him recommending that you see Dr. Peter Mitchell?

A.   Which doctor is he?

Q.   I think he's the one that ended up suggesting this carbon fiber brace.

A.   Oh, yes, I do remember him.

Q.   Okay.  Do you remember Dr. Sharpe was the one who recommended you see Dr. Mitchell?

A.   Yes.

Q.   And it was to see what he thought might be able -- what could be done to maybe help out this situation?

A.   Yes.

Q.   And one of the things Dr. Mitchell came up with was this new carbon fiber-type brace?

A.   Yes.

BRANDNER 00303

Page 58

Q. And did Dr. Sharpe help in getting that arranged for you?

A. I don't know if he helped with arranging for me to get the brace, but I know that he sent me to Dr. Mitchell, who sent me to get the brace.

Q. Has that brace helped you?

A. It does what the -- it does what the other braces do, except it's a lot lighter, and the other braces rubbed a lot more. This one doesn't rub as much, but it does still rub a little bit.

Q. Okay. So it does the same basic function as the other braces, but it's more comfortable?

A. Yes, it is way more comfortable.

Q. And a lot lighter weight?

A. Yes.

Q. Is that the one you wear now?

A. Yes.

Q. What church do you go to now?

A. Central Christian.

Q. Where is that located?

A. On Lindsey and Brown -- or Lindsey and adobe, I guess.

Q. And what types of activities do you do over there?

A. I normally just attend the service. I did go to

Page 59

the youth group a couple times, but I didn't really connect, so I didn't stay there.

Q.   Okay.   When you say "the service," are you talking about on Sunday mornings?

A.   Yes.   It's just where you -- the preacher preaches and you sing some songs.   Not Sunday school or the youth group.   It's the normal Sunday service.

Q.   Oh, so you don't -- do they have a separate youth group meeting on Sundays?

A.   Yeah.   It is at the same time as the service. You can either go to the teenage service or you can go to the normal service, and I choose to go to the normal service.

Q.   So you can't do both?

A.   No.   Well, you might be able to.   I don't know if they offer an earlier one, but --

Q.   Okay.   But you've never really connected with the youth group over there?

A.   No.   I do attend my dad's church, too, often.

Q.   What's that, which church?

A.   That is called San Tan Heights.

Q.   Baptist church?

A.   Yes.   And that's -- that youth I've connected with a little more.   I haven't really done any activities, but I did attend Sunday school almost every other Sunday,

BRANDNER 00305

Page 60

and I enjoyed the youth pastor. And me and my girlfriend e-mailed him and his wife occasionally.

Q. Does that offer a youth group in the sense that you can do activities?

A. Yes.

Q. But you haven't done that yet?

A. No, no activities.

MR. CAUSEY: Can we take a short break?

MR. CRAWFORD: Absolutely.

MR. CAUSEY: It looks like you're kind of finishing up your notes as well, or at least that topic. Is this a good time to break?

MR. CRAWFORD: No. Just picking them up and looking to a different page.

MR. CAUSEY: Good time to break?

MR. CRAWFORD: Yeah, it's fine.

(Recessed from 1:01 p.m. until 1:10 p.m.)

Q. ███ your attorney has disclosed a Dr. Patrick Brandner, who is an orthopedic surgeon up in Las Vegas, as an expert in this case. Have you been evaluated by him?

A. No.

Q. Dr. Sharpe had a nerve conduction study performed; do you remember that?

A. Yes.

Q. Do you remember him discussing the results of it

Page 61

with you?

A.    Vaguely.  I remember him saying that my side-to-side movement has come back, but I still don't have any dorsiflexion.

Q.    Immediately after surgery and for the months following, were you able to move the foot side to side?

A.    I don't remember.  I don't think I was.

Q.    Can you now?

A.    Move it side to side?

Q.    Yes.

A.    Yes, I can.

Q.    You said that you used to go wakeboarding?

A.    I had been twice.

Q.    Who had you gone with?

A.    I don't really remember.  I think it might have been one of my dad's co-workers, but I'm not sure.

Q.    Do you remember how long ago it was that you last went --

A.    It was --

Q.    -- wakeboarding?

A.    -- the summer before I was playing football, the summer before I had broken my leg.

Q.    So that's not something you did a lot?

A.    No.  I had done it twice, and I liked it.

Q.    So your plan for the summer is to perhaps work

BRANDNER 00307

Page 62

part-time for your dad, work part-time for your mom, and then maybe do a job with Sports Authority?

A.   Yes.

Q.   Have you applied to Sports Authority?

A.   Not yet, no.  I'm kind of waiting till after this recital because we have a lot of practices at the dance studio.

Q.   And that recital is when, again?

A.   June 17th and 18th, I think.

Q.   So you're busier now than you normally are?

A.   Yes.

Q.   How many hours a week are you putting in because of this upcoming dance recital?

A.   Maybe a couple more hours because of rehearsals with the kids.  I don't know if -- we don't have extra classes; we just have extra rehearsals.

Q.   Okay.  Do you have an understanding that there are openings at Sports Authority?

A.   Yes.

Q.   Do you know somebody that works there?

A.   Yes.

Q.   And do you know how many hours a week you'd be working if you got the job?

A.   No, I don't know exactly.

Q.   Is your plan --

Multi-Page™

Page 63

A.    It would have to fit in with my schedule at the studio, the dance studio.

Q.    When do you work at the dance studio, what hours of the day?

A.    It's usually -- well, the schedule's going to change after the recital, and that's when I would start working, and I would work on Mondays, so I'd have to take Monday off from Sports Authority.

So anywhere -- any other day than Monday probably I could work there.

Q.    And do you want to work full-time, then, if you can?

A.    If I could, yes.

MR. CRAWFORD:  Okay.  That's what I think I have for you.  Thank you.  It was nice meeting you.

THE WITNESS:  Thanks.

MR. CAUSEY:  We're good.  Your mother can now change seats.

(1:14 p.m.)

Page 64

STATE OF ARIZONA )
) ss.
COUNTY OF MARICOPA )

BE IT KNOWN that the foregoing deposition was taken before me, Jean L. Lea, a Certified Court Reporter in the State of Arizona; that the witness before testifying was duly sworn by me to testify to the whole truth; that the questions propounded to the witness and the answers of the witness were taken down by me in shorthand and thereafter reduced to print under my direction; that the deposition was submitted to the witness to read and sign; that the foregoing 63 pages are a true and correct transcript of all proceedings had upon the taking of said deposition, all done to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

DATED at Phoenix, Arizona, this 30th day of June, 2005.

_____
Certified Court Reporter
Certificate No. 50004