# EXHIBIT "27"

Multi-Page™

THE SUPERIOR COURT OF ARIZONA

MARICOPA COUNTY

███████ and ███████ individually)
and as parents and guardians, and        )
███████, a minor,                        )
                                         )
                        Plaintiffs,      )
                                         )
        vs.                              ) No. CV2003-017451
                                         )
ANDRE MATTHEWS, M.D., and JANE DOE        )
MATTHEWS, husband and wife; KIPLING P.   )
SHARPE, M.D., and JANE DOE SHARPE,       )
husband and wife; BAYWOOD ORTHOPEDIC     )
CLINIC, an Arizona Corporation; MEZONA   )
ORTHOPAEDIC, an Arizona Corporation;     )
VALLEY LUTHERAN HOSPITAL, an Arizona     )
Non-Profit Organization; et al.,         )
                                         )
                        Defendants.      )
                                         )

Tempe, Arizona
June 8, 2005
1:17 p.m.

DEPOSITION OF ███████

LEA, SHERMAN & HABESKI
Registered Professional Reporters
834 North First Avenue, Phoenix, Arizona   85003
(602) 257-8514   Fax:  (602) 257-8582
Reported by:  Jean L. Lea, RMR, CRR
Certified Court Reporter
Certificate No. 50004

BRANDNER 00311

Page 2


EXAMINATION INDEX


PAGE

By
   Mr. Crawford..................................... 4

BRANDNER 00312

Multi-Page™

Page 3
DEPOSITION OF KIM CLARK,

taken at 1:17 p.m. on June 8, 2005, at the law offices of

Crawford & Kline, Suite 101, 1920 East Southern Avenue

Tempe, Arizona, before JEAN L. LEA, RMR, CRR, a

Certified Court Reporter in the State of Arizona.


APPEARANCES:

          For the Plaintiffs:
               Koeller, Nebeker, Carlson & Haluck, LLP
               by WADE R. CAUSEY, ESQ.
               3200 North Central Avenue, Suite 2300
               Phoenix, Arizona   85012

          For Defendants Sharpe and Mezona:
               Crawford & Kline
               by BRUCE D. CRAWFORD, ESQ
               Suite 101, 1920 East Southern Avenue
               Tempe, Arizona   85282

BRANDNER 00313

Multi-Page™

Page 4

████████,

called as a witness herein, having been first duly sworn,

was examined and testified as follows:


EXAMINATION

BY MR. CRAWFORD:

Q. Can you tell us your full name for the record,

please.

A. ████████████.

Q. Mrs. ████ you've attended the two depositions

today?

A. Yes.

Q. Do you understand that if I ask you a question

that's unclear, that you shouldn't answer it and you

should ask me to clarify it?

A. Yes.

Q. All right. Have you ever had your deposition

taken before, other than the prior deposition in this

case?

A. Not that I recall.

Q. Have you reviewed any documents to help prepare

yourself for today's testimony?

A. I saw a document earlier that Wade showed me, a

disclosure by Dr. Sharpe.

Q. Okay.

Multi-Page™

Page 5

A.    And I read it quickly and -- well, parts of it quickly, and that's all.

Q.    Okay.  And is this the one where there's a summary of what his testimony may be in this case?

A.    Correct.

Q.    Okay.  And do you have some specific disagreements with that?

A.    Yes.

Q.    And what is it you disagree with?

A.    The portion that I read spoke of a time when he, prior to the surgery on ████, disclosed to us that there could be specifically nerve damage, including foot drop.  That was not the case.

Q.    All right.  You're saying he didn't do that or you don't remember it?

A.    He did not say that specifically.

Q.    Okay.  Did he say there was a risk of nerve injury?

A.    Yes.

Q.    All right.  Let's just me ask you about that particular topic.  Before surgery do you remember two separate meetings with Dr. Sharpe?

A.    Yes.

Q.    And do you remember during those two separate meetings he discussed, among other things, potential risks

BRANDNER 00315

Multi-Page™

Page 6

and complications of surgery?

A.     I do not recall him speaking about it in both. I recall the one -- the second one, where we had made the decision to go through with surgery and he was, you know, clarifying everything that he was going to do, going over the risks of surgery.

Q.     Okay.  His records indicate that he discussed risks with you during both visits.  Now, are you saying that that's something that did not happen or you don't remember it?

A.     I don't recall it that way because initially, when we met with him for the first time, there was no decision that we were going to go forward with the surgery, so he -- I just don't recall it because we hadn't made that decision yet.

Q.     All right.  If his records and his testimony in this case are that he did discuss potential risks and complications with you and your son --

A.     M'hum.

Q.     -- during both visits at his office before surgery, are you going to say that's not correct?

A.     I will say that I don't recall it in the first meeting for the reasons that I've already stated.

Q.     I understand you don't recall it for the reasons you stated, but are you going to go the next step and

Page 7

say --

A. No, I won't.

Q. -- that's not the truth, that did not happen?

A. No, I won't go that far.

Q. Okay. You're saying that it is possible that he discussed risks during both of those, but you do not remember that?

A. Correct.

Q. All right. You definitely remember it during the preop visit, which was the second visit?

A. Correct.

Q. You definitely remember that Dr. Sharpe sat down with you, your son, and your husband and went over potential risks and complications?

A. I don't recall ████ being there.

Q. His note says that ████ and his parents are present. Are you going to say your husband was not there, or you don't remember it?

A. I'll just say I don't remember it.

Q. Your husband was present during one of the meetings with Dr. Sharpe?

A. Correct, the first meeting.

Q. That's your recollection?

A. Correct.

Q. His records suggest that it was just you and

Page 8

[REDACTED] the first meeting.

A.    It was [REDACTED] and I the first meeting with anybody from Mezona.  The second meeting [REDACTED] was there.

Q.    Okay.  The first meeting was with Dr. Dinowitz.

A.    Correct.

Q.    Okay.  And I understand you and [REDACTED] were there for that meeting, right?

A.    Correct.

Q.    The next meeting was with Dr. Sharpe?

A.    Correct.

Q.    Now, are you saying that your husband was not present during that meeting?  Or was?

A.    The very first meeting with Dr. Sharpe, he was there.

Q.    Your husband?

A.    My ex-husband, yes.

Q.    Sorry.  The second meeting with Dr. Sharpe where you were specifically deciding and discussing surgery, your memory is that your husband wasn't there?

A.    Correct.

Q.    Is that a point on which your memory may be failing you?

A.    Possibly.

Q.    During the specific occasion before surgery where Dr. Sharpe went over potential risks and

Page 9

complications of surgery, at least you and your son ▮▮▮▮ were present?

A.    Correct.

Q.    Do you remember Dr. Sharpe telling you that one of the potential risks of surgery was death?

A.    Yes.

Q.    Do you remember him telling you that one of the potential ways in which death could occur was an adverse reaction to anesthesia?

A.    No.

Q.    If his records suggest he told you that, is that a point where you're going to say he didn't say that or you may not remember it?

A.    I may not remember it.

Q.    Whether death was due to the surgery in some way or anesthesia, you knew that if your son consented to this surgery and you consented to it, there was a risk that he could die?

A.    Yes.

Q.    Do you remember Dr. Sharpe telling you-all that infection was a risk?

A.    Yes.

Q.    And that that could be very serious?

A.    Yes.

Q.    Bleeding was a risk?

BRANDNER 00319

Page 10

A. Yes.

Q. And that that could be very serious?

A. Yes.

Q. Do you remember him talking about blood clots that could possibly develop?

A. I don't recall.

Q. Do you remember him talking about a condition called pulmonary embolism?

A. I don't recall.

Q. In terms of blood clots, is that something you may not remember but he may have told you?

A. Correct.

Q. Do you remember him telling you that ▬▬ could still have stiffness and/or pain after surgery?

A. Yes. Pain.

Q. Do you remember him telling you about stiffness?

A. I don't recall that.

Q. Do you deny that he told you that?

A. No.

Q. Do you remember him telling you that his hope was that this surgery would be successful, but there was no guarantee?

A. Not specifically that way. It --

Q. How did he phrase it?

A. That the chances of success were a high

Page 11

percentage that ▮▮▮ would be able to return to activities as normal.

Q. And did you glean from that, then, there was a smaller percentage that he wouldn't?

A. Correct.

Q. And you remember him telling you that one of the risks was nerve injury?

A. Nerve damage.

Q. Okay. Did you ask him any questions about that?

A. No, I did not. He listed them all one after another, so there was no great-length discussion of every single issue and how it might end up. There was just like a listing, these are the things that can happen.

Q. I'm not trying to be facetious, but the risk of death, you knew how that would end up?

A. Correct.

Q. When he told you that one of the risks was nerve injury or nerve damage, what did that mean to you?

A. I wasn't sure.

Q. Okay. When he was telling you about these potential risks or complications of surgery, did you ask any follow-up questions?

A. He gave us the impression that the risks were quite small in terms of these things occurring.

MR. CAUSEY: His question was whether you

Page 12

asked him any follow-up questions.

THE WITNESS:  Oh, I'm sorry.

MR. CAUSEY:  Try and answer his question.

A.  No, not specifically.

Q.  BY MR. CRAWFORD:  So he said, "These various risks I'm telling you about, they don't happen very often, but they are things you have to know and you have to understand could happen"?

A.  Yes.

Q.  Do you remember him discussing various options available to Scott?

A.  Yes.

Q.  What did he discuss?

A.  The opportunity to leave it the way that it was, and then a great deal of discussion about having a surgery and various ways that that surgery might go.

They had, "they" being Mezona, had collectively looked at ███ x-rays and made an opinion that he voiced to us that surgery was probably our best option for ███ to correct the situation, so that's why he spent a lot of time on the surgery portion.

Q.  Okay.  So he told you one of the options was do nothing, leave it alone, and see what happens?

A.  Correct.

Q.  He told you, in addition, there was various

Page 13

different ways the surgery could be performed from more of a technical standpoint?

A. Right.

Q. Okay. Do you remember him explaining using x-rays or a model or something how surgery would be performed to correct the problem?

A. I recall us looking at x-rays and him, you know, showing us again angles of degrees that things were off, but he said that he probably would need further tests to determine exactly what avenue surgery would be best for ▆▆▆▆

And that was -- the plan was to have further tests to see if there was rotation and, you know, even -- you know, it not healing because of the pain, there might be a reason to think that it might not have even healed correctly yet.

Q. Are we talking about the CT scans?

A. Correct.

Q. All right. So during both of the meetings with Dr. Sharpe, at least you and your son were present during both?

A. Yes.

Q. And so at least you as the mother were there to help make a decision on whether your son was going to have surgery or not?

Multi-Page™

Page 14

A. Yes.

Q. You didn't just leave it to your son who had just turned 15, did you?

A. No.

Q. You certainly respected what he had to say?

A. Correct.

Q. One of the things he had to say was "I don't want to live like this"?

A. Absolutely.

Q. And you and your husband had concluded: This isn't good, we don't want him to live like this?

A. Correct.

Q. Doing nothing and seeing what happened in the future was not acceptable to you guys, was it?

MR. CAUSEY: Form.

A. Not at this point.

Q. BY MR. CRAWFORD: Not at that point?

A. Right, I'm sorry, yes, not at that point.

Q. Let me jump to a totally different topic. What's your education background?

A. Through high school.

Q. Where did you go to high school?

A. Apache Junction High School.

Q. And your husband, did he complete high school?

A. Yes.

Multi-Page™

Page 15

Q. Your ex-husband?

A. Yes.

Q. Sorry, I apologize.

A. That is okay.

Q. Where did he go to high school?

A. Apache Junction High School.

Q. So you guys met there?

A. Yes.

Q. And you own a dance studio?

A. Yes.

Q. What is it called again?

A. Dance Network. I'm a partner, co-owner.

Q. All right. How big a dance studio is it?

A. Approximately 200 students.

Q. Where is it located?

A. It's on Southern and Leisure World Drive.

Q. You don't get all the people from Leisure World over there, do you?

A. No.

Q. You might not want to.

MR. CAUSEY: It's not the Fred Astaire Studio.

(Discussion off the record.)

Q. How long have you been involved with teaching dance?

BRANDNER 00325

Page 16

A. 29 years.

Q. And because of that, both of your sons have gotten interested in dance?

A. Yes.

Q. I'm going to give you the same time frame I gave your husband and your son, so I can get a better handle on what problems he was having before Dr. Sharpe's first surgery, okay?

A. Yes.

Q. So saw Dr. Matthews the end of January 2002. You guys became pretty unhappy with Matthews, right?

A. Yes.

Q. And did you have the same feeling, that he was basically blowing off Scott's complaints?

A. Yes.

Q. That you thought were very legitimate?

A. Yes.

Q. And ███ was having a lot of problems that Dr. Matthews didn't appear to be acknowledging?

A. Correct.

Q. Let's just arbitrarily take us to June 1, 2002, which would be about three weeks before Dr. Sharpe's surgery, okay?

A. Okay.

Q. I want to know how he was doing at that point

Page 17

and the problems he was having, okay?

A. Okay.

Q. Was he having a lot of problems with pain?

A. Yes.

Q. Was it a situation that had been getting worse over time?

A. Yes.

Q. Was it both a chronic-type pain as well as becoming a sharp and throbbing pain when he would do activities?

A. Yes.

Q. Had it gotten to the point where it was pretty much a constant situation where he was having some degree of pain in that leg?

A. Yes.

Q. Was the lower right leg obviously deformed to you as a mother?

A. Yes.

Q. And I've heard it was bowed in, and I've heard it was bowed out. What did it appear like to you?

A. There was a huge lump on the front of the leg just below the knee where the break was.

Q. Like another kneecap?

A. Correct.

Q. All right.

BRANDNER 00327

Page 18

A.   The leg, the calf bone, was bowed this way, in an arch, which bowed outwards but came back in, tilting the ankle inwards.

Q.   Okay.  So if we were looking straight down at his feet, from his head looking straight down to his feet, you're saying that the lower right leg from the knee to the ankle was bowed outward toward the right, correct?

A.   If it should be straight like so, the bone was like this, yes.

Q.   Right.  So the bow is to the outside?

A.   Correct.

Q.   But it caused the right foot to point in toward the left foot?

A.   Correct.

Q.   Do you have any pictures of that?

A.   I believe we have pictures.  There is a video also that is all ready to be given to you, I gather, that shows him standing on a stage clogging, and you can see his leg pretty good because he's wearing a pair of shorts.

Q.   Okay.

A.   And you can see kind of the . . .

MR. CAUSEY:  Excuse me, Bruce.

Is that one I already have?

THE WITNESS:  Yes, yes.

Multi-Page™

Page 19

MR. CAUSEY: Okay.

Q. BY MR. CRAWFORD: Okay. So there's a videotape during a recital?

A. Correct.

Q. In which he's in shorts, and it shows the bow pretty well?

A. Yes.

Q. And I know I'm going to get the opportunity to review these. During what type of dance routine?

A. Clogging.

Q. Clogging, okay. Other than that video, do you have any photographs of what this leg looked like?

A. I am not sure. I can look to see if we specifically have that.

Q. Would you see if you have pictures of what the leg looked like before Dr. Sharpe's surgery, please?

A. Yes.

Q. All right. And I think your attorney told you during ███████ deposition, but I do want copies of all of the videotapes of recitals or competition or even practice that will show what ████ was doing in terms of dance before this all happened, before Dr. Sharpe's surgery, and then afterwards, okay?

A. Yes.

Q. You don't need to go back to when he was two

BRANDNER 00329

Page 20

years old, okay?

A. Okay.

Q. You know, 13, 14 years old's fine, all right?

A. M'hum.

Q. The pain and the deformity that he was having as of June 1, 2002, he wasn't able to run?

A. Not long. He could run some, but after a very short time, pain would cease -- make him cease.

Q. You mean after like maybe a hundred feet?

A. About.

Q. Okay. Then he would have a lot of pain in the leg?

A. Yes.

Q. You were able to observe how it affected him at dance?

A. Yes.

Q. And how was it affecting him at dance?

A. He tired easily. The leg was not as strong as his other leg was. I believe that helped to increase the pain, how it came on pretty quickly. He -- we had to adjust a lot of choreography, especially on the floor things, because he couldn't put his knee down because of the lump. He wasn't able to jump off very well and land because the pain would hit. And I think a lot of it changed because he knew it was going to hurt, so he tried

Page 21

to be preventive and just not do the thing that he knew would hurt it.

Q. All right. So jumping on the foot was a real problem?

A. Yes.

Q. Landing on the foot in some way was a real problem?

A. Yes.

Q. Or the leg, I should say?

A. Yes.

Q. Tumbling would have been a real problem?

A. Correct. He had -- he was still able to do everything other than set his knee directly on the floor, but it had to do with how much pain he'd be in doing it.

Q. Okay. So --

A. Okay? And a lot of times he took the pain to do the thing.

Q. All right. He wouldn't have been able to go on point with that leg, would he?

A. Generally men don't, but he wouldn't have been able to, I don't think.

Q. Okay. You have a lot more expertise in the world of dance than the normal person, right?

A. Correct.

Q. Okay. Do you agree that the problems he was

Page 22

having with that leg as of June 1, 2002, was significantly impacting his ability to do dance?

A.    Absolutely.

Q.    And if that situation had continued, he was not going to be heading toward any scholarships?

MR. CAUSEY:   Form.

A.    Depending on what ▮▮▮▮ felt he could take painwise, he may have tried to proceed.

Q.    BY MR. CRAWFORD:  Well, he may have tried, but from your perspective, seeing the limitations he had, you knew pretty well he wasn't going to get any scholarships with those problems?

A.    I can't say definitely because his ability -- he still had a great deal of ability to do things necessary. I think it really would have depended on how ▮▮▮▮ farred (sic) as time went by.

Q.    How what?

A.    How he did as time went by, how he dealt with the pain.  You know, I mean, at that point in time we knew that it was just causing him excruciating pain.  We were looking for options to change that, to fix that.

Q.    How else was this problem with the leg affecting his life as of June 1, 2002?

A.    He had gone out for track and was limited in what he could do because he couldn't run distances.  He

Page 23

ended up doing the discus because it was something that used upper body rather than a whole lot of leg strength, but it did interfere because he couldn't push off as well as he needed to to get --

Q. You say it did or did not interfere?

A. It did interfere.

Q. Okay.

A. Because he couldn't push off as well. He didn't play football anymore because of pain and non- -- non-ability to run as much as you have to.

Q. How else did it affect him?

A. I think it discouraged him a great deal.

Q. So emotionally?

A. Yes.

Q. How else did it affect him?

A. Just a lot of activity he had to, you know, kind of monitor himself to discern whether the activity was going to hurt him to the point where it would be unbearable. He would have to kind of go into an activity, whatever it was, and see how he was going to do with it.

You know, he had to really test himself. Certain things he had decided he wouldn't do, like skateboarding he wouldn't even try.

Q. Well, you'd have killed him if he did it, wouldn't you?

Multi-Page™

Page 24

A.  Possibly.

Q.  I mean, look, if he said, based on what you saw the problems he was having with that leg and he said, for example, "I'm going to go snow skiing" or "I'm going to go wakeboarding," you would have said no way?

A.  Right, I would have urged him to be cautious.  I mean, even watching him dance hurt me, but he had a real desire to do what he was doing.

Q.  Could you see as he was dancing the pain on his face?

A.  Yes.

Q.  All right.  So given all of that, it was clear to you, your husband, and to ███ that something needed to be done to correct this problem?

A.  Yes.

Q.  Now, you go to Mezona to see Dr. Dinowitz, according to the records, on March 22, 2002.  Does that sound about right in terms of a time frame?

A.  Yes.

Q.  And your memory is it was just you and ███?

A.  Yes.

Q.  And you were going there to get basically a second opinion from him?

A.  Yes.

Q.  What do you remember him saying?

LEA, SHERMAN & HABESKI      PHOENIX, ARIZONA (602)257-8514

BRANDNER 00334

Page 25

A. I remember him calculating the degree that the bone was twisted or warped and saying that it really was falling outside the limitations of normal, that it was, you know, extremely bent and that he wanted to take this before his clinic, board, to have them observe to see what they thought might be options for ████ before he said anything specific.

Q. Do you remember him using the word "conference"?

A. Yes.

Q. Okay. That he was going to present it to a conference of doctors?

A. Yes.

Q. Do you remember him saying at the end of that visit that it was his feeling that surgery was necessary, but he wanted to conference this thing with the other doctors?

A. Possibly.

Q. Did you express to Dr. Dinowitz during that meeting that living with this situation was not acceptable?

A. Yes.

Q. Is there anything else of that meeting with Dr. Dinowitz that you remember?

A. He did bring Dr. Sharpe in for a moment to meet ████, to have him look at the x-rays, because his

Page 26

expertise was in hand and wrist injury and Dr. Sharpe's expertise is in leg injury.

Q. Okay. And do you remember anything Dr. Sharpe said?

A. I believe he just commented on the degree that it was off and said, "We'll conference this" or something to that effect.

Q. But you don't remember the specifics of what he said?

A. Not exactly, no.

Q. Okay. Is the next thing that happened you get a call from Dr. Dinowitz?

A. I believe so. Or the office, one of the two.

Q. Well, do you remember Dr. Dinowitz calling you and telling you what the results of the conference were?

A. I believe it was him. I can't recall exactly if it was him. I just know for sure it was from Mezona, and they said that we needed to meet with Dr. Sharpe so that he could discuss our options, and one of them being the surgery was really something that they were looking towards.

Q. Okay. Were you the person they spoke with?

A. Yes.

Q. Do you recall the person who was speaking with you telling you that it had been conferenced and the

BRANDNER 00336

Page 27

conclusion was surgery is something you ought to consider?

A.   Yes.

Q.   And Dr. Sharpe would be the person to meet with and go over that with?

A.   Correct.

Q.   And basically you made an appointment, I assume?

A.   Yes.

Q.   All right.  And according to the records, you go in to see Dr. Sharpe on April 11, 2002.  Does that sound about right?

A.   Yes.

Q.   And your memory is that you, your husband, and your son were present?

A.   As far as I can remember.

Q.   Okay.

A.   I feel we all were there.

Q.   Do you remember Dr. Sharpe asking Scott and you two with him what problems he was having?

A.   Yes.

Q.   And how was this interfering with his life?

A.   Yes.

Q.   And what are the things you want to try to get back to?

A.   Yes.

Q.   Do you remember him talking with you about the

BRANDNER 00337

Page 28

results of that conference?

A.   Yes.

Q.   What did he say about that?

A.   That the -- they suggested that surgery was probably our best option for correcting the situation with Scott, and then he discussed the various surgeries.

Q.   Do you remember him telling you why they had reached that conclusion, that surgery was the best option?

A.   Not exactly.

Q.   Well, do you remember anything about why they were thinking that surgery was the best option?

A.   I think that it came up that ██████ had pretty much reached the end of his growth span and that his -- most of his plates were closed, so there wouldn't be a whole lot of ability for the body to adjust the bone and that it probably would be fixated like that, so to correct that, it would be a rebreak and then some kind of device to hold it still.

Q.   All right.  So the options that Dr. Sharpe discussed with you that day are do nothing, surgery, and then the different types of surgery?

A.   Right.

Q.   And do you remember what the different types of surgery were that he discussed?

A.   He discussed -- well, each one called for a

Page 29

rebreak of the bone, and one was a plate being put in alongside the bone, one was a rod being put down through the bone, and one was where you'd use something on the outside to hold it still.

Q. An external fixator?

A. Yes, I believe so.

Q. Do you remember him using the term "osteotomy"?

A. No.

Q. Do you remember him saying the bones would need to be cut?

A. Yes.

Q. We've already talked about risks, and I realize that you don't have a specific memory of risks being discussed that visit, but is there anything else, putting aside risks or complications of surgery, that you have a memory of being discussed that day?

A. Just that information and telling us to evaluate it and let them know -- or let him know what our decision was.

Q. So he wasn't trying to push you or rush you into surgery?

A. No.

Q. And did he mention that one of the things he would want done would be a CT scan at some point?

A. Yes.

Page 30

Q.   Do you remember him telling you why a CT scan would be a good thing to have done?

A.   I think that he said for a couple of reasons: one, to make sure that the bone had healed because he wasn't sure that it had come together.  The other was to see the degrees of rotation and angle of the bone to discern, you know, which surgery would be best, if that was the choice that we made.

Q.   All right.  You finish up with Dr. Sharpe, and it's my understanding you then go to see Dr. Walls in Scottsdale for another opinion?

A.   Yes.  The office we went to was in Mesa.

Q.   Okay.  Who scheduled that visit?

A.   I did.

Q.   Had it been scheduled before you saw Dr. Sharpe?

A.   I don't recall.

Q.   Why did you schedule the visit with Dr. Walls?

A.   We wanted more than just one other opinion.

Q.   Okay.  So did you have -- well, you had somewhat of an opinion from Matthews, which is he didn't think there was anything wrong, right?

A.   From back in January, yes.

Q.   And then you had the opinion of the conference of doctors that they felt surgery was probably your best option?

Page 31

A. Yes.

Q. And you had an opinion from Dr. Sharpe that, in his mind, surgery was probably your best option?

A. Yes.

Q. So now you get another opinion by Dr. Walls, and was that again to see is surgery the best way to go and, if so, what kind of surgery?

A. Yes.

Q. How did you get his name?

A. I had attended physical therapy next door, and I knew that he was a doctor who worked with athletes and their injuries. So I went to -- made an appointment with him.

Q. So you and ██████ go into that one?

A. Yes.

Q. And your husband was not present?

A. No.

Q. Did he ask you the same types of questions, like "What problems are you having with it, ████?" "How is it impacting your life?" "What do you want to try and get back to"?

A. Yes.

Q. And I'm assuming both during the meetings with Dr. Sharpe and then this meeting with Dr. Walls, the group communicated clearly that this was a major impact in his

Page 32

life?

A.    Yes.

Q.    What did Dr. Walls say he thought was the way to go?

A.    After reviewing the x-rays, his prominent thought also was to have surgery done, and he specifically spoke of a rod being placed in the bone.

Q.    Did he tell you that he didn't think just letting it go as it was was a good option?

A.    No.

Q.    He didn't say that either way?

A.    I don't believe he said that that was a good option at all.

Q.    Okay.  Did he discuss leaving it alone and not doing anything?

A.    He said that we could do that, but he foresaw other complications that might occur because of leaving it that way and it getting worse.

Q.    All right.  So he agreed with the idea that surgery was the best way to go?

A.    Yes.

Q.    And he proposed, out of all of the different ways that the bones could be put back together, using this rod?

A.    Correct.

Page 33

Q. Did he show you one of those rods?

A. No.

Q. Did he describe it for you?

A. He just said it was a steel rod.

Q. And did he basically say, "This is my recommendation; get back to me and let me know what you want to do"?

A. Yes.

Q. It's my understanding you then go back to see Dr. Matthews; is that your memory?

A. Yes.

Q. By the way, the visit with Dr. Walls, according to our records, was April 18, 2002. Is that consistent with your memory?

A. Yes.

Q. And then the visit with Dr. Matthews is April 22, 2002?

A. Yes.

Q. Do you remember that visit with Dr. Matthews?

A. Yes, I do.

Q. Did he basically just say, "I don't think there's a problem"?

A. He said that there was some degree of rotation, but he didn't feel it was very extreme. He knew that we had already spoken to other doctors, and he said, before

Page 34

we left, that he would like to see if there's anything that he could do to help.

Q. Well, what did he suggest?

A. Nothing.

Q. Was there any discussion with him about surgery versus no surgery?

A. We asked him what his opinion was, and he said he didn't know if it was severe enough for surgery, that it was very slight.

Q. Okay. And did you get the sense from that meeting with Dr. Matthews that he wasn't taking seriously the extent of problems ████ was having?

A. Absolutely.

Q. So, in other words, you guys were telling him, "He's having all these problems, he's having all this pain," and it just doesn't seem to be registering with Dr. Matthews?

A. Correct.

Q. Did Dr. Matthews ever get back to you on anything after that visit, call you --

A. No.

Q. -- and say, you know, anything?

A. No.

Q. Why did you go back to see Dr. Matthews?

A. My ex-husband and I thought that we should go

Page 35

just to see what he had to say, to see if he saw the problems that the other doctors were seeing. He recognized a slight difference, but that was it.

Q. Was your impression that everybody else was saying there's a significant problem, and this one guy, Dr. Matthews, is kind of saying it's not?

MR. CAUSEY: Form.

A. It's just not as severe as everybody else is saying.

Q. BY MR. CRAWFORD: Okay. So he's all by himself over in this camp?

A. Correct.

Q. Everybody else is over in the other camp?

A. Correct.

Q. According to the records, ▉ has a couple of CT scans of the leg, and then he goes back to see Dr. Sharpe. Do you remember that sequence of events?

A. Yes.

Q. And during that visit, do you remember Brian, his physician's assistant, being involved at all?

A. I know that Brian was, and I think that's when he first came in. He was with Dr. Sharpe pretty much after that all the way through the rest of ▉ care.

Q. And this is the visit that you have a specific memory that Sharpe went over the risks and complications

BRANDNER 00345

Multi-Page™

Page 36

we discussed earlier?

A.    Correct.

Q.    Because the purpose of this visit was basically a chance to regroup with Dr. Sharpe and make a decision?

A.    The -- it was to find out exactly what surgery he was going to do because we had made the decision to have him do surgery.

Q.    You hadn't made that decision as of the first time you met with him, though?

A.    Correct.

Q.    You had gone through these other steps and then decided that you were going to go with Sharpe?

A.    Correct.

Q.    Why did you choose Sharpe as opposed to this Dr. Walls?

A.    My ex-husband had had experiences with the Mezona Clinic, and they'd come highly regarded; and we felt that because of the time and effort that Dr. Sharpe was putting into ████ and his case, that he really was somebody who cared about ████, and we felt that was very important.

Q.    What do you mean by "the time and effort that Dr. Sharpe was putting into the case"?

A.    He thought about -- he specifically told us in this particular visit that he had spent a great deal of

Page 37

time going over exactly how he would do the surgery and, as he explained it to us, he was explaining how he had, you know, decided to do it this way versus another way and that he had spent time with him in thought. He had mentioned that on the telephone when I called back to make the appointment, too.

Q. Okay. What do you remember of that discussion with him?

A. On the telephone?

Q. Yeah.

A. Well, that we had decided that surgery would be best, and he at that time said, "I have thought about ███ a great deal, and I think that," you know, "I can come up with the best plan of treatment for him." He showed a real interest in ███.

Q. So between the first time you met with Dr. Sharpe, which was mid-April, and when the surgery was performed was the end of June, that's about two and a half months?

A. Correct.

Q. There was lots of time for you to think about what, of the various things you'd been told, you as parents were going to choose for ███?

A. Yes.

Q. Do you remember during -- strike that.

Page 38

I'll tell you, the second visit with Dr. Sharpe, according to the records, was June 6th, 2002. Does that sound consistent with your memory?

A.   Yes.

Q.   And he specifically went over the CT scan results with you?

A.   Yes.

Q.   Do you remember him doing a physical examination that day?

A.   I believe he did manipulate the bone and ankle.

Q.   Right.  And go over again how ███ was doing and the problems he was having and what he wanted for the future?

A.   Yes.

Q.   And this was the visit again that you do remember a discussion of risks and complications?

A.   Yes.

Q.   And hopefully the benefits of surgery?

A.   Yes.

Q.   And then is there anything specifically of that visit on June 6th, 2002, that you recall that we haven't discussed already?

A.   A great deal of time was also spent on keeping ███ pain under control through the surgery and on that -- when he was released from the hospital.  And a lot

BRANDNER 00348

Page 39

of arrangements were made, special arrangements were made at that time for ▓▓▓▓ in pain management, being they were going to use an epidural as well as general anesthesia.

They were going to monitor him and allow him to use a morphine, you know, on-call pretty much, trying to keep his pain down, because that was the biggest concern they had was that he not have such great pain when he got done.

Q.   So I'm assuming by all of that you guys understood that this is going to be a painful deal in terms of the recovery?

A.   Yes.

Q.   Do you remember him talking with you about something called compartment syndrome?

A.   Not specifically.

Q.   It's something where the leg can swell up, and if it builds up too much pressure, it can cause damage to muscle or nerves, et cetera?  Do you remember him talking about that that's one of the things that they needed to look out for?

A.   I recall talking about drainage.  If that has to do with that, then yes.

Q.   That they might have to put in a drain?

A.   Not put in a drain, but the chance that they might have to -- depending on how it was healing, there

Page 40

could be areas that clot up inside, where Scott needs to have them drained out, one way or another, whether it's with a drain or surgery.

Q. Because if you don't do that, it could cause damage?

A. Correct.

Q. Okay. Anything else about that meeting with Dr. Sharpe on June 6th, 2002, that we haven't talked about?

A. Not that I can recall.

Q. So the next thing that happens is he has surgery at Mesa Lutheran Hospital?

A. Correct.

Q. When did you first realize after surgery that there was a problem with his ability to move his foot?

A. When Dr. Sharpe told me.

Q. Okay. So he was actually the first one that told you about it?

A. Yes.

Q. What did he tell you about it?

A. That █████ ankle was not responding. At first he thought it might have to do with the epidural, so they had to wait until the epidural wore off.

And then when that happened, he spoke again and said that he was not able to move his foot up or down

BRANDNER 00350

Multi-Page™

Page 41

or side to side.

Q. How soon was that after surgery that Dr. Sharpe told you that?

A. I'd say within maybe a day or two.

Q. Okay.

A. Pretty quickly.

Q. So did it appear to you he was being completely up-front about it?

A. Yes, as much as he knew.

Q. Okay. I understand he didn't know exactly what was going on, but your impression was he told you right away, "There's a problem here and we need to watch it"?

A. Correct.

Q. And do you remember him telling you that hopefully it would be temporary, but it is something that could be permanent?

A. Yes. Leaning towards temporary.

Q. Hoping, right?

MR. CAUSEY: Form.

Q. BY MR. CRAWFORD: Okay. Let me rephrase the question. This discussion occurred very early on after surgery?

A. Correct.

Q. And do you remember him saying hopefully this is a temporary situation, and hopefully it's not permanent?

BRANDNER 00351

Multi-Page™

Page 42

A. Yes. He said that he felt that the nerves were asleep.

Q. Okay. And ████ had a lot of other complications after surgery?

A. Yes.

Q. And do you remember being told why that happened, most probably?

A. Most probably it was determined that it had something to do with Ibuprofen saturation, taking drugs to -- they felt maybe it had to do with him having Ibuprofen every single day.

Q. And that it had been affecting his liver?

A. Yes.

Q. Had he been taking a lot of Ibuprofen?

A. Yes.

Q. Was that what he had for pain management?

A. Yes.

Q. So was it a situation where he was taking more and more Ibuprofen because of the pain with his leg?

A. He took what he -- what the limit was per day.

Q. What was that?

A. I think he could take six a day.

Q. Was this just over-the-counter?

A. Yes.

Q. Who told you that it may have been related to

Multi-Page™

Page 43

Ibuprofen?

A.    I think -- I cannot be absolutely certain.  It was either the specialist that they brought in or Dr. Sharpe himself said that at first they thought it might have been the anesthesia, but then we had a great discussion about different things that might have affected ████; and we talked about the pain medication of Ibuprofen, and so they thought that probably was it, but they couldn't be absolutely certain.

Q.    Was there a discussion about hepatitis?

A.    Oh, yes, it caused hepatitis.

Q.    Okay.  So hepatitis was a result of whatever happened?

A.    Yes.

Q.    Do you remember Dr. Sharpe ultimately explaining the results of the nerve-conduction study?

A.    Yes.

Q.    And what did he tell you about that?

A.    He said there were two nerves that were damaged; one made the foot go side to side, and at the time that we went in, ████ already had gained that, and that was within five days or so after the study.

Q.    He had gained that back?

A.    Correct.  But the up-down one had not -- was still not working.

LEA, SHERMAN & HABESKI        PHOENIX, ARIZONA (602)257-8514

BRANDNER 00353

Page 44

Q. Up and down called dorsiflexion?

A. I think so.

Q. All right. But the side-to-side movement of his foot, he had gained that back?

A. Yes.

Q. Did he at any point give you his best thought as to how this had probably happened?

A. Yes.

Q. And what did he tell you?

A. He said there could have been two things: In having to move the bone, he might have stretched the nerve, or there was a chance that in cutting the bone, he cut the nerve.

Q. Was that before or after the results of the nerve-conduction study?

A. That was before.

Q. Do you remember him telling you that the nerve-conduction study pretty well ruled out the idea of the nerve being cut?

A. He didn't ever be specific that way.

Q. Now, you didn't get the impression he was saying that he had done something wrong?

A. No, that that's just what happened.

Q. Just the explanation for how it could have happened?

BRANDNER 00354

Page 45

A.   Correct.

Q.   When, to your memory, was ████ able to get back and be active in dance?

A.   I think it was maybe the fall of 2003 he started doing some things, trying.

Q.   When did he get to the point where he was able to, you know, be active in terms of teaching and stuff like that?

A.   I believe he started assisting in our tumbling -- let's see.  Maybe in January-February of 2004.

Q.   How has he been doing in terms of being an instructor for those classes?

A.   Because it doesn't take a lot of movement for him in terms of demonstrating, he doesn't have to do that; he spots, so he -- ████ quite good with children, and he handles that role very well as long as he doesn't have to demonstrate.

Q.   Dr. Sharpe has a note, January 2, 2003, and part of it says that ████ had been doing some dancing, no ballet, but some modern dance, and his mom, who is an expert in the field, says he's been doing fairly well. Does that sound about right?

A.   He -- yes, he had started doing a little bit, moving around.  He was in a dance production class at school, too, in 2002 or '3; it was the semester following

Page 46

the surgery, and he could not dance.

Q.   So that would have been the fall of 2002?

A.   Correct.

Q.   All right.  And that would have been at Red Mountain?

A.   Right.

Q.   As a freshman or a junior?

A.   As a sophomore.  Red Mountain starts tenth grade.

Q.   Ah, okay.

A.   And he came -- he was walking around.  He was in a ballet dance in 2003, modernish-type ballet, where he walked and did a couple of lifts, but Scott was not literally dancing.

Q.   Now, is that in one of these videotapes?

A.   Yes.

Q.   Okay.  We're going to have a file of videotapes.

          MR. CAUSEY:  Actually, well, I'm getting worried.  I think I only have two.

          THE WITNESS:  A couple of these are ones that we had discussed but we didn't --

          MR. CAUSEY:  You haven't given me yet?

          THE WITNESS:  Right.  Well --

          MR. CAUSEY:  And we'll get?

BRANDNER 00356

Page 47

THE WITNESS: Yes, you will.

MR. CAUSEY: Okay. The ones we talked about that didn't show ███ very well?

THE WITNESS: Correct.

MR. CAUSEY: Okay. Yeah, I was getting those for my personal use.

Q. BY MR. CRAWFORD: How many videotapes are there, do you think, that show ███ dancing or in competition, what have you?

A. Since the surgery?

Q. Yeah.

A. I'd say maybe three or four, that I can get.

Q. Now, can you get copies of the ones from the competition he was in?

A. No. Those you pay for, and we don't pay for them. We don't get those free.

Q. Okay. What --

A. There might be one that I can get of that possibly. But that's --

Q. Can you try?

A. M'hum.

Q. Yes?

A. Yes.

Q. That's okay. Well, who are these competitions with that I could potentially contact and see if I can get

BRANDNER 00357

Page 48

a videotape?

A.    Let's see.  Encore, Cathy Roe.  These are the names of their competitions.

Q.    Is Kathy with a "K" or a "C"?

A.    "C."

Q.    And "Row"?

A.    R-O-E.

Q.    Okay.  Any others?

A.    I believe those are the only two he's done.

Q.    Do you know when he did those?

A.    Cathy Roe was in April.

Q.    Of?

A.    Or May, May of this year.

Q.    5 of '05.

A.    And Encore would have been May of last year, April or May of last year, 2004.

Q.    Do they have Web sites?

A.    Yes, they do.

Q.    So if I wanted to get the videotape of ███ in the Encore and Cathy Roe competitions, what do I ask for?

A.    As far as I know, these places don't save them beyond two or three weeks out of the competition.

        MR. CAUSEY:  Well, what would they call it is what he wants to know.  If he's going to send them a letter asking them for it, how does he describe what he's

Page 49

wanting?

THE WITNESS: He'd have to say it was the Phoenix competition attended by Dance Network and the month that we were there.

And you may have to know the exact number, which we might -- I don't think we have that information anymore.

Q. BY MR. CRAWFORD: You mean which number they were?

A. Correct.

Q. Do you know other people that were involved in that, those competitions?

A. I know a lot of people.

Q. Other students in your --

A. Yes.

Q. Now, do you think any of the parents of those other students may have purchased those videotapes?

A. Possibly at the Encore, but not of Cathy Roe.

Q. So what are the things that are particularly difficult for him to do in the field of dance now?

A. He cannot do any tap or clogging. He has no ability to flex and press. He -- our choreography is always adjusted if ████ included in the dance, whether it's myself, my partner, or my older son choreographing for ████. We all take into consideration that he has a

Page 50

limitation and we have to be careful what we do.

He isn't able to jump like he was capable of. He has no point, no flex. Still tires quite easily, you know, with the use of the leg. Any down movement, if he goes down on the floor, you have to give him lots of extra time to come back up because he can't come up quickly and push off of that leg.

He, as far as my knowledge, wouldn't be able to be a professional dancer, as far as I can see, based upon what I know of professional dancing, because of that limitation.

Q. How much do you know of professional dancing?

A. I've been a dancer for all of my life.

Q. Okay. The way you phrased that, "as far as I know about professional dancing," suggests that there's some limitation there.

A. Because I know that sometimes people in unique situations might be selected to do certain things with disabilities, there is a very slight chance of him doing something, but in the world of dance, as competitive as it is, ▇▇▇▇ would not make it as a professional dancer.

Q. But he could continue to help instruct?

A. Under -- under a lot of limitations, yes. He would have to keep it to what he's doing. He wouldn't per se be able to teach as much in, say, a jazz or a

Page 51

ballet class because that takes more ability to demonstrate.

Q. Okay. Do you have other students that have any kind of physical disabilities at all?

A. Not that I'm aware of.

Q. Okay.

A. Other than asthma.

Q. Okay. So you have to make some accommodations for whoever has asthma, I assume?

A. Yes.

Q. In terms of the medical bills related to Dr. Sharpe's surgeries and the care after that, has pretty much all of that been paid by insurance?

A. I'd say the majority of it. There has been some that we have had to put out ourselves, for instance, co-pays and for prescription drugs and whatever our insurance does not cover.

There came a point -- we had the school insurance. Meyer-Stevens covered ████ for a long time, paying any -- any gaps, and that came to an end I believe in 2002. Maybe it was extended to 2003.

But since then any of the extra, like, for instance, this new brace, we've had to pay the extra on that, that the insurance doesn't cover.

Q. Okay. But do you agree the vast majority of the

BRANDNER 00361

Multi-Page™

Page 52

bills have been paid by insurance?

A.    Yes.

Q.    Do you have an estimate for me as to how much you've paid out of pocket?

A.    I could take a very quick guess at that.  I'd say maybe 2- or $3,000.

Q.    Okay.

MR. CRAWFORD:  Why don't we take a five-minute break, let me review my notes, and --

MR. CAUSEY:  Sure.

MR. CRAWFORD:  -- see what else I need to follow up with you on.

MR. CAUSEY:  And, Bruce, I may be confusing my cases, but I think I answered some earlier discovery in this case where I broke down what you were just asking; the insurance paid X amount, and they paid X amount.  I think I've broken it down in some other discovery answers in this case.

MR. CRAWFORD:  I don't think so.

MR. CAUSEY:  Not to you but to prior counsel, I think.  I may be mixing them up, but I'll look and see.  And if I haven't, we could find that out.

MR. CRAWFORD:  No, you haven't really given me anything on that.

MR. CAUSEY:  What are you looking at?  Is

BRANDNER 00362

Page 53

that my disclosure?

MR. CRAWFORD: No. This is the answers to interrogatories that asks you about collateral sources.

MR. CAUSEY: Oh, okay, all right.

MR. CRAWFORD: There's pretty much nothing there.

(Recessed from 2:21 p.m. until 2:26 p.m.)

MR. CRAWFORD: By the way, Wade, can you answer these interrogatories on behalf of all three of them? You just answered them, it looks like, on behalf of ████, but the parents are plaintiffs as well.

MR. CAUSEY: Can I see?

MR. CRAWFORD: Sure. That doesn't mean you have to answer every interrogatory but --

MR. CAUSEY: Oh, no, no, no. Just the ones that pertain.

MR. CRAWFORD: Yeah.

MR. CAUSEY: Okay. I'll take a look into that and see.

MR. CRAWFORD: For example, what they're claiming their damages are and stuff like that.

MR. CAUSEY: Right.

MR. CRAWFORD: Background information.

Q. I'm looking at some interrogatory answers that have been provided by your attorney, and some of them

Page 54

haven't been answered as to you. When did you and ▮▮▮ divorce?

A. It was final in October of 1998.

Q. Okay. Are you still single?

A. Yes.

Q. And he has remarried?

A. Yes.

Q. And the name of his wife again?

A. ▮▮▮.

Q. What's the last name?

A. ▮▮▮.

Q. Okay. Do you know when they got remarried -- when they got married?

A. February of 2004.

Q. You have one other son?

A. I have a son and a daughter besides ▮▮▮.

Q. What's your other son's name?

A. ▮▮▮.

Q. And how old is he?

A. 23.

Q. And how about your daughter?

A. ▮▮▮ is 15.

Q. What does the older son do for a living?

A. He works for his father, construction.

Q. Okay. And then also does stuff with you?

Page 55

A.   M'hum, yes.

Q.   So he works full-time for his dad?

A.   Yes.

Q.   All right.  Has ████ made it pretty clear to you over the years that, although it's nice to have some part-time work with his dad, he doesn't want to do construction --

A.   Correct.

Q.   -- in terms of a life-long goal?

A.   Yes.

Q.   Have you gotten him any counseling for any emotional issues he has?

A.   Not psychologists or psychiatrists, but with -- I guess they're called religious people.  We believe in prayer and healing through prayer.

Q.   Okay.

A.   He had a youth pastor at Red Mountain Community Church that spoke to him a little bit about what was going on.

Q.   Do you know how long he met with him?

A.   I think he only met with him once or twice.

Q.   Okay.

A.   And it was not per se official visit where -- you know, he just talked casually with ████ about what was going on.

Multi-Page™

Page 56

Q. Okay. So other than meeting with the pastor at that church, has he had any other type of counseling?

A. No.

Q. You go to Central Christian?

A. No.

Q. Where do you go?

A. I go to Faith Community Church.

Q. Has ▇▇▇ ever been involved over at Faith?

A. He's only attended one time.

Q. And is Central Christian his church?

A. Yes.

Q. Well, I know there's a lot of people from Faith Christian, kids that have gone to Valley Christian. Are there kids from Central Christian that have gone over to Valley Christian High School?

A. I don't know. I don't know.

Q. Okay. I know a lot of people at Faith.

Who is the pastor at Faith, do you know? Yeah, you know that --

A. Pastor Edmondson.

Q. Do you know who the pastor is over at Central Christian?

A. I listened to him for years. I don't remember his name.

Q. Does ▇▇▇ regularly attend Central Christian?

Page 57

A. Pretty often. Almost every Sunday.

Q. I'm just looking through some stuff you've previously provided to see if there's something we need to follow up with, but this is a good sign; this means I'm wrapping up.

Do you remember that another one of the problems that ████ was having in the months leading up to his visit with Dr. Sharpe was numbness in the leg?

A. There's a possibility. I don't recall exactly.

Q. There's a comment in a legal document that was filed on your behalf that said it looks like as of January 2002 that Dr. Matthews ignored ████ pain and made him feel like a whiner?

A. Yes.

Q. Is that how you felt about it?

A. Yes.

Q. Did you get the impression that Dr. Sharpe ever ignored ████ pain or made him feel like a whiner?

A. No.

Q. Is ████ involved in any type of physical therapy at this point?

A. No.

Q. Has any been recommended?

A. He -- he had some extensive physical therapy when he was under Dr. Sharpe's care after the surgery.

BRANDNER 00367

Multi-Page™

Page 58

But since that ended, no.

Q. Okay. So who would you call his treating physician for his leg at this point in time?

A. Nobody.

Q. So there's nobody that's taken over that role?

A. Not yet. We haven't found anybody.

Q. Have you tried?

A. We're looking.

Q. Okay. Do you have any sense at this point who you might take him to, to see?

A. No.

Q. Is he having any specific new problems now that you think he needs to go see somebody, or is it just that you want someone that's familiar with his problem?

A. He has mentioned a number of times that there's pain in the break area that makes us know that we need to find somebody to see him.

MR. CRAWFORD: Okay. I think that's what I have for you. It's nice meeting you.

THE WITNESS: You, too.

MR. CRAWFORD: Take care.

THE WITNESS: Thank you.

MR. CAUSEY: And I made a list of all those things. I'll check on those and get the videos.

MR. CRAWFORD: Okay.

**LEA, SHERMAN & HABESKI     PHOENIX, ARIZONA (602)257-8514**
BRANDNER 00368

Page 59

MR. CAUSEY: I'm gone all next week, I'm out of state, so it may be the following week, but we're not on a huge time table here.

MR. CRAWFORD: No, we're not.

THE REPORTER: Wade, do you need copies?

MR. CAUSEY: Yes, please.

(2:36 p.m.)

BRANDNER 00369

Page 60

STATE OF ARIZONA         )
                         )  ss.
COUNTY OF MARICOPA        )

BE IT KNOWN that the foregoing deposition was taken before me, Jean L. Lea, a Certified Court Reporter in the State of Arizona; that the witness before testifying was duly sworn by me to testify to the whole truth; that the questions propounded to the witness and the answers of the witness were taken down by me in shorthand and thereafter reduced to print under my direction; that the deposition was submitted to the witness to read and sign; that the foregoing 59 pages are a true and correct transcript of all proceedings had upon the taking of said deposition, all done to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

DATED at Phoenix, Arizona, this 30th day of June, 2005.

                                    _____
                                    Certified Court Reporter
                                    Certificate No. 50004

LEA, SHERMAN & HABESKI        PHOENIX, ARIZONA (602)257-8514

BRANDNER 00370