# EXHIBIT "28"

# ORIGINAL

1

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

███████ and ███████ et al.,

         Plaintiffs,

        vs.

        ) CV No. 2003-017451

ANDRE MATTHEWS, M.D., and JANE DOE MATTHEWS, et al.,

        Defendants.

April 28, 2008
Phoenix, Arizona

BEFORE THE HONORABLE:  MICHAEL JONES, Judge

REPORTER'S TRANSCRIPT OF PROCEEDINGS
Testimony of ███████

Lisa H. Vitoff
Certified Court Reporter
CCR #50251

BRANDNER 00371

2

A P P E A R A N C E S

FOR THE PLAINTIFFS:
        KOELLER, NEBEKER, CARLSON & HALUCK, LLP
        BY:  Mr. Wade R. Causey

FOR THE DEFENDANTS
        CRAWFORD & KLINE, P.L.C.
        BY:  Mr. Bruce D. Crawford

P R O C E E D I N G S

████████████████,

having been duly sworn herein, took the stand and testified

as follows:

        THE COURT:  Thanks, Mr. ████.  Go over there and

have a seat on the witness stand.

        MR. CAUSEY:  That one there.

BRANDNER 00372

DIRECT EXAMINATION

BY MR. CAUSEY:

Q    Would you state your name, please?

A    ████████████████

Q    And ████ you are identified as the plaintiff in this action; correct?

A    Yes.

Q    ████, I want to talk a little about your background and you, personally, at this point.

First of all, how old are you now?

A    21.

Q    And we've -- you've heard mention of the football incident in 9th grade where you broke your leg?

A    Yes.

Q    How old were you at that time, ████?

A    14.

Q    ████, have you completed high school?

A    Yes.

Q    Did you graduate?

A    Yes.

Q    Where did you go to high school?

A    Red Mountain.

Q    Since you've gotten out of high school, have you gone on to any college courses or any other type of work

BRANDNER 00373

4

at this point?

A   I went to ASU for a semester.  I also went to work for my father in construction.  I worked for T Mobile as a manager there, and for Pinnacle Security as a sales consultant.

Q   What are you doing right now?

A   I work as a teacher for my mother and my brother at her studio and a construction worker for my father at his company.

Q   Let's talk about what type of construction are you talking about?

A   Residential.  We do home additions, awnings, decks, covers like that, Arizona rooms, screen rooms, remodels, stuff like that.

Q   So you're not talking about where you -- for lack of a better term -- new construction, start from ground?

A   No, existing.

Q   Is this primarily or is it all residential type stuff?

A   Yeah.  We do do some work for businesses, but mostly our work is residential.

Q   ████, it's my understanding that you've worked for your dad in that capacity off and on for a number of years; is that correct?

BRANDNER 00374

5

A    Yes.

Q    Did you also, as a young boy, before the injury when you were 14, had you worked for your father at all in that industry as well?

A    Yes.

Q    What was kind of your role back then?

A    Gofer, sweep up, clean-up after them; little things that I couldn't mess anything up, stuff like that.

Q    This particular stint now, where you're working for your father's construction company -- first of all, let me ask you about the construction company.

Describe it for me, how many employees does it have?

A    We have about six guys that actually go out on jobs. We have two office ladies, then my dad and ████, who own the company.

Q    What do you do for them currently?

A    I'm just a general contracter. I do build, I do go out on jobs, with me and another guy, and we'll build an awning by ourselves. We'll do a room addition by ourselves. It's usually me and one other guy that go out on jobs by ourselves.

Q    Now, ████, let's talk about September 26, 2001. This is the football accident?

A    Yes.

BRANDNER 00375

6

Q    Describe what happened.

A    I was playing both sides.  This was, I believe, our fourth game of that year.  We were playing at home.  We were playing against Marcos de Niza.

It was about -- it was before second half.  We were up at the time.  I was playing on defense as a defensive end.

My job was to contain the outside.  Anybody that would run outside, any passes that would go outside, I, would, you know, contain, make sure that nothing got outside of me.

Well, their running back had run to the outside towards me, and so I was going to tackle him.  And as I was diving for him, our inside linebacker, his job was to help me as well.  So he was coming to help tackle.

So my right leg was out as I dove to tackle him, and I picked him up and was going to drop him to my right.  And at that time, our inside linebacker dove at him at the same time.

And so when I was coming down like this, our inside linebacker dove onto my leg.  So my leg was under him while I was going this way.  It just kind of snapped under him.

After that, all I remember -- I just blacked out.  I remember sitting up and nobody was around me except

BRANDNER 00376

7

for the ref was blowing his whistle, telling me to go back to the huddle. That's all I remember.

Q Where were you going to school when this happened?

A Shepherd Junior High.

Q Is that in Mesa?

A Yes, Mesa, Arizona.

Q I take it you didn't go back and get in the huddle; correct?

A No, yeah.

Q Okay.

A I tried. I couldn't.

Q My understanding, that you went to an emergency room of some kind apparently.

A Yes.

Q Tell us what happened after that. Tell us about your treatment?

A Up to what point?

Q Well, tell us about --

A At the emergency room in the hospital?

Q The emergency room, yes.

A Okay. So, I was taken from the emergency -- or from the football field in an ambulance to an emergency room.

At that point, my mom and my brother were there

BRANDNER 00377

8

with me, and there was, I believe it was a nurse. She had to do a pre-set, where they took off the air cast.

They rotated my leg up. Then she set it into place and put a little splint on it and wrapped it.

Then from that point, I had to go get x-rays, and then that's when I met Dr. Matthews.

He had come in and told us what we were going to do -- or had talked to my mom. Then that's when I went in and got the full leg cast put on.

Q    So if I understand you correctly, Dr. Matthews, I assume they reset it first, before they put the cast on?

A    Yes.

Q    And so you had that procedure done.

A    Yeah.

Q    The external fixation?

A    There was no pins or anything. It was just set in a cast and that was that.

Q    They straightened it out, I assume, and hopefully got some pain medicine?

A    Yeah --

Q    For them to set it off?

A    -- it was kind of strange because, I guess what had happened was, when the ambulance got there, they never gave me any pain medication. I don't know if they thought that the EMT on the field had given it to me.

BRANDNER 00378

9

So when I got to the emergency room, the lady who was setting my leg thought the ambulance had given me some pain medication, and I had hadn't gotten any until I had gone into the actual surgery, when he was giving -- when he was going to set it. That's when I first got the pain medication.

Q    By "he," your referring to Dr. Matthews?

A    Yes, Dr. Matthews.

Q    You get the cast on.

How long were you at the facility? Were you there for couple days?

A    I think it was three days.

Q    Then after the three-day stay at the hospital and the casting, as you've described it, did you go home at that point?

A    Yes. We -- yeah -- we went home. And I was just, basically, told to stay off it and let it heal. I had a wheelchair that I rolled around in in school, that sort of thing.

Q    I assume that there were some follow-up visits with Dr. Matthews; correct?

A    Yes.

Q    Now, ▮▮▮▮, you heard mention earlier, you treated with Dr. Matthews -- well, you actually last saw him in April 2002, was your very last visit.

BRANDNER 00379

10

Do you recall that?

A    Yes, I do.

Q    But there was also a January of 2002.  Do you recall that being about the time when you were released from his care to go out and engage in any activities you could withstand, depending upon whatever pain you were having?

A    Yes.  That's when he had told me to go ahead, try to get back into dancing, try to get back into some sports, and basically just push my limits and see what I could do, that I was able to take what I wanted to do with it.

Q    Did you do what you were told by Dr. Matthews?

A    Yes.

Q    Now, at some point, after -- let me back up.

You had the long cast on; right?

A    Yes, all the way up to my hip.

Q    Was there some follow-up type cast or boot of some kind?

A    Yeah.  It was a L-shaped boot that went into my shoe.  It had a front-type of plastic guard and it Velcro-ed.  And it basically was a walking cast, so I could walk on it and do some things with that on.

Q    At what point in this process that you've described, this chronology that you've covered, at what point do you recall concerns arising about how the leg was

BRANDNER 00380

healing?

A    How it looked?

Q    Yes.

A    Yeah.  I would say around -- after we got the original full cast off, there was a little bit of a bone callus, but it wasn't -- I wouldn't say it was a huge concern.  It was, he had explained it as a bone callus and that's what we had gotten from it.  We took it at that.

And then that's when we got our walking cast.  And he told me to go ahead and start engaging in activities, sports, dancing.

And after a while, we noticed that the leg started to look like it was bowing a little bit.  And we had -- I had a pretty large callus right under the kneecap.

So I would say it was, maybe, a month or two after I was on it everyday, dancing and doing sports and stuff like that.

Q    So your recollection is it's approximately a month or two after you had gone back to engaging in activities, as Dr. Matthews had told you you could, and you tried to?

A    Yes, yes.

Q    Now, ████, you indicated that the callus, the large bump had not -- said at first it wasn't very large.  Did it get bigger?

BRANDNER 00381

12

A    Yes.

Q    It just seemed to get bigger over time?

A    Yeah.  It seemed, as time went on, that it got bigger.

Q    Was this right below your kneecap?

A    Yes, right where the break had occurred.

Q    Now, ████, were you experiencing any pain with respect to activity on the leg?

A    Yes.  Just walking, I really didn't have any pain.  It was when I tried doing the activities, as dancing, jumping around on it, running for long periods; just strenuous activity would cause pain at the break, definitely, yes.

Q    So I understand correctly, the more active you were on the leg during this time frame we're talking about, you would have pain at the fracture site?

A    Yes.

Q    Was that one of the concerns I asked you earlier, you know, when you started having concerns, in addition to the way it looked, was that also a a concern?

A    Yes, definitely.

Q    And did your parents and you discuss these concerns?

A    Yes, frequently.  I was with my mom everyday because I danced at her studio after school almost everyday,

BRANDNER 00382

also with my dad. We would take these concerns to Dr. Matthews, yes.

Q    So at some of your follow-up visits, you would discuss this with Dr. Matthews?

A    Yes.

Q    And what was Dr. Matthews telling you?

A    From what I recall, when we had brought up concerns about the bone callus, he would explain it as just that, a bone callus.

He used to refer to one of his knuckles he had, I believe it was on this hand, when he had broken his finger playing hockey. He had a bump on his finger from when he broke his finger.

And he explained it as a calcium build up, and eventually it would wear down. But because right now it was healing, that's why it was so big.

And with the pain, he explained to us that as time went on, and as it fully healed, that the pain would basically just go away.

Q    At the fracture site?

A    At the fracture site, yes.

Q    So the callus, was it your understanding that was a normal thing?

A    Yes, from what he had told us, yes.

Q    What was your understanding, from your

BRANDNER 00383

14

discussions with him, about the bow in the leg?

A     I don't specifically remember what he told us.

I know that we had concerns about it, but I don't remember exactly what he had said.

I know that it wasn't like he wasn't concerned about it as anything that would get worse.  I just don't remember specifically what he said about it though.

Q     At some point after these concerns arose, did there come a time where the decision was made to seek some additional opinions of other doctors?

A     Yes.

Q     Were you involved -- I understand at the time you're still what, 14 years old?

A     14, yes.

Q     Your parents, sounds like primarily your mother, was very involved in what was going on?

A     Yes.  She was very concerned.

Q     The decision that I just referred to, to seek other opinions, was that something that was discussed between you and your parents?

A     Yes, it was.  It was mostly my mom brought it up as a concern because I would have so much pain and because of the way it was looking.

But when it came down to it, we had all set down and we all discussed, because we were going to Dr.

BRANDNER 00384

15

Matthews, and he ultimately just didn't really seem concerned at all. It didn't seem like, you know, like it was an issue to him at all.

So we ultimately decided to go somewhere else to, at least, get a second opinion, if nothing else.

Q So if I understand you correctly, you guys -- it was your understanding, based on discussions with your parents, that all of you felt like you needed to get some other opinions about this, in addition to what you were hearing from Dr. Matthews?

A Yes.

Q One of the people -- tell me who you first recall seeing?

A Dr. Dinowitz.

Q And as was mentioned earlier, your father had known Dr. Dinowitz; is that correct?

A Yes.

Q I believe that Dr. Dinowitz had performed some type of procedure on your father's hand. He had broke h hand or something like that?

A Yeah. He had broken it into, like, eight pieces or something. And Dr. Dinowitz put it back to together so he could use it again.

Q That was your understanding of how you came to go to Mezona Orthopedics?

BRANDNER 00385

16

A   Yes.

Q   Tell me about the initial meeting you had with Dr. Dinowitz.

A   From what I remember --

Q   First of all, ████, I don't mean to interrupt -- I'm not asking you if you recall specific dates.

I show in the records that's March 22, 2002, when you went to see him initially.  Does that sound right?

A   Yes, it does.

Q   Go ahead, I'm sorry.

A   From what I recall, my father, my mother, and I were all present.  We went -- we got there.  We were taken into an exam room.  And we had brought our x-rays from Dr. Matthews' office.

And when Dr. Dinowitz came in, we discussed with him the issues we had.  We had discussed with him what Dr. Matthews had told us.

And from there, he had taken our x-rays.  He put them up into the little light, and I remember him taking a protractor, because we were showing -- we were talking about the angle of the leg.

He put it on the x-ray.  He took a little line, he drew it with his pen.  Then he put it on the other side of the bone, below the break and he did the same.

BRANDNER 00386

17

And he measured the angle. I think it was something like 14 degrees, I think, something like that. And that was, you know, a certain amount of degrees off.

And he had told us that although it wasn't, you know, his specific area of expertise, that he believed that that was too much of an angle, that it might get worse if it stayed like that.

Q    Do you recall any other discussions with him, at that time, about -- let me be more specific.

Were there any discussions at that meeting, between yourself, or in your presence with Dr. Dinowitz, about any type of specific surgical procedures?

A    No, not that I remember, no.

Q    Was there any discussion, at that meeting with Dr. Dinowitz, about any types of problems if you just left it the way it was?

A    Not that I remember. I just remember him addressing the angle as a problem.

Q    Did you have any discussions with Dr. Dinowitz, at the time, about the pain at the site of the fracture?

A    Yes.

Q    Did you have any discussion with him regarding the stage at which the bone had healed at the fracture site?

A    Not that I remember.

Q    This sounds like it was a fairly preliminary

BRANDNER 00387

18

discussion?

A    Basic, yes.

Q    Did Dr. Dinowitz, at this meeting, tell you that he was a more of an expert in the upper extremities as opposed to the lower extremities?

A    Yes.

Q    You said you brought some x-rays with you.  Do you remember having any additional x-rays done at that time?

A    I think we did.  I think, if I remember correctly, we had the x-rays taken and we compared them to the ones from Dr. Matthews' office, if I remember correctly.

Q    Do you remember anything about those discussions about the x-rays?

A    Not specifically, no.

Q    Of course, I mean, other than what you already told us, about the measuring?

A    The angulation, yes.

Q    Tell me, the meeting with Dr. Dinowitz, how was it left?  What was the conclusion, if you will, at the end of that meeting, where did you stand?

A    We had felt better knowing, basically, that we weren't crazy.  We had felt something there was an issue. We felt better that, possibly, there basically was somebody that saw what we saw basically.

So where it was left then was, could -- since

BRANDNER 00388

19

it wasn't his specific area of expertise, I don't know if we, if specifically Dr. Sharpe's came up or not, but I do remember that he was going to take it and discuss it with his colleagues.

Like we heard from Mr. Crawford, that they would -- they meet every few mornings and everybody comes in, all the partners, and they discuss different cases.

That they would -- I remember that he was going to take that, our case, and discuss it with them. And we would -- I don't know if it was an in-office visit or over the phone, discuss what had -- what was said at that meeting.

Q   So if I understand your testimony correctly, there may have been phone call after that?

A   Yes.

Q   The phone call you're referring to, was that a phone call that you participated in or is that something you learned about?

A   Something I heard about.

Q   Was that phone call with your mother?

A   Yes, if I remember.

Q   So I take it she would be the one to ask more details about that discussion?

A   Definitely, yes.

Q   You weren't on the line with her or anything?

BRANDNER 00389

20

A    No.

Q    It was your understanding that there was a discussion that took place that then led to a second meeting at Mezona Orthopedics?

A    Yes.

Q    That was April 11 of 2002?

A    Yes.

Q    I want you to take me through that meeting, as best you can.

Obviously, you arrive at the Mezona Orthopedic offices, which at that time were in Mesa; correct?

A    Yes.

Q    Who did you meet with?

A    Dr. Sharpe.

Q    Okay.  Did you meet with anyone else at Mezona Orthopedic, that meeting where there was a substantive discussion.  And by that I mean, other than, hi, Scott, how are, you good to see you, or anything like that?

A    No.

Q    So the only substantive discussion you had with anybody from Mezona Orthopedics on April 11 of '02 was with Dr. Sharpe?

A    Yes.

Q    Was your mother present?

A    Yes.

21

Q    Do you remember if your dad was present at that meeting?

A    Yes, he was.

Q    All right.  As you go into that meeting, tell me what your mind set was with respect to what you had decided or had not decided at that point?

A    Basically, we were, we were excited to hear what they had said.  We were excited to hear of solutions, possible solutions to what we could do.  Basically open-minded to anything Dr. Sharpe had to say.

Q    Before you went to see Dr. Sharpe on April 11, 2002, this first meeting that we're getting ready to discuss, had you, yourself, made up your mind what you were going to do yet?

A    No.

Q    Where did the majority of that meeting take place?  What I'm trying to get at, was there some type of -- was it in the doctor's personal office, was there an examination room?

A    Yes.  It was the same type of room that we were in with Dr. Dinowitz, maybe even the same room.  I don't know.

Q    So, your mom and your dad and yourself are in there and Dr. Sharpe comes in?

A    Yes.  I think Dr. Dinowitz may have introduced

22

him, if I remember correctly.

Q     You had not met Dr. Sharpe up to that point?

A     Not that I can recollect, no.

Q     All right.  Tell me what you recall of Dr. Dinowitz introduces Dr. Sharpe.  Does Dr. Dinowitz stick around?

A     No.  From what I can remember, after he introduces us, he leaves us with Dr. Sharpe.

Q     Tell me what you recall, as best you recall, the conversations you had with Dr. Sharpe at that meeting.

A     I remember -- all I can remember are him -- is him talking about different types of surgeries that we could do.

I remember him discussing with us putting a metal plate in my leg.  I remember, not so extensively, I was talking about a rod.

Also we talked about the external device, where they would have something external that would be on my leg. They would crank it every few days to slowly make it position -- go back to where it was supposed to be positioned.

And I do remember that it was his opinion that the best choice, out of those, was to go ahead and go with the metal plate.  As far as I remember, that was the majority of the meeting.

BRANDNER 00392

I also remember we discussed -- I think we went over some possible risks at that time too.

Q   Do you recall the doctor dictating into a recorder during the meeting?

A   Yes, yes.  I don't believe it was during the meeting.  I believe it was after the meeting.  After we had went over everything, he would sit there and he would discuss -- or he would talk into the thing about everything we had discussed.

Q   And ▆▆▆, do you recall that taking place that meeting?

A   The dictating?

Q   Yes.

A   Yes.

Q   ▆▆▆, you said that some of the -- let me cover something else real quick.

At this meeting of April 11, 2002, was there any discussion about a nonsurgical option?

A   I don't remember.

Q   You don't recall a discussion?

A   I don't, no, not that I recall.

Q   You had already been told by Dr. Matthews that he didn't think anything needed to be done at that time with this; right?

A   Yes.

BRANDNER 00393

24

Q    So, in a general sense, you knew, am I correct, that waiting was an option?

A    Yes.  We knew that I could continue with the activity I was doing and we could basically just live my life that way, not do anything, and just continue dancing and doing sports and live with the pain, basically.

Q    You mentioned that during the meeting then there was a discussion about some of the risks.  This was a discussion with Dr. Sharpe; correct?

A    Yes.

MR. CAUSEY:  Your Honor, I have what's been marked as Plaintiff's Exhibit 10.  It is an extract from the Mezona Orthopedics records, which are marked as another exhibit.

I've already conferred with counsel, and it's my understanding he has no objection to me utilizing this with this witness.

THE COURT:  Did you wish to admit 10 at this point?  Is that what you wanted to do?

MR. CRAWFORD:  I don't object to that, as long as the Mezona chart gets submitted into evidence, and he's agreeing to that.

MR. CAUSEY:  I do.

THE COURT:  What is the entire chart number, the exhibit number?

MR. CRAWFORD:  Can I get back to you with that?

BRANDNER 00394

25

They have this labeled differently than the other one we have.

THE COURT: We do that to see if you're on your toes.

I'm just kidding. Of course, 10 will be admitted.

And Mr. Crawford when you find it, just let me know. We will enter that on the record as well.

Mr. Causey, go right ahead.

MR. CAUSEY: Your Honor, I was looking for my list to see if I could help with that, and I'll have to give get back to that.

THE COURT: We have to change the names, they might not fit on those little tiny lines on our forms.

Go ahead. 10 is admitted.

MR. CAUSEY: 10, as well as we might as well take care of 11, at this point. That's the June 6, your Honor.

MR. CRAWFORD: That's fine.

THE COURT: 11 is admitted as well.

Go right ahead.

MR. CAUSEY: Thank you, your Honor.

BY MR. CAUSEY:

Q    Now, we're going to run into a problem with me making sure I know how to work the technology here, your Honor. So bear with me just a moment.

BRANDNER 00395

26

███, is that on your screen right there the in front of you?

A    Yes.

Q    You can see that okay?

A    Yes.

Q    I will move it around, get to the portions.  I just wanted to --

███ this is a medical record of your treatment at Mezona Orthopedics.  It is Plaintiff's Exhibit 10 at this point.

Have you seen these records before?

A    Yes.

Q    And by that I mean, before today.  I'm not talking about before your meetings.

A    Yes.

Q    I'm talking about present tense.

A    Yes.

Q    Okay, I apologize.  I should have been more clear.

This is dated April 11 of 2002.  Do you see that?

A    Yes, I do.

Q    It says Dr. Kipling Sharpe.  Do you see that?

A    Yes.

Q    If I knew how to work the technology better, I

BRANDNER 00396

27

would know that I can actually underline things on this screen here if we need to. I'm learning, your Honor.

█████, I want to turn to -- there's a second page to this April 11. I'll put that right there in the middle there.

Do you see that again, it says April 11 here?

A Yes.

Q Again, it's Dr. Kipling Sharpe. Do you see that?

A Yes.

Q █████, there is some reference here to the discussions that took place. I just wanted to cover it with you to see if this is what you were referring to earlier when you testified about this meeting of April 11, 2002.

Looks like they're going to get a CAT scan; you understood that?

A Yes.

Q It was -- was that -- what was your understanding of what the CAT scan was and what it's purpose was?

A It was to see if the leg had, had completely healed or not. If it was still, if it was still healing, if there was a malunion or not.

Q Are you talking about the fracture site?

A Around the fracture site, yes.

BRANDNER 00397

28

Q    Is that one where you're having the pain --

THE COURT:  Question --

A JUROR:  Is there -- I just can't read it.

THE COURT:  We will do, definitely do that.  My guess is no one else can read it either.  Thank you for letting us know.

Folks, there's a zoom feature.  Let's see if we can zoom in.

MR. CAUSEY:  Is that better?  I apologize.  Thank you for letting us know.  I'll just move it around, your Honor, to get the pieces on the screen.

A JUROR:  Can we get the whole -- the first page and second page?

THE COURT:  Yes.  It has been admitted.  I'd like for you to be able to read it now too, if you can.

A JUROR:  Fantastic.  If we can put the first page back up.

MR. CAUSEY:  Yes.

A JUROR:  I don't mean to disrupt your line of questioning.

MR. CAUSEY:  No, no, that's fine.  I can go over it too.

You can see the first paragraph, I believe, is some history, on this exhibit, and basically discussing, what we have already discussed.

BRANDNER 00398

29

Q ████, do you recall having discussion with the doctor about your history, the football injury, things we already discussed? I don't want repeat it all again.

A Yes.

Q The next thing has a heading, past medical history. Do you see that?

A Yes.

Q I'm assuming that's some information you also provided to the doctor?

A Yes.

Q Denies any other significant problems.

I don't want to move it too fast.

Do you want me to move it up a little bit at this point? Okay.

Move it up?

Okay, thank you.

Actually, that's the end of it, except it looks like there may have been a hole punch of some kind, bottom left corner there.

Everybody done with this page?

Is that -- your Honor, may I move the stand? It maybe blocking part of the bottom part of that.

THE COURT: Certainly, oh, sure.

Next page.

A JUROR: Yes, sir.

BRANDNER 00399

30

MR. CAUSEY: All right, thank you. All right.

Q     ████, let's talk about -- we're going to go to the last segment of this. You can see it goes on into June 2002. I don't want to get into June 2002 yet. I want to talk about the April 11.

████, you were mentioning earlier some discussions you had with Dr. Sharpe at this meeting, you and your parents.

It says there, I discussed other fixation options with the parents as well.

Is that what you were describing, the different types of surgeries that you could use to fix this?

A     Yes.

Q     Now, ████, was it your understanding that if the bone was going to be fixed, straightened back to the angle it should be, that that was going to require a surgical procedure of some kind?

A     Yes.

Q     Okay. And just to clarify one more thing on that, you weren't under the impression at this time, or any time, that that bone was going to straighten itself back out; right?

A     No.

Q     So when we talk about the option of wait and see, you understood that it would be a situation where it

BRANDNER 00400

31

would still have some deformity or angle in it if you didn't have the surgical procedure; is that correct?

A    Yes.

Q    It says fibular osteotomy will also be necessary.

And again, Mr. Crawford demonstrated the two different bones, the large bone and the small bone.

And that's a breaking of the small bone.  Was that your understanding?

A    It was -- we were going to cut out a piece of the small bone.

Q    Take a piece out.

A    Yes.

Q    Okay.  So the procedures Dr. Sharpe, at the April 11, 2002, meeting, the procedures and what they involve, the type of procedures themselves, the operation, if you will, that was discussed; correct?

A    Yes.

Q    Now, as far as the length of the discussion, did that take up most of the discussion?

A    Yes, definitely.

Q    I want to get to the next portion of this.  It says:  And we did an extensive discussion today about risks, comma, including anesthetic risk, death, infection, nonunion of leg union, nerve injury, vessel injury.

BRANDNER 00401

32

When you said earlier that they discussed -- Dr. Sharpe discussed risks with you, is that what you're referring to?

A     Yes, sir.

Q     Was there any additional discussion, other than what is contained in the notes that Dr. Sharpe dictated immediately after the meeting?

A     No.

Q     It says:  They understand all these risks, and I believe, and have discussed with him the proposed benefits outweigh the risks, and they understand that, and wish to proceed.

Did Dr. Sharpe express to you that he had an opinion that the risks of this surgery were outweighed by the benefits?

A     Yes.

Q     Was it your understanding that that was his feeling?

A     Yes.

Q     Was it your impression that Dr. Sharpe was advocating that you have this surgical procedure?

A     Yes.

Q     I want to talk about some of these risks here specifically and the discussion, if you recall it.

First of all, I want to -- it's my

BRANDNER 00402

33

understanding that there was another discussion of these risks or a similar list at the June 6th meeting; is that right?

A    Yes.

Q    To the extent that you can keep them separate, delineate them, that's what I want to talk about now.

I want to talk about what you recall of the April 11, 2002, discussion.

If you can't separate the two discussions out, then let me know and I'll ask you it differently; okay?

A    Okay.

Q    As far as nerve injury, do you see that phrase there?

A    Yes.

Q    At this meeting, did Dr. Sharpe discuss with you any specific nerve that was at risk from this surgery?

A    No.

Q    Did Dr. Sharpe describe to you any type of nerve that comes down the leg and wraps around below the knee or the knee area and controls the function of your foot?  Was there any discussion about that?

A    No.

Q    Was there any discussion, at this April 11, 2002, meeting, what I'm talking about is what Dr. Sharpe said to you.

BRANDNER 00403

34

We've already established he's basically doing the talking; right?

A   Yes.

Q   Was there any discussion, at that meeting, that you could permanently lose function of your foot as a result of this osteotomy procedure?

A   No.

Q   Was there any discussion about function of the foot, at all, talking about the foot, as part of this discussion regarding surgery?

A   No.

Q   Do you recall whether the doctor was looking at any type of paperwork when he was reading off this list of potential risks?

A   If I remember correctly, he had a paper in front of him.  It might have been actually been a pamphlet, which he was reading off the actual risks themselves.

Q   I'm sorry, did everybody read that to the extent they wanted to, that April 11?  I just took that off without asking.  I apologize.

███████, is there anything else about the April 11, 2002, meeting, that you recall?

A   I do recall when -- it's something that kind of sticks out in my head -- when death was brought up, where I was kind of like, whoa, you know.

BRANDNER 00404

35

Q    You mean as a potential risk?

A    As a potential risk, yes.

He had mentioned that it was something that had to be discussed in any surgery that involved an anesthetic, that there was a risk for death.  And that it was a very small risk, and that's, basically, the only thing, other than that, that sticks out.

Q    At the end of the April 11, 2002, meeting, we've covered all that you recall on that?

A    Yes.

Q    Do you have a recollection of what your thought was at the end of that meeting, after you left that meeting, where you were on this process?

A    If I remember correctly, I was excited for surgery.  It was the answer to our problems -- to my problems.

Q    At that point in time, ████, did you have any appreciation for any real dangers, as a result of that surgery?

A    No, not at all.  It was, it was a great thing that was going to fix it.

Q    Based on your discussion with Dr. Sharpe at that meeting, did you feel like there was -- this was a surgical procedure that would actually fix this?

A    Yes.

36

Q    Okay.  ████, I want to move onto the June 6, 2002, meeting.  But before we get there, before that meeting, you went back and saw Dr. Matthews, but you also saw doctor -- a Dr. Walls; is that correct?

A    Yes.

Q    Why do we go see Dr. Walls?

A    We wanted to make sure -- we basically wanted a third opinion, some -- another opinion, to make sure that we were making the right choice.

Q    Okay.  During any of your discussions with Dr. Walls, did he discuss with you, in any detail at all, the wait and see option, the leave-it-alone option?

A    Not that I remember.  I think it may have come up, but I can't say specifically one way or another.

Q    Do you remember any discussion with Dr. Walls, of any detail, such as, if we leave it as it is, and it heals with the same angle it's at, here's what you can expect down the road, if you want to just try to live with this?  Any discussion like that at all?

A    Not that I remember.

Q    What do you remember about your discussions with Dr. Walls?

A    I don't remember very much from his office visit.  I don't know if it was because it didn't last very long or not.

BRANDNER 00406

I do remember that he had a — he was talking about a different surgery. It was the same idea, you know, go in and straighten it out. But instead of using a plate, his idea was to use a rod through the center of the leg.

Other than that, I don't really remember anything else from that meeting.

Q   Now, I'm -- was it your understanding that Dr. Walls agreed that in order to straighten the bone, a surgical procedure would be necessary?

A   Yeah, to fix the angle, we needed to have a surgery, yes.

Q   Right, in order to realign the bone, it needed -- there needed to be some type of surgical procedure?

A   Yes.

Q   So, at this point in time, are you under the impression that if your decision is to go in and try to straighten the bone, as opposed to the wait-and-see option, it's going to require some surgical procedure?

A   Yes.

Q   Approximately, looks like maybe a week later, you went back to see Dr. Matthews again?

A   Yes.

Q   The meeting with Dr. Matthews, in April of 2002, of course, this is after Dr. Sharpe's discussion that

BRANDNER 00407

38

we just covered?

A     Yes.

Q     This is after Dr. Walls; right?

A     Yes.

Q     At that time, except for seeking out these additional opinions, you'd still been treated by Dr. Matthews; is that correct?

A     Yes.

Q     So April 22, 2002, is the date that we have here, from the chart that counsel provided, the time line, does that sound about the right date, a week later?

A     Yes.

Q     Kind of each week had a doctor's appointment here, this time period?

A     Kind of, yeah.

Q     What do you recall about that meeting with Dr. Matthews?

A     I recall us going back there.  It was my mom said it was basically to give him, you know, one last chance to, I don't know, keep us as a patient.

We wanted to see if he had changed anything about his previous opinions, if he wanted to, like I said, basically change anything about what he had said before.

If the angle was a problem, if the callus was something other than just a bone callus, if the pain meant

BRANDNER 00408

39

anything, anything like that.

Q    Did you feel like Dr. Matthews wasn't addressing this aggressively enough?

A    In a way, yeah, yes.

Q    I know we discussed this a little bit, as far as when you -- the time period when you got out of surgery -- excuse me, got out of the cast, up to the time where you started seeking other opinions, we have discussed a little bit, the difficulties, the pain you were having?

A    Yes.

Q    I want to talk a little bit, we're now up to June of 2002, the second meeting with Dr. Sharpe, June 6, 2002.

First of all, tell me what you recall brought that additional meeting to Dr. Sharpe's about. Was there some decision making?

A    I think that, from what I can remember, that was the final meeting before surgery. It was just to finalize everything, to go over any extra things we needed to go over, that sort of thing. It was kind of to wrap up everything before surgery.

Q    When you went to see Dr. Matthews that last time, had you already made up your mind, definitively, that you were going forward with the surgical procedure?

A    Yes.

BRANDNER 00409

40

Q    And I assume, since you went back to Dr. Sharpe, you weren't interested in Dr. Walls' procedure?

A    No.  Like --

Q    The rod recommendation, you were mentioning.

A    Yes.  No.

Q    All right.  What I wanted to discuss, and bring us forward a little bit, June 6, 2002, prior to Dr. Sharpe's surgical procedure, the one at issue, what were the problems you were having with your leg at that time.

Was -- and I'm talking more along the lines of the pain.  First of all, was the knot still there?

A    Yes.

Q    Callus was still there?

A    Yes.

Q    Was it pretty much the same as it had been when you first went to see Dr. Sharpe?

A    Yes.

Q    Or when you first went to Mezona Orthopedics?

A    Yes.

Q    The bow in the leg, it's still there, obviously?

A    Yes.

Q    What I want to know, has there been a change, or is there any difference in the pain you're experiencing, before this June 6, 2002, procedure.

BRANDNER 00410

41

Do you still have pain at the fracture site if you're very active?

A    Yes, definitely.  There is some stiffness in the ankle too, from the bow of the leg, yes.

Q    So you're having some stiffness in your right ankle?

A    Yes.

Q    Does that vary depending upon activity?

A    Yes, definitely.

Q    Is the pain at the fracture site, is that varying, at that time, depending upon the degree of activity?

A    Very much so, yes.

Q    And the type of activity?

A    Yes, definitely.

Q    All right.  Let's go to June 6, 2002.

First of all, Scott, who was in attendance at that meeting?

Let me back up a minute.  I want to set the stage a little.  Was this in another exam room type of thing?

A    Yes.

Q    Take me from the beginning of the meeting.  Who is in the meeting initially?

A    My mother and I.

BRANDNER 00411

42

Q     Who are you meeting with initially?

A     Dr. Sharpe, yes.

Q     And there has been some discussion that a Brian Sharp, physician's assistant, was involved, to some degree, on your case.

Do you recall this person?

A     Yes.

Q     The April 11, 2002, meeting -- I'm sorry, I'm going to bounce backwards on you a little bit -- did you have any discussion, substantively at all, with Brian Sharp at that meeting?

A     No.

Q     At that visit at all?

A     No.

Q     So June 6, 2002, the meeting starts off with Dr. Sharpe, is your recollection?

A     Yes.

Q     And tell me what you were discussing, what was being discussed?

A     I don't remember very much from that meeting. I do remember us going over the list of risks again. That's one thing I do remember from that meeting.

Q     Did you discuss the procedures at all?

A     We discussed the anesthetic, basically the -- what we could expect, you know. We were going to do an

BRANDNER 00412

43

epidural. I was going to get a catheter as well.

We were going to, you know, different type of things like that, that we could expect from the surgery. But other than that, I don't remember any other specific things that we discussed.

Q Was there any discussion, at the June 6, 2002, meeting, of the option to wait and let the fracture to continue to finish healing or, hopefully, the pain would not be at the fracture site and then seeing where you were at that time?

A No.

Q No discussion of that option?

A At that time, surgery was the answer.

Q Let me finish up with Brian Sharp, the PA, here, at the June 6, meeting, of 2002.

Did Brian Sharp attend that meeting, at all, to your recollection?

A Was he in the actual exam room?

Q Yes.

A Not that I can remember, no.

Q How long do you recall that meeting taking place?

A How long was the meeting, like time period?

Q Yeah.

A I couldn't say exactly. I don't know.

BRANDNER 00413

44

Q    The discussion, the substantive discussion that took place, be it the procedures to expect as part of the surgery, be it the risk list again, or any portion of it — I'll put the medical record up here.

Is it your testimony that that discussion, the substantive portion, was all with Dr. Sharpe?

A    Yes.  In fact, the only time I remember even talking with Brian Sharp was just meeting him and shaking his hand, that being before the surgery.

Q    At the Mezona —

A    At Mezona, yes.  Other than that, I don't remember him talking about — to us, you know, substantively at all.

I do remember after the surgery having discussions with him, but before the surgery, the only thing I can actually remember is just meeting him and shaking his hand.

I remember, because we were walking out of the doctor's office, and there were — they have each of their cards in there.  There was Dr. Sharpe's and Brian Sharp's and we had talked about Brian Sharp, but I remember, you know, picking up both their cards and Dr. Sharpe would follow us out.

And he goes, oh, he's actually here and we can go ahead and introduce you to him.  And that's when we had

BRANDNER 00414

45

been introduced.

I'm not sure if that was the first or second meeting. If it was April 4th or June 6th, but I do remember that the only time, before surgery, actually talking with him was, you know, either just shaking his hand or meeting and saying hello.

Q You don't recall if that was the April 11 or June 6, 2002, meeting?

A No, I don't.

Q So, ████ prior to the surgery, I take it, is it your position that Brian Scott, the PA, never discussed any risks with you?

THE COURT: Brian Sharp.

MR. CAUSEY: What did I -- I'm sorry, Brian.

MR. CRAWFORD: Brian Scott.

BY MR. CAUSEY:

Q I apologize, Brian Sharp.

A What was the question again, I'm sorry.

Q Let me ask it again.

If I understand your testimony correctly, is it your position then that prior to the surgery, at any time prior to the surgery, the physician's assistant, Brian Sharp, never had a discussion with you about the risks of the surgery?

A No.

BRANDNER 00415

46

Q    That's correct?

A    Yes.

Q    All right.  Tell me what you recall -- have you told me everything that you recall about the June 6 discussion regarding the procedures?

A    Yes.

Q    Let me put up here -- and I'll try to leave it up.  So everybody -- I think it's still blown up.  June 6.

██████, this is a note of June 6, Exhibit 11.  Plaintiff's Exhibit 11, it's been admitted.

████████, this is a note of June 6, 2002, from Dr. Sharpe's records.

Have you seen this document before?

A    Yes.

Q    ████████, at the beginning there it says you're there for the pre-op evaluation; is that correct?

A    Yes.

Q    It also indicates you had, already had you're second CAT scan, CT scan, done the day before.

Do you recall that?

A    Yes.

Q    Now, the next sentence says:  This has not been read by the radiologist yet, but Dr. Sharpe discussed this with Dr. Schenk -- I hope I'm pronouncing that correctly -- this morning and it will be done in time for the surgery.

BRANDNER 00416

47

Do you see what I'm referring to?

A    Yes.

Q    Let me ask you this, did you see Dr. Sharpe dictating anything at this meeting?

A    Yes.  Every meeting we went to, at the end of the meeting he dictated it.

Q    He dictated --

A    Yes.

Q    Do you know whether he dictated this information or not or someone else did?

A    Not that I can remember.  I don't remember him saying specifically saying this though.

Q    I'm going to move it up slowly in a little bit. Okay.

████, in the assessment portion, it says malunion right tibial fracture.

By this time, had you come to understand that the description of what was wrong with your leg, with the tibial bone in your leg, was it had a malunion?

A    Yeah.

Q    That was the phrase that was now being used, that you understood?

A    Yeah.  That's what was used to describe the fact that it hadn't healed completely, yes.

Q    It says, hopefully, ORIF, with a plate, could

BRANDNER 00417

48

possibly — some sort of external fixation device.

At this June 6, 2002, meeting, was the external fixation device something you were still considering?

A    Not that I remember.  I thought that we, from what I remember, I thought we had decided to do the plate.

Q    Okay.  Let me get down to the portion here where you indicated, again, there was some discussion regarding risks.

A    Yes.

Q    Do you recall that, earlier you testified to that?

A    Yes.

Q    Can I ask you, this time, when the doctor was also discussing the risks, do you recall whether he was referring to any type of documentation when he was reading off the list?

A    Not specifically.  I don't remember this time specifically him having a piece of paper or not.

Q    Okay.  So at this meeting you don't recall that specifically?

A    Not specifically, no.

Q    It says:  I've given them a prescription for post-op pain medication.  Do you see where I'm referring?

A    Yes.

Q    And reviewed the risks of surgery.  These

BRANDNER 00418

49

include, but are not limited to, death, other anesthetic complications, blood vessel injury, nerve injury, fracture, chronic stiffness, chronic pain, malunion, non-union, re-fracture, mechanical failure of the components. I think that says blood loss. Looks like there was probably a three-hole punch of some kind in the record there. Blood clots and infection.

Do you see what I'm referring to?

A    Yes.

Q    And ████, do you recall being read that list of potential risks?

A    Yes.

Q    Same thing I asked you about the April 11, 2002, meeting. I want to talk specifically about the nerve injury.

When this list was read off to you June 6, 2002, okay? Did you -- was there any different discussion about it than what had take place April 11, 2002?

A    No, same list, same discussion.

Q    Let me go back to the April 11, 2002, briefly. Did either you or your mother, when the list was read off back then -- or your father, I guess he was at that meeting -- raise any questions, at that time, about the risks, other than you mentioned the risk of death issue that --

BRANDNER 00419

50

A    That's the only one that I remember.

Q    When this list was also communicated to you at the June 6, 2002, meeting. Do you recall any questions that any of you raised at that meeting?

A    No. We had no questions.

Q    I'm talking about at that meeting --

A    Just my mother.

Q    Your mother?

A    Yes.

Q    Any discussions June 6, 2002, about a specific nerve that could be injured?

A    None.

Q    Any discussion that that nerve, or this surgical procedure, could result in a permanent impairment -- permanent loss of function of your foot?

A    No.

Q    Any discussion of if that happens, that you, in order to not drag your foot on the ground or to be able to move your foot, might have to wear a brace the rest of your life?

A    No.

Q    No discussion along those lines?

A    None whatsoever.

Q    There is another small portion -- has everybody read this portion?

BRANDNER 00420

51

I believe there is just a couple lines there at the top. I'll try to piece them together so you can read them in context. I'm not quite sure how good I'll be at this.

Patient and his mother understand these risks. He's ready to proceed with surgery. We will see the patient back one week after the surgery.

Do you see that?

A    Yes.

Q    See where it says Brian Sharp, PA dash C?

A    Yes.

Q    Do you recall, have a recollection of seeing Brian Sharp dictating?

A    No.

Q    ████, I want to cover just a couple more things and we'll finish up with the April 11 — the June 6, 2002, meetings.

At either of those meetings, did Dr. Sharpe tell you that he thought that if you did the wait-and-see option that 20 to 30 years down the road you might have some arthritic issues regarding your knee or some issues with your ankle?

A    From what I can remember, yes.

Q    Do you remember him telling you that it would be 20 to 30 years down the road?

BRANDNER 00421

52

A     About 20 or 30 years, yes.

Q     All right.  So we finished the June 6th, 2002, meeting.  And at this point, the surgery is being scheduled.  It's a go decision; is that right?

A     Yes.

Q     ████, had you known about the specific risk to the nerve, that can cause you to lose, permanently, loss of function of your foot, would you have elected to proceed with this surgery?

A     No.

Q     What would your option have been at that point?

A     To wait and see if it would heal, stop hurting.

Q     Even though you had the bow in the leg and the knot in the knee, did you still have function of your foot?

A     Yes.

Q     So you could still lift up and move your foot?

A     Yes.

Q     You still had the ability to push off the foot?

A     Yes.

Q     You still had the ability that when you walked, the foot would come back into place?

A     Yes.

Q     Okay.  ████, we go to the surgery, June 26, 2002.  What do you recall, pre-operatively, in other words prior to going under and during the surgery, who did you

BRANDNER 00422

53

talk to?

A   I remember talking to Dr. Sharpe for a short period. I remember him being in his blue gown with his everything. I might have doctor -- or Brian Sharp might have said hi to me, as well. I don't specifically remember.

I remember talking to my dad and my mom and my grandmother were there.

Q   All right. But as far as health care providers, have you listed everybody?

A   The anesthesiologist, I remember meeting with him more than anybody else, because he went over exactly what was going to happen and --

Q   The epidural?

A   Yes, the epidural and actually going under.

Q   Did anybody, prior to that surgery, during the communications you had with them at the hospital, again, did anyone mention anything about the risk to a specific nerve and any loss of function of the foot that could result?

A   No.

Q   All right. So, ████, you go through the surgical procedure. When is the first point in time where you realize that something may not be exactly as hoped?

A   The first time I talked to Dr. Sharpe after the surgery.

Q   Tell us about that.

BRANDNER 00423

54

A    I remember the first time, I was in my hospital room and he had walked in, and I think I was asleep.  And my mom had woke me up and we started taking -- he had started to take the bandages off and the brace and the bandages. And he asked if, you know, everything was okay, how I was feeling, if it was hurting; that sort of thing.

Once he had gotten the bandages and brace off, he asked me if I could flex my foot -- or first he asked me to wiggle my toes, and I couldn't.  He asked me to flex my foot.  I couldn't do that.  He asked me --

Q    Describe -- I don't mean the interrupt you -- describe what you mean by flex your foot?

A    Pull it upward, like that.  He asked me if I could move it side to side, like this, which I couldn't, or push down, which I couldn't either.  So, I couldn't move my foot.

I remember my mom asking, you know, what the significance of that was.

Q    Was this in the room there with everybody present?

A    This is in the hospital room, yes.

I remember him telling us that there may have -- I may not be able to move my foot because of the epidural might not have worn off yet.

But there was another possibility that I might

55

have lost function of foot, but we would not know for sure, and it wouldn't be anything to really get upset about until the epidural had wore off and we could actually see if something had gone wrong or not.

Q    This conversation that you were having with the doctor, this is the first communication post surgery?

A    Yeah, yes.

MR. CAUSEY:  Your Honor, I noticed you're glancing at the clock.

THE COURT:  I am.  Is this a good time to pause?

MR. CAUSEY:  It would probably be, your Honor.

THE COURT:  Let's do that then.  Thank you. Mr. ████, you can go ahead and step down.

Ladies and gentlemen, we will go ahead and take our evening break.  If I could ask all of you to be here, please, promptly at 9:30 tomorrow.

We'll ask that you meet inside the jury room. I think you all know how to get into the jury room, to get through our security screens.

So, if you will be ready to come into the courtroom at 9:30, I'd appreciate it.

Remember the admonition.  Thank you folks. We'll be in recess.

(The proceedings were concluded.)

BRANDNER 00425

56

C E R T I F I C A T E

I, Lisa H. Vitoff, do hereby certify that the foregoing pages constitute a full, accurate computer transcription of my stenographic notes taken at said time and place, all done to the best of my skill and ability.

DATED this 2nd day of February 2010.


Lisa H. Vitoff, CPR
Official Court Reporter
CRR No. 50521

BRANDNER 00426