# EXHIBIT "29"

Case: 1:10-cv-08161 Document #: 81-29 Filed: 12/13/11 Page 2 of 146 PageID #:2937

# ORIGINAL

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

███████ and ███████ et al.,

           Plaintiffs,

      vs.

ANDRE MATTHEWS, M.D., and
JANE DOE MATTHEWS, et al.,
          Defendants.

CV No. 2003-017451

April 29, 2008
Phoenix, Arizona

BEFORE THE HONORABLE: MICHAEL JONES, Judge

REPORTER'S TRANSCRIPT OF PROCEEDINGS
Testimony of ███████████████

Lisa H. Vitoff
Certified Court Reporter
CCR #50251

BRANDNER 00427

2

APPEARANCES

FOR THE PLAINTIFFS:
KOELLER, NEBEKER, CARLSON & HALUCK, LLP
BY:  Mr. Wade R. Causey

FOR THE DEFENDANTS
CRAWFORD & KLINE, P.L.C.
BY:  Mr. Bruce D. Crawford

PROCEEDINGS

███████████

having been previously sworn herein, resumed the stand and testified as follows:

DIRECT EXAMINATION continued

BY MR. CAUSEY:

Q    ████, I want to finish up what we were discussing yesterday.  I know we got close to covering everything.

BRANDNER 00428

3

We left off at a point where we were discussing the post surgery, the Dr. Sharpe issues and discussions, when you realized that the foot was not moving?

A    Yes.

Q    I'll get back to that in just a second, but there was one other thing I wanted to ask you about.

The discussions, prior to the surgical procedure, and I want to ask first, with respect to Dr. Sharpe -- or Brian Sharp.

Did anybody discuss with you that, with respect to the pain you were having at the fracture site, that less activity, staying off of it, would help reduce that pain?

A    No.

Q    Did anyone discuss with you that staying off of it thereby and potentially reducing the pain also would be the process to allow the fracture to finish healing?

A    No.

Q    So, at that time, you were still engaging in whatever activities you could, pain allowing; is that a fair statement?

A    Yes.

Q    Where we left off yesterday, we were talking about the discussions that occurred after the surgery with Dr. Sharpe.

And if I recall, we just had gotten to that

BRANDNER 00429

4

topic. I believe we had briefly mentioned that a few hours after the surgery, or the day, on the same day of the surgery, you had been asked to move your foot.

Do you recall that?

A    Yes.

Q    Now, I believe we covered all of the discussions that you recalled at that meeting, where it was explained to you it might be the epidural.

Do you remember that yesterday?

A    Yes.

Q    Is there anything else that you can think of about that conversation or discussion with Dr. Sharpe, following the surgery, that you didn't mention yesterday?

A    What was said?

Q    Yes.

A    Not that I can think of, no.

Q    Now, obviously there was some continued treatment after this surgery, regarding the condition that you now have as a result of the nerve damage; is that correct?

A    Yes.

Q    And you continued to treat with Dr. Sharpe, I believe, a couple years after that?

A    Yes.

Q    I want to talk a little bit about the follow-up

BRANDNER 00430

5

treatment. I don't want to go into a great deal of detail. I just want to -- kind of the highlights that have been mentioned already.

At what point did it become, in your eyes, based upon your communications with your doctor, apparent that this was a permanent condition?

A     I would say probably a few months after the initial surgery.

Q     Were there discussions regarding other options to try and gain some function of this nerve or function of the foot?

A     Yes.

Q     What were those? Tell me what those were.

A     I remember one specific discussion. I know Dr. Sharpe had referred us to another doctor that specialized in foot drop. I believe that was his specialty.

And we had discussed with him doing a tendon transfer surgery, where we would take a tendon from the back of my leg, the calf area, transfer it to the front, and that would -- if it worked, that would help me have 50 percent mobility in the front, but I would lose 50 percent from the back.

Also there was another surgery, a nerve graft surgery. I don't remember going too much into that.

I remember we were -- we did some research. He

BRANDNER 00431

6

referred us to a website to do some research on that subject, but we never really went too much into it.

It was just grafting a nerve over the top of the peroneal nerve, something like that, to gain mobility in the foot.

Q    Was it your understanding that procedure may also have been a give and take?

In other words, if you --

A    Yes.

Q    -- gained, you'd lose somewhere else?

A    Yes.  And that one had a very low probability of working.

Q    That's what you were told?

A    Yes.

Q    That was by the doctor you were referred to?

A    It was either by him or by the research that we had done.

Q    Do you recall seeing a Dr. Mitchell at some point?

A    Yes.

Q    Is that the doctor you're referring to?

A    Yes, I believe so.

Q    So, based upon the information you were provided about the nerve transfer surgical procedures, you decided not to go forward with that; is that correct?

BRANDNER 00432

7

A    Yes.

Q    You also had a referral to somebody regarding the brace?

A    Yes.

Q    Tell me about that.

A    I believe Dr. Mitchell went over that was one of the options, was changing out braces, because prior to that, I had a pretty bulky brace that rubbed in a lot of areas, and it was really heavy and it stuck out a lot.

So, he was talking to us about other options with braces.  And he had referred us to another doctor, I don't remember his name, who had fit me for a carbon fiber brace.  It was a lot lighter.  Still rubbed in some areas, but it was a lot smaller and it was a lot better for me.

Q    Now, ▓▓▓▓, during this time period, after the surgery, where there's follow-up treatment, are you having visits with Dr. Sharpe at his facility?

A    Yes.

Q    That's where these referrals are taking place and these discussions?

A    Yes.  At his offices, is that what you're asking, where the referrals --

Q    Yes.

A    No.  We had to go to other offices to meet with other doctors.

BRANDNER 00433

8

Q    Right.  But the discussion with Dr. Sharpe and the referrals, were those at his office?

A    Yes.

Q    If you went to Dr. Mitchell, you went to his office?

A    Yes.

Q    Okay, I understand.

During this time period, when you would refer to your nerve injury condition, how was it referred to? What were the terminology that was used?

A    Foot drop or drop foot.

Q    Foot drop?

A    Yes.

Q    Did that become synonomous with your understanding of your nerve injury?

A    Yes.

Q    Now, ▆▆▆▆ had you ever heard the term foot drop before the surgery?

A    No.

Q    By that I mean, the surgery with Dr. Sharpe. You understood that; right?

A    Yes.

Q    Okay.  ▆▆▆▆, you've been deposed twice in this case; is that correct?

A    Yes.

BRANDNER 00434

9

Q     Do you remember giving a deposition the first time?

A     Yes.

Q     I don't expect you to remember the date that I'm going to give you, a date of January 29, 2004.

A     Okay.

Q     Does that sound about right?

A     About right, yes.

Q     That would have been approximately a couple years after the surgery?

A     Yes.

Q     A year and a half, I guess, maybe?

A     Uh-huh.

Q     I need you to answer yes.

A     Yes, sorry.

Q     Thank you.

      And ▮▮▮▮, at that time you were asked some questions by an attorney; do you remember that?

A     Yes.

Q     Is that the first time you'd ever been deposed?

A     Yes, sir.

Q     How old were you then, ▮▮▮▮; do you remember?

A     I believe 16 at the time.

Q     And ▮▮▮▮, do you remember that you were asked a question -- actually, it was a series of questions. And I

BRANDNER 00435

10

want to show this to you.

This is Page 28 of the first deposition. It is the deposition — I'm sorry, counsel, I should have told you, January 29, would be 2004, I believe I said.

MR. CRAWFORD: Page 28?

MR. CAUSEY: Page 28.

Q ▇▇▇ I want to clarify something with you here. Do I need to blow it up for the jury a little bigger, anybody? I know my eyes aren't great.

▇▇▇ I want to start at Line 10. This isn't — the second deposition you took, Mr. Crawford was the one who was deposing you; do you recall that?

A Yes.

Q This was not Mr. Crawford; right?

A No.

Q Okay. And the attorney that's asking you these questions said: When did you first — I'm sorry — when did you notice that you first had a foot drop?

Then you're talking about the post surgery meeting we just had.

It says: Right when I woke up out of surgery. Dr. Sharpe asked if I was able to — he had me move my leg and foot in certain directions and he had asked me to flex and I wasn't able to flex. And he asked me to go out and I wasn't able to do that.

BRANDNER 00436

11

Do you see that, ████?

A    Yes.

Q    Now, ████, the next question though, that attorney asked you, before you had the surgery, did Dr. Sharpe ever discuss with you or did anyone discuss with you, you might end up with foot drop.

And ████, your answer says yes.

A    Yes.

Q    He told me all the things that could happen.  I would -- it could have nerve damage.  And he said all the things.

He even mentioned death, though we had an anesthesiologist in there, could be accidents and stuff.

Now, ████, you've told the jury that you never heard the term foot drop before the surgery.

A    Yes.

Q    It appears from your answer to this attorney's question, though, that you're saying you had.

Can you explain that?

A    Yes.  At the time that this question was asked, this was about two years after the surgery, the actual nerve damage that I had was foot drop.

So, when I answered this question, I equated nerve damage with foot drop.

So when he asked the question, had you ever

BRANDNER 00437

12

been asked if I would end up with foot drop, that meant, to me, nerve damage.

You can see here when I answer the question. Yes, he told me all the things that could happen. I would -- it could have nerve damage.

So when he asked if I may end up with foot drop, I answered nerve damage.

Q    At the time your deposition was taken, did you equate foot drop with nerve damage?

A    Yeah.  They were one and the same to me.

Q    You had a lot of discussions by that point about it?

A    Yes.

Q    With Dr. Sharpe and others.

A    Yes.

Q    Did the attorney that was asking you -- you kind of mentioned a list there.

I'm sorry, let me put that back up.

The death, the nerve damage, anesthesiologist.

Did the attorney that was asking you the question at that deposition, did he ever show you the medical records with the list?

A    No.

Q    So you were working purely off your memory at that time?

BRANDNER 00438

13

A    Yes.

MR. CRAWFORD:  Objection, your Honor; leading.

THE COURT:  Sustained.

BY MR. CAUSEY:

Q    Had you reviewed the medical records in preparation for that deposition at all?

A    No.

Q    So, to the extent that you were trying to recall that list, you would have been trying to recall something that was told to you ---

A    A couple years ago.

Q    -- a couple years before?

A    Yes.

Q    ████, I want to show you Exhibit 10.  I believe it is -- yes, it's been marked as Exhibit 10.

We looked at it yesterday.  This is the April 11, 2002, list.  Do you see that?

A    Yes.

Q    And, of course, there is another list as well, the June 6, and we'll look at that, and I'll come over and show that here in just a minute, and I have that as well.

Do you see the list that we went over yesterday, anesthetic risk, death, infection, non-union or delayed union.

Do you see what I'm referring to, the list?

BRANDNER 00439

14

A    Yes.

Q    Were you trying to remember that list in response to that question?

A    Yes.

Q    I'll show you Exhibit 11, it's right down at the bottom there, June 6.  I do have the little punch out again.  It's something we looked at yesterday.

Do you see the list at the bottom of the June 6?

A    Yes.

Q    Anesthetic complications, blood vessel injury, nerve injury, fracture.  Okay.

Again, is this what you understood the question to be, was asking you about what was discussed prior?

A    The risks, yes, that were discussed.

Q    And just to be clear, were there any other risks discussed, other than what is contained in these lists I've just shown you?

A    No.

Q    ███████, I want to cover, just briefly -- I don't think it will take very long to cover this, there has been some mention about your history with dance and your mother's studio.

First of all -- and your mother's going to testify later, so I'll find out a little bit more about the

BRANDNER 00440

15

studio from her -- let's talk about your activities in that.

When did you first start that activity?

A   Dance?

Q   The dance, yes.

A   When I was about two years old.

Q   This was with your mother and through her studio?

A   Yes.

Q   And did you continue that -- I guess, this football injury, you were 14; is that right?

A   Yes.

Q   Had you continued the dance on a regular basis up to that point?

A   Yes.

Q   Describe a little bit about what that involved, let's just say, in an average week or month?

A   How many days or what type of dance?

Q   Yeah.

A   Both, okay.  I danced probably five days a week, sometimes six up to that point, every week, every month, for 14 years or 12 years of my life, from time I was two.

That involved tap, clogging, hip hop, even ballet, some modern dance as well.

We did competitions, performances at old folks

BRANDNER 00441

16

homes, churches, different types of things like that.

So it was -- I mean, basically, after I'd go to school, I'd go to dance. That was my life, that was my hobby, was dance.

Q ███, obviously, you were playing football when this injury occurred. I assume then that you were involved in some athletic activities as well?

A Yes. That was the first time I'd ever done any organized sport.

Q ███, I want to talk a little bit about -- and this will involve maybe the dancing as well -- but I want to talk about -- I'll give you two parameters here -- I want to talk about after the Matthews surgery and the activities you were engaging in and could engage in.

And then I want to talk about the activities after the Sharpe surgery, and what you were able to do and not able to do.

So let's start with after the Matthews. And we've already covered some issues about up to the limitations of pain. But I just want you to describe for me what activities you could do after the Matthews surgery and you had been released --

A Matthews --

Q -- to go back to activities.

A Okay. After the time he had released me,

BRANDNER 00442

17

around about -- I had been in the walking brace for a little bit, and even out of the walking brace -- I was able to still do most types of dance, hip hop. I even did tap and clogging. I did some ballet still, some modern, some jazz. The difficulties I had lie in the pain itself.

So, it wouldn't be the types of dance, as much as how much of that dance I could do. I couldn't do certain moves, as to, you know, jumping off of the leg or on to the leg too much.

In certain types of classes I would have to lift girls and do certain types of lifts. I couldn't hold them up for too long if.

We had to choreograph that into a dance, it had to be where -- inside my limitations, what I could do with that.

I also, after my leg healed, I decided to try for track. Since I couldn't run very much or for long periods of time, I could not do any of the running events.

Since I couldn't really jump off of it or on to it, it I couldn't do any jumping, so I decided to do the discus.

So with the discus, I went to State. I qualified for City, went to City. I think I placed third in City. Qualified for State, went to State, and I think I placed, out of 15 guys, I think I placed 10th or something

BRANDNER 00443

18

like that.

But like the prior -- or Mr. Crawford had said, I wasn't able to do the spin that was included, which in high school not everybody does a spun. You can choose just to do a stationary throw or the spin.

And since doing the spin caused more pain for me, I just decided to do the stationary throw, and I still did pretty well with that.

Q ████, you said in reference to the dance, that you were attempting -- the dancing you were attempting, choreographed, et cetera, to your limitations.

What limitations are you talking about, was it the pain?

A Yes, the pain.

Q Okay. The bow in the leg, was that -- and if it was, describe it — affecting the choreography or what you could do or couldn't do?

A No. The only thing it affected was the way my leg looked. I remember watching a tape from one of our performances, when I was doing a clogging dance, and the only difference that the bow caused was I could see my foot was kind of -- my leg was kind of bowed out a little bit.

But other than that, I was still able to do all the types of dance. I was just limited, pain-wise, in the amounts I could do.

BRANDNER 00444

19

Q     With respect to the track, you talked about limitations as well.  Again, is that the pain you're referring to?

A     Yes.  It was the pain, yes.

Q     So the deformity was something that looked off?

A     Yes.

Q     Looked irregular?

A     Yes.

Q     But the pain was what was limiting you; is that what you're saying?

A     Yes.

Q     Let's talk about after the nerve damage and you've lost the function of your foot now.

First of all, initially, you couldn't turn your foot sideways or lift it up; is that correct?

A     Yes.

Q     Or push down?

A     I, I don't remember about the push down.  I know I couldn't flex and move side-to-side.

Q     Okay.  The side-to-side movement came back; correct?

A     Yes, I believe a few months later it came back.

Q     I just want to clarify that, before we talk about -- so, the issue you have now is the inability to lift the foot up; is that correct?

BRANDNER 00445

20

A   Yes.

Q   It just simply won't lift?

A   It won't flex, yes.

Q   Mind tells it to; body doesn't react?

A   Yeah.  Sometimes I'll sit there and just focus on it, and it just doesn't move.

Q   All right.  Your normal activities that you liked to engage in before this, even after the Dr. Matthews surgery, to the extent you could, with the pain, tell us what limitations, if there are any additional limitations, that you now have in those activities as a result of not being able to move your foot?

A   Well, I do have more limitations now.  Now, because I cannot flex my foot, my ankle is kind of, I guess you would call it, fused in its position.

I do have, you know, some down movement, but since your tendons are pulling up on the foot and equally pulling down, it stays stationary.  So whichever way you pull it, is the way it's going to go.

Well, since I have no tendons pulling up on it, it sits down.  So when I'm pushing down, I don't have very much room to go down.

And side to side, it's very limited because it's kind of frozen like that.  So that I mean that, in itself, not even talking about flexing the foot, just the

BRANDNER 00446

21

fact that I have -- it's kind of stiff and doesn't move, it's caused me limitations with every type of dance that I was doing, every single dance.

Q   Let's talk about that.  Some of your dances, I believe, it was mentioned earlier, involved some jumping or lifting; things like that?

A   Yes.

Q   Does it adversely affect that?

A   Yeah, definitely.  Since I have very little down movement because it's basically frozen down, I have no -- I'm not able to jump off of it or on to it.  I have no cushion when I jump on to it.

I mean, lifting, you know, I can still lift girls because I can stand on my leg, which that doesn't cause me any problems.  But I can't do tap or clogging because you have to be able, you know, to pick up your foot to do your tap moves.  And I trip and fall or I fall in.

When I've tried to do ballet, I can't do, you know, have to point your foot, which I can't do, my toes are kind of pulled up and my foot's pushed down, so I can't point my foot at all.

I can't, I mean, I can't do almost any type of move in hip hop.  I mean, a lot of hip hopping, I mean, it's in the name, it's called hip hop.  So, I mean, I really can't do much there.

BRANDNER 00447

22

I do teach hip hop and I do spot in tumbling. So, I mean, I can kind of demonstrate, you know, to a smaller degree, of what they're supposed to do, but anything full out, I'm just not able to do.

Q    You say that you're currently teaching.  Talk about that a little bit.  What type classes and who are you teaching?

A    Okay.  I teach hip hop.  I teach ages three all the way up to adults, 50, 60 years old.  I teach on Wednesdays, Thursdays, and Saturdays.

With hip hop, what I'll do is, we'll do stretches for the first 15 minutes.  After that, I'll have them go across the floor and do different steps.

For the first -- the studio opened up, I believe it was, in September, and that's when I started teaching there.

For the first month, my brother was in the classes with me and we'd go over a set thing we do for our warm up and things we'd do across the floor.  So, once he was out of the class, they had an idea of what they had to do full out, since I couldn't do full out.  So they understood the moves, yes.

Q    When you say I couldn't do it full out, are you talking that trying to demonstrate the moves?

A    Yes.

BRANDNER 00448

23

Q    This studio that you said just opened, this was a new studio your mother had opened?

A    My brother and his wife own this studio, yes.

Q    Is that in the east valley?

A    That's in Queen Creek, yes.  My mother's the director of that studio.

Q    Oh, I understand.  Okay.

That's the studio that you're teaching at and assisting at currently?

A    Yes.

Q    Now, your mother, though, didn't she have a studio before?

A    Yes.  Up to that point, is where I taught before, and that was in Mesa.  She had owned a studio with a partner, yes.

Q    ██████, let's talk about how -- the limitations on your foot, as it currently exists, the function of your foot, how that has adversely, if it at all, affected your work.

My understanding is your work, at this point, and even during the interim that we talked about, between Matthews and Sharpe surgery, I'm talking about work with your dad's company.

A    Okay.

Q    Talk about, if at all, how the limitations on

BRANDNER 00449

24

your ability to move your foot, or as we've already discussed, affects that at all.

A    Okay.  It definitely affects it in that everybody that works in the field, our guys, you know, bigger guys, we have to be able to lift, you know, heavy beams and stuff.

And I don't have any problem lifting lighter things, but I still do have pain in the ankle, and any time I'm lifting something extremely heavy, they have to do that and I kind of just stand back.

Anything on ladders, I do walk up and down six-foot ladders, I'm able to do that.  But like I was saying before, we do awnings and roofs and stuff like that. So, any prolonged standing on ladders, I'd say for more than 10, 15 minutes at a time, I have to come down and rest, let my leg rest for at least five or 10 minutes, and then I can go back up and do it again.

Q    I'm sorry — go ahead.

A    It's just basically prolonged activity, like sometimes we'll do digging, we'll dig trenches or footers or post holes, and I'm able to do, you know, I'm able to do some, to a limit.

Then too much activity on the leg, I have to stop, it's just too much for me.  I just can't continue to do it.

BRANDNER 00450

25

Q    Now, the materials that you're building, most of these structures, what kind of materials are you talking about?

A    We do aluminum lattice covers. We do -- they're called rough cut beams. They're, you know, eight by 10 or six by 10 20-foot beams that we put up, big ramadas. We do room additions with two by fours, two by sixes, sheetrock, OSB plywood, that sort of thing.

Q    It sounded like, in that list, there is a variety of materials with different types of weights. Some are heavier than others?

A    The aluminum are basically the ones I don't have trouble lifting, but with the aluminum lattice covers, those are the ones we spend the majority of the ladders on. We'll be up on the ladders building those.

Q    So it's lighter and easier to handle, but you've got to be on the ladder?

A    Exactly. So, I can do some, but not others.

Then with the heavier stuff, I can't really lift them, but we don't have to be a ladders as much, so...

Q    ▆▆▆, are there any other activities, be it work or leisure activities, that we haven't talked about, where you feel like there's a specific limitation on you now, today -- I'm talking about today — as a result of the inability to use lift your foot?

BRANDNER 00451

26

A    There's a few.  First, I'll start with -- I want to go back to dance for a little bit.

Before -- even after Matthews, before the surgery with Sharpe, I used to participate in dance competitions and dance performances regularly.

Every year, with the studio, we'd have at least two performances, so the parents could see the dances.  And, if not with the studio competing, me and my brother would do a duet and we'd go off, even out of state sometimes, and go and compete.

And since Dr. Sharpe's surgery, I haven't been able to, you know, perform in, in the -- what's the word for it?

Q    Competitions?

A    Well, that too, but I'm talking right now about the actual performances for the studio.  I haven't been able to do those.

Any time I would have come out, I would do a -- I would be able to do a lift with a girl.  I remember for school, in 12th grade, I did do a dance performance for them.  And I was in two dances.  But I came out, I think, for 16 counts in one dance and I lifted up a girl, set her down, walked off stage.

The second one, I came on, did two lifts with a girl and then walked off stage.  I wasn't able to do any

BRANDNER 00452

27

dancing.

And since then, I haven't been able to compete, me and my brother, haven't been able to compete with our duet. That's one thing that was important to me.

I tried to snowboard. Obviously, I can't do that because I can't flex, you know, sit back, and that sort of thing.

I went to, recently, went to get my scuba license. I was able to get through that with some limitations. I did end up getting through that.

I -- when I went to do that, we went and finished up, I tried to surf. I wasn't able to do that. Wake boarding, I wasn't able to do that.

You know, just fun things that I would want to do, that I was able to do before, those sort of things, any kind of board sport, I guess you would say.

Q   ████, I want to ask you a couple more questions about the brace.

Now, have you -- have your doctors told you that -- these are questions about wearing the brace -- have they told you that you have to wear the brace all the time or something will get worse? Has that been discussed at all?

A Yes. Yes.

Q Has there been any discussion -- I'm not trying

BRANDNER 00453

28

to predict one way or the other -- what I'm saying is, is it okay to not wear the brace sometimes, if you feel like not wearing it that day around the house --

A    Yes.

Q    Or what's the discussions; what's your understanding?

A    My understanding is if I'm outside walking around, that sort of thing, I should wear the brace because it keeps my foot flexed and, in turn, like I was saying, it's not sitting down like this and freezing like this.

But around the house, just, you know, sitting around or relaxing, things, I don't have to wear the brace, it's to my understanding.

Q    ▮▮▮, do you have the brace on right now?

A    Yes.

MR. CAUSEY: Your Honor, can he step outside the box and show the brace as it's attached?

THE COURT: Yes, of course.

MR. CAUSEY: Thank you, your Honor.

Q    This is the carbon fiber?

A    Yes this is carbon fiber brace.

Q    ▮▮▮, why don't you come over here. Can everybody see? People down on the end, is it too low?

Oh, that was good. I'm sorry, I don't choreograph anything. Go ahead, ▮▮▮.

BRANDNER 00454

29

And it straps, does it go down in the shoe?

A    Yeah, this part.

Q    I hate to ask you -- feel like airport security -- can you take your shoe off and show them that, please?

You don't need to -- oh, you've got to take the brace off to take the shoe off?

A    Yeah, it's kind of attached to it. I can slip it out of the shoe, but the shoe has to come off first.

Q    I see. Okay.

Now, ████, when you're not wearing that brace and you walk, what does your foot do, your right foot?

A    It drags.

Q    So it doesn't lift, like if I walk I --

A    Flip your --

Q    I know I talked to my kids sometimes about dragging their feet. Is that kind of -- you do that without intending to?

A    Yes. Sometimes, I kind of, to make up for that, I'll lift my hip up and kind of flip my foot at the end, just like that. So I can flip it up like that.

But when I do that, sometimes if there's a crack, my foot will catch at the last second.

Q    Thank you, ████.

You can go ahead and put that back on.

BRANDNER 00455

30

Does that brace -- I assume the shoes you have on today aren't shoes that you wear to work?

A    No.

Q    Because you're in the construction business; correct?

A    Yes.

Q    And this brace, does it work with whatever type of shoes you're wearing?

A    Mostly, yes, because it's a set size in the foot.  These dress shoes, I had to get a certain type of dress shoes because they're wider and they have a square toe, but some shoes it doesn't fit.  But it fits with most shoes, yes.

MR. CAUSEY:  Your Honor, that's all I have at this time.

THE COURT:  All right, very good.

Cross-examination, Mr. Crawford.

MR. CRAWFORD:  Thank you, your Honor.

Your Honor, as a housekeeping matter, we discussed yesterday -- I did figure out that the Mezona office charges, Exhibit 18, so I'd move for admission of that.

THE COURT:  Any objection?

MR. CAUSEY:  No, your Honor.  And I believe that is a duplicate of the plaintiffs marked Exhibit 1.

BRANDNER 00456

31

Obviously, we only need to admit one of them, so that's fine.

THE COURT: Very good. 18 will be admitted.

MR. CRAWFORD: Your Honor, Exhibit 20, is a copy of Dr. Walls' office chart.

I'd move for admission of that, please.

THE COURT: Mr. Causey, 20?

MR. CAUSEY: 20, I have no objection to that, your Honor.

THE COURT: 20 is admitted.

MR. CRAWFORD: Then your Honor, Exhibit 23 is the Mesa Lutheran Hospital chart for the February -- let's see, hold on, just a minute --

I'm sorry, Exhibit 22, is the Mesa Lutheran Hospital chart for the June 26th, 2002, admission.

I move for that into evidence, please.

MR. CAUSEY: No objection, your Honor.

THE COURT: 22 is admitted.

MR. CRAWFORD: I'm going to take a couple of the original depositions, if that's okay.

THE COURT: Sure.

MR. CRAWFORD: Put these up here for you, ▮▮▮. You might want to refer to them. Just lay them all right here.

BRANDNER 00457

32

CROSS-EXAMINATION

BY MR. CRAWFORD:

Q    Do you need some water?

A    I'm good.

Q    Okay.  We have heard that your deposition was taken twice in this case, and you remember that?

A    Yes.

Q    And a deposition is a situation where you come to a lawyer's office, you're sworn to tell the truth by a court reporter?

A    Yes.

Q    And you give your testimony under oath, just like we're doing today?

A    Yes.

Q    Now, your first time your deposition was taken in this case was January 29, 2004; sound about right?

A    Yes.

Q    And that was about a year and a half after the surgery by Dr. Sharpe?

A    Yes.

Q    Is your memory better today than it was January 29, 2004?

A    I would probably say no.

Q    You agree with me that your memory of things

BRANDNER 00458

33

was probably better a year and a half after these events than today, which is six years down the road?

A   Yes, probably.

Q   And that first deposition was before Dr. Sharpe was in this case as a defendant; you understand that?

A   Yes.

Q   And what happened was, the lawyer asked you whether Dr. Sharpe had ever told you, before surgery, about foot drop.

Remember that?

A   Yes.

Q   I'll try and get it on here as best we can.

And this is what your attorney just asked you about?

A   Yes.

Q   First off, you never corrected your deposition and indicated that this testimony was inaccurate, did you?

A   Not that I remember, no.

Q   Page 28, Line 4.

Question:  Did you ultimately end up with what's called a foot drop?

Answer:  Yes.

And what does that mean to you?  What does a foot drop mean to you?

Answer:  I'm not able to flex my foot.

BRANDNER 00459

34

Question: When did you notice that you first had a foot drop?

Answer: Right when I woke up out of the surgery. Dr. Sharpe asked if I was able to -- he had me move my leg and foot in certain directions, and he asked me to flex. And I wasn't able to flex. And he asked me to go out and in, and I wasn't able to at that time.

Question: Before you had the surgery, did Dr. Sharpe ever discuss with you, or did anyone discuss with you, you might even up with a foot drop?

Answer: Yes. He told me all the things that could happen. I would -- it could have nerve damage and he said all the things. He even mentioned death. The -- we had an anesthesiologist and there could be accidents and stuff. There was a lot of things.

Did I read that correctly?

A    Yes.

Q    Now, you gave this testimony when you were 16 years old?

A    Yes.

Q    You did understand the importance of giving truthful testimony when you were 16 years old?

A    Yes.

Q    Just like you understand the importance today?

A    Definitely, yes.

BRANDNER 00460

35

Q    When you were just asked, did Dr. Sharpe ever tell you about foot drop before this surgery, your answer, four years ago, was yes?

A    Yes.

MR. CAUSEY:  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  As I understood the question, yes.

BY MR. CRAWFORD:

Q    I understand now you're telling us didn't understand the question?

A    No.  I understood it as I understood it, yes.

Q    So, when you understood, when the lawyer was asking you, did you -- did Dr. Sharpe tell you about foot drop before surgery, you understood what that meant?

A    Yes.

Q    Okay.  Now, Dr. Sharpe, before surgery, told you that you needed to understand that one of the things could happen, not likely, but it could happen, is that you could die?

A    Yes.

Q    And you took that seriously, I assume?

A    I would hope so, yes.

Q    You told us yesterday, you went kind of like wow, you mean that can happen?

A    Uh-huh.

BRANDNER 00461

36

Q    So you were willing to accept the risk of having this surgery, the risk that you could die?

A    Yes.

Q    And the anesthesiologist told you about that again?

A    Yes.

Q    Over at the hospital before surgery?

A    Yes.

Q    Dr. Sharpe told you that one of the risks of this surgery was that you could have abnormal bleeding?

A    Yes.

Q    Right?

A    Yes.

Q    You understood that could be bad, that could be very serious?

A    Yes.

Q    And you were willing to accept that risk of this surgery?

A    Yes.

Q    And Dr. Sharpe told you that you could develop an infection?

A    Yes.

Q    You understood that could be very serious?

A    Yes.

Q    You were willing to accept that risk as well?

BRANDNER 00462

37

A     Yes.

Q     He told you that you could -- these bones may not heal correctly from the surgery?

A     Yes.

Q     You were willing to accept that risk?

A     Yes.

Q     He told you that despite this surgery, it might not work, you could continue to have pain in your leg?

A     Yes.

Q     And you were willing to accept that?

A     Yes.

Q     Is your position, in this case, that Dr. Sharpe tried to talk you into surgery?

A     No.

Q     Is it your position, in this case, that you didn't have plenty of time to think about how you were doing and whether you wanted this surgery?

A     No.

Q     You had, on the first visit with Dr. Sharpe, you had your dad present and your mom present and you present?

A     Yes.

Q     The second visit with Dr. Sharpe, it was just you and your mom?

A     Yes.

BRANDNER 00463

38

Q     But you had your parents there to assist you in making this decision, am I going to go ahead and live the way this is, with the limitations that I have, or do I want to do something that might get me better, meaning surgery?

A     Yes.

Q     Now, you understood, because you were --- you understood that by doing less activity, this leg wouldn't be as painful, without Dr. Sharpe saying anything to you, you understood that?

A     When I didn't do it, it wasn't as painful, yes.

Q     Right, because your doctor had said, use your good judgment and do what activities you can, but if it starts causing pain, back off.

That's what Dr. Matthews had told you; right?

A     Not that I remember.  I just remember him saying go back to normal activities.

Q     He didn't say, use your good common sense here?

A     I'm saying what I remember.  He said go back to your normal activities, that's basically what I remember.

Q     Okay.  Well, when you went back to your normal activities, sports, dance, you couldn't do them the way you wanted to do them, could you?

A     No.

Q     You couldn't do any sports, other than try to do discus, and when you tried to do discus, you couldn't

BRANDNER 00464

39

even throw it the way you really needed to throw it to be competitive; fair?

A    No.  I was competitive, yes.

Q    In your mind, you were competitive?

A    Yes.

Q    Putting aside discus, you couldn't run?

A    Not for a long period of time, no.

Q    Because it caused pain?

A    Yes, definitely.

Q    You couldn't dance the way you wanted to?

A    No.

Q    Because it would cause pain?

A    Yes.

Q    You had actually a couple of competitions or recitals --

A    Uh-huh.

Q    -- actually between the second visit with Dr. Sharpe and the surgery in June of 2002; right?

A    Right, right before the surgery, yes.

Q    What happened was, you couldn't do a lot of the activities, a lot of the moves, so they had to choreograph it around you?

A    Yes.

Q    By the time this surgery took place, you were having pain in your hip, in your knee, and in your ankle.

BRANDNER 00465

40

Do you remember that?

A    Yes.

Q    Now, you told us yesterday that Dr. Sharpe said that one of the problems with not fixing this, is that 20 to 30 years down the road you might develop pain in the ankle, the knee, and the hip.

Do you remember that?

A    Yes.

Q    In fact, you already had that problem before this surgery was taking place, didn't you?

A    Is that a question?  Yes.

Q    Did you understand what -- this leg, the lower leg, was, to your naked eye, was obviously deformed before you agreed to have the surgery done?

A    Yes.

Q    Okay.  The lower leg was bowed out?

A    Yeah, yes.

Q    And the leg was kind of twisted in?

A    Yes.

Q    And your right foot was kind of twisted towards your left foot?

A    Yes.

Q    And what Dr. Sharpe and Dr. Walls told you, when you met with them for opinions, second opinions, was, if that continues, it's going to cause you, probably cause

BRANDNER 00466

41

you problems long term?

A   Yes.

Q   Hip pain, knee pain, and ankle pain?

A   Yes.

Q   Including arthritis?

A   Yes.

Q   Did you — you understood -- and I understand you were 16, okay.  Actually, at the time you were 15; right?

A   15, yes.

Q   But you understood that you didn't want to go on the way you were at, with the pain and the disability and not being able to do the activities that you wanted to do?

A   I wanted to do them better, yes.

Q   The condition of this leg was totally unacceptable to you before surgery, wasn't it?

A   Yes, the pain was.

Q   Is it your testimony that Brian Sharp did not meet with you on June 6, 2002, and do an examination of you and speak with you?

A   Not that I remember, no.

Q   Well, there's a difference between saying I don't remember something and it didn't happen?

A   Yeah, yes.  Exactly.

Q   Okay.  Well, I don't want to talk about —

BRANDNER 00467

42

let's clear that up then.

A   To my recollection, before the surgery, the only time I remember meeting him was just meeting him, was that.

Q   Are you going to -- is it your testimony, to the jury, that Brian Sharp did not meet with you on June 6, 2002, and discuss your problem and the surgery?

A   Not that I remember. I can't say any more than that. I just don't remember that.

Q   So you're saying he may have, in fact, met with you and gone over those things with you and just don't remember them at this time?

A   Sure, yeah. I just don't remember. All I remember, shaking his hand and meeting him. That's what I'm saying, yes.

Q   So you've seen the record that he dictated that note?

A   Yes.

Q   Okay. So your memory --

A   I also remember that I never saw him talking to a recorder thing, that's all. All I remember is Dr. Sharpe doing that.

Q   Well, I didn't ask you about that.

A   When I hear dictating, that's what I hear, when I hear dictating. That's what I think of.

BRANDNER 00468

43

Q    Is it your testimony that doctor -- that Brian Sharp did not dictate in front of you on June 6, 2002?

A    Yes, yes.

Q    He did not?

A    No.

Q    And you remember that?

A    I remember that, yes.

Q    But you don't remember whether he was there or not?

A    He may have been there.  What I'm saying, he might have been there, and but he didn't have any conversation like that is what I'm saying, in front of me, no.  He may have been there, yeah.

Q    You just told me you don't remember if he was there or was not there?

A    No.  I don't remember if he had that discussion with me.  You said, if he asked those things.

Q    Let's back up.

Is it your testimony that Brian Sharp, Dr. Sharpe's physician's assistant, was present on June 6, 2002?

A    He was there because I met him that day, yes.

Q    Was he in the room with you, going through your understanding of the surgery, how you were doing; did he discuss things like that with you?

A    No, not that I remember.

BRANDNER 00469

44

Q    Not that I remember.

A    Yes.

Q    So you're saying it's possible he did, and you don't remember it today?

A    Yes.  I want to differentiate, I'm saying it's possible he was there, yes, inside the room, yes.

He didn't have any discussion into one of those in front of me, is what I'm saying.

Q    You remember Brian Sharp didn't have a discussion into a Dictaphone?

A    Yes.

Q    But you don't remember whether he was actually there or not?

A    I know he had to have been there at some point because that's when I met him.  That's what I'm saying.

Q    Your memory, ████, your memory -- do you understand your memory is very important?

A    Yes, definitely.

Q    Okay.  You can't even tell us that Brian Sharp was in the room with you that day, discussing the surgery, things that you could expect.

You don't remember; is that fair?

A    That's fair, yes.  But I know when he -- I was just — the reason I remember that, that's something that stuck out in my head, because that was unusual to me,

BRANDNER 00470

45

whenever Dr. Sharpe would do that, that was something weird to me. That's why it stuck out every time.

Q    Do you know why he did that?

A    For notes, yes. I understood that it was for notes.

Q    Did you have an understanding why he actually dictates in front of his patients?

A    So we can hear what's going into the notes.

Q    So if you hear something that you don't understand, it gives you chance to ask him, what do you mean by that?

A    Okay.

Q    Right. Did you understand that?

A    I guess, yeah.

Q    I want to go through the chronology a little bit with you, please, if I could.

Do it the old fashioned way. Well, our focus is not working. Out of focus. Okay. Out of focus.

Can you see that okay?

A    Yeah.

Q    All right. You break your leg, September 26, 2001; right?

A    Yes.

Q    You treat with Dr. Matthews for basically four months leading up to January 25, 2002?

BRANDNER 00471

46

A    Yes.  That's when he released me to do activities.

Q    What he'd actually done, was early in January, he had taken you out of this walking cast and had given you about three weeks or so to see how you were doing, then have you come back?

A    Yes.

Q    And January 25 is when he, quote, released you to do whatever you wanted to do?

A    Yes.

Q    And do you agree that, at that point, you were very unhappy with the situation with your leg?

A    You mean the bowing and so forth?

Q    Yeah, the way it looked, what you could or could not do with it?

A    You're talking about the 25th?

Q    Yes, sir.

A    I don't know if I was unhappy at that point or not.  I don't know if that's when the bow was apparent or not.

Q    Okay.

A    I know it had to be by 3-22, because that's when we got a second opinion.

Q    Isn't that when you decided to start getting second opinions?

BRANDNER 00472

47

A   On the 25th?

Q   Yeah, after the 25th?

A   I don't remember exactly, I don't remember exactly.

Q   All right.  Your deposition was taken, by me, at my office, June 8, 2005; do you remember that?

A   Yes.

MR. CRAWFORD:  Counsel, Page 38, Line 15.

MR. CAUSEY:  Page 38, thank you.

MR. CRAWFORD:  That's where it starts.

Q   Again, this is --- this was a time when you came to my office, there was a court reporter, you were sworn to tell the truth; right?

A   Yes.

Q   Now, this occurred, ███████ this testimony was June 8, 2005.  So, that was about two years ago.

Do you think your memory was better two years ago than it is today?

A   Definitely.

Q   Line 15.  Question:  As of the end of January 2002, had you become pretty frustrated with what Dr. Matthews was telling you about the condition of your leg?

Answer:  Yes.

And there was something in one of your legal documents that you felt like he was blowing off the problems

BRANDNER 00473

48

you were telling him you were having.

Yes.

Question: Meaning, he didn't appear to be really taking them seriously?

Answer: Yes.

Going up to Page 39.

Question: At that point, you were having a fair amount of pain?

Answer: Yes.

Question: And there was this obvious deformity of your leg?

Answer: Yes.

Question: And it was interfering with your activities?

Answer: Yes.

Did that help refresh your memory?

A    Yeah.  I understand the question.  I know the answer to those is all yes.  But the time frame, I mean, there is so many dates that, I mean -- really, I didn't know exactly when we started having those concerns.  But I still understand the answer is yes.

Q    Then in fairness you would agree with me that January 25 -- in fact, by January 25, 2002, you were pretty frustrated and unhappy with the condition of your leg and what Dr. Matthews was telling you?

BRANDNER 00474

49

A    Yes.

Q    Okay.  That's when you started -- you ask your family, trying to get other opinions?

A    Is that a question?  Yes.

Q    Do you agree, by the time you had surgery, that you had constant pain in your leg?

A    No.

Q    No?

A    No.  From what I remember, no.

Q    Given that you were 15 when this surgery took place, did you understand your mom had to be involved with signing legal documents and things for the hospital so you could do activities?

A    Yes.

Q    I'm going to show you, ████, this is contained within, I believe it's Exhibit 22.  See these little tabs, says history and physical, right here.

You open it up right to that, you can also see it on the screen.

Do you know what basically a history is, a medical history?

A    Yes.

Q    Okay.  This is a -- if you want to flip it over, you'll see it's a four-page form?

A    Okay.

BRANDNER.00475

50

Q    And the form was completed by ▇▇▇▇▇▇, mother, June 21, 2002.  Do you see that?

A    Okay, uh-huh.

Q    Yes?

A    Yes.

Q    Let's go to the first page.  I've highlighted this copy for purposes of the overhead here.

Please check any over-the-counter medicines you take.

It indicated that you were taking pain medicine at that time.  Do you remember that?

A    What, when was this taken again?

Q    June 21, 2002.

A    Okay, yes.

Q    And, actually, we haven't really talked about this yet, you had some medical complications after this surgery; do you remember that?

A    After Dr. Sharpe's?

Q    Yeah.

A    Yeah, because ibuprofen --

Q    Some problems with your liver?

A    Yes.

Q    It was because you had been taken so much ibuprofen, it had caused a problem, in retrospect, with your liver?

BRANDNER 00476

51

A    Yes.

Q    So, you were taking a lot of ibuprofen to try to deal with the pain you were having?

A    Yes.

Q    If you go to the next page, again, this is -- if you look down at the bottom -- this is a form completed by ██████, your mom; right?

A    Yes.

Q    It talks about in your musculoskeletal system, other, it says you have right leg pain dash hip, knee, and ankle?

A    Yes.

Q    That's consistent with your memory, that by that point, you were having pain, not just where the fracture was, but, in fact, your hip, knee, and ankle?

A    Yes.  You have to understand that I was taking a lot of ibuprofen because I was very active.  I was dancing, still, five days a week.  So I was taking tons of ibuprofen.

Q    Tons of it?

A    Yeah.  I was taking a lot of it.  I was dancing non-stop.  I wasn't going to stop dancing because I want to dance.  That's what kept me happy.

Q    And you were willing to accept the risk of surgery because that's what you wanted to do?

BRANDNER 00477

52

A    Yes.  I wanted to get better.  I wanted to dance, yes.

Q    Let's talk — go up at the top.  It asks you what kind of pain.

Do you have any reason to believe that your mom would provide the hospital with inaccurate information at that point?

A    No, no, sir.

Q    Pain.  Do you suffer from pain or discomfort?  Answer, yes.  Where is it located?  Right leg.  On a scale of 1 to 10, please rate your pain.  She says 6 to 7.

Sound fair to you?

A    Yes.

Q    Okay.  How long has the pain bothered you?  Since broken on September 26, 2001.

Then it goes down.  How would you describe the pain you're having now?  Answer, constant.

Does that help refresh your memory that you, in fact, were having constant pain at that point?

A    Yeah, because I was constantly active, yes.  Under that, it says what relieves your pain.  Ibuprofen helps, resting the leg helps.

Q    Taking a ton of ibuprofen was what was helping?

A    And resting, yes.

Q    Do you agree it was hurting all the time by

BRANDNER 00478

53

that point?

A    By that point, sure.

Q    And we've already talked about how it was interfering with dance, but you weren't doing skateboarding at that point, were you?

A    No.

Q    Because your leg hurt?

A    Well, I couldn't exactly.

Q    So, well, you couldn't do it, why?  Because it hurt, because it was bowed?

A    No, because it hurt.

Q    You weren't doing skiing?

A    No.

Q    Same thing, it was hurting?

A    Yeah.

Q    You didn't even try those things because it was hurting so much?

A    Yeah, sure.

Q    You weren't doing wake boarding, were you?

A    No.

Q    You tried playing basketball, but you could not run?

A    No, not when we played full court, no.

Q    Certainly you weren't doing football?

A    Not tackle, no.

BRANDNER 00479

54

Q   By the time we get around to June of 2002 --

A   Okay.

Q   You had been out of the cast and released to do activities to tolerance for four and a half months?

A   Yes.

Q   And in that period of time, you had had a second opinion by Dr. Dinowitz?

A   Yes.

Q   He told you this didn't look right, probably something needed to be done?

A   Yes.

Q   You had a meeting with Dr. Sharpe, where he told you that was the consensus of their group?

A   Yeah.

Q   You had a meeting with Dr. Walls, where he told you, surgery?

A   Yes, because we wanted to get back to dance, that was the answer, yes.

Q   Then you went back and you even gave Dr. Matthews another chance; right?

A   Yes.

Q   So you had basically, before you met with Dr. Sharpe to discuss surgery, you had had five opinions about what to do:  Dr. Matthews the first time, Dr. Dinowitz, Dr. Sharpe, Dr. Walls, then back to Dr. Matthews?

BRANDNER 00480

55

A    Sure, yes.

Q    You had, before the surgery took place, five months between that, when you got unhappy with Dr. Matthews and when the surgery took place, to think about what you wanted to do, how this was interfering with your activities, and whether thing were just getting worse or not; right?

A    Well, we did not hear surgery until April 11th, I think it was, or maybe March 22nd.  But we were unhappy with the pain for five months.

Q    But this is -- you had a long time to think about how you were doing and what you wanted to get back to?

A    Oh, definitely, yeah.

Q    And as of early June 2002, when you all, as a family, decided that you were going to have surgery, the things in your leg were getting worse, aren't they?

A    The pain?

Q    The pain was getting worse?

A    You're asking me if the pain was getting worse?

Q    Yes, sir.

A    Yes.

Q    The lump was getting bigger?

A    If I remember, yes, it could have been.  I don't — I couldn't say one way or another, exactly, but I'm sure it was because between that point it was.

Q    Your leg was rotating out more?

BRANDNER 00481

56

A    I don't know, maybe.

Q    What is your best memory, Scott?

A    I'd say yeah, because from the time I got out of the walking cast, to this point, it had shifted. So, I'm sure it was shifting.

Q    Is it your testimony that you have a good memory of everything that occurred during the visit with Dr. Sharpe on April 11, 2002?

A    Can you say that one more time, so I'm understanding?

Q    Is it your testimony that you have a good memory, today, of everything that occurred during the meeting with Dr. Sharpe on April 11, 2002?

A    Yes.

Q    A good memory?

A    Yes.

Q    And you have told us that you remember now two different visits with Dr. Sharpe; right?

A    Now I remember two, yes.

Q    You have a good memory of that?

A    That there are two different ones? Yes.

Q    Do you remember when I took your deposition, I asked you if remembered whether there were two visits?

A    Do I remember you asking me that?

Q    Yeah.

BRANDNER 00482

57

A    Not really, no.

Q    Do you remember saying you didn't even remember if there were two visits?

A    No, I don't.  If you bring it up, then I'm sure I said it, yeah.

Q    We've already agreed, you don't have a better memory today than you did when I took your deposition two years ago?

A    Yes, that's true.  But I know there were two meetings now because we have all the notes in front of us.

Q    Okay.  So your -- somebody's refreshed your memory that there was two?

A    That there was two meetings, yes.

Q    But when you were asked, without anybody showing you documents or trying to refresh your memory, when you were asked -- I took your deposition two years ago, ███████, do you remember two separate visits with Dr. Sharpe before surgery, your answer was:  I don't remember?

A    Exactly.

Q    And do you remember now that when Dr. Sharpe met with you, the first time, on April 11, 2002, he asked you what kind of activities are you doing?

A    Yes.

Q    He asked you how is the condition of your leg interfering with the activities that you want be to doing?

BRANDNER 00483

58

A    Yes.

Q    Did you tell him the truth?

A    Yes.

Q    Okay.  And did he ask you, what are your goals? What do you want to get to being able to do?

A    I believe so, yes.  I think I said 100 percent.

Q    He asked you about what the problems you had had with the leg, leading up to the time of your coming and seeing him?

A    Yes.

Q    And you remember him examining your leg?

A    Yes.

Q    He actually took your leg and he kind of torqued it a little bit and asked you, does that hurt, and up yes?

A    Yes.

Q    You remember him using a device that kind of looked like this.  This is called a goniometer -- I'll just tell you -- where he put the x-ray up on the view box and measured the degree of deformity and explained to you what that meant?

A    From my memory, I thought that was Dr. Dinowitz that did that.  I don't remember Dr. Sharpe doing that.

Q    Is it your testimony Dr. Sharpe did not do that?

BRANDNER 00484

59

A    No, it's not my testimony he did not.

Q    He may have done it, you don't remember?

A    Exactly, yes.

Q    And Dr. Sharpe discussed with you that it was his feeling that if we're going to do surgery to fix your leg, he would put a plate on the side of the leg and you would use screws to put that in?

A    Yeah.

Q    He told you that he would have to cut the bones to correct the deformity of your leg?

A    Yes.

Q    He said there were other ways to do it as well, using a rod.

A    An exterior rod.

Q    The external fixator?

A    Yes.

Q    And he discussed with you various different risks of the surgery?

A    Yes.

Q    And you do agree, there was some discussion about nerve damage?

A    Yes, nerve damage was said, yes.

Q    And you do agree -- well, first off, do you recall he actually discussed that, and it was after he had discussed things with you, done his examination, that that's

BRANDNER 00485

60

when he picked up his Dictaphone and dictated?

A    Can you say that one more time?

Q    Sure.  He did the visit with you.

A    Okay.

Q    He did the examination.  He spoke with you about potential risks of surgery.  Then before you left his office --

A    Yes.

Q    -- he picked up the Dictaphone and he dictated --

A    What he had just told us.

Q    -- that note.

A    Yes.  At the end of each meeting, he would pick it up and, basically, say into that what he just told us, yes.

Q    Do you remember, actually, when he was -- when he was dictating and he was going through the risks, he would -- he'd say, and I've discussed the risks of surgery, including death, and then he would stop and he'd look at you, just to make eye contact?

A    No, I don't remember.

Q    You deny that he did that?

A    I don't deny it, no.  I don't remember.

Q    Do you deny, ███████, that Dr. Sharpe, during the two office visits before surgery, discussed the potential

61

risks and complications with at least you and your mom?

A    No, I don't deny that.

Q    So yesterday you said that second office visit, you don't have a real good memory of.  Do you remember that?

A    Yes.

Q    And so, there's maybe a lot of things that were said and that occurred during that second office visit on June 6, 2002, that you just don't remember?

A    I don't know if I'd say a lot, but sure, yeah, there's things I don't remember about that.

Like you said in the other deposition, I really only remember one office visit.

Q    Okay.

A    That's what I'm saying.  So, sure, yes.

Q    There's a lot of things that may have occurred, during both of those office visits, that you simply don't remember at this time?

A    Not both of them, no.

Q    Which one?  Is it the second one you don't have a great memory of?

A    Yes.

Q    Do you know the second office visit was intended to be the pre-operative visit?

A    Yes, I know that now, yes.

Q    Putting aside whether Brian Sharp was there or

BRANDNER 00487

62

not, do you remember, at some point, Dr. Sharpe coming into the room?

A    Dr. Sharpe?

Q    Yes.

A    Yes.

Q    He went over -- let me see if I can refresh your memory -- he went over how you were doing?

A    Uh-huh.

Q    What problems you were having?

A    Are you asking me?

Q    Yes, sir.

A    Like I said, I don't really remember.

Q    Let me just ask it this way, since you don't have a good memory, let me ask you if you can tell me this did happen.  Okay.

A    Okay.

Q    If he, his note indicates that he went over all the problems you were having with your leg, on the June 6, 2002, visit, you're not going to deny that?

A    No.

Q    And if he indicates that he explained the potential surgery he might do, you're not going to deny that?

A    No.

Q    If he says he had a detailed discussion with

BRANDNER 00488

63

you about the risks and benefits of this surgery, including complications, you're not going to deny, that are you?

A    No, not that he went over the risks, no.

Q    When -- I'm going to jump back to this meeting you had with Dr. Walls, this was, I think, a third opinion that you had?

A    Yeah.  It went Dinowitz, Walls, Dinowitz, Sharpe, Walls.

Q    This is -- he told you surgery was necessary, but he said the way he'd do it is stick a rod in the leg?

A    Yeah, he was going to use the rod.

Q    And he told you that an option was doing nothing, but he didn't think that was very good idea.

A    Not that I remember.  I don't remember that.

Q    Do you deny that?

A    No.

Q    Then you decide, you go back to Dr. Matthews again, but you felt like he was kind of upset at you because you had gotten a bunch of other opinions?

A    Yeah, I remember that.

Q    And he -- your sense was, you're going back to him to give him another chance to give you his thoughts, and he just didn't even appear like he was listening to you?

A    Yeah.  I felt like -- he just felt cold, that's how I felt about him.

BRANDNER 00489

64

Q    Your sense was he was kind of unhappy with you because you had gone around and gotten second opinions?

A    Yes.

THE COURT:  Mr. Crawford, I need to interrupt you.

Folks, we need take our mid morning break. Let's take 10 minutes.  Please remember the admonition.

(Recess)

THE COURT:  Mr. ████, go ahead and have a seat.

Thanks everybody.  Go ahead and be seated.

Were back on the record with all the members of our jury, counsel, and the parties as well.

Mr. Crawford, I interrupted your cross-examination.  Go ahead and continue.

MR. CRAWFORD:  Thank you your Honor.

BY MR. CRAWFORD:

Q    I'll switch gears with you, ████.  The surgery takes place on June 26, 2002?

A    Yes.

Q    Right?  And after surgery, you remembered Dr. Sharpe bringing up this issue about the movement of your foot, pretty quickly after the surgery.

A    Yes.

Q    And he told you there was a potential problem?

BRANDNER 00490

65

A    Yes.

Q    He was very up front with you?

A    Yes.

Q    And he told you that it's going to have to be a wait-and-see thing. Hopefully this would be temporary, but it's possible it could be permanent?

A    Yes.

Q    Then you continued to treat with him as your doctor for another two years?

A    Yes.

Q    In terms of how you're at -- how you ultimately recovered from this, the leg is, in fact, straight now, isn't it?

A    Yes, from what I can tell, yeah.

Q    And the big knot that you had concerns about, that's gone?

A    Yes.

Q    You originally had difficulty moving your foot side to side, but you've regained that function?

A    Yes.

Q    So --

A    It doesn't really move that much, but yeah, I have that nerve back.

Q    That's come back?

A    Yes, definitely.

BRANDNER 00491

66

Q    It's the up and down movement that is still an issue?

A    Yeah.

Q    And you do wear this brace?

A    Yes.

Q    And when you do wear that brace, you're able to do things like help teach dance?

A    Yes.

Q    You can do choreography for dance?

A    Yeah.  I make dances.

Q    Help demonstrate to these kids how to do things.

A    Yes.

Q    And you're able to work?

A    Yes.

Q    You're able to go to school?

A    Yes.

Q    Can't do everything you want to do?

A    No.

Q    But you can lead a relatively normal life, can't you?

A    Yes.  Compared to what I was before, no, but now, yes.

MR. CRAWFORD:  That's all I have, your Honor.  Thank you?

BRANDNER 00492

67

THE COURT:  Redirect?

MR. CAUSEY:  Yes, your Honor, thank you.


                    REDIRECT EXAMINATION


BY MR. CAUSEY:

Q    ████, there was some discussion about the pain medication you were taking, ibuprofen.  This was over the counter stuff?

A    Yes.

Q    I just want to clarify, if you were active, it was painful.  Is that what you were saying?

A    Yes.

Q    If you -- I'm not sure you did this, so I don't know, but if you let me back up.  Did you ever just lay around and play video games for a week or two and see how it felt?

A    No.

Q    When you went to see Dr. Matthews, at any time during any of the discussions, do you have a recollection of him telling you that if you'll curb your activities, okay, that the pain at the fracture site would lessen?

A    No.

Q    Did any doctor, prior to the Sharpe surgery, tell you that?

BRANDNER 00493

68

A    No.

Q    The pain, we described the pain in a number of areas. I want to quantify that a little bit.

The pain that you were asked about, and I think there was some records that you were shown about that, that your mother filled out, you don't deny that at times you had pain in the hip and knee; correct?

A    No.

Q    Was whether -- was it a determining factor, whether you had pain in the hip and knee areas, did that relate to the activity level?

A    Definitely, yes.

Q    Would that be true of the ankle as well?

A    Yes.

Q    Okay. And again, we're talking about prior to the Dr. Sharpe surgery?

A    Yes.

Q    You understood that?

A    Yes.

Q    Okay. The pain that you were having the most difficulty with, though, between the ankle, some knee pain, soreness or pain in the hip, whatever it was described as, and the fracture site, what was the one that was the worst pain?

A    Definitely at the fracture site.

BRANDNER 00494

69

Q    What was the one that you were taking the pills for?

A    The fracture site.

Q    The shoes that you wear today on your right foot, where do they wear out?

A    The back heel, on the right side.

Q    So even though you've had the surgery and you wear the brace, is your foot still turned in?

A    Yeah, yes.

Q    Do you have a recollection, at any of your meetings with the Mezona people, including, primarily, Dr. Sharpe, anyone explaining to you why they would dictate in front of you?

A    No.

Q    Did anybody ever tell you the reason or the purpose they were doing that?

A    No.

Q    They just did it?

A    Yes.

Q    Did anybody say, now, █████, if I say something wrong, you need to let me know?

A    No.  That's just something I would have done, obviously.

Q    It just happened; is that a fair statement?

A    Yes.

BRANDNER 00495

Q    I want to show you -- I forgot the exhibit number -- it's 10.  We looked at this a few times, April 11th.  Okay.  I'm going to find that zoom button somewhere.

Is it on this box here, your Honor?

THE COURT:  It is, yes.

BY MR. CAUSEY:

Q    I think I got it.  There we go.

Apologize, for a lack of practice with the machine.

Let's look at this portion of the April 11.  Of course, we've already heard that this was dictated by Dr. Sharpe, apparently, that's what's been advanced.  And then the June 6th, apparently, was dictated by his physician's assistant.

April 11, 2002, which, as you have testified to, is the one meeting you remember the most, or the single most meeting, if you will.

A    Yes.

Q    The list of things that were dictated there, when the doctor was dictating this in front of you, do you remember any deviation from what he actually said versus what he dictated?

A    No.

Q    But you wouldn't have known to make a correction anyhow because you hadn't been told that was

BRANDNER 00496

71

something you should do?

MR. CRAWFORD: Objection; leading.

MR. CAUSEY: I'll rephrase.

BY MR. CAUSEY:

Q   Would you have felt it was proper for you to have corrected the doctor's dictation?

A   Yes.

Q   To have told him, while he was sitting there, that you're dictating it wrong?

A   Well, I don't know if I'd say it like that, but yes.

Q   So, if the doctor had told you something in the meeting, and he dictated it incorrectly -- for example -- let me make it simpler.

If he'd said I'm here with ▆▆▆ and his parents are gone, when your parents are both there, that would have been something that would have triggered some response from you?

A   Yes, yes.

Q   Was there any such response?

A   No.

Q   You were asked about whether your pain was constant just prior to this surgery. Was your activity constant prior to the surgery?

A   Yes.

BRANDNER 00497

72

Q    Okay.  ████, do you have any dispute, whatsoever, that you fully understood at the time that all this was going on, that if you chose the option of let's straighten the bone, that would require surgery?

A    No, that -- I knew that that would require surgery.

Q    The other option, we're going to not straighten, and that's the one that doesn't require surgery; correct?

A    Yes.

Q    You were asked whether you recalled one or two meetings, and you were shown your deposition.

Do you remember the questions about, well, your memory was better a year and a half after today several years later do you recall that?

A    Yes.

Q    When Mr. Crawford was asking you those questions at your deposition, did he show you his client's notes from the April 11 and June 6, of 2002?

A    No.

Q    So you were relying entirely on your memory and recollection, without the benefits of the hospital records?

A    Yes.

Q    Excuse me, the doctor's records; is that correct?

BRANDNER 00498

73

MR. CRAWFORD: Your Honor, I object to the leading of this witness.

THE COURT: Sustained.

MR. CAUSEY: That's fine. I'll rephrase, your Honor.

THE COURT: Thank you.

BY MR. CAUSEY:

Q   What were you relying on, in answering questions from Mr. Crawford about how many meeting you recall?

A   Memory.

Q   Had you reviewed those medical records at all prior to that?

A   No.

Q   Do you recall, at any time during your deposition, where Mr. Crawford was asking you questions, showing you any medical records to help refresh your memory about what took place?

A   No.

Q   ▇▇▇▇, when you made the decision to go forward with the surgery -- I realize your parents also were involved in that process, I'm talking about you, personally. Let me back up, I'm sorry, I skipped something I was asking a minute ago.

▇▇▇▇ you were asked a question, okay, about

BRANDNER 00499

74

just prior to the June surgery with Dr. Sharpe, up to that point, whether you felt that the angle, the irregularity in the angle of the bone, the deformity, whatever you want to call it, was worsening, you indicated you thought it was.

Do you remember that testimony?

A    Yes.

Q    Now, I want to show you -- well, Page 9 and 10, I want to show you what Dr. Sharpe testified to under oath at his deposition in this matter, one of his depositions.

And I've got to -- I hope I'm going back far enough to catch the context here. If I'm not, I will try to do so.

Says Question -- Mark, Line 7, I think is far enough back. It says: Now, was the bone that drifted, the tibial fracture only?

Well, not, no, they both had to -- the tibia and fibula were both broken. And it says, what maybe a step ahead in time, here, sure, just a brief moment, what I discovered subsequently was that tibia probably never did fully heal. Although it appeared radiographically to have healed. The CAT scan suggests that it probably wasn't fully healed although the fibula was fully healed -- the fibula being the smaller bone — and so at that point it probably stopped moving. Okay. And the tibia apparently never fully healed, although I'd have to look at my operative note to

BRANDNER 00500

75

see how much of it wasn't healed.

Why don't you do that.

Since we're on the subject, can I get that. There it is -- if we go to the next page, Page 10, at the top.

Dr. Sharpe says: No, I stand corrected. I said apparently there was some union present. There was very minimal motion at the fracture site. So, it was not, certainly was not fully healed.

As far as whether your fracture site and leg was moving and getting worse, just prior to the surgery, would you have deferred to Dr. Sharpe on that issue?

A    Yes.

Q    You have no medical training or background, I take it?

A    No.

Q    Could you have looked at an x-ray and determined that?

A    No.

Q    So you're just going on what you see and feel?

A    Yes.

Q    Lastly, ███, I just want to ask you one more thing. When you made the decision, when you were weighing the factors and made the decision to go forward with this surgical procedure, did you take into consideration, at all,

BRANDNER 00501

76

the risk of a permanent loss of function of your foot?

A   No.

Q   Why not?

A   Because I was never told that.

MR. CAUSEY:  I don't have anything further, your Honor?

THE COURT:  Ladies and gentlemen, before we let Mr. ███ step down, do any of you have questions for him?

Any questions for Mr. ███?  No?  All right. Thank you then.

Mr. ███, you can go ahead and step down.

Mr. Causey, your next witness, please.

MR. CAUSEY:  I need to go outside.

Your Honor, I wish to call ███ mom, ███ ███.

THE COURT:  All right.  Mrs. ███, this is Maggie, and she'll swear you in.

███

having been duly sworn herein, took the stand and testified as follows:

THE COURT:  Thanks, Miss ███  Go ahead and have a seat over there on the witness stand.

Mr. Causey, whenever you're ready.

BRANDNER 00502

77

MR. CAUSEY: Thank you, your Honor.

DIRECT EXAMINATION

BY MR. CAUSEY:

Q    Good morning.

A    Good morning.

Q    I guess it's still morning for a little while.

A    Yes.

Q    Could you state your full name, please?

A    ████████████████████

Q    And ███ you're ████████ mother; correct?

A    Yes.

Q    I'm going to try not to jump around too much. We've already heard some testimony from ████, of course, about a variety of things.

What I want to get to first with you is we heard some things about your dance in the studio.

What I would like you to do is tell us a little bit about that, what exactly is that?

A    As far as my background in dance?

Q    Yes.

A    I started dancing around one and a half, two years old, and I've been dancing ever since.

I started teaching when I was 13, owned a dance

BRANDNER 00503

studio in Apache Junction, and have been participating as either an owner, co-owner, or director since, and I still am.

Q How many children do you have?

A Three.

Q So in addition to ████, you have?

A ████ who is 26, and Cherise, my daughter, is ██.

Q Did you involve all your children in this activity?

A Yes.

Q Tell me, kind of specifically about — let's talk about, do you remember the football injury —

A Oh, yes.

Q — September of 2001. Okay.

Tell me a little bit that ████ involvement in the studio or the dance activities before that occurred.

A ████ took a full range of classes. He was able to do — he did exceedingly well in dance. He was being encouraged to eventually audition for scholarships in college, to try and get some scholarship monies in. He was very good, took tap, ballet, jazz, tumbling, clogging, modern, hip hop.

Q When did he start, what age?

A He started before he was born. Taking classes,

BRANDNER 00504

79

probably between two and three years old. At three he competed and took a first place as a tumbler. So, he's been dancing a long time.

Q While he's in 9th grade, I want to bring us up to current now, during the 9th grade time frame -- I don't necessarily mean when school's in -- as a 14 year old, prior to this accident, what type of schedule did he keep with respect to his involvement in dance?

A He basically danced almost every day, I believe, except for Sundays. And he had some type of class or rehearsal, because we did a lot of performing and ███ competed a lot. He was in groups, he did solo work, duet work.

Q Would you, at that time, have described ███ as having developed a passion for the dance?

A I think so. He especially fell in love with modern dance. He really liked that. And he's always been terrific at hip hop.

Q In addition to the dance-type activities that Scott was engaged in prior to the football injury, what other type of activities were there?

A He was really physically active. He really liked skateboarding. He would mess around with my older son playing basketball. I think that he also may have been involved in some track things.

BRANDNER 00505

80

Q    What I'm -- would you describe ▆▆▆ as an active 14 year old?

A    Yes.

Q    Was ▆▆▆, the type that would sit around and play video games all day --

A    No.

Q    -- in the house?

A    No.

Q    I want to talk a little bit about the medical care that took place after the football injury.  And I believe that was Dr. Matthews; is that correct?

A    Yes.

Q    After Scott was injured at the football game, he was -- was he was taken to some facility -- first of all, were you there?

A    Yes.

Q    Tell us what you recall?

A    It was their first home game.  And I was late. The game started around four, I think.  And I had come from work.  I worked another job, at that time, besides the dance studio.  And I had some time before I had to teach.  So I told him I would come.

And I was in the stands.  The first time I saw ▆▆▆, he was playing defense in the game and he was tackling -- or maybe -- I'm sorry it was offense.  He was

BRANDNER 00506

81

tackling, somebody that was like three times his size.

And then it changed over, and he, I believe, he might have gone to defense. And there was a tackle made at that time, and somebody was down, somebody was injured. And everybody finally came off the pile and somebody was still on the ground.

And I couldn't see my son's number, so I wasn't sure who was hurt. Then eventually he sat up and it was him.

And I sat there and waited while, you know, they tried to discern, I guess, the extent of the injury. And a paramedic went out, and when she came back, I was kind of relieved.

A lady in the stand said probably knocked the air out of him, and I agreed with her, you know, he'll be all right. I was like I think he'll be all right.

And then she ran out with a back board. That's when I got real concerned and I went down to the field.

Q   He wound up going to the hospital or some medical facility; is that correct?

A   Yes.

Q   Where did he go, do you remember?

A   It used to be -- it's now Banner Baywood.

Q   Was he taken in an ambulance or something?

A   Yes.

BRANDNER 00507

82

Q   Do you go in the ambulance or follow?

A   I followed.

Q   In any event, we get to the hospital and you learn that he's broken his leg, I assume?

A   Well, I knew beforehand. I saw him on the field.

Q   When did you first come into contact with Dr. Matthews?

A   It was, I believe, just prior to him going into a surgery situation. He came out and talked to me about the injuries, said I believe that we need to take him in and have it set.

Q   So they were going to go in -- and I don't mean to get technical as to what amounts to a surgery or doesn't -- but your understanding was they weren't going to cut his leg, they were just going to reset it and cast it?

A   At that point he wasn't sure what he would exactly do. So, I -- when he said surgery, I thought, you know, possibility of cutting him to place the leg.

Because he said he wasn't sure the extent or how, you know, how bad it was and what type of a situation he would find, once he saw the leg.

Q   Okay. So ▮▮▮ comes out of this procedure, I'll use that term, and I take it, at some point, you learned what had taken place, as far as the procedure and

83

what they had done to fix it?

A    Yes.

Q    Was it your understanding that they had realigned the bones --

A    Yes.

Q    -- reset them and put them in him in a long cast?

A    Yes.

Q    And do you recall how long ▋▋▋ was in the long cast.

A    I think it was about eight weeks or so.

Q    Then there was some type of -- that was taken off; is that correct?

A    Yes.

Q    Then there was some type of another type of casting or boot or something that he wore for a while; is that correct?

A    Yes, it looked like a brace.

Q    Now, at some point in time, following the Dr. Matthews' procedure, did you and ▋▋▋ become concerned -- and let me talk just about you, ▋▋▋ already talked about this -- did you become concerned about the way it was healing?

A    Yes.

Q    What was it that -- first of all, tell me

BRANDNER 00509

84

approximately -- I'm not asking you to give me a specific date, on such-and-such a date I became concerned -- tell me, in the chronology of events, approximately when you first started becoming concerned?

A    Once he was out of the long cast and in the brace, I noticed, after a time, that there was a huge lump and all. I think it looked like it was moving. It was starting to bow.

Q    So when you first started having concerns, those were the two concerns that you were having?

A    Yes. And he said that it hurt, so that concerned me too.

Q    Do you need any water?

A    Probably a good idea.

Q    Okay. Now, did you talk to Dr. Matthews about the lump?

A    Yes.

Q    What were you told?

A    It was, I believe he called it, a bone callus, a build-up that would be on the area. And then eventually, you know, at some point it would start to wear down once the bone was fully healed.

Q    So was he telling you that it would eventually go away?

A    I don't think he ever said it would totally go

BRANDNER 00510

85

away, but it would -- I think he might have used the word remodel, so it wasn't protruding so bad. It was really big. It looked like another knee.

Q    As a result of your communications with the doctor about the lump, was it your understanding it would get better? By that I mean, it would get smaller over time?

A    Yes.

Q    Okay. Let's talk about the other issue that you had you thought, the leg was moving, it was bowing?

A    Yes.

Q    Did you talk with Dr. Matthews about that?

A    Yes.

Q    What was your understanding of what was going on, based on your communication with him?

A    That it was, that it was just needing time to heal.

Q    So, it was -- was it your understanding then, at that time, that it hadn't healed?

A    It was still in the process.

Q    Now, at some point in time, you decided that you wanted to get some other opinions from some other doctors; is that correct?

A    Yes.

Q    Tell me what led you to do that?

A    Not only myself, but my ex-husband and I were

BRANDNER 00511

86

both concerned, because we didn't feel that Dr. Matthews was really listening to our concerns.

And we just thought maybe we should just see if there is something else that should be done or, you know, just find out another opinion would be best, you know, about how it was healing.

Q   We've heard the term earlier that you were looking for a second opinion.  Is that basically what you were doing?

A   Yes.

Q   So, at that point, were you going to other doctors to seek their thoughts on what was going on?

A   Basically that's what we wanted to know.

Q   And you went to see Mezona Orthopedics to Dr. Dinowitz; is that correct?

A   Yes.

Q   Tell me, were you at the initial meeting Scott had with Dr. Dinowitz?

A   Yes.

Q   You attended that?

A   Yes.

Q   Do you remember if his dad was there, ████?

A   No, he wasn't.

Q   He was not there?

A   No.

BRANDNER 00512

87

Q    So it was just you and ████?

A    Yes.

Q    Tell me what you recall about that initial meeting with Dr. Dinowitz?

A    He examined ████. He looked at x-rays. He saw the things that had concerned us. He noticed there was a bowing, that it was off. He seemed concerned.

Q    Do you remember him using any type of ruler thing to show you angles?

A    Yes, he did. And he said it was off a certain degrees, which I don't recall, but he felt they were not in the normal range.

Q    He communicated that to you?

A    Yes.

Q    And at the conclusion -- I'm sorry is there anything else that you remember, substantively, about the meeting, the discussions?

A    What he said was, before really offering any real opinion about it, that he was going to conference it with the group.

And that means, from what he explained, the group of doctors that were involved in the practice with him.

Q    How did you come to find out about Dr. Dinowitz and Mezona Orthopedics?

BRANDNER 00513

88

A    He had worked on my ex-husband's hand at a point when it was broken.

Q    That was Dr. Dinowitz?

A    Correct.

Q    When you left the initial meeting with Dr. Dinowitz -- let me back up.

At the initial meeting with Dr. Dinowitz, was there any discussion of surgery?

A    He, at that point, had said that that was something that might have to happen.

Q    At the conclusion of the meeting with Dr. Dinowitz, where was it left?  Had you decided, one way or the other, what you were going to do?

A    No, because, at that point, he said that he wanted to take the time to conference it.

He did let us know to that he is a hand and upper body, arms, I think, specialist, and he needed to also speak with somebody who had some greater knowledge about the legs.

Q    So when you leave the meeting with Dr. Dinowitz, the initial meeting, it's still up in the air what you're going to do?

A    Yes.

Q    Now, had Dr. Matthews ever suggested further surgery --

BRANDNER 00514

89

A  No.

Q  -- up to this point?

A  No.

Q  What was, up to that point, the position that you'd been told by Dr. Matthews about what to do about this?

A  Basically, let ▮▮▮▮ continue to what he's doing. If he was hurting, give him ibuprofen for the -- to help him relieve the pain, and just see how things went, see him back on -- I think sometime in the summer, early summer.

Q  You also -- I'll use the chronology, after the initial meeting with Dr. Dinowitz, and I'll tell you that counsel's provided us with this time line, and I'll use that here.

Is that on your screen, ma'am?

A  Yes.

Q  Okay. After Dr. Dinowitz -- and this time line, I believe we're all in agreement with this, that initial meeting was March 22 of 2002; do you see that?

A  Yes.

Q  Now, after that meeting, the next -- what happened next? What's the next communication you had with Mezona Orthopedics?

A  I believe it was a phone call from someone in the office, explaining that they had conferenced and that we should come in and talk with Dr. Sharpe.

BRANDNER 00515

90

Q    About what?

A    About the options that they wanted to present us, and they had talked about surgery.

Q    So, at that point, did you set another meeting with Dr. Sharpe?

A    Yes.  I set up the first time that we would consult with him.

Q    And I said that poorly.

You set up another meeting, and this one was with Dr. Sharpe?

A    Correct.

Q    So, I apologize, on April 11, 2002, you go in and you have a meeting with Dr. Sharpe; is that correct?

A    Yes.

Q    Is ▇▇▇ there?

A    Yes.

Q    And are you there?

A    Yes.

Q    Okay.  I just want to get a list of attendees. Was Steve there?

A    Yes.

Q    Okay.  ▇▇▇ father was there then?

A    Yes.

Q    And from Mezona Orthopedics, who all was in attendance?

BRANDNER 00516

91

A   As far as I can recall, it was just Dr. Sharpe at that time.

Q   Do you have a recollection of that first meeting with Dr. Sharpe, of meeting of physician's assistant named Brian Sharp?

A   I don't recall.

Q   You might have, but you don't have a recollection?

A   Yes.

Q   Do you remember having any substantive conversations with anyone, other than Dr. Sharpe, at that meeting?

A   Not that I recall.  It was Dr. Sharpe.

Q   Do you have a recollection of Dr. Sharpe dictating during that meeting?

A   Yes.

Q   Did he ever tell you why he dictated during the meeting?

A   Just to take notes on what was being said, discussed.

Q   Did he tell you that or did you assume that?

A   I don't know.  I think I commented to him, because I'd never see it happen before, so I think that he did give me an explanation of what he was doing.

Q   Did he ever tell you that if he was dictating

BRANDNER 00517

92

something wrong, that you should correct him?

A    I don't recall that.

Q    Tell me what you recall about the April 11, 2002, meeting at Mezona Orthopedics with Dr. Sharpe?

A    Well, he had told us that he had gotten the results of the conference, and that they had felt that surgery was probably the best course of action for Scott's condition, at that time.

And he basically discussed different ways to do a surgery on ████████ leg.

Q    Do you recall a conversation -- let me talk about the surgical procedures.

Was there a conversation about a rod, for example?

A    I believe so.

Q    Do you remember any of the other procedures that were talked about?

A    He had talked about a steel plate.  He also had talked about, I believe, using some kind of fixation device on the outside.  I've seen it, like pins on the outside.  I think that's -- there may have been others, but I think those are the ones that I can  remember.

Q    The plate one, what do you remember about that?

A    I think that he said that was attached to the bone by screws.  I don't know if he was really, really super

BRANDNER 00518

93

specific about all these things. I just know he told us different options.

Q Do you remember, at the April 11, 2002, meeting, whether he told you that the plate option, as well as any of the other options, required a re-breaking of the two bones?

A I think that he did say that.

Q I want to show you what's been marked as Exhibit 10. Do I need to blow that up any more for anyone? Thank you.

This is a April 11, 2002, note, Dr. Sharpe's records. Do you see there, it says: I discussed other fixation options with the parents as well.

Is that what you were referring to?

A Yes.

Q Then it says fibular osteotomy will also be necessary, and we did have an extensive discussion about risks. I'll get to that in a minute. I want to talk to you about that fibular osteotomy.

Do you remember any discussion at that meeting regarding the difference between what the large bone was doing, the tibia, versus the small bone, the fibula?

Do you remember any discussion about the difference between those two, what was going on?

A I'm not absolutely certain. I believe that the

BRANDNER 00519

94

tibia, the smaller bone, was kind of just maybe not even attached to anything. It was just there. But it was the fibula that was the issue. That's the one that was bent.

Q     Do you remember any discussion, at the April 11, 2002, meeting, about where the small bone -- there might need to be a piece taken out of it?

A     I can't recall.

Q     That's fine that's fine. The knot, the lump, I believe is how you described it, on the front of the leg, that we discussed a moment ago, was it your understanding that that was on the big bone?

A     Yes.

Q     So that was on the tibia, was your understanding?

A     Whichever.

Q     If that's the big bone?

A     Yeah, the big bone.

Q     You don't have a medical background?

A     No. And I always mess those two up.

Q     Okay, I understand.

There is -- next, and it's in conjunction with that fibular osteotomy sentence there, it says: We did have an extensive discussion today about risks, including anesthetic risk, death, infection non-union or delayed union, nerve injury, vessel injury.

BRANDNER 00520

95

Do you see what I'm referring to?

A    Yes.

Q    Do you have any recollection of a discussion along the line -- those lines taking place?

A    I don't recall.

Q    You don't recall this, a discussion about risks at this meeting?

A    I don't think -- I just don't recall.  I don't I don't think we did, but it's possible.

Q    Okay.  Do you remember having a discussion about risks, at some point in time, before the surgery?

A    Oh, yes.

Q    Okay.  Do you recall -- and we'll get to the June 6, 2002, pre-op conversation -- do you recall that meeting?

A    Yes.

Q    I just want to understand your testimony correctly.

You do recall discussing risks --

A    Yes.

Q    -- before the surgery?

A    Yes.

Q    What you're saying, if I understand you correctly, is you just don't recall the date, which meeting?

A    Well, I know, absolutely, certainly, risks were

BRANDNER 00521

96

discussed in the pre-op one in June. I'm not sure about the April 11 discussion happening.

Q Let me ask you this then, at the April 11 meeting, if risks were discussed, as is set forth by the doctor in his dictation — you see where it says nerve injury?

A Yes.

Q Do you have a recollection, on April 11, 2002, of any discussion that there was a specific nerve, in the lower part of the leg — it's referred to as the peroneal nerve, which I assume you found out by now — but even if we don't use the term peroneal nerve, was there a specific discussion about a nerve that was at risk in this type of surgery, where loss of function of the foot could occur?

MR. CRAWFORD: Lacks foundation.

THE COURT: Overruled.

MR. CAUSEY: Go ahead, you can answer.

THE WITNESS: No.

BY MR. CAUSEY:

Q I want to go to the June 6th meeting, but there's a couple things that occurred in between I want to cover first, just to keep our chronology in order. Okay?

A Okay.

Q Dr. Walls, are you familiar with that doctor?

A Yes.

BRANDNER 00522

97

Q    You took ██████ there for another opinion; is that --

A    Yes.

Q    -- right?

A    Yes.

Q    And the time line indicates it was April 18 of 2002.  So it would have been about a week after the Dr. Sharpe meeting; does that sound right?

A    Yes.

Q    Tell me what you recall about the discussion with Dr. Walls?

A    He also viewed ██████ x-rays and took a look at ██████ leg and saw that there was -- that it was off in degrees.  It was — he saw the bowing and the bone callus also.

And he said along the same lines as Dr. Sharpe, you know, surgery looks like it might be the thing to do. And then he talked about, specifically, putting a rod in the bone.

Q    He talked about the surgical option that involved the use of a rod?

A    Yes.

Q    Did Dr. Walls, if you recall, talk to you, at all, about the option of let it heal.  To reduce the pain, lay off the activity.  You can let it heal and, hopefully,

BRANDNER 00523

98

reduce the pain at the site, if the fracture heals, and then see how it is at that time?

A He may have said do nothing, you know, just let it go, but I don't recall any of the other discussion about laying off activities. I don't remember that.

Q So you -- it's your testimony that he may have mentioned, you know, we can wait and see, but he did not give you any details about that side of the options?

A I don't recall any details.

Q Do you recall any discussion with him about if you wait and see, whether it would get worse or it might heal at the same angle it was at right then, anything like that?

A I really don't remember.

Q Then -- and at this point, is it your understanding that if we're going to straighten the bone, it's going to require a surgical procedure?

A Yes.

Q So then you go back to -- it looks like Dr. Matthews, April 22, 2002.

Did you attend that meeting as well?

A Yes.

Q Let me ask you this, did you attend all the meetings?

A Yes, I did.

BRANDNER 00524

99

Q    It's my understanding you were with ▮▮▮ at all the meetings; is that correct?

A    That's correct.

Q    Then his father, ▮▮▮ attended some of the meetings; is that correct?

A    Yes.

Q    Dr. Matthews, April 22, 2002, you go back to see him after Dr. Walls.  Why?

A    My ex-husband and I felt that he needed an opportunity to look at it also and see what his thinking was.

Q    And following that meeting, you went back to Mezona Orthopedics; correct?

A    Yes.

Q    So you still, at that point, felt Dr. Matthews was not as responsive to you as you wanted him to be; is that a fair statement?

A    Yes.

Q    Okay.  Now, Dr. Sharpe, there is -- pretty much the whole month of May, then we have a gap there, April 22 of 2002, Dr. Matthews, then before we have the pre-op meeting of, June 6, 2002, what was going on during that time period?

A    ▮▮▮ had some tests done, scans, and I think that Dr. Sharpe -- and I may have talked on the phone

BRANDNER 00525

100

also -- and we had decided, my ex-husband and I, that ▓▓▓ would go have a surgery to fix the leg.

Q   Okay.  In making that decision, did you also take into consideration ▓▓▓ thoughts?

A   Oh, yes.

Q   So it was a group decision at that point?

A   Yes.

Q   Now, up to that point, where you made that decision, had you ever heard about that specific nerve that could be damaged in this type of procedure?

A   No.

Q   From any of the doctors, including Dr. Sharpe?

A   Not from any of them.

Q   Had you ever been told that there was a risk of a permanent loss of function of the foot?

A   No.

Q   · Had you ever been told that if that happened, ▓▓▓ might have to wear a brace the rest of his life?

A   No.

Q   Why were you interested in having the surgical procedure?

Do you need a drink?

A   Yeah.

Q   It's okay.

A   To make it better for my son.

BRANDNER 00526

101

Q     So you were trying to improve ▮▮▮▮ condition?

A     Yes.

Q     Let's talk -- do you need a second?

THE COURT:  Mr. Causey, this is good time to break any way this afternoon.

And folks, we need to take our noon break.  If I could have all of you back at 1:30, ready to come back into court, at that time.  I'd appreciate it.  Please remember the admonition.  We'll be in recess.

(Dr. Brandner was called as a witness.  His testimony was reported but has been omitted from this transcript.)

(Recess.)

BRANDNER 00527

102

THE COURT: All right. Thank you everybody.

Go ahead and be seated, please.

We're back on the record with all of the members of our jury present, counsel, and the parties.

And Mr. Causey, do you wish to go ahead and continue with Miss ████? Very good.

Miss ███, you're still under oath, and we'll go ahead and complete your examination.

BY MR. CAUSEY:

Q    Sorry for the interruption. I'll try to start off right where we left off.

I believe that we were -- had just finished discussing why, prior to the June 6, 2002, meeting with Dr. Sharpe, the decision had been made to proceed with surgery.

And it was your position, if I remember correctly, that the idea was seeking improvement of the condition; is that right?

A    Yes.

Q    Okay. June 6, 2002, okay, let's talk about that. Was there a meeting at Mezona Orthopedics?

A    Yes.

Q    Who all was present at the meeting that you attended? Did you attend it, first of all?

A    Yes.

BRANDNER 00528

103

Q    Who all was present at the meeting?

A    ▓▓▓▓, Dr. Sharpe, myself, and that's all I recall.

Q    Now, do you have any recollection of a physician's assistant by the name of Brian Sharp?  Do you know who that is?

A    Yes, I do.

Q    Do you have a recollection of him attending the June 6 pre-op meeting?

A    I don't recall it, but he may have.

Q    Do you have any memory of him, while at that pre-op meeting, dictating anything?

A    I don't remember.

Q    And just to save some questions down the road, are you saying that could happen, could have happened, you just don't remember it?

A    Yes.

Q    Do you remember Dr. Sharpe being involved at the meeting?

A    Yes.

Q    Now, as far as any substantive discussions, were you provided any substantive information about the procedures or the risks or anything related to the surgery?
        Who did that come from at the meeting?

A    I believe it was Dr. Sharpe.

BRANDNER 00529

104

Q      I want to show you what has been marked as Exhibit 11 in this matter.  We've looked at it several times.

I want to go down to the bottom paragraph there.  See the assessment paragraph?

A      Yes.

Q      Is that in focus on your screen?  Everything okay to read?

A      Yes.

Q      If you skip down, it says:  I've given them a prescription for post-op pain medication and reviewed the risk of surgery; do you see that?

A      Yes.

Q      Do you recall that taking place, this discussion?

A      Yes.

Q      Then next it says:  These include, but are not limited to, death, other anesthetic complications, blood vessel injury, nerve injury, fracture, chronic stiffness, chronic pain, malunion, non-union, refracture, mechanical failure of the components, blood loss, blood clots, and infection.

Do you see what I read there?

A      Yes.

Q      Then the next sentence though says:  The

BRANDNER 00530

105

patient and his mother understand these risks.

Do you see where it says that?

A    Yes.

Q    And he is ready to proceed with surgery.

Is that an accurate statement?

A    Yes.  We understood that those were the risks.

Q    So, to the extent of what you had been told, you understood that?

A    Correct.

Q    Now, were you told anything -- let me put it back on there, if you need to refer to it.

As far as the risks were concerned, were you told anything other than this list?

A    No.  It was very list oriented.  It was these are the things that could happen.

And yes I understood that these things had a possibility of happening.

Q    Let's talk about -- do you recall any discussion, any specific discussion, about the likelihood of any of these risks?

A    They -- the doctor said that the risks were minimal compared to the benefit.

Q    That was Dr. Sharpe?

A    Yes.

Q    Is it your testimony that you remember that

BRANDNER 00531

106

specifically at that meeting?

A    No.  I had heard that from him at some point.

Q    You just don't recall which meeting it was?

A    Correct.

Q    Is there anything else about the second meeting with Dr. Sharpe, June 6, 2002, what we were referring to as the pre-operative meeting or evaluation, pre-operative evaluation, anything else about the substantive discussions at that meeting that you recall?

A    I believe we talked at some length about ▮▮▮▮▮ pain management at that time.

Q    Are you talking about after the surgery?

A    Yes.

Q    Okay.  Anything else?

A    I don't believe so.

Q    Do you recall, and whether it's at the June 6, 2002, meeting or at any of the meetings with Dr. Sharpe, pre-surgery, any discussion involving the option of let's wait and let's see if it heals over the next few months, the fracture.  Let's cut down on ▮▮▮▮▮ activity level and let's let it heal.  Let's see if we can reduce the pain and then see where we are.

MR. CRAWFORD:  Objection; irrelevant.

THE COURT:  Overruled, I'll allow it.

THE WITNESS:  May I answer?

BRANDNER 00532

107

THE COURT: Yes.

MR. CAUSEY: Yes.

THE WITNESS: The only time it was mentioned that we had a choice to wait, was, basically, that you could wait, and I believe that was in the first meeting that we talked about that as an option, but no discussion about how that would be done, what that meant.

BY MR. CAUSEY:

Q    You don't recall a discussion of the wait option, about what that would involve?

A    I don't recall.

Q    Do you have any recollection, at any of the pre-surgery meetings, of being told that there was a specific nerve at risk from this type of surgical procedure, and that if it was injured, ███ could permanently lose some loss of function of his foot?

A    No.

Q    ███ when you were weighing the decision, as to whether or not to have your son undergo this surgical procedure, what did you weigh? What was the information that you weighed in rendering that decision?

A    What I basically was thinking about was where he was at that time, which he had a deformity, as far as I could see; that it was hurting him; and that this surgery was going to help that basically go away.

BRANDNER 00533

108

Q    Based on your discussions with Mezona Orthopedics, that was your feelings at the time?

A    Yes.

Q    I assume, since you had not been -- you had not discussed -- or excuse me, strike that.

I assume, since no one had discussed with you a specific nerve and a loss of function of the foot, that wasn't part of the factors or the weighing of whether to go with surgery or not go with surgery?

A    No, it was not.

Q    So June 26 of 2002, we have the surgical procedure. Do you recall that?

A    Yes.

Q    Were you there?

A    Yes.

Q    And I don't mean actually in the room, you were at the hospital, the facility?

A    Yes.

Q    When is the first time that you recall having a substantive conversation -- by that I mean, other than hi, how are you or someone sitting in on a meeting -- with Brian Sharp?

A    I think it was there in the pre-op room. I think he was there and he talked with us a little bit.

Q    This is the first substantive conversation you

BRANDNER 00534

109

recall with him?

A    I think so.

Q    And when you say pre-op room, are we talking about at Mezona Orthopedics offices or at the surgical facility?

A    I think it was at the surgical facility, although, he could have been around before that, but I think that's the first time I think I talked with him.

Q    You're not suggesting you may have had a conversation with him earlier, you just don't recall one; is that fair?

A    Yes, correct.

Q    So the surgery takes place, and when is -- when is the first time that you became aware that there might have been a problem?

A    Dr. Sharpe told me.

Q    Tell us about that conversation.

A    He said that there was some concern because Scott wasn't able to move his foot, wiggle his toes, you know, flex and point, at a point when he woke up.

     And at first it was thought it could have been an epidural, because he did have one, and we were just going to wait and see.

Q    At that meeting, did he warn you that it might have been a nerve damage and that it might be permanent?

BRANDNER 00535

110

A    He might have said something about it being possibility of a nerve, but I don't recall it.  I think it was more wait and see, because of the epidural, there was no way to really determine where Scott was.

Q    Was there a subsequent conversation you had with Dr. Sharpe, post surgery, where there was a discussion where Dr. Sharpe indicated to you that he did, in fact, now think it was a nerve injury and that it was permanent?

A    Yes.  There was a discussion that there was damage to a nerve in ███████ leg that was stopping his foot from flexing and pointing and moving side-to-side.

The hope was that it was temporary, that it was sleeping, and would at some point wake up, but there was a chance that it might not recover or might recover to a point, but maybe not fully.

Q    So where did that conversation take place?  Was that at the facility?  Was Scott still in the facility?

A    At the hospital?

Q    Yes.

A    Yes.

Q    The surgery, on June 26, 2002, that took place at the hospital; correct?

A    Yes.

Q    That wasn't -- they now have the out-patient surgical facility, it wasn't in one of those; correct?

BRANDNER 00536

111

A   No.  He was in the hospital for quite some time.

Q   So the communications you've told us about so far took place at the hospital?

A   Yes.

Q   I'm talking about the post surgery discussions.

A   Yes.

Q   Now, how long after the surgery was it when Dr. Sharpe warned you it that might have been something about the nerve and that it could be permanent?

You said that you didn't think that was the first conversation.  How long after?

A   It would probably be a day or two later because they needed to wait for it to wear off, the epidural.  Then, at that point, he realized that it was beyond that.

Q   So this discussion would have taken place after the epidural was allowed to have worn off?

A   Yes.

MR. CAUSEY:  Your Honor, I don't have any further questions at this time.

THE COURT:  Thanks, very good.  Cross-examination, Mr. Crawford.

MR. CRAWFORD:  Thank you, your Honor.

CROSS-EXAMINATION

BRANDNER 00537

112

BY MR. CRAWFORD:

Q    Is that coming up on your screen, Mrs. ████?
Okay.

A    Yes.

Q    Let's talk about the kind of the chronology of
things for a few minutes; okay?

A    Okay.

Q    ████ breaks his leg September 26, 2001.  In, I
believe it was, December of 2001, he was taken out of the
long leg cast, is that your memory?

A    Yes.  I think it was mid to late December, if I
recall.

Q    Then he was put in a walking cast?

A    It was a type of a brace.

Q    People have called it a walking cast?

A    Yes.  He straps it on, yeah.

Q    Something below his knee.

A    Yes.

Q    Then he was actually -- that was taken off and
he was told return to normal activities in early January of
2002?

A    If I recall correctly, yes, around that time
frame.

Q    And then that's when you start noticing that

BRANDNER 00538

113

the lower leg was bowed out?

A     Correct.

Q     And that it was also kind of -- the foot was actually kind of twisted in?

A     Yes.

Q     And it was obviously deformed to you?

A     Yes, it looked deformed to me.

Q     And ███ tried to get back to activities, but he was really struggling?

A     Yes.

Q     Including dance, sports, whatever?

A     Yes.

Q     And you go to Dr. Matthews, January 25, 2002, because you're concerned about that; right?

A     Yes.

Q     And got, what to you, was a very unsatisfactory response from Dr. Matthews; is that fair?

A     Yes.

Q     Basically, it didn't seem to you like he was really listening, taking into consideration what you were telling him, in terms of the problems that Scott was having?

A     Right.

Q     Okay.  That's what caused you to discuss with your ex-husband and your son the potential of getting a second opinion?

BRANDNER 00539

114

A    Yes.

Q    And you choose Dr. Dinowitz, because he had done surgery on your husband's hand?

A    Correct.

Q    So you get a second opinion from Dr. Dinowitz on March 22, 2002?

A    Well, we met with him, and he said he'd conference and then give us his opinion.

Q    Well, in fact, the purpose of that visit was a second opinion; right?

A    Correct.

Q    And he did say that he thought this was a problem?

A    Yes, he did.

Q    That something needed to be done about it?

A    Yes.

Q    What he wanted to do is present it to his colleagues or partners at Mezona and get their thoughts as well?

A    Yes.

Q    He was very up front, that's what he was going to do?

A    Oh, yes.

Q    Okay.  And the next thing you remember happening is that somebody from Mezona calls you and says

BRANDNER 00540

115

Dr. Sharpe has expertise in the lower extremities and he's the person that you would want to meet with, something to that effect?

A    Right.  We had already known that Dr. Sharpe would probably be the person.

Q    Okay.  But officially, you got the call and, yeah, Dr. Sharpe's the person.

A    Yes.

Q    And so you go in on March 11 — I'm sorry, you go in on April 11, 2002, for yet another opinion, this time by Dr. Sharpe?

A    Yes.

Q    Dr. Sharpe gives you his thoughts, and then you go for yet another opinion by Dr. Walls on April 18, 2002?

A    Yes.

Q    Then you go for yet another opinion by Dr. Matthews on April 22, 2002?

A    Yes.

Q    And at a minimum, Dr. Sharpe and Dr. Walls told you that they thought surgery was the appropriate way to go?

A    Yes.

Q    And that you go back to Dr. Matthews and you get, again, a very unsatisfactory experience with him; fair?

A    Basically, yes.

Q    He seemed to be a little bit miffed that you

BRANDNER 00541

116

had gotten second opinions?

A     Yes.  He let us know he knew.

Q     Okay.  And he didn't really seem to be listening to you or what ▮▮▮▮ said the problems he was having or what he wanted to get back to doing?

A     He just said that whatever I can do to help you, I'd be willing to do, or something like that.

Q     But he also just didn't seem to be listening, did he?

A     Right.

Q     Okay.  So that's when you decided, we're not going to continue to treat with Dr. Matthews any more?

A     Right.

Q     And then you, again, the family talks about it and decides that surgery is the way you want to go and Dr. Sharpe is the person you want to do it?

A     Yes.

Q     And you made that decision because you thought Dr. Sharpe was really concerned about Scott, had spent a lot of time thinking about the case, and basically had communicated to you that he really was thinking about what to do?

A     Yes.

Q     So before surgery was performed, you had gotten opinions from, initially, Dr. Matthews in January, then Dr.

BRANDNER 00542

117

Dinowitz, then Dr. Sharpe, then Dr. Walls, then Dr. Matthews again, five doctors, right, five visits?

A    Yes.

Q    And you had plenty of time before surgery to think about what you wanted to do?

A    Yes.

Q    Dr. Sharpe didn't push you into surgery, did he?

A    No.

Q    Over the period of January 25, 2002, to June 26, 2002, almost to the day, five months; right?

A    Yes.

Q    And you got to see firsthand the problems your son was having?

A    Yes.

Q    The struggles he was having?

A    Yes.

Q    The pain he was having?

A    Yes.

Q    And the things he couldn't do?

A    Yes.

Q    And how this was impacting his life?

A    Yes.

Q    He was becoming very discouraged?

A    Yes.

BRANDNER 00543

118

Q    He was becoming emotionally upset about it?

A    Yes.

Q    By the time surgery is done -- I'm sorry -- before surgery is done, he's actually already having pain in his ankle, his knee, and his hip?

A    Yes, he had some, after activity, yes.

Q    Well, and do you remember telling people at the hospital that he had actually constant pain in his leg by the time the surgery was going to be done?

A    Yes.

Q    When ▇▇▇ would try to do the activities that he wanted to do, especially toward the end, you could tell that he was in excruciating pain?

A    Yes.

Q    You, I mean, you could just see it on his face?

A    Yep.

Q    Do you remember Dr. Sharpe telling you, during one of these visits, that if his leg remained in this bowed and twisted position, that he could develop early problems, early arthritis in his ankle, his knee, and his hip?

A    I don't recall that.

Q    Do you deny that he told you that?

A    No.

Q    One of things that was very important to Scott was doing dance?

BRANDNER 00544

119

A    Yes.

Q    And the problem with his leg, over that five-month period of time, between the visit with Dr. Matthews on January 25, and the surgery by Dr. Sharpe on January 26 (sic) you got to see firsthand the struggles that he had trying to do dance?

A    Yes.

Q    And it was clear to you that this was having a significant impact on his ability to do that activity?

A    Yes.

Q    He couldn't do a lot of the moves that were required?

A    Right.

Q    And there was actually two recitals in June of 2002, before the surgery, that he was involved with; do you remember that?

A    A competition and a concert, yes.

Q    I'm sorry.

A    That's right.

Q    Because he could not do all of the stuff that he would normally be doing, you actually had to choreograph the routine so -- around his problems?

A    Yes.

Q    The condition of ███████ leg, by the point we go into the June 2002 time period, was unacceptable to you?

BRANDNER 00545

120

A  Right.  I wanted him to be well.

Q  It was unacceptable to Scott?

A  Yes.

Q  And it was unacceptable to your ex-husband?

A  Yes.

Q  Dr. Sharpe met with you on April 11, 2002 -- I'm going to have to do this in sections here because we won't be able to see the whole thing -- and I have highlighted this to talk about some things with you.

He indicates in this note that he had an extensive discussion with you, meaning the family, about this deformity, problems that ███ was having, things like that.

Do you deny that, do you deny that?

A  Deny that we did have that discussion?

Q  Do you deny that he had an extensive discussion with you that day about ███ problems, what he wanted to get back to, the nature of the deformity?

A  No, I don't deny that.  We did talk extensively.

Q  It would include what he wanted to get back to doing; is that fair?

A  Oh, yes.

Q  And are you saying you have a good memory of everything that occurred during the April 11, 2002, meeting

BRANDNER 00546

121

or not so good a memory?

A    I think it's fair.

Q    Somewhere in between?

A    Yeah.

Q    Okay.  But you don't remember any discussion about the risks of the surgery that day?

A    I don't recall on that day.

Q    Are you saying that did not happen?

A    No.

Q    Okay.  So, you remember the April 11, 2002, visit, but in terms of your memory about the discussion of risks, it's completely blank today; fair?

A    Right.  At this point, I don't recall that.

Q    Either way?

A    Exactly.

Q    Okay.  But you don't remember that discussion at all, but you told us earlier this morning you do recall there was no discussion about possible nerve damage?

A    I was asked about a particular nerve.  No, there was no discussion about that particular nerve.

Q    So you remember that specific fact, but then whether even the idea of risks was discussed, you have no memory; right?

A    I believe that the question was asked, did I have a discussion with or did we have a discussion about a

BRANDNER 00547

122

particular nerve, not specifically nerve damage.

No, we did not have a discussion about a particular nerve. I don't even recall if we discussed the risks.

Q   So you have a good memory there was no discussion about risks to a particular nerve, but you don't even remember the general discussion about risks, that's what you're telling us?

A   Right.  The risk of the nerve damage wasn't something I recall because I don't even recall a discussion about risks.

Q   But you're not saying it didn't happen.

A   That's correct.

Q   Okay.  So, in fact, what Dr. Sharpe has in his note, that he had an extensive discussion with you that day about risks, he may have done it, you just don't remember it today?

A   The discussion that I recall was an extensive discussion, but the discussion extensively was about the surgical options that ████ had.

Because it was their position on that day that surgery was the option that we should look towards and that there should be a decision based on whether we should have surgery or not.

Q   Let me make sure I understand your testimony.

BRANDNER 00548

123

Are you willing to tell the jury today, that on April 11, 2002, Dr. Sharpe did not discuss risks of surgery with you?

A    No, I'm not willing to say that.  I don't recall a discussion of risks on that day.

Q    Okay.  Either way.

A    Either way.

Q    All right.  So he may have very well told you about the risks of anesthesia, but you don't remember?

A    Correct.

Q    He may have very well told you about the risks of death, but you don't recall it today?

A    Correct.

Q    He may have very well told you about the risk of infection, but you don't recall it today?

A    Correct.

Q    He may have very well told you about the risk of non-union, but you don't recall it today.

A    Correct.

Q    He may have very well told you about the risk of delayed union, but you don't recall it today?

A    Correct.

Q    He may have very well told you about the risk of nerve injury, but you don't recall it today?

A    Correct.

Q    He may have very well told you about the risk

BRANDNER 00549

124

of vessel injury, but you don't recall it today?

A    Correct.

Q    Do you remember that Dr. Sharpe would go through, in his office visits with you, how ▆▆▆▆ was doing. He'd do his examination and everything, and then at the end of it, he would actually dictate in to a Dictaphone?  You do remember that?

A    Yes.

Q    And you asked him why do you do that?

A    I think I did.

Q    Do you remember what he told you?

A    So that he would have a recall of what was done in the visit.  Well, not just him, but there would be a record.  That's his record.

Q    Do you also remember him telling that so if you hear something that you haven't heard before, you can speak up?

A    I don't remember that.

Q    You do agree that on June 6 -- it's under my pile here somewhere, I'll find it.

Do you agree on June 6, 2002, the pre-op visit, that Dr. Sharpe did, in fact, discuss with you the risks of surgery?

A    I remember having a discussion about the risks of surgery, yes.

BRANDNER 00550

125

Q    Let me put this note, June 6, 2002.

Do you see at the bottom, it says Brian Sharp, PAC?

A    Yes.

Q    I want you to assume that Brian dictated this note.  Okay?

A    Okay.

Q    That's what that means.

You do not remember Brian being part of this meeting on June 6, 2002; is that fair?

A    That is correct.

Q    You're not saying he didn't participate, he may have?

A    Correct, he may have.

Q    I want you to hypothetically assume that he's going to confirm that he discussed all of the things in this note with you.

And then when he was done having his discussions with you, Dr. Sharpe came into the room and went over some things with you.  Okay?  I just want you to assume that's what he's going to say.

A    Okay.

Q    Are you going to deny that that scenario of events happened?

A    No.

BRANDNER 00551

Q    If, in fact, that is true, that Brian went over all these things with you, then Dr. Sharpe came into the room, you have a very poor memory of the visit on June 6, 2002; do you agree?

A    No.

Q    So, you have a very good memory of what occurred on June 6, 2002, but you can't remember this other guy being present and discussing how Scott was doing, medications, allergies, surgical history, doing an examination of your son, going over the surgery or potential risks?

A    I believe that the discussion that occurred was Dr. Sharpe, and he was the one that was doing the visit with us.

Q    Well, Dr. Sharpe will testify that he did, in fact, discuss these things with you that visit too.  So will Brian.

But your memory seems to be completely blank on Brian's involvement that day; fair?

A    Okay, yes.

Q    But you don't see that as a significant lapse in your memory of what happened that day?

A    No.

Q    Okay.  Do you agree that Dr. Sharpe discussed how ███ was doing that day, in other words, how things

BRANDNER 00552

127

were going?

A    Yes.

Q    Do you agree that he discussed with you the limitations ████ was having?

A    Yes, we may have gone over those.

Q    Did he --

A    I believe he was asking if ████ -- how Scott was doing that day, yes.

Q    Who did the examination of ████, listening to his heart and his lungs?

A    I believe that it was Dr. Sharpe.

Q    And you have no memory at all about Brian going over risks with you; right?

A    Not Brian.

Q    Okay.  But you do have a memory of Dr. Sharpe going over the risks with you?

A    I do believe it was him.

Q    Did he tell you that one of the risks of surgery was death?

A    Yes.

Q    Had you decided -- he did tell you that that is very unlikely to happen, but it is something that can happen.  You need to know it and you need to understand it?

A    Yes.

Q    And you were willing to have your son

128

potentially die during this surgery, rather than him go on living like he was living?

A    Based on the fact that Dr. Sharpe had told me that the risks were minimal for these things to occur, yes.

Q    And he told you there were complications with -- potential complications with anesthesia?

A    Yes.

Q    Told you it's very unlikely that it would happen, that it can happen?

A    Yes.

Q    You need to take that into consideration?

A    Yes.

Q    And did you understand that the risk of anesthesia, the major risk is death as well?

A    Yes.

Q    You were willing to accept that?

A    Yes.

Q    He told you that there could be abnormal bleeding?

A    Yes.

Q    And that would be very unlikely to happen, but it is something that's possible and you need to take that into consideration?

A    Yes.

Q    And you were willing to accept that risk?

BRANDNER 00554

129

A    Yes, because it was minimal, in comparison to what -- Dr. Sharpe said that these were all minimal, and I believed and trusted that.

Q    They're minimal, but they could have happened?

A    True.

Q    This was your son?

A    Exactly.

Q    He could die during the surgery?

A    That's true.

Q    You knew that?

A    Yes.

Q    You still thought, even though I understand it's not likely, but that gets your attention, as a mom, doesn't it?  My son could die during this surgery?

A    Yes, it did.

Q    He did, in fact, discuss nerve injury with you; right?

A    These were presented as a list, not specifically breaking every single one down.

Q    Dr. Sharpe discussed nerve injury with you that day, didn't he?

A    He said nerve injury could happen.

Q    Okay.  Tell me all the questions you asked in response to that?

A    I didn't ask any.

BRANDNER 00555

130

Q    You didn't ask what do you mean by nerve injury?  I haven't heard anything about that in all of our discussions, what do you mean by that?

A    This is the list that every person sees when they're getting ready to sign the consent form for surgery.  They're listed just like this, almost exactly in this order.

No, I didn't, because I was told by Dr. Sharpe that these risks were minimal and it outweighed what my son was experiencing at that time.

Q    Let's go back.  What is this list you're talking about, this list that's given to everybody?

A    This is the list right here, because we were getting ready to, I believe, proceed into surgery soon and so he had to go over the list that is on the consent form.  It's right there, on a consent form that you have to sign before anybody can go into surgery.  That's the list.

Q    No, it's not.  *

A    It's very similar to it.

Q    Okay.  Let's show it to you.  Do you see the consent form that's in the chart?

A    Yes.

Q    You just said all of these things are listed in the consent form.  They're not, are they?

A    No, they're not.

Q    Do you remember Dr. Sharpe telling you that it

BRANDNER 00556

131

was possible that surgery would not work, that he could go on to have problems and pain?

A    There was a slight possibility.  Dr. Sharpe was confident in his ability to help ███.  And I based -- we based our opinion upon his confidence and his expertise as the doctor in this situation.

Q    I appreciate you wanted a surgeon that had confidence in himself; right?

A    Absolutely.

Q    Let's get back to what we were talking about. Did he tell you that there was a risk of infection?

A    Yes.

Q    Did you consider that to be a possible serious thing?

A    Yes.

Q    That's something you were willing to accept?

A    Yes.

Q    Do you remember what -- that he discussed blood clots?

A    Yes, I believe he said that.

Q    Do you remember him telling you that blood clots, if they develop, could go to the lung and if they go to the lung, they could kill you?

A    No.

Q    Do you understand what blood clots meant?

BRANDNER 00557

132

A    Yes.

Q    When you got to the hospital, they had you sign some consent forms on behalf of your son?

A    Yes, I believe.

Q    One of the things they asked you to consent to was blood transfusions?

A    I believe so, yes.

Q    And did you understand that despite whatever testing can be done, there is still the risk that with a blood transfusion you could get disease?

A    Yes.

Q    You were willing to accept that risk for your son?

A    Yes.

Q    Dr. Walls, you saw him on April 18, 2002; is that right?

A    Yes.

Q    And he told -- this was like a third opinion at that point; right?

A    Yes.

Q    Okay.  And he told you that he thought surgery was the best option for your son?

A    Yes.

Q    In terms of waiting and do nothing, he didn't think that was a good idea and told you that Scott could

BRANDNER 00558

133

have future problems if that occurred?

A    I don't recall exactly what he said. He just said that surgery was the best option.

Q    Do you recall him telling you that wait and do nothing was not a good idea?

A    Right.

Q    At the time the surgery took place -- first off, when the surgery took place, Dr. Sharpe was very up front with you and let you know that there might be a problem pretty quickly after surgery, didn't he?

A    Yes, he did.

Q    And he was -- it didn't seem to you like he was trying to hide anything or withhold any information from you at all, did it?

A    No. He was very concerned. He seemed stunned.

Q    Did he tell you that, hopefully, this would be temporary, but it could be permanent?

A    Yes.

Q    And your son had some medical complications also because of his liver; do you remember that?

A    Yes.

Q    And that was because he had been taking so much ibuprofen to deal with the pain that he was having?

A    It was thought that could be it. It was never discerned that that was it.

BRANDNER 00559

134

Q    But he was taking a lot of ibuprofen every day?

A    Yes, he took what he could.

Q    He was taking like six pills a day, every day?

A    Most days, yes.  That was what we were told he could take.

Q    That was to deal with the pain that he was going through?

A    Yes, on the days when he had activity, he did.

Q    Have you seen your deposition testimony from January 29, 2004, which is the first time you were deposed in this case?  Have you seen that recently?

A    What's this, with you and I?

Q    No.  This was before Dr. Sharpe was sued in this case.

Do you remember your deposition was taken before that?

A    Yes.

Q    I'm just asking, have you seen that testimony recently?

A    Yes.

Q    By any chance were Pages 50 and 51 called to your attention?

A    I'm not exactly sure what pages those are.

Q    Okay.  Let's take a look.

Just take a minute to read that, if you could,

BRANDNER 00560

135

okay, to yourself. Let me know when you've had a chance to read.

Have you had a chance to look it over?

A    Yes.

Q    Is that the testimony that was recently called to your attention?

A    The entire deposition was given to me to read.

Q    But that specific testimony was called to your attention, wasn't it?

MR. CAUSEY:  Objection; your Honor, may we approach?

THE COURT:  Yes.

(An off-the-record discussion was held out of the hearing of the jury.)

THE COURT:  For the record, the objection is sustained.

BY MR. CRAWFORD:

Q    Have you recently reviewed Page 51 of your deposition that was given on January 29, 2004?

A    Yes.

Q    Within the past week?

A    Yes.

Q    Okay.  And you were asked the following question, series of questions:  Did ███ have that foot

BRANDNER 00561

136

drop, as far as you could tell, before the surgery performed by Dr. Sharpe?

Answer: No.

What do you mean by foot drop?

Answer: There are, there are nerves that control the flex in a foot and because the bone had been twisted and the -- there was a callus on it, it had put pressure on those nerves. And Dr. Sharpe had said that when he moves it back into alignment and corrects all that, that those particular nerves might be very stretched and might be damaged pause of that, and that's what happened.

Did I read it correctly?

A    Yes.

MR. CRAWFORD: That's all I have.

Thank you, your Honor.

THE COURT: Redirect.

MR. CAUSEY: Thank you, your Honor.

REDIRECT EXAMINATION

BY MR. CAUSEY:

Q    ████ I'll be brief. I just had a couple of

BRANDNER 00562

137

things I wanted to clarify.

The Page 51 conversation that you were just shown, when did that take place, the conversation you were describing?

A    That conversation about nerve drop?

Q    Let me show it to you. I don't want anybody guessing here. I want you to see.

It was just up on the board and counsel was just reading it.

A    Okay, yes.

Q    Let me show you here, I think it's lines — you're being asked, at that time, your understanding of foot drop. In Lines 7 through 13, you describe communication with Dr. Sharpe.

When did that take place?

A    That was when he was telling me, after surgery, what he thought had happened to ███████ foot and nerve.

Q    And quite frankly, the question there, which is what do you mean by foot drop, the attorney asking that question isn't asking your understanding of it before the surgery versus after the surgery.

Was that your understanding?

A    Correct, he wasn't doing that.

Q    He was asking you as of that day --

A    Right.

BRANDNER 00563

138

Q     -- is that your understanding?

A     That's what I thought.

Q     You were asked some questions about this five-month period of time during the decision making process on whether or not to go forward with the surgery.

Do you recall some questions about that five months?

A     Yes.

Q     And I also have that here.  This was up on the screen -- I'm going to have to zoom down, a little bit, excuse me.  It goes all the way to zero.  Okay.  Let me zoom in a little bit.  It's a little fuzzy, but we've seen it before.

This was up on the screen.  You were being asked about that five month period of time.  That's the period of time between the Dr. Matthews surgery and the Dr. Sharpe surgery, is that correct, or the decision to go forward with the Dr. Sharpe surgery; correct?

A     Right.

Q     January to June, roughly, is that your understanding?

A     Right.

Q     And during that period of time, did Dr. Sharpe or anyone discuss with you that, during this period of time, let's cut down on the activity, see if that reduces the

BRANDNER 00564

139

pain, see if we can let the fracture heal? Was there any discussion about that?

A    No.

Q    Did Dr. Sharpe discuss that with you?

A    No.

Q    Had anyone, at any time during this process, told you ▮▮▮▮▮ being to active, he shouldn't be this active? And I'm talking about health care providers, any of these doctors?

A    No.

Q    As you were shown earlier during some of the records, and you were asked questions about it, when you went to see Dr. Sharpe and Dr. Dinowitz initially, there were discussions about ▮▮▮▮▮ activities, weren't there?

A    Yes.

Q    There were a lot of questions about your recollection of the April 11 meeting or lack thereof, and back and forth.

My question is real simple, prior to the surgical procedure, whether it was Brian Sharp or Dr. Sharpe, and whether it was April 11 or June 6, okay, did anyone tell you that your son could lose loss of function of the foot, if a specific nerve at issue was damaged?

A    No.

Q    Did you — I assume, therefore, you did not

BRANDNER 00565

140

weigh that in your decision making process?

A    No.

Q    So everything else that you answered questions to about belief in the doctor, we didn't want it to go that way, missing from that puzzle was that information; is that correct?

A    Absolutely correct.

MR. CAUSEY:  Just a moment, your Honor.  I'm sorry, I think I'm about done.

THE COURT:  It's all right.

BY MR. CAUSEY:

Q    ██████, you were asked some questions about what was discussed prior to the surgical procedure, with respect to nerve injury risks.

You were asked that on cross examination.  Do you recall those questions?

A    Yes.

Q    Do you recall, at the first deposition that was taken in this matter, January 29, 2004, being asked a question about whether you had talked to Dr. Sharpe — I got to back up to make sure I put it in context — whether there was any doubt in your mind that the nerve injury occurred during Dr. Sharpe's surgery.

Do you remember being asked about that?

A    I'm not positive.

BRANDNER 00566

141

Q    Let me show you. This is a Page 99, then 100. Right here we see the question from the attorney -- and I'm skipping through the oh I forgot... says: Is there any doubt in your mind that the nerve injury occurred during Dr. Sharpe's surgery?

Objection.

This says: I think it happened before the leg had to be re-broken. I think it happened because the leg had to be re-broken, and I think that it happened because everything had to be moved.

Do you see what I'm referring to? It's a little fuzzy, I apologize.

A    Yes, I see.

Q    Let's see if I can auto focus. I didn't gain much. Hang on just a second.

Do you see what I'm referring to?

A    Yes.

Q    Those were the questions you were asked and those answers were correct and accurate at the time?

A    Yes.

Q    Let me show you the next page because the conversation continues on. It says: Did you talk to Dr. Sharpe about that?

And you say, that's right after your answer, I think it happened because the leg had to be re-broken or had

BRANDNER 00567

142

to be removed... did you talk to Dr. Sharpe.

He had warned us prior to that, you know, movement of the bone, when he had to put back in the place, could cause various things. He went through a list of many things.

Did you talk him about it afterwards?

He, in the context of how it did happen, how did this happen, yes.

What did he say?

He said because of having to twist the bone back into place there, you know, was some movement of the nerve that might have been stripped. And so when he put it back, it didn't come back where it was supposed to be.

Do you see what I'm referring to?

A    Yes.

Q    Those conversations that you're, that you're answering these questions, the communications that you're talking about, when did those take place?

A    After the surgery.

Q    We discussed earlier that there were a couple of communications after the surgical procedure. And that the first one was, if I remember your testimony correctly, correct me if I'm wrong, basically let's wait and see if the epidural goes off, wears off, and see what comes back?

A    Right.

BRANDNER 00568

143

Q    And then I believe you told me that later on there was a discussion where the doctor was telling you what it might be, what he thought it might be?

A    Right.

Q    And then subsequently there was a little more confirmation of what I do, in fact, believe it is?

A    Yes.

Q    This was a progression of communications?

A    Yes.

MR. CRAWFORD:  Your Honor, object to the continued leading.

THE COURT:  Sustained.  I know you're trying to move quickly.  Sustain the objection.

MR. CAUSEY:  I apologize, your Honor.  Do you want me to rephrase that one?

THE COURT:  Please.

BY MR. CAUSEY:

Q    Was there a progression of communications after the surgery, where that information was provided to you?

A    Yes.

MR. CAUSEY:  That's all I have, your Honor.

THE COURT:  Ladies and gentlemen, before we let Miss ███ step down, did you have questions for her?  No?

All right, very good.

Then Miss ███, thank you, you can step done.

BRANDNER 00569

144

Counsel, do you wish to excuse Miss ███?

MR. CAUSEY:  I do, your Honor.  And once that done may we approach?

* * * *

BRANDNER 00570

145

C E R T I F I C A T E

I, Lisa H. Vitoff, do hereby certify that the foregoing pages constitute a full, accurate computer transcription of my stenographic notes taken at said time and place, all done to the best of my skill and ability.

DATED this 2nd day of February 2010.

Lisa H. Vitoff, CPR
Official Court Reporter
CRR No. 50521

BRANDNER 00571