# EXHIBIT "33"

R. Glen Woods*‡
John R. Erickson*
Brian C. Whitaker†
Aaron R. Maurice
Jason M. Wiley††
Bryan D. Dixon
Scott R. Taylor
Justin Hepworth
Andrew B. Platt

*Also Admitted in Utah
†Also Admitted in California
‡Also Admitted in Arizona
††Also Admitted in Iowa

### ◆ WOODS ERICKSON
### WHITAKER & MAURICE LLP

ATTORNEYS AT LAW

1349 West Galleria Drive
Suite 200
Henderson, NV 89014-6653
Telephone:
702.433.9696
Telefax:
702.434.0615
Website:
www.woodserickson.com

February 24, 2010



Richard N. Peterson, Esq.
Office of General Counsel
American Academy of
Orthopaedic Surgeons
6300 North River Road
Rosemont, Illinois 60018.

<u>**SENT VIA OVERNIGHT MAIL**</u>

Re:    Grievance 2008-23
       Kipling P. Sharpe, MD v. Patrick J. Brandner, MD

Dear Mr. Peterson:

I am in receipt of a letter dated February 1, 2010, from Rosalind Giuletti, discussing "revised internal guidelines (2010) for Professional Compliance Program grievance material." Attached to the letter were redacted copies of those documents submitted to the American Academy of Orthopaedic Surgeons ("AAOS") by the respective parties to the Grievance. The letter instructed that unredacted copies of the documents should be destroyed to protect patient confidentiality.

I am, on this date, submitting Dr. Brandner's Appeal Statement to the AAOS. Attached to the Appeal Statement are fourteen exhibits. Nine of those exhibits (Exhibits 1-3, 7, 8, and 11-14) have already been redacted by the AAOS. They are, therefore, presented in their redacted form. Five of the exhibits (4-6, 9 and 10), however, have not yet been redacted by the AAOS. While my original intention was to redact the documents and attach them as exhibits in their redacted form (so that all of the exhibits attached to the Appeal Statement would be redacted), it dawned on me that if I eliminated all of the identifying patient information from the exhibits, the AAOS would have no way of knowing whether the documents were in fact what they were being represented to be. Accordingly, Dr. Brandner's Appeal Statement is presented with five unredacted exhibits (again, Exhibits 4-6, 9 and 10).

Cognizant of the burden which would be imposed on the AAOS by having to redact the information from the exhibits in the short time leading up to the appeal hearing, I went ahead and had my office prepare redacted versions of the exhibits at issue. Attached hereto you will find those exhibits in their redacted form. You will also find a version of Dr. Brandner's Appeal

CONFIDENTIAL

AAOS_B0000635

Brandner001005

Richard N. Peterson, Esq.
February 24, 2010
Page 2

Statement which has had all identifying patient information redacted. Please feel free to substitute these documents for those in Dr. Brandner's Appeal Statement to ensure compliance with the "revised internal guidelines."

If you have any questions or concerns regarding this matter, please do not hesitate to contact me.

Very truly yours,

Aaron R. Maurice, Esq.

CONFIDENTIAL

AAOS_B0000636

Brandner001006

R. Glen Woods*‡
John R. Erickson*
Brian C. Whitaker†
Aaron R. Maurice
Jason M. Wiley††
Bryan D. Dixon
Scott R. Taylor
Justin Hepworth
Andrew B. Platt

*Also Admitted in Utah
†Also Admitted in California
‡Also Admitted in Arizona
††Also Admitted in Iowa

◆ W O O D S   E R I C K S O N
W H I T A K E R   &   M A U R I C E   LLP

A T T O R N E Y S   A T   L A W

1349 West Galleria Drive
Suite 200
Henderson, NV 89014-6653
Telephone:
702.433.9696
Telefax:
702.434.0615
Website:
www.woodserickson.com

February 24, 2010

Richard N. Peterson, Esq.
Office of General Counsel
American Academy of
Orthopaedic Surgeons
6300 North River Road
Rosemont, Illinois 60018

**RECEIVED**
FEB 2 5 2010
OFFICE OF
GENERAL COUNSEL

*SENT VIA OVERNIGHT MAIL*

Re:   *Grievance 2008-23*
*Kipling P. Sharpe, MD v. Patrick J. Brandner, MD*

Dear Mr. Peterson:

This letter is written in response to your correspondence of January 14, 2010, wherein you indicated that if Dr. Brandner wanted the Judiciary Committee to review a written statement ("Appeal Statement") prior to the date of the appeal hearing, that said statement needed to be submitted to the American Academy of Orthopaedic Surgeons ("AAOS") no later than Thursday, February 25, 2010. Please consider this letter as Dr. Brandner's Appeal Statement.[1]

## APPEAL STATEMENT

### Introduction

The Standards of Professionalism for Orthopaedic Expert Witness Testimony adopted by the AAOS provide: "As a member of this profession, an orthopaedic surgeon must recognize a responsibility to provide testimony that is truthful, scientifically correct and in accordance with the merits of the case." Patrick J. Brandner, MD has been a member of the AAOS for twenty-four

---

[1] My correspondence of December 29, 2009, identified the substantive and procedural grounds for Dr. Brandner's appeal. Since writing that letter, my office has (through the threat of litigation) managed to obtain many of the documents that Dr. Sharpe withheld from the Committee on Professionalism ("COP") Hearing Panel (in two instances – documents that Dr. Sharpe represented to the COP Hearing Panel did not exist). For the purposes of simplicity, this Appeal Statement is presented as a stand-alone document (i.e., it includes the material contained in my December 29, 2009 correspondence – incorporates additional information obtained since that date – and attaches the documents being referenced as exhibits for easy reference). As a result, the Judiciary Committee need not review the December 29, 2009 correspondence in preparation for the hearing. This is Dr. Brandner's Appeal Statement.

CONFIDENTIAL

AAOS_B0000637

Brandner001007

Richard N. Peterson, Esq.
February 24, 2010
Page 2

years. The testimony which he offered in the case styled ▮▮▮ *et al. v. Matthews et al.*, was truthful (the standard of care as it relates to informed consent in a proximal tibial osteotomy requires a discussion of the risk to the peroneal nerve and the possibility of a drop foot), scientifically correct (there is a 3-13% incidence rate of peroneal nerve palsy in a proximal tibial osteotomy) and in accordance with the merits of the case (Dr. Brandner made it clear that he could not testify as to whether Dr. Sharpe discussed the risk to the peroneal nerve with the ▮▮▮ (Plaintiffs) when obtaining consent to perform the procedure (as Dr. Sharpe claimed), or whether he had failed to do so (as the Plaintiffs claimed) – it was for the jury to decide whether such a discussion had in fact occurred). Under such circumstances, the COP Hearing Panel's Report and Recommendation is without basis.

**Due Process**

Section VI.C of the AAOS Professional Compliance Program Grievance Procedures provides:

> **EACH PARTY** to a grievance is responsible for obtaining and providing **ALL** written material, such as transcripts and medical records, for consideration by AAOS. All correspondence or materials must be sent to the Office of General Counsel.

(Emphasis added.)

In the context of this Grievance – where the Grievant (Dr. Sharpe) was a party to the underlying litigation (and therefore has access to all of the documents in connection with the same) and the Respondent (Dr. Brandner) was not (i.e., he has no direct access to the documents necessary to respond to the allegations made against him)) – Section VI.C is vital. It ensures that the Grievant cannot pick and choose among the relevant documents (painting only half the picture) when submitting a Grievance. That is exactly what Dr. Sharpe did in this case. As repeatedly explained by Dr. Brandner (in his Response to Dr. Sharpe's Grievance (Exhibit 1), in his Witness List & Grievance Material (Exhibit 2), and during the hearing itself (Exhibit 3)), Dr. Brandner is not in possession of any of the materials related to the ▮▮▮ case. Upon conclusion of the case, the materials were returned to the Plaintiffs' counsel (Wade R. Causey, Esq.). Upon receiving Dr. Sharpe's Grievance, Dr. Brandner requested copies of the materials from Mr. Causey to allow him to respond to Dr. Sharpe's allegations, but his request was rejected.[2]

---

[2] Mr. Causey indicated that he was concerned about Mr. ▮▮▮ (Patient's) privacy rights under the Health Insurance Portability & Accountability Act ("HIPAA"). See Email Chain attached hereto as Exhibit 4 (a copy of which was attached to the undersigned's letter of December 29, 2009, advising the AAOS of Dr. Brandner's decision to appeal the COP Hearing Panel's Report and Recommendation).

CONFIDENTIAL

AAOS_B0000638

Brandner001008

Richard N. Peterson, Esq.
February 24, 2010
Page 3

Despite Dr. Brandner's repeated pleas, the COP Hearing Panel ignored Section VI.C of the AAOS Professional Compliance Program Grievance Procedures and the mutuality of the same. Rather than ask Dr. Sharpe – a party to the litigation with full access to the materials – why he failed to provide the Office of General Counsel (as required by Section VI.C of the AAOS Professional Compliance Program Grievance Procedures) with copies of the transcripts from ▮▮▮ (Patient) and ▮▮ ▮▮ (Patient's Mother's) second depositions, transcripts from their trial testimony and copies of the X-rays taken prior to March 22, 2002,[3] the COP Hearing Panel chose to ask Dr. Brandner why he – a non-party to the litigation with no power to compel the production of the same – failed to provide the materials.[4] See Transcript from Hearing, attached hereto as Exhibit 4, p.36, ll.3-24; p.37, ll.1-24; p.38, ll.1-24; p.39, ll.1-16.

Under Section VII.D.9 of the AAOS Professional Compliance Program Grievance Procedures, the COP Hearing Panel could have, prior to issuing its Report and Recommendation, "request[ed] additional information from the Grievant, Respondent, or any third party." In other words, upon being advised by Dr. Brandner (on no fewer than three occasions) that he (as a non-party to the underlying litigation) was unable to obtain copies of the transcripts of ▮▮▮ (Patient) and ▮▮ ▮▮ (Patient's Mother's) second depositions, transcripts from their trial testimony and copies of the X-rays taken prior to March 22, 2002 (all documents readily obtainable by Dr. Sharpe), the COP Hearing Panel could have requested that Dr. Sharpe produce the materials and delayed issuing a Report and Recommendation pending receipt and review of the same. Rather than do so, the COP Hearing Panel ignored the pleas of Dr. Brandner, accepted the misrepresentations by Dr. Sharpe, and issued a Report and Recommendation based on what amounts to only half (Dr. Sharpe's half) of the story.

Understanding that under Section VII.A.5 of the AAOS Professional Compliance Program Grievance Procedures "[t]he Grievant bears the burden of proof and must submit written material as part of the grievance process," and that, in this case, the COP Hearing Panel didn't ask Dr. Sharpe why he hadn't produced the materials or when he could produce the materials (instead focusing on why Dr. Brandner had been unable to produce the materials), it is apparent that the COP Hearing Panel improperly held the fact that Dr. Brandner was unable to produce materials from the underlying litigation (to which he was not a party) against him. The COP Hearing Panel misunderstood the burden of production and misapplied the burden of proof

---

[3] Of which there were four sets.

[4] At one point during the hearing, Dr. Sharpe interjected (i.e., no question was posed): "I believe I provided all the depositions to this Committee." See Transcript from Hearing, attached hereto as Exhibit 4, p.37, ll.3-4. Dr. Sharpe's qualification (that it was his "belief") may save him from prosecution for perjury but it should not save him from censure by the AAOS. The deposition transcripts for ▮▮▮ (Patient) and ▮▮ ▮▮ (Patient's Mother) that Dr. Sharpe provided in support of his Grievance were taken in January of 2004 – before Dr. Sharpe was even a party to the case. ▮▮▮ (Patient) and ▮▮ ▮▮ (Patient's Mother) were subsequently deposed on June 8, 2005 (approximately fifteen months after their first depositions were taken and two months before Dr. Brandner was deposed). See the Deposition Transcripts that Dr. Sharpe didn't want the AAOS to see (i.e., the transcripts from ▮▮▮ (Patient) and ▮▮ ▮▮ (Patient's Mother's) second depositions, attached hereto as Exhibits 5 and 6, respectively. Dr. Sharpe's statement to the COP Hearing Panel that he believed that he had "provided all the depositions" was patently false.

CONFIDENTIAL

AAOS_B0000639

Brandner001009

Richard N. Peterson, Esq.
February 24, 2010
Page 4

(asking Dr. Brandner to prove his innocence instead of asking Dr. Sharpe to prove Dr. Brandner's guilt). Both procedural missteps – especially when viewed in light of Dr. Sharpe's misrepresentation to the COP Hearing Panel – constitute due process violations. Either one, standing alone, require the Judiciary Committee to recommend that the Grievance not be sustained.

The switching of the burdens was not the only procedural misstep by the COP Hearing Panel. The Panel also failed to issue its written Report and Recommendation within sixty days from the conclusion of the grievance hearing as required by Section VII.D.14 of the AAOS Professional Compliance Program Grievance Procedures. The hearing concluded on October 2, 2009. Accordingly, pursuant to Section VII.D.14 of the AAOS Professional Compliance Program Grievance Procedures, the COP Hearing Panel was required to issue its Report and Recommendation by December 1, 2009. The Report and Recommendation was not issued until December 14, 2009. See Correspondence from AAOS to Patrick J. Brandner, MD dated December 14, 2009, enclosing the COP Hearing Panel's Recommendation dated December 10, 2009, attached hereto as Exhibit 7.

While Section VII.D.14 does provide that the "AAOS has sole discretion to extend the date of the Grievance Hearing Panel's Report and Recommendations if, for example, additional information from either Grievant or Respondent has been requested," no notice was ever provided to Dr. Brandner that the COP Hearing Panel had requested such an extension. Moreover, in light of the fact that the COP Hearing Panel did not request that either the Grievant or the Respondent provide additional information, it is hard to fathom upon what grounds the COP Hearing Panel would have requested such an extension from the AAOS Board of Directors.

Dr. Brandner expected to receive the COP Hearing Panel's Report and Recommendation on or before December 1, 2009. Knowing that he would have only fifteen days to appeal any adverse ruling, he retained counsel and arranged his holiday travel plans to ensure that he would be available to assist in the preparation of an appeal (if necessary). The untimely issuance of the Report and Recommendation deprived Dr. Brandner of the ability to meaningfully assist in his defense.[5] The COP Hearing Panel's refusal to follow its own rules constitutes a due process violation. Dr. Brandner was prejudiced by the same. Standing alone, it justifies a recommendation to the AAOS Board of Directors that the Grievance not be sustained.

---

[5] The fact that the fifteen-day appeal period ran over the Christmas holiday is not viewed as mere happenstance. It will be addressed (along with the COP Hearing Panel's denial of Dr. Brandner's request to continue the hearing to accommodate his travel plans) in subsequent litigation.

CONFIDENTIAL

AAOS_B0000640

Brandner001010

Richard N. Peterson, Esq.
February 24, 2010
Page 5

**The Evidence**

**Mandatory Standards Nos. 3 & 4**

The COP Hearing Panel -- based on its review of the materials produced by Dr. Sharpe -- found that Dr. Brandner violated Mandatory Standards Nos. 3 and 4 because:

> The record shows that informed consent was given. The COP found that the deposition transcripts reflected that both the plaintiff and his mother had an understanding about the specific possibility and causation of a foot drop. The COP believed that, in this regard, Dr. Brandner condemned performance that falls within generally accepted practice standards in obtaining informed consent.

See COP Hearing Panel's Recommendation, attached hereto as Exhibit 8.

This finding demonstrates that the COP Hearing Panel failed to either grasp or accept the limited nature of the expert testimony offered by Dr. Brandner. Dr. Brandner was not called upon to testify (despite what the COP Hearing Panel Report and Recommendation claims) as to whether "informed consent was given" – that was a factual issue to be decided by the jury. Dr. Brandner was called as an expert witness for the limited purpose of establishing the standard of care for informed consent in the context of a proximal tibial osteotomy. In this regard, Dr. Brandner didn't "condemn" anything. Dr. Brandner simply testified that a general discussion of "nerve damage" (such as that called for on a standard surgical consent form) would not satisfy the standard of care. The basis for Dr. Brandner's testimony was simple: There is a significantly increased likelihood of peroneal nerve palsy in a proximal tibial osteotomy (a 3-13% likelihood). It is respectfully submitted that for the AAOS to take a different position – i.e., that a surgical risk with a 3-13% incidence rate **DOES NOT** require a specific discussion to satisfy the standard of care for informed consent – would run contrary to the Academy's claim that it "serves as an advocate for improved patient care and informs the public about the science of orthopaedics."

The COP Hearing Panel's finding also proves that the hearing process was tainted by Dr. Sharpe's violation of Section VI.C of the AAOS Professional Compliance Program Grievance Procedures (i.e., his decision not to produce transcripts of ██ (Patient) and ██ ██ (Mother of Patient's) second depositions or from their trial testimony). Such is the case as the COP Hearing Panel's finding that "plaintiff and his mother had an understanding about the specific possibility and causation of a foot drop" is belied by the evidence in the case.

During his deposition on June 8, 2005 -- **A DEPOSITION TRANSCRIPT DR. SHARPE DIDN'T PRODUCE TO THE AAOS** -- ██ ██ (Patient) testified unequivocally that Dr. Sharpe never discussed the peroneal nerve or the risk of a foot drop when obtaining

CONFIDENTIAL

AAOS_B0000641

Brandner001011

Richard N. Peterson, Esq.
February 24, 2010
Page 6

consent to perform the surgery. Specifically, the following questions were asked and the following answers were given:

> Q. Okay. Do you remember disagreeing with something specifically that was in that document [the document being a summary of some of the things Dr. Sharpe was going to say in the case]?
>
> A. Yes.
>
> Q. What is it that you recall disagreeing with?
>
> A. It said that he had discussed extensively the exact term "foot drop" and "perennial [sic] nerve" and that that was a risk before going into surgery.
>
> Q. And you don't remember that?
>
> A. Not at all, no.
>
> Q. Are you saying that did not happen, or are you saying you don't remember it?
>
> A. I'm saying it didn't happen.

See Transcript from the deposition taken on June 8, 2005, of ▮▮ ▮▮ (Patient), attached hereto as Exhibit 5, p.6, ll.7-18.

The testimony given by ▮▮ ▮▮ (Patient's Mother) on June 8, 2005 – **ANOTHER DEPOSITION TRANSCRIPT DR. SHARPE DIDN'T PRODUCE TO THE AAOS** – was no less damning. Specifically, the following questions were asked and the following answers were given:

> Q. Have you reviewed any documents to help prepare yourself for today's testimony?
>
> A. I saw a document earlier that Wade showed me, a disclosure by Dr. Sharpe.
>
> Q. Okay.
>
> A. And I read it quickly and – well, parts of it quickly, that's all.

CONFIDENTIAL

AAOS_B0000642

Brandner001012

Richard N. Peterson, Esq.
February 24, 2010
Page 7

Q. Okay. And is this the one where there's a summary of what his testimony may be in this case?

A. Correct.

Q. Okay. And do you have some specific disagreements with that?

A. Yes.

Q. And what is it you disagree with?

A. The portion that I read spoke of a time when he, prior to the surgery on ▮▮ [Patient], disclosed to us that there could be specifically nerve damage, including foot drop. That was not the case.

See Transcript from the deposition taken on June 8, 2005, of ▮▮ ▮▮ (Patient's Mother), attached hereto as Exhibit 6, p.4, ll.21-25; p.5, ll.1-13 (emphasis added).

▮▮ ▮▮ (Patient's) trial testimony – **ANOTHER TRANSCRIPT DR. SHARPE ELECTED NOT TO PRODUCE TO THE AAOS** – was in accord with his deposition testimony. When asked about his meeting with Dr. Sharpe on April 11, 2002, the following exchange occurred:

Q. At this meeting, did Dr. Sharpe discuss with you any specific nerve that was at risk from this surgery?

A. No.

Q. Did Dr. Sharpe describe to you any type of nerve that comes down the leg and wraps around below the knee area and controls the function of your foot? Was there any discussion about that?

A. No.

. . . .

Q. Was there any discussion, at that meeting, that you could permanently lose function of your foot as a result of this osteotomy procedure?

A. No.

CONFIDENTIAL

AAOS_B0000643

Brandner001013

Richard N. Peterson, Esq.
February 24, 2010
Page 8

> Q. Was there any discussion about function of the foot, at all, talking about the foot, as part of this discussion regarding surgery?
>
> A. No.

<u>See</u> Transcript from trial showing ███ ████ (Patient's) testimony on April 28, 2008, attached hereto as Exhibit 9, p.33, ll.12-22; p.34, ll.4-11.

When asked about his pre-operative meeting with Dr. Sharpe on June 6, 2002, the following exchange occurred:

> Q. Any discussion June 6, 2002, about a specific nerve that could be injured?
>
> A. None.
>
> Q. Any discussion that that nerve, or this surgical procedure, could result in a permanent impairment – permanent loss of function of your foot?
>
> A. No.
>
> Q. Any discussion of it that happens, that you, in order to not drag your foot on the ground or to be able to move your foot, might have to wear a brace the rest of your life?
>
> A. No.
>
> Q. No discussion along those lines?
>
> A. None whatsoever.

<u>See</u> Transcript from trial showing ███ ███ (Patient's) testimony on April 28, 2008, attached hereto as Exhibit 9, p.50, ll.10-23.

███ ███ (Patient's) trial testimony concluded with the following exchange:

> Q. Lastly, ███ [Patient], I just want to ask you one more thing. When you made the decision, when you were weighing the factors and made the decision to go forward with this surgical procedure, did you take into consideration, at all, the risk of permanent loss of function of your foot?

CONFIDENTIAL

AAOS_B0000644

Brandner001014

Richard N. Peterson, Esq.
February 24, 2010
Page 9



A.    No.

Q.    Why not?

A.    Because I was never told that.

See Transcript from trial showing ███ ███ (Patient's) and ███ ████ (Patient's Mother's) testimony on April 29, 2008, attached hereto as Exhibit 10, p.7, ll.22-25; p.76, ll.1-4.

███ ███ (Patient's Mother's) trial testimony – **ANOTHER TRANSCRIPT DR. SHARPE ELECTED NOT TO PRODUCE TO THE AAOS** – was in accord with her deposition testimony. When asked about the meeting with Dr. Sharpe on April 11, 2002, the following exchange occurred:

Q.    Do you have a recollection, on April 11, 2002, of any discussion that there was a specific nerve, in the lower part of the leg . . . that was at risk in this type of surgery, where loss of function of the foot could occur?

Mr. Crawford:    Lacks foundation.

The Court:    Overruled.

Mr. Causey:    Go ahead, you can answer.

The Witness:    No.

See Transcript from trial showing ███ ███ (Patient's) and ███ ████ (Patient's Mother's) testimony on April 29, 2008, attached hereto as Exhibit 10, p.96, ll.28-18.

While ███ ███ (Patient's Mother) had a difficult time differentiating between the two (April 11, 2002 and June 6, 2002) pre-operative meetings, ███ ███ was unequivocal in her testimony.

Q.    Do you have any recollection, at any of the pre-surgery meetings, of being told that there was a specific nerve at risk from this type of surgical procedure, and that if it was injured, ███ could permanently lose some loss of function of his foot.

A.    No.

. . . .

CONFIDENTIAL

AAOS_B0000645

Brandner001015

Richard N. Peterson, Esq.
February 24, 2010
Page 10

Q. There were a lot of questions about your recollection of the April 11 meeting or lack thereof, and back and forth.

My question is real simple, prior to the surgical procedure, whether it was Brian Sharp or Dr. Sharpe, and whether it was April 11 or June 6, okay, did anyone tell you that your son could lose loss of function of the foot, if a specific nerve at issue was damaged?

A. No.

Q. Did you -- I assume, therefore, you did not weigh that in your decision making process?

A. No.

See Transcript from trial showing ███ ███ (Patient's) and ███ ███ (Patient's Mother's) testimony on April 29, 2008, attached hereto as Exhibit 10, p.107, ll.12-17; p.139, ll.16-25; p.140, ll.1-2.

Had the COP Hearing Panel reviewed the transcripts from ███ (Patient) and ███ ███ (Mother of Patient's) second depositions or from their trial testimony (i.e., had Dr. Sharpe fulfilled his obligations under Section VI.C of the AAOS Professional Compliance Program Grievance Procedures), there is no way the COP Hearing Panel would have found that "plaintiff and his mother had an understanding about the specific possibility and causation of a foot drop." Such is the case as ███ (Patient) and ███ ███ (Patient's Mother's) deposition and trial testimony clearly establish that such was not in fact the case.

**Mandatory Standard No. 7.**

The COP Hearing Panel found that Dr. Brandner violated Mandatory Standard No. 7 because "Dr. Brandner's testimony that the fracture could remodel was clearly not correct and, as such, his statements did not accurately reflect the scientific evidence in this matter." The COP Hearing Panel had no basis to make such a finding. Such is the case as the Panel never reviewed the X-rays upon which Dr. Brandner based his testimony.[6]

Dr. Brandner testified during his deposition that he could not remember the date on which the films he reviewed had been taken, but that the films were pre-operative and they showed that the fracture had the potential to remodel "some". See Transcript of Brandner Deposition, attached hereto as Exhibit 11, p.39, ll.19-22.

---

[6] Dr. Brandner's testimony regarding the remodeling potential was based on X-rays taken months before the X-rays Dr. Sharpe provided to the COP Hearing Panel in support of his Grievance.

CONFIDENTIAL

AAOS_B0000646

Brandner001016

Richard N. Peterson, Esq.
February 24, 2010
Page 11

At trial, Dr. Brandner was presented with X-rays taken by Mezona Orthopaedic on March 22, 2002.[7] Upon reviewing the same, Dr. Brandner immediately noted that the films were not the ones that he had previously reviewed. See Transcript of Brandner Trial Testimony, attached hereto as Exhibit 12, p.12, ll.5-12. Dr. Brandner explained that the X-rays that he had reviewed in preparation for his deposition depicted someone "between an adolescent and an adult; . . . his growth plates were in the process of closing." See Transcript of Brandner Trial Testimony, attached hereto as Exhibit 12, p.14, ll.1-2. It was for this reason that Dr. Brandner had testified that he "felt the growth plates had some potential to continue to grow." See Transcript of Brandner Trial Testimony, attached hereto as Exhibit 12, p.43, ll.1-2. When asked at trial whether the X-rays taken by Mezona Orthopaedic on March 22, 2002, depicted open growth plates, Dr. Brandner acknowledged that they did not. See Transcript of Brandner Trial Testimony, attached hereto as Exhibit 12, p.43, ll.9-15 (noting: "I don't see open growth plates on these. They appear to be closed.").

In what can only be described as a display of "gamesmanship"[8], Dr. Sharpe elected not to provide the AAOS with the X-rays taken by Baywood Orthopedic Clinic[9] (i.e., the X-rays upon which Dr. Brandner based his testimony that the fracture had the potential to remodel "some"). Instead, Dr. Sharpe provided the AAOS with the X-rays that were taken months later by Mezona Orthopaedic (X-rays which Dr. Brandner openly admitted at trial depicted closed growth plates). While the reason for Dr. Sharpe's slanted presentation of the evidence is apparent on its face (it is the same reason why he referred to Dr. Brandner as a "character" in his Grievance (Exhibit 13) and claimed that neither he nor his expert could find any support for the proposition that there is 3-13% incidence rate of peroneal nerve palsy in a proximal tibial osteotomy when a simple internet search would have revealed the investigation performed at the Department of Orthopaedic Surgery at Johns Hopkins University stating as such (Exhibit 14) – revenge)), the reason the COP Hearing Panel didn't request that Dr. Sharpe produce the X-rays taken by Baywood Orthopedic Clinic before issuing its Report and Recommendation is not as obvious.

The COP Hearing Panel (ignoring Section VI.C of the AAOS Professional Compliance Program Grievance Procedures) never asked Dr. Sharpe – a party to the litigation with full access to the materials – why he failed to provide the X-rays taken by Baywood Orthopedic Clinic as required by Section VI.C; didn't (as permitted under Section VII.D.9) request that Dr. Sharpe produce the X-rays taken by Baywood Orthopedic Clinic; and, instead, issued its Report and Recommendation (which concluded that "Dr. Brandner's testimony that the fracture could remodel was clearly not correct") despite never having reviewed the very X-rays upon which Dr. Brandner based his testimony. Understanding that under Section VII.A.5 the burden of proof was Dr. Sharpe's (as the Grievant), it is apparent that the Grievant failed to carry his burden.[10]

_____

[7] The same X-rays that Dr. Sharpe presented to the COP Hearing Panel in support of his Grievance.
[8] A word which aptly describes the entirety of Dr. Sharpe's Grievance.
[9] Taken on October 30, 2001; November 9, 2001; December 7, 2001; and January 4, 2002, respectively.
[10] One cannot help but wonder if the COP Hearing Panel's Report and Recommendation would have been the same had Dr. Brandner testified for the defense.

CONFIDENTIAL

AAOS_B0000647

Brandner001017

Richard N. Peterson, Esq.
February 24, 2010
Page 12

## CONCLUSION

As demonstrated above, the COP Hearing Panel's Report and Recommendation is without basis. The testimony which Dr. Brandner offered in the case styled ■■■■ et al. v. Matthews et al., was truthful, scientifically correct and in accordance with the merits of the case. Under such circumstances, the Judiciary Committee must recommend that the Grievance not be sustained.[11]

Very truly yours,

Aaron R. Maurice, Esq.

---

[11] Besides the materials attached hereto, Dr. Brandner reserves the right to rely upon any of the materials identified in his letter of September 15, 2009 (including the letter itself), as well as any and all materials supplied to the AAOS by Dr. Sharpe. They are, for the purposes of Section VII.E.10 of the AAOS Professional Compliance Program Grievance Procedures, incorporated by reference herein.

CONFIDENTIAL

AAOS_B0000648

Brandner001018



**DESERT ORTHOPAEDIC CENTER**
Est. 1970

**Central Office** —
2800 E. Desert Inn Rd., Suite 100
Las Vegas, Nevada 89121
(702) 731-1616 (Fax) 731-0741

**Northwest Office**
8402 W. Centennial Parkway
Las Vegas, Nevada 89149
(702) 869-3486 (Fax) 869-3542

**Green Valley Office**
2930 W. Horizon Ridge Pkwy, Suite 100
Henderson, Nevada 89052
(702) 263-9082 (Fax) 263-9088

John M. Baldwof, M.D.
*Reconstructive Surgery and Sports Medicine*

Mark A. Barry, M.D.
*Pediatric Orthopedics and Scoliosis Surgery*

Hugh L. Bassewitz, M.D.
*Adult Spinal Surgery*

Gregory T. Bigler, M.D.
*Arthroscopic and Reconstructive Surgery*

Patrick J. Brandner, M.D., F.A.C.S.
*General Orthopaedics*

Thomas Dunn, M.D.
*Adult Spinal Surgery*

Chester W. Eskey, M.D.
*Emeritus*

Matthew N. Fouse, M.D.
*Arthroscopy and Sports Medicine*

Mervyn B. Fouse, M.D.
*Arthroscopy and Sports Medicine*

Ronald W. Hillock, M.D.
*Orthopaedic Oncology*

Michael L. Lee, M.D.
*Hand, Wrist and Upper Extremity Surgery*

Michael Miao, M.D.
*Arthroscopy and Sports Medicine*

Lowell T. Niebaum, M.D.
*Orthopaedic and Joint Replacement Surgery*

John H. Payne, M.D.
*Emeritus*

Archie C. Perry, Jr., M.D.
*Adult Spinal Surgery*

Abdi Raissi, M.D.
*Foot and Ankle Surgery*

William T. Stewart, M.D.
*Orthopaedic Surgery and Hand Surgery*

Timothy B. Sutherland, M.D.
*Arthroscopy of Knee and Shoulder*

Todd V. Swanson, M.D.
*Total Joint Replacement*

Troy S. Watson, M.D.
*Foot and Ankle Surgery, Arthroscopy*

Michael F. Pendleton, J.D., CMPE
*CEO/General Counsel*

James P. Wasber II, CMA, CFM
*Director of Finance*

Sharen E. Marchitti
*Director of Operations*

All Appointments (702) 731-4088
www.docly.com

---

**RECEIVED**

APR 1 6 2009

OFFICE OF
GENERAL COUNSEL

April 7, 2009

Grievance Committee
American Academy of Orthopaedic Surgeons
6300 North River Road
Rosemont, Illinois 60018

Attention:     Mr. Richard Peterson

Re:     Grievance 2008-23
        Kipling D. Sharpe, M.D. vs Patrick J. Brandner, M.D.

I have reviewed all information to the best of my ability.

This case was driven by the Plaintiff, ███████ (a minor at that time) and his family. I was asked to review this case for a malpractice complaint against Dr. Andrew Matthews. The information provided included the fact that the treating surgeon, Dr. Kipling Sharpe, was critical of Dr. Matthews' care and was supportive of a malpractice complaint against Dr. Matthews. After review of the records and complaints, it was evident to me that there was doubtful evidence of malpractice by any physician involved in the treatment of Mr. ████s tibial malunion (see Brandner deposition, 8/5/02, page 18, line 6).

I am presently at somewhat of a disadvantage due to the absence of the actual records and literature reviewed for the case. All documents were returned to Plaintiff's attorney, who states the information is irretrievable.

In responding to the complaint, I would first like to state that Dr. Sharpe appears to attack numerous individuals he feels were responsible for the lawsuit brought against him. Dr. Sharpe's vilification of my character based on my practice description on my clinic's web site unveils his arrogance and hubris.

Brandner001019

Grievance Committee – American Academy of Orthopaedic Surgeons
RE: Kipling D. Sharpe, M.D. vs Patrick J. Brandner, M.D.
April 7, 2009
continued – page 2

Twenty percent of my practice is medico-legal based
                                    and involves tort related to alleged slip-and-fall
injuries and injuries in motor vehicle accidents. I have participated in medico-legal
practice since 1982, increasing my participation in same in 1995 after a lumbosacral
spine condition disabled me from surgical practice. During my entire career, I have
testified seven times in malpractice cases

I trained in the United States Army during and just after the Vietnam conflict. I was
exposed to significant medical trauma in my training. I was an Associate Clinical
Professor at the University of Nevada Medical Center as a staff physician at
University Medical Center, Las, Vegas, for ten years. In this capacity, I was
involved in significant trauma experience. I was the chief of the Las Vegas
Orthopaedic Division for ten years. In this position, I was intimately involved in
morbidity/mortality conferences, reviewing complications of reconstructive
procedures which included corrective tibial osteotomies. During my surgical career
over twenty years I can specifically recall performing five tibial osteotomies and
assisting in over ten. However, I believe I have performed more than five.

Based on this experience, I believe I am qualified to give expert testimony on
treatment of tibial fractures, tibial osteotomies, complications and informed consent
regarding potential peroneal nerve injury.

During my career, I have observed that the peroneal nerve injury is a unique
complication of tibial osteotomies, presenting in numbers higher than the statistical
background complications which would occur with this surgical procedure. Due to
my medico-legal experience, I have observed an increase in alleged malpractice
lawsuits brought forth because of peroneal nerve injuries associated with this
procedure. (It should be noted that I have also observed the same increased
number of complaints associated with the repair of biceps brachii tendon ruptures
and injury to the posterior interosseous nerve.)

This experience leads me to strongly believe that informed consent needs to include
and document more than a statement of "nerve injury" as stated in the routine
preoperative consent form I reviewed. Patients do not understand the residual that
"nerve injury" encompasses when the peroneal nerve is injured as a complication
of this osteotomy.

Due to the increased incidence of injury to the peroneal nerve over and above the
background complication rates of all other complications, I believe that this nerve

278

Brandner001020

Grievance Committee - American Academy of Orthopaedic Surgeons
RE: Kipling D. Sharpe, M.D. vs Patrick J. Brandner, M.D.
April 7, 2009
continued - page 3

complication needs some type of specific discussion with patients who elect to undergo a corrective tibial osteotomy.

The literature which "objectively" supports this belief is rare and scant. There is no specific journal paper which put a specific number on this complication. In my literature search, I relied on a communication (from the pediatric service of a Toronto, Canada hospital) which was an observation of a retrospective evaluation of corrective tibial osteotomies in adolescents. The communication defined a 1% to 13% range of peroneal nerve complications. I cannot find the communication now. As previously stated, I sent this back (along with all records involved in this case) to the plaintiff attorney following my testimony.

My testimony in this case was narrow and focused. It entailed my belief that the preoperative records should have documented the potential peroneal nerve complication in some format, either by statement that discussion was held or the concepts of weakness, drop foot and/or sensory loss was discussed as part of the informed consent. I did not state in any testimony that there was malpractice involved in the treatment rendered in the case.

I testified to the facts in the case. My testimony did not vilify Dr. Sharpe; my testimony actually supported his treatment.

Dr. Sharpe states in his deposition that he pre-operatively discussed the peroneal nerve specifically with Plaintiff ███████ and his mother. This statement alone supports my belief that this specific nerve complication needs to be discussed pre-operatively for corrective tibial osteotomy. Apparently, Dr. Sharpe also agrees with this, based on his own testimony.

The records I reviewed did not document that this specific discussion was held. Dr. Sharpe's pre-operative records did not document discussion of the peroneal nerve. Plaintiff ████ stated neither he nor his mother were informed about drop foot or peroneal nerve injury in pre-operative discussions, based on the objective records I reviewed. However, I testified, both in deposition and trial testimony, that if the peroneal nerve complication was discussed, then informed consent was proper.

I, therefore, advised the plaintiff's attorney that I would testify to the facts of the case, my experience related to peroneal nerve injury and tibial osteotomy, and the "he said, she said" situation, understanding that this would be a jury decision based on the testimony of the plaintiff and defendant at trial.

279

Brandner001021

Grievance Committee - American Academy of Orthopaedic Surgeons
RE: Kipling D. Sharpe, M.D. vs Patrick J. Brandner, M.D.
April 7, 2009
continued - page 4

Dr. Sharpe won this case, which I feel is proper and just.

Dr. Sharpe's attempt to obfuscate the facts in the case and attack both the plaintiff's attorney and myself, based on his former patient's civil right to redress an unexpected injury, maligns the judicial process we all live under as United States citizens and marginalizes ███████s severe, unfortunate injury. Dr. Sharpe's actions expose his arrogance and hubris. He won; he could take away a valuable lesson and possibly become a better doctor in relation to empathy and communication with future patients. Unfortunately, his attitude indicates the opposite: an opportunity lost to become a better doctor.

I will now respond to each allegation that Dr. Sharpe makes against me.

*Mandatory Standards Violated*

*Number 3:*   I did not state corrective osteotomy, with a valgus angle of 36 degrees, was an unaccepted standard at the time, place and in the context of the case of ██████. This is supported in both my deposition and court testimony.

*Number 4:*   My testimony neither condemned performance nor condoned performance of any orthopaedic surgeon in this case.

*Number 6:*   I reviewed extensive literature for the case. The literature I found that put a range on the potential complication was in a communication for retrospective review of tibial osteotomies in adolescents on a pediatric service in Toronto, Canada. This was not from a specific journal and the copy was sent back to Plaintiff ████s attorney over one year ago upon completion of the review of case material. The attorney cannot locate the document and I cannot find it on re-review of the literature in my attempt to answer this allegation.

Therefore, I attended the 2009 AAOS Instructional Course Number 381: *Current Management of Tibial Fractures*. The staff consisted of Jaffrey Anglen, M.D. and Robert Winquist, M.D. In the question-and-answer period of this course, I presented this case and the exact malunion deformity. My specific question entailed whether peroneal nerve injury, in any format (i.e., foot drop, weakness, etc.) should be stated in informed consent for the elective proceedure. One staff member stated he felt the peroneal nerve is at distinct risk

280

Brandner001022

Grievance Committee - American Academy of Orthopaedic Surgeons
RE: Kipling D. Sharpe, M.D. vs Patrick J. Brandner, M.D.
April 7, 2009
continued – page 5

for injury, above the routine complication rate associated with tibial osteotomy. The other staff member stated he specifically discusses the potential for peroneal nerve injury with his patients prior to corrective tibial osteotomy for mal-union.

Note: My deposition testimony stated an educated estimate of between one to ten percent. My trial testimony, after reading the aforementioned Toronto pediatric communication, was between one to thirteen percent. It is unfortunate that the communication cannot be reproduced, but the inability to reproduce this document does not indict my testimony in the entire context of the case, since the incidence of the complication was not the issue in the case. The actual complication of drop foot the appropriatness of the proceedure was the issue.

Number 6: All records presented were reviewed in entirety. It appears Dr. Sharpe is complaining that the plaintiff admitted the pre-operative knowledge of a "drop foot" in his deposition. It should be noted that Plaintiff ███ was referring to his knowledge of his condition, revealed and discussed post-operatively. Records by Dr. Sharpe do not reflect any discussion of the peroneal nerve pre-operatively. Further, Mr. ███ and his mother both stated specifically in deposition that they did not have any discussion about the drop foot potential or peroneal nerve injury pre-operatively. This is a distinct and troubling misrepresentation by Dr. Sharpe and suggests misuse of this AAOS process.

Number 7: My knowledge and experience was explained in the above narrative.

Number 8: ibid.

There is one more item which I feel needs to be addressed: The x-rays I originally reviewed were those of an adolescent with closed tibial growth plates and closing femoral growth plates. There was both mature and immature callus. In my review, I did not document the dates of these original x-rays. The x-rays presented at trial were those of a skeletally mature individual with a majority of mature callus; it appears that the x-rays presented at trial were not the x-rays sent to me for original review. However, I was not asked whether the x-rays were different from the original

281

Brandner001023

282

Grievance Committee - American Academy of Orthopaedic Surgeons
RE: Kipling D. Sharpe, M.D. vs Patrick J. Brandner, M.D.
April 7, 2009
continued - page 6

x-rays that I reviewed at trial. I believe that the x-rays were not the original films I reviewed for my opinions.

I did not recant any testimony in the trial. I focused on facts in the case and maintained consistency in testimony, both in deposition and trial. Again, Dr. Sharpe contorts and misrepresents my testimony in his effort at vilification.

I apologize for the length of this communication. However, in the letter by Dr. Sharpe, there are a lot of allegations, as well as attempted character vilification, which required responses.

Sincerely,

Patrick J. Brandner, M.D.

PJB:vf

Brandner001024

September 15, 2009

Richard N. Peterson, Esq.
General Counsel
American Association of Orthopaedic Surgeons
6300 North River Road
Rosemont, Illinois 60018-4262

RECEIVED
SEP 1 6 2009
OFFICE OF
GENERAL COUNSEL

*Sent Via Federal Express*

    RE:    Grievance 2008-23
             Kipling P. Sharpe, MD v. Patrick J. Brandner, MD

Dear Mr. Peterson:

I am writing to provide you with my witness list and grievance material for the Hearing scheduled for Friday, October 2, 2009, at 11:00 a.m.

**Witness List**

Patrick J. Brandner, MD
Desert Orthopaedic Center, Ltd.
2800 E. Desert Inn Rd., Suite 100
Las Vegas, Nevada 89121

I will testify as to the validity of the opinions which I offered (both at deposition and at trial) in the litigation stylized ███████ *et al. v. Andre Matthews, MD et al.*, formerly pending in Superior Court for the State of Arizona in and for Maricopa County (Case No. CV2003-017451).

E. James Greenwald, MD
Specialty Health Nevada
350 W. 6th Street, Suite D2
Reno, Nevada 89503

Dr. Greenwald will testify as to the validity of the opinions which I offered (both at deposition and at trial) in the litigation stylized ██████ *et al. v. Andre Matthews, MD et al.*, formerly pending in Superior Court for the State of Arizona in and for Maricopa County (Case No. CV2003-017451).

**Grievance Material**

    1.    My updated curriculum vitae;

    2.    Article from the JBJA Journal of Bone & Joint Surgery – American 1996-1998 (June 1996, Volume 78-A, 863-9), entitled "The Operative

Brandner001025

Treatment of Peroneal Nerve Palsy" (noting that the cumulative reported prevalence of peroneal nerve palsy after proximal tibial osteotomy has ranged from 3 to 13 per cent (i.e., the exact percentages to which I testified at trial));

3. Article from emedicine.medscape.com (updated December 26, 2006), entitled "Foot Drop" (noting that foot drop has "a 3-13% occurrence rate after proximal tibial osteotomy" (again, the exact percentage to which I testified at trial));

4. Article from Knee Surg Sports Traumatol Arthrosc (2005, 13:23-33), entitled "Drop Foot After High Tibial Osteotomy: A Prospective Study of Aetiological Factors" (documenting a 12% occurrence rate following high tibial osteotomy for genu varum);

5. Affidavit and Summary of Jeffrey W. Mast, MD (discussing his thoughts on Scott Clark's treatment and supporting the opinions which I offered in the underlying litigation);

6. Curriculum vitae for Jeffrey W. Mast, MD;

7. Letter dated September 8, 2009, from E. James Greenwald, MD to the Hearing Panel (discussing his thoughts on Scott Clark's treatment; supporting the opinions which I offered in the underlying litigation; and rejecting Dr. Sharpe's attack on my character);

8. Curriculum vitae for E. James Greenwald, MD;

9. Letter dated August 14, 2009, from Peter L. Althausen, MD, MBA, to E. James Greenwald, MD (commenting on the importance of including a discussion of compartment syndrome on the consent obtained for the surgery (not simply referencing "nerve injury")); and

10. Curriculum vitae for Peter L. Althausen, MD, MBA.

I am not in possession of any of         medical records beyond those forwarded to me by the Academy in connection with Dr. Sharpe's Grievance (which were presumably provided to the Academy by Dr. Sharpe). I attempted to obtain copies of the records from        attorney, Wade R. Causey, Esq., but my requests were rejected. According to Mr. Causey, the consent for the release of the medical records executed by        parents was limited to the use of the records for the litigation. He believes any other use of the records would be a violation of the Health Insurance Portability & Accountability Act ("HIPAA"). Mr. Causey has sent Dr. Sharpe a letter demanding that he take no further actions in violation of        privacy rights and that he take those steps necessary to recover all of the records (including copies) improperly provided to third-parties. Out of respect for        , I will rely on the materials identified above (copies of which are enclosed herewith).

284

Brandner001026

If you have any questions or concerns regarding this matter, please do not hesitate to contact me. Otherwise, I look forward to meeting you in October.

Very truly yours,

Patrick J. Brandner, MD

285

Brandner001027

Multi-Page™

**Page 1**

AAOS PROFESSIONAL COMPLIANCE PROGRAM
GRIEVANCE HEARING

IN RE THE MATTER OF:
)
KIPLING P. SHARPE, M.D.,
)
Grievant,
)
and
)
2008-23
PATRICK J. BRANDNER, M.D.,
)
Respondent.
)

Report of Proceedings taken before Patricia S. Mann, CSR, RPR, License No. 084-001841, a notary public in and for the County of Cook and State of Illinois, at Rosemont Hyatt Hotel, 5350 North River Road, Suite Lindbergh B, Rosemont, Illinois, on Friday, October 2, 2008, at the hour of 11:07 o'clock a.m.

Reported for LAKE SHORE REPORTING SERVICE, by:
Patricia S. Mann, CSR, RPR.
License No. 084-001841.

**Page 2**

HEARING PANEL:

Richard B. Strain, Jr., M.D., Hearing Panel Chair
Richard A. Brown, M.D.
Murray J. Goodman, M.D.
William J. Hopkinson, M.D.
Tamara L. Martin, M.D.
Vincent J. Silvaggio, M.D.

AAOS STAFF:

Karen L. Beckett, RNCBS, COO, CEO
Richard A. Peterson, JD, General Counsel
Melissa Young, Assistant General Counsel
Rosalind Giuliotti, Professional Compliance Program Administrator (PCP)

GRIEVANT:

Kipling P. Sharpe, M.D.

RESPONDENT:

Patrick J. Brandner, M.D.

WITNESS:

James Greenwald, M.D.

RECUSED:

Dale R. Butler, M.D.

AAOS OUTSIDE COUNSEL:

Russell R. Pelton, J.D.

VIDEOGRAPHER:

Donald Peterson

* * * * *

**Page 3**

MR. PELTON: Let the record reflect that this is the hearing of the Committee on Professionalism of the American Academy of Orthopaedic Surgeons. The Committee is meeting here in Rosemont, Illinois, to hear charges of unprofessional conduct brought by Dr. Kipling Sharpe against Dr. Patrick Brandner. Drs. Sharpe and Brandner are here today, also present is Dr. James Greenwald, a witness for Dr. Brandner.

The members of the AAOS' Committee on Professionalism who are present today are Dr. Richard Strain, Chair of this hearing; and Drs. William Hopkinson, Richard Brown, Murray Goodman, Vincent Silvaggio, Tamara Martin. Dr. Dale Butler has recused himself from this matter.

Also present are Karen Beckett, CEO of the Academy; Richard Peterson, General Counsel of the AAOS; Melissa Young, Assistant General Counsel; and Rosalind Giuliotti, Professional Compliance Program Coordinator of the AAOS. I'm Russell Pelton, Counsel for the Committee. Our Court Reporter is Patricia Mann of Lake Shore Reporting, a copy of the transcript of this proceeding will be attached to the Committee's

**Page 4**

report. Will the witnesses raise their hands to be sworn?

(The witnesses were duly sworn.)

MR. PELTON: All right. Dr. Strain.

DR. STRAIN: Welcome. The rules of the presentations are as follows: Each side will have thirty minutes to present, there is a timer over to your right in front of Ms. Giulietti, if you see it turn yellow, that's going to be time to finish up. At the end, there may be time for Committee members to question you and possibly for one side to question the other. We'll begin with Dr. Sharpe.

DR. SHARPE: Thank you. I do not take my presence here lightly, I think it is a serious matter. I am not here to retry _____ versus Sharpe, I'm not here on a sense of vengeance or hubris, I'm here because Dr. Brandner agreed to be an expert in a case in which he is not qualified by the standards of our Academy, I am here because he failed in his obligation to fairly review the facts before agreeing to testify.

I am proud to belong to an organization that has establish standards of professionalism as we do. I'm grateful to each of

Multi-Page™

you Committee members for taking time out of your busy practices and lives to be here.

We are here today to determine whether Dr. Brandner has met the Standards of Professionalism which I believe he has not. I believe that the Standards of Professionalism that he failed to meet were Number 8, that he was not properly qualified as an expert in this case. The testimony which he gave was contrary to established orthopaedic knowledge, the testimony that he gave was not based on fair and impartial review of all available information he had and the testimony tried to establish a higher — a standard of care higher than that of the community standard.

A brief time line, I first met the patient in April of 2002, I was the third orthopaedic surgeon to see him for this problem. Subsequent to seeing me, they sought two more orthopaedists. In June of 2002, I performed a corrective tibial osteotomy which was complicated by a peroneal nerve palsy. In June — or in 2003, the patient filed a lawsuit against the original treating orthopaedic surgeon. The plaintiffs were deposed in January of 2004, I was deposed in May of

Page 5

2004 prior to being a named defendant. In approximately November of 2004, Dr. Brandner agreed to be an expert witness; in February of 2005, I was served as a defendant; in August of 2005, Dr. Brandner was deposed by my attorney.

I believe Dr. Brandner inadequately reviewed the material that he had at the time that he had agreed to be a witness; he was provided with my office notes, he was provided with plaintiff's depositions, . the patient, and his mother; he was provided with my deposition which was taken before I was a defendant; and he was provided with X-rays. In my office note, I clearly documented that the risk of — the risk associated with surgery as a summary of my visit with the patient dictated in front of the patient, these notes were on April 11th and June 6th of 2002, both of these notes mention, along with other risks, nerve injury, but not the word "peroneal" nor is the word drop foot used.

These notes like most surgeons are a summary, not a verbatim transcription of everything that transpired in the visit. I don't think this projects well, but this is a copy of my

Page 6

office notes which I believe the Committee has been provided which show the portion where the risks was discussed and again on 2002. These are the X-rays, these were the ones that were taken before the surgery and it shows closed physes and a significant deformity that is a complex deformity of approximately 35 degrees.

My deposition, the attorney asked did you discuss peroneal nerve specifically with him, my answer, yes. the patient's mother, did Dr. Sharpe talk with you about that, he warned us prior to that, you know, movement of the bone, when he put it back in place could cause various things, he went through a list of many things. the patient, before you had surgery, did Dr. Sharpe ever discuss with you or did anyone discuss with you you might end up with a drop foot. Yes, he told all the things that could happen, I would — it could have been — it could have nerve damage and he said all these things, he even mentioned death.

Dr. Brandner concluded that the patient was not properly given the option of nonoperative care, that the bone had a chance to

Page 7

remodel its deformity and that I was required by the standard of care to list peroneal nerve injury in my pre-op notes. Is that a fair and impartial review of the facts I have just presented?

Asked of his qualifications, by his own admission, sworn testimony, he has minimal experience with this particular type of problem, only having performed five osteotomies, the last of which was 25 years prior to his deposition. From the letter he sent to this Committee, I understand he hasn't actually operated since 1995. He is clearly not an expert on the standard of care in tibial osteotomies when he's only done five 25 years prior. I think any of us who did five procedures 25 years ago would not consider ourself an expert in a court of law on that procedure.

In his deposition, he testified that there was a possibility that this young man with these closed physes could remodel this remarkable deformity, he testified that the growth plates were open. This was one of the two accusations made by the plaintiff, the other being a lack of informed consent.

As to the standard of care, I think

Page 8

Lake Shore Reporting 312-782-9833

442

Brandner001029

there is a difference between exceeding the standard of care and meeting the standard of care. I agree that it is appropriate to discuss peroneal nerve injuries just as I did. My witness at trial, Dr. Russo, testified that there is also risk to the posterior tibial nerve. Listing a specific nerve injury is not the standard of care, both Dr. Russo and I feel that the discussion of nerve injury meets the standard of care. If we followed Dr. Brandner's logic, we would have to list radial, ulnar and median nerves in our notes with every form -- elbow surgery, axillary nerve along with the other nerves of every shoulder surgery, not that it would be wrong to do this, but I don't think that that is the community standard. These wouldn't just require that we have the discussion, but that each nerve be listed in our notes, that's the standard he wanted to hold me to. I've had the opportunity, as many of you have, to read many surgeon's notes and few would meet that standard of care.

To review, I think there are three main points: One, Dr. Brandner was not qualified per our Academy standards to testify in this case;

Page 9

he gave testimony that was specifically medically incorrect; and he either performed an incomplete review of the material given to him or gave an unfair and not impartial review of that material. Thank you for your time.

DR. STRAIN: Questions. Do any of the Panel members have any questions? No? Okay. Dr. Brandner?

DR. BRANDNER: Thank you, gentlemen. Good morning, ladies and gentlemen. I've been a member of the American Academy of Orthopaedic Surgeons for 24 years and I'm here to defend my reputation against baseless allegations that have been made by Dr. Sharpe. Present with me today to assist me in this matter is Dr. James Greenwald, he is a member -- he is the medical director for the State of Nevada and has been a member of the American Academy of Orthopaedic Surgeons for 33 years.

As you know, this matter stems from a civil action styled      et al versus Matthews et al which resulted in a jury verdict in favor of Dr. Sharpe in late April 2008. In that case, I offered certain testimony regarding the standard of care as it relates to informed consent in a

Page 10

proximal tibial osteotomy. Specifically, I opined that a general discussion of nerve damage such as that called for on a standard surgical consent form was insufficient in the context of a proximal tibial osteotomy because of the significantly increased likelihood of peroneal nerve palsy as a result of such a procedure, a 3 to 13 percent incident rate.

I testified that informed consent required a discussion of the risks to the peroneal nerve and the possibility of a drop foot. I made it clear to the jury through my testimony that I was not there to testify as a fact witness, that is, I could not testify as to whether Dr. Sharpe had, in fact, discussed the risk to the peroneal nerve with          and his parents prior to obtaining their consent to perform the procedure as Dr. Sharpe claimed. Or if Dr. Sharpe had failed to do so as to Clark's claim, I could only testify regarding the fact that nothing in the pre-operative medical records documented a discussion regarding the peroneal nerve.

As set forth in the letter I sent to the Academy in response to Dr. Sharpe's grievance.

Page 11

report, the Clarks' case against Dr. Sharpe was a he-said-she-said situation. The jury believed Dr. Sharpe, so he won, I've got no problem with that. With that said, I stand behind the testimony I offered in the case, with a 3 to 13 percent incident rate, the standard of care as it relates to informed consent requires a pre-operative discussion of the peroneal nerve. With that said, I'll address each of the allegations that Dr. Sharpe has made against me. For simplicity, I'll address them in the order Dr. Sharpe elected to raise them in his grievance report.

The allegations: Mandatory Standard Number 2, Dr. Sharpe alleges I violated Mandatory Standard Number 2. That provides "An orthopaedic expert witness shall provide opinions and/or factual testimony in a fair and impartial manner." Dr. Sharpe alleges I violated this standard by testifying that, quote, "This malunion in a skeletally mature person could substantially remodel" and — and testifying that a 39-degree deformity was acceptable.

The allegation is on its face absurd. Such is the case for two reasons: First, I never

Page 12

Pages 9 to 12

LAKE SHORE REPORTING 312-782-9833

443

Brandner001030

offered such testimony. I testified that based on the X-rays that were provided to me by attorney which Dr. Sharpe elected not to supply to the Academy, was not completely skeletally mature. The growth plates at the distal femur were partially open, but were closed in the proximal tibia. I presented these unmarked X-rays to Dr. John Payne, a highly respected orthopaedic surgeon and Academy member for more than 35 years. I also presented the case with a description of the X-rays defining a closing femoral growth plate and mature and immature callus and a 38-degree deformity in valgus to Dr. Greenwald in Reno. I stated that this individual was very near to an adult skeleton. Dr. Greenwald is here to support these facts. Dr. Payne tragically died in 2007 unexpectedly.

Second, a review of my testimony in this case reveals that there was nothing unfair or partial about it. I was very complimentary of Sharpe, see my trial transcript pages 44 and 45. I simply testified that the standard of care required discussion of the peroneal nerve, that is, the potential of a drop foot, not just nerve damage in general, and the records do not -- did not

Page 13

document that such a discussion had occurred prior to the operation. The patient and his family said it hadn't. Sharpe said it had. It was for the jury to decide who to believe and you can go to trial transcript page 16, 17 for that.

I described Dr. Sharpe's pre-operative workup of this patient as excellent. I testified that all the appropriate studies were done in terms of planning the surgery, I testified that the surgery was performed correctly, I testified it was an elegant presentation of the definition of a deformity, a hard case and an excellent application of the correction and internal fixation, trial transcript pages 44 and 45.

If you doubt what I'm saying, read the transcript of my trial testimony, it's 53 pages and they're double spaced. There's no way you can read that testimony and conclude that my testimony was somehow unfair or partial to the plaintiffs in this case.

Mandatory Standards 3 on 4. Sharpe alleges 1 violated Mandatory Standards 3 and 4. Number 3, "An orthopaedic expert witness shall evaluate the medical condition and care provided in

Page 14

light of generally accepted standards at the time, place and in the context of care delivered." Four, "An expert — orthopaedic expert witness shall neither condemn performance that falls within the generally accepted practice standards nor endorse or condone performance that falls outside these standards.

Sharpe alleges I violated these Mandatory Standards by stating that the standard of care required a discussion of a specific nerve, testifying at deposition that the patient was not given the nonoperative option and testifying at deposition that the fracture had a remodeling potential. Again, Dr. Sharpe's allegations are flawed.

With regard to my testimony concerning the standard of care as I set forth previously, I stand behind the same. I continue to believe as do many other orthopaedic surgeons with whom I have spoken that a general discussion of nerve damage such as that called for in a standard surgical consent form does not satisfy the standard of care as it relates to informed consent in a proximal tibial osteotomy. Such is the case as

Page 15

there is a significantly increased likelihood of peroneal nerve palsy as a result of such a procedure 3 to 13 percent.

Dr. James Greenwald is here today to specifically address this issue and I'll -- hopefully, he'll have the time to do that. Dr. Jeffrey Mass has included his affidavit and is supporting this information, and Dr. Althausen has also given me an affidavit.

With regard to Dr. Sharpe's allegations regarding my deposition testimony, two points must be made: First, I never testified the patient was not given the nonoperative option, I simply testified that the standard of care required such a discussion. Whether that discussion occurred was a question of fact for the jury, that's in deposition transcript page 69.

Second, while I did testify that based on the X-rays I had reviewed, the fracture had remodeling potential, deposition transcript page 39, I was careful to point out that the fracture would likely not completely remodel, transcript — deposition transcript page 39, pages 52 to 53.

Mandatory Standard 6, Dr. Sharpe

Page 16

alleges I violated this -- and this says "An orthopaedic expert witness shall seek and review all pertinent medical records related to a particular patient prior to rendering an opinion on the medical or surgical management of the patient." Dr. Sharpe alleges I violated this by failing to adequately review transcripts from the first depositions taken of _____ nd Dr. Sharpe focuses on those two deposition transcripts because of what he views as certain admissions made by the plaintiffs and -- the plaintiff and his mother with respect to their understanding of the risk of the peritoneal nerve.

Three points are made in response. First, I did review the transcript and the first deposition of ____ and| I testified as such in my deposition transcript page twelve, nine through eleven. They are nowhere near as damaging to the plaintiff's case as Dr. Sharpe would have this Panel believe.

Second, this Panel needs to understand this is the third time that Dr. Sharpe has tried to convince someone that the testimony given by ____ and ____ during their first

Page 17

depositions proves that he discussed the risk of the peroneal nerve with the ____ prior to performing the proximal tibial osteotomy. This is the exact same argument he advanced when trying to have the plaintiff's case summarily decided by the court and it's the exact same argument he advanced when trying to have ____ attorney sanctioned by the Arizona State Bar.

Dr. Sharpe's argument was rejected on both occasions, the court and the state bar recognized that Sharpe's characterization of the deposition testimony was inaccurate. Viewed in its entirety, which includes the| ____ subsequent depositions, there was ample evidence to support the plaintiff's claim that Dr. Sharpe failed to discuss the risk to the peroneal nerve in a proximal tibial osteotomy when he obtained the consent to perform the surgery.

That Sharpe prevailed at trial is irrelevant. This Panel should likewise reject Dr. Sharpe's self-serving characterization of the evidence in the case especially where he has failed to provide the Panel with all of the evidence.

Finally, even if this Panel elected

Page 18

to ignore my deposition testimony where I testified to my review of the transcripts from the plaintiff's first depositions and my testimony here today also attesting to the fact that I reviewed the transcripts, the fact is Dr. Sharpe has not properly alleged a violation of Mandatory Standard Number 6. Such is the case as Mandatory Number 6 is very clear in its scope, it encompasses pertinent medical records.

Let me read Mandatory Standard Number 6 to you again, "An orthopaedic expert witness shall seek and review all pertinent medical records related to a particular patient prior to rendering an opinion on the medical or surgical management of the patient." A deposition transcript is not a medical record, it is a litigation document. That Dr. Sharpe would ask the Academy to take disciplinary action against me under Mandatory Standard Number 6 for allegedly failing to review a deposition transcript as opposed to a medical record says volumes about his motive and how far he's willing to go to try to support his baseless allegations.

Mandatory Standard Number 7, Dr.

Page 19

Sharpe alleged that I violated this, and this provides "An orthopaedic expert witness shall have knowledge and experience about the standard of care and the available scientific evidence for the condition in question during the relevant time, place and in the context of medical care provided and shall respond accurately to questions about standard of care and available scientific evidence."

Dr. Sharpe alleges I violated this standard by testifying I had no current relevant experience with the procedure. This claim is nonsense. Dr. Sharpe would have this Panel believe that in order to offer expert testimony as to the standard of care for informed consent, a physician must have recently performed a significant number of the type of operations involved in the case on patients of the exact same age as the plaintiff. That is ridiculous.

Arizona law is clear on when expert testimony is permitted and what qualifies a person as an expert. With regard to when expert testimony is permitted, Rule 702 of Arizona rules of evidence provides "If scientific, technical or other

Page 20

Pages 17 to 20

specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact -- a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

The Arizona Supreme Court has noted "The primary concern in the admission of expert testimony is whether the subject of inquiry is one of such common knowledge that people of ordinary education could reach a conclusion as intelligently as the expert witness or whether, on the other hand, the matter is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact," State versus Stickney, 608 P period 2(d) 302-308, Arizona 1980.

With regard to what qualifies a person as an expert, the Arizona Supreme Court has noted "The test of whether a person is an expert is whether a jury can receive help on a particular subject from the witness," Liss versus Tries, 658, P period 2(d), 169, 172-73, 1983.

In this case, Sharpe's attorney did not object to my being called as an expert witness

Page 21

and did nothing to try and prevent me from taking the stand, note that he did not request an opportunity to voir dire me as was his right. The pre-operative standard of care for an orthopaedic surgeon is not within the common knowledge of people of ordinary education, accordingly, I was properly admitted as an expert witness and offered testimony within my area of expertise. Any claim by Sharpe to the contrary is ridiculous.

Mandatory Standard 8, I violated this according to Dr. Sharpe, and this provides that "An orthopaedic expert witness shall provide evidence or testify only in matters in which he or she has relevant clinical experience and knowledge in the areas of medicine that are the subject of the procedure." Dr. Sharpe alleges I violated this standard by testifying that the patient should have been offered nonoperative management, the patient had a good chance of remodeling, that he fell below standard of care by failing to discuss the risk of the peroneal nerve injury and testifying that there's a 3 to 13 percent risk of injury occurring in this type of surgery.

Again, his allegations are baseless.

Page 22

When it comes to Standard 8, the issue is not whether you have X number of operations over Y number of years on fifteen-year-old patients with fractures of the tibia and fibula and the proximal one-third as Dr. Sharpe would have this Panel believe. The issue is whether you have a basis from which to testify to the areas of medicine that were the subject of the proceeding -- i.e., the standard of care as it relates to informed consent in the context of proximal tibial osteotomies.

The answer in this case is yes, I've been practicing orthopaedic surgery for thirty years, I've treated this injury in the Army, I've seen this injury in private practice, I've read the recent literature regarding the danger to the peroneal nerve in this type of injury and procedure, I consulted with well-qualified, experienced and well-recognized orthopaedic surgeons before opining in this case. This surely gives me the basis from which to testify to the areas of medicine that were the subject of the proceeding, to argue otherwise is absurd.

With regard to the allegations specifically, I did testify that the patient could

Page 23

and should have been offered nonoperative management with informed consent. I did testify that if Dr. Sharpe failed to discuss the risk to the peroneal nerve injury, that he fell below standard of care and I would do it again.

With regard to my testimony at trial that there was a 3 to 13 percent risk of this injury occurring with this type of surgery, Dr. Sharpe's grievance regarding the same is by far the greatest evidence of his abuse of this Academy's grievance process. His grievance report states "he" -- meaning me "-- authoritatively stated that there was a 3 to 13 percent risk to this injury occurring. Neither my expert or I could find these numbers elsewhere." You know the reason they couldn't find the numbers elsewhere? Because they didn't look for them. Rather than do a basic internet research regarding the issue which would have clearly uncovered the investigation that was performed at the Department of Orthopaedic Surgery at Johns Hopkins University and the other multiple sources which I provided the Panel which cite the same in support of 3 to 13 percent incident rate of peroneal nerve palsy in proximal tibial osteotomies, Dr.

Page 24

Pages 21 to 24

Brandner001033

Sharpe elected to file a grievance, calling me a character and claiming that neither he nor his expert could find any support for the statistics that I had testified to in trial.

I resent that I've had to travel to Chicago to defend myself against these baseless allegations and I resent that I had to reschedule a family reunion because Dr. Sharpe is unwilling to agree to my request to move the hearing of this matter to accommodate travel plans. I further resent the fact that I have to impose on Dr. Greenwald, Dr. Jeffrey Mass and Dr. Althausen to take time out of their busy schedules to help me against Dr. Sharpe's baseless allegations.

With that said, I ask the Panel to recommend to the Academy's Board of Directors that Dr. Sharpe's grievance not be sustained. I'd like to turn this over now to Dr. Greenwald.

DR. GREENWALD: Good morning. Jeff Mass was the third American to be asked to join the Swiss AO group, many of you here may know him. Perhaps even a bigger honor is that he was the first American to be asked to sit on the AO technical committee. Jeff and I trained together at Los Angeles County USC

Page 25

Medical Center, I believe you trained there. We were in the same class together and we were partners together for many years in Reno. Jeff has been a distinguished professor, as you know, coming back to USC.

Mainly because of this association with Jeff, I was aware of the AO's view of this specific fracture. I've prepared copies for you of the pertinent chapter from Professor Vaper's book discussing this specific fracture. If the guys in Arizona would have had this chapter early on in the care of this case, I think it could have made a huge difference and maybe none of us would be here today.

I was uniquely prepared to discuss this specific case with Dr. Brandner when he called me in the early two thousands. I understood this injury, I understood the risks to the peroneal nerve in this osteotomy. We see dropped foot peroneal nerve injury as, quote, a predictable complication of this specific osteotomy over and above the 3 to 13 percent baseline risk that the literature puts forth.

In the letter I wrote to you, I

Page 26

talked about using your imagination to appreciate the increased tension laterally when you correct a 39-degree deformity, I thought Dr. Russo's work was very interesting. But instead of doing it that way, I thought why not try it with a model. Here's the tibia -- I went through a lot of lumber to do this -- this is a tibia that's straight, the red part here represents the pes anserine tendon coming down to the fracture site as Dr. Vaper points out, pes anserine tendon in this growing child has an invaginated fracture site and that's what leads to this incredibly malignant pattern of valgus, and in a case of continued growth of the child, repeated osteotomies being necessary.

Okay, straight. Now, here we are, this is the front, here we are just before the osteotomy is being done. What I hope you can appreciate is the valgus deformity and the flexion deformity -- is everybody okay with that? The common peroneal nerves, the peroneal nerve, the deep peroneal nerve. Now, let's do this this way, let's put the proximal portion straight up and down and correct the distal portion. Anybody want to take a guess how far the angle is going to move?

Page 27

Eight and a-half centimeters, look what happened to the peroneal nerve. Every element of the correction in this specific deformity puts increased tension on the peroneal nerve, every single element of the correction.

There are three things that I think we can point out from the X-rays that we had to work with -- pass those to you and you can pass those around. These are the same X-rays that Dr. Sharpe showed in his presentation. On the AP X-ray of 3-22-02, the circle on the medial tibial metaphysis labeled A we believe represents the invaginated pes anserine tendon. On the post-operative X-rays, on the AP X-ray labeled B, the size of the fibular gap is significant, Dr. Sharpe said that he did a one-and-a-half centimeter osteotomy of the fibula, by the time he was done, it was a three-centimeter gap, the tension of the lateral side of this leg was tremendous.

This is Dr. Mass' point, number two, on the lateral post-operative X-rays, the gap between the fibula you see, what I want you to appreciate is the anterior displacement of the fibula compared to --of the fibula distally, we

Page 28

Pages 25 to 28

see that as being extremely important because the peroneal nerve is tethered proximally. Dr. Mass, as many of you know, has led the Academy on pre-operative planning, pre-operative planning would have let you anticipate this problem.

The trauma doctors who we had review this case have a very high suspicion of anterior compartment syndrome happening post-operatively. I would point out Dr. Althausen's letter, Dr. Mass' letter, my letter.

Closing comments, in his letter, Dr. Sharpe talks about Dr. Brandner being the kind of character this Panel should be looking at. Dr. Sharpe doesn't know a thing about Dr. Brandner. I'll also leave for you a copy from CNN — a CNN report of August 19th of this year discussing the Las Vegas Medical Mafia. Many of you may have seen this, it describes a group of musculoskeletal physicians in Las Vegas doing unnecessary spine surgery simply for huge amounts of money. Dr. Fred Redfern, the president of the Nevada Orthopaedic Society and Pat and I and others have asked the AAOS for help with this situation. Unfortunately, we were turned down. Nobody in our State has done

Page 29

more to shut down the Medical Mafia than Dr. Patrick Brandner and he continues in this difficult and stressful task. I'm extremely proud to call him a friend and a colleague, he's a credit to the AAOS.

DR. STRAIN: Is that the end of the presentation?

DR. GREENWALD: That's it.

DR. STRAIN: So we have time for questions. Dr. Brown?

DR. BROWN: I have several questions. Dr. Brandner, how do you reconcile the statements regarding foot drop made by the Clarks in deposition?

DR. BRANDNER: and when you look at all the depositions and the trial transcripts, they were discussing what they knew after the surgery. They were confused, they were discussing the fact that they understood the foot drop and they didn't understand that there was no pre-operative discussion, they then -- they understood in the context of what happened to them and they were answering the questions. These were not sophisticated medical people.

Page 30

DR. BROWN: So we -- when he says before you had the surgery, did Dr. Sharpe ever discuss with you or anyone discuss you might end with a foot drop, and he says, yes, we should just disbelieve that?

DR. BRANDNER: You need to look at all the transcript, you were given partial selected information. If you look at the cross examination, if you look at the trial transcripts, you would see that they were confused and they had no informed consent.

DR. BROWN: Okay. The second question is if the posterior tibial nerve had been injured or the sural nerve had been injured or the saphenous nerve had been injured and there was a neuroma developed or some dysfunction, would that also have been a compromise of the standard of care?

DR. BRANDNER: No, no. This -- what I'm testifying to is that 3 to 13 percent far exceeds the background complications we see in general -- in general operative procedures. You don't have a 3 to 13 percent incidence of those conditions in the surgery, that just happens.

DR. BROWN: So if we're fixing a radius —

Page 31

distal radius fracture and it's an ulnar-sided distal radius fracture and the median nerve is protected and it's stated in the surgical consent that the median nerve may be at risk, but it's not stated that the ulnar nerve is at risk and the ulnar nerve ultimate gets injured, so then you would say if you were in court, well, Dr. Brown, said that nerve injuries may be an issue, and he said the median nerve might be an issue, but they didn't mention the ulnar nerve, but it's still okay, because the ulnar nerve is less likely to be injured, is that okay?

DR. BRANDNER: Dr. Brown, I'm not picking out — I'm not stating that you have to go over every nerve, what I'm stating is in this particular surgery, the peroneal nerve is at risk and this is what I felt needed to be stated. I strictly state -- focus in my testimony based on this and I felt like this nerve needed to be discussed and I've given you affidavits by qualified people who agree with me and the literature shows a 3 to 13 percent incidence, I think that's significant.

DR. BROWN: Okay.

DR. STRAIN: Other Panel members, questions?

Page 32

Pages 29 to 32

LAKE SHORE REPORTING 312-782-9833

448

Brandner001035

Multi-Page™

Yes, Dr. Hopkinson?

DR. HOPKINSON: So if, in fact, as the depositions of the injured client and his mother say, it was discussed, then you have no problems with this?

DR. BRANDNER: All I said was I didn't see it in the medical records. My -- my mandate are the medical records, that's what the court describes. I saw those transcripts, but I saw all the transcripts, I just didn't see the transcripts Dr. Sharpe sent you, I saw transcripts of depositions where they were asked specifically were you told about this before the surgery and they said no, there was confusion on their part, and this was clarified in the court and in other depositions. They're discussing their knowledge after the condition happened and they were confused about it.

DR. STRAIN: Other questions? I have a question. When the mother stated in her deposition of January 29th of 2004, page 51, line ten, "And Dr. Sharpe said that when he moves it back into alignment and corrects all that, that those particular nerves might be stretched and might be

Page 33

damaged because of that and that's what happened." You're saying that she was confused? Because I think it's pretty clear from the English that that's something that when he was going to move it, so --

DR. BRANDNER: Dr. Strain, if you take it out of context and you don't look at all of the evidence in the trial and you just read those depositions, yes. He's done this -- if that had been the case, the court would have not -- would have -- and his accusation against the plaintiff's attorney would have stood, the court looked at all of the depositions and transcripts and they found that he -- that was baseless, that these people did not understand it and that was my point in my presentation. You don't have all of the evidence, you have selected evidence.

DR. BROWN: Can I follow-up? You stated clearly that Dr. Sharpe had performed an elegant surgery, that it was well carefully planned out and you stated that these people are easily confused and there's some evidence at least to suggest that they were pretty plain questions presented to them and then they responded.

Page 34

Do you not think it's possible that perhaps they were not confused in the office and that despite a very clear presentation of what the risks were, that they didn't understand, but that -- the information was presented to them.

DR. BRANDNER: Dr. Brown, anything is possible, of course I would think that's possible. But the problem is that this is a he-said-she-said issue and that's all I testified to. They said that they didn't understand it nor did the medical records that I am mandated to look at state anything about peroneal nerve or drop foot. All I stated to the jury and the court was I didn't see it in the medical records, it was up to the jury to decide if Dr. Sharpe's testimony was accurate or if their testimony was accurate.

I thought that there was no malpractice as far as the application of the surgery, the operative procedure, and I thought that this kid would have ended up with peroneal nerve palsy no matter how you fixed this. All I stated was that the literature states that this needs -- they need to know going in that this is a great risk and it's going to probably happen with

Page 35

this amount of deformity.

DR. STRAIN: Dr. Goodman.

DR. GOODMAN: Dr. Brandner, we have a lot of testimony in front of us and perhaps you could point out to us where the testimony indicates that the mother and the patient were confused and testimony that supports that allegation or that statement.

DR. BRANDNER: Dr. Goodman, I was shut down on this, I got blindsided by this. Years after I did it, I went after the records to get them all, and the plaintiff's attorney -- I don't know what you've been shown, but I sent all this --

DR. GOODMAN: Well, you do know what we've been shown because you've gotten a copy of it, is that correct?

DR. BRANDNER: Right. And I asked for all of the records and I was told that HIPAA -- they sent a letter to Dr. Sharpe to cease and desist and the attorney would not release the records based on his concern about HIPAA.

DR. GOODMAN: Are you talking about medical records or depositions?

DR. BRANDNER: I'm talking about depositions

Page 36

Brandner001036

Multi-Page™

because that's what's needed to be cleared up here.

DR. GOODMAN: Okay.

DR. SHARPE: I believe I provided all the depositions to this Committee.

DR. GOODMAN: Can you tell us which deposition records are missing?

DR. BRANDNER: No, I could not. I sent back everything to the attorney and I could not get anything.

DR. GOODMAN: Do you have a list of the records that you reviewed in preparation for this case for your testimony?

DR. BRANDNER: I don't have a specific list. I've got — I think that the records that were provided, I don't have the hospital records —

DR. GOODMAN: We're talking about depositions. You are telling us, I believe, if I'm correct, that there are depositions that are missing from our packet.

DR. BRANDNER: I believe there are, I believe they —

DR. GOODMAN: Can you tell us which depositions are missing?

DR. BRANDNER: Not specifically. I think that

Page 37

it's in trial testimony, I think this was cleared up in trial testimony when they were examined and the attorney brought up the fact that they did not hear about the peroneal nerve.

DR. STRAIN: I just want to clarify one thing just so I'm sure I have it right. You tried to get the records from the plaintiff's attorney, is that correct?

DR. BRANDNER: Correct.

DR. STRAIN: And the plaintiff's attorney told you, as you said, you were blindsided, he shut you down, he told you that HIPAA would not allow him to send you the depositions, is that your testimony here?

DR. BRANDNER: Correct. I asked him for the entire packet that I reviewed and he said he had HIPAA concerns.

DR. STRAIN: Do you have a copy of that letter that if we asked for it, you could supply us?

DR. BRANDNER: I could look, I can look, I can — in fact, Mr. Wade Causey may have the letter and I can ask him to send it.

DR. GOODMAN: Is trial testimony protected by HIPAA or is that a public record?

Page 38

DR. SHARPE: It's a public record.

DR. GOODMAN: And I believe you told me that this information came out in the trial testimony?

DR. BRANDNER: I believe that's correct.

DR. GOODMAN: Do you have a copy of the trial testimony to support your claims?

DR. BRANDNER: No, I don't.

DR. GOODMAN: Did you try to get a copy for this hearing?

DR. BRANDNER: I asked — well, I asked the attorney to give me everything, all testimony, and he said he wouldn't.

DR. GOODMAN: Okay. Thank you.

DR. STRAIN: But you didn't ask the court, correct?

DR. BRANDNER: No, I didn't ask the court.

DR. STRAIN: Okay. Yes, Dr. Brown?

DR. BROWN: Dr. Brandner, what do you think the likelihood is that this young man would have remodeled his tibia to a point where it would have been acceptable clinically had he not undergone any type of operative management?

DR. BRANDNER: It's hard to say, there was — I stated it was only possible that he would remodel,

Page 39

but I didn't think the remodeling would be significant to the court. I said that his main complaint was that he was having pain with dancing and repetitive heavy activity, otherwise, he seemed to not have too much of a problem. So my testimony was if we can wait and see what happens and you can alter your activity, you may find it — that it's acceptable. However, it was — it appeared to be a significant deformity and if it didn't remodel substantially, which I didn't think it would, you would probably have problems, that was my feeling.

DR. BROWN: Thank you.

DR. STRAIN: Any other questions? There being none, I would like to thank you both — all three of you for your presentations and the — yes, Russ?

MR. PELTON: Dr. Greenwald, if I might ask you, you say you brought your documents you intend to leave with the Committee?

DR. GREENWALD: I did, sir.

MR. PELTON: Okay, were those distributed to the Committee and the Office of General Counsel in advance of this hearing? Had they been distributed prior to today?

DR. STRAIN: Were they submitted to you?

Page 40

Page 37 - Page 40

Brandner001037

DR. GREENWALD: No.

MR. FELTON: They were not. Then under our rules, the Committee cannot receive them today, they have to be exchanged in advance of the hearing.

DR. BRANDNER: I was trying to make it easy for you to get this Swiss book.

MR. FELTON: We appreciate that, but our rules are very clear documents have to be exchanged prior to the hearing so both sides of the Committee can review them prior to the hearing.

DR. STRAIN: Right, okay. Thank you.

* * * * *

Page 41

STATE OF ILLINOIS )
) SS.
COUNTY OF COOK )

I, PATRICIA S. MANN, CSR, RPR, a certified shorthand reporter in the State of Illinois, do hereby certify that the above matter was recorded stenographically by me and reduced to writing by me.

I FURTHER CERTIFY that the foregoing transcript of the said matter is a true, correct and complete transcript of the proceedings at the time and place specified hereinbefore.

I FURTHER CERTIFY that I am not a relative or employee of any of the parties, nor a relative or employee of the attorneys of record or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Chicago, Illinois, this 9th day of October, 2009.

Patricia S. Mann, CSR, RPR
License No. 084-001853

Page 42

Pages 41 to 42

**A**

AAOS (8) 1:1
2:6,19 3:10,18
3:20 29:23
30:5
absurd (2)
12:23 23:22
abuse (1) 24:10
Academy (11)
3:3,17 4:19
9:24 10:11,17
11:24 13:4,9
19:17 29:3
Academy's (2)
24:10 25:16
acceptable (3)
12:22 39:21
40:8
accepted (2)
15:1,5
accommodate...
25:10
accurate (2)
35:15,16
accurately (1)
20:7
accusation (1)
34:11
accusations (1)
8:21
action (3) 10:20
19:18 42:16
activity (2) 40:4
40:7
address (3) 12:8
12:10 16:5
adequately (1)
17:7
Administrato...
2:10
admission (2)
8:6 21:8
admissions (1)
17:10
admitted (1)
22:7
adult (1) 13:14
advance (2)

40:22 41:4
advanced (2)
18:4,6
affidavit (2)
16:7,9
affidavits (1)
32:20
affixed (1) 42:18
age (1) 20:18
ago (1) 8:15
agree (3) 9:2
25:9 32:20
agreed (3) 4:17
6:2,8
agreeing (1)
4:21
al (2) 10:20,21
alignment (1)
33:23
allegation (2)
12:23 36:7
allegations (10)
10:13 12:9,13
15:14 16:11
19:23 22:24
23:23 25:7,14
alleged (2) 19:6
20:1
allegedly (1)
19:19
alleges (8) 12:14
12:18 14:22
15:8 17:1,6
20:10 22:16
allow (1) 38:12
alter (1) 40:7
Althausen (2)
16:8 25:12
Althausen's (1)
29:9
American (5)
3:3 10:11,17
25:20,22
amount (1) 36:1
amounts (1)
29:20
ample (1) 18:14
and/or (1) 12:16

Angeles (1)
25:24
angle (1) 27:24
anserine (3)
27:8,10 28:13
answer (2) 7:10
23:11
answering (1)
30:23
anterior (2)
28:23 29:7
anticipate (1)
29:5
Anybody (1)
27:23
AO (2) 25:20,23
AO's (1) 26:7
AP (2) 28:10,14
appeared (1)
40:8
application (2)
14:13 35:18
appreciate (4)
27:1,18 28:23
41:8
appropriate (2)
9:3 14:8
approximatel...
6:2 7:7
April (3) 5:16
6:17 10:22
area (1) 22:8
areas (3) 22:15
23:7,20
argue (1) 23:21
argument (3)
18:4,6,9
Arizona (7) 18:8
20:20,23 21:7
21:16,18 26:11
Army (1) 23:13
asked (11) 7:8
8:5 25:20,23
29:22 33:12
36:17 38:15,19
39:10,10
assist (3) 10:14
21:1,14

Assistant (2) 2:8
3:18
associated (1)
6:15
association (1)
26:6
attached (1)
3:24
attesting (1)
19:4
attorney (13)
6:5 7:8 13:3
18:7 21:23
34:11 36:12,20
37:8 38:3,7,10
39:11
attorneys (1)
42:15
August (2) 6:4
29:16
authoritativel...
24:12
available (3)
5:12 20:4,8
aware (1) 26:7
axillary (1) 9:12
a.m (1) 1:16

**B**

B (2) 1:14 28:14
back (4) 7:13
26:4 33:22
37:7
background (1)
31:20
bar (2) 18:8,10
based (5) 5:11
13:1 16:19
32:18 36:20
baseless (6)
10:13 19:22
22:24 25:6,14
34:14
baseline (1)
26:22
basic (1) 24:17
basis (2) 23:6,19
believe (17) 5:5

5:6 6:6 7:1
14:4 15:19
17:20 20:13
23:6 26:1
28:12 37:3,17
37:20,20 39:2
39:4
believed (1)
12:2
belong (1) 4:22
beyond (1)
21:13
bigger (1) 25:22
blindsided (2)
36:10 38:11
Board (1) 25:16
bone (2) 7:13,24
book (2) 26:9
41:7
Brandner (44)
1:7 2:14 3:6,7
3:9 4:17 5:4
6:2,5,6 7:22
9:23 10:8,9
26:16 29:12,14
30:2,12,15
31:6,18 32:13
33:6 34:6 35:6
36:3,9,17,24
37:7,13,20,24
38:9,15,20
39:4,7,10,16
39:18,23 41:6
Brandner's (1)
9:10
brief (1) 5:15
brought (3) 3:5
38:3 40:17
Brown (15) 2:3
3:13 30:10,11
31:1,12,24
32:7,13,23
34:18 35:6
39:17,18 40:12
busy (2) 5:2
25:13
Butler (2) 2:18
3:14

Brandner001039

| C | | | | |
|---|---|---|---|---|
| CAE (1) 2:7 | Chair (2) 2:2 | 34:19 | 26:20 | 23:10 30:22 |
| call (1) 30:3 | 3:12 | client (1) 33:3 | complications... | 34:7 |
| called (4) 11:3 | chance (2) 7:24 | clinical (1) | 31:20 | continue (1) |
| 15:21 21:24 | 22:19 | 22:14 | complimentar... | 15:18 |
| 26:16 | chapter (2) 26:9 | clinically (1) | 13:19 | continued (1) |
| calling (1) 25:1 | 26:11 | 39:21 | compromise (1) | 27:13 |
| callus (1) 13:12 | character (2) | closed (3) 7:5 | 31:17 | continues (1) |
| care (29) 5:14 | 25:2 29:13 | 8:19 13:6 | concern (2) 21:8 | 30:2 |
| 7:24 8:2,12,24 | characterizati... | closing (2) 13:11 | 36:21 | contrary (2) 5:9 |
| 9:2,2,7,9,21 | 18:11,21 | 29:11 | concerning (1) | 22:9 |
| 10:24 12:6 | charges (1) 3:5 | CNN (2) 29:15 | 15:17 | convince (1) |
| 13:21 14:24 | Chicago (2) | 29:15 | concerns (1) | 17:23 |
| 15:2,10,17,23 | 25:6 42:18 | colleague (1) | 38:17 | Cook (2) 1:12 |
| 16:14 20:3,6,8 | child (2) 27:10 | 30:4 | conclude (1) | 42:2 |
| 20:15 22:4,20 | 27:13 | comes (1) 23:1 | 14:18 | Coordinator (1) |
| 23:9 24:4 | circle (1) 28:11 | coming (2) 26:4 | concluded (1) | 3:20 |
| 26:12 31:17 | cite (1) 24:22 | 27:8 | 7:22 | copies (1) 26:8 |
| careful (1) | civil (1) 10:20 | comments (1) | conclusion (1) | copy (7) 3:23 |
| 16:21 | claim (4) 11:19 | 29:11 | 21:11 | 6:24 29:15 |
| carefully (1) | 18:15 20:12 | committee (14) | condemn (1) | 36:15 38:18 |
| 34:20 | 22:8 | 3:2,4,10,21 | 15:4 | 39:5,8 |
| case (26) 4:18 | claimed (1) | 4:10 5:1 7:1 | condition (3) | correct (10) |
| 5:8 9:24 10:22 | 11:18 | 8:10 25:23 | 14:24 20:5 | 27:2,23 36:16 |
| 12:1,5,24 | claiming (1) | 37:4 40:18,21 | 33:17 | 37:17 38:8,9 |
| 13:10,18 14:12 | 25:2 | 41:3,10 | conditions (1) | 38:15 39:4,15 |
| 14:20 15:24 | claims (1) 39:6 | Committee's (1) | 31:22 | 42:10 |
| 17:19 18:5,22 | clarified (1) | 3:24 | condone (1) | correction (3) |
| 19:7 20:17 | 33:15 | common (4) | 15:6 | 14:13 28:2,5 |
| 21:23 23:11,19 | clarify (1) 38:5 | 21:10,13 22:5 | conduct (1) 3:5 | corrective (1) |
| 26:12,16 27:13 | (13) 4:15 | 27:20 | confused (7) | 5:20 |
| 29:7 34:9 | 6:10,11 7:10 | community (2) | 30:18 31:10 | correctly (1) |
| 37:11 | 7:15 10:20 | 5:14 9:15 | 33:17 34:2,21 | 14:10 |
| cause (1) 7:13 | 11:16 13:4 | compared (1) | 35:2 36:6 | corrects (1) |
| cease (1) 36:19 | 17:8,16,24 | 28:24 | confusion (1) | 33:23 |
| Center (1) 26:1 | 18:13 30:15 | compartment... | 33:14 | Cosey (1) 38:21 |
| centimeter (1) | (4) 12:1 | 29:8 | consent (14) | Counsel (7) 2:8 |
| 28:16 | 18:2,17 30:13 | complaint (1) | 8:23 10:24 | 2:9,19 3:17,19 |
| centimeters (1) | (3) | 40:3 | 11:3,9,17 12:7 | 3:21 40:21 |
| 28:1 | 11:19 13:2 | complete (1) | 15:22,23 18:18 | County (3) 1:12 |
| CEO (2) 2:7 | 18:7 | 42:10 | 20:15 23:9 | 25:24 42:2 |
| 3:16 | class (1) 26:2 | completely (2) | 24:2 31:11 | course (1) 35:7 |
| certain (2) | clear (6) 11:12 | 13:4 16:22 | 32:3 | court (15) 3:22 |
| 10:23 17:10 | 19:7 20:20 | complex (1) 7:6 | consider (1) | 8:16 18:6,10 |
| certified (1) | 34:3 35:3 41:9 | Compliance (3) | 8:15 | 21:7,18 32:7 |
| 42:4 | cleared (2) 37:1 | 1:1 2:10 3:20 | consulted (1) | 33:8,15 34:10 |
| certify (3) 42:6 | 38:1 | complicated (1) | 23:17 | 34:12 35:13 |
| 42:9,13 | clearly (4) 6:14 | 5:20 | context (6) 11:4 | 39:14,16 40:2 |
| | 8:12 24:18 | complication (... | 15:2 20:6 | credit (1) 30:4 |

cross (1) 31:8
CSR (4) 1:11,22
  42:4,23
current (1)
  20:11

**D**

Dale (2) 2:18
  3:14
damage (4) 7:20
  11:2 13:23
  15:21
damaged (1)
  34:1
damaging (1)
  17:18
dancing (1) 40:3
danger (1)
  23:15
day (1) 42:19
death (1) 7:21
decide (2) 14:4
  35:14
decided (1) 18:5
deep (1) 27:21
defend (2) 10:12
  25:6
defendant (3)
  6:1,4,12
defining (1)
  13:11
definition (1)
  14:12
deformity (13)
  7:6,6 8:1,20
  12:22 13:12
  14:12 27:3,18
  27:19 28:3
  36:1 40:9
degrees (1) 7:7
delivered (1)
  15:2
Department (1)
  24:20
deposed (3) 5:24
  5:24 6:5
deposition (20)
  6:12 7:8 8:9,17

15:11,13 16:11
16:17,20,23
17:9,16,17
18:12 19:1,15
19:20 30:14
33:20 37:5
depositions (18)
  6:10 17:8 18:1
  18:14 19:3
  30:16 33:3,11
  33:15 34:8,13
  36:23,24 37:4
  37:16,18,22
  38:13
described (1)
  14:6
describes (2)
  29:18 33:8
description (1)
  13:10
desist (1) 36:19
despite (1) 35:3
determine (2)
  5:3 21:2
developed (1)
  31:15
dictated (1) 6:16
died (1) 13:16
difference (2)
  9:1 26:13
difficult (1) 30:2
dire (1) 22:3
directly (1)
  42:16
director (1)
  10:16
Directors (1)
  25:16
disbelieve (1)
  31:4
disciplinary (1)
  19:18
discuss (10) 7:9
  7:16,17 9:3
  18:16 22:20
  24:3 26:15
  31:2,3
discussed (5)

7:3 11:15 18:1
32:19 33:4
discussing (5)
  26:10 29:16
  30:17,19 33:16
discussion (13)
  9:8,16 11:2,10
  11:21 12:7
  13:22 14:1
  15:10,20 16:15
  16:15 30:21
displacement ...
  28:23
distal (4) 13:5
  27:23 32:1,2
distally (1)
  28:24
distinguished ...
  26:4
distributed (2)
  40:20,22
doctors (1) 29:6
document (2)
  14:1 19:17
documented (2)
  6:14 11:21
documents (2)
  40:17 41:9
doing (2) 27:4
  29:19
Donald (1) 2:22
double (1) 14:17
doubt (1) 14:15
Dr (173) 3:6,6,8
  3:8,11,14 4:4,5
  4:12,13,17 5:4
  6:2,4,6 7:11,16
  7:22 9:4,7,9,23
  10:6,7,9,14,15
  10:22 11:14,17
  11:18,24 12:1
  12:2,9,11,14
  12:17 13:3,8
  13:13,15,15
  14:6 15:14
  16:4,6,8,10,24
  17:6,8,19,22
  18:9,15,20

19:5,17,24
20:10,13 22:11
22:16 23:5
24:2,8,24 25:8
25:11,12,12,14
25:17,18,19
26:16 27:3,9
28:9,15,20
29:2,9,9,11,12
29:13,14,20
30:1,6,8,9,10
30:11,11,15
31:1,2,6,12,18
31:24 32:7,13
32:13,23,24
33:1,2,6,10,19
33:21 34:6,6
34:18,19 35:6
35:6,15 36:2,2
36:3,3,9,9,14
36:17,19,22,24
37:2,3,5,7,10
37:13,16,20,22
37:24 38:5,9
38:10,15,18,20
38:23 39:1,2,4
39:5,7,8,10,13
39:14,16,17,17
39:18,18,23
40:12,13,16,19
40:24 41:1,6
41:12
drop (8) 6:20
  7:18 11:11
  13:23 30:13,20
  31:4 35:12
dropped (1)
  26:19
Drs (2) 3:7,12
duly (1) 4:3
dysfunction (1)
  31:16

**E**

E (1) 2:2
early (2) 26:11
  26:17
easily (1) 34:21

easy (1) 41:6
education (3)
  21:5,11 22:6
Eight (1) 28:1
either (1) 10:2
elbow (1) 9:12
elected (4) 12:11
  13:3 18:24
  25:1
elegant (2)
  14:11 34:19
element (2) 28:2
  28:4
eleven (1) 17:18
employee (2)
  42:14,15
encompasses (1)
  19:8
ended (1) 35:20
endorse (1) 15:5
English (1) 34:3
entire (1) 38:16
entirety (1)
  18:13
especially (1)
  18:22
establish (2)
  4:23 5:13
established (1)
  5:10
et (2) 10:20,21
evaluate (1)
  14:24
everybody (1)
  27:19
evidence (13)
  18:14,22,23
  20:4,9,23 21:2
  22:13 24:10
  34:7,16,17,22
exact (3) 18:4,6
  20:18
examination (1)
  31:8
examined (1)
  38:2
exceeding (1)
  9:1

Brandner001041

exceeds (1) 31:19
excellent (2) 14:7,13
exchanged (2) 41:4,9
experience (6) 8:7 20:3,12 21:4,13 22:14
experienced (1) 23:17
expert (27) 4:18 5:8 6:3 8:12,16 12:16 14:23 15:3,3 17:2 19:11 20:2,14 20:20,22,22 21:3,8,12,14 21:18,19,24 22:7,12 24:14 25:3
expertise (1) 22:8
extremely (2) 29:1 30:3

__F__

face (1) 12:23
FACHE (1) 2:7
fact (15) 11:13 11:15,20 16:16 19:4,5 21:1,2,3 21:15 25:11 30:19 33:2 38:3,21
facts (3) 4:20 8:4 13:15
factual (1) 12:16
failed (6) 4:20 5:7 11:18 18:15,22 24:3
failing (3) 17:6 19:19 22:20
fair (3) 5:11 8:3 12:17
fairly (1) 4:20
falls (2) 15:4,6
family (2) 14:2

25:8
far (5) 19:21 24:9 27:24 31:19 35:18
favor (1) 10:21
February (1) 6:3
feel (1) 9:8
feeling (1) 40:11
fell (2) 22:19 24:4
felt (2) 32:17,18
femoral (1) 13:11
femur (1) 13:6
fibula (5) 23:4 28:17,22,24,24
fibular (1) 28:15
fifteen-year-ol... 23:3
file (1) 25:1
filed (1) 5:22
Finally (1) 18:24
financially (1) 42:15
find (4) 24:14 24:15 25:3 40:7
finish (1) 4:9
first (9) 5:15 12:24 16:12 17:7,15,15,24 19:3 25:22
five (3) 8:8,13 8:14
fixation (1) 14:14
fixed (1) 35:21
fixing (1) 31:24
flawed (1) 15:15
flexion (1) 27:18
focus (1) 32:18
focuses (1) 17:9
followed (1) 9:9
follows (1) 4:6
follow-up (1) 34:18

foot (9) 6:20 7:18 11:11 13:23 26:19 30:13,19 31:3 35:12
foregoing (1) 42:9
form (4) 9:12 11:4 15:22 21:5
forth (3) 11:23 15:17 26:23
found (1) 34:13
Four (1) 15:2
fracture (9) 15:13 16:19,21 26:8,10 27:9 27:11 32:1,2
fractures (1) 23:4
Fred (1) 29:20
Friday (1) 1:15
friend (1) 30:4
front (4) 4:8 6:16 27:16 36:4
further (3) 25:10 42:9,13

__G__

gap (3) 28:15,18 28:21
general (10) 2:7 2:8 3:17,18 11:2 13:24 15:20 31:20,21 40:21
generally (2) 15:1,5
gentlemen (2) 10:9,10
Giulietti (3) 2:9 3:19 4:8
give (1) 39:11
given (8) 7:23 10:3 15:12 16:9,13 17:24 31:7 32:20

gives (1) 23:19
go (3) 14:4 19:22 32:14
going (5) 4:9 27:24 34:4 35:23,24
good (3) 10:9 22:19 25:19
Goodman (17) 2:3 3:13 36:2,3 36:9,14,22 37:2,5,10,16 37:22 38:23 39:2,5,8,13
gotten (1) 36:15
grateful (1) 4:24
great (1) 35:24
greatest (1) 24:9
Greenwald (13) 2:16 3:8 10:15 13:13,15 16:4 25:12,18,19 30:8 40:16,19 41:1
grievance (8) 1:1 11:24 12:11 24:9,10 24:11 25:1,17
Grievant (2) 1:5 2:11
group (2) 25:21 29:18
growing (1) 27:10
growth (4) 8:20 13:5,11 27:13
guess (1) 27:24
guys (1) 26:10

__H__

Hackett (2) 2:7 3:16
half (1) 28:1
hand (2) 21:12 42:17
hands (1) 4:1
happen (2) 7:19 35:24

happened (4) 28:1 30:22 33:17 34:1
happening (1) 29:8
happens (2) 31:23 40:6
hard (2) 14:12 39:23
hear (2) 3:5 38:3
hearing (11) 1:1 2:1,2 3:2,12 25:9 39:9 40:22 41:5,10 41:11
heavy (1) 40:4
help (3) 21:20 25:13 29:23
hereinbefore (... 42:12
hereunto (1) 42:17
he'll (1) 16:6
he-said-she-sa... 12:2 35:8
high (1) 29:7
higher (2) 5:13 5:14
highly (1) 13:8
HIPAA (5) 36:18,21 38:12 38:17,24
hold (1) 9:18
honor (1) 25:22
hope (1) 27:17
hopefully (1) 16:6
Hopkins (1) 24:21
Hopkinson (4) 2:4 3:13 33:1,2
hospital (1) 37:15
Hotel (1) 1:13
hour (1) 1:15
hubris (1) 4:17
huge (2) 26:13 29:20

Hyatt (1) 1:13

**I**

ignore (1) 19:1
Illinois (6) 1:13
 1:15 3:4 42:1,5
 42:18
imagination (1)
 27:1
immature (1)
 13:12
impartial (4)
 5:11 8:3 10:4
 12:17
important (1)
 29:1
impose (1)
 25:11
inaccurate (1)
 18:12
inadequately (...
 6:6
incidence (2)
 31:22 32:22
incident (3) 11:8
 12:5 24:23
included (1)
 16:7
includes (1)
 18:13
incomplete (1)
 10:2
incorrect (1)
 10:2
increased (4)
 11:6 16:1 27:2
 28:3
incredibly (1)
 27:12
indicates (1)
 36:5
indirectly (1)
 42:16
individual (1)
 13:14
information (5)
 5:12 16:8 31:8
 35:5 39:3

informed (9)
 8:22 10:24
 11:9 12:6
 15:23 20:15
 23:9 24:2
 31:10
injured (6)
 31:13,14,15
 32:6,12 33:3
injuries (2) 9:4
 32:8
injury (14) 6:19
 8:2 9:7,8 22:21
 22:22 23:13,14
 23:16 24:4,7
 24:13 26:18,20
inquiry (1) 21:9
insufficient (1)
 11:4
intelligently (1)
 21:11
intend (1) 40:17
interested (1)
 42:16
interesting (1)
 27:4
internal (1)
 14:13
internet (1)
 24:17
invaginated (2)
 27:11 28:13
investigation (...
 24:19
involved (1)
 20:17
irrelevant (1)
 18:20
issue (8) 16:5
 21:3 23:1,6
 24:18 32:8,9
 35:8
i.e (1) 23:8

**J**

J (5) 1:7 2:3,4,5
 2:14
James (4) 2:16

3:8 10:15 16:4
January (2)
 5:24 33:21
JD (1) 2:7
Jeff (4) 25:19,23
 26:3,7
Jeffrey (2) 16:7
 25:12
John (1) 13:8
Johns (1) 24:20
join (1) 25:20
Jr (1) 2:2
June (3) 5:19,21
 6:17
jury (8) 10:21
 11:12 12:2
 14:3 16:16
 21:20 35:13,14
J.D (1) 2:20

**K**

Karen (2) 2:7
 3:16
kid (1) 35:20
 (6) 6:11
 7:10 17:8,16
 17:24 30:15
kind (1) 29:12
Kipling (3) 1:4
 2:12 3:6
knew (1) 30:17
know (10) 7:12
 10:19 24:15
 25:21 26:4
 29:3,14 35:23
 36:12,14
knowledge (8)
 5:10 20:3 21:1
 21:4,10 22:5
 22:14 33:16

**L**

L (2) 2:4,7
labeled (2)
 28:12,14
lack (1) 8:22
ladies (1) 10:10
Lake (2) 1:22

3:22
Las (2) 29:17,19
late (1) 10:22
lateral (2) 28:19
 28:21
laterally (1)
 27:2
law (2) 8:16
 20:20
lawsuit (1) 5:22
leads (1) 27:11
leave (2) 29:15
 40:18
led (1) 29:3
leg (1) 28:19
letter (10) 8:10
 11:23 26:24
 29:9,10,10,11
 36:19 38:18,21
let's (2) 27:21,22
License (3) 1:11
 1:23 42:23
light (1) 15:1
lightly (1) 4:14
likelihood (3)
 11:6 16:1
 39:19
likewise (1)
 18:20
Lindburgh (1)
 1:14
line (2) 5:15
 33:21
Liss (1) 21:21
list (5) 7:14 8:2
 9:10 37:10,13
listed (1) 9:17
Listing (1) 9:6
literature (4)
 23:15 26:22
 32:21 35:22
litigation (1)
 19:16
lives (1) 5:2
logic (1) 9:10
look (10) 24:16
 28:1 30:16
 31:6,8,9 34:7

35:11 38:20,20
looked (1) 34:12
looking (1)
 29:13
Los (1) 25:24
lot (2) 27:6 36:3
lumber (1) 27:6

**M**

M (1) 2:20
Mafia (2) 29:17
 30:1
main (2) 9:23
 40:2
malignant (1)
 27:12
malpractice (1)
 35:18
malunion (1)
 12:19
man (2) 8:18
 39:19
management (...
 17:5 19:15
 22:18 24:1
 39:22
mandate (1)
 33:7
mandated (1)
 35:11
Mandatory (12)
 12:13,14 14:21
 14:22 15:9
 16:24 19:6,7
 19:10,18,24
 22:10
Mann (5) 1:11
 1:22 3:22 42:4
 42:23
manner (1)
 12:17
Martin (2) 2:4
 3:14
Mass (6) 16:7
 25:12,19 28:20
 29:2,9
material (3) 6:7
 10:3,4

matter (10) 1:3
3:15 4:15
10:15,19 21:13
25:10 35:21
42:6,10
matters (1)
22:13
Matthews (1)
10:20
mature (3)
12:20 13:5,12
meaning (1)
24:12
medial (1) 28:11
median (4) 9:11
32:2,4,9
medical (20)
10:16 11:20
14:24 17:3,5
19:8,12,14,16
19:20 20:6
26:1 29:17
30:1,24 33:7,8
35:10,14 36:22
medically (1)
10:1
medicine (3)
22:15 23:7,20
meet (2) 5:7
9:20
meeting (2) 3:4
9:2
meets (1) 9:9
Melissa (2) 2:8
3:18
member (4)
10:10,15,17
13:9
members (5)
3:10 4:10 5:1
10:7 32:24
mention (2)
6:18 32:10
mentioned (1)
7:21
met (2) 5:4,15
metaphysis (1)
28:12

minimal (1) 8:6
minutes (1) 4:7
missing (3) 37:6
37:18,23
model (1) 27:5
money (1) 29:20
morning (2)
10:10 25:19
mother (6) 6:11
7:11 17:12
33:3,20 36:6
motive (1) 19:21
move (3) 25:9
27:24 34:4
movement (1)
7:12
moves (1) 33:22
multiple (1)
24:21
Murray (2) 2:3
3:13
musculoskelet...
29:18
M.D (12) 1:4,7
2:2,3,3,4,4,5
2:12,14,16,18

_____N_____

N (1) 2:7
named (1) 6:1
near (2) 13:14
17:18
necessary (1)
27:14
need (2) 31:6
35:23
needed (3)
32:17,19 37:1
needs (2) 17:21
35:23
neither (3) 15:4
24:14 25:2
nerve (53) 5:21
6:19 7:9,20 8:2
9:3,6,6,8,12,17
11:2,6,11,15
11:22 12:8
13:22,23 15:10

15:21 16:2
17:13 18:2,16
22:21 23:16
24:4,24 26:18
26:20 27:20,21
28:2,4 29:2
31:13,14,14
32:2,4,5,6,8,9
32:10,11,15,16
32:19 35:12,21
38:4
nerves (4) 9:11
9:13 27:20
33:24
neuroma (1)
31:15
Nevada (2)
10:17 29:21
never (2) 12:24
16:12
nine (1) 17:17
nonoperative ...
7:24 15:12
16:13 22:18
24:1
nonsense (1)
20:13
North (1) 1:14
notary (1) 1:12
note (2) 6:18
22:2
noted (2) 21:7
21:19
notes (9) 6:9,17
6:18,21 7:1 8:3
9:11,17,20
November (1)
6:2
number (13) 5:7
12:14,15 14:23
19:6,7,11,19
19:24 20:16
23:2,3 28:20
numbers (2)
24:14,16

_____O_____

object (1) 21:24

obligation (1)
4:20
obtained (1)
18:17
obtaining (1)
11:16
occasions (1)
18:10
occurred (2)
14:1 16:15
occurring (3)
22:22 24:8,13
October (2)
1:15 42:19
offer (1) 20:14
offered (6)
10:23 12:5
13:1 22:7,18
24:1
office (6) 6:9,13
7:1 35:2 40:21
42:18
OGC (1) 2:10
okay (12) 10:7
27:15,19 31:12
32:10,12,23
37:2 39:13,17
40:20 41:12
ones (1) 7:4
one-and-a-hal...
28:16
one-third (1)
23:5
open (2) 8:21
13:6
operated (1)
8:11
operation (1)
14:2
operations (2)
20:17 23:2
operative (3)
31:21 35:19
39:22
opined (1) 11:1
opining (1)
23:18
opinion (4) 17:4

19:14 21:6,14
opinions (1)
12:16
opportunity (2)
9:19 22:3
opposed (1)
19:20
option (3) 7:23
15:12 16:13
order (2) 12:10
20:14
ordinary (2)
21:10 22:6
organization (1)
4:23
original (1) 5:22
orthopaedic (...
3:3 5:10,17,23
10:11,18 12:15
13:8 14:23
15:3,19 17:2
19:11 20:2
22:4,12 23:12
23:18 24:20
29:21
orthopaedists ...
5:19
osteotomies (5)
8:8,13 23:10
24:24 27:14
osteotomy (10)
5:20 11:1,5
15:24 18:3,17
26:19,21 27:17
28:17
ourself (1) 8:15
outside (2) 2:19
15:6
o'clock (1) 1:16

_____P_____

P (4) 1:4 2:12
21:15,22
packet (2) 37:19
38:16
page (6) 14:5
16:17,20,23
17:17 33:21

Brandner001044

pages (4) 13:20
14:14,16 16:23
pain (1) 40:3
palsy (5) 5:21
11:6 16:2
24:24 35:21
Panel (14) 2:1,2
10:6 17:20,21
18:20,23,24
20:13 23:5
24:22 25:15
29:13 32:24
parents (1)
11:16
part (2) 27:7
33:14
partial (3) 13:19
14:19 31:7
partially (1)
13:6
particular (6)
8:7 17:4 19:13
21:20 32:15
33:24
parties (1) 42:14
partners (1)
26:2
pass (2) 28:8,8
Pat (1) 29:22
patient (19)
5:16,22 6:10
6:16,16 7:15
7:23 14:2,7
15:11 16:13
17:4,5 19:13
19:15 22:17,18
23:24 36:6
patients (2)
20:18 23:3
patient's (1)
7:10
Patricia (5) 1:11
1:22 3:22 42:4
42:23
Patrick (4) 1:7
2:14 3:6 30:2
pattern (1)
27:12

Payne (2) 13:8
13:16
Pelton (8) 2:20
3:1,21 4:4
40:16,20 41:2
41:8
people (6) 21:10
22:5 30:24
32:20 34:14,21
percent (11)
11:7 12:5 16:3
22:22 24:7,13
24:23 26:22
31:19,22 32:21
perform (2)
11:17 18:18
performance (...
15:4,6
performed (7)
5:19 8:8 10:2
14:10 20:16
24:19 34:19
performing (1)
18:3
period (2) 21:15
21:22
peritoneal (1)
17:13
permitted (2)
20:21,23
peroneal (30)
5:21 6:19 7:9
8:2 9:3 11:6,10
11:15,22 12:8
13:22 16:2
18:2,16 22:21
23:16 24:3,23
26:18,19 27:20
27:20,21 28:2
28:4 29:2
32:16 35:12,20
38:4
person (4) 12:20
20:21 21:18,19
pertinent (4)
17:3 19:8,12
26:9
pes (3) 27:8,10

28:13
Peterson (3) 2:7
2:22 3:17
physes (2) 7:5
8:19
physician (1)
20:15
physicians (1)
29:19
picking (1)
32:13
place (4) 7:13
15:2 20:6
42:11
plain (1) 34:23
plaintiff (3) 8:22
17:11 20:18
plaintiffs (3)
5:23 14:19
17:11
plaintiff's (9)
6:10 17:19
18:5,15 19:2
34:11 36:12
38:7,10
planned (1)
34:20
planning (3)
14:9 29:4,4
plans (1) 25:10
plate (1) 13:11
plates (2) 8:20
13:5
point (7) 16:21
28:7,20 29:9
34:15 36:5
39:20
points (4) 9:23
16:12 17:14
27:9
portion (3) 7:2
27:22,23
possibility (2)
8:18 11:11
possible (4) 35:1
35:6,7 39:24
possibly (1) 4:11
posterior (2) 9:6

31:13
post-operativ...
28:14,21
post-operativ...
29:8
potential (3)
13:23 15:14
16:20
practice (2) 15:5
23:14
practices (1) 5:2
practicing (1)
23:12
predictable (1)
26:20
preparation (1)
37:11
prepared (2)
26:8,15
presence (1)
4:14
present (5) 3:8
3:11,16 4:7
10:14
presentation (5)
14:11 28:10
30:7 34:16
35:3
presentations ...
4:6 40:15
presented (5)
8:4 13:7,10
34:23 35:5
president (1)
29:21
pretty (2) 34:3
34:23
prevailed (1)
18:19
prevent (1) 22:1
previously (1)
15:18
pre-op (1) 8:3
pre-operative ...
11:20 12:7
14:7 22:4 29:4
29:4 30:21
primary (1)

21:8
prior (12) 6:1
7:12 8:9,14
11:16 14:1
17:4 18:2
19:13 40:23
41:9,11
private (1)
23:14
probably (2)
35:24 40:11
problem (6)
5:17 8:7 12:3
29:5 35:8 40:5
problems (2)
33:4 40:11
procedure (8)
8:16 11:7,17
16:2 20:12
22:16 23:16
35:19
procedures (2)
8:15 31:21
proceeding (3)
3:24 23:8,21
proceedings (2)
1:10 42:11
process (1)
24:11
Professional (3)
1:1 2:9 3:19
professionalis...
3:2,11 4:24 5:5
5:6
professor (2)
26:4,9
Program (3) 1:1
2:10 3:20
projects (1) 6:24
properly (4) 5:8
7:23 19:5 22:6
protected (2)
32:3 38:23
proud (2) 4:22
30:3
proves (1) 18:1
provide (3)
12:16 18:23

Brandner001045

22:12
provided (11)
6:8,9,11,13 7:2
13:2 14:24
20:6 24:22
37:3,15
provides (4)
12:15 20:2,24
22:11
proximal (10)
11:1,4 13:7
15:24 18:3,16
23:4,10 24:24
27:22
proximally (1)
29:2
public (3) 1:12
38:24 39:1
put (2) 7:13
27:22
puts (2) 26:22
28:3

**Q**

qualifications ...
8:5
qualified (5)
4:18 5:8 9:23
21:3 32:20
qualities (2)
20:21 21:17
question (6)
4:11,12 16:16
20:5 31:12
33:20
questions (10)
10:6,7 20:7
30:9,11,23
32:24 33:19
34:23 40:13
quote (2) 12:19
26:20

**R**

R (1) 2:18
radial (1) 9:10
radius (3) 31:24
32:1,2

raise (2) 4:1
12:11
rate (3) 11:8
12:6 24:23
reach (1) 21:11
read (6) 9:19
14:15,18 19:10
23:14 34:8
reason (1) 24:15
reasons (1)
12:24
receive (2)
21:20 41:3
recognized (1)
18:11
recommend (1)
25:16
reconcile (1)
30:12
record (6) 3:1
19:16,20 38:24
39:1 42:15
recorded (1)
42:6
records (18)
11:21 13:24
17:3 19:9,13
33:7,8 35:10
35:14 36:11,18
36:20,23 37:6
37:10,14,15
38:7
recused (2) 2:17
3:15
red (1) 27:7
Redfern (1)
29:21
reduced (1) 42:7
reflect (1) 3:1
regard (6) 15:16
16:10 20:22
21:17 23:23
24:6
regarding (8)
10:23 11:19,21
16:11 23:15
24:9,18 30:13
reject (1) 18:20

rejected (1) 18:9
related (2) 17:3
19:13
relates (4) 10:24
12:6 15:23
23:9
relative (2)
42:13,14
release (1) 36:20
relevant (3)
20:5,11 22:14
remarkable (1)
8:19
remodel (6) 8:1
8:19 12:21
16:22 39:24
40:9
remodeled (1)
39:20
remodeling (4)
15:13 16:20
22:19 40:1
rendering (2)
17:4 19:14
Reno (2) 13:13
26:3
repeated (1)
27:13
repetitive (1)
40:4
report (6) 1:10
4:1 12:1,12
24:11 29:16
Reported (1)
1:21
reporter (2)
3:22 42:5
Reporting (2)
1:22 3:23
represents (2)
27:8 28:12
reputation (1)
10:12
request (2) 22:2
25:9
require (1) 9:16
required (5) 8:1
11:10 13:22

15:10 16:14
requires (1)
12:7
reschedule (1)
25:7
research (1)
24:17
resent (3) 25:5,7
25:11
respect (1)
17:12
respected (1)
13:8
respond (1) 20:7
responded (1)
34:24
Respondent (2)
1:8 2:13
response (2)
11:24 17:14
result (2) 11:7
16:2
resulted (1)
10:21
retry (1) 4:15
reunion (1) 25:8
reveals (1)
13:18
review (15) 4:20
5:12 8:4 9:22
10:3,4 13:17
17:2,7,15 19:2
19:12,19 29:6
41:11
reviewed (5) 6:7
16:19 19:4
37:11 38:16
Richard (6) 2:2
2:3,7 3:12,13
3:17
ridiculous (2)
20:19 22:9
right (6) 4:4,8
22:3 36:17
38:6 41:12
risk (17) 6:14,14
9:5 11:15
17:13 18:1,16

22:20,22 24:3
24:7,13 26:22
32:4,5,16
35:24
risks (5) 6:18
7:2 11:10
26:18 35:4
River (1) 1:14
Road (1) 1:14
Rosalind (2) 2:9
3:19
Rosemont (3)
1:13,14 3:4
RPR (4) 1:11,22
42:4,23
Rule (1) 20:23
rules (4) 4:5
20:23 41:3,8
Russ (1) 40:15
Russell (2) 2:20
3:21
Russo (2) 9:5,7
Russo's (1) 27:3

**S**

S (4) 1:11,22
42:4,23
sanctioned (1)
18:8
saphenous (1)
31:14
satisfy (1) 15:22
saw (3) 33:9,9
33:11
saying (2) 14:15
34:2
says (4) 17:1
19:21 31:1,4
schedules (1)
25:13
scientific (3)
20:4,8,24
scope (1) 19:8
10) 6:10
7:15 11:16
13:2,4 17:8,16
17:24 18:7
30:15

Brandner001046

| | | | | |
|---|---|---|---|---|
| seal (1) 42:18 | 36:19 37:3 | 13:14 | 10:16 18:8,10 | 5:18 18:13 |
| second (4) 13:17 | 39:1 | skill (1) 21:4 | 21:15 29:24 | substantially (... |
| 16:18 17:21 | Sharpe's (12) | Society (1) | 32:17 35:11 | 12:20 40:10 |
| 31:12 | 11:24 14:6 | 29:22 | 42:1,5 | sufficiently (1) |
| see (12) 4:8 5:17 | 15:14 16:10 | sophisticated ... | stated (11) | 21:13 |
| 13:20 26:19 | 18:9,11,21 | 30:24 | 13:13 24:12 | suggest (1) |
| 28:22 29:1 | 21:23 24:8 | sought (1) 5:18 | 32:3,5,17 | 34:22 |
| 31:9,20 33:6 | 25:14,17 35:15 | sources (1) | 33:20 34:18,21 | Suite (1) 1:14 |
| 33:10 35:13 | Shore (2) 1:22 | 24:21 | 35:12,22 39:24 | summarily (1) |
| 40:6 | 3:22 | spaced (1) 14:17 | statement (1) | 18:5 |
| seeing (1) 5:18 | shorthand (1) | specialized (1) | 36:8 | summary (2) |
| seek (2) 17:2 | 42:5 | 21:1 | statements (1) | 6:15,22 |
| 19:12 | shoulder (1) | specific (8) 9:6 | 30:12 | supply (2) 13:3 |
| seen (2) 23:14 | 9:13 | 15:10 26:8,10 | states (2) 24:11 | 38:19 |
| 29:17 | show (1) 7:2 | 26:16,21 28:3 | 35:22 | support (6) |
| selected (2) 31:7 | showed (1) | 37:13 | stating (3) 15:9 | 13:15 18:14 |
| 34:17 | 28:10 | specifically (7) | 32:14,15 | 19:22 24:23 |
| self-serving (1) | shown (2) 36:13 | 7:9 10:1 11:1 | statistics (1) | 25:3 39:6 |
| 18:21 | 36:15 | 16:5 23:24 | 25:3 | supporting (1) |
| send (2) 38:13 | shows (2) 7:5 | 33:12 37:24 | stems (1) 10:19 | 16:8 |
| 38:22 | 32:21 | specified (1) | stenographica... | supports (1) |
| sense (1) 4:16 | shut (3) 30:1 | 42:12 | 42:7 | 36:7 |
| sent (6) 8:10 | 36:9 38:11 | spine (1) 29:19 | Stickney (1) | Supreme (2) |
| 11:23 33:11 | side (3) 4:6,11 | spoken (1) | 21:15 | 21:7,18 |
| 36:13,18 37:7 | 28:19 | 15:20 | stood (1) 34:12 | sural (1) 31:14 |
| serious (1) 4:14 | sides (1) 41:10 | SS (1) 42:1 | straight (3) 27:7 | sure (1) 38:6 |
| served (1) 6:4 | significant (6) | STAFF (1) 2:6 | 27:15,22 | surely (1) 23:19 |
| SERVICE (1) | 7:6 20:16 | stand (3) 12:4 | Strain (19) 2:2 | surgeon (4) 5:17 |
| 1:22 | 28:15 32:22 | 15:18 22:2 | 3:12 4:4,5 10:6 | 5:23 13:9 22:5 |
| set (3) 11:23 | 40:2,9 | standard (41) | 30:6,9 32:24 | surgeons (6) 3:3 |
| 15:17 42:17 | significantly (2) | 5:13,14 8:2,12 | 33:19 34:6 | 6:21 10:11,18 |
| Sharpe (55) 1:4 | 11:5 16:1 | 8:24 9:1,2,7,9 | 36:2 38:5,10 | 15:19 23:18 |
| 2:12 3:6,7 4:12 | Silvaggio (2) 2:5 | 9:15,18,20 | 38:18 39:14,17 | surgeon's (1) |
| 4:13,16 7:11 | 3:14 | 10:23 11:3 | 40:13,24 41:12 | 9:20 |
| 7:16 10:14,22 | simplicity (1) | 12:6,13,15,18 | stressful (1) | surgery (20) |
| 11:14,17,18 | 12:10 | 13:21 15:9,17 | 30:3 | 6:15 7:5,16 |
| 12:1,3,9,11,14 | simply (3) 13:21 | 15:21,22 16:14 | stretched (1) | 9:12,13 14:9 |
| 12:18 13:3,20 | 16:14 29:20 | 16:24 19:6,10 | 33:24 | 14:10 18:18 |
| 14:3,21 15:8 | single (1) 28:4 | 19:19,24 20:3 | strictly (1) | 22:23 23:12 |
| 16:24 17:6,9 | sir (1) 40:19 | 20:8,11,15 | 32:17 | 24:8,20 29:20 |
| 17:19,22 18:15 | sit (1) 25:23 | 22:4,10,17,20 | studies (1) 14:8 | 30:18 31:2,23 |
| 18:19 19:5,17 | site (2) 27:9,11 | 23:1,9 24:4 | styled (1) 10:20 | 32:16 33:13 |
| 20:1,10,13 | situation (2) | 31:17 | subject (5) 21:9 | 34:20 35:19 |
| 22:8,11,16 | 12:2 29:23 | standards (11) | 21:21 22:15 | surgical (5) 11:3 |
| 23:5 24:3 25:1 | size (1) 28:15 | 4:19,23 5:4,6 | 23:8,21 | 15:22 17:5 |
| 25:8 28:10,16 | skeletally (2) | 9:24 14:21,22 | submitted (1) | 19:14 32:3 |
| 29:12,14 31:2 | 12:20 13:5 | 15:1,5,7,9 | 40:24 | suspicion (1) |
| 33:11,22 34:19 | skeleton (1) | state (10) 1:13 | subsequent (2) | 29:7 |

Brandner001047

sustained (1) 25:17
Swiss (2) 25:20 41:7
sworn (3) 4:2,3 8:6
syndrome (1) 29:8

**T**

take (5) 4:13 19:18 25:13 27:24 34:6
taken (4) 1:10 6:12 7:4 17:8
talk (1) 7:11
talked (1) 27:1
talking (3) 36:22,24 37:16
talks (1) 29:12
Tamara (2) 2:4 3:14
task (1) 30:3
technical (2) 20:24 25:23
tell (2) 37:5,22
telling (1) 37:17
ten (1) 33:21
tendon (3) 27:8 27:10 28:13
tension (3) 27:2 28:3,18
terms (1) 14:9
test (1) 21:19
testified (15) 8:17,20 9:5 11:9 13:1,21 14:8,9,11 16:12,14 17:16 19:1 25:4 35:9
testify (12) 4:21 9:24 11:13,14 11:19 16:18 21:5 22:13 23:7,20,24 24:2
testifying (8) 12:19,21 15:11

15:12 20:11 22:17,21 31:19
testimony (41) 5:9,10,13 8:6 10:1,23 11:12 12:4,17 13:1 13:17 14:16,18 14:18 15:16 16:11 17:23 18:12 19:1,3 20:14,21,22 21:9 22:7 24:6 32:18 35:15,16 36:4,5,7 37:12 38:1,2,13,23 39:3,6,11 40:5
tethered (1) 29:2
thank (7) 4:13 10:5,9 39:13 40:12,14 41:12
thereto (1) 21:5
thing (2) 29:14 38:5
things (5) 7:14 7:15,18,20 28:6
think (18) 4:14 6:24 8:14,24 9:15,22 26:12 28:6 32:22 34:3 35:1,7 37:14,24 38:1 39:18 40:1,10
third (3) 5:16 17:22 25:20
thirty (2) 4:7 23:12
thought (4) 27:3 27:5 35:17,19
thousands (1) 26:17
three (4) 9:22 17:14 28:6 40:14
three-centime... 28:18
tibia (5) 13:7

23:4 27:6,7 39:20
tibial (12) 5:20 8:13 9:6 11:1,5 15:24 18:3,17 23:10 24:24 28:11 31:13
time (14) 4:9,10 5:1,15 6:7 10:5 15:1 16:6 17:22 20:5 25:13 28:17 30:9 42:11
timer (1) 4:7
today (9) 3:7,11 5:3 10:14 16:4 19:3 26:14 40:23 41:3
told (6) 7:18 33:12 36:18 38:10,12 39:2
tragically (1) 13:16
trained (2) 25:24 26:1
training (1) 21:4
transcript (16) 3:23 13:20 14:5,14,16 16:17,20,22,23 17:15,17 19:15 19:20 31:7 42:9,11
transcription ... 6:22
transcripts (11) 17:7,9 19:2,5 30:17 31:9 33:9,10,10,11 34:13
transpired (1) 6:23
trauma (1) 29:6
travel (2) 25:5 25:10
treated (1) 23:13
treating (1) 5:23

tremendous (1) 28:19
trial (16) 9:4 13:20 14:4,14 14:16 18:19 24:6 25:4 30:16 31:9 34:8 38:1,2,23 39:3,5
tried (3) 5:13 17:23 38:6
trier (2) 21:1,14
Tries (1) 21:21
true (1) 42:10
try (4) 19:22 22:1 27:5 39:8
trying (3) 18:4,7 41:6
turn (2) 4:9 25:18
turned (1) 29:24
twelve (1) 17:17
two (7) 5:18 8:21 12:24 16:11 17:9 26:17 28:20
type (6) 8:7 20:17 22:23 23:16 24:8 39:22

**U**

ulnar (5) 9:11 32:5,5,10,11
ulnar-sided (1) 32:1
ultimate (1) 32:6
uncovered (1) 24:19
undergone (1) 39:21
understand (7) 8:11 17:22 21:2 30:20 34:15 35:4,10
understandin... 17:12

understood (4) 26:17,18 30:19 30:22
unexpectedly ... 13:16
unfair (3) 10:4 13:18 14:19
Unfortunately... 29:23
uniquely (1) 26:15
University (1) 34:21
unmarked (1) 13:7
unnecessary (1) 29:19
unprofessiona... 3:5
unwilling (1) 25:8
USC (2) 25:24 26:5

**V**

valgus (3) 13:13 27:12,18
Vaper (1) 27:9
Vaper's (1) 26:9
various (1) 7:14
Vegas (2) 29:17 29:19
vengeance (1) 4:16
verbatim (1) 6:22
verdict (1) 10:21
versus (4) 4:15 10:20 21:15,21
VIDEOGRAP... 2:21
view (1) 26:7
Viewed (1) 18:12
views (1) 17:10
Vincent (2) 2:5 3:14

violated (10) 12:14,18 14:22 15:8 17:1,6 20:1,10 22:10 22:16
violation (1) 19:6
visit (2) 6:15,23
voir (1) 22:3
volumes (1) 19:21

**W**

Wade (1) 38:21
wait (1) 40:6
want (3) 27:23 28:22 38:5
wanted (1) 9:18
warned (1) 7:12
way (3) 14:17 27:4,21
Welcome (1) 4:5
well-qualified... 23:17
well-recogniz... 23:18
went (3) 7:14 27:6 36:11
We'll (1) 4:12
we're (2) 31:24 37:16
we've (1) 36:14
WHEREOF (1) 42:17
William (2) 2:4 3:13
willing (1) 19:22
witness (19) 2:15 3:8 6:3,8 9:4 11:13 12:16 14:23 15:3 17:2 19:12 20:2 21:3,12,21,24 22:7,12 42:17
witnesses (2) 4:1 4:3
won (1) 12:3

word (2) 6:19 6:20
work (2) 27:3 28:8
workup (1) 14:7
wouldn't (2) 9:16 39:12
writing (1) 42:7
wrong (1) 9:14
wrote (1) 26:24

**X**

X (1) 23:2
X-ray (2) 28:10 28:14
X-rays (10) 6:13 7:3 13:2,7,11 16:19 28:7,9 28:14,21

**Y**

Y (1) 23:2
year (1) 29:16
years (10) 8:9 8:14,15 10:12 10:18 13:9 23:3,13 26:3 36:10
yellow (1) 4:9
young (4) 2:8 3:18 8:18 39:19

**0**

084-001853 (3) 1:11,23 42:23

**1**

11th (1) 6:17
11:07 (1) 1:16
13 (11) 11:7 12:5 16:3 22:22 24:7,13 24:23 26:22 31:19,22 32:21
16 (1) 14:5
169 (1) 21:22
17 (1) 14:5
172-73 (1) 21:22

19th (1) 29:16
1980 (1) 21:16
1983 (1) 21:22
1995 (1) 8:11

**2**

2 (3) 1:15 12:14 12:15
2(d) (2) 21:15,22
2002 (4) 5:16,19 6:17 7:3
2003 (1) 5:21
2004 (4) 5:24 6:1,2 33:21
2005 (2) 6:3,4
2007 (1) 13:16
2008 (1) 10:22
2009 (2) 1:15 42:19
2009-23 (1) 1:6
24 (1) 10:12
25 (3) 8:9,13,15
29th (1) 33:21

**3**

3 (14) 11:7 12:5 14:21,22,23 16:3 22:22 24:7,13,23 26:21 31:19,22 32:21
3-22-02 (1) 28:11
302-308 (1) 21:16
33 (1) 10:18
35 (2) 7:7 13:9
38-degree (1) 13:12
39 (2) 16:21,23
39-degree (2) 12:21 27:3

**4**

4 (2) 14:21,22
44 (2) 13:20 14:14
45 (2) 13:20

14:14

**5**

51 (1) 33:21
52 (1) 16:23
53 (2) 14:16 16:23

**6**

6 (5) 16:24 19:6 19:7,11,19
6th (1) 6:17
608 (1) 21:15
6350 (1) 1:13
658 (1) 21:21
69 (1) 16:17

**7**

7 (1) 19:24
702 (1) 20:23

**8**

8 (3) 5:7 22:10 23:1

**9**

9th (1) 42:19

Brandner001049

**From:** Wade R. Causey [mailto:WCausey@doylelawgroup.com]
**Sent:** Tuesday, July 07, 2009 1:37 PM
**To:** BRANDNER
**Subject:** RE: Kipling Sharpe vs. Scott Clarke case
**Importance:** High

True,but the unauthorized use or disclosure by Sharpe is a violation of the physician/patient privilege. The privilege belongs to the patient. Please let me know what documents he has produced and the persons/groups that have received the records from Sharpe. I will notify Sharpe to cease these improper disclosures.

Wade R. Causey, Esq.
Doyle Berman Murdy, P.C.
1313 East Osborn Road, Suite 100
Phoenix, AZ 85014
602-240-6711
wcausey@doylelawgroup.com

---

**From:** BRANDNER [mailto:patkellib@lvcoxmail.com]
**Sent:** Tuesday, July 07, 2009 1:23 PM
**To:** Wade R. Causey
**Cc:** 'Aaron Maurice'
**Subject:** RE: Kipling Sharpe vs. Scott Clarke case

Sharpe is only providing records that support his allegations. Since I looked at the records for the case; is this really a HIIPA concern? I could have kept the records if I had the space to store them. PJB

---

**From:** Wade R. Causey [mailto:WCausey@doylelawgroup.com]
**Sent:** Tuesday, July 07, 2009 11:19 AM
**To:** BRANDNER
**Subject:** RE: Kipling Sharpe vs. Scott Clarke case
**Importance:** High

For me to provide you with the records and for you to use them for this purpose may be a HIPPA violation. I would suggest that you require Sharpe to produce the records. If he does he may be violating HIPPA. Without the records how does he succeed on his complaint? The waiver by my client extends only to the malpractice action.

Wade R. Causey, Esq.
Doyle Berman Murdy, P.C.
1313 East Osborn Road, Suite 100
Phoenix, AZ 85014
602-240-6711
wcausey@doylelawgroup.com

Brandner001050

**From:** BRANDNER [mailto:patkellib@lvcoxmail.com]
**Sent:** Monday, June 29, 2009 3:01 PM
**To:** Wade R. Causey
**Subject:** RE: Kipling Sharpe vs. Scott Clarke case

Because the infectious disease expert called it a
noninfectious hepatitis. In my defense of the case I am
having other experts, including Infectious Disease, look at
the limited records Sharpe is using to present to the
Academy and they are very suspicious of this diagnosis. The
other trauma expert is suspicious that Sharpe did not
report dead muscle when he debrided the draining wound and
I need to see if a urinalysis showed myoglobin in the
report. If that shows this then I think that Sharpe missed
the dead compartment. All of this is speculative at
present, but it's also possibly sinister on Sharpe's part.
Thanks, PJB

**From:** Wade R. Causey [mailto:WCausey@doylelawgroup.com]
**Sent:** Monday, June 29, 2009 9:42 AM
**To:** BRANDNER
**Subject:** RE: Kipling Sharpe vs. Scott Clarke case

I will be out of the office until Mon. the 6th. I can get to it at that point. What is
your time frame? Why didn't we catch the iatrogenic compartment
syndrome?

Wade Causey

**From:** BRANDNER [mailto:patkellib@lvcoxmail.com]
**Sent:** Sunday, June 28, 2009 10:49 AM
**To:** Wade R. Causey
**Subject:** Kipling Sharpe vs. Scott Clarke case

Wade, I am preparing to defend myself before the
Academy charges of "unprofessional conduct" by
Sharpe. I have experts for my side that think that
Sharpe caused and missed an iatrogenic compartment
syndrome. The second op report should have described
dead muscle when he went back in. Either he missed it
or is deliberately misrepresenting the findings. I
need the hospital records. I sent everything back to
you. If you could get them out of storage and send
them to me at 2604 E Viking Rd.,Las Vegas, NV 89121;
I will p[ay for the time and postage. The documents
sent from the case by the Academy do not include the
records and they (Sharpe et al) are making the case
seem like the plaintiff knew about the drop foot pre-

Brandner001051

op. The partial records can be confusing. Please let me know if you can do this for my case. Thank you, Patrick J. Brandner, MD.

Brandner001052

Multi-Page

1

THE SUPERIOR COURT OF ARIZONA

MARICOPA COUNTY

STEVE CLARK and KIM CLARK, individually)
and as parents and guardians, and )
SCOTT CLARK, a minor, )
)
              Plaintiffs, )
)
    vs. ) No. CV2003-017451
)
ANDRE MATTHEWS, M.D., and JANE DOE )
MATTHEWS, husband and wife; KIPLING P. )
SHARPE, M.D., and JANE DOE SHARPE, )
husband and wife; BAYWOOD ORTHOPEDIC )
CLINIC, an Arizona Corporation; MEZONA )
ORTHOPAEDIC, an Arizona Corporation; )
VALLEY LUTHERAN HOSPITAL, an Arizona )
Non-Profit Organization; et al., )
)
              Defendants. )
)

Tempe, Arizona
June 8, 2005
11:50 a.m.

DEPOSITION OF SCOTT VERNON CLARK

COPY

LEA, SHERMAN & HABESKI
Registered Professional Reporters
834 North First Avenue, Phoenix, Arizona   85003
(602) 257-8514   Fax:   (602) 257-8582
Reported by:   Jean L. Lea, RMR, CRR
Certified Court Reporter
Certificate No. 50004

Brandner001053



Page 2

EXAMINATION INDEX

PAGE

By
    Mr. Crawford...................................... 4

LEA, SHERMAN & HABESKI         PHOENIX, ARIZONA (602)257-8514

Brandner001054

Page 3
DEPOSITION OF SCOTT VERNON CLARK,

taken at 11:50 a.m. on June 8, 2005, at the law offices of

Crawford & Kline, Suite 101, 1920 East Southern Avenue

Tempe, Arizona, before JEAN L. LEA, RMR, CRR, a

Certified Court Reporter in the State of Arizona.


APPEARANCES:

      For the Plaintiffs:
        Koeller, Nebeker, Carlson & Haluck, LLP
        by WADE R. CAUSEY, ESQ.
        3200 North Central Avenue, Suite 2300
        Phoenix, Arizona 85012

      For Defendants Sharpe and Mezona:
        Crawford & Kline
        by BRUCE D. CRAWFORD, ESQ
        Suite 101, 1920 East Southern Avenue
        Tempe, Arizona 85282

      Also present:
        Kim Clark

LEA, SHERMAN & HABESKI       PHOENIX, ARIZONA (602)257-8514

Brandner001055

Multi-Page

Page 4

SCOTT VERNON CLARK,

called as a witness herein, having been first duly sworn,

was examined and testified as follows:

EXAMINATION

BY MR. CRAWFORD:

Q.   Can you tell us your name, please.

A.   Scott Vernon Clark.

Q.   How old are you, Scott?

A.   18.

Q.   Your deposition was previously taken in this case back when Dr. Matthews was being sued?

A.   Yes.

Q.   You haven't had any other depositions --

A.   No.

Q,   -- have you?

A.   No.

Q.   Let me just remind you of one thing that was probably discussed with you during your first deposition, and that's this:  If you do not understand a question, don't answer it.

A.   M'hum.

Q.   Tell me you don't understand the question, okay?

A.   M'hum.

Q.   And give me a chance to rephrase it.

Brandner001056

Page 5

A. Okay.

Q. Okay? In normal conversation we say "m'hum" and "uh-uh" a lot --

A. Okay, yes, no. Sorry.

Q. If you do that, and we all do it, I'm going to ask you if you meant "yes" or "no."

A. Okay.

Q. I'm not trying to give you a hard time; I'm trying to make sure the record is accurate.

A. M'hum, yes.

Q. And try to make sure I've finished my question before you start your answer so we're not talking over each other, okay?

A. Okay.

Q. Because it make it very difficult for the court reporter.

Have you reviewed anything, Scott, to help get yourself ready for today's deposition?

A. Wade showed me some piece of paper that said some -- that Dr. Sharpe had wroten down or something, and then I just quickly read it.

Q. Okay. I think Wade told me before we started this deposition that he may have shown you guys Dr. Sharpe's disclosure statement. Is that what you're talking about?

Brandner001057

Page 6

A. Yes, I think --

Q. Okay.

A. -- that's it.

Q. And it has a summary of some of the things Dr. Sharpe is going to say in the case?

A. Yes.

Q. Okay. Do you remember disagreeing with something specifically that was in that document?

A. Yes.

Q. What is it that you recall disagreeing with?

A. It said that he had discussed extensively the exact term "foot drop" and "perennial nerve" and that that was a risk before going into surgery.

Q. And you don't remember that?

A. Not at all, no.

Q. Are you saying that did not happen, or are you saying you don't remember it?

A. I'm saying it didn't happen.

Q. Okay. Anything else?

A. No, that's it.

Q. Do you remember Dr. Sharpe discussing the risk of nerve injury with you?

A. Yes, he did say nerve injury, that there could be nerve damage, but nothing further was said about that, to my knowledge.

Brandner001058

Muln-rage

Page 7

Q. Okay. And when he made the comment that there was the risk of nerve injury, do you remember that at least on one occasion you, your mom, and your dad were all present?

A. I'm not sure. I don't remember.

Q. Do you remember at least one of your parents was present?

A. Yes, of course.

Q. Okay. Since we're dealing with that topic, let me just ask you this: Do you remember him telling you before surgery, during an office visit, that one of the risks of surgery was death?

A. Yes, I do.

Q. Do you remember him telling you that one of the risks was infection?

A. Yes, I do.

Q. Do you remember him telling you that one of the risks was bleeding?

A. Yes, I do.

Q. Do you remember him telling you that one of the risks was the surgery may not work?

A. Yes, I do.

Q. Do you remember him telling you that bad things could happen from receiving an anesthetic?

A. What's an anesthetic?

Brandner001059

Multi-Page

Page 8

Q. That's what puts you to sleep.

A. Oh, yes, I do remember that.

Q. Okay. Do you remember him discussing these various risks with you on more than one occasion before surgery?

MR. CAUSEY: Form.

A. All I remember is once hearing that I could die from the anesthetic.

Q. BY MR. CRAWFORD: Okay. So that specific risk, you only remember it once?

A. No. I remember that from the anesthesia and that when he was discussing the actual surgery.

Q. Dr. Sharpe?

A. Yes.

Q. Okay.

A. Now, I think it was -- I remember the anesthesiologist discussing the risk of the anesthetic. I don't remember Dr. Sharpe talking to me about the anesthetic.

Q. Okay. So when you --

A. Exactly.

Q. When you were at the surgery, the doctor who was going to give you the anesthetic told you that one of the risks was death?

A. Yes, as far as I remember.

LEA, SHERMAN & HABESKI          PHOENIX, ARIZONA (602)257-8514

Brandner001060

Multi-Page ™

Page 9

Q. Okay. Now, are you saying Dr. Sharpe did not discuss the risk of anesthesia --

A. I don't --

Q. -- i.e., death, with you?

A. Not that I remember.

MR. CAUSEY: Let him finish.

Q. BY MR. CRAWFORD: Okay. Well, there's a difference between "I don't remember" and "It didn't happen." You told me that the discussion about peroneal nerve injury and foot drop didn't happen, right?

A. Yes.

Q. Now, with respect to Dr. Sharpe discussing with you the risk of death from anesthesia, are you saying he didn't say that or you may not remember it?

A. Okay. As far as I remember, I thought that when Dr. Sharpe was talking to me about death, that that had to do with the actual surgery, but I also remember hearing it from the anesthesiologist having to do with anesthesia.

Q. Okay. So --

A. The anesthetic.

Q. Fair.

A. Okay.

Q. You remember Sharpe telling you that one of the risks of surgery is you could die?

A. Exactly.

LEA, SHERMAN & HABESKI     PHOENIX, ARIZONA (602)257-8514

Brandner001061

Multi-Page

Page 10

Q. But you don't remember him specifically tying it to anesthesia?

A. Yes.

Q. All right, fair. Now, do you remember that there were two meetings with Dr. Sharpe at his office before the surgery?

A. No, I don't remember two meetings.

Q. So you only remember one meeting?

A. Yes.

Q. His records say there were two meetings. Is that something you may not remember?

A. Yes, that's something I may not remember.

Q. Okay. His records say that he discussed the risks and complications with you and at least one of your parents on two different occasions before surgery. Are you saying that may have happened on two different occasions and you just don't remember it?

A. Yes.

Q. Do you remember prior to surgery Dr. Sharpe telling you that one of the risks was that you could end up with a chronically stiff leg?

A. No, I don't remember that.

Q. Is that something you just may not remember?

A. Yes.

Q. As opposed to saying he didn't say it?

Brandner001062

Multi-Page™

## Page 11

A. Yes.

Q. Do you remember him telling you that you could end up with chronic pain in the leg?

A. Yes, I do remember that.

Q. I appreciate the fact you were only 15 years old at the time?

A. Yes.

Q. All right. You were not happy with where things were at in terms of your recovery from the original fracture and the care that you received from Dr. Matthews?

A. No.

Q. Is that correct?

A. Yes.

Q. Okay. Why were you not happy with where things were at?

A. Because, for one, of course, the pain. Also, the way it looked and, you know, people would comment on it, like, "Oh, man, what's wrong with your leg" and stuff like that. And I couldn't do a lot of activities that I could do prior to the break.

Q. Such as?

A. Like I used to -- before this ever happened, I was a very active dancer. I did all sorts of dance. I did skateboarding and I went skiing and wakeboarding, and I worked a lot with my dad. And I liked to play

Brandner001063

Case: 1:10-cv-08161 Document #: 81-33 Filed: 12/13/11 Page 61 of 491 PageID #:3168

Page 12

basketball, and I loved football, until the break happened.

Q. Anything else in terms of activities that you weren't able to do at that point prior to Dr. Sharpe's surgery?

A. Well, there was one thing I could do after -- I mean, it still hurt to do, but I did throw discus in track, and that's something I was pretty good at, even with the leg being crooked and hurting, I was still pretty good. So I did that.

Q. But did you feel like you were going to be as good as you could be, given the problems you were having?

A. No, I didn't. I knew I could be better if I was a hundred percent.

Q. Okay. Any other specific activities that you weren't able to do at that point? And we're talking about prior to Dr. Sharpe's surgery.

A. Not that I remember.

Q. Okay. So after discussions with Dr. Sharpe and maybe other doctors, you in conjunction with your parents decided that you wanted to go forward with the surgery that Dr. Sharpe was discussing?

A. Yes.

Q. All right. Tell me what kind of pain you were in prior to deciding you wanted to go forward with the

Brandner001064

Page 13

surgery that Dr. Sharpe was suggesting.

A. This is before Sharpe, after Matthews?

Q. Sure.

A. Okay. My -- it hurt right where I' had broken it, and my ankle hurt sometimes when I did clogging and tap dancing, and that's pretty much it. Just mostly it was right on the break where it hurt the most.

Q. Your dad told me earlier that the pain seemed to be getting worse over those maybe four or five months between the last visit with Matthews and talking with Sharpe about surgery. Does that sound right to you?

A. Yes, it does.

Q. So it was becoming more and more of a problem?

A. M'hum, yes.

Q. Now, you said you didn't like -- strike that.

That pain was interfering with stuff like doing track, discus, dancing, and stuff like that?

A. Yes.

Q. And those were all things you wanted to get back to being able to do?

A. Yes.

Q. All right. You said you didn't like the way it looked. How did it look at that point?

A. There was a huge knot under my knee. It kind of looked like I had a second kneecap, to me. And it was

Brandner001065

### Page 14

curved. Like if my leg was straight, it looked like it bowed out, away from my left leg.

Q. Okay. So the lower leg, if we go below the knee down to the foot, those bones, you're saying, had the appearance that the leg was bowing out to the outside, in other words, away from the right side of your body?

A. Yeah. Not the actual foot but the leg part.

Q. Okay. I mean, and this was pretty obvious to you?

A. Yes.

Q. What else about the way it looked was bothering you?

A. That's it. Those two things.

Q. Your dad told me that your foot looked like it was pointing in towards the left foot. Do you remember that?

A. That could be part of the bowing. I mean, the two things I mostly remember are the way my leg looked like when it bowed out and the actual big lump.

Q. Okay. And it was noticeable enough to other people that they were commenting about it?

A. Yes.

Q. Give me just an example.

A. They -- I'd often hear that it did look like a second kneecap, the bump did. And that --

Brandner001066

Page 15

Q. Were people teasing you about it?

A. Yes. Well, I guess you -- you would call it teasing, but they were actually my friends, just like, "Oh, my goodness, look at his leg" and "You need to get that fixed" and stuff like that.

Q. Okay. Tell me how it was interfering at that point with your ability to do dance. Just so we're clear, I'm trying to find out how it was before surgery by Sharpe and then this last -- well, the visit with Matthews, which was at the end of January of 2002. Do you understand the time frame I'm talking about?

A. Okay.

Q. Yeah.

A. Like the four months or --

Q. Yeah.

A. -- five months right there?

Q. Yeah.

A. Okay. I had still done clogging, but it had hurt a lot more to do it and -- as time went on, after I had visited with Matthews, and so I was doing less of that, less tap dancing, less, you know, running on my leg.

The more I put weight on it or jumped on it, the more it would hurt, so I had to do less of that kind of stuff. Just anything that would put extra weight

Brandner001067

Multi-Page™

Page 16

or effort on the leg I had to do less of.

Q. Okay. You've used a term that I'm not familiar with. What do you mean by "clogging"?

A. That's -- it's -- do you know what tap dancing is?

Q. M'hum.

A. It's like a tap dance except it's more jumpy and the taps are loose on the bottom of the shoe.

Q. Okay. What types of dance were you involved with? Obviously tap was one. What other types?

A. When? Before -- or in that time frame we're still talking about?

Q. Yeah, yeah.

A. Okay. I did do tap and clogging and jazz, modern, and ballet at that time, and hip-hop as well. And some acrobatics, too.

Q. Okay. Was it affecting all of those different types of dance?

A. Yes, it -- the pain was, yeah.

Q. Okay. For example, with ballet, could you go on point with that leg?

A. I -- I never had done point ever.

Q. Pardon me?

A. I never did point.

Q. Okay. Did you have to hold other dancers?

LEA, SHERMAN & HABESKI      PHOENIX, ARIZONA (602)257-8514

Brandner001068

Page 17

A. Yes, I did.

Q. Okay. Would it interfere with your ability to do that?

A. Somewhat, yes, putting more weight on the leg.

Q. And I mean, could it have been a safety issue for whoever you were holding if you started having pain?

A. Yes, it could. I think I remember at one time setting a girl down before I was supposed to because of the pain hurt, because it hurt. And this was on stage, too.

Q. So you may have dropped her?

A. No, I didn't drop her. I set her down before I would drop her.

Q. I said you may have if you hadn't done that.

A. Oh, exactly, yes.

Q. Okay. No, I appreciate that. Being the father of three little girls, I'm very happy to hear that you let her down before you dropped her.

Okay. So in terms of tap, clogging, jazz, ballet, hip-hop, the pain that you were in was interfering with your ability to do all of those the way you wanted to?

A. Yes, very much so.

Q. And was it pretty clear to you that you could not continue to go on like this and be able to do these

Brandner001069

Page 18

activities the way you wanted to?

A.   Yes.

Q.   Now, during that period of time were you doing any skateboarding?

A.   No.  I had quit after the first break.

Q.   All right.  It's something you hopefully could get back to?

A.   Yes.

Q.   And now is the same about skiing and wakeboarding?

A.   Yes.

Q.   You hadn't done it, but it was something you hoped to get back to?

A.   Yes.

Q.   So at that point you were not able to get back to working construction as much with your dad as you had been before the break?

A.   Yes, that's true.

Q.   Had you tried basketball?

A.   I -- I shot around frequently, but I never was able to run back and forth and play full court like I used to do.

Q.   Would that have been very painful?

A.   Yes, running would.

Q.   So was running particularly painful?

Brandner001070

Multi-Page™

Page 19

A.   Yes.

Q.   Please feel free to have some pretzels while we talk.

MR. CRAWFORD:   I presume you guys just want to go through lunch and get this done.

MR. CAUSEY:   I would prefer that.

Are you guys good with that?

(Discussion off the record.)

Q.   BY MR. CRAWFORD:   Would you agree that the condition of your leg as of, let's say, early June of 2002, which was several weeks before the surgery, was unacceptable to you?

A.   Yes.

Q.   And the restrictions it was placing on your ability to do activities was unacceptable?

A.   Yes.

Q.   I don't mean this facetiously, but when Dr. Sharpe and this anesthesiologist told you that one of the risks was death, did you take that seriously?

A.   Yes, I very much did.   All the risks I thought about before going into surgery, but because of the things I couldn't do, I -- I was willing -- you know, the good outweighed the bad to me.

Q.   Including the risk of really bad things like death?

Brandner001071

Page 20

A.   Yes.

Q.   Had you been able to do any hunting during, let's say, the four or five months before this surgery by Dr. Sharpe?

A.   I'm not sure I did do any hunting.   I might -- when I fell, I'm not sure of the exact date, but I know that was either during Dr. Matthews' care or right after. I know I did go, and then I had fallen and hurt my leg at that point.

Q.   This is the right leg?

A.   Yes, sir.

Q.   How did you fall?

A.   We were climbing up a -- or I think we were climbing down a hill, and there was some rocks, and I had slipped on a rock and fell on the leg.

Q.   And what, did you notice a fair amount of pain?

A.   Yeah, it hurt a lot.   There was, I mean, nothing visually, but it hurt a lot.

Q.   Did that incident, at least from your perspective, have anything to do with how this leg was bowing out, for example?   I mean, did it seem to happen after that or --

A.   No.

Q.   -- was it something that was already going on?

A.   It was already going on.

Page 21

Q. Did it seem to, on a longer-term basis, increase the pain, or was it more of an isolated event?

A. It was an isolated event.

Q. Have you not gone hunting with your dad since the surgery with Dr. Sharpe because of the problems you're having with your leg?

A. No, I have -- well, I don't know. Wait, could you restate the question, please.

Q. Sure. Have you not gone hunting with your dad since the surgery by Dr. Sharpe because of the problems with your leg?

A. Yes, because I knew that I wouldn't be able to walk long distances, and that's very much involved in hunting. You have to be able to, you know, actually hunt. Just sitting there, your chances aren't very good of finding something, so I was kind of discouraged in the fact that I wouldn't be able to actually hunt.

Q. Okay. Is that why you turned your dad down when he asked you to go?

A. That's one of the reasons, yes.

Q. Is there any other reason?

A. Yeah. I -- I mean, I don't know exactly, but I know that I was busy. I had, you know, schooling; and a lot of times he would ask me to go hunting was during school. And I also teach classes, so it would interfere

Brandner001073

Multi-Page™

Page 22

with that as well.

Q. When you say "teach classes," are you talking about dance?

A. Yes.

Q. When did you get back to being able to teach dance following the surgery with Dr. Sharpe?

A. I'm not sure exactly the time.

Q. Okay. The surgery by Sharpe occurs the end of June 2002. Can you give me any estimate when after that you were able to start teaching dance again?

A. Maybe -- maybe a year and a half later. Maybe a year later.

Q. Okay. Well --

A. Sometime in there. I know it was -- what?

Q. That's okay, go ahead.

A. I know it was before last summer, so -- and maybe even six months before that, so . . .

Q. Okay. Have you been back to teaching dance for at least a year?

A. Yes.

Q. What types of dance have you been back to teaching for at least a year?

A. I teach tumbling. I'm a spotter. And I do teach some tumbling classes. I help my brother in teaching hip-hop. And that's it. Those are the two.

LEA, SHERMAN & HABESKI     PHOENIX, ARIZONA (602)257-8514

Brandner001074

Case: 1:10-cv-08161 Document #: 81-33 Filed: 12/13/11 Page 72 of 491 PageID #:3179

Page 23

Q. Okay. Do you actually do tumbling?

A. No. I can demonstrate some things, but there are a lot of things that I can't do. I usually just spot the kids in doing what they do.

Q. Okay. And then what was the other one you said?

A. Hip-hop.

Q. Can you actually do hip-hop?

A. Yes, I can do some things. I usually choreograph, help my brother choreograph his class, the dances.

Q. But do you also show the students how to do certain moves?

A. Yes, some moves I do.

Q. And are you able to do some of the moves at least?

A. Yes.

Q. Are you able to do most of the moves?

A. Yeah, you could say most of the moves.

Q. What do the --

A. A lot of times when we make up dances, we won't make up on-the-floor things because I can't usually do things on the floor because I can't hop up in time, you know.

Q. Tell me some of the things you can't do now in terms of dance, so I can get a better handle on how this

Brandner001075

Multi-Page™

Page 24

is affecting you.

A.    I can't do clogging or tap because I can't, you know, make the actual sounds because I can't pick up my foot.  I can't really do ballet anymore because, you know, you have to be able to point and do those sort of things, and I can't really point.

A lot of times in acro, like say I was to do a round-off back handspring, because of the way I would land on my feet, because I couldn't flex my foot to come down, my toes would jam into the floor.  I can't do that sort of thing.

Q.    Let me stop you.  Were you able to do that between the point in time that you stopped seeing Matthews and Dr. Sharpe's surgery?

A.    Was I able to do a back -- round-off back handspring?

Q.    Yeah.

A.    No, I could not do a round-off back handspring. I could do a simple round-off, but not a back handspring at that time.  My leg wasn't strong enough.

Q.    And it would hurt when you did it?

A.    Yeah.

Q.    Okay.  Keep going.  Tell me some --

A.    We're still talking about dance?

Q.    Yeah, examples of how it's limiting your ability

Brandner001076

Page 25

to do dance now.

A.   I can't -- like I said, I can't do a lot of things on the floor because of it, because like in a -- in dance we do a thing called a toe rise, and I can't do that because I can't flex my foot or put weight on the point of my foot.

Q.   Let me just stop you real quick.  Most of the things you just told me, were you able to do that before Dr. Sharpe's surgery?

A.   Yeah, I did do tap and I did do clogging and I did do -- I could go down on the ground in hip-hop, and I did do some ballet.  Even though they hurt, I was still -- I could still, you know, participate in them.

Q.   You just couldn't do them like you wanted?

A.   Exactly.

Q.   Okay.  And then you had the pain when you would do some of these maneuvers?

A.   Yes.

Q.   All right.  Well, have you given me what you can think off the top of your head --

A.   Yes.

Q.   -- are examples of what you can't do?

A.   Yes.

Q.   Since the surgery with Dr. Sharpe, have you gotten back into discus at all?

Brandner001077

Multi-Page™

Page 26

A.    I did try at Red Mountain my senior year -- that was this year -- to get back in.  I had gone to the head coaches and discussed them -- to them my -- how I couldn't flex my foot and everything, and I asked if that would affect my discus throwing.

And they said, "Well, yeah, it would affect it, but I'm sure you could still try."  So I did try. And because I can't flex my foot, I wouldn't run the track with them.  They'd do two laps in the beginning, and I wouldn't run with them.  And then there would be certain exercises to warm up for track like box jumps and jump-roping, things I couldn't do.

And then in throwing the discus, there's a move, you can either throw it called post where you just throw it standing, or you can do a spin and throw it, which gives you more leverage and the disk goes further. I couldn't do that because I can't flex my foot.

And after a while I was falling behind because I couldn't do a lot of these things, so I just quit.

Q.    Who is your coach?

A.    Coach Marquis was our throwing coach.

Q.    Coach what?

A.    Coach Marquis, Mr. Marquis.

Q.    Who is the head coach?

Brandner001078

Multi-Page™

Page 27

A. The head coach of track was Mr. Jones.

Q. Okay. So you tried to do it, but you couldn't keep up with the training and couldn't make some of the moves that you needed, so you just gave up on it?

A. Yes.

Q. Had you been back to throwing discus -- well, strike that.

Had you been throwing a discus in the months leading up to Dr. Sharpe's surgery?

A. Yes, I did. I threw almost all the way -- I threw up to probably May 10th because that's when -- around when State was, and I threw through State.

Q. And that was still affecting how well you were able to do it?

A. Yeah, the pain was definitely.

Q. Okay. You did compete at State?

A. Yes.

Q. And how did you throw?

A. I was -- there's three different brackets. I was placed in the top bracket with the top throwers, but at State -- at State I threw particularly pretty poorly. It wasn't a good day for me. I did finish last in my bracket.

Q. How many kids were in that bracket?

A. I don't know exactly. I'd say probably five or

LEA, SHERMAN & HABESKI     PHOENIX, ARIZONA (602)257-8514

Brandner001079

Page 28

six.

Q. Now, do you think the fact that you threw poorly that day had something to do with how you were feeling with your leg?

A. Not particularly. I mean, it hurt like it had before, but I just wasn't on that day.

Q. And Red Mountain's 5A, isn't it?

A. Yes.

Q. How did you do at the regional meet?

A. Oh, I'm not sure. I don't really remember. I'd say, because I don't remember, probably average.

Q. Okay. Your dad said you were a pretty good student. Is that right?

A. Yes.

Q. What was your GPA, do you remember?

A. Finishing when I graduated?

Q. Yeah.

A. I think it was a 3.9.

Q. And did you get any scholarship offers as a result?

A. We thought that we would from U of A, but we didn't. That's why I didn't end up going there, because I needed some scholarship money 'cause I was going to live on campus and have to pay for tuition and books and all that other stuff, so a representative from ASU had called

Brandner001080

Multi-Page™

Page 29

and left a message on our phone saying he was surprised that I didn't apply there because of -- my academics and my SAT scores were pretty good, so he asked me to come to a meeting with him at Red Mountain.

So I did, and he told me to apply because they had some leftover scholarship money, and so I just applied, and my application is being --

Q. Reviewed?

A. -- reviewed, and I might get scholarship money, I'm not sure.

Q. Did he say how much you might get if you're approved?

A. He said I could get anywhere from, you know -- well, he said I could get a full ride, I might. But I might not, so I mean, it depends on how it goes.

So right now I don't have any scholarship money, but there is a possibility.

Q. Okay. And if you get that, you're going to go to ASU East?

A. Yes.

Q. And your idea is to study what?

A. I want to do premed. That's what I -- that's what I'm focusing on right now, to be an ophthalmologist.

Q. Why do you want to be an ophthalmologist?

A. I just felt -- feel kind of led by the Lord, I

Multi-Page™

Page 30

guess you could say. I was pointing towards that. There's no particular reason. I mean, I've always wanted to, you know, do something to help people, but -- or, you know, like be a lawyer or doctor or something, you know, that would challenge me.

Q. My brother's an ophthalmologist. Go the ophthalmologist route.

MR. CAUSEY: Ophthalmologist.

A. Just something, you know, above average, not like -- I had worked many years with my dad, and I didn't want to do something that was, you know, that much labor, outside, working with your hands. I'd rather do something -- 'cause I've succeeded in academics -- something that would challenge my brain more than my hands, I guess you could say.

Q. BY MR. CRAWFORD: Okay. So regardless of this injury to your leg that occurred playing football and the problems you've had since, you've had experience working in the construction industry?

A. Yes.

Q. And nothing wrong with working in the construction industry, but that's not where Scott Clark wanted to end up, fair?

A. Yes.

Q. You're more interested in advancing your

LEA, SHERMAN & HABESKI       PHOENIX, ARIZONA (602)257-8514

Brandner001082

Multi-Page™

Page 31

education and doing some kind of white-collar job or something like that?

A.   Yes.

Q.   Okay.

MR. CAUSEY:   You know, Ira Fulton's done pretty good, though.

THE WITNESS:   Who?

MR. CAUSEY:   Ira Fulton.

THE WITNESS:   Who's that?

MR. CAUSEY:   Of Fulton Homes.   I'll tell you later.

MR. CRAWFORD:   Off the record.

(Discussion off the record.)

Q.   Do you have any plans to work this summer?

A.   I was just discussing with my mom that I want to get an application to Sports Authority, and if I get hired, work there, and if I don't, my dad said I could work with him this summer.   So either way, I'll either work there or with my dad.

Q.   How many classes a week do you help teach?

A.   Oh, I have three acro --- or three tumbling classes, one tumbling private, and I help my brother -- or one hip-hop class, and then I help my brother in his hip-hop class, so I have --

Q.   Six or seven?

LEA, SHERMAN & HABESKI          PHOENIX, ARIZONA (602)257-8514

Brandner001083

Multi-Page™

Page 32

A.   -- five.

Q.   Five, okay.

A.   Five, six.  Yes, six.

Q.   One of them's private --

A.   Yes.

Q.   -- now?

A.   That's just one on one, me and one student.

Q.   Teaching them what?

A.   Tumbling.

Q.   What aspects of tumbling?  Everything?

A.   Mostly the basics.  What I do with her is I critique what she does, and I spot her a lot.

Q.   Okay.

A.   That's what I do in there is spot mostly.

Q.   How many hours a week are you involved with teaching dance?

A.   Probably four to five hours a week.

Q.   Does your mom have a dance studio?

A.   Yes.

Q.   Where is it located?

A.   On Higley and Southern.

Q.   And do you get paid for that?

A.   Yes.

Q.   What do you get paid?

A.   I get paid per class, which is 45 minutes, so I

Brandner001084

Multi-Page™

Page 33

don't know exactly what it is per hour, but I get $6 a class and then $15 every half hour for my private.

Q. So what do you earn a week?

A. Probably like $25. 20, $25 a week.

Q. Is there opportunity to do more of that or not?

A. Yes, there is actually. I'm taking on a couple -- one more hip-hop class during the summer and I think another private after the concert, which is June 18th.

Q. You say "concert." Is that the same as recital?

A. Yes, that's what --

Q. And where is it going to be at?

A. Apache Junction High.

Q. Are those typically videotaped?

A. Yes.

Q. Have you been in any recitals since the surgery by Dr. Sharpe?

A. Yes.

Q. And how many?

A. I think I've been in two recitals, and we've competed probably two or three times.

Q. What do you mean? Are those different?

A. Yes. A competition is where a bunch of people go and compete and win awards.

Q. Are those videotaped, too?

Brandner001085

Page 34

A. Yes, they are videotaped, but you have to buy the videotapes.

Q. Okay. Have you boughten any of the videotapes?

A. I think we've bought one or two, but I don't know exactly how many.

Q. Well, your mom runs the show; she probably gets a videotape for free, at least with the recitals, right?

A. With the recitals, yes, we have videos.

Q. Okay, you have those. Do those show you dancing at all?

A. Yes, they do.

MR. CRAWFORD: I asked for those.

MR. CAUSEY: I thought I had given you all the ones where you could actually see him in, but I'll give you all of them and you can decide.

MR. CRAWFORD: I don't think you've given me anything at this point.

MR. CAUSEY: Oh. Well, then maybe we gave them to prior counsel first, but I have them in a file and you can have copies of all of them.

MR. CRAWFORD: Yeah, I'd like all of the videotapes.

MR. CAUSEY: Just off the record here a minute.

(Discussion off the record.)

Brandner001086

Multi-Page™

Page 35

Q. BY MR. CRAWFORD: Okay. You've done two recitals and three competitions?

A. As far as I know, yes.

Q. In the recitals, what type of dance did you do?

A. Now, ever since the surgery with Dr. Sharpe, all I do is modern, hip-hop, and I'm not sure if I've done any tumbling. But I know that those are the two dances that -- the two types of dances that I do, are modern and hip-hop.

Q. And how about the competition? Same thing?

A. Same thing.

Q. And how did you guys do in any of the competitions?

A. We do pretty good. Mostly firsts and seconds. Me and my brother do pretty well when -- we do a duet in every concert, and usually at the competitions we usually do pretty well.

Q. Okay. There's something in your answers to interrogatories that said that you've lost out on the opportunity for a dance scholarship.

A. Yeah. We did this thing in -- at U of A called "Jazz in AZ." It was a dance convention.

MR. CAUSEY: Say that again for the court reporter.

A. "Jazz in AZ." And it's a dance convention,

Multi-Page™

Page 36

which is you go and take classes from a professional dancer, and they tell you -- they teach dances and you learn, you know, special types of dances and how it is in the professional world.

So there they did have auditions for scholarships money, scholarship moneys from the dance department, and I did an audition, and, you know, I thought that if I could go back and audition, that maybe I could get some scholarship money, you know, to U of A.

Q. BY MR. CRAWFORD: Okay. Was this before or after the surgery by Sharpe?

A. Jazz in AZ was before, and then I wanted to go back but I never did go back.

Q. Okay. The purpose of going to that was to see about getting scholarship money --

A. Yeah, it was to audition, yes.

Q. -- to U of A?

MR. CAUSEY: Let him finish, let him finish.

THE WITNESS: Oh, I'm sorry.

Q. BY MR. CRAWFORD: Did anybody approach you about offering you scholarship money?

A. As far as I remember, I remember one of the teachers -- I think I remember one of the teachers talking to my instructor, telling her that she would like to see

LEA, SHERMAN & HABESKI      PHOENIX, ARIZONA (602)257-8514

Brandner001088

Page 37

me come audition 'cause there's a good chance that I could get some scholarship moneys, especially because I was a guy, and there weren't many guy dancers that could perform like I could.

Q. When was that Jazz in AZ down at U of A?

A. I'm not quite sure exactly when.

Q. Well, was it before you broke your leg during football?

A. I don't remember.

Q. Do you remember it being after you broke your leg in football?

A. I don't remember exactly when, no.

Q. Okay. No formal offer was ever made of any type of scholarship money, fair?

A. Not that I know.

Q. Okay. Is there some way you can figure out when that Jazz in AZ was?

A. Yes, there is a way.

Q. How?

A. I could talk to my mom or --

Q. Okay.

A. -- Stephanie.

Q. All right. Have you looked into whether there's -- strike that.

Does ASU have dance as part of its

Multi-Page™

Page 38

curriculum?

A. Yes.

Q. Have you looked into whether there may be any scholarship money for you there?

A. I know they do offer scholarships, yes.

Q. Have you looked into whether they might be willing to offer any for you?

A. No. Well, no, I have not.

Q. Why not?

A. Because I don't feel that I'm good enough to even try out, I guess.

Q. So you've made that decision based on where you feel you're at in terms of your abilities?

A. Yes.

Q. As of the end of January 2002, had you become pretty frustrated with what Dr. Matthews was telling you about the condition of your leg?

A. Yes.

Q. And there was something in one of your legal documents that you felt like he was blowing off the problems you were telling him you were having?

A. Yes.

Q. Meaning he didn't appear to be really taking them seriously?

A. Yes.

Brandner001090

Page 39

Q. And at that point you were having a fair amount of pain?

A. Yes.

Q. And there was this obvious deformity of your leg?

A. Yes.

Q. And it was interfering with your activities?

A. Yes.

Q. And you were telling him all of that, and it didn't seem to be registering with him?

A. No. I remember specifically, when I used to tell him about the lump on my leg, he used to show me this bone callus he has on his finger from some accident where he broke his finger; and he kept comparing it, and I used to say to that, "Well, this is really big and it hurts," and he kind of just, you know, blew it off. That's what I remember specifically.

Q. Okay. So is it fair to say that you, your mom, and your dad decided that you needed to seek an opinion elsewhere?

A. Yes.

Q. The first person that you went to see at Mezona Orthopedics was Dr. Marc Dinowitz. Do you remember that?

A. Yes.

Q. Do you remember that visit with him on March 22,

Brandner001091

Multi-Page™

Page 40

2002?

A.   I don't remember that, if that was the exact visit, but I do remember a visit with him where he got a protractor or something to measure the angles of my leg from an x-ray and that they were some amount of degrees off.

Q.   Okay.  My understanding is you only had one office visit with Dr. Dinowitz.  Is that your memory?

A.   I don't know if it was more than one, but I know -- I do remember only one, so --

Q.   Okay.  The records suggest there was only one.

A.   Okay.

Q.   Let's assume there was one.  You remember during that visit that he got a protractor out, held it up to the x-ray, and did some kind of measurement?

A.   M'hum, yes.

Q.   What else do you remember about that meeting with Dr. Dinowitz?

A.   That he was going to take that and show it to somebody and see what they had to say.

Q.   Did he say why he was going to take it to someone and show it to them and see what they had to say?

A.   Because that there was enough -- a big enough angle, it was off enough to actually do something about it because it was not right, I guess.

LEA, SHERMAN & HABESKI          PHOENIX, ARIZONA (602)257-8514

Brandner001092

Multi-Page™

Page 41

Q. Did he ask you at the beginning of the visit how this was affecting you and what kind of problems you were having with it?

A. Not that I remember.

Q. You don't remember that?

A. I don't remember if he did ask me.

Q. Is it something you may not remember at this point?

A. Yes.

Q. Okay. So do you remember him saying that he was going to conference your case with some other doctors?

A. I don't know if it was him that said it, but I do remember that being said, yes.

Q. Okay. So you remember the x-rays and the use of the protractor. Is there anything else you remember of that visit with Dr. Dinowitz?

A. No. Not right now.

Q. Do you remember him saying whether he thought surgery would be needed?

A. I don't remember him discussing surgery, but I do remember him saying that it was definitely a problem.

Q. So it was definitely a problem, and something needed to be done?

A. Yes.

Q. But you don't remember the specific word

Brandner001093

Page 42

"surgery"?

A. No.

Q. He may have and you just don't remember it?

A. Yes.

Q. Do you remember Dr. Dinowitz calling your home and discussing the results of this conference?

A. No, I don't remember that.

Q. Is the next thing you remember after meeting with Dr. Dinowitz that an appointment was scheduled for you to see Dr. Sharpe?

A. I don't remember that exactly, but I do remember seeing Dr. Sharpe after seeing Dr. Dinowitz.

Q. Do you remember seeing anybody else in between Dr. Dinowitz and Dr. Sharpe?

A. No, I don't remember.

Q. All right. The first visit, according to the records, with Dr. Sharpe was April 11, 2002; does that sound consistent with your memory?

A. Yes.

Q. Tell me what you recall of that meeting with Dr. Sharpe.

A. I don't really recall much. I couldn't say anything, you know, exact or I don't really remember anything at all, unless you could bring it up to me and tell me and then I could --

LEA, SHERMAN & HABESKI        PHOENIX, ARIZONA (602)257-8514

Brandner001094

Page 43

Q. Well, do you remember him asking you what kind of problems you were having with the leg?

A. No, I don't. I don't remember anything.

Q. You're not denying that he asked you that?

A. No.

Q. And do you remember him asking you what types of things you wanted to do long-term?

A. No, I don't remember.

Q. You're not denying that he asked you that?

A. No.

Q. Do you remember him doing a physical examination of your leg?

A. What does "physical examination" mean?

Q. Touches your leg, moves the leg, sees what the leg can and cannot do.

A. Yeah. I don't know exactly when he did that, but I do remember him, you know, bend- -- or torquing it, asking if it hurt, and I told him that it did hurt and where it hurt.

Q. Okay. So basically he held your calf with one hand and he held your foot with the other hand and he moved it around?

A. Yes.

Q. Did you call it torquing it?

A. Yes.

LEA, SHERMAN & HABESKI          PHOENIX, ARIZONA (602)257-8514

Brandner001095

Multi-Page™

Page 44

Q. Okay. And he asked you what caused the pain, things like that?

A. Yes.

Q. Do you remember him getting x-rays done that day or going over them with you?

A. No, I don't remember.

Q. Do you remember him discussing x-rays with you?

A. No, I don't remember.

Q. Okay. Do you deny that he did that?

A. No.

Q. Do you remember him discussing the fact that he'd like a CT scan or CAT scan done of the leg?

A. Yes, I do remember that.

Q. Do you remember him telling you why?

A. To see if it was healing or not, because that could be a source for pain, was that it wasn't healed.

Q. Do you remember him telling you that that would help in terms of planning a surgery?

A. Yes.

Q. Is this the time when you saw Dr. Sharpe that you remember him going over the risks that we talked about earlier?

A. I don't know. I'm not sure if that's when it happened.

Q. His records and his testimony in this case will

Brandner001096

Page 45

be that he discussed potential risks and complications with you and one or both parents on two occasions before surgery. Would it be your testimony in this case that he didn't do it on two occasions or you just don't remember?

A. I just don't remember.

Q. So it may have happened, but you don't remember it?

A. Yes.

Q. Do you remember him discussing what the various options were?

A. Options being types of surgery?

Q. Types of surgery, not doing surgery.

A. I remember two, because the one we did and another one, which him and one doctor both discussed. The one that he did where he'd rebreak it and attach a plate to keep it there. And then another where they'd insert some sort of rod into it, into my leg. I don't know the details of that one.

Q. Okay. Do you remember understanding that you didn't have to have surgery?

A. I knew I could -- there was the option of not having surgery at all and just staying how I was.

Q. Yeah, living with it?

A. Yes.

Q. But you didn't want that one?

Brandner001097

Multi-Page™

Page 46

A.   Yes.

Q.   Do you remember having ankle pain?

A.   When?

Q.   The first time you saw Dr. Sharpe.

A.   After Matthews, the first time I saw him?

Q.   Yeah, the very first visit you had with Dr. Sharpe, whichever day that was, do you remember complaining of ankle pain?

A.   No, not -- not exactly.

Q.   Were you having pain with your ankle?

A.   I could have.  I -- I don't really remember it precisely right now.  I mean, my leg hurt all the time, so I know that there was one focus pain where the break was, but it could have hurt in other places and I just don't remember.

Q.   So the pain had gotten to the point where it was hurting all the time?

A.   Yes.

Q.   And then certain activities made the pain worse?

A.   Yes.  I mean, I guess you could say it was uncomfortable when I would just sit there, but when I'd actually do activity on it, it would hurt.

Q.   What kind of pain?  Was it a sharp pain?

A.   Yes.

Q.   Was it like a throbbing pain?

Brandner001098

Page 47

A. It came to that every once in a while, but like as soon as it happened, like say I were to jump on my leg, it would be a sharp pain, yes. And then after that it would throb.

Q. How long would that usually last?

A. I don't remember.

Q. Is it something that could go on for a number of hours?

A. I -- I don't remember exactly. I know it lasted a while, but I couldn't tell you any sort of amount.

Q. Do you remember, after this last visit with Dr. Matthews in January 2002, developing any pain in your ankle at any point?

A. Not exactly, no, I don't remember.

Q. Do you remember that one of the things Dr. Sharpe discussed was something called an osteotomy where he would cut the bone?

A. I don't remember that. I do remember him discussing that that would happen in one of the surgeries, that he would have to cut the bone to rebreak it, and I don't remember the word oste- --

Q. Osteotomy?

A. Yes.

Q. Okay. Do you remember Dr. Sharpe saying that it was unlikely your leg would get better on its own?

Multi-Page™

Page 48

A. With no surgery at all?

Q. Yeah.

A. I don't remember, no.

Q. Okay.

A. I kind of figured that it wouldn't just heal itself because it hadn't but --

Q. Appreciate that, but you don't remember him saying that?

A. No.

Q. Is it fair to say, Scott, that you remember one visit with Dr. Sharpe; if there were two, they're probably just kind of jumbled together in your memory?

A. Discussing the --

Q. Yeah.

A. -- risks?

Q. Yeah, everything.

A. Wait, what's the question?

Q. Let me rephrase the question. The records indicate you had two office visits with Dr. Sharpe before the surgery.

A. Okay.

Q. You've told me you remember at least one.

A. Yes. They probably did just join together.

Q. And you may have had a second visit; you don't remember?

Brandner001100

Multi-Page™

Page 49

A. Yeah.

Q. What I'm trying to get at, and let's assume there were two visits, are you telling me you can't differentiate between two visits, that whatever was discussed is just kind of meshed together in your brain?

A. Yeah, that I just remember certain things from both visits that kind of join together.

Q. Do you remember who was present in terms of your mom or dad during the visit with Dr. Sharpe that you do remember?

A. I remember my mom was there for almost every one, but I don't remember if my dad was there or not.

Q. All right. Do you remember a visit with a physician's assistant by the name of Brian Sharp before surgery?

A. I know who he is, but I don't remember an exact visit.

Q. Okay. Do you remember, between you, your mom, and/or your dad, telling Dr. Sharpe that between the choices of doing nothing and living with this and surgery, you'd rather do surgery?

A. Do I remember discussing that with them?

Q. Yes.

A. I don't remember exactly, but I know that I did, just because I would have discussed with them.

LEA, SHERMAN & HABESKI     PHOENIX, ARIZONA (602)257-8514

Brandner001101

Multi-Page™

Page 50

Q. Okay. But do you remember communicating to Dr. Sharpe that between the choice of not doing surgery and surgery, you'd rather do the surgery and see if things could get better?

A. Yes. It was apparent that the good outweighed the bad to me. And when he discussed the risks, I remember him telling me that there was a small percentage that these things would happen and that kind of stuff.

Q. Okay. And what did he say the potential benefit of the surgery would be?

A. He said that it could come out a hundred percent, as far as I remember, that, you know, it would be straight and that I would be able to get back to my activities almost as normal.

Q. Okay. Put aside, you know, the drop foot, which I understand is a problem for you; I'm not belittling that, okay?

A. Yes.

Q. But did the surgery correct the alignment and the deformity of the leg?

A. Yes, it's straight now. I mean, there is still -- there's not the lump, but there is scars that are a deformity.

Q. They're not what?

A. They are a deformity, the scars that are left

Brandner001102

Multi-Page™

Page 51

there.

Q. I didn't understand what you said. They are --

A. A deformity, the scars.

Q. Oh, okay.

A. The actual lump isn't there.

Q. The scars are a deformity to you?

A. Yes.

Q. All right. Putting aside the scarring, I'm talking about the shape of the leg and the alignment of it, does it look good to you?

A. Yes.

Q. Do you remember why you were taken to see Dr. Thomas Walls in Scottsdale in the middle of April 2002?

A. Because we wanted another opinion.

Q. About what?

A. To see if surgery was the right path and to see what surgeries he would offer, if any different ones.

Q. And do you remember who went with you on that visit?

A. Yes. My mom.

Q. And do you remember what Dr. Walls said?

A. I remember him saying that -- discussing a surgery, that he would insert a rod into the bone. That's all I remember.

Brandner001103

Page 52

Q. Okay. Did he say that he agreed that surgery was necessary?

A. I don't know if he said that. I just remember him discussing that one surgery with us. I don't know if he said that would be the way to go. He was just giving us options, I think.

Q. Okay. Well, what other options did he give you?

A. That's all that I remember.

Q. So the only option he gave you was surgery?

A. As far as I remember, yes.

Q. Or doing nothing?

A. Yes.

Q. Okay. What I'm trying to find out is you're going now to see Dr. Walls for yet another opinion, and is the essence of what he told you that he thought it needed to be corrected by some type of surgery?

A. Yes. It did need to be corrected, yes.

Q. And then after Dr. Walls, you went back to see Dr. Matthews?

A. Yes.

Q. Why did you go back to Dr. Matthews?

A. I don't remember. I do remember when we were there that he said that he had heard through the physicians' grapevine that we were getting second opinions. That's what I remember from that visit.

Brandner001104

Multi-Page™

Page 53

Q. Well, do you have any recollection -- this is a guy that you had been unhappy with, right?

A. Yes.

Q. And now you're going back to see him again?

A. Yes.

Q. Do you have any understanding why?

A. I think we were giving him one last chance maybe to see if he would discuss that he was wrong and some sort of way we could fix it.

Q. Okay. Did you get the sense during that visit that he blew you off again?

A. I got the sense during that visit that he was more upset that we were getting second opinions than even focusing on my leg.

Q. Okay. Were you satisfied with that visit with Dr. Matthews?

A. Not at all, no.

Q. Okay. Did he seem to again belittle the problems you were having?

A. Yes.

Q. Was there any discussion with him about surgery versus not having surgery?

A. No.

Q. Okay. I'll tell you that you had a couple of CT scans on your leg. Do you remember that?

Brandner001105

Page 54

A. Yes.

Q. And I'll tell you that after those CT scans on the leg, there was another visit at Mezona, and Brian Sharp, physician's assistant, and Dr. Sharpe were involved.

Having tried to orient you about -- in a chronology when it all happened, do you remember now this visit with Dr. Sharpe after the CT scan had been done?

A. I think I do, because I remember him discussing the CT scan and that did it show that it wasn't healing, that there wasn't a -- or there was mal-something or other, or there wasn't mal-something.

Q. Malunion?

A. Yeah. Yes, that's the word. I just remember him saying that it wasn't healing exactly like it should have been.

Q. Okay. So is there anything else about that specific visit with Dr. Sharpe that you remember, other than the discussion about the CT scan results and what it meant?

A. No.

Q. The surgery takes place at Mesa Lutheran Hospital on June 26, 2002. Do you remember any discussions with Dr. Sharpe or with Brian, his physician's assistant, before the surgery?

LEA, SHERMAN & HABESKI       PHOENIX, ARIZONA (602)257-8514

Brandner001106

Multi-Page™

Page 55

A.    Not exactly, no.  I can't really differentiate between meetings at his office or meetings at the hospital before that.

Q.    When do you first remember speaking with Dr. Sharpe about the problem not being able to move your foot?

A.    I remember him discussing it with me before I ever said anything to him.  I was in the hospital bed and he said something.  He asked me if I could move my foot or flex it, I wasn't sure -- I'm not sure which one, and I wasn't able to at that time.

        And he said, as far as I remember, that "There might be some nerve problem, but we'll have to wait to see."

Q.    Do you remember how many days after surgery it was that he discussed that with you?

A.    No.  I know that it was recently -- or pretty close.  I'm not sure how many days.  But I remember that I was still -- my leg was still pretty swollen at that time of the surgery.

Q.    Did you ever get the sense that Dr. Sharpe was trying to be evasive about that problem or not explain what happened?

A.    No.

Q.    So he was pretty up-front about it?

LEA, SHERMAN & HABESKI        PHOENIX, ARIZONA (602)257-8514

Brandner001107

Page 56

A. Yes.

Q. And do you remember him saying basically "This is a problem," that it could be temporary; it might get better, or it might not?

A. I don't really remember that at that time.

Q. Do you remember him telling you why it happened?

A. No.

Q. You had a number of other medical complications during that hospitalization?

A. Yes.

Q. Do you remember being told why they probably happened?

A. Some sort of hepatitis, a liver infection.

Q. Okay. You had another surgical procedure by Dr. Sharpe where there was like a blood clot that had built up in the leg?

A. Yes. A Melatoma.

Q. Hematoma?

A. Hematoma.

Q. Pretty good.

MR. CAUSEY: You're close. One letter off.

MR. CRAWFORD: Not bad.

Q. BY MR. CRAWFORD: And do you remember him telling you why he thought that he needed to go in and

Brandner001108

Page 57

drain that out of there?

A. Yea, because it could have caused infection, so he wanted to clean it out so it wouldn't infect my leg.

Q. Was that just an in-and-out, outpatient procedure?

A. I don't know what that means.

Q. Where you go in, have surgery that day, it's done, and then you're discharged that same day?

A. No. I was there for a couple days, I think.

Q. Couple days? At some point do you remember him recommending that you see Dr. Peter Mitchell?

A. Which doctor is he?

Q. I think he's the one that ended up suggesting this carbon fiber brace.

A. Oh, yes, I do remember him.

Q. Okay. Do you remember Dr. Sharpe was the one who recommended you see Dr. Mitchell?

A. Yes.

Q. And it was to see what he thought might be able -- what could be done to maybe help out this situation?

A. Yes.

Q. And one of the things Dr. Mitchell came up with was this new carbon fiber-type brace?

A. Yes.

Brandner001109

Multi-Page™

Page 58

Q. And did Dr. Sharpe help in getting that arranged for you?

A. I don't know if he helped with arranging for me to get the brace, but I know that he sent me to Dr. Mitchell, who sent me to get the brace.

Q. Has that brace helped you?

A. It does what the -- it does what the other braces do, except it's a lot lighter, and the other braces rubbed a lot more. This one doesn't rub as much, but it does still rub a little bit.

Q. Okay. So it does the same basic function as the other braces, but it's more comfortable?

A. Yes, it is way more comfortable.

Q. And a lot lighter weight?

A. Yes.

Q. Is that the one you wear now?

A. Yes.

Q. What church do you go to now?

A. Central Christian.

Q. Where is that located?

A. On Lindsey and Brown -- or Lindsey and adobe, I guess.

Q. And what types of activities do you do over there?

A. I normally just attend the service. I did go to

Brandner001110

Multi-Page™

Page 59

the youth group a couple times, but I didn't really connect, so I didn't stay there.

Q. Okay. When you say "the service," are you talking about on Sunday mornings?

A. Yes. It's just where you -- the preacher preaches and you sing some songs. Not Sunday school or the youth group. It's the normal Sunday service.

Q. Oh, so you don't -- do they have a separate youth group meeting on Sundays?

A. Yeah. It is at the same time as the service. You can either go to the teenage service or you can go to the normal service, and I choose to go to the normal service.

Q. So you can't do both?

A. No. Well, you might be able to. I don't know if they offer an earlier one, but --

Q. Okay. But you've never really connected with the youth group over there?

A. No. I do attend my dad's church, too, often.

Q. What's that, which church?

A. That is called San Tan Heights.

Q. Baptist church?

A. Yes. And that's -- that youth I've connected with a little more. I haven't really done any activities, but I did attend Sunday school almost every other Sunday,

Multi-Page™

Page 60

and I enjoyed the youth pastor. And me and my girlfriend e-mailed him and his wife occasionally.

Q. Does that offer a youth group in the sense that you can do activities?

A. Yes.

Q. But you haven't done that yet?

A. No, no activities.

MR. CAUSEY: Can we take a short break?

MR. CRAWFORD: Absolutely.

MR. CAUSEY: It looks like you're kind of finishing up your notes as well, or at least that topic. Is this a good time to break?

MR. CRAWFORD: No. Just picking them up and looking to a different page.

MR. CAUSEY: Good time to break?

MR. CRAWFORD: Yeah, it's fine.

(Recessed from 1:01 p.m. until 1:10 p.m.)

Q. Scott, your attorney has disclosed a Dr. Patrick Brandner, who is an orthopedic surgeon up in Las Vegas, as an expert in this case. Have you been evaluated by him?

A. No.

Q. Dr. Sharpe had a nerve conduction study performed; do you remember that?

A. Yes.

Q. Do you remember him discussing the results of it

Brandner001112

Page 61

with you?

A. Vaguely. I remember him saying that my side-to-side movement has come back, but I still don't have any dorsiflexion.

Q. Immediately after surgery and for the months following, were you able to move the foot side to side?

A. I don't remember. I don't think I was.

Q. Can you now?

A. Move it side to side?

Q. Yes.

A. Yes, I can.

Q. You said that you used to go wakeboarding?

A. I had been twice.

Q. Who had you gone with?

A. I don't really remember. I think it might have been one of my dad's co-workers, but I'm not sure.

Q. Do you remember how long ago it was that you last went --

A. It was --

Q. -- wakeboarding?

A. -- the summer before I was playing football, the summer before I had broken my leg.

Q. So that's not something you did a lot?

A. No. I had done it twice, and I liked it.

Q. So your plan for the summer is to perhaps work

Brandner001113

Page 62

part-time for your dad, work part-time for your mom, and then maybe do a job with Sports Authority?

A. Yes.

Q. Have you applied to Sports Authority?

A. Not yet, no. I'm kind of waiting till after this recital because we have a lot of practices at the dance studio.

Q. And that recital is when, again?

A. June 17th and 18th, I think.

Q. So you're busier now than you normally are?

A. Yes.

Q. How many hours a week are you putting in because of this upcoming dance recital?

A. Maybe a couple more hours because of rehearsals with the kids. I don't know if -- we don't have extra classes; we just have extra rehearsals.

Q. Okay. Do you have an understanding that there are openings at Sports Authority?

A. Yes.

Q. Do you know somebody that works there?

A. Yes.

Q. And do you know how many hours a week you'd be working if you got the job?

A. No, I don't know exactly.

Q. Is your plan --

Brandner001114

Multi-Page™

Page 63

A.    It would have to fit in with my schedule at the studio, the dance studio.

Q.    When do you work at the dance studio, what hours of the day?

A.    It's usually -- well, the schedule's going to change after the recital, and that's when I would start working, and I would work on Mondays, so I'd have to take Monday off from Sports Authority.

So anywhere -- any other day than Monday probably I could work there.

Q.    And do you want to work full-time, then, if you can?

A.    If I could, yes.

MR. CRAWFORD:  Okay.  That's what I think I have for you.  Thank you.  It was nice meeting you.

THE WITNESS:  Thanks.

MR. CAUSEY:  We're good.  Your mother can now change seats.

(1:14 p.m.)

_____
SCOTT VERNON CLARK

LEA, SHERMAN & HABESKI      PHOENIX, ARIZONA (602)257-8514

Brandner001115

Page 64

STATE OF ARIZONA )
) ss.
COUNTY OF MARICOPA )

BE IT KNOWN that the foregoing deposition was taken before me, Jean L. Lea, a Certified Court Reporter in the State of Arizona; that the witness before testifying was duly sworn by me to testify to the whole truth; that the questions propounded to the witness and the answers of the witness were taken down by me in shorthand and thereafter reduced to print under my direction; that the deposition was submitted to the witness to read and sign; that the foregoing 63 pages are a true and correct transcript of all proceedings had upon the taking of said deposition, all done to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

DATED at Phoenix, Arizona, this 30th day of June, 2005.

Certified Court Reporter
Certificate No. 50004

LEA, SHERMAN & HABESKI        PHOENIX, ARIZONA (602)257-8514

Brandner001116

Multi-Page™

1

THE SUPERIOR COURT OF ARIZONA

MARICOPA COUNTY

STEVE CLARK and KIM CLARK, individually)
and as parents and guardians, and    )
SCOTT CLARK, a minor,                 )
                                      )
                    Plaintiffs,       )
                                      )
        vs.                           )  No. CV2003-017451
                                      )
ANDRE MATTHEWS, M.D., and JANE DOE     )
MATTHEWS, husband and wife; KIPLING P. )
SHARPE, M.D., and JANE DOE SHARPE,     )
husband and wife; BAYWOOD ORTHOPEDIC   )
CLINIC, an Arizona Corporation; MEZONA )
ORTHOPAEDIC, an Arizona Corporation;   )
VALLEY LUTHERAN HOSPITAL, an Arizona   )
Non-Profit Organization; et al.,       )
                                      )
                    Defendants.       )
                                      )

Tempe, Arizona
June 8, 2005
1:17 p.m.

DEPOSITION OF KIM CLARK

LEA, SHERMAN & HABESKI
Registered Professional Reporters
834 North First Avenue, Phoenix, Arizona  85003
(602) 257-8514  Fax: (602) 257-8582
Reported by:  Jean L. Lea, RMR, CRR
Certified Court Reporter
Certificate No. 50004

LEA, SHERMAN & HABESKI        PHOENIX, ARIZONA (602)257-8514

Brandner001117



Page 2

EXAMINATION INDEX

PAGE

By
  Mr. Crawford..................................................... 4

Brandner001118

Multi-Page™

Page 3
DEPOSITION OF KIM CLARK,

taken at 1:17 p.m. on June 8, 2005, at the law offices of

Crawford & Kline, Suite 101, 1920 East Southern Avenue

Tempe, Arizona, before JEAN L. LEA, RMR, CRR, a

Certified Court Reporter in the State of Arizona.

APPEARANCES:

        For the Plaintiffs:
            Koeller, Nebeker, Carlson & Haluck, LLP
            by WADE R. CAUSEY, ESQ.
            3200 North Central Avenue, Suite 2300
            Phoenix, Arizona  85012

        For Defendants Sharpe and Mezona:
            Crawford & Kline
            by BRUCE D. CRAWFORD, ESQ
            Suite 101, 1920 East Southern Avenue
            Tempe, Arizona  85282

Brandner001119

Mini-Page

Page 4

KIM CLARK,

called as a witness herein, having been first duly sworn,

was examined and testified as follows:

EXAMINATION

BY MR. CRAWFORD:

Q. Can you tell us your full name for the record, please.

A. Kim Frances Clark.

Q. Mrs. Clark, you've attended the two depositions today?

A. Yes.

Q. Do you understand that if I ask you a question that's unclear, that you shouldn't answer it and you should ask me to clarify it?

A. Yes.

Q. All right. Have you ever had your deposition taken before, other than the prior deposition in this case?

A. Not that I recall.

Q. Have you reviewed any documents to help prepare yourself for today's testimony?

A. I saw a document earlier that Wade showed me, a disclosure by Dr. Sharpe.

Q. Okay.

Brandner001120

Page 5

A. And I read it quickly and -- well, parts of it quickly, and that's all.

Q. Okay. And is this the one where there's a summary of what his testimony may be in this case?

A. Correct.

Q. Okay. And do you have some specific disagreements with that?

A. Yes.

Q. And what is it you disagree with?

A. The portion that I read spoke of a time when he, prior to the surgery on Scott, disclosed to us that there could be specifically nerve damage, including foot drop. That was not the case.

Q. All right. You're saying he didn't do that or you don't remember it?

A. He did not say that specifically.

Q. Okay. Did he say there was a risk of nerve injury?

A. Yes.

Q. All right. Let's just me ask you about that particular topic. Before surgery do you remember two separate meetings with Dr. Sharpe?

A. Yes.

Q. And do you remember during those two separate meetings he discussed, among other things, potential risks

Brandner001121

Mini-page

Page 6

and complications of surgery?

A.    I do not recall him speaking about it in both. I recall the one -- the second one, where we had made the decision to go through with surgery and he was, you know, clarifying everything that he was going to do, going over the risks of surgery.

Q.    Okay.  His records indicate that he discussed risks with you during both visits.  Now, are you saying that that's something that did not happen or you don't remember it?

A.    I don't recall it that way because initially, when we met with him for the first time, there was no decision that we were going to go forward with the surgery, so he -- I just don't recall it because we hadn't made that decision yet.

Q.    All right.  If his records and his testimony in this case are that he did discuss potential risks and complications with you and your son --

A.    M'hum.

Q.    -- during both visits at his office before surgery, are you going to say that's not correct?

A.    I will say that I don't recall it in the first meeting for the reasons that I've already stated.

Q.    I understand you don't recall it for the reasons you stated, but are you going to go the next step and

Brandner001122

Page 7

say --

A.   No, I won't.

Q.   -- that's not the truth, that did not happen?

A.   No, I won't go that far.

Q.   Okay.  You're saying that it is possible that he discussed risks during both of those, but you do not remember that?

A.   Correct.

Q.   All right.  You definitely remember it during the preop visit, which was the second visit?

A.   Correct.

Q.   You definitely remember that Dr. Sharpe sat down with you, your son, and your husband and went over potential risks and complications?

A.   I don't recall Steve being there.

Q.   His note says that Scott and his parents are present.  Are you going to say your husband was not there, or you don't remember it?

A.   I'll just say I don't remember it.

Q.   Your husband was present during one of the meetings with Dr. Sharpe?

A.   Correct, the first meeting.

Q.   That's your recollection?

A.   Correct.

Q.   His records suggest that it was just you and

Brandner001123

Mini-Page

## Page 8

Scott the first meeting.

A.   It was Scott and I the first meeting with anybody from Mezona.   The second meeting Steve was there.

Q.   Okay.   The first meeting was with Dr. Dinowitz.

A.   Correct.

Q.   Okay.   And I understand you and Scott were there for that meeting, right?

A.   Correct.

Q.   The next meeting was with Dr. Sharpe?

A.   Correct.

Q.   Now, are you saying that your husband was not present during that meeting?   Or was?

A.   The very first meeting with Dr. Sharpe, he was there.

Q.   Your husband?

A.   My ex-husband, yes.

Q.   Sorry.   The second meeting with Dr. Sharpe where you were specifically deciding and discussing surgery, your memory is that your husband wasn't there?

A.   Correct.

Q.   Is that a point on which your memory may be failing you?

A.   Possibly.

Q.   During the specific occasion before surgery where Dr. Sharpe went over potential risks and

Brandner001124

Multi-Page

Page 9

complications of surgery, at least you and your son Scott were present?

A. Correct.

Q. Do you remember Dr. Sharpe telling you that one of the potential risks of surgery was death?

A. Yes.

Q. Do you remember him telling you that one of the potential ways in which death could occur was an adverse reaction to anesthesia?

A. No.

Q. If his records suggest he told you that, is that a point where you're going to say he didn't say that or you may not remember it?

A. I may not remember it.

Q. Whether death was due to the surgery in some way or anesthesia, you knew that if your son consented to this surgery and you consented to it, there was a risk that he could die?

A. Yes.

Q. Do you remember Dr. Sharpe telling you-all that infection was a risk?

A. Yes.

Q. And that that could be very serious?

A. Yes.

Q. Bleeding was a risk?

LEA, SHERMAN & HABESKI        PHOENIX, ARIZONA (602)257-8514

Brandner001125

Page 10

A. Yes.

Q. And that that could be very serious?

A. Yes.

Q. Do you remember him talking about blood clots that could possibly develop?

A. I don't recall.

Q. Do you remember him talking about a condition called pulmonary embolism?

A. I don't recall.

Q. In terms of blood clots, is that something you may not remember but he may have told you?

A. Correct.

Q. Do you remember him telling you that Scott could still have stiffness and/or pain after surgery?

A. Yes. Pain.

Q. Do you remember him telling you about stiffness?

A. I don't recall that.

Q. Do you deny that he told you that?

A. No.

Q. Do you remember him telling you that his hope was that this surgery would be successful, but there was no guarantee?

A. Not specifically that way. It --

Q. How did he phrase it?

A. That the chances of success were a high

Page 11

percentage that Scott would be able to return to activities as normal.

Q. And did you glean from that, then, there was a smaller percentage that he wouldn't?

A. Correct.

Q. And you remember him telling you that one of the risks was nerve injury?

A. Nerve damage.

Q. Okay. Did you ask him any questions about that?

A. No, I did not. He listed them all one after another, so there was no great-length discussion of every single issue and how it might end up. There was just like a listing, these are the things that can happen.

Q. I'm not trying to be facetious, but the risk of death, you knew how that would end up?

A. Correct.

Q. When he told you that one of the risks was nerve injury or nerve damage, what did that mean to you?

A. I wasn't sure.

Q. Okay. When he was telling you about these potential risks or complications of surgery, did you ask any follow-up questions?

A. He gave us the impression that the risks were quite small in terms of these things occurring.

MR. CAUSEY: His question was whether you

LEA, SHERMAN & HADESKI       PHOENIX, ARIZONA (602)257-8514

Brandner001127

Multi-Page

Page 12

asked him any follow-up questions.

THE WITNESS: Oh, I'm sorry.

MR. CAUSEY: Try and answer his question.

A. No, not specifically.

Q. BY MR. CRAWFORD: So he said, "These various risks I'm telling you about, they don't happen very often, but they are things you have to know and you have to understand could happen"?

A. Yes.

Q. Do you remember him discussing various options available to Scott?

A. Yes.

Q. What did he discuss?

A. The opportunity to leave it the way that it was, and then a great deal of discussion about having a surgery and various ways that that surgery might go.

They had, "they" being Mezona, had collectively looked at Scott's x-rays and made an opinion that he voiced to us that surgery was probably our best option for Scott to correct the situation, so that's why he spent a lot of time on the surgery portion.

Q. Okay. So he told you one of the options was do nothing, leave it alone, and see what happens?

A. Correct.

Q. He told you, in addition, there was various

LEA, SHERMAN & HABESKI        PHOENIX, ARIZONA (602)257-8514

Brandner001128

Page 13

different ways the surgery could be performed from more of a technical standpoint?

A. Right.

Q. Okay. Do you remember him explaining using x-rays or a model or something how surgery would be performed to correct the problem?

A. I recall us looking at x-rays and him, you know, showing us again angles of degrees that things were off, but he said that he probably would need further tests to determine exactly what avenue surgery would be best for Scott.

And that was -- the plan was to have further tests to see if there was rotation and, you know, even -- you know, it not healing because of the pain, there might be a reason to think that it might not have even healed correctly yet.

Q. Are we talking about the CT scans?

A. Correct.

Q. All right. So during both of the meetings with Dr. Sharpe, at least you and your son were present during both?

A. Yes.

Q. And so at least you as the mother were there to help make a decision on whether your son was going to have surgery or not?

Page 14

A.   Yes.

Q.   You didn't just leave it to your son who had just turned 15, did you?

A.   No.

Q.   You certainly respected what he had to say?

A.   Correct.

Q.   One of the things he had to say was "I don't want to live like this"?

A.   Absolutely.

Q.   And you and your husband had concluded, This isn't good, we don't want him to live like this?

A.   Correct.

Q.   Doing nothing and seeing what happened in the future was not acceptable to you guys, was it?

MR. CAUSEY:  Form.

A.   Not at this point.

Q.   BY MR. CRAWFORD:  Not at that point?

A.   Right, I'm sorry, yes, not at that point.

Q.   Let me jump to a totally different topic. What's your education background?

A.   Through high school.

Q.   Where did you go to high school?

A.   Apache Junction High School.

Q.   And your husband, did he complete high school?

A.   Yes.

Brandner001130

Page 15

Q. Your ex-husband?

A. Yes.

Q. Sorry, I apologize.

A. That is okay.

Q. Where did he go to high school?

A. Apache Junction High School.

Q. So you guys met there?

A. Yes.

Q. And you own a dance studio?

A. Yes.

Q. What is it called again?

A. Dance Network. I'm a partner, co-owner.

Q. All right. How big a dance studio is it?

A. Approximately 200 students.

Q. Where is it located?

A. It's on Southern and Leisure World Drive.

Q. You don't get all the people from Leisure World over there, do you?

A. No.

Q. You might not want to.

MR. CAUSEY: It's not the Fred Astaire Studio.

(Discussion off the record.)

Q. How long have you been involved with teaching dance?

LEA, SHERMAN & HABESKI      PHOENIX, ARIZONA (602)257-8514

Brandner001131

Multi-Page™

Page 16

A.   29 years.

Q.   And because of that, both of your sons have gotten interested in dance?

A.   Yes.

Q.   I'm going to give you the same time frame I gave your husband and your son, so I can get a better handle on what problems he was having before Dr. Sharpe's first surgery, okay?

A.   Yes.

Q.   So saw Dr. Matthews the end of January 2002. You guys became pretty unhappy with Matthews, right?

A.   Yes.

Q.   And did you have the same feeling, that he was basically blowing off Scott's complaints?

A.   Yes.

Q.   That you thought were very legitimate?

A.   Yes.

Q.   And Scott was having a lot of problems that Dr. Matthews didn't appear to be acknowledging?

A.   Correct.

Q.   Let's just arbitrarily take us to June 1, 2002, which would be about three weeks before Dr. Sharpe's surgery, okay?

A.   Okay.

Q.   I want to know how he was doing at that point

Brandner001132

Page 17

and the problems he was having, okay?

A. Okay.

Q. Was he having a lot of problems with pain?

A. Yes.

Q. Was it a situation that had been getting worse over time?

A. Yes.

Q. Was it both a chronic-type pain as well as becoming a sharp and throbbing pain when he would do activities?

A. Yes.

Q. Had it gotten to the point where it was pretty much a constant situation where he was having some degree of pain in that leg?

A. Yes.

Q. Was the lower right leg obviously deformed to you as a mother?

A. Yes.

Q. And I've heard it was bowed in, and I've heard it was bowed out. What did it appear like to you?

A. There was a huge lump on the front of the leg just below the knee where the break was.

Q. Like another kneecap?

A. Correct.

Q. All right.

LEA, SHERMAN & HABESKI     PHOENIX, ARIZONA (602)257-8514

Brandner001133

Mun-Page

Page 18

A.   The leg, the calf bone, was bowed this way, in an arch, which bowed outwards but came back in, tilting the ankle inwards.

Q.   Okay.  So if we were looking straight down at his feet, from his head looking straight down to his feet, you're saying that the lower right leg from the knee to the ankle was bowed outward toward the right, correct?

A.   If it should be straight like so, the bone was like this, yes.

Q.   Right.  So the bow is to the outside?

A.   Correct.

Q.   But it caused the right foot to point in toward the left foot?

A.   Correct.

Q.   Do you have any pictures of that?

A.   I believe we have pictures.  There is a video also that is all ready to be given to you, I gather, that shows him standing on a stage clogging, and you can see his leg pretty good because he's wearing a pair of shorts.

Q.   Okay.

A.   And you can see kind of the . . .

MR. CAUSEY:  Excuse me, Bruce.

Is that one I already have?

THE WITNESS:  Yes, yes.

LEA, SHERMAN & HABESKI       PHOENIX, ARIZONA (602)257-8514

Brandner001134

Multi-Page

Page 19

MR. CAUSEY: Okay.

Q.   BY MR. CRAWFORD: Okay.  So there's a videotape during a recital?

A.   Correct.

Q.   In which he's in shorts, and it shows the bow pretty well?

A.   Yes.

Q.   And I know I'm going to get the opportunity to review these.  During what type of dance routine?

A.   Clogging.

Q.   Clogging, okay.  Other than that video, do you have any photographs of what this leg looked like?

A.   I am not sure.  I can look to see if we specifically have that.

Q.   Would you see if you have pictures of what the leg looked like before Dr. Sharpe's surgery, please?

A.   Yes.

Q.   All right.  And I think your attorney told you during Scott's deposition, but I do want copies of all of the videotapes of recitals or competition or even practice that will show what Scott was doing in terms of dance before this all happened, before Dr. Sharpe's surgery, and then afterwards, okay?

A.   Yes.

Q.   You don't need to go back to when he was two

LEA, SHERMAN & HABESKI          PHOENIX, ARIZONA (602)257-8514

Brandner001135

Page 20

years old, okay?

A.    Okay.

Q.    You know, 13, 14 years old's fine, all right?

A.    M'hum.

Q.    The pain and the deformity that he was having as of June 1, 2002, he wasn't able to run?

A.    Not long.  He could run some, but after a very short time, pain would cease -- make him cease.

Q.    You mean after like maybe a hundred feet?

A.    About.

Q.    Okay.  Then he would have a lot of pain in the leg?

A.    Yes.

Q.    You were able to observe how it affected him at dance?

A.    Yes.

Q.    And how was it affecting him at dance?

A.    He tired easily.  The leg was not as strong as his other leg was.  I believe that helped to increase the pain, how it came on pretty quickly.  He -- we had to adjust a lot of choreography, especially on the floor things, because he couldn't put his knee down because of the lump.  He wasn't able to jump off very well and land because the pain would hit.  And I think a lot of it changed because he knew it was going to hurt, so he tried

Brandner001136

Page 21

to be preventive and just not do the thing that he knew would hurt it.

Q. All right. So jumping on the foot was a real problem?

A. Yes.

Q. Landing on the foot in some way was a real problem?

A. Yes.

Q. Or the leg, I should say?

A. Yes.

Q. Tumbling would have been a real problem?

A. Correct. He had -- he was still able to do everything other than set his knee directly on the floor, but it had to do with how much pain he'd be in doing it.

Q. Okay. So --

A. Okay? And a lot of times he took the pain to do the thing.

Q. All right. He wouldn't have been able to go on point with that leg, would he?

A. Generally men don't, but he wouldn't have been able to, I don't think.

Q. Okay. You have a lot more expertise in the world of dance than the normal person, right?

A. Correct.

Q. Okay. Do you agree that the problems he was

Brandner001137

Multi-Page™

Page 22

having with that leg as of June 1, 2002, was significantly impacting his ability to do dance?

A.   Absolutely.

Q.   And if that situation had continued, he was not going to be heading toward any scholarships?

MR. CAUSEY:   Form.

A.   Depending on what Scott felt he could take painwise, he may have tried to proceed.

Q.   BY MR. CRAWFORD:  Well, he may have tried, but from your perspective, seeing the limitations he had, you knew pretty well he wasn't going to get any scholarships with those problems?

A.   I can't say definitely because his ability -- he still had a great deal of ability to do things necessary. I think it really would have depended on how Scott farred (sic) as time went by.

Q.   How what?

A.   How he did as time went by, how he dealt with the pain.  You know, I mean, at that point in time we knew that it was just causing him excruciating pain.  We were looking for options to change that, to fix that.

Q.   How else was this problem with the leg affecting his life as of June 1, 2002?

A.   He had gone out for track and was limited in what he could do because he couldn't run distances.  He

LEA, SHERMAN & HABESKI       PHOENIX, ARIZONA (602)257-8514

Brandner001138

Multi-Page™

Page 23

ended up doing the discus because it was something that used upper body rather than a whole lot of leg strength, but it did interfere because he couldn't push off as well as he needed to to get --

Q. You say it did or did not interfere?

A. It did interfere.

Q. Okay.

A. Because he couldn't push off as well. He didn't play football anymore because of pain and non- -- non-ability to run as much as you have to.

Q. How else did it affect him?

A. I think it discouraged him a great deal.

Q. So emotionally?

A. Yes.

Q. How else did it affect him?

A. Just a lot of activity he had to, you know, kind of monitor himself to discern whether the activity was going to hurt him to the point where it would be unbearable. He would have to kind of go into an activity, whatever it was, and see how he was going to do with it.

You know, he had to really test himself. Certain things he had decided he wouldn't do, like skateboarding he wouldn't even try.

Q. Well, you'd have killed him if he did it, wouldn't you?

**LEA, SHERMAN & HABESKI       PHOENIX, ARIZONA (602)257-8514**

Brandner001139

Page 24

A.    Possibly.

Q.    I mean, look, if he said, based on what you saw the problems he was having with that leg and he said, for example, "I'm going to go snow skiing" or "I'm going to go wakeboarding," you would have said no way?

A.    Right, I would have urged him to be cautious. I mean, even watching him dance hurt me, but he had a real desire to do what he was doing.

Q.    Could you see as he was dancing the pain on his face?

A.    Yes.

Q.    All right. So given all of that, it was clear to you, your husband, and to Scott that something needed to be done to correct this problem?

A.    Yes.

Q.    Now, you go to Mezona to see Dr. Dinowitz, according to the records, on March 22, 2002. Does that sound about right in terms of a time frame?

A.    Yes.

Q.    And your memory is it was just you and Scott?

A.    Yes.

Q.    And you were going there to get basically a second opinion from him?

A.    Yes.

Q.    What do you remember him saying?

Brandner001140

Page 25

A. I remember him calculating the degree that the bone was twisted or warped and saying that it really was falling outside the limitations of normal, that it was, you know, extremely bent and that he wanted to take this before his clinic, board, to have them observe to see what they thought might be options for Scott before he said anything specific.

Q. Do you remember him using the word "conference"?

A. Yes.

Q. Okay. That he was going to present it to a conference of doctors?

A. Yes.

Q. Do you remember him saying at the end of that visit that it was his feeling that surgery was necessary, but he wanted to conference this thing with the other doctors?

A. Possibly.

Q. Did you express to Dr. Dinowitz during that meeting that living with this situation was not acceptable?

A. Yes.

Q. Is there anything else of that meeting with Dr. Dinowitz that you remember?

A. He did bring Dr. Sharpe in for a moment to meet Scott, to have him look at the x-rays, because his

Brandner001141

Multi-Page™

Page 26

expertise was in hand and wrist injury and Dr. Sharpe's expertise is in leg injury.

Q. Okay. And do you remember anything Dr. Sharpe said?

A. I believe he just commented on the degree that it was off and said, "We'll conference this" or something to that effect.

Q. But you don't remember the specifics of what he said?

A. Not exactly, no.

Q. Okay. Is the next thing that happened you get a call from Dr. Dinowitz?

A. I believe so. Or the office, one of the two.

Q. Well, do you remember Dr. Dinowitz calling you and telling you what the results of the conference were?

A. I believe it was him. I can't recall exactly if it was him. I just know for sure it was from Mezona, and they said that we needed to meet with Dr. Sharpe so that he could discuss our options, and one of them being the surgery was really something that they were looking towards.

Q. Okay. Were you the person they spoke with?

A. Yes.

Q. Do you recall the person who was speaking with you telling you that it had been conferenced and the

LEA, SHERMAN & HABESKI     PHOENIX, ARIZONA (602)257-8514

Brandner001142

Multi-Page™

Page 27

conclusion was surgery is something you ought to consider?

A.    Yes.

Q.    And Dr. Sharpe would be the person to meet with and go over that with?

A.    Correct.

Q.    And basically you made an appointment, I assume?

A.    Yes.

Q.    All right.  And according to the records, you go in to see Dr. Sharpe on April 11, 2002.  Does that sound about right?

A.    Yes.

Q.    And your memory is that you, your husband, and your son were present?

A.    As far as I can remember.

Q.    Okay.

A.    I feel we all were there.

Q.    Do you remember Dr. Sharpe asking Scott and you two with him what problems he was having?

A.    Yes.

Q.    And how was this interfering with his life?

A.    Yes.

Q.    And what are the things you want to try to get back to?

A.    Yes.

Q.    Do you remember him talking with you about the

Brandner001143

Multi-Page™

Page 28

results of that conference?

A. Yes.

Q. What did he say about that?

A. That the -- they suggested that surgery was probably our best option for correcting the situation with Scott, and then he discussed the various surgeries.

Q. Do you remember him telling you why they had reached that conclusion, that surgery was the best option?

A. Not exactly.

Q. Well, do you remember anything about why they were thinking that surgery was the best option?

A. I think that it came up that Scott had pretty much reached the end of his growth span and that his -- most of his plates were closed, so there wouldn't be a whole lot of ability for the body to adjust the bone and that it probably would be fixated like that, so to correct that, it would be a rebreak and then some kind of device to hold it still.

Q. All right. So the options that Dr. Sharpe discussed with you that day are do nothing, surgery, and then the different types of surgery?

A. Right.

Q. And do you remember what the different types of surgery were that he discussed?

A. He discussed -- well, each one called for a

LEA, SHERMAN & HABESKI       PHOENIX, ARIZONA (602)257-8514

Brandner001144

Multi-Page™

## Page 29

rebreak of the bone, and one was a plate being put in alongside the bone, one was a rod being put down through the bone, and one was where you'd use something on the outside to hold it still.

Q. An external fixator?

A. Yes, I believe so.

Q. Do you remember him using the term "osteotomy"?

A. No.

Q. Do you remember him saying the bones would need to be cut?

A. Yes.

Q. We've already talked about risks, and I realize that you don't have a specific memory of risks being discussed that visit, but is there anything else, putting aside risks or complications of surgery, that you have a memory of being discussed that day?

A. Just that information and telling us to evaluate it and let them know -- or let him know what our decision was.

Q. So he wasn't trying to push you or rush you into surgery?

A. No.

Q. And did he mention that one of the things he would want done would be a CT scan at some point?

A. Yes.

Brandner001145

Multi-Page™

Page 30

Q.   Do you remember him telling you why a CT scan would be a good thing to have done?

A.   I think that he said for a couple of reasons: one, to make sure that the bone had healed because he wasn't sure that it had come together.  The other was to see the degrees of rotation and angle of the bone to discern, you know, which surgery would be best, if that was the choice that we made.

Q.   All right.  You finish up with Dr. Sharpe, and it's my understanding you then go to see Dr. Walls in Scottsdale for another opinion?

A.   Yes.  The office we went to was in Mesa.

Q.   Okay.  Who scheduled that visit?

A.   I did.

Q.   Had it been scheduled before you saw Dr. Sharpe?

A.   I don't recall.

Q.   Why did you schedule the visit with Dr. Walls?

A.   We wanted more than just one other opinion.

Q.   Okay.  So did you have -- well, you had somewhat of an opinion from Matthews, which is he didn't think there was anything wrong, right?

A.   From back in January, yes.

Q.   And then you had the opinion of the conference of doctors that they felt surgery was probably your best option?

Brandner001146

Page 31

A. Yes.

Q. And you had an opinion from Dr. Sharpe that, in his mind, surgery was probably your best option?

A. Yes.

Q. So now you get another opinion by Dr. Walls, and was that again to see is surgery the best way to go and, if so, what kind of surgery?

A. Yes.

Q. How did you get his name?

A. I had attended physical therapy next door, and I knew that he was a doctor who worked with athletes and their injuries. So I went to -- made an appointment with him.

Q. So you and Scott go into that one?

A. Yes.

Q. And your husband was not present?

A. No.

Q. Did he ask you the same types of questions, like "What problems are you having with it, Scott?" "How is it impacting your life?" "What do you want to try and get back to"?

A. Yes.

Q. And I'm assuming both during the meetings with Dr. Sharpe and then this meeting with Dr. Walls, the group communicated clearly that this was a major impact in his

Brandner001147

Multi-Page™

Page 32

life?

A. Yes.

Q. What did Dr. Walls say he thought was the way to go?

A. After reviewing the x-rays, his prominent thought also was to have surgery done, and he specifically spoke of a rod being placed in the bone.

Q. Did he tell you that he didn't think just letting it go as it was was a good option?

A. No.

Q. He didn't say that either way?

A. I don't believe he said that that was a good option at all.

Q. Okay. Did he discuss leaving it alone and not doing anything?

A. He said that we could do that, but he foresaw other complications that might occur because of leaving it that way and it getting worse.

Q. All right. So he agreed with the idea that surgery was the best way to go?

A. Yes.

Q. And he proposed, out of all of the different ways that the bones could be put back together, using this rod?

A. Correct.

LEA, SHERMAN & HABESKI        PHOENIX, ARIZONA (602)257-8514

Brandner001148

Multi-Page™

Page 33

Q. Did he show you one of those rods?

A. No.

Q. Did he describe it for you?

A. He just said it was a steel rod.

Q. And did he basically say, "This is my recommendation; get back to me and let me know what you want to do"?

A. Yes.

Q. It's my understanding you then go back to see Dr. Matthews; is that your memory?

A. Yes.

Q. By the way, the visit with Dr. Walls, according to our records, was April 18, 2002. Is that consistent with your memory?

A. Yes.

Q. And then the visit with Dr. Matthews is April 22, 2002?

A. Yes.

Q. Do you remember that visit with Dr. Matthews?

A. Yes, I do.

Q. Did he basically just say, "I don't think there's a problem"?

A. He said that there was some degree of rotation, but he didn't feel it was very extreme. He knew that we had already spoken to other doctors, and he said, before

LEA, SHERMAN & HARESKI       PHOENIX, ARIZONA (602)257-8514

Brandner001149

Page 34

we left, that he would like to see if there's anything that he could do to help.

Q. Well, what did he suggest?

A. Nothing.

Q. Was there any discussion with him about surgery versus no surgery?

A. We asked him what his opinion was, and he said he didn't know if it was severe enough for surgery, that it was very slight.

Q. Okay. And did you get the sense from that meeting with Dr. Matthews that he wasn't taking seriously the extent of problems Scott was having?

A. Absolutely.

Q. So, in other words, you guys were telling him, "He's having all these problems, he's having all this pain," and it just doesn't seem to be registering with Dr. Matthews?

A. Correct.

Q. Did Dr. Matthews ever get back to you on anything after that visit, call you --

A. No.

Q. -- and say, you know, anything?

A. No.

Q. Why did you go back to see Dr. Matthews?

A. My ex-husband and I thought that we should go

Brandner001150

Page 35

just to see what he had to say, to see if he saw the problems that the other doctors were seeing. He recognized a slight difference, but that was it.

Q. Was your impression that everybody else was saying there's a significant problem, and this one guy, Dr. Matthews, is kind of saying it's not?

MR. CAUSEY: Form.

A. It's just not as severe as everybody else is saying.

Q. BY MR. CRAWFORD: Okay. So he's all by himself over in this camp?

A. Correct.

Q. Everybody else is over in the other camp?

A. Correct.

Q. According to the records, Scott has a couple of CT scans of the leg, and then he goes back to see Dr. Sharpe. Do you remember that sequence of events?

A. Yes.

Q. And during that visit, do you remember Brian, his physician's assistant, being involved at all?

A. I know that Brian was, and I think that's when he first came in. He was with Dr. Sharpe pretty much after that all the way through the rest of Scott's care.

Q. And this is the visit that you have a specific memory that Sharpe went over the risks and complications

LEA, SHERMAN & HABESKI          PHOENIX, ARIZONA (602)257-8514

Brandner001151

Page 36

we discussed earlier?

A. Correct.

Q. Because the purpose of this visit was basically a chance to regroup with Dr. Sharpe and make a decision?

A. The -- it was to find out exactly what surgery he was going to do because we had made the decision to have him do surgery.

Q. You hadn't made that decision as of the first time you met with him, though?

A. Correct.

Q. You had gone through these other steps and then decided that you were going to go with Sharpe?

A. Correct.

Q. Why did you choose Sharpe as opposed to this Dr. Walls?

A. My ex-husband had had experiences with the Mezona Clinic, and they'd come highly regarded; and we felt that because of the time and effort that Dr. Sharpe was putting into Scott and his case, that he really was somebody who cared about Scott, and we felt that was very important.

Q. What do you mean by "the time and effort that Dr. Sharpe was putting into the case"?

A. He thought about -- he specifically told us in this particular visit that he had spent a great deal of

Brandner001152

Multi-Page™

Page 37

time going over exactly how he would do the surgery and, as he explained it to us, he was explaining how he had, you know, decided to do it this way versus another way and that he had spent time with him in thought. He had mentioned that on the telephone when I called back to make the appointment, too.

Q. Okay. What do you remember of that discussion with him?

A. On the telephone?

Q. Yeah.

A. Well, that we had decided that surgery would be best, and he at that time said, "I have thought about Scott a great deal, and I think that," you know, "I can come up with the best plan of treatment for him." He showed a real interest in Scott.

Q. So between the first time you met with Dr. Sharpe, which was mid-April, and when the surgery was performed was the end of June, that's about two and a half months?

A. Correct.

Q. There was lots of time for you to think about what, of the various things you'd been told, you as parents were going to choose for Scott?

A. Yes.

Q. Do you remember during -- strike that.

Brandner001153

Multi-Page™

Page 38

I'll tell you, the second visit with Dr. Sharpe, according to the records, was June 6th, 2002. Does that sound consistent with your memory?

A. Yes.

Q. And he specifically went over the CT scan results with you?

A. Yes.

Q. Do you remember him doing a physical examination that day?

A. I believe he did manipulate the bone and ankle.

Q. Right. And go over again how Scott was doing and the problems he was having and what he wanted for the future?

A. Yes.

Q. And this was the visit again that you do remember a discussion of risks and complications?

A. Yes.

Q. And hopefully the benefits of surgery?

A. Yes.

Q. And then is there anything specifically of that visit on June 6th, 2002, that you recall that we haven't discussed already?

A. A great deal of time was also spent on keeping Scott's pain under control through the surgery and on that -- when he was released from the hospital. And a lot

Brandner001154

Multi-Page™

Page 39

of arrangements were made, special arrangements were made at that time for Scott in pain management, being they were going to use an epidural as well as general anesthesia.

They were going to monitor him and allow him to use a morphine, you know, on-call pretty much, trying to keep his pain down, because that was the biggest concern they had was that he not have such great pain when he got done.

Q.   So I'm assuming by all of that you guys understood that this is going to be a painful deal in terms of the recovery?

A.   Yes.

Q.   Do you remember him talking with you about something called compartment syndrome?

A.   Not specifically.

Q.   It's something where the leg can swell up, and if it builds up too much pressure, it can cause damage to muscle or nerves, et cetera?  Do you remember him talking about that that's one of the things that they needed to look out for?

A.   I recall talking about drainage.  If that has to do with that, then yes.

Q.   That they might have to put in a drain?

A.   Not put in a drain, but the chance that they might have to -- depending on how it was healing, there

Brandner001155

Multi-Page™

Page 40

could be areas that clot up inside, where Scott needs to have them drained out, one way or another, whether it's with a drain or surgery.

Q. Because if you don't do that, it could cause damage?

A. Correct.

Q. Okay. Anything else about that meeting with Dr. Sharpe on June 6th, 2002, that we haven't talked about?

A. Not that I can recall.

Q. So the next thing that happens is he has surgery at Mesa Lutheran Hospital?

A. Correct.

Q. When did you first realize after surgery that there was a problem with his ability to move his foot?

A. When Dr. Sharpe told me.

Q. Okay. So he was actually the first one that told you about it?

A. Yes.

Q. What did he tell you about it?

A. That Scott's ankle was not responding. At first he thought it might have to do with the epidural, so they had to wait until the epidural wore off.

And then when that happened, he spoke again and said that he was not able to move his foot up or down

LEA, SHERMAN & HABESKI     PHOENIX, ARIZONA (602)257-8514

Brandner001156

Multi-Page™

Page 41

or side to side.

Q. How soon was that after surgery that Dr. Sharpe told you that?

A. I'd say within maybe a day or two.

Q. Okay.

A. Pretty quickly.

Q. So did it appear to you he was being completely up-front about it?

A. Yes, as much as he knew.

Q. Okay. I understand he didn't know exactly what was going on, but your impression was he told you right away, "There's a problem here and we need to watch it"?

A. Correct.

Q. And do you remember him telling you that hopefully it would be temporary, but it is something that could be permanent?

A. Yes. Leaning towards temporary.

Q. Hoping, right?

MR. CAUSEY: Form.

Q. BY MR. CRAWFORD: Okay. Let me rephrase the question. This discussion occurred very early on after surgery?

A. Correct.

Q. And do you remember him saying hopefully this is a temporary situation, and hopefully it's not permanent?

LEA, SHERMAN & HABESKI        PHOENIX, ARIZONA (602)257-8514

Brandner001157

Page 42

A. Yes. He said that he felt that the nerves were asleep.

Q. Okay. And Scott had a lot of other complications after surgery?

A. Yes.

Q. And do you remember being told why that happened, most probably?

A. Most probably it was determined that it had something to do with Ibuprofen saturation, taking drugs to -- they felt maybe it had to do with him having Ibuprofen every single day.

Q. And that it had been affecting his liver?

A. Yes.

Q. Had he been taking a lot of Ibuprofen?

A. Yes.

Q. Was that what he had for pain management?

A. Yes.

Q. So was it a situation where he was taking more and more Ibuprofen because of the pain with his leg?

A. He took what he -- what the limit was per day.

Q. What was that?

A. I think he could take six a day.

Q. Was this just over-the-counter?

A. Yes.

Q. Who told you that it may have been related to

Brandner001158

Page 43

Ibuprofen?

A.   I think -- I cannot be absolutely certain.   It was either the specialist that they brought in or Dr. Sharpe himself said that at first they thought it might have been the anesthesia, but then we had a great discussion about different things that might have affected Scott; and we talked about the pain medication of Ibuprofen, and so they thought that probably was it, but they couldn't be absolutely certain.

Q.   Was there a discussion about hepatitis?

A.   Oh, yes, it caused hepatitis.

Q.   Okay.   So hepatitis was a result of whatever happened?

A.   Yes.

Q.   Do you remember Dr. Sharpe ultimately explaining the results of the nerve-conduction study?

A.   Yes.

Q.   And what did he tell you about that?

A.   He said there were two nerves that were damaged; one made the foot go side to side, and at the time that we went in, Scott already had gained that, and that was within five days or so after the study.

Q.   He had gained that back?

A.   Correct.  But the up-down one had not -- was still not working.

Page 44

Q. Up and down called dorsiflexion?

A. I think so.

Q. All right. But the side-to-side movement of his foot, he had gained that back?

A. Yes.

Q. Did he at any point give you his best thought as to how this had probably happened?

A. Yes.

Q. And what did he tell you?

A. He said there could have been two things: In having to move the bone, he might have stretched the nerve, or there was a chance that in cutting the bone, he cut the nerve.

Q. Was that before or after the results of the nerve-conduction study?

A. That was before.

Q. Do you remember him telling you that the nerve-conduction study pretty well ruled out the idea of the nerve being cut?

A. He didn't ever be specific that way.

Q. Now, you didn't get the impression he was saying that he had done something wrong?

A. No, that that's just what happened.

Q. Just the explanation for how it could have happened?

Brandner001160

Multi-Page™

Page 45

A.    Correct.

Q.    When, to your memory, was Scott able to get back and be active in dance?

A.    I think it was maybe the fall of 2003 he started doing some things, trying.

Q.    When did he get to the point where he was able to, you know, be active in terms of teaching and stuff like that?

A.    I believe he started assisting in our tumbling -- let's see. Maybe in January-February of 2004.

Q.    How has he been doing in terms of being an instructor for those classes?

A.    Because it doesn't take a lot of movement for him in terms of demonstrating, he doesn't have to do that; he spots, so he -- Scott's quite good with children, and he handles that role very well as long as he doesn't have to demonstrate.

Q.    Dr. Sharpe has a note, January 2, 2003, and part of it says that Scott had been doing some dancing, no ballet, but some modern dance, and his mom, who is an expert in the field, says he's been doing fairly well. Does that sound about right?

A.    He -- yes, he had started doing a little bit, moving around. He was in a dance production class at school, too, in 2002 or '3; it was the semester following

Brandner001161

Multi-Page™

Page 46

the surgery, and he could not dance.

Q. So that would have been the fall of 2002?

A. Correct.

Q. All right. And that would have been at Red Mountain?

A. Right.

Q. As a freshman or a junior?

A. As a sophomore. Red Mountain starts tenth grade.

Q. Ah, okay.

A. And he came -- he was walking around. He was in a ballet dance in 2003, modernish-type ballet, where he walked and did a couple of lifts, but Scott was not literally dancing.

Q. Now, is that in one of these videotapes?

A. Yes.

Q. Okay. We're going to have a file of videotapes.

MR. CAUSEY: Actually, well, I'm getting worried. I think I only have two.

THE WITNESS: A couple of these are ones that we had discussed but we didn't --

MR. CAUSEY: You haven't given me yet?

THE WITNESS: Right. Well --

MR. CAUSEY: And we'll get?

LEA, SHERMAN & HABESKI        PHOENIX, ARIZONA (602)257-8514

Brandner001162

Multi-Page™

Page 47

THE WITNESS: Yes, you will.

MR. CAUSEY: Okay. The ones we talked about that didn't show Scott very well?

THE WITNESS: Correct.

MR. CAUSEY: Okay. Yeah, I was getting those for my personal use.

Q. BY MR. CRAWFORD: How many videotapes are there, do you think, that show Scott dancing or in competition, what have you?

A. Since the surgery?

Q. Yeah.

A. I'd say maybe three or four, that I can get.

Q. Now, can you get copies of the ones from the competition he was in?

A. No. Those you pay for, and we don't pay for them. We don't get those free.

Q. Okay. What --

A. There might be one that I can get of that possibly. But that's --

Q. Can you try?

A. M'hum.

Q. Yes?

A. Yes.

Q. That's okay. Well, who are these competitions with that I could potentially contact and see if I can get

Brandner001163

Page 48

a videotape?

A. Let's see. Encore, Cathy Roe. These are the names of their competitions.

Q. Is Kathy with a "K" or a "C"?

A. "C."

Q. And "Row"?

A. R-O-E.

Q. Okay. Any others?

A. I believe those are the only two he's done.

Q. Do you know when he did those?

A. Cathy Roe was in April.

Q. Of?

A. Or May, May of this year.

Q. 5 of '05.

A. And Encore would have been May of last year, April or May of last year, 2004.

Q. Do they have Web sites?

A. Yes, they do.

Q. So if I wanted to get the videotape of Scott in the Encore and Cathy Roe competitions, what do I ask for?

A. As far as I know, these places don't save them beyond two or three weeks out of the competition.

MR. CAUSEY: Well, what would they call it is what he wants to know. If he's going to send them a letter asking them for it, how does he describe what he's

Brandner001164

Page 49

wanting?

THE WITNESS: He'd have to say it was the Phoenix competition attended by Dance Network and the month that we were there.

And you may have to know the exact number, which we might -- I don't think we have that information anymore.

Q. BY MR. CRAWFORD: You mean which number they were?

A. Correct.

Q. Do you know other people that were involved in that, those competitions?

A. I know a lot of people.

Q. Other students in your --

A. Yes.

Q. Now, do you think any of the parents of those other students may have purchased those videotapes?

A. Possibly at the Encore, but not of Cathy Roe.

Q. So what are the things that are particularly difficult for him to do in the field of dance now?

A. He cannot do any tap or clogging. He has no ability to flex and press. He -- our choreography is always adjusted if Scott's included in the dance, whether it's myself, my partner, or my older son choreographing for Scott. We all take into consideration that he has a

LEA, SHERMAN & HABESKI     PHOENIX, ARIZONA (602)257-8514

Brandner001165

Page 50

limitation and we have to be careful what we do.

He isn't able to jump like he was capable of. He has no point, no flex. Still tires quite easily, you know, with the use of the leg. Any down movement, if he goes down on the floor, you have to give him lots of extra time to come back up because he can't come up quickly and push off of that leg.

He, as far as my knowledge, wouldn't be able to be a professional dancer, as far as I can see, based upon what I know of professional dancing, because of that limitation.

Q. How much do you know of professional dancing?

A. I've been a dancer for all of my life.

Q. Okay. The way you phrased that, "as far as I know about professional dancing," suggests that there's some limitation there.

A. Because I know that sometimes people in unique situations might be selected to do certain things with disabilities, there is a very slight chance of him doing something, but in the world of dance, as competitive as it is, Scott would not make it as a professional dancer.

Q. But he could continue to help instruct?

A. Under -- under a lot of limitations, yes. He would have to keep it to what he's doing. He wouldn't per se be able to teach as much in, say, a jazz or a

LEA, SHERMAN & HABESKI     PHOENIX, ARIZONA (602)257-8514

Brandner001166

Page 51

ballet class because that takes more ability to demonstrate.

Q.   Okay.  Do you have other students that have any kind of physical disabilities at all?

A.   Not that I'm aware of.

Q.   Okay.

A.   Other than asthma.

Q.   Okay.  So you have to make some accommodations for whoever has asthma, I assume?

A.   Yes.

Q.   In terms of the medical bills related to Dr. Sharpe's surgeries and the care after that, has pretty much all of that been paid by insurance?

A.   I'd say the majority of it.  There has been some that we have had to put out ourselves, for instance, co-pays and for prescription drugs and whatever our insurance does not cover.

There came a point -- we had the school insurance.  Meyer-Stevens covered Scott for a long time, paying any -- any gaps, and that came to an end I believe in 2002.  Maybe it was extended to 2003.

But since then any of the extra, like, for instance, this new brace, we've had to pay the extra on that, that the insurance doesn't cover.

Q.   Okay.  But do you agree the vast majority of the

Brandner001167

Multi-Page™

Page 52

bills have been paid by insurance?

A.    Yes.

Q.    Do you have an estimate for me as to how much you've paid out of pocket?

A.    I could take a very quick guess at that.   I'd say maybe 2- or $3,000.

Q.    Okay.

MR. CRAWFORD:  Why don't we take a five-minute break, let me review my notes, and --

MR. CAUSEY:  Sure.

MR. CRAWFORD:  -- see what else I need to follow up with you on.

MR. CAUSEY:  And, Bruce, I may be confusing my cases, but I think I answered some earlier discovery in this case where I broke down what you were just asking; the insurance paid X amount, and they paid X amount.  I think I've broken it down in some other discovery answers in this case.

MR. CRAWFORD:  I don't think so.

MR. CAUSEY:  Not to you but to prior counsel, I think.  I may be mixing them up, but I'll look and see.  And if I haven't, we could find that out.

MR. CRAWFORD:  No, you haven't really given me anything on that.

MR. CAUSEY:  What are you looking at?  Is

Brandner001168

Multi-Page™

Page 53

that my disclosure?

MR. CRAWFORD: No. This is the answers to interrogatories that asks you about collateral sources.

MR. CAUSEY: Oh, okay, all right.

MR. CRAWFORD: There's pretty much nothing there.

(Recessed from 2:21 p.m. until 2:26 p.m.)

MR. CRAWFORD: By the way, Wade, can you answer these interrogatories on behalf of all three of them? You just answered them, it looks like, on behalf of Scott, but the parents are plaintiffs as well.

MR. CAUSEY: Can I see?

MR. CRAWFORD: Sure. That doesn't mean you have to answer every interrogatory but --

MR. CAUSEY: Oh, no, no, no. Just the ones that pertain.

MR. CRAWFORD: Yeah.

MR. CAUSEY: Okay. I'll take a look into that and see.

MR. CRAWFORD: For example, what they're claiming their damages are and stuff like that.

MR. CAUSEY: Right.

MR. CRAWFORD: Background information.

Q. I'm looking at some interrogatory answers that have been provided by your attorney, and some of them

LEA, SHERMAN & HABESKI        PHOENIX, ARIZONA (602)257-8514

Brandner001169

Multi-Page™

Page 54

haven't been answered as to you. When did you and Steve divorce?

A. It was final in October of 1998.

Q. Okay. Are you still single?

A. Yes.

Q. And he has remarried?

A. Yes.

Q. And the name of his wife again?

A. Stacey.

Q. What's the last name?

A. Clark.

Q. Okay. Do you know when they got remarried -- when they got married?

A. February of 2004.

Q. You have one other son?

A. I have a son and a daughter besides Scott.

Q. What's your other son's name?

A. Bryan.

Q. And how old is he?

A. 23.

Q. And how about your daughter?

A. Charyse is 15.

Q. What does the older son do for a living?

A. He works for his father, construction.

Q. Okay. And then also does stuff with you?

Brandner001170

Multi-Page™

Page 55

A. M'hum, yes.

Q. So he works full-time for his dad?

A. Yes.

Q. All right. Has Scott made it pretty clear to you over the years that, although it's nice to have some part-time work with his dad, he doesn't want to do construction --

A. Correct.

Q. -- in terms of a life-long goal?

A. Yes.

Q. Have you gotten him any counseling for any emotional issues he has?

A. Not psychologists or psychiatrists, but with -- I guess they're called religious people. We believe in prayer and healing through prayer.

Q. Okay.

A. He had a youth pastor at Red Mountain Community Church that spoke to him a little bit about what was going on.

Q. Do you know how long he met with him?

A. I think he only met with him once or twice.

Q. Okay.

A. And it was not per se official visit where -- you know, he just talked casually with Scott about what was going on.

LEA, SHERMAN & HABESKI      PHOENIX, ARIZONA (602)257-8514

Brandner001171

Multi-Page™

Page 56

Q. Okay. So other than meeting with the pastor at that church, has he had any other type of counseling?

A. No.

Q. You go to Central Christian?

A. No.

Q. Where do you go?

A. I go to Faith Community Church.

Q. Has Scott ever been involved over at Faith?

A. He's only attended one time.

Q. And is Central Christian his church?

A. Yes.

Q. Well, I know there's a lot of people from Faith Christian, kids that have gone to Valley Christian. Are there kids from Central Christian that have gone over to Valley Christian High School?

A. I don't know. I don't know.

Q. Okay. I know a lot of people at Faith.

Who is the pastor at Faith, do you know? Yeah, you know that --

A. Pastor Edmondson.

Q. Do you know who the pastor is over at Central Christian?

A. I listened to him for years. I don't remember his name.

Q. Does Scott regularly attend Central Christian?

LEA, SHERMAN & HABESKI        PHOENIX, ARIZONA (602)257-8514

Brandner001172

Multi-Page™

Page 57

A. Pretty often. Almost every Sunday.

Q. I'm just looking through some stuff you've previously provided to see if there's something we need to follow up with, but this is a good sign; this means I'm wrapping up.

Do you remember that another one of the problems that Scott was having in the months leading up to his visit with Dr. Sharpe was numbness in the leg?

A. There's a possibility. I don't recall exactly.

Q. There's a comment in a legal document that was filed on your behalf that said it looks like as of January 2002 that Dr. Matthews ignored Scott's pain and made him feel like a whiner?

A. Yes.

Q. Is that how you felt about it?

A. Yes.

Q. Did you get the impression that Dr. Sharpe ever ignored Scott's pain or made him feel like a whiner?

A. No.

Q. Is Scott involved in any type of physical therapy at this point?

A. No.

Q. Has any been recommended?

A. He -- he had some extensive physical therapy when he was under Dr. Sharpe's care after the surgery.

LEA, SHERMAN & HABESKI     PHOENIX, ARIZONA (602)257-8514

Brandner001173

Multi-Page™

Page 58

But since that ended, no.

Q. Okay. So who would you call his treating physician for his leg at this point in time?

A. Nobody.

Q. So there's nobody that's taken over that role?

A. Not yet. We haven't found anybody.

Q. Have you tried?

A. We're looking.

Q. Okay. Do you have any sense at this point who you might take him to, to see?

A. No.

Q. Is he having any specific new problems now that you think he needs to go see somebody, or is it just that you want someone that's familiar with his problem?

A. He has mentioned a number of times that there's pain in the break area that makes us know that we need to find somebody to see him.

MR. CRAWFORD: Okay. I think that's what I have for you. It's nice meeting you.

THE WITNESS: You, too.

MR. CRAWFORD: Take care.

THE WITNESS: Thank you.

MR. CAUSEY: And I made a list of all those things. I'll check on those and get the videos.

MR. CRAWFORD: Okay.

LEA, SHERMAN & HABESKI      PHOENIX, ARIZONA (602)257-8514

Brandner001174

Multi-Page™

Page 59

MR. CAUSEY: I'm gone all next week, I'm out of state, so it may be the following week, but we're not on a huge time table here.

MR. CRAWFORD: No, we're not.

THE REPORTER: Wade, do you need copies?

MR. CAUSEY: Yes, please.

(2:36 p.m.)

_____
KIM CLARK

LEA, SHERMAN & HABESKI        PHOENIX, ARIZONA (602)257-8514

Brandner001175

Multi-Page

Page 60

STATE OF ARIZONA )
) ss.
COUNTY OF MARICOPA )

BE IT KNOWN that the foregoing deposition was taken before me, Jean L. Lea, a Certified Court Reporter in the State of Arizona; that the witness before testifying was duly sworn by me to testify to the whole truth; that the questions propounded to the witness and the answers of the witness were taken down by me in shorthand and thereafter reduced to print under my direction; that the deposition was submitted to the witness to read and sign; that the foregoing 59 pages are a true and correct transcript of all proceedings had upon the taking of said deposition, all done to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

DATED at Phoenix, Arizona, this 30th day of June, 2005.

Certified Court Reporter
Certificate No. 50004

LEA, SHERMAN & HABESKI          PHOENIX, ARIZONA (602)257-8514

Brandner001176



**AAOS**
AMERICAN ACADEMY OF
ORTHOPAEDIC SURGEONS

AMERICAN ASSOCIATION OF
ORTHOPAEDIC SURGEONS

6300 North River Road
Rosemont, Illinois 60018

P. 847.823.7186
F. 847.823.8125

www.aaos.org

December 14, 2009

**VIA EXPEDITED MAIL**

**Personal and Confidential**

Kipling P. Sharpe, MD                      Patrick J. Brandner, MD
Mezona Orthopaedic, PA                     Desert Orthopaedic Center, LTD
2940 E. Banner Gateway Dr., #200           2800 E. Desert Inn Rd
Gilbert, AZ 85234                          Suite 100
                                           Las Vegas, NV 89121

      **Re:**    **Grievance 2008-23**
            **Kipling P. Sharpe, MD v. Patrick J. Brandner, MD**

Dear Drs. Sharpe and Brandner:

On October 2, 2009, the Committee on Professionalism (COP) Hearing Panel
conducted a formal hearing of the grievance filed by Kipling P. Sharpe, MD,
against Patrick J. Brandner, MD. Enclosed is a copy of the COP Hearing
Panel's report of this hearing, which contains recommendations to the Board of
Directors. Also enclosed is a copy of the official transcript of the grievance
hearing.

The Professional Compliance Program Grievance Procedures permit either
party to file an appeal within fifteen (15) days of receipt of the COP Hearing
Panel's report. If you wish to appeal, AAOS must be notified **no later than
Wednesday, December 30, 2009.** Appeals must be submitted in writing to
the Office of General Counsel. Please refer to the AAOS Professional
Compliance Program Grievance Procedures (September 2008), Sections VII.
D.16 and VII.D.17 for specific information on appeals. If an appeal is not
filed, the AAOS Board of Directors will consider the COP recommendations
pertaining to this grievance at its June 18-19, 2010 meeting in Rosemont,
Illinois. Please note that personal appearances before the Board are granted
only to parties whose matters have first been considered on appeal by the
AAOS Judiciary Committee.

As a general reminder and consistent with the AAOS Professional
Compliance Program Grievance Procedures, all communications
regarding this grievance are confidential and must be directed to the
Office of General Counsel (OGC). Please do not share with others
information about this grievance until the Board of Directors has taken
final action.



Bone and Joint
D E C A D E

Brandner001177

Drs. Sharpe and Brandner
December 14, 2009
Page 2

Please contact Rosalind Giulietti, Professional Compliance Program
Coordinator, if you have questions. You may reach her at 847-384-4047, by
email at giulietti@aaos.org or by fax at 847-823-8028.

Sincerely,

Richard N. Peterson
General Counsel

Enclosures

cc:     Russell M. Pelton, JD
        Karen L. Hackett, CAE, FACHE
        Melissa Young, JD
        Rosalind Giulietti

Brandner001178

# THE AMERICAN ASSOCIATION OF ORTHOPAEDIC SURGEONS
## COMMITTEE ON PROFESSIONALISM

## GRIEVANCE HEARING REPORT
## TO THE BOARD OF DIRECTORS

### Grievance 2008-23

Grievant: Kipling P. Sharpe, MD – Gilbert, AZ

Respondent: Patrick J. Brandner, MD – Las Vegas, NV

## INTRODUCTION

On October 21, 2008, Kipling P. Sharpe, MD, filed a grievance against Patrick J. Brandner, MD, for consideration by the AAOS Committee on Professionalism (COP) alleging violations of Standards of Professionalism (SOPs) on Orthopaedic Expert Witness Testimony, Mandatory Standards Nos. 3, 4, 6, 7 and 8[1]. Dr. Sharpe's grievance arose from statements made by Dr Brandner during deposition testimony of August 5, 2005, as well as trial testimony dated April 29, 2008. In the underlying medical liability lawsuit, the plaintiff-patient alleged that Dr. Sharpe was negligent in his performance of an unnecessary right tibial corrective osteotomy and that he failed to adequately advise the patient of potential risks and complications from the surgical procedure. The jury rendered a verdict in favor of the defendant and, on June 5, 2008, the court entered final judgment and ordered all claims dismissed with prejudice.

The COP members reviewed all grievance material submitted by Dr. Sharpe and Dr. Brandner and determined that a *prima facie* case was established and that a hearing was warranted.

---

[1]Mandatory Standard No. 3: An orthopaedic expert witness shall evaluate the medical condition and care provided in light of generally accepted standards at the time, place and in the context of care delivered.
Mandatory Standard No. 4: An orthopaedic expert witness shall neither condemn performance that falls within generally accepted practice standards nor endorse or condone performance that falls outside these standards.
Mandatory Standard No. 6: An orthopaedic expert witness shall seek and review all pertinent medical records related to a particular patient prior to rendering an opinion on the medical or surgical management of the patient.
Mandatory Standard No. 7: An orthopaedic expert witness shall have knowledge and experience about the standard of care and the available scientific evidence for the condition in question during the relevant time, place and in the context of medical care provided and shall respond accurately to questions about the standard of care and the available scientific evidence.
Mandatory Standard No. 8: An orthopaedic expert witness shall provide evidence or testify only in matters in which he or she has relevant clinical experience and knowledge in the areas of medicine that are the subject of the proceeding.

Brandner001179

## MEDICAL CASE SUMMARY

The clinical case involved a 15-year old skeletally mature male who developed a peroneal nerve palsy following a corrective osteotomy for a 39 degree deformity of the tibia. The patient had been treated non-operatively by another orthopaedic surgeon for six months prior to presenting to Dr Sharpe; the surgery was performed three months after initial presentation to Dr Sharpe. Prior to the surgery, two other orthopaedic surgeons agreed that osteotomy was necessary, although the original treating surgeon continued to recommend non-operative treatment. The operation was performed in June of 2002. It was complicated by peroneal nerve palsy and a draining hematoma. A foot drop was evident on the first postoperative day. The patient continued treating with Dr Sharpe until May of 2004, almost two years after the surgery. The patient continued to demonstrate a foot drop but returned to a number of vigorous activities.

## Pertinent Excerpts from Grievant's Records / Documentation

Dr Sharpe's office notes document that the risk of nerve injury was discussed on two occasions; April 11, 2002 and June 6, 2002.

*April 11, 2002 chart excerpt:*

"We will get the CAT scan in the interim to do some preoperative planning in making the cuts. It needs to be ordered with a cut through the knee and through the ankle to assess rotation as well as having 3-D reconstruction to evaluate the angulation at the fracture. I think that we will probably use a plate fixation to fix this. I discussed other fixation options with the parents as well. Fibular osteotomy will also be necessary and we did have an extensive discussion today about risks, including anesthetic risk, death, infection, nonunion or delayed union, nerve injury, vessel injury. They understand all these risks and I believe, and have discussed with him, the proposed benefits outweigh the risks and they understand that and wish to proceed."

*June 6, 2002 chart excerpt:*

"Assessment: Malunion, right tibial fracture. Plan is for ORIF. Dr. Sharpe has discussed the surgical procedure and options in detail with Scott and his mother, to include fibular osteotomy. Hopefully, ORIF with a plate, but possibly some sort of external fixator device. I've answered other general questions regarding hospitalization, rehabilitation. I've given them a prescription for post-op pain medication and reviewed the risks of surgery. These include but at are not limited to: death, other anesthetic complications, blood vessel injury, nerve injury, fracture, chronic stiffness, chronic pain, malunion, nonunion, refracture, mechanical failure of the components, blood loss, blood clots and infection. The patient and his mother understand."

2

Brandner00t180

## Dr. Brandner's Deposition Testimony Dated August 5, 2005: Pertinent Extractions

- Dr. Brandner stated he believed that, following review of Dr. Sharpe's office notes and deposition, as well as the depositions of the patient's family, Dr. Sharpe fell below the standard of care with regard to informed consent. (Page 19;Lines 12-19; P 20:L 16-25)

- When asked whether this belief was because the patient's family disputes what they were told about risk to the peroneal nerve, Dr. Brander responded:

  "Specifically my problem is that peroneal nerve is not stated specifically to the plaintiff or their understanding was they state that they never heard the work peroneal nerve or drop foot, and basically the bottom line is that that is the nerve you are worried about and that is the nerve that will be injured if you state nerve injury in informed consent. That's the only real nerve that you are worried about. It's not going to be the tibial nerve. It's going to be the peroneal nerve, and although surgery may be a choice in the treatment of this type of case, peroneal injury needs to be emphatically discussed and so everyone understands what peroneal nerve injury means." (21:1-17)

- Dr. Brandner admitted that his belief regarding whether Dr. Sharpe fell below the standard of care depended upon whether the jury believes Dr. Sharpe or the patient and family. (21:18-25)

- Dr. Brander described the patient's tibial angular deformity prior to Dr. Sharpe's surgery as:

  "There was 17 degrees of angulation in the plane from the frontal plane, and there was what was reported as 30 degrees of angulation in the plane from front to back." (41:15-20)

- When asked whether he had compared x-rays taken in January of 2002 with the plain films taken in March of 2002, when the patient was initially seen by Dr. Sharpe, Dr. Brandner replied:

  "No, I told you I didn't do a comparison. All I did was look at all x-rays provided. I can't recall the dates right now, but I looked at the x-rays that were provided. I looked at the CT scan, and my feeling was that this fracture had the potential to heal and remodel further. That's all I can tell you." (46:25, 47:1)

## Patient Deposition Testimony Dated January 29, 2004: Pertinent Extractions

- The patient could not recall if, prior to surgery, he was told of the cause of his increasing leg deformity. (28:1-3)

3

Brandner001181

- He reported that he ultimately ended up with what is called a foot drop and stated that this means he is not able to flex his foot. (28:4-9)

- When asked when he first noticed that he had a foot drop, the patient responded:

  "Right when I woke up out of surgery, Dr. Sharpe asked if I was able to—he had me move my leg and foot in certain directions, and he asked me to flex, and I wasn't able to flex, and he asked to go out and in, and I wasn't able to at that time." (28:10-16)

- The patient affirmed that Dr. Sharpe had, prior to the surgery, discussed with him that he might end up with foot drop. The patient further stated that he was told of the potential for nerve damage among other complications, including death. (21:17-24)

- When questioned whether Dr. Sharpe had explained the cause of the foot drop, the patient replied:

  "Yes. He said that the nerve probably got caught up in the—the bone's healing, the calcium that was building around it, and it stretched it out inside there, and it wasn't able to function because of that. It was damaged too much. (28:25, 29:1-6)

### Deposition of Patient's Mother Dated January 29, 2004: Pertinent Extractions

- The patient's mother stated that her son had what was called "foot drop" and that it was "a nerve damage." (51:1-2)

- She reported that, as far as she could tell, the patient did not demonstrate a foot drop prior to the surgery performed by Dr. Sharpe. (51:3-5)

- The mother defined her understanding of foot drop:

  "There are—there are nerves that control the flex in the foot, and because the bone had been twisted and the—there was a callus on it, it had put pressure on those nerves, and Dr. Sharpe had said that when he moves it back into alignment and corrects all that, that those particular nerves might be very stretched and might be damaged because of that, and that's what happened." (51:6-13)

- She explained that a second procedure was performed by Dr. Sharpe in July of 2002 to drain and clean out the patient's wound because it had not totally sealed. (51:14-20)

- When asked whether there was any doubt in her mind that the nerve injury occurred during Dr. Sharpe's surgery, the patient's mother replied:

  "I think it happened because it—everything had to be moved around." (99:19-25)

4

Brandner001182

- The mother stated that she had talked to Dr. Sharpe about the nerve injury:

  "He had warned us prior to that, you know, movement of that bone, when he had to put it back in place, could cause various things. He went through a list of many things." (100:2-6)

- She further stated that she had talked to Dr. Sharpe after the surgery to inquire as to how the injury occurred:

  "He said because of having to twist the bone back into place, there, you know, was some movement of the nerve that might have been stripped and so when he put it back, it didn't come back where it was supposed to be." (100:7-16)

### Dr. Brandner's Letter of Response to the Grievance, Dated April 7, 2009: Excerpts

- "This experience leads me to strongly believe that informed consent needs to include and document more than a statement of "nerve injury" as stated in the routine preoperative consent form I reviewed. Patients do not understand the residual that 'nerve injury' encompasses when the peroneal nerve is injured as a complication of this osteotomy."

- "Due to the increased incidence of injury to the peroneal nerve over and above the background complication rates of all other complications, I believe that this nerve complication needs some type of specific discussion with patients who elect to undergo a corrective tibial osteotomy."

- "My testimony in this case was narrow and focused. It entailed my belief that the preoperative records should have documented the potential peroneal nerve complication in some format, either by statement that discussion was held or the concepts of weakness, drop foot and/or sensory loss was discussed as part of the informed consent. I did not state in any testimony that there was malpractice involved in the treatment rendered in the case."

- "The records I reviewed did not document that this specific discussion was held. Dr. Sharpe's preoperative records did not document discussion of the peroneal nerve. The plaintiff stated neither he nor his mother were (sic) informed about drop foot or peroneal nerve injury in pre-operative discussions, based on the objective records I reviewed. However, I testified, both in deposition and trial testimony, that if the peroneal nerve complication was discussed, then informed consent was proper."

- "I, therefore, advised plaintiff's attorney that I would testify to the facts of the case, my experience related to peroneal nerve injury and tibial osteotomy, and the 'he said, she said' situation, understanding that this would be a jury decision based on the testimony of the plaintiff and defendant at trial."

- Dr. Sharpe won this case, which I feel is proper and just."

5

Brandner001183

## COP GRIEVANCE HEARING

On October 2, 2009, the Committee on Professionalism (COP) met at the Hyatt Rosemont Hotel in Rosemont, Illinois, to conduct a hearing based on the grievance brought by Dr. Sharpe against Dr. Brandner. Each party was given timely notice of the grievance hearing in accordance with the Professional Compliance Program Grievance Procedures. Both Dr. Sharpe and Dr. Brandner were present for the hearing. Dr. Brandner was accompanied by James Greenwald, MD, as his witness.

The COP Hearing Panel in attendance included: Richard E. Strain, Jr., MD, Chair; Richard A. Brown, MD; Murray J. Goodman, MD; Tamara L. Martin, MD; Vincent J. Silvaggio, MD; and William J. Hopkinson, MD. The AAOS staff in attendance was: Richard N. Peterson, JD, General Counsel; Melissa Young, JD, Assistant General Counsel; and Rosalind Giulietti, Professional Compliance Program Coordinator. Also in attendance was AAOS outside counsel to the COP Hearing Panel, Russell M. Pelton, JD.

The findings and recommendation of the COP Hearing Panel are based on the documents made available by both parties, their oral testimonies and the responses to questions from the Hearing Panel members. The official transcript of the hearing is attached to this report.

### Summary of statements by Dr. Sharpe:

- Dr. Sharpe maintained that the possibility of nerve damage was adequately disclosed as shown by his office notes as well as in the patient's and mother's depositions taken prior to Dr Sharpe being named in the lawsuit.

  "In my office note, I clearly documented that the risk of -- the risk associated with surgery as a summary of my visit with the patient dictated in front of the patient, these notes were on April 11th and June 6th of 2002, both of these notes mention, along with other risks, nerve injury, but not the word "peroneal" nor is the word drop foot used. (COP Grievance Hearing Transcript, 6:13-20)

- "These notes like most surgeons are a summary, not a verbatim transcription of everything that transpired in the visit." (6:21-23)

- Dr. Sharpe stated that Dr. Brandner:

  "In his deposition, testified that there was a possibility that this young man with these closed physes could remodel this remarkable deformity, he testified that the growth plates were open. This was one of the two accusations made by the plaintiff, the other being a lack of informed consent." (8:17-24)

6

Brandner001184

- "My witness at trial, Dr. Russo, testified that there is also risk to the posterior tibial nerve. Listing a specific nerve injury is not the standard of care; both Dr. Russo and I feel that the discussion of nerve injury meets the standard of care. If we followed Dr. Brandner's logic, we would have to list radial, ulnar and median nerves in our notes with every form -- elbow surgery, axillary nerve along with the other nerves of every shoulder surgery, not that it would be wrong to do this, but I don't think that that is the community standard." (9:4-15)

- When the question arose as to availability of deposition testimony, Dr. Sharpe reported that he believed he had provided all depositions to the Committee. (37:3-4)

## Summary of statements by Dr. Brandner:

- "I offered certain testimony regarding the standard of care as it relates to informed consent in a proximal tibial osteotomy. Specifically, I opined that a general discussion of nerve damage such as that called for on a standard surgical consent form was insufficient in the context of a proximal tibial osteotomy because of the significantly increased likelihood of peroneal nerve palsy as a result of such a procedure, a 3 to thirteen percent incident rate." (10:22-24, 11:1-8)

- "I testified that informed consent required a discussion of the risks to the peroneal nerve and the possibility of a drop foot. I made it clear to the jury through my testimony that I was not there to testify as a fact witness, that is, I could not testify as to whether Dr. Sharpe had, in fact, discussed the risk to the peroneal nerve (with the patient and his parents) prior to obtaining their consent to perform the procedure as Dr. Sharpe claimed. Or if Dr. Sharpe had failed to do so as to the (patient's) claim, I could only testify regarding the fact that nothing in the preoperative medical records documented a discussion regarding the peroneal nerve." (11:9-22)

- "I simply testified that the standard of care required discussion of the peroneal nerve, that is, the potential of a drop foot, not just nerve damage in general, and the records do not -- did not document that such a discussion had occurred prior to the operation. The patient and his family said it hadn't. Sharpe said it had. It was for the jury to decide who to believe." (13:21-24, 13:1-5)

- "Mandatory Standard 6, Dr. Sharpe alleges I violated this -- and this says 'An orthopaedic expert witness shall seek and review all pertinent medical records related to a particular patient prior to rendering an opinion on the medical or surgical management of the patient.' Dr. Sharpe alleges I violated this by failing to adequately review transcripts from the first depositions taken (of the patient and patient's mother). Dr. Sharpe focuses on those two deposition transcripts because of what he views as certain admissions made by the plaintiffs and -- the plaintiff and his mother with respect to their understanding of the risk of the peritoneal (sic) nerve. (16:24, 17:1-13)

7

Brandner001185

- "Three points are made in response. First, I did review the transcript and the first depositions (of the patient and his mother), I testified as such in my deposition transcript page twelve, nine through eleven. They are nowhere near as damaging to the plaintiff's case as Dr. Sharpe would have this Panel believe." (17:17-20)

- Dr Brandner advanced the argument that depositions are not "medical records" as follows:

  "Dr. Sharpe has not properly alleged a violation of Mandatory Standard Number 6. Such is the case as Mandatory Number 6 is very clear in its scope, it encompasses pertinent medical records. Let me read Mandatory Standard Number 6 to you again, 'An orthopaedic expert witness shall seek and review all pertinent medical records related to a particular patient prior to rendering an opinion on the medical or surgical management of the patient.' A deposition transcript is not a medical record, it is a litigation document." (19:5-17)

- "With regard to Dr. Sharpe's allegations regarding my deposition testimony, two points must be made: First, I never testified the patient was not given the non-operative option, I simply testified that the standard of care required such a discussion. Whether that discussion occurred was a question of fact for the jury." (16:10-17)

- "Second, while I did testify that based on the X-rays I had reviewed, the fracture had remodeling potential...I was careful to point out that the fracture would likely not completely remodel. (16:18-23)

## Summary of presentation by Dr. Greenwald, witness for Dr. Brandner

- Dr. Greenwald provided a demonstration of an osteotomy correction.

- He attempted to submit new evidence to the Hearing Panel; however due to lack of compliance with established deadlines for submission of grievance materials, this new information could not be accepted.

## Summary of Dr. Brandner's responses to questions posed by the COP

- When asked whether he could define what deposition records were missing from the grievance material, Dr. Brander stated that he could not. (37:5-6)

- Dr. Brandner did not have a list of the records reviewed in preparation for testimony. (37:10-15)

- When questioned as to the reason he was unable to supply evidence in the form of these "missing" depositions as well as the trial testimony in support of his claims,

8

Brandner001186

Dr. Brandner replied:

"I asked -- well, I asked the attorney to give me everything, all testimony, and he said he wouldn't." (37:16-21, 37:24, 38:1-4, 39:2-12)

- Dr. Brandner did not ask the court for the documents. (39:14-16)

## DISCUSSION AND SUMMARY

After thorough consideration of the issues and material in this case, as well as the oral testimony presented, the COP Grievance Hearing Panel:

1. **Unanimously found Dr. Brandner in violation of Standards Nos. 3 and 4.** The record shows that informed consent was given. The COP found that the deposition transcripts reflected that both the plaintiff and his mother had an understanding about the specific possibility and causation of a foot drop. The COP believed that, in this regard, Dr. Brandner condemned performance that falls within generally accepted practice standards in obtaining informed consent.

2. **Unanimously found Dr. Brandner in violation of Standard No. 7.** Dr. Brandner's testimony that the fracture could remodel was clearly not correct and, as such, his statements did not accurately reflect the scientific evidence in this matter.

3. **Unanimously voted that Dr. Brandner did not violate Standards Nos. 6 and 8.** The Hearing Panel found no evidence that Dr. Brandner failed to review all the medical records. Furthermore, the COP found Dr. Brander qualified by relevant experience and knowledge.

## RECOMMENDATION

The COP Hearing Panel is unanimous in its finding that Patrick J. Brandner, MD, violated Mandatory Standards Nos. 3, 4 and 7 of the Standards of Professionalism on Orthopaedic Expert Witness Testimony and that action is warranted.

The COP Hearing Panel unanimously recommends to the AAOS Board of Directors that Patrick J Brandner, MD, of Las Vegas, Nevada, have his Fellowship in the American Academy of Orthopaedic Surgeons and the American Association of Orthopaedic Surgeons suspended for one year because of unprofessional conduct in the performance of expert witness testimony.

9

Brandner001187

Dated: December 10, 2009


Richard E. Strain, Jr., MD
Chair, Hearing Panel

Richard A. Brown, MD


Murray J. Goodman, MD

Tamara L. Martin, MD


William J. Hopkinson, MD

Vincent J. Silvaggio, MD

10

Brandner001188

1

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STEVE CLARK and KIM CLARK, )
et al., )
          Plaintiffs, )
                   )
              vs. )
                   )   CV No. 2003-017451
                   )
ANDRE MATTHEWS, M.D., and )
JANE DOE MATTHEWS, et al., )
          Defendants. )
_____)

April 28, 2008
Phoenix, Arizona

BEFORE THE HONORABLE: MICHAEL JONES, Judge

REPORTER'S TRANSCRIPT OF PROCEEDINGS
Testimony of Scott Clark

Lisa H. Vitoff
Certified Court Reporter
CCR #50251

Brandner001189

2

A P P E A R A N C E S

FOR THE PLAINTIFFS:
         KOELLER, NEBEKER, CARLSON & HALOCK, LLP
         BY:  Mr. Wade R. Causey

FOR THE DEFENDANTS
         CRAWFORD & KLINE, P.L.C.
         BY:  Mr. Bruce D. Crawford

P R O C E E D I N G S

SCOTT VERNON CLARK,

having been duly sworn herein, took the stand and testified

as follows:

THE COURT:  Thanks, Mr. Clark.  Go over there and have a seat on the witness stand.

MR. CAUSEY:  That one there.

Brandner001190

3

DIRECT EXAMINATION

BY MR. CAUSEY:

Q    Would you state your name, please?

A    Scott Vernon Clark.

Q    And Scott, you are identified as the plaintiff in this action; correct?

A    Yes.

Q    Scott, I want to talk a little about your background and you, personally, at this point.

First of all, how old are you now?

A    21.

Q    And we've -- you've heard mention of the football incident in 9th grade where you broke your leg?

A    Yes.

Q    How old were you at that time, Scott?

A    14.

Q    Scott, have you completed high school?

A    Yes.

Q    Did you graduate?

A    Yes.

Q    Where did you go to high school?

A    Red Mountain.

Q    Since you've gotten out of high school, have you gone on to any college courses or any other type of work

Brandner001191

4

at this point?

A    I went to ASU for a semester.  I also went to work for my father in construction.  I worked for T Mobile as a manager there, and for Pinnacle Security as a sales consultant.

Q    What are you doing right now?

A    I work as a teacher for my mother and my brother at her studio and a construction worker for my father at his company.

Q    Let's talk about what type of construction are you talking about?

A    Residential.  We do home additions, awnings, decks, covers like that, Arizona rooms, screen rooms, remodels, stuff like that.

Q    So you're not talking about where you -- for lack of a better term -- new construction, start from ground?

A    No, existing.

Q    Is this primarily or is it all residential type stuff?

A    Yeah.  We do do some work for businesses, but mostly our work is residential.

Q    Scott, it's my understanding that you've worked for your dad in that capacity off and on for a number of years; is that correct?

Brandner001192

5

A    Yes.

Q    Did you also, as a young boy, before the injury when you were 14, had you worked for your father at all in that industry as well?

A    Yes.

Q    What was kind of your role back then?

A    Gofer, sweep up, clean-up after them; little things that I couldn't mess anything up, stuff like that.

Q    This particular stint now, where you're working for your father's construction company -- first of all, let me ask you about the construction company.

Describe it for me, how many employees does it have?

A    We have about six guys that actually go out on jobs. We have two office ladies, then my dad and Stacy, who own the company.

Q    What do you do for them currently?

A    I'm just a general contracter. I do build, I do go out on jobs, with me and another guy, and we'll build an awning by ourselves. We'll do a room addition by ourselves. It's usually me and one other guy that go out on jobs by ourselves.

Q    Now, Scott, let's talk about September 26, 2001. This is the football accident?

A    Yes.

Brandner001193

6

Q    Describe what happened.

A    I was playing both sides.  This was, I believe, our fourth game of that year.  We were playing at home.  We were playing against Marcos de Niza.

It was about -- it was before second half.  We were up at the time.  I was playing on defense as a defensive end.

My job was to contain the outside.  Anybody that would run outside, any passes that would go outside, I, would, you know, contain, make sure that nothing got outside of me.

Well, their running back had run to the outside towards me, and so I was going to tackle him.  And as I was diving for him, our inside linebacker, his job was to help me as well.  So he was coming to help tackle.

So my right leg was out as I dove to tackle him, and I picked him up and was going to drop him to my right.  And at that time, our inside linebacker dove at him at the same time.

And so when I was coming down like this, our inside linebacker dove onto my leg.  So my leg was under him while I was going this way.  It just kind of snapped under him.

After that, all I remember -- I just blacked out.  I remember sitting up and nobody was around me except

Brandner001194

7

for the ref was blowing his whistle, telling me to go back to the huddle. That's all I remember.

Q    Where were you going to school when this happened?

A    Shepherd Junior High.

Q    Is that in Mesa?

A    Yes, Mesa, Arizona.

Q    I take it you didn't go back and get in the huddle; correct?

A    No, yeah.

Q    Okay.

A    I tried. I couldn't.

Q    My understanding, that you went to an emergency room of some kind apparently.

A    Yes.

Q    Tell us what happened after that. Tell us about your treatment?

A    Up to what point?

Q    Well, tell us about —

A    At the emergency room in the hospital?

Q    The emergency room, yes.

A    Okay. So, I was taken from the emergency — or from the football field in an ambulance to an emergency room.

At that point, my mom and my brother were there

Brandncr001195

8

with me, and there was, I believe it was a nurse. She had to do a pre-set, where they took off the air cast.

They rotated my leg up. Then she set it into place and put a little splint on it and wrapped it.

Then from that point, I had to go get x-rays, and then that's when I met Dr. Matthews.

He had come in and told us what we were going to do -- or had talked to my mom. Then that's when I went in and got the full leg cast put on.

Q     So if I understand you correctly, Dr. Matthews, I assume they reset it first, before they put the cast on?

A     Yes.

Q     And so you had that procedure done.

A     Yeah.

Q     The external fixation?

A     There was no pins or anything. It was just set in a cast and that was that.

Q     They straightened it out, I assume, and hopefully got some pain medicine?

A     Yeah --

Q     For them to set it off?

A     -- it was kind of strange because, I guess what had happened was, when the ambulance got there, they never gave me any pain medication. I don't know if they thought that the EMT on the field had given it to me.

Brandner001196

9

So when I got to the emergency room, the lady who was setting my leg thought the ambulance had given me some pain medication, and I had hadn't gotten any until I had gone into the actual surgery, when he was giving -- when he was going to set it. That's when I first got the pain medication.

Q    By "he," your referring to Dr. Matthews?

A    Yes, Dr. Matthews.

Q    You get the cast on.

How long were you at the facility? Were you there for couple days?

A    I think it was three days.

Q    Then after the three-day stay at the hospital and the casting, as you've described it, did you go home at that point?

A    Yes. We — yeah — we went home. And I was just, basically, told to stay off it and let it heal. I had a wheelchair that I rolled around in in school, that sort of thing.

Q    I assume that there were some follow-up visits with Dr. Matthews; correct?

A    Yes.

Q    Now, Scott, you heard mention earlier, you treated with Dr. Matthews -- well, you actually last saw him in April 2002, was your very last visit.

Brandner001197

10

Do you recall that?

A     Yes, I do.

Q     But there was also a January of 2002.  Do you recall that being about the time when you were released from his care to go out and engage in any activities you could withstand, depending upon whatever pain you were having?

A     Yes.  That's when he had told me to go ahead, try to get back into dancing, try to get back into some sports, and basically just push my limits and see what I could do, that I was able to take what I wanted to do with it.

Q     Did you do what you were told by Dr. Matthews?

A     Yes.

Q     Now, at some point, after -- let me back up.
      You had the long cast on; right?

A     Yes, all the way up to my hip.

Q     Was there some follow-up type cast or boot of some kind?

A     Yeah.  It was a L-shaped boot that went into my shoe.  It had a front-type of plastic guard and it Velcro-ed.  And it basically was a walking cast, so I could walk on it and do some things with that on.

Q     At what point in this process that you've described, this chronology that you've covered, at what point do you recall concerns arising about how the leg was

Brandner001198

11

healing?

A    How it looked?

Q    Yes.

A    Yeah.  I would say around — after we got the original full cast off, there was a little bit of a bone callus, but it wasn't -- I wouldn't say it was a huge concern.  It was, he had explained it as a bone callus and that's what we had gotten from it.  We took it at that.

And then that's when we got our walking cast. And he told me to go ahead and start engaging in activities, sports, dancing.

And after a while, we noticed that the leg started to look like it was bowing a little bit.  And we had -- I had a pretty large callus right under the kneecap.

So I would say it was, maybe, a month or two after I was on it everyday, dancing and doing sports and stuff like that.

Q    So your recollection is it's approximately a month or two after you had gone back to engaging in activities, as Dr. Matthews had told you you could, and you tried to?

A    Yes, yes.

Q    Now, Scott, you indicated that the callus, the large bump had not -- said at first it wasn't very large. Did it get bigger?

Brandner001199

12

A    Yes.

Q    It just seemed to get bigger over time?

A    Yeah.  It seemed, as time went on, that it got bigger.

Q    Was this right below your kneecap?

A    Yes, right where the break had occurred.

Q    Now, Scott, were you experiencing any pain with respect to activity on the leg?

A    Yes.  Just walking, I really didn't have any pain.  It was when I tried doing the activities, as dancing, jumping around on it, running for long periods; just strenuous activity would cause pain at the break, definitely, yes.

Q    So I understand correctly, the more active you were on the leg during this time frame we're talking about, you would have pain at the fracture site?

A    Yes.

Q    Was that one of the concerns I asked you earlier, you know, when you started having concerns, in addition to the way it looked, was that also a a concern?

A    Yes, definitely.

Q    And did your parents and you discuss these concerns?

A    Yes, frequently.  I was with my mom everyday because I danced at her studio after school almost everyday,

Brandner001200

13

also with my dad. We would take these concerns to Dr. Matthews, yes.

Q   So at some of your follow-up visits, you would discuss this with Dr. Matthews?

A   Yes.

Q   And what was Dr. Matthews telling you?

A   From what I recall, when we had brought up concerns about the bone callus, he would explain it as just that, a bone callus.

He used to refer to one of his knuckles he had, I believe it was on this hand, when he had broken his finger playing hockey. He had a bump on his finger from when he broke his finger.

And he explained it as a calcium build up, and eventually it would wear down. But because right now it was healing, that's why it was so big.

And with the pain, he explained to us that as time went on, and as it fully healed, that the pain would basically just go away.

Q   At the fracture site?

A   At the fracture site, yes.

Q   So the callus, was it your understanding that was a normal thing?

A   Yes, from what he had told us, yes.

Q   What was your understanding, from your

Brandner001201

14

discussions with him, about the bow in the leg?

A    I don't specifically remember what he told us.

I know that we had concerns about it, but I don't remember exactly what he had said.

I know that it wasn't like he wasn't concerned about it as anything that would get worse. I just don't remember specifically what he said about it though.

Q    At some point after these concerns arose, did there come a time where the decision was made to seek some additional opinions of other doctors?

A    Yes.

Q    Were you involved -- I understand at the time you're still what, 14 years old?

A    14, yes.

Q    Your parents, sounds like primarily your mother, was very involved in what was going on?

A    Yes. She was very concerned.

Q    The decision that I just referred to, to seek other opinions, was that something that was discussed between you and your parents?

A    Yes, it was. It was mostly my mom brought it up as a concern because I would have so much pain and because of the way it was looking.

But when it came down to it, we had all set down and we all discussed, because we were going to Dr.

Brandner001202

15

Matthews, and he ultimately just didn't really seem concerned at all. It didn't seem like, you know, like it was an issue to him at all.

So we ultimately decided to go somewhere else to, at least, get a second opinion, if nothing else.

Q So if I understand you correctly, you guys — it was your understanding, based on discussions with your parents, that all of you felt like you needed to get some other opinions about this, in addition to what you were hearing from Dr. Matthews?

A Yes.

Q One of the people — tell me who you first recall seeing?

A Dr. Dinowitz.

Q And as was mentioned earlier, your father had known Dr. Dinowitz; is that correct?

A Yes.

Q I believe that Dr. Dinowitz had performed some type of procedure on your father's hand. He had broke h hand or something like that?

A Yeah. He had broken it into, like, eight pieces or something. And Dr. Dinowitz put it back to together so he could use it again.

Q That was your understanding of how you came to go to Mezona Orthopedics?

Brandner001203

16

A    Yes.

Q    Tell me about the initial meeting you had with Dr. Dinowitz.

A    From what I remember --

Q    First of all, Scott, I don't mean to interrupt -- I'm not asking you if you recall specific dates.

I show in the records that's March 22, 2002, when you went to see him initially.  Does that sound right?

A    Yes, it does.

Q    Go ahead, I'm sorry.

A    From what I recall, my father, my mother, and I were all present.  We went -- we got there.  We were taken into an exam room.  And we had brought our x-rays from Dr. Matthews' office.

And when Dr. Dinowitz came in, we discussed with him the issues we had.  We had discussed with him what Dr. Matthews had told us.

And from there, he had taken our x-rays.  He put them up into the little light, and I remember him taking a protractor, because we were showing -- we were talking about the angle of the leg.

He put it on the x-ray.  He took a little line, he drew it with his pen.  Then he put it on the other side of the bone, below the break and he did the same.

Brandner001204

17

And he measured the angle. I think it was something like 14 degrees, I think, something like that. And that was, you know, a certain amount of degrees off.

And he had told us that although it wasn't, you know, his specific area of expertise, that he believed that that was too much of an angle, that it might get worse if it stayed like that.

Q    Do you recall any other discussions with him, at that time, about -- let me be more specific.

Were there any discussions at that meeting, between yourself, or in your presence with Dr. Dinowitz, about any type of specific surgical procedures?

A    No, not that I remember, no.

Q    Was there any discussion, at that meeting with Dr. Dinowitz, about any types of problems if you just left it the way it was?

A    Not that I remember. I just remember him addressing the angle as a problem.

Q    Did you have any discussions with Dr. Dinowitz, at the time, about the pain at the site of the fracture?

A    Yes.

Q    Did you have any discussion with him regarding the stage at which the bone had healed at the fracture site?

A    Not that I remember.

Q    This sounds like it was a fairly preliminary

Brandner001205

18

discussion?

A    Basic, yes.

Q    Did Dr. Dinowitz, at this meeting, tell you that he was a more of an expert in the upper extremities as opposed to the lower extremities?

A    Yes.

Q    You said you brought some x-rays with you. Do you remember having any additional x-rays done at that time?

A    I think we did. I think, if I remember correctly, we had the x-rays taken and we compared them to the ones from Dr. Matthews' office, if I remember correctly.

Q    Do you remember anything about those discussions about the x-rays?

A    Not specifically, no.

Q    Of course, I mean, other than what you already told us, about the measuring?

A    The angulation, yes.

Q    Tell me, the meeting with Dr. Dinowitz, how was it left? What was the conclusion, if you will, at the end of that meeting, where did you stand?

A    We had felt better knowing, basically, that we weren't crazy. We had felt something there was an issue. We felt better that, possibly, there basically was somebody that saw what we saw basically.

So where it was left then was, could -- since

Brandner001206

19

it wasn't his specific area of expertise, I don't know if we, if specifically Dr. Sharpe's came up or not, but I do remember that he was going to take it and discuss it with his colleagues.

Like we heard from Mr. Crawford, that they would -- they meet every few mornings and everybody comes in, all the partners, and they discuss different cases.

That they would -- I remember that he was going to take that, our case, and discuss it with them. And we would -- I don't know if it was an in-office visit or over the phone, discuss what had -- what was said at that meeting.

Q   So if I understand your testimony correctly, there may have been phone call after that?

A   Yes.

Q   The phone call you're referring to, was that a phone call that you participated in or is that something you learned about?

A   Something I heard about.

Q   Was that phone call with your mother?

A   Yes, if I remember.

Q   So I take it she would be the one to ask more details about that discussion?

A   Definitely, yes.

Q   You weren't on the line with her or anything?

Brandner001207

20

A    No.

Q    It was your understanding that there was a discussion that took place that then led to a second meeting at Mezona Orthopedics?

A    Yes.

Q    That was April 11 of 2002?

A    Yes.

Q    I want you to take me through that meeting, as best you can.

Obviously, you arrive at the Mezona Orthopedic offices, which at that time were in Mesa; correct?

A    Yes.

Q    Who did you meet with?

A    Dr. Sharpe.

Q    Okay.  Did you meet with anyone else at Mezona Orthopedic, that meeting where there was a substantive discussion.  And by that I mean, other than, hi, Scott, how are, you good to see you, or anything like that?

A    No.

Q    So the only substantive discussion you had with anybody from Mezona Orthopedics on April 11 of '02 was with Dr. Sharpe?

A    Yes.

Q    Was your mother present?

A    Yes,

Brandner001208

21

Q    Do you remember if your dad was present at that meeting?

A    Yes, he was.

Q    All right. As you go into that meeting, tell me what your mind set was with respect to what you had decided or had not decided at that point?

A    Basically, we were, we were excited to hear what they had said. We were excited to hear of solutions, possible solutions to what we could do. Basically open-minded to anything Dr. Sharpe had to say.

Q    Before you went to see Dr. Sharpe on April 11, 2002, this first meeting that we're getting ready to discuss, had you, yourself, made up your mind what you were going to do yet?

A    No.

Q    Where did the majority of that meeting take place? What I'm trying to get at, was there some type of -- was it in the doctor's personal office, was there an examination room?

A    Yes. It was the same type of room that we were in with Dr. Dinowitz, maybe even the same room. I don't know.

Q    So, your mom and your dad and yourself are in there and Dr. Sharpe comes in?

A    Yes. I think Dr. Dinowitz may have introduced

Brandner001209

22

him, if I remember correctly.

Q    You had not met Dr. Sharpe up to that point?

A    Not that I can recollect, no.

Q    All right.  Tell me what you recall of Dr. Dinowitz introduces Dr. Sharpe.  Does Dr. Dinowitz stick around?

A    No.  From what I can remember, after he introduces us, he leaves us with Dr. Sharpe.

Q    Tell me what you recall, as best you recall, the conversations you had with Dr. Sharpe at that meeting.

A    I remember — all I can remember are him -- is him talking about different types of surgeries that we could do.

I remember him discussing with us putting a metal plate in my leg.  I remember, not so extensively, I was talking about a rod.

Also we talked about the external device, where they would have something external that would be on my leg. They would crank it every few days to slowly make it position -- go back to where it was supposed to be positioned.

And I do remember that it was his opinion that the best choice, out of those, was to go ahead and go with the metal plate.  As far as I remember, that was the majority of the meeting.

Brandner001210

23

I also remember we discussed -- I think we went over some possible risks at that time too.

Q    Do you recall the doctor dictating into a recorder during the meeting?

A    Yes, yes. I don't believe it was during the meeting. I believe it was after the meeting. After we had went over everything, he would sit there and he would discuss -- or he would talk into the thing about everything we had discussed.

Q    And Scott, do you recall that taking place that meeting?

A    The dictating?

Q    Yes.

A    Yes.

Q    Scott, you said that some of the -- let me cover something else real quick.

At this meeting of April 11, 2002, was there any discussion about a nonsurgical option?

A    I don't remember.

Q    You don't recall a discussion?

A    I don't, no, not that I recall.

Q    You had already been told by Dr. Matthews that he didn't think anything needed to be done at that time with this; right?

A    Yes.

Brandner001211

24

Q   So, in a general sense, you knew, am I correct, that waiting was an option?

A   Yes.  We knew that I could continue with the activity I was doing and we could basically just live my life that way, not do anything, and just continue dancing and doing sports and live with the pain, basically.

Q.  You mentioned that during the meeting then there was a discussion about some of the risks.  This was a discussion with Dr. Sharpe; correct?

A   Yes.

MR. CAUSEY:  Your Honor, I have what's been marked as Plaintiff's Exhibit 10.  It is an extract from the Mezona Orthopedics records, which are marked as another exhibit.

I've already conferred with counsel, and it's my understanding he has no objection to me utilizing this with this witness.

THE COURT:  Did you wish to admit 10 at this point?  Is that what you wanted to do?

MR. CRAWFORD:  I don't object to that, as long as the Mezona chart gets submitted into evidence, and he's agreeing to that.

MR. CAUSEY:  I do.

THE COURT:  What is the entire chart number, the exhibit number?

MR. CRAWFORD:  Can I get back to you with that?

Brandner001212

25

They have this labeled differently than the other one we have.

THE COURT: We do that to see if you're on your toes.

I'm just kidding. Of course, 10 will be admitted.

And Mr. Crawford when you find it, just let me know. We will enter that on the record as well.

Mr. Causey, go right ahead.

MR. CAUSEY: Your Honor, I was looking for my list to see if I could help with that, and I'll have to give get back to thet.

THE COURT: We have to change the names, they might not fit on those little tiny lines on our forms.

Go ahead. 10 is admitted.

MR. CAUSEY: 10, as well as we might as well take care of 11, at this point. That's the June 6, your Honor.

MR. CRAWFORD: That's fine.

THE COURT: 11 is admitted as well.

Go right ahead.

MR. CAUSEY: Thank you, your Honor.

BY MR. CAUSEY:

Q    Now, we're going to run into a problem with me making sure I know how to work the technology here, your Honor. So bear with me just a moment.

Brandner001213

26

Scott, is that on your screen right there the in front of you?

A    Yes.

Q    You can see that okay?

A    Yes.

Q    I will move it around, get to the portions.  I just wanted to --

Scott this is a medical record of your treatment at Mezona Orthopedics.  It is Plaintiff's Exhibit 10 at this point.

Have you seen these records before?

A    Yes.

Q    And by that I mean, before today.  I'm not talking about before your meetings.

A    Yes.

Q    I'm talking about present tense.

A    Yes.

Q    Okay, I apologize.  I should have been more clear.

This is dated April 11 of 2002.  Do you see that?

A    Yes, I do.

Q    It says Dr. Kipling Sharpe.  Do you see that?

A    Yes.

Q    If I knew how to work the technology better, I

Brandner001214

27

would know that I can actually underline things on this screen here if we need to. I'm learning, your Honor.

Scott, I want to turn to — there's a second page to this April 11. I'll put that right there in the middle there.

Do you see that again, it says April 11 here?

A   Yes.

Q   Again, it's Dr. Kipling Sharpe. Do you see that?

A   Yes.

Q   Scott, there is some reference here to the discussions that took place. I just wanted to cover it with you to see if this is what you were referring to earlier when you testified about this meeting of April 11, 2002.

Looks like they're going to get a CAT scan; you understood that?

A   Yes.

Q   It was -- was that -- what was your understanding of what the CAT scan was and what it's purpose was?

A   It was to see if the leg had, had completely healed or not. If it was still, if it was still healing, if there was a malunion or not.

Q   Are you talking about the fracture site?

A   Around the fracture site, yes.

Brandner001215

28

Q    Is that one where you're having the pain --

THE COURT:  Question --

A JUROR:  Is there — I just can't read it.

THE COURT:  We will do, definitely do that.  My guess is no one else can read it either.  Thank you for letting us know.

Folks, there's a zoom feature.  Let's see if we can zoom in.

MR. CAUSEY:  Is that better?  I apologize.  Thank you for letting us know.  I'll just move it around, your Honor, to get the pieces on the screen.

A JUROR:  Can we get the whole -- the first page and second page?

THE COURT:  Yes.  It has been admitted.  I'd like for you to be able to read it now too, if you can.

A JUROR:  Fantastic.  If we can put the first page back up.

MR. CAUSEY:  Yes.

A JUROR:  I don't mean to disrupt your line of questioning.

MR. CAUSEY:  No, no, that's fine.  I can go over it too.

You can see the first paragraph, I believe, is some history, on this exhibit, and basically discussing, what we have already discussed.

Brandner001216

29

Q    Scott, do you recall having discussion with the doctor about your history, the football injury, things we already discussed?  I don't want repeat it all again.

A    Yes.

Q    The next thing has a heading, past medical history.  Do you see that?

A    Yes.

Q    I'm assuming that's some information you also provided to the doctor?

A    Yes.

Q    Denies any other significant problems.

I don't want to move it too fast.

Do you want me to move it up a little bit at this point?  Okay.

Move it up?

Okay, thank you.

Actually, that's the end of it, except it looks like there may have been a hole punch of some kind, bottom left corner there.

Everybody done with this page?

Is that --- your Honor, may I move the stand? It maybe blocking part of the bottom part of that.

THE COURT:  Certainly, oh, sure.

Next page.

A JUROR:  Yes, sir.

Brandner001217

30

MR. CAUSEY: All right, thank you. All right.

Q    Scott, let's talk about -- we're going to go to the last segment of this. You can see it goes on into June 2002. I don't want to get into June 2002 yet. I want to talk about the April 11.

Scott, you were mentioning earlier some discussions you had with Dr. Sharpe at this meeting, you and your parents.

It says there, I discussed other fixation options with the parents as well.

Is that what you were describing, the different types of surgeries that you could use to fix this?

A    Yes.

Q    Now, Scott, was it your understanding that if the bone was going to be fixed, straightened back to the angle it should be, that that was going to require a surgical procedure of some kind?

A    Yes.

Q    Okay. And just to clarify one more thing on that, you weren't under the impression at this time, or any time, that that bone was going to straighten itself back out; right?

A    No.

Q    So when we talk about the option of wait and see, you understood that it would be a situation where it

Brandner001218

31

would still have some deformity or angle in it if you didn't have the surgical procedure; is that correct?

A    Yes.

Q    It says fibular osteotomy will also be necessary.

And again, Mr. Crawford demonstrated the two different bones, the large bone and the small bone.

And that's a breaking of the small bone.  Was that your understanding?

A    It was -- we were going to cut out a piece of the small bone.

Q    Take a piece out.

A    Yes.

Q    Okay.  So the procedures Dr. Sharpe, at the April 11, 2002, meeting, the procedures and what they involve, the type of procedures themselves, the operation, if you will, that was discussed; correct?

A    Yes.

Q    Now, as far as the length of the discussion, did that take up most of the discussion?

A    Yes, definitely.

Q    I want to get to the next portion of this.  It says:  And we did an extensive discussion today about risks, comma, including anesthetic risk, death, infection, nonunion of leg union, nerve injury, vessel injury.

Brandner001219

32

When you said earlier that they discussed -- Dr. Sharpe discussed risks with you, is that what you're referring to?

A    Yes, sir.

Q    Was there any additional discussion, other than what is contained in the notes that Dr. Sharpe dictated immediately after the meeting?

A    No.

Q    It says:  They understand all these risks, and I believe, and have discussed with him the proposed benefits outweigh the risks, and they understand that, and wish to proceed.

Did Dr. Sharpe express to you that he had an opinion that the risks of this surgery were outweighed by the benefits?

A    Yes.

Q    Was it your understanding that that was his feeling?

A    Yes.

Q    Was it your impression that Dr. Sharpe was advocating that you have this surgical procedure?

A    Yes.

Q    I want to talk about some of these risks here specifically and the discussion, if you recall it.

First of all, I want to -- it's my

33

understanding that there was another discussion of these risks or a similar list at the June 6th meeting; is that right?

A    Yes.

Q    To the extent that you can keep them separate, delineate them, that's what I want to talk about now.

I want to talk about what you recall of the April 11, 2002, discussion.

If you can't separate the two discussions out, then let me know and I'll ask you it differently; okay?

A    Okay.

Q    As far as nerve injury, do you see that phrase there?

A    Yes.

Q    At this meeting, did Dr. Sharpe discuss with you any specific nerve that was at risk from this surgery?

A    No.

Q    Did Dr. Sharpe describe to you any type of nerve that comes down the leg and wraps around below the knee or the knee area and controls the function of your foot? Was there any discussion about that?

A    No.

Q    Was there any discussion, at this April 11, 2002, meeting, what I'm talking about is what Dr. Sharpe said to you.

Brandner001221

34

We've already established he's basically doing the talking; right?

A    Yes.

Q    Was there any discussion, at that meeting, that you could permanently lose function of your foot as a result of this osteotomy procedure?

A    No.

Q    Was there any discussion about function of the foot, at all, talking about the foot, as part of this discussion regarding surgery?

A    No.

Q    Do you recall whether the doctor was looking at any type of paperwork when he was reading off this list of potential risks?

A    If I remember correctly, he had a paper in front of him.  It might have been actually been a pamphlet, which he was reading off the actual risks themselves.

Q    I'm sorry, did everybody read that to the extent they wanted to, that April 11?  I just took that off without asking.  I apologize.

Scott, is there anything else about the April 11, 2002, meeting, that you recall?

A    I do recall when — it's something that kind of sticks out in my head -- when death was brought up, where I was kind of like, whoa, you know.

Brandner001222

35

Q    You mean as a potential risk?

A    As a potential risk, yes.

He had mentioned that it was something that had to be discussed in any surgery that involved an anesthetic, that there was a risk for death. And that it was a very small risk, and that's, basically, the only thing, other than that, that sticks out.

Q    At the end of the April 11, 2002, meeting, we've covered all that you recall on that?

A    Yes.

Q    Do you have a recollection of what your thought was at the end of that meeting, after you left that meeting, where you were on this process?

A    If I remember correctly, I was excited for surgery. It was the answer to our problems -- to my problems.

Q    At that point in time, Scott, did you have any appreciation for any real dangers, as a result of that surgery?

A    No, not at all. It was, it was a great thing that was going to fix it.

Q    Based on your discussion with Dr. Sharpe at that meeting, did you feel like there was -- this was a surgical procedure that would actually fix this?

A    Yes.

Brandner001223

36

Q     Okay.  Scott, I want to move onto the June 6, 2002, meeting.  But before we get there, before that meeting, you went back and saw Dr. Matthews, but you also saw doctor — a Dr. Walls; is that correct?

A     Yes.

Q     Why do we go see Dr. Walls?

A     We wanted to make sure — we basically wanted a third opinion, some — another opinion, to make sure that we were making the right choice.

Q     Okay.  During any of your discussions with Dr. Walls, did he discuss with you, in any detail at all, the wait and see option, the leave-it-alone option?

A     Not that I remember.  I think it may have come up, but I can't say specifically one way or another.

Q     Do you remember any discussion with Dr. Walls, of any detail, such as, if we leave it as it is, and it heals with the same angle it's at, here's what you can expect down the road, if you want to just try to live with this?  Any discussion like that at all?

A     Not that I remember.

Q     What do you remember about your discussions with Dr. Walls?

A     I don't remember very much from his office visit.  I don't know if it was because it didn't last very long or not.

Brandner001224

37

I do remember that he had a -- he was talking about a different surgery. It was the same idea, you know, go in and straighten it out. But instead of using a plate, his idea was to use a rod through the center of the leg.

Other than that, I don't really remember anything else from that meeting.

Q    Now, I'm -- was it your understanding that Dr. Walls agreed that in order to straighten the bone, a surgical procedure would be necessary?

A    Yeah, to fix the angle, we needed to have a surgery, yes.

Q    Right, in order to realign the bone, it needed -- there needed to be some type of surgical procedure?

A    Yes.

Q    So, at this point in time, are you under the impression that if your decision is to go in and try to straighten the bone, as opposed to the wait-and-see option, it's going to require some surgical procedure?

A    Yes.

Q    Approximately, looks like maybe a week later, you went back to see Dr. Matthews again?

A    Yes.

Q    The meeting with Dr. Matthews, in April of 2002, of course, this is after Dr. Sharpe's discussion that

Brandner001225

38

we just covered?

A    Yes.

Q    This is after Dr. Walls; right?

A    Yes.

Q    At that time, except for seeking out these additional opinions, you'd still been treated by Dr. Matthews; is that correct?

A    Yes.

Q    So April 22, 2002, is the date that we have here, from the chart that counsel provided, the time line, does that sound about the right date, a week later?

A    Yes.

Q    Kind of each week had a doctor's appointment here, this time period?

A    Kind of, yeah.

Q    What do you recall about that meeting with Dr. Matthews?

A    I recall us going back there.  It was my mom said it was basically to give him, you know, one last chance to, I don't know, keep us as a patient.

We wanted to see if he had changed anything about his previous opinions, if he wanted to, like I said, basically change anything about what he had said before.

If the angle was a problem, if the callus was something other than just a bone callus, if the pain meant

Brandner001226

39

anything, anything like that.

Q    Did you feel like Dr. Matthews wasn't addressing this aggressively enough?

A    In a way, yeah, yes.

Q    I know we discussed this a little bit, as far as when you -- the time period when you got out of surgery -- excuse me, got out of the cast, up to the time where you started seeking other opinions, we have discussed a little bit, the difficulties, the pain you were having?

A    Yes.

Q    I want to talk a little bit, we're now up to June of 2002, the second meeting with Dr. Sharpe, June 6, 2002.

First of all, tell me what you recall brought that additional meeting to Dr. Sharpe's about. Was there some decision making?

A    I think that, from what I can remember, that was the final meeting before surgery. It was just to finalize everything, to go over any extra things we needed to go over, that sort of thing. It was kind of to wrap up everything before surgery.

Q    When you went to see Dr. Matthews that last time, had you already made up your mind, definitively, that you were going forward with the surgical procedure?

A    Yes.

Brandner001227

40

Q    And I assume, since you went back to Dr. Sharpe, you weren't interested in Dr. Walls' procedure?

A    No.. Like --

Q    The rod recommendation, you were mentioning.

A    Yes.  No.

Q    All right.  What I wanted to discuss, and bring us forward a little bit, June 6, 2002, prior to Dr. Sharpe's surgical procedure, the one at issue, what were the problems you were having with your leg at that time.

Was -- and I'm talking more along the lines of the pain.  First of all, was the knot still there?

A    Yes.

Q    Callus was still there?

A    Yes.

Q    Was it pretty much the same as it had been when you first went to see Dr. Sharpe?

A    Yes.

Q    Or when you first went to Mezona Orthopedics?

A    Yes.

Q    The bow in the leg, it's still there, obviously?

A    Yes.

Q    What I want to know, has there been a change, or is there any difference in the pain you're experiencing, before this June 6, 2002, procedure.

Brandner001228

41

Do you still have pain at the fracture site if you're very active?

A    Yes, definitely.  There is some stiffness in the ankle too, from the bow of the leg, yes.

Q    So you're having some stiffness in your right ankle?

A    Yes.

Q    Does that vary depending upon activity?

A    Yes, definitely.

Q    Is the pain at the fracture site, is that varying, at that time, depending upon the degree of activity?

A    Very much so, yes.

Q    And the type of activity?

A.   Yes, definitely.

Q    All right.  Let's go to June 6, 2002.

First of all, Scott, who was in attendance at that meeting?

Let me back up a minute.  I want to set the stage a little.  Was this in another exam room type of thing?

A    Yes.

Q    Take me from the beginning of the meeting.  Who is in the meeting initially?

A    My mother and I.

Brandner001229

42

Q   Who are you meeting with initially?

A   Dr. Sharpe, yes.

Q   And there has been some discussion that a Brian Sharp, physician's assistant, was involved, to some degree, on your case.

Do you recall this person?

A   Yes.

Q   The April 11, 2002, meeting -- I'm sorry, I'm going to bounce backwards on you a little bit -- did you have any discussion, substantively at all, with Brian Sharp at that meeting?

A   No.

Q   At that visit at all?

A   No.

Q   So June 6, 2002, the meeting starts off with Dr. Sharpe, is your recollection?

A   Yes.

Q   And tell me what you were discussing, what was being discussed?

A   I don't remember very much from that meeting. I do remember us going over the list of risks again. That's one thing I do remember from that meeting.

Q   Did you discuss the procedures at all?

A   We discussed the anesthetic, basically the —
what we could expect, you know. We were going to do an

Brandner001230

43

epidural. I was going to get a catheter as well.

We were going to, you know, different type of things like that, that we could expect from the surgery. But other than that, I don't remember any other specific things that we discussed.

Q Was there any discussion, at the June 6, 2002, meeting, of the option to wait and let the fracture to continue to finish healing or, hopefully, the pain would not be at the fracture site and then seeing where you were at that time?

A No.

Q No discussion of that option?

A At that time, surgery was the answer.

Q Let me finish up with Brian Sharp, the PA, here, at the June 6, meeting, of 2002.

Did Brian Sharp attend that meeting, at all, to your recollection?

A Was he in the actual exam room?

Q Yes.

A Not that I can remember, no.

Q How long do you recall that meeting taking place?

A How long was the meeting, like time period?

Q Yeah.

A I couldn't say exactly. I don't know.

Brandner001231

44

Q   The discussion, the substantive discussion that took place, be it the procedures to expect as part of the surgery, be it the risk list again, or any portion of it -- I'll put the medical record up here.

Is it your testimony that that discussion, the substantive portion, was all with Dr. Sharpe?

A   Yes.  In fact, the only time I remember even talking with Brian Sharp was just meeting him and shaking his hand, that being before the surgery.

Q   At the Mezona --

A   At Mezona, yes.  Other than that, I don't remember him talking about -- to us, you know, substantively at all.

I do remember after the surgery having discussions with him, but before the surgery, the only thing I can actually remember is just meeting him and shaking his hand.

I remember, because we were walking out of the doctor's office, and there were — they have each of their cards in there.  There was Dr. Sharpe's and Brian Sharp's and we had talked about Brian Sharp, but I remember, you know, picking up both their cards and Dr. Sharpe would follow us out.

And he goes, oh, he's actually here and we can go ahead and introduce you to him.  And that's when we had

Brandner001232

45

been introduced.

I'm not sure if that was the first or second meeting. If it was April 4th or June 6th, but I do remember that the only time, before surgery, actually talking with him was, you know, either just shaking his hand or meeting and saying hello.

Q    You don't recall if that was the April 11 or June 6, 2002, meeting?

A    No, I don't.

Q    So, Scott, prior to the surgery, I take it, is it your position that Brian Scott, the PA, never discussed any risks with you?

THE COURT:  Brian Sharp.

MR. CAUSEY:  What did I -- I'm sorry, Brian.

MR. CRAWFORD:  Brian Scott.

BY MR. CAUSEY:

Q    I apologize, Brian Sharp.

A    What was the question again, I'm sorry.

Q    Let me ask it again.

If I understand your testimony correctly, is it your position then that prior to the surgery, at any time prior to the surgery, the physician's assistant, Brian Sharp, never had a discussion with you about the risks of the surgery?

A    No.

Brandner001233

46

Q    That's correct?

A    Yes.

Q    All right.  Tell me what you recall — have you told me everything that you recall about the June 6 discussion regarding the procedures?

A    Yes.

Q    Let me put up here — and I'll try to leave it up.  So everybody — I think it's still blown up.  June 6.

Scott, this is a note of June 6, Exhibit 11.  Plaintiff's Exhibit 11, it's been admitted.

Scott, this is a note of June 6, 2002, from Dr. Sharpe's records.

Have you seen this document before?

A    Yes.

Q    Scott, at the beginning there it says you're there for the pre-op evaluation; is that correct?

A    Yes.

Q    It also indicates you had, already had you're second CAT scan, CT scan, done the day before.

Do you recall that?

A    Yes.

Q    Now, the next sentence says:  This has not been read by the radiologist yet, but Dr. Sharpe discussed this with Dr. Schenk — I hope I'm pronouncing that correctly — this morning and it will be done in time for the surgery.

Brandner001234

47

Do you see what I'm referring to?

A    Yes.

Q    Let me ask you this, did you see Dr. Sharpe dictating anything at this meeting?

A    Yes.  Every meeting we went to, at the end of the meeting he dictated it.

Q    He dictated —

A    Yes.

Q    Do you know whether he dictated this information or not or someone else did?

A    Not that I can remember.  I don't remember him saying specifically saying this though.

Q    I'm going to move it up slowly in a little bit. Okay.

Scott, in the assessment portion, it says malunion right tibial fracture.

By this time, had you come to understand that the description of what was wrong with your leg, with the tibial bone in your leg, was it had a malunion?

A    Yeah.

Q    That was the phrase that was now being used, that you understood?

A    Yeah.  That's what was used to describe the fact that it hadn't healed completely, yes.

Q    It says, hopefully, ORIF, with a plate, could

Brandner001235

48

possibly -- some sort of external fixation device.

At this June 6, 2002, meeting, was the external fixation device something you were still considering?

A    Not that I remember.  I thought that we, from what I remember, I thought we had decided to do the plate.

Q    Okay.  Let me get down to the portion here where you indicated, again, there was some discussion regarding risks.

A    Yes.

Q    Do you recall that, earlier you testified to that?

A    Yes.

Q    Can I ask you, this time, when the doctor was also discussing the risks, do you recall whether he was referring to any type of documentation when he was reading off the list?

A    Not specifically.  I don't remember this time specifically him having a piece of paper or not.

Q    Okay.  So at this meeting you don't recall that specifically?

A    Not specifically, no.

Q    It says:  I've given them a prescription for post-op pain medication.  Do you see where I'm referring?

A    Yes.

Q    And reviewed the risks of surgery.  These

Brendner001236

49

include, but are not limited to, death, other anesthetic complications, blood vessel injury, nerve injury, fracture, chronic stiffness, chronic pain, malunion, non-union, re-fracture, mechanical failure of the components. I think that says blood loss. Looks like there was probably a three-hole punch of some kind in the record there. Blood clots and infection.

Do you see what I'm referring to?

A    Yes.

Q    And Scott, do you recall being read that list of potential risks?

A    Yes.

Q    Same thing I asked you about the April 11, 2002, meeting. I want to talk specifically about the nerve injury.

When this list was read off to you June 6, 2002, okay? Did you -- was there any different discussion about it than what had take place April 11, 2002?

A    No, same list, same discussion.

Q    Let me go back to the April 11, 2002, briefly. Did either you or your mother, when the list was read off back then -- or your father, I guess he was at that meeting -- raise any questions, at that time, about the risks, other than you mentioned the risk of death issue that --

Brandner001237

50

A    That's the only one that I remember.

Q    When this list was also communicated to you at the June 6, 2002, meeting.  Do you recall any questions that any of you raised at that meeting?

A    No.  We had no questions.

Q    I'm talking about at that meeting --

A    Just my mother.

Q    Your mother?

A    Yes.

Q    Any discussions June 6, 2002, about a specific nerve that could be injured?

A    None.

Q    Any discussion that that nerve, or this surgical procedure, could result in a permanent impairment -- permanent loss of function of your foot?

A    No.

Q    Any discussion of if that happens, that you, in order to not drag your foot on the ground or to be able to move your foot, might have to wear a brace the rest of your life?

A    No.

Q    No discussion along those lines?

A    None whatsoever.

Q    There is another small portion -- has everybody read this portion?

Brandner001238

51

I believe there is just a couple lines there at the top. I'll try to piece them together so you can read them in context. I'm not quite sure how good I'll be at this.

Patient and his mother understand these risks. He's ready to proceed with surgery. We will see the patient back one week after the surgery.

Do you see that?

A    Yes.

Q    See where it says Brian Sharp, PA dash C?

A    Yes.

Q    Do you recall, have a recollection of seeing Brian Sharp dictating?

A    No.

Q    Scott, I want to cover just a couple more things and we'll finish up with the April 11 -- the June 6, 2002, meetings.

At either of those meetings, did Dr. Sharpe tell you that he thought that if you did the wait-and-see option that 20 to 30 years down the road you might have some arthritic issues regarding your knee or some issues with your ankle?

A    From what I can remember, yes.

Q    Do you remember him telling you that it would be 20 to 30 years down the road?

Brandner001239

52

A    About 20 or 30 years, yes.

Q    All right. So we finished the June 6th, 2002, meeting. And at this point, the surgery is being scheduled. It's a go decision; is that right?

A    Yes.

Q    Scott, had you known about the specific risk to the nerve, that can cause you to lose, permanently, loss of function of your foot, would you have elected to proceed with this surgery?

A    No.

Q    What would your option have been at that point?

A    To wait and see if it would heal, stop hurting.

Q    Even though you had the bow in the leg and the knot in the knee, did you still have function of your foot?

A    Yes.

Q    So you could still lift up and move your foot?

A    Yes.

Q    You still had the ability to push off the foot?

A    Yes.

Q    You still had the ability that when you walked, the foot would come back into place?

A    Yes.

Q    Okay. Scott, we go to the surgery, June 26, 2002. What do you recall, pre-operatively, in other words prior to going under and during the surgery, who did you

Brandner001240

53

talk to?

A    I remember talking to Dr. Sharpe for a short period. I remember him being in his blue gown with his everything. I might have doctor -- or Brian Sharp might have said hi to me, as well. I don't specifically remember.

I remember talking to my dad and my mom and my grandmother were there.

Q    All right. But as far as health care providers, have you listed everybody?

A    The anesthesiologist, I remember meeting with him more than anybody else, because he went over exactly what was going to happen and --

Q    The epidural?

A    Yes, the epidural and actually going under.

Q    Did anybody, prior to that surgery, during the communications you had with them at the hospital, again, did anyone mention anything about the risk to a specific nerve and any loss of function of the foot that could result?

A    No.

Q    All right. So, Scott, you go through the surgical procedure. When is the first point in time where you realize that something may not be exactly as hoped?

A    The first time I talked to Dr. Sharpe after the surgery.

Q    Tell us about that.

Brandner001241

54

A    I remember the first time, I was in my hospital room and he had walked in, and I think I was asleep. And my mom had woke me up and we started taking -- he had started to take the bandages off and the brace and the bandages. And he asked if, you know, everything was okay, how I was feeling, if it was hurting; that sort of thing.

Once he had gotten the bandages and brace off, he asked me if I could flex my foot -- or first he asked me to wiggle my toes, and I couldn't. He asked me to flex my foot. I couldn't do that. He asked me --

Q    Describe -- I don't mean the interrupt you -- describe what you mean by flex your foot?

A    Pull it upward, like that. He asked me if I could move it side to side, like this, which I couldn't, or push down, which I couldn't either. So, I couldn't move my foot.

I remember my mom asking, you know, what the significance of that was.

Q    Was this in the room there with everybody present?

A    This is in the hospital room, yes.

I remember him telling us that there may have -- I may not be able to move my foot because of the epidural might not have worn off yet.

But there was another possibility that I might

Brandner001242

55

have lost function of foot, but we would not know for sure, and it wouldn't be anything to really get upset about until the epidural had wore off and we could actually see if something had gone wrong or not.

Q    This conversation that you were having with the doctor, this is the first communication post surgery?

A    Yeah, yes.

MR. CAUSEY:  Your Honor, I noticed you're glancing at the clock.

THE COURT:  I am.  Is this a good time to pause?

MR. CAUSEY:  It would probably be, your Honor.

THE COURT:  Let's do that then.  Thank you. Mr. Clark, you can go ahead and step down.

Ladies and gentlemen, we will go ahead and take our evening break.  If I could ask all of you to be here, please, promptly at 9:30 tomorrow.

We'll ask that you meet inside the jury room. I think you all know how to get into the jury room, to get through our security screens.

So, if you will be ready to come into the courtroom at 9:30, I'd appreciate it.

Remember the admonition.  Thank you folks. We'll be in recess.

(The proceedings were concluded.)

Brandner001243

56

C E R T I F I C A T E

I, Lisa H. Vitoff, do hereby certify that the foregoing pages constitute a full, accurate computer transcription of my stenographic notes taken at said time and place, all done to the best of my skill and ability.

DATED this 2nd day of February 2010.

_____
Lisa H. Vitoff, CPR
Official Court Reporter
CRR No. 50521

Brandner001244

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STEVE CLARK and KIM CLARK,
et al.,
          Plaintiffs,

        vs.

                        CV No. 2003-017451

ANDRE MATTHEWS, M.D., and
JANE DOE MATTHEWS, et al.,
          Defendants.

April 29, 2008
Phoenix, Arizona

BEFORE THE HONORABLE: MICHAEL JONES, Judge

REPORTER'S TRANSCRIPT OF PROCEEDINGS
Testimony of Scott Clark and Kim Clark

Lisa H. Vitoff
Certified Court Reporter
CCR #50251

Brandner001245

2

APPEARANCES

FOR THE PLAINTIFFS:
        KOELLER, NEBEKER, CARLSON & HALUCK, LLP
        BY:  Mr. Wade R. Causey


FOR THE DEFENDANTS
        CRAWFORD & KLINE, P.L.C.
        BY:  Mr. Bruce D. Crawford


PROCEEDINGS




SCOTT VERNON CLARK,

having been previously sworn herein, resumed the stand and

testified as follows:


DIRECT EXAMINATION continued


BY MR. CAUSEY:

    Q    Scott, I want to finish up what we were

discussing yesterday.  I know we got close to covering

everything.

Brandner001246

3

We left off at a point where we were discussing the post surgery, the Dr. Sharpe issues and discussions, when you realized that the foot was not moving?

A   Yes.

Q   I'll get back to that in just a second, but there was one other thing I wanted to ask you about.

The discussions, prior to the surgical procedure, and I want to ask first, with respect to Dr. Sharpe — or Brian Sharp.

Did anybody discuss with you that, with respect to the pain you were having at the fracture site, that less activity, staying off of it, would help reduce that pain?

A   No.

Q   Did anyone discuss with you that staying off of it thereby and potentially reducing the pain also would be the process to allow the fracture to finish healing?

A   No.

Q   So, at that time, you were still engaging in whatever activities you could, pain allowing; is that a fair statement?

A   Yes.

Q   Where we left off yesterday, we were talking about the discussions that occurred after the surgery with Dr. Sharpe.

And if I recall, we just had gotten to that

Brandner001247

4

topic. I believe we had briefly mentioned that a few hours after the surgery, or the day, on the same day of the surgery, you had been asked to move your foot.

Do you recall that?

A    Yes.

Q    Now, I believe we covered all of the discussions that you recalled at that meeting, where it was explained to you it might be the epidural.

Do you remember that yesterday?

A    Yes.

Q    Is there anything else that you can think of about that conversation or discussion with Dr. Sharpe, following the surgery, that you didn't mention yesterday?

A    What was said?

Q    Yes.

A    Not that I can think of, no.

Q    Now, obviously there was some continued treatment after this surgery, regarding the condition that you now have as a result of the nerve damage; is that correct?

A    Yes.

Q    And you continued to treat with Dr. Sharpe, I believe, a couple years after that?

A    Yes.

Q    I want to talk a little bit about the follow-up

Brandner001248

5

treatment. I don't want to go into a great deal of detail. I just want to — kind of the highlights that have been mentioned already.

At what point did it become, in your eyes, based upon your communications with your doctor, apparent that this was a permanent condition?

A    I would say probably a few months after the initial surgery.

Q    Were there discussions regarding other options to try and gain some function of this nerve or function of the foot?

A    Yes.

Q    What were those? Tell me what those were.

A    I remember one specific discussion. I know Dr. Sharpe had referred us to another doctor that specialized in foot drop. I believe that was his specialty.

And we had discussed with him doing a tendon transfer surgery, where we would take a tendon from the back of my leg, the calf area, transfer it to the front, and that would — if it worked, that would help me have 50 percent mobility in the front, but I would lose 50 percent from the back.

Also there was another surgery, a nerve graft surgery. I don't remember going too much into that.

I remember we were -- we did some research. He

Brandner001249

6

referred us to a website to do some research on that subject, but we never really went too much into it.

It was just grafting a nerve over the top of the peroneal nerve, something like that, to gain mobility in the foot.

Q    Was it your understanding that procedure may also have been a give and take?

In other words, if you --

A    Yes.

Q    -- gained, you'd lose somewhere else?

A    Yes.  And that one had a very low probability of working.

Q    That's what you were told?

A    Yes.

Q    That was by the doctor you were referred to?

A    It was either by him or by the research that we had done.

Q    Do you recall seeing a Dr. Mitchell at some point?

A    Yes.

Q    Is that the doctor you're referring to?

A    Yes, I believe so.

Q    So, based upon the information you were provided about the nerve transfer surgical procedures, you decided not to go forward with that; is that correct?

Brandner001250

7

A    Yes.

Q    You also had a referral to somebody regarding the brace?

A    Yes.

Q    Tell me about that.

A.    I believe Dr. Mitchell went over that was one of the options, was changing out braces, because prior to that, I had a pretty bulky brace that rubbed in a lot of areas, and it was really heavy and it stuck out a lot.

So, he was talking to us about other options with braces. And he had referred us to another doctor, I don't remember his name, who had fit me for a carbon fiber brace. It was a lot lighter. Still rubbed in some areas, but it was a lot smaller and it was a lot better for me.

Q    Now, Scott, during this time period, after the surgery, where there's follow-up treatment, are you having visits with Dr. Sharpe at his facility?

A    Yes.

Q    That's where these referrals are taking place and these discussions?

A    Yes. At his offices, is that what you're asking, where the referrals --

Q    Yes.

A    No. We had to go to other offices to meet with other doctors.

Brandner001251

B

Q   Right.   But the discussion with Dr. Sharpe and the referrals, were those at his office?

A   Yes.

Q   If you went to Dr. Mitchell, you went to his office?

A   Yes.

Q   Okay, I understand.

During this time period, when you would refer to your nerve injury condition, how was it referred to? What were the terminology that was used?

A   Foot drop or drop foot.

Q   Foot drop?

A   Yes.

Q   Did that become synonomous with your understanding of your nerve injury?

A   Yes.

Q   Now, Scott, had you ever heard the term foot drop before the surgery?

A   No.

Q   By that I mean, the surgery with Dr. Sharpe. You understood that; right?

A   Yes.

Q   Okay.   Scott, you've been deposed twice in this case; is that correct?

A   Yes.

Brandner001252

9

Q    Do you remember giving a deposition the first time?

A    Yes,

Q    I don't expect you to remember the date that I'm going to give you, a date of January 29, 2004,

A    Okay,

Q    Does that sound about right?

A    About right, yes.

Q    That would have been approximately a couple years after the surgery?

A    Yes.

Q    A year and a half, I guess, maybe?

A    Uh-huh.

Q    I need you to answer yes.

A    Yes, sorry.

Q    Thank you.

And Scott, at that time you were asked some questions by an attorney; do you remember that?

A    Yes.

Q    Is that the first time you'd ever been deposed?

A    Yes, sir.

Q    How old were you then, Scott; do you remember?

A    I believe 16 at the time.

Q    And Scott, do you remember that you were asked a question -- actually, it was a series of questions.  And I

Brandner001253

10

want to show this to you.

This is Page 28 of the first deposition. It is the deposition — I'm sorry, counsel, I should have told you, January 29, would be 2004, I believe I said.

MR. CRAWFORD: Page 28?

MR. CAUSEY: Page 28.

Q Scott, I want to clarify something with you here. Do I need to blow it up for the jury a little bigger, anybody? I know my eyes aren't great.

Scott, I want to start at Line 10. This isn't — the second deposition you took, Mr. Crawford was the one who was deposing you; do you recall that?

A Yes.

Q This was not Mr. Crawford; right?

A No.

Q Okay. And the attorney that's asking you these questions said: When did you first — I'm sorry — when did you notice that you first had a foot drop?

Then you're talking about the post surgery meeting we just had.

It says: Right when I woke up out of surgery. Dr. Sharpe asked if I was able to — he had me move my leg and foot in certain directions and he had asked me to flex and I wasn't able to flex. And he asked me to go out and I wasn't able to do that.

Brandner001254

11

Do you see that, Scott?

A   Yes.

Q   Now, Scott, the next question though, that attorney asked you, before you had the surgery, did Dr. Sharpe ever discuss with you or did anyone discuss with you, you might end up with foot drop.

And Scott, your answer says yes.

A   Yes.

Q   He told me all the things that could happen.  I would — it could have nerve damage.  And he said all the things.

He even mentioned death, though we had an anesthesiologist in there, could be accidents and stuff.

Now, Scott, you've told the jury that you never heard the term foot drop before the surgery.

A   Yes.

Q   It appears from your answer to this attorney's question, though, that you're saying you had.

Can you explain that?

A   Yes.  At the time that this question was asked, this was about two years after the surgery, the actual nerve damage that I had was foot drop.

So, when I answered this question, I equated nerve damage with foot drop.

So when he asked the question, had you ever

Brandner001255

12

been asked if I would end up with foot drop, that meant, to me, nerve damage.

You can see here when I answer the question. Yes, he told me all the things that could happen. I would -- it could have nerve damage.

So when he asked if I may end up with foot drop, I answered nerve damage.

Q    At the time your deposition was taken, did you equate foot drop with nerve damage?

A    Yeah.  They were one and the same to me.

Q    You had a lot of discussions by that point about it?

A    Yes.

Q    With Dr. Sharpe and others.

A    Yes.

Q    Did the attorney that was asking you -- you kind of mentioned a list there.

I'm sorry, let me put that back up.

The death, the nerve damage, anesthesiologist.

Did the attorney that was asking you the question at that deposition, did he ever show you the medical records with the list?

A    No.

Q    So you were working purely off your memory at that time?

Brandner001256

13

A    Yes.

MR. CRAWFORD:  Objection, your Honor; leading.

THE COURT:  Sustained.

BY MR. CAUSEY:

Q    Had you reviewed the medical records in preparation for that deposition at all?

A    No.

Q    So, to the extent that you were trying to recall that list, you would have been trying to recall something that was told to you --

A    A couple years ago.

Q    -- a couple years before?

A    Yes.

Q    Scott, I want to show you Exhibit 10.  I believe it is -- yes, it's been marked as Exhibit 10.

We looked at it yesterday.  This is the April 11, 2002, list.  Do you see that?

A    Yes.

Q    And, of course, there is another list as well, the June 6, and we'll look at that, and I'll come over and show that here in just a minute, and I have that as well.

Do you see the list that we went over yesterday, anesthetic risk, death, infection, non-union or delayed union.

Do you see what I'm referring to, the list?

Brundner001257

14

A    Yes.

Q    Were you trying to remember that list in response to that question?

A    Yes.

Q    I'll show you Exhibit 11, it's right down at the bottom there, June 6. I do have the little punch out again. It's something we looked at yesterday.

Do you see the list at the bottom of the June 6?

A    Yes.

Q    Anesthetic complications, blood vessel injury, nerve injury, fracture. Okay.

Again, is this what you understood the question to be, was asking you about what was discussed prior?

A    The risks, yes, that were discussed.

Q    And just to be clear, were there any other risks discussed, other than what is contained in these lists I've just shown you?

A    No.

Q    Scott, I want to cover, just briefly -- I don't think it will take very long to cover this, there has been some mention about your history with dance and your mother's studio.

First of all -- and your mother's going to testify later, so I'll find out a little bit more about the

Brandner001258

15

studio from her -- let's talk about your activities in that.

When did you first start that activity?

A    Dance?

Q    The dance, yes.

A    When I was about two years old.

Q    This was with your mother and through her studio?

A    Yes.

Q    And did you continue that -- I guess, this football injury, you were 14; is that right?

A    Yes.

Q    Had you continued the dance on a regular basis up to that point?

A    Yes.

Q    Describe a little bit about what that involved, let's just say, in an average week or month?

A    How many days or what type of dance?

Q    Yeah.

A    Both, okay.  I danced probably five days a week, sometimes six up to that point, every week, every month, for 14 years or 12 years of my life, from time I was two.

That involved tap, clogging, hip hop, even ballet, some modern dance as well.

We did competitions, performances at old folks

Brandner001259

16

homes, churches, different types of things like that.

So it was — I mean, basically, after I'd go to school, I'd go to dance. That was my life, that was my hobby, was dance.

Q   Scott, obviously, you were playing football when this injury occurred. I assume then that you were involved in some athletic activities as well?

A   Yes. That was the first time I'd ever done any organized sport.

Q   Scott, I want to talk a little bit about -- and this will involve maybe the dancing as well -- but I want to talk about -- I'll give you two parameters here — I want to talk about after the Matthews surgery and the activities you were engaging in and could engage in.

And then I want to talk about the activities after the Sharpe surgery, and what you were able to do and not able to do.

So let's start with after the Matthews. And we've already covered some issues about up to the limitations of pain. But I just want you to describe for me what activities you could do after the Matthews surgery and you had been released --

A   Matthews --

Q   -- to go back to activities.

A   Okay. After the time he had released me,

Brandner001260

17

around about -- I had been in the walking brace for a little bit, and even out of the walking brace -- I was able to still do most types of dance, hip hop. I even did tap and clogging. I did some ballet still, some modern, some jazz. The difficulties I had lie in the pain itself.

So, it wouldn't be the types of dance, as much as how much of that dance I could do. I couldn't do certain moves, as to, you know, jumping off of the leg or on to the leg too much.

In certain types of classes I would have to lift girls and do certain types of lifts. I couldn't hold them up for too long if.

We had to choreograph that into a dance, it had to be where -- inside my limitations, what I could do with that.

I also, after my leg healed, I decided to try for track. Since I couldn't run very much or for long periods of time, I could not do any of the running events.

Since I couldn't really jump off of it or on to it, it I couldn't do any jumping, so I decided to do the discus.

So with the discus, I went to State. I qualified for City, went to City. I think I placed third in City. Qualified for State, went to State, and I think I placed, out of 15 guys, I think I placed 10th or something

Brandner001261

18

like that.

But like the prior -- or Mr. Crawford had said, I wasn't able to do the spin that was included, which in high school not everybody does a spin. You can choose just to do a stationary throw or the spin.

And since doing the spin caused more pain for me, I just decided to do the stationary throw, and I still did pretty well with that.

Q   Scott, you said in reference to the dance, that you were attempting -- the dancing you were attempting, choreographed, et cetera, to your limitations.

What limitations are you talking about, was it the pain?

A   Yes, the pain.

Q   Okay.  The bow in the leg, was that — and if it was, describe it -- affecting the choreography or what you could do or couldn't do?

A   No.  The only thing it affected was the way my leg looked.  I remember watching a tape from one of our performances, when I was doing a clogging dance, and the only difference that the bow caused was I could see my foot was kind of -- my leg was kind of bowed out a little bit.

But other than that, I was still able to do all the types of dance.  I was just limited, pain-wise, in the amounts I could do.

Brandner001262

19

Q    With respect to the track, you talked about limitations as well.  Again, is that the pain you're referring to?

A    Yes.  It was the pain, yes.

Q    So the deformity was something that looked off?

A    Yes.

Q    Looked irregular?

A    Yes.

Q    But the pain was what was limiting you; is that what you're saying?

A    Yes.

Q    Let's talk about after the nerve damage and you've lost the function of your foot now.

First of all, initially, you couldn't turn your foot sideways or lift it up; is that correct?

A    Yes.

Q    Or push down?

A    I, I don't remember about the push down.  I know I couldn't flex and move side-to-side.

Q    Okay.  The side-to-side movement came back; correct?

A    Yes, I believe a few months later it came back.

Q    I just want to clarify that, before we talk about — so, the issue you have now is the inability to lift the foot up; is that correct?

Brandner001263

20

A    Yes.

Q    It just simply won't lift?

A    It won't flex, yes.

Q    Mind tells it to; body doesn't react?

A    Yeah.  Sometimes I'll sit there and just focus on it, and it just doesn't move.

Q    All right.  Your normal activities that you liked to engage in before this, even after the Dr. Matthews surgery, to the extent you could, with the pain, tell us what limitations, if there are any additional limitations, that you now have in those activities as a result of not being able to move your foot?

A    Well, I do have more limitations now.  Now, because I cannot flex my foot, my ankle is kind of, I guess you would call it, fused in its position.

I do have, you know, some down movement, but since your tendons are pulling up on the foot and equally pulling down, it stays stationary.  So whichever way you pull it, is the way it's going to go.

Well, since I have no tendons pulling up on it, it sits down.  So when I'm pushing down, I don't have very much room to go down.

And side to side, it's very limited because it's kind of frozen like that.  So that I mean that, in itself, not even talking about flexing the foot, just the

Brandner001264

21

fact that I have — it's kind of stiff and doesn't move, it's caused me limitations with every type of dance that I was doing, every single dance.

Q    Let's talk about that.  Some of your dances, I believe, it was mentioned earlier, involved some jumping or lifting; things like that?

A    Yes.

Q    Does it adversely affect that?

A    Yeah, definitely.  Since I have very little down movement because it's basically frozen down, I have no -- I'm not able to jump off of it or on to it.  I have no cushion when I jump on to it.

I mean, lifting, you know, I can still lift girls because I can stand on my leg, which that doesn't cause me any problems.  But I can't do tap or clogging because you have to be able, you know, to pick up your foot to do your tap moves.  And I trip and fall or I fall in.

When I've tried to do ballet, I can't do, you know, have to point your foot, which I can't do, my toes are kind of pulled up and my foot's pushed down, so I can't point my foot at all.

I can't, I mean, I can't do almost any type of move in hip hop.  I mean, a lot of hip hopping, I mean, it's in the name, it's called hip hop.  So, I mean, I really can't do much there.

Brandner001265

22

I do teach hip hop and I do spot in tumbling. So, I mean, I can kind of demonstrate, you know, to a smaller degree, of what they're supposed to do, but anything full out, I'm just not able to do.

Q     You say that you're currently teaching.  Talk about that a little bit.  What type classes and who are you teaching?

A     Okay.  I teach hip hop.  I teach ages three all the way up to adults, 50, 60 years old.  I teach on Wednesdays, Thursdays, and Saturdays.

With hip hop, what I'll do is, we'll do stretches for the first 15 minutes.  After that, I'll have them go across the floor and do different steps.

For the first -- the studio opened up, I believe it was, in September, and that's when I started teaching there.

For the first month, my brother was in the classes with me and we'd go over a set thing we do for our warm up and things we'd do across the floor.  So, once he was out of the class, they had an idea of what they had to do full out, since I couldn't do full out.  So they understood the moves, yes.

Q     When you say I couldn't do it full out, are you talking that trying to demonstrate the moves?

A     Yes.

Brandner001266

23

Q    This studio that you said just opened, this was a new studio your mother had opened?

A    My brother and his wife own this studio, yes.

Q    Is that in the east valley?

A    That's in Queen Creek, yes.  My mother's the director of that studio.

Q    Oh, I understand.  Okay.

That's the studio that you're teaching at and assisting at currently?

A    Yes.

Q    Now, your mother, though, didn't she have a studio before?

A    Yes.  Up to that point, is where I taught before, and that was in Mesa.  She had owned a studio with a partner, yes.

Q    Scott, let's talk about how --- the limitations on your foot, as it currently exists, the function of your foot, how that has adversely, if it at all, affected your work.

My understanding is your work, at this point, and even during the interim that we talked about, between Matthews and Sharpe surgery, I'm talking about work with your dad's company.

A    Okay.

Q    Talk about, if at all, how the limitations on

Brandner001267

24

your ability to move your foot, or as we've already discussed, affects that at all.

A    Okay.  It definitely affects it in that everybody that works in the field, our guys, you know, bigger guys, we have to be able to lift, you know, heavy beams and stuff.

And I don't have any problem lifting lighter things, but I still do have pain in the ankle, and any time I'm lifting something extremely heavy, they have to do that and I kind of just stand back.

Anything on ladders, I do walk up and down six-foot ladders, I'm able to do that.  But like I was saying before, we do awnings and roofs and stuff like that.  So, any prolonged standing on ladders, I'd say for more than 10, 15 minutes at a time, I have to come down and rest, let my leg rest for at least five or 10 minutes, and then I can go back up and do it again.

Q    I'm sorry -- go ahead.

A    It's just basically prolonged activity, like sometimes we'll do digging, we'll dig trenches or footers or post holes, and I'm able to do, you know, I'm able to do some, to a limit.

Then too much activity on the leg, I have to stop, it's just too much for me.  I just can't continue to do it.

Brandner001268

25

Q   Now, the materials that you're building, most of these structures, what kind of materials are you talking about?

A   We do aluminum lattice covers. We do -- they're called rough cut beams. They're, you know, eight by 10 or six by 10 20-foot beams that we put up, big ramadas. We do room additions with two by fours, two by sixes, sheetrock, OSB plywood, that sort of thing.

Q   It sounded like, in that list, there is a variety of materials with different types of weights. Some are heavier than others?

A   The aluminum are basically the ones I don't have trouble lifting, but with the aluminum lattice covers, those are the ones we spend the majority of the ladders on. We'll be up on the ladders building those.

Q   So it's lighter and easier to handle, but you've got to be on the ladder?

A   Exactly. So, I can do some, but not others.

Then with the heavier stuff, I can't really lift them, but we don't have to be a ladders as much, so...

Q   Scott, are there any other activities, be it work or leisure activities, that we haven't talked about, where you feel like there's a specific limitation on you now, today -- I'm talking about today -- as a result of the inability to use lift your foot?

Brandner001269

26

A    There's a few. First, I'll start with -- I want to go back to dance for a little bit.

Before --- even after Matthews, before the surgery with Sharpe, I used to participate in dance competitions and dance performances regularly.

Every year, with the studio, we'd have at least two performances, so the parents could see the dances. And, if not with the studio competing, me and my brother would do a duet and we'd go off, even out of state sometimes, and go and compete.

And since Dr. Sharpe's surgery, I haven't been able to, you know, perform in, in the -- what's the word for it?

Q    Competitions?

A    Well, that too, but I'm talking right now about the actual performances for the studio. I haven't been able to do those.

Any time I would have come out, I would do a -- I would be able to do a lift with a girl. I remember for school, in 12th grade, I did do a dance performance for them. And I was in two dances. But I came out, I think, for 16 counts in one dance and I lifted up a girl, set her down, walked off stage.

The second one, I came on, did two lifts with a girl and then walked off stage. I wasn't able to do any

Brandner001270

27

dancing.

And since then, I haven't been able to compete, me and my brother, haven't been able to compete with our duet. That's one thing that was important to me.

I tried to snowboard. Obviously, I can't do that because I can't flex, you know, sit back, and that sort of thing.

I went to, recently, went to get my scuba license. I was able to get through that with some limitations. I did end up getting through that.

I -- when I went to do that, we went and finished up, I tried to surf. I wasn't able to do that. Wake boarding, I wasn't able to do that.

You know, just fun things that I would want to do, that I was able to do before, those sort of things, any kind of board sport, I guess you would say.

Q    Scott, I want to ask you a couple more questions about the brace.

Now, have you -- have your doctors told you that -- these are questions about wearing the brace -- have they told you that you have to wear the brace all the time or something will get worse? Has that been discussed at all?

A    Yes.  Yes.

Q    Has there been any discussion -- I'm not trying

Brandner001271

28

to predict one way or the other — what I'm saying is, is it okay to not wear the brace sometimes, if you feel like not wearing it that day around the house --

A    Yes.

Q    Or what's the discussions; what's your understanding?

A    My understanding is if I'm outside walking around, that sort of thing, I should wear the brace because it keeps my foot flexed and, in turn, like I was saying, it's not sitting down like this and freezing like this.

But around the house, just, you know, sitting around or relaxing, things, I don't have to wear the brace, it's to my understanding.

Q    Scott, do you have the brace on right now?

A    Yes.

MR. CAUSEY:  Your Honor, can he step outside the box and show the brace as it's attached?

THE COURT:  Yes, of course.

MR. CAUSEY:  Thank you, your Honor.

Q    This is the carbon fiber?

A    Yes this is carbon fiber brace.

Q    Scott, why don't you come over here.  Can everybody see?  People down on the end, is it too low?

Oh, that was good.  I'm sorry, I don't choreograph anything.  Go ahead, Scott.

Brandner001272

29

And it straps, does it go down in the shoe?

A   Yeah, this part.

Q   I hate to ask you — feel like airport security — can you take your shoe off and show them that, please?

You don't need to — oh, you've got to take the brace off to take the shoe off?

A   Yeah, it's kind of attached to it. I can slip it out of the shoe, but the shoe has to come off first.

Q   I see. Okay.

Now, Scott, when you're not wearing that brace and you walk, what does your foot do, your right foot?

A   It drags.

Q   So it doesn't lift, like if I walk I —-

A   Flip your —

Q   I know I talked to my kids sometimes about dragging their feet. Is that kind of — you do that without intending to?

A   Yes. Sometimes, I kind of, to make up for that, I'll lift my hip up and kind of flip my foot at the end, just like that. So I can flip it up like that.

But when I do that, sometimes if there's a crack, my foot will catch at the last second.

Q   Thank you, Scott.

You can go ahead and put that back on.

Brandner001273

30

Does that brace -- I assume the shoes you have on today aren't shoes that you wear to work?

A    No.

Q    Because you're in the construction business; correct?

A    Yes.

Q    And this brace, does it work with whatever type of shoes you're wearing?

A    Mostly, yes, because it's a set size in the foot.  These dress shoes, I had to get a certain type of dress shoes because they're wider and they have a square toe, but some shoes it doesn't fit.  But it fits with most shoes, yes.

MR. CAUSEY:  Your Honor, that's all I have at this time.

THE COURT:  All right, very good.

Cross-examination, Mr. Crawford.

MR. CRAWFORD:  Thank you, your Honor.

Your Honor, as a housekeeping matter, we discussed yesterday -- I did figure out that the Mezona office charges, Exhibit 18, so I'd move for admission of that.

THE COURT:  Any objection?

MR. CAUSEY:  No, your Honor.  And I believe that is a duplicate of the plaintiffs marked Exhibit 1.

Brandner001274

31

Obviously, we only need to admit one of them, so that's fine.

THE COURT: Very good. 18 will be admitted.

MR. CRAWFORD: Your Honor, Exhibit 20, is a copy of Dr. Walls' office chart.

I'd move for admission of that, please.

THE COURT: Mr. Causey, 20?

MR. CAUSEY: 20, I have no objection to that, your Honor.

THE COURT: 20 is admitted.

MR. CRAWFORD: Then your Honor, Exhibit 23 is the Mesa Lutheran Hospital chart for the February -- let's see, held on, just a minute --

I'm sorry, Exhibit 22, is the Mesa Lutheran Hospital chart for the June 26th, 2002, admission.

I move for that into evidence, please.

MR. CAUSEY: No objection, your Honor.

THE COURT: 22 is admitted.

MR. CRAWFORD: I'm going to take a couple of the original depositions, if that's okay.

THE COURT: Sure.

MR. CRAWFORD: Put these up here for you, Scott. You might want to refer to them. Just lay them all right here.

Brandner001275

32

CROSS-EXAMINATION

BY MR. CRAWFORD:

Q   Do you need some water?

A   I'm good.

Q   Okay.  We have heard that your deposition was taken twice in this case, and you remember that?

A   Yes.

Q   And a deposition is a situation where you come to a lawyer's office, you're sworn to tell the truth by a court reporter?

A   Yes.

Q   And you give your testimony under oath, just like we're doing today?

A   Yes.

Q   Now, your first time your deposition was taken in this case was January 29, 2004; sound about right?

A   Yes.

Q   And that was about a year and a half after the surgery by Dr. Sharpe?

A   Yes.

Q   Is your memory better today than it was January 29, 2004?

A   I would probably say no.

Q   You agree with me that your memory of things

Brandner001276

33

was probably better a year and a half after these events than today, which is six years down the road?

A    Yes, probably.

Q    And that first deposition was before Dr. Sharpe was in this case as a defendant; you understand that?

A    Yes.

Q    And what happened was, the lawyer asked you whether Dr. Sharpe had ever told you, before surgery, about foot drop.

Remember that?

A    Yes.

Q    I'll try and get it on here as best we can.

And this is what your attorney just asked you about?

A    Yes.

Q    First off, you never corrected your deposition and indicated that this testimony was inaccurate, did you?

A    Not that I remember, no.

Q    Page 28, Line 4.

Question:  Did you ultimately end up with what's called a foot drop?

Answer:  Yes.

And what does that mean to you?  What does a foot drop mean to you?

Answer:  I'm not able to flex my foot.

Brandner001277

34

Question: When did you notice that you first had a foot drop?

Answer: Right when I woke up out of the surgery. Dr. Sharpe asked if I was able to -- he had me move my leg and foot in certain directions, and he asked me to flex. And I wasn't able to flex. And he asked me to go out and in, and I wasn't able to at that time.

Question: Before you had the surgery, did Dr. Sharpe ever discuss with you, or did anyone discuss with you, you might even up with a foot drop?

Answer: Yes. He told me all the things that could happen. I would -- it could have nerve damage and he said all the things. He even mentioned death. The -- we had an anesthesiologist and there could be accidents and stuff. There was a lot of things.

Did I read that correctly?

A    Yes.

Q    Now, you gave this testimony when you were 16 years old?

A    Yes.

Q    You did understand the importance of giving truthful testimony when you were 16 years old?

A    Yes.

Q    Just like you understand the importance today?

A    Definitely, yes.

Brandner001278

35

Q    When you were just asked, did Dr. Sharpe ever tell you about foot drop before this surgery, your answer, four years ago, was yes?

A    Yes.

MR. CAUSEY:  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  As I understood the question, yes.

BY MR. CRAWFORD:

Q    I understand now you're telling us didn't understand the question?

A    No.  I understood it as I understood it, yes.

Q    So, when you understood, when the lawyer was asking you, did you -- did Dr. Sharpe tell you about foot drop before surgery, you understood what that meant?

A    Yes.

Q    Okay.  Now, Dr. Sharpe, before surgery, told you that you needed to understand that one of the things could happen, not likely, but it could happen, is that you could die?

A    Yes.

Q    And you took that seriously, I assume?

A    I would hope so, yes.

Q    You told us yesterday, you went kind of like wow, you mean that can happen?

A    Uh-huh.

Brancher001279

36

Q   So you were willing to accept the risk of having this surgery, the risk that you could die?

A   Yes.

Q   And the anesthesiologist told you about that again?

A   Yes.

Q   Over at the hospital before surgery?

A   Yes.

Q   Dr. Sharpe told you that one of the risks of this surgery was that you could have abnormal bleeding?

A   Yes.

Q   Right?

A   Yes.

Q   You understood that could be bad, that could be very serious?

A   Yes.

Q   And you were willing to accept that risk of this surgery?

A   Yes.

Q   And Dr. Sharpe told you that you could develop an infection?

A   Yes.

Q   You understood that could be very serious?

A   Yes.

Q   You were willing to accept that risk as well?

Brandner001280

37

A    Yes.

Q    He told you that you could — these bones may not heal correctly from the surgery?

A    Yes.

Q    You were willing to accept that risk?

A    Yes.

Q    He told you that despite this surgery, it might not work, you could continue to have pain in your leg?

A    Yes.

Q    And you were willing to accept that?

A    Yes.

Q    Is your position, in this case, that Dr. Sharpe tried to talk you into surgery?

A    No.

Q    Is it your position, in this case, that you didn't have plenty of time to think about how you were doing and whether you wanted this surgery?

A    No.

Q    You had, on the first visit with Dr. Sharpe, you had your dad present and your mom present and you present?

A    Yes.

Q    The second visit with Dr. Sharpe, it was just you and your mom?

A    Yes.

Brandner001281

38

Q    But you had your parents there to assist you in making this decision, am I going to go ahead and live the way this is, with the limitations that I have, or do I want to do something that might get me better, meaning surgery?

A    Yes.

Q    Now, you understood, because you were -- you understood that by doing less activity, this leg wouldn't be as painful, without Dr. Sharpe saying anything to you, you understood that?

A    When I didn't do it, it wasn't as painful, yes.

Q    Right, because your doctor had said, use your good judgment and do what activities you can, but if it starts causing pain, back off.

That's what Dr. Matthews had told you; right?

A    Not that I remember.  I just remember him saying go back to normal activities.

Q    He didn't say, use your good common sense here?

A    I'm saying what I remember.  He said go back to your normal activities, that's basically what I remember.

Q    Okay.  Well, when you went back to your normal activities, sports, dance, you couldn't do them the way you wanted to do them, could you?

A    No.

Q    You couldn't do any sports, other than try to do discus, and when you tried to do discus, you couldn't

Brandner001282

39

even throw it the way you really needed to throw it to be competitive; fair?

A    No.  I was competitive, yes.

Q    In your mind, you were competitive?

A    Yes.

Q    Putting aside discus, you couldn't run?

A    Not for a long period of time, no.

Q    Because it caused pain?

A    Yes, definitely.

Q    You couldn't dance the way you wanted to?

A    No.

Q    Because it would cause pain?

A    Yes.

Q    You had actually a couple of competitions or recitals —

A    Uh-huh.

Q    — actually between the second visit with Dr. Sharpe and the surgery in June of 2002; right?

A    Right, right before the surgery, yes.

Q    What happened was, you couldn't do a lot of the activities, a lot of the moves, so they had to choreograph it around you?

A    Yes.

Q    By the time this surgery took place, you were having pain in your hip, in your knee, and in your ankle.

Brandner001283

40

Do you remember that?

A    Yes.

Q    Now, you told us yesterday that Dr. Sharpe said that one of the problems with not fixing this, is that 20 to 30 years down the road you might develop pain in the ankle, the knee, and the hip.

Do you remember that?

A    Yes.

Q    In fact, you already had that problem before this surgery was taking place, didn't you?

A    Is that a question?  Yes.

Q    Did you understand what -- this leg, the lower leg, was, to your naked eye, was obviously deformed before you agreed to have the surgery done?

A    Yes.

Q    Okay.  The lower leg was bowed out?

A    Yeah, yes.

Q    And the leg was kind of twisted in?

A    Yes.

Q    And your right foot was kind of twisted towards your left foot?

A    Yes.

Q    And what Dr. Sharpe and Dr. Walls told you, when you met with them for opinions, second opinions, was, if that continues, it's going to cause you, probably cause

Brandner001284

41

you problems long term?

A    Yes.

Q    Hip pain, knee pain, and ankle pain?

A    Yes.

Q    Including arthritis?

A    Yes.

Q    Did you — you understood -- and I understand you were 16, okay.  Actually, at the time you were 15; right?

A    15, yes.

Q    But you understood that you didn't want to go on the way you were at, with the pain and the disability and not being able to do the activities that you wanted to do?

A    I wanted to do them better, yes.

Q    The condition of this leg was totally unacceptable to you before surgery, wasn't it?

A    Yes, the pain was.

Q    Is it your testimony that Brian Sharp did not meet with you on June 6, 2002, and do an examination of you and speak with you?

A    Not that I remember, no.

Q    Well, there's a difference between saying I don't remember something and it didn't happen?

A    Yeah, yes.  Exactly.

Q    Okay.  Well, I don't want to talk about --

Brandner001285

42

let's clear that up then.

A    To my recollection, before the surgery, the only time I remember meeting him was just meeting him, was that.

Q    Are you going to — is it your testimony, to the jury, that Brian Sharp did not meet with you on June 6, 2002, and discuss your problem and the surgery?

A    Not that I remember. I can't say any more than that. I just don't remember that.

Q    So you're saying he may have, in fact, met with you and gone over those things with you and just don't remember them at this time?

A    Sure, yeah. I just don't remember. All I remember, shaking his hand and meeting him. That's what I'm saying, yes.

Q    So you've seen the record that he dictated that note?

A    Yes.

Q    Okay. So your memory —

A    I also remember that I never saw him talking to a recorder thing, that's all. All I remember is Dr. Sharpe doing that.

Q    Well, I didn't ask you about that.

A    When I hear dictating, that's what I hear, when I hear dictating. That's what I think of.

Brandner001286

43

Q    Is it your testimony that doctor -- that Brian Sharp did not dictate in front of you on June 6, 2002?

A    Yes, yes.

Q    He did not?

A    No.

Q    And you remember that?

A    I remember that, yes.

Q    But you don't remember whether he was there or not?

A    He may have been there. What I'm saying, he might have been there, and but he didn't have any conversation like that is what I'm saying, in front of me, no. He may have been there, yeah.

Q    You just told me you don't remember if he was there or was not there?

A    No. I don't remember if he had that discussion with me. You said, if he asked those things.

Q    Let's back up.

Is it your testimony that Brian Sharp, Dr. Sharpe's physician's assistant, was present on June 6, 2002?

A    He was there because I met him that day, yes.

Q    Was he in the room with you, going through your understanding of the surgery, how you were doing; did he discuss things like that with you?

A    No, not that I remember.

Brandner001287

44

Q    Not that I remember.

A    Yes.

Q    So you're saying it's possible he did, and you don't remember it today?

A    Yes.  I want to differentiate, I'm saying it's possible he was there, yes, inside the room, yes.

He didn't have any discussion into one of those in front of me, is what I'm saying.

Q    You remember Brian Sharp didn't have a discussion into a Dictaphone?

A    Yes.

Q    But you don't remember whether he was actually there or not?

A    I know he had to have been there at some point because that's when I met him.  That's what I'm saying.

Q    Your memory, Scott, your memory -- do you understand your memory is very important?

A    Yes, definitely.

Q    Okay.  You can't even tell us that Brian Sharp was in the room with you that day, discussing the surgery, things that you could expect.

You don't remember; is that fair?

A    That's fair, yes.  But I know when he — I was just -- the reason I remember that, that's something that stuck out in my head, because that was unusual to me,

Brardner001288

45

whenever Dr. Sharpe would do that, that was something weird to me. That's why it stuck out every time.

Q   Do you know why he did that?

A   For notes, yes.  I understood that it was for notes.

Q   Did you have an understanding why he actually dictates in front of his patients?

A   So we can hear what's going into the notes.

Q   So if you hear something that you don't understand, it gives you chance to ask him, what do you mean by that?

A   Okay.

Q   Right.  Did you understand that?

A   I guess, yeah.

Q   I want to go through the chronology a little bit with you, please, if I could.   -

Do it the old fashioned way.  Well, our focus is not working.  Out of focus.  Okay.  Out of focus.

Can you see that okay?

A   Yeah.

Q   All right.  You break your leg, September 26, 2001; right?

A   Yes.

Q   You treat with Dr. Matthews for basically four months leading up to January 25, 2002?

Brandner001289

46

A    Yes.  That's when he released me to do activities.

Q    What he'd actually done, was early in January, he had taken you out of this walking cast and had given you about three weeks or so to see how you were doing, then have you come back?

A    Yes.

Q    And January 25 is when he, quote, released you to do whatever you wanted to do?

A    Yes.

Q    And do you agree that, at that point, you were very unhappy with the situation with your leg?

A    You mean the bowing and so forth?

Q    Yeah, the way it looked, what you could or could not do with it?

A    You're talking about the 25th?

Q    Yes, sir.

A    I don't know if I was unhappy at that point or not.  I don't know if that's when the bow was apparent or not.

Q    Okay.

A    I know it had to be by 3-22, because that's when we got a second opinion.

Q    Isn't that when you decided to start getting second opinions?

Brondner001290

47

A    On the 25th?

Q    Yeah, after the 25th?

A    I don't remember exactly, I don't remember exactly.

Q    All right.  Your deposition was taken, by me, at my office, June 8, 2005; do you remember that?

A    Yes.

MR. CRAWFORD:  Counsel, Page 38, Line 15.

MR. CAUSEY:  Page 38, thank you.

MR. CRAWFORD:  That's where it starts.

Q    Again, this is -- this was a time when you came to my office, there was a court reporter, you were sworn to tell the truth; right?

A    Yes.

Q    Now, this occurred, Scott, this testimony was June 8, 2005.  So, that was about two years ago.

Do you think your memory was better two years ago than it is today?

A    Definitely.

Q    Line 15.  Question:  As of the end of January 2002, had you become pretty frustrated with what Dr. Matthews was telling you about the condition of your leg?

Answer:  Yes.

And there was something in one of your legal documents that you felt like he was blowing off the problems

Brandner001291

48

you were telling him you were having.

Yes.

Question: Meaning, he didn't appear to be really taking them seriously?

Answer: Yes.

Going up to Page 39.

Question: At that point, you were having a fair amount of pain?

Answer: Yes.

Question: And there was this obvious deformity of your leg?

Answer: Yes.

Question: And it was interfering with your activities?

Answer: Yes.

Did that help refresh your memory?

A    Yeah. I understand the question. I know the answer to those is all yes. But the time frame, I mean, there is so many dates that, I mean -- really, I didn't know exactly when we started having those concerns. But I still understand the answer is yes.

Q    Then in fairness you would agree with me that January 25 -- in fact, by January 25, 2002, you were pretty frustrated and unhappy with the condition of your leg and what Dr. Matthews was telling you?

Brandner001292

49

A    Yes.

Q    Okay. That's when you started -- you ask your family, trying to get other opinions?

A    Is that a question? Yes.

Q    Do you agree, by the time you had surgery, that you had constant pain in your leg?

A    No.

Q    No?

A    No. From what I remember, no.

Q    Given that you were 15 when this surgery took place, did you understand your mom had to be involved with signing legal documents and things for the hospital so you could do activities?

A    Yes.

Q    I'm going to show you, Scott, this is contained within, I believe it's Exhibit 22. See these little tabs, says history and physical, right here.

You open it up right to that, you can also see it on the screen.

Do you know what basically a history is, a medical history?

A    Yes.

Q    Okay. This is a -- if you want to flip it over, you'll see it's a four-page form?

A    Okay.

Brandner001293

50

Q    And the form was completed by Kim Clark, mother, June 21, 2002.  Do you see that?

A    Okay, uh-huh.

Q    Yes?

A    Yes.

Q    Let's go to the first page.  I've highlighted this copy for purposes of the overhead here.

Please check any over-the-counter medicines you take.

It indicated that you were taking pain medicine at that time.  Do you remember that?

A    What, when was this taken again?

Q    June 21, 2002.

A    Okay, yes.

Q    And, actually, we haven't really talked about this yet, you had some medical complications after this surgery; do you remember that?

A    After Dr. Sharpe's?

Q    Yeah.

A    Yeah, because ibuprofen --

Q    Some problems with your liver?

A    Yes.

Q    It was because you had been taken so much ibuprofen, it had caused a problem, in retrospect, with your liver?

Brandner001294

51

A   Yes.

Q   So, you were taking a lot of ibuprofen to try to deal with the pain you were having?

A   Yes.

Q   If you go to the next page, again, this is -- if you look down at the bottom -- this is a form completed by Kim, your mom; right?

A   Yes.

Q   It talks about in your musculoskeletal system, other, it says you have right leg pain dash hip, knee, and ankle?

A   Yes.

Q   That's consistent with your memory, that by that point, you were having pain, not just where the fracture was, but, in fact, your hip, knee, and ankle?

A   Yes.  You have to understand that I was taking a lot of ibuprofen because I was very active.  I was dancing, still, five days a week.  So I was taking tons of ibuprofen.

Q   Tons of it?

A   Yeah.  I was taking a lot of it.  I was dancing non-stop.  I wasn't going to stop dancing because I want to dance.  That's what kept me happy.

Q   And you were willing to accept the risk of surgery because that's what you wanted to do?

Brandner001295

52

A    Yes.  I wanted to get better.  I wanted to dance, yes.

Q    Let's talk -- go up at the top.  It asks you what kind of pain.

Do you have any reason to believe that your mom would provide the hospital with inaccurate information at that point?

A    No, no, sir.

Q    Pain.  Do you suffer from pain or discomfort?  Answer, yes.  Where is it located?  Right leg.  On a scale of 1 to 10, please rate your pain.  She says 6 to 7.

Sound fair to you?

A    Yes.

Q    Okay.  How long has the pain bothered you?  Since broken on September 26, 2001.

Then it goes down.  How would you describe the pain you're having now?  Answer, constant.

Does that help refresh your memory that you, in fact, were having constant pain at that point?

A    Yeah, because I was constantly active, yes.  Under that, it says what relieves your pain.  Ibuprofen helps; resting the leg helps.

Q    Taking a ton of ibuprofen was what was helping?

A    And resting, yes.

Q    Do you agree it was hurting all the time by

Brandner001296

53

that point?

A    By that point, sure.

Q    And we've already talked about how it was interfering with dance, but you weren't doing skateboarding at that point, were you?

A    No.

Q    Because your leg hurt?

A    Well, I couldn't exactly.

Q    So, well, you couldn't do it, why?  Because it hurt, because it was bowed?

A    No, because it hurt.

Q    You weren't doing skiing?

A    No.

Q    Same thing, it was hurting?

A    Yeah.

Q    You didn't even try those things because it was hurting so much?

A    Yeah, sure.

Q    You weren't doing wake boarding, were you?

A    No.

Q    You tried playing basketball, but you could not run?

A    No, not when we played full court, no.

Q    Certainly you weren't doing football?

A    Not tackle, no.

Brandner001297

54

Q    By the time we get around to June of 2002 --

A    Okay.

Q    You had been out of the cast and released to do activities to tolerance for four and a half months?

A    Yes.

Q    And in that period of time, you had had a second opinion by Dr. Dinowitz?

A    Yes.

Q    He told you this didn't look right, probably something needed to be done?

A    Yes.

Q    You had a meeting with Dr. Sharpe, where he told you that was the consensus of their group?

A    Yeah.

Q    You had a meeting with Dr. Walls, where he told you, surgery?

A    Yes, because we wanted to get back to dance, that was the answer, yes.

Q    Then you went back and you even gave Dr. Matthews another chance; right?

A    Yes.

Q    So you had basically, before you met with Dr. Sharpe to discuss surgery, you had had five opinions about what to do:  Dr. Matthews the first time, Dr. Dinowitz, Dr. Sharpe, Dr. Walls, then back to Dr. Matthews?

Brandner001298

55

A    Sure, yes.

Q    You had, before the surgery took place, five months between that, when you got unhappy with Dr. Matthews and when the surgery took place, to think about what you wanted to do, how this was interfering with your activities, and whether thing were just getting worse or not; right?

A    Well, we did not hear surgery until April 11th, I think it was, or maybe March 22nd. But we were unhappy with the pain for five months.

Q    But this is -- you had a long time to think about how you were doing and what you wanted to get back to?

A    Oh, definitely, yeah.

Q    And as of early June 2002, when you all, as a family, decided that you were going to have surgery, the things in your leg were getting worse, aren't they?

A    The pain?

Q    The pain was getting worse?

A    You're asking me if the pain was getting worse?

Q    Yes, sir.

A    Yes.

Q    The lump was getting bigger?

A    If I remember, yes, it could have been. I don't -- I couldn't say one way or another, exactly, but I'm sure it was because between that point it was.

Q    Your leg was rotating out more?

Brandner001299

56

A    I don't know, maybe.

Q    What is your best memory, Scott?

A    I'd say yeah, because from the time I got out of the walking cast, to this point, it had shifted.  So, I'm sure it was shifting.

Q    Is it your testimony that you have a good memory of everything that occurred during the visit with Dr. Sharpe on April 11, 2002?

A    Can you say that one more time, so I'm understanding?

Q    Is it your testimony that you have a good memory, today, of everything that occurred during the meeting with Dr. Sharpe on April 11, 2002?

A    Yes.

Q    A good memory?

A    Yes.

Q    And you have told us that you remember now two different visits with Dr. Sharpe; right?

A    Now I remember two, yes.

Q    You have a good memory of that?

A    That there are two different ones?  Yes.

Q    Do you remember when I took your deposition, I asked you if remembered whether there were two visits?

A    Do I remember you asking me that?

Q    Yeah.

Brandner001300

57

A   Not really, no.

Q   Do you remember saying you didn't even remember if there were two visits?

A   No, I don't. If you bring it up, then I'm sure I said it, yeah.

Q   We've already agreed, you don't have a better memory today than you did when I took your deposition two years ago?

A   Yes, that's true. But I know there were two meetings now because we have all the notes in front of us.

Q   Okay. So your -- somebody's refreshed your memory that there was two?

A   That there was two meetings, yes.

Q   But when you were asked, without anybody showing you documents or trying to refresh your memory, when you were asked -- I took your deposition two years ago, Scott, do you remember two separate visits with Dr. Sharpe before surgery, your answer was: I don't remember?

A   Exactly.

Q   And do you remember now that when Dr. Sharpe met with you, the first time, on April 11, 2002, he asked you what kind of activities are you doing?

A   Yes.

Q   He asked you how is the condition of your leg interfering with the activities that you want be to doing?

Brandner001301

58

A    Yes.

Q    Did you tell him the truth?

A    Yes.

Q    Okay.  And did he ask you, what are your goals? What do you want to get to being able to do?

A    I believe so, yes.  I think I said 100 percent.

Q    He asked you about what the problems you had had with the leg, leading up to the time of your coming and seeing him?

A    Yes.

Q    And you remember him examining your leg?

A    Yes.

Q    He actually took your leg and he kind of torqued it a little bit and asked you, does that hurt, and up yes?

A    Yes.

Q    You remember him using a device that kind of looked like this.  This is called a goniometer — I'll just tell you -- where he put the x-ray up on the view box and measured the degree of deformity and explained to you what that meant?

A    From my memory, I thought that was Dr. Dinowitz that did that.  I don't remember Dr. Sharpe doing that.

Q    Is it your testimony Dr. Sharpe did not do that?

Brandner001302

59

A    No, it's not my testimony he did not.

Q    He may have done it, you don't remember?

A    Exactly, yes.

Q    And Dr. Sharpe discussed with you that it was his feeling that if we're going to do surgery to fix your leg, he would put a plate on the side of the leg and you would use screws to put that in?

A    Yeah.

Q    He told you that he would have to cut the bones to correct the deformity of your leg?

A    Yes.

Q    He said there were other ways to do it as well, using a rod.

A    An exterior rod.

Q    The external fixator?

A    Yes.

Q    And he discussed with you various different risks of the surgery?

A    Yes.

Q    And you do agree, there was some discussion about nerve damage?

A    Yes, nerve damage was said, yes.

Q    And you do agree -- well, first off, do you recall he actually discussed that, and it was after he had discussed things with you, done his examination, that that's

Brandner001303

60

when he picked up his Dictaphone and dictated?

A    Can you say that one more time?

Q    Sure.  He did the visit with you.

A    Okay.

Q    He did the examination.  He spoke with you about potential risks of surgery.  Then before you left his office --

A    Yes.

Q    -- he picked up the Dictaphone and he dictated --

A    What he had just told us.

Q    -- that note.

A    Yes.  At the end of each meeting, he would pick it up and, basically, say into that what he just told us, yes.

Q    Do you remember, actually, when he was -- when he was dictating and he was going through the risks, he would -- he'd say, and I've discussed the risks of surgery, including death, and then he would stop and he'd look at you, just to make eye contact?

A    No, I don't remember.

Q    You deny that he did that?

A    I don't deny it, no.  I don't remember.

Q    Do you deny, Scott, that Dr. Sharpe, during the two office visits before surgery, discussed the potential

Brandner001304

Case: 1:10-cv-08161 Document #: 81-33 Filed: 12/13/11 Page 302 of 491 PageID #:3409

61

risks and complications with at least you and your mom?

A   No, I don't deny that.

Q   So yesterday you said that second office visit, you don't have a real good memory of. Do you remember that?

A   Yes.

Q   And so, there's maybe a lot of things that were said and that occurred during that second office visit on June 6, 2002, that you just don't remember?

A   I don't know if I'd say a lot, but sure, yeah, there's things I don't remember about that.

Like you said in the other deposition, I really only remember one office visit.

Q   Okay.

A   That's what I'm saying. So, sure, yes.

Q   There's a lot of things that may have occurred, during both of those office visits, that you simply don't remember at this time?

A   Not both of them, no.

Q   Which one? Is it the second one you don't have a great memory of?

A   Yes.

Q   Do you know the second office visit was intended to be the pre-operative visit?

A   Yes, I know that now, yes.

Q   Putting aside whether Brian Sharp was there or

62

not, do you remember, at some point, Dr. Sharpe coming into the room?

A    Dr. Sharpe?

Q    Yes.

A    Yes.

Q    He went over -- let me see if I can refresh your memory -- he went over how you were doing?

A    Uh-huh.

Q    What problems you were having?

A    Are you asking me?

Q    Yes, sir.

A    Like I said, I don't really remember.

Q    Let me just ask it this way, since you don't have a good memory, let me ask you if you can tell me this did happen. Okay.

A    Okay.

Q    If he, his note indicates that he went over all the problems you were having with your leg, on the June 6, 2002, visit, you're not going to deny that?

A    No.

Q    And if he indicates that he explained the potential surgery he might do, you're not going to deny that?

A    No.

Q    If he says he had a detailed discussion with

Brandner001306

63

you about the risks and benefits of this surgery, including complications, you're not going to deny, that are you?

A    No, not that he went over the risks, no.

Q    When -- I'm going to jump back to this meeting you had with Dr. Walls, this was, I think, a third opinion that you had?

A    Yeah.  It went Dinowitz, Walls, Dinowitz, Sharpe, Walls.

Q    This is -- he told you surgery was necessary, but he said the way he'd do it is stick a rod in the leg?

A    Yeah, he was going to use the rod.

Q    And he told you that an option was doing nothing, but he didn't think that was very good idea.

A    Not that I remember.  I don't remember that.

Q    Do you deny that?

A    No.

Q    Then you decide, you go back to Dr. Matthews again, but you felt like he was kind of upset at you because you had gotten a bunch of other opinions?

A    Yeah, I remember that.

Q    And he -- your sense was, you're going back to him to give him another chance to give you his thoughts, and he just didn't even appear like he was listening to you?

A    Yeah.  I felt like -- he just felt cold, that's how I felt about him.

Brandner001307

64

Q    Your sense was he was kind of unhappy with you because you had gone around and gotten second opinions?

A    Yes.

THE COURT: Mr. Crawford, I need to interrupt you.

Folks, we need take our mid morning break. Let's take 10 minutes.  Please remember the admonition.

(Recess)

THE COURT: Mr. Scott, go ahead and have a seat.

Thanks everybody.  Go ahead and be seated.

Were back on the record with all the members of our jury, counsel, and the parties as well.

Mr. Crawford, I interrupted your cross-examination.  Go ahead and continue.

MR. CRAWFORD: Thank you your Honor.

BY MR. CRAWFORD:

Q    I'll switch gears with you, Scott.  The surgery takes place on June 26, 2002?

A    Yes.

Q    Right?  And after surgery, you remembered Dr. Sharpe bringing up this issue about the movement of your foot, pretty quickly after the surgery.

A    Yes.

Q    And he told you there was a potential problem?

Brandner001308

65

A    Yes.

Q    He was very up front with you?

A    Yes.

Q    And he told you that it's going to have to be a wait-and-see thing.  Hopefully this would be temporary, but it's possible it could be permanent?

A    Yes.

Q    Then you continued to treat with him as your doctor for another two years?

A    Yes.

Q    In terms of how you're at — how you ultimately recovered from this, the leg is, in fact, straight now, isn't it?

A    Yes, from what I can tell, yeah.

Q    And the big knot that you had concerns about, that's gone?

A    Yes.

Q    You originally had difficulty moving your foot side to side, but you've regained that function?

A    Yes.

Q    So --

A    It doesn't really move that much, but yeah, I have that nerve back.

Q    That's come back?

A    Yes, definitely.

Brandner001309

66

Q     It's the up and down movement that is still an issue?

A     Yeah.

Q     And you do wear this brace?

A     Yes.

Q     And when you do wear that brace, you're able to do things like help teach dance?

A     Yes.

Q     You can do choreography for dance?

A     Yeah.  I make dances.

Q     Help demonstrate to these kids how to do things.

A     Yes.

Q     And you're able to work?

A     Yes.

Q     You're able to go to school?

A     Yes.

Q     Can't do everything you want to do?

A     No.

Q     But you can lead a relatively normal life, can't you?

A     Yes.  Compared to what I was before, no, but now, yes.

MR. CRAWFORD:  That's all I have, your Honor.  Thank you?

Brandner001310

67

THE COURT: Redirect?

MR. CAUSEY: Yes, your Honor, thank you.


                    REDIRECT EXAMINATION


BY MR. CAUSEY:

Q    Scott, there was some discussion about the pain medication you were taking, ibuprofen. This was over the counter stuff?

A    Yes.

Q    I just want to clarify, if you were active, it was painful. Is that what you were saying?

A    Yes.

Q    If you -- I'm not sure you did this, so I don't know, but if you let me back up. Did you ever just lay around and play video games for a week or two and see how it felt?

A    No.

Q    When you went to see Dr. Matthews, at any time during any of the discussions, do you have a recollection of him telling you that if you'll curb your activities, okay, that the pain at the fracture site would lessen?

A    No.

Q    Did any doctor, prior to the Sharpe surgery, tell you that?

Brandner001311

68

A    No.

Q    The pain, we described the pain in a number of areas. I want to quantify that a little bit.

The pain that you were asked about, and I think there was some records that you were shown about that, that your mother filled out, you don't deny that at times you had pain in the hip and knee; correct?

A    No.

Q    Was whether — was it a determining factor, whether you had pain in the hip and knee areas, did that relate to the activity level?

A    Definitely, yes.

Q    Would that be true of the ankle as well?

A    Yes.

Q    Okay. And again, we're talking about prior to the Dr. Sharpe surgery?

A    Yes.

Q    You understood that?

A    Yes.

Q    Okay. The pain that you were having the most difficulty with, though, between the ankle, some knee pain, soreness or pain in the hip, whatever it was described as, and the fracture site, what was the one that was the worst pain?

A    Definitely at the fracture site.

Brandner001312

69

Q    What was the one that you were taking the pills for?

A    The fracture site.

Q    The shoes that you wear today on your right foot, where do they wear out?

A    The back heel, on the right side.

Q    So even though you've had the surgery and you wear the brace, is your foot still turned in?

A    Yeah, yes.

Q    Do you have a recollection, at any of your meetings with the Mezona people, including, primarily, Dr. Sharpe, anyone explaining to you why they would dictate in front of you?

A    No.

Q    Did anybody ever tell you the reason or the purpose they were doing that?

A    No.

Q    They just did it?

A    Yes.

Q    Did anybody say, now, Scott, if I say something wrong, you need to let me know?

A    No.  That's just something I would have done, obviously.

Q    It just happened; is that a fair statement?

A    Yes.

Brandner001313

70

Q    I want to show you — I forgot the exhibit number -- it's 10.  We looked at this a few times, April 11th.  Okay.  I'm going to find that zoom button somewhere.

Is it on this box here, your Honor?

THE COURT:  It is, yes.

BY MR. CAUSEY:

Q    I think I got it.  There we go.

Apologize, for a lack of practice with the machine.

Let's look at this portion of the April 11.  Of course, we've already heard that this was dictated by Dr. Sharpe, apparently, that's what's been advanced.  And then the June 6th, apparently, was dictated by his physician's assistant.

April 11, 2002, which, as you have testified to, is the one meeting you remember the most, or the single most meeting, if you will.

A    Yes.

Q    The list of things that were dictated there, when the doctor was dictating this in front of you, do you remember any deviation from what he actually said versus what he dictated?

A    No.

Q    But you wouldn't have known to make a correction anyhow because you hadn't been told that was

Brandner001314

71

something you should do?

MR. CRAWFORD: Objection; leading.

MR. CAUSEY: I'll rephrase.

BY MR. CAUSEY:

Q    Would you have felt it was proper for you to have corrected the doctor's dictation?

A    Yes.

Q    To have told him, while he was sitting there, that you're dictating it wrong?

A    Well, I don't know if I'd say it like that, but yes.

Q    So, if the doctor had told you something in the meeting, and he dictated it incorrectly -- for example -- let me make it simpler.

If he'd said I'm here with Scott and his parents are gone, when your parents are both there, that would have been something that would have triggered some response from you?

A    Yes, yes.

Q    Was there any such response?

A    No.

Q    You were asked about whether your pain was constant just prior to this surgery. Was your activity constant prior to the surgery?

A    Yes.

Brandner001315

72

Q    Okay.  Scott, do you have any dispute, whatsoever, that you fully understood at the time that all this was going on, that if you chose the option of let's straighten the bone, that would require surgery?

A    No, that -- I knew that that would require surgery.

Q    The other option, we're going to not straighten, and that's the one that doesn't require surgery; correct?

A    Yes.

Q    You were asked whether you recalled one or two meetings, and you were shown your deposition.

Do you remember the questions about, well, your memory was better a year and a half after today several years later do you recall that?

A    Yes.

Q    When Mr. Crawford was asking you those questions at your deposition, did he show you his client's notes from the April 11 and June 6, of 2002?

A    No.

Q    So you were relying entirely on your memory and recollection, without the benefits of the hospital records?

A    Yes.

Q    Excuse me, the doctor's records; is that correct?

Brandner001316

73

MR. CRAWFORD: Your Honor, I object to the leading of this witness.

THE COURT: Sustained.

MR. CAUSEY: That's fine. I'll rephrase, your Honor.

THE COURT: Thank you.

BY MR. CAUSEY:

Q    What were you relying on, in answering questions from Mr. Crawford about how many meeting you recall?

A    Memory.

Q    Had you reviewed those medical records at all prior to that?

A    No.

Q    Do you recall, at any time during your deposition, where Mr. Crawford was asking you questions, showing you any medical records to help refresh your memory about what took place?

A    No.

Q    Scott, when you made the decision to go forward with the surgery -- I realize your parents also were involved in that process, I'm talking about you, personally. Let me back up, I'm sorry, I skipped something I was asking a minute ago.

Scott, you were asked a question, okay, about

Brandner001317

74

just prior to the June surgery with Dr. Sharpe, up to that point, whether you felt that the angle, the irregularity in the angle of the bone, the deformity, whatever you want to call it, was worsening, you indicated you thought it was.

Do you remember that testimony?

A    Yes.

Q    Now, I want to show you -- well, Page 9 and 10, I want to show you what Dr. Sharpe testified to under oath at his deposition in this matter, one of his depositions.

And I've got to -- I hope I'm going back far enough to catch the context here. If I'm not, I will try to do so.

Says Question -- Mark, Line 7, I think is far enough back. It says: Now, was the bone that drifted, the tibial fracture only?

Well, not, no, they both had to -- the tibia and fibula were both broken. And it says, what maybe a step ahead in time, here, sure, just a brief moment, what I discovered subsequently was that tibia probably never did fully heal. Although it appeared radiographically to have healed. The CAT scan suggests that it probably wasn't fully healed although the fibula was fully healed -- the fibula being the smaller bone — and so at that point it probably stopped moving. Okay. And the tibia apparently never fully healed, although I'd have to look at my operative note to

Brandner001318

75

see how much of it wasn't healed.

Why don't you do that.

Since we're on the subject, can I get that. There it is -- if we go to the next page, Page 10, at the top.

Dr. Sharpe says: No, I stand corrected. I said apparently there was some union present. There was very minimal motion at the fracture site. So, it was not, certainly was not fully healed.

As far as whether your fracture site and leg was moving and getting worse, just prior to the surgery, would you have deferred to Dr. Sharpe on that issue?

A    Yes.

Q    You have no medical training or background, I take it?

A    No.

Q    Could you have looked at an x-ray and determined that?

A    No.

Q    So you're just going on what you see and feel?

A    Yes.

Q    Lastly, Scott, I just want to ask you one more thing. When you made the decision, when you were weighing the factors and made the decision to go forward with this surgical procedure, did you take into consideration, at all,

Brandner001319

76

the risk of a permanent loss of function of your foot?

A    No.

Q    Why not?

A    Because I was never told that.

MR. CAUSEY:  I don't have anything further, your Honor?

THE COURT:  Ladies and gentlemen, before we let Mr. Clark step down, do any of you have questions for him?

Any questions for Mr. Clark?  No?  All right.

Thank you then.

Mr. Clark, you can go ahead and step down.

Mr. Causey, your next witness, please.

MR. CAUSEY:  I need to go outside.

Your Honor, I wish to call Scott's mom, Kim Clark.

THE COURT:  All right.  Mrs. Clark, this is Maggie, and she'll swear you in.

KIM FRANCIS CLARK BOWER,

having been duly sworn herein, took the stand and testified as follows:

THE COURT:  Thanks, Miss Clark.  Go ahead and have a seat over there on the witness stand.

Mr. Causey, whenever you're ready.

Brandner001320

77

MR. CAUSEY: Thank you, your Honor.

DIRECT EXAMINATION

BY MR. CAUSEY:

Q   Good morning.

A   Good morning.

Q   I guess it's still morning for a little while.

A   Yes.

Q   Could you state your full name, please?

A   Kim Francis Clark Bower.

Q   And Kim, you're Scott's mother; correct?

A   Yes.

Q   I'm going to try not to jump around too much. We've already heard some testimony from Scott, of course, about a variety of things.

What I want to get to first with you is we heard some things about your dance in the studio.

What I would like you to do is tell us a little bit about that, what exactly is that?

A   As far as my background in dance?

Q   Yes.

A   I started dancing around one and a half, two years old, and I've been dancing ever since.

I started teaching when I was 13, owned a dance

Brandner001321

78

studio in Apache Junction, and have been participating as either an owner, co-owner, or director since, and I still am.

Q  How many children do you have?

A  Three.

Q  So in addition to Scott, you have?

A  Brian, who is 26, and Cherise, my daughter, is 18.

Q  Did you involve all your children in this activity?

A  Yes.

Q  Tell me, kind of specifically about -- let's talk about, do you remember the football injury --

A  Oh, yes.

Q  -- September of 2001. Okay.

Tell me a little bit that Scott's involvement in the studio or the dance activities before that occurred.

A  Scott, took a full range of classes. He was able to do -- he did exceedingly well in dance. He was being encouraged to eventually audition for scholarships in college, to try and get some scholarship monies in. He was very good, took tap, ballet, jazz, tumbling, clogging, modern, hip hop.

Q  When did he start, what age?

A  He started before he was born. Taking classes,

Brandner001322

79

probably between two and three years old. At three he competed and took a first place as a tumbler. So, he's been dancing a long time.

Q   While he's in 9th grade, I want to bring us up to current now, during the 9th grade time frame -- I don't necessarily mean when school's in -- as a 14 year old, prior to this accident, what type of schedule did he keep with respect to his involvement in dance?

A   He basically danced almost every day, I believe, except for Sundays. And he had some type of class or rehearsal, because we did a lot of performing and Scott competed a lot. He was in groups, he did solo work, duet work.

Q   Would you, at that time, have described Scott as having developed a passion for the dance?

A   I think so. He especially fell in love with modern dance. He really liked that. And he's always been terrific at hip hop.

Q   In addition to the dance-type activities that Scott was engaged in prior to the football injury, what other type of activities were there?

A   He was really physically active. He really liked skateboarding. He would mess around with my older son playing basketball. I think that he also may have been involved in some track things.

Brandner001323

80

Q    What I'm -- would you describe Scott as an active 14 year old?

A    Yes.

Q    Was Scott the type that would sit around and play video games all day --

A    No.

Q    -- in the house?

A    No.

Q    I want to talk a little bit about the medical care that took place after the football injury.  And I believe that was Dr. Matthews; is that correct?

A    Yes.

Q    After Scott was injured at the football game, he was -- was he was taken to some facility -- first of all, were you there?

A    Yes.

Q    Tell us what you recall?

A    It was their first home game.  And I was late. The game started around four, I think.  And I had come from work.  I worked another job, at that time, besides the dance studio.  And I had some time before I had to teach.  So I told him I would come.

And I was in the stands.  The first time I saw Scott, he was playing defense in the game and he was tackling -- or maybe -- I'm sorry it was offense.  He was

Brandner001324

81

tackling, somebody that was like three times his size.

And then it changed over, and he, I believe, he might have gone to defense. And there was a tackle made at that time, and somebody was down, somebody was injured. And everybody finally came off the pile and somebody was still on the ground.

And I couldn't see my son's number, so I wasn't sure who was hurt. Then eventually he sat up and it was him.

And I sat there and waited while, you know, they tried to discern, I guess, the extent of the injury. And a paramedic went out, and when she came back, I was kind of relieved.

A lady in the stand said probably knocked the air out of him, and I agreed with her, you know, he'll be all right. I was like I think he'll be all right.

And then she ran out with a back board. That's when I got real concerned and I went down to the field.

Q  He wound up going to the hospital or some medical facility; is that correct?

A  Yes.

Q  Where did he go, do you remember?

A  It used to be -- it's now Banner Baywood.

Q  Was he taken in an ambulance or something?

A  Yes.

Brandner001325

82

Q    Do you go in the ambulance or follow?

A    I followed.

Q    In any event, we get to the hospital and you learn that he's broken his leg, I assume?

A    Well, I knew beforehand.  I saw him on the field.

Q    When did you first come into contact with Dr. Matthews?

A    It was, I believe, just prior to him going into a surgery situation.  He came out and talked to me about the injuries, said I believe that we need to take him in and have it set.

Q    So they were going to go in -- and I don't mean to get technical as to what amounts to a surgery or doesn't -- but your understanding was they weren't going to cut his leg, they were just going to reset it and cast it?

A    At that point he wasn't sure what he would exactly do.  So, I -- when he said surgery, I thought, you know, possibility of cutting him to place the leg.

Because he said he wasn't sure the extent or how, you know, how bad it was and what type of a situation he would find, once he saw the leg.

Q    Okay.  So Scott comes out of this procedure, I'll use that term, and I take it, at some point, you learned what had taken place, as far as the procedure and

Brandner001326

83

what they had done to fix it?

A    Yes.

Q    Was it your understanding that they had realigned the bones --

A    Yes.

Q    -- reset them and put them in him in a long cast?

A    Yes.

Q    And do you recall how long Scott was in the long cast.

A    I think it was about eight weeks or so.

Q    Then there was some type of -- that was taken off; is that correct?

A    Yes.

Q    Then there was some type of another type of casting or boot or something that he wore for a while; is that correct?

A    Yes, it looked like a brace.

Q    Now, at some point in time, following the Dr. Matthews' procedure, did you and Scott become concerned -- and let me talk just about you, Scott's already talked about this -- did you become concerned about the way it was healing?

A    Yes.

Q    What was it that -- first of all, tell me

Brandner001327

84

approximately — I'm not asking you to give me a specific date, on such-and-such a date I became concerned — tell me, in the chronology of events, approximately when you first started becoming concerned?

A    Once he was out of the long cast and in the brace, I noticed, after a time, that there was a huge lump and all. I think it looked like it was moving. It was starting to bow.

Q    So when you first started having concerns, those were the two concerns that you were having?

A    Yes. And he said that it hurt, so that concerned me too.

Q    Do you need any water?

A    Probably a good idea.

Q    Okay. Now, did you talk to Dr. Matthews about the lump?

A    Yes.

Q    What were you told?

A    It was, I believe he called it, a bone callus, a build-up that would be on the area. And then eventually, you know, at some point it would start to wear down once the bone was fully healed.

Q    So was he telling you that it would eventually go away?

A    I don't think he ever said it would totally go

Brandner001328

85

away, but it would -- I think he might have used the word remodel, so it wasn't protruding so bad. It was really big. It looked like another knee.

Q As a result of your communications with the doctor about the lump, was it your understanding it would get better? By that I mean, it would get smaller over time?

A Yes.

Q Okay. Let's talk about the other issue that you had you thought, the leg was moving, it was bowing?

A Yes.

Q Did you talk with Dr. Matthews about that?

A Yes.

Q What was your understanding of what was going on, based on your communication with him?

A That it was, that it was just needing time to heal.

Q So, it was -- was it your understanding then, at that time, that it hadn't healed?

A It was still in the process.

Q Now, at some point in time, you decided that you wanted to get some other opinions from some other doctors; is that correct?

A Yes.

Q Tell me what led you to do that?

A Not only myself, but my ex-husband and I were

Brandner001329

86

both concerned, because we didn't feel that Dr. Matthews was really listening to our concerns.

And we just thought maybe we should just see if there is something else that should be done or, you know, just find out another opinion would be best, you know, about how it was healing.

Q    We've heard the term earlier that you were looking for a second opinion.  Is that basically what you were doing?

A    Yes.

Q    So, at that point, were you going to other doctors to seek their thoughts on what was going on?

A    Basically that's what we wanted to know.

Q    And you went to see Mezona Orthopedics to Dr. Dinowitz; is that correct?

A    Yes.

Q    Tell me, were you at the initial meeting Scott had with Dr. Dinowitz?

A    Yes.

Q    You attended that?

A    Yes.

Q    Do you remember if his dad was there, Steve?

A    No, he wasn't.

Q    He was not there?

A    No.

Brandner001330

87

Q    So it was just you and Scott?

A    Yes.

Q    Tell me what you recall about that initial meeting with Dr. Dinowitz?

A    He examined Scott. He looked at x-rays. He saw the things that had concerned us. He noticed there was a bowing, that it was off. He seemed concerned.

Q    Do you remember him using any type of ruler thing to show you angles?

A    Yes, he did. And he said it was off a certain degrees, which I don't recall, but he felt they were not in the normal range.

Q    He communicated that to you?

A    Yes.

Q    And at the conclusion -- I'm sorry is there anything else that you remember, substantively, about the meeting, the discussions?

A    What he said was, before really offering any real opinion about it, that he was going to conference it with the group.

And that means, from what he explained, the group of doctors that were involved in the practice with him.

Q    How did you come to find out about Dr. Dinowitz and Mezona Orthopedics?

Brandner001331

88

A    He had worked on my ex-husband's hand at a point when it was broken.

Q    That was Dr. Dinowitz?

A    Correct.

Q    When you left the initial meeting with Dr. Dinowitz -- let me back up.

At the initial meeting with Dr. Dinowitz, was there any discussion of surgery?

A    He, at that point, had said that that was something that might have to happen.

Q    At the conclusion of the meeting with Dr. Dinowitz, where was it left? Had you decided, one way or the other, what you were going to do?

A    No, because, at that point, he said that he wanted to take the time to conference it.

He did let us know to that he is a hand and upper body, arms, I think, specialist, and he needed to also speak with somebody who had some greater knowledge about the legs.

Q    So when you leave the meeting with Dr. Dinowitz, the initial meeting, it's still up in the air what you're going to do?

A    Yes.

Q    Now, had Dr. Matthews ever suggested further surgery --

Brandner001332

89

A    No.

Q    -- up to this point?

A    No.

Q    What was, up to that point, the position that you'd been told by Dr. Matthews about what to do about this?

A    Basically, let Scott continue to what he's doing. If he was hurting, give him ibuprofen for the -- to help him relieve the pain, and just see how things went, see him back on -- I think sometime in the summer, early summer.

Q    You also -- I'll use the chronology, after the initial meeting with Dr. Dinowitz, and I'll tell you that counsel's provided us with this time line, and I'll use that here.

Is that on your screen, ma'am?

A    Yes.

Q    Okay. After Dr. Dinowitz — and this time line, I believe we're all in agreement with this, that initial meeting was March 22 of 2002; do you see that?

A    Yes.

Q    Now, after that meeting, the next — what happened next? What's the next communication you had with Mezona Orthopedics?

A    I believe it was a phone call from someone in the office, explaining that they had conferenced and that we should come in and talk with Dr. Sharpe.

Brandner001333

90

Q   About what?

A   About the options that they wanted to present us, and they had talked about surgery.

Q   So, at that point, did you set another meeting with Dr. Sharpe?

A   Yes.  I set up the first time that we would consult with him.

Q   And I said that poorly.

You set up another meeting, and this one was with Dr. Sharpe?

A   Correct.

Q   So, I apologize, on April 11, 2002, you go in and you have a meeting with Dr. Sharpe; is that correct?

A   Yes.

Q   Is Scott there?

A   Yes.

Q   And are you there?

A   Yes.

Q   Okay.  I just want to get a list of attendees. Was Steve there?

A   Yes.

Q   Okay.  Scott's father was there then?

A   Yes.

Q   And from Mezona Orthopedics, who all was in attendance?

Brandner001334

91

A    As far as I can recall, it was just Dr. Sharpe at that time.

Q    Do you have a recollection of that first meeting with Dr. Sharpe, of meeting of physician's assistant named Brian Sharp?

A    I don't recall.

Q    You might have, but you don't have a recollection?

A    Yes.

Q    Do you remember having any substantive conversations with anyone, other than Dr. Sharpe, at that meeting?

A    Not that I recall.  It was Dr. Sharpe.

Q    Do you have a recollection of Dr. Sharpe dictating during that meeting?

A    Yes.

Q    Did he ever tell you why he dictated during the meeting?

A    Just to take notes on what was being said, discussed.

Q    Did he tell you that or did you assume that?

A    I don't know.  I think I commented to him, because I'd never see it happen before, so I think that he did give me an explanation of what he was doing.

Q    Did he ever tell you that if he was dictating

Brandner001335

92

something wrong, that you should correct him?

A    I don't recall that.

Q    Tell me what you recall about the April 11, 2002, meeting at Mezona Orthopedics with Dr. Sharpe?

A    Well, he had told us that he had gotten the results of the conference, and that they had felt that surgery was probably the best course of action for Scott's condition, at that time.

And he basically discussed different ways to do a surgery on Scott's leg.

Q    Do you recall a conversation -- let me talk about the surgical procedures.

Was there a conversation about a rod, for example?

A    I believe so.

Q    Do you remember any of the other procedures that were talked about?

A    He had talked about a steel plate. He also had talked about, I believe, using some kind of fixation device on the outside. I've seen it, like pins on the outside. I think that's -- there may have been others, but I think those are the ones that I can remember.

Q    The plate one, what do you remember about that?

A    I think that he said that was attached to the bone by screws. I don't know if he was really, really super

Brandner001336

93

specific about all these things. I just know he told us different options.

Q Do you remember, at the April 11, 2002, meeting, whether he told you that the plate option, as well as any of the other options, required a re-breaking of the two bones?

A I think that he did say that.

Q I want to show you what's been marked as Exhibit 10. Do I need to blow that up any more for anyone? Thank you.

This is a April 11, 2002, note, Dr. Sharpe's records. Do you see there, it says: I discussed other fixation options with tha parents as well.

Is that what you were referring to?

A Yes.

Q Then it says fibular osteotomy will also be necessary, and we did have an extensive discussion about risks. I'll get to that in a minute. I want to talk to you about that fibular osteotomy.

Do you remember any discussion at that meeting regarding the difference between what the large bone was doing, the tibia, versus the small bone, the fibula?

Do you remember any discussion about the difference between those two, what was going on?

A I'm not absolutely certain. I believe that the

Brandner001337

94

tibia, the smaller bone, was kind of just maybe not even attached to anything. It was just there. But it was the fibula that was the issue. That's the one that was bent.

Q    Do you remember any discussion, at the April 11, 2002, meeting, about where the small bone -- there might need to be a piece taken out of it?

A    I can't recall.

Q    That's fine that's fine. The knot, the lump, I believe is how you described it, on the front of the leg, that we discussed a moment ago, was it your understanding that that was on the big bone?

A    Yes.

Q    So that was on the tibia, was your understanding?

A    Whichever.

Q    If that's the big bone?

A    Yeah, the big bone.

Q    You don't have a medical background?

A    No. And I always mess those two up.

Q    Okay, I understand.

There is -- next, and it's in conjunction with that fibular osteotomy sentence there, it says:  We did have an extensive discussion today about risks, including anesthetic risk, death, infection non-union or delayed union, nerve injury, vessel injury.

Brandner001338

95

Do you see what I'm referring to?

A    Yes.

Q    Do you have any recollection of a discussion along the line -- those lines taking place?

A    I don't recall.

Q    You don't recall this, a discussion about risks at this meeting?

A    I don't think -- I just don't recall.  I don't I don't think we did, but it's possible.

Q    Okay.  Do you remember having a discussion about risks, at some point in time, before the surgery?

A    Oh, yes.

Q    Okay.  Do you recall -- and we'll get to the June 6, 2002, pre-op conversation -- do you recall that meeting?

A    Yes.

Q    I just want to understand your testimony correctly.

You do recall discussing risks --

A    Yes.

Q    -- before the surgery?

A    Yes.

Q    What you're saying, if I understand you correctly, is you just don't recall the date, which meeting?

A    Well, I know, absolutely, certainly, risks were

Brandner001339

96

discussed in the pre-op one in June. I'm not sure about the April 11 discussion happening.

Q   Let me ask you this then, at the April 11 meeting, if risks were discussed, as is set forth by the doctor in his dictation — you see where it says nerve injury?

A   Yes.

Q   Do you have a recollection, on April 11, 2002, of any discussion that there was a specific nerve, in the lower part of the leg -- it's referred to as the peroneal nerve, which I assume you found out by now -- but even if we don't use the term peroneal nerve, was there a specific discussion about a nerve that was at risk in this type of surgery, where loss of function of the foot could occur?

MR. CRAWFORD:   Lacks foundation.

THE COURT:   Overruled.

MR. CAUSEY:   Go ahead, you can answer.

THE WITNESS:   No.

BY MR. CAUSEY:

Q   I want to go to the June 6th meeting, but there's a couple things that occurred in between I want to cover first, just to keep our chronology in order.  Okay?

A   Okay.

Q   Dr. Walls, are you familiar with that doctor?

A   Yes.

Brandner001340

97

Q     You took Scott there for another opinion; is that —

A     Yes.

Q     — right?

A     Yes.

Q     And the time line indicates it was April 18 of 2002.  So it would have been about a week after the Dr. Sharpe meeting; does that sound right?

A     Yes.

Q     Tell me what you recall about the discussion with Dr. Walls?

A     He also viewed Scott's x-rays and took a look at Scott's leg and saw that there was — that it was off in degrees.  It was — he saw the bowing and the bone callus also.

And he said along the same lines as Dr. Sharpe, you know, surgery looks like it might be the thing to do.  And then he talked about, specifically, putting a rod in the bone.

Q     He talked about the surgical option that involved the use of a rod?

A     Yes.

Q     Did Dr. Walls, if you recall, talk to you, at all, about the option of let it heal.  To reduce the pain, lay off the activity.  You can let it heal and, hopefully,

Brandner001341

98

reduce the pain at the site, if the fracture heals, and then see how it is at that time?

A    He may have said do nothing, you know, just let it go, but I don't recall any of the other discussion about laying off activities. I don't remember that.

Q    So you — it's your testimony that he may have mentioned, you know, we can wait and see, but he did not give you any details about that side of the options?

A    I don't recall any details.

Q    Do you recall any discussion with him about if you wait and see, whether it would get worse or it might heal at the same angle it was at right then, anything like that?

A    I really don't remember.

Q    Then -- and at this point, is it your understanding that if we're going to straighten the bone, it's going to require a surgical procedure?

A    Yes.

Q    So then you go back to — it looks like Dr. Matthews, April 22, 2002.

Did you attend that meeting as well?

A    Yes.

Q    Let me ask you this, did you attend all the meetings?

A    Yes, I did.

Brandner001342

99

Q    It's my understanding you were with Scott at all the meetings; is that correct?

A    That's correct.

Q    Then his father, Steve, attended some of the meetings; is that correct?

A    Yes.

Q    Dr. Matthews, April 22, 2002, you go back to see him after Dr. Walls. Why?

A    My ex-husband and I felt that he needed an opportunity to look at it also and see what his thinking was.

Q    And following that meeting, you went back to Mezona Orthopedics; correct?

A    Yes.

Q    So you still, at that point, felt Dr. Matthews was not as responsive to you as you wanted him to be; is that a fair statement?

A    Yes.

Q    Okay. Now, Dr. Sharpe, there is -- pretty much the whole month of May, then we have a gap there, April 22 of 2002, Dr. Matthews, then before we have the pre-op meeting of, June 6, 2002, what was going on during that time period?

A    Scott had some tests done, scans, and I think that Dr. Sharpe -- and I may have talked on the phone

Brandner001343

100

also -- and we had decided, my ex-husband and I, that Scott would go have a surgery to fix the leg.

Q    Okay.  In making that decision, did you also take into consideration Scott's thoughts?

A    Oh, yes.

Q    So it was a group decision at that point?

A    Yes.

Q    Now, up to that point, where you made that decision, had you ever heard about that specific nerve that could be damaged in this type of procedure?

A    No.

Q    From any of the doctors, including Dr. Sharpe?

A    Not from any of them.

Q    Had you ever been told that there was a risk of a permanent loss of function of the foot?

A    No.

Q    Had you ever been told that if that happened, Scott might have to wear a brace the rest of his life?

A    No.

Q    Why were you interested in having the surgical procedure?

Do you need a drink?

A    Yeah.

Q    It's okay.

A    To make it better for my son.

Brandner001344

101

Q    So you were trying to improve Scott's condition?

A    Yes.

Q    Let's talk — do you need a second?

THE COURT: Mr. Causey, this is good time to break any way this afternoon.

And folks, we need to take our noon break. If I could have all of you back at 1:30, ready to come back into court, at that time. I'd appreciate it. Please remember the admonition. We'll be in recess.

(Dr. Brandner was called as a witness. His testimony was reported but has been omitted from this transcript.)

(Recess.)

Brandner001345

102

THE COURT: All right. Thank you everybody.

Go ahead and be seated, please.

We're back on the record with all of the members of our jury present, counsel, and the parties.

And Mr. Causey, do you wish to go ahead and continue with Miss Clark? Very good.

Miss Clark, you're still under oath, and we'll go ahead and complete your examination.

BY MR. CAUSEY:

Q   Sorry for the interruption. I'll try to start off right where we left off.

I believe that we were -- had just finished discussing why, prior to the June 6, 2002, meeting with Dr. Sharpe, the decision had been made to proceed with surgery.

And it was your position, if I remember correctly, that the idea was seeking improvement of the condition; is that right?

A   Yes.

Q   Okay. June 6, 2002, okay, let's talk about that. Was there a meeting at Mezona Orthopedics?

A   Yes.

Q   Who all was present at the meeting that you attended? Did you attend it, first of all?

A   Yes.

Brandner001346

103

Q    Who all was present at the meeting?

A    Scott, Dr. Sharpe, myself, and that's all I recall..

Q    Now, do you have any recollection of a physician's assistant by the name of Brian Sharp?  Do you know who that is?

A    Yes, I do.

Q    Do you have a recollection of him attending the June 6 pre-op meeting?

A    I don't recall it, but he may have.

Q    Do you have any memory of him, while at that pre-op meeting, dictating anything?

A    I don't remember.

Q    And just to save some questions down the road, are you saying that could happen, could have happened, you just don't remember it?

A    Yes.

Q    Do you remember Dr. Sharpe being involved at the meeting?

A    Yes.

Q    Now, as far as any substantive discussions, were you provided any substantive information about the procedures or the risks or anything related to the surgery?  Who did that come from at the meeting?

A    I believe it was Dr. Sharpe.

Brandner001347

104

Q    I want to show you what has been marked as Exhibit 11 in this matter. We've looked at it several times.

I want to go down to the bottom paragraph there. See the assessment paragraph?

A    Yes.

Q    Is that in focus on your screen? Everything okay to read?

A    Yes.

Q    If you skip down, it says: I've given them a prescription for post-op pain medication and reviewed the risk of surgery; do you see that?

A    Yes.

Q    Do you recall that taking place, this discussion?

A    Yes.

Q    Then next it says: These include, but are not limited to, death, other anesthetic complications, blood vessel injury, nerve injury, fracture, chronic stiffness, chronic pain, malunion, non-union, refracture, mechanical failure of the components, blood loss, blood clots, and infection.

Do you see what I read there?

A    Yes.

Q    Then the next sentence though says: The

Brandner001348

105

patient and his mother understand these risks.

Do you see where it says that?

A    Yes.

Q    And he is ready to proceed with surgery.

Is that an accurate statement?

A    Yes. We understood that those were the risks.

Q    So, to the extent of what you had been told, you understood that?

A    Correct.

Q    Now, were you told anything -- let me put it back on there, if you need to refer to it.

As far as the risks were concerned, were you told anything other than this list?

A    No. It was very list oriented. It was these are the things that could happen.

And yes I understood that these things had a possibility of happening.

Q    Let's talk about -- do you recall any discussion, any specific discussion, about the likelihood of any of these risks?

A    They -- the doctor said that the risks were minimal compared to the benefit.

Q    That was Dr. Sharpe?

A    Yes.

Q    Is it your testimony that you remember that

Brandner001349

106

specifically at that meeting?

A    No.  I had heard that from him at some point.

Q    You just don't recall which meeting it was?

A    Correct.

Q    Is there anything else about the second meeting with Dr. Sharpe, June 6, 2002, what we were referring to as the pre-operative meeting or evaluation, pre-operative evaluation, anything else about the substantive discussions at that meeting that you recall?

A    I believe we talked at some length about Scott's pain management at that time.

Q    Are you talking about after the surgery?

A    Yes.

Q    Okay.  Anything else?

A    I don't believe so.

Q    Do you recall, and whether it's at the June 6, 2002, meeting or at any of the meetings with Dr. Sharpe, pre-surgery, any discussion involving the option of let's wait and let's see if it heals over the next few months, the fracture.  Let's cut down on Scott's activity level and let's let it heal.  Let's see if we can reduce the pain and then see where we are.

MR. CRAWFORD:  Objection; irrelevant.

THE COURT:  Overruled, I'll allow it.

THE WITNESS:  May I answer?

Brandner001350

107

THE COURT: Yes.

MR. CAUSEY: Yes.

THE WITNESS: The only time it was mentioned that we had a choice to wait, was, basically, that you could wait, and I believe that was in the first meeting that we talked about that as an option, but no discussion about how that would be done, what that meant.

BY MR. CAUSEY:

Q You don't recall a discussion of the wait option, about what that would involve?

A I don't recall.

Q Do you have any recollection, at any of the pre-surgery meetings, of being told that there was a specific nerve at risk from this type of surgical procedure, and that if it was injured, Scott could permanently lose some loss of function of his foot?

A No.

Q Kim, when you were weighing the decision, as to whether or not to have your son undergo this surgical procedure, what did you weigh? What was the information that you weighed in rendering that decision?

A What I basically was thinking about was where he was at that time, which he had a deformity, as far as I could see; that it was hurting him; and that this surgery was going to help that basically go away.

Brandner001351

108

Q    Based on your discussions with Mezona Orthopedics, that was your feelings at the time?

A    Yes.

Q    I assume, since you had not been -- you had not discussed -- or excuse me, strike that.

I assume, since no one had discussed with you a specific nerve and a loss of function of the foot, that wasn't part of the factors or the weighing of whether to go with surgery or not go with surgery?

A    No, it was not.

Q    So June 26 of 2002, we have the surgical procedure. Do you recall that?

A    Yes.

Q    Were you there?

A    Yes.

Q    And I don't mean actually in the room, you were at the hospital, the facility?

A    Yes.

Q    When is the first time that you recall having a substantive conversation -- by that I mean, other than hi, how are you or someone sitting in on a meeting -- with Brian Sharp?

A    I think it was there in the pre-op room. I think he was there and he talked with us a little bit.

Q    This is the first substantive conversation you

Brandner001352

109

recall with him?

A    I think so.

Q    And when you say pre-op room, are we talking about at Mezona Orthopedics offices or at the surgical facility?

A    I think it was at the surgical facility, although, he could have been around before that, but I think that's the first time I think I talked with him.

Q    You're not suggesting you may have had a conversation with him earlier, you just don't recall one; is that fair?

A    Yes, correct.

Q    So the surgery takes place, and when is -- when is the first time that you became aware that there might have been a problem?

A    Dr. Sharpe told me.

Q    Tell us about that conversation.

A    He said that there was some concern because Scott wasn't able to move his foot, wiggle his toes, you know, flex and point, at a point when he woke up.

And at first it was thought it could have been an epidural, because he did have one, and we were just going to wait and see.

Q    At that meeting, did he warn you that it might have been a nerve damage and that it might be permanent?

Brandner001353

110

A    He might have said something about it being possibility of a nerve, but I don't recall it.  I think it was more wait and see, because of the epidural, there was no way to really determine where Scott was.

Q    Was there a subsequent conversation you had with Dr. Sharpe, post surgery, where there was a discussion where Dr. Sharpe indicated to you that he did, in fact, now think it was a nerve injury and that it was permanent?

A    Yes.  There was a discussion that there was damage to a nerve in Scott's leg that was stopping his foot from flexing and pointing and moving side-to-side.

The hope was that it was temporary, that it was sleeping, and would at some point wake up, but there was a chance that it might not recover or might recover to a point, but maybe not fully.

Q    So where did that conversation take place?  Was that at the facility?  Was Scott still in the facility?

A    At the hospital?

Q    Yes.

A    Yes.

Q    The surgery, on June 26, 2002, that took place at the hospital; correct?

A    Yes.

Q    That wasn't -- they now have the out-patient surgical facility, it wasn't in one of those; correct?

Brandner001354

111

A     No.  He was in the hospital for quite some time..

Q     So the communications you've told us about so far took place at the hospital?

A     Yes.

Q     I'm talking about the post surgery discussions.

A     Yes.

Q     Now, how long after the surgery was it when Dr. Sharpe warned you it that might have been something about the nerve and that it could be permanent?

You said that you didn't think that was the first conversation.  How long after?

A     It would probably be a day or two later because they needed to wait for it to wear off, the epidural.  Then, at that point, he realized that it was beyond that.

Q     So this discussion would have taken place after the epidural was allowed to have worn off?

A     Yes.

MR. CAUSEY:  Your Honor, I don't have any further questions at this time.

THE COURT:  Thanks, very good.  Cross-examination, Mr. Crawford.

MR. CRAWFORD:  Thank you, your Honor.


CROSS-EXAMINATION

Brandner001355

112

BY MR. CRAWFORD:

Q    Is that coming up on your screen, Mrs. Clark? Okay.

A    Yes.

Q    Let's talk about the kind of the chronology of things for a few minutes; okay?

A    Okay.

Q    Scott breaks his leg September 26, 2001. In, I believe it was, December of 2001, he was taken out of the long leg cast, is that your memory?

A    Yes. I think it was mid to late December, if I recall.

Q    Then he was put in a walking cast?

A    It was a type of a brace.

Q    People have called it a walking cast?

A    Yes. He straps it on, yeah.

Q    Something below his knee.

A    Yes.

Q    Then he was actually -- that was taken off and he was told return to normal activities in early January of 2002?

A    If I recall correctly, yes, around that time frame.

Q    And then that's when you start noticing that

Brandner001356

113

the lower leg was bowed out?

A    Correct.

Q    And that it was also kind of -- the foot was actually kind of twisted in?

A    Yes.

Q    And it was obviously deformed to you?

A    Yes, it looked deformed to me.

Q    And Scott tried to get back to activities, but he was really struggling?

A    Yes.

Q    Including dance, sports, whatever?

A    Yes.

Q    And you go to Dr. Matthews, January 25, 2002, because you're concerned about that; right?

A    Yes.

Q    And got, what to you, was a very unsatisfactory response from Dr. Matthews; is that fair?

A    Yes.

Q    Basically, it didn't seem to you like he was really listening, taking into consideration what you were telling him, in terms of the problems that Scott was having?

A    Right.

Q    Okay.  That's what caused you to discuss with your ex-husband and your son the potential of getting a second opinion?

Brandner001357

114

A    Yes.

Q    And you choose Dr. Dinowitz, because he had done surgery on your husband's hand?

A    Correct.

Q    So you get a second opinion from Dr. Dinowitz on March 22, 2002?

A    Well, we met with him, and he said he'd conference and then give us his opinion.

Q    Well, in fact, the purpose of that visit was a second opinion; right?

A    Correct.

Q    And he did say that he thought this was a problem?

A    Yes, he did.

Q    That something needed to be done about it?

A    Yes.

Q    What he wanted to do is present it to his colleagues or partners at Mezona and get their thoughts as well?

A    Yes.

Q    He was very up front, that's what he was going to do?

A    Oh, yes.

Q    Okay.  And the next thing you remember happening is that somebody from Mezona calls you and says

Brandner001358

115

Dr. Sharpe has expertise in the lower extremities and he's the person that you would want to meet with, something to that effect?

A    Right. We had already known that Dr. Sharpe would probably be the person.

Q    Okay. But officially, you got the call and, yeah, Dr. Sharpe's the person.

A    Yes.

Q    And so you go in on March 11 -- I'm sorry, you go in on April 11, 2002, for yet another opinion, this time by Dr. Sharpe?

A    Yes.

Q    Dr. Sharpe gives you his thoughts, and then you go for yet another opinion by Dr. Walls on April 18, 2002?

A    Yes.

Q    Then you go for yet another opinion by Dr. Matthews on April 22, 2002?

A    Yes.

Q    And at a minimum, Dr. Sharpe and Dr. Walls told you that they thought surgery was the appropriate way to go?

A    Yes.

Q    And that you go back to Dr. Matthews and you get, again, a very unsatisfactory experience with him; fair?

A    Basically, yes.

Q    He seemed to be a little bit miffed that you

Brandner001359

116

had gotten second opinions?

A   Yes.  He let us know he knew.

Q   Okay.  And he didn't really seem to be listening to you or what Scott said the problems he was having or what he wanted to get back to doing?

A   He just said that whatever I can do to help you, I'd be willing to do, or something like that.

Q   But he also just didn't seem to be listening, did he?

A   Right.

Q   Okay.  So that's when you decided, we're not going to continue to treat with Dr. Matthews any more?

A   Right.

Q   And then you, again, the family talks about it and decides that surgery is the way you want to go and Dr. Sharpe is the person you want to do it?

A   Yes.

Q   And you made that decision because you thought Dr. Sharpe was really concerned about Scott, had spent a lot of time thinking about the case, and basically had communicated to you that he really was thinking about what to do?

A   Yes.

Q   So before surgery was performed, you had gotten opinions from, initially, Dr. Matthews in January, then Dr.

Brandner001360

117

Dinowitz, then Dr. Sharpe, then Dr. Walls, then Dr. Matthews again; five doctors, right, five visits?

A   Yes.

Q   And you had plenty of time before surgery to think about what you wanted to do?

A   Yes.

Q   Dr. Sharpe didn't push you into surgery, did he?

A   No.

Q   Over the period of January 25, 2002, to June 26, 2002, almost to the day, five months; right?

A   Yes.

Q   And you got to see firsthand the problems your son was having?

A   Yes.

Q   The struggles he was having?

A   Yes.

Q   The pain he was having?

A   Yes.

Q   And the things he couldn't do?

A   Yes.

Q   And how this was impacting his life?

A   Yes.

Q   He was becoming very discouraged?

A   Yes.

Brandner001361

118

Q    He was becoming emotionally upset about it?

A    Yes.

Q    By the time surgery is done — I'm sorry — before surgery is done, he's actually already having pain in his ankle, his knee, and his hip?

A    Yes, he had some, after activity, yes.

Q    Well, and do you remember telling people at the hospital that he had actually constant pain in his leg by the time the surgery was going to be done?

A    Yes.

Q    When Scott would try to do the activities that he wanted to do, especially toward the end, you could tell that he was in excruciating pain?

A    Yes.

Q    You, I mean, you could just see it on his face?

A    Yep.

Q    Do you remember Dr. Sharpe telling you, during one of these visits, that if his leg remained in this bowed and twisted position, that he could develop early problems, early arthritis in his ankle, his knee, and his hip?

A    I don't recall that.

Q    Do you deny that he told you that?

A    No.

Q    One of things that was very important to Scott was doing dance?

Brandner001362

119

A    Yes.

Q    And the problem with his leg, over that five-month period of time, between the visit with Dr. Matthews on January 25, and the surgery by Dr. Sharpe on January 26 (sic) you got to see firsthand the struggles that he had trying to do dance?

A    Yes.

Q    And it was clear to you that this was having a significant impact on his ability to do that activity?

A    Yes.

Q    He couldn't do a lot of the moves that were required?

A    Right.

Q    And there was actually two recitals in June of 2002, before the surgery, that he was involved with; do you remember that?

A    A competition and a concert, yes.

Q    I'm sorry.

A    That's right.

Q    Because he could not do all of the stuff that he would normally be doing, you actually had to choreograph the routine so -- around his problems?

A    Yes.

Q    The condition of Scott's leg, by the point we go into the June 2002 time period, was unacceptable to you?

Brandner001363

120

A    Right.  I wanted him to be well.

Q    It was unacceptable to Scott?

A    Yes.

Q    And it was unacceptable to your ex-husband?

A    Yes.

Q    Dr. Sharpe met with you on April 11, 2002 -- I'm going to have to do this in sections here because we won't be able to see the whole thing — and I have highlighted this to talk about some things with you.

He indicates in this note that he had an extensive discussion with you, meaning the family, about this deformity, problems that Scott was having, things like that.

Do you deny that, do you deny that?

A    Deny that we did have that discussion?

Q    Do you deny that he had an extensive discussion with you that day about Scott's problems, what he wanted to get back to, the nature of the deformity?

A    No, I don't deny that.  We did talk extensively.

Q    It would include what he wanted to get back to doing; is that fair?

A    Oh, yes.

Q    And are you saying you have a good memory of everything that occurred during the April 11, 2002, meeting

Brandner001364

121

or not so good a memory?

A    I think it's fair.

Q    Somewhere in between?

A    Yeah.

Q    Okay. But you don't remember any discussion about the risks of the surgery that day?

A    I don't recall on that day.

Q    Are you saying that did not happen?

A    No.

Q    Okay. So, you remember the April 11, 2002, visit, but in terms of your memory about the discussion of risks, it's completely blank today; fair?

A    Right. At this point, I don't recall that.

Q    Either way?

A    Exactly.

Q    Okay. But you don't remember that discussion at all, but you told us earlier this morning you do recall there was no discussion about possible nerve damage?

A    I was asked about a particular nerve. No, there was no discussion about that particular nerve.

Q    So you remember that specific fact, but then whether even the idea of risks was discussed, you have no memory; right?

A    I believe that the question was asked, did I have a discussion with or did we have a discussion about a

Brandner001365

122

particular nerve, not specifically nerve damage.

No, we did not have a discussion about a particular nerve. I don't even recall if we discussed the risks.

Q   So you have a good memory there was no discussion about risks to a particular nerve, but you don't even remember the general discussion about risks, that's what you're telling us?

A   Right.   The risk of the nerve damage wasn't something I recall because I don't even recall a discussion about risks.

Q   But you're not saying it didn't happen.

A   That's correct.

Q   Okay.   So, in fact, what Dr. Sharpe has in his note, that he had an extensive discussion with you that day about risks, he may have done it, you just don't remember it today?

A   The discussion that I recall was an extensive discussion, but the discussion extensively was about the surgical options that Scott had.

Because it was their position on that day that surgery was the option that we should look towards and that there should be a decision based on whether we should have surgery or not.

Q   Let me make sure I understand your testimony.

Brandner001366

123

Are you willing to tell the jury today, that on April 11, 2002, Dr. Sharpe did not discuss risks of surgery with you?

A    No, I'm not willing to say that.  I don't recall a discussion of risks on that day.

Q    Okay.  Either way.

A    Either way.

Q    All right.  So he may have very well told you about the risks of anesthesia, but you don't remember?

A    Correct.

Q    He may have very well told you about the risks of death, but you don't recall it today?

A    Correct.

Q    He may have very well told you about the risk of infection, but you don't recall it today?

A    Correct.

Q    He may have very well told you about the risk of non-union, but you don't recall it today.

A    Correct.

Q    He may have very well told you about the risk of delayed union, but you don't recall it today?

A    Correct.

Q    He may have very well told you about the risk of nerve injury, but you don't recall it today?

A    Correct.

Q    He may have very well told you about the risk

Brandner001367

124

of vessel injury, but you don't recall it today?

A    Correct.

Q    Do you remember that Dr. Sharpe would go through, in his office visits with you, how Scott was doing. He'd do his examination and everything, and then at the end of it, he would actually dictate in to a Dictaphone?  You do remember that?

A    Yes.

Q    And you asked him why do you do that?

A    I think I did.

Q    Do you remember what he told you?

A    So that he would have a recall of what was done in the visit.  Well, not just him, but there would be a record.  That's his record.

Q    Do you also remember him telling that so if you hear something that you haven't heard before, you can speak up?

A    I don't remember that.

Q    You do agree that on June 6 — it's under my pile here somewhere, I'll find it.

Do you agree on June 6, 2002, the pre-op visit, that Dr. Sharpe did, in fact, discuss with you the risks of surgery?

A    I remember having a discussion about the risks of surgery, yes.

Brandner001368

125

Q    Let me put this note, June 6, 2002.

Do you see at the bottom, it says Brian Sharp, PAC?

A    Yes.

Q    I want you to assume that Brian dictated this note. Okay?

A    Okay.

Q    That's what that means.

You do not remember Brian being part of this meeting on June 6, 2002; is that fair?

A    That is correct.

Q    You're not saying he didn't participate, he may have?

A    Correct, he may have.

Q    I want you to hypothetically assume that he's going to confirm that he discussed all of the things in this note with you.

And then when he was done having his discussions with you, Dr. Sharpe came into the room and went over some things with you. Okay? I just want you to assume that's what he's going to say.

A    Okay.

Q    Are you going to deny that that scenario of events happened?

A    No.

Brandner001369

126

Q    If, in fact, that is true, that Brian went over all these things with you, then Dr. Sharpe came into the room, you have a very poor memory of the visit on June 6, 2002; do you agree?

A    No.

Q    So, you have a very good memory of what occurred on June 6, 2002, but you can't remember this other guy being present and discussing how Scott was doing, medications, allergies, surgical history, doing an examination of your son, going over the surgery or potential risks?

A    I believe that the discussion that occurred was Dr. Sharpe, and he was the one that was doing the visit with us.

Q    Well, Dr. Sharpe will testify that he did, in fact, discuss these things with you that visit too.  So will Brian.

But your memory seems to be completely blank on Brian's involvement that day; fair?

A    Okay, yes.

Q    But you don't see that as a significant lapse in your memory of what happened that day?

A    No.

Q    Okay.  Do you agree that Dr. Sharpe discussed how Scott was doing that day, in other words, how things

Brandner001370

127

were going?

A    Yes.

Q    Do you agree that he discussed with you the limitations Scott was having?

A    Yes, we may have gone over those.

Q    Did he --

A    I believe he was asking if Scott -- how Scott was doing that day, yes.

Q    Who did the examination of Scott, listening to his heart and his lungs?

A    I believe that it was Dr. Sharpe.

Q    And you have no memory at all about Brian going over risks with you; right?

A    Not Brian.

Q    Okay.  But you do have a memory of Dr. Sharpe going over the risks with you?

A    I do believe it was him.

Q    Did he tell you that one of the risks of surgery was death?

A    Yes.

Q    Had you decided -- he did tell you that that is very unlikely to happen, but it is something that can happen.  You need to know it and you need to understand it?

A    Yes.

Q    And you were willing to have your son

Brandner001371

128

potentially die during this surgery, rather than him go on living like he was living?

A     Based on the fact that Dr. Sharpe had told me that the risks were minimal for these things to occur, yes.

Q     And he told you there were complications with -- potential complications with anesthesia?

A     Yes.

Q     Told you it's very unlikely that it would happen, that it can happen?

A     Yes.

Q     You need to take that into consideration?

A     Yes.

Q     And did you understand that the risk of anesthesia, the major risk is death as well?

A     Yes.

Q     You were willing to accept that?

A     Yes.

Q     He told you that there could be abnormal bleeding?

A     Yes.

Q     And that would be very unlikely to happen, but it is something that's possible and you need to take that into consideration?

A     Yes.

Q     And you were willing to accept that risk?

Brandner001372

129

A     Yes, because it was minimal, in comparison to what -- Dr. Sharpe said that these were all minimal, and I believed and trusted that.

Q     They're minimal, but they could have happened?

A     True.

Q     This was your son?

A     Exactly.

Q     He could die during the surgery?

A     That's true.

Q     You knew that?

A     Yes.

Q     You still thought, even though I understand it's not likely, but that gets your attention, as a mom, doesn't it? My son could die during this surgery?

A     Yes, it did.

Q     He did, in fact, discuss nerve injury with you; right?

A     These were presented as a list, not specifically breaking every single one down.

Q     Dr. Sharpe discussed nerve injury with you that day, didn't he?

A     He said nerve injury could happen.

Q     Okay. Tell me all the questions you asked in response to that?

A     I didn't ask any.

Brandner001373

130

Q    You didn't ask what do you mean by nerve injury? I haven't heard anything about that in all of our discussions, what do you mean by that?

A    This is the list that every person sees when they're getting ready to sign the consent form for surgery. They're listed just like this, almost exactly in this order.

No, I didn't, because I was told by Dr. Sharpe that these risks were minimal and it outweighed what my son was experiencing at that time.

Q    Let's go back. What is this list you're talking about, this list that's given to everybody?

A    This is the list right here, because we were getting ready to, I believe, proceed into surgery soon and so he had to go over the list that is on the consent form. It's right there, on a consent form that you have to sign before anybody can go into surgery. That's the list.

Q    No, it's not.

A    It's very similar to it.

Q    Okay. Let's show it to you. Do you see the consent form that's in the chart?

A    Yes.

Q    You just said all of these things are listed in the consent form. They're not, are they?

A    No, they're not.

Q    Do you remember Dr. Sharpe telling you that it

Brandner001374

131

was possible that surgery would not work, that he could go on to have problems and pain?

A    There was a slight possibility.  Dr. Sharpe was confident in his ability to help Scott.  And I based -- we based our opinion upon his confidence and his expertise as the doctor in this situation.

Q    I appreciate you wanted a surgeon that had confidence in himself; right?

A    Absolutely.

Q    Let's get back to what we were talking about.  Did he tell you that there was a risk of infection?

A    Yes.

Q    Did you consider that to be a possible serious thing?

A    Yes.

Q    That's something you were willing to accept?

A    Yes.

Q    Do you remember what -- that he discussed blood clots?

A    Yes, I believe he said that.

Q    Do you remember him telling you that blood clots, if they develop, could go to the lung and if they go to the lung, they could kill you?

A    No.

Q    Do you understand what blood clots meant?

Brandner001375

132

A    Yes.

Q    When you got to the hospital, they had you sign some consent forms on behalf of your son?

A    Yes, I believe.

Q    One of the things they asked you to consent to was blood transfusions?

A    I believe so, yes.

Q    And did you understand that despite whatever testing can be done, there is still the risk that with a blood transfusion you could get disease?

A    Yes.

Q    You were willing to accept that risk for your son?

A    Yes.

Q    Dr. Walls, you saw him on April 18, 2002; is that right?

A    Yes.

Q    And he told -- this was like a third opinion at that point; right?

A    Yes.

Q    Okay.  And he told you that he thought surgery was the best option for your son?

A    Yes.

Q    In terms of waiting and do nothing, he didn't think that was a good idea and told you that Scott could

Brandner001376

133

have future problems if that occurred?

A    I don't recall exactly what he said. He just said that surgery was the best option.

Q    Do you recall him telling you that wait and do nothing was not a good idea?

A    Right.

Q    At the time the surgery took place -- first off, when the surgery took place, Dr. Sharpe was very up front with you and let you know that there might be a problem pretty quickly after surgery, didn't he?

A    Yes, he did.

Q    And he was -- it didn't seem to you like he was trying to hide anything or withhold any information from you at all, did it?

A    No. He was very concerned. He seemed stunned.

Q    Did he tell you that, hopefully, this would be temporary, but it could be permanent?

A    Yes.

Q    And your son had some medical complications also because of his liver; do you remember that?

A    Yes.

Q    And that was because he had been taking so much ibuprofen to deal with the pain that he was having?

A    It was thought that could be it. It was never discerned that that was it.

Brandner001377

134

Q    But he was taking a lot of ibuprofen every day?

A    Yes, he took what he could.

Q    He was taking like six pills a day, every day?

A    Most days, yes.  That was what we were told he could take.

Q    That was to deal with the pain that he was going through?

A    Yes, on the days when he had activity, he did.

Q    Have you seen your deposition testimony from January 29, 2004, which is the first time you were deposed in this case?  Have you seen that recently?

A    What's this, with you and I?

Q    No.  This was before Dr. Sharpe was sued in this case.

     Do you remember your deposition was taken before that?

A    Yes.

Q    I'm just asking, have you seen that testimony recently?

A    Yes.

Q    By any chance were Pages 50 and 51 called to your attention?

A    I'm not exactly sure what pages those are.

Q    Okay.  Let's take a look.

     Just take a minute to read that, if you could,

Brandner001378

135

okay, to yourself. Let me know when you've had a chance to read.

Have you had a chance to look it over?

A   Yes.

Q   Is that the testimony that was recently called to your attention?

A   The entire deposition was given to me to read.

Q   But that specific testimony was called to your attention, wasn't it?

MR. CAUSEY:  Objection; your Honor, may we approach?

THE COURT:  Yes.

(An off-the-record discussion was held out of the hearing of the jury.)

THE COURT:  For the record, the objection is sustained.

BY MR. CRAWFORD:

Q   Have you recently reviewed Page 51 of your deposition that was given on January 29, 2004?

A   Yes.

Q   Within the past week?

A   Yes.

Q   Okay.  And you were asked the following question, series of questions:  Did Scott have that foot

Brandner001379

136

drop, as far as you could tell, before the surgery performed by Dr. Sharpe?

Answer: No.

What do you mean by foot drop?

Answer: There are, there are nerves that control the flex in a foot and because the bone had been twisted and the -- there was a callus on it, it had put pressure on those nerves. And Dr. Sharpe had said that when he moves it back into alignment and corrects all that, that those particular nerves might be very stretched and might be damaged pause of that, and that's what happened.

Did I read it correctly?

A    Yes.

MR. CRAWFORD:  That's all I have.

Thank you, your Honor.

THE COURT:  Redirect.

MR. CAUSEY:  Thank you, your Honor.

REDIRECT EXAMINATION

BY MR. CAUSEY:

Q    Kim, I'll be brief.  I just had a couple of

Brandner001380

137

things I wanted to clarify.

The Page 51 conversation that you were just shown, when did that take place, the conversation you were describing?

A    That conversation about nerve drop?

Q    Let me show it to you.  I don't want anybody guessing here.  I want you to see.

It was just up on the board and counsel was just reading it.

A    Okay, yes.

Q    Let me show you here, I think it's lines -- you're being asked, at that time, your understanding of foot drop.  In Lines 7 through 13, you describe communication with Dr. Sharpe.

When did that take place?

A    That was when he was telling me, after surgery, what he thought had happened to Scott's foot and nerve.

Q    And quite frankly, the question there, which is what do you mean by foot drop, the attorney asking that question isn't asking your understanding of it before the surgery versus after the surgery.

Was that your understanding?

A    Correct, he wasn't doing that.

Q    He was asking you as of that day --

A    Right.

Brandner001381

138

Q  -- is that your understanding?

A  That's what I thought.

Q  You were asked some questions about this five-month period of time during the decision making process on whether or not to go forward with the surgery.

Do you recall some questions about that five months?

A  Yes.

Q  And I also have that here. This was up on the screen -- I'm going to have to zoom down, a little bit, excuse me. It goes all the way to zero. Okay. Let me zoom in a little bit. It's a little fuzzy, but we've seen it before.

This was up on the screen. You were being asked about that five month period of time. That's the period of time between the Dr. Matthews surgery and the Dr. Sharpe surgery, is that correct, or the decision to go forward with the Dr. Sharpe surgery; correct?

A  Right.

Q  January to June, roughly, is that your understanding?

A  Right.

Q  And during that period of time, did Dr. Sharpe or anyone discuss with you that, during this period of time, let's cut down on the activity, see if that reduces the

Brandner001382

139

pain, see if we can let the fracture heal? Was there any discussion about that?

A No.

Q Did Dr. Sharpe discuss that with you?

A No.

Q Had anyone, at any time during this process, told you Scott's being to active, he shouldn't be this active? And I'm talking about health care providers, any of these doctors?

A No.

Q As you were shown earlier during some of the records, and you were asked questions about it, when you went to see Dr. Sharpe and Dr. Dinowitz initially, there were discussions about Scott's activities, weren't there?

A Yes.

Q There were a lot of questions about your recollection of the April 11 meeting or lack thereof, and back and forth.

My question is real simple, prior to the surgical procedure, whether it was Brian Sharp or Dr. Sharpe, and whether it was April 11 or June 6, okay, did anyone tell you that your son could lose loss of function of the foot, if a specific nerve at issue was damaged?

A No.

Q Did you -- I assume, therefore, you did not

Brandner001383

140

weigh that in your decision making process?

A    No.

Q    So everything else that you answered questions to about belief in the doctor, we didn't want it to go that way, missing from that puzzle was that information; is that correct?

A    Absolutely correct.

MR. CAUSEY:  Just a moment, your Honor.  I'm sorry. I think I'm about done.

THE COURT:  It's all right.

BY MR. CAUSEY:

Q    Kim, you were asked some questions about what was discussed prior to the surgical procedure, with respect to nerve injury risks.

You were asked that on cross examination.  Do you recall those questions?

A    Yes.

Q    Do you recall, at the first deposition that was taken in this matter, January 29, 2004, being asked a question about whether you had talked to Dr. Sharpe -- I got to back up to make sure I put it in context — whether there was any doubt in your mind that the nerve injury occurred during Dr. Sharpe's surgery.

Do you remember being asked about that?

A    I'm not positive.

Brandner001384

141

Q    Let me show you.  This is a Page 99, then 100.
Right here we see the question from the attorney — and I'm
skipping through the oh I forgot... says:  Is there any
doubt in your mind that the nerve injury occurred during Dr.
Sharpe's surgery?

Objection.

This says:  I think it happened before the leg
had to be re-broken.  I think it happened because the leg
had to be re-broken, and I think that it happened because
everything had to be moved.

Do you see what I'm referring to?  It's a
little fuzzy, I apologize.

A    Yes, I see.

Q    Let's see if I can auto focus.  I didn't gain
much.  Hang on just a second.

Do you see what I'm referring to?

A    Yes.

Q    Those were the questions you were asked and
those answers were correct and accurate at the time?

A    Yes.

Q    Let me show you the next page because the
conversation continues on.  It says:  Did you talk to Dr.
Sharpe about that?

And you say, that's right after your answer, I
think it happened because the leg had to be re-broken or had

Brandner001385

142

to be removed... did you talk to Dr. Sharpe.

He had warned us prior to that, you know, movement of the bone, when he had to put back in the place, could cause various things. He went through a list of many things.

Did you talk him about it afterwards?

He, in the context of how it did happen, how did this happen, yes.

What did he say?

He said because of having to twist the bone back into place there, you know, was some movement of the nerve that might have been stripped. And so when he put it back, it didn't come back where it was supposed to be.

Do you see what I'm referring to?

A    Yes.

Q    Those conversations that you're, that you're answering these questions, the communications that you're talking about, when did those take place?

A    After the surgery.

Q    We discussed earlier that there were a couple of communications after the surgical procedure. And that the first one was, if I remember your testimony correctly, correct me if I'm wrong, basically let's wait and see if the epidural goes off, wears off, and see what comes back?

A    Right.

Brandner001386

143

Q    And then I believe you told me that later on there was a discussion where the doctor was telling you what it might be, what he thought it might be?

A    Right.

Q    And then subsequently there was a little more confirmation of what I do, in fact, believe it is?

A    Yes.

Q    This was a progression of communications?

A    Yes.

MR. CRAWFORD:  Your Honor, object to the continued leading.

THE COURT:  Sustained.  I know you're trying to move quickly.  Sustain the objection.

MR. CAUSEY:  I apologize, your Honor.  Do you want me to rephrase that one?

THE COURT:  Please.

BY MR. CAUSEY:

Q    Was there a progression of communications after the surgery, where that information was provided to you?

A    Yes.

MR. CAUSEY:  That's all I have, your Honor.

THE COURT:  Ladies and gentlemen, before we let Miss Clark step down, did you have questions for her?  No?

All right, very good.

Then Miss Clark, thank you, you can step done.

Brandner001387

144

Counsel, do you wish to excuse Miss Clark?

MR. CAUSEY: I do, your Honor. And once that done may we approach?

* * * *

Brandner001388

145

CERTIFICATE

I, Lisa H. Vitoff, do hereby certify that the foregoing pages constitute a full, accurate computer transcription of my stenographic notes taken at said time and place, all done to the best of my skill and ability.

DATED this 2nd day of February 2010.

Lisa H. Vitoff, CPR
Official Court Reporter
CRR No. 50521

Brandner001389

DR. PATRICK BRANDNER     AUGUST 5, 2005

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

███████████████████ individually
and as parents and guardians, and
███████ a minor,

Plaintiffs,

vs.

No. CV2003-017451

ANDRE MATTHEWS, M.D., and JANE DOE
MATTHEWS, husband and wife; KIPLING P.
SHARPE, M.D., and JANE DOE SHARPE,
husband and wife; BAYWOOD ORTHOPEDIC
CLINIC, an Arizona Corporation;
MEZONA ORTHOPAEDIC, an Arizona
Corporation; VALLEY LUTHERAN HOSPITAL,
an Arizona Non-Profit-Organization,
et al.,

Defendants.

DEPOSITION OF

DR. PATRICK BRANDNER

LAS VEGAS, NEVADA

AUGUST 5, 2005

At 1:59 p.m.

ATKINSON-BAKER, INC.
COURT REPORTERS
500 North Brand Boulevard, Third Floor
Glendale, California 91203-4725
(818) 551-7300

REPORTED BY: MARGIE L. CARLSON, C.C.R. No. 287

FILE NO.: 9F03779

Page 1

Brandner001390

9F03779
DR. PATRICK BRANDNER    AUGUST 5, 2005

**-- APPEARANCES --**

FOR THE PLAINTIFFS:

LAW OFFICES OF KOELLER, NEBEKER, CARLSON & HALUCK, LLP
BY: CHRISTOPHER GRAHAM, ESQUIRE
3100 North Central Avenue
Suite 2300
Phoenix, Arizona 85012

FOR THE DEFENDANTS SHARPE AND MEDONA ORTHOPAEDIC:
LAW OFFICES OF CRAWFORD & KLINE, P.L.C.
BY: BRUCE D. CRAWFORD, ESQUIRE
1920 East Southern Avenue
Suite 101
Tempe, Arizona 85282

Page 2

**INDEX**

WITNESS: DR. PATRICK BRANDNER

| EXAMINATION | | PAGE |
|---|---|---|
| BY MR. CRAWFORD | | 4 |

| EXHIBITS NUMBER | PLAINTIFFS' DESCRIPTION | PAGE |
|---|---|---|
| | (NONE) | |

| LETTER | DEFENDANTS' DESCRIPTION | PAGE |
|---|---|---|
| | (NONE) | |

QUESTIONS WITNESS WAS INSTRUCTED NOT TO ANSWER:
(NONE)

INFORMATION TO BE SUPPLIED:
(NONE)

Page 3

PATRICK BRANDNER,
having been first duly sworn, was
examined and testified as follows:

EXAMINATION

BY MR. CRAWFORD:

Q. Could you please tell me your full name for the record, sir?

A. Patrick Brandner, B-r-a-n-d-n-e-r.

Q. And could you give me your professional address, please?

A. 2800 East Desert Inn Road, No. 100, Las Vegas 89121.

Q. You have been retained as an expert witness by the plaintiffs in this case, is that correct?

A. Yes.

Q. I assume you have had your deposition taken many times?

A. Yes.

Q. Do you feel comfortable that you understand the basic guidelines of a deposition?

A. I do.

Q. Let me just remind you of one, and that's this, if you do not understand one of my questions tell me, don't answer it, just let me know you have a

Page 4

problem with it so that I can rephrase it, okay?

A. Yes.

Q. If you go ahead and answer a question without indicating you have a problem, I'm going to assume that you understood it, fair enough?

A. Fair.

Q. Doctor, we asked you to bring your complete file related to this case with you today. You have brought some things, but I understand in some off-the-record discussions you have not brought everything, is that correct?

A. I brought everything that I had available. I'm not sure where the other file is, whether we sent it back earlier than when we received the request or the subpoena.

Q. Subpoena by who; do you know?

A. Well, I'm saying it's a subpoena I assume that, the notice of the deposition.

Q. Okay. Okay. So you believe there are some additional medical records you have reviewed which you do not have here today?

A. Correct.

Q. Can you tell me what the health-care provider was?

A. Well, I recall the hospitalization under

Page 5

2 (Pages 2 to 5)

Brandner001391

9F03779

DR. PATRICK BRANDNER     AUGUST 5, 2005

Dr. Sharps and the records from the hospital, progress notes. I believe that's all.

Q. So you are talking about the hospital chart for the surgery that Dr. Sharpe performed?

A. Correct.

Q. And did it appear to you based on your knowledge of what's typically in a hospital chart that you were provided with a complete copy?

A. It appeared so.

Q. There were nurses' notes, doctors' notes, orders, things like that?

A. Correct.

Q. And that's the part of what you have been sent that you do not have and you are not sure exactly where it is today, fair?

A. Correct.

Q. I noticed while reviewing your file that you had some records from Dr. Sharpe's office, correct?

A. Correct.

Q. As far as you understand were you provided with a complete copy of Dr. Sharpe's office records?

A. As far as my understanding, yes.

Q. What other health-care providers' records have you reviewed?

Page 6

A. Repeat the question.

Q. Look at that disclosure statement. It lists some medical records you have been sent. Do you see that?

A. Correct.

Q. You have reviewed some records in addition to what's listed there, and you have told me about that on the record.

A. Correct.

Q. Are there any records from any other health-care providers that you have reviewed in this case?

A. No.

Q. So what you have told me on the record and then what's listed in that first supplemental disclosure statement would be exhaustive of the medical records that you have seen?

A. To the best of my knowledge, yes.

Q. Now, it also indicates that you reviewed some radiological studies.

A. Yes, there was also the CT scan and plain X-rays. I don't remember the radiologists, but there were some studies.

Q. Okay, you were actually brought the films at some point or sent the films at some point?

Page 8

A. I reviewed some records from Dr. Peter Mitchell.

Q. Okay, I saw those in there too, in fairness to you.

A. And the original orthopedic surgeon, and I'm blocking his name right now.

Q. Dr. Matthews?

A. Matthews. Of course the hospital records contained other consultants that came in on the case while the plaintiff was hospitalized.

Q. From?

A. Infectious disease.

Q. You mean subsequent to Dr. Sharpe's surgery?

A. Correct.

Q. Yeah, those were contained within the hospital chart.

A. Correct.

Q. Let me show you a document I received from plaintiffs' counsel. It's the plaintiffs' first supplemental disclosure statement. They have listed some records. You have identified some of those. It sounds to me like you have reviewed some additional records that you have told me about on the record today; is that correct?

Page 7

A. Yes.

Q. Do you still have those or did you send those back?

A. The films I had were the plain films, preop and postop, of _____'s tibia and fibula fracture. Those are in my vehicle, and my wife took my vehicle this morning because of a sticker getting into a controlled area for a home development and I didn't know that, so I do have the X-rays, and they are traveling somewhere around the city right now.

Q. Okay, traveling somewhere around Las Vegas.

Do you recall having made any markings on those X-rays to demonstrate anything?

A. Absolutely not, no, I did not.

Q. Would any of the records that you have here today tell us the dates of those X-rays and CT scans that you have seen?

A. Yes, the CT scan report is in these records, and I can't remember the date.

Q. Okay, so there was a preop CT scan for planning purposes or are you talking about a postop CT scan?

A. I think it was a preop CT scan for planning purposes.

Page 9

3 (Pages 6 to 9)

Brandner001392

9F03779

DR. PATRICK BRANDNER    AUGUST 5, 2005

Q. Did you see the spiral images as well?

A. I have the report of the spiral images. To the best of my recollection those were included in the hard films that I reviewed.

Q. I'll let you and the attorney figure it out. I would like to know the dates of the X-rays that you have seen and what views you have seen.

A. Okay.

Q. And I don't know if it's easiest for you to just send them back to plaintiffs' counsel and he can let me look at those or you can simply provide a list. I don't know what's the easiest.

A. It would be easiest for the plaintiffs' counsel to -- I think you have a record of what was sent. I know the films I can give you today on the tibia, pre- and postop. I don't remember the exact date on the reconstruction CT X-rays, and I believe there was such a voluminous amount of records that some of them may have been sent back because we can't store them, and I certainly don't want to take the chance of losing them.

Q. Do you have a recollection of seeing the plain X-ray views that were taken at Mezona Orthopaedic the first time ███████ was there when he saw Dr. Dalovitz on I think it was March 22, 2002?

Page 10

A. To the best of my recollection those are the X-rays that I have, and I looked at those as late as last night in preparation.

Q. And those I presume are things that you were sent originally when you first reviewed this case, both the records and the X-rays?

A. Yes.

Q. Have you reviewed anything in terms of specific medical literature that you think is relevant to this case or your opinions?

A. I did review the basic literature on the peroneal nerve, the complexity of the structure and the anatomy and the actual microscopic anatomy, histology.

Q. Did you go to a textbook?

A. Yes, I did.

Q. What textbook?

A. It was the -- the authors. I believe it's both Roger Mann's textbook on the foot and ankle and lower leg, and it was the foot and ankle, three volume text. I can give you the cover page and copy it. I don't remember the authors. It's well-known foot and ankle experts known nationally. I have it. I own it. It's probably more volumes now because mine's probably ten years old, but I can easily copy the

Page 11

cover page and provide that for you.

Q. That could be great if you could just copy the cover page of both texts and send them to counsel, that will be helpful, and although it's a ten years old, the structure of the peroneal nerve hasn't changed.

A. Correct.

Q. And you specifically referenced the pages that deal with the anatomy of the peroneal nerve?

A. Yes, I did.

Q. Anything else?

A. Any other literature?

Q. Or anything within those texts that you specifically looked at. I don't know, for example, is there something in there about surgical technique or something like that?

A. There was some discussion about reconstruction for tendon transfer that I looked at, but I didn't go in depth on that.

Q. So primarily what you were looking at is simply refresh yourself again the distribution of the peroneal nerve?

A. Not only distribution, but the histology, why the peroneal nerve is susceptible to injury, at least in the best understanding of anatomists and basic science.

Page 12

Q. Fair enough. Any other literature you have reviewed?

A. No.

Q. In terms of depositions, it appeared to me that you had reviewed Dr. Sharpe's deposition before he was actually a defendant in this case when Dr. Matthews was the defendant?

A. Yes.

Q. And then you reviewed the depositions of ███████████████████████?

A. Yes.

Q. Is there any other deposition testimony you have seen or reviewed?

A. To the best of my recollection there is not.

Q. And then there appear to be some miscellaneous legal documents in there, including the summary of other experts' opinions including the defense expert, correct?

A. Correct, and I want to clarify. I'm not sure if the deposition of Dr. Sharpe's was before he was a defendant. I think it was after he was a defendant.

Q. It has to have been before because he hasn't had his deposition since he has been sued.

Page 13

4 (Pages 10 to 13)

Atkinson-Baker, Inc., Court Reporters

1-800-288-3376

134

Brandner001393

9803779

## DR. PATRICK BRANDNER    AUGUST 5, 2005

A. Well, it's a deposition of Dr. Sharpe. I know that.

Q. And then you have seen the summary of the defense expert's opinions?

A. Yes, I have.

Q. Is there anything else that you have been sent to review or that you have relied upon for purposes of any opinions that you have in this case?

A. No.

Q. And then I put separately, there is a manila folder here with some correspondence in it, and then we took some of the cover letters and included those, and I'm going to, hopefully we can get those copied before you leave today.

Are there other cover letters that you have been sent that may be with other records or with those X-rays?

A. There may be, but it would be again identifying any records that I was being sent for review, and there was no other — it was after I accepted the case as an expert witness, and it didn't give any other information in the letter to the best of my recollection.

Q. Fair enough. If when you go looking for those X-rays or those records you find any additional

*Page 14*

contacted about looking at this case and giving an opinion appears to have been October, 2004; is that fair?

A. Let me see that letter.

Q. Sure.

A. Well, I don't know the legal aspects of what it means to be retained. I believe this letter introduced the case to me. My instructions were that I would look at this case, determine on where I felt problems were and if I was needed as an expert I was going to discuss it further because the initial presentation of the case to me was, didn't seem to be out of bounds by either orthopedist, the initial presentation on discussion, so I wanted to get into this case further. It's a fine line case.

Q. I think I understand.

A. This letter introduced, I believe this letter introduced the case to me. I don't think I accepted the jersey and the number.

Q. I think you are thinking I'm being sneakier than I really am.

A. No; no; no, I know the first letter was written to me, and I can't remember the date, but I basically reviewed a lot of records before I came on to this as an expert.

*Page 16*

cover letters, would you make a copy and send those on to plaintiffs' counsel as well?

A. Yes, I will.

THE WITNESS: There will be a list of things out of this deposition that you will send me?

MR. GRAHAM: Sure.

MR. CRAWFORD: Right now it's the X-rays.

THE WITNESS: The cover letters.

MR. CRAWFORD: And then those two textbooks, just the cover pages.

Q. It appears to me that you were first retained in October, 2004, and just going by the first cover letter to you; is that correct?

A. I don't know what that cover letter says, but if the initial discussion was that I would look at the case, I didn't accept it until I looked at the case and defined what the exact problems would be, so if that's the initial letter, I didn't agree to be a plaintiff's expert until I reviewed it, and I believe I may have reviewed it and then said, "Okay, I will take it," but I defined what I was going to look at and testify to.

Q. Okay. I appreciate your answer, I know, you are trying to be helpful. What I was really trying to find out is the first time you were

*Page 15*

Q. Okay, I understand. Your first contact with the case was October, 2004.

A. I don't know. The letter obviously speaks for itself. I cannot recall dates with this case. There were a lot of letters and there was a lot of discussion.

Q. At some point you were sent some initial records to review?

A. That is correct.

Q. And you are telling me that you did not agree to be an expert witness in the case until, quote, more information was provided?

A. Until more — well, until I defined the case further, but, and again I'm not, I don't know the legal aspects of when you are accepted as an expert or when you are not accepted as an expert, and I can't remember the exact dates. I do know in my mind before I told Mr. Catsey, "Okay, I will testify and be an expert," there was discussion about whether I would take the case or not based on the information I received and looked at.

Q. Let me see if I understand it correctly. You are sent some records. You look at those records, and they included the records of Dr. Matthews, Dr. Sharpe, and the operations that they were both

*Page 17*

5 (Pages 14 to 17)

9F03779

**DR. PATRICK BRANDNER     AUGUST 5, 2005**

Involved with, correct?

A. Correct.

Q. And based on that review it didn't appear to you that either Dr. Matthews or Dr. Sharpe had done anything wrong, fair?

A. I didn't see where there was gross malpractice at that point by any physician.

Q. What do you mean by gross malpractice?

A. Gross malpractice is a term that is always used when you are defending some case in my experience against an accusation of malpractice.

Q. People use different terms based on the cities they are in, and it can mean something different. You are just talking about you didn't see that somebody fell below the standard of care?

A. Correct.

Q. And then you basically said, "I don't see based on what I've read here malpractice," and you said, "Before I get involved as an expert I need some more information"?

A. That is correct; that would be an accurate depiction.

Q. And the more information you got was what? Was it discussions with Mr. Causey basically?

A. It was depositions. It was, it was further...

Page 18

records regarding informed consent on Dr. Sharpe's, in Dr. Sharpe's records. And I don't know if it was postop hospital records or not. I can't recall, but there were further records to define informed consent.

Q. The only deposition you could have been provided would have been Dr. Sharpe's because that was the only one that had been taken at that point, so I assume you asked for Dr. Sharpe's deposition?

A. Oh, absolutely. I wanted to see Dr. Sharpe's deposition, and I wanted to see records regarding informed consent.

Q. So the records regarding informed consent would be what's in Dr. Sharpe's office records before surgery and then is there an informed consent form or something like that perhaps in the hospital chart?

A. That's correct.

Q. But you had the preoperative office records from Dr. Sharpe, and you know what they said on informed consent?

A. I had some, but in my mind to the best of my recollection in the chronology of the case I required more records before making a decision to be an expert in the case.

Q. And did you need to get, beyond these records you were provided or Dr. Sharpe's deposition

Page 19

did you still need some information from Mr. Causey that was not contained within these records before you were willing to act as an expert?

A. To the best of my recollection I wanted to see mainly the depositions, particularly the plaintiff's deposition and the parents' deposition to try and define what their understanding of nerve injury was.

Q. But you were disclosed as an expert in this case before their depositions were taken; are you aware of that?

A. No, I wasn't aware of that, and basically in my mind it was sort of an ongoing running decision I was going to make if I was going to be an expert or not.

Q. You have now reviewed the depositions of the ████ family.

A. I have.

Q. You have seen what they have to say about issues that would fall within the rubric of informed consent?

A. Yes.

Q. Do you still believe Dr. Sharpe fell below the standard of care?

A. Yes.

Page 20

Q. And is it because they dispute what's been disclosed on behalf of Dr. Sharpe in terms of whether they were told about a risk to the peroneal nerve?

A. Specifically my problem is that peroneal nerve is not stated specifically to the plaintiff or their understanding was they state that they never heard the word peroneal nerve or drop foot, and basically the bottom line is that that is the nerve you are worried about and that is the nerve that will be injured if you state nerve injury in informed consent. That's the only real nerve that you are worried about. It's not going to be the tibial nerve. It's going to be the peroneal nerve, and although surgery may be a choice in the treatment of this type of case, peroneal injury needs to be emphatically discussed and so everyone understands what peroneal nerve injury means.

Q. Okay. I appreciate your answer, but what it comes down to in terms of whether you believe Dr. Sharpe fell below the standard of care or not in this case is whether basically the jury believes what the ████ have to say or the jury believes what Dr. Sharpe has to say.

MR. GRAHAM: Form.

A. By golly, that is exactly what I said to

Page 21

6 (Pages 18 to 21)

Atkinson-Baker, Inc., Court Reporters

136

1-800-288-3376

Brandner001395

DR. PATRICK BRANDNER     AUGUST 5, 2005

Wade Causey.

MR. CRAWFORD:

Q. Because you have seen the disclosure of Dr. Sharpe's anticipated testimony specific to that point?

A. Correct.

Q. So in your mind this whole case rises and falls on whether the ▮▮▮ are accurate or not on the peroneal nerve issue?

A. Well, the whole case rises and falls on what the jury believes whether peroneal nerve was stated or not.

Q. Okay, but you can't make that decision as an expert in terms of your opinion that Dr. Sharpe fell below the standard of care; it's dependent on whether the ▮▮▮ testimony is accurate or not, fair?

MR. GRAHAM: Object to the form.

A. I don't think that's ever going to be able to be decided. Dr. Sharpe says, he stated, "I discussed the peroneal nerve injury." According to my understanding of looking at the ▮▮▮ ▮▮▮ deposition as well as his parents, they have no knowledge of peroneal nerve nor drop foot. Is it a he said she said case? I would state in a nonexpert,

nonlawyer stance that, yes, it looks like that. I don't dispute that Dr. ▮▮▮ claims he says peroneal nerve.

MR. CRAWFORD:

Q. Dr. Sharpe. You said ▮▮▮

A. Dr. Sharpe.

Q. And I'm not asking you to be the decider here about who is telling the truth, okay. You are right, a jury is going to decide that issue. My point is if the ▮▮▮ are wrong, if their memory is incorrect, they were told about potential injury to the peroneal nerve and the possibility of drop foot, then you have no criticisms of Dr. Sharpe, fair?

A. Fair.

Q. Have you ever expressed an opinion that Dr. Matthews did anything wrong?

A. No.

Q. Did you see when you were first sent materials in October, 2004, Dr. Matthews had already been sued and they were basically asking you to comment on his care?

A. Yes, I understood that, and that's why I didn't accept the case.

Q. Let me do some more housekeeping. What will your charges be to come to Phoenix, Arizona, and

testify at trial?

A. Cost of hotel, cost of flight, a full day is $8,000 to testify.

Q. Is there any charge for travel time on top of that or is that the charge?

A. Well, yeah, I'll charge what the lawyers charge, from the time I leave my front door to go to the airport and the time I get back to my front door. I don't know.

Q. I'll trade you.

A. I'll find out what the standard is, I've never traveled to give testimony.

Q. We are just kidding here.

Your charge for coming to Arizona to testify would be $8,000 because you are going to miss a whole day of work?

A. Correct.

Q. On top of that there will be some hourly charge for travel time?

A. Correct.

Q. And then costs on top of that?

A. Correct.

Q. I have been provided by plaintiffs' counsel, Dr. Brandner, a listing of some cases that you have been involved with in the past.

A. Oh, good, I don't have that.

Q. Let me just show it to you. I think you sent it to them, and they sent it in March of 2005?

A. Yes.

Q. What I'd like to know, have you ever testified in a medical malpractice case before on the issue of informed consent?

A. Yes.

Q. Do you know which cases out of those?

A. Yes, there is two. Well, from the best of my recollection there is only two medical malpractice cases I've been an expert in and two — let me put it this way, there are two that I remember being expert witness in that involved malpractice against or I was the plaintiff's expert, and that was a case against Andrew Welch and a case against Hisham Hla, H-l-a.

Q. Are those M.D.s to your knowledge?

A. They are both orthopedic surgeons here in Las Vegas. I'm sorry, there is one more, and this involves the case you have here, Brenda Page, and that was against Dr. Entagar, E-g-t-a-g-a-r, I think.

Q. M.D. again?

A. Yes, an orthopedic surgeon. Those are the three that stand out that I was expert in. As far as those three, as far as informed consent, you know,

Brandner001396

9F03779

DR. PATRICK BRANDNER          AUGUST 5, 2005

that's a fine line question because two of them involved whether the patient knew that they might have a complication. There were complications in both cases, so none of the cases were exactly like this where you go in and look in the records and see that there is a claim of informed consent on one side and an absence of knowledge of informed consent on the other, none of them are that discrete, but there were complications in both cases and both of them involved whether the individual knew that there would be problems if they had surgery.

Q. All right, so to that extent they involved informed consent?

A. Yes.

Q. Now, do you remember the defense attorneys that took your depositions in those cases?

A. One, that one attorney for -- no, I don't remember the defense attorney. I can give you the plaintiff's attorney.

Q. Okay, who is the plaintiff's attorney?

A. The plaintiff's attorney for Hito was Bob Vannah.

Q. B-a-n-a?

A. V, as in victory, V-a-n-n-a-h.

Q. Is he from here?

Page 26

A. Yeah, and I don't remember the other, and I think that was Vannah was for Dr. Hito, was against Dr. Hito.

Q. How about Welch?

A. I don't remember who that was. That was over ten years ago.

Q. How about the last one?

A. No, I don't remember.

Q. Were all of these cases up here in Las Vegas, the normal court system?

A. Correct.

Q. I've also been provided with a copy of your curriculum vitae. Let me show you. What I would like to know is whether it is current. There is one attached, Doctor, to the plaintiff's first supplemental disclosure statement and if you could just take a look at it and let me know whether it appears to be current.

A. The staff privileges have changed since you have gotten this. Actually the staff privileges have become a little bit in flux because of the malpractice situation here in town and the fact that the group doesn't take emergency call any longer, so I am not on staff at Sunrise Hospital. I am not on staff at Sunrise MountainView Hospital. I am not on staff at

Page 27

Valley Hospital, and I am regaining staff privileges as we speak at Desert Springs Hospital. Formerly they didn't have any orthopedic surgery for their emergency room, and now they are opening up for orthopedics again so they are asking for staff privileges. I am on staff at Southern Hills Hospital, which is a new hospital here in town.

Q. Do you have an updated curriculum vitae?

A. Dee Kleindorfer, my medical-legal secretary, should have provided. This may have been sent out before we just changed it, but the hospital staff privileges have changed quickly in this town.

MR. CRAWFORD: Counsel, can you give me a copy of the current CV?

MR. GRAHAM: All right.

MR. CRAWFORD:

Q. You say the hospital staff privileges situation has changed because of the malpractice situation you have up here and because you guys don't take trauma call?

A. We don't take trauma call any longer, and a lot of surgery by my group has been switched to outpatient surgery, so we have our own surgery center or we have a surgery center as part of our building and our practice.

Page 28

Q. First off why is the group not taking trauma call anymore? Just give me the short summary.

A. They don't want to take trauma. Trauma is, this is becoming a major situation in town that it's not, it's not necessarily covered. I'm sure it's the same situation in Phoenix or any major city. It will eat up a significant amount of your professional time, and it will cut into your practice, and your private practice can literally be turned upside-down.

Q. What do you mean it's not covered?

A. A lot of it is not insured, and we don't have any way to --

Q. Get reimbursed?

A. Well, reimbursement is one thing, but there are also some socioeconomic problems involved. For instance, cut flexor tendons, and if you are on call for a, for instance, cut flexor tendon in the hand which is treated by the emergency room, a bandage is slapped on it, but they have to go back and get it fixed, and they are uninsured, you are responsible for that individual, and the hospital does not have to take them back, so that is a socioeconomic problem that's been dumped on physicians to figure out a way to treat these people.

Q. And then the other issue you said is the

Page 29

8 (Pages 26 to 29)

Atkinson-Baker, Inc., Court Reporters

138

1-800-288-3376

Brandner001397

**Page 30**

malpractice situation. How does that have anything to do with the staff privileges?

A. There is a tremendous amount of malpractice involved or a tremendous amount of malpractice allegations involved with severe trauma. In other words, significant polytrauma, infection, gunshot wounds, a lot of times these are uninsured individuals, and there can be a lot of complications involved that you are liable for.

Q. So you are just saying it's not worth it?

A. I'm saying that your malpractice can go up significantly, and it's unaffordable.

Q. Your malpractice premiums can go up significantly if you take trauma call?

A. Correct.

Q. And these hospitals basically say "If you don't take trauma call here you are not going to be on staff"?

A. It used to be like that. They are starting to change that now.

MR. CRAWFORD: Off the record.

(Discussion off the record.)

MR. CRAWFORD: Back on the record.

Q. What specific information did you need and finally get from some source before you agreed to be

**Page 31**

an expert and give the opinion that Dr. Sharpe fell below the standard of care?

A. Well, let me put a caveat on that, and I'll answer your question. If Dr. Sharpe did not discuss specifically peroneal nerve injury and drop foot, if, then it's below standard of care, in my opinion. Now, what I needed to see was mainly the depositions of all of the involved individuals in the case, Dr. Sharpe, ████████████████████, to try and figure out if there was informed consent. The supposed position of the tibia when I looked at it was not so bad in my mind and my experience that it could not have gone on to heal and not been a problem. I also needed to look at the discussion surrounding the family as to why they felt they needed to have this fixed. I wanted to see what activities were involved in causing pain, what level of activity ████ was involved in, what his plans were for the future, if he was a potential college scholarship, those kind of things, because all of that in my mind had a lot to do with whether that treatment, surgical treatment, was chosen.

Q. Okay. You signed an affidavit in this case indicating that you thought Dr. Sharpe fell below the standard of care because there was not a specific

**Page 32**

discussion of potential injury to the peroneal nerve and its consequences and that was before the ████ depositions occurred, so were you told something by plaintiffs' counsel to fill in the gap in terms of what these people were or were not going to say once they were deposed?

A. No, I was told that peroneal nerve — well, what I was told was the peroneal nerve specifically was not discussed and drop foot was not discussed.

Q. So you asked Mr. Causey flat out, "I need to know what their position is in terms of whether this was discussed or not before I would be willing to be an expert"?

A. Not only that, I wanted to go back in the records after I read those depositions and look to see if the records reflected specifically a statement of peroneal nerve and drop foot.

Q. Okay. But again, and I'm not accusing you of anything so don't take this question this way, but you said in an affidavit that it was your opinion that Dr. Sharpe fell below the standard of care because he did not discuss the risk of injury to the peroneal nerve and the consequences with the family and that was before these people were deposed in this case so you couldn't have been given their depositions at that

**Page 33**

point. Did you have a specific discussion with Mr. Causey about what they were going to be saying in their deposition on that issue?

A. I asked Mr. Causey if they understood specifically that nerve injury meant peroneal nerve and drop foot.

Q. Okay, and he got back to you and said no?

A. He said that they did not. My first discussion with Mr. Causey was that, No. 1, I signed the affidavit based on some review of the records. When he was going after the first physician I looked at the records, and I called him, and I said, "No, there is no malpractice on this gentleman's part." Subsequently I guess the sites changed and from the best of my recollection there was a hard look at the records on Dr. Sharpe's side to see if peroneal nerve and drop foot was in the records despite what the deposition says, is it in the records that that was discussed? All I could find was two entries that said that gave the standard menu of things that are stated to patients before they have surgery, despite the fact that there are statements that there was in-depth discussion about this. There was nothing documented in the records as to peroneal nerve or drop foot.

Q. I'll grant you those words were not written

9 (Pages 30 to 33)

Brandner001398

9F03779

DR. PATRICK BRANDNER    AUGUST 5, 2005

In the records, but you clearly did see documentation by Dr. Sharpe before he was ever sued in this case that he had an extensive discussion with these people before surgery about potential risks and complications; he does say that?

A. He says it, yes.

Q. And he lists a number of risks and complications that he says that he told them about.

A. There is a menu of complications that are in the record, yes.

Q. Well, and you have read their depositions, the family's depositions?

A. Yes, I have.

Q. They clearly were told about those risks and complications; weren't they?

A. They were told about nerve injuries in general.

Q. Well, they were told about you could die from the surgery?

A. Yes, the menu they were told about, correct, and they admit that in the depositions. What they say they didn't understand was what nerve injuries meant. Now, that's believable. It depends on and in my practice you have to -- let's take another separate injury. Let's take an example of

Page 34

rupture of the tendon of the biceps at the elbow. Well, you can tell someone I have got to fix this, but there is a potential for nerve injury. That individual, that layperson is not going to understand what that means, nerve injury. If you tell them that the nerve in the forearm will result in weakness in extending your fingers and your thumb, and it's a known complication, and sometimes you can't avoid it because the nerve is right behind where you have to reattach the tendon, you give them an idea of what their choice is. Do they accept the weakness in their arm that's still functional or do they want to take the chance on getting it repaired. Peroneal nerve injury is a well-known injury with this kind of correction in surgery, but if you just say nerve injury to a layperson, that doesn't really register. Nerve injury is, well, I might not be able to feel something. You have got to go into depth and tell them what nerve you are worried about, what nerves in the literature is the known complication, and do you understand that there may be a problem. Then you are giving them an informed consent and choice.

Q. I understand that's your opinion.

A. That's my opinion, yes.

Q. I understand.

Page 35

A. And again I agree with you, if Dr. Sharpe said it to them then I feel badly about being an expert, but I didn't see it specifically elucidated in the hospital records.

Q. Okay, you keep referring to the lists of complications and risks that he puts in his records as a menu.

A. Okay, look on April, I remember the dates, it's April, 2002, and June, 2002.

Q. I know the dates too, but my specific, why do you keep calling it a menu?

A. Because you see it over and over in standard informed consents for the patient, death, anesthesia complications, pneumonia. You know, it's the same bundle of complications, and obviously you can't go and talk about each thing. It would take you three days. I use the analogy of you listen to these potential complications but put it in context, you also have potential problems if you cross the street with the light, you could get hit by a car, but they understand death. They may understand pneumonia or lung problems. I'm not sure they understand nerve injury, and if you have an incidence that is fairly significant with a procedure you are doing, and it's a possibility, you can't just state nerve injury in

Page 36

general. My feeling is you go into it with them.

Q. Is there any other nerve in your opinion he was required to discuss?

A. In the leg associated with this?

Q. Yeah.

A. I've never seen it, I've never read or seen an incidence of other nerve injuries associated with this surgery.

Q. My question was-was he required to discuss any other nerves?

A. I think that's going to depend upon your community standards as far as what your jury thinks. I don't think you can discuss every possible scenario. You discuss the obvious ones, and if the discussion of the obvious one is general you go into specifics.

Q. I understand. I'm just trying to find out in your opinion for this surgery, you have told me that you think he was required to discuss specifically injury to the peroneal nerve and its consequences, I understand that. I'm trying to find out if there are any other specific nerves that you believe he was required to discuss with him before surgery to comply with the standard of care.

A. No.

Page 37

10 (Pages 34 to 37)

Atkinson-Baker, Inc., Court Reporters

1-800-288-3376

140

Brandner001399

9803779

## DR. PATRICK BRANDNER    AUGUST 5, 2005

Q. Have you reviewed the orthopedic literature specific on informed consent and how people forget over time what they were told before surgery?

MR. GRAHAM: Object to the form.

A. I don't know of any literature that defines the exact memory of the general population.

MR. CRAWFORD:

Q. Do you agree that ▆▆▆ had significant problems before he ever went to Mezona and saw Dr. Dinowitz or Dr. Sharpe?

MR. GRAHAM: Object to the form.

THE WITNESS: You would have to define significant.

MR. CRAWFORD: Significant to him and his parents.

A. It was significant to him in the activities that he was doing, and apparently it was significant to his mother and father. Pain is significant to people. I think you have got to put pain in a context and define and help people understand what that pain means, and if you have an understanding of it and you decrease the anxiety level, then the pain, the physical pain will decrease or you put limitations on an individual, and you again give them informed consent about what you expect this fracture to do.

Page 38

MR. CRAWFORD:

Q. This was a situation where Dr. Matthews' attempt to repair the fracture had not resulted in complete healing, fair?

A. Fair.

Q. What was the specific initial fracture that he had?

A. ▆▆▆ had a tibia and fibula fracture in the proximal third.

Q. And that was managed in what way by Dr. Matthews?

A. Closed reduction and casting.

Q. And at the time that the family started seeking other opinions, meaning someone other than Dr. Matthews, was there a malunion?

A. I would call it a delayed union. At that point in time it was mal — it wasn't united yet, but it was a malpositioned fracture.

Q. Was it a malunion?

A. It wasn't united. It was partially united so it had the potential to heal further, and it had the potential to remobilize some.

Q. How many times have you treated that type of a patient?

A. I've thought back on the number of tibial

Page 39

fractures I've done with osteotomies, and to the best of my recollection I've done five tibial osteotomies.

Q. So where you had to go in and essentially try to fix a fracture that had not appropriately healed?

A. To straighten the bone because it was in a position that was causing problems.

Q. Because a fracture had not healed correctly?

A. Correct.

Q. So about five times over how many years?

A. Twenty-five.

Q. And it's not common for any orthopedic surgeon to deal with that a lot, fair?

A. Correct.

Q. Were any of those in your training?

A. There were probably one or two in my training; but the most of them, I don't recall any of them being in private practice. I was in the army for eight years, and the remainder that weren't in my training were at the basic training facility, Fort Jackson, South Carolina.

Q. How long ago was that?

A. 1979, 1980.

Q. So it's been about 25 years since you have

Page 40

dealt with one of these?

A. Yes, since I did surgery on one.

Q. Okay, well, have you had, how many times have you had a situation like that that was presented to Dr. Sharpe before he performed surgery?

A. You mean that particular position of a fracture?

Q. Yeah. In that age person.

A. I don't think I've had any in that position in my practice.

Q. In private practice?

A. In private practice — well, at any time. I had malunions, but they weren't at that level of the tibia, and they weren't in that age group.

Q. Was there an angular deformity to tibia before Dr. Sharpe performed surgery?

A. There was 17 degrees of angulation in the plane from the frontal plane, and there was what was reported as 30 degrees of angulation in the plane from front to back.

Q. And what are you relying on, the CT scan?

A. The report of the CT scan, and the CT scan is misstated too. They call it a varus angulation. It was a valgus angulation.

Q. And that's not normal; those angulations

Page 41

11 (Pages 38 to 41)

Brandner001400

9F03779

DR. PATRICK BRANDNER     AUGUST 5, 2005

are not normal?

A. No, it's not normal.

Q. And do you believe that had this been allowed to go on for a number of additional months that those angulation deformities would have corrected?

A. I don't believe they would have corrected fully. I believe they would have corrected some. Let me put it this way, it's not basically what I believe would be the outcome. It's what I think the potential was. This individual had potential to change that fracture some.

Q. Okay, by the time Dr. Sharpe performed surgery it was about nine months down the road from the original fracture?

A. Correct.

Q. At that point the term nonunion applies, correct?

A. Yes, according to the literature nonunion is defined beyond, or a nonunion would be defined beyond six months of the injury.

Q. How much longer do you think you personally would have allowed this to go on without surgery? In other words, without going to this family and say, "Hey, we have waited long enough. This isn't going

Page 42

there is still potential for healing. There is still potential for remodeling. Surgery is an option, can be done now or it can be done in a short period of time if this goes on to show it's going to be a bad actor, this fracture is going to go on and continue to cause you problems. I would have backed him off of his high-end activity.

Q. Meaning his dancing?

A. Well, his dancing, his impact. I think he. was having, from what I could understand he was having problems with impacting this fracture, whether it be dancing or gymnastic moves or whatever, even running, but the individual, the patient has to understand that the fracture was healing. There was potential for complete healing, albeit it was nine months down the road, and there were, there would be considerations for other treatment if they found that if this thing was what we call a bad actor, was not going to heal, and it was going to be in a bad position so he continued to have pain in whatever life he chose, then you could go over the surgical option with him. Surgery was an option. It's just that you have got to understand what you're facing with that option.

Q. What if ▇▇▇ and his family said, "Dance is too important to me. I can't give up the impact

Page 44

to heal. This needs to be surgically fixed"?

A. With certain caveats, and I'll go over the caveats with you if you would like, but to answer your question specifically, with certain caveats and establishing a rapport with the family I would have watched this for another eight months to one year.

Q. What are the caveats?

A. Okay, I was hoping you would ask. The caveats would have been first and foremost explaining to the family what you think this fracture could do, i.e., go on and heal.

Secondly to explain that the activities that ▇▇ was involved in was probably causing increased symptoms, and if he would back off and put this into a scenario of use of the leg without the high-end activity that he was trying to do, we could go on and see if this would heal.

Thirdly if I had that rapport with the family and told them that they should trust the opinions I would encourage them to get other opinions, and if they had rapport with me to come back, and we could go over those opinions, surgery being one opinion, if they went out and some doctor said, "I need to fix this."

I think the explanation would have been

Page 43

dynamic of dancing and do what I potentially want to do in the future"? Now, if he says that does that put surgery higher up in terms of whether you're going to recommend it?

MR. GRAHAM: Object to the form.

A. If the individual wants to go for the quicker fix because of whatever demands he is putting on his leg, then surgery is an option with the understanding that there can be complications from the surgery.

MR. CRAWFORD: Understood.

Q. Did you see the January 2002 plain X-ray that Dr. Matthews took and compare it with the first X-ray that was taken at Mazona?

A. I did not do that so I can't say that I saw those X-rays and specifically compared them.

Q. So you don't know whether there had been a significant change between those two X-rays and how this fracture appeared or the angulation?

A. My recollection was that I looked at the X-rays that were used by the radiologist who did the CT scan to formulate his report. That's basically what I recall. I didn't look at the sequential X-rays to see what the fracture was doing over a period of time.

Page 45

12 (Pages 42 to 45)

Atkinson-Baker, Inc., Court Reporters

142

1-800-288-3376

Brandner001401

DR. PATRICK BRANDNER    AUGUST 5, 2005

Q. What impact would it have if in a two to two-and-a-half-month period of time, January, 2002, versus middle of March, 2002, there was a significant change for the worse in terms of how this fracture appeared?

A. Well, define for me the change that you understand and define for the worse.

Q. How about that the X-rays showed that he had gone into further drift?

A. I don't know what that means.

Q. Dr. Sharpe put that in his records, and in fairness you are not sure exactly what he means by that?

A. No, I don't know what that means, drift. I didn't see it drifting.

Q. Well, but did you look at the X-rays that Dr. Matthews took in January of 2001 and compare them with the plain films that were taken at Mazona when he first showed there in March of 2002? Did you do that comparison?

A. No, I told you I didn't do a comparison. All I did was look at all X-rays provided. I can't recall the dates right now, but I looked at the X-rays that were provided. I looked at the CT scan, and my feeling was that this fracture had the potential to

*Page 46*

Dr. Matthews. I just thought that they were confused because they weren't getting the answers that they were looking for.

MR. CRAWFORD: Off the record.

(Discussion off the record.)

MR. CRAWFORD: Back on.

Q. So you did not get the impression that the family was unhappy with Dr. Matthews' care or his recommendations at least from reading the depositions?

A. Well, unhappy, I mean you are using terms that, you are asking me for subjective statements based on my experience. Unhappy means, yes, unhappy can mean confused. I don't know if they were angry at Dr. Matthews or not. I didn't get the impression they were angry. I got the impression that they were looking for answers, and they really didn't understand what the expectation was from this type of fracture, and I understand that they looked at it and saw some deformity and were concerned about the lump in the front, and my impression was that Dr. Matthews didn't establish a relationship that they would trust him saying, "Calm down, wait, this is what the situation is." I don't think Dr. Matthews ever sat down and gave them an in-depth explanation. I'm not faulting Dr. Matthews. That might be his personality.

*Page 48*

heal and remodel further. That's all I can tell you.

Q. But you understand I need to perhaps get more specific than that.

A. Well, I can't give it to you. I can tell you that I did see where Dr. Sharpe felt it was drifting. It didn't strike me because I would have remembered that if I saw it worsening significantly.

Q. I'm just trying to find out if in fact you even looked at those X-rays.

A. Oh, I can tell you I did.

Q. So you looked at Dr. Matthews' X-rays from January of 2002, and you also looked at the ones from March of 2002 that were done at Mazona?

A. I can't give you the dates, but I looked at all the X-rays that were sent to me.

Q. But you just don't know if you got, for example, Dr. Matthews' preoperative X-rays?

A. I don't know.

Q. Fair enough. Did you glean from the depositions of the ████ that they were very unhappy with the situation and not satisfied with what they were hearing from Dr. Matthews?

A. Overall my impression looking at the cold hard deposition was that they were somewhat confused. I didn't pick up any significant animosity toward

*Page 47*

Q. Have you seen the records of Dr. Wall, the other orthopedic surgeon that they got another opinion by?

A. Yes, I did.

Q. We didn't talk about that earlier, but you didn't say you did, but you remember that?

A. Right, there were two second opinions that they got.

Q. So —

A. A second opinion and third opinion, that sounds really stupid.

Q. Well, Wall gave another opinion after Sharpe and he basically agreed surgery was the way to go. Do you understand that factually?

A. Well, there was no statement that surgery is the way to go. That's not my recollection. My recollection was that, yes, surgery could be done, and, yes, it would be done with pins or a fixator, but I didn't get the feeling from his note that he was saying, "Look, this needs to be operated on immediately."

Q. Wall, I think the only thing he said differently was that he might use a rod for fixation as opposed to pins and screws and plates.

A. Well, he said that he would use a rod, yes,

*Page 49*

13 (Pages 46 to 49)

Brandner001402

9F03779
DR. PATRICK BRANDNER    AUGUST 5, 2005

an iron rod.

Q. So you didn't get from Dr. Wall's note that he was in agreement surgery was the way to go; you didn't get that?

A. I got from his note that he discussed surgery with them, and I don't know if surgery was what they came to discuss or not. There wasn't in anything -- well, there wasn't anything in the record that he gave a list of opinions. There was just discussion of surgery. Now, whether a note out of, in the vacuum means that that's all he talked about and that was his recommendation, it didn't come across as that was the only recommendation that he was giving. It came across as that was what they wanted to discuss, what surgery would be done.

Q. Didn't the [redacted] say that in fact Dr. Wall was in agreement that surgery was the way to go?

A. Yes, it was their understanding that Wall would have operated.

Q. And you are just saying that Wall's note is not clear enough to you to get that?

A. Well, no, Dr. Wall's note is clear. You are asking -- I'm basing my reactions on these records from my own experience, and I'm not so sure that the patient wasn't coming in to discuss the type of

Page 50

surgery versus what other things could be done. It was a search for a second opinion about how the fracture could be aligned. That was my impression.

Q. You agree surgery like that performed by Dr. Sharpe was an appropriate option to offer these people?

A. Yes, it is an option, and the way he did it was appropriate.

Q. So his surgical technique was appropriate?

A. It looked excellent to me.

Q. And the fact that a complication occurs doesn't mean that Dr. Sharpe did anything wrong from a technical standpoint.

A. No.

Q. They knew that doing nothing and waiting was an option, correct?

MR. GRAHAM: Object to form.

THE WITNESS: You are asking me what they understood.

MR. CRAWFORD: Factually.

THE WITNESS: Pardon?

MR. CRAWFORD: Factually.

A. Factually Dr. Matthews had given them that choice, wait and do nothing. I mean that was what they didn't like I think.

Page 51

Q. Do you believe they understood that an option was wait and do nothing at this point?

MR. GRAHAM: Object to the form.

A. I don't know.

MR. CRAWFORD:

Q. Was there any other option or is it really just those two?

A. There really is no other option.. Either you wait and try and get that to heal or you straighten it out or you straighten it out later. Well, there is three options -- I mean there is two options, wait and do nothing and let this heal, let it remottle.

Q. Ever, don't ever do surgery?

A. Well, later on down the line, it's, yeah, wait and do nothing completely. Let's just put it this way, there are two options. You could let this heal, wait and let it heal, or you can correct it with surgery. You can correct it with surgery at that time when they were searching for it or you could wait and do surgery later. In the interim that bone had the potential to improve and the function had the potential to improve. That's my opinion, but as far as they're concerned they needed to either wait and let it see if it would heal and see if it would change

Page 52

its position, or surgery. That's what they understood.

Q. Are you going to give an opinion that it is likely that this would have gone on to complete healing, good remottling, and acceptable result without surgery?

A. I don't know. I can't say it would be likely. I can't say it would be probable. What I'm saying is that this poor kid was in the never never land of between having a child's skeleton and an adult skeleton, and there is an unpredictable amount of remottling that can occur, and obviously you want to watch this fracture. You want to let them know what you are doing, and let them know that maybe further down the line you would need surgery if this thing, No. 1, didn't heal or, No. 2, healed in a position that interfered with your normal function.

Q. Given everything you know about this case and knowing what this young man wanted to do long term, do you think it's probable he is going to end up with this type of surgery?

A. Again you can't, I can't state that to a reasonable degree of medical probability. It comes out in his deposition that what he wanted to do is be an eye surgeon, and I don't know how this leg would

Page 53

14 (Pages 50 to 53)

9803719
DR. PATRICK BRANDNER    AUGUST 5, 2005

have functioned if you are fairly sedentary on it. I don't know if the thing would have straightened more and he could have been a high-end individual where, you know, you go out and you do a lot of activity. You can't say, I cannot say how this leg would have turned out unless there is more time down the road where his growth plates completely close in all of the bones and he is truly an adult skeleton.

Q. If given where he was at, his age, he wanted to pursue dancing, and he wanted the best chance to pursue dancing immediately and not have to give up the impact of dancing, was the best option then at that point surgery?

A. Yes.

Q. And then it would go back to your proviso that there was a discussion about potential injury to the peroneal nerve, as long as he knew that?

A. Yeah, and what I'm saying, let me be clear about this. Surgery is an option at the time. Dr. Sharpe did it. It's just getting a feel for, it's the fine line of getting an idea of what your patient is involved in, how smart they are, what their understanding is of what potential problems they can have and explaining in depth what the main problem would be with operating on this fracture. It's not an

Page 54

Q. And you would agree and tell a jury that the fact that this complication occurred does not mean that Dr. Sharpe did anything wrong during surgery?

A. Correct.

Q. His postoperative care was appropriate?

A. Excellent.

Q. If given what you see in these records by Dr. Sharpe, given that and then you throw into it that he will testify that he did in fact discuss injury to the peroneal nerve and the potential of foot drop, would you agree that his preoperative discussions with these people would fall within the category of excellent as well?

MR. GRAHAM: Object to the form.

A. Yes.

MR. CRAWFORD: Why don't we take a five-minute break, Doctor. I am just going to check off things that we have already covered.

(Whereupon, a recess was taken from 3:10 p.m. to 3:14 p.m.)

MR. CRAWFORD:

Q. Doctor, Dr. Sharpe had a couple of CT scans done preoperatively for planning purposes. I assume you believe that was a good thing to do.

A. Oh, yes.

Page 56

innocuous procedure, unfortunately.

Q. You did see they agreed that he spent a fair amount of time discussing with them by showing them X-rays and drawing diagrams how this surgery would be performed?

A. I saw that in his notes and deposition, yes.

Q. Well, you saw that in their depositions as well, didn't you?

A. Yes.

Q. And he also specifically discussed that there are different opinions in terms of fixation?

A. Yes, I think I recall that.

Q. And he specifically discussed what an osteotomy is and what that means?

A. Yes.

Q. Let me just see if we can get rid of some issues in this case. You believe surgery was an appropriate option; you have told me that, correct?

A. Correct, it's a choice of treatment in this case.

Q. You believe that in this particular case the surgery that Dr. Sharpe actually performed from a technical standpoint was done correctly?

A. Yes.

Page 55

Q. In the information I've gotten before today about your opinions you described this as an aggressive surgery. What do you mean by an aggressive surgery?

A. Out of the two choices of just leave it alone and wait or operate at that point, that's the most aggressive.

Q. All right. But surgery is generally speaking always more aggressive than not doing surgery?

A. Correct, yeah, but I mean if you've got a choice between opening the skin or not opening the skin and seeing what happens understanding that surgery might be necessary in the future, well, let's put may or may not. If it's a may or may not situation in the future, it's an aggressive approach at that time.

Q. Do you agree there was the potential with this fracture that had not completely healed to the tibia that it could get significantly worse over time?

A. No, I don't think it would have gotten significantly worse than it was.

Q. So it was about as bad as you think it was going to get?

A. I think it was as bad as it was going to

Page 57

15 (Pages 54 to 57)

Brandner001404

9F03779
DR. PATRICK BRANDNER     AUGUST 5, 2005

get. It was partially united.

Q. Would you agree if you waited another eight months down the road, and he was still at the same spot in terms of not a complete union and the same angulation that that is not an acceptable result and that surgery would be the best choice at that point?

A. No, it would depend on, really a malunion depends on not necessarily what you see on X-ray if it was at the same spot on plain films and looking at it physically. It would really depend on how he functioned. If his function was interfered with with that malunion then it would be considered something you would have to fix.

Q. Let's assume that you wait the eight months. He doesn't get any better. He is at the same spot in terms of an incomplete healing. He has the same limitations on film being able to do dance and the activities he wants to do, then you would agree at that point surgery is the best option for him?

A. Yes.

Q. This fracture, if it didn't heal any more than it was healed at the time Dr. Sharpe performed surgery, in other words, if you allowed that to go on

*Page 58*

over time, that would be a very unstable tibia, wouldn't it?

A. Unstable mechanically?

Q. Yeah, for example, it would be at very high risk in a kid for refracturing.

A. Well, it wouldn't be a kid. At some point his growth plates closed. You look at the skeleton. So he is on his way to becoming an adult. Obviously you wouldn't just wait eight months and say come back in eight months and then you figure on surgery. You accept him as a patient. You follow him. So you are going to know if he is drifting any further. I'm saying he won't drift any further, but that's my opinion based on my clinical experience. It's possible that he could drift further because anything is possible, so you are watching him as a doctor. You are also establishing your relationship. Your relationship needs to be established with this family, so you can't just take this out of a vacuum. You establish a relationship with them. You give them an option, do nothing, and let's give this some time because there is a potential for remolding, but you have to back off your activity which is causing it to hurt. You have to understand that. Now, what you are saying is if this kid doesn't want to back off, if he

*Page 59*

doesn't like the looks of it, and it is unacceptable to him to wait, surgery is the only option then.

Q. Okay, fair. What I was getting at is, and let me try and go at it a different way, how long would you have to wait seeing no improvement in the situation before you would say, okay, surgery is the best way to go?

A. Six to eight months in my estimation. There is no one time you can state, but I'm looking at the X-rays of this child, this kid, and he has still got some growth in the distal femur. His tibial growth plates have closed, but he is going to grow a little bit more. The bone will remodel a little bit more. He is not truly an adult yet in the skeleton, so I don't know what would be totally acceptable. You are watching this thing. It's partially united. Obviously the two criteria you have is this thing has got to heal or, yes, it is prone to further injury potentially, and your activity level has to be defined. What are your wishes in life, what do you want to do. You have to know all these things and make sure that the family is satisfied with it, and if they have the education you teach them about the bone, and I think Dr. Sharpe tried to. The only problem I have is that the word peroneal and the two words drop

*Page 60*

foot are not in the actual records so if they are pushing and saying, Look, we don't want this right now. We don't like it, and we want to take the chance, although we don't know what the percentages are, and I'm going to protect that nerve, but you want to take the chance and we can fix it, and the peroneal nerve may or may not be stretched, we do it now, but six to eight months is what I think in my experience in treating these both open and closed that I would have given this fracture to go on and get better.

Q. When you say that there was a significant risk of peroneal nerve damage as a result of this surgery, how much of a risk are you talking about?

A. We don't know because we don't know, we don't even know why the peroneal nerve was injured. It wasn't obviously cut. It was more likely a combination of stretch and ischemia, and that's why I went and looked back at the physiology of the peroneal nerve to look back and make sure that the people who do the basic science on this nerve don't have some understanding that I didn't have, but it's a horrible problem. It can occur with any operation along the tibia but most of the time closer to the knee, and there was an attempted surgery, and there was probably a successful attempt to isolate the area where that

*Page 61*

16 (Pages 58 to 61)

Atkinson-Baker, Inc., Court Reporters

1-800-288-3376

Brandner001405

DR. PATRICK BRANDNER     AUGUST 5, 2005

nerve was and to keep it out of the surgical site. I don't think anything was done to it instrumentwise. I think the injury to the nerve occurred when that leg got straightened out, and it was going to happen whether you used a rod, whether you used an external fixator, or if you put a plate on it like Dr. Sharpe did, and we can not predict ahead of time whether it's going to happen or not. I think the incidence is definitely less than 50 percent, probably less than 20 percent or it would not be in our surgical armamentarium.

Q. You believe in retrospect the nerve was probably going to suffer this kind of an injury whether surgery was performed in June of 2002 or eight months later down the road, fair?

A. Fair. I think if this nerve was already shortened and tethered with the healing process at that point, any time beyond that point was going to damage that nerve. The problem is you can't pick out these individuals beforehand.

MR. CRAWFORD: I understand.

I'm just reading this description of some of your opinions and see if we have covered everything.

Q. Even if Dr. Sharpe wrote in his records

Page 62

that he discussed injury to the peroneal nerve and the potential of foot drop, if the family says he didn't, then you would be at the same spot?

MR. GRAHAM: Object to the form.

A. No, I would not. I would not be sitting here. If I saw peroneal nerve and drop foot in the formal medical records, I don't think there would be a case.

MR. CRAWFORD:

Q. Well, but if they say he didn't discuss that.

A. I wouldn't be an expert here.

Q. So you would believe the doctor under that circumstance?

A. My whole reason for being here is that I cannot see peroneal or drop foot in the official medical records.

Q. I just want to make sure that I'm clear on one point, you do agree that the family knew that doing nothing and waiting was an option, you are just saying that with respect to this discussion about doing surgery this additional information needed to be discussed about injury to this specific nerve and the potential consequence; is that fair?

MR. GRAHAM: Object to the form.

Page 63

A. That's fair, and to put it in laymen's terms, if I sat down with ███████ and said, "Okay, I will operate on your fracture and straighten that bone out, you have to understand there is a chance, it may be smaller than 20 percent, it may be smaller than 10 percent, I can't tell you, but there is a chance you will have permanent damage because we stretched that nerve. I'm going to protect it and I'm not going to cut it as best as I can, but you have to understand that it can be stretched, and you may have a foot that's weak, and you may not be able to do all the things you are doing now. If you understand that, we can straighten that bone out."

MR. CRAWFORD:

Q. Okay, let me role play here. I'm ███ ███ and I say back to you, "Okay, if we wait and see, does that mean that I can't do my dancing where I am doing all of these different moves, putting impact on the bone on my leg that I want to?"

MR. GRAHAM: Object to the form.

A. And I would say that everything you are doing as far as jumping and hitting that leg that is causing you pain you have to back off from. You can walk. You can do things as long as you can tolerate the pain, but I don't want you running. I don't want

Page 64

you to in contact sports, and I don't want you doing flips or dancing heavily if it's causing you pain.

MR. CRAWFORD:

Q. "Okay, the problem is, Dr. Brandner, that means I don't have any chance of going on to be a more accomplished dancer or to get a scholarship, et cetera, and I don't want that, so what do you have to offer me?"

A. "What we have to offer is surgery and straightening that bone, but if the nerve is stretched, and we can't predict it, and we can't avoid it when we straighten that bone out, and it's going to move, if it moves and it gets stretched, you will not be a dancer. You will have a drop foot to some extent, and you will not be able to run as much as you did before or dance at a high level. You have to understand that if you want me to operate on it."

Q. So if I wait this eight months I cannot do the dance at the high level, right?

A. Correct.

Q. And then if I wait the eight months and I haven't gotten any better, and we do surgery, I've got the same risk that you are telling me about now?

A. That's correct, but within that discussion is a discussion that this could get straighter, and it

Page 65

17 (Pages 62 to 65)

Atkinson-Baker, Inc., Court Reporters                    1-800-288-3376

147

Brandner001406

9F03779
DR. PATRICK BRANDNER    AUGUST 5, 2005

may heal.

Q. Understood.

Dr. Sharpe's deposition that you reviewed, there were a few highlights in there. Is there anything that you recall from this deposition of Dr. Sharpe that's specific on the opinions you have or criticisms you have of him?

A. No.

Q. And what I'm getting at is a defense attorney's fear is at trial you will point to a specific testimony in the doctor's deposition and say, "Aha, here it is. See, I told you." There is nothing like that in there, is there?

A. No, there are no surprises that I'm going to give you at trial regarding this deposition. I don't see anything that I would criticize in Dr. Sharpe's deposition.

Q. Okay, thank you.

You have never examined        have you?

A. No.

Q. And you haven't been asked to do that?

A. No, I have not.

Q. So in terms of his current functional status, what he is going to be able to do in the future, do you have an understanding or given any

Page 66

Q. Significantly abnormal?

A. Well, you've got to always compare one side to the other, and I don't know what the other normal position of the tibia was, but obviously it's not 17 degrees, so it's significant enough that you have a physical bump and that you would get some mechanical pain in the knee and possibly the ankle with activity.

Q. What long-term problems could that have caused Scott if it was allowed to go on without improvement and without surgery?

A. Okay, this is a hypothetical, but if a patient heals in that position and doesn't remodle any further, then with activity they will not have parallel joints. The knee joint and the ankle joint won't be parallel when they stand, which is going to cause increased wear and tear more likely than not on the ankle and the lower leg, and it could lead to traumatic arthritis.

Q. In which joints?

A. In the ankle, possibly in the knee but in the ankle mainly with increased activity. Obviously if you are totally sedentary you are going to get a lot more longevity out of your leg.

Q. And that's not likely given this —

A. Unlikely, but I'm just trying to give you

Page 68

opinions on that? They haven't been disclosed, but I just need to check.

A. Not unless I'm asked. I mean I can give an opinion based on the latest records and where       is at a certain time. If I see, I don't think I'm going to get any further records, I don't know if discovery is still open, I doubt it. But it appears to me that he has improved to a certain extent, but, no, I mean if asked I can give my opinion on his activity level based on what I know, but I don't think I've been asked.

Q. And in fairness it would be better to actually examine him.

A. Oh, absolutely. It's always better as a witness to have eyeballed the individual, talked to them, and examined them.

Q. In terms of the degree of angular deformity in the two planes that are in the records various people say different degrees of deformity. Did you see that?

A. No, all I saw was, what stuck in my mind, and I think it's correct, 17 degrees of angulation in one plane and 30 degrees in another plane.

Q. Is that significant?

A. Yes, it's significant.

Page 67

the scenario.

Q. I'm just saying given his age it's unlikely he is going to lead a totally sedentary life.

A. Correct.

Q. Are there any other opinions that you understand you are going to be offering in this case that we have not gone over today?

A. No, and there is only two opinions I have, and it's no surprise to you, and I'll restate them at the end of this if you would like.

Q. I know what your two core criticisms are. Surgery was an option but so was waiting and seeing if this got better on its own.

A. Okay.

Q. And that needed to be discussed, and if surgery is going to be undertaken then you also need to explain to the patient that because of this type of surgery there is an increased risk of injury to the specific nerve called the peroneal nerve, and if it gets injured here is the consequence, i.e., drop foot?

A. Perfect, that's it.

MR. CRAWFORD: Okay, then it was a pleasure meeting you, and I think I am done.

Do you want him to read and sign or do you want to waive?

Page 69

18 (Pages 66 to 69)

Brandner001407

DR. PATRICK BRANDNER      AUGUST 5, 2005

MR. GRAHAM: It's up to you.

THE WITNESS: I've got my position stated extremely clearly. I've got a lot of wordiness in there, but that's it. That's the essence of why I'm here.

MR. CRAWFORD: He is going to waive.

(Whereupon, the deposition was concluded at 3:36 p.m.)

Page 70

REPORTER'S CERTIFICATE

STATE OF NEVADA )
                 ) ss
COUNTY OF CLARK )

I, Margie L. Carlson, CCR No. 287, do hereby certify:

That I reported the taking of the deposition of the witness, DR. PATRICK BRANDNER, commencing on Friday, August 5, 2005, at the hour of 1:54 p.m.

That prior to being examined, the witness was duly sworn to testify to the truth, the whole truth, and nothing but the truth and that I thereafter transcribed said shorthand notes into typewriting and the typewritten transcript of said deposition is a complete, true and accurate transcription of said shorthand notes taken down at said time.

I further certify that I am not a relative or employee of any party involved in said action, nor a person financially interested in the action.

Dated at Las Vegas, Nevada, this 15th day of August, 2005.

Margie L. Carlson
CCR No. 287

Page 71

19 (Pages 70 to 71)

Atkinson-Baker, Inc., Court Reporters                    1-800-288-3376

149

Brandner001408

9F03779

**DR. PATRICK BRANDNER**   **AUGUST 5, 2005**

Atkinson-Baker, Inc., Court Reporters

150

Brandner001409

9F03779

## DR. PATRICK BRANDNER     AUGUST 5, 2005

closed 39:12 59:7 80:12 61:9
closer 61:23
cold 47:23
college 31:19
combination 61:17
come 23:25 43:21 50:12 59:9
comes 21:19 53:23
comfortable 4:20
coming 24:14 50:29
commencing 71:9
comment 23:21
common 40:13
community 37:12
compare 45:13 46:17 68:2
compared 45:18
comparison 46:20,21
complete 5:7 6:6,22 38:4 44:16 53:4 58:4 71:16
completely 52:16 54:7 57:19
complexity 11:12
complication 26:3 36:9,20 51:11 58:2
complications 26:3,9 30:6 34:5,8,9,15 36:6,14,15,16-45:9
comply 37:23
concerned 48:19 52:2
concluded 70:8
confused 47:24 48:1 48:13
consent 18:1,4,11,12 19:14,19 20:21 21:11 25:7,25 28:9,7 26:13 31:10 35:22 38:3,25
consents 36:13
consequence 68:24 69:20
consequences 32:2,23 37:20
considerations 44:18
considered 58:13
consultants 7:9
contact 17:1 65:1
contacted 18:1
contained 7:9,18 20:2
context 36:18 38:19
continue 44:5
continued 44:20
controlled 9:6
copied 14:14
copy 6:8,22 11:21,25 12:2 16:1 27:12 28:14
core 69:11
Corporation 1:11,12
correct 4:15 5:11,22 6:6,12,16,19,20 7:15 7:18,25 8:5,9 12:6 13:19,20 15:13 17:9 18:1,2,16,21 19:16 22:6 24:17,20,22 27:11 30:15 34:21 40:10,15 42:16,16

61:16 52:18,19
65:19,20 58:4 57:11
85:20,24 87:22 69:4
corrected 42:6,7,8
correction 95:15
correctly 17:22 40:9 56:24
correspondence 14:11
cost 24:2,2
costs 24:21
counsel 7:20 10:10,14 12:3 15:2 24:24 28:13 32:4
COUNTY 1:2 71:4
couple 56:22
course 7:6
court 1:1,21 27:10
cover 11:21 12:1,9 14:12,16 15:1,8,10 15:13,14
covered 28:6,10 58:18 52:23
CRAWFORD 2:8,8 3:4 4:6 16:7,9 22:2 23:4 28:13,16 30:21,23 38:7,14 39:1 46:11 49:4,6 51:20,22 52:5 55:16,21 62:21 63:9 64:14 65:3 69:22 70:6
criteria 60:17
criticisms 23:13 66:7
critics 69:11
critics 68:16
cross 36:19
CT 8:21 9:17,18,21,29 9:24 10:17 41:21,22 41:22 45:22 46:24 68:22
current 27:14,18 28:14 66:23
curriculum 27:13 28:8
cut 20:8,16,17 61:16 64:9
CV 28:14
CV2009 1:9
C.C.R 1:24

### O

D 2:8 3:1
Dad 31:9
damage 61:12 62:19 64:7
dance 44:24 58:18 65:16,19
dancer 65:9,14
dancing 44:6,8,12 45:1 54:10,11,12 64:17 65:2
date 9:20 10:17 18:23
Dated 71:21
dates 9:17 10:6 17:4 17:17 36:8,10 46:23 47:14
day 24:2,16 71:21
days 36:17
deal 12:8 40:14
dealt 41:1
death 38:19,21
decide 23:9

decided 22:20
decide 23:7
decision 19:22 20:13 22:13
decrease 36:22,23
Dee 28:9
defendant 13:6,7,22 13:23
defendants 1:14 2:7 3:9
defending 16:10
defense 13:19 14:4 26:16,18 59:9
define 19:4 20:7 38:12 38:20 46:6,7
defined 15:17,21 17:13 42:20,20 60:20
defines 36:5
definitely 62:9
deformities 42:5
deformity 41:15 48:19 67:17,19
degree 53:23 57:17
degrees 41:17,19 57:19,22,23 66:5
delayed 39:16
demands 46:7
demonstrate 9:14
depend 37:11 58:8,11
dependent 22:15
depends 34:23 58:9
depiction 18:22
deposed 32:8,24
deposition 1:15 4:17 4:21 5:16 13:5,12,21 13:25 14:1 15:5 19:5 19:6,10,25 20:5,6 22:23 53:3,15 47:24 53:24 55:6 69:3,5,11 65:16,17 70:7 71:9 71:16
depositions 13:4,9 16:25 20:5,10,16 23:16 31:7 32:3,15 32:25 34:11,12,21 47:20 48:9 55:8
depth 12:18 35:18 64:24
described 37:2
description 3:8,9 62:22
Desert 4:12 28:2
despite 33:17,21
determine 16:9
development 9:8
diagrams 55:4
die 34:16
different 16:12,14 35:12 60:4 64:18 67:19
differently 49:23
Dimowitz 10:25 36:10
disclosed 20:9 21:2 67:1
disclosure 7:21 8:2,16 22:3 27:18
discovery 67:6
discrete 28:8
discuss 15:11 31:4 32:22 37:3,9,13,14

37:19,23 60:7,18,25 55:6 63:10
discussed 21:18 22:23 32:9,9,12 33:19 50:9 56:11,14 63:1,23 69:16
discussing 55:3
discussion 12:16 15:15 16:14 17:6,19 30:22 31:14 32:1 33:1,9,25 34:3 37:18 46:5 50:10 54:16 63:21 66:24,25
discussions 6:10 16:24 56:11
disease 7:12
dispute 21:1 23:2
distal 60:11
distribution 12:20,22
doctor 6:7 27:15 43:23 56:17,22 56:18 63:13
doctors 6:10
doctor's 56:11
document 7:19
documentation 24:1
documented 33:23
documents 13:17
DOB 19,10
doing 36:24 36:17 46:24 61:15 63:14 67:9 63:20,22 64:12 64:16,22 68:1
done 18:4 40:1,2 44:3 44:3 47:13 49:17,18 50:15 51:1 56:24 56:23 62:2 69:23
door 24:7,6
doubt 67:7
down 21:19 42:14 44:15 48:22,23 62:16 63:15 54:8 58:3 62:16 64:2 71:17
dr 1:16 8:2 6:1,4,18,22 7:1,7,13 10:25 13:5 13:7,21 14:1 17:24 17:25 18:4,4 19:1,2 19:5,6,10,15,16,25 20:23 21:2,20,23 22:4,14,20 23:2,6,5 23:6,13,16,19 24:24 25:21 27:2,9 31:3,4 31:9,24 32:21 33:16 34:2 35:1 36:10,10 39:2,11,16 41:5,16 42:19 45:19 46:11 46:17 47:5,11,17,22 48:1,8,14,20,23,25 49:1 50:2,19,22 51:9 61:12,23 54:20 53:23 66:3,8,22 58:24 60:24 62:6,25 65:4 66:9,6,17 71:9
drawing 55:4
drill 48:9,14 59:13,15
drifting 46:15 47:6 59:12
drop 21:7 22:24 23:12 31:5 32:9,17 33:6,17

33:24 58:10 60:25 63:2,6,16 65:14 69:20
duly 4:2 71:12
dumped 29:23
during 58:3
dynamic 45:1

### E

E 2:1,1 3:1
each 36:16
earlier 5:14 49:9
easiest 10:9,12,18
easily 11:25
East 2:9 4:12
eat 29:7
education 60:23
Eetngn 25:21
eight 40:20 43:6 58:9 58:16 59:9,10 60:9 51:6 62:14 65:16,21
either 16:13 16:4 62:6 53:24
elbow 35:1
elucidated 38:3
emergency 27:23 28:3 29:18
emphatically 21:16
employee 71:10
encourage 43:20
and 53:20 69:10
enough 5:6 13:1,14,24 42:25 47:19 50:21 68:6
entries 33:10
ESQUIRE 2:4,9
essence 70:4
essentially 40:3
establish 48:21 59:20
established 59:18
establishing 43:5 69:17
estimation 60:8
at 1:13 65:6
even 44:12 47:9 61:16 62:25
ever 22:19 23:18 25:8 34:2 38:9 46:23 52:14,14
every 37:13
everyone 21:16
everything 5:10,12 53:16 62:24 64:21
exact 10:16 16:17 17:17 38:6
exactly 6:14 21:25 28:4 46:12
EXAMINATION 3:3 4:5
examine 67:13
examined 4:3 69:19 67:16 71:11
example 12:13 34:25 47:17 59:4
excellent 51:10 56:9 56:13
exhaustive 6:16
EXHIBITS 3:8
expect 36:25
expectation 49:17
experience 18:10

Page 2

Brandner001410

9F03779
## DR. PATRICK BRANDNER     AUGUST 5, 2005

31:12 48:12 50:24
59:14 61:8
expert 4:14 13:19
14:21 15:19 16:10
16:25 17:11,15,16
17:19 18:19 19:23
20:3,9,14 22:14
25:12,13,15,24 31:1
32:13 36:3 63:12
experts 11:23 13:18
expert's 14:4
explain 43:12 89:17
explaining 43:9 54:24
explanation 43:25
46:24
expressed 23:15
extending 35:7
extensive 34:3
extent 28:12 65:15
67:8
external 62:5
extremely 70:3
eye 53:25
eyeballed 67:13
E-g-t-a-g-e-r 25:21

F
facility 40:21
facing 44:23
fact 27:22 33:21 47:5
50:16 61:11 66:2,8
faculty 49:14 51:20
51:22,23
fair 6:5,6 6:15 13:1
14:24 16:3 18:5
22:17 23:13,14 39:4
39:5 40:14 47:19
55:3 60:5 62:15,16
63:24 64:1
fairly 35:23 54:1
fairness 7:3 46:12
67:12
fall 20:20 58:12
falls 22:8,10
family 20:17 31:15
32:23 39:13 42:24
43:5,10,19 44:24
48:9 58:18 60:22
63:2,19
family's 34:12
far 6:21,23 25:24,25
37:12 62:23 64:22
father 58:18
faulting 46:24
fear 66:10
feel 4:20 35:17 36:2
54:20
feeling 37:1 46:25
49:19
fell 18:16 20:23 21:20
22:19 31:1,24 32:21
32:23 45:19 47:11,13,19,22
46:9,17 49:19 50:2,5
50:24 51:12 65:23
56:19 64:23 66:5
femur 60:11
few 66:4
fibula 8:5 39:8
figure 10:5 29:23 31:9
59:10
file 1:25 6:8,13 6:17
fill 32:4
films 8:24,25 9:4,4

10:4,16 46:16 58:10
finally 30:25
financially 71:20
find 14:25 15:25 24:11
33:19 37:17,21 47:8
fine 16:15 26:1 54:21
fingers 35:7
first 4:2 7:20 8:18
10:24 11:5 15:11,12
15:25 16:22 17:1
23:18 27:16 29:1
33:5,11 43:9 46:13
46:19
five 40:2,11
five-minute 56:17
fix 35:2 40:4 43:24
46:7 55:14 61:5
fixation 49:23 55:12
fixator 49:19 52:5
fixed 28:20 31:19 49:1
flat 32:10
flexor 29:16,17
flight 24:2
floor 1:21
fix 27:21
folder 14:11
follow 59:11
follows 4:9
foot 11:19,20,22 21:7
22:24 23:12 31:5
32:9,17 33:6,17,24
56:10 61:1 63:2,8,16
64:10 65:14 69:20
forearm 35:6
foremost 43:9
forget 36:2
form 19:14 21:24 22:16
35:4,11 46:5 51:17
52:3 56:14 63:4,25
64:20
formal 53:7
formerly 28:2
formulate 46:22
Fort 40:22
found 44:17
fracture 6:8 38:25 39:3
39:5,6,16 40:4,5
41:7 42:13,16 43:10
44:5,11,14 46:19,24
48:4,26 49:17 51:3
53:13 54:25 57:19
58:23 61:10 64:3
fractures 40:1
Friday 71:10
front 24:7,8 41:20
46:20
frontal 41:18
full 4:7 24:2
fully 42:8
function 52:22 63:17

59:12
functional 35:12 68:23
functioned 54:1 56:12
further 16:17,16 17:14
18:25 19:4 39:21
46:9 47:1 53:14
59:12,13,15 60:18
67:8 68:13 71:16
future 51:18 45:2
57:14,16 66:25

G
gap 32:4
gave 33:20 48:24
49:12 50:9
general 34:17 37:1,16
38:9
generally 57:8
gentlemen's 38:13
gets 65:18 69:20
getting 9:7 65:18 46:2
54:20,21 60:3 66:9
give 4:10 10:16 11:21
14:22 24:12 26:16
25:13 29:2 31:1
35:10 36:24 44:25
47:14,14 53:3 54:12
59:20,21 66:15 67:3
67:9 68:25
given 35:25 51:23
53:18 54:9 55:7,8
61:10 66:25 66:24
69:2
giving 16:1 35:22
50:13
glean 47:19
Glendale 1:22
go 5:3 11:14 12:15
14:24 24:7 25:8
29:19 30:11,13
32:14 35:18 36:16
37:1,15 40:3 42:4,23
43:2,11,17,22 44:5
44:21 45:8 49:14,16
50:3,17 54:4,15
55:25 60:4,7 61:10
63:9
goes 44:4
going 6:4 14:13 15:12
16:21 18:11 20:14
20:14 21:12,19
22:19 23:9 24:15
30:17 32:5 33:2,11
35:4 37:11 42:24,25
44:4,5,16,19 45:3
53:3,20 56:17 57:24
57:25 59:12 66:12
61:5 62:4,9,13,18
64:8,8 66:5,12 66:14
66:24 67:5 68:15,22
69:3,8,16 70:5
golly 31:25
gone 31:13 48:9 59:4
69:7
good 26:1 53:5 56:24
gotten 27:20 57:1,21
65:22
GRAHAM 2:4 15:5
21:24 22:1 8 28:15
36:4,11 45:5 61:17

52:3 56:14 63:4,25
64:20 70:1
grant 33:25
great 12:2
gross 18:5,8,9
group 27:22 28:22
29:1 41:14
grow 60:12
growth 54:7 59:7 60:11
60:12
guardians 1:5
guess 33:14
guidelines 4:21
gunshot 30:3
guys 28:18
gymnastic 44:12

H
HALUCK 2:3
hand 29:17
happen 62:4,6
happens 67:13
hard 10:4 39:15 47:24
having 4:2 9:13 44:10
44:10 53:10
heal 31:18 39:21 43:1
43:11,17 44:18 47:1
52:9,12,18,19,25
53:18 59:23 60:18
66:1
healed 40:5,8 63:16
57:19 58:24
healing 39:4 44:1,14
44:19 53:5 58:17
52:17
heals 66:12
health-care 6:23 6:24
6:11
heard 21:7
hearing 47:22
heavily 63:2
help 36:20
helpful 12:4 15:24
hey 42:25
high 59:4 65:16,19
higher 45:3
highlights 68:4
high-end 43:16 44:7
54:3
Hills 26:9
him 33:12 37:23 56:14
38:16 44:8,21 48:21
63:16,21 59:11,11
59:18 60:2 66:7
67:13 69:24
Hisham 25:16
histology 11:14 12:22
hit 36:20
Hit 25:16 26:21 27:2,3
hitting 64:22
home 6:8
hopefully 14:13
hoping 43:8
horrible 61:21
hospital 1:12 6:1,3,7
7:6,17 19:3,15 27:24
27:25 28:1,2,6,7,11
28:17 29:21 36:4
hospitalization 9:25
hospitalized 7:10

hospitals 30:16
hotel 24:2
hour 71:10
hourly 24:16
housekeeping 23:24
hurt 59:24
husband 1:9,10
hypothetical 68:11
H-t-t-o 25:16

I
idea 36:10 54:21
identified 7:22
identifying 14:19
images 10:1,2
immediately 49:21
54:11
impact 44:9,25 46:1
54:12 64:18
impacting 44:11
important 44:25
impression 47:23 48:7
48:14,15,20 51:3
improve 52:22,23
improved 67:8
improvement 50:5
68:10
INC 1:20
incidence 36:23 37:7
62:6
included 10:3 14:12
17:24
including 15:17,16
incomplete 58:17
incorrect 23:11
increased 43:14 66:16
66:21 69:16
indicated 8:18
indicating 5:4 61:24
individual 28:10 29:21
35:4 38:24 42:11
44:13 45:8 64:3
67:15
individually 1:5
individuals 30:8 31:8
62:20
infection 30:9
infectious 7:12
information 3:18 14:22
17:12,20 18:20,23
20:1 30:24 67:1
63:22
informed 19:1,4,11,12
19:14,19 20:20
21:10 25:7,25 26:6,7
28:13 31:10 35:22
38:15 56:2,24
initial 16:16,18 18:11
18:13 17:7 39:8
injured 21:10 61:15
69:20
injuries 34:16,23 37:7
injury 12:23 20:8 21:10
21:15,17 22:21
23:11 31:5 32:1,22
33:6 34:25 35:3,5,14
35:14,16,17 36:23
36:25 37:20 42:21
54:16 56:9 60:16
62:3,13 63:1,23

Page 3

151

Brandner001411

9F03779

DR. PATRICK BRANDNER     AUGUST 5, 2005

Page 4

Atkinson-Baker, Inc., Court Reporters     1-800-288-3376

Brandncr001412

9F03779

DR. PATRICK BRANDNER    AUGUST 5, 2005

| | | | | |
|---|---|---|---|---|
| 17:2 23:18 | orthopedist 16:13 | 12:21,23 21:3,4,7,19 | 34:24 40:19 41:10 | **R** |
| oh 28:1 30:21,22 43:14 | osteotomies 40:1,2 | 21:18,17 22:9,11,21 | 41:11,12 | R 2:1 |
| 44:8 45:4,5 55:16 | osteotomy 55:15 | 22:24 23:2,12 31:5 | prs 10:16 | radiological 8:20 |
| 59:23,25 84:23 | other 6:13 6:24 7:9 | 32:1,7,8,17,22 33:5 | predict 62:7 65:11 | radiologist 46:21 |
| offer 51:5 55:8,9 | 8:10 12:11 13:1,12 | 33:16,24 36:13 | premiums 30:13 | radiologists 8:22 |
| offering 59:5 | 13:18 14:15,19,20 | 37:20 54:17 56:10 | preop 3:4,21,24 | rapport 43:5,16,21 |
| office 6:18,22 19:13,17 | 14:22 25:8 27:1 | 60:25 61:8,12,15,18 | preoperative 19:17 | reactions 50:23 |
| OFFICES 2:3,8 | 29:25 30:5 37:2,7,10 | 63:1,6,16 66:19 | 47:17 56:11 | read 18:18 32:15 34:11 |
| official 53:18 | 37:22 39:14,14 | person 41:3 71:20 | preoperatively 58:23 | 37:6 69:24 |
| off-the 8:9 | 42:24 43:20 44:17 | personality 46:29 | preparation 11:3 | reading 48:9 62:22 |
| Oh 19:3 25:1 47:10 | 49:2 51:1 52:6,8 | personally 42:22 | presentation 18:12,14 | real 21:11 |
| 58:25 67:14 | 58:25 68:3,3 69:5 | Peter 7:1 | presented 41:4 | really 16:24 18:21 |
| okay 5:1,19,19 7:3 8:24 | out 10:6 15:5,25 16:13 | Phoenix 2:5 29:25 29:5 | presume 11:4 | 35:16 48:16 49:11 |
| 9:11,21 10:9 15:20 | 24:11 25:9,24 28:11 | physical 36:23 68:6 | primarily 12:19 | 52:5,5 55:8,11 |
| 15:23 17:1,18 21:18 | 29:23 31:10 32:10 | physically 58:11 | prior 71:11 | reason 63:15 |
| 22:13 23:8 26:20 | 37:17,21 49:23 47:8 | physician 18:7 38:11 | private 29:8 40:19 | reasonable 53:23 |
| 31:23 32:16 33:7 | 60:10 52:10,10 | physicians 29:23 | 41:11,12 | reattach 35:10 |
| 36:5,6 41:3 42:18 | 53:24 54:4,6 57:5 | physiology 61:16 | privileges 27:19,20 | recall 6:25 9:13 17:4 |
| 43:5 60:3,6 64:2,15 | 59:19 62:1,4,19 64:4 | pick 47:25 62:19 | 28:15,12,17 30:2 | 19:3 40:18 45:23 |
| 64:16 65:4 66:16 | 64:13 65:12 68:23 | play 49:15,24 | probability 53:23 | 48:23 55:13 66:5 |
| 68:11 69:14,22 | outcome 42:10 | plain 6:21 9:4 10:23 | probable 53:8,20 | received 5:14 7:19 |
| old 11:28 12:4 | outpatient 28:23 | 45:12 46:18 66:19 | probably 11:24,25 | 17:21 |
| once 32:5 | over 27:8 38:12,12 | plaintiff 7:10 21:5 | 40:17 45:13 61:24 | recess 56:19 |
| one 4:23,24 19:7 25:19 | 38:9 40:11 43:3,22 | plaintiffs 1:7 22 3:5 | 62:9,13 | recollection 10:3,22 |
| 28:6,17,17 27:7,14 | 44:21 46:24 57:20 | 4:15 7:20,20 10:10 | problem 5:1,4 21:4 | 11:1 13:14 14:23 |
| 29:14 37:15 40:17 | 59:1 69:7 | 10:19 15:2 24:23 | 29:22 31:13 35:21 | 19:21 20:4 28:11 |
| 41:1,2 43:6,22 60:9 | Overall 47:23 | 32:4 | 54:24 60:24 61:22 | 33:15 40:2 45:20 |
| 63:19 67:23 68:2 | own 11:23 28:23 50:24 | plaintiff's 15:19 20:9 | 62:19 65:4 | 49:16,17 |
| ones 37:14 47:12 | 69:13 | 25:18 26:19,20,21 | problems 15:17 16:10 | recommend 45:4 |
| ongoing 20:13 | | 27:15 | 28:11 29:16 35:19 | recommendation |
| only 12:22 19:5,7 | **P** | place 41:18,18,19 | 36:22 38:3 40:7 44:9 | 60:12,13 |
| 21:11 25:11 32:14 | P 1:9 2:1,1 | 57:23,23 | 44:11 64:23 68:8 | recommendations |
| 49:22 50:13 60:2,24 | page 8:3,6,9 11:21 | places 57:18 | procedure 38:24 55:1 | 48:9 |
| 62:8 | 12:1,3 25:20 | planning 9:22,24 56:23 | process 62:17 | reconstruction 19:17 |
| open 61:9 67:7 | pages 12:7 15:10 | plans 31:15 | professional 4:10 29:7 | 12:17 |
| opening 26:4 57:12,12 | pain 31:17 36:16,19,20 | plate 52:5 | progress 6:1 | record 4:8 5:10 7:24 |
| operate 57:9 64:3 | 38:22,23 44:20 | plates 49:24 54:7 59:7 | prone 60:18 | 6:8,14 10:14 30:21 |
| 65:17 | 64:23,25 65:2 66:7 | 60:12 | protect 61:3 64:8 | 30:22,23 34:10 48:4 |
| operated 49:20 50:18 | parallel 68:14,15 | play 64:16 | provide 10:11 12:1 | 48:5 50:8 |
| operating 54:25 | Pardon 51:21 | please 4:7,11 | provided 6:8,21 17:12 | records 5:20 6:1,18,22 |
| operation 61:22 | parents 1:5 20:6 22:23 | pleasure 68:23 | 19:6,25 24:23 27:12 | 6:24 7:1,8,22,24 8:3 |
| operations 17:28 | 38:15 | pneumonia 35:14,21 | 28:10 48:22,24 | 8:8,10,17 9:18,20 |
| opinion 16:2 22:14 | part 6:13 28:24 33:19 | point 8:25,25 17:7 18:7 | provider 5:24 | 10:16 11:3 14:16,19 |
| 22:15 31:1,5 32:20 | partially 39:20 58:1 | 18:7 22:9 23:9 33:1 | providers 6:24 8:11 | 14:23 16:24 17:6,23 |
| 35:23,24 37:2,18 | 60:16 | 39:17 42:17 52:2 | proviso 54:15 | 17:23,24 19:1,2,3,4 |
| 43:23 49:2,10,10,12 | particular 41:3 65:22 | 54:13 57:6 58:7,20 | proximal 39:9 | 19:10,12,13,17,22 |
| 51:2 52:23 58:6 | particularly 20:5 | 59:9 62:18,18 63:19 | purposes 8:22,25 14:8 | 19:25 20:2 28:5 |
| 58:14 67:4,5 | party 71:19 | 68:10 | 58:23 | 32:15,18 33:10,12 |
| opinions 11:10 13:15 | past 24:25 | polytrauma 30:9 | pursue 54:10,11 | 33:19,17,19,24 34:1 |
| 14:4,9 39:14 43:20 | patient 28:2 38:18 | poor 53:9 | pushing 61:2 | 36:4,8 46:11 49:1 |
| 43:20,22 49:7 50:9 | 38:24 44:13 60:25 | population 36:8 | put 14:10 25:12 31:9 | 50:23 56:7 61:1 |
| 55:12 57:8 62:23 | 64:21 68:11 68:12 | position 31:11 32:11 | 38:18 38:18,23 42:9 | 62:25 63:7,17 67:4,9 |
| 66:6 67:1 68:5,8 | 68:17 | 40:7 41:9,9 44:19 | 43:14 46:2 48:11 | 67:18 |
| opposed 49:24 | patients 33:21 | 53:1,19 66:4,12 70:2 | 62:16 57:16 62:5 | reduction 39:12 |
| option 44:2,21,22,23 | patrick 1:16 3:2 4:1,9 | possibility 23:12 38:25 | 64:1 | referenced 12:7 |
| 45:8 51:5,7,18 52:2 | 71:9 | possible 37:13 59:15 | puts 38:8 | referring 38:5 |
| 52:8,8 54:12,19 | people 18:12 23:24 | 59:15 | putting 45:7 64:18 | reflected 32:16 |
| 55:19 59:20 59:21 | 32:5,24 34:3 38:2,18 | possibly 68:7,20 | P_L_O 2:8 | refracturing 59:5 |
| 60:2 63:20 69:12 | 38:20 61:6 66:12 | postop 9:5,22 10:18 | p.m 1:19 56:20,20 70:6 | refresh 12:20 |
| options 53:11,12,17 | 61:18 67:19 | 19:5 | 71:10 | regaining 25:1 |
| orders 5:11 | percent 52:8,10 54:5,8 | postoperative 58:6 | | regarding 19:1,11,12 |
| Organization 1:12 | percentages 61:4 | potential 23:11 31:19 | **Q** | 55:15 |
| original 7:5 42:15 | Perfect 53:21 | 32:1 34:4 35:3 36:15 | question 5:3 6:1 26:1 | register 35:16 |
| originally 11:5 | performed 6:4 41:5,18 | 36:19 39:21,22 | 31:4 32:19 37:9 43:4 | reimbursed 29:13 |
| orthopaedic 1:11 2:7 | 42:13 51:4 55:5,23 | 42:10,11 44:1,2,14 | questions 3:12 4:24 | reimbursement 29:14 |
| 10:24 | 58:24 62:14 | 46:25 62:22,23 | quicker 45:7 | related 5:6 |
| orthopaedic 1:10 7:5 | perhaps 19:15 47:2 | 54:18,23 56:10 | quickly 28:12 | relationship 46:21 |
| 25:18,23 38:3 39:1 | period 44:3 45:24 46:2 | 57:18 59:22 63:2,24 | quote 17:12 | 58:17,18,20 |
| 40:13 49:2 | permanent 54:7 | potentially 45:1 60:19 | | relative 71:18 |
| orthopedics 26:4 | peroneal 11:12 12:5,8 | practice 28:25 29:8,9 | | |

9F03779
DR. PATRICK BRANDNER AUGUST 5, 2005

relevant 11:9
relied 14:7
relying 41:21
remainder 40:20
remember 8:22 9:20 10:16 11:22 16:23 17:17 25:19 26:16 26:16 27:1,5,8 39:6 49:8
remembered 47:7
remind 4:23
remodels 39:22 47:1 62:13 60:13 68:12
remodeling 44:2 53:5 53:12 69:22
repair 39:3
repaired 35:13
Repeat 6:1
rephrase 6:1
report 6:19 10:2 41:22 45:22
reported 1:24 41:19 71:8
REPORTERS 1:21
REPORTER'S 71:1
request 5:14
required 19:22 37:3,9 37:19,23
respect 63:21
responsible 28:20
restate 69:9
result 35:8 63:5 66:5 61:12
resulted 39:3
retained 4:14 15:12 16:7
retrospect 62:12
review 11:11 14:7,20 17:8 18:3 33:10
reviewed 5:20 6:25 7:1 7:23 8:8,11,19 10:4 11:8,8 13:2,8,9,19 15:19,20 18:24 20:16 38:1 65:3
reviewing 6:17
rid 55:17
right 7:5 9:10 16:7 23:9 28:12 28:15 35:9 46:23 49:7 57:9 61:2 65:19
rises 22:7,10
risk 21:3 32:22 59:6 61:12,13 68:23 69:18
risks 34:4,7,14 36:6
road 4:12 42:14 44:16 54:6 59:3 62:15
rod 48:23,25 50:1 62:9
Roger 11:19
role 64:15
room 28:4 28:16
rubric 20:20
run 65:15
running 20:13 44:12 64:25
rupture 35:1

S

S 2:1
same 29:9 39:16 66:4
58:5,10,17,18 63:3 68:25
sat 48:23 64:2
satisfied 47:21 60:22
saw 7:3 10:25 38:9 45:15 47:7 48:18 65:6,8 63:8 67:21
saying 6:17 30:10,11 33:2 46:22 49:20 50:20 53:8 54:18 58:18,25 61:2 63:21 69:2
says 16:14 22:20 23:2 33:16 34:6,8 45:2 63:2
scan 8:21 9:19,21,23 9:24 41:21,22,22 45:22 48:24
scans 9:17 56:22
scenario 37:14 43:15 69:1
scholarship 31:19 65:8
science 12:25 61:20
[redacted]6 9:5 10:24 13:10 22:22 31:9,17 36:8 39:8 43:13 44:24 64:2,15 66:10 67:4 68:9
[redacted]49:8 41:18
screws 49:24
search 51:2
searching 52:20
second 49:7,10 61:2
Secondly 43:12
secretary 23:10
sedentary 64:1 66:22 68:3
see 8:4 10:1 16:4 17:22 18:8,14,17 19:9,10 20:5 23:18 28:5 31:7 31:16 32:16 33:16 34:1 36:3,12 43:17 45:12,24 46:16 47:5 52:25,25 66:2,17 58:7 59:9 62:23 63:16 64:17 65:12 66:16 67:3,20
seeing 10:22 57:13 60:6 69:12
seeking 38:14
seem 16:12
seen 6:17 9:18 10:7,7 13:13 14:3 20:19 22:3 37:6,7 49:1
send 9:2 10:10 12:3 15:1,6
sent 6:13 6:14 6:3,25 10:16,19 11:5 14:7 14:18,19 17:7,23 23:18 25:3,5 26:11 47:15
separate 34:20
separately 14:10
sequential 45:23
severe 30:5
sharps 1:10,10 2:7 6:1 6:4 14:1 17:23 18:4 19:18 20:23 21:2,20
21:23 22:14,20 23:5 23:6,13 31:1,4,8,24 32:21 34:2 36:1 38:10 41:6,18 42:18 46:11 47:5 49:13 51:5,12 54:20 55:23 58:3,8,22 59:24 60:24 62:5,25 66:8
Sharpe's 6:18,22 7:13 13:5,21 19:1,2,6,8 19:10,13,25 22:4 33:16 66:2,17
short 29:2 44:3
shortened 52:17
shorthand 71:14,17
show 7:10 25:2 27:18 44:4
showed 46:8,19
showing 65:3
side 28:5 33:16 66:2
sign 59:24
signed 31:23 33:9
significant 29:7 30:5 36:24 38:8,13,14,16 38:17,19 45:18 46:3 47:25 61:11 67:24 67:25 69:5
significantly 30:12,14 47:7 67:20,22 68:1
simply 10:11 12:20
since 13:25 27:18 40:25 41:2
sir 4:3
site 62:1
sites 33:14
sitting 63:5
situation 27:22 28:18 28:19 29:4,8 30:1 39:2 41:4 47:21 49:22 57:18 60:8
six 42:21 60:8 61:5
skeleton 53:10,11 54:8 59:7 60:14
skin 67:12,13
slapped 29:18
smaller 64:8,6
smart 64:22
snookier 18:20
socioeconomic 28:15 29:22
some 5:9,9,19 6:18 7:1 7:22,22,23 8:3,8,20 8:23,25,25 10:18 12:18 13:16 14:11 14:12 17:7,7,23 18:10,19 19:20 20:1 23:24 24:18,24 29:15 30:25 33:10 38:22 42:9,12 43:23 46:18 55:17 59:8,21 60:11 61:20 62:22 66:14 68:8
somebody 18:16
someone 35:2 39:14
something 12:14,16 18:13 19:18 32:3 36:18 58:13
sometimes 36:3
somewhat 47:24
somewhere 9:10,11
sort 18:10
sorry 25:19
sort 20:13
sounds 7:23 49:11
source 30:25
South 10:22
Southern 2:9 26:6
speak 29:2
speaking 57:9
speaks 17:3
specific 11:9 22:4 30:24 31:25 33:1 36:10 37:22 38:2 39:6 47:3 63:23 66:6 66:11 69:19
specifically 12:7,18 21:4,5 31:6 32:6,16 33:5 36:3 37:19 43:4 46:16 66:11,14
specifics 37:16
spent 55:2
spiral 10:1,2
sports 65:1
spot 58:4,10,17 63:3
Springs 28:2
ss 71:3
staff 27:19,20,24,24,25 28:1,5,6,12,17 30:2 30:18
stance 23:1
stand 25:24 68:16
standard 19:15 20:24 21:20 22:15 24:11 31:2,8,25 32:21 33:20 36:19 37:24
standards 37:12
standpoint 51:19 56:24
started 39:13
starting 30:19
state 1:1 21:5,10 22:26 36:26 53:22 60:9 71:3
stated 21:5 22:12,20 33:20 70:2
statement 7:21 8:2,16 27:16 32:18 49:16
statements 33:22 49:11
status 68:24
STEVE 1:5
sticker 8:7
still 9:2 20:1,23 35:12 44:1,1 58:8 60:10 67:7
store 10:20
straighten 40:8 62:10 52:10 64:3,13 65:12
straightened 64:2 62:4
straightening 65:10
straighter 66:25
street 38:19
stretch 61:17
stretched 61:7 64:7,10 65:11,13
strike 47:8
structure 11:12 12:5
stuck 67:21
studies 6:20,23
stupid 48:11
subjective 46:11
subpoena 5:16,16,17
subsequent 7:13
Subsequently 33:14
successful 61:25
sued 13:26 23:20 34:2
suffer 62:13
Suite 2:6,9
summary 13:16 14:3 29:2
Sunrise 27:24,25
SUPERIOR 1:1
supplemental 7:21 8:16 27:18
SUPPLIED 3:18
supposed 31:10
sure 5:13 6:14 13:21 15:6 16:5 29:5 36:22 46:12 50:24 60:22 61:19 65:19
surgeon 7:5 29:23 40:14 49:2 53:26
surgeons 25:18
surgery 6:4 7:14 18:14 21:14 26:11 28:3,22 28:23,23,24 33:21 34:4,19 35:15 37:9 37:18,23 38:3 41:2,5 41:18 42:14,23 43:22 44:2,22 45:3,8 45:10 46:13,15,17 50:3,5,8,10,16,17 51:1,4 52:14,18,19 52:21 53:1,8,15,21 54:13,19 55:4,18,23 58:3 57:3,4,8,10,14 58:6,20,25 59:10 60:2,8 61:13,24 62:14 63:22 65:9,22 66:10 69:12,18,16
surgical 12:14 31:21 44:21 61:9 62:1,10
surgically 43:1
surprise 68:8
surprises 66:14
surrounding 31:14
susceptible 12:23
switched 29:22
sworn 4:2 71:12
symptoms 43:14
system 27:10

T

take 10:20 15:21 17:20 27:17,23 28:20,21 29:3,22 30:14,17 32:19 34:24,25 35:12 38:18 56:16 69:19 61:3,8
taken 4:17 10:23 19:7 20:10 45:14 48:18 68:19 71:17
taking 29:1 71:8
talk 38:19 48:5
talked 60:11 67:15
talking 8:3 9:22 18:14 61:13
teach 60:23
tear 66:18
technical 61:13 55:24

Page 6

9F03779

## DR. PATRICK BRANDNER    AUGUST 5, 2005

technique 12:14 51:9
tell 4:7,25 8:23 9:17
35:2,5,19 47:1,4,10
56:1 64:8
telling 17:10 23:5
65:23
Tempe 2:10
ten 11:25 12:4 27:3
tendon 12:17 29:17
35:1,10
tendons 29:18
term 16:9 42:17 53:20
terms 11:6 13:4 16:12
21:2,19 22:14 32:4
32:11 45:3 46:4
48:10 56:12 58:4,17
64:2 66:23 67:17
testified 4:3 25:6
testify 15:22 17:16
24:1,3,18 58:9 71:12
testimony 13:12 22:4
22:16 24:12 66:11
tethered 52:17
text 11:21
textbook 11:15,17,19
textbooks 16:10
tests 12:3,12
thank 68:16
their 18:10 20:7,10
21:8 28:10 28:3
32:11,25 33:3 34:11
35:11,11 50:18
54:22 55:9
thing 29:14 38:18
44:17 49:22 53:15
54:2 56:24 60:16,17
things 5:9 8:11 11:4
15:5 31:20 33:20
51:1 56:18 60:21
64:12,24
think 9:24 10:14,25
11:9 13:22 16:16,18
16:20 22:19 26:2,21
27:2 37:11,13,19
38:19 41:9 42:10,22
43:10,25 44:8 48:23
49:22 51:25 53:20
55:13 57:21,23,25
60:24 61:9 62:2,3,6
62:16 63:7 67:6,10
67:22 69:23
thinking 16:20
thinks 37:12
third 1:21 38:9 49:10
Thirdly 43:16
thought 31:24 39:25
46:1
three 11:20 25:24,26
38:17 62:11
throw 58:8
thumb 35:7
time 9:5 10:16 31:11
39:8 41:14,16 57:20
59:1 61:23 68:4
total 21:12 39:25 40:2
60:11
Elma 10:24 15:25 24:4
24:7,8,19 29:3 38:3
39:13,17 41:12
42:13 44:4 45:25

46:2 52:19 54:5,19
55:3 57:17,20 58:24
59:1,21 60:9 61:23
62:7,18 67:5 71:17
times 4:18 30:7 39:23
40:11 41:3
today 5:8,21 6:15 7:25
9:17 10:15 14:14
57:1 59:7
told 7:24 67:14 17:18
21:3 23:11 32:3,7,8
34:8,14,18,19,20
37:18 38:3 43:18
46:21 56:18 66:12
tolerate 64:24
top 24:4,18,21
totally 60:18 68:22
59:3
toward 47:25
town 27:22 28:7,12
28:4
trade 24:10
training 40:18,19,21
40:21
transcribed 71:14
transcript 71:19
transcription 71:16
transfer 12:17
trauma 28:20,21 29:2,3
29:3 30:5,14,17
traumatic 66:18
travel 24:4,19
traveled 24:12
traveling 9:10,11
treat 29:24
treated 29:16 39:25
treating 61:9
treatment 21:14 31:21
31:21 44:17 55:20
tremendous 30:3,4
trial 24:1 66:10,13
tried 60:24
true 71:18
truly 54:8 60:14
trust 43:19 48:21
truth 23:8 71:12,12,13
try 20:7 31:9 40:4 62:9
60:4
trying 19:24,25 37:17
37:21 43:19 47:6
68:25
turned 29:9 54:9
Twenty-five 40:12
two 16:9 25:10,11,12
26:13 28:1 33:19
40:17 45:18 48:1
49:7 52:7,12,17 57:5
60:17,25 67:18,69:8
69:11
two-and-a-half-month
49:2
type 21:15 39:23 49:17
50:25 53:21 69:17
typewriting 71:14
typewritten 71:15
typically 8:7

### U

unacceptable 60:1
unaffordable 30:12

under 5:25 69:18
understand 4:20,24
5:9 6:21 16:16 17:1
17:22 34:22 35:4,21
35:22 37:17,21
38:20 44:10,13,23
46:7 47:2 48:18,18
49:14 59:24 62:21
64:4,9,12 65:17 69:8
understanding 6:23
12:24 20:7 21:9
22:22 38:21 45:8
50:18 54:23 67:18
61:21 68:28
understands 21:16
understood 5:5 23:22
33:4 48:11 51:18
62:1 53:2 68:2
undertaken 69:16
unfortunately 55:1
unhappy 47:20 48:9,10
46:12,12
unhinsured 29:20 30:7
union 39:18 58:4
united 39:17,20,20
58:1 60:16
unless 54:6 67:3
unlikely 68:25 69:2
unpredictable 53:11
unreliable 69:1,3
until 15:16,19 17:11,13
17:13
updated 28:8
upside-down 29:9
use 18:12 36:17 43:15
49:23,25
used 18:10 50:19
46:21 62:5,5
using 46:10

### V

V 26:24
vacuum 50:11 59:19
vague 41:24
valley 1:12 28:1
Vannah 26:22 27:2
various 67:18
varus 41:23
vegas 1:17 4:13 9:12
25:19 27:10 71:21
vehicle 9:6,7
versus 46:3 51:1
very 47:20 69:1,4
victory 26:24
views 10:7,23
video 27:13 28:6
volume 11:20
volumes 11:24
voluminous 10:18
vs 1:6
V-a-n-n-a-h 26:24

### W

Wade 22:1
wait 48:22 51:24 52:2
52:9,12,16,18,20,24
57:6 58:16 59:9 60:2
60:8 64:16 65:16,21

waited 42:25 58:2
waiting 51:16 63:20
69:12
waive 69:25 70:6
walk 64:24
Wall 49:1,12 50:16,18
Wall's 50:2,20,22
want 10:20 13:20 29:3
35:12 45:1 53:12,13
59:25 60:21 61:2,3,5
63:18 64:18,25,25
65:1,7,17 69:24,25
wanted 16:14 19:9,10
20:4 31:16 32:14
50:15 53:19,24
64:10,10
wants 45:6 58:19
wasn't 20:12 39:17,20
50:7,6,25 61:16
watch 53:18
watched 48:8
watching 55:16 56:16
way 25:13 29:12,23
32:19 39:10 42:9
49:13,16 50:3,17
51:7 52:17 58:8 60:4
60:7
weak 54:11
weakness 35:8,11
wear 58:16
Welch 25:19 27:4
well 8:17,25 10:1 14:1
16:2 16:9 17:13
22:10,23 24:9 25:10
29:14 31:3 32:7
34:11,18 35:2,17
41:9,12 44:8 48:9,19
47:4 48:10 49:12,15
49:22,25 50:8,22
52:11,15 55:3,9
58:13 57:14 59:6
63:10 68:2
well-known 11:22
35:14
went 38:9 43:23 61:16
were 8:5,10,21 7:18
8:23,24 9:4 10:5,23
11:5 12:19 15:11,21
16:8,10 17:5,7,23
19:4,25 20:3,8,10
21:3 23:11,18,20
26:3,4,8 27:9 31:16
31:18 32:3,5,6,8,24
33:2,25 34:14,16,18
34:20 36:3 40:16,17
40:21 44;16 45:21
46:18,24 47:13,15
47:20,22,24 48:1,3
48:13,15,16,19 49:7
52:20 68:4
weren't 34:16 40:20
41:13,14 48:2
while 8:17 7:10
whole 22:7,10 24:16
63:15 71:12
wife 19:9,10 9:8
willing 20:3 32:12
wishes 60:20
witness 3:2,12 4:14
14:21 15:4,8 17:11

25:14 38:12 51:16
61:21 67:15 70:2
71:9,11
word 21:7 60:25
wordiness 70:3
words 38:6 39:25
42:24 58:25 60:25
work 24:18
worried 21:9,12 35:19
worse 46:4,7 57:20,22
worsening 47:7
worth 30:10
wouldn't 59:2,6,9
63:12
wounds 30:7
written 18:23 33:25
wrong 16:5 23:10,19
51:12 56:3
wrote 62:25

### X

X 3:1
X-ray 10:23 45:12,14
58:9
X-rays 8:22 9:9,14,17
10:6,17 11:2,5 14:17
14:25 15:7 45:16,16
45:21,23 46:9,16,22
46:23 47:9,11,15,17
65:4 66:10

### Y

yeah 7:16 24:6 27:1
37:5 41:5 52:15
64:16 67:11 68:4
year 43:8
years 11:25 12:4 27:5
40:11,20,25
young 38:18

### $

$8,000 24:3,15

### 0

017461 1:9

### 1

1 33:9 53:16
1:54 71:10
1:59 1:19
10 54:5
100 4:12
101 2:9
16th 71:21
17 41:17 57:22 68:5
1920 2:9
1978 40:24
1980 40:24

### 2

2 69:16
20 62:10 64:5
2002 10:25 36:9,9
46:12 46:2,3,17,19
47:12,13 62:14
2004 15:12 16:2 17:2
23:19
2005 1:16 25:8 71:10

Brandner001415

9F03779
DR. PATRICK BRANDNER     AUGUST 5, 2005

71:22
22 10:25
9300 2:5
29 40:25
2800 4:12
267 1:24 71:8,29

3
3:10 66:20
3:14 66:20
3:38 70:8
30 41:19 67:23
3200 2:4

4
4.3:4

5
5 1:16 71:10
50 62:9
500 1:21
551-7300 1:22

6
818 1:22
85012 2:5
85262 2:10
89121 4:13

9
9F03778 1:25
81203-4725 1:22

Page 8

Brandner001416

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

███████ and wife, and ████
██████, a minor,
                  Plaintiffs,

           vs.

KIPLING P. SHARPE, M.D., and
JANE DOE SHARPE, husband and
wife, et al.,
                  Defendants.

CV No.   2003-017451

April 29, 2008
Phoenix, Arizona

BEFORE THE HONORABLE:   MICHAEL JONES, Judge

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Testimony of Patrick Brandner, M.D.

Lisa H. Vitoff
Certified Court Reporter
CCR #50251

TESTIMONY OF DR. BRANDNER

221

Brandner001417

2

APPEARANCES

FOR THE PLAINTIFFS:
KOELLER, NEBEKER, CARLSON & HALUCK, LLP
by Mr. Wade R. Causey

FOR THE DEFENDANTS
CRAWFORD & KLINE, PLC
by Mr. Bruce D. Crawford

PROCEEDINGS

PATRICK BRANDNER, M.D.,

having been duly sworn herein, took the stand and testified as follows:

THE COURT: Doctor, thank you. If you will go ahead, have a seat on our witness stand, please.

Now we're on the record. The record will show the presence of all the members of our jury, counsel, the parties as well, and we have Dr. Brandner called out of order by the plaintiff, Mr. Causey.

Go right away.

MR. CAUSEY: Thank you for that.

TESTIMONY OF DR. BRANDNER

222

Brandner001418

3

DIRECT EXAMINATION

BY MR. CAUBEY:

Q    Dr. Brandner has come in from out of town and we had scheduled a specific time.

Would you state your full name, please.

A    Patrick Brandner.

Q    And what is your profession?

A    I'm an orthopedic surgeon.

Q    Doctor, are you licensed to practice medicine then?

A    I'm licensed in the State of Nevada, Arizona, California, and Louisiana.

Q    Where do you principally office?

A    My office is in Las Vegas, Nevada, and Henderson, Nevada.

Q    Doctor, do you hold any certifications within your profession?

A    I'm board certified by the American Board of Orthopedic Surgery.

Q    Doctor, at some point in time you were contacted by my office to review a case to render your thoughts and opinions on that; is that correct?

A    That is correct.

Q    And the materials that you reviewed, those were provided by my office; correct?

TESTIMONY OF DR. BRANDNER

Brandner001419

4

A    Correct.

Q    Describe, if you will -- it's not a test, if you miss a document or two -- as best you recall, describe the documents or information you were provided when you were initially retained in the matter?

A    To the best of my recollection, I was provided medical records of ███████ by two separate physicians. I was provided hospital records. I was provided post-operative care. I was provided x-rays, which were the pre-operative x-rays. And I believe I was provided a deposition by Dr. Sharpe.

Q    Doctor, as part of your initial work on this matter, do you review all of these materials?

A    Yes, I did.

Q    I just want to clarify at the beginning, your function in being here today is to render expert opinions within your field; is that correct?

A    Correct.

Q    In reviewing the materials and performing the initial work, if you will, on this case, am I correct that you ultimately had no complaints -- for lack of a better term -- regarding the care and treatment that Dr. Matthews had provided?

A    That is correct.

Q    And I want to talk about Dr. Sharpe. Am I also

TESTIMONY OF DR. BRANDNER

Brandner001420

S

correct, with respect to the actual surgical procedure on June 26, 2002, the actual physical procedure and how it was performed itself, you also have no adverse opinions about it; is that correct?

A    Correct.  I thought it was excellent.

Q    If I understand correctly then, your opinions in this case are limited to the exchange of information that needed to take place prior to Dr. Sharpe's surgery; is that correct?

A    Correct.

Q    Sometimes we use the term "informed consent," is that what you refer to it as?

A    Yes, sir.

Q    Tell me what your understanding was about the procedure that Dr. Sharpe was going to perform?

A    The procedure was to correct a angular deformity of a fracture in the lower leg bone in an individual who was just reaching adulthood or an adult skeleton, that was partial healing, which had further healing to take place, but the healing was fairly progressed along, it was fairly going toward maturity.

Q    Does the term malunion have any specific meaning?

A    The term malunion is a term that describes a fracture that is healed in a unacceptable position.  This

TESTIMONY OF DR. BRANDNER

225

Brandner001421

6

was not a malunion, in my estimation. It was still a mal-positioned fracture.

Although it met the strict criteria for a malunion, meaning it was over the period of time that science tells us that the bone is healed, there was still healing potential apparent in the physiology that appeared on x-ray.

So it was mal-positioned at that time.

Q    Doctor, you mentioned that you had reviewed some medical records in order to familiarize yourself with what had taken place historically in the treatment of Scott Clark.

I want to show you some documents that we've already looked at here today and yesterday, actually. This is what's been marked as Plaintiff's Exhibit 10, Doctor.

It should show up on the screen there in front of you. As you can see, it's the April 11, 2002, office note of Dr. Sharpe.

Do you recall reviewing this document as part of your review of this case?

A    To the best of my recollection, I did review this.

Q    Okay. Let me see if I can show you -- this is, as you can see, refers to the x-rays talking about the degrees of the deformities; do you see that?

TESTIMONY OF DR. BRANDNER

226

Brandner001422

7

A    Yes.

Q    Do you have a recollection of reviewing that?

A    Yes.

Q    Then on the second page of that same day, it carries over to the next page. You can see there's a list of things.

Says: Fibular osteotomy will also be necessary. And we did have an extensive discussion about risks, including anesthetic risk, death, infection, nonunion, or delayed union, nerve injury, vessel injury.

Do you see what I'm referring to?

A    Yes, I do.

Q    Doctor, did you review these specific entries as part of your review?

A    Yes, I did.

Q    Doctor, in front of you there is a stack of documents, I believe it's marked as defendant's Exhibit 22. There's a yellow -- may I approach, your Honor?

THE COURT:  Yes, of course.

BY MR. CAUSEY:

Q    I'm going to misspeak, there should be a yellow tab at the bottom, not the bright yellow one, looks like this Post-it, is the word I'm trying to think of, right down at the bottom?

A    Pale yellow Post-it?

TESTIMONY OF DR. BRANDNER

227

Brandner001423

8

Q    Exactly. Thank you, Doctor.

And Doctor, that is Exhibit 22, defendant's Exhibit 22.

I want to show you -- I'm putting it up here on the screen as well, then I'm going to have to zoom back down, hang on just a second.

Actually, we'll just start at the top and work back, that way the words are kind of small.

Doctor, this is a document that says consent for surgical or invasive procedure. I believe this is the hospital's document where the procedure took place.

Did you also review these materials as part of your initial work in this case?

A    Yes, I did.

Q    You can see down at the bottom there it says physician attestation; do you see that?

A    Yes.

Q    Is it your reading of these documents -- this document, excuse me, that that's the portion where the doctor is supposed to sign that?

A    Yes.

Q    One more document I want to show you. It's not in those materials, so you can set that aside. I have an overhead here of it.

Exhibit 11, that's been entered into evidence,

TESTIMONY OF DR. BRANDNER

228

Brandner001424

9

it's a June 6, 2002, entry. You can see there it says Dr. Sharpe again.

This is what's been referred to as the pre-op evaluation, and you can see that in the very first entry: Scott is here for pre-op evaluation.

Do you see that?

A    Yes, I do.

Q    Again, is this a document you would have reviewed as part of your work in this case?

A    Yes.

Q    I apologize for moving it while you're looking at it there.

Then down at the bottom again there is language regarding there's a list again of potential risks.

You got to read the sentence in front of it to put it in context. I've given them a prescription for post-op pain medication and reviewed the risks of surgery.

Do you see what I'm referring to?

A    Yes, I do.

Q    Says these include, but are not limited to, death, other anesthetic complications, blood vessel injury, nerve injury, fracture, chronic stiffness, chronic pain, malunion, nonunion, refracture, mechanical failure of the components -- I believe that's blood loss, it looks like there might be a three-hole punch -- blood clots and

TESTIMONY OF DR. BRANDNER

229

Brandner001425

10

infection.

Do you see that?

A    Yes, I do.

Q    And is this something you reviewed as part of your work in this case?

A    Yes, I did.

Q    Doctor, I asked you a moment ago about the knowledge of the procedure that Dr. Sharpe was performing.

Can you describe tibial osteotomy, this procedure that took place?

A    Yes.  The osteotomy itself is a cut at the -- what's call the apex of the deformity.  Because it's a complex deformity, it both was angled in this plane and in the front and back plane.

So, you can do this by a one-cut procedure, which has a mathematical model to it, and correct the deformity.  And you also have to cut the other bone, the fibula, in order to get this to straighten up.

So it's a, it's a fairly elegant procedure to correct a complex malposition or malunion to bring the bone back into alignment and then internally fix the bone in the position of correction with rigid fixation devices so that the fracture can heal, or the doctor-created fracture can heal.

Q    Is one of these fixation devices, would that be

TESTIMONY OF DR. BRANDNER

230

Brandner001426

11

a plate and screws?

A    It's a plate and screws, yes.

Q    Doctor, as part of your review of this case, you indicated that you had also looked at some pre-operative x-rays?

A    Yes, I did.

Q    What was your purpose of looking at those?

A    The purpose of looking at the x-rays was to No. 1, define the problem; No. 2, to look at the degree of the problem, the complexity of the problem, and to determine the state of healing and the overall condition of the joint above and joint below.

Q    What did you -- actually, your Honor, 37, I believe is agreed to?

THE COURT:    You're offering 37?

MR. CAUSEY:    Yes, defendant's Exhibit 37.

THE COURT:    There is no objection?

MR. CRAWFORD:    No, your Honor.

THE COURT:    37 is admitted.  Thank you.  Go ahead.

BY MR. CAUSEY:

Q    Doctor I want to hand you what has been marked as Exhibit 37, which I believe there are actually two sheets inside, we don't have a hold-up board, but I think you might be able to utilize the light behind there.

We tried it on this projection screen, it

TESTIMONY OF DR. BRANDNER

231

Brandner001427

12

didn't show up very, good so... Can everyone see okay?

A     Okay.

Q     All right, Doctor --

A     This --

Q     What if anything was significant about the x-rays? First of all, is this an x-ray that you reviewed, the Mezona March 22, 2002?

A     I can't recall exactly. I think I did. There was a series of x-rays I reviewed with what appeared to be much more callus. With callus meaning this type of bone. And the x-rays that I saw were -- had less maturity, I believe.

But in any event, what we are looking at is an anterior-posterior or front to back view of a tibia and fibula, which includes the knee joint.

And what we're seeing is mature callus through the fibula fracture, meaning that the bone has bridged the fracture and it's beginning to look like the mature bone above and below where the shaft is.

We're also seeing a fracture, which is poorly defined in the -- what's called the proximal one-third of the tibia or the -- we call the metaphyseal, which is this part of the bone, and the diaphyseal, the tubular part of the bone, junction. So that's how we describe it to each other.

TESTIMONY OF DR. BRANDNER

232

Brandner001428

13

And this appears to be a non displaced fracture with an angulation, which is what we call valgus, which is the distal fragment away from the midline.

The second x-ray is from the side. It shows, again, the tibia and fibula. And it's, I think, it's apparent the amount of angulation or bowing that is present in the fracture.

Again, this does show more of the callus. It appears that the fibula callus is more mature. There is some cloudy or puffy-looking bone which is called primary callus or initial callus, then you get some mature bone above it.

So basically what this shows is an angulation both in the front-to-back plane and the side-to-side plane and a fractured tibia mainly.

Q   Thank you, Doctor.

What was the significance, as far as the opinions that you were going to render in this case, of the information you gathered from the x-rays?

A   The x-rays that I had seen, and I can't recall if they were these, but I saw x-rays that were presented to me that were representing a pre-operative x-ray, meaning that those were the x-rays that surgery was going to be planned on.

And I felt that, that the individual was

TESTIMONY OF DR. BRANDNER

233

Brandner001429

14

between an adolescent and an adult; in other words, his growth plates were in the process of closing.

I had had experience where I had treated or been involved in cases where these fractures, in that age group, were watched and left alone and there was a certain amount of remodeling. Remodel, meaning the bone moves when it's stimulated by the body. It gradually can straighten some, we don't know how much.

The younger you are, the more growth you have, the better the chance you can straighten the bone on your own.

The closer the fracture is to the joint, the better the chance you can straighten the bone on your own, if you have open growth plates.

This gentleman had partially closed growth plates or closing growth plates. I felt that it could be watched a bit longer to -- one opinion I had was it could be watched a bit longer to see how much remodeling could take place. And if that amount of remodeling did not improve it significantly, then the surgical option or leave it alone were the choices.

Q    When you said or leave it alone, then whatever it healed to, the degrees of angulation, make a decision at that time with respect to proceeding to the risk of surgery or live with limitations --

TESTIMONY OF DR. BRANDNER

234

Brandner001430

15

A    Correct.

Q    -- you have at the time?

A    Accept, accept what you've got and live with it.  If it's unacceptable or you're developing pain in your joints or you don't like it or you can't live with it, then surgery would be an option.

Q    As part of the pre-surgical discussions between patient and doctor, with respect to                case specifically, and this type of procedure, tibial osteotomy, did you, as a result of your review of this case, develop any opinions along those lines?

A    I felt that, No. 1, if              and his parents wanted the surgery, it was appropriate to do it.

But my only problem was I couldn't find specific discussion of the most -- the greatest potential for injury complication when you do this.  I didn't see that specifically discussed in nerve injury.

And since most of the surgeries that we do in the United States, there's a .5 percent or less of complication, meaning death, or whether the procedure works.

And not to get off the track, but an example of that was what we call the bariatric surgery, where they used to start stapling stomachs.

There was a very high mortality morbidity rate with that, so it never was mainstream.

TESTIMONY OF DR. BRANDNER

235

Brandner001431

16

It's suddenly now reached the point where it's approaching every other procedure that we do that's predictable, and it's being more and more accepted.

When you have a surgery around an area that has a greater risk of injury over the vascular injury or other things that we mentioned, I felt that it had to be talked about because there's a greater chance that that is the thing that's going to happen.

And the peroneal nerve, in this type of osteotomy, has a three to 13 percent incidents of damage, not because of the surgeon, but because of the way God made the peroneal nerve.

So it's got a three to 13 percent incidents of damage, and I felt like that should have been discussed specifically, because many people get so much information from a sophisticated -- the subject, that they can't really remember everything. So it's important that they remember the thing that could -- has the greatest chance of happening.

So I felt like that needed to be discussed and I didn't see that in the medical records themselves.

Q    Doctor, are you here to render any opinions as to whether or not these conversations or communications in fact took place?

A    No.  I just didn't see it stated in the medical

TESTIMONY OF DR. BRANDNER

236

Brandner001432

17

records I reviewed.

Q    Your opinion, with respect to the discussions that are needed regarding the risk of damage to the specific nerve in this case, how would that be described? What are we talking about?

A    Well, you're talking about a nerve that supplies the muscles to the front of your leg and controls the top of your foot and the top of your toes. It also controls the sensation to your foot.

So what you want to tell an individual is that that nerve can be injured and it's unavoidable. Sometimes we don't know why it gets injured, but there is a three to 13 or 15 percent chance that this thing can be injured.

So, we want you to understand that, if you're going to decide to have this straightened out -- and I think you write down the name of the nerve, which won't mean much, but they can understand paralysis of your foot, where you can't bring the foot up and they can understand loss of sensation to the top of the foot and they can understand you might need to wear a brace for the rest of your life which can fit in your shoe and you walk with it, but -- and you wear a brace if that happens.

Now, that's a lot of information. And there has been some criticism of physicians that say, well, you should have mentioned this. And the answer is, well, it

TESTIMONY OF DR. BRANDNER

237

Brandner001433

18

would take three days to go over everything that could happen in an operating room, and we understand that.

But when you get down to something that is beyond the norm that can happen, I think it's imperative that you talk about it and you identify it and you make your patient understand it.

Q   And Doctor, the things that we just discussed, if the physician who is performing that surgery fails to discuss those issues with his patient during the process, pre-surgery process, where the decision to go forward with the surgery is being made, would that conduct fall below the standard of care?

A   Yes, it's my feeling it would.

Q   Doctor, a moment ago you were talking about -- I just wanted to clarify something -- you were talking about the growth plates and partially closed and the straightening of the bone on its own.

Are you suggesting that the bone will straighten all the way back on its own or some --

A   No.  In fact, I think it would straighten some, but I don't think I could predict that it would straighten anywhere near normal.  And that's a total hypothetical.  I just felt that there was potential there, and that would have been discussed.

Q   Doctor, have you performed any tibial

TESTIMONY OF DR. BRANDNER

238

Brandner001434

19

osteotomies in your practice over the years?

A    Yes, I have.

Q    Do you recall approximately how many?

A    Well, the traumatic -- the ones that were -- had poor -- bad angulation from trauma were five, but I also did reconstructive osteotomies in people with arthritis. And I would say that I've done over 50 of those.

Q    Doctor, along with the discussion regarding the risks of the surgery, you've mentioned earlier there was a wait and see option as well, see how it does.

Did you develop any opinions as to the content of what should be discussed with respect to that other option?

A    Well, the other option, I think, would be, in this particular case, the problem was that the individual was trying to do athletics, and it hurt. He had a bump on the front, and it was mainly he couldn't do -- participate in what he enjoyed.

I don't think they had a good rapport with the first surgeon that was treating it closed. I don't think he had answers to the problem. So, he sought other doctors to get opinions and the opinions were we can surgically fix it.

I think that in the discussion with the family, they needed to understand that this could potentially straighten a bit more, if you slow down, back off, stop

TESTIMONY OF DR. BRANDNER

Brandner001435

20

making it hurt, and let's give it a little bit of time.

We're not talking about a year, we're talking somewhere between six and eight months. If it doesn't, we will straighten it.

It doesn't mean that that was a better choice than operating on it at the time because, basically, everything I'm saying is a total hypothetical.

It could have been eight months from now and you looked at this fracture and it was just as bad or maybe worse and the same problem would happen. You would go in, operate on it, and I think that the peroneal nerve would be stretched.

I think this was a fait accompli. I think that peroneal nerve was going to be stretched with anybody who straightened this tibia out.

Q    Doctor, the discussion that you just described regarding the wait and see option, if the surgeon, prior to this type of surgery, failed to discuss those issues as well as part of the risk discussion and the decision to make -- excuse me the decision to go forward with this type of surgery, would that fall below the standard of care as well?

A    No, I don't think so. This is something based on the experience of two physicians in my group who have seen this.

But this fracture, I think, is showing

TESTIMONY OF DR. BRANDNER

Brandner001436

21

progressive healing and it's showing significant angulation. So, I wouldn't agree that the choice to do surgery, at the time it was done, fell below standard of care and it's the discussion of wait and see was not done, fell below standard of care.

Q    And Doctor, I may have -- I appreciate your answer, but I think -- I'm not sure we're on the same page.

My question was more with respect to what was discussed, as opposed to the decision.

A    Correct.

Q    I just want to clarify on this before we move on.

You've testified that the risks that you described -- I don't want you to -- we won't repeat those, they've already heard that -- but the risks that you described, with respect to the peroneal nerve and the potential results from that, if the doctor had failed to discuss those as part of the pre-surgery process the surgeon had, that that fell below the standard of care.

My question now is in conjunction with that, during this same time frame, pre-surgery, if the doctor, the surgeon, also doesn't discuss, as you just described, the reduce activity, reduce pain, the wait and see option, as you described it, would that fall below the standard of care?

TESTIMONY OF DR. BRANDNER

241

Brandner001437

22

A    I don't think so.

Q    Okay.  So your focus, primarily, is on a proper discussion of the risks and this peroneal nerve because of what you've already stated?

A    The discussion of foot drop.

Q    Doctor, did you have an opinion as to whether this fracture, if you did this, I think you said six to eight months wait, something along those lines, would it have become significantly worse?

A    Well, again, it's a hypothetical.  It wouldn't become necessarily significantly worse.  The possibility is it could worsen.  The possibility was that it could improve. I don't know.

But there was -- I would, I would assume, based on the historical knowledge of fractures, that if you stimulate your leg appropriately with walking on it and using it, your body's message to the bone is to straighten it out.

You're using it, you're stimulating it, so any remodeling that would occur, I would think, probably would improve alignment.

Q    Doctor, I want to understand what you mean by activity.  You mentioned walking on it.  And then earlier you mentioned that reduce activity, reduce the pain.  I'm assuming there is line there somewhere.

TESTIMONY OF DR. BRANDNER

Brandner001438

23

A    Well, specifically in this case, what your client was doing, I think he was doing significant dance steps and attempting to do heavy cyclic loading on the leg and he was getting pain from that.

I think activities of daily living, such as walking, swinging your leg, using it for normal activity, would still stimulate the leg, and the stimulation would lend more towards straightening than it would progressing -- getting -- making the fracture progress in a worse position.

Q    If I understand you correctly, you're saying reduce the activity, but not eliminate it entirely. Reduce it to a gentler state?

A    Correct.

Q    Doctor, with the foot drop and the brace that is now in, would there be any future problems may have with respect to the other joints in that lower extremity?

MR. CRAWFORD:  Lacks foundation.

THE COURT:  Counsel, in what way?  What foundation is lacking at this point?

MR. CRAWFORD:  I don't believe the doctor's ever evaluated the patient, certainly not recently.

MR. CAUSEY:  I can rephrase, your Honor.

THE COURT:  Please.

TESTIMONY OF DR. BRANDNER

243

Brandner001439

23

A     Well, specifically in this case, what your client was doing, I think he was doing significant dance steps and attempting to do heavy cyclic loading on the leg and he was getting pain from that.

I think activities of daily living, such as walking, swinging your leg, using it for normal activity, would still stimulate the leg, and the stimulation would lend more towards straightening than it would progressing -- getting -- making the fracture progress in a worse position.

Q     If I understand you correctly, you're saying reduce the activity, but not eliminate it entirely.  Reduce it to a gentler state?

A     Correct.

Q     Doctor, with the foot drop and the brace that Scott is now in, would there be any future problems Scott may have with respect to the other joints in that lower extremity?

MR. CRAWFORD:  Lacks foundation.

THE COURT:  Counsel, in what way?  What foundation is lacking at this point?

MR. CRAWFORD:  I don't believe the doctor's ever evaluated the patient, certainly not recently.

MR. CAUSEY:  I can rephrase, your Honor.

THE COURT:  Please.

TESTIMONY OF DR. BRANDNER

Brandner001440

24

BY MR. CAUSEY:

Q    Doctor, in a typical patient that would have the foot drop and wear this type of brace that ▮▮▮s wearing, the fiber glass brace that he wears to keep his foot up, what would you expect, down the road, future, any problems with the ankle, knee, or hip joints in that extremity?

A    The problems that I've seen with chronic use of the ankle, foot arthrosis or wear problems, where you have to change it, it will break down.

Obviously, there will be atrophy in the leg where the muscles aren't functioning, so they lose their mass and tone.

There's a possibility of a knee problem in the future because of the changed mechanisms across the knee, so that you would potentially get a wear and tear force across the knee that wouldn't have been there otherwise and might lead to arthritis. There's a possibility, but smaller, in the hip I think.

And I'm not sure whether the ankle would suffer any problems. The ankle may get stiffer and lose its motion ability, and so would the, potentially, the joints below the ankle.

Q    The stiffer ankle, is that a result of the foot drop condition?

TESTIMONY OF DR. BRANDNER

245

Brandner001441

25

A   I think the stiffer ankle is due to the tissues that go -- glide across the front of the ankle, and the fact that they're not being stimulated by the nerve any longer and so they change from muscle to more of a fibrotic or scar tissue.

Q   Now, Doctor, if the choice had been made not to have surgery, the wait and see option, and as you've said, you had no expectation that it would heal itself back to pre-injury status, but if it didn't heal sufficiently enough that the patient decided not to have surgery and we were in the wait and see -- or are we at that point where a live-with-it-status, I guess is the phrase that was used, would there have been still some joint future problems down the road?

A   Yes.  There's a greater potential that the knee would get forces that would create sheer forces and create traumatic arthritis or arthritis in the knee.

There also may be ankle pain due to the mechanical access changing, where the ankle is not exactly parallel to the ground any longer compared to the hip.

Q   You didn't mention hip in that list, would the hip be involved there?

A   The hip to a lesser extent, but I think the main concerns would be the knee and the ankle.

Q   Is there any way of predicting how many years

TESTIMONY OF DR. BRANDNER

Brandner001442

26

down the road these problems would arise?

A   No.

MR. CAUSEY:  That's all I have at this time, your Honor.

THE COURT:  Cross examination.

CROSS-EXAMINATION

BY MR. CRAWFORD:

Q   Doctor, what do you charge to come down to Arizona to testify?

A   $8,000.

Q   Plus expenses?

A   Plus my plane fare, and that's it.

Q   And we've heard you have an Arizona license. How long has it been since you've -- since you practiced in Arizona?

A   I practiced in a clinic in Bullhead City, 1990.

Q   18 years ago?

A   Correct.

Q   So you don't actively practice in Arizona. You don't have an office here?

A   I don't actively practice in California, Arizona, or Louisiana.

Q   I don't care about California, Louisiana, Arizona, you don't actively practice here?

TESTIMONY OF DR. BRANDNER

247

Brandner001443

27

A    No, sir.

Q    You keep renewing your license you had a long time ago?

A    Yes, sir.  Yeah, based on the renewal requirements.

Q    We're talking about a fracture of the tibia and the fibula in what's called the proximal one-third area; is that right?

A    Correct.

Q    In a young man who is basically 15 years old?

A    Correct.

Q    You ever treated a patient like that?

A    Not at that age, no.

Q    In fact, you haven't treated this kind of a problem in over 25 years, that we're talking about in this case?

A    No, I've treated that kind of a problem.  25 years?

Q    Do you remember telling me, when I took your deposition, you hadn't treated one of these fractures since you've been in private practice?

A    I don't recall that.  I know I treated them in the military, but I think I did have a patient in private practice.  I can't remember how far back it was.

Q    Okay.  August 5, 2005, I came up to Las Vegas

TESTIMONY OF DR. BRANDNER

Brandner001444

28

to take your deposition and find out what your opinions were going to be when this case went to trial.

Do you remember that, sir?

A   I remember that, yes.

Q   And you've had your deposition taken lots of times; right?

A   Correct.

Q   Okay.  Let me show you -- counsel, Page 40, and 41 -- and I'm asking you about your experience.

Does this help refresh your recollection?

A   Let me see how you phrased it though because I think what I was referring to was the shaft near that area.

But I can tell you that I treated an individual with a malunion in the distal third, and he's a still my patient --

Q   Talking about the proximal one-third.

A   Correct, okay.  Well, that would be correct, yes.

Q   So, what we're talking about in this case was a fracture of the tibia and the fibula in the proximal one-third.  You haven't seen a patient or done surgery on a patient like that in over 25 years?

A   Only the patients that -- when I was in the deposition, I was thinking of the traumatic fractures.  I have treated multiple patients, through my career, for

TESTIMONY OF DR. BRANDNER

249

Brandner001445

29

arthritis, with tibial osteotomies, but I don't think you were alluding to that, so...

Q   This isn't an arthritis patient, is it?

A   No, but the position of the tibia is off, so I did treat that. But no, I did not treat a fracture like this for 25 years.

Q   And you've never treated a fracture like this in a man, young man who's 15 years old?

A   Correct, not exactly this age and this position.

Q   I notice that you brought a carrying case with you. By any chance did you bring the materials that you had been sent to review in this case with you?

A   Some of them.

Q   Did you bring the depositions that you had been sent?

A   Only my deposition.

Q   Okay. Experts rely on attorneys providing them materials to come to opinions; is that a fair statement?

A   Yes, sir.

Q   And is it a fair statement that expert opinions, in some cases, can only be as good as the amount of information they've been provided?

A   I would agree with that.

Q   Were you provided with ▮▮▮▮▮▮▮'s deposition

TESTIMONY OF DR. BRANDNER

250

Brandner001446

30

and his mom's depositions that were taken in this case before Dr. Sharpe was sued?

A    I don't know if it was before -- well, I was -- I don't know.  I was given their depositions, I don't know the time frame there.

Q    How many ▮▮▮▮▮ depositions were you given?

A    One that I know of.

Q    How many Mrs. ▮▮▮▮ depositions were you given?

A    One.

Q    Do you have any memory, sir, of having been given the depositions of ▮▮▮▮▮ and his mother that were taken in this case before Dr. Sharpe was brought into the case and sued?

A    I don't know.

Q    Well, if there is two volumes of their depositions, your memory is you've only been given one of each?

A    May have been that I got the whole thing in a volume and I looked at it and I didn't pay attention to the times that they were given.  But I don't recall exactly what dates they were given.

Q    And you don't recall any testimony where ▮▮▮▮ ▮▮▮▮ was asked:  Did Dr. Sharpe tell you about foot drop before the surgery?  And his answer being yes?

TESTIMONY OF DR. BRANDNER

251

Brandner001447

31

A    I don't remember that, no.

Q    Do you remember testimony from mother's deposition, where she, hypothetically -- I'll give this to you as a hypothetical -- says that Dr. Sharpe warned her before surgery that there were nerves in the legs and when he corrected the deformity those nerves could be stretched?

MR. CAUSEY:  Your Honor, objection; evidence not in the record, and foundation.

THE COURT:  Overruled.  I'll allow it.

THE WITNESS:  I have snippets that were sent, if you allow me to look at it, I think --

BY MR. CRAWFORD:

Q    Sure, let's see what you got.

A    I think that's what is in here.  I have what was sent a, recently, deposition of [redacted] performed January 29th, 2004.

Q    Can I see that, please?

A    Yeah.

Q    Today is April 29, 2008; right?

A    Correct.

Q    You were faxed something four days ago, that's what you were pulling out?

A    Correct.

Q    So the first time you saw testimony that you are talking about was four days ago?

TESTIMONY OF DR. BRANDNER

252

Brandner001448

32

A    No.  I think I had seen this before, but this was basically information to center me around the trial.

Q    You just brought the snippets with you today?

A    Correct.  I think I sent back everything, that's why.  The volumes were too great, I did not have the storage room.

Q    Let's talk about this fax that you got four days ago.  It, in fact, was a portion of the deposition of ████████ that was taken on January 29, 2004?

A    Correct.

Q    And you were sent Page 51?

A    That's what I have here.

Q    Okay.  Take a look at it.

MR. CAUSEY:  Your Honor, may we approach?

THE COURT:  Of course.

(An off-the-record discussion was held out of the hearing of the jury.)

THE COURT:  For the record, the objection is overruled.

BY MR. CRAWFORD:

Q    Okay.  You were sent four days ago Page 51 of Mrs. ████ 's deposition; is that correct?

A    Correct.

Q    And did you have any discussions as to why it was four days ago that this one page happened to be faxed up

TESTIMONY OF DR. BRANDNER

253

Brandner001449

33

to you?

A No, I did not talk to Mr. Causey. I just took it, looked at it, and I was reviewing a lot of things.

Q Just out of the blue, four days ago you get faxed Page 51 of Mrs. ████'s deposition, right, and you have no idea why it's coming?

A I know why it's coming, but I have no idea how it pertains to what my testimony is until I look at it.

Q Okay. Let's read it.

She's asked the following question:

Question: Did ████ have that foot drop, as far as you could tell, before the surgery performed by Dr. Sharpe?

Answer: No.

Question: What do you mean by foot drop?

Answer: There are, there are nerves that control the flex in a foot. And because the bone had been twisted and there was a callus on it, it had put pressure on those nerves.

And Dr. Sharpe had said that when he moves it back into alignment and corrects all that, that those particular nerves might be very stretched and might be damaged because of that. And that's what happened.

You don't remember ever seeing that testimony before four days ago, do you, Doctor?

TESTIMONY OF DR. BRANDNER

254

Brandner001450

34

A    No.

Q    Were you, by any chance, sent Pages 99 and 100 from Mrs. ████'s deposition, the one back from January 2004?

A    99 and -- Page 99 and 100?

Q    Yes, sir.

A    I don't know.

Q    Well, you got the fax right there.  Do you see 99 and 100 in there?

A    Oh, no, not in this fax.

Q    By the way, before I get to that, you also were sent one page out of ████████'s deposition from January 2004; is that right?

A    I was sent two.

Q    Two pages?

A    28 and 29.

Q    Was that the page from his deposition back then where he was asked did Dr. Sharpe tell you about foot drop before the surgery, and he said, "Yes, he told me about all sorts of things?"

A    No -- let's see, yes.  Line 17, Page 28.

Before you had the surgery, did Dr. Sharpe ever discuss with you or did anyone discuss with you, you might end up with a drop foot?

Answer:  Yes.  He told me all the things that

TESTIMONY OF DR. BRANDNER

255

Brandner001451

35

could happen. It could have nerve damage. And he said all the things. He even mentioned death. The dash dash dash we had an anesthesiologist and there could be accidents and stuff. There were a lot of things.

Q Let me show you Page 99 and 100 of Mrs. █████'s prior deposition.

Question: One thing I forgot -- I swear to you it was here and I forgot to ask -- is there any doubt in your mind that the nerve injury occurred during Dr. Sharpe's surgery?

There's an objection.

The witness: I think it happened because the leg had to be re-broken, and I think that it happened because it -- everything had to be moved around.

Question: Did you talk to Dr. Sharpe about that?

Answer: He had warned us prior to that, you know, movement of that bone, when he had to put it back in place could cause various things. And he went through a list of many things.

Have you ever been aware of that testimony?

A I believe so. I can't recall exactly, but again, it's -- the reason I'm saying I can't recall is because it strikes me, as this lady, knowing a list or a laundry list of things, and not specifically addressing --

TESTIMONY OF DR. BRANDNER

256

Brandner001452

36

it looks like she's talking about things that happened after the surgery and she understands it and she mentions it. But she doesn't specifically define that she knew the nerve could be stretched, before.

Q    I see. By any chance, have you discussed that testimony with Mr. Causey recently?

A    No.

Q    How about the stuff that got faxed up to you out of the blue four days a ago?

A    No, I did not.

Q    Do you agree with me, sir, that a doctor, when he sees a patient, he goes through lots of things, there is lots of things discussed.

Then when that visit is over, he prepares a note which, generally speaking, is a summary of the meeting?

A    Yes.

Q    And you do not expect a doctor to do a verbatim transcript of every single thing that is said during that meeting with a patient, do you, sir?

A    No.

Q    It's -- a note is supposed to be a summary?

A    Correct, a salient summary.

Q    In fact, if you, as doctors, tried to dictate a verbatim transcript of everything that was discussed with the patient during a visit, you wouldn't see very many

TESTIMONY OF DR. BRANDNER

257

Brandner001453

37

patients a day, would you?

A    Either that or I'd be paying for a court reporter to follow you for every patient.

Q    Okay.  You don't have that kind of expectation, Dr. Sharpe, do you, sir?

A    No.

Q    So, what you want to know, as an expert, is was this general concept of there are nerves in the lower leg and when I correct this thing they could get stretched, and if they get stretched, you could lose some function in the leg.

That's the gist of what you're looking for in this case?

A    Correct.

Q    And it doesn't have to be the magic words "foot drop" or "peroneal nerve," does it?

A    No.

Q    So if -- regardless of whether those specific words appear in Dr. Sharpe's medical record, if you concluded, hypothetically, that there was this lay-person discussion about the concept of this nerve being injured potentially during surgery, you wouldn't have any criticisms of Dr. Sharpe at all, would you?

A    No.  And let me put this into the terms that I -- is acceptable, if you don't mind.

TESTIMONY OF DR. BRANDNER

258

Brandner001454

38

If there was a discussion saying there is a nerve in the area of this operation that can be stretched and is susceptible to stretching and we just don't know, it's not injured, I won't cut it, it's going to be protected, but sometimes it doesn't work after the surgery and we don't know why and it doesn't come back in most cases.

Something like that, I think, sticks with a person and it gets it, it gets it burned in their cerebrum and so they remember, okay, I've got a potential for a nerve that won't function, make my foot function, but other than that, I think I want this operation and I'll take the chance.

That's pretty much what I think I'm driving at, just make sure that your patient remembers that kind of thing.

Q    Doctor, you can't control somebody's memory six years later?

A    No, you can't.

Q    All right.

My question was this:  If there was the gist of the discussion, was in lay terms -- not trying to throw technical medical terms at them, but just try to say, hey, I'm going to be straightening out this deformity of your leg.  And when I do that, you need to understand there are

TESTIMONY OF DR. BRANDNER

259

Brandner001455

39

nerves or a nerve in your leg and it could get stretched.

And if that happens, the nerve could get knocked out, could not -- could lose its function and because of that you could have some loss of function of your foot, that -- if that general discussion took place, you wouldn't be here criticizing Dr. Sharpe, would you?

A    Correct.

Q    The consent form is a standard type consent form that's used at hospitals, isn't it?

A    It appears to be, yes.

Q    Okay.  And it's, it's done just before the surgery, where there is just one last time to say, okay, you agree, you have been told about potential risks, complications, things like that?

A    It can function like that, yes.

Q    Did you review Dr. Russo's deposition by any chance?

A    I did.

Q    During his deposition, you saw there was discussion about a graft that he prepared.  Do you remember that?

A    Yes.

Q    What he did is he took the two deformities that were in two different planes and he calculated what, in his mind, is the real degree of deformity?

TESTIMONY OF DR. BRANDNER

260

Brandner001456

40

A    Correct.

Q    And he came up with I think 38 --

A    38 degrees.

Q    And do you agree with what he did there?

A    Oh, it's elegant, yes.

Q    So, the true deformity, when you do those kind of calculations like Dr. Russo did, is a 38 degree deformity of this leg?

A    Correct.

Q    That's not normal?

A    It's very abnormal.

Q    And it's a significant problem?

A    Yes, it can be.

Q    In fact, you know that ███████ had developed ankle pain, knee pain, and hip pain before the surgery even took place?

A    Yes.

Q    Those are the kind of things that you can see happen with a lower leg that is this mal-position?

A    Yes.

Q    Now, you don't think, technically, the term malunion applies?

A    Well, I didn't operate on this, so I don't know what the callus looked like.

On x-ray, it doesn't look like all the callus

TESTIMONY OF DR. BRANDNER

Brandner001457

41

is secondary callus. It's matured. It looks like there is some primary callus and, therefore, technically, if you go by the book, it's a malunion.

I thought that if there's potential to remodel, and in my experience there was some, then it was a mal-positioned fracture that could change, potentially, in a short future time.

Q So, technically, if we go by the medical books, this is, in fact, a malunion?

A Yes. If you presented this case, it should be discussed as a malunion.

Q In fact, that's what Dr. Dinowitz said in his records?

A I agree.

Q That's what Dr. Sharpe said in his records?

A I agree.

Q And that's what Dr. Walls said in his records?

A I agree. And I agree that surgery is a very good choice.

Q You were shown the March 22, 2002, x-rays, do you remember that, just a few minutes ago?

A Yes.

Q You told us you're not sure those are the x-rays that you reviewed?

A I just recalled seeing more callus on the

TESTIMONY OF DR. BRANDNER

262

Brandner001458

42

anterior posterior. I just -- I mean, this was four years ago. So, I just got a recollection that I'm looking at it and I'm just seeing more callus, in my memory.

Q    What was four years ago?

A    When I saw the x-rays, three to four years ago.

Q    Those are pretty important x-rays. Those are the first set of x-rays that are taken at the Mezona Orthopedics, Dr. Sharp's office; right?

A    Correct.

Q    You can't tell us, in fact, that you ever saw them before today?

A    No, no, no. I'm just saying, in my memory, they appear to be different to me. And it's been a four year span. I looked at the x-rays. I presented the x-rays. I went to my group and talked about this. The same thing Dr. Sharpe did.

So, I had x-rays. I don't remember exact the date, but I know they were pre-op x-rays.

Q    And your testimony is that the growth plates are not closed?

A    The growth plates, we felt that the growth plates had some potential. So, there is two of us in our group --

Q    I don't want to know about everybody in your group. I care about your opinion.

TESTIMONY OF DR. BRANDNER

263

Brandner001459

43

A    Okay, yes.  I felt the growth plates had some potential to continue to grow.

Q    My question is this:  Are you testifying, under oath, today, looking at those x-rays before surgery, March 22, 2002, that the growth plates were not closed?

A    Let me have the x-rays again.

MR. CAUSEY:  I think they're right there next to you.

THE WITNESS:  I don't see open growth plates on these.  They appear to be closed.

BY MR. CRAWFORD:

Q    So, the March 22, 2002, x-rays that you've now -- you've seen today, you agree that growth plates in this young man were closed?

A    They appear to be.

Q    If this degree of deformity in ███████'s lower leg does not correct, surgery is not performed, and it's not -- it doesn't correct itself, okay, to any degree, he is set up for problems in his knee and his ankle; agree?

A    And potentially his hip.  Agree.

Q    So yes.  And he's set up for developing arthritis as he gets older?

A    I agree.

Q    And that is something that you, as a surgeon, as a doctor, need to tell people when you're having these

TESTIMONY OF DR. BRANDNER

264

Brandner001460

44

discussions, that if this doesn't correct itself and you don't have surgery, one thing you can be looking at is problems in the other joints of your leg?

A    Correct.

Q    You're not telling us today that, in fact, had this gone on eight months without surgery that there would have, in fact, been any correction of that deformity?

A    Absolutely not.

Q    Putting aside this issue of whether this lay-person type discussion about tha nerves and the function of the foot occurred, put that aside; okay?   You would describe Dr. Sharp's pre-operative work up of this young man as excellent?

A    Yes.

Q    And all of the appropriate studies were done in terms of planning this surgery?

A    Yes.

Q    And, in fact, the surgery, from a technical standpoint, was performed correctly?

A    Yes.

Q    And you would describe it as excellent?

A    Yes.

Q    A fairly elegant procedure, is that what you told us earlier?

A    An elegant presentation of the definition of

TESTIMONY OF DR. BRANDNER

265

Brandner001461

45

the deformity.  A hard case and an excellent application of correction and internal fixation.

Q  Okay.  You're not suggesting to the jury, in any way, shape, or form, that Dr. Sharpe did something technically wrong during that surgery to cause this problem with this nerve?

A  Absolutely not.

Q  Okay.  It's not something you can predict in an individual patient ahead of time?

A  Correct.

Q  In other words, you can't say:  It's going to happen to ███████ as opposed to Jane Doe or whoever; right?  You just can't do that.

A  It's going to happen between 86 -- it's going to happen to 13 -- or three people -- between three and 13 people out of 100.

Q  Doctor, you can't predict --

A  So it's unpredictable, yes.

Q  You cannot predict with an individual patient whether it's going to happen to them or not, ahead of time?

A  I answered yes.

Q  And the fact that ████ had a complication from surgery does not mean that Dr. Sharpe did anything wrong during the surgery?

A  No, he didn't.

TESTIMONY OF DR. BRANDNER

266

Brandner001462

46

Q    And you looked at the post-operative care and you thought that was excellent as well?

A    The post-op what?

Q    Post-operative care.

A    Correct.

Q    Were you aware of Dr. Sharpe's personal practice of at the end of a meeting with a patient and his mom, that after he'd gone over everything, he would then dictate right in front of them?

A    No, I wasn't aware of that.

Q    I'll tell you that he does that.

A    Okay.

Q    Certainly nothing wrong with doing that, is there.

A    No, it's fine.

Q    You have -- you don't recall Dr. Sharpe's testimony about why he does that?

A    No, I don't.

Q    In terms of if ▮▮▮ wanted the best chance to get back to dancing at a high level, as soon as possible, surgery was the best option for him?

A    Yes.

Q    The activity level of the patient and their desires is certainly relevant to you, as the surgeon, in terms of is surgery a higher, a better option for this

TESTIMONY OF DR. BRANDNER

267

Brandner001463

47

person than something else?

A    The indication for surgery increases with the demands and wishes of the patient and the family and what they want to achieve from an activity level.

Q    In terms of how this nerve likely got affected by the surgery, do you agree that it doesn't appear to be a case where it was inadvertently cut or it was, it was -- got caught up in an instrument or something like that, that's not likely what happened?

A    Not likely, because, mainly, because surgeons who do this understand the anatomy and they take care to retract tissues in a way that does not put tension in that area.

Q    In addition, we know that part of the function of the nerve returned?

A    Correct.

Q    So what likely happened is when the leg was being -- the deformity was being corrected during surgery and the bones were being rotated, that that nerve probably, in retrospect, had gotten scarred down somehow, and when that correction occurred the nerve got stretched.

Do you think that's the most likely?

A    I think that can be the only conclusion you can come to, that the nerve was tethered due to the healing process and it had to be moved, whether it's half a

TESTIMONY OF DR. BRANDNER

268

Brandner001464

48

centimeter or two centimeters, and when it does, that nerve is very sensitive to stretch and it stretches.

Q    So if this surgery had been performed two months later, six months later, you believe the same outcome would have occurred. He would have had the same complication?

A    Yes.  I testified that I think it's a fait accompli.  This nerve was going to get damaged at surgery no matter when it was done.

Q    And no matter who did it.  In other words, no matter who the surgeon was, in retrospect it was going to happen?

A    If you operated at the deformity, like you're supposed to, it was going to happen.

MR. CRAWFORD:  That's all I have.

Thank you, your Honor.

THE COURT:  Folks, I think before we do the redirect, we need to take our afternoon break.

Let's take about 10 minutes, please.

MR. CAUSEY:  Your Honor, I will be extremely brief, and the doctor has a plane to catch, and I can do this real brief, I promise.

THE COURT:  Okay, all right.

MR. CAUSEY:  If I may.

THE COURT:  Sure.

TESTIMONY OF DR. BRANDNER

Brandner001465

49

REDIRECT EXAMINATION

BY MR. CAUSEY:

Q · Doctor, first of all, you were asked about your practice in Nevada versus Arizona and California and Louisiana came up.

Are you aware of any standard in the United States, in your orthopedic field, where anyone in Arizona is entitled to less or more information than a patient in Nevada, when it comes to a surgical procedure?

A No. We have a national standard of care.

Q And Doctor, even though you believe that the surgery would have been a good choice, a viable choice, as we discussed earlier, along with also the option of wait and see, whose choice is that ultimately?

A The choice is the patient's.

Q And Doctor, you were asked a question about whether or not you could testify that there would have, in fact, been any correction in the deformity under the wait and see option. Do you recall that?

A Correct.

Q And Doctor, isn't it safe to say that the reason we don't know that is because the surgical option was the option that was engaged in at the time?

A Correct.

TESTIMONY OF DR. BRANDNER

270

Brandner001466

50

Q    That really eliminated the ability to determine what correction, if any, could have occurred over the next six to eight months; is that correct?

A    Correct.

MR. CAUSEY:  I'm done, your Honor, thank you.

THE COURT:  Marcina, please come into the courtroom. Hopefully, she's listening, folks, you have quite a few questions there.

Thank you, Marcina.  Questions, please.

(An off-the-record discussion was held out of the hearing of the jury.)

THE COURT:  Doctor, if you could tell us, please, what is the percentage of drop foot after this type of surgery?  The juror notes three to 13 people out of 100; is that correct?  Is that what you've stated?

THE WITNESS:  That's what's referred to in the literature.  There's an incident of three to 13 percent peroneal nerve palsy or peroneal nerve injury.

THE COURT:  That's not the same as drop foot, is it?

THE WITNESS:  Well, the peroneal nerve can be injured in various ways.  It can either get the sensory part, where you get numbness, or you can get numbness and a little weakness or you can get the whole thing, numbness and severe weakness, where the nerve doesn't function and your foot drops.

TESTIMONY OF DR. BRANDNER

271

Brandner001467

51

You can get a weak foot that you can lift a little, but a true drop foot is where the foot can't be raised, nor the toes, and you have to support it with an ankle foot orthosis because you can't clear the ground when you walk.

THE COURT: Do you know the percentage of individuals who have the drop foot, as opposed to the other complications you've talked that?

THE WITNESS: They didn't break down the percentages in drop foot versus -- they didn't qualify the peroneal nerve injury.

THE COURT: What are the percentages of surgical risk of all of the other risks that you've explained?

THE WITNESS: The percentage, well, the percentage, generally, in these, in all procedures, should be less than .5 to one percent.

Now, in a healthy young individual, I think I would use that number because people who -- the older you get and other diseases that you get may affect your immunity, you could be more prone to infection.

If you have co-morbidities that affect your immune system, you can get infection. If you are older and have vein problems, you can get deep vein thrombosis and a pulmonary embolism.

So, generally, when we do a surgery and we

TESTIMONY OF DR. BRANDNER

272

Brandner001468

52

identify through the medical history the co-morbidities, the co-morbidities are then sent to the appropriate physician for clearance and definition to try and define risk. And that's the main thing you want to try and identify.

Sometimes you can't define risk in a numerical way. You can either say it's optimum or it's too risky, but, in general, the question being, all other complications in ███████████, in a healthy young man, would probably be less than .5 percent.

THE COURT: You stated then and explained then that three to 13 percent have nerve damage. And the question is, is that the percentage that pertains to any type of nerve or is it just the peroneal nerve?

THE WITNESS: It's the peroneal nerve in the procedure called tibial osteotomy.

THE COURT: Ladies and gentlemen, any other questions? No?

Counsel, any follow up?

MR. CAUSEY: No, your Honor.

MR. CRAWFORD: No questions.

THE COURT: Very good. Any objection if we excuse Dr. Brandner? No?

MR. CRAWFORD: No.

THE COURT: Very good. Doctor, thank you. You can step down. You can also be excused. And folks, now we'll

TESTIMONY OF DR. BRANDNER

273

Brandner001469

53

take our 10 minute break, please.

Brandner001470





AAOS

**Professional Compliance Program
Grievance Report**

---

<u>Section I: Your Contact Information:</u>

**Your Name (Grievant):** KIPLING P. SHARPE, MD

**Address:** MEZONA ORTHOPAEDIC, P.A.

3940 E. BANNER GATEWAY DR. #200

GILBERT AZ 85234

**Telephone Number:** 480. 964. 2908

**Fax Number:** 480. 833. 2136

**Email Address:** Sharpe.md@aol.com

---

<u>Section II: Information about the Grievance:</u>

1. **Name and address of the Fellow or Member who is the subject of this report:**

PATRICK JOSEPH BRANDNER

2800 E. DESERT INN RD

SUITE 100

LAS VEGAS NV 89121

2. **Date of the action or statement that is the subject matter of this grievance:**

Deposition - 8/5/05 Trial testimony 4/29/08

---

2.1

2

Brandner001471

3. If this matter has been before a court, state medical board, or other state or federal administrative body, please attach an order from the appropriate authority referencing all parties and indicating that the matter has reached a final conclusion.

_____ **Order attached**

4. If there is a confidentiality or non-disclosure agreement or a protective order related to this matter, please attach a copy of the agreement or protective order. *You should consult your attorney about any agreement or protective order.*

_____ **Agreement/Protective Order attached**

_____ **It is my intention to disclose the confidentiality or non-disclosure agreement.**

---

**Section III: Information About the Specific Allegation:**

The Professional Compliance Program requires that you provide detailed information for each action or statement that you allege violated an AAOS Standard of Professionalism. For each action or statement, please provide separate answers to each of the questions below. Each set of answers will form a single allegation.

5. **Identify the AAOS Standards of Professionalism (SOPs) that you believe were violated:**

_____ Providing Musculoskeletal Services to Patients

_____ Professional Relationships

X Orthopaedic Expert Witness Testimony

_____ Research and Academic Responsibilities

_____ Advertising by Orthopaedic Surgeons

_____ Orthopaedist-Industry Conflicts of Interest

**List the number(s) of the Mandatory Standard(s) that you believe were violated:**

___3___ ___4___ ___6___ ___7___
___8___

6. Describe in detail how the action or statement allegedly violated the Minimum Standard listed above and identify any evidence that supports your allegation. *Attach **complete** copies of any documents that you rely on as evidence, providing specific page references to the portions that support your allegations.*

Please word process or type your answers. You may provide your answers on a separate piece of paper, using paragraph numbers that correspond to the numbered questions below. At the top of each separate page, include your name and the name of the Fellow or Member who you feel committed the violation.

Pursuant to HIPAA requirements, you must de-identify all patient information in your attachments except as otherwise noted in the Grievance Application Form.

3

2.1

Brandner001472

Section IV: Information About Allegations of Unethical Orthopaedic Expert Witness Testimony:

*Answer the following questions only if this complaint involves allegations that a Fellow or Member testified in a manner that allegedly violated the Standards of Professionalism on Orthopaedic Expert Witness Testimony:*

7.  Did the Fellow or Member prepare a written report? _____ Yes   _X_ No
    If yes, please submit a complete copy of the report.

8.  Did the Fellow or Member testify at a deposition?  _X_ Yes   _____ No
    If yes, please submit a complete transcript of the deposition testimony, including copies of all exhibits.
    **Note: Video depositions may be submitted to AAOS. Multiple copies of videos may be required and are the responsibility of the individual who submitted the video.**

9.  Did the Fellow or Member testify at trial?   _X_ Yes   _____ No
    If yes, please submit a complete transcript of the trial testimony, including copies of all exhibits.

I acknowledge that I am a Fellow or Member of AAOS. I acknowledge that I have a professional and ethical obligation to include in my grievance only information that is truthful, accurate, and complete. I agree that I shall promptly notify the AAOS, through its Office of General Counsel, of any subsequent information that is relevant to my grievance.

I acknowledge that I will treat as confidential all information from AAOS and will not share information about grievances until the Board of Directors has taken final action.

Signature: _____     Date: 10/15/08

2.1

-4

33

Brandner001473

Brandner001474



Complaint against D. Brandner by K. Sharpe

**PROFESSIONAL ASSOCIATION**
www.mezonaortho.com

Ralph V. Wilson, M.D. • Dwight S. Keller, M.D.
Kipling P. Sharpe, M.D. • Marc I. Olnowitz, M.D.

Maxwell Thomas, M.D. • Daniel J. Mullen, M.D.
Cynthia L. Kooima, M.D. • T. Brian Sharp, PA-C

October 13, 2008

To Whom It May Concern:

I am filing this grievance against Dr. Patrick Brandner for "expert testimony" given against me in a recently concluded lawsuit ( ___ v. Sharpe). The jury found in my favor. I believe (as does the expert who testified on my behalf) that Dr. Brandner failed to live up to the required Standards of Professionalism of the AAOS, first and foremost, standard # 8. I also believe that he fell short of the bar on standards 3, 4, 6, and 7. I was able to find Dr. Brandner listed on-line as a witness for hire and according to this web-site, he has been deposed or testified 50 times in the past 4 years. This, in my opinion, is exactly the type of character that deserves scrutiny by our academy.

This was a case of a peroneal nerve injury which occurred during a corrective osteotomy in a skeletally mature 15 year old with a 39 degree deformity of his proximal tibia. The radiographs clearly show that his physes were closed. He had been treated non-operatively by another orthopedic surgeon prior to my care and had developed this deformity gradually after cast removal. He came to see me over 6 months post injury and had surgery 9 months post injury. Prior to my surgery they had obtained the opinion of 2 other board certified orthopedic surgeons who recommended corrective osteotomy. They also went back to the original surgeon who recommended nonoperative management. They chose to return to me for the corrective surgery. It is well-documented in my chart that I discussed risks with the patient and his parents including nerve injury on 2 separate visits. In depositions taken prior to my being named in a lawsuit (they sued original orthopedist first) both the patient and his mother acknowledged that I discussed risks including the specific risk of peroneal nerve. While I did have this very specific discussion, it is my opinion (and that of my expert at trial) that standard of care only required nerve injury discussion, not specific nerve. Subsequently, the mother and son changed their story and sued me for lack of informed consent. Their attorney hired Dr. Brandner as an expert witness.

In his deposition, Dr. Brandner testified that the patient should have been offered nonoperative management and that he had a good chance of remodeling. During trial, when pressed on this issue, he recanted. He testified in both his deposition and in court that I fell below the standard of care in my preoperative care by failing to discuss the risk of peroneal nerve injury. He authoritatively stated there was a 3% to 13% risk of this injury occurring. Neither my expert nor I can find these numbers elsewhere. He testified that he had reviewed the depositions of both the plaintiff and his parents prior to forming his opinion as well as having reviewed the x-rays. He further testified that in his entire career he had performed 5 (five) tibial osteotomies, the last having been 25 years prior (pages 39 -41 of his deposition). This, I believe, is a self-indictment of his failure to adhere to standards 7 and 8.

2940 E. Banner Gateway Dr. • Suite 200 — Gilbert, AZ 85234 • Telephone (480) 964-2908 • Fax (480) 833-2139


35

BRANDNER 00117

Brandner001475

Complaint against P. Brandner by K. Sharpe

In summary, I think Dr. Brandner failed to meet standards 3 and 4 by stating that the standard of care required a discussion of a specific nerve, and by stating in his deposition that the patient was not given the non-operative option and that the fracture had re-modeling potential. I believe he violated standard 6 by failing to adequately review the plaintiff's first deposition in which they stated that I did, in fact, discuss peroneal nerve injury with them. I believe he violated standard 7 by testifying that he had no current relevant experience with this procedure. Finally, I think he is either incompetent or violated standard 2 when he testified that this malunion in a skeletally mature person could substantially remodel or that a 39 degree deformity was acceptable.

Sincerely,

Kipling P. Sharpe, M.D.

36

BRANDNER 00118

Brandner001476

THE JOURNAL OF BONE & JOINT SURGERY

# J B J S

*This is an enhanced PDF from The Journal of Bone and Joint Surgery*

*The PDF of the article you requested follows this cover page.*

## The Operative Treatment of Peroneal Nerve Palsy

MICHAEL A. MONT, A. LEE DELLON, FRANKLIN CHEN, MARC W. HUNGERFORD, KENNETH A. KRACKOW and DAVID S. HUNGERFORD
*J Bone Joint Surg Am.* 1996;78:863-9.

This information is current as of June 20, 2009

| | |
|---|---|
| Reprints and Permissions | Click here to order reprints or request permission to use material from this article, or locate the article citation on Jbjs.org and click on the [Reprints and Permissions] link. |
| Publisher Information | The Journal of Bone and Joint Surgery<br>20 Pickering Street, Needham, MA 02492-3157<br>www.jbjs.org |

291

Brandner001477

JBJA Journal of Bone and Joint Surgery -
American 1996 - 1998
*June 1996, Volume 78-A, Number 6*
863    The Operative Treatment of Peroneal Nerve
Palsy*
Article

AUTHOR(S): MONT, MICHAEL A., M.D.†;
DELLON, A. LEE, M.D.†;
CHEN, FRANKLIN, M.D.†;
HUNGERFORD, MARC W., M.D.†;
KRACKOW, KENNETH A., M.D.†;
HUNGERFORD, DAVID S., M.D.†BALTIMORE,
MARYLAND

*Investigation performed at the Department of
Orthopaedic Surgery, The Johns Hopkins University
School of Medicine, Baltimore*

*J Bone Joint Surg [Am]* 1996; 78-A; 863-9

ABSTRACT: We retrospectively reviewed the
results of operative decompression for peroneal
nerve palsy in thirty-one patients who had been
managed between 1980 and 1990. All patients had
been managed non-operatively for at least two
months after they had initially been seen.
Intraoperatively, we found epineurial fibrosis and
bands of fibrous tissue constricting the peroneal
nerve at the level of the fibular head and at the
proximal origin of the peroneus longus muscle.

At a mean of thirty-six months (range, twelve to
seventy-two months) postoperatively, thirty (97
per cent) of the thirty-one patients reported
subjective and functional improvement and were
able to discontinue the use of the ankle-foot
orthosis. In contrast, only three of nine patients
who had been managed non-operatively reported
subjective and functional improvement (p < 0.01).

Peroneal nerve palsy does not always resolve
spontaneously; if it is left untreated, the loss of
dorsiflexion of the ankle and persistent
paresthesias can result in severe functional
disability. Therefore, if non-operative measures do
not lead to improvement within two months, we
believe that operative decompression should be
considered.

Peroneal nerve palsy is the most frequently
encountered mononeuropathy in the lower
extremity[6]. The cumulative reported prevalence after
total knee arthroplasty has ranged from less than 1 to
4 per cent (seventy-four [0.58 per cent] of 12,784
procedures[1,5,9,12,16,17,21,23,29,35]), and the prevalence
after proximal tibial osteotomy has ranged from 3 to
13 per cent (thirty-eight [10 per cent] of 395
procedures[3,8,14,15,18,25,30,33,42]). Operative injury of the
peroneal nerve has many causes, including ischemia,
mechanical irritation, traction, crushing injury, and
laceration[14]. Some investigators have suggested that
operative correction of excessive valgus or flexion
deformities during knee arthroplasty can stretch the
peroneal nerve[1,9,11,12,17,24,29]. We found a peroneal
nerve palsy after a total knee arthroplasty for a fixed
valgus deformity of 15 degrees or more in four (3 per
cent) of 138 knees (unpublished data).

Spontaneous resolution of peroneal nerve palsy,
over a period ranging from months to years, has been
reported by authors who have advocated non-
operative treatment[11,16,21,35]. Operative treatment is
controversial even though decompression of the
common peroneal nerve has been well described in
the literature[26,27,39]. The authors who have
recommended operative treatment have not
delineated the indications for or the timing of such
intervention[39].

In the current study, we describe the results after
operative decompression of the peroneal nerve in
patients who had severe palsy that did not resolve
after a minimum of two months of observation. The
results of non-operative treatment are described for a
separate group of patients.

## Materials and Methods

We retrospectively reviewed the results of
operative treatment of peroneal nerve palsy in thirty-
one patients who had had no improvement for at least
two months after the onset of the symptoms. The
mean age of the twenty female and eleven male
patients was forty-seven years (range, sixteen to
seventy-eight years). The mean interval between the
initial presentation of the nerve palsy and the
operative decompression was twenty-one months
(range, two to eighty-four months) (Table I).

Twenty-six of the thirty-one patients had initially
been managed elsewhere for the underlying problem
and were referred to us for treatment of the peroneal
nerve palsy. The hospital and clinic records were
reviewed with respect to the demographic data; the
possible etiology, the onset, and the initial treatment
of the palsy; the clinical findings; the results and
timing of any diagnostic studies; the operative
findings; the pathological reports; the postoperative
management; and any complications. In six patients,
the palsy had developed after a total knee
arthroplasty; in four, after a proximal tibial
osteotomy; in three, after a fracture of the tibia; in
six, after a fracture of the knee that had been treated
with open reduction; in three, after a fracture of the
ankle that had been treated with a cast; in one, after a
distal femoral osteotomy; in one, as a complication of
traction after a total hip arthroplasty; in one, after a
fracture of the foot; and in six, as a result of a soft-
tissue injury (Table I).

The preoperative and postoperative clinical
evaluations and the operations were performed by
one of the senior ones of us (M. A. M., A. L. D., K. A.
K., or D. S. H.). At the most recent follow-up
examination, the patients were questioned by four of
us (M. A. M., F. C., A. L. D., and M. W. H.) about
their satisfaction with the result of the procedure, and
a palsy score was calculated on the basis of the
findings of the motor and sensory examination. The
motor examination included a manual test of the
muscles of the great toe and ankle with use of the
unaffected side as a control, and the sensory
examination identified areas of numbness,
paresthesias, and pain. Scoring of sensory and motor

Redistribution of this article permitted only in accordance with the publisher's copyright provisions.

BRANDNER 00219
Brandner001478

function was on a scale ranging from 0 to 5 points, as described previously[24]. The need for an orthosis and function with regard to walking were also assessed.

The severity of the palsy in all patients was assigned a score according to a 5-point scale that was originally used to assess peripheral neuropathies associated with hip arthroplasty[24,41]. This scale describes functional deficits more precisely than the previously used terms complete or incomplete for motor loss and mild or profound for sensory loss. A score of 1 point indicates only electromyographic evidence of neural damage and no symptoms; 2 points, electromyographic and physical findings of neuropathy but no symptoms; 3 points, electromyographic changes and slight signs and symptoms of neuropathy but no need for walking aids; 4 points, moderate motor and sensory loss, electromyographic changes, and some problems with gait; and 5 points, severe motor and sensory loss, marked electromyographic changes, and the need for an orthosis in order to walk at all times. Only patients who had a score of 4 or 5 points were included in the study. Patients who had diffuse peripheral neuropathy (without isolated compromise of the peroneal nerve) secondary to diabetes or lead poisoning were excluded.

All patients had had electromyographic and nerve-conduction-velocity studies at some point in time, with documented peroneal motor-nerve-conduction blocks (recording electrodes were placed in the tibialis anterior muscle[3,20]) at the level of the fibular head. Whenever possible, the studies were performed within one month after the onset of the symptoms; they were done in this period in twenty-two of the thirty-one patients. Electromyographic and nerve-conduction-velocity studies were performed immediately preoperatively in twenty-seven patients; four patients did not have the preoperative tests for personal reasons. Eighteen of the twenty-seven patients had had the earlier studies (the studies were repeated after a three-month or longer period of no clinical improvement), and none had evidence of any changes compared with the initial findings. The studies in the nine patients who initially had not had such studies all demonstrated delays in the conduction of the peroneal nerve at the level of the fibular head. None of the patients had nerve-conduction-velocity studies postoperatively.

External neurolysis of the peroneal nerve was performed at the level of the fibular head[24,27,39]. Postoperatively, the extremity was immobilized in a bulky Robert Jones-type dressing for two days, followed by early range-of-motion exercises. All patients were allowed to bear weight as tolerated immediately after the procedure.

An additional group of nine patients who had severe peroneal-nerve palsy (a score of 4 or 5 points) were managed non-operatively during the same time-period (Table II). There were three men and six women, with an average age of fifty-six years (range, twenty-six to eighty-nine years). In four patients, the peroneal nerve palsy had developed after a total knee arthroplasty; in one, after a total hip arthroplasty (because of pressure from balanced suspension); in

two, after blunt trauma to the knee during a motor-vehicle accident; in one, after a hysterectomy that involved the use of leg stirrups for four hours; and in one, after a proximal tibial osteotomy. One of the nine patients was managed non-operatively because of an acute myocardial infarction; the eight remaining patients refused operative intervention for personal reasons.

### Results

At the time of follow-up (mean duration, thirty-six months; range, twelve to seventy-two months), the mean preoperative palsy score was 4.5 points (4 or 5 points), compared with a mean of 1.5 points (range, 1 to 4 points) postoperatively. Of the thirty-one patients, twenty-one (68 per cent) had no remaining motor or sensory symptoms (a palsy score of 1 point), four (13 per cent) had complete or nearly complete relief of the sensory symptoms (a score of 2 points), five (16 per cent) had some decrease in the symptoms but still had residual sensory or motor deficits (a score of 3 points), and one had little improvement (a score of 4 points).

We did not find any relationship between the age of the patient and the recovery of neural function. Thirteen of the nineteen patients who were less than fifty years old had complete resolution of the sensory and motor symptoms, compared with eight of the twelve who were more than fifty. The time-interval between the onset of the symptoms and the decompression appeared to affect the outcome of the operation. Full recovery of motor function (grade 5) was seen in all eight patients who had had the decompression within six months after the onset of the palsy, in four of the five who had been operated on between seven and twelve months after it, in seven of the eleven who had been operated on between thirteen and twenty-four months after it, and in six of the seven who had been operated on more than twenty-four months after it. There was no relationship between the severity of the preoperative palsy and recovery of motor function; twelve of the fourteen patients who had had a score of 5 points and thirteen of the seventeen who had had a score of 4 points had full recovery.

A longer duration of follow-up did not alter the clinical outcome. Thirteen of the seventeen patients who had been followed for more than two years (mean, fifty-three months; range, twenty-seven to seventy-two months) had full motor recovery, compared with twelve of the fourteen who had been followed for less than two years (mean, sixteen months; range, twelve to twenty-three months).

The six patients in whom the palsy had developed after a total knee arthroplasty had a decrease in the symptoms after the operative decompression. Five of these patients had complete relief of the motor and sensory symptoms. The sixth patient regained complete motor function but had some residual sensory paresthesias. All four patients in whom the palsy had developed secondary to a proximal tibial osteotomy had a decrease in the symptoms.

There were no intraoperative or postoperative complications. Intraoperative examination of the

Redistribution of this article permitted only in accordance with the publisher's copyright provisions.

Brandner001479

peroneal nerve at the fibular head revealed a variable range of scarring and edema. There was no relationship between the extent of scarring or edema and the clinical result. We found epineurial fibrosis and bands of fibrous tissue constricting the peroneal nerve at the level of the fibular head and at the proximal origin of the peroneus longus muscle.

Three of the nine patients who had been managed non-operatively recovered motor and sensory function, at a mean of fifty months (range, twenty-four to eighty-four months). The palsy scores for these nine patients improved from a mean of 4.3 points (4 or 5 points) preoperatively to a mean of 3.1 points (range, 1 to 5 points) postoperatively. The difference in the rate of recovery between the patients who had been managed operatively and those who had been managed non-operatively was significant (p < 0.01, Fisher exact test).

### Discussion

Peroneal nerve palsy after trauma or an elective procedure around the knee can be functionally debilitating. A complete palsy results in weakness of dorsiflexion of the foot and toes and eversion of the foot, leading to the characteristic footdrop and slapping gait. The sensory loss or paresthesias extend over the anterolateral surface of the leg and the dorsum of the foot. Without a high index of suspicion, it is possible that the milder forms of peroneal nerve palsy may be missed.

Damage to the peroneal nerve can result from musculoskeletal trauma to the hip, ankle, or foot[4,23,24,20,30,31,34,36,37] as well as from direct pressure on the nerve at the knee from a constrictive dressing, splint, or cast[10]. The common peroneal nerve can be damaged anywhere along its course, from its origin in the pelvis as the lateral trunk of the sciatic nerve to its bifurcation just distal to the knee[6,15,40]. The pressure from the proximal portion of a below-the-knee cast that ends just distal to the neck of the fibula can result in peroneal nerve palsy. A hematoma in the nerve sheath may produce sufficient compression of the peroneal nerve to result in the gradual development of a palsy[34,36].

The cumulative reported prevalence of peroneal nerve palsy was 0.58 per cent (seventy-four of 12,784 procedures) after total knee arthroplasty[1,5,9,12,16,17,21,23,29,35] and 10 per cent (thirty-eight of 395 procedures) after proximal tibial osteotomy[2,4,14,15,18,27,33,33,42]. After total knee arthroplasty in 138 knees that had a fixed valgus deformity, we noted a 3 per cent prevalence of peroneal nerve palsy (unpublished data).

In the current study, we could not estimate the prevalence of this problem after knee or ankle injuries, as we did not know how many patients had such injuries. Others have reported a high prevalence in association with sprains of the ankle[12,23,30,31,34,36,37]. Bosien et al., in a follow-up study of college students, found mild weakness of the peroneal muscles after twenty-nine (22 per cent) of 133 sprains of the ankle[4]. However, the weakness may have been related to overstretching or disuse of the muscles rather than to injury of the nerve. Other authors have

thought that persistent disability after ankle injuries may be partially due to subclinical neural injury[23,31,34] and that attempts should be made to determine whether a mild peroneal-nerve paralysis is contributing to the disability.

Nobel applied traction on the superficial peroneal nerve at the foot in twelve cadaver specimens and produced increased tautness of the common peroneal nerve in eight; in the other four specimens, all from older subjects, the nerve was found to be torn where it exited from the fascia near the ankle[30]. Nobel suggested that, as traction alone produced these changes, the much greater tensile forces on the nerve produced by spiral fractures of both bones of the leg would result in tears in the nutrient vessels and nerve along the entire length of the nerve, including the common peroneal nerve at the sciatic bifurcation. Minor trauma to the ankle can involve the terminal branches of the superficial peroneal nerve where they pierce the deep fascia of the leg proximal to the ankle[36].

Treatment has ranged from simple immobilization of the leg in flexion for acute palsies to the use of an ankle-foot orthosis for chronic motor palsies with footdrop, slapping gait, and sensory loss. One report suggested that spontaneous recovery does not occur[1]. However, most studies[2,5,9,31,16,21,29,42] have included less than five patients and have been somewhat anecdotal. We are aware of only two reports on the non-operative treatment of peroneal nerve palsies after total knee replacement. Rose et al. reported on twenty-three peroneal nerve palsies after 2626 total knee arthroplasties[31]. The patients either had no treatment or the dressing was simply loosened. Only two patients, who initially had motor loss alone, had complete recovery at a mean of three years (range, six months to seven years). The motor deficits initially noted in all twenty-two patients (twenty-three palsies) fully resolved in six. Asp and Rand reported the results of non-operative treatment of twenty-six peroneal nerve palsies after 8998 knee arthroplasties[1]. The treatment of thirteen palsies led to full recovery, at a mean of five years (range, one to eleven years). The more severe palsies (complete motor and sensory deficits) were associated with a worse prognosis (treatment of only seven of nineteen led to full recovery) than the incomplete lesions (treatment of six of seven led to complete recovery)[1]. These authors[1,34] concluded that the value of operative exploration of the nerve was not known. It is not clear how they reached this conclusion.

The ideal approach to postoperative nerve palsy is prevention. An understanding of the anatomy about the knee and meticulous operative technique when performing knee operations can prevent iatrogenic nerve palsy[7,22]. Anatomical studies have shown that the nerve is at high risk for injury during a proximal tibial osteotomy because of the proximity of the bone to the motor branches. Kirgis and Albrecht, in a study of twenty-nine cadaver legs, showed that the peroneal nerve is closely adherent to the periosteum of the fibula, particularly at the most proximal forty millimeters of the fibula and at points located in the

294

Redistribution of this article permitted only in accordance with the publisher's copyright provisions.

segment of bone between seventy to 153 millimeters from the fibular head[22]. Therefore, a fibular osteotomy should be performed between forty and seventy millimeters from the fibular head or between the middle and distal thirds of the fibula, about 160 millimeters distal to the proximal tip of the head, to avoid the risk of damage to the peroneal nerve. These high-risk locations correspond to the locations where decompression of the peroneal nerve was performed in our patients.

If a peroneal nerve palsy is recognized in the immediate postoperative period, the initial treatment should involve removal of any constrictive dressing to allow for 30 to 40 degrees of flexion of the knee. If there is evidence of an expanding hematoma about the proximal aspect of the fibula, urgent exploration of the wound may be necessary. If there is no clear evidence of a compressive hematoma and dysfunction of the peroneal nerve persists despite the measures just described, some advocate observation for years, as these palsies have been found to resolve with time[11,16,25]. However, the results of the present study suggest that the prognosis for sensorimotor recovery deteriorates with time and that operative decompression should be considered earlier. In the current study, thirty (97 per cent) of our thirty-one patients had a decrease in the symptoms after exploration of the peroneal nerve and external neurolysis, compared with three of nine patients who had been managed non-operatively (p < 0.01, Fisher exact test). As some of the patients in the latter group might have been found to need cable grafts if exploration had been performed, caution should be exercised in interpreting these data. Although the peroneal nerve palsies in our patients may have resolved with non-operative treatment after an extended period of time, operative decompression spared these patients many months of pain and disability. Twenty-two patients (71 per cent) noted a decrease in the symptoms within three months, and six had a dramatic decrease within four weeks. In addition, early resolution of the palsy facilitated the functional recovery of six patients who had had a knee replacement.

Our findings are similar to those of Vastamäki, who evaluated the results of decompression of the peroneal nerve in twenty-seven extremities at a mean of fourteen months (range, one month to five years) postoperatively[39]. Relief of paresis and of sensory symptoms was noted in twenty-four of the limbs at a mean of seventeen months (range, four days to eight years) after the onset of the neuropathy. Styf evaluated the results of fasciotomy and neurolysis of the superficial peroneal nerve in twenty-two extremities (nineteen patients)[38]. At a mean of thirty-seven months (range, ten to fifty months), thirteen patients had unlimited or increased physical function, although only nine were satisfied with the result of the procedure. We recently reported on five patients who had a peroneal nerve palsy after a total knee arthroplasty; decompression of the peroneal nerve was performed five to forty-five months after the onset of the symptoms[24]. All patients had improved neurological function, and four of them had complete

recovery.

In the current study, patients who had a complete peroneal nerve palsy (a palsy score of 5 points) were as likely to have full recovery (twelve of fourteen patients) as those who had a partial nerve palsy (a score of 4 points) (thirteen of seventeen patients). These results differ from those of Asp and Rand[1], who found that initial profound neurological loss decreased the potential for full recovery. We did not find any relationship between the severity of involvement of the peroneal nerve and the time to improvement. Postoperative electromyographic and nerve-conduction-velocity studies would have more clearly defined the progress of recovery; however, we could not justifiably subject our patients to these studies, given the continuing decrease in the symptoms.

The approach to common peroneal nerve palsy should be based on the pathophysiology and natural history of nerve compression and should mirror the treatment of other compressive neuropathies of the peripheral nerves, such as median nerve entrapment at the wrist. We see no qualitative difference between a peroneal palsy associated with a knee injury or a fracture of the leg and a median nerve compression neuropathy associated with a fracture of the distal part of the radius. On the basis of our experience and our review of the literature, we recommend: (1) that motor and sensory function of the common peroneal nerve be evaluated clinically before and after any elective operation on the knee and after any trauma to the lower extremity; (2) that electromyographic and nerve-conduction-velocity studies be conducted if the sensorimotor defect persists for more than three weeks and that the studies be repeated if the defect is still present at three months; (3) that operative exploration be performed during the fourth month of persistent dysfunction of the peroneal nerve (similar to the time-frame suggested by Styf[38] and by Vastamäki[39]); and (4) that simultaneous decompression of the peroneal nerve be performed in a patient who has a sensorimotor deficit of the nerve and who needs operative intervention for the inciting injury.

References: [1-42]

1. Asp, J. P. L.; and Rand, J. A.: Peroneal nerve palsy after total knee arthroplasty. Clin. Orthop. 1990; 261:233-237.

2. Bauer, G. C. H.; Insall, J.; and Koshino, T.: Tibial osteotomy in gonarthrosis (osteoarthritis of the knee) J. Bone and Joint Surg. Dec. 1969; 51-A:1545-1563.

3. Berry, H.; and Richardson, P. M.: Common peroneal nerve palsy: a clinical and electrophysiological review. J. Neurol., Neurosurg., and Psychiat. 1976; 39:1162-1171.

4. Bosien, W. R.; Staples, O. S.; and Russell, S. W.: Residual disability following acute ankle sprains. J. Bone and Joint Surg. Dec. 1955; 37-A:1237-1243.

Redistribution of this article permitted only in accordance with the publisher's copyright provisions.

295

Brondner001481

5. Buechel, F. F.; and Pappas, M. J.: New Jersey low contact stress knee replacement system. Ten-year evaluation of meniscal bearings. Orthop. Clin. North America 1989; 20:147-177.

6. Coert, H.; and Dellon, A. L.: Clinical implications of the surgical anatomy of the sural nerve. Plast. and Reconstr. Surg. 1994; 94:850-855.

7. Curley, P.; Eyres, K.; Brezinova, V.; Allen, M.; Chan, R.; and Barnes, M.: Common peroneal nerve dysfunction after high tibial osteotomy. J. Bone and Joint Surg. 1990; 72-B(3):405-408.

8. Dawson, D. M.; Hallet, M.; and Millender, L. H.: Peroneal nerve entrapment. In Entrapment Neuropathics. Ed. 2, pp. 277-289. Boston, Little, Brown, 1990.

9. Deburge, A.; and GUEPAR: GUEPAR hinge prosthesis. Complications and results with two years' follow-up. Clin. Orthop. 1976; 120:47-53.

10. De Luca, C. J.; Bloom, L. J.; and Gilmore, L. D.: Compression induced damage on in-situ severed and intact nerves. Orthopedics 1987; 10:777-784.

11. Engelbrecht, E.; Siegel, A.; Röttger, J.; and Bucholz, H. W.: Statistics of total knee replacement: partial and total knee replacement, design St. Georg. A review of a 4-year observation. Clin. Orthop. 1976; 120:54-59.

12. Engelhardt, P.; Röder, R.; and Köhler, M.: Neurologische Komplikationen bei der Implantation von Knieendoprosthese. Eine klinische und EKG-dokumentierte Untersuchung. Zeitschr. Orthop 1987; 125:190-193.

13. Garland, D. E.; and Hughston, J.C.: Peroneal nerve paralysis: a complication of extensor reconstruction of the knee. Clin. Orthop. 1979; 140:169-171.

14. Gibson, M. J.; Barnes, M. R.; Allen, M. J.; and Chan, R. N. W.: Weakness of foot dorsiflexion and changes in compartment pressures after tibial osteotomy. J. Bone and Joint Surg. 1986; 68-B(3):471-475.

15. Harris, W. R.; and Kostuik, J. P.: High tibial osteotomy for osteo-arthritis of the knee. J. Bone and Joint Surg. March 1970; 52-A:330-336.

16. Hui, F. C.; and Fitzgerald, R. H., Jr.: Hinged total knee arthroplasty. J. Bone and Joint Surg. June 1980; 62-A:513-519.

17. Insall, J.; Scott, W. N.; and Ranawat, C. S.: The total condylar knee prosthesis. A report of two hundred and twenty cases. J. Bone and Joint Surg March 1979; 61-A:173-180.

18. Jackson, J. P.; and Waugh, W.: The technique and complications of upper tibial osteotomy. A review of 226 operations. J. Bone and Joint Surg. 1974; 56-B(3):236-245.

19. Johnston, R. B.; Zachary, L.; Dellon, A. L.; Mackinnon, S. E.; and Gottlieb, L.: The effect of a distal site of compression on neural regeneration J. Reconstr. Microsurg. 1993; 9:271-274.

20. Katirji, M. B.; and Wilbourn, A. J.: Common peroneal mononeuropathy: a clinical and electrophysiologic study of 116 lesions. Neurology 1988; 38:1723-1728.

21. Kaufer, H.; and Matthews, L. S.: Spherocentric arthroplasty of the knee. Clinical experience with an average four-year follow-up. J. Bone and Joint Surg. April 1981; 63-A:545-559.

22. Kirgis, A.; and Albrecht, S.: Palsy of the deep peroneal nerve after proximal tibial osteotomy. An anatomical study. J. Bone and Joint Surg. Sept 1992; 74-A:1180-1185.

23. Knutson, K.; Leden, L.; Sturfelt, G.; Rosen, I.; and Lidgren, L.: Nerve palsy after knee arthroplasty in patients with rheumatoid arthritis. Scandinavian J. Rheumat. 1983; 12:201-205.

24. Krackow, K. A.; Maar, D. C.; Mont, M. A.; and Carroll, C. IV: Surgical decompression for peroneal nerve palsy after total knee arthroplasty. Clin. Orthop. 1993; 292:223-228.

25. Leach, R. E.; Purnell, M. B.; and Saito, A.: Peroneal nerve entrapment in runners. Am. J. Sports Med. 1989; 17:287-291.

26. Leonard, M. H.: Immediate improvement of sensation on relief of extraneural compression. J. Bone and Joint Surg. Oct. 1969; 51-A:1282-1284.

27. Mackinnon, S. E., and Dellon, A. L.: Surgery of the Peripheral Nerve. New York, Thieme, 1988.

28. Mansoor, I A.: Delayed incomplete traction palsy of the lateral popliteal nerve. Clin. Orthop. 1969; 66:183-187.

29. Marmor, L.: The modular (Marmor) knee. Case report with a minimum follow-up of 2 years. Clin. Orthop. 1976; 120:86-94.

30. Meals, R. A.: Peroneal-nerve palsy complicating ankle sprain. Report of two cases and review of the literature. J. Bone and Joint Surg. Oct. 1977; 59-A:966-968.

31. Moller, B. N.; and Kadin, S.: Entrapment of the common peroneal nerve. Am. J. Sports Med. 1987; 15:90-91.

32. Mont, M. A.; Alexander, N.; Krackow, K. A.; and Hungerford, D. S.: Total knee arthroplasty after failed high tibial osteotomy. Orthop. Clin. North America 1994; 25:515-525.

33. Mont, M. A.; Antonaides, S.; Krackow, K. A.; and Hungerford, D. S.: Total knee arthroplasty after failed high tibial osteotomy. A comparison with a matched group. Clin. Orthop. 1994; 299:125-130.

34. Nobel, W.: Peroneal palsy due to hematoma in the common peroneal nerve sheath after distal torsional fractures and inversion ankle sprains. Report of two cases. J. Bone and Joint Surg. Dec. 1966; 48-A:1484-1495.

35. Rose, H. A.; Hood, R. W.; Otis, J. C.;

Redistribution of this article permitted only in accordance with the publisher's copyright provisions.

296

Brandner001482

Ranawat, C. S.; and Insall, J. N.: Peroneal-nerve palsy following total knee arthroplasty. A review of The Hospital for Special Surgery experience. J. Bone and Joint Surg. March 1982; 64-A:347-351.

36. Sidey, J. D.: Weak ankles. A study of common peroneal entrapment neuropathy. British Med. J. 1969; 3:623-626.

37. Streib, E. W.: Traction injury of peroneal nerve caused by minor athletic trauma: electromyographic studies. Arch. Neurol. 1983; 40:62-63.

38. Styf, J.: Entrapment of the superficial peroneal nerve. Diagnosis and results of decompression. J. Bone and Joint Surg. 1989; 71-B(1):131-135.

39. Vastamäki, M.: Decompression for peroneal nerve entrapment. Acta Orthop. Scandinavica 1986; 57:551-554.

40. Vastamäki, M.; and Solonen, K. A.: Peroneal entrapment neuropathy [abstract] Acta Orthop. Scandinavica 1981; 52:593.

41. Weber, E. R.; Daube, J. R.; and Coventry, M. B.: Peripheral neuropathies associated with total hip arthroplasty. J. Bone and Joint Surg. Jan. 1976; 58-A:66-69.

42. Windsor, R. E.; Insall, J. N.; and Vince, K. G.: Technical considerations of total knee arthroplasty after proximal tibial osteotomy. J. Bone and Joint Surg. April 1988; 70-A:547-555.

Redistribution of this article permitted only in accordance with the publisher's copyright provisions.

Brandner001483

Knowledge Server®: Retrieved Documents    Page 7   Fri Nov 20 14:43:09 1996

TABLE 1
DATA ON THE THIRTY-ONE PATIENTS WHO HAD OPERATIVE DECOMPRESSION

| Case | Gender, Age (Yrs.) | Inciting Event | Possible Etiology |
|---|---|---|---|
| 1 | F, 76 | Total knee arthroplasty | 30° valgus stretch |
| 2 | F, 70 | Total knee arthroplasty | 20° valgus stretch |
| 3 | F, 34 | Total knee arthroplasty | Unclear |
| 4 | F, 78 | Total knee arthroplasty | Compressive dressing |
| 5 | F, 72 | Total knee arthroplasty | Unclear |
| 6 | F, 45 | Fract., ankle | Pressure due to cast |
| 7 | M, 45 | Fract., tib. plateau | Initial trauma |
| 8 | M, 24 | Dist. fem. osteot. | Unclear |
| 9 | F, 67 | Prox. tib. osteot. | Scarring |
| 10 | F, 63 | Total knee arthroplasty | Scarring |
| 11 | F, 55 | Prox. tib. osteot. | Compressive dressing |
| 12 | F, 74 | Total hip arthroplasty | Traction |
| 13 | M, 72 | Prox. tib. osteot. | Scarring |
| 14 | F, 61 | Prox. tib. osteot. | Hematoma |
| 15 | M, 39 | Fract., tib. | Malunion |
| 16 | F, 27 | Fall on knee | Initial trauma |
| 17 | M, 34 | Fract., tib. plateau | Initial trauma |
| 18 | F, 39 | Fract., tib. plateau | Cast |
| 19 | M, 52 | Fract., tib. plateau | Injury |
| 20 | M, 16 | Fract., tib. | Injury |
| 21 | F, 42 | Fall on knee | Injury |
| 22 | M, 30 | Fract., tib. | Injury |
| 23 | F, 34 | Fall on knee | Injury |
| 24 | F, 37 | Ankle injury | Injury |
| 25 | F, 73 | Fract., tib. plateau | Injury |
| 26 | M, 26 | Fract., ankle | Injury |
| 27 | F, 25 | Fract., ankle | Injury |
| 28 | F, 48 | Fract., foot | Injury |
| 29 | M, 38 | Fract., tib. plateau | Injury |
| 30 | M, 17 | Fall on knee | Injury |
| 31 | F, 48 | Ankle injury | Injury |

*EMG = electromyographic, and early = within one month after the onset of the symptoms.

Redistribution of this article permitted only in accordance with the publisher's copyright provisions.

298

Brandner001484

Knowledge Server®: Retrieved Documents    Page 8    Fri Nov 20 14:43:09 1998

| EMG and Nerve-Conduct.-Veloc. Studies* | | Time to Improve. | Palsy Score (Points) | |
| Early | Immed. before Decompres. | | Preop. | Postop. |
|---|---|---|---|---|
| + | + | 3 wks. | 4 | 1 |
| + | Not done | 3 mos. | 5 | 1 |
| + | + | 3 mos. | 5 | 1 |
| + | + | 2 mos. | 4 | 1 |
| + | + | 6 wks. | 5 | 3 |
| Not done | + | 3 yrs.? | 5 | 1 |
| + | Not done | 4 mos. | 4 | 2 |
| Not done | + | No improve. | 4 | 3 |
| + | + | 2 mos. | 4 | 1 |
| + | + | 3 wks. | 4 | 1 |
| + | + | 6 mos. | 4 | 3 |
| + | + | 3 mos. | 5 | 4 |
| Not done | + | 3 mos. | 4 | 1 |
| + | + | 3 mos. | 4 | 2 |
| + | + | 2 mos. | 5 | 3 |
| Not done | + | 3 mos. | 5 | 1 |
| + | + | 1 mo. | 5 | 1 |
| Not done | + | 3 mos. | 3 | 1 |
| Not done | + | 2 mos. | 5 | 1 |
| + | + | 4 mos. | 5 | 3 |
| + | + | 6 mos. | 4 | 2 |
| + | + | 2 mos. | 5 | 1 |
| Not done | + | 2 mos. | 5 | 1 |
| + | Not done | 5 mos. | 4 | 1 |
| Not done | + | 5 mos. | 4 | 1 |
| + | + | 1 mo. | 4 | 1 |
| + | + | 3 mos. | 5 | 1 |
| + | Not done | 1 mo. | 4 | 1 |
| + | + | 1 mo. | 4 | 1 |
| Not done | + | 2 mos. | 4 | 2 |
| + | + | 4 mos. | 4 | 1 |

Redistribution of this article permitted only in accordance with the publisher's copyright provisions.

Brandner001485

Knowledge Server[0]: Retrieved Documents    Page 9   Fri Nov 20 14:43:09 1998

| Postop. | Durat. of Follow-up (Mos.) |
|---|---|
| 5 | 72 |
| 5 | 60 |
| 5 | 70 |
| 5 | 60 |
| 5 | 54 |
| 5 | 42 |
| 5 | 56 |
| 4 | 42 |
| 5 | 58 |
| 5 | 60 |
| 4 | 60 |
| 4 | 56 |
| 5 | 60 |
| 5 | 60 |
| 5 | 17 |
| 5 | 15 |
| 5 | 23 |
| 5 | 15 |
| 5 | 19 |
| 4 | 17 |
| 4 | 31 |
| 5 | 20 |
| 5 | 17 |
| 5 | 12 |
| 5 | 12 |
| 5 | 27 |
| 5 | 27 |
| 5 | 18 |
| 5 | 12 |
| 4 | 12 |
| 5 | 12 |

Redistribution of this article permitted only in accordance with the publisher's copyright provisions.

300

Brandner001486

Case: 1:10-cv-08161 Document #: 81-33 Filed: 12/13/11 Page 484 of 491 PageID #:3591

TABLE II
DATA ON THE NINE PATIENTS WHO HAD NON-OPERATIVE TREATMENT

| Case | Gender, Age (Yrs.) | Inciting Event | Onset of Peroneal Nerve Palsy | Possible Etiology |
|------|------|------|------|------|
| 32 | F, 89 | Total knee arthroplasty | Immed. postop. | Tight dressing |
| 33 | F, 72 | Total knee arthroplasty | Immed. postop. | 20° Valgus stretch |
| 34 | F, 73 | Total hip arthroplasty | 3 days postop. | Traction from suspension |
| 35 | F, 76 | Total knee arthroplasty | Immed. postop. | 20° valgus deform. |
| 36 | M, 51 | Prox. tib. osteot. | Immed. postop. | Possible hematoma |
| 37 | M, 31 | Fract., tib. plateau | Immed. postop. | Initial trauma |
| 38 | F, 36 | Fract., tib. plateau | Immed. postop. | Initial trauma |
| 39 | F, 26 | Hysterectomy | Immed. postop. | Traction |
| 40 | M, 52 | Total knee arthroplasty | Immed. postop. | Valgus deform. |

*EMG = electromyographic, and early = within one month after the onset of the symptoms.

Redistribution of this article permitted only in accordance with the publisher's copyright provisions.

301

Brandner001487

Knowledge Server®: Retrieved Documents    Page 11   Fri Nov 20 14:43:09 1998

| Late | Time to Improve, | Palsy Score [20] (Points) | | |
| --- | --- | --- | --- | --- |
| | | Initial Exam. | Latest Exam. | Initial Exam. |
| + | 1 yr. | 4 | 1 | 0 |
| + | No improve. | 4 | 3 | 5 |
| + | No improve. | 4 | 4 | 5 |
| + | No improve. | 5 | 5 | 0 |
| + Not done | 8 mos. 3 mos. | 5 5 | 2 1 | 0 5 |
| + | No improve. | 4 | 4 | I |
| + ↓ | No improve. No improve. | 4 4 | 4 4 | 1 1 |

Redistribution of this article permitted only in accordance with the publisher's copyright provisions.

302

Brandner001488

Knowledge Server®: Retrieved Documents    Page 12  Fri Nov 20 14:43:09 1998

| Latest Exam. | Durat. of Follow-up (Mos.) |
|---|---|
| 5 | 84 |
| 5 | 72 |
| 5 | 72 |
| 0 | 60 |
| 4 | 42 |
| 5 | 24 |
| 2 | 24 |
| 3 | 24 |
| 1 | 28 |

Redistribution of this article permitted only in accordance with the publisher's copyright provisions.

Brandner001489

304

Brandner001490



**STATE BAR OF ARIZONA**

Assistant's Direct Line: (602) 340-7250

February 24, 2009

**FILED**

FEB 24 2009

STATE BAR OF ARIZONA
BY

**Personal and Confidential**

Wade R. Causey
Doyle Berman Murdy, PC
1313 E. Osborn Road, Suite 100
Phoenix, Arizona 85014-0001

Re:    File No. 08-1753
       Kipling P. Sharpe, Complainant

Dear Mr. Causey:

The charges filed against you by Kipling P. Sharpe have been investigated and, upon review by bar counsel, have been dismissed.

Pursuant to Rule 52(b)2, Ariz.R.Sup.Ct., the complainant may appeal this decision within ten (10) days of receipt of the dismissal letter. Any such appeal will be referred to the Probable Cause Panelist for a decision. You will be notified if an appeal is filed.

Sincerely,

Matthew E. McGregor
Staff Bar Counsel

MEM/lmc

Brandner001491



**AAOS** AMERICAN ACADEMY OF ORTHOPAEDIC SURGEONS
AMERICAN ASSOCIATION OF ORTHOPAEDIC SURGEONS

## Letter from Dr Zuckerman

**IMPORTANT UPDATE: As this letter was being prepared, heath care reform activity in Washington accelerated on many different fronts. Rather than pre-empt this update, the AAOS has decided to initiate a separate series of e-mail updates related specifically to developments in health care reform. The first will appear tomorrow, and then at least weekly for as long as needed.**

**As it becomes necessary to mobilize the membership to contact their senators and congressional representatives, more frequent e-mails will be sent. We — the Presidential Line and Peter J. Mandell, MD, chair of the Council on Advocacy — believe this is a critical time for our membership to be informed and involved.**

My Fellow members of the AAOS,

Four years ago, the AAOS Fellowship developed and adopted a Professional Compliance Program. Initially grounded in members' concerns about expert witness testimony, the program has grown to establish minimum standards of conduct in areas as diverse as advertising by orthopaedic surgeons, professional and patient relationships, academic and research responsibilities, and orthopaedist-industry conflicts of interest.

Although several articles have been written about the program and its operations, I thought it appropriate to update you on its effectiveness and success.

### A short history

You may recall that a professional compliance program was first proposed by the Board of Councilors in 2002. This was followed by the establishment of an AAOS project team and by two surveys of the Fellowship to assess support. The bylaws and the first three Standards of Professionalism (SOPs) were adopted on April 18, 2005, and the first case under the program was filed in August of that year. Since then, 70 grievances have been submitted, mostly in the area of expert witness testimony.

To ensure proper due process and allow both sides to be heard, several safeguards are built into the AAOS Professional Compliance Program. All members of both the Committee on Professionalism (COP) and the Judiciary Committee are given extensive training in the logistics and legalities of the program. Additionally, the grievance hearing process itself and AAOS Grievance Procedures have been designed to ensure maximum due process and at least two opportunities to be heard.

The first step of the grievance process is an administrative review conducted by the AAOS general counsel, to determine whether the materials submitted meet the program's requirements, as outlined in the Grievance Procedures. If the case proceeds, the Committee on Professionalism (COP) reviews the material and determines whether a hearing is warranted.

The next step is the hearing, conducted by a Hearing Panel of the COP, and both parties have 30 minutes each to present their cases. In executive session after the hearing, the COP Hearing Panel

Brandner001492

Case: 1:10-cv-08161 Document #: 81-33 Filed: 12/13/11 Page 490 of 491 PageID #:3597

will develop a report and may decide to take no action, to issue of a letter of concern, or to recommend that the AAOS Board censure, suspend for a specified period, or expel the AAOS Fellow or Member found to have violated the SOPs .

Either party may appeal the decision of the COP Hearing Panel to the Judiciary Committee (although the Grievant—the party bringing the grievance—may do so only at his/her own expense). During the appeal hearing, both parties may argue that the recommendation of the COP Hearing Panel violated due process or was contrary to the clear weight of the evidence.

Your Board of Directors makes the final decision, after hearing the reports and recommendations of the COP Hearing Panel, and as applicable, the Judiciary Committee and the two parties. Having reviewed a number of cases already and sat through several days of testimony, I can tell you that we take this responsibility very seriously. A written secret ballot is taken and a two thirds vote of the Board is necessary for the AAOS to take professional compliance action.

### By the numbers...

So, what does all this mean? Here are the numbers:

- 70 grievances have been submitted.
- 8 grievances have been withdrawn or are in abeyance.
- 6 cases failed the administrative review process.
- In 13 grievances, the COP determined in its prima facie assessment process that no hearing was warranted. One fellow demanded a hearing, which was granted at his/her own expense.
- 9 cases are currently undergoing the administrative review or prima facie assessment process.
- The COP issued 13 letters of concern and closed or took no action in 10 cases.
- The Judiciary Committee has conducted 10 appeal hearings.
- The Board of Directors has taken action in 16 cases—4 censures and 12 suspensions. The suspensions ranged in length from 3 months to 2 years.

In short, the program works. It is being challenged, but we have been extraordinarily careful in developing the program and its safeguards.

### Why it matters

At a time when the medical profession is under intense scrutiny and criticism, AAOS Fellows can be proud of the steps the Academy has taken to ensure that our members uphold the highest standards of professional ethics. The AAOS Standards of Professionalism (SOPs) spell out, in detail, exactly what is expected of orthopaedic surgeons in the following key areas:

- Advertising by Orthopaedic Surgeons
- Providing Musculoskeletal Services to Patients
- Professional Relationships
- Orthopaedic Expert Witness Testimony
- Orthopaedist Industry Conflicts of Interest
- Research and Academic Responsibilities

If you have any questions about the AAOS Professional Compliance Program, I urge you to review the information on the AAOS Web site, or to e-mail our program coordinator, Rosalind Giulietti.

Case: 1:10-cv-08161 Document #: 81-33 Filed: 12/13/11 Page 491 of 491 PageID #:3598

This is an outstanding program and I applaud our members who initiated and developed the program, our members on the Committee on Professionalism and the Judiciary Committee who have devoted countless hours to fulfilling their responsibilities, and our staff who have been instrumental in maintaining all facets of the program.

 Dr Zuckerman signature

-**PRIVACY POLICY**- Disclaimers & Agreement Advertising & Sponsorship Contact AAOS Technical Requirements Careers
6300 North River Road Rosemont, Illinois 60018-4262 Phone 847.823.7186 Fax 847.823.8125
© 1995-2011 by the American Academy of Orthopaedic Surgeons. "All Rights Reserved." This website and its contents may not be reproduced in whole or in part without written permission. "American Academy of Orthopaedic Surgeons" and its associated seal and "American Association of Orthopaedic Surgeons" and its logo are all registered U.S. trademarks and may not be used without written permission.