# EXHIBIT "34"

LAW OFFICES OF
# CRAWFORD & KLINE, P.L.C.

Bruce D. Crawford*
Peter G. Kline*

SUITE 101
1920 EAST SOUTHERN AVENUE
TEMPE, ARIZONA 85282-7518

(480) 491-5100
Fax (480) 491-5115
bcrawford@crawford-kline.com

February 19, 2010

RECEIVED by FAX

FEB 2 4 2010  2/19/10

OFFICE OF
GENERAL COUNSEL

Richard N. Peterson
General Counsel
AMERICAN ACADEMY OF ORTHOPAEDIC SURGEONS
6300 North River Road
Rosemont, IL 60018-4262

Re:     Grievance 2008-23
        Kipling P. Sharpe, M.D. v. Patrick J. Brandner, M.D.

Dear Mr. Peterson:

I have been retained by Dr. Kipling Sharpe related to the above appeal. This letter sets forth Dr. Sharpe's response to the issues raised in the appeal. This response is not meant to reiterate all of the evidence the COP Hearing Panel had or considered before unanimously finding that Dr. Brandner had violated Mandatory Standards 3, 4 and 7. Unfortunately, rather than admitting to his errors, Dr. Brandner has chosen to threaten and attack AAOS and Dr. Sharpe. His appeal further confirms his violations of the Mandatory Standards.

## BACKGROUND

This patient originally filed suit against another Orthopedic Surgeon, Dr. Matthews. Dr. Sharpe was not named as a Defendant in the original lawsuit. Dr. Sharpe's medical records, his office's x-rays, his deposition (taken before he was sued), and the patient and his mother's depositions (again, taken before Dr. Sharpe was sued), were all available to Dr. Brandner. Dr. Sharpe was brought into the case as a Defendant as a result of Dr. Brandner's review and his opinions. Dr. Matthews was subsequently dismissed.

This patient was first seen at Mezona Orthopaedics on March 22, 2002, by one of Dr. Sharpe's partners, Dr. Marc Dinowitz. He took x-rays that day. He noted, "new x-rays today show that he has gone onto further drift." He further noted, "unfortunately, the patient's growth plates look to be closed and I do not know how much remodeling he has. I would guess minimal as far as how much growth he has left."

Dr. Dinowitz believed the patient needed surgical correction of his tibia/fibula deformity. He presented the case to a conference of Orthopedic Surgeons (his partners), who all agreed. Dr. Sharpe was asked to assume the patient's care. He met with the patient and his mother on April 11, 2002. His first office note began , "Essentially this is a 15-year-old young man who has reached skeletal maturity, referred by Dr. Dinowitz, with a malunion of his right tibia. He was presented in conference by Dr. Dinowitz and the agreement was that this was an unacceptable deformity." After examining the patient, Dr. Sharpe documented an extensive discussion with him and his mother about the risks of surgery, including nerve injury. He had a second preoperative visit/surgical consultation with them on June 6, 2002. He and his Physician's Assistant documented another extensive discussion about the risks of surgery, including nerve injury.

*Certified Specialist — Injury and Wrongful Death Litigation —
State Bar of Arizona/Board of Legal Specialization

BRANDNER 00572

LAW OFFICES OF
**CRAWFORD & KLINE, P.L.C.**

February 19, 2010
Page 2

_____

## DUE PROCESS

Dr. Brandner was afforded due process. The AAOS Grievance Procedures give both parties the opportunity to provide relevant documents/material to AAOS for consideration. Dr. Brandner had multiple opportunities to provide AAOS with whatever medical records, deposition/trial transcripts, etc., he wanted it to consider. He failed to do so. He cannot legitimately claim "lack of due process" given his failure to do so.

Dr. Brandner claims he tried to obtain records, etc., but was thwarted by the patient's attorney. He submits an e-mail string to support that assertion. (Exhibits to appeal letter). The e-mail string does not support Dr. Brandner's claim. The only documents/records he requested from the patient's attorney were the hospital records. (See, June 28, 2009, e-mail at 10:49 a.m.). The e-mail string confirms Dr. Brandner did not attempt to obtain the "missing" x-rays he claims were relevant,[1] additional depositions or additional trial testimony transcripts.

The hospital records concerned the surgery Dr. Sharpe performed and his post-operative care of the patient's complications. The e-mail string demonstrates Dr. Brandner was trying to smear Dr. Sharpe related to a postoperative care issue which was not an issue in the litigation and was not part of Dr. Sharpe's Grievance. (See, e-mails dated June 28, 2009, at 10:49 a.m.; June 29, 2009, at 3:01 p.m.). In fact, Dr. Brandner had previously testified in deposition and at trial the surgery was performed correctly; this complication would have occurred, in retrospect, whenever it was performed and no matter who performed it; and, that Dr. Sharpe's postoperative care was "excellent."

Deposition transcripts and trial testimony transcripts are a matter of public record. Dr. Brandner could have obtained copies at his expense, just like Dr. Sharpe. He never made the effort. Neither HIPAA nor the physician-patient privilege applied to medical records or x-rays which were part of the litigation. The patient waived those protections by having filed a lawsuit. Even though the patient's attorney suggested Dr. Brandner obtain the records from Dr. Sharpe, he made no such request. He did not ask AAOS to request additional documents prior to the Grievance Hearing.

Dr. Sharpe provided AAOS with all of the medical records, deposition/trial transcripts, x-rays, etc., which he believed were relevant to his grievance. It was not Dr. Sharpe's responsibility to decide what Dr. Brandner thought relevant or provide documents for Dr. Brandner. Dr. Sharpe pointed out in his grievance letter and reply that the patient and his mother had, not surprisingly, changed their prior deposition testimony related to the informed consent issues after Dr. Brandner agreed to be their expert against Dr. Sharpe. The point is Dr. Brandner never should have agreed to be an expert or offer the opinions he did.

Dr. Brandner's second due process allegation is also without merit. AAOS has sole discretion to extend the sixty (60) day time frame for issuing the report. See, AAOS "Professional

_____

[1] The x-rays Dr. Brandner claims were relevant were taken 3 - 5½ months before the patient saw Dr. Sharpe on April 11, 2002. They were not the x-rays upon which Dr. Sharpe made his surgical recommendations to the patient and his mother. Those were the March 22, 2002, x-rays.

BRANDNER 00573

LAW OFFICES OF
**CRAWFORD & KLINE, P.L.C.**

February 19, 2010
Page 3

---

Compliance Program Grievance Procedures," § VII(D)(14). Also, although claiming "prejudice," Dr. Brandner has failed to establish actual prejudice.[2]

## THE EVIDENCE

### A.    Preoperative X-rays

The x-rays taken at Baywood Orthopedic Clinic (Dr. Matthews) were irrelevant. Again, Dr. Sharpe based his surgical recommendations on the x-rays taken on March 22, 2002, not those taken 3 to 5½ months earlier. The March 22, 2002, x-rays clearly demonstrated the patient's growth plates were closed. Dr. Brandner testified during deposition he based his opinions on the March 22, 2002, x-rays. (See, Deposition Dr. Brandner, p. 10/22 - p. 11/7; p. 45/12-25). He reiterated his opinions at trial, while holding up and reviewing the March 22, 2002, x-rays in front of the jury! (See, trial testimony of Dr. Brandner, p. 4/2-10; p. 11/3-12; p. 12/5-8; pp. 13/17 - p. 14/21). It was only when confronted during cross-examination that Dr. Brandner finally admitted the growth plates were closed in those x-rays. (Id., p. 43/3-15). He has since played a cat-and-mouse game by claiming he saw "some other x-rays." He has never identified or produced those x-rays.[3] Is Dr. Brandner now admitting he agreed to testify as an expert against Dr. Sharpe without ever having reviewed the preoperative x-rays upon which Dr. Sharpe based his surgical recommendations? If so, his misconduct is even more appalling.

### B.    Informed Consent

Before agreeing to act as an expert in October 2004, the following deposition testimony was available to Dr. Brandner:

- **The patient's, taken on January 29, 2004:**

  Q.    When did you notice that you first had a foot drop?

  A.    Right when I woke up out of surgery, Dr. Sharpe asked if I was able to – he had me move my leg and foot in certain directions, and he asked me to flex, and I wasn't able to flex, and he asked me to go out and in, and I wasn't able to at that time.

  Q.    Before you had the surgery, did Dr. Sharpe ever discuss with you, or did anyone discuss with you, you might end up with a foot drop?

---

[2] The AAOS Judiciary Committee procedures allow Dr. Brandner to provide additional argument at the hearing.

[3] The prior x-rays were taken from Mezona Orthopaedic by the patient and his mother after the April 11, 2002, office visit and were "missing" during the litigation. Dr. Sharpe never had them during the litigation, and doesn't have them now.

BRANDNER 00574

LAW OFFICES OF
**CRAWFORD & KLINE, P.L.C.**

February 19, 2010
Page 4

_____

A.    Yes, he told me all the things that could happen I would – it could have nerve damage, and he said all the things. He even mentioned death. The – we had an anesthesiologist, and there could be accidents and stuff. There was a lot of things.

Deposition of "SC" @ p. 28/10-24.

- **The patient's mother, taken on January 29, 2004:**

Q.    What do you mean by "foot drop"?

A.    There are – there are nerves that control the flex in a foot, and because the bone had been twisted and the – there was a callus on it, it had put pressure on those nerves, and Dr. Sharpe had said that when he moves it back into alignment and corrects all that, that those particular nerves might be very stretched and might be damaged because of that, and that's what happened.

                    *       *       *

Q.    One thing I forgot. I swear to you it was here, and I forgot to ask. Is there any doubt in your mind that the nerve injury occurred during Dr. Sharpe's surgery?

A.    THE WITNESS: I think it happened because the leg had to be rebroken, and I think that it happened because it – everything had to be moved around.

Q.    Okay. Did you talk to Dr. Sharpe about that?

A.    He had warned us prior to that, you know, movement of that bone, when he had to put it back in place, could cause various things. He went through a list of many things.

Deposition of "KC" @ p. 51/6-13; p. 99/19 - p. 100/6.

- **Dr. Sharpe's, taken on May 19, 2004:**

Q.    In preparation for the surgery you saw the patient on June 6th of 2002; correct?

A.    Yes.

Q.    And you discussed the risk of surgery with the young man; correct?

A.    No, I did not see him. That is not correct. My physician's assistant saw him on June 6th.

BRANDNER 00575

LAW OFFICES OF
**CRAWFORD & KLINE, P.L.C.**

February 19, 2010
Page 5

—————————

Q.   Okay. Who would have discussed the — had the informed consent discussion with him at that time, you or the assistant?

A.   My recollection is that we both had that discussion with him. I had one back in April and discussed risks with him at the April visit. And then the June 6th visit they were reviewed by my physician assistant.

I believe that I also, my recollection is, that I came into the room at that visit and went over them again with him because I was concerned about this particular case.

*      *      *

Q.   One of the issues you discuss in the informed consent discussion is nerve injury; correct?

A.   Yes.

Q.   And in general you tell the patient even in the hands of the best surgeon, certain adverse outcomes can occur and you have to be aware of them; correct?

A.   Yes.

Q.   What sort of nerve injury can occur even when you do the best job possible?

A.   THE WITNESS: Well, I was specifically concerned in this case about the risk of peroneal nerve injury in correcting the valgus deformity. I did discuss that with him.

Q.   Did you discuss the peroneal nerve specifically with him?

A.   Yes.

Deposition of "Dr. Sharpe" @ p. 10/17 - p. 11/10; p. 11/21 - 12/14. In addition, Dr. Brandner had copies of the April 11, 2002, and June 6, 2002, office notes. They both documented extensive informed consent discussions, including the risk of nerve injury.

Given the records and the available deposition testimony, there was no basis for Dr. Brandner to agree to be an expert witness or testify there was a lack of proper informed consent. The idea he agreed to testify "if the patient and mother were confused," is specious. That invites exactly what happened: to-wit, they changed their testimony to fit Dr. Brandner's "opinion."

## CONCLUSION

Dr. Brandner was afforded due process, and the COP Grievance Panel's Report/decision was consistent with the weight of the evidence. Dr. Brandner had the opportunity to provide AAOS with whatever information he deemed relevant/important. His threats and

BRANDNER 00576

LAW OFFICES OF
**CRAWFORD & KLINE, P.L.C.**

February 19, 2010
Page 6

accusations against AAOS and Dr. Sharpe are spurious. Dr. Brandner violated Mandatory Standards 3, 4 and 7. The unanimous decision of the Grievance panel was well-founded and should stand.

Very truly yours,

Bruce D. Crawford
For the Firm

BDC/cjr

c: Kipling Sharpe, M.D.
   [*Personal & Confidential*]

BRANDNER 00577