# EXHIBIT "35"

MARCH 12, 2010

Page 1

AMERICAN ASSOCIATION OF ORTHOPAEDIC SURGEONS
JUDICIARY COMMITTEE HEARING

KIPLING P. SHARPE, M.D.    GRIEVANCE APPEAL
        Grievant,        HEARING NO. 2008-23
    vs.
PATRICK J. BRANDNER, M.D.
        Respondent/Appellant.
-----------------------------------

        TRANSCRIPT OF PROCEEDINGS
        taken at the Hilton Riverside Hotel,
        New Orleans, Louisiana, commencing
        at 1:35 p.m., Friday, March 12,
        2010, before Rebecca T. Fussell, CSR
        No. 70003.

Page 2

APPEARANCES:

Chair of the Hearing Panel:
    Richard D. Schmidt, M.D.

Hearing Panel:
    Edward V. Craig, M.D.
    Joseph C. DeFiore, M.D.
    Richard A. Geline, M.D.
    Thomas M. Green, M.D.


Also present:

    Kipling P. Sharpe, M.D., Grievant
    Patrick J. Brandner, M.D.,
Respondent/Appellant
    Mr. Bruce D. Crawford, Counsel for
Grievant
    Mr. Aaron R. Maurice, Counsel for
Respondent/Appellant
    Mr. Michael A. Chabraja, AAOS Outside
Counsel for the Judiciary Committee

Page 3

P R O C E E D I N G S
    MR. CHABRAJA:
        Let the record reflect that
this is a hearing of the Judiciary
Committee of the American Academy of
Orthopedic Surgeons. The Committee is
meeting today in New Orleans, Louisiana
to hear Dr. Patrick J. Brandner's appeal
of the AAOS Committee on
Professionalism's decision based on
charges of unprofessional conduct brought
by Dr. Kipling P. Sharpe against Dr.
Brandner. The Committee on
Professionalism's initial decision being
appealed today was to recommend a
one-year suspension of Dr. Brandner.
        Dr. Brandner is present today
with his attorney, Aaron Maurice. Dr.
Sharpe is also present with his attorney,
Bruce Crawford.
        The members of the AAOS
Judiciary Committee who are present today
are Dr. Richard Schmidt, Chair of this
appeal hearing, and Drs. Edward Craig,
Joseph DeFiore, Richard Geline and Thomas

Page 4

Green.
        Also present are Richard
Peterson, General Counsel of the AAOS;
Melissa Young, Assistant General Counsel
and Rosalind Giulietti, AAOS Professional
Compliance Program Coordinator. Russell
Pelton, counsel for the Committee was
unable to attend today's hearing.
        I am Michael Chabraja, partner
in Mr. Pelton's former law firm, McGuire
Woods, in Chicago, Illinois. I represent
the AAOS in various matters involving the
Professional Compliance Program.
        Our court reporter today is
Rebecca Fussell, and a copy of the
transcript from this proceeding will be
attached to the Judiciary Committee's
report.
        Before we begin, Drs. Sharpe
and Brandner, would you please raise your
right hands. Madam Court Reporter, would
you swear in the witnesses?
            *   *   *   *   *
        Whereupon, KIPLING P. SHARPE, M.D.,
and PATRICK J. BRANDNER, M.D., after having

1 (Pages 1 to 4)

8410a85a-b0ee-4717-8779-b2b7bfb68cb4

BRANDNER 00578

MARCH 12, 2010

Page 5

been first duly sworn, testified as follows:

MR. CHABRAJA:

Dr. Schmidt.

CHAIRMAN SCHMIDT:

Good afternoon. I'm Dr. Richard Schmidt, Chair of the Judiciary Committee. As you were advised, the Professional Compliance Program procedures allow each party the opportunity to make a statement to this Committee before any action is taken on the grievance hearing's panel recommendation.

As a reminder, no new evidence or information may be presented at the appeal hearing. You may assume that the Committee has read all the material submitted pertaining to this grievance.

Each party will be given ten minutes to make his presentation, and any statements by legal counsel are included in the ten-minute limit. Dr. Brandner, the original respondent, will be permitted to speak first followed by Dr. Sharpe.

Page 6

There is a timer to assist so that you know how long the presentation has been. The red light will go on when your time is up. Following the presentation by both parties, each of you may have five minutes for questions, but extensive cross-examination will not be permitted.

The members of the Judiciary Committee will then have the opportunity to ask questions of both parties. Please speak directly into the microphone so that the court reporter may accurately record this proceeding.

Before we begin, I have been asked to remind both parties to refrain from identifying the patient in the underlying case by name.

Are there any questions?

MR. MAURICE:

No.

MR. CRAWFORD:

None.

CHAIRMAN SCHMIDT:

Dr. Brandner, you may proceed.

Page 7

MR. MAURICE:

Aaron Maurice on behalf of Dr. Brandner.

On October 2nd, the COP Hearing Panel was presented with a whole slew of allegations leveled by Dr. Sharpe, everything from that Dr. Brandner was not qualified to testify as an expert to that Dr. Brandner had not reviewed all of the pertinent medical records.

The COP Hearing Panel did a good job of fairing through those allegations for which they had all of the documents. They unanimously determined that Dr. Brandner was qualified to offer the expert testimony which he provided in the case. They unanimously found that Dr. Brandner had reviewed all of the pertinent medical records. And they unanimously rejected the proposition that his testimony, that there was a 3 to 13 percent likelihood or incidence rate of peroneal nerve palsy, and a proximal tibial osteotomy was supported by research. In fact, it was a supported by

Page 8

a study that was performed by the Department of Orthopedics at Johns Hopkins.

Where the COP Hearing Panel ran into trouble were on those issues where they were not presented with all the pertinent documents, specifically with regard to the allegations concerning what Dr. Brandner did and did not testify to in connection with the case.

The unanimous findings of the hearing panel, and there really are two. One relates to what was or was not said in the depositions, and one deals with x-rays. And I will just break them up.

With regard to the first finding, which was that Dr. Brandner had violated mandatory standards three and four, the specific finding says the record show that informed consent was given. The COP found that the deposition transcripts reflected that both the plaintiff and his mother had an understanding about the specific possibility and causation of a foot drop.

2 (Pages 5 to 8)

8410a85a-b0ee-4717-8779-b2b7bfb68cb4
BRANDNER 00579

MARCH 12, 2010

Page 9

The COP believed that in this regard, Dr. Brandner condemned performance that falls within the generally-accepted practice standards in obtaining informed consent.

There are two problems with that. The first one is, it shows that the COP Hearing Panel did not understand the nature of Dr. Brandner's testimony. Dr. Brandner did not testify that Dr. Sharpe had failed to give, had failed to advise the patient or his family of the potential of a foot drop. He acknowledged in his deposition and at trial that this was a "he said, she said" situation, and he could not opine on whether that information had or had not been conveyed to the patient. He was very clear Dr. Sharpe said that he had advised the patient and his family of that. And the patient and his family indicated that Dr. Sharpe had not provided that information. It was for the jury to decide that issue.

In this regard, the mere fact that the COP Hearing Panel concluded that

Page 10

Dr. Brandner had condemned any type of performance shows that they swung and missed in terms of their understanding of the nature of his testimony.

The fact that the statement is made the COP found that the deposition transcripts reflected that both the plaintiff and his mother had an understanding about the specific possibility and causation of a foot drop shows the importance of the next issue. And that is they didn't have all of the deposition transcripts. They just weren't in possession of them.

The patient and his mother were deposed twice. The deposition transcripts that were provided in the COP Hearing Panel were from their first deposition. For some reason Dr. Sharpe chose not to produce the second deposition transcripts for the Panel.

Had the Panel had those transcripts, there is no way this statement could have been made. You cannot read the second set of deposition

Page 11

transcripts from the patient and his mother and make such a finding. Because they -- and they do it -- quite frankly, they basically say no. If Dr. Sharpe says that that is what happened, that is not true. To say that they called him a liar, they may not have called him a liar at the deposition, but they certainly did at trial. At the trial, they came out and said, we absolutely disagree with this proposition. That did not happen.

So with regard to the first finding, with respect to Dr. Brandner had condemned performance that fell within the -- fell within the generally-accepted practice standards, one, he did not condemn anything. All he did was advise a jury of lay people as to the standard of care and allow them to determine the "he said, she said" situation. That's all he did.

And second of all, there is no way that the finding can be true that based on the deposition transcript, it's clear that the patient and his mother had

Page 12

an understanding, because the COP Panel did not have the transcripts they needed. Dr. Brandner pointed that out on three occasions, in his original response to the grievant, in his witness list, and he pleaded with the Panel at the time of the hearing.

For some reason, the Panel chose to question him as to why he could not produce these things. It doesn't make a whole lot of sense in the context of Rule 6C, which requires the parties to produce all documentation related to the matter. And it makes even less sense in light of the fact that it's Dr. Sharpe's burden. He is the grievant. It's his burden of proof. It's his obligation to produce the materials to sustain his grievance.

And it further makes even less sense when you consider Dr. Brandner was not a party to the underlying litigation. And the reason why that's important is because I have read in the response from Mr. Crawford that these are public

3 (Pages 9 to 12)

MARCH 12, 2010

Page 13

records. He makes it sound as if you can just do a Freedom of Information Act request, and suddenly these documents will be sent to you. That is absolute nonsense.

When you have a deposition in a civil matter, it is a public record to the extent you can find out where that deposition, who took that deposition. If you are willing to pay the copying costs, you can get that transcript. That wasn't the case in this situation.

If you look at the transcripts that Dr. Sharpe presented to the academy in connection with this grievance, you can look at the court reporters that generated those transcripts. You have Griffin & Associates. You have -- they did three. You have Atwood Reporting Service. And then you have Atkinson Baker.

Now, Dr. Brandner could have called all three of those court reporting services, and it wouldn't matter because none of those court reporting services

Page 14

took the depositions that are at issue here, the second deposition of the patient and the patient's mother. We have attached those to our written materials, and you can see they are not the same.

The simple fact is that Dr. Sharpe had access to these materials. They were in his possession. They were within his realm of control. He could have submitted them. The reason he didn't submit them is because they just don't support his allegation.

On two occasions during this trial, Dr. Sharpe moved for a directed verdict in his favor. And on each occasion, he did exactly what he did in front of this panel. He held up those first deposition transcripts and said, "Look, I win. They knew."

And on each occasion, the plaintiff's attorneys held up the second set of depositions and said, "No, they didn't. Look at the evidence." And the judge rejected it.

Page 15

Then after he prevails at trial, he files a bar complaint against Mr. Causey, the plaintiff's counsel. And he does the same thing. He submits the first set of deposition transcripts. Look, "They knew. I win. Mr. Causey should be sanctioned."

What does Mr. Causey do? He holds the deposition transcripts out and sends them to the State Bar. The State Bar rejects the claim.

Well, unfortunately, in this case, Dr. Brandner didn't have access to those transcripts. He was not able to pull them out of his desk drawer, like Dr. Sharpe and Mr. Crawford could have, because he didn't them. He attempted to get them and was unable to get them.

The COP Hearing Panel only had half the story. And unfortunately, based on half of the story they had, they sustained the grievance. In reality, had they had all of the evidence, I don't think anybody could look at that and determine that the facts could certainly

Page 16

not -- there is no way the finding could be sustained that the deposition transcripts show that the patient, the patient and his family actually had informed consent.

With regard to the second finding, the one that provides that the Panel found Dr. Brandner in violation of standard number seven. Dr. Brandner's testimony that the fracture could remodel was clearly not correct. And as such, his statements did not accurately reflect the scientific evidence in this matter.

The same situation, the testimony that Dr. Brandner provided at deposition, let's be clear. He made it very clear at that deposition this was not an injury that was going to remodel completely or substantiate.

What he said, and it's quoted in our papers, and we have identified the exact cite. It could remodel some. That's what he said. It could remodel some. That was based on the initial x-rays that he had seen that were

4 (Pages 13 to 16)

8410a85a-b0ee-4717-8779-b2b7bfb68cb4

BRANDNER 00581

MARCH 12, 2010

Page 17

provided by the Braewood facility, not the facility that Dr. Sharpe works at.

This was the exact same finding that Dr. Sharpe's partner had. And I thank Mr. Crawford for pointing this out.

If you go through the medical records that were submitted by Dr. Sharpe in connection with his grievance, and you go to -- well, it's page 55, I guess in the official record in terms of documents that were provided by the academy.

It says, "X-rays, x-rays are reviewed. I looked through all of his old x-rays." This is Dr. Marc Dinowitz, one of Dr. Sharpes' partners. At the end, he says, "I do not know how much remodeling he has."

Okay. We are not saying it's going to remodel substantially, but this is Dr. Dinowtiz reviewing the Braewood x-rays saying, "I don't know how much remodeling he has." It sounds very similar to Dr. Brandner at the deposition saying it could remodel some.

But what happens at trial is, a

Page 18

different set of x-rays is pulled out. The x-rays from Dr. Sharpe's facility are pulled out and handed to Dr. Brandner. And Dr. Brandner in the written papers that were submitted by Mr. Crawford make the allegation that it was not until Dr. Brandner was confronted on cross-examination that he acknowledged that, in fact, the bone would not remodel, that the growth -- that the bone had healed as much as it was going to heal. That is absolutely not true.

If you go to Dr. Brandner's trial testimony, and it's our Exhibit 12. And if you go to page 12 of Exhibit 12, that is the portion of the transcript that reflects when the plaintiff's counsel presented the x-rays to Dr. Brandner. He pulls them out. There are two sheets of x-rays.

And immediately you watch Dr. Brandner go through two pages of testimony where he's continually pointing out these x-rays do not appear to be same as he reviewed previously. He says when

Page 19

the question is asked --

MR. CHABRAJA:

Mr. Maurice, I'm sorry to interrupt. Your ten minutes are up. Could you very briefly conclude?

MR. MAURICE:

I will.

If you look at page 12, you will see the testimony offered on direct where Dr. Brandner is pointing out these x-rays appeared.

The simple fact is just like with the deposition, the COP Hearing Panel could not determine that Dr. Brandner's testimony that the fracture could remodel was clearly not correct. And as such, his statement does not accurately reflect the scientific evidence because they didn't review the same x-rays.

Dr. Brandner's testimony was directly in line with Dr. Dinowtiz's testimony, which is, it could remodel some. And that was based on the Braewood x-rays, which have not been presented to

Page 20

this Panel.

CHAIRMAN SCHMIDT:

Dr. Sharpe.

MR. CRAWFORD:

Thank you. Bruce Crawford.

I realize you have an understanding of the facts. Let me remind you kind of the chronology of issues here.

March 22, 2002 is when this young man first comes to Dr. Sharpe's group, which is Mezona. He sees Dr. Dinowitz, who is an upper extremity physician. Dr. Dinowitz takes x-rays that day, believes that there is a substantial deformity, believes that the growth plates are closed, believes that this patient needs surgery.

He presents it to his partners, who all agree with that. They ask Dr. Sharpe to see the patient because he has more expertise in this area than Dr. Dinowitz.

Dr. Sharpe sees the patient on April 11, 2002 and specifically discusses

5 (Pages 17 to 20)

8410a85a-b0ee-4717-8779-b2b7bfb68cb4

BRANDNER 00582

MARCH 12, 2010

Page 21

what those x-rays show. And he has a discussion, an extensive discussion, with the patient and the patient's mother about the risks of surgery, including among everything else, nerve injury.

On June 6th -- oh, by the way, the patient goes to see -- gets second opinions from other people and comes back to Dr. Sharpe, selects him as the surgeon.

He sees him again on June 6, 2002 in conjunction with his physician's assistant and goes over the surgery again, including an extensive discussion of the risks of surgery, including nerve injury.

A lawsuit is filed against Dr. Matthews sometime in 2003. The attorneys in that case take the depositions of the patient, the mother, and Dr. Sharpe. Those depositions are what Dr. Brandner reviewed when he agreed to be an expert witness in this case.

You have that testimony. And when the young man is asked flat out,

Page 22

"Did Dr. Sharpe discuss the risk of foot drop with you," "Yes. He explained everything to me."

The mother is asked a similar type of question, and she recalls the discussion that Dr. Sharpe had with her and her son before surgery about how when the bones are moved, this potential could happen.

Dr. Brandner agrees to be an expert witness in this case sometime in October of 2004. And what he has available to him are the medical records, the x-rays, the depositions of Dr. Sharpe, the patient and mother before Dr. Sharpe was ever sued. And Dr. Sharpe, in fact, specifically says that the risk of peroneal nerve injury was discussed.

That is what he had before he agreed to be an expert witness in this case. And that is the point of Dr. Sharpe's grievance in this case. The point of the grievance from day one by Dr. Sharpe has been, based on the information available, Dr. Brandner

Page 23

should not have agreed to give expert testimony opinions critical of Dr. Sharpe in any way, shape or form. That was the point.

This whole idea that they changed their testimony, and we have depositions later on that prove that, that was never disputed.

If you look in Dr. Sharpe's grievance and you look in his response to Dr. Brandner's response, you will see he specifically pointed that out to the Panel. That is the point.

The opportunity was set up by Dr. Brandner agreeing to be an expert witness that people would, in fact, change their testimony.

Dr. Sharpe submitted all of the depositions he thought were relevant to his grievance, which was what did Dr. Brandner have available before he agreed to testify.

In terms of the x-rays, it appears that both in their written papers and today, their defense is Dr. Brandner

Page 24

never reviewed the March 22, 2002 preoperative x-rays that Dr. Sharpe was relying upon in giving his recommendation to this family. He's now telling you, "I never looked at the very x-ray upon which this doctor made his decision before I agreed to be an expert witness in this case."

I will suggest to you if you look at his deposition at page ten, line 22, question: "Do you have a recollection of seeing the plain x-ray views that were taken at Mezona Orthopedic the first time blank was there when he saw Dr. Dinowitz on I think it was March 22, 2002."

Answer: "To the best of my recollection, those are the x-rays that I have. And I looked at those as late as last night in preparation."

Question: "And those, I presume, are things that you were sent originally when you first reviewed this case, both the records and the x-rays?"

Answer: "Yes."

6 (Pages 21 to 24)

8410a85a-b0ee-4717-8779-b2b7bfb68cb4
BRANDNER 00583

MARCH 12, 2010

Page 25

He's now saying that he was willing to testify against one of his colleagues, a member of this organization, and he never reviewed the very x-ray upon which that doctor made his recommendations and decisions to this patient.

You have those x-rays. Those x-rays show a skeletally-mature man, young man. They show the growth plates are closed. They show a significant severe deformity.

Dr. Brandner offered the opinion that the standard of care required Dr. Sharpe to tell this family before surgery this has the potential to remodel on its own to a clinically-acceptable result, and that is something you should think about doing instead of surgery.

That is not medically accurate under any stretch. It is not a defense under any stretch to say, I agreed to testify against this doctor based on what he's now saying are x-rays that were

Page 26

taken three to five-and-a-half months earlier, which I will tell you, he has still not provided to you. We never had them during the litigation. They were taken by the patient when they left the office on April 22, 2002, and they were missing during the litigation. We never had them, and we couldn't provide them to you today.

But the bottom line is those aren't the x-rays upon which Dr. Sharpe made his recommendations or decision, period.

Let's make sure it's clear. This entire appeal is based on new information that is being provided to you. And the rules don't permit it. But I want it to be clear. We have no objection to you looking at those depositions that were taken months later where they said the exact opposite of what they said when Dr. Brandner agreed to be an expert witness. We don't care. So that is clear. We have nothing to hide. Dr. Sharpe never had anything to

Page 27

hide in this case. And he was never trying to hide anything from the Committee.

It is not a surprise that that occurred respectfully. He made a comment about Dr. Sharpe filing a complaint against the lawyer involved. You don't have any information as to why he did that, but I will tell you why.

That lawyer met with him before he was ever sued and told him, "Don't worry. We know you didn't do anything wrong. They knew all about it before that this could happen." That is why Dr. Sharpe filed an ethics complaint against Mr. Causey. Because he then turned around and sued him.

If you look at the Grievance Panel's comments, when they looked at the testimony of these people, they didn't seem to have any difficulty understanding that that testimony was clear.

Before I ever involved in defending Sharpe, before he's ever a defendant, a lawyer asks him flat out,

Page 28

before surgery, did you -- did Dr. Sharpe tell you that you could end up with a foot drop? And the answer is yes.

The mother is asked what her understanding was and describes the conversation that Dr. Sharpe had before surgery with her.

That is the grievance -- just so it is very clear, the grievance was based on the information Dr. Brandner had available to him, before he agreed to be an expert witness, there was no basis for what he said on the informed consent issue.

Secondly, on the x-ray issue, there is no basis for Dr. Brandner to have said that the standard of care required Dr. Sharpe to tell his family that this fracture had the potential to remodel on its own to a clinically-acceptable level.

MR. MAURICE:
We'll object to the extent that that misstates any of his testimony.
MR. CRAWFORD:

7 (Pages 25 to 28)

8410a85a-b0ee-4717-8779-b2b7bfb68cb4

BRANDNER 00584

MARCH 12, 2010

Page 29

I don't believe I've misstated any --

CHAIRMAN SCHMIDT:

I'm sorry. That is not part of this discussion. Would you finish up?

MR. CHABRAJA:

Mr. Crawford, your ten minutes have elapsed. Will you conclude?

MR. CRAWFORD:

Yes.

I would encourage you to look at Dr. Althausen's letter dated August 14, 2009 that Dr. Brandner submitted as part of his case to the Grievance Committee. He saw the x-rays. He understood that this was not going to correct on its own without surgical intervention.

The Committee's decision was well founded. It was well founded based on the allegations as Dr. Sharpe had framed them. And there was no lack of due process, and the evidence supports the decision, and I do thank you for your time.

Page 30

CHAIRMAN SCHMIDT:

As we said before, we will give each side five minutes to ask questions, make a brief statement but primarily to ask some questions and gain some further explanation.

Dr. Brandner.

EXAMINATION

BY MR. MAURICE:

Q    Dr. Sharpe, you understood when you submitted the grievance that Rule 6C of the Professional Compliance Program Grievance Procedures required you to obtain and provide all written materials, such as transcripts and medical records, for consideration by the Panel; didn't you?

A    I understood that I was to provide all relevant materials, which I did. I did not understand I was to provide every single document from the entire court case. I don't believe that is what was required.

Q    The rule doesn't say "relevant." Have you looked at the rule?

A    I would have to look at it right now to say what exact wording that is in

Page 31

there.

Q    Well, it requires each party to a grievance is responsible for obtaining and providing all written material, such as transcripts and medical records, for consideration by AAOS. All correspondence or materials must be sent to the office of general counsel. It doesn't say "relevant"; does it?

A    It also says each. I would assume that would apply to Dr. Brandner equally as it would apply to me.

Q    But it doesn't say "relevant"; correct?

A    I did not hear you say relevant.

Q    And it certainly doesn't say, as your counsel has argued, that it's a subjective relevant? In other words, it's not just what a reasonable person would think is relevant. Your position is that it's what you believe is relevant?

A    Well, I have never tried to hide anything from him. Had anybody specifically requested that particular deposition of me, as Dr. Brandner could have, he could have

Page 32

requested it of my attorney, we would have gladly provided that deposition. I never intended to hide it. We have acknowledged that today.

And in my grievance, I initially stated they changed their tune. So I don't understand a concern there that you would think I am hiding something. I am not.

Q    You attended the COP Hearing of the Panel; correct?

A    Yes.

Q    And there was a significant amount of discussion at that time regarding Dr. Brandner's allegations that you had not produced all of the deposition transcripts. Do you recall that?

A    Yes.

Q    Okay. And do you recall -- that's on page 37 of the transcript, lines two through five, you interjected -- there was no question asked. You interjected, "I believe I provided all the depositions to this Committee." Do you recall making that statement?

A    Yes.

8 (Pages 29 to 32)

8410a85a-b0ee-4717-8779-b2b7bfb68cb4
BRANDNER 00585

MARCH 12, 2010

Page 33

Q    That is not true; is it?

A    It is true I believe I had provided all the depositions that were relevant to the case. I did not believe I had provided every court document, every court deposition. There were depositions of others involved that were not relevant that I did not provide.

Q    But your statement, "I believe I provided all the depositions to this Committee," you didn't say relevant depositions; correct?

A    That's correct.

Q    You represented to the Committee it was your belief you provided all the depositions; correct?

A    I provided all depositions upon which by Dr. Brandner based his decision to be an expert witness against me.

Q    So Dr. Brandner is sitting there pleading with the Committee, telling them that there are these additional depositions. You haven't seen them. He's only telling you half the story, and you interject, "I believe I have provided all the depositions to the

Page 34

Committee"; is that correct?

MR. CRAWFORD:
Excuse me. This is argument, and it is extensive cross-examination.

MR. CHABRAJA:
Mr. Maurice, you are on extensive cross-examination. I think we understand the point.

BY MR. MAURICE:

Q    You did know that those other depositions, the ones you had not produced, that those were directly contrary to the grievance you had filed; correct?

A    I think we have stated that four or five times now.

MR. MAURICE:
No further questions.

CHAIRMAN SCHMIDT:
Dr. Sharpe.

EXAMINATION

BY MR. CRAWFORD:

Q    Doctor, in your grievance and in your reply, did you point out that these people changed their testimony after Dr. Brandner agreed to be an expert?

Page 35

A    Yes, I did.

MR. CRAWFORD:
May I direct a question to Dr. Brandner?

CHAIRMAN SCHMIDT:
Yes.

EXAMINATION

BY MR. CRAWFORD:

Q    Dr. Brandner, are you telling us today that you never reviewed the March 22, 2002 x-rays before agreeing to be an expert witness in this case against Dr. Sharpe?

A    What I have testified to was that I had x-rays which showed what I testified to, that there was immature callous and closing growth plates on the femoral side, and those are the x-rays. I didn't know the dates. But it was not the x-rays that were shown to me in court. And that's what I testified to.

My testimony had nothing to do with whether this fracture was going to remodel. My testimony concerned informed consent only, "he said, she said." Based on the medical records as per the resolutions in

Page 36

this COP. Medical records. And --

Q    Doctor, I asked you a simple question. Are you telling us today that you never reviewed the March 22, 2002 x-rays before you agreed to be an expert witness in this case against Dr. Sharpe? That's a simple question.

A    What I am telling you is that the x-rays I reviewed, I did not have the date of.

Q    You have seen the March 22, 2002 x-rays since?

A    I believe I have. I don't know. I can't -- I didn't look at the dates. You showed me an x-ray at trial. The x-ray I looked at was not that x-ray.

Q    Okay. I won't argue with you. If you look at page ten, footnote six of Dr. Brandner's appeal, you will see the answer to my question.

CHAIRMAN SCHMIDT:
Are there any further questions?
Hearing none, the appeal hearing is closed. Thank you for coming.

9 (Pages 33 to 36)

8410a85a-b0ee-4717-8779-b2b7bfb68cb4

BRANDNER 00586

MARCH 12, 2010

Page 37

MS. YOUNG:

Questions from the Panel?

CHAIRMAN SCHMIDT:

Oh, questions from us. Don't let me jump ahead. Okay. So from the Committee, do you have questions for the Grievant and Respondent?

DR. CRAIG:

I do. In Dr. Brandner's deposition in Las Vegas on August 5th, 2005 by Mr. Crawford on pages 134 and 135 in our book. I'm sorry, pages 136 and 137.

There seem to be two different things being said. I understand Dr. Brandner's point about the standard of care being met if this had been discussed, the peroneal nerve specifically.

But before that, he's asked a direct question by Mr. Crawford. "Do you still believe Dr. Sharpe fell below the standard of care?" A simple yes-or-no question. And he says yes, he did. So he didn't say, yes, if he happened to

Page 38

discuss peroneal nerve. He said yes.

And so to me, that implies that he's already made the decision in his mind that that question has either been discussed or not been discussed. But later on, he says that is up for the jury to believe one person or another. They seem to be two, a little bit conflicting thoughts.

MR. MAURICE:

And the only thing I have to say to that, Dr. Craig, is that if you believe the trial transcript, what was actually said to the jury, it is very clear that Dr. Brandner was unwilling to weigh in on the "he said, she said" portion.

He was literally there to advise a group of lay people as to the standard of care for informed consent for this procedure because it is unusual because a physician can do everything right, and this result can still happen. There is a 3 to 13 percent incidence rate of this.

Page 39

So I recognize that if you were to pull out one sentence of a deposition, as the grievant wants you to do, I can understand how that will cause you questions.

If you read that in the context of the entire deposition, like you said, it is very clear that he is complimentary of Dr. Sharpe's performance in the procedure, and he is unwilling to -- he is unwilling to condemn Dr. Sharpe's performance.

And at trial, with all due respect, he was probably one of the better witnesses for Dr. Sharpe, because although he was there to testify as to the standard of care, he certainly was very complimentary of Dr. Sharpe's performance as a surgeon.

DR. GREEN:

Related to the same point, it may be a more general question about it. Where a physician making a record having to do with informed consent and what was discussed with the patient, tell me what

Page 40

your kind of general view of the standard is.

MR. MAURICE:

And on this one, do you want Dr. Brandner to answer directly?

DR. GREEN:

Whatever you are comfortable with, but, yes, I would think that --

DR. BRANDER:

In 30 years of looking at literature and in my practice, there is a background of complications, and it is probably one percent or less. I mean, I don't expect -- I have never sat with a patient and went over everything that can happen. But -- and it's impossible.

But this is a 3 to 13 percent incidence that is significant. And I think if any nerve is going to be injured, it's going to be the peroneal nerve.

I was asked by the members in the first session am I going to condemn people if they get a saphenous nerve neuroma if they do an ankle. Of course

10 (Pages 37 to 40)

8410a85a-b0ee-4717-8779-b2b7bfb68cb4
BRANDNER 00587

MARCH 12, 2010

Page 41

not, but a 3 to 13 percent that is in the literature is significant.

And I didn't condemn anything. I just looked at the medical records, and I didn't see anything stating peroneal nerve or drop foot. All I saw was potential nerve injury.

And I don't think patients understand what nerve injury means. And when it's 3 to 13 percent, I think that that is beyond the background.

DR. GREEN:

So in your mind when you are asked a question like this, how do you establish what is your view of where the bar is in terms of what physicians actually do as it relates to what they write in the record? Because that's what you're commenting on, I believe.

DR. BRANDER:

Well, I felt my mandate was to look at the medical records. And Dr. Sharpe says that he talked to the patient about peroneal nerve. I said okay. I don't see it in the medical records.

Page 42

That's all I can tell you, and it is a significant complication at 3 to 13 percent.

DR. GREEN:

You are saying in practice, the standard is and probably the majority of people actually do make a note of that in the record. And you are saying that he didn't, and that is the reason for falling below the standard of care?

THE WITNESS:

I base -- probably I base that statement on what I was seeing in the medical records, and that's why I was at the deposition.

At the end of my deposition, I had the attorney repeat exactly what I was going to testify to. If you look at the very last page of my deposition, he repeated what I was going to limit my testimony to. And I made him state it.

But yes, I think a 3 to 13 percent incidence is significant, and I think that that needs to be discussed.

DR. GREEN:

Page 43

I don't want to belabor this, but I want to ask one more question to make sure I kind of understand how you view this.

In terms of what physicians actually do related to the standard of care in this, are you saying that you feel nearly all the physicians would put in there that they discussed peroneal nerve in order to meet the standard of care?

MR. MAURICE:

Dr. Green, you do understand that Dr. Brandner did not testify either at deposition or at trial that the failure of Dr. Sharpe to write in his records peroneal nerve or drop foot, that that standing alone fell below the standard of care. That is not what the line of testimony was.

The testimony was, if Dr. Sharpe failed to discuss it, that would have been -- that would have fallen below the standard of care. And then he was asked, do you see in the anything in the

Page 44

records that reflects that was discussed, he says no, I see a general discussion of nerve injury.

But it was not that Dr. Sharpe's failure to write down peroneal nerve or foot drop in and of itself was a breach of the standard of care. I just want to make sure we are on the same page with regard to the nature of the testimony.

DR. GREEN:

I hear you. That's fine. I appreciate your comments. Thank you. I have no other questions.

DR. DeFIORE:

Dr. Brandner, did you have these records, the ones we read there where the child and the mother both admitted that they were told about the foot drop before, before you made this decision that they didn't?

DR. BRANDER:

I had.

DR. DeFIORE:

That's what I am confused

11 (Pages 41 to 44)

8410a85a-b0ee-4717-8779-b2b7bfb68cb4

BRANDNER 00588

MARCH 12, 2010

Page 45

about. I think you said something about not having or having.

DR. BRANDER:

No, I had both depositions. I had the depositions where they said that they had been informed preop and the second set of depositions where they said that that was their understanding was that after the surgery, they were told extensively about drop foot and peroneal nerve injury, and that is what they were referring to.

In other words, it appeared to come across as them being totally confused in the first deposition. They thought they were being asked, according to what they said in their second deposition, did Dr. Sharpe talk to you about drop foot and peroneal nerve? And after the surgery, they said yes, he did.

And the questioning was specifically, did you know before the surgery? They were confused about that. They didn't appear to be sophisticated people.

Page 46

So all I did was look at the medical records. The depositions were conflicting. And they explained in the second deposition emphatically that that is not what they were referring to. They never knew preop what peroneal nerve injury or drop foot was.

DR. DeFIORE:

But you also had -- you did review the first deposition?

DR. BRANDER:

I had the first and second depositions. And I reviewed both.

DR. DeFIORE:

Then I have a question for Dr. Sharpe. What do you feel is necessary to tell a patient about when you do a procedure like this? Do you think you have to mention the fact -- I know you said you have mentioned it, and it was in the record. But do you feel it was necessary to just say nerve injury, or do you think that you have to go ahead and say, yes, there is a possibility in this case that there could be a peroneal

Page 47

injury or a foot drop?

MR. SHARPE:

Thank you.

DR. GELINE:

I'm sorry, Doctor. I add one thing, because one of the people that testified on your behalf said nerve injury was fine, and you did not have to mention about peroneal nerve.

MR. SHARPE:

Thank you. I think that it's important to have a discussion about nerve injury and explain what that means. I do that with all of my extremity patients when I am operating on them and explain there is a risk of nerve injury and what that could mean.

And I believe that it is the standard of care to only document that a risk benefit discussion has even occurred. I think that documenting specifics, and it goes above the standard of care as far as documentation. And so having the discussion I think is important.

Page 48

Documenting I think needs to record that you have had that discussion with the patient. I think that by documenting more specifics, I exceed the standard of care, and I think in my discussion with the patient going into detail about the peroneal nerve, I again exceeded what I would consider the standard of care.

I would have no problem with some other doctor doing the same surgery saying I discussed with the patient that there could be a nerve injury that could affect the function of his foot. I think it needs to be geared to the patient's ability to understand. And that is what I believe the standard of care is.

Did I address your question?

DR. DeFIORE:

You did. I just want to give you a hypothetical case. Say, for instance, you were doing a biceps tendon repair in the upper extremity, would you feel it was necessary to just say you may have nerve injury, or would you say the

12 (Pages 45 to 48)

MARCH 12, 2010

Page 49

possibility of the injury would be the radial nerve, even though, yes, you could injure the median and the ulnar? But I am saying is do you think it's important in that case, to go ahead and write that down and document it?

MR. SHARPE:

No. Because if per chance --

DR. DeFIORE:

Or in the same situation, peroneal?

MR. SHARPE:

No. Because if per chance I only documented radial, and in that rarer incidence that the ulnar or the median nerve were injured, I would feel like I had hung myself out to dry by only saying radial.

So I would document again nerve injury, and my discussion with the patient might say this nerve happens to be more at risk, but any of the nerves are at risk. And that is how I continue to practice.

DR. DeFIORE:

Page 50

Thank you.

DR. CRAIG:

Can I just ask one clarification?

CHAIRMAN SCHMIDT:

Yes, Dr. Craig.

DR. CRAIG:

It just seems like we have just been told two different things and that Mr. Crawford has said that what the doctor had before he made his decision to testify was only the first deposition by mother and child. And what you said was that you had both sets of depositions. Is there a way to rectify those two conflicting sets of information?

MR. CRAWFORD:

I can explain what I said. He agreed to be an expert witness in this case in approximately October of 2004. The only depositions he had available to review were the depositions that we submitted from January, 2004, which were the patient's and the mother's, and then I think the summer of 2004 was Dr.

Page 51

Sharpe's.

DR. CRAIG:

But he is saying something different. He is saying he had both sets of depositions.

MR. CRAWFORD:

Not at the time he agreed to be an expert witness. That's not what he's saying. He said later he got those.

MR. MAURICE:

By the time he testifies at his August 5th, 2005 deposition where he is questioned and asked to opine, he's already in possession of both the original deposition and then the second deposition.

DR. CRAIG:

But not at the time he agrees to testify?

DR. BRANDER:

When I discussed this case with the attorney, I said specifically, exactly what I am telling you. I feel that the peroneal nerve needed to be stated. And he -- the attorney told me

Page 52

that his clients did not -- were not informed of that. This is before I got any records.

And I said I will only be an expert for you if the records reflect a deficit in that the peroneal nerve or drop foot is not stated. I said I feel that there is a high percentage of peroneal nerve injury with this particular procedure, and I will look at everything. Then, I got everything.

My agreement to be an expert was contingent on medical records showing that there weren't -- well, first of all, I was called because the lawsuit was against Dr. Matthews. And I am talking from memory here, years ago, now. I don't have all these documents. But Dr. Matthews was being sued for not operating on this.

And I looked at this x-ray, and I said, nobody should be sued. There is no malpractice here. And I stated that in my deposition with Mr. Crawford right off the bat. I don't feel there is any

13 (Pages 49 to 52)

MARCH 12, 2010

Page 53

malpractice by either physician.

The only thing I was testifying to was the statement of nerve injury versus discussion of peroneal nerve with the patient. If Dr. Sharpe said he discussed it with the patient, then it's a "he said, she said," because they said he didn't. And it was up to the jury to decide that.

Nothing about the surgery. I felt that this kid was going to need surgery anyhow. All I said was in my experience, we have seen some remodeling of this. This kid hurt because he was dancing on this, not anything else. When he stopped doing his high activities, it wasn't so bad.

DR. CRAIG:

Excuse me. When was the second set of depositions, the date of the second set of depositions? If the agreement was in October of 2004, had the second set of depositions been taken yet?

MR. CRAWFORD:

At what point, sir?

Page 54

DR. CRAIG:

When the doctor agreed to be an expert witness in October of 2004, if that is correct, had the second set of depositions been taken yet?

MR. CRAWFORD:

No, sir.

MR. MAURICE:

That is when the lawsuit is still against Dr. Matthews. At that point, the question is had Dr. Matthews done something wrong by failing to perform this procedure. The second set of depositions was not taken until June 8th of 2005.

MR. CRAWFORD:

Excuse me. Dr. Brandner agreed to be an expert witness involving Dr. Sharpe in approximately October of 2004. And that is why Dr. Sharpe was brought into the case as a defendant several months later before the second depositions where they changed their testimony.

DR. CRAIG:

Page 55

Thank you.

CHAIRMAN SCHMIDT:

Dr. Geline.

DR. GELINE:

Yes. Most of my questions have been answered. But I just want to go over that one more time.

Mr. Crawford has just said you entered as an expert witness in October or '04. At that time, you could have had Dr. Sharpe's office record of 4/11/2002 and then two depositions, mother and patient, to review. That's really all there is at that time; is that correct?

DR. BRANDER:

I believe so, yes.

DR. GELINE:

That is the evidence that you used to base your decision before having become an expert in this case; is that correct?

DR. BRANDER:

Yes, sir.

DR. GELINE:

Those are the three pieces.

Page 56

Let me just read the note of Dr. Sharpe, 4/11/2002. A tibial osteotomy will also be necessary. There has been extensive discussion made on risks, including anesthetic risks, staph infection, nonunion and late union nerve injury vessel injury. They understand all these risks, and I believe I have discussed with them, and as a result, they have weighed the risks and understand, and we can proceed.

Are you telling me that note is not the standard note that an orthopedic surgeon would write under this kind of circumstance?

DR. BRANDER:

It's a standard note that you could accept from most surgeries. When you are doing a tibial osteotomy, that's moving the tibia eight centimeters. That peroneal nerve is at risk. And that's been my experience, and I think the literature is showing that.

So that particular operation puts the peroneal nerve at risk. I don't

14 (Pages 53 to 56)

8410a85a-b0ee-4717-8779-b2b7bfb68cb4
BRANDNER 00591

MARCH 12, 2010

Page 57

think a patient is going to understand what nerve injury means.

When I talk to patients and ask them, particularly since I have been involved in this, what is your understanding of nerve injury, they say numbness, and that's all they know. This procedure moved that tibia eight centimeters in an arc.

DR. GELINE:

We understand that. But the allegation is that the violation of standards three and four, and I won't quote exactly. But it basically paraphrases, and then it says we will not condemn practices, you know, that fall within the standard and so forth.

So my question is: Did you believe that this note in the record fell outside the standard and justified in going ahead and becoming an expert?

DR. BRANDER:

If you look at my testimony, I did not condemn anything. I just explained the standard of care to the

Page 58

jury. That's basically all I can say. In this venue, you got to take one side or other to get into the court system.

DR. GELINE:

Let me go on. The quotation in the deposition of the patient, the first deposition of January 29, '04 where they say, "Before you had the surgery, did Dr. Sharpe ever discuss with you or did anyone discuss with you that you might end up with a foot drop?"

Answer: "Yes."

Are you still telling me that Dr. Sharpe did not address the issue of peroneal nerve in this case? This is page 28 of the deposition of 1/29/2004.

MR. MAURICE:

He was not called as an expert witness to testify as to whether Dr. Sharpe had or had not engaged in that discussion. He made that very clear at his deposition and at trial. He was not. He was called -- you have to understand. When you go to court, you have to have an expert witness to explain the standard of

Page 59

care because these are lay people. They don't understand.

All Dr. Brandner's role was to come in and educate a group of lay people and say this is a discussion which must have occurred. Dr. Sharpe says it did occur. The plaintiffs say it didn't occur. And I can't tell you whether it did or didn't. I don't see specific reference to it in the medical records, but the choice is yours. So he's not condemning anything.

I mean, if the Panel is -- if the COP were taking the position that Dr. Brandner's testimony regarding the standard of care was inaccurate, if that Panel unanimously found you don't need to discuss the peroneal nerve, you don't need to discuss it at all, then the finding would be correct. And Dr. Brandner would have condemned performance, which fell within the standard of care. But that's not what he did.

All he did was advise people

Page 60

that there was a 3 to 13 percent incidence rate. You can lose function of the foot, up, down, to each side in this procedure by no fault of the surgeon. And so it's something that needs to be discussed. Whether it was discussed, that is for you to decide.

DR. GELINE:

Thank you.

CHAIRMAN SCHMIDT:

Dr. Green.

DR. GREEN:

I feel I keep coming back to the same thing. But I am going to ask one other question. If you are not condemning him -- I guess I would like to ask two questions.

Do you not feel that your testimony in any way condemned him?

And the second question is: If you are not condemning him, what was the basis for the lawsuit? Why would you file a lawsuit if there were no opinions other than he said, she said? And you are just -- I mean, I can't believe

15 (Pages 57 to 60)

8410a85a-b0ee-4717-8779-b2b7bfb68cb4

BRANDNER 00592

MARCH 12, 2010

Page 61

somebody would fail a lawsuit just to inform -- you know what I am saying?

DR. BRANDER:

Let me ask have the expert in law to explain that to you because I think we are all physicians, and that is an important thing.

MR. MAURICE:

First of all, it's not Dr. Brandner's choice to move forward with the lawsuit or not. The simple fact is any time you have specialized knowledge that you are asking a jury to make a determination for the standard of care, you have to establish that standard of care. And both parties to that lawsuit retained experts to do so. Dr. Brandner came in and said the standard of care requires the specific discussion. Dr. Russo came in and said the standard of care does not require the specific discussion. There was a disagreement on that.

Again, at the COP hearing, if the panel agreed with Dr. Russo that that

Page 62

discussion is not required at all, then I can understand the finding. But that is not the way that they proceeded in their finding. They took the position to say, factually, based on the facts, it's clear that this happened.

And our point was, you can't say that because you didn't have the facts. You had one-third of the story. That panel had one-third of the depositions. They did not have the patient and his mother's deposition from 2005. They did not have the patient's and his mother's trial testimony where they came out and disagreed with Dr. Sharpe.

The best way I can explain it is -- well, the best thing I can do is ask you to do this. Review the trial transcript. The trial transcript from Dr. Brandner's testimony is really something to see. It's the first time I have ever seen an expert called for the plaintiffs who refers to the surgical performance of the defendant as elegant,

Page 63

as an effective presentation of a difficult case and refuses at any point to opine that Dr. Sharpe had done anything incorrectly.

All Dr. Brandner did was get up there and say this is the standard of care. It is for you to decide. I cannot weigh in on this because I was not there. And it also — reviewing that trial testimony is also helpful with regard to the other issues, which is these x-rays, because you can see in that testimony that Dr. Brandner, as soon as those two sheets come out of the sleeve and go up on the overhead projector, he immediately starts making comments regarding the fact that these do not appear to be the same x-rays upon which I opined in my deposition.

MR. BRANDNER:

And let me add this, gentlemen. I live in a part of the country where I have access to a Jeffrey Mass, who is pretty much a pioneer in osteotomies. And I have access to some pretty

Page 64

sophisticated people in Reno Orthopedic Center. I talked to a lot of physicians before I even took this case.

And if you look at what I presented as far as what Jeffrey Mass says, he agrees 150 percent that this is a significant problem with this osteotomy, and you have to discuss the peroneal nerve.

I don't know what standard of care is across the country. I do know that I have seen this a heck of a lot in practice and in 30 years of practice. And I think that the literature shows that 3 to 13 percent is significant. I don't know what you all do, but if you got a 3 to 13 percent incidence of an injury to a nerve, I think you are thinking about that when you are discussing it with the patient.

DR. GREEN:

The first question, again, I would kind of like to know, having to do with your testimony and how it characterizes the standard of care having

16 (Pages 61 to 64)

8410a85a-b0ee-4717-8779-b2b7bfb68cb4
BRANDNER 00593

MARCH 12, 2010

Page 65

to do with informed consent, just reading it, you don't feel it's condemning?

DR. BRANDER:

I don't feel that that is condemning if he told the patient the peroneal nerve or a dropped foot or something explaining it in layman's terms was appropriate. But that's what I stated. Did you discuss that specifically because that is the nerve that stands out in the headlights?

DR. GREEN:

Thank you.

MR. MAURICE:

And Dr. Brandner was clear in both his deposition and trial testimony. There are no magic words. He did not need to see the word "peroneal." He did not need to see the word "drop foot." That was not the requirement.

There needed to be a discussion of this -- of what could happen with regard to the peroneal nerve and that a drop foot could result. But there are no magic words here. The jury did not need

Page 66

to see these words to find in favor of Dr. Sharpe. They just needed to understand -- they just needed to reach the conclusion that there either was or was not a discussion regarding this situation.

CHAIRMAN SCHMIDT:

Dr. Geline.

DR. GELINE:

A little different question. Tell me if this is out of the realm of questioning, please just stop me. But I am a little confused here.

You entered the case in October of 2004, and a lawsuit was already going on. There were depositions of the patient and the mother beforehand.

In my mind, there had to be an expert present for the plaintiff before that time. So I guess the question is: How did you happen to become involved in your role when this case is already so far in the process?

DR. BRANDER:

This is what I was told.

Page 67

DR. GELINE:

And I am sorry, if this is the wrong question, just tell me, and we'll drop it.

DR. BRANDER:

This is what I was told. Dr. Matthews was going to be sued. Dr. Sharpe was going to be the expert. I looked at the case, and I said I don't see where there is malpractice, and this is after the operation obviously. I don't see where there is malpractice in either doctor.

But the only thing I could say is with a drop foot, I think the peroneal nerve needed to be discussed.

DR. GELINE:

If I am wrong, are you saying that it was your understanding that Dr. Sharpe was going to be the original plaintiff's expert?

DR. BRANDER:

That's what I was told, against Dr. Matthews.

DR. GELINE:

Page 68

I have one more question. There is a bit of verbiage here. But is it your contention that stating or the failure to state the presence of a specific injury or a potential injury of the peroneal nerve is not a condemnation? Just saying it belongs there, but it wasn't there, is it your position that that is not a condemnation?

MR. MAURICE:

When you say was not there, do you mean was not there in the written record?

DR. GELINE:

It's not there, the discussion whichever way it is, the superficial didn't discuss in enough detail the peroneal nerve, which should be there, and are you telling me that that is not a condemnation?

MR. MAURICE:

I will let him answer. But I think testifying simply that this is the standard of care, and it's your choice whether you believe Dr. Sharpe or them.

17 (Pages 65 to 68)

ASSOCIATED REPORTERS, INC.
504 529 3355

8410a85a-b0ee-4717-8779-b2b7bfb68cb4

BRANDNER 00594

MARCH 12, 2010

Page 69

DR. GELINE:

Saying this belongs there and it is not in the evidence that I see, are you telling me that this is not a condemation?

MR. MAURICE:

The case was not about what was or was not in the medical records. That was not the case.

DR. GELINE:

The question --

MR. MAURICE:

Nobody claimed that Dr. Sharpe fell below the standard of care by not writing down peroneal nerve or drop foot.

DR. GELINE:

But you are giving this innocent kind of appearance of what Dr. Brandner said is in my mind asking us to accept that is not a condemnation.

MR. MAURICE:

Absolutely. We, as lawyers, when it comes to medical malpractice cases are completely dependent upon doctors to testify as to the standard of

Page 70

care, just as Dr. Russo testified that he did not believe this discuss was required. He did that on behalf of Mr. Crawford and Dr. Sharpe as the defense.

The plaintiffs were required to present somebody that did believe that the standard of care did require that. And Dr. Brandner did testify to that. He doesn't apologize for that. We submitted affidavits from other physicians, prominent physicians who believe absolutely 3 to 13 percent incidence rate by no fault of the surgeon. A surgeon can do everything right, and you still could lose function of the foot. Absolutely, it must be discussed. Whether it was discussed, that is for the jury to decide. That is not condemning anything else. That is -- it's educating the jury.

CHAIRMAN SCHMIDT:

Dr. Green.

MR. CRAWFORD:

Can I address one thing? I

Page 71

apologize. I apologize. Dr. Sharpe never agreed to be an expert witness against Dr. Matthews. And if you look at his April 11, 2002 note under the assessment and plan, he specifically says without casting any aspersions on anyone, this thing has gone into an unacceptable deformity, so I just don't want you to be mislead.

DR. GELINE:

Thank you.

MR. CRAWFORD:

I apologize.

CHAIRMAN SCHMIDT:

Dr. Green.

DR. GREEN:

This is a change in the subject. In your appeal statements, you brought up some procedural issues, none of which you mentioned in your comments today. Without asking you to go over and reiterate them because I have read them, I would take it those are not pivotal issues, or what is your feeling about that?

Page 72

MR. MAURICE:

Those are issues that we have identified as due process violations, and we are not waiving them, and we are not stepping back from them. We just understood in the ten-minute discussion, it wasn't going to do any good to spend four minutes talking about whether something arrived on the 45th day or the 15th day.

DR. GREEN:

Thank you.

CHAIRMAN SCHMIDT:

Are there any other questions?

I have one last question in follow up then.

I believe, Dr. Brandner, you made the comment that in the court system, or at least in the adversarial system, in malpractice cases, one must take one side or the other to get the case into the court system. I believe you stated that today or something very close to that. The AAOS would expect an expert to be impartial. Is that

18 (Pages 69 to 72)

8410a85a-b0ee-4717-8779-b2b7bfb68cb4
BRANDNER 00595

MARCH 12, 2010

Page 73

impartiality?

DR. BRANDER:

Yes. Well, basically, my statement goes to the fact that the attorney called me and discussed this on the phone and presented the case to me. And I told him my feeling. And he said I am sending you the records, but this is the situation.

Basically, all I told him was if I see this there is adequate discussion of a drop foot, a peroneal or something to that effect, I am not going to be your expert.

So I don't know the timeline of when I was declared or not declared. But that is basically what I stated. And that is what I stuck to, informed consent.

Now, are you asking me specifically am I biased toward -- have I accepted bias before the case?

CHAIRMAN SCHMIDT:

Well, I asked if you were impartial in making your statement.

Page 74

DR. BRANDER:

I think that based on what I stated to the attorney and what I stated in deposition, I am impartial about everything. And I am looking specifically for what the literature defines. And I am trying to educate people about what the literature says and what the standard of care has evolved into.

CHAIRMAN SCHMIDT:

Any further questions?

From what I said before, now I believe we have reached that point. The hearing is complete. Thank you.

(Whereupon, the hearing adjourned at 2:46 p.m.)

Page 75

REPORTER'S PAGE

I, Rebecca T. Fussell, Certified Court Reporter, in and for the State of Louisiana, the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(b) of the Louisiana Code of Civil Procedure, before whom this sworn testimony was taken, do hereby state on the record:

That due to the interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicate pauses, changes in thought, and/or talk overs; that same is the proper method for a Court Reporter's transcription of proceeding, and that the dashes (--) do not indicate that words or phrases have been left out of this transcript.

Also, any words and/or names which could not be verified through reference material have been denoted with the phrase "(inaudible)."

_____
REBECCA T. FUSSELL, CSR

Page 76

CERTIFICATE OF REPORTER

I, Rebecca T. Fussell, Certified Court Reporter, in and for the State of Louisiana, do hereby certify that the proceedings were hereinafter set forth in the foregoing pages;

That the proceeding was reported by me in stenographic machine shorthand by Computer Aided Transcription, transcribed by me, and is a true and correct transcript to the best of my ability and understanding.

That I am not of counsel nor related to any person participating in this cause and am in no way interested in the outcome of this event.

This certification is valid only for a transcript accompanied by my original signature and original raised seal on this page.

_____
REBECCA T. FUSSELL, CSR

19 (Pages 73 to 76)

8410a85a-b0ee-4717-8779-b2b7bfb68cb4

BRANDNER 00596

BRANDNER 00597

MARCH 12, 2010

Page 1

**A**

AAOS 2:15 3:9,21 4:3 4:5,12 31:6 72:24
Aaron 2:14 3:18 7:2
ability 48:16 76:11
able 15:14
about 8:24 10:9 21:4 22:7 25:19 27:6,13 37:16 39:22 41:24 44:19 45:1,1,10,19 45:23 46:17 47:9,12 48:7 53:10 64:19 69:7 71:24 72:8 74:4 74:8
above 47:22
absolute 13:4
absolutely 11:10 18:12 69:22 70:13,17
academy 3:5 13:14 17:11
accept 56:18 69:20
accepted 73:22
access 14:8 15:13 63:23 63:25
accompanied 76:17
according 45:16
accurate 25:21
accurately 6:13 16:12 19:18
acknowledged 9:13 18:8 32:3
across 45:14 64:11
Act 13:2
action 5:11
activities 53:16
actually 16:4 38:14 41:17 42:7 43:6
add 47:5 63:21
additional 33:22
address 48:18 58:14 70:25
adequate 73:11
adjourned 74:17
admitted 44:19
adversarial 72:19
advise 9:11 11:17 38:19 59:25
advised 5:7 9:19
affect 48:14
affidavits 70:11
after 4:25 15:1 34:24 45:9,20 67:11
afternoon 5:5
again 21:11,14 48:7 49:19 61:24 64:22
against 3:12 15:2 21:17

25:2,24 27:7,15 33:19 35:12 36:6 52:16 54:10 67:23 71:3
ago 52:17
agree 20:20
agreed 21:22 22:20 23:1,21 24:7 25:23 26:22 28:11 34:25 36:5 50:19 51:7 54:2 54:17 61:25 71:2
agreeing 23:15 35:11
agreement 52:12 53:22
agrees 22:10 51:18 64:6
ahead 37:5 46:23 49:5 57:21
Aided 76:9
allegation 14:13 18:6 57:12
allegations 7:6,13 8:8 29:21 32:14
allow 5:9 11:19
alone 43:18
already 38:3 51:14 66:15,22
Althausen's 29:12
although 39:16
American 1:1 3:5
among 21:5
amount 32:13
and/or 75:6,13,19
anesthetic 56:5
ankle 40:25
another 38:7
answer 24:17,25 28:3 36:19 40:5 58:12 68:22
answered 55:6
anybody 15:24 31:23
anyhow 53:12
anyone 58:10 71:6
anything 11:17 26:25 27:2,12 31:23 41:3,5 43:25 53:15 57:24 59:12 63:4 70:20
apologize 70:10 71:1,1 71:13
appeal 1:5 3:8,24 5:16 26:15 36:19,24 71:18
appealed 3:15
appear 18:24 45:24 63:17
appearance 69:18
APPEARANCES 2:1
appeared 19:11 45:13

appears 23:24
apply 31:11,12
appreciate 44:13
appropriate 65:8
approximately 50:20 54:19
April 20:25 26:6 71:4
arc 57:9
area 20:22
argue 36:17
argued 31:17
argument 34:3
around 27:17
arrived 72:9
Article 75:7
asked 6:16 19:1 21:25 22:4 28:4 32:21 36:2 37:20 40:22 41:14 43:25 45:16 51:13 73:24
asking 61:13 69:19 71:21 73:20
asks 27:25
aspersions 71:6
assessment 71:5
assist 6:1
assistant 4:4 21:13
Associates 13:18
ASSOCIATION 1:1
assume 5:16 31:11
Atkinson 13:20
attached 4:17 14:4
attempted 15:17
attend 4:8
attended 32:9
attorney 3:18,19 32:1 42:17 51:22,25 73:5 74:3
attorneys 14:22 21:18
Atwood 13:19
August 29:13 37:10 51:12
available 22:13,25 23:21 28:11 50:21

**B**

back 21:8 60:13 72:5
background 40:12 41:11
bad 53:17
Baker 13:21
bar 15:2,10,11 41:16
base 42:12,12 55:19
based 3:10 11:24 15:20 16:24 19:24 22:24 25:24 26:15 28:10

29:20 33:18 35:24 62:5 74:2
basically 11:4 57:14 58:1 73:3,10,17
basis 28:12,16 60:22
bat 52:25
become 55:20 66:21
becoming 57:21
before 1:17 4:19 5:11 6:15 22:7,15,19 23:21 24:6 25:16 27:10,13,23,24 28:1 28:6,11 30:2 35:11 36:5 37:20 44:20,20 45:22 50:11 52:2 54:22 55:19 58:8 64:3 66:19 73:22 74:13 75:8
beforehand 66:17
begin 4:19 6:15
behalf 7:2 47:7 70:3
being 3:14 26:16 37:15 37:17 45:14,16 52:19
belabor 43:1
belief 33:15
believe 29:1 30:21 31:21 32:21 33:2,4,9 33:24 36:13 37:22 38:7,13 41:19 47:18 48:17 55:16 56:8 57:19 60:25 68:25 70:2,7,12 72:17,22 74:14
believed 9:1
believes 20:15,16,17
belongs 68:7 69:2
below 37:22 42:10 43:18,23 69:14
benefit 47:20
best 24:17 62:17,18 76:10
better 39:15
beyond 41:11
bias 73:22
biased 73:21
biceps 48:22
bit 38:8 68:2
blank 24:14
bone 18:9,10
bones 22:8
book 37:12
both 6:5,11,16 8:22 10:7 23:24 24:24 44:18 45:4 46:13 50:14 51:4,14 61:16 65:16

bottom 26:10
Braewood 17:1,20 19:24
BRANDER 40:9 41:20 44:22 45:3 46:11 51:20 55:15,22 56:16 57:22 61:3 65:3 66:24 67:5,22 73:2 74:1
Brandner 1:8 2:12 3:13,16,17 4:20,25 5:22 6:25 7:3,7,9,15 7:18 8:9,17 9:2,9 10:1 11:13 12:3,21 13:22 15:13 16:8,15 17:23 18:3,4,7,19,22 19:10 21:21 22:10,25 23:15,21,25 25:13 26:22 28:10,16 29:13 30:7 31:11,25 33:18 33:20 34:25 35:4,9 38:15 40:5 43:14 44:16 54:17 59:21 61:17 63:5,13,20 65:15 69:19 70:9 72:17
Brandner's 3:8 9:8 16:9 18:13 19:15,21 23:11 32:14 36:19 37:9,16 59:3,15 61:10 62:21
breach 44:7
break 8:15
brief 30:4
briefly 19:5
brought 3:11 54:20 71:19
Bruce 2:13 3:20 20:5
burden 12:16,17

**C**

C 2:7 3:1
called 11:6,7 13:23 52:15 58:18,23 62:23 73:5
callous 35:15
came 11:9 61:18,20 62:15
care 11:19 25:14 26:23 28:17 37:17,23 38:20 39:17 42:10 43:7,11 43:19,24 44:7 47:19 47:23 48:5,9,17 57:25 59:1,16,23 61:14,16,18,21 63:7 64:11,25 68:24 69:14

BRANDNER 00598

MARCH 12, 2010

Page 2

70:1,8 74:9
case 6:18 7:17 8:10 13:12 15:13 21:19,23 22:11,21,22 24:8,24 27:1 29:14 30:20 33:4 35:12 36:6 46:25 48:21 49:5 50:20 51:21 54:21 55:20 58:15 63:2 64:3 66:14,22 67:9 69:7,9 72:22 73:6,22
cases 69:24 72:20
casting 71:6
causation 8:25 10:10
cause 39:4 76:13
Causey 15:3,6,8 27:16
Center 64:2
centimeters 56:20 57:9
certainly 11:8 15:25 31:16 39:17
CERTIFICATE 76:1
certification 76:16
Certified 75:3 76:3
certify 76:5
Chabraja 2:15 3:2 4:9 5:2 19:2 29:6 34:5
Chair 2:3 3:23 5:6
CHAIRMAN 5:4 6:24 20:2 29:3 30:1 34:18 35:5 36:21 37:3 50:5 55:2 60:10 66:7 70:22 71:14 72:13 73:23 74:11
chance 49:8,13
change 23:17 71:17
changed 23:6 32:6 34:24 54:23
changes 75:13
characterizes 64:25
charges 3:11
Chicago 4:11
child 44:18 50:13
choice 59:11 61:10 68:24
chose 10:20 12:9
chronology 20:8
circumstance 56:15
cite 16:22
civil 13:7 75:6,7
claim 15:11
claimed 69:13
clarification 50:4
clear 9:18 11:25 16:16 16:17 26:14,18,24 27:22 28:9 38:15 39:8 58:21 62:5

65:15
clearly 16:11 19:16
clients 52:1
clinically-acceptable 25:18 28:21
close 72:24
closed 20:17 25:11 36:25
closing 35:16
Code 75:7
colleagues 25:3
come 45:14 59:4 63:14
comes 20:11 21:8 69:23
comfortable 40:7
coming 36:25 60:13
commencing 1:15
comment 27:5 72:18
commenting 41:19
comments 27:19 44:13 63:16 71:20
Committee 1:2 2:15 3:5,6,9,13,22 4:7 5:7 5:11,17 6:10 27:3 29:15 32:23 33:11,14 33:21 34:1 37:6
Committee's 4:17 29:19
complaint 15:2 27:6,15
complete 74:15
completely 16:19 69:24
Compliance 4:6,13 5:8 30:12
complication 42:2
complications 40:12
complimentary 39:8,18
Computer 76:8
concern 32:7
concerned 35:23
concerning 8:8
conclude 19:5 29:8
concluded 9:25
conclusion 66:4
condemation 69:5
condemn 11:17 39:11 40:23 41:3 57:16,24
condemnation 68:6,9 68:20 69:20
condemned 9:2 10:1 11:14 59:21 60:19
condemning 59:12 60:16,21 65:2,5 70:19
conduct 3:11
conflicting 38:8 46:3 50:16
confronted 18:7

confused 44:25 45:15 45:23 66:13
conjunction 21:12
connection 8:10 13:15 17:8
consent 8:20 9:4 16:5 28:13 35:24 38:20 39:24 65:1 73:19
consider 12:21 48:8
consideration 30:15 31:6
contention 68:3
context 12:11 39:6
contingent 52:13
continually 18:23
continue 49:23
contrary 34:12
control 14:10
conversation 28:6
conveyed 9:17
Coordinator 4:6
COP 7:4,11 8:4,21 9:1 9:7,25 10:6,17 12:1 15:19 19:13 32:9 36:1 59:14 61:24
copy 4:15
copying 13:10
correct 16:11 19:16 29:17 31:14 32:10 33:12,13,16 34:1,13 54:4 55:14,21 59:20 76:10
correspondence 31:6
costs 13:10
counsel 2:13,14,15 4:3 4:4,7 5:21 15:3 18:18 31:8,17 76:12
country 63:22 64:11
course 40:25
court 4:14,21 6:13 13:16,23,25 30:20 33:5,5 35:19 58:3,24 72:18,22 75:4,14 76:3
Craig 2:7 3:24 37:8 38:12 50:2,6,7 51:2 51:17 53:18 54:1,25
Crawford 2:13 3:20 6:22 12:25 15:16 17:5 18:5 20:4,5 28:25 29:7,9 34:2,21 35:2,8 37:11,21 50:10,17 51:6 52:24 53:24 54:6,16 55:8 70:4,24 71:12
critical 23:2

cross-examination 6:7 18:8 34:4,7
CSR 1:17 75:24 76:22

_____
**D**
_____

D 2:4,13 3:1
dancing 53:15
dashes 75:12,16
date 36:9 53:20
dated 29:12
dates 35:18 36:14
day 20:15 22:23 72:9 72:10
deals 8:14
decide 9:23 53:9 60:7 63:7 70:19
decision 3:10,14 24:6 26:12 29:19,24 33:18 38:3 44:21 50:11 55:19
decisions 25:6
declared 73:16,16
defendant 27:25 54:21 62:25
defending 27:24
defense 23:25 25:22 70:5
deficit 52:6
defined 75:5
defines 74:7
DeFiore 2:7 3:25 44:15 44:24 46:8,14 48:19 49:9,25
deformity 20:16 25:12 71:8
denoted 75:21
Department 8:2
dependent 69:24
deposed 10:16
deposition 8:21 9:13 10:6,13,16,19,21,25 11:8,24 13:6,9,9 14:2 14:19 15:5,9 16:2,16 16:17 17:23 19:13 24:10 31:24 32:2,15 33:6 37:10 39:2,7 42:15,16,19 43:15 45:15,18 46:4,10 50:12 51:12,15,16 52:24 58:6,7,16,22 62:12 63:19 65:16 74:4
depositions 8:14 14:1 14:23 21:19,21 22:14 23:7,19 26:20 32:22 33:3,6,10,12,16,17

33:22,25 34:11 45:4 45:5,7 46:2,13 50:14 50:21,22 51:5 53:20 53:21,23 54:5,14,23 55:12 62:11 66:16
describes 28:5
desk 15:15
detail 48:7 68:17
determination 61:14
determine 11:19 15:25 19:14
determined 7:14
different 18:1 37:14 50:9 51:4 66:10
difficult 63:2
difficulty 27:21
Dinowitz 17:14 20:13 20:14,23 24:15
Dinowtiz 17:20
Dinowtiz's 19:22
direct 19:9 35:3 37:21
directed 14:15
directly 6:12 19:22 34:12 40:5
disagree 11:10
disagreed 62:15
disagreement 61:22
discourse 75:11
discuss 22:1 38:1 43:22 58:9,10 59:18,19 64:8 65:9 68:17 70:2
discussed 22:18 37:18 38:5,5 39:25 42:24 43:9 44:1 48:12 51:21 53:6 56:8 60:6 60:6 67:16 70:17,18 73:5
discusses 20:25
discussing 64:20
discussion 21:2,2,14 22:6 29:5 32:13 44:2 47:12,20,24 48:2,6 49:20 53:4 56:4 58:21 59:5 61:19,22 62:1 65:21 66:5 68:15 72:6 73:12
disputed 23:8
doctor 24:6 25:5,24 34:22 36:2 47:5 48:11 50:11 54:2 67:13
doctors 69:25
document 30:20 33:5 47:19 49:6,19
documentation 12:13 47:23

BRANDNER 00599

MARCH 12, 2010

Page 3

documented 49:14
documenting 47:21
  48:1,4
documents 7:14 8:7
  13:3 17:10 52:18
doing 25:19 48:11,22
  53:16 56:19
done 54:12 63:3
down 44:5 49:6 60:3
  69:15
Dr 3:8,12,12,16,17,18
  3:23 5:3,5,22,24 6:25
  7:2,6,7,9,15,18 8:9
  8:17 9:1,8,9,9,18,21
  10:1,19 11:4,13 12:3
  12:15,21 13:14,22
  14:7,15 15:13,16
  16:8,9,15 17:2,4,7,14
  17:15,20,23 18:2,3,4
  18:6,13,18,21 19:10
  19:14,21,22 20:3,11
  20:12,14,20,22,24
  21:9,17,20,21 22:1,6
  22:10,14,15,16,21,24
  22:25 23:2,9,11,15
  23:18,20,25 24:2,15
  25:13,15 26:11,22,25
  27:6,14 28:1,6,10,16
  28:18 29:12,13,21
  30:7,10 31:11,25
  32:14 33:18,20 34:19
  34:24 35:3,9,12 36:6
  36:18 37:8,9,15,22
  38:12,15 39:9,11,15
  39:18,20 40:5,6,9
  41:12,20,22 42:4,25
  43:13,14,16,21 44:4
  44:11,15,16,22,24
  45:3,18 46:8,11,14
  46:15 47:4 48:19
  49:9,25 50:2,6,7,25
  51:2,17,20 52:16,18
  53:5,18 54:1,10,11
  54:17,18,20,25 55:3
  55:4,11,15,17,22,24
  56:1,16 57:10,22
  58:4,8,14,19 59:3,6
  59:14,20 60:8,11,12
  61:3,9,17,19,25
  62:15,21 63:3,5,13
  64:21 65:3,12,15
  66:2,8,9,24 67:1,5,6
  67:7,17,19,22,24,25
  68:14,25 69:1,10,13
  69:16,18 70:1,4,9,23
  71:1,3,10,15,16

72:11,17 73:2 74:1
drawer 15:15
drop 8:25 9:12 10:10
  22:2 28:3 41:6 43:17
  44:6,20 45:10,19
  46:7 47:1 52:7 58:11
  65:19,24 67:4,15
  69:15 73:12
dropped 65:6
Drs 3:24 4:19
dry 49:17
due 29:23 39:13 72:3
  75:10
duly 5:1
during 14:14 26:4,7

— E —
E 3:1,1
each 5:9,19 6:5 14:16
  14:21 30:3 31:2,10
  60:3
earlier 26:2
educate 59:4 74:7
educating 70:20
Edward 2:7 3:24
effect 73:13
effective 63:1
eight 56:20 57:8
either 38:4 43:14 53:1
  66:4 67:13
elapsed 29:8
elegant 62:25
emphatically 46:4
encourage 29:11
end 17:16 28:2 42:16
  58:11
engaged 58:20
enough 68:17
entered 55:9 66:14
entire 26:15 30:20 39:7
equally 31:12
establish 41:15 61:15
ethics 27:15
even 12:14,20 47:20
  49:2 64:3
event 76:15
ever 22:16 27:11,23,24
  58:9 62:23
every 30:19 33:5,5
everything 7:7 21:5
  22:3 38:22 40:15
  52:11,11 70:15 74:5
evidence 5:14 14:24
  15:23 16:13 19:19
  29:23 55:18 69:3
evolved 74:9

exact 16:22 17:3 26:21
  30:25
exactly 14:17 42:17
  51:23 57:14
EXAMINATION 30:8
  34:20 35:7
exceed 48:4
exceeded 48:8
Excuse 34:3 53:19
  54:17
Exhibit 18:14,15
expect 40:14 72:24
experience 53:13 56:22
expert 7:8,16 21:22
  22:11,20 23:1,15
  24:7 26:23 28:12
  33:19 34:25 35:11
  36:5 50:19 51:8 52:5
  52:12 54:3,18 55:9
  55:20 57:21 58:18,25
  61:4 62:23 66:19
  67:8,21 71:2 72:25
  73:14
expertise 20:22
experts 61:17
explain 47:13,16 50:18
  58:25 61:5 62:17
explained 22:2 46:3
  57:25
explaining 65:7
explanation 30:6
extensive 6:7 21:2,14
  34:4,7 56:3
extensively 45:10
extent 13:8 28:23
extremity 20:13 47:14
  48:23

— F —
facility 17:1,2 18:2
fact 7:25 9:24 10:5
  12:15 14:7 18:9
  19:12 22:17 23:16
  46:19 61:11 63:16
  73:4
facts 15:25 20:7 62:5,9
factually 62:5
failed 9:10,10 43:22
failing 54:12
failure 43:16 44:5 68:4
fairing 7:12
fall 57:16 61:1
fallen 43:23
falling 42:10
falls 9:2
family 9:11,19,20 16:4

24:4 25:15 28:18
far 47:23 64:5 66:23
fault 60:4 70:14
favor 14:16 66:1
Federal 75:6
feel 43:8 46:16,21
  48:24 49:16 51:23
  52:7,25 60:13,18
  65:2,4
feeling 71:24 73:7
fell 11:14,15 37:22
  43:18 57:19 59:22
  69:14
felt 41:21 53:11
femoral 35:16
file 60:23
filed 21:17 27:15 34:13
files 15:2
filing 27:6
find 13:8 66:1
finding 8:17,19 11:2,13
  11:23 16:1,7 17:3
  59:20 62:2,4
findings 8:11
fine 44:12 47:8
finish 29:5
firm 4:10
first 5:1,24 8:16 9:6
  10:18 11:12 14:19
  15:5 20:11 24:14,23
  40:23 45:15 46:10,12
  50:12 52:14 58:6
  61:9 62:22 64:22
five 6:6 30:3 32:20
  34:15
five-and-a-half 26:1
flat 21:25 27:25
follow 72:16
followed 5:24
Following 6:4
follows 5:1
foot 8:25 9:12 10:10
  22:1 28:3 41:6 43:17
  44:6,20 45:10,19
  46:7 47:1 48:14 52:7
  58:11 60:3 65:6,19
  65:24 67:15 69:15
  70:16 73:12
footnote 36:18
foregoing 76:6
form 23:3
former 4:10
forth 57:17 76:6
forward 61:10
found 7:17 8:21 10:6
  16:8 59:17

founded 29:20,20
four 8:19 34:14 57:13
  72:8
fracture 16:10 19:15
  28:19 35:22
framed 29:22
frankly 11:3
Freedom 13:2
Friday 1:16
from 4:16 6:17 7:7
  10:18 11:1 12:24
  18:2 21:8 22:23 27:2
  30:20 31:23 37:2,4,5
  50:23 52:17 56:18
  62:12,20 70:11 72:5
  74:13
front 14:18
function 48:14 60:2
  70:16
further 12:20 30:5
  34:17 36:22 74:12
Fussell 1:17 4:15 75:3
  75:24 76:3,22

— G —
G 3:1
gain 30:5
geared 48:15
Geline 2:8 3:25 47:4
  55:3,4,17,24 57:10
  58:4 60:8 66:8,9 67:1
  67:17,25 68:14 69:1
  69:10,16 71:10
general 4:3,4 31:8
  39:22 40:1 44:2
generally-accepted 9:3
  11:15
generated 13:17
gentlemen 63:21
gets 21:7
Giulietti 4:5
give 9:10 23:1 30:2
  48:20
given 5:19 8:21
giving 24:3 69:17
gladly 32:2
go 6:3 17:6,9 18:13,15
  18:22 46:23 49:5
  55:6 58:5,24 63:14
  71:21
goes 21:7,13 47:22 73:4
going 16:18 17:19
  18:11 29:16 35:22
  40:19,20,23 42:18,20
  48:6 53:11 57:1,21
  60:14 66:15 67:7,8

BRANDNER 00600

MARCH 12, 2010

Page 4

67:20 72:7 73:13
gone 71:7
good 5:5 7:12 72:7
Green 2:8 4:1 39:20
40:6 41:12 42:4,25
43:13 44:11 60:11,12
64:21 65:12 70:23
71:15,16 72:11
grievance 1:5 5:12,18
12:19 13:15 15:22
17:8 22:22,23 23:10
23:20 27:18 28:8,9
29:15 30:11,12 31:3
32:5 34:13,22
grievant 1:6 2:11,13
12:5,16 37:7 39:3
Griffin 13:18
group 20:12 38:19 59:4
growth 18:10 20:17
25:10 35:16
guess 17:9 60:16 66:20

**H**

half 15:20,21 33:23
handed 18:3
hands 4:21
happen 11:11 22:9
27:14 38:23 40:16
65:22 66:21
happened 11:5 37:25
62:6
happens 17:25 49:21
having 4:25 39:23 45:2
45:2 47:24 55:19
64:23,25
headlights 65:11
heal 18:12
healed 18:11
hear 3:8 31:15 44:12
hearing 1:2,6 2:3,6 3:4
3:24 4:8 5:16 7:4,11
8:4,12 9:7,25 10:18
12:7 15:19 19:13
32:9 36:24,25 61:24
74:15,16
hearing's 5:12
heck 64:12
held 14:18,22
helpful 63:10
her 22:6,7 28:4,7
hereinafter 76:6
hide 26:25 27:1,2 31:22
32:3
hiding 32:8
high 52:8 53:16
Hilton 1:14

him 11:6,7 12:9 21:9,11
22:13 27:10,11,17,25
28:11 31:23 42:21
60:16,19,21 68:22
73:7,10
holds 15:9
Hopkins 8:3
Hotel 1:14
hung 49:17
hurt 53:14
hypothetical 48:21

**I**

idea 23:5
identified 16:21 72:3
identifying 6:17
Illinois 4:11
immature 35:15
immediately 18:21
63:15
impartial 72:25 73:25
74:4
impartiality 73:1
implies 38:2
importance 10:11
important 12:23 47:12
47:25 49:4 61:7
impossible 40:16
inaccurate 59:16
inaudible 75:22
incidence 7:22 38:24
40:18 42:23 49:15
60:2 64:17 70:13
included 5:21
including 21:4,14,15
56:4
incorrectly 63:4
indicate 75:12,16
indicated 9:21
infection 56:5
inform 61:2
information 5:15 9:16
9:22 13:2 22:25
26:16 27:8 28:10
50:16
informed 8:20 9:4 16:5
28:13 35:23 38:20
39:24 45:6 52:2 65:1
73:18
initial 3:14 16:24
initially 32:5
injure 49:3
injured 40:20 49:16
injury 16:18 21:5,16
22:18 41:7,9 44:3
45:11 46:7,22 47:1,8

47:13,16 48:13,25
49:1,20 52:9 53:3
56:6,7 57:2,6 64:18
68:5,5
innocent 69:18
instance 48:22
instead 25:20
intended 32:3
interaction 75:10
interested 76:14
interject 33:24
interjected 32:20,21
interrupt 19:4
intervention 29:18
involved 27:7,23 33:7
57:5 66:21
involving 4:12 54:18
issue 9:23 10:11 14:1
28:14,15 58:14
issues 8:5 20:9 63:11
71:19,24 72:2
it's3 41:10

**J**

J 1:8 2:12 3:8 4:25
January 50:23 58:7
Jeffrey 63:23 64:5
job 7:12
Johns 8:2
Joseph 2:7 3:25
judge 14:25
Judiciary 1:2 2:15 3:4
3:22 4:17 5:6 6:9
jump 37:5
June 21:6,11 54:15
jury 9:23 11:18 38:6,14
53:8 58:1 61:13
65:25 70:19,21
just 8:15 10:13 13:2
14:12 19:12 28:8
31:19 41:4 44:7
46:22 48:20,24 50:3
50:8,8 55:6,8 56:1
57:24 60:25 61:1
65:1 66:2,3,12 67:3
68:7 70:1 71:8 72:5
justified 57:20

**K**

keep 60:13
kid 53:11,14
kind 20:8 40:1 43:3
56:14 64:23 69:18
Kipling 1:5 2:11 3:12
4:24
knew 14:20 15:6 27:13

46:6
know 6:2 17:16,21
27:12 34:10 35:17
36:13 45:22 46:19
57:7,16 61:2 64:10
64:11,16,23 73:15
knowledge 61:12

**L**

lack 29:22
Las 37:10
last 24:20 42:19 72:15
late 24:19 56:6
later 23:7 26:20 38:6
51:9 54:22
law 4:10 61:5
lawsuit 21:17 52:15
54:9 60:22,23 61:1
61:11,16 66:15
lawyer 27:7,10,25
lawyers 69:22
lay 11:18 38:19 59:1,4
layman's 65:7
least 72:19
left 26:5 75:17
legal 5:21
less 12:14,20 40:13
let 3:3 20:7 37:5 56:1
58:5 61:4 63:21
68:22
letter 29:12
let's 16:16 26:14
level 28:21
leveled 7:6
liar 11:7,7
light 6:3 12:15
like 15:15 19:12 39:7
41:14 46:18 49:16
50:8 60:16 64:23
likelihood 7:22
limit 5:22 42:20
line 19:22 24:10 26:10
43:20
lines 32:19
list 12:5
literally 38:18
literature 40:11 41:2
56:23 64:14 74:6,8
litigation 12:22 26:4,7
little 38:8 66:10,13
live 63:22
long 6:2
look 13:13,16 14:20,24
15:6,24 19:8 23:9,10
24:10 27:18 29:11
30:24 36:14,18 41:22

42:18 46:1 52:10
57:23 64:4 71:3
looked 17:13 24:5,19
27:19 30:23 36:16
41:4 52:21 67:9
looking 26:19 40:10
74:5
lose 60:2 70:16
lot 12:11 64:2,12
Louisiana 1:15 3:7
75:5,7 76:4

**M**

M 2:8
machine 76:8
Madam 4:21
made 10:6,24 16:16
24:6 25:5 26:12 27:5
38:3 42:21 44:20
50:11 56:4 58:21
72:18
magic 65:17,25
majority 42:6
make 5:10,20 11:2
12:11 18:5 26:14
30:4 42:7 43:3 44:8
61:13
makes 12:14,20 13:1
making 32:23 39:23
63:16 73:25
malpractice 52:23 53:1
67:10,12 69:23 72:20
man 20:11 21:25 25:9
25:10
mandate 41:21
mandatory 8:18
Marc 17:14
March 1:16 20:10 24:1
24:16 35:10 36:4,11
Mass 63:23 64:5
material 5:17 31:4
75:21
materials 12:18 14:5,8
30:14,18 31:7
matter 12:14 13:7,24
16:13
matters 4:12
Matthews 21:18 52:16
52:19 54:10,11 67:7
67:24 71:3
Maurice 2:14 3:18 6:20
7:1,2 19:3,6 28:22
30:9 34:6,9,16 38:10
40:3 43:12 51:10
54:8 58:17 61:8
65:14 68:10,21 69:6

BRANDNER 00601

MARCH 12, 2010

Page 5

69:12,21 72:1
may 5:15,16 6:6,13,25
11:7 35:3 39:22
48:24
McGuire 4:10
mean 40:13 47:17
59:13 60:25 68:12
means 41:9 47:13 57:2
median 49:3,15
medical 7:10,19 17:6
22:13 30:15 31:5
35:25 36:1 41:4,22
41:25 42:14 46:2
52:13 59:10 69:8,23
medically 25:21
meet 43:10
meeting 3:7
Melissa 4:4
member 25:3
members 3:21 6:9
40:22
memory 52:17
mention 46:19 47:9
mentioned 46:20 71:20
mere 9:24
met 27:10 37:17
method 75:14
Mezona 20:12 24:13
Michael 2:15 4:9
microphone 6:12
might 49:21 58:10
mind 38:4 41:13 66:18
69:19
minutes 5:20 6:6 19:4
29:7 30:3 72:8
mislead 71:9
missed 10:3
missing 26:7
misstated 29:1
misstates 28:24
months 26:1,20 54:22
more 20:22 39:22 43:2
48:4 49:22 55:7 68:1
most 55:5 56:18
mother 8:23 10:8,15
11:2,25 14:3 21:3,20
22:4,15 28:4 44:18
50:13 55:12 66:17
mother's 50:24 62:12
62:14
move 61:10
moved 14:15 22:8 57:8
moving 56:20
much 17:16,21 18:11
63:24
must 31:7 59:5 70:17

72:20
myself 49:17
M.D 1:5,8 2:4,7,7,8,8
2:11,12 4:24,25

**N**

N 3:1
name 6:18
names 75:19
nature 9:8 10:4 44:9
nearly 43:8
necessary 46:16,22
48:24 56:3
need 53:11 59:17,19
65:18,19,25
needed 12:2 51:24
65:21 66:2,3 67:16
needs 20:18 42:24 48:1
48:15 60:5
nerve 7:23 21:5,15
22:18 37:18 38:1
40:19,21,24 41:6,7,9
41:24 43:10,17 44:3
44:6 45:11,19 46:6
46:22 47:7,9,13,16
48:7,13,25 49:2,16
49:19,21 51:24 52:6
52:9 53:3,4 56:6,21
56:25 57:2,6 58:15
59:18 64:9,18 65:6
65:10,23 67:16 68:6
68:18 69:15
nerves 49:22
neuroma 40:25
never 23:8 24:1,5 25:4
26:3,7,25 27:1 31:22
32:2 35:10 36:4
40:14 46:6 71:2
new 1:15 3:7 5:14
26:15
next 10:11
night 24:20
nobody 52:22 69:13
none 6:23 13:25 36:24
71:19
nonsense 13:5
nonunion 56:6
note 42:7 56:1,12,13,17
57:19 71:4
nothing 26:24 35:21
53:10
number 16:9
numbness 57:7

**O**

O 3:1

object 28:23
objection 26:19
obligation 12:17
obtain 30:13
obtaining 9:4 31:3
obviously 67:11
occasion 14:17,21
occasions 12:4 14:14
occur 59:7,8
occurred 27:5 47:21
59:6
October 7:4 22:12
50:20 53:22 54:3,19
55:9 66:14
off 52:25
offer 7:15
offered 19:9 25:13
office 26:6 31:7 55:11
officer 75:5
official 17:10
oh 21:6 37:4
okay 17:18 32:18 36:17
37:5 41:24
old 17:14
one 8:13,14 9:6 11:16
16:7 17:15 22:23
25:2 38:7 39:2,14
40:4,13 43:2 47:5,6
50:3 55:7 58:2 60:15
68:1 70:25 72:15,20
72:21
ones 34:11 44:17
one-third 62:9,10
one-year 3:16
only 15:19 33:23 35:24
38:11 47:19 49:14,17
50:12,21 52:4 53:2
67:14 76:16
operating 47:15 52:19
operation 56:24 67:11
opine 9:15 51:13 63:3
opined 63:18
opinion 25:14
opinions 21:8 23:2
60:23
opportunity 5:10 6:10
23:14
opposite 26:21
order 43:10
organization 25:4
original 5:23 12:4
51:15 67:20 76:17,18
originally 24:23
Orleans 1:15 3:7
**ORTHOPAEDIC** 1:1
orthopedic 3:6 24:14

56:13 64:1
**Orthopedics** 8:2
osteotomies 63:24
osteotomy 7:24 56:2,19
64:8
other 21:8 31:18 34:10
44:14 45:13 48:11
58:3 60:15,24 63:11
70:11 72:14,21
others 33:6
out 11:9 12:3 13:8 15:9
15:15 17:5 18:1,3,19
18:24 19:10 21:25
23:12 27:25 34:23
39:2 49:17 62:15
63:14 65:11 66:11
75:17
outcome 76:14
outside 2:15 57:20
over 21:13 40:15 55:7
71:21
overhead 63:15
overs 75:13
own 25:17 28:20 29:17

**P**

P 1:5 2:11 3:1,12 4:24
page 17:9 18:15 19:8
24:10 32:19 36:18
42:19 44:8 58:16
75:1 76:19
pages 18:22 37:11,12
76:6
palsy 7:23
panel 2:3,6 5:12 7:5,11
8:4,12 9:7,25 10:18
10:21,22 12:1,6,8
14:18 15:19 16:8
19:14 20:1 23:13
30:16 32:10 37:2
59:13,17 61:25 62:10
**Panel's** 27:19
papers 16:21 18:4
23:24
paraphrases 57:15
part 29:4,14 63:22
participating 76:13
particular 31:24 52:10
56:24
particularly 57:4
parties 6:5,11,16 12:12
61:16
partner 4:9 17:4
partners 17:15 20:19
party 5:9,19 12:22 31:2
patient 6:17 9:11,17,19

9:20 10:15 11:1,25
14:3 16:3,4 20:18,21
20:24 21:3,7,20
22:15 25:7 26:5
39:25 40:15 41:23
46:17 48:3,6,12
49:21 53:5,6 55:13
57:1 58:6 62:12
64:20 65:5 66:17
patients 41:8 47:15
57:3
patient's 14:3 21:3
48:15 50:24 62:13
**Patrick** 1:8 2:12 3:8
4:25
pauses 75:12
pay 13:10
Pelton 4:7
Pelton's 4:10
people 11:18 21:8
23:16 27:20 34:24
38:19 40:24 42:7
45:25 47:6 59:1,4,25
64:1 74:8
per 35:25 49:8,13
percent 7:22 38:24
40:13,17 41:1,10
42:3,23 60:1 64:6,15
64:17 70:13
percentage 52:8
perform 54:13
performance 9:2 10:2
11:14 39:9,12,19
59:22 62:25
performed 8:1
period 26:13
permit 26:17
permitted 5:24 6:8
peroneal 7:23 22:18
37:18 38:1 40:20
41:5,24 43:9,17 44:5
45:10,19 46:6,25
47:9 48:7 49:11
51:24 52:6,9 53:4
56:21,25 58:15 59:18
64:9 65:6,18,23
67:15 68:6,18 69:15
73:12
person 31:19 38:7
76:13
pertaining 5:18
pertinent 7:10,19 8:7
Peterson 4:3
phone 73:6
phrase 75:21
phrases 75:17

BRANDNER 00602

MARCH 12, 2010

Page 6

physician 20:14 38:22 39:23 53:1
physicians 41:16 43:5,8 61:6 64:2 70:11,12
physician's 21:12
pieces 55:25
pioneer 63:24
pivotal 71:23
plain 24:12
plaintiff 8:23 10:8 66:19
plaintiffs 59:7 62:24 70:6
plaintiff's 14:22 15:3 18:17 67:21
plan 71:5
plates 20:17 25:10 35:16
pleaded 12:6
pleading 33:21
please 4:20 6:11 66:12
point 22:21,23 23:4,13 34:8,23 37:16 39:21 53:25 54:11 62:7 63:2 74:14
pointed 12:3 23:12
pointing 17:5 18:23 19:10
portion 18:16 38:17
position 31:20 59:14 62:4 68:8
possession 10:14 14:9 51:14
possibility 8:25 10:10 46:24 49:1
potential 9:12 22:8 25:16 28:19 41:7 68:5
practice 9:3 11:16 40:11 42:5 49:24 64:13,13
practices 57:16
preop 45:6 46:6
preoperative 24:2
preparation 24:20
presence 68:4
present 2:10 3:17,19,22 4:2 66:19 70:7
presentation 5:20 6:2,5 63:1
presented 5:15 7:5 8:6 13:14 18:18 19:25 64:5 73:6
presents 20:19
presume 24:22
pretty 63:24,25

prevails 15:1
previously 18:25
primarily 30:4
probably 39:14 40:13 42:6,12
problem 48:10 64:7
problems 9:5
procedural 71:19
procedure 38:21 39:10 46:18 52:10 54:13 57:8 60:4 75:6,8
procedures 5:9 30:13
proceed 6:25 56:11
proceeded 62:3
proceeding 4:16 6:14 75:11,15 76:7
proceedings 1:13 76:5
process 29:23 66:23 72:3
produce 10:20 12:10 12:13,18
produced 32:15 34:11
Professional 4:5,13 5:8 30:12
Professionalism's 3:10 3:14
Program 4:6,13 5:8 30:12
projector 63:15
prominent 70:12
proof 12:17
proper 75:14
proposition 7:20 11:11
prove 23:7
provide 26:8 30:13,18 30:19 33:8
provided 7:16 9:22 10:17 16:15 17:1,11 26:3,16 32:2,22 33:3 33:5,10,15,17,25
provides 16:7
providing 31:4
proximal 7:23
public 12:25 13:7
pull 15:15 39:2
pulled 18:1,3
pulls 18:19
put 43:8
puts 56:25
p.m 1:16 74:17

**Q**

qualified 7:8,15
question 12:9 19:1 22:5 24:11,21 32:21 35:3 36:3,7,20 37:21,24

38:4 39:22 41:14 43:2 46:15 48:18 54:11 57:18 60:15,20 64:22 66:10,20 67:3 68:1 69:11 72:15
questioned 51:13
questioning 45:21 66:12
questions 6:6,11,19 30:3,5 34:17 36:23 37:2,4,6 39:5 44:14 55:5 60:17 72:14 74:12
quite 11:3
quotation 58:5
quote 57:14
quoted 16:20

**R**

R 2:14 3:1
radial 49:2,14,18
raise 4:20
raised 76:18
ran 8:4
rarer 49:14
rate 7:22 38:24 60:2 70:13
reach 66:3
reached 74:14
read 5:17 10:25 12:24 39:6 44:17 56:1 71:22
reading 65:1
reality 15:22
realize 20:6
really 8:12 55:13 62:21
realm 14:10 66:11
reason 10:19 12:8,23 14:11 42:9
reasonable 31:19
Rebecca 1:17 4:15 75:3 75:24 76:3,22
recall 32:16,18,23
recalls 22:5
recognize 39:1
recollection 24:12,18
recommend 3:15
recommendation 5:13 24:3
recommendations 25:6 26:12
record 3:3 6:14 8:20 13:7 17:10 39:23 41:18 42:8 46:21 48:2 55:11 57:19 68:13 75:9

records 7:10,19 13:1 17:7 22:13 24:24 30:15 31:5 35:25 36:1 41:4,22,25 42:14 43:17 44:1,17 46:2 52:3,5,13 59:10 69:8 73:8
rectify 50:15
red 6:3
reference 59:10 75:20
referring 45:12 46:5
refers 62:24
reflect 3:3 16:12 19:18 52:5
reflected 8:22 10:7
reflects 18:17 44:1
refrain 6:16
refuses 63:2
regard 8:8,16 9:1,24 11:12 16:6 44:9 63:10 65:23
regarding 32:13 59:15 63:16 66:5
reiterate 71:22
rejected 7:20 14:25
rejects 15:11
related 12:13 39:21 43:6 76:12
relates 8:13 41:17
relevant 23:19 30:18 30:22 31:8,13,15,18 31:20,21 33:4,7,11
relying 24:3
remind 6:16 20:8
reminder 5:14
remodel 16:10,18,22 16:23 17:19,24 18:10 19:16,23 25:17 28:20 35:23
remodeling 17:17,22 53:13
Reno 64:1
repair 48:23
repeat 42:17
repeated 42:20
reply 34:23
report 4:18
reported 76:7
reporter 4:14,21 6:13 75:4 76:1,4
reporters 13:16
Reporter's 75:1,15
reporting 13:19,23,25
represent 4:11
represented 33:14
request 13:3

requested 31:24 32:1
require 61:21 70:8
required 25:15 28:18 30:13,21 62:1 70:3,6
requirement 65:20
requires 12:12 31:2 61:19
research 7:25
resolutions 35:25
respect 11:13 39:14
respectfully 27:5
respondent 5:23 37:7
Respondent/Appellant 1:9 2:12,14
response 12:4,24 23:10 23:11
responsible 31:3
result 25:18 38:23 56:9 65:24
retained 61:17
review 19:19 46:10 50:22 55:13 62:19
reviewed 7:9,18 17:13 18:25 21:22 24:1,23 25:4 35:10 36:4,9 46:13
reviewing 17:20 63:9
Richard 2:4,8 3:23,25 4:2 5:6
right 4:21 30:24 38:23 52:24 70:15
risk 22:1,17 47:16,20 49:22,23 56:21,25
risks 21:4,15 56:4,5,8 56:10
Riverside 1:14
role 59:3 66:22
Rosalind 4:5
rule 12:12 30:11,22,23 75:5
rules 26:17 75:6
Russell 4:6
Russo 61:20,25 70:1

**S**

S 3:1
same 14:6 15:4 16:14 17:3 18:24 19:20 39:21 44:8 48:11 49:10 60:14 63:17 75:14
sanctioned 15:7
saphenous 40:24
sat 40:14
saw 24:15 29:15 41:6
saying 17:18,21,24

BRANDNER 00603

MARCH 12, 2010

25:1,25 42:5,8 43:7 48:12 49:4,17 51:3,4 51:9 61:2 67:18 68:7 69:2
says 8:19 11:5 17:12,16 18:25 22:17 31:10 37:24 38:6 41:23 44:2 57:15 59:6 64:6 71:5 74:8
Schmidt 2:4 3:23 5:3,4 5:6 6:24 20:2 29:3 30:1 34:18 35:5 36:21 37:3 50:5 55:2 60:10 66:7 70:22 71:14 72:13 73:23 74:11
scientific 16:13 19:18
seal 76:18
second 10:20,25 11:22 14:2,22 16:6 21:7 45:7,17 46:4,12 51:15 53:19,21,23 54:4,13,22 60:20
Secondly 28:15
see 14:5 19:9 20:21 21:7 23:11 36:19 41:5,25 43:25 44:2 59:9 62:22 63:12 65:18,19 66:1 67:10 67:12 69:3 73:11
seeing 24:12 42:13
seem 27:21 37:14 38:8
seems 50:8
seen 16:25 33:23 36:11 53:13 62:23 64:12
sees 20:12,24 21:11
selects 21:9
sending 73:8
sends 15:10
sense 12:11,14,21
sent 13:4 24:22 31:7
sentence 39:2
Service 13:20
services 13:24,25
session 40:23
set 10:25 14:23 15:5 18:1 23:14 45:7 53:20,21,23 54:4,13 76:6
sets 50:14,16 51:4
seven 16:9
several 54:21
severe 25:12
shape 23:3
Sharpe 1:5 2:11 3:12 3:19 4:19,24 5:25 7:6

9:10,18,21 10:19 11:4 13:14 14:8,15 15:16 17:2,7 20:3,21 20:24 21:9,20 22:1,6 22:15,16,16,24 23:2 23:18 24:2 25:15 26:11,25 27:6,15,24 28:1,6,18 29:21 30:10 34:19 35:12 36:6 37:22 39:15 41:23 43:16,22 45:18 46:16 47:2,10 49:7 49:12 53:5 54:19,20 56:1 58:9,14,20 59:6 62:16 63:3 66:2 67:8 67:20 68:25 69:13 70:4 71:1
Sharpes 17:15
Sharpe's 12:15 17:4 18:2 20:11 22:22 23:9 39:9,11,18 44:5 51:1 55:11
sheets 18:20 63:14
shorthand 76:8
show 8:20 16:3 21:1 25:9,10,11
showed 35:14 36:15
showing 52:13 56:23
shown 35:19
shows 9:6 10:2,11 64:14
side 30:3 35:16 58:2 60:3 72:21
signature 76:18
significant 25:11 32:12 40:18 41:2 42:2,23 64:7,15
similar 17:23 22:4
simple 14:7 19:12 36:2 36:6 37:23 61:11
simply 68:23
since 36:12 57:4
single 30:20
sir 53:25 54:7 55:23
sitting 33:20
situation 9:15 11:20 13:12 16:14 49:10 66:6 73:9
six 36:18
skeletally-mature 25:9
sleeve 63:14
slew 7:5
some 10:19 12:8 16:22 16:24 17:24 19:24 30:5,5 48:11 53:13 63:25 71:19

somebody 61:1 70:7
something 25:19 32:8 45:1 51:3 54:12 60:5 62:22 65:7 72:9,23 73:13
sometime 21:18 22:11
son 22:7
soon 63:13
sophisticated 45:24 64:1
sorry 19:3 29:4 37:12 47:5 67:2
sound 13:1
sounds 17:22
speak 5:24 6:12
specialized 61:12
specific 8:19,24 10:9 59:9 61:19,21 68:5
specifically 8:7 20:25 22:17 23:12 31:23 37:19 45:22 51:22 65:10 71:5 73:21 74:6
specifics 47:22 48:4
spend 72:7
spontaneous 75:11
standard 11:18 16:9 25:14 28:17 37:16,23 38:20 39:17 40:1 42:6,10 43:6,10,19 43:24 44:7 47:19,22 48:5,9,17 56:13,17 57:17,20,25 58:25 59:16,23 61:14,15,18 61:20 63:6 64:10,25 68:24 69:14,25 70:8 74:9
standards 8:18 9:4 11:16 57:13
standing 43:18
stands 65:11
staph 56:5
starts 63:16
state 15:10,10 42:21 68:4 75:4,9 76:4
stated 32:6 34:14 51:25 52:7,23 65:9 72:23 73:17 74:3,3
statement 5:10 10:5,24 19:17 30:4 32:24 33:9 42:13 53:3 73:4 73:25
statements 5:21 16:12 71:18
stating 41:5 68:3
stenographic 76:8

stepping 72:5
still 26:3 37:22 38:23 54:10 58:13 70:15
stop 66:12
stopped 53:16
story 15:20,21 33:24 62:9
stretch 25:22,23
stuck 73:18
study 8:1
subject 71:18
subjective 31:18
submit 14:12
submits 15:4
submitted 5:18 14:11 17:7 18:5 23:18 29:14 30:11 50:23 70:10
substantial 20:16
substantially 17:19
substantiate 16:19
suddenly 13:3
sued 22:16 27:11,17 52:19,22 67:7
suggest 24:9
summer 50:25
superficial 68:16
support 14:13
supported 7:24,25
supports 29:23
sure 26:14 43:3 44:8
surgeon 21:10 39:19 56:14 60:4 70:14,14
Surgeons 1:1 3:6
surgeries 56:18
surgery 20:18 21:4,13 21:15 22:7 25:16,20 28:1,7 45:9,20,23 48:11 53:10,12 58:8
surgical 29:17 62:24
surprise 27:4
suspension 3:16
sustain 12:18
sustained 15:22 16:2
swear 4:22
sworn 5:1 75:8
swung 10:2
system 58:3 72:19,20 72:22

_____
**T**
_____
T 1:17 75:3,24 76:3,22
take 21:19 58:2 71:23 72:21
taken 1:14 5:11 24:13 26:1,5,20 53:23 54:5

54:14 75:9
takes 20:14
taking 59:14
talk 45:18 57:3 75:13
talked 41:23 64:2
talking 52:16 72:8
tell 25:15 26:2 27:9 28:2,18 39:25 42:1 46:17 59:8 66:11 67:3
telling 24:4 33:21,23 35:9 36:3,8 51:23 56:12 58:13 68:19 69:4
ten 5:19 19:4 24:10 29:7 36:18
tendon 48:22
ten-minute 5:22 72:6
terms 10:3 17:10 23:23 41:16 43:5 65:7
testified 5:1 35:13,15 35:20 47:7 70:1
testifies 51:11
testify 7:8 8:9 9:9 23:22 25:2,24 39:16 42:18 43:14 50:12 51:19 58:19 69:25 70:9
testifying 53:2 68:23
testimony 7:16,21 9:8 10:4 16:10,15 18:14 18:23 19:9,15,21,23 21:24 23:2,6,17 27:20,22 28:24 34:24 35:21,23 42:21 43:20 43:21 44:10 54:24 57:23 59:15 60:19 62:14,21 63:10,12 64:24 65:16 75:8
thank 17:5 20:5 29:24 36:25 44:13 47:3,11 50:1 55:1 60:9 65:13 71:11 72:12 74:15
their 10:3,18 23:6,17 23:24,25 32:6 34:24 45:8,17 54:23 62:3
thing 15:4 38:11 47:6 53:2 60:14 61:7 62:18 67:14 70:25 71:7
things 12:10 24:22 37:15 50:9
think 15:24 24:15 25:19 31:19 32:8 34:7,14 40:8,19 41:8 41:10 42:22,24 45:1 46:18,23 47:11,21,24

BRANDNER 00604

MARCH 12, 2010

Page 8

48:1,3,5,14 49:4
50:25 56:22 57:1
61:6 64:14,18 67:15
68:23 74:2
thinking 64:19
Thomas 2:8 3:25
though 49:2
thought 23:19 45:16
75:13
thoughts 38:9
three 8:18 12:3 13:19
13:23 26:1 55:25
57:13
through 7:12 17:6,13
18:22 32:20 75:20
tibia 56:20 57:8
tibial 7:24 56:2,19
time 6:4 12:6 24:14
29:25 32:13 51:7,11
51:18 55:7,10,14
61:12 62:22 66:20
timeline 73:15
timer 6:1
times 34:15
today 3:7,15,17,22 4:14
23:25 26:9 32:4
35:10 36:3 71:21
72:23
today's 4:8
told 27:11 44:19 45:9
50:9 51:25 65:5
66:25 67:6,23 73:7
73:10
totally 45:14
toward 73:21
transcribed 76:9
transcript 1:13 4:16
11:24 13:11 18:16
32:19 38:13 62:20,20
75:18 76:10,17
transcription 75:15
76:9
transcripts 8:22 10:7
10:13,17,21,23 11:1
12:2 13:13,17 14:19
15:5,9,14 16:3 30:14
31:5 32:15
trial 9:14 11:9,9 14:15
15:2 17:25 18:14
36:15 38:13 39:13
43:15 58:22 62:14,19
62:20 63:9 65:16
tried 31:22
trouble 8:5
true 11:6,23 18:12 33:1
33:2 76:10

trying 27:2 74:7
tune 32:6
turned 27:16
twice 10:16
two 8:12 9:5 14:14
18:20,22 32:19 37:14
38:8 50:9,15 55:12
60:17 63:13
type 10:1 22:5

**U**

ulnar 49:3,15
unable 4:8 15:18
unacceptable 71:7
unanimous 8:11
unanimously 7:14,17
7:20 59:17
under 25:22,23 56:14
71:4
underlying 6:18 12:22
understand 9:7 30:19
32:7 34:8 37:15 39:4
41:9 43:3,13 48:16
56:7,10 57:1,11
58:23 59:2 62:2 66:3
understanding 8:24
10:3,9 12:1 20:7
27:21 28:5 45:8 57:6
67:19 76:11
understood 29:16
30:10,17 72:6
unfortunately 15:12,20
union 56:6
unprofessional 3:11
until 18:6 54:14
unusual 38:21
unwilling 38:15 39:10
39:11
upper 20:13 48:23
used 55:19 75:12

**V**

V 2:7
valid 76:16
various 4:12
Vegas 37:10
venue 58:2
verbiage 68:2
verdict 14:16
verified 75:20
versus 53:4
very 9:18 16:17 17:22
19:5 24:5 25:5 28:9
38:14 39:8,18 42:19
58:21 72:23
vessel 56:7

view 40:1 41:15 43:4
views 24:13
violated 8:18
violation 16:8 57:12
violations 72:3
vs 1:7

**W**

waiving 72:4
want 26:18 40:4 43:1,2
44:8 48:20 55:6 71:8
wants 39:3
wasn't 13:11 53:17
68:8 72:7
watch 18:21
way 10:23 11:23 16:1
21:6 23:3 50:15
60:19 62:3,17 68:16
76:14
weigh 38:16 63:8
weighed 56:10
well 15:12 17:9 29:20
29:20 31:2,22 41:21
52:14 62:18 73:3,24
went 40:15
were 5:7 8:5,6 10:15,17
10:18 14:9,9 16:25
17:7,11 18:5 23:19
24:13,22 25:25 26:4
26:6,20 33:3,6,7
34:12 35:18 39:1
44:19 45:9,11,16,23
46:2,5 48:22 49:16
50:22,23 52:1 59:14
60:23 66:16 70:6
73:24 76:5
weren't 10:14 52:14
we'll 28:23 67:3
whichever 68:16
whole 7:5 12:11 23:5
willing 13:10 25:2
win 14:20 15:6
witness 12:5 21:23
22:11,20 23:16 24:7
26:23 28:12 33:19
35:12 36:5 42:11
50:19 51:8 54:3,18
55:9 58:19,25 71:2
witnesses 4:22 39:15
Woods 4:11
word 65:18,19
wording 30:25
words 31:18 45:13
65:17,25 66:1 75:17
75:19
works 17:2

worry 27:12
wouldn't 13:24
write 41:18 43:16 44:5
49:5 56:14
writing 69:15
written 14:4 18:4 23:24
30:14 31:4 68:12
wrong 27:13 54:12
67:3,18

**X**

x-ray 24:5,12 25:5
28:15 36:15,15,16
52:21
x-rays 8:15 16:25
17:12,12,14,21 18:1
18:2,18,20,24 19:11
19:20,25 20:14 21:1
22:14 23:23 24:2,18
24:24 25:8,9,25
26:11 29:15 35:11,14
35:17,18 36:4,9,12
63:11,18

**Y**

years 40:10 52:17
64:13
yes-or-no 37:23
young 4:4 20:11 21:25
25:10 37:1

**0**

04 55:10 58:7

**1**

1/29/2004 58:16
1:35 1:16
11 20:25 71:4
12 1:16 18:14,15,15
19:8
13 7:22 38:24 40:17
41:1,10 42:3,23 60:1
64:15,17 70:13
134 37:11
135 37:11
136 37:12
137 37:13
14 29:13
1434(b) 75:7
15th 72:10
150 64:6

**2**

2nd 7:4
2:46 74:17
2002 20:10,25 21:12
24:1,16 26:6 35:11

36:4,11 71:4
2003 21:18
2004 22:12 50:20,23,25
53:22 54:3,19 66:15
2005 37:11 51:12 54:15
62:13
2008-23 1:6
2009 29:13
2010 1:17
22 20:10 24:1,11,16
26:6 35:10 36:4,11
28 58:16 75:5
29 58:7

**3**

3 7:21 38:24 40:17 41:1
42:2,22 60:1 64:15
64:17 70:13
30 40:10 64:13
37 32:19

**4**

4/11/2002 55:11 56:2
45th 72:9

**5**

5th 37:10 51:12
55 17:9

**6**

6 21:11
6C 12:12 30:11
6th 21:6

**7**

70003 1:18

**8**

8th 54:15

BRANDNER 00605