IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PATRICK J. BRANDNER, M.D.,

        Plaintiff,

v.

AMERICAN ACADEMY OF
ORTHOPAEDIC SURGEONS and
AMERICAN ASSOCIATION OF
ORTHOPAEDIC SURGEONS,

        Defendants.

Case No. 10-cv-8161

Hon. Dist. J. Ronald Guzman

**DEFENDANTS' RULE 56.1(B)(3) RESPONSE TO PLAINTIFF'S
RULE 56.1(A)(3) STATEMENT OF UNDISPUTED FACTS**

Defendants American Academy of Orthopaedic Surgeons (the "Academy") and American Association of Orthopaedic Surgeons (the "Association") (collectively, the "Defendants" or "AAOS"), respectfully submit their Rule 56.1(b)(3) Response to Plaintiff's Rule 56.1(a)(3) Statement of Undisputed Facts.

**PREFATORY STATEMENT**

1.  Defendants object to Plaintiff's Rule 56.1(a)(3) Statement of Undisputed Facts ("Plaintiff's SOF") insofar as it violates Local Rule 56.1(a), which provides, in relevant part, that the statement of material facts "shall consist of short numbered paragraphs" and that "[a]bsent prior leave of Court, a movant shall not file more than 80 separately-numbered statements of undisputed material fact." Local Rule 56.1(a). "[A] district court may strictly enforce compliance with its local rules regarding summary judgment motions." *Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 630 (7th Cir. 2010). Indeed, "[Local Rule 56.1] serves an important function by ensuring that the proposed findings of fact are in a form that permits the district court to analyze the admissible evidence supporting particular factual propositions and

determine precisely what facts, if any, are material and disputed." *Id. See also Hedrich v. Bd. of Regents of Univ. of Wis. Sys.*, 274 F.3d 1174, 177-78 (7th Cir. 2001) (upholding district court's decision to enforce compliance with Local Rule 56.1). Simply put, "the rule provides district courts with the means to resolve motions for summary judgment *on the merits*." *Schmidt*, 599 F.3d at 630 (emphasis added).

2.      Plaintiff's SOF totals forty-eight (48) pages and, in numerous instances, violates Local Rule 56.1's mandate that the statement shall consist of short numbered paragraphs. *See* Plaintiff's SOF ¶¶ 11, 13, 26, 36, 38, 41-44, 46, 50, 52-53, 56, 57, 64-65, 72-73. For example, Paragraph 38 of Plaintiff's SOF is nearly five (5) pages long, and Paragraphs 53, 57 and 65 are each more than two (2) pages in length. *Id.* at ¶¶ 38, 53, 57 and 65.

3.      Additionally, although Plaintiff's SOF purports to assert seventy-five (75) numbered paragraphs, certain paragraphs contain multiple sub-paragraphs. *Id.* at ¶¶ 13, 26. With the inclusion of the sub-paragraphs, Plaintiff's SOF exceeds the limit of eighty (80) numbered paragraphs set forth in Local Rule 56.1(a).

4.      Lastly, Plaintiff's SOF is replete with argumentative statements that fail to set forth undisputed material facts. *Id.* at ¶¶ 8, 19, 24-26, 31, 39, 41, 45-49, 52, 54, 56, 61, 64 and 66. "It is inappropriate to make legal arguments in a Rule 56.1 statement of facts." *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008), *citing Malec v. Sanford*, 191 F.R.D. 581, 585 (N.D. Ill. 2000) *and Thomas v. Sheahan*, 499 F. Supp. 2d 1062, 1072 (N.D. Ill. 2007). Defendants respectfully request that those portions of Plaintiff's SOF that merely set forth attorney argument or legal conclusions be disregarded and/or stricken.

5.     Defendants hereby incorporate by reference this Prefatory Statement in the remainder of their response to Plaintiff's SOF.

## DEFENDANTS' RESPONSES TO PLAINTIFF'S STATEMENT OF FACTS

## DESCRIPTION OF THE PARTIES

**STATEMENT NO. 1:**

Plaintiff, PATRICK J. BRANDNER, MD ("Dr. Brandner") is an orthopedic surgeon residing in the State of Nevada, licensed to practice in the states of Nevada, Louisiana, Arizona and California.  See, Deposition of Patrick J. Brandner attached hereto as Exhibit 1, p.13, ll;.20.

**RESPONSE:**

Defendants do not object to Statement No. 1.

**STATEMENT NO. 2:**

Defendants, AMERICAN ACADEMY OF ORTHOPAEDIC SURGEONS ("Academy") and AMERICAN ASSOCIATION OF ORTHOPAEDIC SURGEONS ("Association") (collectively the AAOS) are interrelated not-for-profit corporations organized and existing under the laws of the State of Illinois, with a principal place of business in Rosemont, Illinois.  (Answer to Amended Complaint ¶¶ 2-4, Doc. 33).

**RESPONSE:**

Defendants do not object to Statement No. 2.

**STATEMENT NO. 3:**

The Academy and Association are, by design, indistinguishable.  Compare Bylaws of the Academy (attached hereto as Exhibit "2") with Bylaws of the Association (attached hereto as Exhibit "3").  In this regard, a member of Academy is considered a member of the Association and a member of the Association is considered a member of the Academy.  Id. see also deposition transcript of Melissa Young, attached hereto as Exhibit 4, p.33, ll.5-8.  Similarly, suspension from the Academy results in suspension from the Association (and vice versa).  Id. The Academy and the Association even share a Board of Directors.  Id.

**RESPONSE:**

Defendants object to Plaintiff's assertion that the "Academy and Association are, by design, indistinguishable" as contrary to the weight of the evidence.  The Academy and the Association are separate (yet related) entities that, by design, serve different purposes.  The

primary function of the Academy is to provide continuing musculoskeletal medical education to orthopaedic surgeons, while the Association primarily engages in health policy and advocacy activities on behalf of orthopaedic surgeons and the profession. (Affidavit of Melissa Young ("Young. Aff."), enclosed with Defendants' Statement of Undisputed Material Facts ("Defendants' SOF"), at ¶ 2; Academy Bylaws, attached as Exhibit 2 to Plaintiff's SOF, at Article II; Academy Bylaws, attached as Exhibit 3 to Plaintiff's SOF, at Article II.) Defendants do not dispute that: (i) a member of the Association is also considered a member of the Academy; (ii) suspension from the Academy results in suspension from the Association (and vice versa); and (iii) the Academy and Association share a common Board of Directors.

### STATEMENT NO. 4:

The AAOS has a public purpose which exceeds merely that of a social organization and its endeavor to benefit from various State and Federal laws. (Answer to Amended Complaint ¶¶ 2-4, Doc. 33).

### RESPONSE:

Defendants do not object to Statement No. 4.

### DESCRIPTION OF JURISDICTION AND VENUE

### STATEMENT NO. 5:

Dr. Brandner has been a member of the Academy for twenty-five years. Pursuant to Article III of the Bylaws for the Academy, all members of the Academy are also considered members of the Association. (Answer to Amended Complaint ¶5, Doc. 33).

### RESPONSE:

Defendants do not object to Statement No. 5.

### STATEMENT NO. 6:

The AAOS has recognized its obligations to the public and the profession when reviewing issues of professional compliance. (Answer to Amended Complaint ¶6, Doc. 33).

**RESPONSE:**

Defendants do not object to Statement No. 6.

**STATEMENT NO. 7:**

By letter dated December 9, 2010, Dr. Brandner was advised that the Board of Directors for the Association voted to suspend him from the AAOS for a period of one year "based on violations of the Standards of Professionalism for Orthopaedic Expert Witness Testimony, Mandatory Standards Nos. 3 and 4." (Answer to Amended Complaint ¶6, Doc. 33).

**RESPONSE:**

Defendants do not object to Statement No. 7.

**STATEMENT NO. 8:**

Dr. Brandner in no way violated Mandatory Standards Nos. 3 and 4 of the Standards of Professionalism for Orthopaedic Expert Witness Testimony (the Standards of Professionalism for Orthopaedic Expert Witness Testimony were not even adopted by the AAOS until six months after Dr. Brandner was retained as an expert in the underlying litigation) — Dr. Brandner's testimony was truthful, scientifically correct and in accordance with the merits of the case. See Deposition of Joseph Zuckerman, attached hereto as Exhibit 9, pp. 112-16, ll.11-18; September 15, 2009, correspondence attached hereto as Exhibit 23 with supporting exhibits.

**RESPONSE:**

Defendants object to Statement No. 8 due to the fact that it is argumentative, contrary to the weight of the evidence, and sets forth conclusory assertions rather than material facts. Mandatory Standard No. 3 of the AAOS Standards of Professionalism for Orthopaedic Expert Witness Testimony ("SOPs") requires an orthopaedic expert witness to "evaluate the medical condition and care provided in light of generally accepted standards at the time, place and in the context of care delivered." (SOPs, attached as Exhibit 7 to Plaintiff's SOF, at p. 2.) Mandatory Standard No. 4 mandates that an orthopaedic expert witness shall "neither condemn performance that falls within generally accepted practice standards nor endorse or condone performance that falls outside these standards." (*Id.*) In the underlying action, Dr. Brandner testified that Dr. Sharpe had not met the applicable standard of care because he failed to specifically advise the

patient of the risk of surgery to the peroneal nerve prior to performing a tibial osteotomy. (Plaintiff's August 5, 2005 Deposition, pertinent portions of which are attached as Exhibit 11 to the Young Aff., at 20:16-25 (Q: Do you still believe that Dr. Sharpe fell below the standard of care? A: Yes.).)  Dr. Brandner gave his testimony over three months after the AAOS adopted the SOPs.  The AAOS determined that this testimony constituted a violation of Mandatory Standards Nos. 3 and 4 in light of the following facts:  (i) Dr. Sharpe's pre-operative records memorialized that he discussed with the patient and his mother the risk of "nerve injury" associated with a tibial osteotomy on two occasions prior to performing the patient's surgical procedure (Dr. Sharpe's April 11, 2002 and June 6, 2002 pre-operation notes, attached as Exhibit 7 to the Young Aff.);  (ii) Dr. Sharpe testified in his deposition that he discussed the risk of peroneal nerve injury with the patient and his mother prior to the surgery (Dr. Sharpe's May 19, 2004 Deposition, pertinent portions of which are attached as Exhibit 10 to the Young Aff., at 11:21-12:14); and (iii) in their initial depositions taken in the underlying malpractice action, the patient and his mother both testified that Dr. Sharpe had discussed the risk of peroneal nerve injury or foot drop with them prior to the surgery.  (Patient's January 29, 2004 Deposition, pertinent portions of which are attached as Exhibit 8 to the Young Aff., at 28:10-24; Patient's Mother's January 29, 2004 Deposition, pertinent portions of which are attached as Exhibit 9 to the Young Aff., at 51:6-13, 99:19-100:6; COP Hearing Panel Report and Recommendation, attached as Exhibit 30 to Plaintiff's SOF, at pp. 1, 3, 9; Judiciary Committee Report and Recommendation, attached as Exhibit 36 to Plaintiff's SOF, at pp. 7-8.)

### STATEMENT NO. 9:

In excess of seventy percent of Dr. Brandner's revenue is derived from medical-legal support (independent medical examinations, records reviews, expert testimony).  See Plaintiff's Answer to Interrogatory Number 6, attached hereto as Exhibit 5. Dr. Brandner's value as an expert witness is dependent upon his professional reputation.  See Exhibit 1, p. 22, ll. 1-13; p. 34,

ll.7-14, p. 37-38, ll.19-8;p. 39-40, ll.16-9.  Public disclosure of Dr. Brandner's suspension (as required by AAOS Professional Compliance Grievance Procedures V(B) and V(D) and as permitted by AAOS Professional Compliance Grievance Procedure V(C)) would significantly damage Dr. Brandner's professional reputation.  Id.  Accordingly, the value of the declaratory and injunctive relief sought in this litigation is in excess of Seventy-Five Thousand Dollars ($75,000).  Id.

**RESPONSE:**

Defendants do not dispute that in excess of seventy percent of Plaintiff's *present* revenue is derived from medical-legal support.  Defendants object to Plaintiff's statement that public disclosure of his suspension will significantly damage Dr. Brandner's professional reputation as speculative.  Dr. Brandner merely testified in his deposition as what he believes will transpire if there is public disclosure of his suspension.  In further responding, the AAOS states that, when adjudicating a grievance, it does not consider factors such as Plaintiff's physical disability or the amount of revenue generated by Plaintiff through medical-legal support.  The AAOS's analysis is confined to whether the conduct challenged in a grievance constitutes a violation of the applicable SOPs.  (Dr. Goodman Deposition ("Dr. Goodman Dep."), pertinent portions of which are attached hereto as **Exhibit 1**, at 35:4-37:9, 39:19-40:13.)

**STATEMENT NO. 10:**

Accordingly, this Court has jurisdiction over the parties to this action and the claims asserted herein.  This Court is the proper venue for this proceeding because the principal place of business for the AAOS is Rosemont, Illinois.  (Answer to Amended Complaint ¶¶ 1-6, Doc. 33).

**RESPONSE:**

Defendants do not object to Statement No. 10.

**GENERAL ALLEGATIONS**

**STATEMENT NO. 11:**

Dr. Brandner has practiced medicine in the State of Nevada as a Board certified orthopaedic surgeon since 1982, when he was honorably discharged from the U.S. Army as a Lieutenant Colonel.  See Exhibit 1, p.12, ll.4-18.  Initially, Dr. Brandner's practice consisted of general orthopaedic surgery, reconstructive surgery and trauma.  Id.  Unfortunately, in 1986 (at

age thirty-nine), Dr. Brandner developed severe, symptomatic dynamic lumbar spinal stenosis which significantly limited his ability to perform surgery.  Id. at p.16, ll.10-24.  Unfortunately, due to progression of the instability of his lumbosacral spine, Dr. Brandner suffered chronic dynamic pain.  Id.  As a result, in 1995, Dr. Brandner declared surgical disability.  Id.  In 1997, Dr. Brandner underwent a reconstructive surgery in an attempt to stabilize the lumbar spine.  Id. The surgery did not remedy the condition and instead resulted in chronic neuropathic pain.  Id. To make up for the revenue lost as the result of his surgical disability, Dr. Brandner began providing medical-legal support (independent medical examinations, records reviews, expert testimony).  Id.  To do so, Dr. Brandner modified his practice to allow him to dedicate one day per week to medical-legal support (four days were spent practicing outpatient orthopaedics). Dr. Brandner's medical-legal practice has grown significantly over the years.   It currently comprises in excess of twenty percent (20%) of Dr. Brandner's practice and accounts for in excess of seventy percent (70%) of his revenue.  Id. at p.52, ll.11-17; see also, Exhibit 5, Plaintiff's Answer to Interrogatory Number 6.  Indeed, it is the revenue that Dr. Brandner derives from medical-legal support that satisfies his overhead obligation; thereby making it possible for him to practice outpatient orthopaedics.  See Exhibit 1, p.38-40, ll.14-3.  Moreover, Dr. Brandner testified unequivocally at deposition that it is his belief that suspension from the AAOS would end his medical career.  Id. at 39, ll. 1-7.

**RESPONSE:**

Defendants object to Statement No. 11 on the grounds that it is neither short nor limited

to material facts, as required by Local Rule 56.1(a).  Defendants do not dispute the facts set forth

in Statement No. 11 regarding Dr. Brandner's qualifications and orthopaedic practice, his

physical disability, and his medical-legal practice.  Further, Defendants do not dispute that it is

Dr. Brandner's belief that his suspension from the AAOS would result in the reduction of his

medical legal work, thereby preventing him from meeting his overhead demands where he

currently maintains his orthopaedic practice.

**STATEMENT NO. 12:**

In October of 2004, Dr. Brandner was contacted by an attorney in Arizona who was representing a minor and his parents in a medical malpractice case against a physician in Arizona.  See Affidavit of Patrick J. Brandner, attached hereto as Exhibit 6.  The attorney described the facts of the case and indicated that he wanted to retain Dr. Brandner to perform a records review in connection with the case and, possibly, to provide expert testimony on behalf of the plaintiff.  Id.  Dr. Brandner agreed to perform the records review but indicated that he could not agree to provide expert testimony until after he had reviewed all of the pertinent medical records.  Id.

**RESPONSE:**

Defendants do not object to Statement No. 12.

**STATEMENT NO. 13:**

The attorney forwarded the plaintiff's medical records to Dr. Brandner and Dr. Brandner reviewed the same. See Exhibit 6. The records revealed:

a. That the plaintiff had suffered a fractured tibia while playing in a high school football game in September of 2001. Id. The physician who was the subject of the malpractice claim had treated the fracture with a long leg cast for approximately eight weeks. Id. Within four months of the removal of the cast, there was an obvious deformity in the proximal leg (i.e., the bones at the fracture site were drifting). Id. The plaintiff was complaining that the leg had returned to full function and that he suffered pain during strenuous activity. Id. The plaintiff and his parents had questioned the physician with regard to the options available to correct the deformity and restore full function to the leg. Id. The physician advised that there were multiple surgical options but recommended against them at that time (counseling a "wait and see" approach). Id.

b. In March of 2002 (approximately six months after the injury), the plaintiff and his parents sought a second opinion. See Exhibit 6. The physician with whom they met examined the plaintiff and his medical records; noted the obvious deformity in the proximal leg; and concluded that there was a malunion of the proximal tibial fracture. Id. The physician noted that he believed that the malunion should probably be corrected but indicated that he wanted to discuss the matter with a conference of orthopaedic surgeons because surgical correction in cases such as the plaintiff's — especially where the patient was having minimal pain on flat walking — was a controversial issue. Id. Ultimately, the physician referred the plaintiff to another physician in his practice group — Kipling G. Sharpe, MD ("Dr. Sharpe"). Id.

c. In April of 2002, the plaintiff and his parents met with Dr. Sharpe. See Exhibit 6. Dr. Sharpe reviewed the plaintiff's medical records; performed a physical examination of the plaintiff; made a recommendation for a surgical correction of the deformity; discussed the risks involved in surgery; and, upon obtaining consent for the procedure, ordered a series of studies related to the deformity and scheduled the plaintiff for surgery. Id.

d. In early June of 2002, the plaintiff and his mother attended a pre-operative evaluation. See Exhibit 6. During that evaluation Dr. Sharpe performed a physical examination of the plaintiff and discussed the surgical procedure and options in detail with the plaintiff and his parents. Id. Dr. Sharpe's assistant then identified the risks inherent in surgery and indicated that the plaintiff and his mother understood the risks and were ready to proceed with the surgery. Id.

e.      On June 26, 2002, Dr. Sharpe performed the surgical procedure (a proximal tibial osteotomy) on the plaintiff. <u>See</u> Exhibit 6. Unfortunately, as a result of the surgery the plaintiff suffered peroneal nerve palsy (i.e., a "foot drop"). <u>Id.</u> The plaintiff's ability to control the upward and downward movement of his foot was lost. <u>Id.</u>

**RESPONSE:**

Statement No. 13 consists of five (5) separate sub-paragraphs. Defendants object to Statement No. 13 on the grounds that it is neither short nor limited to material facts, as required by Local Rule 56.1(a). Notwithstanding their objections, Defendants do not dispute the facts set forth in sub-paragraphs 13(a), (b), (c), (d) and (e). Responding further, Dr. Sharpe testified in his deposition, taken in the underlying action, that he specifically discussed the risk of injury to the peroneal nerve with the patient prior to surgery. (Dr. Sharpe's May 19, 2004 Deposition, pertinent portions of which are attached as Exhibit 10 to the Young Aff., at 11:21-12:14.)

**STATEMENT NO. 14:**

Upon completing his review of the plaintiff's medical records, Dr. Brandner concluded that there was doubtful evidence of malpractice by any physician involved in the treatment of the plaintiff. <u>See</u> Exhibit 6. He reported to the attorney that the course of treatment employed by the original treating physician was appropriate; that the drifting of the bones at the fracture site was not the result of anything the treating physician (who had been sued for malpractice) did or did not do; that a proximal tibial osteotomy was an appropriate surgical procedure to correct the deformity; and that the fact that the plaintiff suffered a foot drop did not mean that Dr. Sharpe had improperly performed the proximal tibial osteotomy (peroneal nerve palsy is a significant complication in such a surgical procedure). <u>Id.</u> The only thing that Dr. Brandner indicated was unusual about the medical records was the absence of a notation documenting a discussion between Dr. Sharpe and the plaintiff and his parents about the risk to the peroneal nerve and the potential of a foot drop when obtaining their consent to perform the surgical procedure. <u>Id.</u> Dr. Brandner indicated that such a discussion was required to satisfy the standard of care for informed consent in the context of a proximal tibial osteotomy because of the increased likelihood of the complication (i.e., a general discussion regarding the potential of "nerve injury" was not sufficient). <u>Id.</u>

**RESPONSE:**

Defendants do not object to Statement No. 14.

**STATEMENT NO. 15:**

The attorney indicated that it was his understanding that the plaintiff and his parents had been unaware of the risk to the peroneal nerve or the potential of a foot drop when consenting to the surgery. See Exhibit 6. It was only after the surgery, when they learned of the complication, that Dr. Sharpe advised them of the risk to the peroneal nerve in a proximal tibial osteotomy. Id. The attorney indicated that based on Dr. Brandner's review of the medical records, it was his intention to amend the complaint to assert a claim against Dr. Sharpe for failure to obtain informed consent for the surgical procedure. Id.

**RESPONSE:**

Defendants object to the second sentence contained in Statement No. 15 on the grounds that it is contrary to the weight of the evidence. As set forth in Defendants' Response to Plaintiff's Statement No. 8, above, Dr. Sharpe testified in his deposition, taken in the underlying action, that he specifically discussed the risk of peroneal nerve injury with the patient and his mother prior to the surgery. (Dr. Sharpe's May 19, 2004 Deposition, pertinent portions of which are attached as Exhibit 10 to the Young Aff., at 11:21-12:14.) Further, in their initial depositions, both of which were taken prior to Dr. Sharpe was added as a defendant in the underlying action, the patient and his mother testified that Dr. Sharpe discussed the risk of peroneal nerve injury or "foot drop" with them prior to the surgery. (Patient's January 29, 2004 Deposition, pertinent portions of which are attached as Exhibit 8 to the Young Aff., at 28:10-24; Patient's Mother's January 29, 2004 Deposition, pertinent portions of which are attached as Exhibit 9 to the Young Aff., at 51:6-13, 99:19-100:6.) Defendants do not object to the first and third sentences set forth in Statement No. 15.

**STATEMENT NO. 16:**

The attorney inquired as to whether Dr. Brandner would be willing to provide expert testimony on behalf of the plaintiff in relation to such a claim. See Exhibit 6. Dr. Brandner indicated that he would only be willing to testify: (1) That the standard of care for informed consent in the context of a proximal tibial osteotomy required a discussion of the risk to the peroneal nerve and the potential of a foot drop; and (2) That there was nothing in plaintiff's medical records that documented that such a discussion had occurred (only that there had been a

discussion of "nerve injury" in general). Id. The question of whether such a discussion in fact occurred would be a question for the jury. Id.

**RESPONSE:**

Defendants do not object to Statement No. 16 to the extent it is limited to facts pertaining to Dr. Brandner's discussions with the attorney prior to his actual testimony in the underlying action. Responding further, Dr. Brandner testified in the underlying action that, after having reviewed the depositions of Dr. Sharpe, the patient and his mother, it was his belief that Dr. Sharpe fell below the standard of care regarding informed consent. (Plaintiff's August 5, 2005 Deposition, pertinent portions of which are attached as Exhibit 11 to the Young Aff., at 20:16-25.) Dr. Brandner further testified that it was his belief the initial testimony of the patient and his mother regarding their pre-operative discussions with Dr. Sharpe was actually in reference to post-surgical discussions. (April 29, 2008 Trial Testimony, relevant portions of which are attached as Exhibit 16 to the Young Aff., at 35:21-36:4.)

**STATEMENT NO. 17:**

The attorney agreed with the limitations imposed by Dr. Brandner. See Exhibit 6. An amended complaint was filed naming Dr. Sharpe as a defendant. Id.

**RESPONSE:**

Defendants do not object to Statement No. 17.

**STATEMENT NO. 18:**

Approximately six months later, on April 18, 2005, the AAOS adopted Standards of Professionalism for Orthopaedic Expert Witness Testimony ("Original Standards of Professionalism"). See Original Standards of Professionalism, attached hereto as Exhibit 7. The Professional Compliance Grievance Procedures at Section IV(A) (entitled "Applicability of Professional Compliance Procedures") provides that the Grievance Procedures "shall apply to grievances filed against an AAOS Fellow or Member that allege a violation of the AAOS Standards of Professionalism arising from activities that occurred on or after April 18, 2005, and to alleged violations of any additional SOPs occurring after their adoption by the AAOS as provided for in the Bylaws." See Exhibit 16.

**RESPONSE:**

Defendants do not dispute the facts set forth in Statement No. 18. In further responding, the AAOS's finding that Dr. Brander violated the Standards of Professionalism for Orthopaedic Expert Witness Testimony is based on his August 5, 2005 deposition testimony and April 29, 2008 trial testimony. Plaintiff's deposition and trial testimony in the underlying malpractice action occurred subsequent to the adoption of the Standards of Professionalism for Orthopaedic Expert Witness Testimony. (COP Hearing Panel Report and Recommendation, attached as Exhibit 30 to Plaintiff's SOF, at pp. 1, 3, 9; Judiciary Committee Report and Recommendation, attached as Exhibit 36 to Plaintiff's SOF, at pp. 7-8.)

**STATEMENT NO. 19:**

The Professional Compliance Program is established in Article VIII of the Bylaws for the Association (as opposed to the Academy). See Bylaws of the Association (attached hereto as Exhibit "3"). The Association was established specifically to engage in advocacy activities (i.e., lobbying). See Deposition transcript of Young, attached hereto as 4, p.32-33, ll. 19-4; see also Deposition of Joseph Zuckerman, attached hereto as Exhibit 9, p.28, ll. 19-22. One of the Association's primary areas of focus is tort reform (i.e., efforts to shield its members from liability to their patients for malpractice). Ex. 4, p.24, ll.10-12; pp.25-26; Ex. 9, p.30, ll.1-7.

**RESPONSE:**

Defendants do not object to the first sentence of Statement No. 19. Defendants' object to the remainder of Statement No. 19 on the grounds that it is argumentative, mischaracterizes the testimony of Melissa Young and Dr. Zuckerman, and is contrary to the weight of the evidence. Although Melissa Young and Dr. Joseph Zuckerman acknowledged in their depositions that the Association's purpose is to engage in musculoskeletal advocacy issues, neither individual testified that lobbying is the equivalent of advocacy. Further, the record reflects that Ms. Young and Dr. Zuckerman testified that tort reform is a part of the advocacy agenda for the AAOS; neither individual testified that tort reform is one of the Association's primary areas of focus. Plaintiff's characterization of tort reform as "efforts to shield its members from liability to their

patients for malpractice" is attorney-argument and finds no support in the record. Dr. Zuckerman testified that the Association's position on tort reform is that there should be a complete reevaluation of the current system of medical liability in the country. (Dr. Zuckerman Deposition, attached as Exhibit 9 to Plaintiff's SOF, at 30:1-19.) Neither individual testified that the AAOS advocated for tort reform as a means to shield its members from liability to their patients for malpractice. (Melissa Young Deposition, attached as Exhibit 4 to Plaintiff's SOF, at 24:10-26:20, 32:17-33:4; Dr. Zuckerman Deposition, attached as Exhibit 9 to Plaintiff's SOF, at 28:14-32:14.)

### STATEMENT NO. 20:

The preamble of the Original Standards of Professionalism provided: "It is in the public interest for orthopaedic testimony to be readily available, knowledgeable and objective. As a member of this profession, an orthopaedic surgeon must recognize a responsibility to provide testimony that is truthful, scientifically correct and in accordance with the merits of the case." See Exhibit 7.

### RESPONSE:

Defendants do not object to Statement No. 20.

### STATEMENT NO. 21:

Mandatory Standard No. 6 in the Original Standards of Professionalism provided: "An orthopaedic expert witness shall seek and review all ***PERTINENT MEDICAL RECORDS*** related to a particular patient prior to rendering an opinion on the medical or surgical management of the patient." See Exhibit 7 (Emphasis added). Nothing in the Original Standards of Professionalism required an orthopaedic expert witness to review legal documents or depositions before rendering an opinion on the medical or surgical management of a patient. See Exhibit 7. The AAOS has recognized this fact. On May 12, 2010, the AAOS adopted amended Standards of Professionalism for Orthopaedic Expert Witness Testimony ("Amended Standards of Professionalism"). See Amended Standards of Professionalism, attached hereto as Exhibit 8. Mandatory Standard No. 6 in the Amended Standards of Professionalism now provides: "An orthopaedic surgeon who provides oral or written medical testimony or expert medical opinions shall seek and review all pertinent medical records ***AND APPLICABLE LEGAL DOCUMENTS, INCLUDING RELEVANT PRIOR DEPOSITIONS***, before rendering any statement or opinion on the medical or surgical management of the patient." See Exhibit 8. (Emphasis added).

**RESPONSE:**

Defendants object to Statement No. 21 on the grounds that it fails to set forth material facts. Dr. Brandner was not found to have violated Mandatory Standard No. 6. In further responding, Defendants do not dispute that Mandatory Standard No. 6 of the original SOPs did not expressly require an expert witness to review applicable legal documents or depositions prior to rendering an opinion "on the medical or surgical management of the patient." (Mandatory Standard No. 6 of the SOPs, attached as Exhibit 7 to Plaintiff's SOF, at p. 2.) Defendants also do not dispute that Mandatory Standard No. 6 of the amended SOPs now expressly requires an expert witness to review applicable legal documents, including relevant prior depositions, before rending any statement or opinion "on the medical or surgical management of the patient."

**STATEMENT NO. 22:**

On August 5, 2005, Dr. Brandner gave deposition testimony as an expert witness in the action against Dr. Sharpe. See August 5, 2005, deposition transcript of Dr. Brandner, attached hereto as Exhibit 10. At his deposition, Dr. Brandner testified: (1) That the standard of care for informed consent in the context of a proximal tibial osteotomy required a discussion of the risk to the peroneal nerve and the potential of a foot drop; and (2) That there was nothing in plaintiff's medical records that documented that such a discussion had occurred (only that there had been a discussion of "nerve injury" in general). Id. at p.21-23, ll.1-14. When asked if he was aware that there was a dispute regarding whether Dr. Sharpe had discussed the risk to the peroneal nerve and the potential of a foot drop with the plaintiff and his parents when obtaining their consent to perform the surgical procedure (Dr. Sharpe claiming that he had discussed it and the plaintiff and his parents denying as such), Dr. Brandner testified that he was aware of the dispute (noting that it was a "he said, she said" situation) and acknowledged that he could not testify as to what was or was not said — it was an issue for the jury. Id. at p.21-23, ll.18-14.

**RESPONSE:**

Defendants object to Statement No. 22 on the grounds that the summary of Plaintiff's testimony is misleading and fails to adequately set forth the totality of his testimony. As set forth in Defendants' Response to Statement No. 8, above, Plaintiff testified during his August 5, 2005 deposition that, after reviewing the depositions of Dr. Sharpe, the patient and his family, Plaintiff believed that Dr. Sharpe fell below the standard of care regarding informed consent. (Plaintiff's

August 5, 2005 Deposition, pertinent portions of which are attached as Exhibit 11 to the Young Aff., at 20:16-25 (Q: Do you still believe that Dr. Sharpe fell below the standard of care? A: Yes.).) Although Plaintiff characterized the dispute of whether Dr. Sharpe discussed the risk of injury to the peroneal nerve and the potential of foot drop as a "he said, she said" situation, Plaintiff clearly expressed his belief that Dr. Sharpe had fallen below the standard of care. (*Id.*)

### STATEMENT NO. 23:

On April 29, 2008, Dr. Brandner testified at trial as an expert witness in the action against Dr. Sharpe. See April 29, 2008, trial testimony of Dr. Brandner, attached hereto as Exhibit 11. Again, at that time, his conduct was governed by the Original Standards of Professionalism (i.e., the ones that only required the review of all pertinent medical records). See Exhibit 7. At trial, Dr. Brandner again testified: (1) That the standard of care for informed consent in the context of a proximal tibial osteotomy required a discussion of the risk to the peroneal nerve and the potential of a foot drop; and (2) That there was nothing in plaintiff's medical records that documented that such a discussion had occurred (only that there had been a discussion of "nerve injury" in general). See Exhibit 11, p. 4-5 (Brandner 00061-00062), ll. 25-13; p. 15-16 (Brandner 00072-00073), ll. 7-6. Dr. Brandner admitted that he could not testify as to whether Dr. Sharpe had discussed the risk to the peroneal nerve and the potential of a foot drop with the plaintiff and his parents when obtaining their consent to perform the surgical procedure and was generally complimentary of Dr. Sharpe's assessment and treatment of the plaintiff. Id.

### RESPONSE:

Defendants object to Statement No. 23 on the grounds that it references the requirements of Mandatory Standard No. 6 of the Original Standards of Professionalism and thus fails to set forth a statement of material facts. Dr. Brandner was not found to have violated Mandatory Standard No. 6. In further responding, Defendants do not dispute the summary of Dr. Brander's trial testimony set forth in Statement No. 23. Dr. Brandner also testified at trial, when asked about the January 2004 testimony of the patient's mother that Dr. Sharpe had warned her of the risks prior to surgery, that the patient's mother was referring to post-surgical rather than pre-operative discussions with Dr. Sharpe. (Young Aff. ¶ 40; April 29, 2008 Trial Testimony, relevant portions of which are attached as Exhibit 16 to the Young Aff., at 35:21-36:4.)

**STATEMENT NO. 24:**

The jury found in favor of Dr. Sharpe and against the plaintiff.  <u>See</u> judgment, attached hereto as Exhibit 12.  Unsatisfied with the vindication provided by the jury, Dr. Sharpe lashed out at those affiliated with the plaintiff.  <u>See</u> Deposition transcript of Kipling Sharpe, attached hereto as Exhibit 13, p.20, ll.9-17.  Specifically, he filed a bar complaint against the attorney for the plaintiff (claiming that deposition testimony given in January of 2004 by the plaintiff and his parents established that Dr. Sharpe had discussed the risk to the peroneal nerve and the potential of a foot drop with the plaintiff and his mother when obtaining their consent for the surgical procedure) and a Grievance Report with the AAOS against Dr. Brandner (alleging a whole slew of allegations).  <u>See</u> Exhibit 13, p.22, ll.4-13; p.24, ll.3-19.

**RESPONSE:**

Defendants object to Statement No. 24 on the grounds that  it is argumentative and does

not set forth material facts.  In further responding, Defendants do not dispute that the jury found

in favor of Dr. Sharpe and that subsequent to the trial, Dr. Sharpe filed a bar complaint against

the attorney for the patient and a Grievance Report with the AAOS against Dr. Brandner.

**STATEMENT NO. 25:**

The attorney — who had access to all of the deposition transcripts — had no difficulty getting the bar complaint dismissed (deposition testimony given by the plaintiff and his parents in June of 2005 (two months prior to when Dr. Brandner was deposed) clearly established a factual dispute regarding what Dr. Sharpe discussed with the plaintiff and his parents when obtaining their consent to perform the surgical procedure).  <u>See</u> Exhibit 13, p. 24, ll. 16-19. Dr. Brandner — who, as a non-party to the litigation, had no access to the deposition transcripts — wasn't as fortunate.  <u>See</u> Committee on Professionalism Report and Recommendations, attached hereto as Exhibit 14.

**RESPONSE:**

Defendants object to Statement No. 25 on the grounds that it is argumentative, is not

limited to material facts, and is contrary to the weight of the evidence.  Defendants do not

dispute that the bar complaint filed against the attorney for the patient in the underlying action

was dismissed.  The remainder of Statement No. 25 is contrary to the weight of the evidence.

Dr. Brandner had possession of the deposition transcripts but elected to return them to the

plaintiff's attorney rather than retaining copies. (Plaintiff's April 7, 2009 Letter in response to Dr. Sharpe's Grievance Report, attached as Exhibit 18 to Plaintiff's SOF.)

**STATEMENT NO. 26:**

On October 21, 2008, the AAOS received the Grievance Report submitted by Dr. Sharpe. See Grievance Report, attached hereto as Exhibit 15; Exhibit 13, p.30, ll.9-12. The AAOS designated the matter Grievance No. 2008-23. Id. In the Grievance Report, Dr. Sharpe attacked Dr. Brandner personally and professionally. See Exhibit 15. Noting that Dr. Brandner was listed on a website indicating that he had been deposed or testified fifty times in the past four years, Dr. Sharpe wrote: "This, in my opinion, is exactly the type of character that deserves scrutiny by our academy." See Exhibit 15. Dr. Sharpe then went on to allege that Dr. Brandner had violated Mandatory Standards Nos. 3, 4, 6, 7 and 8 of the Original Standards of Professionalism when he testified in litigation against Dr. Sharpe. Id. Specifically, Dr. Sharpe alleged:

a. That Dr. Brandner violated Mandatory Standards Nos. 3 and 4 when he: (1) Testified at deposition and at trial that the standard of care for informed consent in the context of a proximal tibial osteotomy required a discussion of the peroneal nerve; and (2) Testified at deposition that the plaintiff was not given a non-operative option and that the fracture had remodeling potential; See Exhibit 15.

b. That Dr. Brandner violated Mandatory Standard No. 6 when he failed to adequately review the deposition testimony of plaintiff and his mother given in January of 2004 before agreeing to testify as an expert on behalf of the plaintiff; and See Exhibit 15.

c. That Dr. Brandner violated Mandatory Standards Nos. 7 and 8 when he: (1) Testified that there was a 3-13% incidence rate of peroneal nerve palsy in a proximal tibial osteotomy; and (2) Testified in a case in which he had no "current relevant experience with [the] procedure." See Exhibit 15.

**RESPONSE:**

Defendants object to Statement No. 26, including sub-paragraphs (a)–(c), on the grounds that it is not a concise statement of material fact as required by Local Rule 56.1. Defendants further object to Statement No. 26 as misleading. The references to the grievance report by Plaintiff fail to take into account the totality of Dr. Sharpe's grievance report, including its accompanying letter and supporting materials (collectively, the "Grievance Report"). Dr. Sharpe's letter of October 13, 2008, which accompanied the grievance report, explained that the

basis for his grievance was, among other things, Dr. Brandner's testimony that Dr. Sharpe fell below the standard of care by failing to discuss the risk of peroneal nerve injury. (Young Aff. ¶ 28; Grievance Report, attached as Exhibit 15 to Plaintiff's SOF, at p. 4.) Defendants further assert that the totality of Dr. Sharpe's Grievance Report speaks for itself. (Grievance Report, attached as Exhibit 15 to Plaintiff's SOF.)

### STATEMENT NO. 27:

Pursuant to AAOS Professional Compliance Grievance Procedure VII(A)(1), a member submitting a Grievance Report is required to follow HIPAA guidelines for de-identifying patient information. See Professional Compliance Grievance Procedure, attached hereto as Exhibit 16. Dr. Sharpe failed to do so. See Exhibit 15. Article II of the Professional Compliance Grievance Procedures provides: "These Professional Compliance Grievance Procedures are designed to supplement Article VIII of the Association Bylaws and to create a process that is transparent, expeditious, and equitable." Id. Accordingly, a violation of the Professional Compliance Grievance Procedures is a violation of the AAOS' bylaws. See Exhibit 4, p.34, ll.4-24.

### RESPONSE:

Defendants object to Statement No. 27 on the grounds that it is argumentative and contrary to the weight of the evidence. Defendants do not dispute that the Grievance Procedures required de-identification of patient information. However, at the time Dr. Sharpe submitted his Grievance Report in October 2008, the AAOS did not require parties to de-identify patient information in those instances where a patient had waived the HIPAA guidelines by filing a malpractice action. In December 2009, fourteen (14) months after Dr. Sharpe had submitted his Grievance Report, the Association's internal procedures were revised to require de-identification of patient information even in those instances where the patient had initiated malpractice litigation. Plaintiff and Dr. Sharpe were advised of this change in a letter dated December 30, 2009, and Dr. Sharpe subsequently resubmitted his grievance materials and de-identified the patient information. (Young Aff. ¶ 29; Rosalind Giulietti Deposition ("Giulietti Dep."), pertinent portions of which are attached hereto as **Exhibit 2**, at 169:12-170:9.)

**STATEMENT NO. 28:**

Pursuant to AAOS Professional Compliance Grievance Procedure VII(B)(2), within sixty days of receipt of the grievance, the AAOS is obligated to conduct a preliminary administrative evaluation of the grievance and any grievance that fails to conform to the required format is to be returned to the Grievant. See Exhibit 16; Exhibit 4, p.235, ll.13-16. The AAOS failed to do so. See Exhibit 4, p.116, ll.1-10.

**RESPONSE:**

Defendants do not dispute that Section VII(B)(2) of the Grievance Procedures requires the AAOS to conduct a preliminary administrative evaluation of a grievance within 60 days of its receipt. Defendants object to the remainder of Statement No. 28 as contrary to the weight of the evidence. The deposition testimony taken in this matter demonstrates that the AAOS defines a "grievance" as a completed report with submissions that allow the AAOS to conduct its preliminary administrative evaluation. Frequently, grievance reports are incomplete when initially submitted, and the AAOS takes no action until it receives a complete report with submissions. In this case, AAOS requested additional materials from Dr. Sharpe after receipt of his initial grievance letter, and Dr. Sharpe later submitted those materials. Once the AAOS received those materials, and after the relevant radiographs were converted into digital format, the AAOS conducted its preliminary administrative evaluation of the Grievance Report. On February 18, 2009, the AAOS determined that the Grievance Report passed preliminary administrative evaluation and notified Dr. Brandner of the grievance on that same date. (Young. Aff. ¶¶ 46-47; Giulietti Dep., pertinent portions of which are attached hereto as Exhibit 2, at 75:18-81:14.) The AAOS completed its preliminary administrative evaluation within 60 days of receiving Dr. Sharpe's complete grievance report. (*Id.*)

**STATEMENT NO. 29:**

Pursuant to AAOS Professional Compliance Grievance Procedure VII(B)(3), within thirty days of determining that the Grievant's materials have passed the preliminary administrative evaluation, the AAOS is obligated to advise the Respondent that a grievance has

been filed. See Exhibit 16; Exhibit 4, p.235, ll. 17-21. The AAOS failed to do so. See Exhibit 4, p.244, ll.12-20. The failure of the AAOS to comply with AAOS Professional Compliance Grievance Procedure VII(B)(3) also constituted a violation of AAOS Professional Compliance Grievance Procedure VI(B)(1) (which provided that the parties to a grievance have a right to timely communications from the AAOS). See Exhibit 16.

**RESPONSE:**

Defendants do not dispute that Section VII(B)(3) of the Grievance Procedures requires the AAOS, within thirty days of determining that the grievant's materials have passed the preliminary administrative evaluation, to advise the Respondent that a Grievance has been filed. Defendants object to the remainder of Statement No. 29 as contrary to the weight of the evidence. As set forth in Defendants' Response to Statement No. 28, above, Defendants did not violate Section VII(B) of the Grievance Procedures. At the time Dr. Sharpe submitted his grievance in October 2008, the grievance was incomplete and the AAOS requested that Dr. Sharpe submit additional materials so that the AAOS could conduct a preliminary administrative evaluation. Dr. Sharpe submitted those materials in January 2009. The AAOS completed its preliminary administrative evaluation of Dr. Sharpe's grievance against Dr. Brandner on February 18, 2009. The AAOS advised Dr. Brandner of the grievance in correspondence dated February 18, 2009. (Young Aff. ¶¶ 46-47; February 18, 2009 letter to Plaintiff, attached as Exhibit 17 to Plaintiff's SOF.) Plaintiff does not dispute these facts. (Plaintiff's Response to Defendants' SOF [Docket # 82] ¶¶ 33-34.)

**STATEMENT NO. 30:**

On February 18, 2009, the AAOS sent Dr. Brandner a letter advising him that a Grievance had been filed against him. See February 18, 2009 letter from the AAOS, attached hereto as Exhibit 17. The letter advised Dr. Brandner that, as the Respondent, he had sixty days in which to submit a written response along with any additional materials that he believed should be considered in connection with the Grievance. Id.

**RESPONSE:**

Defendants do not dispute that the February 18, 2009 letter: (i) advised Plaintiff that a grievance had been filed against him; (ii) attached a copy of Dr. Sharpe's Grievance Report; and (iii) further advised Plaintiff that he would have sixty (60) days to submit "whatever written responses and/or exhibits you believe are appropriate." (February 18, 2009 letter to Plaintiff, attached as Exhibit 17 to Plaintiff's SOF.)

**STATEMENT NO. 31:**

On April 7, 2009, Dr. Brandner submitted his written response to the Grievance submitted by Dr. Sharpe. See April 7, 2009 letter, attached hereto as Exhibit 18. In it, Dr. Brandner noted that he was at a disadvantage because all of the materials related to the case (including the literature he reviewed in preparation for his testimony) had been returned to the attorney and that he had been advised that the information was irretrievable. Id. Dr. Brandner described his extensive trauma experience and the scientific basis for the testimony which he provided regarding the incidence rate of peroneal nerve palsy in a proximal tibial osteotomy. Id. Dr. Brandner went through each of the Mandatory Standards that he was alleged to have violated and explained — in detail — why his testimony and conduct was in full compliance with said standards. Id. Above all, he emphasized the limited nature of the testimony he provided in the litigation — all he did was testify: (1) That the standard of care for informed consent in the context of a proximal tibial osteotomy required a discussion of the risk to the peroneal nerve and the potential of a foot drop; and (2) That there was nothing in plaintiff's medical records that documented that such a discussion had occurred (only that there had been a discussion of "nerve injury" in general). Id.

**RESPONSE:**

Defendants do not dispute that Dr. Brandner submitted his response to Dr. Sharpe's grievance on April 7, 2009 and that Statement No. 31 is an accurate summary of the areas covered in Dr. Brandner's response. Defendants object to Statement No. 31 on the grounds that it seeks to characterize Dr. Brandner's testimony in the underlying action as limited in scope due to the two (2) points set forth in the final sentence of Statement No. 31. The record shows that Dr. Brandner's testimony was broader in scope. (Young Aff. ¶¶ 35, 40; Plaintiff's August 5, 2005 Deposition, pertinent portions of which are attached as Exhibit 11 to the Young Aff., at

20:16-25; April 29, 2008 Trial Testimony, relevant portions of which are attached as Exhibit 16 to the Young Aff., at 16:22-17:1, 35:21-36:4.)

**STATEMENT NO. 32:**

Pursuant to AAOS Professional Compliance Grievance Procedure VII(B)(4), upon receipt of the written response from the Respondent, the Office of General Counsel was to collect and collate all materials from the Grievant and the Respondent and send the same to the Committee on Professionalism.  See Exhibit 16.  Nothing in AAOS Professional Compliance Grievance Procedure VII(B) provided that the Grievant was allowed to submit a response to the written response submitted by the Respondent.  Id.  Dr. Sharpe did so.  See Exhibit 4, pp.119-20; ll.19-3.  Pursuant to AAOS Professional Compliance Grievance Procedure VII(B)(2), Dr. Sharpe's response should have been returned to the Grievant.  See Exhibit 16.  The AAOS failed to do so.  See Exhibit 4, pp.120-26, ll.12-20.  Alternatively, at a minimum, pursuant to AAOS Professional Compliance Grievance Procedure VII(B)(3), Dr. Sharpe's response should have been sent to Dr. Brandner.  See Exhibit 16.  The AAOS failed to do so.  See Exhibit 4, pp.120-26, ll.12-20.

**RESPONSE:**

Defendants do not object to the first sentence of Statement No. 32.  In further responding, AAOS Professional Compliance Grievance Procedure Section VII(B) is silent as to whether a grievant may submit a reply to a respondent's written response.  The depositions taken in this matter demonstrate that, since the inception of the AAOS Professional Compliance Program, it has been the practice of the AAOS to accept replies submitted by the parties to a grievance.  However, any such replies are not provided to the COP in connection with its determination of whether a grievance states a *prima facie* case of a violation of the SOPs.

Responding further, Dr. Sharpe's April 23, 2009 letter was sent to Dr. Brandner on September 18, 2009, in accordance with standard practice of the AAOS.  (Young Aff. ¶¶ 54-56; Giulietti Dep., pertinent portions of which are attached hereto as Exhibit 2, at 24:8-26:5, 97:14-98:20, 152:14-154:5.)  Plaintiff does not dispute that Dr. Sharpe's April 23, 2009 letter did not change the allegations set forth in his grievance or modify the Mandatory Standards which Dr.

Sharpe alleged Dr. Brandner had violated. (Plaintiff's Response to Defendants' SOF [Docket # 82] ¶ 40.)

**STATEMENT NO. 33:**

On May 26, 2009, the AAOS advised Dr. Brandner that the AAOS Committee on Professionalism ("COP") had reviewed the Grievance and the written response provided by Dr. Brandner and concluded that a prima facie case of unprofessional conduct had been established. See May 26, 2009 correspondence, attached hereto as Exhibit 19. The letter advised that a hearing on the matter would be scheduled for either Friday, October 2, 2009, or Saturday, October 3, 2009, and requested that Dr. Brandner advise the AAOS no later than August 3, 2009, as to whether he would be attending. Id. Pursuant to AAOS Professional Compliance Grievance Procedure VII(C)(11), in the letter advising the Respondent that the grievance had been accepted for review, the AAOS was required to "advise the Grievant and the Respondent of the specific Mandatory Standard(s) of the AAOS Standards of Professionalism that [were] alleged to have been violated and that [would] be considered at the grievance hearing." See Exhibit 16. The AAOS never made such a disclosure. See Exhibit 4, pp.243-45, ll.23-3; Exhibit 17.

**RESPONSE:**

Defendants do not object to the first two sentences of Statement No. 33. Defendants object to the remaining sentences in Statement No. 33 as contrary to the weight of the evidence. Section VII(C)(11) of the Grievance Procedures requires that the AAOS: (i) notify the grievant and the Respondent if the grievance has been accepted for review; and (ii) advise the parties to the grievance of the specific Mandatory Standards of the SOPs alleged to have been violated and that will be considered at the grievance hearing. There is nothing in the language of Section VII(C)(11) of the Grievance Procedures that requires that this information be included in a single letter. (Section VII(C)(11) of the Grievance Procedures, attached as Exhibit 16 to Plaintiff's SOF, at p. 10.) Here, the AAOS's letter to Dr. Brandner of February 18, 2009 notified him of Dr. Sharpe's grievance and provided Dr. Brandner with a copy of the Grievance Report and its supporting materials, which included all of the Mandatory Standards that Dr. Sharpe alleged Dr. Brandner to have violated. Additionally, the AAOS's May 26, 2009 letter advised Dr. Brandner that the COP made a preliminary determination that a *prima facie* case of unprofessional conduct

had been established and that the Association reserved the right to rely upon materials submitted

by either party as the basis for making its decision.  (Young Aff. ¶¶ 50-52; February 18, 2009

and May 26, 2009 letters, attached as Exhibits 17 and 19, respectively, of Plaintiff's SOF.)

### STATEMENT NO. 34:

On June 9, 2009, Dr. Brandner sent a letter to the AAOS advising that while he looked forward to attending the COP Hearing to defend himself against the baseless allegations leveled by Dr. Sharpe, he was scheduled to be out of the country from September 29th through October 11th.  See June 9, 2009 correspondence attached hereto as Exhibit 20.  Accordingly, as permitted by AAOS Professional Compliance Grievance Procedure VII(D)(3), Dr. Brandner requested that the COP Hearing be postponed to the next COP meeting. Id.

### RESPONSE:

Defendants do not object to Statement No. 34.

### STATEMENT NO. 35:

On June 10, 2009, the AAOS sent a letter to Dr. Sharpe advising of Dr. Brandner's scheduling conflict and his request to postpone the COP Hearing to the next COP meeting.  See June 10, 2009 correspondence, attached hereto as Exhibit 21.  On June 23, 2009, Dr. Brandner received a letter from the AAOS advising that Dr. Sharpe had declined to postpone the hearing. See June 23, 2009 correspondence, attached hereto as Exhibit 22.  Accordingly, Dr. Brandner rearranged his travel plans (at significant cost) to allow him to attend the COP Hearing.  See Exhibit 6.

### RESPONSE:

Defendants do not dispute that Dr. Brandner requested to postpone the COP Hearing and

that Dr. Sharpe declined to postpone the hearing.  In further responding, the AAOS states it

complied with its Grievance Procedures with respect to Dr. Brandner's request for a continuance.

Section VII(D)(3) of the Grievance Procedures provides, in relevant part, that "[a] party may

request a postponement of a grievance hearing, and such postponement will be allowed, provided

the other party concurs."  (*See* Section VII(D)(3) of the Grievance Procedures, attached as

Exhibit 16 to Plaintiff's SOF, at p. 10.)  Due to the fact that Dr. Sharpe did not concur to Dr.

Brandner's request, the hearing was not postponed.

**STATEMENT NO. 36:**

On September 15, 2009, Dr. Brandner submitted his witness list and grievance material for the COP Hearing. See September 15, 2009, correspondence attached hereto as Exhibit 23. In the letter providing the same, Dr. Brandner again advised the AAOS that he was not in possession of any of the materials related to the case (they had been returned to the attorney upon the conclusion of the case). Id. Dr. Brandner advised the AAOS that he had attempted to obtain copies of the records from the attorney but that his requests had been rejected (the attorney noted concerns regarding HIPAA). Id. Dr. Brander's witness list included two names — his own and E. James Greenwald, MD ("Dr. Greenwald"). Id. The description of the subject matter of Dr. Greenwald's testimony provided: "Dr. Greenwald will testify as to the validity of the opinions which [Dr. Brandner] offered (both at deposition and at trial) in the litigation . . . ." Id. Included in the grievance materials Dr. Brandner produced for the COP Hearing was a letter from Dr. Greenwald. Id. In it, Dr. Greenwald explained why a discussion of the risk to the peroneal nerve was required to satisfy the standard of care for informed consent in the context of the surgical procedure performed on the plaintiff. Id. Specifically, the letter stated:

> I see this as an extremely treacherous fracture pattern for many reasons; particularly vulnerability of the peroneal nerve and the possibility of foot drop. When Dr. Brandner asked me if a general consent (i.e., nerve injury) was enough in a case such as this, I said "No I did not think it was." I believe that it takes very little imagination to realize the increased tension on the peroneal nerve as you correct a 39-degree deformity (Dr. Russo) from vagus flexion and certainly rotation, back to normal alignment.

> I have reviewed this case with five very smart orthopedic surgeons. Every one of them was concerned about the peroneal nerve, and our trauma specialist was particularly worried about the possibility of creating an anterior compartment syndrome . . . . I think it is hard to know exactly why this patient ended up with a drop foot. I think there are several possibilities; certainly traction on the nerve at the time of the osteotomy could be one of them.

Id. Also included in the grievance materials Dr. Brandner produced for the COP Hearing was an Affidavit of Jeffrey Mast, MD and a letter from Peter L. Althausen, MD, MBA. Both concluded, similar to Dr. Brandner's testimony, that in the context of a proximal tibial osteotomy, a general discussion of "nerve injury" (such as that called for on a standard surgical consent form) did not satisfy the standard of care as it related to informed consent in a proximal tibial osteotomy. Id. Such was the case as there was a significantly increased likelihood of peroneal nerve palsy as the result of such a procedure. Id.

**RESPONSE:**

Defendants object to Statement No. 36 on the grounds that it is not a short paragraph, nor

is it a statement of material facts, as required by Local Rule 56.1. Defendants do not dispute that

Dr. Brandner submitted his witness list and grievance materials on September 15, 2009.

Defendants do not dispute that Statement No. 36 is an accurate summary of the arguments set

forth in Dr. Brandner's correspondence of September 15, 2009.

### STATEMENT NO. 37:

On September 19, 2009 (almost five months after it was received by the AAOS), the AAOS sent Dr. Brandner a copy of the response Dr. Sharpe had issued to Dr. Brandner's written response to the Grievance. See Response by Kipling Sharpe, attached hereto as Exhibit 24; Exhibit 4, pp.121-23, ll.20-24. By the time Dr. Brandner received Dr. Sharpe's response, the deadline for the submission of witness lists and written materials to be relied upon at the COP Hearing had already passed. See Exhibit 4, pp.121-23, ll.20-24. Accordingly, Dr. Brandner was not provided an opportunity to respond to Dr. Sharpe's submission prior to the COP Hearing. Id. The failure of the AAOS to provide Dr. Sharpe's response until five months after it was received by the AAOS also constituted a violation of AAOS Professional Compliance Grievance Procedure VI(B)(1) (which provided that the parties to a grievance have a right to timely communications from the AAOS). See Exhibit 16.

### RESPONSE:

Defendants do not dispute the first two sentences of Statement No. 37. Defendants object

to the remainder of Statement No. 37 as misleading and contrary to the weight of the evidence.

Plaintiff has acknowledged that Dr. Sharpe's two page letter of April 23, 2009 did not change the

allegations set forth in his grievance or modify the Mandatory Standards in issue. (Plaintiff's

Response to Defendants' SOF [Docket # 82] ¶ 40.) Further, the practice of the AAOS is not to

distribute such replies until after the deadline for submissions, to prevent a constant back-and-

forth of sur-replies between the parties. (Young Aff. ¶¶ 54-56; Giulietti Dep., pertinent portions

of which are attached hereto as Exhibit 2, at 24:8-26:5, 97:14-98:20, 152:14-154:5.)

### STATEMENT NO. 38:

On October 2, 2009, Dr. Brandner appeared in Rosemont, Illinois for the COP Hearing. See Transcript of COP Hearing, attached hereto as Exhibit 25. With him was Dr. Greenwald. Id. Following a presentation by Dr. Sharpe (which consisted of him parroting the allegations set forth in his Grievance Report), Dr. Brandner stood before the COP Hearing Panel and addressed each of the allegations made by Dr. Sharpe. Id. at p.10-25. With respect to Mandatory Standards Nos. 3 and 4, Dr. Brandner quoted both, noting:

Mandatory Standard No. 3 provide[d]: "An orthopaedic expert witness shall evaluate the medical condition and care provided in light of generally accepted standards at the time, place and in the context of care delivered."

Mandatory Standard No. 4 provide[d]: "An orthopaedic expert witness shall neither condemn performance that falls within generally accepted practice standards nor endorse or condone performance that falls outside these standards."

See Exhibit 25 at pp.14-15, ll.21-7. Dr. Brandner then noted that Dr. Sharpe had alleged that he violated Mandatory Standards Nos. 3 and 4 when he: (1) Testified at deposition and at trial that the standard of care for informed consent in the context of a proximal tibial osteotomy required a discussion of the peroneal nerve; and (2) Testified at deposition that the plaintiff was not given a non-operative option and that the fracture had remodeling potential. Id. at pp.15-16, ll.9-23. With regard to his testimony at deposition and at trial regarding the standard of care for informed consent in the context of a proximal tibial osteotomy, Dr. Brandner reaffirmed his testimony, noting that he continued to believe (as did many other orthopaedic surgeons with whom he had spoken) "that a general discussion of 'nerve injury' (such as that called for on a standard surgical consent form) [did] not satisfy the standard of care as it relate[d] to informed consent in a proximal tibial osteotomy. Such [was] the case as there [was] a significantly increased likelihood of peroneal nerve palsy as the result of such a procedure (a 3-13% likelihood)." Id. Dr. Brandner then called upon Dr. Greenwald to testify as to the validity of the opinions which Dr. Brandner had offered both at deposition and at trial. Id. at 25. Dr. Greenwald testified that Dr. Brandner's testimony regarding the standard of care for informed consent in the context of a proximal tibial osteotomy was truthful, scientifically correct and in accordance with the merits of the case. Id. at 25-30. A general discussion of "nerve injury" (such as that called for on a standard surgical consent form) did not satisfy the standard of care as it related to informed consent in a proximal tibial osteotomy. Id. at 25-30. Such was the case as there was a significantly increased likelihood of peroneal nerve palsy as the result of such a procedure. Dr. Greenwald testified that this was particularly true in plaintiffs case because of the fracture pattern. Id. at 25-30. Dr. Greenwald described the fracture pattern as treacherous and provided a demonstration (using a model reflecting the exact dimensions of plaintiff s deformity) to show the amount of tension that was applied to the peroneal nerve to correct a 39-degree deformity from vagus flexion and rotation, back to normal alignment. Id. at 25-30. Upon completion of his presentation, Dr. Greenwald was asked by counsel for the COP Hearing Panel if he intended to leave the materials that he used during his presentation with the Panel. Id. at 40, ll.16-19. When Dr. Greenwald indicated that he did, he was asked if the materials had been submitted to the AAOS fifteen days prior to the hearing as required by AAOS Professional Compliance Grievance Procedure VII(D)(4). Id. at 40-41,11.16-12. Dr. Greenwald indicated that they had not. Id. at 40-41, ll.16-12. Despite its repeated non-compliance with its own Professional Compliance Grievance Procedures (especially when dealing with Dr. Sharpe's non-compliance), the COP Hearing Panel elected to strictly enforce AAOS Professional Compliance Grievance Procedure VII(D)(4). Id. at 40-41, ll.16-12. The materials provided by Dr. Greenwald were excluded. Id. at 40-41, ll.16-12. With regard to Dr. Sharpe's allegation that Dr. Brandner had violated Mandatory Standards Nos. 3 and 4 by testifying during his deposition that the plaintiff was not given a non-operative option and that the fracture had remodeling potential,

Dr. Brandner made two points. Id. at 16, ll.10-23. First, he never testified that "the patient was not given a non-operative option" — only that the standard of care required such a discussion. Id. at 16, ll.12-15. Second, while Dr. Brandner did testify that, based on the X-rays that he had reviewed, the fracture had some remodeling potential, he openly acknowledged during his deposition that the fracture would not completely remodel. Id. at 16, ll.18-23. Again, said testimony was truthful, scientifically correct and in accordance with the merits of the case. See Deposition of Joseph Zuckerman, attached hereto as Exhibit 9, pp.112-16, ll.11-18; Exhibit 23. With respect to Mandatory Standard No. 6, Dr. Brandner again quoted the language of the Mandatory Standard. See Exhibit 25, p. 17, ll.1-5.

> Mandatory Standard No. 6 provide[d]: "An orthopaedic expert witness shall seek and review all pertinent medical records related to a particular patient prior to rendering an opinion on the medical or surgical management of the patient."

Id. Dr. Brandner then noted that Dr. Sharpe had alleged that he violated Mandatory Standard No. 6 by failing to adequately review transcripts from the depositions taken of the plaintiff and his mother in January of 2004 (Dr. Sharpe focused on those deposition transcripts because of what he viewed as certain admissions made by the plaintiff and his mother with respect to their understanding of the risk to the peroneal nerve). Id. at 17, ll.6-13. Dr. Brandner responded to the allegation by making three points. Id. at 17-19, ll.14-23. First, he acknowledged that prior to testifying at deposition he had reviewed the transcripts from the two depositions taken of the plaintiff and his mother and they were nowhere near as damaging as Dr. Sharpe contended. Id. at 17, ll.14-20. Second, he pointed out that Dr. Sharpe had intentionally only submitted copies of the transcripts from the first depositions taken of the plaintiff and his mother (the second set of transcripts was very damaging to Sharpe). Id. at 17-18, ll.21-23. Dr. Brandner pointed out that as a non-party to the underlying litigation he had no access to the deposition transcripts and, without the second set of deposition transcripts, the COP Hearing Panel had only half the picture. Id. Finally, Dr. Brandner pointed out that even if the COP Hearing Panel elected to ignore Dr. Sharpe's attempted manipulation of the AAOS grievance process, Mandatory Standard No. 6 was specific in its terms — it required an AAOS member providing orthopaedic expert testimony to review "all pertinent medical records." Id. at 18-19, ll.24-23. Dr. Brandner explained to the COP Hearing Panel that deposition transcripts were not medical records — they were legal documents. Id. Nothing in the Original Standards of Professionalism required a member providing expert testimony to review any legal documents. Id. In this regard, Dr. Brandner argued that he could not be found to have violated Mandatory Standard No. 6. Id. With respect to Mandatory Standards Nos. 7 and 8, Dr. Brandner again quoted the language of both. Id. at 20, ll.2-9; Id. at 22, ll.12-16.

> Mandatory Standard No. 7 provide[d]: "An orthopaedic expert witness shall have knowledge and experience about the standard of care and the available scientific evidence for the condition in question during the relevant time, place and in the context of medical care provided and shall respond accurately to questions about the standard of care and the available scientific evidence."

>Mandatory Standard No. 8 provide[d]: "An orthopaedic expert witness shall provide evidence or testify only in matters in which he or she has relevant clinical experience and knowledge in the areas of medicine that are the subject of the proceeding."

Id. Dr. Brandner then noted that Dr. Sharpe had alleged that he violated Mandatory Standards Nos. 7 and 8 when he: (1) Testified that there was a 3-13% incidence rate of peroneal nerve palsy in a proximal tibial osteotomy (Dr. Sharpe claimed in his Grievance Report that neither he nor his expert (Vincent Joseph Russo, MD) could "find these numbers elsewhere"); and (2) Testified in a case in which he had no "current relevant experience with [the] procedure." Id. at 22, ll.16-23; Id. at 20, ll.10-19. With regard to Dr. Sharpe's claim that there was no support for the proposition (as testified to by Dr. Brandner) that there was a 3-13% incidence rate of peroneal nerve palsy in a proximal tibial osteotomy, Dr. Brandner produced three articles (two of which were published in medical journals) in support of the same. See Exhibit 23. A review of the articles revealed that the 3-13% incidence rate was derived from an investigation performed at the Department of Orthopaedic Surgery at The Johns Hopkins University School of Medicine. Id. As Dr. Brandner pointed out to the COP Hearing Panel, a basic internet search would have discovered the articles and the research to support the same. See Exhibit 25 at pp.24, ll.15-24. With regard to Dr. Sharpe's claim that Dr. Brandner testified in a case in which he had no "current relevant experience with [the] procedure," Dr. Brandner established that such a claim was nonsensical. Id. at 20, ll.10-13. Rule 702 of the Arizona Rules of Evidence governed the admission of expert testimony in the underlying litigation; Dr. Brandner's extensive experience as an orthopaedic surgeon provided him with specialized knowledge that made it possible for him to assist the trier of fact; and the fact that he had not performed a proximal tibial osteotomy on a boy the exact same age as the plaintiff, with the exact same fracture pattern and the exact same angular deformity was irrelevant with regard to the standard of care for informed consent in such a procedure. Id. at 20-23, 11.20-10 (citing Ariz. R. Evid. 702). Dr. Brandner concluded his presentation by noting that he resented the fact that he had to travel to Illinois to defend himself against Dr. Sharpe's baseless allegations; he resented the fact that he had to reschedule his travel plans because Dr. Sharpe was unwilling to agree to postpone the hearing to accommodate his travel schedule; and he resented the fact that he had to impose on Dr. Greenwald, Dr. Mast and Dr. Althausen to take time out of their busy schedules to help him defend himself. Id. at 25, ll.5-14. With that, Dr. Brandner requested that the COP Hearing Panel recommend that Dr. Sharpe's Grievance be rejected. Id. at 25, ll.15-17.

**RESPONSE:**

Defendants object to Statement No. 38 on the grounds that it plainly violates Local Rule 56.1. Notwithstanding Rule 56.1's requirement that a statement of material fact shall consist of short numbered paragraphs, Statement No. 38 is several pages long. Further, rather than setting forth material facts to which Plaintiff claims there is no genuine issue, Statement No. 38 instead attempts to summarize Plaintiff's presentation before the COP Hearing Panel. The transcript of

the proceedings before the COP Hearing Panel speaks for itself. (COP Hearing Transcript, attached as Exhibit 26 to the Young Aff.) The AAOS further objects to Plaintiff's assertions regarding Defendants' supposed "repeated non-compliance" with its Grievance Procedures. Attorney argument is improper under Local Rule 56.1.

Notwithstanding its objections, Defendants do not dispute that Dr. Brandner appeared in Rosemont, Illinois on October 2, 2009 for the COP Hearing. Defendants also do not dispute that Statement No. 38 summarizes Plaintiff's presentation before the COP Hearing Panel.

### STATEMENT NO. 39:

Pursuant to AAOS Professional Compliance Grievance Procedure VII(D)(7), during the grievance hearing, the COP Hearing Panel members are permitted to ask clarifying questions of any party or witness. See Exhibit 16. The COP Hearing Panel members asked twenty-three questions of Dr. Brandner — they asked none of Dr. Sharpe. See Exhibit 25, pp. 30-40, ll.11-15. A review of the questions asked of Dr. Brandner reveals that the COP Hearing Panel ignored AAOS Professional Compliance Grievance Procedure VI(C) (burden of production) and VII(A)(5) (burden of proof) and may have been unaware of the existence of AAOS Professional Compliance Grievance Procedure VII(D)(9). Id.

### RESPONSE:

Defendants do not object to the first two sentences of Statement No. 39. Defendants object to the remainder of Statement No. 39 on the grounds that it is argumentative and without support in the record. The COP hearing transcript speaks for itself and does not reveal, in any fashion, that the COP Hearing Panel ignored Grievance Procedures VI(C) and VII(A)(5). Nor does the COP hearing transcript reflect that the COP Hearing Panel was unaware of the Grievance Procedures. The COP hearing transcript reveals that Dr. Brandner asserted that certain deposition transcripts from the patient and his mother (which were not provided to the COP Hearing Panel by Dr. Sharpe or Dr. Brandner), supposedly demonstrated that the patient and his mother were confused about what Dr. Sharpe told them prior to the surgery. The COP Hearing Panel members then questioned Dr. Brandner about which particular transcripts he

believed were missing and should be considered by the COP Hearing Panel. Dr. Brandner was unable to tell the COP Hearing Panel which transcripts he believed were missing. (Young Aff. ¶ 61; COP Hearing Transcript, attached as Exhibit 26 to the Young Aff., at 30:15-31:11, 36:3-39:16.)

### STATEMENT NO. 40:

AAOS Professional Compliance Grievance Procedure VI(C) provides: "Each party to a grievance is responsible for obtaining and providing all written material, such as transcripts and medical records, for consideration by AAOS." See Exhibit 16. AAOS Professional Compliance Grievance Procedure VII(A)(5) provides: "The Grievant bears the burden of proof and must submit written material as part of the grievance process." See Exhibit 16. AAOS Professional Compliance Grievance Procedure VII(D)(9) provides: "After the grievance hearing and prior to issuing its recommendations, the Grievance Hearing Panel may request additional information from the Grievant, Respondent, or any third party. Any additional information will be made available to each party." See Exhibit 16.

### RESPONSE:

Defendants do not object to the facts set forth in Statement No. 40. Responding further, each Grievance Report requires the grievant to attach "complete copies of any documents that you rely on as evidence, providing specific page references to the portions that support your allegations." Although the grievant bears the burden of proof and must submit written materials in support of the grievance, the Grievance Report clarifies that said grievant must only produce those documents that the grievant relies upon as evidence. (Grievance Report, attached as Exhibit 15 to Plaintiff's SOF, at p. 2; Giulietti Dep., pertinent portions of which are attached hereto as Exhibit 2, at 55:7-57:12.)

### STATEMENT NO. 41:

Despite the fact that Dr. Sharpe was obligated to produce all written material (including transcripts) for consideration by the AAOS; despite the fact that it was Dr. Sharpe's burden to prove the allegations he made against Dr. Brandner and to submit written material in support of the same; despite the fact that Dr. Sharpe, as a party to the underlying litigation, was in possession of transcripts from the depositions of plaintiff and his mother; and despite the fact that the COP Hearing Panel had the authority to request that Dr. Sharpe (as the Grievant) produce the transcripts and make them available to Dr. Brandner (as Respondent), the COP

Hearing Panel chose not to do so. <u>See</u> Exhibit 25. Instead, the COP Hearing Panel asked Dr. Brandner question after question regarding why he had been unable to obtain copies of the transcripts (if they did in fact exist) and why the COP Hearing Panel should give any consideration to the second set of depositions when, in their opinion, the first set of depositions clearly established that Dr. Sharpe had advised the plaintiff and his mother regarding the risk to the peroneal nerve when obtaining their consent to perform the surgical procedure. <u>Id.</u> at 36-39, ll.3-16. If the COP Hearing Panel's decision to ignore the AAOS Professional Compliance Grievance Procedures was not troubling enough, the situation was compounded when Dr. Sharpe lied to COP Hearing Panel in an attempt to conceal his willful noncompliance with AAOS Professional Compliance Grievance Procedure VI(C). <u>Id.</u> at 36-37,11.17-4. Specifically, the following exchange occurred:

> DR. BRANDNER: Right. I asked for all of the records and was told that HIPAA — they sent a letter to Dr. Sharpe to cease and desist and the attorney would not release the records based on his concern about HIPAA.

> DR. GOODMAN: Are you talking about medical records or depositions?

> DR. BRANDNER: I'm talking about depositions because that's what's needed to be cleared up here.

> DR. GOODMAN: Okay.

> DR. SHARPE: I believe I provided all the depositions to this Committee.

<u>Id.</u> In fact, Dr. Sharpe had not provided all the depositions to the COP Hearing Panel (and he knew it). <u>See</u> Exhibit 13, pp.45-47, ll.11-15. Dr. Sharpe had intentionally withheld the depositions taken of the plaintiff and his mother on June 8, 2005 (two months prior to when Dr. Brandner was deposed in the case). <u>Id.</u> During those depositions, the plaintiff and his mother testified unequivocally that Dr. Sharpe never advised them of the risk to the peroneal nerve or the potential of a foot drop when obtaining their consent for the proximal tibial osteotomy. <u>See</u> Deposition transcripts of plaintiff and plaintiff's mother, attached hereto as Exhibit 26, pp.6, ll.7-18 and Exhibit 27, pp.5, 11.3-16. This was the exact same testimony which they offered at trial (also transcripts Dr. Sharpe elected not to provide to the COP Hearing Panel). <u>See</u> trial transcript of plaintiff and plaintiff's mother, attached hereto as Exhibit 28, pp.49-50, ll.10-23 and Exhibit 29, pp.107, ll.12-17. The COP Hearing concluded on October 2, 2009. <u>See</u> Exhibit 25.

### **<u>RESPONSE:</u>**

Defendants object to Plaintiff's Statement No. 41 on the grounds that it is not a short

paragraph as required in Local Rule 56.1. Defendants further object to Statement No. 41 on the

grounds that it sets forth argumentative assertions of counsel rather than undisputed material facts. Plaintiff's repeated assertions that the AAOS violated or ignored the Grievance Procedures are improper and are contrary to the weight of the evidence. The transcript of the proceedings before the COP Hearing Panel speaks for itself. (COP Hearing Transcript, attached as Exhibit 26 to the Young Aff.)

Notwithstanding its objections, the AAOS does not dispute that: (i) the COP Hearing Panel did not request additional materials from Dr. Brandner or Dr. Sharpe after the hearing and prior to issuing its recommendations; (ii) the COP Hearing Panel questioned Dr. Brandner about the depositions he asserted were missing; (iii) Dr. Sharpe did not provide the COP Hearing Panel with the June 8, 2005 deposition transcripts of the patient and his mother and/or the trial transcripts from the testimony of the patient and his mother at trial; (iv) the deposition testimony of the patient and his mother given on June 8, 2005 is consistent with their testimony at trial on the issue of informed consent; and (v) the COP Hearing concluded on October 2, 2009.

### STATEMENT NO. 42:

Pursuant to AAOS Professional Compliance Grievance Procedure VII(D)(14), the COP Hearing Panel was required to issue its Report and Recommendation within sixty days from the conclusion of the COP Hearing. See Exhibit 16. Accordingly, the deadline for the issuance of the Report and Recommendations was December 1, 2009. See Exhibit 16. While AAOS Professional Compliance Grievance Procedure VII(D)(14) did provide that the "AAOS has sole discretion to extend the date of the Grievance Hearing Panel's Report and Recommendation if, for example additional information from either Grievant or Respondent has been requested," no notice was ever provided to Dr. Brandner that the COP Hearing Panel had requested or that the AAOS had granted such an extension. See Exhibit 4, p.128-33, ll.15-24. Moreover, in light of the fact that the COP Hearing Panel did not request that either the Grievant or the Respondent provide additional information (despite Dr. Brandner's repeated requests) no grounds existed for the COP Hearing Panel to request such an extension from the AAOS. See Exhibit 4, p.128-33, ll.15-24. Accordingly, Dr. Brandner expected to receive the COP Hearing Panel's Report and Recommendation on or before December 1, 2009. See Exhibit 6. Knowing that he would have only fifteen days to appeal any adverse ruling, Dr. Brandner retained counsel and arranged his holiday travel plans to ensure that he would be available to assist in the preparation of an appeal (if necessary). See Exhibit 6. The COP Hearing Panel did not issue its Report and Recommendation on or before the December 1, 2009 deadline. See Exhibit 4, p.128-33, ll.15-

24. Instead, the COP Hearing Panel waited until December 14, 2009, to issue its Report and Recommendation. See December 14, 2009 Report and Recommendations, attached hereto as Exhibit 30. The failure of the AAOS to comply with AAOS Professional Compliance Grievance Procedure VII(D)(14) also constituted a violation of AAOS Professional Compliance Grievance Procedure VI(B)(1) (which provided that the parties to a grievance have a right to timely communications from the AAOS). See Exhibit 16.

**RESPONSE:**

Defendants object to Statement No. 42 on the grounds that it is not a short paragraph as required in Local Rule 56.1. Defendants further object to Statement No. 42 on the grounds that it represents argumentative assertions of counsel rather than undisputed material facts.

Defendants do not dispute that Section VII(D)(14) of the Grievance Procedures provides that the COP shall issue its written report and recommendations within sixty (60) days from the completion of the grievance hearing. Section VII(D)(14) further provides that the "AAOS has sole discretion to extend the date of the Grievance Hearing Panel's Report and Recommendations if, for example, additional information from either the grievant or the Respondent has been requested." Additionally, Section III(D) provides that the AAOS has sole discretion to extend any time limitations. (Grievance Procedures, attached as Exhibit 16 to Plaintiff's SOF, at pp. 2, 12.) The AAOS also does not dispute that it exercised its right under Section VII(D)(14) to extend the date of the Grievance Hearing Panel's Report and Recommendations.

The AAOS objects to Plaintiff's argument that no grounds existed for the extension of the COP Hearing Panel's Report and Recommendations and that the AAOS violated its Grievance Procedures, as contrary to the weight of the evidence. The plain language of Section VII(D)(14) demonstrates that requesting additional information from either the grievant or the Respondent is merely one example of why the AAOS might extend the date for the COP Hearing Panel's Report and Recommendation. Further, there is nothing in the language of Grievance Procedure

VII(D)(14) that requires the COP—a committee of the AAOS—to request an extension from the

AAOS for purposes of issuing its Report and Recommendation. (*Id.*)

**STATEMENT NO. 43:**

The Report and Recommendation was adverse to Dr. Brandner (it recommended his suspension from the AAOS) — but not for any of the reasons advanced by Dr. Sharpe in the Grievance Report he submitted to the AAOS. Compare Exhibit 30 (Findings No. 1 and 2) with Exhibit 15. A review of the Report and Recommendation issued by the COP Hearing Panel revealed that not a single one of Dr. Sharpe's allegations was found to have merit. Compare Exhibit 30 (Findings No. 1, 2 and 3) with Exhibit 15. The COP Hearing Panel did not find that Dr. Brandner violated Mandatory Standards Nos. 3 and 4 when he: (1) Testified at deposition and at trial that the standard of care for informed consent in the context of a proximal tibial osteotomy required a discussion of the peroneal nerve; and (2) Testified at deposition that the plaintiff was not given a non-operative option and that the fracture had remodeling potential. See Exhibit 30 (Findings No. 1). The COP Hearing Panel did not find that Dr. Brandner violated Mandatory Standard No. 6 when he failed to adequately review the deposition testimony of plaintiff and his mother given in January of 2004 before agreeing to testify as an expert on behalf of the plaintiff. Id. at (Finding No. 3). The COP Hearing Panel did not find that Dr. Brandner violated Mandatory Standards Nos. 7 and 8 when he: (1) Testified that there was a 3-13% incidence rate of peroneal nerve palsy in a proximal tibial osteotomy; and (2) Testified in a case in which he had no "current relevant experience with [the] procedure." Id. at (Finding No. 2 and 3). Instead, the COP Hearing Panel ignored the allegations leveled by Dr. Sharpe and — in direct violation of Dr. Brandner's due process rights — recast the Grievance. Id. at (Finding No. 1 and 2). The recasting of the Grievance by the COP Hearing Panel violated AAOS Professional Compliance Grievance Procedure VI(B)(3) which provides that the parties to a professional compliance matter have the "[r]ight to know the specific allegations made in the Grievance." See Exhibit 16.

**RESPONSE:**

Defendants object to Statement No. 43 on the grounds that it is not a short paragraph as required in Local Rule 56.1. Further, rather than setting forth material facts to which Plaintiff claims there is no genuine issue, Statement No. 43 instead presents lawyer arguments in an attempt to summarize the COP Hearing Panel's Report and Recommendation. Defendants further object to the description of the COP Hearing Panel's Report and Recommendations set forth in Statement No. 43 as contrary to the weight of the evidence.

In its Report and Recommendations, the COP Hearing Panel concluded that Dr. Brandner violated Mandatory Standards Nos. 3, 4 and 7. Dr. Sharpe's Grievance Report and supporting

materials, as well as his presentation at the COP Hearing demonstrate that the basis for his contention that Dr. Brandner violated Mandatory Standards Nos. 3 and 4 was that it was improper for Dr. Brandner to opine that Dr. Sharpe had fallen below the standard of care in obtaining informed consent. (Plaintiff's SOF ¶ 26(a); Grievance Report, attached as Exhibit 15 to Plaintiff's SOF, at p. 4; Dr. Sharpe's October 13, 2008 letter to AAOS accompanying the Grievance Report, at pp. 1-2 and citing Plaintiff's August 5, 2005 Deposition, pertinent portions of which are attached as Exhibit 11 to the Young Aff., at 20:16-25, and the April 29, 2008 Trial Testimony, relevant portions of which are attached as Exhibit 16 to the Young Aff., at 35:21-36:4; COP Hearing Transcript, attached as Exhibit 26 to the Young Aff., at 8:17-10:5.) Dr. Goodman confirmed in his deposition that the COP Hearing Panel's findings were based on Dr. Brandner's testimony in the underlying action. (Dr. Goodman Dep., pertinent portions of which are attached hereto as Exhibit 1, at 78:18-79:20.)

The COP Hearing Panel's findings track Dr. Sharpe's allegations in this regard and were based on whether Dr. Sharpe had adequately discussed with the patient and his mother the risk of peroneal nerve injury. The COP Hearing Panel's findings were based on the record before it and the requirements of Mandatory Standard Nos. 3 and 4. The record does not support Plaintiff's assertion that the COP Hearing Panel re-casted the grievance in violation of the AAOS Grievance Procedures. (COP Hearing Panel Report and Recommendation, attached as Exhibit 30 to Plaintiff's SOF, at pp. 1, 3, 9.)

### STATEMENT NO. 44:

With respect to the recast Grievance, the COP Hearing Panel ignored the fact that nothing in the Original Standards of Professionalism required an orthopaedic expert witness to review deposition transcripts before rendering an opinion and Dr. Sharpe's willful failure to produce copies of the transcripts from the depositions taken of the plaintiff and his mother in June of 2005 (as required by AAOS Professional Compliance Grievance Procedure VI(C)) and found

that Dr. Brandner violated Mandatory Standard Nos. 3 and 4. <u>See</u> Exhibit 30 (Finding No 1). As explained in the Report and Recommendation issued by the COP Hearing Panel:

> The record shows that informed consent was given. The COP found that the deposition transcripts reflected that both the plaintiff and his mother had an understanding about the specific possibility and causation of foot drop. The COP believed that, in this regard, Dr. Brandner condemned performance that falls within generally accepted practice standards in obtaining informed consent.

<u>Id.</u> (Finding No. 1). The COP Hearing Panel also found that Dr. Brandner violated Mandatory Standard No. 7. <u>Id.</u> at (Finding No. 2). As explained in the Report and Recommendation issued by the COP Hearing Panel: "Dr. Brandner's testimony that the fracture could remodel was clearly not correct and, as such, his statements did not accurately reflect the scientific evidence in this matter. <u>Id.</u> at (Finding No. 2). The COP Hearing Panel did unanimously find that Dr. Brandner had not violated Mandatory Standards Nos. 6 and 8, stating: "The Hearing Panel found no evidence that Dr. Brandner failed to review all of the medical records. Furthermore, the COP found Dr. Brandner qualified by relevant experience and Knowledge." <u>Id.</u> at (Finding No. 3). It was the recommendation of the COP Hearing Panel that Dr. Brandner have his membership in the AAOS suspended for one year "because of unprofessional conduct in the performance of expert witness testimony." <u>See</u> Exhibit 30.

### RESPONSE:

Defendants object to Statement No. 44 on the grounds that it is argumentative and is not a short paragraph as required in Local Rule 56.1. Defendants do not dispute that the COP Hearing Panel concluded that Dr. Brandner had violated Mandatory Standard Nos. 3, 4 and 7 but that he had not violated Nos. 6 and 8. For the reasons set forth in its response to Statement No. 43, the AAOS objects to Plaintiff's reference to the "recast grievance" as contrary to the weight of the evidence. Plaintiff's assertion that Dr. Sharpe was required to produce the June 2005 deposition transcripts of the patient and his mother is also contrary to the weight of the evidence. The Grievance Report required that Dr. Sharpe attach complete copies of any documents that he relied upon as evidence. (Grievance Report, attached as Exhibit 15 to Plaintiff's SOF, at p. 2.) Section VI(C) of the Grievance Procedures merely places the parties on notice that they are responsible for obtaining and providing all written materials, such as transcripts and medical

records, that are to be considered by the AAOS in connection with a grievance. (Section VI(C)

of the Grievance Procedures, attached as Exhibit 16 to Plaintiff's SOF, at p. 6.)

### STATEMENT NO. 45:

Dr. Brandner directed his counsel to appeal the COP Hearing Panel's Report and Recommendation to the AAOS Judiciary Committee. See Exhibit 6. Unfortunately, the untimely issuance of the Report and Recommendation deprived Dr. Brandner of a meaningful opportunity to assist in the preparation of his appeal (he was traveling over the Christmas holiday). See Exhibit 6. Nevertheless, on December 30, 2009, Dr. Brandner's counsel submitted a timely appeal of the COP Hearing Panel's Report and Recommendations. See December 30, 2009 appeal, attached hereto as Exhibit 31.

### RESPONSE:

Defendants do not dispute that Dr. Brandner, through his counsel, submitted a timely

appeal of the COP Hearing Panel's Report and Recommendations. As set forth in Defendants'

Response to Statement No. 42, above, Defendants object to Plaintiff's statement that the COP

Hearing Panel Report and Recommendation was untimely as contrary to the weight of the

evidence.

### STATEMENT NO. 46:

Pursuant to AAOS Professional Compliance Grievance Procedure VII(E)(15), the Judiciary Committee is obligated to reject the recommendation of the COP Hearing Panel if it finds that there has been a lack of due process in the AAOS grievance proceedings or that it is contrary to the clear weight of the evidence. See Exhibit 16. In the appeal, Dr. Brandner's counsel pointed out that the COP Hearing Panel ignored numerous AAOS Professional Compliance Grievance Procedures (not the least of which was AAOS Professional Compliance Grievance Procedure VI(C) (burden of production) and AAOS Professional Compliance Grievance Procedure VII(A)(5) (burden of proof)) and argued that the COP Hearing Panel's failure to follow the AAOS's own rules violated Dr. Brandner's due process rights. See Exhibit 31. Accordingly, Dr. Brandner's counsel argued that the Judiciary Committee should reject the COP Hearing Panel's Report and Recommendation in its entirety. Id. As to Mandatory Standard Nos. 3 and 4 specifically, Dr. Brandner's counsel argued that under the Original Standards of Professionalism, Dr. Brandner had no obligation to review the deposition transcripts (only the pertinent medical records). Id. Accordingly, he could not be found to have violated Mandatory Standard Nos. 3 and 4 based on his decision to testify as an expert for the plaintiff in the face of the deposition testimony. Id. Additionally, Dr. Brandner's counsel argued that without the deposition transcripts that Dr. Sharpe had withheld from the AAOS, the COP Hearing Panel had no basis to find "that the deposition transcripts reflected that both the plaintiff and his mother had an understanding about the specific possibility and causation of a foot drop."

Id. Finally, Dr. Brandner's counsel argued that the COP Hearing panel had no basis to find that Dr. Brandner had condemned performance that fell within the generally accepted practice standards because Dr. Brandner only testified as to the standard of care for informed consent in a proximal tibial osteotomy — not that Dr. Sharpe fell below that standard of care (that was, as Dr. Brandner testified, an issue for the jury to decide). Id. Accordingly, Dr. Brandner's counsel argued that the Judiciary Committee should reject the COP Hearing Panel's Report and Recommendation with respect to Mandatory Standard Nos. 3 and 4. Id. As to Mandatory Standard No. 7, Dr. Brandner's counsel argued that there was no basis for the COP Hearing Panel's finding that Dr. Brandner's. testimony regarding the remodeling potential of the fracture did not accurately reflect the scientific evidence in the case as Dr. Sharpe had failed to provide the AAOS with the X-rays upon which Dr. Brandner based his testimony (instead, Dr. Sharpe provided the AAOS with X-rays taken later in time (after the plaintiff's growth plates had definitely closed)). Id. In support of Dr. Brandner's testimony regarding the remodeling potential of the fracture (based on the earlier set of X-rays), Dr. Brandner's attorney directed the Judiciary Committee to notes from one of Dr. Sharpe's colleagues who, after reviewing the same set of X-rays, noted that there was some potential for remodeling Id. Accordingly, Dr. Brandner's counsel argued that the Judiciary Committee should reject the COP Hearing Panel's Report and Recommendation with respect to Mandatory Standard No. 7. Id. Dr. Brandner's counsel concluded the appeal by stating: "The testimony which Dr. Brandner offered in the case . . . was truthful, scientifically correct and in accordance with the merits of the case. Under such circumstances, the Judiciary Committee must recommend that the Grievance not be sustained." Id.

**RESPONSE:**

Defendants object to Statement No. 46 on the grounds that it is argumentative and is not a short paragraph as required in Local Rule 56.1. Defendants do not dispute that, pursuant to Section VII(E)(15) of the Grievance Procedures, the Judiciary Committee "shall uphold the recommendation of the Grievance Hearing Panel unless it finds that there has been a lack of due process in the AAOS grievance proceedings or it is contrary to the clear weight of the evidence." Defendants do not dispute that Plaintiff made the arguments set forth in Statement No. 46.

In Statement No. 46, Plaintiff references the following argument he made in his appeal – that because Mandatory Standard No. 6 only requires the review of pertinent medical records, he cannot be found to have violated Mandatory Standard Nos. 3 and 4. This argument is contrary to the language of the Mandatory Standards. Mandatory Standard No. 6 requires an expert witness to seek and review all pertinent medical records related to a patient prior to rendering an opinion

-40-

on the "*medical or surgical management* of the patient." (Mandatory Standard No. 6 of the SOPs, attached as Exhibit 7 to Plaintiff's SOF, at p. 2.) Mandatory Standard No. 3 requires an expert witness to evaluate the medical care provided "in light of generally accepted standards at the time, place and in the context of care delivered" while Mandatory Standard No. 4 prohibits an expert from condemning performance that falls within generally accepted practice standards. (Mandatory Standard Nos. 3 and 4 of the SOPs, attached as Exhibit 7 to Plaintiff's SOF, at p. 2.) The COP Hearing Panel determined that Dr. Sharpe's pre-operative records and the initial depositions of the patient and his mother revealed that informed consent was given. (COP Hearing Panel Report and Recommendation, attached as Exhibit 30 to Plaintiff's SOF, at p. 9.) It is undisputed Dr. Brander reviewed these medical records and deposition transcripts prior to testifying in his deposition that Dr. Sharpe had failed to meet the standard of care with respect to informed consent. (Plaintiff's August 5, 2005 Deposition, pertinent portions of which are attached as Exhibit 11 to the Young Aff., at 20:16-25.) The COP Hearing Panel determined that Dr. Brandner's testimony, in light of the record before it, violated Mandatory Standards Nos. 3 and 4 as it condemned performance that fell within generally accepted practice standards for obtaining informed consent. (COP Hearing Panel Report and Recommendation, attached as Exhibit 30 to Plaintiff's SOF, at p. 9.)

**STATEMENT NO. 47:**

By late January of 2010, the AAOS had realized that the Grievance Report submitted by Dr. Sharpe failed to comply with AAOS Professional Compliance Grievance Procedure VII(A)(1) and that the AAOS, by accepting the Grievance Report for consideration, had failed to comply with AAOS Professional Compliance Grievance Procedure VII(B)(2). See Exhibit 4, p.113-14, ll.8-12. Accordingly, on February 1, 2010, the AAOS sent a letter to Dr. Sharpe and Dr. Brandner that included "replacement grievance material." See February 1, 2010 correspondence, attached hereto as Exhibit 32. The letter, which acted as a cover for the "replacement grievance material," counseled: "It is recommended that you substitute this redacted version and destroy previously submitted and/or forwarded documents." Id.

-41-

**RESPONSE:**

Defendants object to Statement No. 47 on the grounds that it is argumentative and is contrary to the weight of the evidence. As set forth in Defendants' Response to Statement No. 27, above, when Dr. Sharpe submitted his Grievance Report in October 2008, the AAOS did not require parties to de-identify patient information in those instances where a patient waived the HIPAA guidelines by filing a malpractice action. The AAOS revised its internal procedures in December 2009 to require de-identification of patient information even in those instances where the patient initiated malpractice litigation. Dr. Brandner and Dr. Sharpe were advised of this change in a letter dated December 30, 2009, and Dr. Sharpe subsequently resubmitted his grievance materials and de-identified the patient information. (Young Aff. ¶ 29; Giulietti Dep., pertinent portions of which are attached hereto as Exhibit 2, at 169:12-170:9.) The AAOS does not dispute that on February 1, 2010, it sent the parties a letter enclosing redacted grievance materials in accordance with its revised internal procedures. (February 1, 2010 Letter, attached as Exhibit 32 to Plaintiff's SOF.)

**STATEMENT NO. 48:**

Leading up to the hearing, Dr. Brandner's counsel was able to obtain copies of the transcripts that Dr. Sharpe had intentionally withheld from the COP Hearing Panel. See Exhibit 6. On February 24, 2010, the transcripts were provided to the AAOS. See February 24, 2010 correspondence attached hereto as Exhibit 33. They included: (1) the deposition transcript of the plaintiff taken on June 8, 2005; (2) the deposition transcript of the plaintiff's mother taken on June 8, 2005; (3) the transcript of the plaintiff's trial testimony taken on April 28, 2008, and April 29, 2008; and (4) the transcript of the plaintiff's mother's trial testimony taken on April 29, 2008. Id. The testimony in all four transcripts was in accord; the plaintiff and his mother testified unequivocally that Dr. Sharpe never disclosed the risk to the peroneal nerve or the potential of a foot drop when obtaining their consent to perform the proximal tibial osteotomy. See Exhibits 26, 27, 28, and 29. That testimony established that the COP Hearing Panel's conclusion (as stated in its Report and Recommendations) that Dr. Brandner violated Mandatory Standard Nos. 3 and 4 because "[t]he deposition transcripts reflected that both the plaintiff and his mother had an understanding about the specific possibility and causation of a foot drop" was clearly erroneous. See Exhibits 26, 27, 28, and 29.

**RESPONSE:**

Defendants do not object to Statement No. 48 with the exception of the final sentence. Defendants object to the last sentence of Statement No. 48 on the grounds that it is argumentative and contrary to the weight of the evidence. In their initial depositions taken on January 29, 2004, both the patient and his mother testified that Dr. Sharpe warned them in pre-operative discussions of the risk of foot drop. (Patient's January 29, 2004 Deposition, pertinent portions of which are attached as Exhibit 8 to the Young Aff., at 28:10-24; Patient's Mother's January 29, 2004 Deposition, pertinent portions of which are attached as Exhibit 9 to the Young Aff., at 51:6-13, 99:19-100:6.) Dr. Sharpe's May 19, 2004 deposition testimony is consistent with the initial account of pre-operative discussions given by the patient and his mother. (Dr. Sharpe's May 19, 2004 Deposition, pertinent portions of which are attached as Exhibit 10 to the Young Aff., at 11:21-12:14.) The AAOS does not dispute that after Dr. Sharpe was added as a defendant in the underlying malpractice action, the patient and his mother changed their testimony regarding pre-operative discussions with Dr. Sharpe and testified that they had not been warned of the risk of foot drop.

**STATEMENT NO. 49:**

On February 19, 2010, Dr. Sharpe's legal counsel submitted a response to the appeal filed by Dr. Brandner's legal counsel. See February 19, 2010 response, attached hereto as Exhibit 34. In it, Dr. Sharpe's legal counsel tried to justify Dr. Sharpe's willful failure to produce transcripts from the depositions taken of the plaintiff and his mother in June of 2005 (i.e., Dr. Sharpe's blatant violation of AAOS Professional Compliance Grievance Procedure VI(C)) by arguing that AAOS Professional Compliance Grievance Procedure VI(C) did not require the production of "all written material, such as transcripts and medical records" — as it provided — but, instead, only the production of those documents that Dr. Sharpe "believed were relevant to his grievance." Id. As to Dr. Sharpe's failure to produce the X-rays upon which Dr. Brandner based his opinion that the facture had some potential to remodel, Dr. Sharpe's legal counsel claimed that they were "missing" and, therefore, could not be produced. Id. Dr. Sharpe's legal counsel offered no explanation as to why Dr. Sharpe lied to the COP Hearing Panel when he stated: "I believe I provided all the depositions to this Committee." Id.

**RESPONSE:**

Defendants object to Statement No. 49 on the grounds that it is argumentative and fails to set forth material facts as required by Local Rule 56.1. Defendants assert that Dr. Sharpe's response to Dr. Brander's appeal speaks for itself. (Dr. Sharpe's February 19, 2010 response letter, attached as Exhibit 34 to Plaintiff's SOF.)

**STATEMENT NO. 50:**

On Friday, March 12, 2010, Dr. Brandner (along with his legal counsel) and Dr. Sharpe (along with his legal counsel) appeared before the Judiciary Committee in New Orleans, Louisiana, to conduct the Appeal Hearing. See Judiciary Committee hearing transcript, attached hereto as Exhibit 35. Pursuant to AAOS Professional Compliance Grievance Procedure VII(E)(11), each party at the Appeal Hearing was given ten minutes to make a statement to the Judiciary Committee. See Exhibit 16. The COP Hearing Panel's recasting of the Grievance rendered the ten minutes insufficient to address all of the issues raised in the appeal. See Exhibit 35. Following the presentation by Dr. Brandner's counsel, Dr. Sharpe's counsel made his presentation. See Exhibit 35, pp.20-29, ll.5-25. Faced with his client's selective document production and AAOS Professional Compliance Grievance Procedure VI(C) (which required the production of "all written material, such as transcripts and medical records"), Dr. Sharpe's counsel argued that the transcripts from the subsequent depositions were irrelevant to Dr. Sharpe's Grievance because the real "point of Dr. Sharpe's Grievance" was that Dr. Brandner never should have agreed to testify as an expert for plaintiff in light of the testimony offered by the plaintiff and his mother during their initial depositions (transcripts which Dr. Sharpe had provided to the AAOS). Id. at 22-23, ll.10-4. As stated by counsel for Dr. Sharpe:

> Dr. Brandner agrees to be an expert witness in this case sometime in October of 2004. And what he has available to him are the medical records, the X-rays, the depositions of Dr. Sharpe, the patient and mother before Dr. Sharpe was ever sued. And Dr. Sharpe, in fact, specifically says that the risk of the peroneal nerve injury was discussed.
>
> That is what he had before he agreed to be an expert witness in this case. And that is the point of Dr. Sharpe's grievance in this case. ***The point of the grievance from day one by Dr. Sharpe has been, based on the information available, Dr. Brandner should not have agreed to give expert opinions critical of Dr. Sharpe in any way, shape or form. That was the point.***

Id. (Emphasis added). Understanding that Dr. Brandner agreed to testify as an expert witness on behalf of the plaintiff in October of 2004, and that it was not until some six months later (on

April 18, 2005) that the AAOS adopted the Original AAOS Standards of Professionalism, it is apparent that Dr. Sharpe's Grievance is legally deficient. The "point of the grievance" (as alleged by Dr. Sharpe and articulated by Dr. Sharpe's counsel) was that Dr. Brandner's actions violated standards that were not established until six months later by the AAOS. See Exhibit 34.

**RESPONSE:**

Defendants object to Statement No. 50 on the grounds that it is not a short paragraph as required in Local Rule 56.1. Defendants further object to Statement No. 50 on the grounds that it is comprised of attorney argument rather than undisputed material facts.

Defendants do not dispute that Doctor Brandner, Dr. Sharpe and their respective legal counsel appeared before the Judiciary Committee on Friday, March 12, 2010 for the Appeal Hearing and that, pursuant to Section VII(E)(11) of the Grievance Procedures, each party was given ten (10) minutes to make their respective presentations. For the reasons set forth in Defendants' Response to Statement No. 43, Plaintiff's assertion that the COP Hearing Panel recast the grievance is contrary to the weight of the evidence.

Responding further, Defendants do not dispute that Dr. Sharpe's attorney made the argument referenced in Statement No. 50. However, Plaintiff's argument that the Grievance was "legally deficient" is contrary to the weight of the evidence. Dr. Sharpe's Grievance Report makes clear that the basis for his grievance is Dr. Brandner's deposition testimony of August 5, 2005 and trial testimony of April 29, 2008 in the underlying malpractice action. (Plaintiff's SOF ¶ 26(a); Grievance Report, attached as Exhibit 15 to Plaintiff's SOF, at p. 4; Dr. Sharpe's October 13, 2008 letter to AAOS accompanying the Grievance Report, at pp. 1-2 and citing Plaintiff's August 5, 2005 Deposition, pertinent portions of which are attached as Exhibit 11 to the Young Aff., at 20:16-25, and the April 29, 2008 Trial Testimony, relevant portions of which are attached as Exhibit 16 to the Young Aff., at 35:21-36:4; COP Hearing Transcript, attached as Exhibit 26 to the Young Aff., at 8:17-10:5.) The findings of the COP Hearing Panel, the

Judiciary Committee and the AAOS Board of Directors are not based on Dr. Brandner's

agreement to become an expert witness in the underlying action. The findings of the AAOS are

based on Dr. Brandner's testimony in the underlying action – all of which was given after the

SOPs on Orthopaedic Expert Witness Testimony were adopted by the AAOS. (COP Hearing

Panel Report and Recommendation, attached as Exhibit 30 to Plaintiff's SOF, at pp. 1, 3, 9;

Judiciary Committee Report and Recommendation, attached as Exhibit 36 to Plaintiff's SOF, at

pp. 7-8.)

### STATEMENT NO. 51:

Pursuant to AAOS Professional Compliance Grievance Procedure VII(E)(12), following the presentations by each party, "the Chair of the Judiciary Committee may allow each side an opportunity of up to five (5) minutes for questions. The parties may ask questions of the opposing side, but extensive cross examination will not be permitted." See Exhibit 16. Following the presentations by both parties, counsel for Dr. Brandner asked Dr. Sharpe a series of questions regarding his willful failure to produce transcripts from the depositions taken of the plaintiff and his mother in June of 2005 and his misrepresentation to the COP Hearing Panel regarding the same. See Exhibit 35, pp.30-34, ll.10-15. When Dr. Sharpe had difficulty responding to the questioning, his counsel objected, arguing that such "cross examination" was not permitted by the AAOS Professional Compliance Grievance Procedures. Id. at 34, ll.2-4. Counsel for the Judiciary Committee agreed and put an end to the questioning. Id. at 34, ll.5-8.

### RESPONSE:

Defendants object to Statement No. 51 on the grounds that it is argumentative and is not

limited to material facts, as required by Local Rule 56.1. Notwithstanding their objections,

Defendants do not dispute the facts set forth in Statement No. 51.

### STATEMENT NO. 52:

AAOS Professional Compliance Grievance Procedure VII(D)(7) provides that during the COP Hearing, members of the COP Hearing Panel "may ask clarifying questions of any party or witness within the thirty (30) minute time limit." See Exhibit 16. There is no similar provision in the AAOS Professional Compliance Grievance Procedures with respect to the Appeal Hearing. See Exhibit 16. In fact, nowhere in Section VII(E) of the AAOS Professional Compliance Grievance Procedures (which governs the Appeal Hearing) is the Judiciary Committee authorized to ask questions of the Grievant or the Respondent (either during the ten minute presentation or following questioning from the opposing party). See Exhibit 16. Despite this fact, the Judiciary Committee asked Dr. Brandner a number of questions following

questioning from the opposing party.  See Exhibit 35, pp.37-46, ll.2-13.  From the questioning, it became apparent that the Judiciary Committee cared little that Dr. Sharpe had intentionally withheld documents from the COP Hearing Panel; that Dr. Sharpe had lied to the COP Hearing Panel when he stated "I believe I provided all the depositions to this Committee"; or that the COP Hearing Panel had ignored the AAOS's own rules (on multiple occasions) in arriving at the findings set forth in its Report and Recommendations.  Id.  Instead, the Judiciary Committee (like the COP Hearing Panel) wanted to determine whether, based on the deposition testimony, Dr. Sharpe satisfied the standard of care when obtaining consent from the plaintiff and his mother to perform the proximal tibial osteotomy.  See Exhibit 34.  No matter how many times Dr. Brandner and his counsel pointed out that was not the issue (Dr. Brandner only testified as to what the standard of care required — not whether Dr. Sharpe had fallen below that standard of care (that was a question for the jury)), the Judiciary Committee could not be deterred.  See Exhibit 35, pp.42-44, ll.4-10. The Appeal Hearing concluded on March 12, 2010.  Id.  at 74, ll.14-17.

**RESPONSE:**

Defendants object to Statement No. 52 on the grounds that it is argumentative and is not a short paragraph as required by Local Rule 56.1.  The AAOS does not dispute that the Grievance Procedures are silent as to the Judiciary Committee members asking questions of the parties.  It has been the standard practice for the members of the Judiciary Committee in all grievances to ask clarifying questions of the parties.  The AAOS does not dispute that the Judiciary Committee members asked questions of Dr. Brandner and Dr. Sharpe following their presentations.  Neither Dr. Brandner nor his attorney objected to the committee members' questions posed to the parties. (Young Aff. ¶ 78; Judiciary Committee Hearing Transcript, attached as Exhibit 35 to Plaintiff's SOF, at 37:1-74:15 and, specifically, at 46:15-50:2 for the Judiciary Committee member's questions to Dr. Sharpe; Young Deposition, relevant portions of which are attached hereto as **Exhibit 3**, at 169:11-21; Giulietti Dep., pertinent portions of which are attached hereto as Exhibit 2, at 108:17-109:1.)

In further responding, Plaintiff appears to argue that the questions asked by the members of the Judiciary Committee were indicative of favoritism or bias.  Plaintiff's assertion is

improper under Local Rule 56.1 and is contrary to the weight of the evidence. The transcript from the Judiciary Committee Hearings speaks for itself.

Defendants object to Plaintiff's characterization of the focus of the Judiciary Committee's inquiry during the hearing. The transcript from the hearing and the Judiciary Committee's Report and Recommendations show that the Judiciary Committee wanted to determine whether Dr. Brandner's testimony in the underlying action violated Mandatory Standard Nos. 3, 4 7, given the record before the Committee. Further, for the reasons stated in Defendants' Response to Statement Nos. 8, 16, 22-23, Defendants object to Plaintiff's characterization of the limited nature of his opinion testimony as contrary to the weight of the evidence. Dr. Brandner testified that Dr. Sharpe fell below the standard of care in obtaining informed consent and, further, that it was his belief that the initial testimony of the patient and his mother regarding their pre-operative discussions with Dr. Sharpe was actually in reference to post-surgical discussions. (Plaintiff's August 5, 2005 Deposition, pertinent portions of which are attached as Exhibit 11 to the Young Aff., at 20:16-25; April 29, 2008 Trial Testimony, relevant portions of which are attached as Exhibit 16 to the Young Aff., at 35:21-36:4.)

**STATEMENT NO. 53:**

On April 21, 2010, the Judiciary Committee issued its Report and Recommendation. See Judiciary Committee Report and Recommendation, attached hereto as Exhibit 36. The Report and Recommendation was adverse to Dr. Brandner (it recommended his suspension from the AAOS) — but not for any of the reasons advanced by the COP Hearing Panel (and not for any of the reasons advanced by Dr. Sharpe in the Grievance Report he submitted to the AAOS). Compare Exhibit 36 (Findings No. 2 and 3) with Exhibit 30 (Finding No. 1, 2 and 3) and Exhibit 15. In this regard, the Judiciary Committee did not find (as the COP Hearing Panel did) that Dr. Brandner violated Mandatory Standard Nos. 3 and 4 because "[t]he record show[ed] that informed consent was given" or that "the deposition transcripts reflected that both the plaintiff and his mother had an understanding about the specific possibility and causation of a foot drop." See Exhibit 36 (Finding No. 2). Similarly, the Judiciary Committee did not find (as the COP Hearing Panel did) that Dr. Brandner violated Mandatory Standard No. 7 because his "testimony that the facture could remodel was clearly not correct and, as such, . . . did not accurately reflect the scientific evidence in this matter." Id. (Finding No. 3). The Judiciary Committee also did

not find (as Dr. Sharpe alleged in the Grievance Report) that Dr. Brandner violated Mandatory Standards Nos. 3 and 4 when he: (1) testified at deposition and at trial that the standard of care for informed consent in the context of a proximal tibial osteotomy required a discussion of the peroneal nerve; and (2) testified at deposition that the plaintiff was not given a non-operative option and that the fracture had remodeling potential. Id. (Finding No. 2). Nor did the Judiciary Committee find (as Dr. Sharpe alleged in the Grievance Report) that Dr. Brandner violated Mandatory Standard No. 6 when he failed to adequately review the deposition testimony of plaintiff and his mother given in January of 2004 before agreeing to testify as an expert on behalf of the plaintiff. Id. (Finding No. 4). Also, the Judiciary Committee did not did not find (as Dr. Sharpe alleged in the Grievance Report) that Dr. Brandner violated Mandatory Standards Nos. 7 and 8 when he: (1) Testified that there was a 3-13% incidence rate of peroneal nerve palsy in a proximal tibial osteotomy; and (2) Testified in a case in which he had no "current relevant experience with [the] procedure." Id. (Finding No. 3). Instead, the Judiciary Committee — like the COP Hearing Panel before it — recast Dr. Sharpe's Grievance. The recasting of the Grievance by the Judiciary Committee violated AAOS Professional Compliance Grievance Procedure VI(B)(3) which provides that the parties to a professional compliance matter have the "[r]ight to know the specific allegations made in the Grievance." Id. (Finding No. 2). With respect to the twice-recast Grievance, the Judiciary Committee elected to accept the reading of AAOS Professional Compliance Grievance Procedure VI(C) advanced by Dr. Sharpe's counsel (changing "providing all written material, such as transcripts and medical records, for consideration by AAOS" to "providing all written material, such as transcripts and medical records *which the party believes is relevant*, for consideration by AAOS") and ignore the COP Hearing Panel's untimely issuance of its Report and Recommendations. Id. (Finding No. 1). After having dismissed the Grievant's procedural noncompliance and that of the COP Hearing Panel, the Judiciary Committee "affirmed the COP Hearing Panel's finding that Dr. Brandner violated Mandatory Standards Nos. 3 and 4", but did so on other grounds. Id. (Finding Nos. 1 and 2). Once again, the deposition testimony — which Dr. Brandner had no obligation to review under the Original Standards of Professionalism — played a key role in the decision. Id. (Finding No. 2). As stated by the Judiciary Committee:

> The Judiciary Committee acknowledged that there is a discrepancy between the initial and second set of depositions of the patient and mother. The Judiciary Committee, however, was not persuaded that the change in testimony given in these later depositions is evidence that Dr. Sharpe failed to inform the patient of peroneal nerve injury. Moreover, the question of whether a violation of the Standards of Professionalism exists is not that he chose to base his opinion on contradictory evidence from patient and treating physician, but the fact that he chose one version of the plaintiffs' depositions over another. This choice took Dr. Brandner out of the realm of objectively "counseling" on standards of care and made him condemning of the care provided by Dr. Sharpe.

Id. (Finding No. 2). The Judiciary Committee recognized that without the X-rays upon which Dr. Brandner based his testimony concerning the remodeling potential of the fracture, there was no basis for the COP Hearing Panel's finding that Dr. Brandner violated Mandatory Standard No. 7. Id. (Finding No. 2). Accordingly, the Judiciary Committee did not affirm the COP

Hearing Panel's with respect to Mandatory Standard No. 7.  Id.  (Finding No. 3).  Based on what it determined was a violation of Mandatory Standard Nos. 3 and 4, the Judiciary Committee concurred with the recommendation of the COP Hearing Panel and recommended that Dr. Brandner be suspended from the AAOS for one year.  Id.  The AAOS Professional Compliance Grievance Procedures requires that the AAOS produce a copy of the recommendations of the COP Hearing Panel and the Judiciary Committee with its notice of Board Meetings.  See Exhibit 16.  The AAOS failed to do so.

**RESPONSE:**

Defendants object to Statement No. 53 on the grounds that it plainly violates Local Rule 56.1.  Statement No. 53 is several pages long and is replete with arguments of counsel rather than stating undisputed material facts.  Defendants further object to the description of the Judiciary Committee's Report and Recommendation as contrary to the weight of the evidence.

Defendants do not dispute that the Judiciary Committee issued its Report and Recommendation on April 21, 2010 and that the Judiciary Committee made the following determinations: (i) the Judiciary Committee affirmed the COP Hearing Panel's finding that Dr. Brandner had violated Mandatory Standard Nos. 3 and 4; (ii) the Judiciary Committee reversed the COP Hearing Panel's finding that Dr. Brandner had violated Mandatory Standard No. 7; (iii) the Judiciary Committee affirmed the COP Hearing Panel's finding that Dr. Brandner had not violated Mandatory Standard Nos. 6 and 8; and (iv) the Judiciary Committee affirmed the COP Hearing Panel's recommendation that Dr. Brandner be suspended from the AAOS for one year. (Young Aff. ¶ 79; Judiciary Committee Report and Recommendation, attached as Exhibit 36 to Plaintiff's SOF, at pp. 8-9.)

Plaintiff's assertion that the Judiciary Committee ignored the allegations in Dr. Sharpe's Grievance and recast the allegations of the grievance are improper and contrary to the weight of the evidence.  The Judiciary Committee's findings with respect to Mandatory Standard Nos. 3 and 4 are based on Dr. Sharpe's allegation that Dr. Brandner's testimony in the underlying malpractice action regarding informed consent was improper.  Although the Judiciary Committee

acknowledged there was a discrepancy between the initial and second set of depositions of the patient and his mother, the Committee stated in its Report that it was not persuaded that the change in testimony given in the later depositions was evidence that Dr. Sharpe failed to inform the patient of the risk of peroneal nerve injury. (Young Aff. ¶ 79; Judiciary Committee Report and Recommendation, attached as Exhibit 36 to Plaintiff's SOF, at p. 8.)

Dr. Edward Craig, a member of the Judiciary Committee, testified that the Committee placed greater weight on the initial depositions of the patient and his mother because they were taken closer in time to the date of the surgery and prior to when Dr. Sharpe was added as a defendant in the underlying action. (Dr. Craig Deposition, pertinent portions of which are attached hereto as **Exhibit 4**, at 135:14-137:8.) Both Dr. Craig and Dr. Richard Geline, another member of the Judiciary Committee, noted that their findings were based on Dr. Brandner's testimony in the underlying action. (*Id.* at 127:18-128:21; Dr. Geline Deposition ("Dr. Geline Dep."), pertinent portions of which are attached hereto as **Exhibit 5**, at 130:6-132:17.)

In its Report, the Judiciary Committee also noted as follows: "In Dr. Brandner's deposition of August 5, 2005, he specifically judged Dr. Sharpe to have fallen below the standard of care because certain key words were not present in Dr. Sharpe's notes to document informed consent. In doing so, Dr. Brandner condemned Dr. Sharpe's performance by disregarding the generally accepted standard." (Young Aff. ¶ 79; Judiciary Committee Report and Recommendation, attached as Exhibit 36 to Plaintiff's SOF, at p. 8.)

Defendants' object to the final two sentences of Statement No. 53 as argumentative and contrary to the weight of the evidence. Section VII(E)(18) of the Grievance Procedures states that the Judiciary Committee's Report and Recommendation, and a copy of the Judiciary Committee hearing transcript, will be sent to the grievant, respondent and the COP Hearing

Panel. (Section VII(E)(18) of the Grievance Procedures, attached as Exhibit 16 to Plaintiff's

SOF, at p. 15.) The AAOS sent Dr. Brandner a copy of the Judiciary Committee's Report and

Recommendation and a copy of the Judiciary Committee hearing transcript on April 21, 2010.

(Young Aff. ¶ 82; April 21, 2010 letter to Dr. Brandner, attached as Exhibit 34 to the Young

Aff.; Plaintiff's Response to Defendants' SOF [Docket #82] ¶ 63.)

### STATEMENT NO. 54:

Pursuant to AAOS Professional Compliance Grievance Procedure VII(F)(1), the Board of Directors adjudicates all recommendations received from the COP Hearing Panel and the Judiciary Committee at the next scheduled meeting of the Board. See Exhibit 16. Pursuant to AAOS Professional Compliance Grievance Procedure VII(F)(8), the Board of Directors is obligated to reject a recommendation by the COP Hearing Panel or the Judiciary Committee if it finds that there has been a lack of due process in the AAOS grievance proceedings or that it is contrary to the clear weight of the evidence. Id. Pursuant to AAOS Professional Compliance Grievance Procedure VII(F)(5), the Grievant and the Respondent have the right to appear before the Board of Directors and make a presentation of no more than ten minutes. Id. Alternatively, the Grievant or the Respondent may submit "a written statement of no more than two (2) pages" in lieu of a personal appearance. The Judiciary Committee's recasting of the Grievance rendered the ten minutes (or the two pages) insufficient to address all of the issues raised by the Grievance and the procedural irregularities in connection with the AAOS's handling of the same. Id.

### RESPONSE:

With the exception of the final sentence, Defendants do not object to Statement No. 54.

The final sentence of Statement No. 54 is argumentative and contrary to the weight of the

evidence. For the reasons stated in Defendants' Response to Statement No. 53, the AAOS

Judiciary Committee did not recast the Grievance.

### STATEMENT NO. 55:

Dr. Brandner and his counsel appeared at the Board meeting. See Transcript of Board of Directors Hearing, attached hereto as Exhibit 37. Neither Dr. Sharpe nor his legal counsel elected to attend. Id. at 5, ll.24-5. Instead, Dr. Sharpe submitted two written statements to the Board in lieu of a personal appearance. Id. The combined length of the statements exceeded two pages. Id. at 18-24, ll.4-2. Despite this fact, the Board of Directors had them read into the record in violation of AAOS Professional Compliance Grievance Procedure VII(F)(5). Id.; Exhibit 16.

**RESPONSE:**

Defendants do not object to the first two sentences of Statement No. 55.  Defendants

object to the remainder of Statement No. 55 on the grounds that it is argumentative and

misleading.  The transcript of the hearing before the Board of Directors reflects that Dr. Sharpe's

cover letter to his written statement was one paragraph in length.  (Board of Directors' June 19,

2010 Hearing Transcript, attached as Exhibit 37 to Plaintiff's SOF, at 17:20-18:16.)  While the

combined length of this one-paragraph cover letter and Dr. Sharpe's written statement exceeded

two pages in the aggregate, the cover letter did not address any of the substantive allegations in

the Grievance Report and simply explained Dr. Sharpe's absence from the hearing.  (*Id.* at 17:20-

24:5.)  Neither the Plaintiff nor his counsel objected to the reading of the cover letter and written

statement into the record at the time of hearing.  (*Id.*)

**STATEMENT NO. 56:**

AAOS Professional Compliance Grievance Procedure VII(F)(6) provides:

> At its option, the [COP Hearing Panel] that considered the case may prepare written comments for the AAOS Board of Directors regarding the Report and Recommendations of the Judiciary Committee.  These comments must be received by AAOS within fifteen (15) days of the meeting of the Board.  These comments will be provided to the Board of Directors; the Grievant; the Respondent; counsel of the Grievant and Respondent, if any; and to the representative of the Judiciary Committee who shall be presenting the matter to the Board of Directors.

See Exhibit 16.  AAOS Professional Compliance Grievance Procedure VII(F)(8) provides:

> A representative of the Judiciary Committee shall be at the meeting of the Board of Directors to present the Judiciary Committee's Report and Recommendation(s).  In addition, the Board of Directors shall also receive a written copy of the Report and Recommendations of the [COP Hearing Panel] and a representative of the [COP Hearing Panel] will be present to address questions from the Board.  If a matter had not been appealed to the Judiciary Committee, the representative of the

-53-

> [COP Hearing Panel] will present the [COP Hearing Panel's] Report and Recommendations.

Id. Grievance 2008-23 was appealed to the Judiciary Committee. Accordingly, pursuant to AAOS Professional Compliance Grievance Procedure VII(F)(8), it was the Judiciary Committee that was entitled to present its Report and Recommendations to the Board of Directors. Id. Nothing in AAOS Professional Compliance Grievance Procedure VII(F)(8) authorizes a member of the COP Hearing Panel to make a presentation to the Board of Directors in a matter that was appealed to the Judiciary Committee. Id. Despite this fact, the Board of Directors allowed representatives of both the COP Hearing Panel and the Judiciary Committee to make presentations to the Board in connection with Grievance 2008-23. See Exhibit 37, pp.7-8, ll.24-8. During the presentation by the representative of the COP Hearing Panel, representations of material fact were made as to what the deposition transcripts reflected. Id. at 11, ll.5-24. Those representations were false. In fact, the COP Hearing Panel was never provided with transcripts from the depositions taken of the plaintiff and his mother in June of 2005. Id. at 17-18, ll.21-23.

### RESPONSE:

Defendants do not dispute that the Grievance Procedures applicable to this grievance did not expressly authorize the representative of the COP Hearing Panel to make an oral presentation to the Board of Directors. (Young Aff. ¶ 91; Grievance Procedures, attached as Exhibit 16 to Plaintiff's SOF.) Defendants object to Plaintiff's description of the presentation given by the COP Hearing Panel representative as contrary to the weight of the evidence. The transcript from the hearing reveals that the representative of the COP Hearing Panel made a short presentation during which he summarized the following pieces of evidence considered by the COP Hearing Panel on the issue of informed consent: (i) Dr. Sharpe's April 11, 2002 and June 6, 2002 pre-operative notes; (ii) the patient's January 29, 2004 deposition; (iii) the patient's mother's January 29, 2004 deposition; (iv) Dr. Sharpe's May 19, 2004 deposition; and (v) Dr. Brandner's August 5, 2005 deposition. (Board hearing transcript, attached as Exhibit 37 to Plaintiff's SOF, at 8:18-24, 11:5-13:11.) All of these transcripts and records had been made part of the record before the COP Hearing Panel, and the Board hearing transcript reflects that the representative of the COP Hearing Panel made no reference to the June 2005 depositions of the patient or his mother. (*Id.* at 8:18-13:11; COP Hearing Transcript, attached as Exhibit 26 to the Young Aff., at 5:15-10:5.)

Defendants do not dispute that the June 2005 depositions of the patient and his mother were not provided to the COP Hearing Panel.

**STATEMENT NO. 57:**

Following the presentations by representatives of the COP Hearing Panel and the Judiciary Committee, Dr. Sharpe's written statements were read into the record. See Exhibit 37, pp.18-24, ll.4-2. In the statements, Dr. Sharpe applauded the AAOS for its handling of the Grievance and reiterated his contention that Dr. Brandner never should have agreed to provide expert testimony on behalf of the plaintiff (no matter how innocuous) in light of the deposition testimony given by the plaintiff and his mother in January of 2004. Id. at 20-22, ll.3-16. The floor was then given to Dr. Brandner's counsel. Id. at 24, ll.6. In light of the presentations made by the representatives of the COP Hearing Panel and the Judiciary Committee and the written statements provided by Dr. Sharpe (all advocating for a finding that Dr. Brandner had violated Mandatory Standards Nos. 3 and 4 — but each advocating as such on different grounds), the ten minutes provided for the presentation was woefully insufficient. Id. Dr. Brandner's counsel began his presentation by pointing out that Dr. Sharpe had lied to the AAOS on no fewer than three occasions: (1) In his Grievance Report — when he claimed that Dr. Brandner had testified during his deposition that the fracture "had a good chance of remodeling" (Dr. Brandner never testified as such); (2) During the COP Hearing — when he represented to the COP Hearing Panel (while under oath) that it was his belief that he had provided all of the depositions to the AAOS (the statement was patently false); and (3) In one of the written statements he provided to the Board of Directors — when he claimed that Dr. Brandner testified at deposition that the pre-operative X-rays depicted growth plates that were only partially closed (Dr. Brandner never testified that he observed partially closed growth plates in the pre-operative X-rays (In fact, when presented with the pre-operative X-rays at trial, Dr. Brandner immediately pointed out that the growth plates were closed.)). Id. at 28, ll. 9-24. Dr. Brandner's counsel then pointed out that the statements made by Dr. Sharpe's counsel during the hearing before the Judiciary Committee were fatal to Dr. Sharpe's Grievance. Id. at 30-31, ll.12-1. He read those statements into the record:

> Dr. Brandner agrees to be an expert witness in this case sometime in October of 2004. And what he has available to him are the medical records, the X-rays, the depositions of Dr. Sharpe, the patient and mother before Dr. Sharpe was ever sued. And Dr. Sharpe, in fact, specifically says that the risk of the peroneal nerve injury was discussed.

> That is what he had before he agreed to be an expert witness in this case. And that is the point of Dr. Sharpe's grievance in this case. *The point of the grievance from day one by Dr. Sharpe has been, based on the information available, Dr. Brandner should not have agreed to give expert opinions critical of Dr. Sharpe in any way, shape or form. That was the point.*

-55-

Id. at p.30, ll.1-8. (Emphasis added). Dr. Brandner's counsel then pointed out that the AAOS did not adopt its Original Standards of Professionalism until April 18, 2005 (some six months after Dr. Brandner agreed to give expert testimony in the case). Id. at p.31. As argued by Dr. Brandner's counsel, Dr. Sharpe's Grievance sought to hold Dr. Brandner accountable to a standard of conduct that had not yet been adopted. Id. Due process required a finding that the Grievance was not sustained. Id. at p.31, ll. 18-21. Dr. Brandner then joined in the presentation, noting that: (1) The AAOS had no Mandatory Standards for Orthopaedic Expert Testimony in October of 2004, when he was retained as an expert witness by counsel for the plaintiff; (2) He became aware that the AAOS had adopted the Original Standards of Professionalism in the Spring of 2005; (3) Because of his growing medical-legal practice, he carefully reviewed the Original Standards of Professionalism; (4) Nothing in the Original Standards of Professionalism required an orthopaedic expert witness to review legal documents or depositions before rendering an opinion on the medical or surgical management of a patient (only "pertinent medical records"); and (5) Nothing in the plaintiff's medical records documented a discussion of the risk to the peroneal nerve or the potential of a foot drop in a proximal tibial osteotomy. Id. at 33-34. Dr. Brandner's counsel followed-up by pointing out that Dr. Brandner was aware that, in May of 2010, the AAOS had adopted Amended Standards of Professionalism and that Amended Standards of Professionalism did require an orthopaedic expert witness to review legal documents (including relevant prior depositions) before rendering an opinion on the medical or surgical management of a patient. Dr. Brandner's counsel advised the Board that Dr. Brandner intended to comply with the Amended Standards of Professionalism prior to agreeing to provide expert testimony in the future. Id. at 36. Dr. Brandner's counsel concluded by advising the Board that, based on the treatment the AAOS had given Dr. Sharpe's Grievance (going to great lengths to try and find some basis to sanction Dr. Brandner), Dr. Brandner understood that the AAOS took a dim view of one AAOS member providing expert testimony (no matter how innocuous) in a medical malpractice action against another AAOS member. Id. at 36. Dr. Brandner's counsel assured the Board that this was something that Dr. Brandner would take into consideration in the future before agreeing to provide testimony in any matter involving another AAOS member. Id. at 36. With that, Dr. Brandner's counsel requested that Board reject the Judiciary Committee's Report and Recommendations and not sustain the Grievance . Id. The Board asked no questions of Dr. Brandner or his counsel. Id. at 37.

**RESPONSE:**

Defendants object to Statement No. 57 on the grounds that it is several pages in length and not a short paragraph as required in Local Rule 56.1. Defendants further object to Statement No. 57 on the grounds that it is argumentative and misleading. The transcript from the hearing before the Board of Directors speaks for itself. (Board meeting transcript, attached as Exhibit 37 to Plaintiff's SOF.)

Responding further, Defendants object to Plaintiff's characterization of the written statement of Dr. Sharpe that was read into the record as incomplete and misleading. The

transcript reflects that Dr. Sharpe also argued in his written statement that Dr. Brandner violated Mandatory Standard Nos. 3 and 4 by testifying that Dr. Sharpe breached the standard of care with respect to informed consent for a tibial osteotomy. (*Id.* at 22:8-16.) Finally, Defendants do not dispute that Dr. Brandner and his counsel made the arguments set forth in Statement No. 57 during the course of the hearing, nor do Defendants dispute that the Board did not ask any questions of Dr. Brandner or his counsel.

### STATEMENT NO. 58:

On July 2, 2010, a letter (dated June 28, 2010) was received by Dr. Brandner's counsel, advising that the Board of Directors of the AAOS voted to suspend Dr. Brandner for a period of one year "based on violations of the Standards of Professionalism for Orthopaedic Expert Witness Testimony, Mandatory Standards Nos. 3 and 4." See June 28, 2010 correspondence, attached hereto as Exhibit 38. The letter provided that "[t]he vote was by secret ballot, with more than two-thirds of the voting members present concurring" and that "[u]nder the AAOS Bylaws, professional compliance actions taken by the Board of Directors are final." Id.

### RESPONSE:

Defendants do not object to Statement No. 58.

### STATEMENT NO. 59:

In response to the letter, Dr. Brandner's counsel sent a letter to the Office of General Counsel for the AAOS. See July 2, 2010, correspondence, attached hereto as Exhibit 39. The letter acknowledged receipt of the Board's decision; expressed disappointment that the Board was willing to ignore Dr. Sharpe's multiple misrepresentations, the AAOS's own Grievance Procedures and the plain language of the AAOS's Standards of Professionalism; advised that suspension from the AAOS would significantly damage Dr. Brandner's ability to provide medical-legal support (which comprised in excess of fifty percent of his practice); and explained that, as a result of the same, Dr. Brandner had no choice but to instigate litigation against the AAOS seeking: (1) a declaration that the AAOS violated his due process rights in its handling of Grievance 2008-23; and (2) a permanent injunction prohibiting the AAOS from taking any Professional Compliance Action against Dr. Brandner in connection with Grievance 2008-23. Id. The letter concluded by requesting that the AAOS agree to refrain from publicly disclosing the Board's decision until the court had ruled on the merits of the case. Id.

### RESPONSE:

Defendants do not object to Statement No. 59.

**STATEMENT NO. 60:**

On July 8, 2010, Dr. Brandner's counsel received a letter (sent via facsimile) from General Counsel for the AAOS which provided:

> This correspondence will confirm that I, on behalf of the American Association of Orthopaedic Surgeons (AAOS), will voluntarily agree to refrain from publicly disclosing the decision of the AAOS Board of Directors, as referenced in the June 28, 2010 letter signed by AAOS President John J. Callaghan. I am authorized to make this agreement only until the full AAOS Board of Directors can convene to consider extending the period until the court has decided the case on the merits.

See July 8, 2010, correspondence, attached hereto as Exhibit 40. The letter indicated that it was anticipated that a conference call of the full Board of Directors would be scheduled within three weeks. Id.

**RESPONSE:**

Defendants do not object to Statement No. 60.

**STATEMENT NO. 61:**

Following discussions between counsel for Dr. Brandner and General Counsel for the AAOS, a draft of Dr. Brandner's Complaint was forwarded to the AAOS for consideration by the Board. See Exhibit 41. The Complaint, which spanned some forty pages, contained a detailed factual statement (encompassing both the underlying litigation and the Grievance process) and identified no fewer than nineteen AAOS Professional Compliance Grievance Procedures that had been violated by the AAOS in the handling of the Grievance 2008-23. See Exhibit 41.

**RESPONSE:**

Defendants do not dispute that counsel for Dr. Brandner forwarded a draft complaint to the General Counsel of the AAOS and that the draft complaint alleged nineteen (19) procedural violations by the AAOS in connection with the grievance.

**STATEMENT NO. 62:**

On July 30, 2010, Dr. Brandner's counsel received a letter (sent via facsimile) from the Chief Executive Officer of the AAOS. See July 30, 2010 correspondence attached hereto as Exhibit 41. The letter thanked Dr. Brandner's counsel for the draft copy of the Complaint; advised that the Board of Directors would give the draft pleading "due consideration"; but advised that the AAOS Board of Directors had met by conference call on July 22, 2010 "and

voted unanimously to follow the AAOS Bylaws regarding the public communication of its decision in AAOS Grievance No. 2008-23." Id. The letter did, however, conclude by indicating that the Board did not "anticipate publication of the Board's decision in the matter . . . while the Board considers Dr. Brandner's draft pleading . . . ." Id.

### RESPONSE:

Defendants do not object to Statement No. 62.

### STATEMENT NO. 63:

On September 30, 2010, Dr. Brandner's counsel received a letter from General Counsel for the AAOS (dated September 29, 2010) stating: "This letter is to advise you that the Board of Directors of the American Association of Orthopaedic Surgeons (AAOS), meeting in Rosemont, Illinois, on September 25, 2010, voted to re-hear the matter of *Sharpe v. Brandner* at its meeting on Saturday, December 4, 2010 in Chicago, Illinois." See September 30, 2010 correspondence attached hereto as Exhibit 42. The letter went on to state that the June 19, 2010 decision of the AAOS Board of Directors was to be considered "null and void" and that the December 4, 2010 Board hearing would be de novo. Id. The AAOS Professional Compliance Grievance Procedures requires that the AAOS produce a copy of the recommendations of the COP Hearing Panel and the Judiciary Committee with its notice of Board Meetings. See Exhibit 16. The AAOS failed to do so. See Exhibit 42.

### RESPONSE:

With the exception of the final two sentences, the AAOS does not object to Statement No. 63. Defendants object to the final two sentences of Statement No. 63 as they are contrary to the weight of the evidence. As set forth in Defendants' Response to Statement No. 53, the AAOS complied with Section VII(E)(18) by sending a copy of the Judiciary Committee's Report and Recommendation and hearing transcript to the parties. At the time the AAOS notified the parties that the Board of Directors elected to re-hear the grievance at its next meeting, Dr. Brandner was already in possession of the Report and Recommendations of the COP Hearing Panel and the Judiciary Committee. (Young Aff. ¶¶ 67-68, 82; December 14, 2009 Letter to Dr. Brandner, enclosing the COP Hearing Panel's Report and Recommendation, attached as Exhibit 30 to Plaintiff's SOF; April 21, 2010 Letter to Dr. Brandner, enclosing the Judiciary Committee's Report and Recommendation, attached as Exhibit 34 to the Young Aff.)

**STATEMENT NO. 64:**

On November 18, 2010, General Counsel for the AAOS sent a letter to Dr. Sharpe and Dr. Brandner (and their counsel) advising that, pursuant to AAOS Professional Compliance Grievance Procedure VII(F)(6), the COP Hearing Panel had prepared written comments to the Board of Directors regarding the Judiciary Committee Report and Recommendation. See November 18, 2010 correspondence, attached hereto as Exhibit 43. Enclosed with the letter were the COP Hearing Panel's comments. Id. In those "comments," the COP Hearing Panel attempted to explain how it — without ever having reviewed the X-rays upon which Dr. Brandner based his testimony — could have found that Dr. Brandner violated Mandatory Standard No. 7 when he testified that the fracture had some remodeling potential (a conclusion that, according to the physician notes, was shared by one of the doctors in Dr. Sharpe's practice group (Dr. Dinowitz) who had reviewed the same set of X-rays). Id. Interestingly, despite having possession of transcripts of Dr. Brandner's deposition and trial testimony for more than a year, the COP Hearing Panel's "comments" incorporated Dr. Sharpe's characterization of Dr. Brandner's testimony (as opposed to quoting Dr. Brandner's actual testimony). Id. Accordingly, the COP Hearing Panel's "comments" asserted (like Dr. Sharpe in his Grievance) that Dr. Brandner had testified that the fracture had "significant remodeling potential." Id. Such a claim was patently false. Compare Exhibit 43, with Exhibit 10 p.39, ll.19-22; p.42, ll.2-10; p.46-47; ll.16-1; p.60, ll.8-14 and Exhibit ll p.14 (Brandner 00071), ll. 4-19; p. 18 (Brandner 00075) ll.18-24; p.42-43 (Brandner 00100-00101) ll. 21- 2. Dr. Brandner testified that, based on the X-rays he had reviewed (which Dr. Sharpe never produced to the AAOS), the fracture had "some" remodeling potential but that it would never completely remodel. Id.

**RESPONSE:**

Defendants do not object to the first two sentences of Statement No. 64. Defendants object to the remainder of Statement No. 64 on the grounds that it contains arguments of counsel rather than undisputed material facts and that it mischaracterizes the COP Hearing Panel's comments. The COP Hearing Panel summarized the status of the appeal, the prior findings of the COP Hearing Panel and the Judiciary Committee, and provided a brief explanation as to the rationale for the COP Hearing Panel's finding that Plaintiff violated Mandatory Standard No. 7. (November 18, 2011 Letter and Written Comments to the AAOS Board of Directors, attached as Exhibit 43 to Plaintiff's SOF.) Neither the Judiciary Committee nor the Board of Directors found that Plaintiff violated Mandatory Standard No. 7. (Young Aff. ¶¶ 79, 94; Judiciary Committee Report and Recommendation, attached as Exhibit 36 to Plaintiff's SOF, at pp. 8-9; June 28, 2010 Letter to Dr. Brandner, attached as Exhibit 38 to Plaintiff's SOF.)

**STATEMENT NO. 65:**

On December 4, 2010, Dr. Brandner and his counsel appeared in Chicago, Illinois for the re-hearing. See Transcript of December 4, 2010 Board of Directors Hearing, attached hereto as Exhibit 44. Once again, neither Dr. Sharpe nor his legal counsel elected to attend. Id. at 2-3. This time, the Board of Directors went to great lengths to adhere to the AAOS Professional Compliance Grievance Procedures; to wit, only one statement from Dr. Sharpe was read into the record and only the representative from the Judiciary Committee was allowed to make a presentation. Id. at 8-16; 26-31. Despite this fact, the presentation by the representative of the Judiciary Committee was, like the written "comments" provided by the COP Hearing Panel, marred by the same misrepresentations that had plagued the Judiciary Committee's presentation during the first hearing before the Board of Directors. Compare Exhibit 44 at 8-16 with Exhibit 10 p.39, ll.19-22; p.42, ll.2-10; p.46-47; ll.16-1; p.60, ll.8-14 and Exhibit 11. p.14 (Brandner 00071), 1 4-19; p. 18 (Brandner 00075)11.18-24; p.42-43 (Brandner 00100-00101) ll. 21- 2. Following the presentation by the representative of the Judiciary Committee, the floor was then given to Dr. Brandner's counsel. Because there were so many procedural missteps in the Grievance process and the Judiciary Committee's report was fraught with misrepresentations, the ten minutes allowed for the presentation was inadequate. See Exhibit 44 at p.24-26, ll.11-11. Dr. Brandner's counsel began his presentation by pointing out that while Dr. Brandner appreciated the fact that the Board of Directors had, upon recognizing its own procedural missteps, chosen to re-hear the Grievance, the reality was that simply re-hearing Grievance would not remedy the procedural missteps which occurred at the screening, COP Hearing Panel and Judiciary Committee levels. Id. at p.20-26. As counsel for Dr. Brandner explained, no fewer than fifteen AAOS Professional Compliance Grievance Procedures were violated by the AAOS (some on more than one occasion) before the Grievance was even referred to the Board of Directors. Id. at p. 24, ll. 13-21. In this regard, Dr. Brandner's counsel argued that the only thing the Board of Directors could do to remedy the multiple due process violations was to reject the recommendation of the Judiciary Committee. Id. Dr. Brandner's counsel then argued that the finding by the Judiciary Committee that Dr. Brandner had violated Mandatory Standards Nos. 3 and 4 was contrary to the clear weight of the evidence. Id. at 24-26. First, Dr. Brandner's counsel emphasized the limited nature of Dr. Brandner's testimony. Id. at 16-20. All Dr. Brandner did was testify as to the standard of care for informed consent in the context of a proximal tibial osteotomy. Id. The decision as to whether Dr. Sharpe had breached that standard of care was a question for the jury (it was a "he said, she said" situation) . Id. at p.16, ll.11-23, p.20, ll.11-17. Then, Dr. Brandner's counsel read an excerpt from Dr. Brandner's trial testimony into the record. Id. at p.18-19, ll.11-7. Therein, Dr. Brandner testified that he found no fault with Dr. Sharpe's pre-operative work (all of the appropriate studies were performed in terms of planning the surgery) and characterized the surgery, from a technical standpoint, as "excellent" (in Dr. Brandner's own words: "An elegant presentation of the definition of the deformity. A hard case and an excellent application of correction and internal fixation."). Id. Dr. Brandner's counsel argued that the limited scope and complementary nature of Dr. Brandner's testimony prevented a finding (such as that by the Judiciary Committee) that Dr. Brandner had somehow "condemned" Dr. Sharpe's performance as a surgeon. Id. at p.19-20, ll.8-10. Finally, Dr. Brandner's counsel pointed out that under the Original Standards of Professionalism (i.e., those in effect at the time Dr. Brandner gave both his deposition and trial testimony), Dr. Brandner had no obligation to review the deposition transcripts (only the pertinent medical

records). Id. at p.24-26, ll.22-10. This was vital as it was undisputed that the medical records did not document a discussion between Dr. Sharpe and the Plaintiffs regarding the risk to the peroneal nerve in a proximal tibial osteotomy (only a general discussion regarding the potential of "nerve injury"). See Exhibit 11 p. 9-10 (Brandner 00066-00067), ll.15-5; p.15 (Brandner 00072) ll.12-17. Under such circumstances, Dr. Brandner's counsel argued that Dr. Brandner could not be found to have violated Mandatory Standard Nos. 3 and 4 based on his decision to testify as an expert for the plaintiff. See Exhibit 45 at p.24-26, ll.22-10. At that point, counsel for the AAOS advised Dr. Brandner's counsel that he was out of time. Id. at p.26, ll.11.

**RESPONSE:**

Defendants object to Statement No. 65 on the grounds that it is several pages in length and is not a short paragraph as required in Local Rule 56.1. Defendants further object to Statement No. 65 on the grounds that it is argumentative and misleading. The transcript from the second hearing before the Board of Directors speaks for itself. (Board re-hearing transcript, attached as Exhibit 44 to Plaintiff's SOF.)

Responding further, Defendants do not dispute that Dr. Brandner and his counsel appeared at the December 4, 2010 hearing before the Board of Directors and that neither Dr. Sharpe nor his legal counsel attended the hearing. Plaintiff's assertion that the presentation of the representative of the Judiciary Committee and the written comments of the COP Hearing Panel were "marred by misrepresentations" constitute arguments of counsel rather than a statement of undisputed material fact. Finally, Defendants do not dispute that Dr. Brandner and his counsel made the arguments set forth in Statement No. 65 during the Board's December 4, 2010 meeting and that counsel for the AAOS advised Dr. Brandner's counsel once he reached the time limit allowed pursuant to the Grievance Procedures.

**STATEMENT NO. 66:**

Following the presentation by Dr. Brandner's counsel, Dr. Sharpe's written statement was read into the record. See Exhibit 44 at p. 26-31. Once again, Dr. Sharpe applauded the AAOS for its handling of the Grievance and reiterated his contention that Dr. Brandner never should have agreed to provide expert testimony on behalf of the plaintiff (no matter how innocuous) in light of the deposition testimony given by the plaintiff and his mother in January of 2004. Id. at p.27-27, ll.22-10. Once Dr. Sharpe's statement had been read into the record, the

Board was asked if there were any questions for Dr. Brandner or his counsel. Id. at p.30, ll.20-22. Hearing none, Dr. Brandner's counsel requested an opportunity to respond to one point raised in Dr. Sharpe's written Statement. Id. at pp.31-32, ll.23-4. The Board granted Dr. Brandner's counsel thirty seconds in which to do so. Id. In the brief rebuttal, Dr. Brandner's counsel pointed out that Dr. Sharpe's main point of contention was that, in light of the deposition testimony provided by the Plaintiffs in January of 2004, Dr. Brandner never should have agreed to offer expert testimony (no matter how innocuous) on behalf of the Plaintiffs. Id. at p.31-33, ll.20-10. Dr. Brandner's counsel pointed out that the Board could not find Dr. Brandner to have violated Mandatory Standards Nos. 3 and 4 just for agreeing to act as an expert for the plaintiffs. Id. Such was the case as Dr. Brandner was retained as an expert in October of 2004. Id. The AAOS did not adopt its Original Standards of Professionalism until April 18, 2005 (some six months after Dr. Brandner agreed to provide testimony for the Plaintiffs as to the standard of care for informed consent). Id. As argued by Dr. Brandner's counsel, Dr. Sharpe's statement — that his main point of contention was that Dr. Brandner never should have agreed to offer expert testimony on behalf of Plaintiffs — demonstrated that Dr. Sharpe's Grievance sought to hold Dr. Brandner accountable to a standard of conduct that had not yet been adopted. Id. Due process required a finding that the Grievance was not sustained. Id. With that, the hearing was concluded. Id. at p.34.

**RESPONSE:**

Defendants object to Statement No. 66 on the grounds that it is argumentative and misleading. The transcript from the December 4, 2010 Board of Directors hearing speaks for itself. (December 4, 2010 Board of Directors Hearing, attached as Exhibit 44 to Plaintiff's SOF.) Responding further, Defendants do not dispute that the Plaintiff made the arguments set forth in Statement No. 66 during the course of the hearing. Finally, it is undisputed that Dr. Sharpe's Grievance Report designates Dr. Brandner's deposition and trial testimony in the underlying action as the basis for his grievance. (Plaintiff's SOF ¶ 26(a); Grievance Report, attached as Exhibit 15 to Plaintiff's SOF, at p. 4; Dr. Sharpe's October 13, 2008 letter to AAOS accompanying the Grievance Report, at pp. 1-2 and citing Plaintiff's August 5, 2005 Deposition, pertinent portions of which are attached as Exhibit 11 to the Young Aff., at 20:16-25, and the April 29, 2008 Trial Testimony, relevant portions of which are attached as Exhibit 16 to the Young Aff., at 35:21-36:4; COP Hearing Transcript, attached as Exhibit 26 to the Young Aff., at 8:17-10:5.)

**STATEMENT NO. 67:**

On December 10, 2010, a letter (dated December 9, 2010) was received by Dr. Brandner's counsel, advising that the Board of Directors of the AAOS had once again voted to suspend Dr. Brandner for a period of one year "based on violations of the Standards of Professionalism for Orthopaedic Expert Witness Testimony, Mandatory Standards Nos. 3 and 4." See December 10, 2010 correspondence, attached hereto as Exhibit 47. The letter provided that "[t]he vote was by secret ballot, with more than two-thirds of the voting members present concurring" and that "[u]nder the AAOS Bylaws, professional compliance actions taken by the Board of Directors are final." Id.

**RESPONSE:**

Defendants do not object to Statement No. 67.

**STATEMENT NO. 68:**

On December 15, 2010, Dr. Brandner's counsel sent a letter to the General Counsel for the AAOS. See December 15, 2010 correspondence attached hereto as Exhibit 46. The letter explained that in excess of fifty percent of Dr. Brandner's income was derived from medical-legal support and that public disclosure of the Board's decision would irreparably harm Dr. Brandner's ability to provide that support. Id. The letter requested that the AAOS delay publicly disclosing the Board's decision until the court had ruled on the Motion for Temporary Restraining Order & Preliminary Injunction that Dr. Brandner would be filing in the instant action. Id.

**RESPONSE:**

Defendants do not object to Statement No. 68.

**STATEMENT NO. 69:**

On December 17, 2010, Dr. Brandner's counsel received a letter from General Counsel for the AAOS advising that the AAOS would not agree to withhold publication of the Board of Directors' decision. See December 17, 2010 correspondence attached hereto as Exhibit 47.

**RESPONSE:**

Defendants do not object to Statement No. 69.

**STATEMENT NO. 70:**

Pursuant to AAOS Professional Compliance Grievance Procedure V(B), after final action by the Board of Directors, the AAOS is obligated to notify its members of the professional compliance actions taken. See Exhibit 16. The AAOS does so by publishing a summary of the matter in one or more of the AAOS publications, "identifying the Respondent by name and the state in which he or she has his or her principal practice." Id. Pursuant to AAOS Professional

Compliance Grievance Procedure V(D), after final action by the Board of Directors, the AAOS is also obligated to "communicate professional compliance actions to the Respondent's state licensing board, state orthopaedic society, state medical society, the American Board of Orthopaedic Surgery (ABOS), and other medical boards or associations as appropriate." Id. Pursuant to AAOS Professional Compliance Grievance Procedure V(C), after final action by the Board of Directors, the AAOS may, if it determines that the professional compliance action relates to patient health and welfare, notify the National Practitioners Data Bank (NPDB). Id.

### RESPONSE:

Defendants do not object to Statement No. 70.

### STATEMENT NO. 71:

Dr. Brandner, having exhausted his administrative remedies, filed a Complaint with this Court seeking : (1) a declaration from the Court that the AAOS failed to act in accordance with its own constitution and bylaws; was influenced by bias, prejudice, or lacked good faith; and violated due process in its handling of Grievance 2008-23; and (2) the issuance of a permanent injunction prohibiting the AAOS from taking any action against Dr. Brandner in connection with Grievance 2008-23. [Doc. 1].

### RESPONSE:

Defendants do not object to Statement No. 71.

### STATEMENT NO. 72:

Section VII(E)(2) of the Grievance Procedures provides:

> For each appeal received by AAOS, the Office of General Counsel will canvass the members of the Judiciary Committee to determine whether there exists any real or perceived conflict of interest between a Judiciary Committee member and the Grievant and/or Respondent. No Judiciary Committee member may participate in a case with whom that individual has a personal relationship or is in partnership or in direct economic competition.

Through discovery, it was revealed that Dr. Richard Geline — who served on the Judiciary Committee — is a member of the board of directors for ISMIE Mutual Insurance Company; a physician-owned insurance company whose primary business is insuring doctors against medical malpractice claims. See Deposition of Richard Geline, attached hereto as Exhibit 48, pp.26-27, ll.24-9. Dr. Geline acknowledged that his position on the board would prohibit him from testifying for a plaintiff in a medical malpractice action. Id. at p.25, ll.13-22. He further testified that he and other members of ISMIE receive a return in the form of a reduction in premiums for any premiums collected which exceed the amount paid out on claims. Id. at p.28-29, ll.21-11. Dr. Geline further testified that he is compensated for serving as a member of the board of directors for ISMIE (he received $24,000 in 2009). Id. at p.30, ll.5-9.

Dr. Geline also acknowledged that the single greatest risk to the financial stability of ISMIE (and, concomitantly, the annual stipend he receives for sitting on the ISMIE board) is medical malpractice claims made by patients. Id. at p.33, ll.11-20. Geline further recognized that he has a fiduciary duty as a member of the ISMIE board to "guard the welfare of the company." Id. at, p.37-38, ll.6-2. Finally, Geline testified that he had disclosed the fact that he was a member of ISMIE to the AAOS. Id. at 48 p.35, ll.6-17. While Dr. Geline was not aware of any other Judiciary Committee member who also served on the board of directors of ISMIE, he did acknowledge that at least one member of the COP Hearing Panel was a member of ISMIE, that a second member of the Judiciary Committee was, to his knowledge, a board member of a similar Minnesota-based insurance company and that he believed that one other member of the Judiciary Committee was insured by a physician's mutual insurance company. Id. at 48 p.33, ll.11-20.

**RESPONSE:**

Defendants object to Statement No. 72 on the grounds that it is not a short paragraph as required by Local Rule 56.1. Defendants do not dispute that Section VII(E)(2) of the Grievance Procedures requires the AAOS Office of General Counsel to canvass the members of the Judiciary Committee to determine whether and conflicts of interest exist between a member of the Judiciary Committee and a party to a grievance. The AAOS Office of General Counsel conducted such an investigation with respect to Dr. Sharpe's Grievance against Dr. Brandner. (December 30, 2009 correspondence to the Judiciary Committee, attached hereto as **Exhibit 6**.)

Defendants object to Plaintiff's summary of Dr. Geline's testimony as incomplete and misleading. Defendants do not dispute that Dr. Geline has been a member of the Board of Directors of ISMIE Mutual Insurance Company since 1989. Dr. Geline testified that the company's policy is to prohibit members of the ISMIE Board from testifying *either as a plaintiff or a defense expert* in malpractice actions. (Dr. Geline Dep., pertinent portions of which are attached hereto as Exhibit 5, at 25:10-26:11.) ISMIE principally insures physicians that practice in Illinois. In certain instances, ISMIE will insure a physician in Illinois and a border state. (*Id.* at 33:21-34:6.) Neither Dr. Brandner nor Dr. Sharpe practice in Illinois or a border state. (Plaintiff's Response to Defendants' SOF [Docket # 82] ¶¶ 6-7.) Dr. Geline testified that the largest threat to the financial stability of ISMIE is an increase in severe claims that would require

a corresponding increase in premiums. (Dr. Geline Dep., pertinent portions of which are attached hereto as Exhibit 5, at 30:10-24, 33:11-33:20.) Additionally, Dr. Geline testified that *he is not aware* of any other member of the Judiciary Committee serving in any capacity with similar physician owned insurance companies. (*Id.* at 35:21-36:5.) He indicated that Dr. Schmidt, another member of the Committee, may have been at one time of member of the board of a corresponding Minnesota company but that he no longer serves in that capacity. (*Id.* at 58:21-59:21.)

Dr. Geline's testified that his position on the Judiciary Committee is independent of his position on the Board of ISMIE and that he is able to carry out his duties and responsibilities as a Judiciary Committee Member in a fair and impartial manner. (*Id.* at 44:13-45:10.) Dr. Geline further testified that the Orthopaedic Expert SOPs emphasize the need for expert testimony as part of the litigation process, both for injured patients and physicians, and that the role of the Judiciary Committee is to determine whether certain challenged testimony complies with the Mandatory Standards. (*Id.* at 45:11-46:13.) Finally, Dr. Geline testified that his position on the Board of ISMIE has no bearing on his evaluation of testimony, or any other challenged conduct, as a member of the Judiciary Committee. (*Id.*)

### STATEMENT NO. 73:

Through discovery it was also revealed that in response to a conflicts inquiry addressed to each of the members of the COP Hearing Panel, Dr. Peter Mandell responded to all members of the hearing panel advising that: "I believe I was on the Board of Councilors with Vince Russo [Dr. Sharpe's expert] a few years back. But I only know him causally [sic.] and haven't seen him in years. I don't think that constitutes a conflict but would welcome other opinions." See electronic e-mails to COP Hearing Panel Members, attached hereto as Exhibit 49, at AAOS_B0038818-AAOS_B0038819. Recognizing the need to disclose the potential conflict, members who received the e-mail responded as follows: "They have the option to object if they believe there is a conflict, correct?" See Exhibit 49 at AAOS_B0038827-AAOS_B0038828. In response, another member of the Committee on Professionalism responded: "Yes, and so far any such objection has be [sic.] honored by the recusal of the objectionable party. The problem is that while one party may be acquainted with a COPper, [sic.] the other party may not know of

that relationship." See Exhibit 49, at AAOS_B0038832- AAOS_B0038833. Dr. Dale Butler, acknowledging his own personal conflict, then responded to all members of the COP Hearing Panel as follows:

> I also knew Vince Russo on the BOC for several years, and I also have not seen him for many years. I am more comfortable recusing myself. I agree that parties have the right to object, but the other side would not know the extent of the relationship or the "COPer's" (is that a new word?) personal feelings about the individual. **I new [sic.] Vince well enough and have good memories of him as a person and doctor. I might be biased for him, so I would prefer not to have any appearance of favoritism.** As for Peter, maybe both parties could be informed about the relationship and let them object if they choose. My general feeling is that we should bend WAY over to avoid any appearance of a conflict, and we have enough COP members to still have a hearing panel even if three members were recused.

See Exhibit 49 at AAOS_B0038834- AAOS_B0038836 (emphasis added). Dr. Mandell then responded as follows:

> My relationship with Vince was not as close (or perhaps as long) as Dale's. I'm confident that I would be fair and impartial in assessing his involvement in this case. Obviously, if he were the grievant or respondent, I would recuse myself. **I agree that Rosalind should inform both parties that I had a past casual acquaintance with Dr. Russo but have had no contact with him for years. The parties should be allowed to object to me.**

See Exhibit 49 at AAOS_B0038837-AAOS B0038839 (emphasis added). Other members agreed that the suggested manner in which to handle the conflict was through disclosure. See Exhibit 49 at AAOS_B0038840-AAOS_B0038842; AAOS_B0038845-AAOS_B0038847; and AAOS_B0038864 (agreeing "both parties will be sent the names of the members on the Hearing Panel if the COP determines that a prima facie violation has been established. At that time, the background information re: Dr. Mandell will be shared with both parties to allow for transparency in the opportunity to challenge for cause."). Id. Despite the members' determination as to how to handle the conflict — through transparent disclosure — the AAOS never informed Dr. Brandner of the conflict (or Dr. Russo's involvement on the AAOS Board of Councilors). See Exhibit 4, p.264, ll.1-8. Moreover, even after having recused himself, Dr. Butler continued to receive correspondence related to the Sharpe/Brandner Grievance — up to and after the hearing was held. See Exhibit 49, at AAOS_B0038909; AAOS_B0038924; see also Exhibit 4, pp.261-73 ll.4-4.

**RESPONSE:**

Defendants object to Statement No. 73 on the grounds that it is not a short paragraph as required by Local Rule 56.1. Defendants do not dispute that the facts set forth in Statement No. 73 regarding the conflict of interest inquiry among the members of the COP. In further responding, neither Dr. Mandell nor Dr. Butler participated in any aspect of Dr. Sharpe's Grievance against Dr. Brandner. (COP Hearing Transcript, attached as Exhibit 26 to the Young Aff.; COP Hearing Panel's Report and Recommendation, attached as Exhibit 30 to Plaintiff's SOF; Supplemental Affidavit of Melissa Young ("Young Supp. Aff."), attached hereto as **Exhibit 7**, at ¶ 4.)

**STATEMENT NO. 74:**

Through discovery, it was determined that of the fifty-seven grievances considered by the AAOS since the inception of the Professional Compliance Program, forty-four have involved complaints against doctors who provided expert testimony in connection with medical malpractice cases. See Affidavit of Tyson Dobbs, attached hereto as Exhibit 50. A review of those forty-four grievances reveals that on not one occasions has the AAOS suspended a member who offered expert medical testimony on behalf of the defense. Id. In marked contrast, on seventeen occasions the AAOS has suspended the member who offered testimony given by a physician in support of the plaintiff (i.e., expert testimony asserting that a fellow or member of the AAOS fell below the standard of care). Id.

**RESPONSE:**

Defendants object to Statement No. 74 insofar as it is argumentative. Defendants do not dispute the facts set forth in Statement No. 74. In further responding, of the forty-four (44) grievances referenced in Statement No. 74 pertaining to alleged violations of the Mandatory Standards of the Orthopaedic Expert SOPs: (i) six (6) of the grievances were dismissed because they failed the preliminary administrative review or were withdrawn; (ii) ten (10) of the grievances were dismissed because the COP determined that the grievant failed to establish a *prima facie* violation of the Mandatory Standards of the Orthopaedic Expert SOPs; and (iii) nine (9) of the grievances were closed after a full hearing on the merits and a determination by the

AAOS that the grievant had failed to establish a violation of the Mandatory Standards. (Young Supp. Aff., attached hereto as Exhibit 7, at ¶ 5.) In one of the grievances, the AAOS censured a member for giving expert medical testimony on behalf of the defense that violated the Mandatory Standards of the Orthopaedic Expert SOPs. (*Id.* at ¶ 5.)

### STATEMENT NO. 75:

Through discovery, it was apparent that members of the various committees, panels and boards that comprise the professional compliance program and staff from the AAOS Office of General Counsel (which oversees the Professional Compliance Program) confirmed that the very people charged with following and enforcing the AAOS internal bylaws are unfamiliar with them and, and their convenience consciously choose to ignore them. See e.g., Exhibit 4, p.44, ll.14-19, p.47, ll.6-9, p.48, ll. 2-6, p.194, ll. 8-10, p.203, ll.2-9 (discussing how the AAOS Grievance Procedures are applied "as a matter of practice."); Exhibit 48, p. 79-80, ll. 22-15.

### RESPONSE:

Defendants object to Statement No. 75 on the grounds that it is argumentative and misstates the testimony of Melissa Young and Dr. Richard Geline. Neither Melissa Young nor Dr. Geline testified that they were unfamiliar with the AAOS Bylaws. The portions of Melissa Young's transcript that are referenced in Statement No. 75 simply explain the practice of the AAOS in applying the Grievance Procedures. Her testimony does not establish that the AAOS consciously chose to ignore the Grievance Procedures.

Dated: January 10, 2012

Respectfully submitted,

AMERICAN ACADEMY OF ORTHOPAEDIC SURGEONS and AMERICAN ASSOCIATION OF ORTHOPAEDIC SURGEONS

By:        s/ Michael A. Chabraja
              One of Their Attorneys

Michael A. Chabraja
VEDDER PRICE P.C.
222 North LaSalle, Suite 2300
Chicago, Illinois 60601
Telephone: (312) 609-7500
Facsimile: (312) 609-5005

## CERTIFICATE OF SERVICE

The hereby certify that I electronically filed the foregoing **DEFENDANTS' RESPONSE TO PLAINTIFF'S RULE 56.1(A)(3) STATEMENT OF UNDISPUTED FACTS** with the Clerk of the Court using the CM/ECF system which will send notifications of such filing to the following

Ryan F. Stephan
Stephan Zouras, LLP
205 N. Michigan Avenue
Suite 2560
Chicago, Illinois 60601

Aaron R. Maurice
Woods Erickson Whitaker
& Maurice LLP
1349 West Galleria Drive
Suite 200
Henderson, Nevada 89014

on January 10, 2012.

s/ Michael A. Chabraja

CHICAGO/#2275300.5