# EXHIBIT 1

A5067A1

MURRAY J. GOODMAN, M.D.    AUGUST 16, 2011

THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

Case No. 10-cv-8161

VOL. 1

PAGES 1-247

PATRICK J. BRANDNER, M.D.,

Plaintiff,

vs.

AMERICAN ACADEMY OF ORTHOPAEDIC SURGEONS and

AMERICAN ASSOCIATION OF ORTHOPAEDIC SURGEONS,

Defendants.

VIDEOTAPED DEPOSITION OF

MURRAY J. GOODMAN, M.D.

August 16, 2011

1:25 p.m.

Hawthorne Hotel

18 Washington Square West

Salem, Massachusetts 01970

ATKINSON-BAKER, INC. COURT REPORTERS

(800) 288-3376

Www.depo.com

REPORTED BY: Lori J. Atkinson

FILE NO. A5067A1

A5067A1

## MURRAY J. GOODMAN, M.D.   AUGUST 16, 2011

**APPEARANCES:**

ON BEHALF OF THE PLAINTIFF,

Aaron R. Maurice, Esq.

WOODS ERICKSON WHITAKER & MAURICE LLP

1349 West Galleria Drive Suite 200

Henderson, Nevada 89014

702.433.9696

ON BEHALF OF THE DEFENDANT,

Michael A. Chabraja, Esq.

VEDDER PRICE, P.C.

222 North Lasalle Street

Chicago, Illinois 60601

312.609.7500

Videographer:  Paul Boche

Page 2

---

INDEX OF EXAMINATION

WITNESS:  MURRAY J. GOODMAN, M.D.

| EXAMINATION | PAGE NO. |
|---|---|
| By Mr. Maurice | 5 |

INDEX TO EXHIBITS

| NO. | DESCRIPTION | PAGE NO |
|---|---|---|
| 1 | AAOS Professional Compliance Program Grievance Report | 91 |
| 2 | Letter February 18, 2009 | 215 |
| 3 | AAOS Bylaws | 216 |
| 4 | AAOS Bylaws | 216 |
| 5 | AAOS Standards of Professionalism | 156 |
| 6 | AAOS Professional Compliance Program Grievance Procedures | 156 |
| 7 | Letter April 7, 2009 | 224 |
| 8 | Letter April 23, 2009 | 227 |
| 9 | Letter September 15, 2009 | 227 |
| 10 | JBJS The Operative Treatment Of Peroneal Nerve Palsy | 43 44 |
| 11 | Drop foot after high tibial Osteotomy: A prospective study Of etiological factors | 214 44 |
| 12 | Letter December 14, 2009 | 214 |

Page 3

---

INDEX TO EXHIBITS (CONT'D):

| NO. | DESCRIPTION | PAGE NO |
|---|---|---|
| 13 | eMedicine article | 44 |
| 14 | AAOS Committee Grievance Hearing Report | 105 |
| 15 | Deposition Transcript Patricia S. Mann | 151 |
| 16 | Deposition Transcript June 8, 2005 Tempe, Arizona 11:50 a.m. | 51 |
| 17 | Deposition Transcript June 8, 2005 Tempe, Arizona 1:17 p.m. | 51 |
| 18 | Deposition Transcript April 28, 2008 Phoenix, Arizona | 51 |
| 19 | Deposition Transcript April 29, 2008 Phoenix, Arizona | 87 |
| 20 | Transcript of Proceedings April 29, 2008 Phoenix, Arizona | 228 |
| 21 | (Not marked) | |
| 22 | AAOS Appeal Hearing Report | 120 |
| 23 | (Not marked) | |
| 24 | AAOS Letter June 28, 2010 | 229 |

Page 4

---

INDEX TO EXHIBITS (CONT'D):

| NO. | DESCRIPTION | PAGE NO |
|---|---|---|
| 25 | Hearing Transcript June 19, 2010 | 205 |
| 26 | (Not marked.) | |
| 27 | Letter November 18, 2010 | 208 |
| 28 | (Not marked.) | |
| 29 | Letter December 9, 2010 | 230 |
| 30 | AAOS Standards on Professionalism Orthopaedic Expert Opinion and Testimony | 125 |
| 31 | Letter May 26, 2009 | 197 |
| 32 | Deposition Transcript Dr. Patrick Brandner | 74 |

***Exhibits retained by the Court Reporter and attached to the transcript.***

Page 5

---

A5067A1
MURRAY J. GOODMAN, M.D.   AUGUST 16, 2011

PROCEEDINGS

THE VIDEOGRAPHER: My name is Paul Boche, your videographer, and I represent Atkinson-Baker, Incorporated in Glendale, California. I'm not financially interested in this action, nor am I a relative or employee of any attorney or of any of the parties. The date is August 16, 2011. The time is 1:23 p.m. This deposition is being taken at the Hawthorne Hotel, Salem, Massachusetts. This is case number 10-CV-8161 entitled Brandner, MD, et al, versus American Academy of Orthopaedic Surgeons, et al. The deponent is Murray J. Goodman, MD. This deposition is being taken on behalf of the Plaintiff. Your court reporter is Lori Atkinson, from Atkinson-Baker, Incorporated.

Counsel, will please introduced yourselves. After all counsel present have introduced themselves, then the witness will be sworn in by the court reporter.

MR. MAURICE: Aaron Maurice on behalf of the Plaintiff, Patrick J. Brandner.

MR. CHABRAJA: Michael Chabraja on behalf of the Defendants and the witness.

Page 6

COURT REPORTER: Would you raise your right hand, please.

(Witness complies.)

COURT REPORTER: Do you solemnly swear that the testimony you are about to give is the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

MURRAY J. GOODMAN, M.D., having been satisfactorily identified and first duly sworn by the Notary Public, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. MAURICE:

Q. Would you please state and spell your name for the record, please.

A. Murray, M-U-R-R-A-Y, middle initial J, Goodman, G-O-O-D-M-A-N.

Q. Dr. Goodman, have you ever had your deposition taken before?

A. Yes.

Q. Approximately how many occasions?

A. I can't count them.

Q. Would you like me to go over the rules that

Page 7

apply with regard to deposition before proceeding, or are you comfortable?

A. I'm comfortable. Unless you have something that is different than I'm used to.

Q. The only thing I want to make clear is I'm not here to trick you today. If I ask you a question, which is inartfully worded and you do not understand it, I don't want you to answer that question. I want you to request that I clarify the question. And I will do everything in my power to provide you with a question that you understand, so that you can answer it; do you understand that?

A. I do.

Q. If you answer a question today, I'm going to presume that you understood it; do you understand that?

A. Yes.

Q. At the end of this process, you are going to have an opportunity to review a deposition transcript, it reads much like a play, you've probably seen one before.

A. Yes.

Q. It is going to have me asking questions, and you

Page 8

answering those questions. You are going to have an opportunity to make any changes that you believe are necessary to your testimony. I want to caution you at this time that substantive changes to that transcript, changes that materially alter the nature of your testimony, may be commented upon by yourself at the time of trial and those comments may tend to reflect on your credibility; do you understand that?

A. Yes, I do.

Q. To begin with, I apologize for being late today. I meant absolutely to be here on time, and somehow the Salem roads once again got me. I appreciate your patience in dealing with me.

A. No, problem. My afternoon is yours.

Q. In terms of preparation for your deposition today, what did you do?

A. I reviewed some of the documents in this grievance.

Q. When you say you reviewed some of the documents in this grievance, what documents?

A. I looked at the grievance report. I looked at the report of the committee on professionalism. I looked at the deposition transcripts of Dr.

Page 9

A5067A1
MURRAY J. GOODMAN, M.D.    AUGUST 16, 2011

already talked about a member's ability to provide day-to-day care for patients while suspended. I believe your testimony is it might not impact that at all?

A. Might not. That's right.

Q. But with respect to a member's ability to provide expert witness testimony, you would acknowledge that the very public suspension from the AAOS would damage that member's ability to provide that testimony?

A. It might damage it. I can't guarantee it would. There are plaintiff's attorneys that would still seek their opinion, and there might be Courts that would allow their opinions to voice, I don't know. If I were making my living as an expert witness, I would rather be in the academy. I would rather have that on my side.

Q. When you say that would be rather in the academy. Well, let's take this in multiple parts --

A. I would rather not have been suspended.

Q. Correct. Basically the reason for that is it gives the other side, whoever that may be, the plaintiff or the defendant the ability to raise

Page 34

issue with the credentials of the expert; correct?

A. Yes, if the Court allows that be presented.

Q. As we sit here today, do you have an understanding of what percentage of my client's income is derived from expert witness testimony?

A. I do not.

Q. As we sit here today, are you aware of the physical disabilities that prevent my client from providing orthopedic surgery?

A. He did raise it at the academy hearing. I don't recall the extent of it.

Q. You do understand that he is surgically disabled; he will never perform surgery again?

A. I don't recall that, but if...

Q. You don't recall him -- you don't recall that being an issue at the initial COP hearing?

A. I don't recall the details of that. If he is, so be it.

Q. When you say, if he is, so be it. What do you mean by that?

A. Well, I'm certain that he's not the only one in the academy in that category. I have a partner in my practice who doesn't perform surgery.

Page 35

Q. What does the partner that you have do to essentially generate income as one of your partners, because he can't provide surgery?

A. He sees patients in the office.

Q. Does he do anything else?

A. Plays golf.

Q. Not a bad job if you can get it?

A. But he could.

Q. How old is your partner?

A. My partner is 75.

Q. So he's surgically disabled?

A. He is not surgically disabled.

Q. He could perform surgeries he just chooses not to.

A. That's correct.

Q. Is that because of his age?

A. I don't know what it is, but...

Q. Well, my client is not 75. My client is much younger than that and is surgically unable to perform surgery. Is this the first time that you are hearing that today?

A. First time I'm hearing what?

Q. That my client is physically unable to perform surgery?

Page 36

A. It's the first time I'm hearing that today. It is not the first time I'm hearing it. As I said, I recall a mention of his disability at the hearing. I don't think that that impacts the criteria by which you judge someone's testimony though.

Q. Okay.

A. I think the two are completely independent issues.

Q. Give me a ballpark figure for how much you made in 2010. I don't need it down to a penny. Give me a number?

A. I can't.

Q. Something.

A. You know, I've got somebody — I don't keep track of that.

Q. North or south of a million dollars?

A. South of a million.

Q. How about if I use, just purely for discussion today, $700,000?

A. I can't — I can't be more specific.

Q. Okay. But if I use the number $700,000, we understand it could be more than that by 300,000 or less than that by 300,000?

Page 37

A5067A1
## MURRAY J. GOODMAN, M.D.     AUGUST 16, 2011

A. I can't — you know, I can't be more specific. I just don't.

Q. If I used the $700,000 figure understanding that I'm giving it a plus or minus of $300,000?

A. What does my income have do to with your client's testimony as an expert witness?

Q. You are about find out. But I need to -- before I go into that line of questioning, are you comfortable with me using a $700,000 figure?

A. No.

Q. Okay. Should I be using a higher figure or lower figure?

A. Why don't we say $500,000 plus or minus 500,000.

Q. Okay. 500,000 plus or minus 500,000. If I told you that you were going to make five percent less than that next year, would you consider that are a significant change in your financial well-being?

A. Personally I wouldn't.

Q. Five percent, you can stomach that, correct?

A. Right.

Q. What about 10 percent?

A. I haven't thought about it. I can't tell you. I have got to look at it in and out. I just

Page 38

don't deal with that stuff.

Q. Right. Well, I'm asking you to think about it now. If I told you your income next year was going to be 10 percent less than it was last year, is that something that would significantly impact your financial well-being?

A. It would concern me. I don't know if it would impact my financial well-being. I don't know. I haven't looked at the numbers.

Q. What about 20 percent?

A. Well, now we're talking national healthcare.

Q. So a 20 percent deduction or reduction, pardon me, in your income is starting to get a little more concerning to you?

A. I guess.

Q. What about 30 percent?

A. You know, let's — I don't know where this is going.

Q. As you sit here today, do you know what percentage of my client's income is derived from providing medical expert testimony?

A. I do not.

Q. If I told you it was in excess of 70 percent, would it surprise you?

Page 39

A. It doesn't surprise me. It doesn't not surprise me. It's of no use -- that information is of no use to me.

Q. Irrelevant?

A. It is irrelevant to me, that's right.

Q. Understanding my client is not anywhere near retirement age. Not a very good golfer and surgically unable to perform — well, physically unable to perform surgery, can you think of any other avenue that an orthopedic surgeon could take to generate income other than providing medical testimony?

A. Taking care of patients in the office.

Q. He does that as well. That is where that other 30 percent comes from? Can you think of anything I'm missing though?

A. You know, I'm not a vocational counselor. You know, I know what friends do. I can't tell you what else is available to him.

Q. Are you familiar with a procedure known as proximal tibial osteotomy?

A. Yes, I am.

Q. What do you know about that?

A. It's a procedure that divides the bone and it

Page 40

changes the angulation of the tibia.

Q. Have you ever performed proximal tibial osteotomy?

A. Yes.

Q. A number of times or a few times?

A. A number of times.

Q. When performing a proximal tibial osteotomy, from a surgeon's standpoint, what are your main concerns in terms of the side effects that could impact a patient post-op?

A. I'm concerned about alignment. I'm concerned about bleeding. I'm concerned about nonunion. I'm concerned about blot clots. I'm concerned about nerve injury.

Q. In terms of nerve injury, is there a specific nerve that concerns you more than others?

A. Sure. The peroneal nerve.

Q. Why are you more concerned about the peroneal nerve than others?

A. But it has more of a likelihood of getting injured in that procedure than others.

Q. Do you have an incidence rate for the likelihood of nerve palsy to the peroneal nerve?

A. Well, I can give you the incidence rate that Dr.

Page 41

A5067A1
MURRAY J. GOODMAN, M.D.    AUGUST 16, 2011

Q. Well, that's what I was going to say. The COP hearing panel only had that one set of transcripts, correct?

A. That's correct.

Q. The COP hearing panel was not provided with the June 2005 transcripts of the patient or the patient's mother; correct?

A. That's correct.

Q. Those were the depositions taken approximately two months before Dr. Brandner's deposition in the case, which is Exhibit 32; correct?

A. Yes.

Q. The COP hearing panel did not have what we've looked at Exhibit 18, which is the transcript from the patient's testimony on April 28, 2008; correct?

A. I believe that is correct.

Q. Seems to me that you were very concerned with whether or not the patient and patient's mother had -- strike that.

It seems to me that you were very concerned; I believe probably the COP hearing panel as well, with respect to the merits of the underlying case. In other words, whether or not the patient and his mother had a discussion with Dr. Sharpe about the potential risks to the foot?

A. The allegation by Dr. Brandner that there was not an adequate informed consent. And that was one of the things that the committee was concerned about. And the committee reviewed the data to determine whether we felt that the informed consent was adequate by reviewing the information available to us. It was our determination that there was adequate informed consent. And that Dr. Sharpe had met the standard of care and that Dr. Brandner had testified that he had not met the standard of care.

Q. Upon what do you base that statement that Dr. Brandner testified that Dr. Sharpe did not meet the standard of care?

A. Based on Dr. Brandner's, I believe it was his deposition testimony.

Q. And you reviewed in preparation for today's deposition?

A. Yes.

Q. I mean, you do recall that there are multiple points in that deposition where Dr. Brandner is asked if he can opine as to whether Dr. Sharpe satisfied that standard of care by engaging in the discussion that Dr. Brandner was testifying was required by the standard of care and that on those occasions he testified -- it is a he said, she said situation; the jury is going to have to make that decision?

A. Dr. Brandner said that Dr. Sharpe failed to meet the standard of care because he did not use the term peroneal nerve or foot drop, is my recollection. I know that he said things about it; he said, she said. And the jury is going to have to determine. But nevertheless, his job was to testify about the standard of care and he made a statement that the standard of care was not met and for those reasons.

Q. If you could pull out Exhibit 32, I think I know the three infamous sentences or the three infamous lines you are discussing. That is on page 20. This is really complicated. It is on the actual page 20 of the mini transcript.

A. Right.

Q. I believe that you are were talking about lines 23 through 25, where you see the question: "Do you still believe Dr. Sharpe fell below the standard care?" The answer is: "Yes."

A. That's correct.

Q. Because I have been through this transcript probably 50 times. That is the only place where you will ever see Dr. Brandner make a statement that Dr. Sharpe may have fallen below the standard of care. Are you aware of any others?

A. It's not that he may have fallen below the standard of care. He said he did fall below the standard of care and everybody on the hearing panel heard that and read it.

Q. I would love to ask you questions about everybody else on the hearing panel. I can only ask you questions about what you did.

A. I'm sorry for referencing obviously.

Q. Did you stop reading this transcript on page 20, line 25 after you saw the word, yes?

A. No. I read the entire transcript.

Q. What you then have is a series of clarifying questions by Bruce Crawford, who is the attorney in the underlying case, that has him asking Dr. Brandner a series of questions about what

Page 78

Page 79

Page 80

Page 81