# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

PATRICK J. BRANDNER, M.D.,   )
                                 )
          Plaintiff,   )
                                 )
  -vs-                   )Case No. 10-cv-8161
                                 )
AMERICAN ACADEMY OF   )
ORTHOPAEDIC SURGEONS and   )
AMERICAN ASSOCIATION OF   )
ORTHOPAEDIC SURGEONS,   )
                                 )
          Defendants.   )

The videotaped deposition of ROSALIAND GIULIETTI, called for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of videotaped depositions, before NOHEMI SALAZAR, C.S.R. No. 084-004648, a Certified Shorthand Reporter within and for the County of Cook, State of Illinois, at 205 North Michigan Avenue, Suite 2560, Chicago, Illinois, on the 22nd day of September, A.D. 2011, at 10:16 a.m.

Page 2

PRESENT:

WOODS ERICKSON WHITAKER & MAURICE LLP,
1349 West Galleria Drive, Suite 200,
Henderson, Nevada 89014-6653,
702-433-9696, by:
MR. AARON R. MAURICE,
    appeared on behalf of the Plaintiff;

VEDDER PRICE,
222 North LaSalle Street,
Chicago, Illinois 60601, Suite 2600,
312-609-7790, by:
MR. MICHAEL A. CHABRAJA,
    appeared on behalf of the Defendants.

ALSO PRESENT:

MR. MARC BUHMANN,
    Legal Videographer.

REPORTED BY:  NOHEMI SALAZAR,
        C.S.R. No. 084-004648.

---

Page 3

INDEX

MELISSA YOUNG              EXAMINATION
BY MR. MAURICE                  7

EXHIBITS

BINDER                          PAGE
Tab 1    AAOS bylaws 3/12/10          30
         Brandner 00004-00030
Tab 2    AAOS bylaws incorporated     31
         2/13/98, Brandner 00702-00745
Tab 3    AAOS Professional Compliance  32
         Program Grievance Procedures
         Brandner 00746-00763
Tab 34   AAOS Professional Compliance  42
         Program Grievance Report
         Brandner 00114-00118
Tab 5    AAOS Standards               132
         amended 4/18/05, Brandner 00003
         00764 and 00766
Tab 6    AAOS letter to Dr. Brandner  140
         2/18/09, Brandner 00119-00120
Tab 7    AAOS letter to Dr. Sharpe and 144
         Dr. Brandner, 5/26/09
         Brandner 00127-00129
Tab 8    Letter from Desert Orthopaedic 147
         Center, 6/9/09
         Brandner 00130-00131
Tab 9    Letter from AAOS             148
         6/10/09, Brandner 00132-00133

---

Page 4

EXHIBITS CONTINUED

BINDER                          PAGE
Tab 10   E-mail to Ms. Giulietti      148
         6/15/09, AAOS_B000000501

Tab 11   AAOS 6/23/09, Brandner 00260  151
Tab 12   AAOS letter to Dr. Brandner   152
         9/18/10, AAOS_B0001183,
         Brandner 002138-00139
Tab 13   AAOS Grievance Hearing Report 154
         Brandner 00767-00776

Tab 14   Letter from Woods Erickson    166
         12/29/09, Brandner 00233-00242

Tab 15   Letter 2/1/10, Brandner 00245-6 167
Tab 16   Letter from Crawford & Kline  170
         to Mr. Peterson, 2/19/10
         Brandner 00572-00577
Tab 17   AAOS Judiciary Committee      175
         appeal hearing report
         Brandner 00606-00614
Tab 18   Letter 6/28/10, Brandner 00633 179
Tab 19   Letter to Mr. Aaron from      180
         Mr. Peterson 7/8/10
         Brandner 00638-00640
Tab 20   Letter to Mr. Maurice from    181
         Ms. Hackett, 7/30/10
         Brandner 00641
Tab 21   AAOS letter to Drs. Sharpe    182
         and Brandner, 9/29/10
         Brandner 00642-00643
Tab 22   Letter from Dr. Callaghan     183

---

Page 5

EXHIBITS CONTINUED

BINDER                          PAGE
Tab 23   E-mail from Ms. Giulietti     184
         1/2/09, AAOS_B0038805-7

Tab 24   E-mail from Dr. Mandell       187
         1/2/09, AAOS_B0038818-9

Tab 25   E-mail from Ms. Martin        188
         1/2/09, AAOS_B0038827-8

Tab 26   E-mail from Dr. Mandell       188
         1/3/09, AAOS_B0038832-0038833

Tab 27   E-mail from Dale Butler       190
         1/3/09, AAOS_B0038834-0038836

Tab 28   E-mail from Dr. Mandell       192
         1/4/09, AAOS_B0038837-0038839

Tab 29   E-mail from Dr. Strain        194
         1/4/09, AAOS_B0038840-0038842

Tab 30   E-mail from Ms. Giulietti     196
         1/5/09, AAOS_B0038858-003885 9

Tab 31   E-mail from Ms. Giulietti     197
         1/5/09, AAOS_B0038865

Tab 32   E-mail from Ms. Giulietti     198
         5/19/09, AAOS_B0038909

Tab 33   E-mail from Ms. Giulietti     201
         5/22/09, AAOS_B0038924

Electronically signed by Nohemi Salazar (601-223-060-0685)

77226bd1-7911-481e-90e9-11a8a6f674d0

Page 6

(Whereupon, Exhibit Nos. 23 through 33 were marked for identification.)

THE VIDEOGRAPHER: Good morning. I am Marc Buhmann, your videographer, and I represent Atkinson-Baker, Incorporated of Glendale, California. I'm not financially interested in this action, nor am I a relative or employee of any attorney of any of the parties. The date today is September 22nd, 2011, and the time is 10:07 a.m.

This deposition is taking place at 205 North Michigan Avenue, Suite 2560, in Chicago, Illinois. This is Case No. 10-cv-8161, entitled Patrick J. Brandner, M.D. versus American Academy of Orthopaedic Surgeons, et al. The Deponent is Rosaliand Giulietti, and this deposition is being taken on behalf of the plaintiff. Your court reporter is Nohemi Salazar. Okay.

Will counsel please introduce themselves for the record.

MR. MAURICE: Aaron Maurice, on behalf of the Plaintiff.

Page 7

MR. CHABRAJA: Mike Chabraja, on behalf of the Defendants.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

(Whereupon, the witness was duly sworn.)

ROSALIAND GIULIETTI, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. MAURICE:

Q. Would you please state and spell your name for the record, please.

A. Yes. My name is Rosalind Giulietti. It's R-O-S, as in "Sam," A-L-I-A-N-D, as in "dog." The last name is Giulietti, G as in "George," I-U-L-I-E double T, as in "Thomas," I.

Q. Ms. Giulietti, have you ever had your deposition taken before?

A. No.

Q. Okay. Let me go over some of the ground rules for you. The oath which you just took, same oath that you would take in a court of law, carries with it the same obligations to tell the

Page 8

truth, same penalties for violating that oath.

Do you understand that?

A. Yes.

Q. The court reporter to my left, to your right, is going to take down everything that is said in this room today and ultimately prepare it into a transcript, reads much like a play with me asking questions and you providing answers.

Because she is creating the transcript, it's important that we follow some special rules. The first rule is all responses must be audible. Nods of the head, shrugs of the shoulders, things that out in the lobby I might take as a response to my questions don't appear on the record.

If I see you use one of those non-audible responses, I will say is that a "yes," is that a "no." I'm not trying to be rude; I'm just trying to clarify it for the record.

Do you understand that?

A. Yes, I do.

Q. With that said, certain responses, although audible, do not appear well on the record. "Uh-huh" and "huh-uh" do not appear well

Page 9

on the record. If I hear you use one of those generic responses, again I will say is that a "yes," is that a "no." Not trying to be rude, just trying to clarify it for the record.

Do you understand that?

A. Yes, I do.

Q. Okay. In everyday life, it's very common for a person who is responding to a question to volunteer the answer about three-fourths of the way through the question. It actually makes it so that our society can move along a little faster. You don't have to wait until the end of a question to respond.

That's great down on the street if somebody is asking for directions; that is not good in a deposition. It creates a very choppy transcript. I'm going to do everything in my power today to wait until you are done answering one of my questions before I ask you a new question. I would just ask that you do everything in your power to wait until I am done asking my questions before you volunteer an answer. Fair enough?

A. Yes.

Electronically signed by Nohemi Salazar (601-223-060-0685)

77226bd1-7911-481e-90e9-11a8a6f674d0

Page 22

If the materials are not in compliance, then it depends on what the problem is.

I mean, almost all grievance submissions have deficiencies, almost all of them. And so depending on what the deficiencies are, there are some cases where the entire materials are returned saying, you know, here they are, they need to be in compliance with the program.

In the majority of cases, there are -- there's documentation missing, there's identification standards missing, and so that's usually handled via correspondence or I may make a phone call to the -- to the grievant explaining what the problems are. Sometimes it's minor, but at that point in time, the administrative review clock is stopped.

Q. Now, you mentioned when you have something that's nonconforming or if additional materials are required, you might handle it through correspondence or a phone call to the grievant. Do you recall that you said that?

A. Uh-huh.

Q. Is that a "yes"?

Page 23

A. Yes. I'm sorry.

Q. Okay. No problem.

What about if it's further down the line? After a prima facie determination has been made, at that point you receive a submission from one of the parties that the rules doesn't allow for or the rules do not allow for, what do you do at that point?

A. It depends on -- this is after prime facie determination.

Q. Correct. So now you have --

A. If there is an addition, an additional submission?

Q. Correct. Somebody sends a document to you that, based on the rules, they're not allowed to submit?

A. If we're at prime facie.

Q. Past prime facie.

A. Okay. So the prima facie materials have gone out, and --

Q. I'm talking about, yes, you have already -- you already have -- well, let's go back.

I understand that at the initial

Page 24

submission of a grievance report there's no contact with the respondent?

A. That's correct.

Q. The responsdent doesn't evem know that they -- that a grievance has been submitted against them, correct?

A. That's correct.

Q. Okay. So I can understand then at that point if you're trying to get additional documents, you might call the grievant, you might send a letter to the grievant requesting these documents. I understand that.

What I'm talking about is after the preliminary administrative review has been completed and it's bean determined that the grievance report has passed, and at this point the respondent is notified that the grievance has been filed against him, correct?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes.

Q. Okay.

A. I apologize.

Q. Okay. No problem. If, following that

Page 25

point, you have a submission by one of the parties that is not allowed for under the rules, would you still feel free to contact either of the parties by telephone?

A. If something came in following prima facie, there's two parts to that I'm not sure I understand. There's a period of time before prime facie.

Q. And that's the time I'm dealing with.

A. Okay. So that you're --

Q. Basically, I'm saying any point after --

A. Well, but there's --

Q. -- completion of the preliminary administrative review?

A. If it comes in between the sending of materials and the grievant and respondent being notified of the prima facie determination, that is -- that material is held because, at the time of prima facie determination, additional material can then be submitted prior to a hearing.

So any material that is received by either party, once those materials are distributed, is held within the office of

7 (Pages 22 to 25)

Page 26

general counsel until the prima facie determination is a yes, at which point it's held until the deadline date for additional materials. If it's a no, it's returned to the party.

Q. I'm not talking about what you do with the document though.

A. Okay.

Q. I'm talking about when you have a document that is submitted that is not permitted under the rules after you have already completed the preliminary administrative evaluation. So now you have a respondent who is on notice that he has a grievance submitted against him, you have a grievant who has already provided the documents necessary to kick off this process.

What I want to know is at that point, if you have a nonconforming document that's submitted, would you still feel free to contact either of the parties by telephone, or from that point forward would you confine your communications to written correspondence?

A. I think it's usually in writing, but it could be e-mail versus correspondence. It might

Page 27

be an e-mail that says that this material cannot be.

Q. Right. And I include in written correspondence an e-mail.

A. Okay.

Q. But specifically, would you feel comfortable at that point communicating with either party by telephone?

A. Generally, it's in writing.

Q. But the question is would you feel comfortable at that point communicating with either party in -- by telephone?

A. Probably not.

Q. Okay.

A. I would probably want that in writing.

Q. In the Brandner-Sharpe grievance, following the completion of the preliminary administrative evaluation, did you have any telephone conferences with Dr. Sharpe?

A. I don't recall.

Q. What Dr. Sharpe's counsel, Bruce Crawford?

A. No call. I generally do not call the attorneys. So if there was a conference where

Page 28

he contacted me, that I don't know, I don't recall that.

Q. Okay. So it might have happened, but you just don't --

A. I --

Q. As you sit here today, you don't have an independent recollection of it?

A. No, I don't.

Q. Okay. Same question, going back a little bit, for Dr. Sharpe.

As you sit here today, is it possible that you had you telephonic communications with Dr. Sharpe following the completion of the preliminary administrative review and you just don't recall it?

A. It's possible he contacted me with a question.

Q. Right. Right.

A. But I -- I don't have any recollection.

Q. Right. I'm not saying that you necessarily called him --

A. Yeah.

Q. -- or he necessarily called you.

I just want to know if it's possible

Page 29

that following completion of the preliminary administrative review if there were telephonic between you and Dr. Sharpe.

A. I don't have a recollection. That's not typical. So --

Q. So it might have happened, it might not have happened, you just -- as you sit here today, you don't have a recollection?

A. I don't have a recollection.

Q. What is your e-mail address at the AAOS?

A. Giulietti, so it's G-I-U-L-I-E-T-T-I, @aaos.org.

Q. And do you ever use any other e-mail account to conduct AAOS business?

A. No.

Q. Do you have a dedicated telephone line at the AAOS?

A. Yes.

Q. What is that number?

A. 847-384-4087.

Q. And you don't happen to know who the AAOS's long distance carrier is, do you?

A. No.

MR. CHABRAJA: Do you want it marked?

Electronically signed by Nohemi Salazar (601-223-060-0685)

77226bd1-7911-481e-90e9-11a8a6f674d0

Page 54

A. It is not my -- I -- it's not my authority to determine what documents are submitted.

Q. I --

A. As long as the documents that are referenced are submitted.

Q. I understand that, but I want to get to this idea that you're saying in Section VI C of the grievance procedures, in fact, only requires the parties to provide those documents that support their position.

Under that interpretation that you take, that would mean that a party has no obligation to produce documents which, in fact, run contrary to their position, correct?

A. I don't have a way of determining that.

Q. Well, you had a way of determining that somehow Section VI C of the grievance procedures provides that the parties are only responsible for producing those documents that they want the AAOS to consider in support of their allegations, correct?

A. Yes.

Q. So use that exact same analytical power

Page 55

and respond to my question.

Does it then necessarily flow therefrom, under your analysis, that a party has no obligation to produce documents that they don't the AAOS to consider because they refute their position?

A. The respondent has the opportunity to refute the position, so the -- the grievance responsibility is to produce the documents in support of the allegations. The respondent's responsibility is to produce the documents that refute those allegations.

That's not my judgment call. It's one party is producing the documents, the other party is producing the documents in refute, if they're -- once these materials go to the committee on professionalism, if they're -- by reviewing those materials, they want additional materials or they ask for additional materials they will do that and then both parties respond with those materials.

So there are times when it gets to the -- to the committee on professionalism and they will say, "You need to find out if there is

Page 56

this," or, "You need to find out if there is this, I want to -- I'm requesting those documents."

So it's their review when they are -- when they are making a prima facie determination. My -- within the office of general counsel, we are receiving the documents that they feel are relevant to their allegations. We are not retrying the entire -- you know, I'm not expecting, you know, 10,000 pages of things.

They are providing the documents in -- in -- that support their allegations, and then it's the respondent's obligation to provide the documents in refute. That's -- that's the rule within the office of general counsel. We don't make the other -- any other determination.

Q. I'm going to ask a very concise question so hopefully we could get past this.

Is it correct to state that your interpretation of Section VI C of the grievance procedures is that the grievant is only responsible for producing those documents that the grievant wants the AAOS to consider with

Page 57

respect to the allegations that they have made in the grievance report?

A. Read it back to me, please.

(Whereupon, the record was read by the reporter as requested.)

BY THE WITNESS:

A. That's in compliance with the grievance procedures that they have -- if they have supplied the documents that are in support of their allegations they are relying on for evidence, they are in compliance with the procedures and the report as written.

BY MR. MAURICE:

Q. Okay. You're making this far more complicated than it needs to be.

A. Then I'm not understanding the questions.

Q. Let's be very clear here.

Do you have in front of you Section VI C of the grievance procedures?

A. Yes.

Q. Section VI C of the grievance procedures provides, "Each party to a grievance is responsible for obtaining and providing all

15 (Pages 54 to 57)

Electronically signed by Nohemi Salazar (601-223-060-0685)

77226bd1-7911-481e-90e9-11a8a6f674d0

Page 74

the grievance process from beginning to end is supposed to supposed to work.

A. Okay. The grievant must complete a Professional Compliance Program Grievance Report. It must specifically identify the mandatory standards alleged in violation. It must include -- first of all, it must include a court document or some indication that the underlying matter has been completed, because the AAOS does not accept anything that has not been resolved.

So the report must be completed, and the grievant must specifically identify the mandatory standards and attach any documents that they are relying on for evidence to support the allegations.

They must also include complete depositions or transcripts if the respondent had provided a deposition transcript -- or testimony related to. The identification of which deposition or testimony is being addressed is also named in the grievance report on that first page.

So they must identify the deposition or

Page 75

testimony at -- in the underlying matter, and then they must supply the complete deposition or testimony.

Q. Okay. Let me interrupt you right there. You mentioned that one of the things they have to do is identify the specific mandatory standards which are alleged to have been violated, correct?

A. Yes.

Q. Okay. But it's not like they can just list five mandatory standards and say these are the ones they violated, correct? They have to provide some kind of detail or specific factual allegations to support the alleged violation of those mandatory standards, correct?

A. Yes.

Q. Okay. Sorry. Back to you.

A. Okay. So the material is submitted to the office of general counsel. The preliminary administrative review is conducted to make sure that the reference material is included.

As I said before, there are almost always deficiencies in the submissions. So once the deficiencies are identified, the grievant is

Page 76

notified of what must be included in the documentation before it can go forward, and the timeframe then is stopped in terms of, you know, the amount of time allowed for the administrative review.

So sometimes this takes multiple correspondence with the -- with the grievant to obtain what's needed. There can be some issues particularly with images, obtaining the images, and presently, we have the de-identification of all the material that has to be done.

Q. Let me interrupt you right there. You talked about the time period is stopped while the office of general counsel is waiting for the grievant to supply these materials; is that correct?

A. Yes.

Q. Okay. Now, the time period for the administrative review is 60 days, correct?

A. In the 2008 procedures, that's correct, not --

Q. Okay. Has it -- has it changed?

A. Yes.

Q. What is it now?

Page 77

A. I believe it's now -- we have 90 days, I believe.

Q. Okay. I don't have the --

A. Yeah.

Q. -- updated ones.

A. I don't have those with me.

Q. But if I understand your testimony correctly, if it the office of general counsel on day 45 sends an e-mail to the grievant and says, "Hey, you got to give us these four transcripts," and the grievant waits a month and a half to submit those four transcripts, the 60-day period is tolled during that period?

A. Correct.

Q. Okay. Under what authority does the office of general counsel toll that period?

A. The professional compliance procedures indicate that the AAOS has a discretion to extend any of the time limitations and -- and, as I said, there's almost always deficiencies.

Q. And, I mean, that, the provision in the professional compliance procedures that says the AAOS has the discretion to extend all time deadlines, is it the office of general counsel's

Electronically signed by Nohemi Salazar (601-223-060-0685)

77226bd1-7911-481e-90e9-11a8a6f674d0

Page 78

interpretation of that that the office of general counsel can, without going to the chairman of any of the committees, without going to the AAOS board, just on its own extend those deadlines?

A. Yes.

Q. Okay. And that -- it basically makes it so that the AAOS, although their deadline's identified in the document for action by the AAOS, they -- they're really more like guidelines because the AAOS can extend them at will, correct?

A. They're deadlines that are -- that we try to meet all the time. This particular part of the process is very -- I mean, it can -- it can be expanded.

Q. Because it's out of your control?

A. It's out of my control, yes.

Q. Okay. So back to you, we were just in the midst of the administrative review.

A. Okay. So at that point in time, if everything arrives, we have the materials, there are times when the materials cannot be provided for whatever reason. That information is noted. If the -- if generally everything is

Page 79

there, then the respondent is notified of the grievance. It is not until that point in time that the grievance is actually considered filed.

Q. Tell me --

A. Yeah.

Q. Sorry.

A. No.

Q. But tell me what it is your office looks for to determine that a grievance has passed preliminary administrative review.

A. First of all, we have to make certain that it's resolved. That's the first thing, otherwise it does not pass. The second issue is that the timing of the alleged violation occurred after the development of the program. So it would be --

Q. It can't be before April 18th of 2005?

A. April 18, 2005.

Q. Okay. What else?

A. Then the next point is, as I said, I review the evidence that they're relying on to make sure that it's complete. So, for example, they're saying in such and such's deposition and it's not the respondent's deposition, then that

Page 80

deposition may be requested.

I -- we also take a look at a lot of times there's references to tests or -- or images and they don't supply them. So those are requested, and that's usually very time-consuming to get a response.

So what I do is make sure that the materials that the respondent -- that the grievant is referencing are included in the submission. And at that point in time, it is considered a filed grievance.

Q. Okay. So if I understand correctly, the preliminary administrative -- is it evaluation or assessment?

A. We actually call it a review, I believe, in --

Q. Review, okay, is to determine essentially the completeness of the grievance report and the documentation substantiating it and basically standing on behalf of the AAOS to consider it, that you have the complete -- that the underlying litigation has been resolved, is complete, and that the alleged action occurred after the initiation of the grievance process,

Page 81

correct?

A. Correct.

Q. Okay. There's no evaluation whatsoever by the office of general counsel as to the merits of the grievance?

A. No.

Q. So you could review it and say, "This is complete nonsense," but that's not your determination, as long as it's complete and within the timeframe and the -- there's documentation submitted to substantiate it. It's going to make it on past the preliminary assessment?

A. Correct.

Q. Okay. What's next?

A. Okay. Then the respondent is notified of the filing of the grievance. So at that -- excuse me. At that point in time, a letter is sent from Mr. Peterson indicating that -- that this has been submitted for review by the committee on professionalism, the specific -- indicates that the allegations has been specifically identified in the materials.

The respondent is given 60 days to

21 (Pages 78 to 81)

Electronically signed by Nohemi Salazar (601-223-060-0685)

77226bd1-7911-481e-90e9-11a8a6f674d0

Page 94

information to the grievant and the respondent so that they can see who these hearing panel members are who they may be affiliated with?

A. I don't know.

Q. Okay. Has there ever been a situation in which the office of general counsel has provided some information to the grievant and respondent with respect to the hearing panel members so that they can take that into consideration when making a determination --

A. No.

Q. -- as to whether they should object for cause?

A. Not that I know of.

Q. And, now, this process that you've just described about the letter going out with the hearing panel members, that process is basically repeated at the judiciary committee level and at the board of the directors level.

A. Yes.

Q. Correct?

A. Yes.

Q. And the same answer that you just provided with respect to the office of general

Page 95

counsel not supplying this information related to the COP hearing panel members applies equally for the judiciary committee members and the board of directors members, correct?

A. Correct.

Q. Have you ever participated in a discussion with anybody at the AAOS that one of the issues that possibly should be discussed disclosed to these parties is the role that these panel members play with insurance companies?

A. No.

Q. Okay. I mean, are you aware that -- are you aware that you have members on these committees who serve in positions of directors for insurance companies that do nothing but issue medical malpractice insurance policies?

A. No, I'm not aware of that.

Q. Okay. Back to -- back to where we were. We now have the parties, they have this list, and they have an opportunity to object for cause.

Let's presume they do not object for cause. What happens next?

A. Okay. So they have a deadline date to submit any additional information they would

Page 96

like to submit. It's established 15 days prior to the hearing itself. They are also given the information that they can be represented by an attorney and that they can have witnesses.

If a witness is going to be in attendance, the information that that witness will testify to must be generally provided and all material, again, that's going to presented at the hearing must be received 15 days in advance, because no new material will be allowed at the hearing.

Let me see. What else is in that letter? Oh, a description of how -- a general description of how the hearing will be run in terms of the time limitation at the committee of the professionalism level, that each side has thirty minutes to present, and if they have an attorney and -- or a witness, that is -- those presentations are also included within that 30-minute time limit.

Q. The letter also advises them that during that 30 minutes, members of the COP hearing panel may ask them questions, correct?

A. Yes.

Page 97

Q. Okay. Sorry to interrupt.

A. I think that's -- I think that is what's in that letter.

So then the next stage is 15 days prior to the hearing, all materials submitted by that deadline date from the period of prima facie to the committee on professionalism --

Q. Is it really the period of prima facie to the 15 days prior, or is it really any information submitted by the grievant or the respondent following the deadlines initially imposed upon them with respect to the grievance report and the response?

A. Well, it's -- it's prima facie. It's the dead -- once prima facie -- once the materials have been distributed, so once I have compiled what was received and it's been sent to the committee on professionalism, that's it.

Anything that comes in after that point in time is held until that deadline date of 15 days prior to the hearing. All the materials are compiled at that time. They are distributed at the same time to the respondent, the grievant, and the committee on professionalism.

25 (Pages 94 to 97)

Electronically signed by Nohemi Salazar (601-223-060-0685)

77226bd1-7911-481e-90e9-11a8a6f674d0

Page 98

Q. And in speaking with Melissa Young yesterday, she acknowledged that there's nothing in the professional compliance grievance procedures that provides for the holding of documents and the delayed delivery of the documents to the other side, but that this is the way the AAOS's office of general counsel has set it up so you don't have documents flying back and forth throughout this whole process.

Do you agree with that?

A. Right. It's not a rolling process.

Q. Right.

A. So when things come in, they're sent on.

Q. Right. If you were to send one letter that was submitted by one side to the other side, what are you going to get? A letter from the other side, and it's just going to keep going, correct?

A. It's going to -- correct.

Q. Okay. Okay. So we're at this point. It's now 15 days in advance of the hearing. The documents have been received. The AAOS has mailed out copies to both sides.

Page 99

What happens next?

A. Okay. At that point in time, we are ready for the hearing. So we go to the committee on professionalism hearing.

At that point, the grievant is the first to present, is allowed 30 minutes. The committee may asked clarifying questions during that period of time or may not.

Following the grievance presentation, the respondent is allowed to present. Again, clarifying questions of the respondent may be asked during that period of time. Following both presentations, the committee on professionalism may ask questions of both parties. Okay.

Q. What happens after that? Let's say the questioning is done, they thank and excuse both parties. What happens then?

A. Okay. Then the committee goes into executive session to discuss the grievance. There are -- the deliberations are done at that time. Sometimes there's been a delay on deliberations, most of the times not, but sometimes there's been a delay maybe for a

Page 100

transcript or something.

Q. Who is present for the deliberations? Who is in the room?

A. The entire hearing panel, general counsel, assistant general counsel, so Rick, Melissa, and I, and then outside counsel, Russ Pelton.

Q. And what role does the office of general counsel play in these deliberations?

A. We are just -- we're observers. We don't participate in the deliberations at all.

Q. Is anybody taking notes?

A. Yes, we -- we take notes.

Q. I mean, I know because the court reporter --

A. No. No. No.

Q. There's no court reporter for deliberations, correct?

A. No. No.

Q. That's correct?

A. That's correct.

Q. Okay. Who from the office of general counsel is taking notes on the discussion?

A. All three of us usually take some

Page 101

notes.

Q. Let's presume they have voted in favor of a professional compliance action.

What happens next?

A. At that point in time -- well, you're saying the deliberations are over, the notes are taken, and so an action has been voted?

Q. A vote to hang them.

A. We record the vote, and then after the grievance hearing, the -- both parties are notified of the decision. They are also given the opportunity -- they are given the information regarding the appeal process.

Q. How -- when they are notified of the decision, how does that occur, just a letter that says you've been --

A. It's --

Q. You're being suspended, or is it more detailed?

A. No, it's -- because the committee on professionalism doesn't have the authority to suspend.

Q. Okay.

A. What -- what is sent out is the report.

26 (Pages 98 to 101)

Electronically signed by Nohemi Salazar (601-223-060-0685)

77226bd1-7911-481e-90e9-11a8a6f674d0

Page 106

A. Well, the "no new information" relates to if something is brought up in the committee on professionalism hearing, that can be referenced. So if the committee asks a question that maybe isn't directly related in some way -- I can't give you an example right now, but the -- if it was brought up in the committee on professionalism hearing, then it can be addressed in the appeal statement.

Q. Right.

A. Okay.

Q. But what I'm saying is the actual presentation of witnesses and documents is supposed to occur at the COP hearing panel where each side has 30 minutes to make their presentation as opposed to further down the line at either the judiciary committee level or the board of directors level, correct?

A. That's correct, yes.

Q. I mean, it just makes sense with the time periods. Nobody can honestly expect you to be able to, you know, make an evidentiary showing in ten minutes and make legal arguments in ten minutes, whereas the -- the COP hearing panel

Page 107

where you have 30 minutes, that would seem more logical.

Would you agree with that?

A. Yes.

Q. And is it true, I mean, that the COP hearings sometimes last, you know, an hour or two hours based on the questions that are asked and the questioning of the grievant and respondent?

A. Yes, they can last.

Q. And the presentations at the judiciary committee level and the board of directors are far shorter, in general?

A. They're shorter because of the presentations, yes.

Q. Okay. Okay. Back to where we were. We're now getting ready for the appeal hearing and we're presuming that nobody has objected for cause to any of the members sitting on the panel, and nobody recused themselves.

What happens then?

A. Okay. So they've received the notification, et cetera. They have submitted their appeal statements on both sides. Those materials then are mailed out immediately after

Page 108

receipt to both parties, the attorneys if they are involved, and the committee -- and the judiciary committee.

Okay. The judiciary committee, however, has received the entire binder of materials for review, and that is sent usually prior to the deadline because our deadline is so close to the hearing that they need to get their materials in advance.

So they are reviewing all of the materials that the committee on professionalism has reviewed, and then in addition they are reviewing the transcript of the hearing and the -- the committee on professionalism report plus the appeal statements. So that will all be reviewed in advance of the appeal hearing.

Q. At the actual appeal hearing, tell me what happens?

A. Okay. Then the person appealing the hearing is going to speak first, and then again the judiciary committee may ask -- well, at that point, the -- it's usually the person appealing the hearing, the opposite party, and then the judiciary committee will ask questions if they

Page 109

need clarification on any of the issues.

Q. What happens after the parties are thanked and excused?

A. Okay. Then they go into deliberation as well. And in this case, the judiciary committee has a chair, and that chair, the chair of the committee chairs all of the appeal hearings. So the chair or the COP chairs do vary by hearing panel. The judiciary committee has -- the chair of the judiciary committee chairs all the appeal hearings.

So the deliberations begin, and in this case, they develop their report, essentially, during the deliberations and the findings by -- I function and Melissa and Rick also take notes primarily as a recording secretary, as a scribe, and they -- they provide detailed language, they provide the citations, they go through and they do it all verbally within those deliberations.

And so after the findings there, then a report is written. The draft report comes from the office of general counsel in this case.

Q. Okay. So unlike the COP hearing panel where the chairman of that panel would prepare

28 (Pages 106 to 109)

Electronically signed by Nohemi Salazar (601-223-060-0685)

77226bd1-7911-481e-90e9-11a8a6f674d0

Page 150

A. Yes.

Q. Okay. But you didn't see this, you didn't view this as something vindictive or spiteful; you accepted it for what it was?

A. Yes, because it had certainly occurred before on other grievance matters.

Q. But ultimately, the judiciary committee hearing was actually conducted in New Orleans at the 2010 annual meeting, correct?

A. Correct.

Q. And Dr. Sharpe did make it to that meeting, correct, to that hearing?

A. I'm -- I'm unsure.

Q. You don't recall Dr. Sharpe sitting there with Bruce Crawford in the hallway waiting for the court reporter, just like we were, giving you the same angry looks?

A. So the -- that was the judiciary committee meeting in February?

Q. Right. Do you recall that?

A. Yes. Yes, now I do.

Q. So he ultimately attended the very meeting that he said here that he could not attend?

Page 151

A. Correct.

MR. MAURICE: Okay. We're going to take a break to change the tape.

THE WITNESS: Okay.

THE VIDEOGRAPHER: We're going off the video record at the end of Tape 2 at 12:51 p.m.

(Whereupon, a recess was had.)

THE VIDEOGRAPHER: We are going back on the video record at the start of Tape 3 at 12:59 p.m.

BY MR. MAURICE:

Q. If you could turn to the document marked for identification as Exhibit 11, do you recognize this document?

A. Yes.

Q. And what is it?

A. This is Mr. Peterson's notification that the grievance will be heard as scheduled because Dr. Sharpe did not accommodate the request for a postponement.

Q. And I see you're copied on the bottom of this letter, but is it possible you drafted this letter as well?

A. Yes.

Q. Okay. And I see at the end of the

Page 152

second paragraph, it says, "Consequently, due to Dr. Sharpe's inability to be present if the proceedings were delayed, the hear of Grievance 2008-23 will remain on the October 2-3, 2009 schedule."

Do you see that?

A. Yes.

Q. And, as we discussed, the -- Dr. Sharpe's inability ultimately must have resolved itself because he was able to attend the hearing in New Orleans in the spring of 2010, correct?

A. Correct.

Q. And if you can turn to the next exhibit, do you recognize this document?

A. Yes.

Q. And what is it?

A. Okay. This is the materials that were submitted following the prima facie review by Dr. Sharpe that -- and I believe it was a letter a correspondence, that had not previously been forwarded to Dr. Brandner, and at this point the deadline for additional materials in preparation for the committee on professionalism hearing had

Page 153

passed, and so all materials were being distributed to all parties and the committee of professionalism.

Q. Okay. Now, you said that this was the letter that Dr. Sharpe had submitted, your language was, following the administrative review. That's not exactly correct, is it?

A. It's -- it's following the distribution of the prima facie materials to the committee on professionalism.

Q. Okay. So the -- well, I guess the administrative review from the office of general counsel's office was complete because the information had been forwarded on --

A. Correct.

Q. -- to the committee on professionalism, correct?

A. Correct.

Q. But the prima facie determination had not been completed, correct?

A. Correct.

Q. And I think you've already made it clear that the -- that the reason the document was held for five months before it was sent to

39 (Pages 150 to 153)

Electronically signed by Nohemi Salazar (601-223-060-0685)

77226bd1-7911-481e-90e9-11a8a6f674d0

Page 154

Dr. Brandner was just because that's the way the AAOS handles these things; they hold the document until the next scheduled time to exchange materials, correct?

A. That's correct.

Q. Can you turn to the document marked for identification as Exhibit 13. Do you recognize this document?

A. Yes. This is the committee on professionalism report following the hearing.

Q. Now, the hearing occurred on October 2nd, 2009.

If you go to the last page of the document, it shows that the report was issued on December 10, 2009. Do you see that?

A. Yes.

Q. That is outside the 60-day deadline that is identified in the rules for the issuance of the grievance -- the committee on professionalism hearing panel's report and recommendation, correct?

A. Yes.

Q. Okay. Are you aware of any request that was made by the committee on professionalism to

Page 155

the board of directors for the AAOS to extend the deadline for the submission of the report?

A. No.

Q. Now, are you aware of any request made by the committee on professionalism to the office of general counsel for an extension of the time period to issue the report?

A. No, that's not required.

Q. When you say it's not required, what do you mean?

A. The committee on professionalism is -- is issuing their report. They are given a deadline. However, they have the discretion to extend that deadline if necessary, and in this -- in this case, it was necessary.

Q. Show me in Exhibit 3 where the committee on professionalism has the ability to extend the deadline if necessary.

A. In -- in III, Section III D, "AAOS has sole discretion to extend any time limitations," and the COP, as a body of the AAOS, has the sole discretion to extend those time limitations.

Q. Hang on. III D what? What am I looking at?

Page 156

A. III D.

Q. Okay. III D, if I'm reading correctly, it says, "'Days' refer to calendar days and shall include Saturdays, Sundays and legal holidays when computing a time period. Time periods commence on the date that AAOS receives the grievance materials. AAOS has sole discretion to extend any time limitations."

Did I read that correctly?

A. Yes.

Q. Okay. So it doesn't say that COP has the sole discretion to extend any limitations, correct?

A. The COP is a body of the AAOS, is representative of the AAOS. That's all inclusive.

Q. Okay. Upon what do you base that interpretation?

A. The committee is a -- AAOS is -- the committees are part of AAOS.

Q. Okay. But --

A. AAOS is used in the procedures as including the COP, the judiciary. Committee on professionalism is defined as the AAOS body

Page 157

responsible.

Q. Right. And the C -- you're looking at Section III, or you're looking at Section III H, correct, when you see the committee on professionalism?

A. Yes.

Q. And you see that committee on professionalism in quotes is to be referred to in the document in the parenthetical "COP," correct?

A. Right.

Q. Okay. Do you see anything in Section III that indicates that it relates specifically to the COP?

A. No, but there -- there isn't any language defining the AAOS as not being its representatives either. The interpretation of D is the AAOS and all its -- and it's bodies --

Q. That's the interpretation --

A. -- as the sole discretion to extend any time limitations. The OGC functions as a body of the AAOS as well.

Q. That's the interpretation that the office of general counsel takes?

A. Yes.

40 (Pages 154 to 157)

Page 166

professional compliance matter have an obligation to adhere to the procedures outlined in this document?

A. Yes.

Q. Okay. Do you see that that's independent of their obligation to participate in the grievance process in good faith?

A. Yes.

Q. Okay. So it's possible that a person could adhere to all of the obligations provided, well, all of the procedures outlined in the grievance procedures, and nonetheless still fail to participate in the grievance process in good faith? They're independent of each other?

A. Yes.

Q. I'll ask you to turn to Exhibit 14, please.

Do you recognize the document marked as for identification as Exhibit 14?

A. Yes, this is Dr. Brandner's appeal statement.

Q. Okay. And the grievance report was mailed to Dr. Brandner on December 14th of 2009, his appeal statement was sent via overnight mail

Page 167

on December 29, 2009.

You don't dispute that the -- Dr. Brandner's appeal was timely, do you?

A. No.

Q. If you turn to the next exhibit in line, Exhibit 15, do you recognize this document?

A. Yes.

Q. What is it?

A. This was dated February 1st, 2010, so at that point in time, we had revised internal guidelines for the grievance material to be in compliance with the stronger HIPAA regulations.

And so this is providing the -- a new set of all the grievance material thus far compiled and with redactions and providing them to both parties, because those were the documents the judiciary committee would be reviewing.

Q. Now, the grievance procedures that were adopted in September of 2008, they already required the parties to follow HIPAA guidelines for de-identifying patient information unless otherwise exempted, correct?

A. Correct.

Page 168

Q. Okay. Tell me about the amendment of those rules.

What changed in the internal guidelines at the AAOS?

A. Well, we were getting -- we were getting notifications from HIPAA and the HSS about the change in the guidelines, that they were going to become stricter, and so discussion about this occurred very early on about what we should be doing in-house.

And so it was decided that at the first of the year, which would be a good starting point, to redact all information according to HIPAA. And so it -- we took on quite a -- quite a task within the OGC to begin to redact -- redact this material.

Q. Did you receive one of those letters from the attorney for the patient and the patient's mother in the underlying action in this litigation?

A. I believe --

Q. His name is Wade Causey?

A. Right. I believe we received a letter somewhere about -- within this grievance matter,

Page 169

yes.

Q. But your testimony is you were getting letters from different sources essentially about the same issue, the HIPAA compliance?

A. Well, it actually wasn't coming from the attorneys. What we were getting information from was from the governmental agencies. So the concern had started that they -- that there was going to be stricter guidelines, and there were. In fact, in December 2009, we received something from HSS with stricter guidelines.

Q. Do you believe Dr. Sharpe's initial grievance report and the submitting -- and the materials submitted in support of that were in compliance with HIPAA?

A. With -- they were in compliance with the guidelines that we had established, which was if a -- if a patient had initiated a litigation, that those were a matter of public record, and consequently that didn't have to be redacted, except, I mean, obviously, things like Social Security number, et cetera, would be.

Q. So it's your belief that Dr. Sharpe's grievance report was in compliance with the AAOS

43 (Pages 166 to 169)

Page 170

grievance procedures related to de-identifying patient information?

A. Yes.

Q. And this process that you have described in terms of redacting the information, that didn't just occur in February of 2010 with respect to the Brandner-Sharpe grievance; that was across the board?

A. Across the board.

Q. If you could turn to the document marked for identification as Exhibit 16, do you recognize this document?

A. Oh, this is the appeal statement of Dr. Sharpe through his attorney.

Q. And I take it if this goes to Richard Peterson, general counsel of the AAOS, there would be a document that would be forwarded on to you?

A. Yes.

Q. On the second page of this letter, the second to last paragraph, Bruce Crawford makes an argument that he would then repeat at the judiciary committee hearing, and I'm just going to read it so it's in the record.

Page 171

And I'm going to start on the third line down where it starts, "Dr. Sharpe pointed out in his grievance letter and reply that the patient and his mother had, not surprisingly, changed their prior deposition testimony related to the informed consent issue after Dr. Brandner agreed to be their expert against Dr. Sharpe. The point is Dr. Brandner never should have agreed to be an expert or offer the opinions he did."

Do you see that?

A. Yes.

Q. This was the theme of an argument that Bruce Crawford advanced in New Orleans as well, that the point of the grievance from day one was that Dr. Brandner never should have agreed to be an expert in the first place because the second set of depositions had not even occurred yet. So all he had to go on was the first set of depositions.

Do you recall that?

A. Yes.

Q. In terms of the deliberations at the judiciary committee level, do you recall that being discussed?

Page 172

A. No, the focus was on the two matters that were identified in the grievance report, the deposition and the testimony.

Q. Okay. It's interesting because, if I remember correctly, the judiciary committee report and recommendation, the initial draft of that comes from the office of general counsel, correct?

A. Yes.

Q. And that initial draft is prepared based upon the notes taken by the general counsel's office, correct?

A. Yes.

Q. And you've already testified that the general counsel's office doesn't, you know, include anything in the draft report and recommendation that wasn't discussed during the deliberations, correct?

A. Yes.

Q. Okay. Well, that issue, the issue about when Dr. Brandner agreed to be an expert in this case, appears six times in the report and recommendation that was ultimately signed by the judiciary committee?

Page 173

A. But it is in the summary. So the summary section includes what's been stated. So when the delib- -- when you said "deliberations," I thought you were referring to the findings.

The fact that this was brought up will be in the report because that section of the report is all summary statements of -- of this, you know, they're citations to the -- to the transcript.

So during the deliberations, if the -- if the doctors are saying, "Well, you're going to put this in, you're going to put this in, you're going to put this in," then I -- that's included in the report. However, the findings don't reflect anything having to do with this.

Q. Okay. So the fact that we see it repeatedly in the summary -- not in the summary, strike that, in the -- how do we describe it? It's like the first six pages --

A. It's like extractions from the transcript.

Q. That just means that that issue came up repeatedly during the actual presentations by both parties, correct?

44 (Pages 170 to 173)

Electronically signed by Nohemi Salazar (601-223-060-0685)

77226bd1-7911-481e-90e9-11a8a6f674d0