# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

CASE NO. 10-CV-8161

---

PATRICK J. BRANDNER, M.D.,            )
                                      )
                         PLAINTIFF,   )
                                      )
v.                                    )
                                      )
AMERICAN ACADEMY OF ORTHOPAEDIC       )
                                      )
SURGEONS and AMERICAN ASSOCIATION     )
                                      )
OF ORTHOPAEDIC SURGEONS,              )
                                      )
                         DEFENDANTS.  )
------------------------------------

DEPOSITION OF EDWARD B. CRAIG

NEW YORK, NEW YORK

SEPTEMBER 9, 2011

ATKINSON-BAKER, INC.
COURT REPORTERS
(888) 288-3376
www.depo.com

REPORTED BY:  SHAVON KOLB, RPR
FILE NO.:     A506778

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
CASE NO. 10-CV-8161
---

PATRICK J. BRANDNER, M.D.,            )
                                      )
        PLAINTIFF,   )
                                      )
v.                       )
                          )
AMERICAN ACADEMY OF ORTHOPAEDIC   )
                                      )
SURGEONS and AMERICAN ASSOCIATION )
                                      )
OF ORTHOPAEDIC SURGEONS,        )
                          )
        DEFENDANTS.  )
_____

Deposition of EDWARD B. CRAIG, a non-party witness, at 641 Lexington Avenue, New York, 10022 commencing at 10:05 a.m., Friday, September 9, 2011, before Shavon Kolb, RPR.

Page 2

---

**A P P E A R A N C E S:**

**FOR PLAINTIFFS:**
WOODS ERICKSON WHITAKER & MAURICE, LLP.
BY: AARON R. MAURICE, ESQ.
1349 West Galleria Drive
Suite 200
Henderson, Nevada 89014

FOR DEFENDANTS and NON-PARTY WITNESS:
STEPHAN ZOURAS, LLP.
BY: MICHAEL A. CHABRAJA, ESQ.
205 North Michigan Avenue
Suite 2560
Chicago, Illinois 60601

**ALSO PRESENT:**
Jim Roberts
Atkinson-Baker
Videographer

          *      *      *

Page 3

---

INDEX
**WITNESS:** EDWARD B. CRAIG
EXAMINATION                  PAGE
   By Mr. Maurice                 6

EXHIBITS
              CRAIG'S
NUMBERS          DESCRIPTION     PAGE
1- through 29-     Documents        5

Page 4

---

(Whereupon, the aforementioned documents were marked as Plaintiff's Exhibits 1 through 29 for identification as of this date by the Reporter.)

THE VIDEOGRAPHER: Stand by.

Good morning. We're going on the record. My name is Jim Roberts. I'm the videographer and I represent Atkinson-Baker, Glendale, California. I'm not financially interested in this action nor am I a relative or employee of any attorney or any of the parties.

Today's date is September 9, 2011. The time is approximately 10:07 a.m. This deposition is taking place at Corporate Suites, 641 Lexington Avenue, New York City, New York. The case number is 10-CV-8161, Patrick J. Brandner, M.D. versus American Academy of Orthopaedic Surgeons, et al. The deponent is Edward B. Craig, M.D. The deposition is being taken on behalf of the plaintiff. The court reporter is Shavon Kolb.

Counsel will please state their appearances for the record.

Page 5

---

**Atkinson-Baker, Inc. Court Reporters**              **(800) 288-3376**

2 (Pages 2 to 5)

**Page 6**

MR. MAURICE: Aaron Maurice on behalf of Dr. Patrick Brandner.

MR. CHABRAJA: Michael Chabraja on behalf of the defendants and the witness.

THE VIDEOGRAPHER: Court reporter will please swear in the witness.

EDWARD B. CRAIG, having first been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. MAURICE:

Q. Please state your name for the record.

A. Edward B. Craig.

Q. Can you state your address.

A. 535 East 70th Street, New York, New York 10021.

Q. Dr. Craig, my name is Aaron Maurice. I represent Dr. Brandner in this action.

I take it you've had your deposition taken on one or more occasions.

A. Yes, sir.

Q. Nevertheless, let me go through a few of the rules that relate to taking a deposition just to make sure we're on the same page. The oath

**Page 7**

CRAIG

which you just took, same oath that you take in a court of law, same obligation to tell the truth, same penalty for violating that oath. Do you understand that?

A. Yes, sir.

Q. The court reporter to your right, to my left, is going to take down everything that's said in this room, whether I say it, whether you say it, whether Mr. Chabraja says it. Accordingly, we need to follow some special rules specifically to make sure that the transcript that is created as a result of this deposition is clear so that we have a clear record.

First rule is all responses must be audible. Nods of the head, shrugs of the shoulders, things which outside the context of a deposition I would take as response to my question do not appear well in the transcript. So for that reason, if I see you use one of those, you know -- if I see you respond to one of my questions in a non-audible manner, I will ask you is that a yes, is that a no. I'm not trying to be rude. I'm just trying to clarify it for the record. Do you understand that?

**Page 8**

CRAIG

A. Yes, I do.

Q. With that said, certain responses, although audible, do not appear well on the record. "Uh-huh" and "uh-uh" and other generic responses will leave Mr. Chabraja and myself scratching our head and then calling each other up on the eve of trial trying to figure out whether you really meant "yes" or you really meant "no." So if I hear you use one of those generic responses, again I will say is that a yes, is that a no. I'm not trying to be rude. I'm just trying to clarify it for the record. Do you understand that?

A. Thank you. Yes.

Q. Okay. In every day conversations, it's very common for a person to volunteer an answer when the person asking the question is about three-fourths of the way through the question. It makes life a little more liveable. It allows us to move in a little faster pace and that's great outside of a deposition but inside a deposition, that creates problems. It creates a choppy transcript. When you read the transcript, you'll see a portion of a question, an answer and then

**Page 9**

CRAIG

the remainder of the question. I'm going to do everything in my power today to wait until you are done answering one of my questions before I ask you another question. I would just ask that you try to do everything in your power to wait until I am done asking my question before you give me an answer. Do you understand that?

A. I do.

Q. Okay. I'm not here to trick you today. I'm here to get your best testimony. So if I ask you an inartfully worded question and you don't understand it, I want you to say Aaron, I don't understand that question and I'm going to do everything in my power to supply you with whatever information you need so that you understand my question, that you can give me an honest answer. Do you understand that?

A. I do.

Q. If you answer one of my questions, I'm going to presume that you understood it. Do you understand that?

A. Yeah.

Q. Okay. At the end of this process, you're going to have an opportunity to read

CRAIG

A. I'm just assuming that AAOS is one of the parties involved in the professional compliance matter, correct?

Q. Well, I don't know. I presume. I mean, "parties" isn't capitalized. I think if they just went the grievant and respondent, they would put "grievant" and "respondent" there. That's why I'm just asking for kind of your thoughts.

A. Okay.

Q. As a member of the judiciary committee is one of the things that you consider when evaluating a grievance whether the AAOS has complied with the grievance procedures in the handling of a grievance?

A. No.

Q. Do you remember at the grievance hearing with regard this specific Sharp v. Brandner agreements one of the issues that I was raising was that the AAOS had violated a number of its own grievance procedures in the handling of the grievance? Do you recall that?

A. I don't recall specifically but I think I recollect something like that.

Q. Well, so with regard to Dr. Brandner's

Page 78

CRAIG

appeal of the grievance was one of the things that you looked at whether the AAOS had complied with its own grievance procedures?

A. That we looked at ahead of the committee meeting?

Q. No. I mean considered in connection with the grievance.

A. Can you restate the question again please.

Q. Yeah. In the Sharp v. Brandner hearing before the judiciary committee there were kind of two different arguments advanced on behalf of Dr. Brandner. One was that the AAOS had failed to follow its own grievance procedures and 2 was that the evidence that had been -- the evidence in the matter did not support the finding of the COP hearing panel and what I'm asking you is did the judiciary committee consider the due process arguments that were raised by Dr. Brandner.

A. I don't recall. Now, this was two years ago but we usually do.

Q. Okay. And when you're considering those due process arguments, is it the professional compliance grievance procedures, what we're

Page 79

CRAIG

looking at as Exhibit 5, that the judiciary committee uses to determine whether the AAOS has complied with its own rules?

A. I don't know to be honest with you. The honest answer is that "due process" is a term that we don't deal with all the time and that we do have counsel in the room that we can ask about due process and we sometimes get some help with that but.

Q. Okay. Now, I guess I should ask you this: When you sat for the Sharp/Brandner grievance, did you have an understanding of the fact that that grievance was likely to result in litigation?

A. Whether the grievance was likely to result?

Q. Yes.

A. No.

Q. Okay. So it's not like you'd been given a heads-up before that hearing --

A. That this is important?

Q. -- hey, pay attention to this one because this one's destined for the courts?

A. No.

Page 80

CRAIG

Q. When you sat for the Brandner/Sharp grievance, did you know that Dr. Brandner was surgically disabled?

A. I don't recall.

Q. Okay. But I mean, as you sit here today you understand that Dr. Brandner is physically unable to perform surgeries as a result of a degenerative spinal condition?

A. I don't know that.

Q. You do not know that?

A. No.

Q. Okay. When you sat for the judiciary committee meeting, did you have any understanding of the extent to which Dr. Brandner's income was derived from providing expert medical testimony?

A. No.

Q. As you sit here today do you know that in excess of 70 percent of Dr. Brandner's income is derived from providing expert witness testimony?

A. No.

Q. When you sat for the Sharp v. Brandner grievance hearing back in New Orleans, did you have an understanding of the fact that

Page 81

CRAIG

extensively the exact term "foot drop" and "perineal nerve" and that that was a risk before going into surgery.

"QUESTION: And you don't remember that?

"ANSWER: Not at all, no.

"QUESTION: Are you saying that did not happen or are you saying you don't remember it?

"ANSWER: I'm saying it didn't happen."

Q. Do you see where I read that?

A. Yes, sir.

Q. Okay. So this is the patient saying absolutely not, Dr. Sharp did not discuss foot drop or perineal nerve with me prior to obtaining the procedure, correct?

A. Correct.

Q. Okay. That is contrary to what the judiciary committee found, correct? I mean, the judiciary committee I guess from what you're telling me, it may not be in the report but the judiciary committee found that Dr. Sharp had satisfied the standard of care and had that discussion with the patient, correct?

A. That he had satisfied the standard of

Page 134

CRAIG

care about informed consent with the patient, yes, and in contrast to the other deposition that the patient and his mother in fact had given, yes.

Q. Okay. But so the judiciary committee finds that Dr. Sharp had satisfied the standard of care based on the January of '04 deposition transcripts from the patient and the patient's mother, correct?

A. Yes.

Q. Those transcripts conflict with what I just read, correct?

A. Yes, yes.

Q. Okay. So the only way to accept the testimony in the January '04 transcripts is to reject the testimony provided in '05, correct?

A. Or to have differential weight to it. I think that that one -- you know this world more than I, that one piece of evidence may carry more weight than another piece of evidence and something that happens closer to the incident may be different than something that happens later on and I think the judiciary committee not only used the depositions but the doctor's own office notes and things like that to come to its decision.

Page 135

CRAIG

Q. But the doctor's own office notes just reflected a general discussion of nerve injury. That was the issue in the underlying case.

A. Yes, that's what the office notes said, correct.

Q. Yeah. I mean, that's -- part of the reason Dr. Brandner, you know, part of the reason why this issue came into the case was because there was no reference in those notes of a specific recollection of perineal nerve or drop foot, correct?

A. Correct.

Q. Okay. Well, when you talk about giving one piece of evidence more weight over the other, I mean, this testimony that we've just read is directly in conflict with that January 2004 testimony, correct?

A. Yes.

Q. Both lines of testimony cannot be correct, can they?

A. Unless somebody's forgetting something significantly.

Q. Right. You're going to have to pick one or the other, correct?

Page 136

CRAIG

A. Yes.

Q. And the judiciary committee if I understand you correctly, you're telling me that the judiciary committee even though it may not be in their discussion and summary accepted the '04 testimony over the patients' '05 testimony?

A. Yes.

Q. Now let's go to Exhibit 16. This is the deposition testimony given on the same date by the patient's mother. Remember she was a minor so his mother had to be in meetings and give informed consent as well, correct?

A. Okay. I don't recall.

Q. Okay. Well, this testimony, they got to it really quick. Go to Brandner 00314 starting on line 21.

"QUESTION: Have you reviewed any documents to help prepare yourself for today's testimony?

"ANSWER: I saw a document earlier that Wade showed me, a disclosure by Dr. Sharp.

"QUESTION: Okay.

"ANSWER: And I read it quickly and well, parts of it quickly and that's all.

Page 137