# EXHIBIT 5

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

PATRICK J. BRANDNER, M.D., )
                              )
            Plaintiff,        )
                              )
      -vs-                    ) Case No. 10-cv-8161
                              )
AMERICAN ACADEMY OF           )
ORTHOPAEDIC SURGEONS and      )
AMERICAN ASSOCIATION OF       )
ORTHOPAEDIC SURGEONS,         )
                              )
            Defendants.       )

The videotaped deposition of RICHARD GELINE, M.D., called for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of videotaped depositions, before ANDREW ROBERT PITTS, C.S.R. No. 84-4575, a Certified Shorthand Reporter within and for the County of Cook, State of Illinois, at 205 North Michigan Avenue, Suite 2560, Chicago, Illinois, on the 20th day of September, A.D. 2011, at 10:06 a.m.

Page 2

PRESENT:

WOODS ERICKSON WHITAKER & MAURICE LLP,
1349 West Galleria Drive, Suite 200,
Henderson, Nevada 89014-6653,
702-433-9696, by:
MR. AARON R. MAURICE,
   appeared on behalf of the Plaintiff;

VEDDER PRICE,
222 North LaSalle Street,
Chicago, Illinois 60601,
312-609-7790, by:
MR. MICHAEL A. CHABRAJA,
   appeared on behalf of the Defendants.

ALSO PRESENT:

MR. MARC BUHMANN,
   Legal Videographer.

REPORTED BY:  ANDREW R. PITTS,
          C.S.R. No. 84-4575.

Page 4

EXHIBITS CONTINUED

| BINDER | | PAGE |
|---|---|---|
| Tab 12 | Letter from Woods Erickson 12/29/09, Brandner 00233-00242 | 232 |
| Tab 13 | Letter from Crawford & Kline to Mr. Peterson, 2/19/10 Brandner 00572-00577 | 233 |
| Tab 14 | Appeal statement from Woods Erickson, 2/24/10 AAOS_B0000637-B0000648 | 234 |
| Tab 15 | Deposition transcript of the patient, 6/8/05 Brandner 00247-00310 | 235 |
| Tab 16 | Deposition transcript of the patient's mother, 6/8/05 Brandner 00311-00370 | 235 |
| Tab 17 | Transcript of proceedings Arizona Superior Court 4/28/08 Brandner 00371-00426 | 236 |
| Tab 18 | Transcript of proceedings Arizona Superior Court 4/29/08 Brandner 00427-00614 | 236 |
| Tab 19 | Trial testimony of Dr. Brandner Arizona Superior Court 4/29/08 Brandner 00058-00111 | 237 |
| Tab 21 | AAOS Judiciary Committee report and recommendation Brandner 00606-00614 | 237 |

Page 3

INDEX

| RICHARD GELINE | EXAMINATION | |
|---|---|---|
| BY MR. MAURICE | 6 | |

EXHIBITS

| BINDER | | PAGE |
|---|---|---|
| Tab 2 | AAOS bylaws 3/12/10 Brandner 00004-00030 | 80 |
| Tab 3 | AAOS bylaws incorporated 2/13/98, Brandner 00702-00745 | 82 |
| Tab 4 | AAOS Standards of Professionalism Brandner 00001-00003 | 96 |
| Tab 28 | AAOS Standards of Professionalism amended 3/12/10, Brandner 00764-766 | 100 |
| Tab 5 | AAOS Professional Compliance Program Grievance Procedures Brandner 00746-00763 | 101 |
| Tab 1 | AAOS Grievance Report Brandner 00114-00118 | 109 |
| Tab 10 | The AAOS Grivance Hearing Report, Brandner 00767-00776 | 112 |
| Tab 6 | Letter from Desert Orthopaedic Center, 4/7/09 Brandner 00121-00126 | 219 |
| Tab 9 | AAOS letter to Drs. Sharpe and Brandner, 12/14/09 Brandner 00231-00232 | 224 |

Page 5

THE VIDEOGRAPHER:  Good morning.  I am Marc Buhmann, your videographer, and I represent Atkinson-Baker, Incorporated of Glendale, California.  I am not financially interested in this action, nor am I a relative or an employee of an attorney of any of the parties.  The date today is September 20th of 2011 and the time is 10:06 a.m.

          This deposition is taking place at 205 North Michigan Avenue, Suite 2560, in Chicago, Illinois.  This is Case No. 10-CV-8161 entitled Patrick J. Brandner, M.D. versus American Academy of Orthopaedic Surgeons, et al.  The deponent is Dr. Richard Geline, and this deposition is being taken on behalf of the Plaintiff.  The court reporter is the Andrew Pitts from Reporters Direct.

          Will counsel please introduce themselves for the record.

          MR. MAURICE:  Aaron Maurice, on behalf of Dr. Brandner.

          MR. CHABRAJA:  Mike Chabraja on behalf of the witness, Dr. Geline, and the Defendant.

          THE VIDEOGRAPHER:  Will the court reporter please swear in the witness.

Page 6

(WHEREUPON, the witness was duly sworn.)

RICHARD GELINE, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. MAURICE:

Q. Would you please state and spell your name for the record, please.

A. My name is Richard Geline. It's spelled G-E-L-I-N-E.

Q. Dr. Geline, have you ever had your deposition taken before?

A. I have given depositions in the past.

Q. Okay. Approximately how many times?

A. I can't recall. It would be in middle double digits probably.

Q. When was the last time you gave a deposition?

A. Many years ago.

Q. Okay. Well, to make sure we're on the same page, let's go over some of the -- the rules related to taking depositions. It may -- they may be redundant to you, but since it's been a little

Page 7

while since you've given a deposition, we probably ought to make sure we're on the same page.

The oath which you just took, the same oath that you take in a court of law, same obligation to tell the truth, same penalty for violating that oath. Do you understand that?

A. Yes.

Q. The court reporter to my left to your right is going to take down everything that is said in this room today. Accordingly, it's important that we follow some special rules. The first rule is all responses to questions must be audible. Nods of the head, shrugs of the shoulders, things which outside the context of a deposition I would take as a response to my questions do not appear on the record.

So if I see you use one of those non-audible responses, I will ask is that a "yes," is that a "no." I'm not trying to be rude; I'm just trying to clarify it for the record. Do you understand that?

A. Yes.

Q. With that said, certain responses, although audible, do not appear well on the record.

Page 8

"Uh-huh" and "huh-uh" do not appear well on the record. If I hear you use one of those generic responses, again, I will say is that a "yes," is that a "no." Again, I'm not trying to be rude; I am just trying to clarify it for the record. Do you understand that?

A. Yes.

Q. I'm not here to trick you today. If I ask you a question that you do not understand, I don't want you to answer it. I want you to ask for clarification. I will do everything in my power to provide you with all the information necessary so that you can give me your best testimony. Do you understand that?

A. Yes.

Q. If you answer one of my questions, I am going to presume that you understood it. Do you understand that?

A. Yes.

Q. At the end of this process, you are going to have an opportunity to review your deposition transcript and make any changes that you feel are necessary to ensure that the transcript accurately reflects your testimony.

Page 9

While you are encouraged to make any changes that you feel are necessary to the transcript, I do want to caution you that substantive changes, changes that materially alter the nature of your testimony, will be commented upon at the time of trial and that those -- and those comments may tend to reflect on your credibility. Do you understand that?

A. Yes.

Q. With that said, is there reason why you can't go forward today and give your best deposition testimony?

A. No.

Q. Okay. You're not under the affects of any medication that make you -- that make it difficult for you to recall events?

A. I'll give my best efforts.

Q. Okay. Well, are you under the effects of any medication that makes it difficult for you to recall events?

A. I am not under influence of any medications.

Q. Are you dealing with any kind of personal crisis that makes it so that you're here

Page 22

medical malpractice case. The rest would be personal injury cases. And, actually, the medical malpractice case, the defendant was not a physician; it was a physical therapist.

Q. And in the one medical malpractice case, did you testify on behalf of the patient or on behalf of the therapist?

A. The therapist, the defendant.

Q. And in the personal injury context, I take it we're talking about, you know, car accident type cases? Am I correct about that?

A. That's correct.

Q. Okay. Of the 11 or so times where you testified as an expert in car accident or personal injury cases, did you tend to testify predominantly more for the Plaintiff or for the defense?

A. Well, let me answer two ways. The number of times I testified is probably less -- is still in single digits, because many of these cases where they asked me to serve as an expert witness, no -- there was no testimony given. You know, you review the records, write a report, and then things were settled and never advanced to that. They would have been uniformly on behalf of the defense.

Page 23

Q. Okay. Have you ever testified on behalf of a plaintiff in a personal injury case?

A. No, not to my best knowledge. I have testified as a treating physician.

Q. Right.

A. I have not accepted physicians as an expert witness, but I have testified any number of times as a treating physician, or I should say I have given depositions as a treating physician. I don't recall any going on to trial, but I've given depositions as a treating physician a number of times, yes.

Q. Just to make sure we're clear on that point, so there has been situations where you have treated a patient who has been injured in an accident of some sort, and then you have been deposed essentially as a fact witness in that case based on the treatment you provided to that patient?

A. Well, I have -- "fact witness," that's a legal term. All I know is what is in my field, and I've treated a large number of injured people. Litigation injuries are basically like bread and butter, so it's impossible not to become involved

Page 24

in these issues as a treating physician, so I just -- whatever was needed -- needed to be done as a treating physician.

"Fact witness," I don't know. That's a legal witness. Whatever it is, you just present the evidence as it's -- reveals itself as the treating physician.

Q. But in terms of an expert witness where you are retained by one side, one party to provide testimony on their behalf or in their favor and you are paid to do so, in that situation you have only testified on behalf of the defense?

A. Yeah, the small number of times it occurs, it's been on the behalf of the defense.

Q. I mean, over a 40-year career, if you've only testified, you know, 11 or -- or if you've only been retained, pardon me, 11 or 12 times, I mean, this never formed a large portion of your -- of your practice, correct?

A. Well, I would say it's always been a negligible portion of the practice.

Q. And is that something you are still available for? In other words, if somebody contacted you today and wanted to retain you as an

Page 25

expert witness in a case, is that something in your current state of semi-retirement that you would consider?

A. I might, but it's unlikely, but, you know, I could do it, but I haven't given that question serious thought because the opportunity doesn't arise, and I don't -- I don't solicit that kind of thing, and so I haven't given it serious thought.

Q. Are there any circumstances under which you would agree to act as an expert for a Plaintiff in a medical malpractice case?

A. Actually, I'd be prohibited from doing that.

Q. Why is that?

A. The reason is I'm a member of the board of directors of ISMIE Mutual Insurance Company, which is the physician-owned insurance company here in the State of Illinois. The company has a policy which prohibits members of the board from testifying either as a plaintiff or a defense expert.

So I would not be -- I would not be doing that. And I might say the one case

Page 26

that -- like I said, the one case where I did testify was not on behalf of a physician, it was a physical therapist, and I did -- as I recall, it's been some time ago, and I'm sure I checked with, you know, the staff to see if it was okay to do that at that time. So it was not a violation.

If the policy wasn't in effect at that time, it was not a violation, but presently, because of the position I hold, I would not accept a position as an expert in a medical malpractice case for either defense or plaintiff.

Q. What was the name of that insurance company?

A. It's called ISMIE. I -- it's called -- well, it's I-S-M-I-E. So ISMIE, I-S-M-I-E, Mutual Insurance Company. The ISMIE refers to Illinois State Medical Insurance Exchange, and I know it's converted to ISMIE Mutual.

Q. And this is a company that, if it's similar to the companies we have in Nevada, all they provide and the sole type of insurance they provide is medical malpractice insurance to physicians, correct?

A. It's basically a single line casualty

Page 27

company. They do have a subsidiary that -- that provides -- a small subsidiary that provides medical surgical coverage, but that's a very small operation, but it's a subsidiary or a wholly owned subsidiary. But no, for all practical purposes, ISMIE Mutual is a single line casualty company.

Q. And that single line is medical malpractice insurance, correct?

A. That's correct and some related things.

Q. And I couldn't call them up and try to get -- even if I was a physician, I couldn't call them up and get auto insurance, correct?

A. They do not sell automobile insurance.

Q. And it's my understanding from your testimony you're on the board of directors of this company?

A. That's correct.

Q. How long have you been on the board of directors of this company?

A. I was first elected to that board in 1989 and reelected -- I think it's every three years since that time.

Q. Do you know when -- am I pronouncing it correctly -- ISMIE --

Page 28

A. ISMIE Mutual.

Q. ISMIE Mutual?

A. If you like, just call it the company.

Q. Okay. Do you know when ISMIE Mutual came into existence?

A. ISMIE, the exchange, the company, because it's changed from a reciprocal to a mutual company in -- the company was formed in 1976.

Q. Were you involved with the company back then when it was originally formed?

A. Only as an original insured but not part of leadership.

Q. And when was it that you began playing a role in the leadership of the company?

A. When I was elected to the board in 1989.

Q. Does ISMIE have shareholders?

A. The mutual company, yes. The insureds are the -- it's a mutual company, and my best understanding is that the -- the insureds are the shareholders.

Q. So the physicians who acquire insurance through ISMIE essentially own a portion of the company because any amounts paid in premiums that exceed the amount paid out on claims and the costs

Page 29

of doing business would be a return to them in terms of some kind of distribution? Am I correct in that?

A. Yeah. Actually, the way it's done, it's returned in the form of a -- a reduction on the premium.

Q. Okay. So you --

A. It's not a check; it's calculated as a reduction on the premium. If there are funds to distribute, they're just applied as a discount or a reduction on the premium, yes.

Q. And have you been with ISMIE since back in 1976 in terms of as an insurance carrier for your own professional --

A. Oh, yeah. I said -- I said I was -- I am an original insured from day one when the company was formed, and I've been continually -- continuously insured by them since.

Q. Are you paid to be on the board of directors for ISMIE?

A. Yes.

Q. Is it an annual salary or stipend, or is it some kind of hourly payment based on the amount of hours you actually --

8 (Pages 26 to 29)

Page 30

A. Actually, it's both. There is a honorarium or whatever you -- it's just annual, and then a per diem depending on the amount of time that's devoted and spent, yes.

Q. In 2009, do you know what the honorarium was?

A. I think it was $20,000. Was it -- it might have been 24,000. No, forgive me, I think it's 24,000.

Q. Other than ISMIE having to pay out a significant amount in any one year on claims asserted against the physicians it insures, can you think of any other factor that could hurt the company financially?

A. Well, there would be two things. There would be the experience. The only other way would be some kind of a catastrophe whereby the reserves, the portfolio, the reserves lost value.

And I might say the company has a very, very conservative policy in terms of its investments, and I suppose, you know, it's what happens if the portfolio were to lose its value because of just financial instability in general, that could be one potential.

Page 31

Q. And let's make sure we have that clear on the record.

If I understand just the way insurance companies work in general, when the insureds pay their premiums, it's not like the insurance company just puts that money in a bank account and lets it sit there in case there are any claims.

The insurance company actually invests that to earn a return on the premiums that are received in the hope that any amounts earned on that will exceed the amount of my claims that are made, correct?

A. Not, no that's not quite -- the first part of your statement is correct. You know, when the company collects the premiums, it's not put in the mattress. It's invested in a very, very conservative manner. And within that province, of course, you hope to earn the maximum return within the appropriate boundaries of conservative investment.

The second part of your statement, saying you hope that the interest will exceed the payouts, that's not true. We just try to apply conservative investment policy, and every year when

Page 32

premiums are calculated, you look at what the anticipated experience is and what the investment picture looks like and what past experience is like and try to make the best estimate of what the premium is needed to be collected to cover the claims, which will inevitably be filed.

Q. And so going back to kind of the testimony that started us on this line of questioning, so it's my understanding other than claims made by patients suing insured physicians for malpractice, the next greatest threat to the financial stability of the company really lies with the investments, the portfolio itself? If the portfolio were -- I understand it's conservative, but if the portfolio were to suffer a loss, I mean, other than patient claims, that's the biggest risk to the financial --

A. That would be my interpretation, yes, right. Now, the question that I haven't really entertained seriously in the past, but, as you pose it now, the only way we could lose money would be through extraordinary claim situation or some kind of upheaval in the financial markets. Okay?

Q. And you've testified that ISMIE follows

Page 33

a conservative investment strategy to try to minimize any losses that might result with respect to its portfolio?

A. That would be my opinion of inspection of the annual reports, the investment reports, they have a very conservative advisors and follow a very conservative investment program. To keep preservation of capital is absolutely essential for the welfare of the company and the welfare of the insureds.

Q. So would you agree that the single largest threat to the financial stability of ISMIE is patient claims?

A. Year in year out, that's been the -- yeah, year in and year out, that's been the -- the major source of, you know, what would be -- I don't know what the word, difficulty or problem would be exorbitant claims, a rising number of claims, increased severity, increased demand requiring corresponding increased premiums, yeah.

Q. Does ISMIE insure physicians who practice outside the State of Illinois?

A. We do insure some border states, some physicians in border states of Indiana, I think

9 (Pages 30 to 33)

Page 34

Iowa, even Missouri. Physicians who are -- reside, you know, in border areas may have a practice in both locations. It's a small number, but, yeah, but it's basically an Illinois company, but there are some adjustments for the surrounding, small number of surrounding states.

Q. Is ISMIE involved in any kind of loss sharing agreements with any other insurance companies or insurance mutuals that operate in other states?

A. Not to my knowledge. They have a reinsurance program, but that's not a loss sharing with similar types of companies, but they do have a very conservative reinsurance program, but that, those companies are not -- those are international and national companies. It's not a -- they're not, you know, other states, they're not ISMIE corresponding companies.

Q. And just to make sure we're clear on that, when you -- when you talk about reinsurance, we are talking about ISMIE, as an insurance mutual, obtains for itself insurance from other insurance companies in case there is some kind of catastrophic claim so that ISMIE will have its

Page 35

own --

A. Yeah, ISMIE is protected. They try to max or, you know, put a cap on certain losses. And losses beyond that, they hand it off to the reinsurers. That's correct.

Q. Have you disclosed your role as a member of the board of directors for ISMIE to the AAOS?

A. I believe I did. Yeah, I am pretty -- I'm pretty sure I did. Yes.

Q. And how is it you believe you did that? E-mail?

A. Oh, they have an annual -- an annual questionnaire comes by, and I'm pretty sure that -- I have inquired about that, and I have often wondered if it -- is it a direct conflict with this kind of activity, and I'm pretty sure I have disclosed that.

Q. Do you know if any other members of the judiciary committee that -- I guess I should broaden it up from that.

Do you know of any other members of either the COP panel, the judiciary committee, or the board of directors who serve in any kind of position with ISMIE?

Page 36

A. There are none others with ISMIE, no.

Q. Okay.

A. There -- no, there are not. There is one Illinois member on the COP, and he is not a member of the ISMIE board.

Q. Other than possibly providing this information in an annual questionnaire to the AAOS, can you recall any specific instances where you have communicated that to the AAOS?

A. No, unless I just drew -- in course of some kind of discussion, I might draw on my background of having been exposed to the -- you know, the milieu for a number of years, but no, I -- it wouldn't be -- those would only be an in-context kind of discussion that I have certain knowledge that I may have just picked up through experience, but it's not -- no, that's the best I can do with that answer.

Q. But also, I mean, beyond having a certain amount of experience or knowledge that you have gained in your position with ISMIE, I mean, you also have a financial incentive in terms of reduced premiums if ISMIE is not subjected to large claims for medical malpractice in a given year,

Page 37

correct?

A. Well, as a policy holder, yes. Every policy holder has an interest in trying to see that the experience is favorable and keeps the premiums to the minimum. Sure.

Q. Right. And as a member of the board of directors, because, I mean, obviously, if there were catastrophic claims in a year that reduced ISMIE's ability to operate, presumably one of the first things to go would be the honorariums that were provided to the -- to the members of the board of directors, correct?

A. Well, I -- I can't address that. In a general way of looking at it, we have a fiduciary responsibility to look after the welfare of the company.

Now, were a radically negative experience to develop, what measures would be taken I cannot -- I can't express an opinion on that, so I can't say yes to the way you formed the question.

I can say yes, we do, as board directors, have a responsibility to guard the welfare of the company and take the appropriate measures, but I cannot tell you what they would be

10 (Pages 34 to 37)

Page 38

at any one given moment or under any one set of circumstances.

Q. And when you say that as a member of the board of directors you have a fiduciary duty to protect the company, I mean, that includes also taking those steps available to you to limit the number and scope of malpractice claims asserted against the company as well, correct?

A. In general, yes. We have a very extensive educational program where we try to, you know, advise the physicians on -- in the field and what they can do and how to -- how to avoid becoming a defendant in a liability case, sure. And I've been involved in that rather extensively through the years.

Q. Now, you serve as a member of the judiciary committee for the AAOS, correct?

A. That's correct.

Q. When did you take your position on that committee?

A. Oh, I'm an original member. When the program was formed, applications were sought, and I extended my -- put in my application, and I was appointed whenever the -- it would be right from

Page 39

the origin of the program, and that's 2005 or '4 or '6. I'm not quite sure what the date is.

Q. And you're still on that committee today?

A. That's correct.

Q. And what do you understand your role to be on the judiciary committee?

A. The role of the judiciary committee is to look at the cases that arrive before us as a result of the process and make a determination over what decisions have been made and what should be made according to the procedures as outlined.

Q. When you were -- well, I guess I should ask you this first.

When you are sitting at a judiciary committee meeting or a hearing and you have a grievant or a respondent in front of you, do you disclose the fact that you are sitting on the board of directors for ISMIE?

A. I don't believe that's been asked or required.

Q. When you say "asked or required," asked -- who would have asked you that? I mean, who are you talking about?

Page 40

A. Any of the -- any of the parties involved.

Q. Okay.

A. Nobody's ever -- nobody's ever raised the question in the course of any of the hearings.

Q. How would they know, though, that you were on ISMIE if you haven't -- if you haven't --

A. I don't know how they would know. They would have -- I guess they would have to look at the background. There is a -- prior to the hearings, it's my understanding the names of the judiciary committee hearing individuals are distributed to all parties for basically the purpose, generally, is there some kind of conflict of interest involved. And so they are free to investigate as much or as little as they would care to do.

And I, from my vantage point, when I'm asked that, well, I'll see, do I know any of the parties, either the grievant or respondent or their attorneys or other individuals, and I'm pretty careful. In one case, I did have to recuse myself. But other individuals could investigate as much or as little as they wished to determine if any kind

Page 41

of conflict of interest exists.

Q. So you do not voluntarily disclose it to the grievant or the respondent that you are on the board of directors of ISMIE?

A. Not directly. Were they to inquire through the AAOS to look for that disclosure material, I don't know how I -- I've never entertained any question. I don't know how they would proceed, but I do not -- I can -- what I -- make my decision on disclosure on whether I had personal knowledge or personal acquaintance with any of the parties that are appearing there.

Q. Okay. Do you also realize one of the other, when they're -- when the AAOS is asking you whether you are going to recuse yourself, they also inquire as to whether you have a financial interest in the matter, correct?

A. I can't answer -- I don't know how the actual inquiry comes. I don't -- I don't recall that. I think they just present the names of the parties, and I'd have to stand corrected if that's not true, but my best recollection says that this is the case, these are the parties, these are the attorneys and so forth, and they ask you if you

11 (Pages 38 to 41)

Page 46

And then the procedures that are set up to ask that orthopaedics or members of the academy follow certain standards is quite well defined. And as a member of the judiciary committee, in my mind, for those proceedings, that's the guiding light is to see that the spirit and the letter of the -- the program, the professional compliance program, and its standards are upheld.

The interest of the insurance company does not bear on that, on those proceedings at all. The driving factor is very much the spirit and the letter of what the language of the professional compliance program is.

Q. Have you ever looked at a statistical analysis of the grievances that have been processed by the AAOS in the area of expert witness testimony?

A. We were given a -- yeah, an analysis some time ago. It's now out of date, and it sort of tabulated what the experience -- how many grievances were arrived, how many were rejected, and how many -- you know, I don't have those number in front of me, and what I was -- what I did see at that time was -- is no longer current. And I -- so

Page 47

I can't comment on the present status of that breakdown as what you're describing.

Q. Would you agree that, based on the grievances that you have seen in your capacity on the judiciary committee, that far more members who have testified as experts for the plaintiffs in medical malpractice cases have received what we'll call professional compliance actions by the AAOS?

A. I can't answer the question. I would ask you to rephrase that. It's a little vague, and I'm going ask you to rephrase it and be more specific.

Q. Do you know how many grievances have been submitted to the AAOS in medical malpractice cases?

A. No. I -- like I said, the only information I have is out of date, and for my position on the judiciary committee, I can only assume that more cases have been filed than we actuarial see, because a number of cases are dropped, they're never -- they don't proceed. Some only go to the level of the COP and -- the committee of professionalism, and there is no appeal. So we only see that filtered number

Page 48

that has come through, and I do not -- I'm not familiar with the rest of the activity that goes on, other than really to know that it exists, but I have no direct knowledge of the numbers or the breakdown or the character of the cases or anything like that.

Q. Based on the materials that have been provided by the AAOS in this litigation, according to our calculations there have been 45 grievances submitted for violation of the mandatory standards for expert witness testimony related to medical malpractice cases. Does that sound plausible to you?

A. I can't -- I mean, if you're telling me those are academy numbers and you have obtained them from the academy, then I'll accept it.

Q. Okay. Well, let me ask you this.

Do you know -- of the 45 grievances that have been filed for violation of mandatory standards for expert witness testimony in medical malpractice cases, do you know how many have resulted in professional compliance actions against the --

A. I do not.

Page 49

Q. Let me finish.

MR. CHABRAJA: Let him finish.

THE WITNESS: Okay.

BY MR. MAURICE:

Q. Against the physician who testified on behalf of the defense?

A. I do not.

Q. Okay. The number is zero. It's never happened.

Can you -- as you sit here today, can you think of any occasion on which you have ever as a member of the judiciary committee voted to uphold or follow the report and recommendation of a COP hearing panel finding for either a censure, suspension, or expulsion of an expert witness who testified on behalf of the defense in a medical malpractice case?

A. That is not -- that has not been our experience. We have not had a complaint for aberrant testimony on behalf of the defense.

Q. At least it's never made it to your level?

A. Yeah. I say to our committee, we have not had to handle that type of case.

13 (Pages 46 to 49)

Page 50

Q. Right. So they could have been submitted but not made it past the prima facie finding, correct?

A. I'll say I just can't -- all I can testify as to what's happened. Now, how any other complaint was handled in another province, I mean, any possibility exists. I can testify to what we've experienced and what I have experienced before the judiciary committee.

Q. Right. Well, that's --

A. And that's all I can -- that's all I'll testify to.

Q. Let's make sure we're clear, though, on the role of the judiciary committee and the grievance process as a whole.

You understand that when a grievance is initially submitted, it goes through an administrative review by the office of the general counsel to determine that it satisfies the professional compliance guidelines, correct?

A. That's my understanding, yes.

Q. Okay. And then once it's been deemed approved by the office of general counsel, the grievant's report is sent to the respondent so that

Page 51

the respondent has an opportunity to respondent to the grievant's report, correct?

A. That -- that's my understanding, yes.

Q. Then once the respondent has submitted his response or her response, then the office of general counsel forwards it on to the COP, the committee on professionalism, for review, correct?

A. That's my -- that's the procedure from the way I understand it, yes.

Q. Then the committee on professionalism reviews the materials and votes on whether there is a prima facie determination, correct?

A. That's my understanding, yes, or some group or subgroup of the COP does that, yes.

Q. If there is a finding that there is not a prima facie showing, the process stops right there, correct? It does not go on to a COP hearing?

A. I'm not certain at that level, if there is room for an appeal. I do not know if it stops absolutely with or without appeal. I can't -- I do not know.

Q. Well, then let's at least phrase it this way.

Page 52

It has to make it past a prima facie determination to get to a COP hearing, correct?

A. That's correct.

Q. Okay. The COP, the committee on professionalism, a panel then conducts a hearing and issues a report and recommendation, correct?

A. That's correct.

Q. That report and recommendation can be appealed by either the grievant or the respondent, correct?

A. That's my understanding.

Q. Then it would be heard by the judiciary committee, correct?

A. That's my understanding.

Q. Okay.

A. That's correct.

Q. So when you are saying you can only testify to what you have seen on the judiciary committee, what you're saying is you can't testify with respect to how many grievances didn't make it through the administrative review handled by the office of general counsel, correct?

A. Yes.

Q. You cannot testify as to how many

Page 53

grievances were filed that resulted in a finding that there was no prima facie showing? You don't know that, correct?

A. No.

Q. Okay. And you don't know --

A. Well, other than the one out of date statistical report, which I've said is not -- no longer really accurate.

Q. Okay. And you don't know how many grievances were submitted for a hearing and before the COP hearing panel, resulted in a decision, and then were not appealed, correct, because then they would go directly --

A. I don't know. I do know that occurs. I have no idea of the numbers.

Q. Okay.

A. I do know that that does -- that the -- every committee decides -- every issue handled by the COP is not -- has not automatically been referred, appealed, yeah. So those things, yes, that does occur.

Q. Okay. What you know is that you have been on the judiciary committee from its inception, correct?

**Page 54**

A. That's correct.

Q. And since that time, that would go back to 2005, you have never heard a case or a grievance in which the Respondent testified as an expert in a medical malpractice case on behalf of the defense?

A. That's -- that would be my best effort -- my best recollection, yes.

Q. Every hearing you have ever conducted on behalf of the judiciary committee dealing with a grievance in a medical malpractice case related to alleged violations of the mandatory standards for expert witnesses has been filed against the physician who testified as an expert on behalf of the plaintiff, correct?

A. That would be my recollection, yes.

Q. Do you know how many of those grievances -- well, I guess I should go back one step.

Do you know how many of the 45 grievances that have been submitted to the AAOS for X violation of the mandatory standards for expert witness testimony in a medical malpractice case that have been asserted against a plaintiff's expert have resulted in professional compliance

**Page 55**

action?

A. No.

Q. Does the number 22 sound about right?

A. That's just a guess. I don't -- I do not know. You're asking me, you know, what's been the experience of the program, and I think I've testified that I do not have accurate figures on that. So whatever number you give me, I have no way of -- I -- I can testify to what the judiciary committee has done, but outside of our activity, I am unprepared to express an opinion.

Q. If the records reflect that the score is 22 to zero, in other words zero experts on behalf of the defense have received any kind of professional compliance action, 22 experts on behalf of the plaintiff have been subjected to professional compliance action, would you agree that the program is being used to essentially punish those members of the AAOS who choose to offer expert testimony in medical malpractice cases against other physicians in the AAOS?

A. Well, no, you -- you'll have to rephrase that question because you used the term complaints against defense. Now, we have agreed or at least

**Page 56**

it hasn't been the experience in the judiciary committee that we have seen complaints for defense testimony which was outside the standards.

The second part of your question that says we have some kind of surreptitious motive or something, or whatever way you phrased it, I would not share because it's been my opinion that the judiciary committee works very hard, as I said earlier, to comply with the letter and the spirit of the professional compliance program as it's been outlined.

And I think the opportunity to take advantage or to exercise the program exists for all parties under all circumstances and would be treated the same regardless of the basis for the compliant, by either a complaint against a defense expert or a plaintiff expert.

Q. And that's your testimony, if it made it to the judiciary committee level?

A. I -- yeah, if -- if a complaint made to it the judiciary committee, it would be -- regardless of whether it was a complaint against a defense or a plaintiff's expert, it would be handled with the same degree of fairness and

**Page 57**

inspection that -- that the procedures call for, absolutely.

Q. But up to today's date, since April of 2005 when this program was created to today's date, no grievance report that's ever been submitted against an expert who testified on behalf of the defense in a medical malpractice case has ever made to it your committee?

A. I believe that's correct. There have been -- there's been a case or two which is not in the expert witness -- part of the expert witness program, but no, as part of the expert witness testimony program, that has not happened, yes.

Q. But that 22 to zero number doesn't concern you at all?

A. Well, 22 to zero is your number. I do not know. I can explain -- I can testify that we have not -- I have not experienced a complaint for aberrant defense testimony as part of the judiciary committee. Now, that's been my -- that's been my experience. The number you present, I can't testify to. I don't know.

Q. If that number turns out to be correct, 22 professional compliance actions taken by the

Page 58

AAOS against expert witnesses who have testified on behalf of the plaintiffs in medical malpractice cases, and zero professional compliance actions taken against experts who have testified on behalf of the defense, would that concern you?

A. No, I -- I know the members of the committee and I know my own personal involvement there, and my -- my opinion is that these people work very hard to try and follow the letter and the spirit of the program as it's outlined and come up with the fairest rendering without any kind of secondary motives, but I think the only motive is to make the -- to have the program be as fair and as balanced as possible.

Q. Now, you have already testified that no other -- you are unaware of any other members on the judiciary committee serving on the board of directors with ISMIE, correct? Do you remember that?

A. That's correct.

Q. Okay. Are you aware of any of the other members of the judiciary committee serving on -- in any capacity with similar insurance mutuals in other states?

Page 59

A. No. Dr. Schmidt at one time, and is not now, was a -- I think, a member of the board of a corresponding Minnesota company. He's told me that. I do not -- the other doctor, DeFiore, I have not idea. I do not know. Dr. Craig I do not know.

Dr. Green I know, just through experience and exposure, is a -- has been a member not of an insurance company, but he's been a part of the -- oh, what do you want to call it? The state licensing or the -- he holds a position in the State of Washington, you know, the licensing board or something like that, but it's not an insurance function.

And that's the most I can express on terms of the backgrounds of the other -- the other individuals. No, I think I -- but whether there is or isn't, I will not say yes or no, but I'm unaware other than past experience of Dr. Schmidt, because I -- we've talked about that, but that doesn't -- he's not there now.

Q. Do you know how long ago he stepped down from that position?

A. I don't know, and I believe that the

Page 60

reason he stepped down was they have a term limits rule for whatever -- for the company that he was on. That's best I can say with that. But I don't know -- I do not know when and how long ago that was.

Q. Can you give me an estimate?

A. No.

Q. Are we talking ten years ago?

A. No.

Q. Are we talking 20 years ago?

A. No.

Q. Do you know?

A. I really don't know. I just -- I prefer not to guess, if you'll excuse me.

Q. Yeah, I don't want you to guess, but if you can give me an estimate.

A. No, that's a guesstimate, but thank you. I'd like to be excused from that.

Q. But do you understand the difference between a guess and an estimate?

A. Uh --

Q. I'll give you an example. If I were to ask you how big, how long a coffee table is in your living room.

Page 61

A. No.

Q. Okay. You can give me an estimate.

A. I can't --

Q. Well, let me finish. You can give me an estimate because you're familiar with your house, you can think back to looking at that coffee table, and you could give me some kind of educated guess.

If I were to ask you to give -- tell me how long the coffee table is in my house, I would be asking you to guess, because you have never been in my house.

So what I am saying is in this instance, can you give me an educated guess?

A. Not really, no.

Q. And Dr. Schmidt is the chairman of your committee, correct?

A. That's correct, he is the chairman of the judiciary committee.

Q. When did you join the AAOS?

A. Let's see. I passed the boards in 1972, and I think the induction occurred in either 1973 or '4, depending on how quickly the application process goes through. Once you're board certified, you fill out the forms, and you have to

16 (Pages 58 to 61)

Page 130

establish that Sharpe had the discussion with the grievant -- pardon me, with the -- with the patient and the patient's mother have anything to do with the the allegations of wrongdoing asserted against Dr. Brandner?

A. Well, the allegation of wrongdoing is failure -- is it was the discussion of Brandner in or out of compliance with 3 and 4.

Q. What discussion with Brandner?

A. I mean the testimony of Brandner, was it in compliance with 3 and 4. The opinion of the judiciary committee was that, based on the evidence in front of it, that Sharpe -- that it did not comply.

Q. But you realize that Brandner was repeatedly asked if he could opine as to weather whether, in fact, a discussion had occurred between Sharpe and the patient and the patient's mother about the risk to the perineal nerve, and Dr. Brandner repeatedly indicated that he could not, that that was a factual issue that required a determination by the jury?

A. Well, the other -- the -- my understanding is that, and you've told us, Sharpe

Page 131

said I did discuss it. What the hard evidence is that's what's written is he documented at length a discussion, and the judiciary committee accepted that what Sharpe did is what every orthopaedic surgeon does. And the criticism of what was done is criticizing things that every orthopaedic surgeon does.

Q. What criticism? What criticism did Dr. Craig --

A. The criticism was that the discussion that is presented in the -- well, the progress note that was written at the time that Sharpe first saw the patient reflects the informed consent discussion that every orthopaedic surgeon writes after that kind of discussion. And when he says later on I did discuss these things, this is a picture of what orthopaedic surgeons do all the time.

So to come out and criticize what is there before us, in the -- my opinion and the opinion of the judiciary committee was that he criticized whatever, you know, the behavior and so forth that -- that is customarily performed by orthopaedic surgeons.

Page 132

Q. Well, what was the criticism? What was the criticism? That was my whole point to you at the judiciary committee was to say all Dr. Craig --

A. No, I think what he's -- what the criticism is that what Brandner -- what Sharpe did was outside of what orthopaedic surgeons do, and the evidence is that the note that was written is exactly the note that I've written hundreds of times.

Other orthopaedic surgeons and the whole committee agree this is the standard note that -- that's written to reflect the discussion that went on, and then Sharpe comes later and says, oh, yeah, I did discuss it, but the note, the note is written the way every orthopaedic surgeon writes a note during this kind of a situation.

Q. But what are you saying that Dr. Brandner -- how are you saying Dr. Brandner criticizes Dr. Sharpe?

A. Brandner? Well, I think Brandner should look at the progress note and say, well, that looks to me like what every orthopaedic surgeon does in the process of discussing it, and to carry the

Page 133

criticism further, I think, is carrying outside of the standards.

Q. All Dr. Brandner did was educate the jury as to the standard of care for informed consent in this procedure. When he was asked if he could opine whether such a discussion had or had not occurred, he said I cannot because I was not there. That's a question for the jury.

And then when asked if he saw a -- any notations in the record that indicated that a specific discussion of a perineal nerve or foot drop had occurred, he indicated I don't see any reflection in there specifically, only discussion of nerve damage and injury -- pardon me, nerve injury in general.

How is that testimony, in your view, criticizing Dr. Sharpe?

A. You'll have to repeat that for me, please.

Q. How about if I do -- let me do that one again, because I was messing up in the middle of it.

A. Much too long and much too complicated.

Q. Okay. Dr. Brandner basically offered

34 (Pages 130 to 133)