**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **PATRICK BRANDNER, M.D.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **10 C 8161** |
| **v.** | ) | |
| | ) | **Judge Ronald A. Guzmán** |
| | ) | |
| **AMERICAN ACADEMY OF** | ) | |
| **ORTHOPAEDIC SURGEONS and** | ) | |
| **AMERICAN ASSOCIATION** | ) | |
| **OF ORTHOPAEDIC SURGEONS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Patrick Brandner sued the American Academy of Orthopaedic Surgeons ("Academy") and its interrelated and parallel organization, the American Association of Orthopaedic Surgeons ("Association") (collectively, the "AAOS"), for failing to follow their own bylaws, acting in bad faith and violating his due process rights when they suspended him from membership based on certain expert testimony he provided during a medical malpractice case.

Brandner contends that the AAOS's sole intent was to punish and make an example of him for offering expert testimony against another orthopedic surgeon who was a fellow member of the AAOS. The parties have cross-moved for summary judgment. For the reasons stated below, Brandner's motion is denied and AAOS's motion is granted.

**I.      Facts**

As an initial matter, the Court notes that its resolution of the parties' motions was made vastly more difficult by Brandner's failure to abide by Local Rule 56.1(a), which requires a

moving party to set forth "short numbered paragraphs" in its statement of facts. Almost all of Brandner's statements violate that rule and, indeed, some statements of fact span more than one single-space page. Brandner's Statement No. 53 is approximately seventeen (lengthy) sentences long. The Local Rules contain a limit on the number of statements of fact for a reason. As noted in the Committee Comment for Local Rule 56.1:

> Local Rule 56.1 is revised to set forth limits on the number of statements of fact that may be offered in connection with a summary judgment motion. The judges of this Court have observed that parties frequently include in their LR56.1 statements of facts that are unnecessary to the motion and/or are disputed. The judges' observation is that in the vast majority of cases, a limit of 80 asserted statements of fact and 40 assertions of additional statements of fact will be more than sufficient to determine whether the case is appropriate for summary judgment. The number of statements of fact has been set in light of the requirement of section (a)(3), which requires that only "material facts" be set down. A party may seek leave to file more asserted statements of fact or additional fact, upon a showing that the complexity of the case requires a relaxation of the 80 or 40 statement limit.

Local Rule 56.1. Brandner's statement of facts clearly violates the spirit of this rule. The Court has attempted to wade through the facts to include only the material ones. To the extent a fact is not discussed in the Fact section of this Memorandum and Order, it will be addressed in the Analysis section, if necessary. Due to Brandner's blatant disregard for the Local Rules, the Court will not look with favor on any motion to reconsider based on the Court's purported failure to appreciate the relevance of a particular fact.

The Court further notes that its review of the facts was complicated by Brandner's (and to a certain extent, AAOS's) argument of legal issues in the statements of fact. This is improper. *Camilotes v. Resurrection Health Care Corp.*, No. 10 C 366, 2012 WL 2905528, at *1 (N.D. Ill. Jul. 16, 2012) ("The purpose of Local Rule 56.1 statements is to identify the relevant admissible evidence supporting the material facts, not to make factual or legal arguments."). Again, the

Court has attempted to eliminate from its statement of the background facts any legal argument inserted by the parties.

Underlying Case

Brandner is an orthopedic surgeon who lives in Nevada. (Pl.'s LR 56.1(a) Stmt., Dkt. # 81, ¶ 1.) Due to a back injury which limited his ability to perform surgery, Brandner began in 1995 to provide independent medical examinations, record reviews, and expert testimony to supplement his income. (*Id.* ¶ 11.) The AAOS is comprised of interrelated not-for-profit corporations organized under the laws of Illinois, which have their principal place of business in Rosemont, Illinois. (*Id.* ¶ 2.) Brandner has been a member of the Academy for 25 years. (*Id.* ¶ 5.) Pursuant to the bylaws of the Academy, all members of the Academy are members of the Association. (*Id.*)

In October 2004, Brandner was contacted to perform a records review and provide possible expert testimony in a medical malpractice case in Arizona. (*Id.* ¶ 12) A minor patient was suing Dr. Kipling Sharpe for nerve damage that occurred during a surgery, a proximal tibial osteotomy, he performed on the patient's leg. (*Id.* ¶ 13.) After reviewing the records, Brandner concluded that the evidence of malpractice as to Dr. Sharpe was "doubtful." (*Id.* ¶ 14.) He indicated, however, that the absence of a notation documenting a discussion between Sharpe and the patient about the risk of damage to the peroneal nerve and potential foot drop was unusual. (*Id.*) Brandner indicated that such a discussion was required to satisfy the standard of care for informed consent for a proximal tibial osteotomy. (*Id.*)

The patient's attorney said it was his understanding that neither the patient nor his mother knew prior to surgery of the risk of damage to the peroneal nerve or the possibility of foot drop. (*Id.* ¶ 15.) Sharpe, however, testified at his deposition that he discussed these risks with the

patient on two occasions prior to the surgery because he was particularly worried about the risks. (Defs.' Resp. Pl.'s LR 56.1(a) Stmt., Dkt. # 87, ¶ 15; Sharpe Dep., Defs.' Ex. 10 at 11-12.)

Brandner stated that he would be willing to act as an expert witness in the case, but would only testify that the standard of care for informed consent in the context of the relevant surgery required a discussion of the specific risks associated with damage to the peroneal nerve and the potential of foot drop and that the medical records failed to indicate that a discussion regarding those particular risks had occurred. (Pl.'s LR 56.1(a) Stmt., Dkt. # 81, ¶ 16.)

As discussed more fully below, Sharpe was not initially named in the patient's lawsuit and both the patient and his mother testified at their January 29, 2004 depositions that Sharpe had discussed with them prior to surgery the risks involved in the surgery, including the possibility of foot drop. (*Id*. ¶¶ 21, 24, 25.) Sharpe was deposed in the underlying lawsuit prior to his being named as a defendant and he testified during the deposition that he was concerned about the risk of peroneal nerve injury and had specifically discussed it with the patient prior to surgery. (*Id*. ¶ 26.) The patient and his mother were deposed again after Brander had been retained by the patient as an expert witness. (*Id*. ¶ 27.) In their June 2005 depositions and at trial, the patient and his mother testified that Sharpe had *not* discussed prior to the surgery the risk of post-surgical foot drop. (*Id*.)

On August 5, 2005, Brandner gave deposition testimony as an expert witness in the malpractice action against Sharpe. (*Id*. ¶ 22.) Brandner testified that Sharpe's conduct fell below the standard of care if no discussion regarding the particular risks of damage to the peroneal nerve and the potential for foot drop had occurred. (Pl.'s Ex. 10, Brandner Dep. at 21-23.) At his deposition, Brandner agreed that while the patient and his mother testified at their depositions that they had not been notified of the specific risks prior to surgery, Sharpe testified at his

deposition that he had discussed the particular risks pre-surgery. (Pl.'s Rule 56.1(a) Stmt., Dkt. # 81, ¶ 22.) Brandner further indicated that he could not resolve the dispute as to who said what to whom and when, but that it was an issue for the jury. (*Id.*)

On April 29, 2008, Brandner testified at trial as an expert witness in the action against Sharpe. (*Id.* ¶ 23.) He testified that the standard of care for informed consent in the context of a proximal tibial osteotomy required a discussion of the specific risks associated with damage to the peroneal nerve and the potential of foot drop and that the medical records failed to indicate that a pre-operative discussion regarding those particular risks had occurred. (*Id.*) Brandner admitted that he could not testify as to whether Sharpe had actually discussed the risk of peroneal nerve damage and the potential for foot drop prior to surgery. (*Id.*) Brandner also testified at trial when asked about the January 2004 deposition testimony of the patient's mother that Sharpe had warned her of the risks prior to surgery, that the patient's mother was referring to a post-surgical rather than pre-operative discussion with Sharpe. (Defs.' Resp. Pl.'s LR 56.1(a) Stmt., Dkt. # 87, ¶ 23.) The jury found in favor of Sharpe. (*Id.* ¶ 24.)

AAOS Grievance Procedures and Standards of Professionalism

In 2005, the AAOS established a Professional Compliance Program in response to member requests. (Pl.'s Resp. Defs.' LR 56.1(a) Stmt., Dkt. # 82, ¶ 9.) On April 18, 2005, the AAOS adopted Standards of Professionalism ("SOP") for Orthopaedic Expert Witness Testimony. (*Id.* ¶ 13.) The SOPs must be followed by all AAOS fellows and members when providing expert opinion services. (*Id.*) Article VIII of the AAOS Bylaws sets forth general procedural mechanisms for the operation of the AAOS Professional Compliance Program. (*Id.* ¶ 14.) In addition, the AAOS promulgated Professional Compliance Grievance Procedures ("Grievance Procedures"), which are dated September 13, 2008 and which apply to Sharpe's

grievance against Brandner, which is discussed in detail below.  (*Id*.)

The Grievance Procedures involve a multi-step process where at least two different groups of AAOS fellows review the merits of a grievance before a final determination is made: the Committee on Professionalism and the AAOS Board of Directors.  (*Id*. ¶ 16.)  In addition, parties to a grievance may seek an appeal with the AAOS Judiciary Committee.  (*Id*.)

Sharpe's Grievance

After the malpractice case against Sharpe was over, he filed a bar complaint against the patient's attorney and a grievance report with the AAOS against Brandner.  (Pl.'s LR 56.1(a) Stmt., Dkt. # 81, ¶ 24.)  The AAOS received Sharpe's grievance against Brandner on October 21, 2008.  (*Id*. ¶ 26.)  Sharpe's grievance letter stated as follows:

> This was a case of peroneal nerve injury which occurred during a corrective osteotomy . . . . It is well-documented in my chart that I discussed risks with the patient and his parents including nerve injury on 2 separate visits.  In depositions taken prior to my being named in a lawsuit . . . both the patient and his mother acknowledged that I discussed risks including the specific risk of peroneal nerve [injury] . . . . Subsequently, the mother and son changed their story and sued me for lack of informed consent.  Their attorney hired Dr. Brandner as an expert witness . . . . He testified in both his deposition and in court that I fell below the standard of care in my preoperative care by failing to discuss the risk of peroneal nerve injury.

(*Id*. ¶ 20.)

In his trial testimony, Brandner first asserted that he had no opinion on the "he-said, she-said" dispute between Sharpe and his patient as to whether a pre-operative discussion of peroneal nerve injury had occurred.  (*Id*. ¶ 28.)  However, when he was shown the January 2004 deposition testimony of the patient's mother that Sharpe "had warned us prior" to surgery of the risk of nerve injury, Brandner testified as follows:

Q:      Have you ever been aware of that testimony?

A:     I believe so.  I can't recall exactly, but again, it's – the reason I'm saying I can't recall is because it strikes me, as this lady, knowing a list or a laundry list of things, and not specifically addressing – it looks like she's talking about things that happened after the surgery and she understands it and she mentions it.  But, she doesn't specifically define that she knew the nerve could be stretched, before.

(*Id*. ¶ 28.)

Sharpe's grievance alleged that Brandner violated: (1) Mandatory Standards Nos. 3 and 4 of the AAOS SOPs when he testified that the standard of care for informed consent in the context of the relevant surgery required a discussion of the specific risks associated with damage to the peroneal nerve and the potential of foot drop and that the medical records failed to indicate that a discussion regarding those particular risks had occurred; (2) Mandatory Standard No. 6 when he failed to adequately review the deposition testimony of the patient and his mother given in January 2004 before agreeing to testify as an expert witness at trial; and (3) Mandatory Standards Nos. 7 and 8 when he testified about the rate of nerve damage after a leg surgery like the one at issue and that he had no "current relevant experience" with the procedure.  (*Id*.)

The relevant Mandatory Standards state as follows:

Mandatory Standard No. 3:  An orthopaedic expert witness shall evaluate the medical condition and care provided in light of generally accepted standards at the time, place and in the context of care delivered.

Mandatory Standard No. 4:  An orthopaedic expert witness shall neither condemn performance that falls within generally accepted practice standards nor endorse or condone performance that falls outside these standards.

Mandatory Standard No. 6: An orthopaedic expert witness shall seek and review all pertinent medical records related to a particular patient prior to rendering an opinion on the medical or surgical management of the patient.

Mandatory Standard No. 7: An orthopaedic expert witness shall have knowledge and experience about the standard of care and available scientific evidence for the condition in question during the relevant time, place and in the context of medical care provided and shall respond accurately to questions about the standards of care

and available scientific evidence.

> Mandatory Standard No. 8: An orthopaedic expert witness shall provide evidence or testify only in matters in which he or she has relevant clinical experience and knowledge in the areas of medicine that are the subject of the proceeding.

(*Id.* ¶ 31.)

On April 7, 2009, Brandner submitted a written response to the grievance noting that he was at a disadvantage because all of the documents he had possessed which related to the case had been returned to the patient's attorney and he had been advised that the information was irretrievable. (Defs.' Resp. Pl.'s LR 56.1(a) Stmt., Dkt. # 87, ¶ 31.) Among other things, Brandner emphasized the limited nature of his testimony. (*Id.*) Specifically, he stated in his response to the grievance that he testified only that (1) the standard of care for the surgery required a discussion of the risks of peroneal nerve injury and that (2) there was nothing in the patient's medical records indicating that such a discussion had occurred. (*Id.*)

Sharpe replied to Brandner's response to the grievance, though no Grievance Procedure addresses the filing of a reply. (*Id.* ¶ 32.) According to the defendants, Brandner was sent a copy of the reply on September 18, 2009, several months after it was received by the AAOS. (*Id.*)

After reviewing Sharpe's grievance report and the initial materials he submitted in support, the AAOS requested additional materials from Sharpe, which is customary. (Pl.'s Resp. Defs.' LR 56.1(a) Stmt., Dkt. #82, ¶ 32.) Upon receipt of this additional information, the AAOS Committee on Professionalism ("COP") concluded that a *prima facie* case of unprofessional conduct had been established and sent Brandner a letter advising him of its conclusion and setting a hearing date on one of two days. (Pl.'s LR 56.1(a) Stmt., Dkt. #81, ¶ 33.) After his request to postpone the hearing was rejected by Sharpe, Brandner had to reschedule travel plans at significant cost in order to attend the hearing. (*Id.* ¶ 35.)

Prior to the hearing, Brandner submitted a witness list and grievance material in which he again advised the AAOS that he was not in possession of any of the materials related to the case. (*Id.* ¶ 36.) He also submitted several letters from other doctors agreeing with his testimony that the standard of care required informed consent with respect to the specific risks already discussed. Brandner did not receive Sharpe's reply to Brandner's response to the grievance until after his COP hearing materials had been submitted. (*Id.* ¶ 37.)

Both Brandner and Sharpe attended the grievance hearing on October 2, 2009. (Pl.'s Resp. Defs.' LR 56.1(a) Stmt., Dkt. #82, ¶ 43.) Both parties were given thirty minutes to make a presentation and both were afforded the opportunity to ask questions of the other side. (*Id.*) Brandner made a presentation on his own behalf, did not ask any questions of Sharpe and elected not to retain counsel to represent him at the hearing. (*Id.* ¶ 44.)

The COP issued its Report and Recommendation on December 14, 2009, recommending that Brandner be suspended from the AAOS for one year based on "unprofessional conduct in the performance of expert witness testimony." (*Id.* ¶ 43.) The COP hearing panel concluded that Brandner had violated Mandatory Standard Nos. 3, 4 and 7. (*Id.*; Defs.' Resp. Pl.'s LR 56.1(a) Stmt., Dkt. # 87, ¶ 43.) With respect to Mandatory Standard Nos. 3 and 4, the COP hearing panel concluded that:

> [t]he record shows that informed consent was given. The COP found that the deposition transcripts reflected that both the plaintiff and his mother had an understanding about the specific possibility and causation of foot drop. The COP believed that, in this regard, Dr. Brandner condemned performance that falls within generally accepted practice standards in obtaining informed consent.

(Pl.'s LR 56.1(a) Stmt., Dkt. # 81, ¶ 44; Pl.'s Ex. 30, Dkt. #81-3, at 9.)

Brandner's counsel timely appealed the COP hearing panel's ruling to the Judiciary

Committee. (Pl.'s LR 56.1(a) Stmt., Dkt. # 81, ¶ 46.) In his appeal, Brandner asserted that the COP hearing panel had ignored numerous AAOS Grievance Procedures and argued that this failure violated his due process rights. (*Id.*) As to the violation of Mandatory Standard Nos. 3 and 4, Brandner argued that under the original SOPs, he had no obligation to review the patient's deposition transcripts, only the pertinent medical records. (*Id.*) He further argued that without the June 2005 transcripts, which Sharpe failed to provide to the COP hearing panel, it had no basis on which to find that the "deposition transcripts reflected that both the plaintiff and his mother had an understanding about the specific causation and possibility of a foot drop." (*Id.*)

Prior to the hearing before the appellate Judiciary Committee, Brandner obtained and forwarded to the Committee the following transcripts: (1) the June 2005 deposition transcripts of the patient and mother; (2) his own trial testimony; and (3) the mother's trial testimony. (*Id.* ¶ 48.)

The appeal hearing was held on March 12, 2010 and each side was given ten minutes to make a statement to the Judiciary Committee. (Pl.'s LR 56.1(a) Stmt., Dkt # 81, ¶ 50.) Sharpe's attorney argued that the transcripts from the subsequent depositions of the patient and the mother (in which they changed their testimony to say that Sharpe did not discuss the risks with them) were irrelevant to the grievance because the real point of the grievance was that Brandner should not have agreed to act as an expert in light of the testimony by the patient and his mother in their initial depositions that Sharpe had discussed the specific risks associated with the surgery. (*Id.*) On April 21, 2012, the Judiciary Committee issued its Report and Recommendation in which it recommended that Brandner be suspended from the AAOS for one year. (*Id.* ¶ 53.)

The AAOS Grievance Procedures state that the AAOS Board of Directors adjudicates all recommendations received from the COP hearing panel and the Judiciary Committee at the next

scheduled meeting of the Board.  (*Id*. ¶ 54.)  The Board is required to reject findings of the COP

and the Judiciary Committee when there has been a lack of due process or a finding that the

recommendation is contrary to the clear weight of the evidence.  (*Id*.)  The grievant and respondent

have a right to appear before the Board and make a presentation of no more than ten minutes.  (*Id*.)

Brandner and his counsel appeared before the Board, but neither Sharpe nor his counsel appeared.

(*Id*. ¶ 55.)  Instead, Sharpe made a written submission.  (*Id*.)  Although the Grievance Procedures

do not expressly call for testimony from members of the COP hearing panel or the Judiciary

Committee before the Board, representatives from each made presentations to the Board regarding

Sharpe's grievance.  (*Id*. ¶ 56.)  Brandner's counsel noted to the board that the AAOS did not

adopt its original SOPs until April 18, 2005, six months after Brandner agreed to give expert

testimony in the underlying case.  (*Id*. ¶ 57.)

On July 2, 2010, Brandner's counsel received a letter stating that the AAOS Board of

Directors had voted to suspend Brandner for one year based on violations of the SOPs, Mandatory

Standards Nos. 3 and 4.  (*Id*. ¶ 58.)  Brandner's lawyer then sent a letter to the AAOS's General

Counsel indicating that Brandner intended to file suit and asking that the decision of the AAOS

Board to suspend Brandner not be publicly disclosed.  (*Id*. ¶ 59.)  Brandner received a response

from the AAOS General Counsel stating that he agreed on behalf of the AAOS to refrain from

publicly disclosing the suspension until the AAOS Board voted on the issue.  (*Id*. ¶ 60.)

Approximately three weeks later, on July 30, 2010, Brandner's counsel received a letter from the

Chief Executive Officer of the AAOS stating that it intended to follow its Bylaws regarding public

communications of its decision but that the Board did not anticipate publication of the matter while

it was considering Brandner's draft pleading.  (*Id*. ¶ 62.)

On September 30, 2010, Brandner's counsel received a letter from AAOS's General

Counsel stating that the Board had voted to rehear Sharpe's grievance at its meeting in Chicago on December 4, 2010. (*Id*. ¶ 63.) The letter also indicated that the June 19, 2010 decision of the AAOS that Brandner should be suspended for one year was null and void. (*Id.*) While Brandner and his counsel attended the December 4, 2010 hearing before the Board of Directors, neither Sharpe nor his lawyer did. (*Id.* ¶ 65.) Brandner's counsel made a ten-minute statement. (*Id.*)

Brandner's counsel received a letter on December 10, 2010, advising him that the Board had once again voted to suspend Brandner for one year based on his violation of Mandatory Standards No. 3 and 4. (*Id*. ¶ 67.) Although Brandner asked the AAOS to withhold public disclosure of its decision until a ruling was issued on Brandner's motion for a temporary restraining order in the instant case, the AAOS stated that it would not withhold publication of the decision. (*Id*. ¶¶ 68-69.)

## II.    Analysis

"In Illinois, voluntary associations have great discretion in conducting their internal affairs, and their conduct is subject to judicial review only when they fail to exercise power consistently with their own internal rules or when their conduct violates the fundamental right of a member to a fair hearing." *Austin v. Am. Ass'n of Neurological Surgeons*, 120 F. Supp. 2d 1151, 1152 (N.D. Ill. 2000) (citation and internal quotation marks omitted). "Under Illinois law, a court ordinarily will not review the actions of a voluntary association with respect to its members; when a court does intervene, the scope of its intervention is exceedingly narrow." *Nat'l Ass'n of Sporting Goods Wholesalers, Inc. v. F.T.L. Mktg. Corp.*, 779 F.2d 1281, 1285 (7th Cir. 1985). Accordingly,

> [u]nder Illinois law, a court may review the internal procedures of a voluntary association with respect to its members only when: (1) the operation of the association significantly harms an important economic interest of the plaintiff

belonging to the association when it acted; (2) the association (a) failed to act in accord with its own constitution and bylaws; (b) was influenced by bias, prejudice, or lacking in good faith, or (c) violated due process.

*Austin,* 120 F. Supp. 2d at 1153.

A.     Important Economic Interest

AAOS contends that Brandner fails this prong given the Seventh Circuit's statement that "[w]here membership is optional, expulsion (or suspension, or denial of admission) is not deemed the invasion of an important economic interest." *Austin v. Am. Ass'n of Neurological Surgeons*, 253 F.3d 967, 971 (7th Cir. 2001). In *Austin*, the plaintiff brought suit against the American Association of Neurological Surgeons after he was suspended for six months based on his testimony in a medical malpractice suit. Similar to the allegations in this case, Austin claimed that he had been suspended as revenge for having testified against another member of the Association. *Id.* at 968. The Seventh Circuit held that his claim against the Association failed because, among other things, Austin failed to show an important economic interest. *Id.* at 971. The court concluded that a 65% drop in earnings from testifying from the previous year's income of $220,000.00 still left a "healthy" $77,000.00 and noted also that this amount represented "income from a sideline to his primary profession, which is that of a neurosurgeon." *Id.* The *Austin* court found that this "is not the kind of professional body blow that the cases have in mind when they speak of an 'important economic interest' jeopardized by the action of a voluntary association." *Id.* at 972.

The Court finds this case distinguishable. Here, it is undisputed that from 2008 through 2010, 73%, or $1,660,950.27, of Brandner's income was generated from medical legal support. During that same period, total revenue from his orthopedic practice was $614,794.00. (Pl.'s Rule 56.1(b)(3) Resp., Dkt. # 82, ¶ 72.). Brandner testified at his deposition that he believed that

suspension from the AAOS would end his medical career and that the loss of income from being suspended would render him unable to meet the overhead obligations associated with his practice. (Defs.' Resp. Pl.'s LR 56.1(a) Stmt., Dkt. # 87, ¶ 11.)  Because it is undisputed that the suspension would "jeopardize the principal source of [Brandner's] livelihood," *Austin*, 253 F.3d at 972, the Court concludes that the suspension would interfere with an important economic interest.

B.  Due Process

The Seventh Circuit has addressed the concept in proceedings relating to voluntary associations as follows:

> [D]ue process is an amorphous concept of less than facile application. There are no rigid or universal rules determining what constitutes procedural due process. Indeed, the dictates of that flexible concept vary substantially depending upon the nature of the proceedings. . . .The procedural due process requirements in an organization's disciplinary or expulsion actions are necessarily dependent in part upon the nature of the member's interest in continuing his membership. . . . [W]e do not find that due process requires that he be given a "trial-type hearing." . . . Plaintiff's interest in maintaining his membership in a private, voluntary association, . . . deserves protection from arbitrary abridgement.  Yet experience teaches that adequate protection can be given without the employment of full-blown adversary proceedings.

*Duby v. Am. Coll. of Surgeons*, 468 F.2d 364, 368-69 (7th Cir. 1972).

Brandner asserts that the AAOS failed to act in accordance with its internal Bylaws and Grievance Procedures, thus depriving Brandner of due process.  While alleging widespread disregard for the Bylaws and Grievance Procedures,[1] Brandner points to two purported violations in particular: (1) improperly shifting the burden of production from Dr. Sharpe as grievant to

---

[1]  Brandner states that the "AAOS failed to act in accordance with its Professional Compliance Grievance Procedures on no fewer that thirty-six occasions in its handling of the Grievance."  (Pl.'s Cross Mot. Summ. J., Dkt. # 80, at 7.)  However, while he acknowledges the "repeated disregard" by the AAOS for their procedures, he focuses and discusses only two in particular.  The Court therefore, will confine its analysis to these two purported violations.

Brandner as respondent, and (2) repeatedly recasting the grievance such that Brander was forced to defend against constantly changing allegations.

                  1.      *Shifting Burden of Proof/Failure to Require Full Document Production*

"[D]isciplinary proceedings conducted by voluntary associations do not require strict compliance with judicial standards of due process . . . . [i]nstead, the accused member is entitled to a hearing before a fair and impartial tribunal." *Butler v. USA Volleyball*, 673 N.E.2d 1063, 1066 (Ill. App. Ct. 1996) (citation and internal quotation marks omitted).

Section VII(A)(5) of the Grievance Procedures provides: "The Grievant bears the burden of proof and must submit written material as part of the grievance process." Section VI(C) states that "[e]ach party to a grievance is responsible for obtaining and providing all written material, such as transcripts and medical records, for consideration by AAOS." Finally, Section VII(D)(9) provides that after the grievance hearing and prior to issuing its recommendations, the Grievance Hearing Panel may request additional information from the Grievant, Respondent, or any third party. Any additional information will be made available to each party.

Brandner contends that as early as his initial response to Sharpe's grievance, he indicated to the COP hearing panel that he did not have access to all of the documents he reviewed for his testimony in the underlying malpractice action because they were returned to Sharpe's attorney, who indicated the documents were irretrievable. Brandner states that, in filings with the hearing panel, he again indicated that he had attempted to obtain records from Sharpe's attorney but his requests were denied. Further, at the initial hearing before the COP hearing panel, Brander states that despite his repeated assertions that Sharpe had failed to produce all deposition transcripts from the underlying malpractice action, the hearing panel took Sharpe at his word that he had provided all of the depositions to the panel. The panel then issued its Report and Recommendation without

reviewing the transcripts from depositions of the patient and his mother in June 2005 or their trial

testimony. Brandner contends that the panel's conclusion that the "record show[ed]" that

informed consent was given by the patient and his mother was based on incomplete record. While

he was able to obtain copies of the transcripts prior to the hearing before the Judiciary Committee,

Brandner asserts that the Grievance Procedures render the Judiciary Committee ill-equipped to

handle new evidence and indeed that Section VII(E)(9) of the Grievance Procedures states that no

new evidence may be presented to the Judiciary Committee. Brandner further argues that, in any

event, the strict time limits for representing one's case before the Judiciary Committee precluded a

full discussion of the evidence. For its part, the AAOS contends that it substantially complied with

the Grievance Procedures and therefore provided Brandner with due process.

      As an initial matter, the Court agrees with the defendants that to the extent that Grievance

Procedure VI(C) provides that "each party to a grievance is responsible for providing all written

material, such as transcripts and medical records, for consideration by AAOS," this simply means

that the parties are responsible for providing copies of any written materials that they want the

AAOS to consider. Brandner's assertion that Grievance Procedure VI(C) requires a party to

provide *all* documents, regardless of whether they support the party's claim, is not supported by

the plain language of the procedure. Indeed, Section III(6) of the grievance report form requires

the grievant to "[a]ttach complete copies of any documents that you rely upon as evidence,

providing specific page references to the portions that support your allegations." (Defs.' Resp.

Pl.'s LR 56.1(a) Stmt., Dkt. # 87, ¶ 40.)

      Brandner faults the COP hearing panel for not requiring Sharpe to produce the June 8,

2005 deposition transcripts from the patient and his mother in which they testified that Sharpe had

not discussed the specific risks of the surgery with them. However, when the COP hearing panel

asked Brandner exactly which transcripts were missing, he indicated that he could not tell them because he had returned all of the documents from the case to the patient's attorney. (Young Aff., Ex. 26, Dkt. # 74-26, at 37-38.) Moreover, when the COP hearing panel confirmed that the patient and his mother's conflicting deposition testimony had come out at trial and asked Brandner if he had a copy of the trial transcript or had obtained one from the court, he said no. (*Id*. at 39.)

Most important, by the time the dispute had reached the Judiciary Committee on review from the findings of the COP hearing panel, Brandner had obtained copies of the deposition transcripts and produced them to the Judiciary Committee. (Pl.'s Ex. 33, Brandner's Appeal Stmt. with exhibits, Dkt. # 81-33.) Brandner discussed the transcripts in his twelve-page written appeal to the Judiciary Committee. (*Id*.) Moreover, Brandner's lawyer specifically discussed the June 8, 2005 version of the deposition transcripts in his presentation to the Judiciary Committee.. (Pl.'s Ex. 35, Jud. Comm. Hr'g Tr., Dkt. # 81-35.) In its written ruling, the Judiciary Committee noted the contradictory testimony between the two sets of depositions and stated it was not persuaded that "the change in testimony given in these later depositions is evidence that Dr. Sharpe failed to inform the patient of peroneal nerve injury." (Pl.'s Ex. 36, Jud. Comm. App. Hr'g. Rep., Dkt. # 81-36, at 8.) The Judiciary Committee indicated that Brandner's choice of accepting one version of the patient's testimony over another had taken Brandner "out of the realm of objectively 'counseling' on standard of care and made him condemning of the care provided by Dr. Sharpe." (*Id*.)

Finally, the Court notes that after receiving a draft of his proposed complaint in support of a threatened lawsuit and acknowledging that it had violated Grievance Procedures during the first hearing by allowing a member of the COP hearing panel to make a presentation, the Board voted to nullify its initial decision and agreed to rehear the case. At the second hearing before it, the

Board allowed Brandner to resubmit written materials and reargue his case. Brandner contends that the second Board hearing did not cure the procedural violation because the same Board members who had heard the "improper" presentation by the COP hearing panel member also presided over the second hearing. Brandner, however, fails to point to any record evidence in support of this assertion. Further, assuming it is factually accurate, he fails to cite any AAOS Bylaws or Grievance Procedures that were purportedly violated. Accordingly, the Court rejects this basis for relief.

Brandner acknowledges that upon rehearing, the prior decision by the Board was null and void and that the AAOS considers the findings of the COP hearing panel and the Judiciary Committee to be essentially irrelevant once the Board has ruled. (Pl.'s Cross Mot. Summ. J., Dkt. # 80, at 18.) Nevertheless, Brandner contends that the procedural irregularities that occurred before the COP hearing panel prejudiced him because the time limits imposed on the presentations before the Judiciary Committee and the Board render those proceedings unsuitable for presenting new evidence. But all litigants, even those proceeding before this Court and the Seventh Circuit, are bound by time and page limits and must select their best arguments, in both their written filings and oral presentations. *Watts v. Thompson*, 116 F.3d 220, 224 (7th Cir. 1997) (rejecting due process argument regarding page limits on briefs and noting that "[e]nforcing page limits and other restrictions on litigants is rather ordinary practice. This court has a page limit which is rather strictly, and cheerfully, enforced."). To assert that he did not have sufficient time to raise the fact of the patient's later depositions is a non-starter, particularly where it is undisputed that Brandner addressed the issue in both his oral argument and written filings with the Judiciary Committee and the Board.

Brandner appears to argue that any violation of a Grievance Procedure (and Brandner

18

details thirty-six purported violations) cannot be cured and requires that a court annul an expulsion or, in this case, a suspension. But that cannot be the case. Otherwise, the concept of limited judicial review of the internal administration of voluntary associations espoused by the Seventh Circuit would be meaningless. All of the relevant documents have been produced and considered. Brandner had a hearing before the COP hearing panel, another before the Judiciary Committee and two in front of the Board of Directors. He was permitted to make oral arguments and supplement with written filings. In terms of compliance with the Grievance Procedures and Bylaws, Brandner received due process.

### 2.   *Changing Allegations*

Brandner also contends that the AAOS recast the allegations against him. Specifically, Brandner asserts that the COP hearing panel ignored the allegations leveled by Sharpe and, in violation of Brandner's due process rights and AAOS Grievance Procedure VI(B)(3), which requires that the parties to a grievance have the right to know the specific allegations against them, recast the allegations.

Sharpe alleged in his grievance that Brandner failed to meet Mandatory Standard Nos. 3 and 4 by stating that the standard of care required a discussion of the specific risks of peroneal nerve damage and by testifying that the patient was not given a non-operative option and that the fracture had remodeling potential. (Defs.' Resp. Pl.'s LR 56.1(a) Stmt., Dkt. #87, ¶ 26.) Brandner asserts that instead of basing their finding of violation on these issues, the COP hearing panel found that Brandner had violated Standard Nos. 3 and 4 by "condemn[ing] performance that [fell] within generally accepted practice standards" because "[t]he record show[ed] that informed consent was given." (Pl.'s Ex. 30, COP Hr'g Rep., Dkt. #81-30, at 9.) He further claims that on appeal, the Judiciary Committee again failed to rule on the merits of the matter as presented to it,

19

but in a different way.  Rather than agreeing with the COP hearing panel's reason for concluding

that Brandner had violated Standard Nos. 3 and 4, the Judiciary Committee found that Brandner

had violated those standards when he agreed to offer expert testimony on behalf of the patient in

the face of conflicting deposition testimony.  Specifically, the Judiciary Committee stated:

> [T]he question of whether a violation of the Standards of Professionalism exists is
> not that [Brandner] chose to base his opinion on contradictory evidence from
> patient and treating physician, but the fact that he chose one version of the
> plaintiffs' depositions over another.  This choice took Dr. Brandner out of the realm
> of objectively "counseling" on standards of care and made him condemning of the
> care provided by Sharpe.

(Pl.'s LR 56.1(a) Stmt., Dkt # 81, ¶ 53.)[2]

But, regardless of how the issue is cast, Sharpe's grievance was always based on the

propriety of Brandner's testimony, both in his deposition and at trial, that Sharpe had failed to

meet the standard of care regarding informed consent.  In Brandner's deposition, when asked

whether he believed that Sharpe had violated the standard of care with respect to informed

consent, he replied, "yes."  (Pl.'s Ex. 10, Brandner Dep., Dkt. # 81-10, at 20.)  While Brandner

may have qualified that statement somewhat in subsequent questions, the fact remains he testified

at his deposition that he believed that Sharpe had violated the standard of care regarding informed

consent.  With respect to his trial testimony, Brandner testified that the relevant standard of care

---

[2] In addition, Brandner argues that the Judiciary Committee's Report and
Recommendation was notable because the standards Brandner was alleged to have violated were
not adopted until six months after he agreed to act as an expert and as originally adopted in April
2005, the Mandatory Standards did not require a member testifying as an expert to review
deposition transcripts, only pertinent medical records.  (Pl.'s Cross Mot. Summ. J., Dkt. #80, at
15.)  According to Brandner, the Grievance Procedures themselves state that they apply only to
grievances filed against an AAOS member that allege a violation of the AAOS SOPs arising
from activities that occurred on or after April 18, 2005, and he agreed to act as an expert in
October 2004.  But, he gave his deposition in the case on August 5, 2005, and his trial testimony
on April 29, 2008, both of which provided the bases for his suspension.  (Pl.'s Exs. 10 & 11,
Dkt. ## 81-10 & 81-11.)

for informed consent in a proximal tibial osteotomy required a discussion about the possibility of peroneal nerve injury and that his review of the medical records indicated that no such discussion had taken place. (Pl.'s Ex. 11, 4/29/08 Trial Tr., at 15-17.) When defense counsel asked Brandner about the patient's mother's 2004 deposition testimony in which she stated that Sharpe had discussed the risk of nerve injury prior to the surgery, Brandner testified that he believed she was discussing "things that happened after the surgery and she understands it and she mentions it . . . . [b]ut she doesn't specifically define that she knew the nerve could be stretched, before." (*Id*. at 36.)

Noticeably absent from Brandner's discussion of the issue of the purported changing allegations is any particularized statement of how Sharpe's grievance differed from the interpretation of the COP hearing panel and the Judiciary Committee, and most important, what evidence or argument he was precluded from presenting based on the purportedly recast allegations. In the absence of any contention that he would have presented different argument or evidence, Brandner's assertion of a violation of due process based on recast allegations fails.

Brandner and his counsel made arguments at every level of the grievance process as to what they believed the evidence showed, including that the scope of Brandner's testimony was limited and was not intended as an indictment of Sharpe's performance regarding the informed consent standard of care. The COP hearing panel, the Judiciary Committee and the Board did not agree. This Court's limited review of an association's actions regarding its members does not permit it to review whether the decision was right or wrong, but simply whether it was made without bias, prejudice or bad faith, by following proper association procedures and in the absence of a due process violation.

      B.      <u>Bias, Prejudice, Lack of Good Faith</u>

Brandner next asserts that the AAOS's lack of good faith and bias is evident in the fact that a member of the Judiciary Committee, Dr. Richard Geline, served on the Board of Directors of ISMIE Mutual Insurance Company, a physician-owned insurance company which insures doctors against malpractice claims.[3] (Pl.'s LR 56.1(a) Stmt., Dkt. # 81, ¶ 72.) Brandner contends that because Sharpe's grievance stemmed from Brandner's testimony as an expert witness for a plaintiff in a medical malpractice claim, Geline, as an ISMIE Board member, had a direct financial incentive to reduce the size and number of medical malpractice claims against doctors. According to Brandner, this purported conflict should have been disclosed to him.

But, it is undisputed that ISMIE insures doctors in Illinois, neither Sharpe nor Brandner was insured by ISMIE, and the underlying malpractice case, which was litigated in Arizona, was over. Brandner has pointed to no evidence that Geline would have personally financially benefitted from participating as a member of the Judiciary Committee with respect to Sharpe's grievance. Geline's duty as an ISMIE Board member to "guard the welfare of the company" is simply too attenuated to be considered either a " real or perceived" conflict that needed to be disclosed.

Brandner also asserts that the COP hearing panel should have disclosed to him that two of the panel members, Drs. Butler and Mandell, knew Sharpe's expert witness, Dr. Russo, from his prior position on the AAOS Board of Councilors. Although neither Butler nor Mandell was a COP hearing panel member with respect to the Sharpe's grievance, Brandner asserts that Butler

---

[3] Brandner also asserts in his reply brief that AAOS's disregard of its procedures, as discussed above, also demonstrated bad faith and bias. The Court, however, will not consider arguments raised for the first time in a reply brief. *Nelson v. La Crosse Cnty. Dist. Attorney*, 301 F.3d 820, 836 (7th Cir. 2002) ("It is well settled that issues raised for the first time in a reply brief are deemed waived.").

"poisoned the well" by sending an e-mail to all of the COP panel members notifying them of his professional relationship with Russo and stating that he had "good memories of him as a person and a doctor." (Pl.'s LR 56.1(a) Stmt., Dkt. # 81, ¶ 73). Butler further indicated in the e-mail that because he might be biased for Russo, he was recusing himself from the Sharpe grievance. Although subsequent communications among the COP hearing panel members indicated that they believed the proper way to handle the information was through disclosure to Brandner, the AAOS never informed Brandner of the purported conflict. But, as already noted, neither Butler nor Mandell participated in hearing Sharpe's grievance. Because Brandner has failed to point to any AAOS procedure that was violated, or indeed, any prejudice resulting from the e-mails, the Court rejects the argument that the failure to disclose the reasons for Butler and Mandell's recusal and their e-mails to the COP hearing panel constituted bad faith.

Finally, Brandner argues that AAOS grievance hearing program results demonstrate that the AAOS has used its Professional Compliance Program as a tool to further its tort reform agenda by punishing doctors who testify against members of the AAOS. Specifically, Brandner asserts that out of forty-four AAOS grievances involving expert testimony, the AAOS never suspended a member who offered expert testimony for the defense. In contrast, on seventeen occasions the AAOS has suspended a member who has offered testimony for the plaintiff. But Brandner fails to put the numbers in context–how many grievances were *brought* against members who testified for the plaintiff versus the defense? If, for example, forty grievances were filed against members who testified for the plaintiff and only four who testified for the defense, then the seventeen suspensions for those who testified for the plaintiff takes on a different meaning. Moreover, in rejecting a similar argument in the *Austin* case, the Seventh Circuit noted that the reason for this type of assymetry is obvious because:

> If a member of the Association is sued for malpractice and another member gives testimony for the plaintiff that the defendant believes is irresponsible, it is natural for the defendant to complain to the Association; a fellow member has irresponsibly labeled him negligent. If a member of the Association who testifies for a plaintiff happens to believe that the defendant's expert witness was irresponsible, he is much less likely to complain, because that expert (and fellow member of the Association) has not accused him of negligence or harmed him in his practice or forced him to stand trial or gotten him into trouble with his liability insurer. The asymmetry that Austin points to as evidence of bad faith is thus no evidence of bad faith at all; and he has no other evidence of bad faith.

*Austin*, 253 F.3d at 967.

Based on Brandner's failure to place the numbers in context and the Seventh Circuit's rejection of a similar argument, the Court rejects Brandner's argument that the suspension record for grievances establishes bad faith.

**IV.    Conclusion**

For the reasons stated above, Brandner's motion for summary judgment [79-1]is denied and the AAOS's motion for summary judgment [70-1] is granted.  The clerk is directed to enter a Rule 58 judgment and terminate this case from the Court's docket.

**Date:**  September 27, 2012

_____
**Ronald A. Guzman**
**United States District Judge**