**Exhibit 15**

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

██████████ and ██████████
et al.,

　　　　　　Plaintiffs,

　　　　vs.

ANDRE MATTHEWS, M.D., and
JANE DOE MATTHEWS, et al.,
　　　　　　Defendants.

April 29, 2008
Phoenix, Arizona

BEFORE THE HONORABLE:　MICHAEL JONES, Judge

REPORTER'S TRANSCRIPT OF PROCEEDINGS
Testimony of ██████████ and ██████████

Lisa H. Vitoff
Certified Court Reporter
CCR #50251

A P P E A R A N C E S

FOR THE PLAINTIFFS:
          KOELLER, NEBEKER, CARLSON & HALUCK, LLP
          BY:  Mr. Wade R. Causey

FOR THE DEFENDANTS
          CRAWFORD & KLINE, P.L.C.
          BY:  Mr. Bruce D. Crawford

P R O C E E D I N G S

████████████ having been previously sworn herein, resumed the stand and testified as follows:

DIRECT EXAMINATION continued

BY MR. CAUSEY:

     Q    ████  I want to finish up what we were discussing yesterday.  I know we got close to covering everything.

see how much of it wasn't healed.

Why don't you do that.

Since we're on the subject, can I get that. There it is — if we go to the next page, Page 10, at the top.

Dr. Sharpe says: No, I stand corrected. I said apparently there was some union present. There was very minimal motion at the fracture site. So, it was not, certainly was not fully healed.

As far as whether your fracture site and leg was moving and getting worse, just prior to the surgery, would you have deferred to Dr. Sharpe on that issue?

A    Yes.

Q    You have no medical training or background, I take it?

A    No.

Q    Could you have looked at an x-ray and determined that?

A    No.

Q    So you're just going on what you see and feel?

A    Yes.

Q    Lastly, ▮▮▮▮ I just want to ask you one more thing. When you made the decision, when you were weighing the factors and made the decision to go forward with this surgical procedure, did you take into consideration, at all,

76

the risk of a permanent loss of function of your foot?

A    No.

Q    Why not?

A.    Because I was never told that.

MR. CAUSEY:  I don't have anything further, your Honor?

THE COURT:  Ladies and gentlemen, before we let Mr. ███ step down, do any of you have questions for him? Any questions for Mr. ███ No?  All right. Thank you then.

Mr. ███ you can go ahead and step down.

Mr. Causey, your next witness, please.

MR. CAUSEY:  I need to go outside.

Your Honor, I wish to call ███ mom, ███ ███

THE COURT:  All right. Mrs. ███ this is Maggie, and she'll swear you in.

███ having been duly sworn herein, took the stand and testified as follows:

THE COURT:  Thanks, ███ Go ahead and have a seat over there on the witness stand.

Mr. Causey, whenever you're ready.

Do you see what I'm referring to?

A    Yes.

Q    Do you have any recollection of a discussion along the line — those lines taking place?

A    I don't recall.

Q    You don't recall this, a discussion about risks at this meeting?

A    I don't think — I just don't recall.  I don't I don't think we did, but it's possible.

Q    Okay.  Do you remember having a discussion about risks, at some point in time, before the surgery?

A    Oh, yes.

Q    Okay.  Do you recall — and we'll get to the June 6, 2002, pre-op conversation — do you recall that meeting?

A    Yes.

Q    I just want to understand your testimony correctly.

You do recall discussing risks —

A    Yes.

Q    — before the surgery?

A    Yes.

Q    What you're saying, if I understand you correctly, is you just don't recall the date, which meeting?

A    Well, I know, absolutely, certainly, risks were

discussed in the pre-op one in June. I'm not sure about the April 11 discussion happening.

Q Let me ask you this then, at the April 11 meeting, if risks were discussed, as is set forth by the doctor in his dictation -- you see where it says nerve injury?

A Yes.

Q Do you have a recollection, on April 11, 2002, of any discussion that there was a specific nerve, in the lower part of the leg -- it's referred to as the peroneal nerve, which I assume you found out by now -- but even if we don't use the term peroneal nerve, was there a specific discussion about a nerve that was at risk in this type of surgery, where loss of function of the foot could occur?

MR. CRAWFORD: Lacks foundation.

THE COURT: Overruled.

MR. CAUSEY: Go ahead, you can answer.

THE WITNESS: No.

BY MR. CAUSEY:

Q I want to go to the June 6th meeting, but there's a couple things that occurred in between I want to cover first, just to keep our chronology in order. Okay?

A Okay.

Q Dr. Walls, are you familiar with that doctor?

A Yes.

THE COURT: Yes.

MR. CAUSEY: Yes.

THE WITNESS: The only time it was mentioned that we had a choice to wait, was, basically, that you could wait, and I believe that was in the first meeting that we talked about that as an option, but no discussion about how that would be done, what that meant.

BY MR. CAUSEY:

Q You don't recall a discussion of the wait option, about what that would involve?

A I don't recall.

Q Do you have any recollection, at any of the pre-surgery meetings, of being told that there was a specific nerve at risk from this type of surgical procedure, and that if it was injured, ▮▮▮ could permanently lose some loss of function of his foot?

A No.

Q ▮▮▮ when you were weighing the decision, as to whether or not to have your son undergo this surgical procedure, what did you weigh? What was the information that you weighed in rendering that decision?

A What I basically was thinking about was where he was at that time, which he had a deformity, as far as I could see; that it was hurting him; and that this surgery was going to help that basically go away.

pain, see if we can let the fracture heal? Was there any discussion about that?

A   No.

Q   Did Dr. Sharpe discuss that with you?

A   No.

Q   Had anyone, at any time during this process, told you ███████ being to active, he shouldn't be this active? And I'm talking about health care providers, any of these doctors?

A   No.

Q   As you were shown earlier during some of the records, and you were asked questions about it, when you went to see Dr. Sharpe and Dr. Dinowitz initially, there were discussions about ██████ activities, weren't there?

A   Yes.

Q   There were a lot of questions about your recollection of the April 11 meeting or lack thereof, and back and forth.

My question is real simple, prior to the surgical procedure, whether it was Brian Sharp or Dr. Sharpe, and whether it was April 11 or June 6, okay, did anyone tell you that your son could lose loss of function of the foot, if a specific nerve at issue was damaged?

A   No.

Q   Did you — I assume, therefore, you did not

weigh that in your decision making process?

A   No.

Q   So everything else that you answered questions to about belief in the doctor, we didn't want it to go that way, missing from that puzzle was that information; is that correct?

A   Absolutely correct.

MR. CAUSEY:  Just a moment, your Honor.  I'm sorry. I think I'm about done.

THE COURT:  It's all right.

BY MR. CAUSEY:

Q   ▮▮▮▮ you were asked some questions about what was discussed prior to the surgical procedure, with respect to nerve injury risks.

You were asked that on cross examination.  Do you recall those questions?

A   Yes.

Q   Do you recall, at the first deposition that was taken in this matter, January 29, 2004, being asked a question about whether you had talked to Dr. Sharpe — I got to back up to make sure I put it in context — whether there was any doubt in your mind that the nerve injury occurred during Dr. Sharpe's surgery.

Do you remember being asked about that?

A   I'm not positive.